1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE: MCKINSEY & CO., INC.              Case No. 21-md-02996-CRB (SK)
     NATIONAL PRESCRIPTION OPIATE
12   CONSULTANT LITIGATION                    **MASTER COMPLAINT (TRIBAL
                                              PLAINTIFFS)**
13   This Document Relates to:
                                              **REDACTED**
14   ALL TRIBAL ACTIONS
                                              **JURY TRIAL DEMANDED**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.     PREAMBLE .................................................................................................... 1

II.    INTRODUCTION ............................................................................................. 1

III.   JURISDICTION AND VENUE ....................................................................... 6

IV.    PARTIES ........................................................................................................... 7

    A.     Tribal Plaintiffs ..................................................................................... 7

    B.     Defendants ........................................................................................... 18

V.     FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ................. 19

    A.     The Opioid Crisis ................................................................................ 19

    B.     Marketing and the Origins of the Opioid Crisis.................................. 21

    C.     What McKinsey Does: "Consulting is more than giving advice."....... 25

        1.     McKinsey's Long-Term Partnership with the Pharmaceuticals
            Industry ..................................................................................... 28

        2.     The McKinsey Pharmaceuticals and Medical Products Practice
            Group ........................................................................................ 28

        3.     The Transformational Relationship ......................................... 34

    D.     McKinsey and Purdue: A Case Study in Transformation.................... 36

        1.     2004: McKinsey and Purdue Meet............................................ 38

        2.     2007: Purdue Pleads Guilty to Misbranding OxyContin and is
            Bound by a Corporate Integrity Agreement.............................. 39

        3.     The Sacklers React to the "Concentration of Risk" Posed to Them
            by the Opioid Business. ............................................................ 40

        4.     Purdue Tasks McKinsey with Boosting Opioid Sales in Light of the
            Guilty Plea and Corporate Integrity Agreement. ..................... 43

        5.     Purdue Relies on McKinsey..................................................... 45

        6.     McKinsey Delivers. .................................................................. 47

            a.     Courting the Regulators: "We All Feel Responsible.".................. 47

            b.     The Granularity of Growth ............................................. 51

            c.     "Identifying Granular Growth Opportunities for
                OxyContin" ................................................................... 52

                i.     Marketing – Countering Emotional Messages................. 53

                ii.     Targeting – Selling More OxyContin to Existing
                    High Prescribers ................................................... 56

                iii.     Titration – Selling Higher Doses of OxyContin .............. 59

                iv.     Covered Persons – Sales Quotas and Incentive
                    Compensation ....................................................... 61

        7.     Transformation: Purdue and McKinsey Adopt and Implement
            McKinsey's Strategies. ............................................................. 63

**TABLE OF CONTENTS**
(continued)

Page

8. Project Turbocharge ................................................................. 64
    a. Targeting High Subscribers .......................................... 68
    b. Circumventing Safeguards Against Abuse and Diversion ........... 73
    c. Incentivizing Opioid Sales .......................................... 74
9. McKinsey's Efforts Triple OxyContin Sales ................................. 74
E. McKinsey's Opioid-Related Work with Other Clients. ....................... 77
  1. Endo ............................................................................. 77
    a. New Blues .............................................................. 78
    b. Old Friends ............................................................ 80
    c. Opana ................................................................... 82
    d. Belbuca: Endo's Answer to Butrans .............................. 88
    e. Turbocharging the Sales Force with a Blitz ....................... 93
  2. Johnson & Johnson ........................................................... 96
    a. Noramco ................................................................ 98
    b. Duragesic .............................................................. 99
    c. Turbocharging Nucynta .............................................. 100
  3. Other Manufacturers ......................................................... 103
  4. McKinsey's Work with Opioid Distributors ............................. 104
  5. McKinsey's Work with the FDA ........................................... 104
F. McKinsey's Efforts to Increase the Overall Size of the Opioid Market: the Larger the Pie, the Larger the Slice ................................................. 109
G. McKinsey's Work Kills People. .................................................... 110
H. McKinsey Knew that OxyContin Was Highly Abusable, Addictive, and Dangerous, and that Its Marketing Strategies Increased Those Harms. ............ 116
I. McKinsey Portrays Itself as Part of a Solution to a Problem It was Integral in Creating. ............................................................................... 119
J. Coda ...................................................................................... 124
  1. Guilty Again - 2020 .......................................................... 126
  2. A Mea Culpa .................................................................. 127
  3. A Hedge Fund ................................................................ 129
VI. TOLLING OF STATUTES OF LIMITATIONS ................................. 133
VII. HARM CAUSED TO TRIBAL PLAINTIFFS ................................... 135
A. The Impact of Opioid Abuse, Addiction, and Diversion on American Indians and Alaska Natives ...................................................... 135
B. The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiffs ...... 139

- ii -

**TABLE OF CONTENTS**
(continued)

Page

VIII.  CLAIMS FOR RELIEF ................................................................. 142

    A.  Multiple States' Plaintiffs ................................................. 142

        1.  Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, *et seq.* (Pleaded by all Plaintiffs) ................................ 142

    B.  Alaska Tribal Plaintiffs .................................................... 179

        1.  Public Nuisance under Alaska Law ...................................... 179

        2.  Negligence under Alaska Law ............................................ 181

        3.  Fraud under Alaska Law ................................................... 184

        4.  Unfair Competition (Alaska Unfair Trade Practices and Consumer Protection Act AS § 45.50.471, *et seq.*) ................................. 185

        5.  Civil Conspiracy under Alaska Law ..................................... 186

    C.  Arizona Tribal Plaintiffs ................................................... 187

        1.  Public Nuisance under Arizona Law...................................... 188

        2.  Negligence under Arizona Law ........................................... 192

        3.  Fraud under Arizona Law .................................................. 194

        4.  Violation of Arizona Consumer Fraud Act (Ariz. Rev. Stat. §§ 44-1521 to -1534) ............................................................... 196

        5.  Civil Conspiracy under Arizona Law ................................... 198

    D.  California Tribal Plaintiffs ................................................. 199

        1.  Public Nuisance – Cal. Civ. Code §§ 3479 and 3480 ............... 199

        2.  Negligence under California Law ......................................... 202

        3.  Fraud under California Law ............................................... 204

        4.  False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*) ......... 206

        5.  Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq.*) ............. 207

    E.  Michigan Tribal Plaintiffs ................................................. 208

        1.  Public Nuisance under Michigan Law ................................... 208

        2.  Negligence under Michigan Law ......................................... 213

        3.  Fraud under Michigan Law ............................................... 215

        4.  Violation of Michigan Consumer Protection Act (M.C.L.A. §§ 445.901-22) ........................................................... 216

        5.  Civil Conspiracy under Michigan Law .................................. 218

    F.  Minnesota Tribal Plaintiff ................................................. 219

        1.  Public Nuisance under Minn. Stat. § 609.74........................... 219

        2.  Negligence under Minnesota Law ....................................... 224

        3.  Fraud under Minnesota Law .............................................. 226

**TABLE OF CONTENTS**
(continued)

Page

4. Violation of Minn. Stat. § 325F.69 – Prevention of Consumer Fraud.... 228

5. Violation of Minn. Stat. § 325D.09, *et seq.* – Unlawful Trade Practices ........................................................................................ 229

6. Violation of Minn. Stat. § 325D.43, *et seq.* – Deceptive Trade Practices ........................................................................................ 230

7. Civil Conspiracy under Minnesota Law ........................................ 232

G. Mississippi Tribal Plaintiff ........................................................................ 233

1. Public Nuisance under Mississippi Law ........................................ 233

2. Negligence under Mississippi Law ............................................... 238

3. Fraud under Mississippi Law ........................................................ 240

4. Civil Conspiracy under Mississippi Law ...................................... 241

H. Montana Tribal Plaintiffs .......................................................................... 242

1. Public Nuisance under Montana Law ........................................... 243

2. Negligence under Montana Law ................................................... 247

3. Fraud under Montana Law ............................................................ 249

4. Violation of Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §§ 30-14-101 to 2602) ...................... 251

5. Civil Conspiracy under Montana Law ........................................... 253

I. New Mexico Tribal Plaintiffs .................................................................... 254

1. Public Nuisance under New Mexico Law...................................... 254

2. Negligence under New Mexico Law.............................................. 259

3. Fraud under New Mexico Law ...................................................... 261

4. Violation of New Mexico Unfair Trade Practices (New Mexico Stat. Ann. §§ 57-12-1 to -26) ........................................................ 262

5. Civil Conspiracy under New Mexico Law..................................... 264

J. Oklahoma Tribal Plaintiffs......................................................................... 265

1. Negligence under Oklahoma Law.................................................. 265

2. Fraud (Actual and Constructive) and Deceit under Oklahoma Law....... 268

3. Civil Conspiracy/Joint and Several Liability under Oklahoma Law ...... 269

4. Civil Aiding and Abetting under Oklahoma Law .......................... 271

K. Oregon Tribal Plaintiff .............................................................................. 272

1. Public Nuisance under Oregon Law .............................................. 272

2. Negligence under Oregon Law ...................................................... 277

3. Fraud under Oregon Law ............................................................... 279

4. Violation of Oregon Unlawful Trade Practices Act (O.R.S. §§ 646.605-56) ................................................................................. 280

**TABLE OF CONTENTS**
(continued)

Page

5.  Civil Conspiracy under Oregon Law ........................................................ 283

L.  Utah Tribal Plaintiff ....................................................................................... 284

1.  Public Nuisance under Utah Law ............................................................. 284

2.  Negligence under Utah Law...................................................................... 288

3.  Fraud under Utah Law .............................................................................. 290

4.  Violation of Utah Consumer Sales Practice Act (Utah Code Ann. §§ 13-1-1 to -23) ........................................................................................... 292

5.  Civil Conspiracy under Utah Law............................................................ 293

M.  Washington Tribal Plaintiffs ......................................................................... 294

1.  Public Nuisance under Washington Law .................................................. 295

2.  Negligence under Washington Law .......................................................... 297

3.  Fraud under Washington Law ................................................................... 299

4.  Washington Consumer Protection Act/Unfair Business Practices Act (RCW § 19.86, *et seq.*) ............................................................................ 300

5.  Civil Conspiracy under Washington Law ................................................. 302

IX.  PRAYER FOR RELIEF.......................................................................................... 303

X.  JURY DEMAND .................................................................................................... 303

I. **PREAMBLE**

This complaint is an administrative device as described in *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D.133, 142 (E.D. La. 2002), for the specific purpose of enabling the Court to address the threshold issues it articulated in its statements and Orders to date, and does not supersede the complaints filed in the individual actions consolidated in this multi-district litigation for pretrial proceedings only. *See Gelboim v. Bank of Am.*, 574 U.S. 405, 413 n.3 (2015). This Complaint does not include every claim asserted in every Tribal action transferred to this MDL, nor is it intended to consolidate for trial the separate claims of the Plaintiffs included. This Complaint does not include every plaintiff-specific fact alleged in the underlying complaints, including facts related to individual damages. This Complaint incorporates by reference the complaints filed by individual Tribal Plaintiffs pending in this MDL as of November 22, 2021.

This Complaint does not concede that a federal court has subject matter jurisdiction over any Plaintiff's case or claim where that Plaintiff filed a timely motion to remand. Any properly-made objections to removal are preserved. Some Plaintiffs have filed motions to remand based on the absence of federal subject matter jurisdiction. By joining in the filing of this complaint, these Plaintiffs do not waive their right to seek remand of their cases to the state courts in which they were originally filed.

II. **INTRODUCTION**

1.      For more than two decades, the opioid crisis has raged across this country. An opioid-related public health emergency was declared by the President in 2017. Last year was the worst on record, with drug overdoses soaring nearly 30%.[1] Today, there are increasingly few Americans whose lives have not been affected by the consequences of opioid dependency, addiction, and overdoses.

2.      McKinsey is a management consulting firm with operations across the globe. It played a central role in the unfolding, propagation, and exploitation of the opioid crisis by advising multiple opioid manufacturers and other industry participants how to sell as many

---

[1] Betsy McKay, "U.S. Drug-Overdose Deaths Soared Nearly 30% in 2020, Driven by Synthetic Opioids," *Wall Street Journal*, July 14, 2021, *available at*: https://www.wsj.com/articles/u-s-drug-overdose-deaths-soared-nearly-30-in-2020-11626271200.

opioids as conceivably possible. Knowing that its clients' products were highly addictive, ineffective, and unsafe for the treatment of long-term chronic pain, non-acute pain, and non-cancer pain, McKinsey developed a singular focus on increasing opioid sales, no matter the resultant cost to society. McKinsey did this for well over a decade, despite knowing full well the risk to public health and safety and the widespread economic harm from developing and implementing the transformation of strictly-controlled substances into top-selling blockbuster drugs.

3.    The purpose of McKinsey's work with its opioids clients was at all times to maximize return on investment. The whole point for those clients (and hence McKinsey) was to make as much money as possible. They all did. This relentless drive to increase sales and create greater availability of opioids was made with no concern about the parallel, known, and inevitable increase in opioid-related deaths, addiction, abuse, diversion, and misuse.

4.    In the world of management consulting, McKinsey is preeminent. It is one of the world's oldest, largest, and most lucrative consulting firms and is generally seen as the most prestigious firm in the industry. More consiglieri than one-off advisor, McKinsey touts its model of engaging in "transformational partnerships" with its clients. McKinsey learns each client's business intimately, embeds itself into all levels of the corporate hierarchy, and provides granular strategies to achieve transformative goals for its clients.

5.    Marvin Bower, the managing director of McKinsey from 1950 to 1967, was "the father of the consulting profession."[2] He "turned the business of selling management advice into a keystone of American corporate culture," and is "credited with taking a fledgling industry and setting its course not only as to the kinds of services it could sell but also the standards it must uphold for its work to be respected."[3] A lawyer by trade, Bower stressed that management consulting should be seen as an emergent profession, akin to the law or accounting, with obligations to clients and to the broader society that extend beyond the mere commercial.

---

[2] Douglas Martin, *Marvin Bower, 99; Built McKinsey & Co.*, N.Y. Times, Jan. 24, 2003, *available at*: https://www.nytimes.com/2003/01/24/business/marvin-bower-99-built-mckinsey-co.html
[3] *Id.*

- 2 -

6.     Bower instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver the bad news if you must, but deliver it properly."[4] Bower's principles, and the values he imparted within McKinsey, are said to guide the firm to the present day. "In many ways, certainly in spirit and soul, Marvin continued to lead it after he retired, and he leads it still," eulogized Rajat Gupta, McKinsey's then-global managing partner, at Bower's funeral in 2003.[5]

7.     This case is, in large part, about the firm's failure to adhere to Bower's simple, foundational tenet. It arises instead from the firm's steadfast and continual work to maximize opioid sales in partnership with numerous clients during the pendency of the worst man-made epidemic in modern medical history. It is about McKinsey never delivering the "bad news" of opioids' devastating impact on Plaintiffs and the public, properly or otherwise, and instead looking the other way for money.

8.     When it came to opioids, McKinsey did far more than just give advice. Not only did it suggest courses of action that its clients should adopt, the firm remained in place and worked collaboratively alongside its clients to actually implement McKinsey's recommendations to achieve objectives jointly identified by the clients and McKinsey. McKinsey stood alongside its clients in the arena doing the deeds.

---

[4] Duff McDonald, *The Firm* 35 (2014).

[5] *Id.* at 270. In many ways, Gupta was an interesting figure to opine on Bower's legacy. Indeed, Gupta's leadership of McKinsey is in many respects to be *contrasted* with Bower's legacy. Many of the values Bower emphasized—an emphasis on professionalism over commercial exploitation, for example—were jettisoned under Gupta's tenure as managing partner of the firm, which ended in 2003. "Under his watch, McKinsey began to chase top billings in a way it never had before." *Id.* at 234. For instance, McKinsey first began accepting equity stakes in clients as a form of incentive compensation during Gupta's tenure. Previously, McKinsey only charged standard fees for its consulting services as Bower disdained the notion of taking equity stakes in clients. *Id.* at 234. Under Gupta, McKinsey also began to allow consultants' compensation to be tied to client performance. *Id.*

Consistent with Gupta's efforts to monetize McKinsey's consulting business in ways previous firm leadership had not, McKinsey also began to expand its client base. "While the firm would never admit as much, under Gupta, McKinsey began working for just about anyone with a fat bank account and a checkbook." *Id.* at 266.

Institutions age, and by the time Gupta came to lead the firm in 1994, McKinsey was a mature institution. It had built up significant value in its *reputation* by historically advising *only* "blue chip" companies "at the top of the corporate pyramid." *Id*. Under Gupta, McKinsey began the process of realizing that value. For McKinsey, the way to monetize an elite reputation was to start advising those it historically may have shunned as clients—to start offering its *imprimatur*, in addition to its services, for money. McKinsey's work with opioid manufacturers began under Gupta's leadership.

- 3 -

9.     The deceptive marketing strategies that McKinsey and its clients invented, developed, deployed, and continually refined for years to expand the market for opioids are foundational to the epidemic.

10.     McKinsey worked hand-in-hand with major opioid manufacturers, including Purdue Pharma L.P., Endo Pharmaceuticals,[6] Johnson & Johnson,[7] and Mallinckrodt[8] for years. At the same time, McKinsey advised other participants in the opioid supply chain, including distributors, pharmacies, and even regulators.

11.     In particular, McKinsey advised the Sackler family and their company, Purdue, for years while Purdue aggressively marketed OxyContin, widely viewed as the taproot of the opioid crisis. The relationship began no later than 2004. In the years following Purdue's 2007 guilty plea for misleadingly marketing OxyContin, McKinsey continued to work closely with Purdue to dramatically increase OxyContin sales, notwithstanding the existence of a five-year Corporate Integrity Agreement that Purdue entered as part of its guilty plea.

12.     McKinsey knew of the dangers of opioids and in particular the prior misconduct of Purdue but nonetheless advised Purdue and other opioid manufacturers to improperly market and sell OxyContin and other prescription opioids, supplying granular sales and marketing strategies and remaining intimately involved throughout implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

13.     For years, McKinsey advised Purdue on, designed, and helped to implement various strategies to raise sales of OxyContin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life. For example, McKinsey urged Purdue to maximize sales by dictating, to a greater degree, which prescribers its sales representatives would target, exploring ways to increase the amount of time those sales

---

[6] "Endo Pharmaceuticals" or "Endo" refers to Endo Health Solutions Inc., Endo International plc, and Endo Pharmaceuticals Inc., collectively.
[7] "Johnson & Johnson" refers to Johnson & Johnson Services, Inc. and its wholly-owned subsidiary Janssen Pharmaceuticals, Inc. ("Janssen").
[8] "Mallinckrodt" refers to Mallinckrodt LLC and Mallinckrodt plc, together.

2331633.1

representatives spent in the field increasing opioid sales and prioritizing OxyContin in incentive compensation targets.[9]

14.     McKinsey's partnership with Purdue reached its fever pitch in the summer of 2013. In January of that year, Purdue's Corporate Integrity Agreement expired, and Purdue was no longer bound by its constraints. Within months, the Sacklers tasked McKinsey with transforming Purdue's approach to OxyContin sales in order to extract as much money as possible from the remaining patent life of the drug.[10]

15.     In response, McKinsey developed and proposed Project Turbocharge, a series of transformational changes that McKinsey proposed to implement at Purdue to dramatically increase OxyContin sales by re-tooling Purdue's sales force and investing large amounts of capital to "turbocharge" it. "[O]ur recommendation is that Purdue makes a clear go-no-go decision to 'Turbocharge the Sales Engine,'" McKinsey told Purdue on August 8, 2013.

16.     The Sacklers chose "go," and McKinsey subsequently implemented and continually refined Project Turbocharge at Purdue over the course of years, to devastating, but profitable, effect.

17.     McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the opioid crisis with Purdue.[11] On March 7, 2019, Kevin Sneader, McKinsey's then-global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated,

> [W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny—fair and unfair— will continue. It is the price we pay for being "in the arena" and working on what matters.[12]

---

[9] PPLPC012000437346

[10] OxyContin, like any branded pharmaceutical, is subject to eventual patent expiration and competition from generic opioid manufacturers.

[11] *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. Times, Feb. 1, 2019, *available at:* https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opiods.html.

[12] *See* "*The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Magazine, March 8, 2019, *available at* https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/. The "arena" reference is to *Citizenship in a Republic*, a speech delivered by Theodore Roosevelt at the *Sorbonne* on April 23, 1910:

> It is not the critic who counts; not the man who points out how the strong man stumbles, or where the doers of deeds could have done them better. The credit belongs to the man who is actually in the

18.     Weeks later, McKinsey announced that it would no longer work for any opioid manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our communities. We are no longer advising clients on any opioid-specific business and are continuing to support key stakeholders working to combat the crisis."[13]

19.     The price for being in the arena is more than mere scrutiny. McKinsey is liable for its misconduct and the harms it caused or exacerbated. McKinsey is liable for its successful efforts to increase opioid sales for years. It continued this work unabated and with alacrity despite events as stunning as Purdue's 2007 guilty plea for misbranding OxyContin, Purdue's 2015 settlement with the State of Kentucky, and numerous other enforcement actions related to opioid sales and marketing by McKinsey clients. Through it all, McKinsey remained steadfast in its efforts to promote opioid sales for all of its clients for the purpose of maximizing return on investment without regard to the obvious implications of what they were doing. Indeed, the firm endeavored alongside its clients to increase the size of the *overall* opioid market for *nearly two decades*, until as late as March 22, 2019, despite increasingly blood-red flags along the way.[14]

## III.     **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action for the reasons stated in each underlying complaint.

---

arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and blood; who strives valiantly; who errs, who comes short again and again, because there is no effort without error and shortcoming; but who does actually strive to do the deeds; who knows great enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring greatly, so that his place shall never be with those cold and timid souls who neither know victory nor defeat.

As it happens, Mr. Sneader is not the only McKinsey person to draw inspiration from Roosevelt. *Citizenship in a Republic* similarly inspired Dominic Barton, the man Mr. Sneader succeeded as McKinsey's global managing partner. It served as the basis for his 2017 address to the Ivey Business School in Canada. *See* Dominic Barton *In the Arena: Leadership in an Age of Disruption,* October 17, 2017, *available at*: https://www.ivey.uwo.ca/media/3780710/daquino_lecture2017.pdf. While McKinsey continues to preach the values of corporate integrity from the Bower area, its actions show that it has moved far afield from its professed moral compass.

[13] *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue Pharma*, CNN, May 24, 2019, *available at*: https://www.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html. The statement was attributed to McKinsey as an entity. No individual's name was attributed.

[14] *See* "About McKinsey's past work for opioid manufacturers," *last updated March 22, 2021*, *available at*: https://www.mckinseyopioidfacts.com ("We decided nearly two years ago to end all work on opioid-specific business . . . .")

21.     This Court has personal jurisdiction over McKinsey for the reasons stated in each underlying complaint.

22.     Venue is appropriate for centralized and consolidated pretrial proceedings in this Court under *In re McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation*, MDL No. 2996, 2021 WL 2351628 (J.P.M.L. June 7, 2021).

## IV.     PARTIES

### A.     Tribal Plaintiffs

23.     Plaintiffs are sovereign, federally recognized Indian Tribes, intertribal consortia, and Tribal health organizations, representing 274 Tribes across the United States.

24.     Nothing herein shall be deemed a waiver of any Tribal Plaintiff's sovereign immunity.

25.     **Akiak Native Community** is a federally recognized Tribe and Yup'ik Eskimo Village. Akiak, Alaska is located on the west bank of the Kuskokwim River, 42 miles northeast of Bethel and 500 miles west of Anchorage. Akiak Native Community has approximately 360 enrolled Tribal citizens, almost all of whom reside in the community.

26.     **Alaska Native Tribal Health Consortium** is Alaska's statewide Tribal health organization and intertribal health consortium that provides healthcare services to American Indians, Alaska Natives, and other eligible individuals in Alaska. An Alaska non-profit corporation with its principal place of business in Anchorage, Alaska, Alaska Native Tribal Health Consortium is collectively managed by, and operated for the benefit of, the 229 federally recognized Alaska Native Tribes and provides a wide range of medical, community health, and other services for more than 158,000 Alaska Native and American Indian people across the State.

27.     **Aleutian Pribilof Islands Association, Inc.** is the Tribal health organization of the Aleut people in Alaska, with its principal place of business in Anchorage, Alaska. It represents thirteen federally recognized Tribes[15] located in the Aleutian Islands, which extend

---

[15] Agdaagux Tribe of King Cove; Native Village of Akutan; Native Village of Atka; Native Village of Belkofski; Native Village of False Pass; Native Village of Nelson Lagoon; Native Village of Nikolski; Pauloff Harbor Village; Qagan Tayagungin Tribe of Sand Point; Qawalangin Tribe of Unalaska; Pribilof Islands Aleut Communities of St. Paul and St. George Islands; and Native Village of Unga.

westward over 1,100 miles from the southwestern corner of the Alaska mainland, and include the Pribilof Islands, which lie to the north. This area is distributed over approximately 100,000 square miles. It operates in one of the most isolated regions of the country.

28.    **Arctic Slope Native Association** is a non-profit Tribal health and social services organization serving eight federally recognized Tribes[16] and other residents of the North Slope Borough, the majority of whom are Alaska Native. Spanning the northernmost region of Alaska, this service area covers approximately 95,000 square miles.

29.    **Asa'carsarmiut Tribe** (a/k/a Native Village of Mountain Village) is a federally recognized Tribe. Most of the Native Village of Mountain Village's citizens live in Mountain Village, Alaska, which is located along the Yukon River in the Kusilvak Census Area. The Asa'carsarmiut Tribe currently has 1,354 Tribal citizens, 764 of whom live in Mountain Village.

30.    **Bristol Bay Area Health Corporation** is a Tribal health organization in Alaska providing healthcare services to American Indians, Alaska Natives, and other eligible individuals in Alaska. It is a non-profit healthcare organization and one of the Alaska Tribal Health System's regional Tribal health organizations, serving the needs of 27 federally recognized Tribes and one village seeking federal recognition [17] in the Bristol Bay region of Alaska, with its principal place of business in Dillingham, Alaska.

31.    **Cherokee Nation** is a federally recognized Tribe. It has approximately 392,000 citizens, most of whom live on a reservation spanning a fourteen-county area in northeastern Oklahoma.

---

[16] Village of Anaktuvuk Pass; Atqasuk Village (aka Atkasook), Kaktovik Village (aka Barter Island); Native Village of Nuiqsut (aka Nooiksut); Native Village of Point Hope; Native Village of Point Lay; Native Village of Barrow Inupiat Traditional Government (aka Utqiaġvik); and Village of Wainwright.

[17] Portage Creek Village (aka Ohgsenakale); Native Village of Ekwok; New Stuyahok Village; New Koliganek Village Council; Native Village of Aleknagik; Village of Clarks Point; Native Village of Ekuk; Knugank; Chignik Bay Tribal Council; Native Village of Chignik Lagoon; Chignik Lake Village; Native Village of Perryville; Ivanof Bay Tribe; Manokotak Village; Twin Hills Village; Traditional Village of Togiak; Native Village of Goodnews Bay; Platinum Traditional Village; Ugashik Village; Native Village of Pilot Point; Egegik Village; Naknek Native Village; South Naknek Village; Levelock Village; King Salmon Tribe; Native Village of Port Heiden; and Native Village of Kanatak.

2331633.1

32.     **Chugachmiut, Inc.** is an intertribal consortium formed by seven federally recognized Tribes[18] to promote self-determination for the Alaska Native communities of the Chugach region in southcentral Alaska, which spans approximately 15,625 square miles. Chugachmiut, Inc. serves a combined population of approximately 2,200 Alaska Natives and American Indians.

33.     **Citizen Potawatomi Nation** is a federally recognized Tribe. Its jurisdictional territory includes an area bounded by the North Canadian River, the South Canadian River, the Pottawatomie-Seminole County boundary (on the east), and the Indian Meridian (on the west) and encompasses all or parts of four Oklahoma counties: Cleveland, Lincoln, Oklahoma, and Pottawatomie counties. It has a population of roughly 36,315 citizens.

34.     **The Confederated Salish and Kootenai Tribes of the Flathead Reservation** is a federally recognized Tribe and consists of the Bitterroot Salish, Kalispel (Pend d'Oreille), and Ksanka Band of Kootenai. Pursuant to the Hellgate Treaty of 1855, the Confederated Salish and Kootenai Tribes reside on the 1,250,000-acre Flathead Indian Reservation in western Montana. It consists of around 8,000 Tribal citizens. The Flathead reservation is home to around 30,000 people, a majority of whom are non-Indian—a legacy of federal homesteading and land allotment laws.

35.     **The Confederated Tribes of the Grand Ronde Community of Oregon** is a federally recognized Tribe with over 5,500 enrolled citizens. Its reservation is located in southwestern Yamhill and northwestern Polk County, Oregon, approximately 25 miles from the Oregon Coast.

36.     **Copper River Native Association** is an intertribal organization designated by five federally recognized Tribes[19] to provide health services, child and youth development, and life-enhancing resources to the Ahtna people of Alaska's Copper River Basin. It provides these

---

[18] Native Village of Port Graham; Native Village of Chenega; Valdez Native Tribe; Native Village of Nanwalek (aka English Bay); Qutekcak Native Tribe; Native Village of Eyak; and Native Village of Tatitlek.
[19] Native Village of Cantwell; Native Village of Gakona; Gulkana Village; Native Village of Kluti-Kaah; and Native Village of Tazlina.

services in an area encompassing approximately 23,000 square miles, with a service population of more than 3,000 people.

37.     **Eastern Aleutian Tribes** is an intertribal organization formed and duly authorized by seven federally recognized Tribes[20] to provide health services in eight Alaska communities located in the Aleutian Islands, the Alaska Peninsula, and Prince William Sound.[21] It provides these services in an area encompassing more than 100,000 square miles across remote Alaska. Eastern Aleutian Tribes serves a combined population of over 4,000 people, about sixty percent of whom are Alaska Native. On average, Eastern Aleutian Tribes has approximately 9,000 patient visits annually.

38.     **Feather River Tribal Health, Inc.** is an intertribal consortium formed by three federally recognized Tribes[22] to address the stark disparities in healthcare services available to Native American patients and Tribal communities in northeastern California. It is a Tribal government non-profit Indian health program with its principal place of business in Oroville, California. Feather River Tribal Health, Inc. also serves members of other federally recognized Tribes, including Native American patients and their families who reside within its service area and are eligible for its services.

39.     **The Fond du Lac Band of Lake Superior Chippewa** is a federally recognized Tribe and occupies the Fond du Lac Reservation in Northern Minnesota, in Carlton and St. Louis Counties and has approximately 4,300 citizens.

40.     **Gila River Indian Community** is a federally recognized Tribe and is composed of the Pima (Akimel O'otham) and Maricopa (Pee-Posh) people. The Gila River Indian Community's reservation is located in southern Arizona and over half of its 22,800 enrolled members live on the reservation.

---

[20] The Agdaagux Tribe of King Cove; Native Village of Akutan; Native Village of False Pass; Native Village of Nelson Lagoon; Native Village of Unga; the Pauloff Harbor Tribe; and the Qagan Tayagungin Tribe of Sand Point.
[21] Adak, Akutan; Cold Bay; False Pass; King Cove; Nelson Lagoon; Sand Point; and Whittier.
[22] The Tyme Maidu Tribe of the Berry Creek Rancheria; the Mooretown Rancheria, Concow Maidu Tribe; and the Enterprise Rancheria, Estom-Yumeka Maidu Tribe.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

41.     **The Grand Traverse of Band of Ottawa and Chippewa Indians** is a federally recognized Tribe with over 4,100 enrolled Tribal citizens. Half of those citizens live on the Grand Traverse Band's lands in the Northwestern section of the lower peninsula of Michigan.

42.     **Fort Belknap Indian Community of the Fort Belknap Reservation of Montana** is a federally recognized Tribe comprising the Gros Ventre (Aaniiih) and Assiniboine (Nakoda) Tribes, with a reservation encompassing nearly 675,147 acres in northcentral Montana between the Canadian border and the Missouri River. It has over 8,000 citizens.

43.     **The Hoopa Valley Tribe** is a federally recognized Tribe and occupies the Hoopa Valley Indian Reservation located in Hoopa, California, in Humboldt County. It has more than 3,400 members.

44.     **Indian Health Council, Inc.** is a non-profit intertribal health consortium and Tribal organization of nine federally recognized Tribes[23] in the northern part of San Diego County, California with its principal place of business on the Rincon Reservation in Valley Center, California. It provides healthcare services and programs to over 5,000 clients, the vast majority of whom are American Indian or Alaska Native. Indian Health Council, Inc. provides additional services to nearly 10,000 people, including cultural events, prevention, child welfare services, counseling, and other community-based programs.

45.     **Jamestown S'Klallam Tribe** is a federally recognized Tribe, with its principal business address in Sequim, Washington. It is located on its reservation and other Tribal lands in Clallam and Jefferson Counties, Washington. It has approximately 550 enrolled citizens.

46.     **The Kenaitze Indian Tribe** is a federally recognized Tribe located on the central Kenai Peninsula in Kenai, Alaska. The Kenaitze Indian Tribe includes approximately 1,634 Tribal citizens.

---

[23] Iipay Nation of Santa Ysabel, California; Inaja Band of Diegueño Mission Indians of the Inaja and Cosmit Reservation, California; La Jolla Band of Luiseño Indians, California; Los Coyotes Band of Cahuilla and Cupeño Indians, California; Mesa Grande Band of Diegueño Mission Indians of the Mesa Grande Reservation, California; Pala Band of Mission Indians; Pauma Band of Luiseño Mission Indians of the Pauma and Yuima Reservation; Rincon Band of Luiseño Mission Indians of the Rincon Reservation, California; and, the San Pasqual Band of Diegueño Mission Indians of California.

- 11 -

47.     **Kodiak Area Native Association** is a non-profit corporation providing healthcare and social services for Alaska Natives throughout the Koniag region of Alaska, with its principal place of business in Kodiak, Alaska. Its service area includes the City of Kodiak and six remote Alaska Native villages (Akhiok, Karluk, Larsen Bay, Old Harbor, Ouzinkie, and Port Lions) encompassing ten federally recognized Tribes of Kodiak Island.[24]

48.     **The Mississippi Band of Choctaw Indians** is a federally recognized Tribe with over 11,000 enrolled citizens and is headquartered in Choctaw, Mississippi. Its reservation consists of approximately 35,000 acres over ten counties in east central Mississippi and 168 acres in western Tennessee.

49.     **The Muscogee (Creek) Nation** is a federally recognized Tribe with a membership of over 91,000 citizens. It covers 4,867 square miles that lie within Oklahoma.

50.     **The Native Village of Port Heiden** is a federally recognized Tribe located 424 miles southwest of Anchorage, at the mouth of the Meshik River on the north side of the Alaska Peninsula. It is comprised of 51.4 square miles, with 0.7 miles of it being water. This area has over 100 residents and is home to one-third of its Tribal members.

51.     **The Navajo Nation** is a federally recognized Tribe with a membership of approximately 400,000 citizens. The Navajo Nation covers 27,000 square miles that extend into the states of Arizona, New Mexico, and Utah.

52.     **Norton Sound Health Corporation** is a non-profit Tribal health organization in Alaska, one of the Alaska Tribal Health Consortium's regional Tribal health organizations, and is owned and managed by the twenty federally recognized Tribes of the Bering Strait region.[25] Its principal place of business is in Nome, Alaska.

---

[24] Native Village of Afognak; Native Village of Akhiok; Kaguyak Village; Native Village of Karluk; Sun'aq Tribe of Kodiak; Native Village of Larsen Bay; Alutiiq Tribe of Old Harbor; Native Village of Ouzinkie; Native Village of Port Lions; and Tangirnaq Native Village.

[25] Native Village of Brevig Mission; Native Village of Council; Native Village of Diomede (aka Inalik); Native Village of Elim; Native Village of Gambell; Chinik Eskimo Community (Golovin); King Island Native Community; Native Village of Koyuk; Native Village of Mary's Igloo; Nome Eskimo Community; Native Village of Saint Michael; Native Village of Savoonga; Native Village of Shaktoolik; Native Village of Shishmaref; Village of Solomon; Stebbins Community Association; Native Village of Teller; Native Village of Unalakleet; Native Village of Wales; and Native Village of White Mountain.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

53.     **The Pala Band of Mission Indians** is a federally recognized Tribe, with its principal business address in Pala, California. It is located in northern San Diego County on a 12,273-acre reservation, where the majority of its citizens live. It has approximately 1,143 enrolled citizens who are Cupeño and Luiseño Indian.

54.     **The Pascua Yaqui Tribe** is a federally recognized Tribe located in southern Arizona with over 21,000 citizens, with over 5,000 living on the Pascua Yaqui Reservation. Yaquis inhabit eight traditional pueblos in Sonora, Mexico in the Rio Yaqui Valley and nine communities in Arizona.

55.     **The Port Gamble S'Klallam Tribe** is a federally recognized Tribe, with its principal business address in Kingston, Washington. The Port Gamble S'Klallam Tribe is located on its Reservation and other Tribal lands in Kitsap County, Washington. It has approximately 1,400 citizens.

56.     **The Puyallup Tribe of Indians**, a/k/a Puyallup Tribe of the Puyallup Reservation, is a federally recognized Tribe with approximately 5,700 Tribal citizens. Its reservation is located in and around the urban core of Tacoma, Washington.

57.     **The Quileute Tribe of the Quileute Reservation** is a federally recognized Tribe with approximately 835 tribal citizens. Its reservation is located in and around La Push, Washington.

58.     **Riverside-San Bernardino County Indian Health, Inc.** is a Tribal health program founded and operated by a consortium of nine federally recognized Tribes[26] in Riverside and San Bernardino Counties, California. It is the largest Native American healthcare organization in California and provides a wide range of outpatient services at each of its eight Indian Health Clinic locations to approximately 17,500 Tribal member patients and their families, totaling about 100,000 visits from its patients each year. Some of these Tribal members are members of other federally recognized Indian Tribes throughout the United States who are

---

[26] Agua-Caliente Band of Cahuilla Indians; Pechanga Band of Luiseño Indians; Ramona Band of Cahuilla Indians; Cahuilla Band of Indians; Soboba Band of Luiseño Indians; Morongo Band of Mission Indians; Santa Rosa Band of Cahuilla Indians; San Manuel Band of Mission Indians; and Torres-Martinez Desert Cahuilla Indians.

1  eligible for its services because they reside in the Riverside or San Bernardino County service
2  area.

3  59. **The San Carlos Apache Tribe** is a federally recognized Tribe with over 16,700
4  enrolled citizens, three-quarters of whom reside on the Tribe's 1.8 million-acre reservation in the
5  northeast corner of Arizona.

6  60. **The Sault Ste. Marie Tribe of Chippewa Indians** is the largest federally
7  recognized Tribe east of the Mississippi River, with over 45,000 enrolled Tribal citizens. Its
8  reservation is located on the Upper Peninsula of Michigan, and the Sault Ste. Marie Tribe is an
9  economic, social and cultural force in its community across Chippewa, Luce, Mackinac,
10  Schoolcraft, Alger, Delta, and Marquette counties.

11  61. **Southcentral Foundation** is an Alaska Native Tribal health organization
12  designated by eleven federally recognized Tribes[27] to provide healthcare services. Its service
13  population and region includes more than 65,000 Alaska Native and American Indian people
14  living in Anchorage, the Matanuska-Susitna Borough, and 55 rural Alaskan villages. Southcentral
15  Foundation's service area encompasses more than 100,000 square miles—an area the size of
16  Wyoming.

17  62. **Southeast Alaska Regional Health Consortium** is a Tribal health organization in
18  Alaska providing healthcare services to American Indians, Alaska Natives, and other eligible
19  individuals in Alaska. It is a consortium of fifteen federally recognized Tribes in Southeast
20  Alaska,[28] a non-profit health consortium, and one of the Alaska Tribal Health System's twelve
21  regional Tribal health organizations serving the health needs of the residents of Southeast Alaska
22  with its principal place of business in Juneau, Alaska.

23

24

---

25  [27] The Aleut Community of St. Paul Island; Igiugig Village; Village of Iliamna; Kokhanok Village; McGrath Native
26  Village; Newhalen Village; Nikolai Village; Nondalton Village; Pedro Bay Village; Telida Village; and Takotna
Village.
27  [28] Chilkat Indian Village (Klukwan); Angoon Community Association; Organized Village of Kake; Wrangell
Cooperative Association; Chilkoot Indian Association (Haines); Klawock Cooperative Association; Hoonah Indian
Association; Central Council of the Tlingit & Haida Indian Tribes; Craig Tribal Association; Douglas Indian
28  Association; Petersburg Indian Association; Hydaburg Cooperative Association; Skagway Village; Sitka Tribe of
Alaska; and Organized Village of Kasaan.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

63.    **The Suquamish Tribe** is a federally recognized Tribe, with its principal business address in Suquamish, Washington. It is located on its reservation and other Tribal lands in Kitsap County, Washington. It has approximately 1,250 citizens.

64.    **The Swinomish Indian Tribal Community** is a federally recognized Tribe occupying the Swinomish Indian Reservation located on Fidalgo Island in Skagit County, Washington, and established by the Treaty of Point Elliott, 12 Stat. 927 (1855). It has approximately 1,000 Tribal members.

65.    **Tanana Chiefs Conference** is an intertribal organization formed by 37 federally recognized Tribes[29] occupying the Brooks Range and the Yukon and Tanana River watersheds in Interior Alaska. It provides a wide range of health and social services that balance traditional Athabascan and Alaska Native values with modern demands. It serves 20,000 Tribal members across a region covering an area of 235,000 square miles in Interior Alaska, which is equal to about 37 percent of the entire state, and just slightly smaller than the state of Texas.

66.    **Yukon-Kuskokwim Health Corporation** is an intertribal consortium established, controlled, and sanctioned by 58 federally recognized Tribes[30] located in and around the

---

[29] Alatna Village; Allakaket Village; Anvik Village; Arctic Village; Beaver Village; Birch Creek Tribe; Chalkyitsik Village; Circle Native Community; Evansville (aka Bettles Field); Galena Village (aka Louden Village); Healy Lake Village; Holy Cross Village; Hughes Village; Huslia Village; Koyukuk Native Village; Manley Hot Springs Village; McGrath Native Village; Native Village of Eagle; Native Village of Fort Yukon; Native Village of Minto; Native Village of Ruby; Native Village of Stevens; Native Village of Tanacross; Native Village of Tanana; Native Village of Tetlin; Native Village of Venetie Tribal Government; Nenana Native Association; Nikolai Village; Northway Village; Nulato Village; Organized Village of Grayling (aka Holikachuk); Rampart Village; Shageluk Native Village; Takotna Village; Telida Village; Village of Dot Lake; and village of Kaltag.

[30] Akiachak Native Community; Akiak Native Community; Village of Alakanuk; Algaaciq Native Village (aka St. Mary's); Yupiit of Andreafski Village of Aniak, Anvik Village, Asa'carsarmiut Tribe (aka Native Village of Mountain Village); Village of Atmautluak; Village of Bill Moore's Slough; Village of Chefornak; Chevak Native Village; Native Village of Chuathbaluk; Chuloonawick Native Village; Village of Crooked Creek; Native Village of Eek, Emmonak Village; Native Village of Georgetown; Organized Village of Grayling (aka Holikachuk); Native Village of Hamilton; Holy Cross Village; Native Village of Hooper Bay; Iqurmuit Traditional Council (aka Native Village of Russian Mission); Village of Kalskag, Kasigluk Traditional Elders Council (aka Native Village of Kasigluk); Native Village of Kipnuk, Native Village of Kongiganak; Village of Kotlik; Organized Village of Kwethluk; Native Village of Kwigillingok; Native Village of Kwinhagak (aka Quinhagak); Lime Village; Village of Lower Kalskag; Native Village of Marshall (aka Fortuna Ledge); Native Village of Mekoryuk; Native Village of Napaimute; Native Village of Napakiak; Native Village of Napaskiak; Newtok Village; Native Village of Nightmute; Native Village of Nunapitchuk, Village of Ohogamiut; Orutsararmuit Native Council (aka Bethel); Oscarville Traditional Village; Native Village of Paimiut; Pilot Station Traditional Village; Native Village of Pitka's Point; Village of Red Devil; Native Village of Scammon Bay; Shageluk Native Village; Native Village of Sheldon's Point (aka Nunam Iqua); Village of Sleetmute; Village of Stony River; Nunakauyarmiut Tribe (aka Native Village of Toksook Bay); Tuluksak Native Community; Native Village of Tuntutuliak; Native Village of Tununak; and Umkumiute Native Village.

2331633.1

confluence of the Yukon and Kuskokwim Rivers in southwest Alaska, known as the Yukon-Kuskokwim Delta. Its region covers approximately 75,000 square miles and is a roadless area roughly the size of South Dakota. The overwhelming majority of the region's 30,000 inhabitants are Yupik, Cupik, and Athabascan. Yukon-Kuskokwim Health Corporation provides healthcare and related services to Alaska Natives and American Indians within its service areas.

67.     **The Yurok Tribe** is a federally recognized Tribe and is the largest federally recognized Tribe in California with approximately 6,242 enrolled Tribal members. Its reservation is located on the lower Klamath River in Humboldt and Del Norte Counties in California. The present-day Yurok Reservation extends for one mile on either side of the Klamath River, from the Pacific Ocean at the mouth of the river upstream approximately 44 miles to just above the Yurok village of Weitchpec and the confluence with the Trinity River.

68.     **The Zuni Tribe of the Zuni Reservation** is a federally recognized Tribe with 12,500 Tribal citizens. The Zuni Tribe's Reservation is located in and around Zuni, New Mexico and encompasses approximately 450,000 acres in western New Mexico.

69.     All Tribes' sovereignty predates the United States Constitution and is recognized and protected under federal law to the extent not expressly limited by treaty or Act of Congress. *See United States v. Wheeler*, 435 U.S. 313, 323 (1978). As sovereign governments, Tribes and their designated entities carry out governmental functions on behalf of, and for the benefit of, their citizens and other residents of Tribal communities.

70.     Based on treaties and its unique historical relationship with Indian Tribes, the United States federal government recognizes a responsibility "to provide all resources necessary" to ensure "the highest possible health status for Indians and urban Indians," 25 U.S.C. § 1602(a), and a policy to advance Tribal self-determination pursuant to the statutory framework set forth under the Indian Self-Determination and Education Assistance Act ("ISDEAA"), 25 U.S.C. §§ 5301–5423.

71.     The ISDEAA allows Tribes to take control over federal programs for Indians by contracting or compacting with the federal government to carry out those programs directly. Thus, through self-determination contracts and self-governance compacts under the ISDEAA,

Tribal governments, as well as Tribal organizations designated by Tribal governments to act on their behalf, carry out a broad range of governmental services for American Indians and Alaska Natives that were previously administered by the Indian Health Service ("IHS") and other federal agencies. These include, among others, healthcare, law enforcement, Tribal courts, education, social services, natural resources management, and child welfare programs.

72.     The modern Indian healthcare delivery system thus marries the federal government's obligation to provide "federal health services to maintain and improve the health of Indians," 25 U.S.C. § 1601(a), with the Tribes' inherent rights to administer such services and programs in ways that best meet the needs of their communities. It includes programs and services operated directly by IHS; programs and services operated by Tribes and Tribal health programs under ISDEAA contracts and compacts; Urban Indian Health Programs operated by Indian health organizations and funded through the Indian Health Care Improvement Act; and, in Alaska, programs and services operated by intertribal consortia and Tribal organizations pursuant to the Alaska Tribal Health Compact—the umbrella agreement between Alaska Native Tribes, Tribal organizations in Alaska, and IHS, entered into pursuant to Title V of the ISDEAA.

73.     Each Tribal Plaintiff is either a federally recognized Tribe or a Tribal organization or consortium carrying out governmental programs and services on behalf of Tribes pursuant to authority granted under federal and Tribal law, including the ISDEAA.

74.     Tribal Plaintiffs have the sovereign duty to vindicate the interests of their communities against the callous actions of companies like McKinsey that facilitated the marketing of fatally addictive prescription opioids. In the exercise of their authority as sovereign governments, they bring these actions in their proprietary capacity and under their *parens patriae* authority in the public interest, to protect the health, safety, and welfare of all of their citizens and to stop the prescription opioid epidemic within their communities.

75.     On February 4, 2021, forty-nine state attorneys general announced a multistate settlement with McKinsey related to its work for opioid manufacturers. McKinsey agreed to pay almost $600 million dollars. Tribal Plaintiffs were not parties to this settlement nor did they

1  participate in the negotiations that led to it. Therefore, as separate sovereigns, Tribal Plaintiffs are

2  not impacted by McKinsey's settlement with the States

3  **B.**   **Defendants**

4  76.   Defendant McKinsey & Company, Inc. is a corporation organized under the laws

5  of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue,

6  New York, NY 10017. It may be served with process via its registered agent, Corporation Service

7  Company, at 80 State Street, Albany, NY 12207.

8  77.   Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal

9  place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with

10  process via its registered agent, Corporation Service Company, 251 Little Falls Drive,

11  Wilmington, DE 19808

12  78.   Defendant McKinsey & Company, Inc. United States is a Delaware corporation

13  with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may

14  be served with process via its registered agent, Corporation Service Company, 251 Little Falls

15  Drive, Wilmington, DE 19808

16  79.   Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware

17  corporation with its principal place of business is located at 711 Third Avenue, New York, NY

18  10017. It may be served with process via its registered agent, Corporation Service Company, 251

19  Little Falls Drive, Wilmington, DE 19808.

20  80.   Upon information and belief, McKinsey & Company, Inc. is the parent company

21  of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey &

22  Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon

23  information and belief, each subsidiary corporation is wholly-owned by its parent. Despite the

24  corporate form, McKinsey began as a partnership and still refers to its senior employees as

25  "partners." Those partners are the firm's shareholders. Collectively, these four Defendants are

26  referenced throughout as "McKinsey."

27  81.   McKinsey a is global management consultancy with offices in over 130 cities in

28  65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston, TX;

1    Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte,

2    NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa,

3    FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle,

4    WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

5        82.    McKinsey is registered to do business in all fifty states.

6    **V.    FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

7        **A.    The Opioid Crisis**

8        83.    The term "opioid" refers to a class of drugs that bind with opioid receptors in the

9    brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from

10   the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human

11   body, the most significant of which are analgesia, euphoria, and respiratory depression.

12       84.    The opium poppy contains various opium alkaloids, three of which are used in the

13   pharmaceutical industry today: morphine, codeine, and thebaine. Early use of opium in Western

14   medicine was a tincture of opium and alcohol called laudanum, which contains all of the opium

15   alkaloids and is still available by prescription today. Chemists first isolated the morphine and

16   codeine alkaloids in the early 1800s.

17       85.    In 1827, the pharmaceutical company Merck began large-scale production and

18   commercial marketing of morphine. During the American Civil War, field medics commonly

19   used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left

20   with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the

21   United States, and many doctors prescribed opioids solely to prevent their patients from suffering

22   withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in

23   1911: "The habit has this nation in its grip to an astonishing extent . . . . Our prisons and our

24   hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and

25   made them beasts who prey upon their fellows . . .  it has become one of the most fertile causes of

26   unhappiness and sin in the United States."

27       86.    Pharmaceutical companies have long tried to develop substitutes for opium and

28   morphine that would provide the same analgesic effects without the addictive properties. In 1898,

Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the United States was limited to prescription only in 1914 and then banned altogether a decade later.

87.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

88.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the Drug Enforcement Administration since 1970.

89.     Throughout the twentieth century, pharmaceutical companies continued to develop prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content.

90.     In contrast, OxyContin, the product whose launch in 1996 ushered in the modern opioid epidemic, is pure oxycodone. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that.

91.     The effects of opioids vary by duration. Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, twelve hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately four to six hours. Still other short-term opioids, such as Insys's Subsys, are designed to be taken in addition to long-acting opioids to specifically address

breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer. The opioid manufacturers promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

92.     Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the "high." However, opioids depress respiration and, at very high doses, can, and often do, arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

93.     Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

94.     As one doctor put it, the widespread long-term use of opioids "was an experiment on the population of the United States. It wasn't randomized, it wasn't controlled, and no data was collected until they started gathering death statistics."

95.     The results were devastating, and the nation continues to reach ever grimmer milestones. In 2020, drug-overdose deaths in the United States soared nearly 30%, reaching all-time highs.[31]

## B.     Marketing and the Origins of the Opioid Crisis

96.     OxyContin, manufactured by Purdue Pharma L.P., was introduced to the market in 1996. Within six years of its introduction, the increasingly widespread misuse and abuse of OxyContin and similar opioids had drawn the attention of the United States Senate.

---

[31] Betsy McKay, "U.S. Drug-Overdose Deaths Soared Nearly 30% in 2020, Driven by Synthetic Opioids," *Wall Street Journal*, July 14, 2020, *available at*: https://www.wsj.com/articles/u-s-drug-overdose-deaths-soared-nearly-30-in-2020-11626271200.

97.     Two decades ago, Dr. Art Van Zee traveled from the rural coal town of St.

Charles, in the southwestern corner of Virginia, to Washington D.C. to provide testimony to the

United States Senate Committee on Health, Education, Labor and Pensions. On February 12,

2002, that Committee held a hearing entitled "Examining the Effects of the Painkiller OxyContin,

Focusing on Federal, State, and Local Efforts to Decrease Abuse and Misuse of this Product

While Assuring Availability for Patients Who Suffer Daily from Chronic Moderate to Severe

Pain."[32]

98.     Today, OxyContin—and the methods used to sell it—is widely seen as a principal

taproot of the opioid crisis. In those early days of the unfolding opioid epidemic, Dr. Van Zee's

medical practice in St. Charles put him in a position to offer informed, first-hand observations of

the toll that the pharmaceutical industry's efforts to market opioids was exacting from his

community. He testified:

> In the 25 years I have practiced as a general internist in St. Charles, which is a small
> Appalachian coal mining town, there has never been anything to compare to the
> epidemic of drug abuse and addiction that we have seen the last 3 years with
> OxyContin. Contrary to what is sometimes portrayed in the media as long-term
> addicts switching to the drug *du jour*, what we have seen for the most part is
> numerous young people recreationally using OxyContin and then becoming very
> rapidly addicted. Many of these kids are good kids, good families with bright,
> promising futures that are being destroyed in every way by their opioid addiction.[33]

99.     Further, Dr. Van Zee identified the sales and marketing practices of the

pharmaceutical industry when selling controlled substances as a primary cause of the problem:

> My own personal view of the complicated OxyContin abuse problem is that there
> are at least three major elements involved. First, there has been an obvious problem
> with physician misprescribing and overprescribing of this drug. Second, this
> epidemic has been a vicious indicator of the alarming degree of prescription drug
> abuse in our society. *Third and perhaps the one closest to this committee and the
> FDA is that the promotion and marketing of OxyContin by Purdue Pharma has
> played a major role in this problem.*[34]

100.    Five years after Dr. Van Zee's testimony and eighty miles from his hometown of

St. Charles, United States Attorney John Brownlee announced in Abingdon, Virginia, the guilty

plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P., relating to the

---

[32] A transcript of the hearing is *available at*: https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/html/CHRG-107shrg77770.htm

[33] *See* https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/html/CHRG-107shrg77770.htm

[34] *Id*. (emphasis added).

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

misbranding of OxyContin. Brownlee stated, "Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market."

101.    Two years later, in 2009, Dr. Van Zee published *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy* in the American Journal of Public Health.

102.    In his paper, Dr. Van Zee stated the matter plainly: "Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health risks when they are overpromoted and highly prescribed."[35] In one sense, Dr. Van Zee's observation is not particularly novel. Indeed, it approaches tautology: controlled substances are *controlled* precisely because they should not be sold to maximize volume and profits. This did not prevent McKinsey and Purdue from marketing Purdue's opioids full hilt, however. By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."[36]

103.    Dr. Van Zee identified the three principal marketing tactics Purdue employed as a source of OxyContin misuse and abuse—the exact tactics McKinsey identified and promoted—and suggested that regulation may be appropriate to curtail its use. The first was the use of granular sales and marketing data to profile individual prescribers and identify those that already prescribe large amounts of opioids. "Through these profiles, a drug company can identify the highest and lowest prescribers of particular drugs on a single zip code, county, state, or the entire

---

[35] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, American Journal of Public Health, February 2009, *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf
[36] *Id.*

2331633.1

country. One of the critical foundations of Purdue's marketing plan for OxyContin was to target the physicians who were the highest prescribers for opioids across the country."[37]

104.    The second tactic was the use of incentive compensation structures to encourage the salesforce to sell ever more prescriptions of OxyContin. Bonuses at Purdue were "uncapped," meaning there was no upper limit to what an OxyContin salesperson could earn. Rather, salesforce remuneration was a direct function of overall OxyContin sales—the more you sell, the more you make. "A lucrative bonus system encouraged sales representatives to increase sales of OxyContin in their territories, resulting in large numbers of visits to physicians with high rates of opioid prescriptions, as well as a multifaceted information campaign aimed at them."[38]

105.    The third tactic was to increase the overall number of individual calls that the salesforce placed to prescribers. "From 1996 to 2000, Purdue increased its internal sales force from 318 sales representatives to 671, and its total physician call list from approximately 33,400 to 44,500 to approximately 70,500 to 94,000 physicians."[39]

106.    When combined, these tactics produced the intended result. "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[40]

107.    Dr. Van Zee's observations regarding the direct link between OxyContin marketing and overall opioid overdose mortality would, in time, be confirmed by further academic work, including empirical research published by the National Bureau of Economic Research in 2019.

108.    McKinsey played a central role in the sales and marketing of these Schedule II controlled substances in the United States for many years. Throughout that time, the purpose of McKinsey's actions was singular: making the most money possible no matter the resultant cost to society. Indeed, no significant concern was given to the fact that greater availability of drugs

---

[37] Id.

[38] Id.

[39] Id.

[40] Id.

- 24 -

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

correlates to opioid-related deaths, addiction, abuse, and misuse. Return on investment was McKinsey's guiding light. McKinsey partnered with numerous opioid manufacturers and other opioid industry participants to maximize the return on investment in sales and marketing efforts for numerous opioid products, and did so contemporaneously. Despite the fact that the Schedule II controlled substances were designed for a small, narrowly defined group—patients with acute, terminal, or cancer-related pain—McKinsey's goal, in all instances, was to sell as many pills as conceivably possible.

### C.   What McKinsey Does: "Consulting is more than giving advice."

109.   McKinsey is a global consulting firm with many areas of expertise, including the pharmaceutical industry. As a management consulting firm, McKinsey provides plans to managers, directors, and owners on how to run their companies or other enterprises, and helps implement those plans.

110.   Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad range of activities, and the many firms and their members often define these practices quite differently."[41]

111.   Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant provides a plan to the client that the client may choose to adopt or not.

112.   "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

---

[41] Arthur Turner, *Consulting is More Than Giving Advice*, Harvard Business Review, September 1982, *available at*: https://hbr.org/1982/09/consulting-is-more-than-giving-advice

2331633.1

113.     In his 1982 *Harvard Business Review* article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work:

> The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job.[42]

114.     Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the suite of services that McKinsey provided within the "transformational relationship" it developed with its clients.[43] Indeed, writing in 2013, Harvard Business School Professor Clayton Christensen observed the decline in "pure" strategy work performed by consultants, as the industry sought to diversify its income streams by offering implementation and other services to clients. "For example, at traditional strategy-consulting firms, the share of work that is classic strategy has been steadily decreasing and is now about 20%, down from 60% of 70% some 30 years ago."[44]

115.     When partnering with clients, a core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[45] McKinsey recognizes it must have its clients' trust and make confidentiality "paramount," as "[c]ompanies share their most competitive secrets with McKinsey" for McKinsey to do its work.[46]

---

[42] *Id.*
[43] For McKinsey's own description of its implementation services, *See https://www.mckinsey.com/business-functions/mckinsey-accelerate/how-we-help-clients/implementation* (last accessed October 19, 2020).
[44] Clayton Christensen, Dina Wang, and Derek van Bever, "Consulting on the Cusp of Disruption," *Harvard Business Review*, October 2013, *available at* https://hbr.org/2013/10/consulting-on-the-cusp-of-disruption
[45] McDonald, *The Firm*, Pg. 308.
[46] *Id.* at 308.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

116.    During the implementation phase, McKinsey essentially bonds with the client. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "In some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we working that cohesively together."[47]

117.    Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[48]

118.    McKinsey's implementation team even has a symbol: a rowing team.



McKinsey Careers: what's behind McKinsey Implementation's logo and success?

5,507 views • Oct 22, 2018                                               👍 20   👎 1   ↪ SHARE   ≡+ SAVE   ...

119.    Jenny, a Practice Manager at McKinsey, explained its significance: "The rowers symbolized to us being in the boat with the clients, doing real work and being jointly responsible for the success."[49]

120.    Eugene, a partner, further offered:

> The reason McKinsey implementation works is because clients love it. The fact that we are staying longer with them, the fact that we're getting in to the trenches, the

---

[47] McKinsey on Implementation, April 30, 2017, *available at* https://www.youtube.com/watch?v=rEQOGVpl9CY
[48] *Id.*
[49] *See* "McKinsey Careers: what's behind McKinsey Implementation's logo and success?", October 22, 2018, *available at* https://web.archive.org/web/20200419140214/https://www.youtube.com/watch?v=3-Zx859VJtw

2331633.1

1    fact that we are there to walk the emotional journey with them when they're going
2    through the tough times and really changing their companies, is what makes
     McKinsey implementation truly distinctive.[50]

3    121.   In the broadest of generalities, then, McKinsey's business model, as a provider of
4    strategy and implementation consulting services, is to partner with clients to pursue business
5    objectives identified by McKinsey. Once an objective is identified, the client and McKinsey then
6    engage in concerted action as a seamless and cohesive unit in order to implement the necessary
7    means to achieve it.

8              **1.    McKinsey's Long-Term Partnership with the Pharmaceuticals
                       Industry**
9    122.   Today, McKinsey's website explains "How We Help Clients" in the
10   pharmaceuticals industry: "Helping clients maximize commercial value by assisting with product
11   launch, marketing, sales, and market access."[51] McKinsey helps numerous clients throughout the
12   pharmaceutical industry, from manufacturers to distributors and pharmacies. It often does so
13   contemporaneously. For instance, McKinsey might advise multiple opioid manufacturers on the
14   sales and marketing of competing branded opioid products.

15   123.   McKinsey's dominance of the consulting space in the pharmaceutical industry
16   presents its own opportunity for further client service. Specifically, McKinsey also helps its
17   clients by telling them what their competitors—who are also McKinsey clients—are doing.

18   124.   For example, McKinsey pitched its services to Purdue on the basis that it was able
19   to "*bring examples from other successful companies*" and perform "detailed analytics."[52]

20             **2.    The McKinsey Pharmaceuticals and Medical Products Practice Group**
21   125.   Like most management consulting companies, McKinsey organizes itself into
22   practice groups that specialize in a given industry.

23   126.   McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP")
24   industry practice group dedicated to working with pharmaceutical companies. In 2004, when
25   McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson. Pearson
26
27   ────────────────
     [50] *Id.*
28   [51] https://www.mckinsey.com/industries/life-sciences/how-we-help-clients/commercial
     [52] PPLPC021000601208 (emphasis added).

1    worked for McKinsey for twenty-three years and was a member of the firm's shareholder council

2    (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing

3    McKinsey in 2008 to helm Valeant Pharmaceuticals.[53]

4        127.    Pearson stated: "At McKinsey pharmaceuticals was one of our biggest industry

5    groups."[54] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was

6    loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp

7    elbowed.'"[55]

8        128.    Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical

9    industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled

10   depth of both functional and industry expertise as well as breadth of geographical reach. Our

11   scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a

12   network of people who are passionate about taking on immense challenges that matter to leading

13   organizations, and often, to the world."

14       129.    In 2012, while advising Purdue, McKinsey described PMP and its health care

15   capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants

16   with significant healthcare experience, including more than 150 physicians and 250 consultants

17   with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and

18   other life sciences. We also have 75 consultants with advanced degrees in public health,

19   healthcare management, and related fields."

20       130.    That same year, the PMP group published a report entitled "Death of a Sales

21   Model, or Not: Perspectives on the Evolution of Pharmaceutical Field Based Selling."[56] In it,

22

23   [53] John Gapper, *McKinsey's fingerprints are all over Valeant*, Financial Times, March 23, 2016, *available at:* https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a

24       Notably, Rob Rosiello, a McKinsey partner who was a Director of Client Services (or "DCS") of the Purdue account alongside co-DCS'es Maria Gordian and Martin Elling , went on to join Pearson at Valeant in 2015 as Chief Financial Officer. The DCS is the partner in charge of the client account.

25   [54] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Investor, September 3, 2014, *available at:* https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry

26   [55] John Gapper, *McKinsey's fingerprints are all over Valeant*, Financial Times, March 23, 2016, *available at:* https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a

27   [56] "Death of a Sales Model, or Not," Pharmaceutical and Medical Product Practice, McKinsey, *available at* https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/pharma%20and%20medical%20products/pmp%20new/pdfs/2012%20death%20of%20a%20sales%20model%20or%20not.pdf

28

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

McKinsey partner Laura Moran co-authored a segment called "The Few, The Proud, The Super-Productive: How a 'smart field force' can better drive sales." In the segment, Moran and her co-authors described various ways a pharmaceutical company could optimize its sales force. Moran worked on the Purdue account, where the strategies outlined in her article were incorporated into Project Turbocharge two years later.

131.   With respect to pharmaceutical marketing, the PMP group states, "We support clients in creating high-impact strategies that maximize value, using customized tools. We also have detailed market data for all major geographic regions."[57] PMP also works with pharma clients regarding their sales force: "Our efforts span the entire organization—we can help train and restructure sales forces, work directly in the field to provide coaching, maximize value from back-office services, develop strategies to accelerate short-term sales, and assist with company-wide commercial transformations."[58]

132.   McKinsey has long considered itself a "leadership factory" for good reason.[59] Nowhere is this more apparent than the pharmaceutical industry, where, thanks to PMP's efforts under Pearson's leadership, McKinsey continues to reign as the dominant management consultant.

133.   Consistent with PMP's ambition that McKinsey be the dominant consultant in the pharmaceutical industry, McKinsey has blanketed the entire pharmaceutical supply chain with alumni.

134.   Rajiv de Silva, for instance, was appointed CEO of Endo Pharmaceutical in March 2013. Endo's two top-selling drugs were pain medications. Endo—and de Silva, individually—have been named in multiple lawsuits related to the ongoing opioid crisis. Previously, de Silva worked with Pearson in a leadership position within PMP at McKinsey before joining Rob

---

[57] *See* https://www.mckinsey.com/industries/pharmaceuticals-and-medical-products/how-we-help-clients/commercial
[58] *Id.*
[59] *See* Adam Jones, "Should business schools fear McKinsey's leadership factory?," *Financial Times*, May 22, 2016, *available at:* https://www.ft.com/content/0d17f670-1612-11e6-b197-a4af20d5575e

Rosiello, a former McKinsey partner, and Pearson at Valeant.[60] McKinsey advised Endo on its opioid business.

135.    Likewise, Frank Scholz was a partner at McKinsey and a leader in the PMP group for seventeen years prior to departing in 2013 to join Mallinckrodt, another opioid manufacturer presently in bankruptcy after being named in numerous lawsuits relating to the ongoing opioid crisis. In fact, Scholz was the President of the "Specialty Generics" division of Mallinckrodt (formerly SpecGX LLC), which is the division that sold generic opioids. McKinsey advised Mallinckrodt on its opioid business.

136.    Teva Pharmaceuticals,[61] another opioid manufacturer named in numerous lawsuits for its role in the opioid crisis, is led by President and Chief Executive Officer and McKinsey alumnus, Kare Schultz. He joined the company in 2017, at which point he was also appointed to Teva's board of directors. Through an asset manager named Deerfield, McKinsey's in-house hedge fund held a financial stake in Teva Pharmaceuticals while McKinsey advised its numerous clients on how to maximize opioid sales.[62]

137.    McKinsey's involvement with Teva has been long-term. In 2006, upon his retirement from McKinsey, Roger Abravanel joined Teva's board of directors the following year.[63] By 2011, Teva had acquired Cephalon, Inc., another manufacturer of opioids, as "a core part of [Teva's] strategy" of "growth through acquisitions."[64] Befitting the pattern, Cephalon had its own long-standing ties to McKinsey before being acquired by Teva. In 2008, when Cephalon's Executive Vice President, General Counsel, and Secretary John E. Osborn retired, he accepted a

---

[60] David Sell, *"Endo CEO downplays Valeant link,"* Philadelphia Inquirer, November 5, 2015, *available at* https://www.inquirer.com/philly/business/20151106_Endo_CEO_downplays_Valeant_link.html
[61] "Teva Pharmaceuticals" or "Teva" refers to Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc., together.
[62] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969
McKinsey's in-house hedge fund is discussed further, below.
[63] Form 20-F dated December 31, 2012, Teva Pharmaceutical Industries Limited, *available at* https://www.sec.gov/Archives/edgar/data/818686/000119312513050510/d450498d20f.htm
[64] *Id.*

- 31 -

1    job as "an advisor on life sciences regulatory and compliance matters to the international

2    consulting firm McKinsey & Company, Inc."[65]

3          138.    McKinsey has ties to another notable opioid industry combination: the 2012

4    acquisition of Actavis, Inc.by Watson Pharmaceuticals, Inc. ("Watson") for €4.25 billion. In the

5    aftermath of the acquisition of the large European pharmaceutical company, Watson created a

6    "Global Integration Management Office" reporting directly to its CEO, Paul Bisaro, to focus "on

7    planning and implementing the integration of Actavis."[66] In order to achieve this critical task,

8    Watson hired Marc Lehnen: "We were very pleased to recruit Marc from McKinsey & Company,

9    Inc. to lead the Integration Management Office. Marc has years of experience in the generic

10   industry and knows our culture and way of operating."[67] Notably, the press release indicates that

11   McKinsey was already advising Watson regarding the acquisition: "*Although Marc does not*

12   *formally join our Company until July*, he will nevertheless be involved in the integration planning

13   during this interim period."[68]

14         139.    Allergan,[69] another opioid manufacturer and defendant in the nationwide opioid

15   litigation, has also relied on McKinsey as a source of management candidates. McKinsey Senior

16   Adviser Christopher J. Coughlin joined Allergan's board in 2014 and remains there today.

17         140.    Abbott Labs, which partnered with Purdue in the early years of OxyContin to use

18   Abbott's sales force to market Purdue's drug, has been led by CEO Miles White since 1998.

19   White began his career at McKinsey around 1980.

20         141.    As the preceding paragraphs make clear, McKinsey was in a truly unique position:

21   given its dominance of pharmaceutical management consulting through PMP, practically all

22   opioid industry participants were its clients. And those same clients routinely hire McKinsey

23   consultants to leadership positions within their companies. While advising multiple industry

24

25   [65] "Cephalon General Counsel John E. Osborn to Resign Position," February 8, 2008, *available at*
     https://www.sec.gov/Archives/edgar/data/873364/000110465908008569/a08-5085_1ex99d1.htm
26   [66] "Watson Announces Formation of Global Integration Management Office to Support ending Actavis Acquisition,"
     PR Newswire, May 9, 2012, *available at* https://www.prnewswire.com/news-releases/watson-announces-formation-
27   of-global-integration-management-office-to-support-pending-actavis-acquisition-150755565.html
     [67] *Id.*
28   [68] *Id.* (emphasis added).
     [69] Allergan is part of the same corporate family as Actavis and Watson.

2331633.1

participants regarding the sales of competing products, McKinsey was in a position to know confidential information and trade secrets of these clients "with the understanding that confidentiality is paramount."[70]

142.    Because of its client relationships, McKinsey was, quite literally, the sole repository on Earth of this collective knowledge of industry-wide tactics regarding the sales and marketing of opioids, and the outcomes thereof. This unique collection of knowledge and expertise made McKinsey a hub: even if any two given industry participants did not know what each other was doing, McKinsey knew exactly what *both* were doing because both were clients.

143.    McKinsey's relationships and influence carry far beyond the manufacturers. For instance, current McKinsey director Nancy Killefer has also been an independent director of Cardinal Health, Inc. ("Cardinal") —one of the "Big Three" Distributor Defendants in the ongoing nationwide opioid litigation—since 2015. Chunhui Moi, Cardinal's current Vice President of Corporate Strategy, was previously an associate principal at McKinsey, where he worked for nine years. Michele Holcomb, Cardinal's current Executive Vice President, Chief Strategy and Business Development Officer, was a partner in the Global Pharmaceutical Practice at McKinsey.

144.    McKinsey populates the "strategy" positions at the other opioid distributors as well. At AmerisourceBergen, the "Director of Corporate Development and Strategy" was hired away from McKinsey, where she had previously been a senior associate. AmerisourceBergen's Executive Vice President and Chief Strategy Officer had previously been a partner at McKinsey.

145.    At McKesson Corporation ("McKesson"), another McKinsey client, the President of McKesson Specialty Health and, previously Vice President of Corporate Strategy, was Marc Owen. "Prior to joining McKesson, Owen was a senior partner at McKinsey, advising pharmaceutical manufacturers, healthcare providers, distributors and technology companies,

---

[70] McDonald, *The Firm*, Pg. 308.

1    *including McKesson*, for more than a decade."[71] After Owen was promoted in 2012, McKesson

2    hired yet another Vice President of Corporate Strategy away from McKinsey.

3         146.    In short, one way McKinsey adds value for a client is by knowing what all of its

4    competitors are doing. It possesses a greater body of knowledge about any given industry in

5    which it advises multiple participants than any individual participant does itself.

6                        **3.      The Transformational Relationship**

7         147.    McKinsey has long touted the notion of a "transformational relationship." It is the

8    goal of every client relationship McKinsey develops and, McKinsey argues, the best way to

9    extract value from a client's use of McKinsey's services. McKinsey is not a one-off seller of

10   advice for any given CEO's problem of the day. Rather, McKinsey argues that real value for the

11   client derives from an ongoing "transformational" relationship with the firm.[72]

12        148.    At its core, the "transformational relationship" is *long-term*. It is the antithesis of a

13   one-off contract wherein McKinsey performs one discreet project for a client and then concludes

14   its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully

15   creating a feedback loop through their work that purports to ease executive anxiety but actually

16   creates more of it."[73] The long term result can be "dependence" on the McKinsey consultants.

17   "We insinuate ourselves," Ron Daniel, McKinsey's then-managing partner, told *Forbes* in 1987.[74]

18        149.    "They have follow-on work not just because they're good at what they do, but

19   because they are trained in how to manage these kinds of client relationships. They understand

20

21   ───────────────

22   [71] "Marc Owen Appointed President of McKesson Specialty Health," McKesson, January 31, 2012, *available at* https://www.mckesson.com/about-mckesson/newsroom/press-releases/2012/marc-owen-appointed-president-of-mckesson-specialty-health/ (emphasis added)

23   [72] Duff McDonald, *The Firm*, Pg. 136-37 ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970s], it sold itself to clients as an ongoing prodder of change, the kind a smart CEO would keep around indefinitely.").

24

25   [73] *Id.* at pg. 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies ("REMS") for OxyContin required by the FDA, McKinsey partner Maria Gordian wrote to fellow partners Martin Elling and Rob Rosiello regarding progress in the

26   "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Craig Landau] to do whatever he thinks is necessary to 'save

27   the business.'. . . *I believe there is a good opportunity to get another project here.*" MCK-MAAG-0117875 (emphasis added). Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy

28   work" for another decade.

     [74] John Merwin, "We Don't Learn from Our Clients, We Learn from Each Other," *Forbes*, October 19, 1987.

1  that the core reality is the relationship and the conversation, and that any particular engagement is

2  merely epiphenomenal," explained Alan Kantrow, formerly the editor of *McKinsey Quarterly*.[75]

3      150.    This strategy of weaving itself into all aspects of its clients' business proved

4  enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its

5  consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players
> in the world, McKinsey rarely left, ensuring a steady and growing flow of billings
> for years if not decades. In 2002, for example, *BusinessWeek* noted that at that
> moment, the firm had served four hundred clients for fifteen years or more.[76]

6

7

8

9      151.    Another aspect of the transformational relationship McKinsey develops with

10  clients is the development and marketing of "leave-behind" products, such as software

11  applications, that are sold to clients as tools that can be used by the business on an on-going and

12  recurring basis, separate and apart from McKinsey's project-based consulting work. As described

13  by Harvard Business School Professor Clayton Christensen, starting in 2007, "McKinsey &

14  Company initiated a series of business model innovations that could reshape the way the global

15  consulting firm engages with clients. One of the most intriguing of these is McKinsey Solutions,

16  software and technology-based analytics and tools that can be embedded at a client, providing

17  ongoing engagement outside the traditional project-based model."[77]

18      152.    McKinsey's relationship with Purdue provides an example of the deployment of

19  these "leave-behind" products. One McKinsey Solution is a pharmaceutical sales and marketing

20  workforce optimization tool called FieldGuide, a proprietary software application McKinsey sells

21  to clients. "The FieldGuide tool optimizes salesforce deployment and territory design through

22  advanced geospatial analysis that leverages both market-potential insights across device

23  categories and advanced sales-response curve analysis."[78] McKinsey sold it to Purdue for the

24  purpose of optimizing Purdue's OxyContin salesforce.

25

26  [75] Duff McDonald, *The Firm,* Pg. 185.

    [76] *Id.* at pg. 136.

27  [77] Clayton Christensen, Dina Wang, and Derek van Bever, "Consulting on the Cusp of Disruption," *Harvard Business Review*, October 2013, *available at* https://hbr.org/2013/10/consulting-on-the-cusp-of-disruption

28  [78] https://www.mckinsey.com/industries/pharmaceuticals-and-medical-products/how-we-help-clients/medtech/marketing-and-sales

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1

D.      **McKinsey and Purdue: A Case Study in Transformation**

2       153.    Indeed, McKinsey's work with Purdue is a prime example of the transformational

3  relationship in action. McKinsey counted Purdue as a client at least as early as 2004, three years

4  *before* Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007.

5  McKinsey was actively working with Purdue to increase OxyContin sales despite that guilty plea

6  and continued to do so throughout the time period that Purdue and its advisors were bound by the

7  terms of the Corporate Integrity Agreement entered in to alongside the guilty plea. McKinsey's

8  work with Purdue continued through at least 2018.

9       154.    McKinsey staffed at least forty known consultants to Purdue, from senior partners

10  all the way down through engagement managers and entry-level associates. Throughout the

11  unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea,

12  McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea*

13  *culpas* would come only later.

14      155.    McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact

15  Summary" internal report to McKinsey director Olivier Hamoir and McKinsey's Personnel

16  Committee, recounted her accomplishments that year on the Purdue account. The document is an

17  annual self-assessment produced by McKinsey partners. In it, Gordian described the state of

18  firm's relationship for Purdue:

19          With client work extending through the 3rd quarter, and several additional proposals
            in progress, we continue to expand the depth and breadth of our relationships at
20          Purdue. We look forward to deepening our relationships with the Sackler family and
            serving them on key business development issues, and to expanding our relationship
21          with [John] Stewart and other members of the senior management team.[79]

22      156.    Gordian even described herself as a counselor to Richard Sackler in the same

23  memorandum, in addition to being a "point of contact for the Board and Sackler family."[80]

24

25

26

[79] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured
27  Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No.
2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex 7, Pg. 48; MCK-
28  MAAG 0118669.
[80] *Id.*

2331633.1

157.    The continued expansion of the depth and breadth of McKinsey's relationship with Purdue was an ever-present internal goal for McKinsey, as it was accompanied by recurring and ever-increasing client billings.

158.    By 2014, both the breadth and depth of McKinsey's relationship with Purdue had expanded dramatically. During the 2009 to 2014 period in particular, Purdue relied extensively on McKinsey to develop and implement its sales and marketing strategy for OxyContin. But McKinsey's work for Purdue involved many other facets of Purdue's business beyond sales and marketing, including general and administrative consulting, review of product acquisition, evaluation of research and development, advising Purdue on the design of clinical studies, risk management, and interactions with regulators.

159.    McKinsey's sales and marketing work for Purdue focused on creating and implementing strategies and tactics to bolster the sales of OxyContin, a Schedule II drug that is widely recognized as among the most frequently diverted and abused opioids. As Purdue faced growing scrutiny, McKinsey also helped the company protect its public image and profit from the market for illicit opioids, which McKinsey's industry-wide efforts helped to promote and maintain.

160.    McKinsey understood the Sacklers' goals for Purdue and the work it would need to perform to maintain and grow Purdue's opioid profits amidst a growing epidemic of addiction and abuse. Part of McKinsey's work involved assessing the "underlying drivers" of OxyContin's (financial) performance. As described below, these drivers boil down to two things: (1) a widespread deceptive marketing campaign and (2) fueling an illicit market for non-medical use. Purdue entered into guilty pleas arising out of both types of conduct in 2007 and 2020, respectively. McKinsey delved into the "granular" aspects of Purdue's sales and promotion. And, throughout the two companies' long-term relationship, McKinsey understood Purdue's business "both in terms of content and culture," as its own renewed consulting agreement assured in 2013.

1

### 1.   **2004: McKinsey and Purdue Meet**

2      161.    On March 1, 2004, McKinsey entered into a Master Consulting Agreement with

3   Purdue for services that would be defined from time to time.[81] The Agreement was signed on

4   McKinsey's behalf by Rob Rosiello, then a senior partner in the PMP practice group. After a

5   ruling that held patents on OxyContin unenforceable due to Purdue misleading the patent office,

6   McKinsey stepped in to help Purdue.[82]

7      162.    The Master Consulting Agreement ███████████████████████████

8   ███████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████

10  ██████████████████████████████████████████"[83]

11  ███████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████

13  █████████████████████████████"[84]

14     163.    From 2004 through 2008, McKinsey advised Purdue on research and development,

15  business development, and product licensing related to Purdue's opioid products.[85] Consistent

16  with its business model, McKinsey leveraged these projects into growth of its "Broader Strategy

17  work" also underway with Purdue.[86] Specifically, in October 2008, Purdue retained McKinsey for

18  broad strategy work after two board members "blessed" Purdue executive Craig Landau with

19  doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and

20  introduction of generic competition to the older OxyContin.[87]

21

22

23

24

25  ───────────────

26  [81] PPLPC012000069192
    [82] *Id.*
    [83] *Id.*
27  [84] PPLPC020000034087
    [85] PPLPC013000116218; PPLP004401340
28  [86] MCK-MAAG-0117875
    [87] *Id.*

2.     **2007: Purdue Pleads Guilty to Misbranding OxyContin and is Bound by a Corporate Integrity Agreement**

164.    On May 10, 2007, John Brownlee, United States Attorney for the Western District of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, relating to the misbranding of OxyContin. Brownlee stated,

> Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market.

165.    Purdue Frederick Company as well as three of Purdue's officers, pleaded guilty to the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301, *et seq.*

166.    Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Part of this deceptive messaging included highlighting OxyContin as a long-acting ("LA") or extended release ("ER") opioid and suggesting it created less chance for addiction than "immediate release" opioids because it had fewer "peak and trough" blood level effects or "did not cause a 'buzz' or euphoria" in the same manner as these other opioids.

167.    Concurrent with its guilty plea, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services on May 7, 2007. Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, and ultimately terminated in January 2013.[88]

168.    Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

---

[88] *See* https://www.justice.gov/opa/press-release/file/1329576/download

a.      "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate . . . including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products";

b.      "compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products"; and

c.      "the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

169.    Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement and to file compliance reports on an annual basis with the Inspector General.

170.    In the wake of its accession to the Corporate Integrity Agreement, Purdue faced newly imposed constraints on its sales and marketing practices. The Corporate Integrity Agreement was a problem to solve. Despite the agreement's constraints (i.e., do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

**3.      The Sacklers React to the "Concentration of Risk" Posed to Them by the Opioid Business.**

171.    The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of Board

seats. To advise the board of directors of Purdue Pharma was to advise the Sackler family. The interests of the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, were all aligned. Practically, they were indistinguishable.[89]

172.   As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded, in the words of Richard Sackler, as an increasingly dangerous "concentration of risk" for Purdue's owners. Ten days after the guilty plea was announced, David Sackler wrote to his father, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis to sue 'the family,'" David replied:

| Message | |
|---|---|
| **From:** | David Sackler ███████████ |
| **Sent:** | 5/17/2007 11:08:08 PM |
| **To:** | 'Sackler, Jonathan' ████████ ii: Sackler, Dr Richard ███████████ |
| **CC:** | Ives, Stephen A. ██████████████ |
| **Subject:** | RE: Idea |
| **Attachments:** | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America.  This is the land of the free and the home of the blameless.  We will be sued.  Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

173.   Given concern over this "concentration of risk," the two sides of the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue, and collectively considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. They discussed Shire as a possible target, as were Cephalon, UCB, and Sepracor, Inc. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance from opioids.

174.   Mortimer D.A. Sackler advocated for a sale or merger in a February 21, 2008 email to Richard Sackler (a former president and co-chairman of Purdue) and several others, writing, "The pharmaceutical industry has become far too volatile and risky for a family to hold

---

[89] Craig Landau, soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

- 41 -

95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to OxyContin.

175.   Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

176.   In order to pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue—by then the subject of substantial public scrutiny— appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

177.   In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to rid themselves of their pharmaceutical company dependency for good.

178.   In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within it as possible: $300 million. Purdue was required to retain that amount pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to its owners.[90]

179.   Given the complexity of the problem, the Sacklers and Purdue realized that they would need assistance in achieving these internally contradictory objectives. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey, which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

---

[90] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall Street Journal, June 30, 2019, *available at:* https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6

2331633.1

- 42 -

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

180.     Notably, under the terms of Paragraph II.C.1(b) of the Corporate Integrity Agreement, McKinsey, as a contractor to Purdue performing sales and marketing functions for the company, was itself a "Covered Person" subject to the strictures of the Agreement.[91]

### 4.    Purdue Tasks McKinsey with Boosting Opioid Sales in Light of the Guilty Plea and Corporate Integrity Agreement.

181.     The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing to comply with the Corporate Integrity Agreement. As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their critics and insisted they had just a few isolated problems. After the settlement, they didn't change—the way the sales force was managed and incentivized, everything stayed the same."[92]

182.     Purdue and the Sacklers were well aware of the constraints posed by the Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to whether Purdue should have a single sales force marketing all Purdue products, including OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would be comprised of approximately 300 representatives." John Stewart, Purdue's then-CEO, saw an opportunity, and asked if the Corporate Integrity Agreement would apply if Purdue were to launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another narcotic painkiller), using the separate sales force. Might the new drug launch fall outside of the Corporate Integrity Agreement, he asked?[93]

183.     It would not, he was told by Bert Weinstein, Purdue's Vice President of Compliance.[94]

184.     Given the tension between compliance with the Corporate Integrity Agreement and the desire to sell more OxyContin, Purdue needed help.

---

[91] The relevant language in the Corporate Integrity Agreement provides: "'Covered Persons' includes . . . all contractors, subcontractors, agents, and other persons who perform sales, marketing, promotional, pricing, government contract, or regulatory functions . . . on behalf of Purdue." PDD1712900096.
[92] David Crow, *How Purdue's 'one-two' punch fuelled the market for* opioids, Financial Times, September 9, 2018, *available at:* https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
[93] PPLPC012000226606, Purdue Pharma Executive Committee Meeting Notes and Actions, May 20, 2009, Pg. 2.
[94] *Id.*

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

185.     Ethan Rasiel, a former McKinsey consultant, has described the typical way McKinsey begins working with a client: "An organization has a problem that they cannot solve with their internal resources. That's the most classic way that McKinsey is brought in."[95]

186.     Such was the case with Purdue. Because it did not have the requisite expertise to address the problems posed by the Corporate Integrity Agreement internally, Purdue expanded on its already-existing relationship with McKinsey to devise a sales and marketing strategy to increase opioid sales despite the Corporate Integrity Agreement and growing concern about the "concentration of risk" that Purdue's business of selling opioids posed to its owners.

187.     McKinsey's task was to thread the needle: to increase OxyContin sales despite the strictures imposed by the five-year Corporate Integrity Agreement. This McKinsey did, turbocharging[96] the sales of a drug it knew fully well was addictive and deadly, while purporting to respect to the Corporate Integrity Agreement.

188.     In short, Purdue would pay money to McKinsey in exchange for McKinsey enabling the company how to sell as much OxyContin as conceivably possible so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue, and keep their money safe from the reach of court judgments, fines, and penalties they feared.

189.     Consistent with their plan to dissociate themselves from the company, the Sacklers appointed Mr. Stewart as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paid more than $25 million for his services to Purdue from 2007 through 2013.

190.     Purdue's Executive Committee discussed Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

---

[95] *How McKinsey Became One of the Most Powerful Companies in the World*, CNBC, June 6, 2019 *available at:* https://www.youtube.com/watch?v=BBmmMj_maII

[96] If the description is overbearing, note that it is McKinsey's own, as described below.

2331633.1

191.   Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey.

192.   In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.[97]

193.   Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

194.   McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia, Vice President of Sales and Marketing.

195.   From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate its sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy, but also its *implementation*. McKinsey was a real presence at Purdue. "A team of McKinsey analysts went in-house, camping out in a conference room at Purdue headquarters."[98]

### 5.   Purdue Relies on McKinsey.

196.   Purdue hired McKinsey not only to give advice, but to devise and then implement a deceptive marketing strategy. For example, for one "major initiative" with Purdue, "McKinsey forecast[ed] a potential incremental increase in sales in the $200-400mm range" over a three-year period, "[w]hen properly implemented."[99]

---

[97] PDD1712900096.
[98] Patrick Radden Keefe, *Empire of Pain* 302 (2021). In September, McKinsey named Mr. Keefe's history of the Sackler family and Purdue and the opioid crisis to its 2021 shortlist for "Business Book of the Year." *See https://www.mckinsey.com/about-us/new-at-mckinsey-blog/for-your-reading-list-the-2021-business-book-of-the-year-shortlist*
[99] PPLPC012000257444

197.    McKinsey is not cheap, either. Indeed, hiring McKinsey is an expensive proposition. A single junior consultant—typically a recent college or business school graduate—runs clients millions of dollars annually.[100] McKinsey is a highly selective employer and advertises that its employees join "for the opportunity to apply their talents to complex, important challenges."[101] "Talent" is key to McKinsey's model; clients pay for the best and brightest.

198.    A client does not choose to pay McKinsey unless it expects to receive benefits it could not have obtained within its own organization. McKinsey offers solutions to clients facing challenges they feel they cannot adequately address on their own. This model has been a stunning success for McKinsey. In 2008, McKinsey's annual revenue was $6 billion. Today, the firm earn more than $10 billion in revenue each year.[102]

199.    Clients pay these exorbitant rates for a reason: McKinsey's plans and partnership work. Even critics of the consulting industry recognize the unique efficacy of McKinsey's work. JPMorgan Chase CEO Jamie Dimon once derided consultants as "substituted management" and stated that "consultants can become a disease for corporations." Dimon made one exception to this rule: McKinsey.[103] Given unique levels of trust, respect, and access by major corporations across the United States and the world, McKinsey has unmatched power to affect how those corporations behave.

200.    When Purdue entered into a "Master Consulting Agreement" with McKinsey in 2004, Purdue explicitly recognized McKinsey "has a fine reputation as well as excellent experience and relationships in our industry," which Purdue was counting on to boost its opioids business.[104]

---

[100] Ian MacDougal, *How McKinsey is Making $100 Million (and Counting) Advising on the Government's Bumbling Coronavirus Response*, ProPublica (July 15, 2020), https://www.propublica.org/article/how-mckinsey-is-making-100-million-and-counting-advising-on-the-governments-bumbling-coronavirus-response.
[101] https://www.mckinsey.com/about-us/overview
[102] Forbes, *McKinsey & Company* (retrieved September 9, 2021), https://www.forbes.com/companies/mckinsey-company/?sh=1201a12624c1.
[103] Duff McDonald. *Behind the singular mystique of McKinsey & Co.* The Guest Blog. CNBC. Sept 25, 2013. Available at: https://www.cnbc.com/2013/09/25/behind-the-singular-mystique-of-mckinsey-co.html
[104] PPLPC012000069192

201.    Purdue explicitly recognized that McKinsey stepped in to help Purdue "protect [its] sales and continue to *grow our business*."[105]

202.    Furthermore, that the Sacklers, as board members of Purdue, relied on McKinsey in their conduct of Purdue affairs is an admitted fact. In a public filing in the recent Purdue bankruptcy proceedings, the one side of the Sackler family conceded that they did so: "McKinsey is widely recognized as 'a leading management consulting firm' and the Former Directors were statutorily entitled to rely on such expertise."[106]

### 6.    McKinsey Delivers.

203.    Purdue, as a monoline manufacturer of opioids, relied on McKinsey in practically all aspects of its business.

### a.    Courting the Regulators: "We All Feel Responsible."

204.    One critical aspect of Purdue's operations, given its status as a producer of controlled substances, was regulatory compliance. McKinsey guided Purdue through practically all of its interactions with regulators whose efforts to protect the public might pose threats to Purdue's business.

205.    McKinsey advised Purdue on how to approach the FDA in light of its criminal conviction and retain business in light of the reputational damage to the company and to OxyContin after the admissions in its guilty plea.

206.    In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time-release mechanism in OxyContin tablets—i.e., another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

207.    Having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA submission, McKinsey knew that reformulated OxyContin could still be abused. Purdue nonetheless touted its introduction of reformulated OxyContin and another ADF opioid as

---

[105] *Id.* (emphasis added).
[106] *In re: Purdue Pharma, L.P.*, No. 19-23649, Doc. 3441-1, at ¶ 328 (Aug. 5, 2021).

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

evidence of its good corporate citizenship and commitment to protecting the public. McKinsey worked with the Sacklers to prepare for Purdue's meetings with the FDA.

208.     On January 20, 2009, McKinsey partner Maria Gordian wrote to partners Rob Rosiello and Martin Elling to update them on these ongoing efforts with Purdue:

> We had a very good FDA rehearsal yesterday *with several family members present*. The team did an outstanding job on the study. [P]reparing the client and executing the mock meeting. We are off to DC today for the actually (sic) FDA meeting tomorrow.[107]

209.     Gordian's email to Rosiello and Elling forwarded encouraging words from Richard Sackler. He wrote to his daughter, Marianna:

> I am writing to tell you how impressed I was by the preparation for the FDA meeting. Both the method and the process as well as the content was excellent and a major departure from efforts like this in the past. Please share with the team my views and best wishes for a successful interchange with the FDA.[108]

Marianna forwarded the well-wishes to Gordian and the team at McKinsey.

210.     In September 2009, Purdue made a presentation to the FDA advisory committee considering its application for its reformulated OxyContin and stated that the new formulation would deter abuse. According to metadata, the PowerPoint presentation was prepared by McKinsey.

211.     The FDA approved the reformulation of OxyContin in April 2010.[109]

212.     Having successfully navigated the approval process with McKinsey's chaperoning, Purdue then proceeded to market the ADF version of OxyContin as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids.

213.     In 2020, two FDA advisory committees evaluating the impact of the reformulated OxyContin concluded that reformulated OxyContin did not, in fact, substantially reduce abuse.

---

[107] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No. 2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex D, Pg. 25 (emphasis added).

[108] *Id.*

[109] *See* https://www.fda.gov/media/126835/download

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

214.    At the same time as it worked to rehabilitate Purdue's image with the FDA, McKinsey, in parallel, advised Purdue on how to limit FDA regulations aimed at mitigating the risks of opioid use. In 2008, shortly after Purdue's criminal plea, the FDA requested Purdue submit a proposed "Risk Evaluation and Mitigation Strategy" ("REMS") for OxyContin. McKinsey provided Purdue with drafts of the submission.[110] Indeed, McKinsey was crucial in devising Purdue's response to the FDA's request for a REMS proposal from Purdue. Gordian informed Rosiello and Elling on October 23, 2008 that John Stewart, Purdue's CEO, "is aware of the critical role we are playing in pulling REMs together and is very appreciative." In the same email, she noted that "the family" was focused "on the response to the non-approval letter" from the FDA.[111]

215.    In 2009, the FDA expanded its scope to a class-wide extended release/long-acting REMS program.

216.    Seeking to avoid a requirement that prescribers undergo mandatory training on OxyContin's risks or management or obtain certification before prescribing OxyContin, which would limit the numbers of available prescribers, Purdue turned to McKinsey. McKinsey found the cost to Purdue of a system to verify completion of prescriber education before prescriptions could be filled would be $50 million—an estimate Purdue used to oppose efforts for more rigorous risk management strategies.[112] ███████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████

217.    Armed with McKinsey's analysis, Purdue's strategy on REMS was effective. The REMS program avoided verification and enrollment provisions that would harm Purdue's profits.

---

[110] PDD8901578031
[111] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No. 2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex C, Pg. 22.
[112] PDD8901530124
[113] PPLPC019000622253

1     218.    Meanwhile, based on McKinsey's work on extended release opioid REMS,

2   McKinsey was aware of warnings and adverse events included within the OxyContin medication

3   guide and communications plans, including risks of overdose and adverse events including

4   dizziness and lethargy.

5     219.    In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee

6   meeting. ███████████████████████████████████████████████

7   ███████████████████

8     220.    McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated

9   OxyContin: Question & Answer Book" in September 2009, with questions including "Why

10  should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge

11  mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]"

12  and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the

13  needs of patients[.]"[115]

14    221.    Sometimes, McKinsey's work was as obfuscating as it was self-revealing. To the

15  question of "Who at Purdue takes personal responsibility for all these deaths?[,]" McKinsey

16  offered the following response:[116]

17

18  **Who at Purdue takes personal responsibility for all these deaths?**

19        •   We all feel responsible

20

21

22  12                                                              MCK-MAAG-0152135

23

24

25

26  _____

27  [114] PDD8901645845
    [115] MCK-MAAG-0152135
    [116] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured
28  Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No.
    2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex F, Pg. 39.

### b.     The Granularity of Growth

222.     To this end, McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

223.     After Purdue's first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

224.     In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth, and exploiting them for all they are worth. In August 2008, McKinsey directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the matter: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance* (Wiley, April 2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[117]

225.     Previously, in an article in *McKinsey Quarterly* (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggests that executives should "de-average" their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[118]

226.     Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[119]

---

[117] *The granularity of growth*, Book Excerpt, McKinsey & Company, March 1, 2008, *available at*: https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth
[118] Mehrdad Baghai *et. al.*, *The granularity of growth,* McKinsey Quarterly, May 2007, *available at:* https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth
[119] *Id.*

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

227.    One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of the milk seller's sales and marketing and discover that the profit margin on milk cartons sold to university cafeterias in dairy-producing states is much greater than the margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both university cafeterias and convenience stores, then McKinsey would likely advise the client to deploy additional resources towards selling milk to university cafeterias in dairy-producing states. McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to newfound growth and profitability for the client.

228.    Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

### c.    "Identifying Granular Growth Opportunities for OxyContin"

229.    McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the implementation of a number of strategies to sell more pills.

230.    By January 2010, McKinsey informed Purdue, in accordance with the lessons of McKinsey's granular growth analysis, that Purdue could generate "$200-400mm" in additional annual sales of OxyContin by implementing McKinsey's strategies.[120]

231.    In November 2010, a McKinsey report instructed sales reps to maximize profits by "emphasizing [the] broad range of doses"—which meant pushing the doses that were highest and most profitable.[121]

232.    In 2012, John Stewart assigned McKinsey to "understand the significance of each of the major factors affecting OxyContin's sales."[122]

233.    This McKinsey did in excruciatingly granular detail, analyzing each sales channel for Purdue's opioids to identify weaknesses, opportunities, and to suggest courses of action to improve performance. Many core themes of McKinsey's work would be crystallized in a series of

---

[120] PPLPC012000257443; PPLPC012000257446
[121] PPLPC018000346294
[122] PPLPC020000587064

presentations and updates made to the Sackler family and to Purdue's board of directors in the summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

### i.        Marketing – Countering Emotional Messages

234.    From the outset of McKinsey's known work for Purdue, the work was grim. In June 2009, McKinsey teamed with Purdue's then-Chief Medical Officer (and current CEO) Craig Landau and his staff to discuss how best to "counter emotional messages from mothers with teenagers that overdosed in [sic] OxyContin."

235.    Months later, McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, give patients "the best possible chance to live a full and active life," and concomitantly reduce stress and isolation.[123]

236.    These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.[124]

[123] PPLPC023000239858
[124] PDD1712900096

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

237.   Purdue's marketing materials from that time period are illustrative of the approach:[125]



238.   Likewise, McKinsey informed Purdue that by highlighting the ability to "tailor the dose" and treat a "broad range of appropriate patients," the prescriber-takeaway would be that "physicians can help their patients function better and lead a fuller and more active life," even though this conclusion was not to be explicitly addressed.[126]

Take-away (not addressed) ... so physicians can help their **patients function better and lead a fuller and more active life**

239.   Claims that OxyContin improved function and quality of life were not supported by substantial evidence and, in addition, failed to take into account risks of addiction. The FDA and other federal agencies have, for years, made clear the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[127] A Centers for

---

[125] *Tennessee v. Purdue Pharma L.P.*, Case No. 1-173-18 (Compl. May 15, 2018) ¶ 24.
[126] PPLPC019000329253
[127] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010) (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact

- 54 -

Disease Control and Prevention guideline, following a "systematic review of the best available evidence," concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[128] According to the CDC director, "for the vast majority of patients, the known, serious, and too-often- fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[129]

240.    In addition to crafting carefully-tailored quality of life assurances designed to avoid the pitfalls of the Corporate Integrity Agreement, McKinsey invented other misleading marketing efforts for Purdue.

241.    For instance, McKinsey urged Purdue to capitalize on OxyContin's extended-release characteristics in another way: marketing OxyContin's twelve-hour dosing as though users only need to take OxyContin twice a day, thus requiring fewer pills. OxyContin in fact was well known to wear off after eight to ten hours in many patients, however. What McKinsey called "convenient," would later be called "a [d]escription of Hell."

242.    This misleading assurance of twelve-hour relief is especially pernicious, as end-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, called OxyContin's twelve-hour dosing "the perfect recipe for addiction."[130] Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking. Promotion of twelve-hour dosing, without disclosing its

---

on a patient's work, physical and mental functioning, daily activities, or enjoyment of life.").
ALLERGAN_MDL_00387583; Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008) (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall balance, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). ALLERGAN_CA_00161496. The FDA's warning letters were available to McKinsey on the FDA website.
[128] CDC Guideline at 2, 18.
[129] Thomas R. Frieden and Debra Houry, New England Journal of Medicine, "Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline" at 1503 (Apr. 21, 2016).
[130] Harriet Ryan, "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, available at http://www.latimes.com/projects/oxycontin-part1/.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1    limitations, is misleading because it implies that the pain relief supplied by each dose lasts twelve

2    hours.

3         243.    In addition to designing misleading marketing messages, McKinsey even

4    suggested encouraging a new channel through which those messages could be delivered to

5    prescribers. McKinsey encouraged the tactic of "patient pushback," wherein McKinsey and

6    Purdue would foment patients to directly lobby their doctors for OxyContin even when those

7    physicians expressed reservations regarding the administration of Purdue's opioids.

8         244.    The idea was that McKinsey and Purdue could spread their own message through

9    pain patients who would be perceived as more credible sources suggesting a need for controlled

10   or extended release opioid—even though the team devising this strategy would have known that

11   extended release opioids did not substantially control pain or thwart addiction better than lower-

12   dose, immediate release opioids.[131]

13        245.    McKinsey also coached Purdue on building "trust" (which from its vantage point,

14   McKinsey knew was misplaced) in Purdue following its criminal conviction.

15            **ii.    Targeting – Selling More OxyContin to Existing High**
                       **Prescribers**
16

17        246.    Perhaps the key insight McKinsey provided was, using its granular approach, to

18   identify historically large prescribers and target ever more sales and marketing resources on them,

19   without any regard for, and indeed conscious disregard of, patient safety. Physician targeting

20   proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per

21   year increased sales. This relentless drive to increase sales and create greater availability of

22   opioids was made with no notable concern about the parallel increase in opioid-related deaths,

23   abuse, and misuse.

24        247.    On January 20, 2010, Purdue's board was informed of the ongoing work

25   McKinsey was performing concerning a new "physician segmentation" initiative whereby

26   McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those

27

28

[131] PDD8901645845

1    that had historically been the highest prescribers.[132] McKinsey then worked with Purdue's sales

2    and marketing staff to specifically target those prescribers with a marketing blitz to encourage

3    even further prescribing.

4           248.    Purdue trained its sales force in tactics to market to these high prescribers based on

5    McKinsey's insights and designed in conjunction with McKinsey.

6           249.    Many of the historically highest prescribers of OxyContin—those same individuals

7    that McKinsey urged Purdue to target for ever more prescriptions—had prescribed Purdue's

8    OxyContin *before* the 2007 guilty plea and had already been subjected to Purdue's

9    misrepresentations regarding OxyContin that were the subject of that guilty plea.

10          250.    McKinsey identified these physicians—those that had already been influenced by

11   Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a

12   massive marketing push to sell more OxyContin.

13          251.    McKinsey worked assiduously with Purdue over many years to continually refine

14   this approach and required ever-more granular data for its analysis. More than three years after

15   the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue

16   provided, "prescriber-level milligram dosing data" so that McKinsey could further analyze the

17   individual amounts of OxyContin prescribed by individual physicians.

18          252.    At the same time it requested this "prescriber-level milligram dosing data" from

19   Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales

20   representative to assure that the maximum amount of each sales representative's time was spent

21   with the most attractive customers.

22          253.    On July 23, 2013, Purdue's board discussed concerns about "the decline in higher

23   strengths" of Purdue's opioids as well as an observed decline is "tablets per Rx." In order to

24   assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to

25   actively monitor the number and size of opioid prescriptions written by individual doctors."[133]

26

27

---

28   [132] PPLPC012000257446
     [133] PPLP004307354

254.    In unveiling Project Turbocharge to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.[134]

255.    McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write. This singular focus on increasing prescriptions was not coupled with colorable concern for the patient population.

256.    By November 2013, McKinsey had obtained the physician-level data they had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board was kept apprised of McKinsey's progress.

257.    Not only did McKinsey identify which doctors prescribed the most of Purdue's opioids, McKinsey also recommended segmenting prescribers into "types" and tailoring messages and tactics to the different prescriber profiles. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended release opioids, including in opioid naïve patients (patients who were not already using opioids), McKinsey urged emphasizing that its seven tablet strengths provide flexibility to "tailor the dose" to customer needs.[135] Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant with long-term use (rather than discontinue use when the drug lost its effectiveness).

258.    In its October 26, 2009 presentation, "OxyContin – driving growth through stronger brand loyalty,"[136] McKinsey proposed tactics to turnaround declining sales, "[e]nhance loyalty to OxyContin among loyalist prescribers," "[c]onvert[ing] 'fence sitters' into more loyal

---

[134] PPLP004409890
[135] MCK-MDL2296-0126522
[136] Id.

1   OxyContin prescribers," and "[p]rotect OxyContin's market share[.]"[137] In other words,

2   McKinsey proposed increasing sales by pushing both willing and reluctant physicians to prescribe

3   more OxyContin.

4       259.   McKinsey also recommended a strategy to target those prescribers who did not

5   regularly prescribe OxyContin—so-called "Resigned Followers and ER Delayers" —encouraging

6   them to "increase step-up" to extended release opioids. These were physicians with "low comfort

7   with extended release opioids." McKinsey encouraged Purdue to emphasize to them the "range of

8   appropriate patients." In other words, McKinsey's strategy recommended that Purdue encourage

9   prescribers to use OxyContin earlier in a patient's treatment for a wider range of patients and for

10  longer periods of time.

11          **iii.**    **Titration – Selling Higher Doses of OxyContin**

12      260.   McKinsey understood that the higher the dosage strength for any individual

13  OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage

14  strength, particularly for longer periods of use, also contributes to opioid dependency, addiction

15  and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of

16  OxyContin.

17      261.   Consistent with its granular growth analysis, as early as October 26, 2009,

18  McKinsey advised the Sacklers and the Purdue board that Purdue should train its sales

19  representatives to "emphasiz[e] the broad range of doses," which would have the intended effect

20  of increasing the sales of the highest (and most profitable) doses of OxyContin.[138]

21      262.   McKinsey's work on increasing individual prescription dose strength continued

22  throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July

23  23, 2013 that Purdue had identified weakness in prescribing rates among the higher doses of

24  OxyContin and reassured the Sacklers that "McKinsey would analyze the data down to the level

25  of individual physicians" in order to study ways to maximize the sales of the highest-dose

26  OxyContin pills.

27

28    [137] *Id.* at 2.
  [138] PPLPC018000346294

- 59 -

263. Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose" and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.[139]

264. McKinsey would have known, however, that higher doses of opioids carry greater risk. Patients receiving high doses of opioids (e.g., doses greater than 100 mg morphine equivalent dose ("MED") per day) as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to opioids' analgesic effects. The Centers for Disease Control and Prevention also recognize that higher doses of opioids tend to increase overdose risks relative to any potential patient benefit.[140]

265. Claims that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose, are deceptive and misleading. They were particularly important to promotional efforts, however, because patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief. Marketers needed to generate a comfort level among doctors to ensure the doctors maintained patients on the drugs even at the high doses that became necessary.

266. Purdue adopted McKinsey's ███████████ proposal.[141] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[142]

267. The titration messaging worked. Nationwide, based on an analysis by the *Los Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on

[139] PPLP003450924
[140] Dowell D, Haegerich TM, Chou R. CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016. MMWR Recomm Rep 2016;65(No. RR-1):1–49. DOI: http://dx.doi.org/10.15585/mmwr.rr6501e1
[141] PPLPC023000251226 (█████████████████████████████); see also PPLPC012000243668 (██████████████); PPLPC012000245087 (███████████████████); PPLPC012000246009 (████████████████████████; PPLPC021000265092 (█████████████████████)
[142] PKY183123435

1    doses greater than sixty milligrams per day, which converts to the ninety MED that the CDC

2    guideline urges prescribers to "avoid" or "carefully justify."[143]

3                          iv.    **Covered Persons – Sales Quotas and Incentive Compensation**

4         268.    McKinsey urged the use of quotas and bonus payments to motivate Purdue's sales

5    force to sell as many OxyContin prescriptions as possible. As McKinsey described it, "[r]evision

6    to incentive comp could better align reps to Purdue's economics."[144]

7         269.    Notably, this behavior was prohibited by the 2007 Corporate Integrity Agreement,

8    which required Purdue to implement written policies regarding "compensation (including salaries

9    and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that

10   are designed to ensure that financial incentives *do not inappropriately motivate such individuals*

11   *to engage in the improper promotion or sales of Purdue's products*."[145]

12        270.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's

13   strategy, to dramatically increase the quota of required annual sales visits by Purdue sales

14   representatives to prescribers. The quota was 545,000 visits in 2010, 712,000 visits in 2011,

15   752,000 in 2012, and 744,000 visits in 2013.

16        271.    On August 15, 2013, as part of their "Identifying Granular Growth Opportunities

17   for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal

18   (*e.g.,* $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO

19   and Board."[146]

20        272.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to

21   the Purdue board in July 2013, McKinsey nonetheless urged Purdue, in addition to increasing the

22   focus of the sales force on the top prescribers, to increase the overall quotas for sales visits for

23   individual sales representatives from 1,400 to 1,700 annually.

24

25

26

27   [143] CDC Guideline at 16.
     [144] PPLPC012000441016
28   [145] PDD1712900096 (emphasis added).
     [146] PPLP004409890

273.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):

**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**

One possible route to benchmark

| Current call activity | | | Potential new allocation | | |
|---|---|---|---|---|---|
| Number of "on territory" days per year | | | Number of "on territory" days per year | | |
| Item | | Days[1] | Item | | Days[1] |
| Number of working days | | 260 | Number of working days | | 260 |
| Holidays | | -11.3 | Holidays | | -11.3 |
| Vacation and other time off | | -27.2 | Vacation and other time off | | -27.2 |
| Trainings and meetings | | -17.5 | Trainings and meetings | | -11.5 |
| Other company-related time off of field | | -4.3 | Other company-related time off of field | | -4.3 |
| Total days | | 199.7 | Total days | | 205.7 |
| Avg calls per day | x | 7 | Avg calls per day | x | 7.35 |
| Total calls per year | | 1398 | Total calls per year | | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue; team analysis

McKinsey & Company | 59

274.    By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

275.    Additionally, McKinsey developed and advised Purdue on a new incentive compensation structure for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives based on the number of OxyContin prescriptions the representative produced could be a powerful driver of incremental OxyContin sales, without regard for patient safety.

1

2

**7.** **Transformation: Purdue and McKinsey Adopt and Implement McKinsey's Strategies.**

3        276.    As early as September 11, 2009, McKinsey determined and told Purdue that it

4   could generate $200 million to $400 million in additional annual sales of OxyContin by

5   implementing McKinsey's strategy based on the opportunities its granular growth analysis had

6   identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of

7   additional OxyContin sales on January 20, 2010.

8        277.    Purdue accepted and, with McKinsey's ongoing assistance, implemented

9   McKinsey's strategies for selling and marketing OxyContin.

10       278.    For instance, in January 2010, Purdue was training its sales and marketing force on

11   the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The

12   strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The

13   initiative sought to identify the most prolific OxyContin prescribers and then devote significant

14   resources towards convincing those high prescribers to continue to prescribe ever more

15   OxyContin, in higher doses, for longer times, to ever more patients.

16       279.    On January 20, 2010, the Purdue board was informed of the progress in

17   implementing McKinsey's "physician segmentation" initiative.

18       280.    This transformative collaboration would continue over the course of the

19   relationship between Purdue and McKinsey.

20       281.    During the time that McKinsey was working with Purdue, Purdue deliberately

21   minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the

22   Purdue sales force from rival Novartis. She would stay with the company until 2013, during

23   which time McKinsey was responsible for increasing OxyContin sales at Purdue, and culminating

24   with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

25       282.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the

26   company in presentations to its sales staff: "They said, 'We were sued, they accused us of mis-

27   marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.'

28

1   You had the impression they were portraying it as a bit of a witch hunt."[147] (Purdue and its

2   executives paid $634.5 million in fines.)

3         283.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to

4   sell OxyContin to doctors while at the same time maintaining technical compliance with the

5   Corporate Integrity Agreement. Ms. Panara stated that, though she was told she could not flatly

6   claim that OxyContin was better or safer than other opioids, "she was trained to talk about

7   product in ways that implied that it was safer." She might tout OxyContin's twelve-hour

8   formulation to a prescriber. "You could say that with a shorter-acting medication that wears off

9   after six hours, there was a greater chance the patient was going to jump their dosing schedule

10  and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told

11  that doctors are smart people, they're not stupid, they'll understand, they can read between the

12  lines."[148]

### 8.     Project Turbocharge

14        284.    The Corporate Integrity Agreement expired in January 2013. With this restriction

15  lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase

16  OxyContin sales.

17        285.    On May 14, 2013, McKinsey entered into a "Statement of Services to the Master

18  Consulting Agreement" (the "2013 Agreement") with Purdue to "conduct a rapid assessment of

19  the underlying drivers of current OxyContin performance, identify key opportunities to increase

20  near-term OxyContin revenue and develop plans to capture priority opportunities." ████████

21  ████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████[149]

23        286.    The 2013 Agreement stated, "We have a long history of partnership with Purdue,

24  and we would make best efforts to leverage our understanding of your business – both in terms of

25  content and culture." It was signed by then-principal Arnab Ghatak, who would "lead the team

26

---

27  [147] David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9, 2018, *available at*: https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c

28  [148] *Id.*
[149] PPLPC030000770531

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1    with senior leadership from Rob Rosiello and Martin Elling." Elling was a leader of McKinsey's

2    PMP group.[150]

3         287.    McKinsey was tasked with "Identifying Granular Growth Opportunities for

4    OxyContin," conducting an "assessment of the underlying drivers of current OxyContin

5    performance," identifying "key opportunities to drive near-term OxyContin performance," and

6    developing "plans to capture priority opportunities."[151]

7         288.    For purposes of the project, McKinsey would need "[f]ull access to work done to

8    date and key data."[152] And, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[153]

10        289.    Staff told the Sacklers that McKinsey would study how to get doctors to prescribe

11   more OxyContin,[154] how to use incentive compensation to push reps to generate more

12   prescriptions, how to use "patient pushback" to get doctors to prescribe more opioids, and how to

13   keep patients on opioids longer.[155]

14        290.    The 2013 Agreement would lead to Project Turbocharge, McKinsey's successful

15   bid to transform Purdue's sales and marketing efforts for OxyContin now that Purdue was no

16   longer bound by the Corporate Integrity Agreement.

17        291.    In the summer of 2013, McKinsey made multiple recommendations to Purdue's

18   board to increase OxyContin revenue, and urged the Sackler family to "make a clear go-no-go

19   decision to 'Turbocharge the Sales Engine.'"

20        292.    Purdue, like McKinsey, recognized that the initiative was no small thing. An

21   internal Purdue email states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[156]

23        293.    The Sacklers were impressed. On August 15, 2013, Richard Sackler emailed

24   Mortimer D.A. Sackler, "[T]he discoveries of McKinsey are astonishing."

25   _____

26   [150] Id.
     [151] PPLPC030000770531 / MCK-MAAG-0024283
27   [152] Id.
     [153] PPLPC012000431809
28   [154] PPLPC012000431262
     [155] Id.; PPLPC012000431266
     [156] PPLPC012000437344

294.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler family—not the Purdue board of directors—to pitch Project Turbocharge. Dr. Arnab Ghatak, one of the McKinsey partners leading the Purdue account, recounted the meeting to fellow McKinsey partner Martin Elling in an email exchange: "[T]he room was filled only with family, including the elder statesman Dr. Raymond [Sackler] . . . . We went through exhibit by exhibit for about 2 hrs . . . . They were extremely supportive of the findings and our recommendations . . . and wanted to strongly endorse getting going on our recommendations."[157]

295.    Elling, a co-leader of the Purdue account, remarked in the same email correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the Sacklers "gave a ringing endorsement of 'moving forward fast.'"[158]

296.    As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper connotations of the name, and re-christened the initiative the decidedly more anodyne "E2E: Evolve to Excellence."[159]

297.    Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales Meeting.

298.    CEO John Stewart also told sales staff that board member Paolo Costa was a "champion for our moving forward with a comprehensive 'turbocharge' process," referring to McKinsey's plan.

299.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Russell Gasdia during Purdue's implementation of McKinsey's recommendations.

---

[157] MCK-MDL2996-0403095

[158] *Id.*

[159] Regarding the name change, CEO John Stewart wrote to McKinsey partners Rob Rosiello and Arnab Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for our moving forward with a comprehensive 'turbocharge' process – *though we do need to find a better and more permanently appropriate name.*" PPLPC012000436626 (emphasis added).

300.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

301.    At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

302.    Evolve to Excellence called for a *doubling* of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's ongoing influence on Purdue's operations after the 2007 guilty plea is stark:



303.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project Turbocharge was implemented, total quarterly sales and marketing spending at Purdue exceeded $45 million, an increase of *800%*.

304.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in

1    order to increase profits, Purdue must again increase the number of sales visits to "high-value"

2    prescribers, i.e., those that prescribe the most OxyContin.[160]

3        305.   Purdue and McKinsey worked together to implement "Turbocharging the Sales

4    Engine." ███████████████████████████████████████████████████████████████████

5    ███████████████████████████████████████████████████████████████████████████████

6    ██████████████████████████████████████████████████████████████████████[161]

7        306.   McKinsey and Purdue also worked together on an "implementation plan" for E2E,

8    with McKinsey taking on the role of "executive oversight" of projects including the creation of

9    target lists, internal dashboards to track progress, and changes to Purdue's incentive

10   compensation plan consistent with E2E.[162]

11                    **a.      Targeting High Subscribers**

12       307.   Project Turbocharge called for revising the existing process for targeting high-

13   prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to

14   considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is

15   significant opportunity to slow the decline of OxyContin by calling on more high-value

16   physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to

17   $250 million."

18

19

20   [160] In fact, recent deposition testimony suggests McKinsey may have been responsible for the fact that Timney was
     given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony

21   (emphasis added):
             Q: Are you familiar with McKinsey & Company?

22           A: I decline to answer on the ground that I may not be compelled to be a witness against
             myself in any proceeding.

23           Q: Did individuals at McKinsey *assist you in getting hired as the CEO* of Purdue?
             A: I decline to answer on the ground that I may not be compelled to be a witness against

24           myself in any proceeding.
     In fact, McKinsey appears to have played a substantial role in the succession of several Purdue CEO's.

25   Martin Elling, in his 2018 annual self-assessment, provided the following example of "how I deliver
     impact:" "Actively managing CEO/CXO transitions: … from Michael Friedman to John Stewart (2007) to

26   Mark Timney (2014) to Craig Landau (2017) at Purdue." MCK-MDL2996-0357931. "I drove our
     introduction of Purdue in 2004 and then, with Rob Rosiello, built it into a substantial and sustaining client…

27   We have served across four CEOs and are now helping the new leadership team adapt to a world of
     headwinds for their core product OxyContin," he added. MCK-MDL2996-0357931.

28   [161] PPLPC021000615265
     [162] MCK-MDL2996-0180338, at 0180340

308.     The core objective of McKinsey's initiative was to ensure that Purdue was "making calls on the highest potential customers with the right frequency to maximize prescribing potential."

309.     McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half. McKinsey advised that Purdue would see a greater return on its sales investment by focusing on these targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. McKinsey's plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, without addressing whether the expanded sales would be for an illicit market.

310.     McKinsey found that Purdue did not "focus on the highest potential docs," measured both by the number of prescriptions and reimbursement considerations.[163] One McKinsey analyst urged McKinsey to recommend Purdue target "[l]iterally, at least all" prescribers in the top 20% of prescribers, "minus another few percent who are no sees[.]"[164] McKinsey team lead Arnab Ghatak replied that "they probably have 20% no see[], but i'd also assume there are not many high writers that are no see."[165] ("No see" prescribers are prescribers who do not accept visits from pharmaceutical sales representatives. Thus, McKinsey recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were willing to entertain sales visits from sales representatives.)

311.     "To put this in perspective," McKinsey stated,

> the average prescriber in decile 5-10 [the top half of prescribers by volume] writes 25 times as many OxyContin scripts as a prescriber in decile 0-4. In Q1 2013 the majority (52%) of OxyContin primary calls were made to decile 0-4 prescribers. Including the secondary calls, 57% of the primary detail equivalents (PDEs) were made to decile 0-4 prescribers. Best practice in the industry is over 80% of effort on higher value prescribers."

---

[163] MCK-MDL2996-0364024
[164] MCK-MDL2996-0364267
[165] *Id.*

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1    McKinsey concluded: "Given that there are 14,000 uncalled physicians in deciles 5-10, there is

2    significant opportunity to shift calls to higher potential prescribers."[166]

3        312.    McKinsey pointed to a "true physician example" in Wareham, Massachusetts, who

4    wrote 167 more OxyContin prescriptions after Purdue sales reps visited him.[167]



*Graphic from McKinsey presentation recommending targeting high prescribers*

15        313.    To slow or reverse the decline in OxyContin sales, McKinsey recommended a shift

16    to "value deciles," which purported to weigh prescribers according to factors including overall

17    opioid prescriptions, including the number of branded versus generic prescriptions; prescriber

18    rules in place limiting sales calls; managed care access; and the number of the prescribers new to

19    brand prescriptions, including new opioid patients and switches from other opioid products.[168]

20    The cumulative effect of the value rankings was to shift detailer emphasis onto the highest-

21    volume prescribers. Further, McKinsey's analysis found that the highest-volume prescribers were

22    themselves most influenced by detail visits.

23        314.    Purdue moved quickly to do as McKinsey advised. All sales representatives

24    received a memo on December 23, 2013, identifying how to select "SuperCore" prescribers, or

25    the top ten targets,[169] in their territory according to the E2E high prescribing principles and

---

27   [166] MCK-MDL2996-0187168 / PPLP004409892
   [167] PPLPC012000437356
28   [168] PPLPC022000646874
   [169] MCK-MDL2996-0316833

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1    required that each SuperCore prescriber be visited at least twice a month.[170] ████████

2    ███████████████████████████████████████████████████████████████████████████

3    ███████████████████████████████████████████████████████████████████████████

4    ██████████ [171] As part of these changes, McKinsey's plan involved *more* minimum sales calls

5    overall.[172]

6         315.   ███████████████████████████████████████████████████████████████

7    ███████████████████████████████████████████████████████████████████████████

8    ████████████ who later plead guilty to criminal charges related to an opioid drug ring. The

9    prescriber also surrendered his license to practice after an Ohio Medical Board investigation

10   revealed that he prescribed excessive and dangerous combinations of opioids and muscle relaxers

11   and that he prescribed opioids to a patients who complained of headaches and others who showed

12   signs of addiction.[173] The same prescriber received at least sixty visits from Purdue from mid-

13   2013 through 2016.[174]

14        316.   ███████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████████████

16   ████████████████████████████████████ The doctor, who worked at a family practice, was

17   charged with involuntary manslaughter, Medicaid fraud, drug trafficking, grand theft, and other

18   offenses.

19        317.   ███████████████████████████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████████████████

21   ██████████ [175] In 2018, the Drug Enforcement Administration issued an Order to Show Cause and

22   Immediate Suspension Order to Dr. Khan-Jaffrey over concerns that her DEA registration

23   "constituted an imminent danger to the public health and safety," finding she prescribed opioids

24   without a legitimate medical purpose and disregarded urine screens indicating abuse and

25   _____

[170] PURCHI-000005915
[171] PPLPC022000686986
[172] MCK-MDL2996-0187168
[173] https://www.cnhinews.com/article_91ffac58-1b32-11e8-b264-6b34793bf5c3.html
[174] Public information about visits at which a payment was made is available for this time period through "Open Payments."
[175] PPLPC014000257127

1  diversion.[176] Dr. Khan-Jaffrey's DEA registration was fully revoked on July 28, 2020.[177] Dr.

2  Louis Spagnoletti, of Marlton, New Jersey, ████████████████████████████████

3  ███████████[178] lost his state license to prescribe controlled substances in 2018.[179]

4  Similarly, Dr. Vivienne Matalon, a Decile 10 prescriber from Cherry Hill, New Jersey, ████

5  ██████████████████████████[180] went on to lose her license in 2018 as well, for

6  allegedly receiving kickbacks to prescribe the fentanyl drug Subsys to three patients, including

7  one that died.[181]

8       318.    Another prescriber, Dr. Damon Cary of Wilmington, Delaware, ████████████

9  ████████████████████████████████████████,[182] received an

10 emergency suspension order in 2019 after prescribing controlled substances, including opioids, to

11 undercover officers without performing any medical examinations.[183] Dr. Eva Dickinsson, of

12 Harrington, Delaware, ███████████████████████████████████████████████

13 ████████████[184] was arrested on marijuana charges in 2016 and had her license suspended in

14 2017 for sharing drugs, including opioids, with her patients.[185]

15      319.    Dr. Michael Cozzi of Fort Wayne, Indiana, ████████████████████

16 ███████████████████████████████, had his medical license

17 suspended in 2016, where he had prescribed more controlled substances than any other Indiana

18 prescriber, with over two million doses of oxycodone, seeing ninety to 100 patients a day.[186] Dr.

19 Jamie Gurrero, ████████████████████████████████████████████

20 ████████████████████████[187] was sentenced to 100 months in prison in

21

[176] https://www.federalregister.gov/documents/2020/07/29/2020-16387/kaniz-f-khan-jaffery-md-decision-and-order
[177] Id.
[178] PPLPC014000257127
[179] https://patch.com/new-jersey/moorestown/state-suspends-doctor-accused-illegally-prescribing-opioids
[180] PPLPC014000257127
[181] https://nj.gov/oag/newsreleases18/pr20180504d.html
[182] PPLPC014000257130
[183] https://www.delawareonline.com/story/news/health/2019/08/05/doctor-prescribed-opioids-undercover-cops-failed-follow-protocol/1920386001/
[184] PPLPC014000257130
[185] https://www.delawareonline.com/story/news/health/2017/01/19/doctors-license-suspended-delaware-maryland/96779080/
[186] https://www.wane.com/news/fort-wayne-pain-doctors-medical-license-suspended/ (He later died in a tractor accident, https://www.journalgazette.net/news/local/police-fire/20180816/tractor-accident-kills-pain-doctor)
[187] PPLPC014000257130

1    2016 after pleading guilty to unlawful distribution or dispensing of controlled substances, health

2    care fraud, conspiracy, and money laundering.[188]

3    320.    ███████████████████████████████████████████

4    ████████████████████████    Misrepresentations to these prescribers were especially

5    insidious because they were aimed at general practitioners who lack the time and expertise to

6    closely manage higher-risk patients on opioids.

7    321.    McKinsey also urged, consistent with continually refining its granular approach,

8    that sales representatives devote two-thirds of their time to selling OxyContin and one-third of

9    their time selling Butrans, another Purdue opioid product. Previously, the split had been fifty-

10   fifty.

11                   **b.    Circumventing Safeguards Against Abuse and Diversion**

12   322.    Project Turbocharge also involved a granular analysis of Purdue's individual sales

13   channels. In its August 8, 2013 report to the Purdue board, McKinsey also attributed the decline

14   in OxyContin sales to safeguards to limit suspicious opioid sales. McKinsey informed Purdue that

15   "[t]he retail channel, both pharmacies and distributors, is under intense scrutiny and direct risk."

16   "There are reports of wholesalers stopping shipments entirely to an increasing number of

17   pharmacies," "[m]any wholesalers are also imposing hard quantity limits on orders based on prior

18   purchase levels," and "[p]harmacy chains are implementing guidelines for which patients can fill

19   opioid prescriptions[.]"[189]

20   323.    For instance, McKinsey recommended that Purdue circumvent pharmacies entirely

21   with a mail order program because enforcement by federal regulators was decreasing OxyContin

22   dispensing through Walgreens. McKinsey informed the Sacklers that "[d]eep examination of

23   Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by

24   18%." Further, "the Walgreens data also shows significant impact on higher OxyContin

25   dosages."[190]

26

27   [188] https://www.justice.gov/usao-wdky/pr/kentuckiana-anesthesiologist-sentenced-100-months-unlawful-distribution-controlled

28   [189] MCK-MAAG-0024297
     [190] Id.

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

324.    In order to counter these perceived problems, McKinsey suggested that Purdue's owners lobby Walgreens specifically to increase sales and circumvent the safeguarding sales limits. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers. Finally, McKinsey suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations to encourage the use of Purdue's opioids despite Walgreens actions.

325.    McKinsey's initiative also included ways to circumvent these safeguards. McKinsey recommended that the sales force distribute vouchers and "starter kits" for patients who faced co-pays for OxyContin prescriptions.[191] In particular, McKinsey recommended dispensing vouchers to outlets of a specific large national pharmacy chain where prescriptions and OxyContin inventories were down.[192] This chain, as part of its own settlement with the Drug Enforcement Administration, had removed pharmacist bonuses for dispensing opioids.[193]

### c.    Incentivizing Opioid Sales

326.    McKinsey's "turbocharging" plan also had other elements. ██████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████ ████████████████████████████████████████
██████████████████████████████████[195]

### 9.    McKinsey's Efforts Triple OxyContin Sales

327.    In 2013, despite significant headwinds, with marketing activities turbocharged, OxyContin sales peaked. The restrictions on Purdue's sales and marketing methods contained in the Corporate Integrity Agreement should have resulted in fewer overall OxyContin sales; the guilty plea identified a specific segment of existing OxyContin sales that were illegitimate and should thus cease. All else being equal, OxyContin sales should have decreased to account for the

---

[191] MCK-MDL2996-0290827.
[192] MCK-MDL2996-0041646.
[193] MCK-MDL2996-0104431; MCK-MDL2996-0041646.
[194] PPLPC012000437346.
[195] *Id.*

1    successful elimination of improper sales. In fact, OxyContin sales did decrease in the immediate

2    aftermath of the 2007 guilty plea.

3          328.   And within five years, however, OxyContin sales would triple. McKinsey is

4    responsible for the strategy that accomplished this. It presented specific plans to Purdue, which

5    Purdue adopted and spent hundreds of millions of dollars implementing. The result: a final spasm

6    of OxyContin sales before the inevitable decline of the drug.[196]

7          329.   The Purdue McKinsey collaboration was a spectacular success. Between the 2008

8    and 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million

9    distributed in 2010 alone.

10         330.   These distributions would not have been possible without the McKinsey's work

11   dramatically increasing OxyContin sales.

12         331.   The Sacklers were aware of the value McKinsey provided: on December 2, 2013,

13   CEO John Stewart informed Kathe Sackler and Vice President of Sales and Marketing Russell

14   Gasdia Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these

15   results were already being realized *before* the strategy was fully deployed as the theme of the

16   2014 National Sales Meeting. Stewart elaborated to Sackler that "trends are more positive than

17   was the case a few months back, and when the E2E Project (the changes arising out of the

18   McKinsey analysis) is fully implemented there will certainly be additional increases."[197]

19         332.   Later that month, ███████████████████████████████████████

20   ████████████████████████████████████[198]

21         333.   McKinsey's contributions to Purdue's growth after 2007 are remarkable.

22   OxyContin sales should have naturally declined; the Department of Justice identified OxyContin

23   sales that were illegitimate because of Purdue's conduct, and the Inspector General of the

24   Department of Health and Human Services entered into a Corporate Integrity Agreement whereby

25   Purdue was monitored to assure that those sales did not continue.

26

27   [196] On February 10, 2018, Purdue announced that it is no longer marketing opioids, and disbanded its OxyContin
     sales force.

28   [197] PPLPC012000454422
     [198] PPLPC012000457292

334.   In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[199]

335.   The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a *tripling* of revenue from OxyContin sales.[200]

336.   Under McKinsey's guidance, OxyContin sales would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[201] That OxyContin sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already peaked* three years earlier, in 2010.[202] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

337.   Project Turbocharge was a continuing success. ███████████████████████ ███████████████████████████████████[203] and Chief Financial Officer Edward Mahoney reported to the Purdue board that the effort "has resulted in significant improvement." ███████████████████████████████████████████████████████████████ ████████████████[204]

338.   McKinsey was paid handsomely: it received more than ████████ for its work for Purdue from 2008 to 2013 alone.[205] In pursuit of these profits, McKinsey continued to help Purdue grow opioid sales even after Purdue reached a 2015 Assurance of Discontinuance with New York arising out of an investigation concerning its Abuse and Diversion Detection program and media coverage highlighted its lack of attention to diversion control. McKinsey's own work elsewhere identified "reducing prescribing" as among the efforts to combat the opioid epidemic

[199] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times, September 9, 2018, *available at*: https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
[200] *Id.*
[201] Phil McCausland and Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC News, February 10, 2018, *available at:* https://www.nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726
[202] Gery P. Guy Jr, *at al.*, *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, Centers for Disease Control and Prevention, July 7, 29017, *available at:* https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4.htm
[203] PPLPC037000159028
[204] PPLPC014000263961
[205] PPLPC029000547371

2331633.1

and also showed that opioid prescribers were frequently writing prescription for patients with known risks of abuse. Still, McKinsey continued to work to help opioid manufacturers increase opioid sales, including through Purdue's deceptive marketing campaign.

339. By 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than sixty milligrams per day.

340. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

**E.     McKinsey's Opioid-Related Work with Other Clients.**

341. Part of the unique value McKinsey provides is its deep knowledge of its clients' competitors, often because it counts those same competitors as its clients. McKinsey generally does not disclose to its clients its work for their competitors.

342. The opioid industry was no different. Indeed, McKinsey specifically worked to

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

**1.     Endo**

343. While McKinsey was working for Purdue, McKinsey was also working for Endo Pharmaceuticals. Arnab Ghatak was a principal McKinsey partner on both accounts at the same time.[207] There was additional overlap between the McKinsey teams staffed to Purdue and Endo, including McKinsey partners Nicholas Mills and Laura Moran. After all, these particular consultants had granular expertise in the specific subject-matter relevant to these opioid

---

[206] MCK-MDL2996-0041741.

[207] Ghatak's familiarity with both Endo and Purdue is perhaps one reason why, on April 3, 2014, Ghatak was placed in charge of analyzing a proposed *partnership* between Purdue and Endo to sell opioids. Lauran Moran described the "partnership workstream" that McKinsey was then performing for Purdue to identify ways for Purdue to obtain near-term growth. She stated that Purdue and McKinsey "agreed the partnerships workstream should include the top 3 potential partners (Valeant, Endo and Pfizer for now). And for each what assets each partner would bring and what growth (most importantly) would the deal bring. Arnie [Ghatak] and Phil to work out Endo and Valeant, John G and Raul to do Pfizer tomo." MCK-MDL2996-0421790.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

manufacturers. That subject-matter expertise is a compelling reason why McKinsey is hired in the first place. McKinsey advised both Endo and Purdue how to maximize the sales or their branded opioid products—Belbuca (Buprenorphine), Butrans (Buprenorphine), Opana (Oxymorphone), and OxyContin (Oxycodone) —all at once.

### a.      New Blues

344.    Like Purdue, Endo was historically a pharmaceutical manufacturer focused on the pain market. Like Purdue, Endo relied on opioid sales for a significant portion of its business. As a matter of fact, Endo's history with opioids predates the Sacklers' ownership of Purdue. In 1950, Endo's predecessor, Intravenous Products of America, Inc., launched Percodan, an Oxycodone/Aspirin tablet. In 1971, Endo, then owned by E.I. du Pont de Nemours and Company ("DuPont"), launched Percocet, another oxycodone-based tablet.[208]

345.    In 1997, Endo separated from DuPont to become a standalone private company retaining Percodan and Percocet.[209] In 2000, as the result of an acquisition, the company became public.[210]

346.    In 2006, Endo launched its own branded oxymorphone products, Opana and Opana ER.[211] With the legacy assets of Percodan and Percocet, Endo's business had always been focused on opioid sales. Oxymorphone is not a new opioid, and Opana was not Endo's first oxymorphone product. It was first synthesized more than a century ago in Germany. Endo began selling it in the United States in 1959 under the name Numorphan.

347.    Numorphan was referred to as "blues," after the color of the 10mg pills. It delivered a more euphoric high than heroin, according to some. In 1974, the National Institute on Drug Abuse noted in its "Drugs and Addict Lifestyle" report that Numorphan was popular as an abused drug for its quick and sustained effect.[212] By 1979, Endo withdrew Numorphan from the

---

[208] https://www.endo.com/about-us/history#fragment-25
[209] https://www.endo.com/about-us/history#fragment-24
[210] https://www.endo.com/about-us/history#fragment-21
[211] https://www.endo.com/about-us/history#fragment-15
[212] John Fauber & Kristina Fiore, *Abandoned Painkiller Makes a Comeback*, MedPage Today (May 10, 2015), *available at:* https://www.medpagetoday.com/psychiatry/addictions/51448

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1  market. Upon information and belief, ████████████████████████████████

2  ██████████████████████[213]

3      348.    The memory of the 1970s Numorphan addiction crises did not fade quickly. In

4  1989, the film *Drugstore Cowboy* featured Matt Dillon as an addict in the 1970s who robs drug

5  stores to obtain drugs to sell in order to finance his opioid dependency.[214] In one scene, an addict

6  asks Dillon's character if he has any "blues." Dillon's character explains that "blues" are

7  increasingly hard to find, and offers to sell morphine sulfate to an addict instead. The addict

8  explained that he much preferred the Numorphan, but settled for the morphine.[215]

9      349.    With the launch of Opana, Endo decided it was time for history to repeat itself.

10  After Opana's approval in 2006, Endo solidified its position as a pain specialist among

11  manufacturers. By 2012, opioid sales accounted for approximately $403 million of Endo's $3

12  billion in revenue, more than 10%. From 2010 to 2013, total Opana ER revenue alone exceeded

13  $1.1 billion.

14      350.    Opana and Numorphan were both oxymorphone. The brand name was the only

15  thing that changed. What Endo removed from the market in 1979 due to abuse concerns, it re-

16  introduced 27 years later. After 2006, Opana was on occasion referred to as "blue heaven," or,

17  more to the point, "new blues."[216]

18      351.    In 2017, Endo would once again remove its branded oxymorphone product from

19  the market, and for the same reason. Endo's abuse-deterrent formulation of Opana was removed

20  at the request of the FDA due to acute concerns about its abuse potential.

21      352.    In addition to its branded products, Endo, through subsidiaries Qualitest

22  Pharmaceuticals, Inc. and, after its acquisition in 2015, Par Pharmaceuticals, also manufactured

23  generic versions of oxycodone, oxymorphone, hydromorphone, and hydrocodone. Over the

25  _____

26  [213] EPI000443330 ████████████████████"); ENDO-OPIOID-MDL-06246554 (

27  ██████████████████████████████████████████).

[214] *See* https://www.imdb.com/title/tt0097240/; https://www.bionity.com/en/encyclopedia/Oxymorphone.html

28  [215] Scene from Drugstore Cowboy, *available at*: https://www.youtube.com/watch?v=TksvZdrx9_A

[216] https://www.deadiversion.usdoj.gov/drug_chem_info/oxymorphone.pdf

course of McKinsey's relationship with Endo, McKinsey would repeatedly advise Endo how to maximize its generics business in addition to sales of Endo's branded opioids.

### b.    Old Friends

353.    McKinsey's relationship with Endo began as early as in 2006, the same year as the Opana launch.

354.    McKinsey's earliest known work with Endo concerned the launch of Opana in Europe, but its relationship with Endo would expand to encompass all aspects of Endo's business, including corporate organization and resource allocation, the launch of a new branded Buprenorphine product, and sales force optimization efforts for Endo's branded and generic opioid products.

355.    In 2007, McKinsey was shaping overall corporate strategy at Endo. In a presentation to Endo's board of directors in May of that year ██████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████ ██████ ."[217]

356.    McKinsey's partnership with Endo would last more than a decade, and, like its relationship with Purdue, is an exemplary example of the transformational relationship in action.

357.    In some ways, the McKinsey's relationship with Endo was even more tightknit and companionable than with Purdue. For instance, no one at Purdue previously worked for McKinsey. In early 2013, Rajiv de Silva, previously a leader of McKinsey's PMP group, was appointed CEO of Endo. At Endo, McKinsey was now advising an old friend, one of its previous senior partners.[218]

358.    As de Silva himself explained, "██████████████████████████ ███████████████████████████████████████████████████████

_____

[217] ENDO-OPIOID_MDL-02899510.
[218] *See* "Rajiv De Silva Named President and CEO of Endo Health Solutions," Press Release dated February 25, 2013, *available at*: https://investor.endo.com/news-releases/news-release-details/rajiv-de-silva-named-president-and-ceo-endo-health-solutions ("Earlier in his career, he was a Principal at McKinsey & Company, where he served as a member of the partnership group that led the global Pharmaceuticals and Medical Products practice.")

1    ████████████████████████████████████████████████████████████

2    ██████████"[219]

3         359.    Under de Silva, Endo relied more heavily on McKinsey than ever before.

4    McKinsey consultants interacted directly and often *exclusively* with de Silva. McKinsey was so

5    close to the Endo CEO that it could intervene in direct reporting from one of de Silva's

6    deputies.[220] It is as if McKinsey had insinuated itself as a shadow layer of bureaucracy within

7    Endo.

8         360.    McKinsey maintained weekly performance review meetings with de Silva and

9    senior Endo management. In these meetings, granular weekly sales data was reviewed for each of

10   Endo's branded products, including Opana.[221]

11        361.    McKinsey advised both Purdue and Endo contemporaneously for more than a

12   decade. With each client, the goal was the same: to maximize opioid sales. The work McKinsey

13   performed for each client was so similar that there was routinely confusion internally about

14   whether a specific project or task to perform was for Endo or Purdue.[222]

15        362.    Despite McKinsey's emphasis on confidentiality, the fact that McKinsey repeats

16   its work from one client to the next is well-known to the client. Indeed, it is part of the

17   justification in hiring McKinsey in the first place. McKinsey can tell you what everyone else is

18   doing. ████████████████████████████████████████████

19   ████████████████████████████████████████████

20   ████████████████████████████████████████████████

21   ████████████████████████████████████████████████

22   ██████████████████████████████"[223]

23   _____

24   [219] ENDO-OPIOID-DEPMAT-000047877 at pg. 320:22 – 321:3.
     [220] *See* MCK-MDL2996-0405502 (Email from Ghatak to de Silva, stating that it "would be great for you to push
     Blaine and Bob [both Endo employees] on why there are no slides showing the metrics on field call attainment . . .

25   there was an explicit agreement to track them. Setting the expectation that you want them included would really
     help").

26   [221] MCK-MDL2996-0062712.
     [222] In response to an internal email from Craig MacKenzie to other McKinsey consultants seeking "expert input on
     labels for abuse deterrent formulations" in conjunction with McKinsey's work on the Belbuca launch (discussed

27   *infra.*), McKinsey consultant Jeff Smith replied, "Craig – is this for Purdue or Endo? If for Endo, I am conflicted."
     MCK-MDL2996-0383805.

28   [223] ENDO-OPIOID-MDL-07619243.



c.      **Opana**

363.   McKinsey's earliest known work with Endo ███████████████

███████. In a November 22, 2006 presentation[224] entitled "██████████████

███████████████████████," McKinsey advised █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████"[225]

364.   McKinsey noted, █████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███.[226]

365.   McKinsey also ██████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████"[227]

366.   McKinsey advised ████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████[228]

---

[224] The McKinsey presentation was ███████████████████████████████

███████████████████████████████" ENDO-OPIOID_MDL-02936031. By 2007,

McKinsey had ████████████████████████" ENDO-OPIOPID_MDL-06078889. Endo acquired Penwest in 2010. "Endo

Pharmaceuticals Agrees to Acquire Penwest Pharmaceuticals," Fierce Biotech, August 10, 2010, *available at*:

https://www.fiercebiotech.com/biotech/endo-pharmaceuticals-agrees-to-acquire-penwest-pharmaceuticals

[225] ENDO-OPIOID_MDL-02936031.

[226] *Id.*

[227] *Id.*

[228] *Id.*

367.    McKinsey ███████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████████████████"[229]

368.    Within a few years of its introduction in the United States, abuse of the drug became widespread. Endo then sought to introduce a reformulated version of Opana that it could market as abuse-deterrent by introducing a tamper-resistant coating to the pill.

369.    In December 2011, Endo obtained FDA approval for a new formulation of Opana ER with the coating that Endo claimed was crush-resistant. The following month, however, the FDA told Endo that it could not market Opana ER, even after the reformulation, as abuse-deterrent.

370.    Endo "did not submit any new clinical safety or efficacy data" as part of its application, but rather relied entirely on the "bioequivalence" of the new and old formulations of Opana. Obtaining approval of reformulated Opana ER on this basis allowed Endo to rely on the safety and efficacy of the original version of the drug as the basis for approval of the reformulated version.[230] The FDA found that such promotional claims "may provide a false sense of security since the product may be chewed and ground for subsequent abuse." In other words, Opana ER was still crushable. In December 2011, Endo admitted that "[i]t has not been established that this new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or addiction."[231]

---

[229] *Id.*

[230] Intervenor Impax Laboratories, Inc.'s (1) Cross-Motion to Dismiss; or, in the Alternative, (2) Opposition to Plaintiff's Motion for a Preliminary Injunction, *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.* ("Impax Br."), No. 1:12-cv-01936 Doc. 18 at 7 (D.D.C. Dec.9, 2012); *see also* FDA Summary Review for Regulatory Action, NDA 201655 (Dec. 9, 2011) (stating that "[n]o new safety data were included in this submission" and "[n]o efficacy studies were submitted in this application.").

[231] Endo Dec. 12, 2011 News Release; Ex. A to Rurka Decl., *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936 Doc. 18-2 (D.D.C. Dec. 9, 2012).

371.    In 2013, an Endo training module directed key opinion leaders to instruct prescribers that OPANA ER with INTAC is the only oxymorphone designed to be "crush-resistant," and advised the key opinion leaders to state during their speeches that "[t]he only way for your patients to receive oxymorphone ER in a formulation designed to be crush-resistant is to prescribe OPANA ER with INTAC."[232] The speakers were advised to stress that generic versions of Oxymorphone "are not designed to be crush-resistant."

372.    These abuse-deterrent attributes of the reformulation—the very characteristics McKinsey and Endo touted as a reason to prescribe Opana—were a sham. The reformulation was designed to prevent the pill from being crushed and snorted through the nose. It did not prevent intravenous use, however. The result was that many users already dependent of Opana began using needles to inject the drug for the first time. As an internal Endo email put it, ████████ ████████████████████████████████████████████"[233]

373.    Jeff, a veteran of the war in Iraq, explained the process. Jeff first became dependent on Percocet and Opana after returning from Iraq, where his back was injured when his Humvee rolled over in 2008. After being prescribed opioids for his back pain, Jeff became dependent, and began using Opana by snorting it. Endo then introduced the reformulated abuse-deterrent version of Opana in 2012. "[A]nd then they reformulated them," he said, referring to the Opana pills. "And the only way you could really do them is inject them because if you actually swallow them, it – you – they really don't do nothing."[234]

374.    Jeff and his companion Joy showed the journalist how the drug was used. "You want to see how to cook it?" Jeff asked. He and Joy then proceeded to place a portion of an Opana pill on piece of aluminum and heat it with a lighter. "Right away, I can start to see this hard, white coating just kind of floating off the piece of the pill. It looks like plastic," described the journalist witnessing the process.[235]

---

[232] EPI000421543.
[233] END00010732.
[234] Kelly McEvers, "Opioid Epidemic Sparks HIV Outbreak in Tiny Indiana Town," NPR, March 31, 2016, *available at*: https://www.npr.org/2016/03/31/472577254/opioid-epidemic-sparks-hiv-outbreak-in-tiny-indiana-town
[235] *Id.*

375.     Joy explained how the abuse-deterrent coating, once melted, was discarded by using the filter of a cigarette: "Now you see the coating of – all that mess laying there still? . . . That's what the filter's for."[236] The journalist described what then took place:

> And Joy puts that cigarette filter into the liquid, and they Joy, Jeff and another guy each take turns with their needles, sticking it into the filter and pulling the liquid through. Joy and Jeff turn their back to me while they inject. And then it just gets really, really quiet.

376.     Joy couldn't conceive of the position she was in. A nurse, she hurt her back at work and began taking prescription pain medication. She began taking the pills by mouth, and later began to snort them. Dependency began. But she told herself, "I'd never ever would use a needle, never. I'm never going to do that."[237]

377.     After Opana's reformulation, Joy began using it intravenously. "I started using the needle about – it was around the 6th of February," she said. "I'm so ashamed . . . . I pack so much shame, and I'm going to cry . . . . I pack so much shame from it. I do."[238]

378.     Endo's 2012 reformulation of Opana caused outbreaks of HIV in populations of intravenous Opana users. In Austin, Indiana, where Jeff and Joy resided, Opana was linked to an outbreak of at least 200 HIV cases in a town with a population of 4,500.[239]

379.     Intravenous use of reformulated Opana has also been associated with outbreaks of Hepatitis C and Thrombotic Thrombocytopenic Purpura ("TTP").[240] The concerns even reached Wall Street, where an analyst asked Endo about a TPP outbreak in Tennessee associated with Opana ER. Endo assured the analyst that the outbreak was, like the outbreak in Indiana, in "a very, very distinct area of the country."

380.     Endo was well aware of these problems. ████████████████
████████████████████████████████████████████
████████████████████████████████████████████

---

[236] *Id.*
[237] *Id.*
[238] *Id.*
[239] *Id.*
[240] "Thrombotic Thrombocytopenic Purpura (TTP)–Like Illness Associated with Intravenous Opana ER Abuse — Tennessee, 2012," *Morbidity and Mortality Weekly Report* (Jan. 11, 2013).

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████"241

3    381.    In June of 2013, McKinsey ████████████████████████

4 ████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ██████████████████████████████████████████████

7 ███████████████████████████████████████████

8 ████████████████████████████████████████████

9 ███████████████████████████████████████████████

10 ██████████████████████████████████████████████

11 ███████████.242

12    382.    McKinsey indicated ████████████████████████████

13 ████████████████████████████████████████████

14 ███████████████████████████████████████████████

15 ████████████████████████████████ ████████████████

16 ████████████████████████████████████████████████

17 █████████████████████████████████████"244

18    383.    In addition to being neither feasible nor safe/ethical, the study was beside the

19 point. An insufflation study is meant to determine the abuse characteristics of a drug when used

20 nasally—i.e., by snorting the drug.245 The relevant concern for Opana's reformulated version was

21 *injection*, not insufflation.

22    384.    But the insufflation study worked for Purdue. Going forward, McKinsey suggested

23 ████████████████████████████████████.246

_____

241 ENDO00260151.
242 EPI002107711.
243 *Id.*
244 *Id.* (emphasis added).
245 *See* General Principles for Evaluating the Abuse Deterrence of Generic Solid Oral Opioid Drug Products, FDA
Center for Drug Evaluation and Research, November 2017, *available at*:
https://www.fda.gov/files/drugs/published/General-Principles-for-Evaluating-the-Abuse-Deterrence-of-Generic-
Solid-Oral-Opioid-Drug-Products-Guidance-for-Industry.pdf
246 EPI002107711.

385.    As the preceding paragraphs make clear, Endo and McKinsey were laser-focused on maximizing overall sales of Endo products, and decidedly *not* on concerns over their actual abuse potential or the appropriate *size* of the market for these products, given evident, longstanding, and ever-present concerns about their abuse. To the point, McKinsey regarded concerns about opioid abuse only as a means by which its clients could introduce *differentiated* products (i.e., those with purported abuse-deterrent or tamper-resistant features) to continually perpetuate overall opioids sales for their clients. In all instances, the parties desired for the size of that overall opioids market to grow in line with the introduction of "differentiated" products like a reformulated Opana.

386.    Endo's purported concern about deterring abuse of its drugs was laid bare as farce by a particularly striking decision: to continue to sell the old formulation of Opana despite touting the notion that the old formulation was purportedly dangerous in ways that the new formulation was not. Endo ███████████████████████████████████████████████████████
█████████████████████████████████.[247]

387.    Endo not only continued to distribute original Opana for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers.[248] In fact, Endo also claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[249]

388.    In June 2013, an Endo employee informed the McKinsey consultants of a █████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████████████████[250]

[247] ENDO-OPIOID-MDL-02324795.
[248] Impax Br. at 1.
[249] *Id.*; Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl) *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936 (Doc. 18-4) (D.D.C. Dec. 9, 2012).
[250] ENDO-OR-CID-00400235 (emphasis added).

1

#### d.    Belbuca: Endo's Answer to Butrans

2       389.    Buprenorphine is another differentiated product. Opioid manufacturers began to

3   introduce Buprenorphine products to the market after the introduction of OxyContin, Opana, and

4   other branded opioids long-known to have abuse and dependency problems. Buprenorphine

5   products were marketed as purportedly less dangerous than products such as OxyContin or

6   Opana.

7       390.    Of course, Endo and Purdue continued to assiduously market and sell OxyContin

8   and Opana alongside their Buprenorphine products, and McKinsey worked with each at every

9   step of the way, despite the implicit contradiction in marketing two products at the same time

10  whose point of differentiation is one being *less addictive and dangerous* than the other.

11      391.    For example, on August 13, 2015, McKinsey's Craig MacKenzie circulated a

12  discussion document to Endo and McKinsey staff entitled "Belbuca value proposition," which

13  laid out McKinsey's thoughts on how to differentiate Endo's buprenorphine product from other

14  opioids in the marketplace.[251] One point of differentiation McKinsey noted was that OxyContin

15  was commonly abused, while Endo's Belbuca hopefully would not be:[252]

16

17



18

19

20

21

22

23      392.    The cognitive dissonance was palpable. At the same time that MacKenzie sent his

24  email differentiating Belbuca, and as described *supra*, McKinsey was *also* maximizing

25  OxyContin sales for Purdue—the opioid it was describing to Endo as commonly abused.

26

27

28  [251] MCK-MDL2996-0410742.
    [252] MCK-MDL2996-0006669, at 0006675.

393. ███████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████ Butrans was Purdue's buprenorphine product.

394.    Once Butrans was launched at Purdue, McKinsey worked with Endo to create another branded Buprenorphine product to compete with Butrans. These product planning and launch processes are long-term affairs. McKinsey worked with Endo on this project for *four years* before Endo's Belbuca obtained FDA approval.

395.    McKinsey remained in place at Endo to implement the launch of Endo's Buprenorphine product. The strategic goal of Belbuca—the key to its commercial success—was to convert short acting opioid ("SAO") users to Belbuca. As McKinsey explained to CEO Rajiv de Silva, "The fundamental question is whether Belbuca will take share from the short-acting opioids."[253]

396.    Ultimately, Belbuca was not a large commercial success for Endo because it failed to transition a sufficient number of short acting opioid users to the long-acting Belbuca. As the drug underperformed, Endo felt ever more pressure to stimulate sales. John Harlow described one meeting with de Silva on April 8, 2016: "We just got out of the review with Rajiv and clearly our TRx trends are not good and are behind other recently launched pain products . . . the request from Rajiv was to do anything possible that could be implemented ASAP to stimulate RXs."[254]

397.    By July 6, 2016, McKinsey and Endo were increasingly focused on converting short-acting opioid users. ███████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████."[255] Notably, the goal was to increase *overall* buprenorphine prescriptions, not only those of Belbuca. The discussion document identified an objective to create "a new treatment paradigm for [Buprenorphine] and Belbuca at the transition between

---

[253] MCK-MDL2996-0210158.
[254] MCK-MDL2996-0358973, at 0358975.
[255] ENDO-OPIOID_MDL-07264539

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

SAO and LAO."[256] In order to do so, the discussion group needed to determine "what medical support we need to position Buprenorphine as the best transition from SAO to LAO."[257]

398.    McKinsey provided a slide to Endo describing the way that narrative would first be *created* and then exploited for market positioning:[258]



399.    McKinsey and Endo referred to this effort to revive Belbuca sales by promoting buprenorphine as a bridge to long-acting opioid use as a "moonshot."[259] One aspect of this "moonshot" would be that Belbuca (and Buprenorphine, generally) would convert short-acting

---

[256] *Id.*
[257] *Id.*
[258] MCK-MDL2996-0382731.
[259] MCK-MDL2996-0382412.

opioid users to long-acting opioids users of products *other than Buprenorphine*. McKinsey and Endo instead conceived of Belbuca as an "*Initial* ATC Opioid Therapy." It was to be positioned as "the *first* LAO for poorly controlled or dissatisfied chronic pain patients transitioning from short-acting to long-acting opioids." Patients could eventually transition from Belbuca to other long-acting opioids, like Opana:[260]



Endo Pain Franchise: Market positioning supportive for both BELBUCA™ and OPANA® ER – Future State

| SAO for Chronic Pain | Initial ATC Opioid Therapy | LAO for Chronic Pain | Poorly Controlled on Initial LAO Therapy |

BELBUCA
(buprenorphine) Buccal Film
75 • 150 • 300 • 450 • 600 • 750 • 900 mcg

**For LAO-naïve:** Be the first LAO for poorly controlled or dissatisfied chronic pain* patients transitioning from short-acting to long-acting opioids

opana ER
(oxymorphone HCl)®
EXTENDED-RELEASE TABLETS
5mg • 7.5mg • 10mg • 15mg • 20mg • 30mg • 40mg

**For LAO-experienced:** For poorly-controlled chronic pain* patients transitioning from their initial LAO therapy

*Pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.

endo                    Draft version

400.    Thus, the overall marketing strategy McKinsey assisted Endo in designing and deploying for Belbuca was designed to transition ever more patients to long-acting opioids. Belbuca could find its market niche as a stepping stone as individuals proceed through the patient funnel from short acting opioid users to longer-term long-acting opioid users. The farther an individual proceeds through this funnel, the more the individual is worth.

---

[260] MCK-MDL2996-0404374, at 0404375.

401.    McKinsey also knew that this same pathway that begins with opioid therapy after a serious injury also leads to opioid dependency and addiction. In 2011, McKinsey was working on "Project X." which was the project to develop a buprenorphine product to compete with Butrans. (Belbuca, in other words, was the result of Project X.) McKinsey described the "opioid dependence treatment pathway" as follows:[261]



402.    In the same presentation, McKinsey identified the key to a successful launch of a branded Buprenorphine product: "The challenge faced by Endo will not be to gain formulary approval, it will be to gain tier 2 status and *minimize restrictions on prescribing*."[262]

---

[261] MCK-MDL2996-0131500, at 0131512.
[262] MCK-MDL2996-0131500, 0131525 (emphasis added).

1

### e.     Turbocharging the Sales Force with a Blitz

2      403.     In 2015, a McKinsey team led by Arnab Ghatak proposed to Endo a sales

3   transformation to invigorate Endo's product sales, including its opioids. At the suggestion of

4   Ghatak, McKinsey used the Purdue Pharma Project Turbocharge model from the previous year as

5   a template for the Endo proposal.[263] Even the PowerPoint presentations used to create the

6   proposal to Endo were drafted off the Project Turbocharge slides. On June 28, 2015, Sherin Ijaz

7   of McKinsey emailed Ghatak, Nicholas Mills, and Laura Moran to circulate a draft proposal for

8   an "Endo sales force transformation" PowerPoint presentation. Ijaz explained, "Laura, I heavily

9   leveraged what you send (sic) from Purdue as it was all applicable."[264] All three of the recipients

10   of Ijaz's email regarding the Endo proposal had been working on the Purdue account for years.

11      404.     Endo ████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████

14                                                                                   "[265]

15      405.     Endo's Vice President & General Manager of its Pain Business Unit, John Harlow,

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████[266]███████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████[267]

21      406.     The Endo and Purdue proposals were essentially identical sales transformations.

22   The goals were the same: to maximize sales of opioids. Merely the names were changed. While

23   McKinsey offered to "turbocharge" Purdue's sales force, McKinsey proposed a "sales force blitz"

24   for Endo.[268]

25

[263] MCK-MDL2996-0075895.
[264] MCK-MDL2996-0070237.
[265] ENDO_AAC_00363406.
[266] *Id.*
[267] *Id.*
[268] *E.g.*, MCK-MDL2996-0130803; MCK-MDL2996-0132851.

407.   In fact, the names weren't *entirely* changed. 

[269]

408.

.

409.

---

[269] MCK-MDL2996-0069747, at 0069749.

1 ████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████ .

3       410.    Upon McKinsey's suggestion, Endo began reallocating sales force resources to

4 Opana from other Endo products such as Sumavel, a migraine medication, and Voltaren, an anti-

5 inflammatory.[270] Writing to the McKinsey team, Endo's Alicia Logan stated the joint mission, "I

6 agree that our main goal is to maximize the increased promotional efforts for [Opana ER] without

7 disrupting/sacrificing [Sumavel] or [Voltaren] TRx volume and it appears that we [can]

8 accomplish this with your recommendation of addition another 500 targets."[271]

9       411.    With the Sales Force Blitz underway, Endo received good news in New York.

10 Years prior, Endo had initiated patent litigation against generic manufacturers of Opana ER,

11 arguing that the generic versions of the drug infringed on Endo's patents. In part because of the

12 perceived impending loss of exclusivity, Endo had in recent years allocated its sales force

13 capacity away from Opana and to other Endo products.

14       412.    On August 14, 2015, Endo received a favorable initial ruling declaring that the

15 generic versions of Opana violated Endo's patents, and enjoined their further sale. The ruling

16 provided additional patent exclusivity for Opana, and Endo was keen to exploit its advantage.

17       413.    That afternoon, ████████████████████████████████

18 ████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████

21 ████[272]

22       414.    The following week, Harlow wrote to the McKinsey team working for Endo to

23 focus their attention on Opana ER. "Now with our litigation victory from last week, plus our

24 UHC opportunity, there is an increased need to increase FF support to drive Sep-Dec

25 business. . . . With this win, I am now willing to go broader with OER targeting."[273]

26

27 [270] MCK-MDL2996-0409466.
   [271] MCK-MDL2996-0409436, at 0409437 (sic).
28 [272] ENDO-OPIOID_MDL-02279530.
   [273] MCK-MDL2996-0358871, at 0358872; ENDO-OPIOID_MDL-02201117 .

415.    McKinsey and Endo proceeded to design and implement retargeting strategies to boost Opana sales in late 2015.

### 2.    Johnson & Johnson

416.    McKinsey also working with Johnson & Johnson, whose role overseeing and contributing to the opioid crisis has been exhaustively detailed in other complaints. *See, e.g.*, *City and County of San Francisco v. Purdue Pharma L.P.*, N.D. Cal. No. 18-2591, Doc. 128 (Mar. 13, 2020). Johnson & Johnson occupied multiple roles within the opioids industry. Through its subsidiary, Janssen Pharmaceuticals ("Janssen"), it marketed and sold branded opioid products, including Duragesic (a transdermal fentanyl patch) and Nucynta (tramadol tablets and oral solution). Through its Noramco and Tasmanian Alkaloids subsidiaries, Johnson & Johnson farmed the poppy plant in New Zealand and created the precursor chemical and raw materials necessary to manufacture *all* opioids. Noramco and Tasmanian Alkaloids sold these raw materials to the other opioid manufacturers: Purdue, Endo, Mallinckrodt, and others. Johnson & Johnson was the origin point in the entire opioids supply chain.

417.    Just like McKinsey's relationships with Purdue, Endo, and the others, McKinsey's opioid-related work for Johnson & Johnson spanned decades.

418.    Just as Endo was led by former partner McKinsey partner Rajiv de Silva, Johnson & Johnson similarly relied on McKinsey as a pipeline for its own management timber. As described above, McKinsey alumni tend to move on to positions with McKinsey clients. Janssen's current Director of Customer Marketing & Value Based Care was hired from McKinsey's PMP group. The relationship flows both ways: Janssen's former Vice President of Sales and Marketing for Janssen Pharmaceuticals is currently a McKinsey partner. Moreover, Ian Davis has been an independent director since 2010 and currently sits on the Audit and Regulatory Compliance committees of Johnson & Johnson's board. Previously, he was a Senior Partner at McKinsey, "having served as Chairman and Worldwide Managing Director from 2003 until 2009."[274]

---

[274] https://www.jnj.com/leadership/ian-e-l-davis

1       419.    Kevin Sneader, until recently McKinsey's global managing partner, and one of

2   Davis' successors, described Davis as a "mentor" who was the managing partner of McKinsey's

3   London office when Sneader was working there and "worked on one of his teams."[275] Given

4   Frazier's presence on the board, Johnson & Johnson was obviously an important account for

5   McKinsey. At present, it is not known which McKinsey partner(s) was the Director(s) of Client

6   Services for the Johnson & Johnson account.

7       420.    What is known, however, is that McKinsey ████████████████████████

8   ███████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████████████████████████████

10  ██████████████████████████████████████████████"[276] On July 6,

11  2011, Ghatak attended an internal McKinsey call with the consultants working on the Johnson &

12  Johnson account to discuss the "J&J Nucynta sales force disruption."[277] The same day, Laura

13  Moran, who like Ghatak worked both the Purdue and Endo accounts, also provided internal

14  advice regarding Nucynta to her McKinsey partner Gerti Pellumbi, who was leading Nucynta

15  sales efforts for the Johnson & Johnson account, and engagement manager Bryan Reinholt, who

16  was with Pellumbi on the Johnson & Johnson account. [278] Martin Elling, one of the lead

17  McKinsey partners on the Purdue account alongside Ghatak, attended internal McKinsey calls on

18  March 25, 2010,[279] and again on May 27, 2011 to discuss McKinsey's work for Johnson &

19  Johnson's Nucynta.[280] Then, on December 13, 2011, Elling attended a meeting with Johnson &

20  Johnson personnel regarding "acceleration opportunities."[281] Aamir Malik attended the meeting

21  with Elling, and, naturally, also worked on the Endo account.[282] Malik and Ghatak had an internal

22

23

24  ───────────────
[275] *See* Interview with Kevin Sneader, Harvard Project for Asian & International Relations, January 31, 2021,
25  *available at* https://www.youtube.com/watch?v=qed53EGG8kU
    [276] JAN-NH-00167575.
26  [277] MCK-MDL2996-0222833.
    [278] MCK-MDL2996-0419348.
27  [279] MCK-MDL-2996-0256186.
    [280] MCK-MDL-2996-0255907.
28  [281] MCK-MDL-2996-0255926.
    [282] *Id.*; *see also* MCK-MDL-2996-0348536 (Example of Malik's work on Endo account).

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

McKinsey meeting amongst themselves regarding the "Nucynta Kickoff" at Johnson & Johnson six months prior, on June 3, 2011.[283]

### a.    Noramco

421.    Janssen was not the only Johnson & Johnson unit ███████████████████ ██████████, and Janssen was not Johnson & Johnson's only division involved in the narcotics trade.

422.    Opioids—all of them—are derivatives of opium, which is derived from the poppy plant. In order to sell opioids, someone needs to farm the opium poppy and process the harvest into the raw materials necessary for opioid manufacturers—all of them—to make their products.

423.    Johnson & Johnson was that farmer. It owned Noramco and Tasmanian Alkaloids, which grew poppies in New Zealand and sold the raw ingredients for opioids to practically all manufacturers.

424.    On August 19, 2009, McKinsey's ████████████████████████ ███████████████████████████████████████████████████ ███████.[284]

425.    ████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ██████.[285]

426.    Seven years later, in 2016, Johnson & Johnson exited the business by selling Noramco and Tasmanian Alkaloids to SK Capital, a private equity firm focused on the pharmaceuticals business, for approximately $800 million.[286] ████████████████ ████████████████████████████████████████████████████

---

[283] MCK-MDL-2996-0261694.
[284] NORAMCO_TX_01136410.
[285] NORAMCO_TX_01136411, slide 4.
[286] Gareth Macdonald, "US Investor buys J&J's opiate API business and announces restructuring," *Outsourcing Pharma*, July 20, 2016, *available at*: https://www.outsourcing-pharma.com/Article/2016/07/21/US-investor-buys-J-J-s-opiate-API-business-and-announces-restructuring

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1    ████████████████████████████████████████ Not only was McKinsey's advice

2    invaluable to Johnson & Johnson, the perspective McKinsey gained of the overall opioid market

3    from advising the principal upstream supplier to the entire industry would be invaluable in to its

4    own work with its other opioid manufacturer clients.

5                              **b.    Duragesic**

6        427.    Fentanyl was first synthesized by Paul Janssen and his pharmaceutical company

7    Janssen Pharmaceuticals in 1959. In the 1990s, the company (by then owned by Johnson &

8    Johnson) developed Duragesic, which is a transdermal patch that administers fentanyl to the

9    patient wearing it.

10        428.    "Duragesic proved to be one of the most successful analgesic pharmaceutical

11    products ever developed, with sales in 2004 (its last year of patent life) exceeding $2.4 billion.

12    The success of the fentanyl patch caused many generic companies to produce equivalents once it

13    went off patent."[287]

14        429.    McKinsey was an integral part of fentanyl's success. As early as 2002, McKinsey

15    was advising Johnson & Johnson regarding methods to boost sales of its opioids. For example, on

16    March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson's subsidiary

17    Janssen regarding how to market their opioid Duragesic. Incredibly, one of the recommendations

18    McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing

19    efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[288]

20        430.    In other words, as early as 2002, McKinsey had such intricate knowledge of the

21    sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with

22    OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its

23    own opioid sales by *following in the footsteps of Purdue.*

24

25

26

---

[287] Theodore Stanley, "The Fentanyl Story," The Journal of Pain, Vol. 15, No. 12 (December), 2014, pg. 1220, *available at*: https://www.jpain.org/article/S1526-5900(14)00905-5/pdf

[288] Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, The Guardian, June 23, 2019, *available at:* https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-lawsuit-latest-trial

431.   McKinsey also advised Johnson & Johnson to target Duragesic on "high abuse-risk patients (e.g., males under 40)." This targeting would take advantage of the marketing claim that Duragesic "was harder to abuse than other opioids on the market."[289]

432.   McKinsey helped Janssen target its opioid marketing by identifying "priority growth opportunities" and growth strategies for Duragesic.[290] In 2002, McKinsey considered "[w]hat are settings of care for opioid high-prescribers and treaters of back pain," listing the "elderly" as an example;[291] ███████████████████████████████████ ███████████████████[292]

### c.   Turbocharging Nucynta

433.   McKinsey's infamous Project Turbocharge to boost OxyContin sales at Purdue in 2013 and 2014—the same project detailed in Purdue's 2020 guilty plea with the Department of Justice—was not McKinsey's first experience turbocharging opioid sales. Before OxyContin, there was Nucynta:[293]



[289] Julia Lurie, *"Inside Johnson and Johnson's Quiet Domination of the Opioid Market,"* June 11, 2019, Mother Jones, *available at* https://www.motherjones.com/politics/2019/06/johnson-and-johnson-opioid-poppies-tasmania-oklahoma-lawsuit/
[290] *Oklahoma v. Johnson & Johnson*, Oklahoma Proposed Findings & Conclusions, citing 5/30/19pm Tr. & S-1253; *see also* JAN-MS-00481545 (Deem-Eshleman Ex 73).
[291] *Oklahoma v. Johnson & Johnson*, 5/30/19 Tr. At 46:1-15.
[292] JAN-MS-00481547 (Deem-Eshleman Ex 74) .
[293] MCK-MDL-2996-0135636.

434.    Nucynta was Janssen's branded tapentadol product. Tapentadol is generally regarded as a moderately strong opioid. Nucynta was first approved as a Schedule II controlled opioid agonist tablet and oral solution in 2008, and indicated for "relief of moderate to severe acute pain in patients 18 years of age or older." In 2011, Janssen obtained approval for a long-acting version Nucynta ER, which was indicated for "management of moderate to sever chronic pain in adults and neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."

435.    McKinsey is a repeat opioid sales turbocharger. McKinsey's efforts to turbocharge Nucynta sales resembled those it later deployed in more robust form at Purdue a few years later. For example, "physician prescribing habits," and "switching behavior," were external factors McKinsey identified as key issues "impacting future Nucynta growth." Understanding these issues at a granular level would be crucial, including "What is physician/market awareness of Nucynta ER? By physician segment?"[294] These same factors drove McKinsey's later work turbocharging OxyContin.

436.    Along the way, McKinsey ██████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ██████████[295]

437.    Despite this ambivalence about tamper-resistance, in a status update on June 23, 2011, McKinsey informed Janssen that its "initial physician interview findings" indicate Nucynta ER has "lower addictive/abuse potential and side-effect profile as key differentiators vs. Oxycontin ER."[296]

438.    As part of the turbocharge process, ████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████

_____

[294] MCK-MDL-2996-0135636.
[295] JAN-MS-00322271.
[296] MCK-MDL-2996-0009526, at 0009529.

2331633.1

1   ███████████████████████████████████████████████████████████

2   ████████████████████████████████"[297]

3       439.    By 2014, Janssen was began exploring the sale of Nucynta, and McKinsey was

4   involved in the process. Incredibly, ████████████████████████████████████████

5   ████[298] Purdue ultimately did not purchase Nucynta. Instead, in 2015, Johnson & Johnson's

6   Janssen unit sold its Nucynta rights to another manufacturer, Depomed Inc., for just over one

7   billion dollars.[299]

8       440.    The year prior, Nucynta accounted for $172 million in annual sales for Janssen.

9   Janssen described the Nucynta sale to Depomed as "a strategic decision designed to focus efforts

10  on growth efforts."[300] Depomed, for its part, saw the Nucynta acquisition as a transformational

11  opportunity to position itself as "a pain and neurology-focused specialty pharmaceutical

12  company."[301]

13      441.    When Depomed bought Nucynta, ███████████████████████████████

14  ████████████████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████████

19  █████████████████████████████████████████████

20

21

22  _____

[297] JAN-MS-02272779.
[298] PPLPC023000661013 ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
██████████████████████).
[299] See https://www.prnewswire.com/news-releases/depomed-announces-closing-of-acquisition-of-us-rights-to-nucynta-tapentadol-nucynta-er-tapentadol-extended-release-tablets-and-nucynta-tapentadol-oral-solution-from-janssen-pharmaceuticals-inc-for-105-billion-300060453.html
[300] Josh Beckerman, "DepoMed to Buy U.S. Rights to Nucynta From J&J Unit," *Wall Street Journal*, January 16, 2015, *available at*: https://www.wsj.com/articles/depomed-to-buy-u-s-rights-to-nucynta-from-j-j-unit-1421357503
[301] *Id.*
[302] DEPO-CDI-00071072 (emphasis added).

1

### 3.   **Other Manufacturers**

2       442.    McKinsey worked with numerous other manufacturers to promote the sale of

3   opioids. To date, Plaintiffs have identified as McKinsey clients ███████[303] and ████

4   ███████████.[304]

5       443.    Coordination among these industry participants was a natural outgrowth of the fact

6   that McKinsey had existing client relationships with each participant. For instance, on May 7,

7   2009, Richard Sackler's personal counselor, McKinsey partner Maria Gordian, ████████

8   ███████████████████████████████████████

9   ███████████████████████████████[305]

10      444.    ████████████████████████████

11  ███████████████████████████████████

12  █████████.[306]

13      445.    ████████████████████████████████

14  ████████████.[307]

15  ████████████████████

16

17

18

19

20

21

22

23

24

25

---

26  [303] MNK-MDL_001756041; MNK-T1_0000968026; MN-T1_0004715842; MNK-T1_0005985720.

27  [304] TEVA_CHI_00187019.

    [305] TEVA_CHI_00187019.

28  [306] TEVA_CHI_00187023.

    [307] *See* ALLERGAN_MDL_00637407.

2331633.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 4.      **McKinsey's Work with Opioid Distributors**

446.    McKinsey worked with opioid distributor AmerisourceBergen █████████████. [308]

447.    McKinsey worked with opioid distributor McKesson on the company's ██████ ████████████████████████████. [309]

### 5.      **McKinsey's Work with the FDA**

448.    As described above, McKinsey assisted Purdue and others to confront FDA regulations that posed threats to their clients' ability to maximize revenues from their opioid products. McKinsey's role in shepherding its clients through regulatory interactions takes on a different hew when considered in light of one of McKinsey's other clients: the Food and Drug Administration itself.

449.    Indeed, the FDA has proved a massive client for McKinsey, who since 2000 has endeavored to expand its public sector practice under the direction and leadership of Nancy Killefer, a now-retired senior partner and director of the firm. [310] Since 2008, the FDA has paid McKinsey more than $140 million. [311] A significant portion of that work for the FDA related to the FDA's Center for Drug Evaluation and Research ("CDER"). The CDER is the principal division tasked with approving, among other classes of drugs, opioids. Since 2008, McKinsey has been awarded at least 17 contracts worth at least $48 million for CDER work. [312]

450.    The REMS protocols, discussed above, that McKinsey assisted Purdue and others in surmounting beginning in 2008 and culminating in 2012, were overseen by CDER. [313]

451.    Meanwhile, in 2010, McKinsey advised the FDA on building a monitoring system called "track and trace" to assist in the identification of potentially improper distribution of harmful prescription drugs, such as opioids. "The 'track and trace' system deeply impacted

---

[308] ABDCMDL12135609, slide 5.

[309] MCKSTCT00753097; MCKSTCT00753098.

[310] Duff McDonald, *The Firm*. Killefer is also a director of Cardinal Health, one of the distributor defendants in the ongoing nationwide opioid litigation, and a company subject to FDA regulations.

[311] Letter to Dr. Janet Woodcock from Senator Margaret Hassan et al, August 23, 2021, *available at*: https://www.hassan.senate.gov/imo/media/doc/fda-mckinsey_letter-final-210823.pdf ("Hassan Letter")

[312] *Id.*

[313] *Id.*

1  McKinsey clients, including the nation's three largest drug distributors—McKesson,

2  AmerisourceBergen, and Cardinal Health [where Killefer has been a director since 2015]."[314]

3  452.  Under one contract, McKinsey developed a roadmap and implemented plans to

4  modernize CDER's new drug regulatory program. Under another, McKinsey developed a

5  framework to increase information technology project delivery across CDER.[315]

6  453.  In 2007, Congress passed the Food and Drug Administration Amendments Act

7  ("FDAAA"), which placed new restrictions on the use of certain high risk prescription drugs,

8  including opioids. The new law mandated that FDA require manufacturers of certain drugs to

9  create REMS.

10  454.  The FDAAA also required the Secretary of Health and Human Services "to

11  develop standards and identify and validate effective technologies for the purpose of securing the

12  drug supply chain against counterfeit, diverted, subpotent, substandard, adulterated, misbranded,

13  or expired drugs." 21 U.S.C. § 355e(a).

14  455.  In 2010 and 2011, under the FDAAA, the FDA awarded McKinsey contracts to

15  design a "track and trace" system to monitor prescription drugs, including opioids, throughout the

16  supply chain and to streamline the drug approval process. The track and trace system had the

17  greatest effect on drug distributors, including McKinsey clients McKesson, AmerisourceBergen,

18  and Cardinal Health.[316]

19  456.  Under these contracts, McKinsey was required to consult with "supply chain

20  stakeholders," which likely included these three McKinsey clients as well as pharmaceutical

21  manufacturers.[317]

22  457.  In 2011, McKinsey also won a $1.8 million contract with CDER's Office of

23  Surveillance and Epidemiology ("OSE"), which monitors and evaluates the safety profiles of

24  drugs available to American consumers.[318] OSE "evaluates more than 2 million adverse event

25

26  [314] *See* http://cg.cardinalhealth.com/board-of-directors/default.aspx; Hassan Letter.

27  [315] Letter to Senator Chuck Grassley from Andrew Tantillo, Oct. 22, 2021, *available at*:
https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf
[316] Hassan Letter.

28  [317] *Id.*
[318] https://www.documentcloud.org/documents/21071060-mckinsey-ose-contract

2331633.1

reports submitted every year to FDA's MedWatch program" and provides "risk management expertise on development and implementation of programs and initiatives to support [CDER's] policies related to [REMS] authorities.[319]

458.    The OSE contract tasked McKinsey with a widespread mission of understanding how OSE functions within the context of a broader system of drug safety in CDER and ultimately developing and implementing a new operating model. In other words, McKinsey helped to restructure a key body that has oversight over the opioid supply chain.

459.    The 2012 Food and Drug Administration Safety and Innovation Act required the FDA to modernize Sentinel, a system meant to monitor the safety of drugs once they are on the market.[320] According to the FDA, "Sentinel generates *real-world evidence* to support regulatory actions aimed at protecting the public's health," which in turn "inform[s] healthcare provider decision-making for patients."[321]

460.    A 2014 contract with the FDA charged McKinsey with assessing the "strengths, limitations and appropriate use" of Sentinel. Like the track and trace contract, the Sentinel project required McKinsey to interview "external stakeholders," including "industry organizations" and "drug and device industry leaders."[322] McKinsey also evaluated how the FDA employees used Sentinel to inform regulatory decision making.[323]

---

[319] https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-office-surveillance-and-epidemiology
[320] https://www.documentcloud.org/documents/21071047-r_sentinel_assessment_award_contract_sow-redacted-pr
[321] https://www.fda.gov/files/about%20fda/published/Sentinel-System-Overview—-Presentation.pdf; https://www.healthaffairs.org/do/10.1377/hpb20150604.936915/full/
[322] Ian MacDougall, "McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency," *ProPublica* (Oct. 4, 2021), *available at* https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency
[323] Letter to Bob Sternfels from Representative Carolyn B. Maloney, Nov. 5, 2021, *available at*: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-11-05.CBM%20to%20Sternfels-McKinsey%20re%20Document%20and%20Information%20Request%20%28001%29.pdf

461.    McKinsey performed similar work for the FDA as recently as 2019,[324] when it signed a contract extension with the agency for work relating to the FDA's efforts to modernize the process by which it regulates new drugs.[325]

462.    The FDA's drug tracking programs have been panned as failures.[326]

463.    A theme was emerging: as new legislation and regulatory systems were enacted that could have hampered the opioid supply chain, McKinsey stepped in as a key consultant for the FDA. Each time, the new system failed to reign in the out-of-control opioid market. While the FDA was not solely responsible for regulating the opioid industry and McKinsey was not wholly responsible for the FDA's inaction, tools like Sentinel and track and trace could have been implemented in a way to provide new information to combat the country's growing opioid crisis.

464.    At the same time it was consulting for the FDA, McKinsey was working with its opioid industry clients on how skirt the FDA's regulatory systems.

465.    For example, McKinsey advised Purdue on how to soften the FDA's proposed REMS and on coordinating with other opioid manufacturers to advocate against strict oversight.[327] The finalized REMS for opioid products was largely devoid of the restrictions that FDA had initially proposed.[328]

466.    McKinsey's work with the FDA was a key factor in why pharmaceutical industry clients tapped McKinsey for FDA-related work. For example, in endorsing McKinsey's proposed strategy of banding together with other opioid manufacturers, Purdue CEO John Stewart suggested that the consultant itself facilitate the pharmaceutical group's approach to FDA. He wrote: "Perhaps a consultant such as McKinsey who did similar work in the industry and FDA on

---

[324] Ian MacDougall, "McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency," *ProPublica* (Oct. 4, 2021), *available at* https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency
[325] Letter to Bob Sternfels from Representative Carolyn B. Maloney, Nov. 5, 2021, *available at*: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-11-05.CBM%20to%20Sternfels-McKinsey%20re%20Document%20and%20Information%20Request%20%28001%29.pdf
[326] Sabrina Tavernise, "F.D.A. Faulted for Problems With Drug Tracking" *The New York Times*, Jan. 14, 2016, *available at* https://www.nytimes.com/2016/01/15/health/fda-faulted-for-problems-with-drug-tracking.html; https://www.gao.gov/assets/gao-16-192.pdf
[327] Hassan Letter.
[328] Hassan Letter; Maloney Letter.

2331633.1

some aspects of clinical trials or a healthcare-related group that would be interested in playing an active role in the program's development and delivery would be a good choice."[329]

467.    McKinsey performed work for the FDA without disclosing its potential conflicts of interest to the FDA in violation of the contracts between the company and the agency.

468.    The FDA typically includes conflict of interest clauses in its contracts and relies on contractors to assess and report any conflicts. McKinsey's contracts with the FDA related to CDER processes contained such provisions. One contract required McKinsey to "make an immediate and full disclosure, in writing, . . . of any potential or actual organizational conflict of interest or the existence of any facts that may cause a reasonably prudent person to question the contractor's impartiality because of the appearance or existence of bias."[330]

469.    But McKinsey never disclosed its work on behalf of opioid supply clients to the FDA despite having a hand in developing some of the FDA's most important regulatory processes.[331]

470.    Disclosing its conflicts might have turned off the lucrative tap to not only FDA contracts but also to pharmaceutical industry clients, given the clear value such clients placed on McKinsey's work for the FDA.

471.    McKinsey's manipulation of regulatory requirements—whether to skirt its own contractual requirements or to bend processes that regulate its clients—is nothing new. McKinsey has come under fire from the Office of Inspector General for the General Services Administration for contract procurement violations[332] and from the Justice Department related to violation of Chapter 11 bankruptcy rules.[333] Most recently, six senators have begun to investigate the

---

[329] Purdue Bankruptcy, Doc. 2166-5, at 58-59.

[330] Ian MacDougall, McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency, *ProPublica* (Oct. 4, 2021), available at https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency

[331] *Id.*; Letter to Senator Chuck Grassley from Andrew Tantillo, Oct. 22, 2021, *available at*: https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf

[332] Ian MacDougall, How McKinsey Makes Its Own Rules, *ProPublica* (Dec. 14, 2019), available at https://www.propublica.org/article/how-mckinsey-makes-its-own-rules

[333] Mary Williams Walsh and Emily Flitter, McKinsey Faces Criminal Inquiry Over Bankruptcy Case Conduct, *New York Times*, Nov. 8, 2019, *available at* https://www.nytimes.com/2019/11/08/business/mckinsey-criminal-investigation-bankruptcy.html

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1   relationship between McKinsey and the FDA[334] the House Committee on Oversight and Reform

2   is exploring its abusive conduct in connection with the opioid industry.[335]

3       472.    As one commentator noted, McKinsey's conduct suggests that it "behaves as if it

4   believes the rules should bend to its way of doing things, not the other way around."[336]

5       **F.    McKinsey's Efforts to Increase the Overall Size of the Opioid Market: the
6            Larger the Pie, the Larger the Slice**

7       473.    McKinsey advised multiple opioid manufacturers regarding how to grow opioid

8   sales. In order to benefit all its clients, McKinsey engaged in efforts to grow the entire opioid

9   market, and not only each individual client's share of it. The theory, basically, is that a rising tide

10  lifts all boats.

11      474.    For example, Purdue incentivized its sales staff "to increase not just sales of

12  OxyContin but also generic versions of extended release oxycodone." Typically, one would not

13  wish to encourage the sales of generic competitors that offer a similar product to one's own. If,

14  however, the goal is to position a company so as to look like an attractive acquisition target, the

15  growth of the overall opioid market is just as important as one's own market share: "Whereas

16  pharma salespeople are usually compensated based on their ability to grow sales of a particular

17  medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall

18  market."[337] McKinsey designed that plan.[338]

19

---

20  [334] Hassan Letter.

    [335] Maloney Letter.

21  [336] Ian MacDougall, *How McKinsey Makes Its Own Rules*, *ProPublica* (Dec. 14, 2019), available at
    https://www.propublica.org/article/how-mckinsey-makes-its-own-rules

22  [337] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9,
    2018, *available at*: https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c

23  [338] Worth noting is that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their
    ownership of Rhodes Pharma, a generic opioid manufacturer. Naturally, McKinsey worked with the Sacklers in

24  connection with Rhodes as well, including proposing ideas for synergizing Purdue and Rhodes. *See, e.g.*, MCK-
    MDL2996-0324955; MCK-MDL2996-0285201. Especially worth noting is that this strategy also benefitted

25  McKinsey's other opioid clients as well. As one observer wrote: "They have a huge amount of inside information,
    which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential

26  role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of
    oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, Institutional Investor, July 8, 2019,

27  *available at:* https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-
    Written.

28      For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin
    Growth Opportunities," McKinsey noted that "McKinsey's *knowledge of the ways other pharma companies operate*

475.    This notion that the size of a company's market share is not as important as the size of the *overall* market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth,* McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in . . . the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[339]

476.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[340] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the Department of Health and Human Services.[341]

## G.    McKinsey's Work Kills People.

477.    The deceptive marketing strategies McKinsey developed and helped to implement were successful. Its granular growth tactics, myopically focused on increased revenues for its clients, substantially contributed to an explosion in the use of opioids across the country. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and as of 2016, 20% of office visits for non-cancer pain included the prescription of an opioid.[342]

478.    In 2009, Dr. Van Zee identified the *precise tactics* that McKinsey deployed for all of its opioid clients, including Purdue, as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to curtail the use of the McKinsey's tactics: "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives

---

suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).

[339] *The granularity of growth*, Book Excerpt, McKinsey & Company, March 1, 2008, *available at*: https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth

[340] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times, September 9, 2018, *available at*: https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c

[341] *Id.*

[342] Deborah Dowell, Tamara M. Haegerich, and Roger Choi, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, CDC (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm

1    for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps

2    the most liberal prescribers of opioids and, in some cases, the least discriminate."[343]

3        479.    In time, additional evidence mounted supporting the conclusion that McKinsey's

4    tactics were demonstrably exacerbating the nationwide opioid crisis. One way of demonstrating

5    the link between aggressive sales and marketing of opioids and worsened mortality outcomes

6    arose out of a quirk of Purdue's own marketing tactics.

7        480.    In 1996, when OxyContin was introduced, five states maintained "triplicate"

8    programs that required prescribers of Schedule II controlled substances to fill out prescriptions in

9    triplicate.[344] One of the triplicate copies would then be filed with the state agency in charge of

10   maintaining a prescription database intended to monitor diversion and other potential issues

11   relating to the over-dissemination of Schedule II narcotics. Because Purdue viewed these

12   triplicate requirements as an overly burdensome hindrance on prescribing, the company chose to

13   focus its marketing efforts in other states that did not impose these constraints.

14       481.    This resource-allocation decision by Purdue to focus more marketing efforts in

15   states with fewer regulations regarding the prescribing of controlled substances provided a way to

16   test whether *marketing* of OxyContin, by itself, was a cause of not only increased overdose rates

17   for OxyContin, but of *all* opioid-related overdoses, *including* those involving illicit opioids such

18   as heroin and fentanyl.

19       482.    The results were stark. In 2019, economists from the University of Pennsylvania,

20   Notre Dame, and the RAND Corporation analyzed the disparate outcomes in overall opioid

21   overdose mortality experienced in the triplicate states where Purdue did not primarily focus its

22   marketing efforts and non-triplicate states where Purdue did primarily focus those efforts.[345]

23       483.    The economists found that "OxyContin distribution was about 50% lower in

24   'triplicate states' in the years after the launch. While triplicate states had higher rates of overdose

25

---

26   [343] Art Van Zee, The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy, 99 AM.
     J. PUB. HEALTH 221, 221, 224 (Feb. 2009), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.

27   [344] Patrick Radden Keefe, *Empire of Pain*, Pg. 407.

     [345] Abby E. Alpert, William N. Evans, Ethan M.J. Lieber, and David Powell, *Origins of the Opioid Crisis and its*

28   *Enduring Impacts*, NBER Working Paper No. 26500, November 2019, *available at*: https://www.nber.org/papers/
     w26500

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

deaths prior to 1996, this relationship flipped shortly after the launch [of OxyContin] and triplicate states saw substantially slower growth in overdose deaths, continuing even twenty years after OxyContin's introduction. *Our results show that the introduction and marketing of OxyContin explain a substantial share of overdose deaths over the last two decades.*"[346]

484.    A 2017 *Journal of American Medical Association* study found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers.[347] The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study involved the research of four different practices which included visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on driving drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in doctor prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

485.    A more recent *Journal of American Medical Association* study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[348]

486.    Those dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge, re-christened E2E, was implemented.

---

[346] *Id.* (emphasis added).
[347] Ian Larkin et al., *Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing*, 317 J. Am. Med. Ass'n 1785 (2017).
[348] Scott E. Hadland *et. al.*, *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related* Overdoses, JAMA Network, January 18, 2019, *available at:* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

487.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[349]

488.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[350]

489.    Referring to the sales and marketing tactics McKinsey specialized in implementing, the authors concluded, "amid a worsening opioid crisis, our results suggest that industry marketing to physicians may run counter to current efforts to curb excessive opioid prescribing."[351]

490.    The authors' proposed solution was plain and simple, and echoed Dr. Van Zee's congressional testimony from 2002: "Pharmaceutical companies might also consider, as one manufacturer recently did, *voluntarily ceasing marketing opioid products directly to physicians*."[352]

491.    The dangers of opioids were known to McKinsey at the time it engaged in the misconduct described in this Complaint. The addictive potential of opioids and the need for control and restraint in their use was internally understood, as was the likelihood of large-scale opioid addiction, abuse, overdoses, illness, and early death resulting from sharply increased use.

492.    McKinsey also performed its own research in evaluating the anticipated effects of Project Turbocharge. An April 2014 implementation update observed an increase in sales calls, as well as that "OxyContin [health care providers] with increased calls consistently outperform HCPs with decreasing or no change in call frequency."

493.    The evidence of a direct link between increased opioids marketing and sales and increased opioid abuse was everywhere. A 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[353]

---

[349] *Id.*
[350] *Id.* (emphasis added)
[351] *Id.*
[352] *Id.* (emphasis added).
[353] Theodore J Cicero *et al.*, *Relationship Between Therapeutic Use and Abuse* of *Opioid Analgesics in Rural,*

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1  McKinsey evidently understands this. In a September 2016 online article, McKinsey asserts that

2  "[t]here is no doubt that more consistent use of best practices – across geographic areas,

3  institutions, and clinicians – would provide tremendous help in combating the crisis" and

4  describes certain examples of such practices as "successful in reducing prescribing."[354]

5      494.    There is a "parallel relationship between the availability of prescription opioid

6  analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and

7  associated adverse outcomes."[355] The opioid epidemic is "directly related to the increasingly

8  widespread misuse of powerful opioid pain medications."[356]

9      495.    In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has

10  quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving

11  opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the

12  CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to

13  reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[357]

14      496.    Compounding the harm from deceptive marketing, McKinsey worked with Purdue

15  to continue and grow the opioid sales of prescribers that raised red flags of diversion, despite

16  Purdue's legal obligations to report and halt supply. In doing so, it enabled an oversupply of

17  opioids, which allows non-patients to become exposed to opioids, and facilitates access to opioids

18  for both patients who could no longer access or afford prescription opioids and addicts struggling

19  with relapse.

20      497.    Most of the illicit use originates from prescribed opioids. It has been estimated that

21  60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

22

23

24  _____

25  *Suburban, and Urban Locations in the United States*, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007), available at https://onlinelibrary.wiley.com/doi/10.1002/pds.1452.

26  [354] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic

27  [355] Dart, MD, *et al.*, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, New Engl. J. Med., 372:241-248 (Jan. 15, 2015).

28  [356] Califf, MD, *et al.*, *A Proactive Response to Prescription Opioid Abuse*, New Engl. J. Med. (Apr. 14, 2016).
[357] CDC, January 1, 2016 Morbidity and Mortality Weekly Report; Rudd, Rose A., *et al.* "Increases in drug and opioid overdose deaths – United States, 2000–2014." American Journal of Transplantation 16.4 (2016): 1323-1327.

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

498.    As McKinsey itself has recognized in citing a study reaching this conclusion, roughly 80% of heroin users previously used prescription opioids.[358] As many as one in four patients who receive prescription opioids long-term for chronic pain in primary care settings struggles with addiction. And, the link between prescription narcotic painkiller abuse and subsequent and/or simultaneous heroin abuse continues to grow.

499.    In fact, people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin. The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. A more recent, and even more deadly problem stemming from the prescription opioid epidemic involves fentanyl, a powerful opioid prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Plaintiffs' communities.

500.    Carfentanil, a powerful derivative of fentanyl, has increasingly been found in heroin and fentanyl sold illicitly. Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants, and has been researched as a chemical weapon. A dose the size of a grain of salt can rapidly lead to deadly overdose in humans.

501.    No demographic is untouched by this epidemic. Nationally, one in five deaths among younger adults in 2016 involved opioids, according to one study. And, deaths involving both prescription and illicit opioids have risen sharply, nearly doubling since 2009.

502.    Opioids were involved in 42% of all fatal drug overdoses in 2015, and another 25% involved heroin. According to the CDC, between 1999 and 2015, more than 183,000 people died in the United States from prescription-related overdoses.

503.    Rising opioid use and abuse have negative social and economic consequences far beyond overdoses in other respects as well. According to a recent analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication. The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this

---

[358] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic

2331633.1

1    group from 2014 to 2016, and 25% of the smaller decline in labor force participation among

2    women. Many of those taking painkillers still said they experienced pain daily.

3    **H.    McKinsey Knew that OxyContin Was Highly Abusable, Addictive, and**
     **Dangerous, and that Its Marketing Strategies Increased Those Harms.**

4

5    504.    McKinsey continued working with Purdue long after the severity of the opioid

6    crisis was well known. McKinsey knew that high dose OyxContin prescriptions carried a serious

7    risk of overdose. In 2017, over half of Purdue's opioids prescriptions exceeded the ninety mg

8    morphine equivalence threshold a day—the recommended maximal dose per the 2016 CDC

9    Guideline for Prescribing Opioids for Chronic Pain.

10   505.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By

11   that time, McKinsey had access to public information indicating that OxyContin and other

12   opioids pose significant risk of addiction and misuse.

13   506.    McKinsey was well aware of the risks of OxyContin based on its extensive

14   experience in the pharmaceutical industry, close collaboration with Purdue, and participation in

15   the regulatory submissions for reformulated OxyContin.[359]

16   507.    The first bullet point of Purdue's 2007 "Observations and Activities Requiring an

17   [Abuse, Diversion, and Detection] Report" was "[a]n apparent pattern of an excessive number of

18   patients for the practice type[.]"[360] Thus, McKinsey knew or should have known that there was a

19   higher risk of abuse and diversion among high-volume prescribers.

20   508.    What is more, on September 13, 2013 McKinsey briefed Purdue on the ongoing

21   concerns regarding OxyContin addiction and diversion among prescribers:

22

23

24

25

26

27   [359] McKinsey ███████████████████████████████████████████████████

PPLPC0390000347612 (

28   ████████████████████████ ); McK-MAAG-0118819 (email chain).
     [360] PPLPC010000033944.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1

2

3

4

5

6

7

8

9

10

11

12



13

14      509.    In a PowerPoint slide entitled "Findings on messaging and positioning," part of a

15  presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report:

16  Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most

17  physicians do not feel that [OxyContin] reformulation positively impacts their prescribing

    behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

18      510.    In an August 2017 presentation, McKinsey recognized that the opioid epidemic

19  was "triggered, in large part, by a massive increase in prescribed opioids in the early 2000's."

20      511.    McKinsey's presentations to Purdue included extensive discussion of doctors'

21  concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the

22  dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated

23  doctors' misgivings as obstacles to confront with new messaging.

24      512.    Indeed, one reason that *Purdue* had knowledge that their own products were

25  addictive and dangerous is because McKinsey told them.

26      513.    If McKinsey was not aware of the adverse consequences of OxyContin, the drug it

27  was paid to sell, such ignorance could not survive the granular reality of its relationship with

28

1  Purdue. For example, in June 2009, McKinsey worked to "counter the emotional messages from

2  mothers with teenagers that overdosed on OxyContin."[361]

3      514.   Within a few years of countering these emotional messages, McKinsey even

4  developed a method to identify geographic hot spots of OxyContin abuse and diversion. Once

5  developed, however, McKinsey simply never used it to decrease these harms.

6      515.   Paul Coplan ███████████████████████████████████████

7  ███████████████████████████████████████████████████████████████

8  ███████████████████████████████.[362]

9      516.   In deposition testimony in prior opioid-related litigation, Coplan was asked,

10  "While you were at Purdue, did Purdue make an effort to identify hot spots for opioid abuse and

11  addiction or not?"[363]

12      517.   "███████████████████████████████████████████

13  ███████████████████████████████████████████████████████

14  ███"[364] ████████████████████████████████████

15  ████████.[365]

16      518.   ████████████████████████████████████████

17  ███ ████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ██████████████████████████████████████████

20  ████████"[366]

21      519.   Instead, McKinsey focused on increasing opioid sales for its clients, despite

22  knowing the harmful consequences of doing so. In yet another indication that OxyContin sales

23  should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase

24  product liability insurance to cover its practice of selling OxyContin.

25

26  _____

[361] PDD8901645845.
[362] Paul M. Coplan 1/18/19 Dep. Tr. At 16:18 -17:17.
27  [363] *Id.* at 355:10.
[364] *Id.* at 355:14–356:11.
28  [365] *Id.* at 357:8-16.
[366] *Id.* at 357:22–358:6.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

520.     The basic premise of McKinsey's work put it on notice of the harmful consequences that would ensure. It was tasked with advising a monoline manufacturer of opioids about sales and marketing practices for its addictive products while that manufacturer was bound by a five-year Corporate Integrity Agreement covering the very same opioid sales and marketing practices. In 2012, OxyContin accounted for 94% of Purdue's revenue.[367] As late as 2018, it remained 84% of Purdue's revenue.[368] According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."[369] In 2015 alone, it obtained $3 billion in annual opioid sales—a four-fold increase from its 2006 sales of $800 million.

521.     McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the *overprescribing of opioids* and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement; to devise strategies to sell as many pills as conceivably possible. Under McKinsey's tutelage, Purdue's growth continued its upward trajectory unabated, the Corporate Integrity Agreement notwithstanding.

## I.     McKinsey Portrays Itself as Part of a Solution to a Problem It was Integral in Creating.

522.     McKinsey's work on the other side of the aisle—helping clients address opioid abuse and addiction—further proves that it was well aware of the risks of OxyContin, and thus the risks of pushing OxyContin sales and high dose sales, and targeting the highest-volume prescribers. McKinsey advised Purdue on "Project Tango," a 2014 plan to enter the addiction drug market.[370] McKinsey noted the ███████████████████████████████████████████████████████████████████████████████"[371]

---

[367] Gerald Posner, *Pharma,* pg. 524 (Simon & Schuster 2020).
[368] *Id.*
[369] https://www.justice.gov/opa/press-release/file/1329571/download
[370] *See* David Armstrong, OxyContin Maker Explored Expansion Into "Attractive" Anti-Addiction Market, ProPublica (Jan. 30, 2019), *available at* https://www.propublica.org/article/oxycontin-purdue-pharma-massachusetts-lawsuit-anti-addiction-market.
[371] PPLPC023000714734.

523.     More than assisting specific clients with addressing the crisis itself, McKinsey saw the ongoing opioid crisis as an opportunity to posture itself as contributing more broadly to *society*. McKinsey likes to think of itself as a change agent capable of solving problems that truly matter, and the opioid crisis is one McKinsey realizes matters. Dr. Sarun Charumilind, a McKinsey partner in Philadelphia, "has led the firm's support to clients and *society* to combat the opioid crisis.[372]

524.     In Detroit, partner Razili Lewis also helps "clients and *society* combat the opioids crisis." She does so by providing "insights, expertise, analytics, and technology."[373]

525.     Over in Cleveland, senior partner Tom Latkovic also "helps clients and *society* combat the opioids crisis."[374]

526.     Kana Enomoto, a senior expert in Washington, D.C., is a "national leader in mental health and substance-use policy," who acted as a "content director" on a study to "raise awareness about opioid-use disorders." She also provided strategic guidance to the United States Surgeon General regarding efforts to "combat the opioid epidemic" when she was his Chief of Staff.[375]

527.     McKinsey consistently states that it takes its obligations to society seriously. Indeed, the firm has established a center:[376]

> The Center for Societal Benefit through Healthcare was established to build on the long-standing mission of McKinsey's Public & Social Sector and Healthcare Systems & Services Practices to improve healthcare. The Center's work is funded solely by McKinsey; it is not commissioned by any business, government, or other institution. The Center brings a range of capabilities to bear, including McKinsey's healthcare expertise, advanced analytics, functional knowledge, technology assets, network, and investment capacity.
>
> The Center aspires to collaborate with other organizations to drive positive innovation to improve overall health and well-being and reduce healthcare disparities.

---

[372] *See* https://www.mckinsey.com/our-people/sarun-charumilind
[373] *See* https://www.mckinsey.com/our-people/razili-lewis
[374] *See* https://www.mckinsey.com/our-people/tom-latkovic
[375] *See* https://www.mckinsey.com/our-people/kana-enomoto
[376] *See* https://www.mckinsey.com/industries/healthcare-systems-and-services/how-we-help-clients/center-for-societal-benefit-through-healthcare/overview

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

528.   The Center has focused on addressing the impacts of the opioid crisis on society. One of the metrics that McKinsey uses to track the opioid crisis *as a matter of public health* is the "opioid prescribing rate" per 100 people in every county in the United States.[377]

529.   As McKinsey's data visualization makes clear, there is an association between areas with higher opioid prescribing rates and higher instances of opioid use disorder.

530.   The Center's data visualization is also reminiscent of similar work McKinsey did for Purdue in 2013, although the analysis McKinsey did for Purdue was more granular, analyzing opioid prescribing patterns on the *zip-code* level in all 50 states, as opposed to the county level:[378]



---

[377] *See* https://csbh-dashboard.mckinsey.com/#/data-insights?chart=SC&geo=County&lob=All&metric1=opioid_rxrate&metric2=oud&tab=Map
[378] MCK-MAAG-0024283.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

531.    In other words, the "opioid prescribing rate" was a metric McKinsey worked with its client to boost for years. Now McKinsey measures the extent of the crisis by the same metric:



532.    Meanwhile, McKinsey has partnered with Shatterproof, a national non-profit organization dedicated to reversing the addiction crisis in the United States, to prepare a report on overcoming stigma associated with opioid use disorder.[379] McKinsey touts the Shatterproof partnership on its webpage as an example of "our societal impact."[380]

533.    In August 2017, McKinsey prepared a presentation entitled "Perspectives on Combatting the Opioid Crisis," which referenced its work on combatting opioid addiction for various other entities:

---

[379] *See* https://www.shatterproof.org/sites/default/files/2020-07/A-Movement-to-End-Addiction-Stigma.pdf
[380] *See* https://www.mckinsey.com/us/our-societal-impact

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

**RECENT CLIENT EXPERIENCE**

» Designed and helped launch a health home program to expand resources and accountability for **substance abuse treatment**

» Conducted a **state wide assessment of opioid prescriber performance** in terms of prescribing rate, dosage, and duration

» Defined clinically relevant opioid quality measures for a **portfolio of episodes-of-care**

» Defined clinically relevant opioid quality measures for a **Patient Centered Medical Home and Accountable Care Organizations**

» Used predictive analytics to develop multi-faceted approach to **assess patient risk** for opioid addiction

» Used geo-spatial and social network analytics to **assess intensity of opioid abuse and treatment needs**

» Integrated claims and PDMP data to **generate transparency on provider prescribing practices**

» Developed a **substance abuse episode of care** focused on priority patient journeys

534.    In June 2018, Dr. Charumilind and Mr. Latkovic, along with fellow McKinsey partner Elena Mendez-Escobar, published a public report, "Ten insights on the Opioid crisis from claims data analysis," stating information about the risks of opioids that McKinsey knew while advising Purdue to sell more opioids and higher dose opioids, and target the highest volume prescribers:

a.    "Providers frequently prescribe opioids to patients with known or potential risk factors for abuse[;]"

b.    "Approximately 35% of the patients given opioid prescriptions in our analysis had features that put them at increased risk for opioid abuse[;]"

c.    "Most opioids are prescribed by providers other than the natural 'quarterback' of a patient's underlying complaint or condition. . . . This finding makes clear that high-dose prescribers and multi-prescriber patterns are separate issues—and both are important to address[;]" and

d.    "A small portion of opioid use originates in emergency departments."[381]

---

[381] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/ten-insights-on-the-us-opioid-crisis-from-claims-data-analysis

535.    Two months later, the same authors, joined by Ms. Lewis, published "Why we need bolder action to combat the opioid epidemic."[382] "Our research suggests that much broader – and bolder – action is required," they announced.[383]

**J.    Coda**

536.    Marvin Bower, the McKinsey legend who admonished, "Deliver bad news if you must, but deliver it properly," died in 2003, one year before the firm began working with Purdue.

537.    McKinsey's work with Purdue would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room—that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States—and delivering that bad news promptly properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales without regard to the consequences.

538.    On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

539.    Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money— "rebates"—to health insurers whenever someone overdosed on Purdue's drug.

540.    These payments for future OxyContin overdoses were christened "Event-Based contracts."[384]

---

[382] *See* https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic
[383] *Id.*
[384] "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, New York Times, November 27, 2020, *available at*: https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

541.     Helpfully, McKinsey provided estimates for the future costs of these "events."[385] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

542.     A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:



543.     The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

544.     McKinsey's analysis also suggested that it could predict the number of people who would become addicted to opioids or overdose on pills sold through Purdue's downstream

---

[385] McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."

customers. McKinsey "projected that in 2019, for example, 2,484 CVS customers would either have an overdose or develop an opioid use disorder."[386]

545.    It is little surprise, then, that McKinsey was concerned with its legal liability for this work. Within months of recommending "event-based contracts" to Purdue, Martin Elling raised this concern with Arnab Ghatak and suggested corrective action: destroying evidence.

---

**Message**

| From: | Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI] |
|---|---|
| Sent: | 7/4/2018 12:10:13 PM |
| To: | A G [drarnabghatak@gmail.com] |
| Subject: | Re: [EXT]Re: Howdy |

```
Have a great fourth.  M

> On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
>
> Thanks for the heads up.  Will do.
>
>> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
>>
>> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
>> Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
>> should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
>> get tougher there someone might turn to us.  M
>>
>> +==========================================================+
>> This email is confidential and may be privileged. If you have received it
>> in error, please notify us immediately and then delete it.  Please do not
>> copy it, disclose its contents or use it for any purpose.
>> +==========================================================+
```

546.    Elling's prediction that things would "get tougher" for Purdue would prove prescient.

### 1.    Guilty Again - 2020

547.    On October 20, 2020, Purdue—McKinsey's co-conspirator—agreed with the United States Department of Justice to plead guilty to improper marketing of OxyContin and other opioids again (the "2020 Settlement Agreement"). This time the plea agreement concerned conduct from 2010 to 2018. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

---

[386] Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. Times (Nov. 27, 2020, updated Dec. 17, 2020), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html

2331633.1

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

548.    Purdue pleaded guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331, 353, violating anti-kickback laws, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

549.    The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

550.    Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

551.    Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

552.    Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ('EOT') and Project Management Office ('PMO')" (emphasis added).

## 2.    A Mea Culpa

553.    On December 5, 2020, six weeks after Purdue's second guilty plea, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

1
2
3
4

## McKinsey statement on its past work with Purdue Pharma

5
6
7

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

8
9
10

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

11
12

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

13   554.   As the statement indicates, McKinsey stopped doing work "anywhere in the

14   world." Given that Purdue's operations addressed only the United States, the global reach of

15   McKinsey's regret is noteworthy.

16   555.   In August 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for

17   Purdue, Tim Reiner, a long-time McKinsey consultant, joined Mundipharma. Mundipharma is a

18   separate company—also owned by the Sacklers—that sells opioids internationally.

19   556.   As late as 2019, Mundipharma has been asserting many of the same misleading

20   claims about opioids that previously led to criminal liability in the United States.[387] McKinsey has

21   long assisted the Sacklers in growing Mundipharma's opioids market.[388] By 2015, McKinsey's

22   workload with Mundipharma was large enough to merit formal coordination and incorporation

23   with the overall McKinsey team servicing the Purdue account. Around this time, McKinsey's

24   Elling agreed to assume "a real operational DCS" role with respect to the work that McKinsey

25   was performing for the various Sackler interests, including "integrat[ing] the Mundipharma

26

27   [387] *See* Kinetz, Erika, *Fake doctors, pilfered medical records drive OxyChina sales*, Associated Press, November 19, 2019, *available at*: https://apnews.com/article/4122af46fdba42119ae3db30aa13537c

28   [388] *See, e.g.*, MCK-MDL2996-0256120; MCK-MDL2996-0327127; MCK-MDL2996-0183279; MCK-MDL2996-0238998; MCK-MDL2996-0286490.

1    stuff."[389] Even if the various components of the Sackler "family conglomerate" were nominally

2    independent, McKinsey consolidated its own treatment of its work for all of these companies as

3    serving just a single client.

4                              **3.      A Hedge Fund**

5          557.    On February 4, 2021, forty-nine state attorneys general announced a multistate

6    settlement with McKinsey related to its work for opioid manufacturers. McKinsey agreed to pay

7    almost $600 million dollars. At the time of the announcement, most of the participating states

8    each filed a complaint and consent decree finalizing the settlement.

9          558.    Three days after the settlement, it came to light that McKinsey appears to have

10   benefitted from its work promoting opioids not only through the fees paid to McKinsey by its

11   clients, but also through investments in opioid-related business made by McKinsey's own hedge

12   fund, the McKinsey Investment Office ("MIO"). MIO is the hedge fund referenced above, with

13   respect to McKinsey's investment in Teva Pharmaceutical.

14         559.    Consultants don't typically have in-house hedge funds overseeing retirement

15   accounts and partners' personal investments. In fact, McKinsey is the only one. "Most large

16   companies, including all the major consulting firms, hire third-party firms . . . to oversee their

17   employees' retirement accounts."[390] MIO manages approximately $31 billion on behalf of

18   McKinsey partners, employees, and former partners.[391]

19         560.    Through MIO, McKinsey was heavily invested in the opioid industry, and stood to

20   gain financially from the continuation of the opioid crisis. It even invested in opioid addiction

21   treatment businesses—a growing industry, as McKinsey knew.

22

23

24

25   ─────────────────────────

[389] MCK-MDL2996-0210149

26   [390] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit
     from treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/

27   consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969
     [391] SEC Order dated November 19, 20201 at Para. 5, available at: https://www.sec.gov/litigation/admin/2021/ia-

28   5912.pdf. That $31 billion under management would make MIO Partners the thirteenth largest hedge fund on Earth.
     *See* https://www.pionline.com/interactive/largest-hedge-fund-managers-2021.

561.   In short, "during the years McKinsey was helping opioid makers propel sales of the drugs, MIO Partners held stakes in companies that profited from increased usage."[392]

562.   To understand MIO, an organizational chart of McKinsey is helpful:



563.   MIO Group, Inc., and MIO Partners, Inc. are directly-owned subsidiaries of McKinsey & Company, Inc. Given that McKinsey advises countless large corporations, McKinsey's hedge fund inevitably invests in McKinsey's clients.

564.   MIO manages money for pension plans sponsored by McKinsey in which current and former McKinsey employees participate, as well as privately-offered investment funds available to partners and former partners. Today, nine of MIO's eleven directors are current or former McKinsey partners. Prior to 2017, there were no outside directors at MIO.

565.   MIO structures its investment activities in three principal ways: (1) approximately 50-60% of MIO's assets are managed by third-party money managers, who have sole discretion on what securities to buy with MIO's money, and where MIO may or may not have information regarding which securities the third-party money manager has purchased for MIO's benefit; (2)

---

[392] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969

"separately managed accounts," comprising approximately 40% of MIO's holdings, are portfolios of securities managed by a third-party money manager, but where MIO "knows what securities are held through each account," and; (3) direct investments, where MIO invests its own money directly, which comprises approximately 10% of MIO's investments.

566.    In other words, for *at least 40*% of MIOs holdings, McKinsey partners are able to know the specific investments held by the various MIO funds. "MIO has a ledger for every security in their managed accounts."[393] That comprises a pool of capital worth more than $6 billion.

567.    MIO is run for the benefit of McKinsey's partners and, to a separate extent, McKinsey's employees. Those individuals (and, crucially, former McKinsey partners) invest their own money in MIO, and their access to those investment opportunities constitutes a meaningful and important component of those individuals' compensation. MIO has, "at a minimum, the ability to view the individual securities that account for approximately 40 to 50 percent." This is approximately $6 billion dollars of invested capital. What is more, MIO *directly invests* approximately 10% of its assets. That is $1.5 billion MIO directly invests in securities without the use of any outside money manager. These numbers exclude leverage.

568.    From a conflicts perspective, the fact that *former* partners may participate in MIO investments merits consideration. With respect to McKinsey's opioid investments, it is notable to consider just who some of those "former partners" are. As noted above, Rajiv de Silva, Chief Executive Officer of opioid defendant Endo Pharmaceuticals, is a former McKinsey partner. Kare Shultz, Chief Executive Officer of opioid defendant Teva Pharmaceutical, is a former McKinsey partner. Frank Scholz, President of opioid defendant SpecGX, a subsidiary of Mallinckrodt, is a former McKinsey partner. Marc Owen, President of opioid defendant McKesson, is a former McKinsey partner. This list is merely illustrative; it is not exhaustive.

569.    The result is the prospect of individual executives at various opioid manufacturing and distribution companies obtaining financial gain from the ongoing propagation of the opioid

---

[393] Michelle Celarier, *McKinsey's Managed Accounts Come Under Scrutiny in Trial*, Institutional Investor, February 5, 2020, *available at*: https://www.institutionalinvestor.com/article/b1k6wnn251s472/McKinsey-s-Managed-Accounts-Come-Under-Scrutiny-in-Trial

2331633.1

1  crisis *not* via compensation from their employers, but via participating in investments alongside

2  their *former* employer (and, in many cases, current consultant).

3      570.    Three days after McKinsey and the state attorneys general announced their

4  settlement, NBC News reported that MIO, McKinsey's hedge fund, owned opioid-related

5  investments during the time that it advised its opioid clients.

6      571.    One is Deerfield Management Co., "a $10 billion dollar health care investment

7  firm based in New York."[394] As ever, "two top Deerfield executives previously worked at

8  McKinsey." A retirement fund managed by MIO held a $108 million stake in funds managed by

9  Deerfield and invested in opioid industry participants. "In 2017, for example, Deerfield was a 6

10 percent shareholder in Mallinckrodt, a major opioid maker."[395] From 2011 through 2016,

11 Deerfield held a stake of up to $90 million in Teva. Deerfield also took stakes in the distributors

12 described above, including McKesson and Cardinal Health.[396]

13     572.    McKinsey is also invested in treatment, an inevitable growth industry sprouting

14 from the over-selling of opioids. Separate from its investments with Deerfield, MIO is also

15 invested in Adamis Pharmaceuticals, "a company that develops products to treat opioid

16 overdoses," and therefore "may also benefit from opioid settlement funds" paid by McKinsey as a

17 result of its settlement with the states. As of 2020, MIO owned 26% of the Adamis' preferred

18 shares through another outside investment manager (not Deerfield).[397] Separately, Deerfield

19 invested $331 million in Recovery Centers of America, an addiction treatment company that

20 operates facilities in states that McKinsey recently settled with.[398]

21     573.    These relationships and investments give a glimpse into the myriad means

22 McKinsey deploys to make money. Consulting is more than giving advice. Indeed, On November

23 19, 2021, MIO Partners agreed to pay an $18 million fine to the SEC due to MIO's possession of

24 material nonpublic information related to its holdings, information obtained through consulting.

25 ─────────────────────

26 [394] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969

27 [395] *Id.*

    [396] *Id.*

28 [397] *Id.*

    [398] *Id.*

1    VI.    **TOLLING OF STATUTES OF LIMITATIONS**

2          574.    McKinsey is equitably estopped from relying upon a statute of limitations defense.

3    Alongside its clients, McKinsey undertook active efforts to deceive the Plaintiffs and to

4    purposefully conceal its unlawful conduct and fraudulently assure the public, including Plaintiffs,

5    that opioids were non-addictive, effective, and safe for the treatment of long-term chronic pain

6    and non-acute, non-cancer pain with the goal of increased sales, greater availability and access to

7    opioids, and maximizing profits.

8          575.    McKinsey and its clients were deliberate in taking steps to conceal their

9    conspiratorial behavior and active role in the deceptive marketing of opioids. This deceptive

10   marketing—which included the above falsehoods that opioids were safer, less subject to abuse,

11   and less addictive than other pain medications—was a substantial factor in the oversupply of

12   opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

13         576.    McKinsey deliberately advised its clients on marketing strategies and tactics to

14   bolster their opioid products as non-addictive, safe, and efficacious without reliable scientific

15   evidence to support same. McKinsey's consulting services were given confidentially, and both

16   McKinsey and its clients concealed the content of those services from the public. In doing so,

17   McKinsey concealed its role in shaping, editing, and providing the content of the false and

18   misleading materials addressing pain management and opioids that were widely disseminated to

19   regulators, prescribers, and the public at large, including Plaintiffs.

20         577.    McKinsey also concealed from Plaintiffs the existence of the Plaintiffs' claims by

21   hiding it and its client's lack of cooperation with law enforcement. For example, in May 2007,

22   Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in

23   what the company acknowledged was an attempt to mislead doctors about the risk of addiction

24   and entered into a Corporate Integrity Agreement explained above. Purdue was ordered to pay

25   $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was

26   misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science.

27   Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge

28   and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty

1   and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled

2   guilty as well and agreed to pay $7.5 million in fines.

3          578.    Nevertheless, even after the guilty pleas, Purdue continued to pay doctors on

4   speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund

5   seemingly neutral organizations to disseminate the message that opioids were non-addictive as

6   well as other misrepresentations. Purdue also assembled an army of lobbyists to fight any

7   legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other

8   painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on

9   lobbying and political contributions—eight times what the gun lobby spent during that period.

10  McKinsey participated extensively in these actions and provided Purdue with strategies and

11  assistance to maximize sales as described in this Complaint. McKinsey knew that the actions it

12  took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's

13  sales and profits, and in turn to serve McKinsey's financial interests.

14         579.    McKinsey affirmatively sought to convince the public that its clients' legal duties

15  to report suspicious sales of opioids had been satisfied through public assurances that they were

16  working to curb the opioid epidemic. For example, after the 2007 Purdue guilty plea described

17  above, McKinsey provided services to protect the company's public image and sales, aiding in

18  the concealment of the addictive nature and dangers associated with opioid use and denying

19  blame for the epidemic, attributing it instead solely to abuse and inappropriate prescribing. At the

20  guidance and advice of McKinsey, Purdue and other McKinsey clients publicly portrayed

21  themselves as committed to working diligently with law enforcement and others to prevent

22  diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises

23  to change their ways, insisting they were good corporate citizens. Instead, McKinsey assisted

24  Purdue, for example, with marketing campaigns and messaging that continued business as usual,

25  indiscriminately targeting high prescribers and promoting opioids as safe but avoiding the pitfalls

26  of the Corporate Integrity Agreement. These repeated misrepresentations misled regulators,

27  prescribers, and the public, including the Plaintiffs, and deprived Plaintiffs of actual or implied

28  knowledge of facts sufficient to put the Plaintiffs on notice of potential claims.

580.     Plaintiffs did not discover the nature, scope, and magnitude of McKinsey's misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

581.     Prior to the applicable limitations period, Plaintiffs did not suspect, and had no reason to suspect, that McKinsey's conduct caused their injuries, including the consumption of Plaintiffs' resources as the opioid epidemic remains unabated.

582.     McKinsey intended that its actions and omissions made with its clients would be relied upon, including by the Plaintiffs. The Plaintiffs did not know and did not have the means to know the truth due to McKinsey and its clients' actions and omissions.

583.     The Plaintiffs reasonably relied on the affirmative statements developed by McKinsey and made by its clients regarding their purported compliance with their obligations under the law and consent orders, which were false and only intended to save the clients' public image.

584.     McKinsey's fraudulent concealment has tolled the running of any statute of limitations. Through it and its clients' affirmative misrepresentations and omissions, McKinsey actively concealed from Plaintiffs the risks associated with opioids that led to the opioids crisis. The wrongdoing, misrepresentations, and omissions by McKinsey has not ceased because the public nuisance remains unabated.

## VII.   HARM CAUSED TO TRIBAL PLAINTIFFS

### A.     The Impact of Opioid Abuse, Addiction, and Diversion on American Indians and Alaska Natives

585.     There are 574 federally recognized Tribes in the United States, located within the borders of 35 states. While they are diverse in terms of their size, geography, culture, and resources, but they share a status as sovereign governments responsible for the health and well-being of their citizens.

586.     Native Americans have disproportionately borne the toll of the opioid crisis.

587.     Native Americans suffer the highest per capita rate of opioid overdoses.

588.   According to the Indian Health Service, there was a "four-fold increase in opioid overdoses from 1999 to 2013 among American Indians and Alaska Natives . . . [t]wice the rate of the general U.S. population."

589.   The Centers for Disease Control and Prevention reported that American Indians and Alaska Natives had the highest drug overdose death rates of any ethnic group in the country in 2015 and the largest percentage increase in the number of deaths over time from 1999 to 2015. During that time, deaths rose more than 400% among American Indians and Alaska Natives. In addition, because of misclassification of race and ethnicity on death certificates, the actual number of deaths may be underestimated by up to 35%. By 2017, American Indian and Alaska Native populations had the second highest overdose rates from opioids among all racial/ethnic groups in the country. Between 2015 and 2019, the overdose death rate more than doubled.

590.   The impact on Native American children is particularly devastating. In a study conducted to examine substance-related disorders among adolescents across racial and ethnic groups, "Racial/Ethnic Variations in Substance-Related Disorders Among Adolescents in the United States," the authors found, of 72,561 adolescents aged 12 to 17 years:

   a.   Analgesic opioids were the second most commonly used illegal drug after marijuana;

   b.   Analgesic opioid use was comparatively prevalent among Native American adolescents (9.7%);

   c.   Native Americans have the highest prevalence of opioid use (47.5%) and opioid use disorders (15.0%); and

   d.   31.5% of Native Americans had substance-related disorders.

591.   The study concluded:

Native Americans have the highest prevalence of substance use and substance-related disorders, adding to evidence that young Native Americans are a vulnerable group facing numerous stressors, trauma, and health disparities (e.g., highest rate of suicide, underfunded systems of care, and lack of access to appropriate care). The results herein highlight a critical need for intervention to reduce their burdens from substance use and for policies to address presently underfunded systems of care and improve infrastructures linking behavioral and primary health care services. [Footnotes omitted.]

592.    The CDC reported that approximately one in ten Native American youths ages 12 or older used prescription opioids for nonmedical purposes in 2012, double the rate for white youth and three times that for African Americans.

593.    The fact that adolescents are able to easily obtain prescription opioids through the black market created by widespread opioid diversion that disregards state and Tribal borders highlights the direct impact on Tribal communities by McKinsey's actions and inactions.

594.    Even the youngest members of Tribal communities bear the consequences of the opioid abuse epidemic fueled by McKinsey's conduct in working with Purdue and other opioid supply chain companies to promote demand for and increased prescribing and use of opioids. Between 2009 and 2012, "American Indian women [were] 8.7 times more likely to be diagnosed with maternal opiate dependence or abuse during pregnancy," compared to non-Hispanic women. That translates into one in ten pregnancies among American Indian women. As a result, a higher rate of Native infants suffer from opioid withdrawal and neonatal abstinence syndrome ("NAS") compared to any other racial or ethnic group.

595.    Infants suffering from NAS are often separated from their families and placed into the custody of the Tribal child welfare services or receive other government services so they can be afforded medical treatment and be protected from drug-addicted parents.

596.    The impact of NAS can be life-long. Most NAS infants are immediately transferred to a neonatal intensive care unit for a period of days, weeks, or even months. NAS can also require an emergency evacuation for care to save the infant's life. Such emergency transportation costs thousands of dollars for each occurrence.

597.    Many NAS infants have short-term and long-term developmental issues that prevent them from meeting basic cognitive and motor-skills milestones. Many will suffer from vision and digestive issues; some are unable to attend full days of school. These disabilities follow these children through elementary school and beyond.

598.    Many of the parents of these children continue to relapse into prescription opioid use and abuse, having an impact on their families and Tribal communities on which they depend for financial and other support.

599.    The opioid epidemic has created an existential threat to certain Tribes as opioid addicted AI/AN parents see their children fostered out to non-Native foster and adoptive parents, which can mean fewer enrolled members over time and the Tribes ceasing to exist. This is particularly true for smaller Tribes.

600.    In some cases, the opioid epidemic also threatens Tribal cultural practice and identity. For example, the death or other absence of Tribal elders and other keepers of traditional knowledge as a result of the opioid crisis can interfere with the transmission of Tribal languages and cultural and religious practices, traditions, or knowledge from one generation to the next.

601.    The use of prescription opioids often leads to the use of non-prescription opioids, such as heroin, a link that is now well documented. Heroin use in Tribal communities has also caused devastating addiction, abuse, and death. This is especially concerning in light of the recent influx of synthetic fentanyl products.

602.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to public health and safety in Tribal communities nationwide.

603.    Tribal businesses have also been impacted by the opioid epidemic. Indian Tribes have invested in a wide variety of businesses, whose revenues, in turn, fund Tribal government programs. These businesses engage in government contracting, construction, energy and natural resource development, gaming, manufacturing and service businesses, tourism, retail, and myriad other activities.

604.    Even before the opioid epidemic, Tribal workforces suffered from lack of education and employment experience, as well as the lowest life expectancy and the worst health outcomes of any group in the United States. Now, Tribes are finding that, due to the sharp increase in opioid use on their reservations in recent years, many otherwise qualified persons are not employable or are unable to retain their employment due to failure to pass drug tests. Tribes have suffered damages in the form of lost productivity of members and employees, increased administrative costs, and lost opportunity for growth and self-determination because of the wave of opioid abuse and addiction affecting existing and potential employees.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

605. Each dollar spent on the opioid crisis represents a lost opportunity to invest elsewhere, including economic development. In addition to the direct loss, diverting funds that could have been used for economic development for the opioid crisis deprives Tribes of the multiplier effect that using such money for business could have provided.

606. Further, employment-related impacts of the opioid crisis often create secondary and tertiary costs the Tribes must shoulder, which again divert funding from reinvestment in Tribal businesses. For example, when a Tribal member fails a pre-employment drug screening, not only do the Tribes incur the expense of processing a job applicant who is precluded from taking the position, the Tribes often end up providing support for the jobless individual and his, her, or their family through welfare assistance programs. The economic impacts threaten to spiral out of control: as the opioid epidemic stifles economic activity, Tribes are left with fewer resources to address the opioid epidemic. This downward spiral can end only when the opioid crisis is reined in.

**B.** **The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiffs**

607. Indian Tribes across the country are currently facing a public health crisis that threatens to undermine the safety and wellbeing of entire communities. Overarching health, public safety, and law enforcement concerns relate to, among others, prescription opioid drug abuse and major crimes involving opioid and drug use.

608. The opioid epidemic has escalated in Tribal communities with devastating effects. Substantial opiate-related substance abuse, hospitalization, and death mirror the increased distribution of opioids.

609. The opioid crisis is straining Tribes' ability to provide adequate services to their members and Tribal health organizations' ability to provide adequate services to the persons they serve. With limited resources, Plaintiffs have been forced to divert funds from other priorities to staff new positions needed to address the opioid crisis, including substance abuse counselors, nurses, physicians specializing in addiction, law enforcement, and social services agents.

610. Plaintiffs' resources were stretched thin even before the opioid epidemic increased burdens on them. In 2017, the national average of healthcare spending per capita was $9,207,

1    while IHS spent an average of only $3,332 per capita. Due to this chronic underfunding, many

2    Plaintiffs have been unable to adequately adjust funds to meet the increased healthcare needs of

3    their patient populations. Their funding has not adequately increased to counteract the expanded

4    costs of the opioid epidemic.

5         611.   The necessity of diverting funding to respond to the opioid-related health crisis is

6    particularly harmful in the negative effect it has on the time and funding available to address

7    other catastrophic diseases, such as diabetes and pulmonary disease, which disproportionately

8    affect Native American populations and are highly prevalent in Tribal communities.

9         612.   Plaintiffs are also impacted because access to substance abuse prevention,

10   treatment, and recovery services is complicated by the remote locations of many Tribal

11   communities and the lack of locally available services.

12        613.   In addition, there has been an increase in major crimes involving opioids and

13   opioid use on certain reservations and Tribal communities, including reports of human trafficking

14   involving opioid abuse and addiction, which undermines the safety of Tribal communities.

15        614.   For many Tribal plaintiffs, costs for treatment related to the misuse, addiction,

16   and/or overdose of opioids that Plaintiffs have borne include, but are not limited, to the following:

17             a.   Emergency medical visits for opioid misuse, addiction, and/or overdose.

18             b.   Emergency medical visits for infections, injuries, illnesses, and drug-

19   seeking related to opioid misuse, addiction, and/or overdose.

20             c.   Hospitalizations related to the misuse, addiction, and/or overdose of

21   opioids.

22             d.   The provision of medication-assisted treatment.

23             e.   Treatment of Tribal members who are addicted to opioids or suffer from

24   pain reliever use disorder, including inpatient and outpatient treatment, holistic community-based

25   treatment programming, lifestyle management and alternative therapy programs, and regular drug

26   screening. Some Tribal health organizations have contracted with third parties for in-patient

27   rehabilitation programs, straining their limited purchased/referred care dollars and diverting

28   resources and funding away from other programs to fight the opioid epidemic.

2331633.1

1          f.      Costs of providing behavioral health services to members, including

2    substance abuse programs that provide clients with a number of vital services, such as one-on-one

3    counseling for adolescents and adults, screening, assessments and testing, referral and inpatient

4    placement, local sobriety sweats, meetings, and intensive outpatient programs that include

5    behavior modification, prevention, relapse and addiction educational topics.

6          g.      Increased costs of administering and staffing social services, including case

7    workers and resources for (1) assistance to Tribal members addicted to and/or dependent on

8    opioids; (2) reintegration of Tribal members into their family and community following

9    treatment; (3) services to address the resulting abuse or neglect of children and elders whose

10   guardians are addicted to opioids; (4) the many foster or adoptive guardians who take on the role

11   of caretaker in their absence; (5) healthy community tip lines; (6) transitional housing; (7) needle

12   exchanges; (8) distribution of naloxone overdose kits and training of Tribal members, staff, and

13   first responders in the use of naloxone; and (9) assistance to families who have become houseless

14   as a result of opioid abuse.

15         h.      Increased costs of administering and staffing police and public safety

16   departments, including police officers and resources to respond to increased opioid and related

17   drug trafficking and human trafficking, including coordination with local and federal law

18   enforcement.

19         i.      Increased costs for testing of drug samples as part of the legal process.

20         j.      Care, education and support of pregnant people addicted to opioids and of

21   their children born with NAS, including ongoing educational and developmental support to

22   address the long-term consequences of fetal opioid exposure.

23         k.      Treatment of victims and criminal offenders in the Tribal courts, including

24   holistic community-based treatment programming and regular drug screening.

25         l.      Hiring of staff, expansion of clinic facilities, and creation of treatment

26   centers to respond to the opioid crisis and address the unmet needs of patients facing opioid

27   addiction.

28

615.    In a vicious cycle that impacts all aspects of Tribal health and welfare, the opioid crisis also diminishes many Tribes' available workforce, decreases productivity, increases poverty, and requires greater governmental expenditures by the Tribes. It also undermines the ability of the Tribes to self-govern and to maintain and develop economic independence, including via Tribal businesses.

616.    Funds used by Tribes to address the effects of the opioid crisis may be diverted from Tribal businesses. These diverted investments may decrease Tribal revenues, diminishing funding for other Tribal government programs.

617.    Furthermore, the opioid epidemic now threatens some Tribal Plaintiffs' reliance on their traditional food sources, which hold great importance both culturally and economically. Many of these Tribes retained legally recognized fishing and hunting rights pursuant to treaties with the United States. Some of the waters they fish, however, have been contaminated by prescription opioids.

618.    Plaintiffs have consistently endorsed, supported, and committed staff, facilities, activities and financial resources to addressing and responding to the opioid epidemic impacting the communities they serve.

## VIII.    CLAIMS FOR RELIEF

### A.    Multiple States' Plaintiffs

#### 1.    Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, *et seq.* (Pleaded by all Plaintiffs)

619.    Plaintiffs reallege all of the foregoing allegations and incorporate them by reference.

620.    This claim is brought by Plaintiffs against McKinsey for actual damages, treble damages, and available injunctive and/or equitable relief under 18. U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*, specifically, 18 U.S.C. § 1962(c) and (d).

621.    Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

1    conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

2    pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

3           622.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. §

4    1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in

5    property."

6           623.    Plaintiffs are each a "person," as the term is defined in 18 U.S.C. § 1961(3), and

7    have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business

8    and/or property "by reason of" the RICO Act violations described herein.

9           624.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section

10   1962(c), among other provisions. See 18 U.S.C. § 1962(d).

11          625.    McKinsey conducted the affairs of an enterprise through a pattern of racketeering

12   activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

13   **Description of the Enterprise**

14          626.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation,

15   association, or other legal entity, and any union or group of individuals associated in fact although

16   not a legal entity." 18 U.S.C. § 1961(4).

17          627.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact

18   that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among

19   those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's

20   purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

21          628.    Opioid manufacturers, including Purdue, Johnson & Johnson, Janssen, Cephalon,

22   Endo, and Mallinckrodt (collectively the "Opioid Manufacturers"), together with McKinsey,

23   which participated in the marketing and sale of opioids as described in this Complaint,

24   (collectively, the "Opioid Marketing Enterprise Members" or the "Enterprise Members") engaged

25   in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription

26   painkiller market and the market as a whole—through repeated and systematic

27   misrepresentations, concealments, and omissions of material fact about the safety and efficacy of

28

1    opioids for treating long-term chronic pain, together with other deceptive and fraudulent acts and

2    practices, as described in the Factual Allegations section of this Complaint.

3         629.    In order to unlawfully increase the demand for opioids and thereby increase their

4    own profits despite their knowledge of the harmful effects that would follow, the Opioid

5    Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing

6    Enterprise" or the "Enterprise"). The Opioids Manufacturers worked together to accomplish their

7    aims, with McKinsey serving as a go-between that held all of the companies together and helped

8    coordinate the deceptive marketing and sales strategies. Through McKinsey and their own

9    personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to

10   form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose: lying

11   to prescribers and Plaintiffs in order to increase sales of addictive and dangerous drugs and line

12   the enterprise members' pockets. The Opioid Marketing Enterprise Members' substantial

13   financial contributions to the Opioid Marketing Enterprise and the advancement of opioids-

14   friendly messaging fueled the U.S. opioid epidemic.

15        630.    In the alternative, the association-in-fact Opioid Marketing Enterprise existed just

16   between McKinsey and Purdue, who worked together to unlawfully increase sales of opioids—

17   and grow Purdue's share of the prescription painkiller market—through repeated and systematic

18   misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

19   McKinsey knew Purdue was marketing its opioids illegally and fueling an opioid epidemic, but

20   using the knowledge it gained from its work with other opioid manufacturers, McKinsey joined

21   forces with Purdue to turbocharge the opioids market in order to profit from this crisis.

22        631.    The Controlled Substances Act (the "CSA") and its implementing regulations

23   require that "[e]very person who manufactures, distributes, dispenses, imports, or exports any

24   controlled substance," including opioids, become a "registrant." *See* 21 U.S.C. § 823(a)-(b); 21

25   C.F.R. § 1301.11(a). These registrants, including opioid manufacturer and distributors, must

26   maintain a system to identify and report suspicious orders, including orders of unusual size or

27   frequency, or orders deviating from a normal pattern, and maintain effective controls against

28   diversion of controlled substances. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

632.     Despite these duties, McKinsey and the other Enterprise Members engaged in a scheme with the overarching purpose of materially expanding prescription opioid use by altering the medical community's opioid prescribing practices through repeated fraudulent statements and misrepresentations. The Opioid Marketing Enterprise's scheme was sophisticated, well-developed, and fraudulent and was designed to increase the prescription rate for opioid medications the Enterprise Members knew where dangerous and highly addictive. At all relevant times, McKinsey was aware of the conduct of the Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of payments from other Enterprise Members as a reward for work done to increase sales and distribution of prescription opioids.

**The Common Purpose and Scheme of the Opioid Marketing Enterprise.**

633.     The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and Plaintiffs and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

634.     The scheme devised, implemented, and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Manufacturers'

1  drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and

2  perpetuated the Opioid Marketing Enterprise's scheme.

3       635.    There was regular communication between the Opioid Marketing Enterprise

4  Members in which information was shared, misrepresentations were coordinated, and payments

5  were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for

6  the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose,

7  and each agreed and took actions to hide the scheme and continue its existence.

8       636.    As public scrutiny and media coverage focused on how opioids ravaged

9  communities throughout the United States, McKinsey did not challenge Purdue or other

10  manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate

11  their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids

12  for chronic pain outweighed their benefits and were not supported by medically acceptable

13  evidence. Instead, despite its knowledge of the ongoing fraud and the danger it posed, McKinsey

14  continued to participate in the Opioid Marketing Enterprise for financial gain.

15       637.    The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., the

16  opioids continue to be prescribed and used for chronic pain throughout the United States, and the

17  epidemic continues to injure Plaintiffs and consume the resources of Plaintiffs.

18       638.    The evidence shows that the Opioid Marketing Enterprise Members, including

19  McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common

20  purpose and interest in the object of the scheme, and functioned within a structure designed to

21  effectuate the Enterprise's purpose.

22  **The Conduct of the Opioid Marketing Enterprise Violated Civil RICO.**

23       639.    From at least 2004 to the present, each of the Opioid Marketing Enterprise

24  Members played some part in directing the affairs of the Opioid Marketing Enterprise and

25  participated in the operation or management of the affairs of the Opioid Marketing Enterprise,

26  directly or indirectly, in the following ways:

27       640.    Creating and providing a body of deceptive, misleading, and unsupported medical

28  and popular literature about opioids that (i) understated the risks and overstated the benefits of

long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus

more likely to be relied upon by physicians, patients, and payors;

641.    Creating and providing a body of deceptive, misleading, and unsupported

electronic and print advertisements about opioids that (i) understated the risks and overstated the

benefits of long-term use; (ii) appeared to be the result of independent, objective research; and

(iii) was thus more likely to be relied upon by physicians, patients, and payors;

642.    Creating and providing a body of deceptive, misleading, and unsupported sales and

promotional training materials about opioids that (i) understated the risks and overstated the

benefits of long-term use; (ii) appeared to be the result of independent, objective research; and

(iii) was thus more likely to be relied upon by physicians, patients, and payors;

643.    Devising and implementing marketing schemes that included targeting and

misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions

and dosages, and evading regulatory constraints; and

644.    Disseminating many of their false, misleading, imbalanced, and unsupported

statements through unbranded materials that appeared to be independent publications.

645.    The scheme devised and implemented by the Opioid Marketing Enterprise

Members amounted to a common course of conduct intended to enrich themselves by increasing

sales of prescription opioids by convincing doctors to prescribe and patients to use opioids,

including for long-term chronic pain, despite the Opioid Marketing Enterprise Members'

knowledge of the addictions and deaths that would occur as a result. The scheme was a

continuing course of conduct, and many aspects of it continue through to the present.

**The Opioid Marketing Enterprise Members Conducted or Participated, Directly or**

**Indirectly, in the Conduct of the Enterprise's Affairs.**

646.    "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise,

"one must participate in the operation or management of the enterprise itself." *Reves v. Ernst &*

*Young*, 507 U.S. 170, 185 (1993).

647.    As described herein, the Opioid Marketing Enterprise Members participated in the

conduct of the Enterprise through a pattern of racketeering activity, and McKinsey was the

mastermind of marketing schemes deployed by the Enterprise members to defraud prescribers and Plaintiffs by using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

648.    The Opioid Marketing Enterprise Members conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the Enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Enterprise by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1962(c) and (d).

649.    The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

650.    Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

651.    Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from prescribers and Plaintiffs by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding key opinion leaders ("KOLs") to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

652.   Further, each of the Opioid Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed the Opioid Marketing Enterprise Members the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

653.   At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Opioid Manufacturer and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose and functioned as a continuing unit.

654.   The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

655.   The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity

- 149 -

1    (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of

2    racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and

3    abetted in the commission of, were related to each other, posed a threat of continued racketeering

4    activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity

5    was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities,

6    services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail,

7    and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the

8    scheme to defraud by using mail, telephones, and the internet to transmit communications and

9    payments in interstate or foreign commerce.

10   **The Conduct was More than a Typical Business Relationship**.

11   656.    There were strong relationships among those associated with the Opioid Enterprise

12   and sufficient longevity among Enterprise associates to pursue the Enterprise's common purpose.

13   The common purpose was to increase opioid revenues unlawfully by misrepresenting and lying

14   about opioids in order to changing prescriber habits and the perception regarding the safety and

15   efficacy of opioids for chronic pain and long-term use. The Enterprise's deceit was, in part, in its

16   failure to disclose that increasing strength and dosing actually increased the risk of addiction and

17   overdose and that patients on opioids for more than a brief period develop tolerance, requiring

18   increasingly high doses to achieve pain relief.

19   657.    On March 1, 2004, McKinsey entered into a "Master Consulting Agreement" with

20   Purdue for "services that would be defined from time to time."[399] The Master Consulting

21   Agreement was signed by then-McKinsey director Rob Rosiello."[400]

22   658.    From 2004 through 2008, McKinsey advised Purdue on research and development,

23   business development, and product licensing related to Purdue's opioid products.[401] Consistent

24   with its business model, McKinsey leveraged these projects into growth of its "Broader Strategy

25   work" also underway with Purdue.[402] Specifically, in October 2008, Purdue retained McKinsey

26

---

27   [399] MCK-MDL2996-0085849; PPLPC012000069192
     [400] MCK-MDL2996-0085849, at 0085880.
28   [401] PPLPC013000116218; PPLP004401340
     [402] MCK-MAAG-0117875

2331633.1

1   for broad strategy work after two board members "blessed" Purdue executive Craig Landau with

2   doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and

3   introduction of generic competition to the older OxyContin.[403] Purdue relied heavily on

4   McKinsey to help Purdue publicly portray itself as a good corporate citizen who could now be

5   trusted and was even working on an "abuse-deterrent" or "ADF" form of OxyContin.

6        659.    Over their many years of working together, McKinsey and Richard Sackler

7   developed a close relationship. Indeed, one McKinsey partner, Maria Gordian, describes herself

8   as a counselor to Richard Sackler in an "Ey 2009 Impact Summary."[404]

9        660.    The Opioid Marketing Enterprise was more than a typical business relationship.

10   Rather, the members of the Enterprise knew that opioids were addictive and causing serious harm

11   to people and communities but chose to work together to lie to prescribers and Plaintiffs about

12   these drugs in order to increase their bottom lines. McKinsey worked closely with the Opioid

13   Manufacturers to achieve these aims. McKinsey, as an advisor of multiple Opioid Manufacturers,

14   also had access to information about multiple players and was able to coordinate the fraud

15   occurring across the Enterprise. As discussed below, McKinsey was particularly embedded in

16   Purdue's organizational structure and the relationship's longevity was sufficient to pursue the

17   Enterprise's purposes. During the 2009-2014 period in particular, Purdue relied extensively on

18   McKinsey to develop its sales and marketing strategy for OxyContin.

19        661.    The intent to defraud is evident in the McKinsey's attempts to strengthen its

20   relationship with Purdue and assist Purdue in selling opioids after Purdue's 2007 criminal guilty

21   plea. As part of the guilty plea, Purdue admitted that its "supervisors and employees, with the

22   intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to

23   abuse and diversion, and less likely to cause tolerance and withdrawal than other pain

24   medication."[405] But rather than be deterred by this, McKinsey dove in. In a March 2009 self-

25   assessment, Ms. Gordian described McKinsey's progress in having "continue[d] to expand the

26

---

27   [403] MCK-MAAG-0117875
     [404] MCK-MAAG-0118669

28   [405] Information at pp. 5-6, *United States v. Purdue Frederick Co.*, No. 07-cr-29-JPJ (W.D. Va. May 10, 2007), Doc. 5.

1   depth and breadth of [its] relationships with Purdue" and plans to "deepen[]" McKinsey's

2   "relationship with the Sackler family," including by "serving them on key business development

3   issues" and "expanding" McKinsey's relationship with members of Purdue's senior management

4   team.[406]

5         662.   By August 2009, Richard Sackler had convened a meeting of Purdue board

6   members and staff to discuss efforts to "reverse the decline in the OxyContin tablets market."[407]

7   During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its

8   sales and marketing strategy for OxyContin. McKinsey worked closely with Purdue on both the

9   creation and implementation of OxyContin sales strategy. McKinsey's work for Purdue included

10   consulting, review of product acquisition, evaluation of research and development, advising

11   Purdue on the design of clinical studies, risk management, and product marketing.[408]

12         663.   On May 28, 2013, McKinsey entered into a "Statement of Services to the Master

13   Consulting Agreement" (the "2013 Agreement") with Purdue to "conduct a rapid assessment of

14   the underlying drivers of current OxyContin performance, identify key opportunities to increase

15   near-term OxyContin revenue and develop plans to capture priority opportunities."[409] The 2013

16   Agreement stated, "We have a long history of partnership with Purdue, and we would make best

17   efforts to leverage our understanding of your business—both in terms of content and culture."

18   The 2013 Agreement was signed by then-principal Arnab Ghatak who would "lead the team with

19   senior leadership from Rob Rosiello and Martin Elling."

20         664.   ███████████████████████████████████

21   ███████████████████████████████████████████

22   ███████████████████████████████████████████████

23   ██.[410]

24

25

---

26   [406] MCK-MAAG-0118669

27   [407] PPLPC061000045395
     [408] PPLPC029000547371

28   [409] Excerpt from U.S. Department of Justice Plea Agreement with Purdue Pharma L.P. October 20, 2020. 18, ¶88.
     https://www.justice.gov/opa/press-release/file/1329576/download.
     [410] PPLPC018001462324 ██████████████████)

665.     Thereby, even after the 2007 guilty plea, Purdue, with McKinsey's aid, saw growing profits from opioid sales. In 2015 alone, Purdue obtained $3 billion in annual opioid sales—a four-fold increase from its 2006 sales of $800 million.

666.     McKinsey's relationship with Purdue went far beyond a typical business relationship. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin sales strategy, a strategy McKinsey knew had been based on misleading and defrauding doctors and patients alike about a dangerous and highly addictive drug.

667.     Further, McKinsey had access to detailed prescribing information enabling it to determine if there were suspicious or problematic prescribing patterns. Rather than using this information to help its clients prevent diversion of controlled substances, McKinsey and the Opioid Marketing Enterprise used this information in furtherance of their scheme to defraud prescribers and Plaintiffs, target and increase sales to prescribers who were overprescribing, and continue to fuel opioid addiction and the resulting epidemic.

**The Fraudulent Schemes**

668.     As detailed above, the operation of the Opioid Marketing Enterprise, included several schemes to defraud that helped to further the goals its members—i.e., to expand the market and increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and to increase profits for the Enterprise Members via expanding the market for opioids.

**Fraudulent Marketing Scheme: Deceptive Messaging Regarding Opioid Use**

669.     As described throughout, McKinsey sought to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain by changing prescriber habits and public perception regarding the safety and efficacy of opioids. McKinsey's fraud specifically targeted prescribers and set out to convince them that they should prescribe more and more opioids, overcoming what could otherwise be a check on opioid manufacturers ability to increase sales of addictive products.

670.     Despite McKinsey knowing that reformulated OxyContin could still be abused, having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA

submission,[411] in furtherance of the scheme to defraud, McKinsey spread messages that prescribing opioids could provide "freedom" and "peace of mind" for its users and that physicians could "tailor the dose."

671.    After Purdue's 2007 criminal plea for illegally marketing OxyContin, McKinsey created strategies to repair Purdue's reputation and boost OxyContin sales. In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time-release mechanism in OxyContin tablets—i.e., another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

672.    In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee meeting. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

673.    McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated OxyContin: Question & Answer Book" in September 2009, with questions including "Why should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]" and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the needs of patients[.]"[414] To the question of "Who at Purdue takes personal responsibility for all these deaths?[,]" McKinsey recommended Purdue say, "We all feel responsible[.]"

674.    McKinsey and the other Opioid Marketing Enterprise Members knew the changes Purdue made would not make opioids non-addictive or prevent them from being used to create and further substance abuse problems. For example, in 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the

---

[411] McK-MAAG-0118669
[412] PDD8901645845
[413] Id.
[414] MCK-MAAK-0152135

1    most common mode of abuse).” Similarly, in approving reformulated OxyContin, the FDA

2    cautioned that the reformulation “is not completely tamper resistant and those intent on abusing

3    this new formulation will likely find a means to do so. In addition, the product can still be

4    misused or abused and result in overdose by simply administering or ingesting larger than

5    recommended oral doses.”[415]

6         675.    Despite this knowledge, the Opioid Marketing Enterprise pursued messaging and a

7    strategy that was deceptive and was designed to deceive doctors in particular. Even after Purdue

8    pleaded guilty to offenses related to its marketing and distribution of addictive opioids, McKinsey

9    advised Purdue to market OxyContin to encourage more prescriptions (that it knew would lead to

10   abuse and overdose events) into higher dose prescriptions by a smaller number of loyalist

11   prescribers.

12        676.    Far from the deception of doctors being an unforeseen consequence, McKinsey

13   intentionally set out to target doctors as a cog in the Enterprise’s scheme to defraud. Indeed,

14   deceiving doctors was part of the marketing scheme, and doctors were utilized in furtherance of

15   the marketing scheme. Medical providers were not a break in the causal chain of harm to

16   Plaintiffs but were targeted players in the scheme to defraud and key links in the casual chain.

17        677.    The marketing scheme involved using data to target high prescribers and training

18   marketers to make misleading statements with the goal to increase high dose prescriptions which

19   McKinsey and Opioid Marketing Enterprise Members knew were more likely to be abused.

20   Enterprise Members knew that overdoses were expected and that such overdoses would lead to

21   need for increased services.

22        678.    Purdue’s 2020 guilty plea acknowledged its role in using aggressive marketing to

23   convince doctors to prescribe opioids unnecessarily, fueling the drug addiction crisis. McKinsey

24   was the mastermind of marketing scheme following Purdue’s 2007 guilty plea. McKinsey

25   developed and helped implement these strategies.

26        679.    In an October 26, 2009 presentation, “OxyContin – driving growth through

27   stronger brand loyalty,” McKinsey proposed tactics to turnaround declining sales, “[e]nhance

28   _____

[415] FDA Summary Review, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022272s000SumR.pdf

loyalty to OxyContin among loyalist prescribers," "convert[ing] 'fence sitters' into more loyal OxyContin prescribers,"[416] and "protect OxyContin's market share[.]"[417] In other words, McKinsey proposed increasing sales by pushing both willing and reluctant physicians to prescribe more OxyContin.

680.    McKinsey recommended segmenting prescribers and tailoring messages and tactics to different segments. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended release opioids, including in patients who were not already using opioids, McKinsey urged emphasizing that its 7 tablet strengths provide flexibility to "tailor the dose" to customer needs.[418] Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant with long-term use (rather than discontinue use when the drug lost its effectiveness).

681.    Purdue adopted McKinsey's ████████████ proposal.[419] ████████

682.    As detailed throughout, McKinsey and Opioid Marketing Enterprise Members were aware of the catastrophic injury inflected on the public by selling harmful, addictive opioid products. Yet when promoting opioids and engaging in doctor detailing, the Enterprise Members intentionally hid the potential for abuse and addiction by marketing OxyContin's 12-hour dosing as meaning that users only need to take OxyContin twice a day, thus requiring fewer pills.

683.    It was foreseeable that this marketing strategy would lead to greater addiction because OxyContin wore off after 8 to 10 hours in many patients. Prescribing 12-hour dosing led

---

[416] MCK-MDL2996-0126522
[417] *Id.* at 2
[418] *Id.* at 12.
[419] PPLPC023000251226 (████████████████████████); see also PPLPC012000243668 (████████████); PPLPC012000245087 (████████████ ████████); PPLPC012000246009 (████████████████; PPLPC021000265092 (████████████████████████ )
[420] PKY183123435

1    to "end of dose failure," which led to a vicious cycle that became "the perfect recipe for

2    addiction."[421] As a result, what McKinsey marketed as "convenient" led to what was described as

3    "a [d]escription of Hell."[422]

4         684.    The marketing scheme worked. Nationwide, based on an analysis by the Los

5    Angeles Times, more than 52% of patients taking OxyContin longer than three months are on

6    doses greater than 60 milligrams per day—which converts to the 90 morphine equivalent dose

7    that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[423]

8         685.    A key element of the marketing scheme that fueled the deadly epidemic of opioid

9    abuse was doctor detailing using detailed prescriber data.

10   **Data Scheme: Use of Prescriber Data for Intentional Targeting of High Opioid Prescribers-**

11   **Not Diversion Prevention**

12        686.    McKinsey was an advisor to DEA registrants and Opioid Marketing Enterprise

13   Members, who had a legal duty to guard against diversion and report suspicious orders of

14   controlled substances. Rather than assisting in reporting suspicious orders, McKinsey used its

15   position and access to detailed prescriber information to actually divert resources to target high

16   volume prescribers to sell more opioids.

17        687.    Distributors of controlled substances have a legal duty to report suspicious orders,

18   and to report those that deviate substantially from a normal pattern and orders of unusual size and

19   frequency. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b). These obligations included a legal duty

20   to maintain effective controls and procedures to guard against diversion of controlled substances

21   and a legal duty to maintain a system to identify and report suspicious orders of controlled

22   substances. *See* 21 C.F.R. §§ 1301.7(a) (b); 1301.74(b). Rather than advising their registrant

23   clients on how to comply with their legal duties to maintain effective controls to guard against

24   diversion and how to operate a system to identify and report suspicious orders, in furtherance of

25

26

27   [421] Harriet Ryan, "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, available at http://www.latimes.com/projects/oxycontin-part1/.
     [422] *Id.*

28   [423] CDC Guideline at 16.

2331633.1

the scheme, McKinsey and the Opioid Marketing Enterprise Members used detailed data to target prescribers to increase the opioid market.

688.    Consistent with the Enterprise's purpose of increasing profit by deceptively marketing opioids, McKinsey was tasked with "Identifying Granular Growth Opportunities for OxyContin," conducting an "assessment of the underlying drivers of current OxyContin performance," identifying "key opportunities to drive near-term OxyContin performance," and developing "plans to capture priority opportunities."[424]

689.    McKinsey received physician-level sales data to develop its marketing strategy to increase OxyContin performance after Purdue's 2007 guilty plea. Rather than using this access to the granular data to avoid diversion and to prevent Enterprise members from targeting prescribers with suspicious prescribing patterns, McKinsey used this information to help the Opioid Marketing Enterprise members push more opioids on high volume prescribers in furtherance of its schemes to defraud. The targets were chosen based on their history of prescribing high doses of opioids in large quantities.

690.    One of the services the Enterprise used in furtherance of this scheme concerned the use of data to help Purdue meet its goals. McKinsey's analysis for the "Evolve to Excellence" proposal shows that it had detailed information from which it could discern, as could Purdue, whether a prescriber had problematic patterns suggesting operation as a "pill mill," including a shift to other opioids after OxyContin's reformulation. Yet, McKinsey urged Purdue to target, and seek to increase the prescribing of, all of these prescribers from whom it perceived Purdue could obtain greater profits.

691.    McKinsey found that Purdue did not "focus on the highest potential docs," measured both by the number of prescriptions and reimbursement considerations.[425] A McKinsey analyst urged McKinsey to recommend Purdue target "[l]iterally, at least all" prescribers in the top 20% of prescribers, "minus another few percent who are no sees[.]" McKinsey team lead Arnab Ghatak replied that "they probably have 20% no see[], but i'd also assume there are not

---

[424] PPLPC030000770531
[425] MCK-MDL2996-0364024

many high writers that are no see."[426] ("No see" prescribers are prescribers who do not accept visits from pharmaceutical sales representatives. Thus, upon information and belief, McKinsey recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were willing to entertain sales visits from sales representatives.)

692.    The Opioid Marketing Enterprise used data for intentional targeting of high prescribers and not for diversion prevention. McKinsey advised Purdue to raise sales of Oxycontin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life. McKinsey urged Purdue to maximize sales by dictating which prescribers its sales representatives would target. For example, McKinsey advised Purdue that it should take "specific actions" to increase sales of OxyContin, including "Prescriber Targeting" and "Turbocharg[ing] Purdue's Sales Engine."

693.    McKinsey targeted not just doctors but also nurse practitioners and physician assistants, recommending Purdue "[d]ouble down on nurse practitioners and physician assistants . . . as they represent a growing market segmentation of prescribers."[427]

694.    The Enterprise's scheme also explored ways to increase the amount of time sales representatives spent in the field increasing opioid sales, and prioritizing OxyContin in incentive compensation targets.[428]

695.    By April 24, 2014, the plan was working and McKinsey reported that Purdue's "sales force is selecting an increasing percentage of high-value OxyContin prescribers as targets."[429]

696.    McKinsey ensured Purdue would benefit from the lessons learned by other Enterprise members, stating that "its experience with other pharmaceutical companies suggests that such a comprehensive Sales transformation program takes nine months."[430] Likewise,

---

[426] MCK-MDL2996-0364267
[427] MCK-MDL2996-0303399
[428] PPLPC012000437346
[429] MCK-MDL2996-0104840; PPLPC035000220406
[430] MCK-MDL2996-0187168

2331633.1

McKinsey recommended physician targeting to other Enterprise members, including Endo and Janssen.[431]

697.    By targeting physicians based on their prescribing patterns, the Opioid Marketing Enterprise was working toward the common purpose of deceptively convincing doctors to prescribe more opioids and thereby increase their own profits. By developing "Evolve to Excellence," which was implemented as a plan to "turbocharge" opioid sales, McKinsey advised that Purdue would see a greater return on its sales investment by focusing its targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. The plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, which McKinsey and the other members of the Opioid Marketing Enterprise knew and/or should have known would result in the expansion of the illicit opioid market.

698.    The Enterprise sought to grow opioid sales to prescribers who raised red flags of diversion and orders it knew or should have known were likely to be diverted or fuel an illegal market. Purdue had a legal obligation not to target these prescribers; rather, it was obligated to report their conduct to law enforcement. Yet the Enterprise used access to prescriber data not to report diversion but to enhance diversion.

**Pattern of Racketeering Activity**

699.    McKinsey together with the other Opioid Marketing Enterprise Members engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain. As a unique consulting entity with knowledge of both the addictive properties and abuse potential of opioids and with access to data regarding internal prescribing behaviors of its targets, McKinsey perpetrated a number of fraudulent schemes using the mails and wires, including advising Purdue to market more opioids, in higher doses, to high volume prescribers while helping Purdue avoid mandatory prescriber education regarding the risks of opioids. McKinsey fueled the epidemic alongside its clients.

---

[431] MCK-MDL2996-0130803; MCK-MDL2996-0135713

Through targeted marketing that McKinsey worked to develop, "turbocharge," and implement, McKinsey substantially contributed to an explosion in the use of opioids across the United States. McKinsey is an enterprise that is engaged in and affects interstate commerce because the company advised opioid manufacturers on the sale of opioid products across the United States, as alleged herein.

700.    The Opioid Marketing Enterprise Members devised and knowingly carried out this illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. They knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, deceive consumers, prescribers, regulators, Plaintiffs, and other intended victims and they used the U.S. Mail and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

701.    By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

702.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members hid from the consumers, prescribers, regulators, and Plaintiffs: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

703.    The Opioid Marketing Enterprise Members with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

704.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This coordination was accomplished via their relationships with each other and via McKinsey's relationships and contacts with key opioids manufacturers.

705.    The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs, while simultaneously generating billion-dollar revenues and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

706.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity. McKinsey in particular used mail and wire transmission, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to prescribers and the public.

707.    McKinsey had a specific intent to deceive and defraud prescribers, regulators and Plaintiffs. For example, as alleged above, McKinsey made repeated and unequivocal statements through the mails and wires that were false and misleading. McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

708.    Similarly, they caused to be transmitted through the mails and wires false and misleading statements regarding the addiction potential of opioids. Moreover, McKinsey had direct involvement in marketing statements and thus caused the statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

709.    The marketing scheme is especially egregious since the public relies on physicians as a position of trust and authority in the community regarding their health and well-being. McKinsey intentionally deceived physicians regarding the abuse potential of opioids. It intended prescribers and the public to rely on its false statements. McKinsey intended reliance on these

false statements as it was their goal for doctors to prescribe more and higher quantities of these dangerous pills to the public. This scheme was therefore reasonably calculated to deceive not only persons of ordinary prudence and comprehension but also educated physicians in a place of high trust in the community.

**Predicate Acts**

710.     To carry out, or attempt to carry out, the scheme, the Enterprise Members, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

711.     Specifically, the Enterprise Members have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

712.     The multiple acts of racketeering activity which the Enterprises Members committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

713.     The racketeering activity was made possible by the Enterprise's regular use of the facilities, services, distribution channels, and employees of the Enterprise Members.

714.     The Opioid Marketing Enterprise Members participated in the schemes by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

715.     The Enterprise Members used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their schemes through common misrepresentations, concealments, and material omissions.

716.     In devising and executing the illegal schemes, the Opioid Marketing Enterprises Members devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and prescribers and to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

717.    For the purpose of executing the illegal schemes, the Enterprise Members committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal schemes.

718.    The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to the conduct described in the Factual Allegations section of this Complaint, and:

719.    Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

720.    Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

721.    The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the Opioid Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, and Plaintiffs relied on the Opioid Marketing Enterprise Members' misrepresentations. These uses of the U.S. Mail or interstate wires included, inter alia:

722.    Marketing materials about opioids and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, and published across the country, including in counties and cities and on Tribal Reservations and to Plaintiffs;

723.    Written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

724.    E-mails, telephone calls, and written communications among the Opioid Marketing Enterprise Members agreeing to or implementing the opioids marketing scheme;

725.    Communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise;

726.    Written and oral communications directed to prescribers, the public, and Plaintiffs that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

727.    Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

728.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are not obtainable (e.g., each time a McKinsey trained marketer "calls" or reached out to a physician using the mails or wires in furtherance of the marketing scheme). Because the Opioid Marketing Enterprise Members disguised their participation in the Enterprise, and worked to keep the Enterprise's existence secret, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, McKinsey engaged in fraudulent activity in furtherance of their scheme.

729.    Below, Plaintiffs also describe examples of occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to

consumers, prescribers, regulators, and Plaintiffs, and how those acts were in furtherance of the scheme.

| From | To | Date | Description |
|---|---|---|---|
| Purdue | Prescribers and Plaintiffs | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book |
| Purdue | Prescribers | Continuous | Telephonic and electronic communications by its sales representatives indicating that opioids will improve patients' function |
| Purdue | FDA advisory committee | September 2009 | Presentation prepared by McKinsey indicating that its reformulated OxyContin will deter abuse |
| Purdue | Prescribers and Plaintiffs | 2010 onwards | Statements that the reformulated OxyContin will deter abuse and therefore doctors can continue to safely prescribe opioids |
| Purdue | Prescribers and Plaintiffs | 2010-2020 | Statements from Purdue at McKinsey's direction that opioids can provide "freedom," "peace of mind," and gives patients "the best possible chance to live a full and active life" |
| Purdue | Prescribers and Plaintiffs | Advertising produced in 2016 | Advertising from Purdue that "We sell hope in a bottle." |
| Purdue | Prescribers and Plaintiffs | 2010 onwards | Statements that OxyContin's 12-hour dosing would allow patients to only need to take OxyContin twice a day, thus requiring fewer pills |
| Purdue | Prescribers and Plaintiffs | 2013 onwards | Statements from Purdue at McKinsey's direction that OxyContin allowed physicians to "Individualize the Dose" and that the dose of OxyContin can safely be increased or tailored as the patients adapt to a certain dose |
| Endo | Prescribers and Plaintiffs | 2009 | Statements made on an Endo-sponsored website, PainKnowledge.com, indicating that patients who take opioids as prescribed usually do not become addicted |
| Endo | Prescribers and Plaintiffs | 2009 | Statements made on another Endo-sponsored website, PainAction.com, indicating that most chronic pain patients do not become addicted to opioid medications |
| Endo | Prescribers and Plaintiffs | Various | Statements in pamphlets and publications described by Endo indicating that most people who take opioids for pain relief do not develop an addiction |
| Endo | Prescribers and Plaintiffs | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid use does not result in addiction |
| Endo | Prescribers and Plaintiffs | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid dependence can be addressed by dosing methods such as tapering |
| Endo | Prescribers and Plaintiffs | Various | Statements made on its website, PainKnowledge.com, that opioid dosages could be increased indefinitely |
| Endo | Prescribers and Plaintiffs | Various | Statements made in a publication entitled "Understanding Your Pain: Taking Oral Opioid Analgesics" suggesting that opioid doses can be increased indefinitely |

| Endo | Prescribers | Various | Electronic and telephonic communications to its sales representatives indicating that the formula for its medicines is "crush resistant" |
| Endo | Prescribers and Plaintiffs | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book |
| Endo | Prescribers | Various | Telephonic and electronic communications by its sales representatives indicating that opioids will improve patients' function |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, indicating that concerns about opioid addiction are overestimated |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements in a 2009 patient education guide claiming that opioids are rarely addictive when used properly |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements included on a 2009 Janssen-sponsored website promoting the concept of opioid pseudoaddiction |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, advocating the concept of opioid pseudoaddiction |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, indicating that opioid addiction can be managed |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements in its patient education guide indicating the risks associated with limiting the dosages of pain medicines |
| McKinsey | Purdue (with prescribers as the planned target) | July 18, 2013 | Discussion of McKinsey plan to increase calls to doctors' offices to fraudulently promote OxyContin, including via "phone, video and even Google like proprietary tools" [432] |
| McKinsey | Purdue (with prescribers as the planned target) | April 24, 2017 | Plan to promote OxyContin to "no-see" physicians through "remote interactions" including presenting "brand interaction and materials" "over the phone/internet"[433] |
| McKinsey | McKinsey | July 14, 2013 | Internal emails interpreting "the Purdue situation" and discussing OxyContin sales strategy including sales benchmarks and "focus on the highest potential docs"[434] |
| McKinsey | Purdue (with prescribers as the | September 23, 2013 | Evolve 2 Excellence PowerPoint planning execution of the scheme and discussing targeted performance metrics including "sales management calls per day, calls per year and adhering to target list"[435] |

---

[432] MCK-MDL2996-0104431, at 0104442
[433] MCK-MDL2996-0104840
[434] MCK-MDL2996-0364024
[435] MCK-MDL2996-0316833, at 0316834

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

| | planned target) | | |
|---|---|---|---|
| McKinsey | Purdue | July 30, 2013 | Presentation showing "Scope of potential OxyContin growth opportunities" with proposed process including "Generate target list" and using "Reps/DMs [to] perform call planning (including refining target list)"[436] |

730.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Plaintiffs, and other intended victims.

731.    These were not isolated incidents. Instead, the Opioid Marketing Enterprise Members engaged in a pattern of racketeering activity by committing thousands of predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue in the future.

732.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and Plaintiffs. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the opioid distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

733.    Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

734.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and Plaintiffs. Each separate use of the U.S. Mail

---

[436] MCK-MDL2996-0303399

2331633.1

1    and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had

2    similar intended purposes, involved similar participants and methods of execution, and had the

3    same results affecting the same victims, including consumers, prescribers, regulators, and

4    Plaintiffs. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering

5    activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing

6    Enterprise.

7         735.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the

8    violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§

9    1341 and 1343 offenses.

10        736.    As described herein, the Opioid Marketing Enterprise Members engaged in a

11   pattern of related and continuous predicate acts for many years. The predicate acts constituted a

12   variety of unlawful activities, each conducted with the common purpose of obtaining significant

13   money and revenue from the marketing and sale of their highly addictive and dangerous drugs.

14   The predicate acts also had the same or similar results, participants, victims, and methods of

15   commission. The predicate acts were related and not isolated events.

16        737.    The Opioid Marketing Enterprise Members' violations of law and pattern of

17   racketeering activity directly and proximately caused Plaintiffs injury in their business and

18   property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically,

19   substantially, and foreseeably caused an opioid epidemic. The injuries of Plaintiff, as described

20   herein, were not unexpected, unforeseen, or independent. Rather, as Plaintiffs allege, the Opioid

21   Marketing Enterprise Members as a whole and McKinsey in particular knew that the opioids were

22   unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use

23   not approved by the FDA, and knew that opioids were highly addictive and subject to abuse.

24   Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that

25   utilized the mail and wires in order to carry out the Opioid Marketing Enterprise's fraudulent

26   scheme, thereby increasing sales of their opioid products.

27        738.    It was foreseeable and expected that the Opioid Marketing Enterprise Members

28   creating and then participating in the Opioid Marketing Enterprise through a pattern of

1   racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid

2   epidemic, including increased opioid addiction and overdose and the injuries that occurred as a

3   result.

4   **The Enterprise Was Well Aware of Risks of Abuse Before It "Turbocharged" its Marketing**

5   **Scheme.**

6          739.    These devastating results were eminently foreseeable by the Opioid Marketing

7   Enterprise Members.

8          740.    When Purdue pleaded guilty in 2007, it was evident that Purdue's behavior and

9   excessive prescribing was directly linked to a drug addiction crisis that caused severe and

10  extensive damage to America. Purdue's methods included "using aggressive marketing tactics to

11  convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say

12  helped fuel a drug addiction crisis that has ravaged America for decades."[437]

13         741.    McKinsey cannot deny knowledge regarding Purdue's 2007 guilty plea. At that

14  point, McKinsey knew that opioids were addictive. McKinsey knew that OxyContin was being

15  widely abused and causing harm to people and entities like Plaintiffs. And McKinsey knew that

16  Purdue had been fraudulently marketing OxyContin as less addictive, less subject to abuse, and

17  less likely to cause withdrawal. And yet, years later, in 2013, McKinsey orchestrated a scheme to

18  continue to aggressively promote opioids despite knowledge that people were still dying from

19  overdoses.

20         742.    Thus, McKinsey continued to add fuel to this fire by persisting in aggressively

21  marketing to physicians and continuing to fuel the opioid crisis after Purdue's guilty plea. It was

22  foreseeable that continuing to do so would devastate American communities.

23  █████  ███████████████████████████████████████

24  ████████████████████████████████████████████████

25  ████████████████████████████████████████████████

26  ██████████  ██████████████████████████████████████

27

28  ---

---

[437] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html.
[438] MCK-MDL2996-0070516, at 0070517

2331633.1



744.

2331633.1

1
2
3
4
5
6
7
8
9
10
11



12   745.    Similarly, news stories across the nation reported additional consequences of wide

13   scale opioid addiction: needles littered around public property, posing costs to the governments

14   and danger to residents.[439]

15   746.    The foreseeability of the abuse and need for additional services that would be

16   required following the misleading marketing and increased prescribing and use of high dose

17   opioids is also evidenced by McKinsey's attempt to put a price tag on overdoses. McKinsey

18   suggested payment amounts for event-based contracts: $6,000 to $15,000 (paid to health insurers

19   for increased medical services). Indeed, McKinsey was well aware that increased prescriptions

20   would lead to overdoses and to an additional financial burden for social and health services.

21   747.    McKinsey is liable for its successful efforts to increase OxyContin sales after

22   Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's focus on increasing

23   opioid sales after Purdue's guilty was incendiary to escalating and perpetuating the opioid

24   epidemic by: (a) using data to specifically target high volume prescribers; (b) persuading sales of

25   higher doses of opioids; (c) tailoring marketing messages to conceal their addictive principles;

26   and (d) by reducing the training of sales representatives.

27

28   _____

[439] *See, e.g.*, https://www.bostonglobe.com/metro/regionals/south/2014/10/25/hypodermic-needles-litter-landscape-south-boston/pzgmgbyjYFCD967TePDyiM/story.html

748.    In 2012, when the consent decree expired (which obligated Purdue to submit annual compliance reports regarding its marketing), McKinsey helped Purdue reengage in its nefarious conduct of targeting and deceiving doctors about the abuse potential of opioids.

749.    After Purdue's guilty plea, McKinsey identified physicians—that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin. McKinsey monitored the prescription behaviors of individual doctors and utilized the prescriber-level data and urged Purdue to allocate its time and resources to high prescribing physicians.

750.    By November 2013, McKinsey had obtained the physician-level data it had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them.

751.    In 2013, Project Turbocharge began. McKinsey proposed Project Turbocharge, a marketing strategy to increase opioids sales by hundreds of millions of dollars annually. With McKinsey's assistance, Purdue trained its sales representatives to operate using McKinsey's strategy for selling OxyContin. It is not coincidental to the Enterprise scheme that as soon as the constraints associated with its guilty plea and consent agreement ended, McKinsey assisted Purdue in turbocharging sales.

752.    While McKinsey was pushing hard to turbocharge and promote the sale of opioids, it anticipated and expected that people would die from opioid overdoses. It acknowledged this when in 2017, it proposed that Purdue pay health insurers or other entities in the distribution chain rebates "for every OxyContin overdose attributable to pills they sold."[440]

753.    McKinsey cannot deny that it was not aware of the abuse and overdose potential of opioids when it provided estimates for the future costs of overdose or opioid use disorder events.

754.    McKinsey and the other Opioid Marketing Enterprise Members marketed a product, through intentionally deceptive means, that it knew would result in consumer deaths and harm to Plaintiffs. This is not an attenuated causal chain. Rather, aggressively marketing to high

---

[440] Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. Times (updated Nov. 5, 2021), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html

2331633.1

1    prescribing individuals, and training to not fully disclose the risk of abuse, were integral parts of

2    the marketing scheme. Deceptive messaging to targeted prescribers who were likely to prescribe

3    more pills in a dose with an anticipated abuse potential was part and parcel of the scheme to

4    defraud.

5         755.    As a result, Plaintiffs have shouldered the burden of these anticipated increased

6    services and harm to business and property that are inherently tied to opioid abuse and misuse,

7    and both the increased services and harms were reasonably and actually expected from increased

8    prescribing.

9         756.    The Enterprise's goal was to increase opioid prescribing, and the Enterprise

10   Members knew that doing so would also result in the need for increased medical services. It was

11   also foreseeable that increased prescriptions would also result in increased costs to Plaintiffs and

12   communities throughout the United States.

13        757.    But for the increase in prescribed opioids, Plaintiffs would not have to expend

14   additional resources or suffered other harm to business and property as a result of harms

15   associated with opioid addiction. The Enterprise persisted in targeting prescribers to prescribe

16   high doses of opioids and knew that doing so would result in adverse health and social outcomes,

17   including overdoses, neo-natal complications, harm to communities like Plaintiffs, hazardous

18   waste in Plaintiff communities, as well as and increased expenditures on services to combat such

19   ill effects.

20   **Plaintiffs' Business and Property Have Been Damaged by the Enterprise's RICO**

21   **Violations.**

22        758.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent

23   prescription opioid diversion damaged Plaintiffs. In addition to medical services, the Opioid

24   Marketing Enterprise's misconduct has contributed to a range of social problems, including

25   violence and delinquency. Adverse social outcomes include child neglect, family dysfunction,

26   babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment,

27   and social despair. As a result, Plaintiffs are devoting more and more resources to the opioid

28   epidemic.

759.     Notably, Plaintiffs have experienced vast harm to Tribal business and property directly, proximately, and foreseeably caused by the racketeering enterprise. The full extent of each Plaintiffs' damage cannot be fully captured in this pleading but can be fleshed out during the bellwether process. Below are some discrete examples that demonstrate the common and typical universal harm to Plaintiffs and the specific types of harm foreseeably caused by the Opioid Marketing Enterprise.

760.     Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid epidemic. The injuries to Plaintiffs, as alleged throughout this Complaint, and expressly incorporated herein by reference, include new, different, and increased expenditures by and losses to the Tribes, for example:

A.     Hazardous waste in Plaintiffs' communities, including on Plaintiffs' real property;

B.     Contamination of traditional food sources, which can cause economic harm to Tribal businesses such as commercial fishing;

C.     Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

D.     Costs of training first responders in the proper treatment of drug overdoses;

E.     Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

F.     Costs associated with emergency responses by first responders to opioid overdoses;

G.     Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

1      H.      Costs for providing treatment of infants born with opioid-related medical

2   conditions, or born dependent on opioids due to drug use by mothers during pregnancy;

3      I.      Increased costs for Tribal health organizations in the form of increased

4   expenditures on prescription opioids and their generic equivalents as a result of the Opioid

5   Marketing Enterprise Members' misstatements and omissions;

6      J.      Costs associated with the injuries to the health and welfare of the Tribal

7   members and residents who reside in the Tribal Plaintiffs' jurisdictionscaused by the

8   opioid epidemic;

9      K.      Costs associated with providing care for children whose parents suffer

10   from opioid-related disability or incapacitation;

11      L.      Costs associated with child protective services resulting from children

12   being removed from their homes due to their parents' addiction to opioids;

13      M.      Costs associated with increased need for judicial staff to address increased

14   crime and child removal cases;

15      N.      Burial costs associated with opioid-related deaths;

16      O.      Diversion of profits from Tribally-owned business enterprises that could

17   otherwise have been reinvested in those business enterprises or used to provide

18   government services, loss of business revenue due to decreased productivity of Tribes'

19   employees and adverse economic conditions created by the opioid epidemic, and loss of

20   tax revenue;

21      P.      Decrease in revenues in Tribally-owned businesses due to decreased

22   employee productivity and adverse economic conditions that accompany the opioid

23   epidemic, which have been created by the Opioid Marketing Enterprise Members' pattern

24   of racketeering activity; and

25      Q.      Losses caused by the diversion of revenue to address the opioid epidemic

26   that would otherwise have been used to provide other services.

27   761.    The injuries to Plaintiffs were directly and proximately caused by the Enterprise's

28   racketeering activities because they were the logical, substantial, and foreseeable cause of the

1    injuries to Plaintiffs. But for the opioid epidemic created by the Opioid Marketing Enterprise

2    Members through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or

3    property, and the health and welfare of citizens would not have been harmed.

4          762.    Plaintiffs have been injured by the Enterprise's conduct, and such injury would not

5    have occurred but for the predicate acts which also constitute acts taken in furtherance of the

6    conspiracy pursuant to Section 1962(d). By working to expand the opioid market, fraudulently

7    concealing the abuse potential of opioids, targeting high volume prescribers, and deceiving

8    prescribers and the public in order to allow opioids to continue to remain on the market, the

9    Enterprise caused the expansion of opioid prescribing and caused a large number of people across

10   the United States, including in Plaintiffs' communities to become addicted to opioids, thus

11   forcing Plaintiffs to expend, time, money and resources to address the opioid epidemic that

12   McKinsey and the Enterprise created through their conduct. Indeed, McKinsey intentionally

13   deceived doctors and public health workers in order to continue to grow the opioid market. The

14   repeated fraudulent misstatements by McKinsey contributed to an explosion in the use of opioids

15   across the country.

16         763.    Plaintiffs were direct victims of McKinsey's misconduct. The Enterprise displayed

17   a wanton disregard for public health and safety by intentionally deceiving doctors about the

18   addiction potential of opioids and by marketing higher doses to physicians. The harm created by

19   McKinsey required Plaintiffs to expend financial and other resources to mitigate the health crisis

20   of opioid misuse and addiction. The expansion of this market was the goal of the Enterprise and

21   was critical to its success. Therefore, the harm suffered by Plaintiffs to their property forced them

22   to expend resources beyond the ordinary costs of services to combat the opioid epidemic, was

23   directly foreseeable, and in fact, was an intentional result of McKinsey's misconduct. Indeed,

24   McKinsey anticipated overdose events and actually estimated price premiums on these expected

25   overdose events. McKinsey knew that the products it was marketing were highly addictive and

26   could lead to deadly overdoses yet continued to "turbocharge" sales by fraudulently pushing the

27   product on doctors through its deceptive marketing scheme.

28

764.    The creation and implementation of the marketing scheme that McKinsey developed and deployed through its Enterprise directly harmed Plaintiffs by imposing costs on their businesses and properties. The harm caused by this scheme was an unnatural, human-caused, profit-driven, and completely preventable disaster (had the Enterprise Members obeyed the law). Thus, Plaintiffs' injuries are not solely the result of routine government expenses. Instead, as a result of McKinsey's misconduct, Plaintiffs have been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce laws and to promote the general welfare in order to combat the opioid epidemic, whose primary origins were in prescription opioids administered by prescribers whom McKinsey targeted with its marketing scheme to increase sales. This includes providing new programs and new services as a direct result and in direct response to McKinsey's misconduct. In addition, Plaintiffs have suffered losses to their property as a direct result of the kind of inevitable consequences of the drug addiction and criminal behavior that McKinsey predicted. As a result of the conduct of the Enterprise, Plaintiffs have incurred and will continue to incur costs that far exceed the norm.

765.    The injuries to Plaintiffs were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Plaintiffs. But for the opioid epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property, and the health and welfare of Tribal members and residents in Plaintiffs' jurisdictions would not have been harmed. Moreover, McKinsey's internal documents show that it actually did foresee many of the harms that resulted from its conduct.

766.    There are no intervening acts or parties that could interrupt the causal chain between McKinsey's mail and wire fraud and Plaintiffs' injuries. McKinsey, in furtherance of the Enterprise's common purpose, caused to be made false and misleading statements directly to the doctors (who consumers rely on to provide health advice) and the public. Doctors are not a break in the causal chain. Instead, the Enterprise members as a whole, and McKinsey in particular, intentionally targeted doctors and sought to deceive them. That doctors were then deceived and

1    behaved as the Enterprise wanted, prescribing more and more opioids, was the purpose of the

2    scheme, not an intervening cause.

3           767.    The Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately

4    caused injuries and damages to Plaintiffs, and Plaintiffs are entitled to bring this action for three

5    times their actual damages, as well as for injunctive/equitable relief, costs and reasonable

6    attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

7           **B.      Alaska Tribal Plaintiffs**

8           768.    The Alaska Tribal Plaintiffs are Akiak Native Community, Alaska Native Tribal

9    Health Consortium; Aleutian Pribilof Islands Association, Inc.; Arctic Slope Native Association;

10   Asa'carsarmiut Tribe; Bristol Bay Area Health Corporation; Chugachmiut, Inc.; Copper River

11   Native Association; Eastern Aleutian Tribes; the Kenaitze Indian Tribe; Kodiak Area Native

12   Association; Native Village of Port Heiden; Norton Sound Health Corporation; Southcentral

13   Foundation; Southeast Alaska Regional Health Consortium; Tanana Chiefs Conference; and

14   Yukon-Kuskokwim Health Corporation.

15          **1.      Public Nuisance under Alaska Law**

16          769.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

17   herein, and further allege as follows:

18          770.    Section 821B of the Restatement (Second) Torts defines a "public nuisance" as

19   "an unreasonable interference with a right common to the general public."

20          771.    This claim is brought by Alaska Tribal Plaintiffs to abate the public nuisance

21   created by McKinsey through its work with Purdue and other opioid supply chain clients.

22          772.    McKinsey has created and/or assisted in the creation of a condition that

23   significantly interferes with the common right to public health and public safety. McKinsey's

24   conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a

25   significant effect upon the public right.

26          773.    The public nuisance is substantial and unreasonable. McKinsey's actions caused

27   and continue to cause the public health epidemic described above and that harm outweighs any

28   offsetting benefit.

774. McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

775. McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

776. McKinsey has breached its duties to Alaska Tribal Plaintiffs by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less or non-addictive painkillers.

777. Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

778. McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of Alaska Tribal Plaintiffs' members and interfered with the comfortable enjoyment of life and property of others, specifically that of Alaska Tribal Plaintiffs and their members.

779. McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

780. McKinsey's acts and omissions render Alaska's Tribal communities insecure.

781. Alaska Tribal Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

782. McKinsey's acts and omissions affect the entire communities of Alaska Tribal Plaintiffs.

783.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of Tribal communities in Alaska.

784.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

785.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

786.   McKinsey has failed to abate the nuisance it created.

787.   Alaska Tribal Plaintiffs seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

788.   Alaska Tribal Plaintiffs seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

789.   As a direct result of McKinsey's conduct, Alaska Tribal Plaintiffs have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

790.   McKinsey is liable to Alaska Tribal Plaintiffs for the costs borne by Alaska Tribal Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

### 2.   Negligence under Alaska Law

791.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

792.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, Alaska Tribal Plaintiffs suffered damages as alleged herein.

793.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed Alaska Tribal Plaintiffs a duty to not expose Alaska Tribal Plaintiffs to an unreasonable risk of harm.

794.    McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

795.    McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to Alaska Tribal Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

796.    McKinsey breached its duty to Alaska Tribal Plaintiffs by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Alaska, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

797.    It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to Alaska Tribal Plaintiffs described herein.

798.    McKinsey's failure to comply with its duties of care proximately caused damage to Alaska Tribal Plaintiffs.

799.    The negligence of McKinsey was a substantial factor in causing Alaska Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Alaska, higher incidence of addiction among Alaska Tribal Plaintiffs' members, and Alaska Tribal Plaintiffs

would not have incurred the increased costs that are associated with higher levels of supply and addiction.

800.    As a further direct and proximate result of McKinsey's negligence, Alaska Tribal Plaintiffs suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

801.    There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to Alaska Tribal Plaintiffs.

802.    Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

803.    Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected Alaska Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Alaska Tribal Plaintiffs and their citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of Alaska Tribal Plaintiffs as set forth by Alaska Code of Civil Procedure § 09.17.020. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

804.    Alaska Tribal Plaintiffs are without fault, and the injuries to Alaska Tribal Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

805.    Alaska Tribal Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 3.      Fraud under Alaska Law

806.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

807.     McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made. These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

808.     For instance, McKinsey, working through Purdue and other opioid supply chain clients, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

809.     McKinsey also made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

810.     McKinsey continued making these materials misrepresentations and omissions, and failed to correct them, despite repeated regulatory settlements and publications demonstrating the false nature of McKinsey's claims.

811.   Doctors, including those working in hospitals and clinics operated by Tribal health organizations in Alaska or serving Alaska Tribal communities, relied on these misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

812.   Patients, including members of Alaska Tribal communities, relied on McKinsey's misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

813.   McKinsey is liable to Alaska Tribal Plaintiffs for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Alaska Tribal Plaintiffs.

## 4.   Unfair Competition (Alaska Unfair Trade Practices and Consumer Protection Act AS § 45.50.471, *et seq.*)

814.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

815.   Alaska Unfair Trade Practices and Consumer Protection Act ("UTPA") § 45.50.471(a) prohibits any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce."

816.   At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from Alaska Tribal Plaintiffs, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the UTPA as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the UTPA because the practices were likely to deceive consumers in Alaska.

817.   McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

818.   McKinsey's omissions, which were deceptive and misleading in their own right, render even McKinsey's seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive Alaska Tribal Plaintiffs.

819.     McKinsey's business practices as described in this Complaint are unlawful and violate the UTPA.

820.     These unlawful practices include, but are not limited to:

a.     Through Purdue and other opioid supply chain clients, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of UTPA § 45.50.471(b)(4);

b.     Through Purdue and other opioid supply chain clients, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of UTPA § 45.50.471(b)(6);

c.     McKinsey unlawfully failed to identify and report suspicious prescribing to law enforcement and health authorities; and

d.     Through Purdue and other opioid supply chain clients, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or caused untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of UTPA.

821.     McKinsey's business practices as described in this Complaint are unfair and violate the UTPA because they offend established public policy and because the harm they caused to Alaska Tribal Plaintiffs greatly outweighs any benefits associated with those practices.

822.     As a direct and proximate result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UTPA described in this Complaint.

823.     As a direct and proximate result of the foregoing acts and practices, McKinsey obtained an unfair advantage over similar businesses that have not engaged in such practices.

### 5.     Civil Conspiracy under Alaska Law

824.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

825.     Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of

treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout Alaska Tribal Plaintiffs' reservations and communities.

826.     For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

827.     Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

828.     None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

829.     Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

830.     As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, Alaska Tribal Plaintiffs and their citizens have suffered damages.

831.     Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

**C.     Arizona Tribal Plaintiffs**

832.     The Arizona Tribal Plaintiffs are the Gila River Indian Community; the Navajo Nation; the Pascua Yaqui Tribe; and the San Carlos Apache Tribe.

1          **1.      Public Nuisance under Arizona Law**

2          833.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

3    herein, and further allege as follows:

4          834.    Section 821B of the Restatement (Second) Torts defines a "public nuisance" as

5    "an unreasonable interference with a right common to the general public."

6          835.    This claim is brought by Arizona Tribal Plaintiffs to abate the public nuisance

7    created by McKinsey through its work with Purdue and other opioid supply chain clients.

8          836.    McKinsey has created and/or assisted in the creation of a condition that

9    significantly interferes with the common right to public health and public safety. McKinsey's

10   conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a

11   significant effect upon the public right.

12         837.    The public nuisance is substantial and unreasonable. McKinsey's actions caused

13   and continue to cause the public health epidemic described above and that harm outweighs any

14   offsetting benefit.

15         838.    McKinsey knew or should have known that its promotion of opioids was false and

16   misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent

17   actions would create or assist in the creation of the public nuisance—the opioid epidemic.

18         839.    McKinsey's actions were, at the very least, a substantial factor in opioids

19   becoming widely available and widely used. McKinsey's actions were, at the very least, a

20   substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the

21   treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction

22   would not have become so widespread, and the opioid epidemic that now exists would have been

23   averted or much less severe.

24         840.    McKinsey has breached its duties to Arizona Tribal Plaintiffs by disseminating

25   false and misleading information through Purdue and other opioid supply chain clients regarding

26   the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain

27   management despite the availability of other, less or non-addictive painkillers.

28

841.    Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

842.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of Arizona Tribal Plaintiffs and their citizens and interfered with the comfortable enjoyment of life and property of others, specifically that of Arizona Tribal Plaintiffs and their members.

843.    McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

a.      to be free from reasonable apprehension of danger to person and property;

b.      to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.      to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around Arizona Tribal Plaintiffs' reservations and communities;

d.      to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.      to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

f.      to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

844.    McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

845.    McKinsey's acts and omissions render Arizona Tribal Plaintiffs' citizens insecure.

846.    Arizona Tribal Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

847.    McKinsey's acts and omissions affect the entire communities of Arizona Tribal Plaintiffs.

848.    McKinsey's acts and omissions threatened and directly harmed the health and welfare of Arizona Tribal Plaintiffs and their citizens.

849.    McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

850.    The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

851.    McKinsey has failed to abate the nuisance it created.

852.    Arizona Tribal Plaintiffs seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

853.    Arizona Tribal Plaintiffs seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

854.    As a direct result of McKinsey's conduct, Arizona Tribal Plaintiffs have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

855.    McKinsey is liable to Arizona Tribal Plaintiffs for the costs borne by Arizona Tribal Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

856.    McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

a.    has harmed and will continue to harm the public health and public peace of Arizona Tribal Plaintiffs;

b.    has harmed and will continue to harm Arizona Tribal Plaintiffs' neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

1     c.  violates statutory and common law duties;

2     d.  is of a continuing nature, and has produced long-lasting effects; and

3     e.  is known to McKinsey that its conduct has a significant effect upon the

4 public rights of Arizona Tribal Plaintiffs and their citizens.

5    857.  In addition, and independently, McKinsey's conduct invades a legally protected

6 interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference

7 because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent

8 knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic

9 pain.

10    858.  Because the co-conspirators have marketed and sold prescription opioids in a

11 manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and

12 substantially interfered with a right common to the general public, McKinsey is liable for public

13 nuisance.

14    859.  The nuisance has affected Arizona Tribal Plaintiffs in that it has undermined, is

15 undermining, and will continue to undermine the public health, quality of life, and safety of

16 Arizona Tribal Plaintiffs' citizens. It has resulted in increased crime and property damage within

17 Arizona Tribal Plaintiffs' reservations and communities. It has resulted in high rates of addiction,

18 overdoses, and dysfunction within Arizona Tribal Plaintiffs' families and communities.

19    860.  Arizona Tribal Plaintiffs' resources have been, are being, and will be consumed in

20 efforts to address the opioid epidemic, thereby eliminating available resources that could be used

21 to benefit Arizona Tribal Plaintiffs.

22    861.  McKinsey's actions and omissions annoy, injure, and endanger the comfort,

23 repose, health, and safety of Arizona Tribal Plaintiffs, offend decency, and render Arizona Tribal

24 Plaintiffs' citizens insecure in their lives and the use of property.

25    862.  McKinsey's nuisance-causing activities are not outweighed by their utility. In fact,

26 these activities are illegal and have no social utility whatsoever. There is no legitimately

27 recognized societal interest in marketing and selling prescription opioids through false and

28 misleading representations.

863.    As a direct and proximate result of the nuisance caused by McKinsey and others, Arizona Tribal Plaintiffs' citizens have been injured in their ability to enjoy rights common to the public.

864.    As a direct and proximate result of the nuisance, Arizona Tribal Plaintiffs have sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social services, welfare, and education systems.

865.    Arizona Tribal Plaintiffs have suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of Arizona Tribal Plaintiffs' culture as well as threatened their continued existence as sovereign Nations.

866.    Arizona Tribal Plaintiffs have also suffered unique harms of a kind that are different from their citizens at large, namely, that Arizona Tribal Plaintiffs have been harmed in their proprietary interests.

### 2.    Negligence under Arizona Law

867.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

868.    The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, Arizona Tribal Plaintiffs suffered damages as alleged herein.

869.    McKinsey, through its work with Purdue and other opioid supply chain clients, owed Arizona Tribal Plaintiffs a duty to not expose Arizona Tribal Plaintiffs to an unreasonable risk of harm.

870.    McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

871.     McKinsey, through its work with Purdue and other opioid supply chain clients,

owed a duty of care to Arizona Tribal Plaintiffs, pursuant to which it would not encourage the

over-marketing and over-prescribing of a controlled substance known at the time to be addictive

and known at the time to be a threat to public health.

872.     McKinsey breached its duty to Arizona Tribal Plaintiffs by working with Purdue

and other opioid supply chain clients to deceptively market and sell opioids, including

minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-

term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid

supply chain clients with implementing a sales and marketing campaign, including Purdue with

Project Turbocharge, that would dramatically increase the amount of opioids prescribed and

distributed to Tribal members in Arizona, including OxyContin. In the process, McKinsey

continually devised misleading claims regarding opioids as part of their efforts to get healthcare

providers to write more and more opioids prescriptions.

873.     It was reasonably foreseeable that McKinsey's actions and omissions would result

in the harm to Arizona Tribal Plaintiffs described herein.

874.     McKinsey's failure to comply with its duties of care proximately caused damage

to Arizona Tribal Plaintiffs.

875.     The negligence of McKinsey was a substantial factor in causing Arizona Tribal

Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase

sales in the years following the 2007 guilty plea, including the five years under the Corporate

Integrity Agreement and the years since its expiration. In the absence of increased sales of

prescription opioids, there would not have been increased supply of opioids in Arizona, higher

incidence of addiction among Arizona Tribal Plaintiffs' members, and Arizona Tribal Plaintiffs

would not have incurred the increased costs that are associated with higher levels of supply and

addiction.

876.     As a further direct and proximate result of McKinsey's negligence, Arizona Tribal

Plaintiffs suffered damages including, but not limited to, economic loss, business loss, property

1    damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or

2    dependency, and neonatal abstinence syndrome.

3          877.    There is moral blame attached to McKinsey because of the terrible injuries and

4    suffering their misconduct caused, including the damage to Arizona Tribal Plaintiffs.

5          878.    Public policy supports finding a duty of care in this circumstance, and a finding of

6    a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the

7    future.

8          879.    Further, the conduct alleged against McKinsey in this Complaint was despicable

9    and subjected Arizona Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their

10   rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary

11   damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard

12   for the safety and welfare of others, including Arizona Tribal Plaintiffs and their citizens.

13   McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference

14   to the interests of Arizona Tribal Plaintiffs. An officer, director, or managing agent of McKinsey

15   personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in

16   this Complaint.

17         880.    Arizona Tribal Plaintiffs are without fault, and the injuries to Arizona Tribal

18   Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due

19   care commensurate to the dangers involved in the distribution and dispensing of controlled

20   substances.

21         881.    Arizona Tribal Plaintiffs are entitled to an award of punitive damages sufficient to

22   punish and make an example of McKinsey.

23                        **3.**      **Fraud under Arizona Law**

24         882.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

25   herein, and further alleges as follows:

26         883.    McKinsey committed fraud by acting to conceal and advising the concealment of

27   the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase

28   sales of opioids through its work for Purdue and others, and concealing all of this information

1    from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint,

2    McKinsey, working through Purdue and other opioid supply chain clients, made material

3    misrepresentations concerning the sale of prescription opioids, as well as false or misleading

4    descriptions and representations of fact during the advertising and promotion of prescription

5    opioids, and those material misrepresentations and false or misleading descriptions and

6    representations of fact were knowingly or recklessly made. These were accompanied by

7    omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

8         884.    For instance, McKinsey, working through Purdue and other opioid supply chain

9    clients, made these material misrepresentations and false or misleading descriptions and

10   representations of fact in an intentional effort to deceive and induce doctors and patients to

11   prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

12   for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were

13   unsuited to these treatments and that opioids were highly addictive and subject to abuse.

14        885.    McKinsey also made statements promoting the use of opioids to treat chronic pain

15   that omitted or concealed material facts and failed to correct prior misrepresentations and

16   omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and

17   misleading in their own right, render even their seemingly truthful statements about opioids false

18   and misleading.

19        886.    McKinsey continued making these materials misrepresentations and omissions,

20   and failed to correct them, despite repeated regulatory settlements and publications demonstrating

21   the false nature of McKinsey's claims.

22        887.    Doctors, including those working in hospitals and clinics operated by Tribal health

23   organizations in Arizona or serving Arizona Tribal communities, relied on these

24   misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and

25   non-cancer pain, and for other uses not approved by the FDA.

26        888.    Patients, including members of Arizona Tribal communities, relied on McKinsey's

27   misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute,

28   and non-cancer pain, and for other uses not approved by the FDA.

889.    McKinsey is liable to Arizona Tribal Plaintiffs for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Arizona Tribal Plaintiffs.

**4.    Violation of Arizona Consumer Fraud Act (Ariz. Rev. Stat. §§ 44-1521 to -1534)**

890.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

891.    McKinsey violated the Arizona Consumer Fraud Act ("Ariz. CFA") by using deception, deceptive and unfair acts and practices, and fraud in connection with the marketing and/or sale of prescription opioids. A.R.S. § 44-1522.

892.    McKinsey violated the Arizona Consumer Fraud Act in connection with the marketing and/or sale of prescription opioids, by making misrepresentations, or by concealing, suppressing, or omitting material facts with the intent that others would rely on such misrepresentations, concealments, suppressions, or omissions. A.R.S. § 44-1522.

893.    As a consequence, and proximate result of, such deception, deceptive or unfair acts or practices, fraud, misrepresentations, and concealment, suppression, or omission of material facts, Arizona Tribal Plaintiffs have been injured and suffered damages.

894.    McKinsey has acted wantonly or recklessly or has engaged in conduct that demonstrates a reckless indifference to the interests of others.

895.    By reason of these deceptive acts and/or practices, Arizona Tribal Plaintiffs and their citizens were injured.

896.    At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from Arizona Tribal Plaintiffs, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the Ariz. CFA as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the Ariz. CFA because the practices were likely to deceive consumers in Arizona.

897.    McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

898.    McKinsey's omissions, which were deceptive and misleading, render even McKinsey's seemingly truthful statements about opioids false and misleading. All this conduct, separately and collectively, was likely to deceive Arizona Tribal Plaintiffs.

899.    McKinsey's business practices as described in this Complaint are unlawful and violate the Ariz. CFA.

900.    These unlawful practices include, but are not limited to:

a.    Through Purdue and other opioid supply chain clients, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of Ariz. CFA;

b.    Through Purdue and other opioid supply chain clients, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of Ariz. CFA;

c.    McKinsey unlawfully failed to identify and report suspicious prescribing to law enforcement and health authorities; and

d.    Through Purdue and other opioid supply chain clients, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of Ariz. CFA.

901.    McKinsey's business practices as described in this Complaint are unfair and violate the Ariz. CFA because they offend established public policy and because the harm they cause to Arizona Tribal Plaintiffs and their citizens greatly outweighs any benefits associated with those practices.

902.    258. As a direct and proximate result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which it would not

1   have received if they had not engaged in the violations of the Ariz. CFA described in this

2   Complaint.

3       903.    As a direct and proximate result of the foregoing acts and practices, McKinsey

4   obtained an unfair advantage over similar businesses that have not engaged in such practices.

5               **5.    Civil Conspiracy under Arizona Law**

6       904.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

7   herein, and further allege as follows:

8       905.    Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged,

9   and continue to engage, in a massive marketing campaign to misstate and conceal the risks of

10  treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this

11  Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding

12  medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a

13  significant increase in the number of opioids prescribed nationwide and throughout Arizona

14  Tribal Plaintiffs' reservations and communities.

15      906.    For example, McKinsey, Purdue, and other opioid supply chain clients agreed to

16  collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey,

17  Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this

18  Complaint.

19      907.    Without Purdue, other opioid supply chain clients, and McKinsey's

20  misrepresentations, which created greater demand for opioids, they would not have been able to

21  sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

22      908.    None of the opioid supply chain companies or McKinsey would have succeeded in

23  profiting so much from the opioid epidemic without the concerted conduct of the other parties.

24      909.    Purdue, other opioid supply chain clients, and McKinsey agreed with each other to

25  accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids

26  through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and

27  McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing,

28

1    selling, and distributing prescription opioids by means of misrepresentations and omissions,

2    violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

3        910.    As a result of the concerted action between Purdue, other opioid supply chain

4    clients, and McKinsey, Arizona Tribal Plaintiffs and their citizens have suffered damages.

5        911.    Purdue, other companies in the opioids supply chain, and McKinsey are jointly

6    and severally liable for the results of their concerted efforts.

7        **D.    California Tribal Plaintiffs**

8        912.    The California Tribal Plaintiffs are Feather River Tribal Health, Inc.; the Hoopa

9    Valley Tribe; Indian Health Council, Inc.; the Pala Band of Mission Indians; Riverside-San

10   Bernardino County Indian Health, Inc.; and the Yurok Tribe.

11       **1.    Public Nuisance – Cal. Civ. Code §§ 3479 and 3480**

12       913.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

13   herein, and further allege as follows:

14       914.    Civil Code § 3479 provides that "[a]nything which is injurious to health . . . or is

15   indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere

16   with the comfortable enjoyment of life or property . . . is a nuisance."

17       915.    Civil Code § 3480 defines a "public nuisance" as "one which affects at the same

18   time an entire community or neighborhood, or any considerable number of persons, although the

19   extent of the annoyance or damage inflicted upon individuals may be unequal."

20       916.    Civil Code § 3490 states that "[n]o lapse of time can legalize a public nuisance,

21   amounting to an actual obstruction of public right."

22       917.    Pursuant to Civil Code § 731, this action is brought by California Tribal Plaintiffs

23   to abate the public nuisance created by McKinsey.

24       918.    McKinsey has created or assisted in the creation of a condition that is injurious to

25   the health and interferes with the comfortable enjoyment of life and property of entire

26   communities or neighborhoods or of any considerable number of persons in the California's

27   Tribal communities in violation of Civil Code §§ 3479 and 3480.

28

919. The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

920. McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

921. McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

922. McKinsey has breached its duties to California Tribal Plaintiffs by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less or non-addictive painkillers.

923. Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

924. McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of California Tribal Plaintiffs and their members and interfered with the comfortable enjoyment of life and property of others, specifically that of California Tribal Plaintiffs and their members.

925. McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

926. McKinsey's acts and omissions render California Tribal Plaintiffs and their members insecure.

927.     California Tribal Plaintiffs did not consent, expressly or impliedly, to McKinsey's wrongful conduct.

928.     As a direct and legal result of the conduct of McKinsey, California Tribal Plaintiffs suffered harm that is different from the type of harm suffered by the general public. McKinsey's acts and omissions proximately caused injury to California Tribal Plaintiffs and their members including, *inter alia*, recoupment of costs of providing or paying for the healthcare, pharmaceutical care, and other necessary services of the California Tribal Plaintiffs, flowing from an ongoing and persistent public nuisance which California Tribal Plaintiffs seek to abate.

929.     McKinsey's acts and omissions affect the entire communities of California Tribal Plaintiffs.

930.     McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

931.     The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

932.     The hazardous condition which was created by and/or permitted to exist by McKinsey affected a substantial number of people at the same time within the general public, including Plaintiff, and constituted a public nuisance under Civil Code §§ 3479 and 3480.

933.     McKinsey has failed to abate the nuisance it created.

934.     California Tribal Plaintiffs seek economic damages from McKinsey as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

935.     Pursuant to California Code of Civil Procedure § 731, California Tribal Plaintiffs seek an order providing for abatement of the public nuisance McKinsey created or assisted in the creation of, and enjoining McKinsey from future violations of Civil Code §§ 3479 and 3480.

936.     California Tribal Plaintiffs seek economic damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

937.     As a direct result of McKinsey's conduct, California Tribal Plaintiffs and their members have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

938.     McKinsey is liable to California Tribal Plaintiffs for the costs borne by California Tribal Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

## 2.     Negligence under California Law

939.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

940.     The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, California Tribal Plaintiffs suffered damages as alleged herein.

941.     Through its work with Purdue and other opioid supply chain clients, McKinsey owed California Tribal Plaintiffs duties of care. McKinsey's failure to comply with their duties of care proximately caused damage to California Tribal Plaintiffs.

942.     McKinsey, through its work with Purdue and other opioid supply chain clients, owed California Tribal Plaintiffs a duty to not expose California Tribal Plaintiffs to an unreasonable risk of harm.

943.     McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

944.     McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to California Tribal Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

945.    McKinsey breached its duty to California Tribal Plaintiffs by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in California, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

946.    It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to California Tribal Plaintiffs described herein.

947.    McKinsey's failure to comply with its duties of care proximately caused damage to California Tribal Plaintiffs.

948.    The negligence of McKinsey was a substantial factor in causing California Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in California, higher incidence of addiction among California Tribal Plaintiffs' members, and California Tribal Plaintiffs would not have incurred the increased costs that are associated with higher levels of supply and addiction.

949.    As a further direct and proximate result of McKinsey's negligence, California Tribal Plaintiffs suffered damages including, but not limited to economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

950.    There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to California Tribal Plaintiffs.

951.    Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

952.    Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected California Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including California Tribal Plaintiffs and their citizens. McKinsey's conduct was and is despicable conduct and constitutes malice as defined by Cal. Civil Code § 3294. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the despicable and wrongful conduct alleged in this Complaint.

953.    California Tribal Plaintiffs are without fault, and the injuries to California Tribal Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

954.    California Tribal Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 3.    Fraud under California Law

955.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

956.    McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription

1   opioids, and those material misrepresentations and false or misleading descriptions and

2   representations of fact were knowingly or recklessly made. These were accompanied by

3   omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

4       957.   For instance, McKinsey, working through Purdue and other opioid supply chain

5   clients, made these material misrepresentations and false or misleading descriptions and

6   representations of fact in an intentional effort to deceive and induce doctors and patients to

7   prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

8   for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were

9   unsuited to these treatments and that opioids were highly addictive and subject to abuse.

10      958.   McKinsey also made statements promoting the use of opioids to treat chronic pain

11  that omitted or concealed material facts and failed to correct prior misrepresentations and

12  omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and

13  misleading in their own right, render even their seemingly truthful statements about opioids false

14  and misleading.

15      959.   McKinsey continued making these materials misrepresentations and omissions,

16  and failed to correct them, despite repeated regulatory settlements and publications demonstrating

17  the false nature of McKinsey's claims.

18      960.   Doctors, including those working in hospitals and clinics operated by Tribal health

19  organizations in California or serving California Tribal communities, relied on these

20  misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and

21  non-cancer pain, and for other uses not approved by the FDA.

22      961.   Patients, including members of California Tribal communities, relied on

23  McKinsey's misrepresentations and omissions in taking prescription opioids for long-term

24  chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

25      962.   McKinsey is liable to California Tribal Plaintiffs for the damage McKinsey's

26  material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false

27  statements have caused to California Tribal Plaintiffs.

28

1

### 4.     False Advertising Law (Cal. Bus. & Prof. Code § 17500, *et seq.*)

2       963.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

3 herein, and further allege as follows:

4       964.    Business and Professions Code § 17500, *et seq.* (the "FAL") makes it unlawful for

5 a business to make, disseminate, or cause to be made or disseminated to the public "any

6 statement, concerning . . . real or personal property . . . which is untrue or misleading, and which

7 is known, or which by the exercise of reasonable care should be known, to be untrue or

8 misleading."

9       965.    As alleged above, McKinsey's conduct working through Purdue and other opioid

10 supply chain clients was likely to deceive California Tribal Plaintiffs, who purchased or covered

11 the purchase of opioids for chronic pain.

12       966.    At times, places, and involving participants known exclusively to McKinsey and

13 other parties and concealed California Tribal Plaintiffs, McKinsey violated the FAL by making

14 and disseminating false or misleading statements about the use of opioids to treat chronic pain, or

15 by causing false or misleading statements about opioids to be made or disseminated to the public.

16       967.    McKinsey violated the FAL by making statements to promote the use of opioids to

17 treat chronic pain that omitted or concealed material facts, and by failing to correct prior

18 misrepresentations and omissions, about the risks and benefits of opioids. McKinsey's omissions,

19 which are false and misleading in their own right, render even their seemingly truthful statements

20 about opioids false and misleading.

21       968.    McKinsey's statements about the use of opioids to treat chronic pain were not

22 supported by or were contrary to the scientific evidence, as confirmed by later pronouncements of

23 the CDC, the FDA, and confirmed by recent investigations based on that evidence.

24       969.    McKinsey knew or should have known, at the time it made or disseminated the

25 false and misleading statements or caused these statements to be made or disseminated, that the

26 statements were false or misleading and therefore likely to deceive the public.

27

28

970.     In addition, McKinsey knew or should have known that its false and misleading advertising created a false or misleading impression of the risks and benefits of long-term opioid use and would result in unnecessary and improper opioid prescriptions and use.

### 5.     Unfair Competition (Cal. Bus. & Prof. Code § 17200, *et seq.*)

971.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

972.     Business and Professions Code § 17200, *et seq.* (the "UCL") prohibits any "unlawful, unfair or fraudulent business act or practice[]."

973.     At times, places, and involving participants known exclusively to McKinsey and third parties and concealed from California Tribal Plaintiffs, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the UCL as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the UCL because the practices were likely to deceive consumers in California.

974.     McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

975.     McKinsey's omissions, which were deceptive and misleading in their own right, render even McKinsey's seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive California payors who purchased, or covered the purchase of, opioids for chronic pain.

976.     McKinsey's business practices as describe in this Complaint are unlawful and violate the UCL.

977.     These unlawful practices include, but are not limited to:

a.     Working through Purdue and other opioid supply chain clients, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of the Consumer Legal Remedies Act, Civ. Code § 1770(a)(5);

1          b.          Working through Purdue and other opioid supply chain clients, McKinsey

2    represented that opioids were of a particular standard, quality, or grade when they were of another

3    in violation of Consumer Legal Remedies Act, Civ. Code § 1770(a)(7);

4          c.          Working through Purdue and other opioid supply chain clients, McKinsey

5    made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use

6    of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to

7    be made or disseminated to the general public in violation of the UCL.

8          d.          Working through Purdue and other opioid supply chain clients, McKinsey

9    directly or indirectly offered or paid remuneration to doctors to prescribe its opioid products in

10   violation of Cal. Welf. & Inst. Code § 14107.2,

11        978.     McKinsey's business practices as described in this Complaint are unfair and

12   violate the UCL because they offend established public policy and because the harm they cause to

13   consumers in California greatly outweighs any benefits associated with those practices.

14        979.     As a direct and proximate result of the foregoing acts and practices, McKinsey has

15   received, or will receive, income, profits, and other benefits, which it would not have received if

16   it had not engaged in the violations of the UCL described in this Complaint.

17        980.     As a direct and proximate result of the foregoing acts and practices, McKinsey

18   have obtained an unfair advantage over similar businesses that have not engaged in such

19   practices.

20        **E.**     **Michigan Tribal Plaintiffs**

21        981.     The Michigan Tribal Plaintiffs are the Sault Ste. Marie Tribe of Chippewa Indians

22   and the Grand Traverse Band of Ottawa and Chippewa Indians.

23        **1.**     **Public Nuisance under Michigan Law**

24        982.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

25   herein, and further allege as follows:

26        983.     Section 821B of the Restatement (Second) Torts defines a "public nuisance" as

27   "an unreasonable interference with a right common to the general public."

28

984.    This claim is brought by Michigan Tribal Plaintiffs to abate the public nuisance created by McKinsey through its work with Purdue and other opioid supply chain clients.

985.    McKinsey has created and/or assisted in the creation of a condition that significantly interferes with the common right to public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

986.    The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

987.    McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

988.    McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

989.    McKinsey has breached its duties to Michigan Tribal Plaintiffs by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive painkillers.

990.    Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

991.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of Michigan Tribal Plaintiffs' members and interfered with the comfortable

enjoyment of life and property of others, specifically that of Michigan Tribal Plaintiffs and their members.

992.   McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

        a.    to be free from reasonable apprehension of danger to person and property;

        b.    to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

        c.    to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around Michigan Tribal Plaintiffs' reservations and communities;

        d.    to be free from blights on the community created by areas of illegal drug use and opioid sales;

        e.    to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

        f.    to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

993.   McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

994.   McKinsey's acts and omissions render Michigan Tribal Plaintiffs' citizens insecure.

995.   Michigan Tribal Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

996.   McKinsey's acts and omissions affect the entire communities of Michigan Tribal Plaintiffs.

997.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of Michigan Tribal Plaintiffs and their citizens.

998.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

999.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

1000.   McKinsey has failed to abate the nuisance it created.

1001.   Michigan Tribal Plaintiffs seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

1002.   Michigan Tribal Plaintiffs seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

1003.   As a direct result of McKinsey's conduct, Michigan Tribal Plaintiffs have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

1004.   McKinsey is liable to Michigan Tribal Plaintiffs for the costs borne by Michigan Tribal Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

1005.   McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

a.     has harmed and will continue to harm the public health and public peace of Michigan Tribal Plaintiffs;

b.     has harmed and will continue to harm Michigan Tribal Plaintiffs' neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

c.     violates statutory and common law duties;

d.     is of a continuing nature, and has produced long-lasting effects; and

e.     is known to McKinsey that its conduct has a significant effect upon the public rights of Michigan Tribal Plaintiffs and their citizens.

1006.   In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference

because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

1007. Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

1008. The nuisance has affected Michigan Tribal Plaintiffs in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of the Michigan Tribal Plaintiffs' citizens. It has resulted in increased crime and property damage within Michigan Tribal Plaintiffs' reservations and communities. It has resulted in high rates of addiction, overdoses, and dysfunction within Michigan Tribal Plaintiffs' families and communities.

1009. Michigan Tribal Plaintiffs' resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit Michigan Tribal Plaintiffs.

1010. McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of Michigan Tribal Plaintiffs, offend decency, and render Michigan Tribal Plaintiffs' citizens insecure in their lives and the use of property.

1011. McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

1012. As a direct and proximate result of the nuisance caused by McKinsey and others, Michigan Tribal Plaintiffs' citizens have been injured in their ability to enjoy rights common to the public.

1013. As a direct and proximate result of the nuisance, Michigan Tribal Plaintiffs have sustained economic harm by spending substantial sums on the societal harms caused by

1   McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social

2   services, welfare, and education systems.

3       1014.   Michigan Tribal Plaintiffs have suffered special injury different in kind from the

4   general public because American Indian populations are more vulnerable to opioid abuse and the

5   damage caused by the nuisance has inflicted harm on the very fabric of Michigan Tribal

6   Plaintiffs' culture as well as threatened their continued existence as sovereign Nations.

7       1015.   Michigan Tribal Plaintiffs have also suffered unique harms of a kind that are

8   different from their citizens at large, namely, that Michigan Tribal Plaintiffs have been harmed in

9   their proprietary interests.

10          **2.      Negligence under Michigan Law**

11      1016.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

12  herein, and further allege as follows:

13      1017.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's

14  negligence. As a direct, proximate, and legal result of said negligence, Michigan Tribal Plaintiffs

15  suffered damages as alleged herein.

16      1018.   McKinsey, through its work with Purdue and other opioid supply chain clients,

17  owed Michigan Tribal Plaintiffs a duty to not expose Michigan Tribal Plaintiffs to an

18  unreasonable risk of harm.

19      1019.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in

20  accordance with applicable standards of conduct in its work relating to the marketing, selling,

21  and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity

22  Agreement as a "Covered Person."

23      1020.   McKinsey, through its work with Purdue and other opioid supply chain clients,

24  owed a duty of care to Michigan Tribal Plaintiffs, pursuant to which it would not encourage the

25  over-marketing and over-prescribing of a controlled substance known at the time to be addictive

26  and known at the time to be a threat to public health.

27      1021.   McKinsey breached its duty to Michigan Tribal Plaintiffs by working with Purdue

28  and other opioid supply chain clients to deceptively market and sell opioids, including

minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Michigan, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1022.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to Michigan Tribal Plaintiffs described herein.

1023.   McKinsey's failure to comply with its duties of care proximately caused damage to Michigan Tribal Plaintiffs.

1024.   The negligence of McKinsey was a substantial factor in causing Michigan Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Michigan, higher incidence of addiction among Michigan Tribal Plaintiffs' members, and Michigan Tribal Plaintiffs would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1025.   As a further direct and proximate result of McKinsey's negligence, Michigan Tribal Plaintiffs suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1026.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to Michigan Tribal Plaintiffs.

1027.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1028.   Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected Michigan Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Michigan Tribal Plaintiffs and their citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of Michigan Tribal Plaintiffs. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1029.   Michigan Tribal Plaintiffs are without fault, and the injuries to Michigan Tribal Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

1030.   Michigan Tribal Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 3.      Fraud under Michigan Law

1031.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

1032.   McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made. These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

1033.   For instance, McKinsey, working through Purdue and other opioid supply chain clients, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

1034.   McKinsey also made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

1035.   McKinsey continued making these materials misrepresentations and omissions, and failed to correct them, despite repeated regulatory settlements and publications demonstrating the false nature of McKinsey's claims.

1036.   Doctors, including those working in hospitals and clinics operated by Tribal health organizations in Michigan or serving Michigan Tribal communities, relied on these misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1037.   Patients, including members of Michigan Tribal communities, relied on McKinsey's misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1038.   McKinsey is liable to Michigan Tribal Plaintiffs for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Michigan Tribal Plaintiffs.

**4.**      **Violation of Michigan Consumer Protection Act (M.C.L.A. §§ 445.901-22)**

1039.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1    1040.   McKinsey violated the Michigan Consumer Protection Act (the "Mich. CPA"),

2    M.C.L.A. §§ 445.901-22, by engaging in deceptive acts and/or practices in connection with the

3    marketing and/or sale of prescription opioids.

4    1041.   McKinsey engaged in these deceptive acts and/or practices by knowingly or

5    intentionally representing that prescription opioids have characteristics, uses, or benefits that they

6    do not have. M.C.L.A. § 445.903 (1)(c).

7    1042.   McKinsey caused false representations to be made that prescription opioids were

8    safe and effective. M.C.L.A. § 445.903(e).

9    1043.   McKinsey engaged in unconscionable acts in the marketing and/or sale of

10   prescription opioids. M.C.L.A. § 445.903.

11   1044.   By reason of these deceptive acts and/or practices, and these unconscionable acts,

12   Michigan Tribal Plaintiffs and their citizens were injured.

13   1045.   At times, places, and involving participants known exclusively to McKinsey and

14   other parties and concealed from Michigan Tribal Plaintiffs, McKinsey has engaged in unlawful,

15   unfair, and fraudulent business practices in violation of the Mich. CPA as set forth above.

16   McKinsey's business practices as described in this Complaint are deceptive and violate the Mich.

17   CPA because the practices were likely to deceive consumers in Michigan.

18   1046.   McKinsey knew or should have known at the time of making or disseminating

19   these statements, or causing these statements to be made or disseminated, that such statements

20   were false and misleading and therefore likely to deceive the public.

21   1047.   McKinsey's omissions, which were deceptive and misleading, render even

22   McKinsey's seemingly truthful statements about opioids false and misleading. All this conduct,

23   separately and collectively, was likely to deceive Michigan Tribal Plaintiffs.

24   1048.   McKinsey's business practices as described in this Complaint are unlawful and

25   violate the Mich. CPA.

26   1049.   These unlawful practices include, but are not limited to:

27

28

1          a.      Through Purdue and other opioid supply chain clients, McKinsey

2   represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits

3   which they did not have in violation of the Mich. CPA;

4          b.      Through Purdue and other opioid supply chain clients, McKinsey

5   represented that opioids were of a particular standard, quality, or grade when they were of another

6   in violation of the Mich. CPA;

7          c.      McKinsey failed to identify and report suspicious prescribing to law

8   enforcement and health authorities; and

9          d.      Through Purdue and other opioid supply chain clients, McKinsey made or

10  disseminated, directly or indirectly, untrue, false, or misleading statements about the use of

11  opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to

12  be made or disseminated to the general public in violation of the Mich. CPA.

13         1050.  McKinsey's business practices as described in this Complaint are unfair and

14  violate the Mich. CPA because they offend established public policy and because the harm they

15  cause to Michigan Tribal Plaintiffs and their citizens greatly outweighs any benefits associated

16  with those practices.

17         1051.  As a direct and proximate result of the foregoing acts and practices, McKinsey has

18  received, or will receive, income, profits, and other benefits, which it would not have received if

19  they had not engaged in the violations of the Mich. CPA described in this Complaint.

20         1052.  As a direct and proximate result of the foregoing acts and practices, McKinsey

21  obtained an unfair advantage over similar businesses that have not engaged in such practices.

22         **5.      Civil Conspiracy under Michigan Law**

23         1053.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

24  herein, and further allege as follows:

25         1054.  Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged,

26  and continue to engage, in a massive marketing campaign to misstate and conceal the risks of

27  treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this

28  Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding

medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout Michigan Tribal Plaintiffs' reservations and communities.

1055.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

1056.   Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

1057.   None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

1058.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1059.   As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, Michigan Tribal Plaintiffs and their citizens have suffered damages.

1060.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

F.     **Minnesota Tribal Plaintiff**

1061.   The Minnesota Tribal Plaintiff is Fond de Lac Band of Lake Superior Chippewa.

1.     **Public Nuisance under Minn. Stat. § 609.74**

1062.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1063.   McKinsey has created and/or assisted in the creation of a condition that unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public. By creating the opioid epidemic, McKinsey caused a condition that unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of an entire community, namely the Fond du Lac Band of Lake Superior Chippewa.

1064.   McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance--the opioid epidemic.

1065.   McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used and a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

1066.   McKinsey has breached its duties to the Fond du Lac Band by disseminating false and misleading information through opioid manufacturers regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less or non-addictive painkillers.

1067.   Working through these opioid manufacturers, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

1068.   McKinsey's acts and omissions created the opioid epidemic and thereby maintained or permitted a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of the Fond du Lac Band and its citizens.

1069.   McKinsey's activities have created the opioid epidemic and thereby maintained or permitted a condition which unreasonably annoys, injures or endangers the safety, health, morals,

comfort, or repose of the Fond du Lac Band of Lake Superior Chippewa and its citizens, including the common rights:

      a.    to be free from reasonable apprehension of danger to person and property;

      b.    to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

      c.    to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around the Fond du Lac Band's communities;

      d.    to be free from blights on the community created by areas of illegal drug use and opioid sales;

      e.    to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

      f.    to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

1070.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Fond du Lac Band and its citizens.

1071.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

1072.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

1073.   McKinsey has failed to abate the nuisance it created.

1074.   Fond du Lac Band of Lake Superior Chippewa seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of and enjoining McKinsey from future conduct creating a public nuisance.

1075.   As a direct result of McKinsey's conduct, the Fond du Lac Band suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

1076. McKinsey is liable to the Fond du Lac Band for the costs borne by the Band because of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

1077. McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

    a.    has harmed and will continue to harm the public health and public peace of the Fond du Lac Band;

    b.    has harmed and will continue to harm the Fond du Lac Band's neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

    c.    violates statutory and common law duties;

    d.    is of a continuing nature, and has produced long-lasting effects; and

    e.    is known to McKinsey that its conduct has a significant effect upon the public rights of the Fond du Lac Band of Lake Superior Chippewa and its citizens.

1078. In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

1079. Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

1080. The nuisance has affected the Fond du Lac Band in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of the Band's citizens. It has resulted in increased crime and property damage within the Fond du Lac Band's community and in high rates of addiction, overdoses, and dysfunction within its families and communities.

1081.   The Fond du Lac Band's resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby rendering unavailable resources that could be used to benefit the Band.

1082.   McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of the Fond du Lac Band of Lake Superior Chippewa, offend decency, and render the Band's citizens insecure in their lives and the use of property.

1083.   McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

1084.   As a direct and proximate result of the nuisance caused by McKinsey and others, the Fond du Lac Band's citizens have been injured in their ability to enjoy rights common to the public.

1085.   The Fond du Lac Band of Lake Superior Chippewa has suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of the Band's culture and threatened its continued existence as a sovereign Nation.

1086.   The Fond du Lac Band of Lake Superior Chippewa has also suffered unique harms of a kind that are different from its citizens at large, namely, that the Band has been harmed in its proprietary interests.

1087.   The Fond du Lac Band's injuries, as alleged throughout this Complaint and expressly incorporated herein by reference, include:

a.      Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

b.      Costs of training first responders in the proper treatment of drug overdoses;

c.      Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

1            d.       Costs associated with emergency responses by first responders to opioid

2  overdoses;

3            e.       Costs for providing mental health services, treatment, counseling,

4  rehabilitation services, and social services to victims of the opioid epidemic and their families;

5            f.       Costs for providing treatment of infants born with opioid-related medical

6  conditions, or born dependent on opioids due to drug use by mothers during pregnancy;

7            g.       Costs associated with the injuries to the health and welfare of the Band and

8  its members caused by the opioid epidemic;

9            h.       Costs associated with providing care for children whose parents suffer

10  from opioid-related disability or incapacitation;

11            i.       Losses caused by the diversion of revenue from the Fond du Lac Band's

12  businesses to address the opioid epidemic that would otherwise have been reinvested in the

13  Band's businesses; and

14            j.       Costs associated with removal of hazardous waste from the Fond du Lac

15  Band's communities, including on its real property.

16          **2.**       **Negligence under Minnesota Law**

17      1088.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

18  herein, and further allege as follows:

19      1089.  The opioid epidemic was a direct, legal, and proximate result of McKinsey's

20  negligence. As a direct, proximate, and legal result of said negligence, the Fond du Lac Band of

21  Lake Superior Chippewa suffered damages as alleged herein.

22      1090.  McKinsey, through its work with Purdue and other opioid supply chain clients,

23  owed the Fond du Lac Band a duty to not expose Tribe to an unreasonable risk of harm.

24      1091.  McKinsey had a legal duty to exercise reasonable and ordinary care and skill in

25  accordance with applicable standards of conduct in its work relating to the marketing, selling,

26  and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity

27  Agreement as a "Covered Person."

28

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1092.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to the Fond du Lac Band, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1093.   McKinsey breached its duty to the Fond du Lac Band by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Minnesota, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1094.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Fond du Lac Band of Lake Superior Chippewa described herein.

1095.   McKinsey's failure to comply with its duties of care proximately caused damage to the Fond du Lac Band.

1096.   The negligence of McKinsey was a substantial factor in causing the Fond du Lac Band's damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Minnesota, higher incidence of addiction among the Fond du Lac Band's members, and the Fond du Lac Band would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1097.   As a further direct and proximate result of McKinsey's negligence, the Fond du Lac Band suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

2331633.1

1098. There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to the Fond du Lac Band.

1099. Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1100. Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected the Fond du Lac Band to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including the Fond du Lac Band and its citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of the Fond du Lac Band. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1101. The Fond du Lac Band is without fault, and the injuries to the Fond du Lac Band would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

### 3. **Fraud under Minnesota Law**

1102. Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

1103. McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and

representations of fact were knowingly or recklessly made. These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

1104.   For instance, McKinsey, working through Purdue and other opioid supply chain clients, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

1105.   McKinsey also made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

1106.   McKinsey continued making these materials misrepresentations and omissions, and failed to correct them, despite repeated regulatory settlements and publications demonstrating the false nature of McKinsey's claims.

1107.   Doctors, including those working in hospitals and clinics operated by Tribal health organizations in Minnesota or serving Minnesota Tribal communities, relied on these misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1108.   Patients, including members of the Fond de Lac Band of Lake Superior Chippewa, relied on McKinsey's misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1109.   McKinsey is liable to the Fond de Lac Band of Lake Superior Chippewa for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to the Fond de Lac Band.

2331633.1

**4.** **Violation of Minn. Stat. § 325F.69 – Prevention of Consumer Fraud**

1110.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1111.   Minn. Stat. § 325F.69 prohibits misrepresenting the quality of goods, as well as sales sounding in fraud, misrepresentation, or deceptive practices, providing in pertinent part:

> 325F.68 UNLAWFUL PRACTICES. Subdivision 1. Fraud, misrepresentation, deceptive practices. The act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is enjoinable as provided in section 325F.70.

1112.   The term "merchandise" within the meaning of Minn. Stat. § 325F.69 includes goods, such as prescription drugs. *See* Minn. Stat. § 325F.68, subd. 2.

1113.   The term "person" includes any partnership or corporation, foreign or domestic. Minn. Stat. § 325F.68, subd. 3. McKinsey is a "person" within the meaning of this statute.

1114.   The opioid drugs have been advertised and sold within the meaning of Section 325F.68, subd. 4.

1115.   McKinsey knowingly made untrue, deceptive, or misleading representations, with the intent that the Fond du Lac Band of Lake Superior Chippewa and others rely on McKinsey's untrue, deceptive, or misleading representations in connection with the sale or advertisement of prescription opioids, as more fully described above. These untrue, deceptive, or misleading statements included, but were not limited to:

   a.   Misrepresenting the truth about how opioids lead to addiction;

   b.   Misrepresenting that opioids improve function;

   c.   Misrepresenting that addiction can be managed;

   d.   Misleading doctors, patients, and payors through the use of misleading terms like "pseudoaddiction";

   e.   Falsely claiming that withdrawal was simply managed;

   f.   Misrepresenting that increased doses pose no significant additional risks;

g.       Falsely omitting or minimizing the adverse effects of opioids and overstating the risks of alternative forms of pain treatment; and

h.       Other representations as more fully described above.

1116.   McKinsey's representations were untrue, deceptive, and/or misleading, in violation of Minn. Stat. § 325F.68, *et seq.*

1117.   McKinsey's untrue, deceptive, and/or misleading representations in connection with the sale or advertisement of prescription opioids caused substantial injury to the Fond du Lac Band of Lake Superior Chippewa.

1118.   McKinsey's violations of Minn. Stat. § 325F.68, *et seq.* directly and proximately caused the Fond du Lac Band to suffer pecuniary losses in an amount to be determined in this litigation.

**5.       Violation of Minn. Stat. § 325D.09, *et seq.* – Unlawful Trade Practices**

1119.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1120.   Minn. Stat. § 325D.13 reads in pertinent part:

325D.13 QUALITY, MISREPRESENTED No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise.

1121.   McKinsey is a person for purposes of this statute.

1122.   Opioid products are merchandise for purposes of this statute.

1123.   McKinsey has misrepresented the addictive quality of opioids. McKinsey engaged in an aggressive marketing campaigns, which in part sought to downplay the dangerousness of opioids while promoting them for chronic pain for which they knew the drug was not safe or suitable.

1124.   Because of the dangerously addictive nature of these drugs, McKinsey's marketing practices, and the practices of its conspirators, caused an opioid epidemic in the Fond du Lac Band's communities.

1125.   As alleged herein, McKinsey wrongfully represented that the opioid prescription medications manufactured, marketed, distributed, and sold by the co-conspirators, had characteristics, uses, or benefits that they do not have.

1126.   McKinsey and its co-conspirators also represented that opioids are safe and effective when such representations were untrue, false, and misleading.

1127.   Because of the dangerously addictive nature of these drugs, which McKinsey concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, McKinsey's conduct constituted a violation of state law.

1128.   McKinsey made misrepresentations about the use of opioids to treat chronic non-cancer pain.

1129.   Because of McKinsey's omissions and misrepresentations to, *inter alia*, the Fond du Lac Band of Lake Superior Chippewa, its residents, and its agents, the Band has suffered significant damages, including, but not limited to those alleged throughout this Complaint, which are expressly incorporated by reference.

1130.   The damages which the Fond du Lac Band of Lake Superior Chippewa seek to recover were sustained as a direct and proximate cause of McKinsey's intentional acts and omissions.

1131.   Plaintiff seeks injunctive relief and actual damages under Minn. Stat. § 325D.15 as well as under Minn. Stat. § 8.31, which creates a private right of action when the action would benefit the public. The present action benefits the public, both in the Fond du Lac Band's communities, as well as in Minnesota, by stemming the flow of diverted opioid drugs into the state, and providing the Fond du Lac Band with the necessary resources, both monetary and non-monetary, to redress the opioid epidemic and treat its victims.

**6.**      **Violation of Minn. Stat. § 325D.43, *et seq.* – Deceptive Trade Practices**

1132.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1133.   Minnesota Statute § 325D.44 reads, in pertinent part:

325D.44 DECEPTIVE TRADE PRACTICES A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . . (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another . . . (13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

1134.   McKinsey's unfair, deceptive, and unconscionable representations, concealments, and omissions were reasonably calculated to create confusion and misunderstanding as to the nature and efficacy of opioid drugs, and in doing so deceive the Fond du Lac Band of Lake Superior Chippewa and its residents.

1135.   As alleged herein, McKinsey has misrepresented the addictive quality of opioids. McKinsey engaged with its co-conspirators in an aggressive marketing campaigns, which in part sought to downplay the dangerousness of opioids while promoting them for chronic pain for which they knew the drug was not safe or suitable.

1136.   Because of the dangerously addictive nature of these drugs, McKinsey's conduct caused an opioid epidemic in the Fond du Lac Band's communities.

1137.   McKinsey wrongfully represented that opioids had characteristics, uses, or benefits that they do not have.

1138.   McKinsey also wrongfully misrepresented that opioids were safe and effective when such representations were untrue, false, and misleading.

1139.   Because of the dangerously addictive nature of these drugs, which McKinsey concealed and misrepresented, they lacked medical value, and in fact caused addiction and overdose deaths; therefore, McKinsey's conduct constituted a violation of state law.

1140.   McKinsey made misrepresentations about the use of opioids to treat chronic non-cancer pain.

1141.   Because of McKinsey's omissions and misrepresentations to, *inter alia*, the Fond du Lac Band of Lake Superior Chippewa and its residents, and its agents, the Band has suffered significant damages, including, but not limited to those alleged throughout this Complaint, which are expressly incorporated by reference.

2331633.1

1142.   The damages which the Fond du Lac Band of Lake Superior Chippewa seeks to recover were sustained as a direct and proximate cause of McKinsey's intentional acts and omissions.

1143.   The Fond du Lac Band of Lake Superior Chippewa seeks injunctive relief and actual damages under Minn. Stat. § 325D.45 as well as under Minn. Stat. § 8.31, which creates a private right of action when the action would benefit the public. The present action benefits the public, both in the Fond du Lac Band's communities, as well as in Minnesota, by stemming the flow of diverted opioid drugs into the state, and providing the Band with the necessary resources, both monetary and non-monetary, to redress the opioid epidemic and treat its victims.

### 7.      Civil Conspiracy under Minnesota Law

1144.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1145.   Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout the Fond du Lac Band's reservation and communities.

1146.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

1147.   Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

1148.   None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

1149.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1150.   As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, the Fond du Lac Band of Lake Superior Chippewa and its citizens have suffered damages.

1151.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

**G.       Mississippi Tribal Plaintiff**

1152.   The Mississippi Tribal Plaintiff is the Mississippi Band of Choctaw Indians.

**1.       Public Nuisance under Mississippi Law**

1153.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1154.   Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

1155.   This claim is brought by the Mississippi Band of Choctaw Indians to abate the public nuisance created by McKinsey through its work with Purdue and other opioid supply chain clients.

1156.   McKinsey has created and/or assisted in the creation of a condition that significantly interferes with the common right to public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

1157.   The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

1158.   McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

1159.   McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

1160.   McKinsey has breached its duties to the Mississippi Band of Choctaw Indians by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive painkillers.

1161.   Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

1162.   McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of the Mississippi Band of Choctaw Indians' members and interfered with the comfortable enjoyment of life and property of others, specifically that of the Mississippi Band of Choctaw Indians and its members.

1163.   McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

        a.      to be free from reasonable apprehension of danger to person and property;

        b.      to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.   to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around the Mississippi Band of Choctaw Indians' reservation and communities;

d.   to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.   to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

f.   to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

1164.   McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

1165.   McKinsey's acts and omissions render the Mississippi Band of Choctaw Indians' citizens insecure.

1166.   The Mississippi Band of Choctaw Indians did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

1167.   McKinsey's acts and omissions affect the entire communities of the Mississippi Band of Choctaw Indians.

1168.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Mississippi Band of Choctaw Indians and its citizens.

1169.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

1170.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

1171.   McKinsey has failed to abate the nuisance it created.

1172.   The Mississippi Band of Choctaw Indians seeks an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

1173.   The Mississippi Band of Choctaw Indians seeks damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

1174.   As a direct result of McKinsey's conduct, the Mississippi Band of Choctaw Indians has suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

1175.   McKinsey is liable to the Mississippi Band of Choctaw Indians for the costs borne by the Band as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

1176.   McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

    a.   has harmed and will continue to harm the public health and public peace of the Mississippi Band of Choctaw Indians;

    b.   has harmed and will continue to harm the Mississippi Band of Choctaw Indians' neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

    c.   violates statutory and common law duties;

    d.   is of a continuing nature, and has produced long-lasting effects; and

    e.   is known to McKinsey that its conduct has a significant effect upon the public rights of the Mississippi Band of Choctaw Indians and its citizens.

1177.   In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

1178.   Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and

substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

1179.   The nuisance has affected the Mississippi Band of Choctaw Indians in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of the Band's citizens. It has resulted in increased crime and property damage within the Mississippi Band of Choctaw Indians' reservation and communities. It has resulted in high rates of addiction, overdoses, and dysfunction within the Band's families and communities.

1180.   The Mississippi Band of Choctaw Indians' resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit the Band.

1181.   McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of the Mississippi Band of Choctaw Indians, offend decency, and render the Band's citizens insecure in their lives and the use of property.

1182.   McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

1183.   As a direct and proximate result of the nuisance caused by McKinsey and others, the Mississippi Band of Choctaw Indians' citizens have been injured in their ability to enjoy rights common to the public.

1184.   As a direct and proximate result of the nuisance, the Mississippi Band of Choctaw Indians has sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social services, welfare, and education systems.

1185.   The Mississippi Band of Choctaw Indians has suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of the Band's culture as well as threatened their continued existence as sovereign Nations.

1186.   The Mississippi Band of Choctaw Indians has also suffered unique harms of a kind that are different from their citizens at large, namely, that the Band has been harmed in its proprietary interests.

## 2.     Negligence under Mississippi Law

1187.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1188.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, the Mississippi Band of Choctaw Indians suffered damages as alleged herein.

1189.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed the Mississippi Band of Choctaw Indians a duty to not expose the Band to an unreasonable risk of harm.

1190.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

1191.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to the Mississippi Band of Choctaw Indians, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1192.   McKinsey breached its duty to the Mississippi Band of Choctaw Indians by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Mississippi, including OxyContin. In the process, McKinsey

continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1193.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Mississippi Band of Choctaw Indians described herein.

1194.   McKinsey's failure to comply with its duties of care proximately caused damage to the Mississippi Band of Choctaw Indians Plaintiffs.

1195.   The negligence of McKinsey was a substantial factor in causing the Mississippi Band of Choctaw Indians' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Mississippi, higher incidence of addiction among the Band's members, and the Mississippi Band of Choctaw Indians would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1196.   As a further direct and proximate result of McKinsey's negligence, the Mississippi Band of Choctaw Indians suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1197.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to the Mississippi Band of Choctaw Indians.

1198.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1199.   Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected the Mississippi Band of Choctaw Indians to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences

a conscious disregard for the safety and welfare of others, including the Mississippi Band of Choctaw Indians and its citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of the Band. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1200.   The Mississippi Band of Choctaw Indians are without fault, and the injuries to the Band would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

1201.   The Mississippi Band of Choctaw Indians is entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 3.        Fraud under Mississippi Law

1202.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

1203.   McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made. These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

1204.   For instance, McKinsey, working through Purdue and other opioid supply chain clients, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

1205.   McKinsey also made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

1206.   McKinsey continued making these materials misrepresentations and omissions, and failed to correct them, despite repeated regulatory settlements and publications demonstrating the false nature of McKinsey's claims.

1207.   Doctors, including those working in hospitals and clinics operated by Tribal health organizations in Mississippi or serving Mississippi Tribal communities, relied on these misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1208.   Patients, including members of the Mississippi Band of Choctaw Indians, relied on McKinsey's misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1209.   McKinsey is liable to the Mississippi Band of Choctaw Indians for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to the Mississippi Band of Choctaw Indians.

**4.      Civil Conspiracy under Mississippi Law**

1210.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1211.   Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a

1   significant increase in the number of opioids prescribed nationwide and throughout the

2   Mississippi Band of Choctaw Indians' reservation and communities.

3       1212.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to

4   collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey,

5   Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this

6   Complaint.

7       1213.   Without Purdue, other opioid supply chain clients, and McKinsey's

8   misrepresentations, which created greater demand for opioids, they would not have been able to

9   sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

10       1214.   None of the opioid supply chain companies or McKinsey would have succeeded in

11   profiting so much from the opioid epidemic without the concerted conduct of the other parties.

12       1215.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to

13   accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids

14   through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and

15   McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing,

16   selling, and distributing prescription opioids by means of misrepresentations and omissions,

17   violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

18       1216.   As a result of the concerted action between Purdue, other opioid supply chain

19   clients, and McKinsey, the Mississippi Band of Choctaw Indians and its citizens have suffered

20   damages.

21       1217.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly

22   and severally liable for the results of their concerted efforts.

23       **H.**      **Montana Tribal Plaintiffs**

24       1218.   The Montana Tribal Plaintiffs are the Confederated Salish and Kootenai Tribes of

25   the Flathead Reservation and Fort Belknap Indian Community of the Fort Belknap Reservation of

26   Montana.

27

28

1. **Public Nuisance under Montana Law**

1219.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1220.   Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

1221.   This claim is brought by Montana Tribal Plaintiffs to abate the public nuisance created by McKinsey through its work with Purdue and other opioid supply chain clients.

1222.   McKinsey has created and/or assisted in the creation of a condition that significantly interferes with the common right to public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

1223.   The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

1224.   McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

1225.   McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

1226.   McKinsey has breached its duties to Montana Tribal Plaintiffs by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive painkillers.

1227.   Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

1228.   McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of Montana Tribal Plaintiffs' members and interfered with the comfortable enjoyment of life and property of others, specifically that of Montana Tribal Plaintiffs and their members.

1229.   McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

a.   to be free from reasonable apprehension of danger to person and property;

b.   to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.   to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around Montana Tribal Plaintiffs' reservations and communities;

d.   to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.   to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

f.   to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

1230.   McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

1231.   McKinsey's acts and omissions render Montana Tribal Plaintiffs' citizens insecure.

1232.   Montana Tribal Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

1   1233.   McKinsey's acts and omissions affect the entire communities of Montana Tribal

2   Plaintiffs.

3   1234.   McKinsey's acts and omissions threatened and directly harmed the health and

4   welfare of Montana Tribal Plaintiffs and their citizens.

5   1235.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid

6   epidemic.

7   1236.   The public nuisance created, perpetuated, and maintained by McKinsey can be

8   abated and further recurrence of such harm and inconvenience can be abated.

9   1237.   McKinsey has failed to abate the nuisance it created.

10  1238.   Montana Tribal Plaintiffs seek an order providing for abatement of the public

11  nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from

12  future conduct creating a public nuisance.

13  1239.   Montana Tribal Plaintiffs seek damages from McKinsey to pay for the costs to

14  permanently eliminate the hazards to public health and safety and abate the public nuisance.

15  1240.   As a direct result of McKinsey's conduct, Montana Tribal Plaintiffs have suffered

16  actual injury and economic damages including, but not limited to, significant expenses for police,

17  emergency, health, education and training, prosecution, child protection, corrections, judicial, and

18  other services.

19  1241.   McKinsey is liable to Montana Tribal Plaintiffs for the costs borne by Montana

20  Tribal Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance

21  created by McKinsey.

22  1242.   McKinsey's interference with these public rights has been, is, and will continue to

23  be unreasonable and objectionable because it:

24          a.      has harmed and will continue to harm the public health and public peace of

25  Montana Tribal Plaintiffs;

26          b.      has harmed and will continue to harm Montana Tribal Plaintiffs'

27  neighborhoods and communities by increasing crime, and thereby interfering with the rights of

28  the community at large;

c.      violates statutory and common law duties;

d.      is of a continuing nature, and has produced long-lasting effects; and

e.      is known to McKinsey that its conduct has a significant effect upon the public rights of Montana Tribal Plaintiffs and their citizens.

1243.   In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

1244.   Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

1245.   The nuisance has affected Montana Tribal Plaintiffs in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of Montana Tribal Plaintiffs' citizens. It has resulted in increased crime and property damage within Montana Tribal Plaintiffs' reservations and communities. It has resulted in high rates of addiction, overdoses, and dysfunction within Montana Tribal Plaintiffs' families and communities.

1246.   Montana Tribal Plaintiffs' resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit Montana Tribal Plaintiffs.

1247.   McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of Montana Tribal Plaintiffs, offend decency, and render Montana Tribal Plaintiffs' citizens insecure in their lives and the use of property.

1248.   McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

1249.   As a direct and proximate result of the nuisance caused by McKinsey and others, Montana Tribal Plaintiffs' citizens have been injured in their ability to enjoy rights common to the public.

1250.   As a direct and proximate result of the nuisance, Montana Tribal Plaintiffs have sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social services, welfare, and education systems.

1251.   Montana Tribal Plaintiffs have suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of Montana Tribal Plaintiffs' culture as well as threatened their continued existence as sovereign Nations.

1252.   Montana Tribal Plaintiffs have also suffered unique harms of a kind that are different from their citizens at large, namely, that Montana Tribal Plaintiffs have been harmed in their proprietary interests.

### 2.      Negligence under Montana Law

1253.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1254.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, Montana Tribal Plaintiffs suffered damages as alleged herein.

1255.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed Montana Tribal Plaintiffs a duty to not expose Montana Tribal Plaintiffs to an unreasonable risk of harm.

1256.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

1257.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to Montana Tribal Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1258.   McKinsey breached its duty to Montana Tribal Plaintiffs by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Montana, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1259.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to Montana Tribal Plaintiffs described herein.

1260.   McKinsey's failure to comply with its duties of care proximately caused damage to Montana Tribal Plaintiffs.

1261.   The negligence of McKinsey was a substantial factor in causing Montana Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Montana, higher incidence of addiction among Montana Tribal Plaintiffs' members, and Montana Tribal Plaintiffs would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1262.   As a further direct and proximate result of McKinsey's negligence, Montana Tribal Plaintiffs suffered damages including, but not limited to, economic loss, business loss,

1   property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug

2   addiction and/or dependency, and neonatal abstinence syndrome.

3       1263.   There is moral blame attached to McKinsey because of the terrible injuries and

4   suffering their misconduct caused, including the damage to Montana Tribal Plaintiffs.

5       1264.   Public policy supports finding a duty of care in this circumstance, and a finding of

6   a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the

7   future.

8       1265.   Further, the conduct alleged against McKinsey in this Complaint was despicable

9   and subjected Montana Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of

10  their rights, constituting oppression, for which McKinsey must be punished by punitive and

11  exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious

12  disregard for the safety and welfare of others, including Montana Tribal Plaintiffs and their

13  citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless

14  indifference to the interests of Montana Tribal Plaintiffs. An officer, director, or managing agent

15  of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful

16  conduct alleged in this Complaint.

17      1266.   Montana Tribal Plaintiffs are without fault, and the injuries to Montana Tribal

18  Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due

19  care commensurate to the dangers involved in the distribution and dispensing of controlled

20  substances.

21      1267.   Montana Tribal Plaintiffs are entitled to an award of punitive damages sufficient to

22  punish and make an example of McKinsey.

23          **3.    <u>Fraud under Montana Law</u>**

24      1268.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

25  herein, and further alleges as follows:

26      1269.   McKinsey committed fraud by acting to conceal and advising the concealment of

27  the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase

28  sales of opioids through its work for Purdue and others, and concealing all of this information

1    from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint,

2    McKinsey, working through Purdue and other opioid supply chain clients, made material

3    misrepresentations concerning the sale of prescription opioids, as well as false or misleading

4    descriptions and representations of fact during the advertising and promotion of prescription

5    opioids, and those material misrepresentations and false or misleading descriptions and

6    representations of fact were knowingly or recklessly made. These were accompanied by

7    omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

8        1270.  For instance, McKinsey, working through Purdue and other opioid supply chain

9    clients, made these material misrepresentations and false or misleading descriptions and

10   representations of fact in an intentional effort to deceive and induce doctors and patients to

11   prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

12   for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were

13   unsuited to these treatments and that opioids were highly addictive and subject to abuse.

14       1271.  McKinsey also made statements promoting the use of opioids to treat chronic pain

15   that omitted or concealed material facts and failed to correct prior misrepresentations and

16   omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and

17   misleading in their own right, render even their seemingly truthful statements about opioids false

18   and misleading.

19       1272.  McKinsey continued making these materials misrepresentations and omissions,

20   and failed to correct them, despite repeated regulatory settlements and publications demonstrating

21   the false nature of McKinsey's claims.

22       1273.  Doctors, including those working in hospitals and clinics operated by Tribal health

23   organizations in Montana or serving Montana Tribal communities, relied on these

24   misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and

25   non-cancer pain, and for other uses not approved by the FDA.

26       1274.  Patients, including members of Montana Tribal communities, relied on

27   McKinsey's misrepresentations and omissions in taking prescription opioids for long-term

28   chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1275.   McKinsey is liable to Montana Tribal Plaintiffs for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Montana Tribal Plaintiffs.

**4.      Violation of Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §§ 30-14-101 to 2602)**

1276.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1277.   McKinsey has violated the Montana Unfair Trade Practices and Consumer Protection Act ("Mont. UTPCPA"), Mont. Code Ann. §§ 30-14-101 to 2602, by committing unfair or deceptive trade practices.

1278.   McKinsey, in the regular course of its trade, knowingly made false or misleading statements in connection with the sale of prescription opioids. Such statements may have, tended to, and/or did deceive or mislead others.

1279.   McKinsey caused false representations to be made that prescription opioids have characteristics, uses, and/or benefits that they do not have. Mont. Admin R. 23.19.101(1)(e).

1280.   McKinsey caused false representations to be made that prescription opioids were safe and effective. Mont. Admin R. 23.19.101(1)(g).

1281.   McKinsey caused the marketing and sale of prescription opioids in a manner that deceived or tended to deceive by (a) using exaggeration, innuendo, or ambiguity as to material facts or (b) failing to state material facts regarding the safety and efficacy of these drugs.

1282.   By reason of these deceptive acts and/or practices, and these unconscionable acts, Montana Tribal Plaintiffs and their citizens were injured.

1283.   At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from Montana Tribal Plaintiffs, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the Mont. UTPCPA as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the Mont. UTPCPA because the practices were likely to deceive consumers in Montana.

1284.   McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

1285.   McKinsey's omissions, which were deceptive and misleading, render even McKinsey's seemingly truthful statements about opioids false and misleading. All this conduct, separately and collectively, was likely to deceive Montana Tribal Plaintiffs.

1286.   McKinsey's business practices as described in this Complaint are unlawful and violate the Mont. UTPCPA.

1287.   These unlawful practices include, but are not limited to:

a.     Through Purdue and other opioid supply chain clients, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of Mont. UTPCPA;

b.     Through Purdue and other opioid supply chain clients, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of Mont. UTPCPA;

c.     McKinsey failed to identify and report suspicious prescribing to law enforcement and health authorities; and

d.     Through Purdue and other opioid supply chain clients, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of Mont. UTPCPA.

1288.   McKinsey's business practices as described in this Complaint are unfair and violate the Mont. UTPCPA because they offend established public policy and because the harm they cause to Montana Tribal Plaintiffs and their citizens greatly outweighs any benefits associated with those practices.

1289.   As a direct and proximate result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which it would not have received if they had not engaged in the violations of the Mont. UTPCPA described in this Complaint.

1290.   As a direct and proximate result of the foregoing acts and practices, McKinsey obtained an unfair advantage over similar businesses that have not engaged in such practices.

### 5.   Civil Conspiracy under Montana Law

1291.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1292.   Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout Montana Tribal Plaintiffs' reservations and communities.

1293.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

1294.   Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

1295.   None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

1296.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1297.   As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, Montana Tribal Plaintiffs and their citizens have suffered damages.

1298.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

**I.**     **New Mexico Tribal Plaintiffs**

1299.   The New Mexico Tribal Plaintiffs are the Navajo Nation and the Zuni Tribe of the Zuni Reservation.

**1.**     **Public Nuisance under New Mexico Law**

1300.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1301.   Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

1302.   This action is brought by New Mexico Tribal Plaintiffs to abate the public nuisance created by McKinsey through its work with Purdue and other opioid supply chain clients.

1303.   McKinsey has created and/or assisted in the creation of a condition that significantly interferes with the common right to public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

1304.   The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

1305.   McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

1306.   McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the

treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

1307.   McKinsey has breached its duties to New Mexico Tribal Plaintiffs by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less or non-addictive painkillers.

1308.   Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

1309.   McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of New Mexico Tribal Plaintiffs and their citizens and interfered with the comfortable enjoyment of life and property of others, specifically that of New Mexico Tribal Plaintiffs and their members.

1310.   McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

a.   to be free from reasonable apprehension of danger to person and property;

b.   to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.   to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around New Mexico Tribal Plaintiffs' reservations and communities;

d.   to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.   to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions;

f.      and to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

1311.   McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

1312.   McKinsey's acts and omissions render New Mexico Tribal Plaintiffs' citizens insecure.

1313.   New Mexico Tribal Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

1314.   McKinsey's acts and omissions affect the entire communities of New Mexico Tribal Plaintiffs.

1315.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of New Mexico Tribal Plaintiffs and their citizens.

1316.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

1317.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

1318.   McKinsey has failed to abate the nuisance it created.

1319.   New Mexico Tribal Plaintiffs seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

1320.   New Mexico Tribal Plaintiffs seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

1321.   As a direct result of McKinsey's conduct, New Mexico Tribal Plaintiffs have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

1322.   McKinsey is liable to New Mexico Tribal Plaintiffs for the costs borne by New Mexico Tribal Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

1323.   McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

        a.      has harmed and will continue to harm the public health and public peace of New Mexico Tribal Plaintiffs;

        b.      has harmed and will continue to harm New Mexico Tribal Plaintiffs' neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

        c.      violates statutory and common law duties;

        d.      is of a continuing nature, and has produced long-lasting effects; and

        e.      is known to McKinsey that its conduct has a significant effect upon the public rights of New Mexico Tribal Plaintiffs and their citizens.

1324.   In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

1325.   Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

1326.   The nuisance has affected New Mexico Tribal Plaintiffs in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of New Mexico Tribal Plaintiffs' citizens. It has resulted in increased crime and property damage within New Mexico Tribal Plaintiffs' reservations and communities. It has resulted in high rates

of addiction, overdoses, and dysfunction within New Mexico Tribal Plaintiffs' families and communities.

1327. New Mexico Tribal Plaintiffs' resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit New Mexico Tribal Plaintiffs.

1328. McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of New Mexico Tribal Plaintiffs, offend decency, and render New Mexico Tribal Plaintiffs' citizens insecure in their lives and the use of property.

1329. McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

1330. As a direct and proximate result of the nuisance caused by McKinsey's and others, New Mexico Tribal Plaintiffs' citizens have been injured in their ability to enjoy rights common to the public.

1331. As a direct and proximate result of the nuisance, New Mexico Tribal Plaintiffs have sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social services, welfare, and education systems.

1332. New Mexico Tribal Plaintiffs have suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of New Mexico Tribal Plaintiffs' culture as well as threatened their continued existence as sovereign Nations.

1333. New Mexico Tribal Plaintiffs have also suffered unique harms of a kind that are different from their citizens at large, namely, that New Mexico Tribal Plaintiffs have been harmed in their proprietary interests.

### 2.     Negligence under New Mexico Law

1334.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1335.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, New Mexico Tribal Plaintiffs suffered damages as alleged herein.

1336.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed New Mexico Tribal Plaintiffs a duty to not expose New Mexico Tribal Plaintiffs to an unreasonable risk of harm.

1337.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

1338.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to New Mexico Tribal Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1339.   McKinsey breached its duty to New Mexico Tribal Plaintiffs by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in New Mexico, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1340.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to New Mexico Tribal Plaintiffs described herein.

1341.   McKinsey's failure to comply with its duties of care proximately caused damage to New Mexico Tribal Plaintiffs.

1342.   The negligence of McKinsey was a substantial factor in causing New Mexico Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in New Mexico, higher incidence of addiction among New Mexico Tribal Plaintiffs' members, and New Mexico Tribal Plaintiffs would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1343.   As a further direct and proximate result of McKinsey's negligence, New Mexico Tribal Plaintiffs suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1344.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to New Mexico Tribal Plaintiffs.

1345.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1346.   Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected New Mexico Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including New Mexico Tribal Plaintiffs and their citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of New Mexico Tribal Plaintiffs. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1347.  New Mexico Tribal Plaintiffs are without fault, and the injuries to New Mexico Tribal Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

1348.  New Mexico Tribal Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 3.      Fraud under New Mexico Law

1349.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

1350.  McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made. These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

1351.  For instance, McKinsey, working through Purdue and other opioid supply chain clients, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

1352.  McKinsey also made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and

1    misleading in their own right, render even their seemingly truthful statements about opioids false

2    and misleading.

3        1353.   McKinsey continued making these materials misrepresentations and omissions,

4    and failed to correct them, despite repeated regulatory settlements and publications demonstrating

5    the false nature of McKinsey's claims.

6        1354.   Doctors, including those working in hospitals and clinics operated by Tribal health

7    organizations in New Mexico or serving New Mexico Tribal communities, relied on these

8    misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and

9    non-cancer pain, and for other uses not approved by the FDA.

10       1355.   Patients, including members of New Mexico Tribal communities, relied on

11   McKinsey's misrepresentations and omissions in taking prescription opioids for long-term

12   chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

13       1356.   McKinsey is liable to New Mexico Tribal Plaintiffs for the damage McKinsey's

14   material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false

15   statements have caused to New Mexico Tribal Plaintiffs.

16       **4.    Violation of New Mexico Unfair Trade Practices (New Mexico Stat. Ann. §§ 57-12-1 to -26)**

17

18       1357.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

19   herein, and further allege as follows:

20       1358.   New Mexico Tribal Plaintiffs incorporate by reference the preceding paragraphs as

21   if fully set forth herein, and further allege as follows:

22       1359.   McKinsey violated the New Mexico Unfair Trade Practices Act ("N.M. UTPA"),

23   N.M.S.A. §§ 57-12-1 to -26, by committing unfair or deceptive trade practices.

24       1360.   McKinsey, in the regular course of its trade, knowingly made false or misleading

25   statements in connection with the sale of prescription opioids. Such statements may have, tended

26   to, and/or did deceive or mislead others. N.M.S.A. § 57-12-2(D).

27       1361.   McKinsey falsely represented that prescription opioids have characteristics, uses,

28   and/or benefits that they do not have. N.M.S.A. § 57-12-2(D)(5).

1362.   McKinsey falsely represented that prescription opioids were safe and effective. N.M.S.A. § 57-12-2(D)(7).

1363.   McKinsey marketed and/or sold prescription opioids in a manner that deceived or tended to deceive by (a) using exaggeration, innuendo, or ambiguity as to material facts or (b) failing to state material facts regarding the safety and efficacy of these drugs.

1364.   McKinsey also committed unconscionable trade practices in connection with the marketing and/or sale of prescription opioids by taking advantage of New Mexico Tribal Plaintiffs and their citizens to a grossly unfair degree and to their detriment. N.M.S.A. § 57-12-2(E)(1).

1365.   By reason of these deceptive acts and/or practices, and these unconscionable acts, New Mexico Tribal Plaintiffs and their citizens were injured.

1366.   At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from New Mexico Tribal Plaintiffs, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the N.M. UTPA as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the N.M. UTPA because the practices were likely to deceive consumers in New Mexico.

1367.   McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

1368.   McKinsey's omissions, which were deceptive and misleading, render even McKinsey's seemingly truthful statements about opioids false and misleading. All this conduct, separately and collectively, was likely to deceive New Mexico Tribal Plaintiffs.

1369.   McKinsey's business practices as described in this Complaint are unlawful and violate the N.M. UTPA.

1370.   These unlawful practices include, but are not limited to:

a.      Through Purdue and other opioid supply chain clients, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of N.M. UTPA;

1          b.          Through Purdue and other opioid supply chain clients, McKinsey

2     represented that opioids were of a particular standard, quality, or grade when they were of another

3     in violation of N.M. UTPA;

4          c.          McKinsey unlawfully failed to identify and report suspicious prescribing to

5     law enforcement and health authorities; and

6          d.          Through Purdue and other opioid supply chain clients, McKinsey made or

7     disseminated, directly or indirectly, untrue, false, or misleading statements about the use of

8     opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to

9     be made or disseminated to the general public in violation of N.M. UTPA.

10    1371.   McKinsey's business practices as described in this Complaint are unfair and

11    violate the N.M. UTPA because they offend established public policy and because the harm they

12    cause to New Mexico Tribal Plaintiffs and their citizens greatly outweighs any benefits associated

13    with those practices.

14    1372.   As a direct and proximate result of the foregoing acts and practices, McKinsey has

15    received, or will receive, income, profits, and other benefits, which it would not have received if

16    they had not engaged in the violations of the N.M. UTPA described in this Complaint.

17    1373.   As a direct and proximate result of the foregoing acts and practices, McKinsey

18    obtained an unfair advantage over similar businesses that have not engaged in such practices.

19    **5.          Civil Conspiracy under New Mexico Law**

20    1374.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

21    herein, and further allege as follows:

22    1375.   Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged,

23    and continue to engage, in a massive marketing campaign to misstate and conceal the risks of

24    treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this

25    Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding

26    medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a

27    significant increase in the number of opioids prescribed nationwide and throughout New Mexico

28    Tribal Plaintiffs' reservations and communities.

1376.  For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

1377.  Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

1378.  None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

1379.  Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1380.  As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, New Mexico Tribal Plaintiffs and their citizens have suffered damages.

1381.  Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

**J.      Oklahoma Tribal Plaintiffs**

1382.  The Oklahoma Tribal Plaintiffs are the Cherokee Nation, Citizen Potawatomi Nation, and the Muscogee (Creek) Nation.

**1.      Negligence under Oklahoma Law**

1383.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1384.  Under Oklahoma law, "[o]ne who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another has been regarded as being as responsible as the one who commits that act so as to impose liability upon

1   the former to the same extent as if he had performed the act himself." *Cooper v. Bondoni*, 1992

2   OK CIV APP 10 (Okla. Ct. App. Feb. 11, 1992).

3       1385.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's

4   negligence. As a direct, proximate, and legal result of said negligence, Oklahoma Tribal Plaintiffs

5   suffered damages as alleged herein.

6       1386.   McKinsey, through its work with Purdue and other opioid supply chain clients,

7   owed Oklahoma Tribal Plaintiffs a duty to not expose Oklahoma Tribal Plaintiffs to an

8   unreasonable risk of harm.

9       1387.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in

10  accordance with applicable standards of conduct in its work relating to the marketing, selling,

11  and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity

12  Agreement as a "Covered Person."

13      1388.   McKinsey, through its work with Purdue and other opioid supply chain clients,

14  owed a duty of care to Oklahoma Tribal Plaintiffs, pursuant to which it would not encourage the

15  over-marketing and over-prescribing of a controlled substance known at the time to be addictive

16  and known at the time to be a threat to public health.

17      1389.   McKinsey breached its duty to Oklahoma Tribal Plaintiffs by working with Purdue

18  and other opioid supply chain clients to deceptively market and sell opioids, including

19  minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-

20  term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid

21  supply chain clients with implementing a sales and marketing campaign, including Purdue with

22  Project Turbocharge, that would dramatically increase the amount of opioids prescribed and

23  distributed to Tribal members in Oklahoma, including OxyContin. In the process, McKinsey

24  continually devised misleading claims regarding opioids as part of their efforts to get healthcare

25  providers to write more and more opioids prescriptions.

26      1390.   It was reasonably foreseeable that McKinsey's actions and omissions would result

27  in the harm to Oklahoma Tribal Plaintiffs described herein.

28

1391.   McKinsey's failure to comply with its duties of care proximately caused damage to Oklahoma Tribal Plaintiffs.

1392.   The negligence of McKinsey was a substantial factor in causing Oklahoma Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Oklahoma, higher incidence of addiction among Oklahoma Tribal Plaintiffs' members, and Oklahoma Tribal Plaintiffs would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1393.   As a further direct and proximate result of McKinsey's negligence, Oklahoma Tribal Plaintiffs suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1394.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to Oklahoma Tribal Plaintiffs.

1395.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care will also deter McKinsey from engaging in such behavior in the future.

1396.   Further, McKinsey's conduct was despicable and subjected Oklahoma Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Oklahoma Tribal Plaintiffs and their citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of Oklahoma Tribal Plaintiffs and their citizens. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1397.   Oklahoma Tribal Plaintiffs are without fault, and the injuries to Oklahoma Tribal Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

1398.   Oklahoma Tribal Plaintiffs are entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 2. Fraud (Actual and Constructive) and Deceit under Oklahoma Law

1399.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1400.   McKinsey made and caused to be made false representations to healthcare providers working in Oklahoma's Tribal communities, and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids generally, and Purdue's opioids specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

a.      Downplayed the substantial risks of addiction and other side effects of opioids generally, and Purdue's opioids specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

b.      Overstated the efficacy of opioids generally, and Purdue's opioids specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability to improve patient function; and

c.      Misrepresented the medical usefulness and necessity of opioids generally, and Purdue's opioids specifically, including affirmatively marketing their drugs for off label uses

1   (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare

2   providers.

3        1401.   These were accompanied by omissions and concealments of material facts, and

4   deceptive acts and practices as alleged herein. McKinsey made statements promoting the use of

5   opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior

6   misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions,

7   which are false and misleading in their own right, render even their seemingly truthful statements

8   about opioids false and misleading.

9        1402.   McKinsey, Purdue, and other opioid supply chain clients' misrepresentations and

10  omissions had a tendency to deceive others, violate public confidence, and/or injure public

11  interests. McKinsey, having chosen to craft the marketing plans used by its opioid supply chain

12  clients to make representations to healthcare providers regarding their opioids, were under a duty

13  to disclose the whole truth, and to not disclose partial and misleading truths.

14       1403.   McKinsey intended healthcare providers to rely upon its false assertions regarding

15  the risks, efficacy, and medical necessity of opioids generally, and Purdue's opioids specifically,

16  to increase the number of opioid prescriptions made by healthcare providers.

17       1404.   Healthcare providers working in Oklahoma's Tribal communities did in fact rely

18  on the false representations made in opioid marketing plans created by McKinsey and

19  implemented with McKinsey's assistance.

20       1405.   Oklahoma Tribal Plaintiffs seek to recover all damages caused by McKinsey's

21  fraudulent representations and omissions.

22       1406.   McKinsey acted with knowledge and willful intent, with reckless disregard for the

23  rights of others, and/or intentionally and with malice towards others. As such, Oklahoma Tribal

24  Plaintiffs seek to recover punitive damages against McKinsey.

25            **3.**    **Civil Conspiracy/Joint and Several Liability under Oklahoma Law**

26       1407.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

27  herein, and further allege as follows:

28

1408. Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout Oklahoma Tribal Plaintiffs' reservations and communities.

1409. McKinsey, Purdue, and its other opioid supply chain clients, working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of opioids. McKinsey and its clients also agreed to use unlawful means to commit lawful act as part of these sales and marketing efforts.

1410. McKinsey, Purdue, and other opioid supply chain clients agreed to pursue the unlawful act of knowingly misrepresenting the addictive nature of opioids in marketing OxyContin and other opioids to healthcare providers serving Oklahoma Tribal Plaintiffs and their members.

1411. McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years Purdue was subject to a Corporate Integrity Agreement after it pled guilty in 2007 to criminal misbranding. McKinsey assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

1412. McKinsey, Purdue, and other opioid supply chain clients conspired to violate the Oklahoma Consumer Protection Act, 15 OK Stat § 15-753, *et. seq.*, McKinsey, Purdue, and other opioid supply chain clients engaged in deceptive trade practices including: making and causing to be made misrepresentations and omissions in marketing of opioids in general, and Purdue's opioids specifically, that deceived or could reasonably be expected to deceive or mislead consumers.

1413.   McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices, including: intentionally downplaying of the risks, overstating the benefits, and misrepresenting the medical necessity of opioids generally, and Purdue's opioids specifically, including for off-label uses. These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

1414.   McKinsey knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids generally, and Purdue's opioids specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids generally, and Purdue's opioids specifically.

1415.   McKinsey, a majority of the Purdue board, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely-held company.

1416.   As a consequence, McKinsey is jointly and severally liable with Purdue and other opioid supply chain clients for the sales and marketing practices used to promote OxyContin and other opioids.

1417.   Oklahoma Tribal Plaintiffs were damaged as a result of unlawful acts McKinsey conspiracy with Purdue and other opioid supply chain clients.

**4.     Civil Aiding and Abetting under Oklahoma Law**

1418.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1419.   McKinsey gave substantial assistance and encouragement to Purdue, the Sacklers, and other opioid supply chain clients regarding conduct McKinsey knew to be tortious and/or in violation of a duty owed by Purdue, the Sacklers, and other opioid supply chain clients to third persons, including to Oklahoma Tribal Plaintiffs.

1420.   Oklahoma Tribal Plaintiffs were damaged as a result of the specific conduct that McKinsey encouraged and substantially assisted.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**K.     Oregon Tribal Plaintiff**

1421.   The Oregon Tribal Plaintiff is the Confederated Tribes of the Grand Ronde Community of Oregon.

**1.     Public Nuisance under Oregon Law**

1422.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1423.   Section 821B of the Restatement (Second) Torts defines a "public nuisance" as "an unreasonable interference with a right common to the general public."

1424.   This claim is brought by the Confederated Tribes of the Grand Ronde Community of Oregon to abate the public nuisance created by McKinsey through its work with Purdue and other opioid supply chain clients.

1425.   McKinsey has created and/or assisted in the creation of a condition that significantly interferes with the common right to public health and public safety. McKinsey's conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a significant effect upon the public right.

1426.   The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

1427.   McKinsey knew or should have known that its promotion of opioids was false and misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

1428.   McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

1429.   McKinsey has breached its duties to the Confederated Tribes of the Grand Ronde Community of Oregon by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less- or non-addictive painkillers.

1430.   Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

1431.   McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of the Confederated Tribes' members and interfered with the comfortable enjoyment of life and property of others, specifically that of the Confederated Tribes of the Grand Ronde Community of Oregon and their members.

1432.   McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

a.   to be free from reasonable apprehension of danger to person and property;

b.   to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.   to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around the Confederated Tribes' reservations and communities;

d.   to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.   to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions; and

f.   to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

2331633.1

1433.   McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

1434.   McKinsey's acts and omissions render the Confederated Tribes' citizens insecure.

1435.   The Confederated Tribes of the Grand Ronde Community of Oregon did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

1436.   McKinsey's acts and omissions affect the entire communities of the Confederated Tribes of the Grand Ronde Community of Oregon.

1437.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Confederated Tribes and their citizens.

1438.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

1439.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

1440.   McKinsey has failed to abate the nuisance it created.

1441.   The Confederated Tribes of the Grand Ronde Community of Oregon seek an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

1442.   The Confederated Tribes of the Grand Ronde Community of Oregon seek damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

1443.   As a direct result of McKinsey's conduct, the Confederated Tribes have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

1444.   McKinsey is liable to the Confederated Tribes of the Grand Ronde Community of Oregon for the costs borne by the Confederated Tribes as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

1445.   McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

      a.    has harmed and will continue to harm the public health and public peace of the Confederated Tribes of the Grand Ronde Community of Oregon;

      b.    has harmed and will continue to harm the Confederated Tribes' neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

      c.    violates statutory and common law duties;

      d.    is of a continuing nature, and has produced long-lasting effects; and

      e.    is known to McKinsey that its conduct has a significant effect upon the public rights of the Confederated Tribes and their citizens.

1446.   In addition, and independently, McKinsey's conduct invades a legally protected interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic pain.

1447.   Because the co-conspirators have marketed and sold prescription opioids in a manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and substantially interfered with a right common to the general public, McKinsey is liable for public nuisance.

1448.   The nuisance has affected the Confederated Tribes of the Grand Ronde Community of Oregon in that it has undermined, is undermining, and will continue to undermine the public health, quality of life, and safety of the Confederated Tribes' citizens. It has resulted in increased crime and property damage within the Confederated Tribes' reservations and communities. It has resulted in high rates of addiction, overdoses, and dysfunction within the Confederated Tribes' families and communities.

1449.   The Confederated Tribes' resources have been, are being, and will be consumed in efforts to address the opioid epidemic, thereby eliminating available resources that could be used to benefit the Confederated Tribes of the Grand Ronde Community of Oregon.

1450.   McKinsey's actions and omissions annoy, injure, and endanger the comfort, repose, health, and safety of the Confederated Tribes of the Grand Ronde Community of Oregon, offend decency, and render the Confederated Tribes' citizens insecure in their lives and the use of property.

1451.   McKinsey's nuisance-causing activities are not outweighed by their utility. In fact, these activities are illegal and have no social utility whatsoever. There is no legitimately recognized societal interest in marketing and selling prescription opioids through false and misleading representations.

1452.   As a direct and proximate result of the nuisance caused by McKinsey and others, the Confederated Tribes' citizens have been injured in their ability to enjoy rights common to the public.

1453.   As a direct and proximate result of the nuisance, the Confederated Tribes of the Grand Ronde Community of Oregon have sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social services, welfare, and education systems.

1454.   The Confederated Tribes of the Grand Ronde Community of Oregon have suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of the Confederated Tribes' culture as well as threatened their continued existence as sovereign Nations.

1455.   The Confederated Tribes of the Grand Ronde Community of Oregon have also suffered unique harms of a kind that are different from their citizens at large, namely, that the Confederated Tribes have been harmed in their proprietary interests.

2331633.1

## 2. **Negligence under Oregon Law**

1456.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1457.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, the Confederated Tribes of the Grand Ronde Community of Oregon suffered damages as alleged herein.

1458.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed the Confederated Tribes of the Grand Ronde Community of Oregon a duty to not expose the Confederated Tribes of the Grand Ronde Community of Oregon to an unreasonable risk of harm.

1459.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

1460.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to the Confederated Tribes of the Grand Ronde Community of Oregon, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1461.   McKinsey breached its duty to the Confederated Tribes of the Grand Ronde Community of Oregon by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Oregon, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

MASTER COMPLAINT
(TRIBAL PLAINTIFFS)
21-MD-02996-CRB (SK)

1462.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Confederated Tribes of the Grand Ronde Community of Oregon described herein.

1463.   McKinsey's failure to comply with its duties of care proximately caused damage to the Confederated Tribes of the Grand Ronde Community of Oregon.

1464.   The negligence of McKinsey was a substantial factor in causing the Confederated Tribes' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Oregon, higher incidence of addiction among the Confederated Tribes' members, and the Confederated Tribes of the Grand Ronde Community of Oregon would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1465.   As a further direct and proximate result of McKinsey's negligence, the Confederated Tribes of the Grand Ronde Community of Oregon suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1466.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to the Confederated Tribes of the Grand Ronde Community of Oregon.

1467.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1468.   Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected the Confederated Tribes of the Grand Ronde Community of Oregon to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to

1   proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others,

2   including the Confederated Tribes of the Grand Ronde Community of Oregon and their citizens.

3   McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference

4   to the interests of the Confederated Tribes. An officer, director, or managing agent of McKinsey

5   personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in

6   this Complaint.

7       1469.   The Confederated Tribes of the Grand Ronde Community of Oregon are without

8   fault, and the injuries to the Confederated Tribes would not have happened in the ordinary course

9   of events if McKinsey had used due care commensurate to the dangers involved in the

10  distribution and dispensing of controlled substances.

11      1470.   The Confederated Tribes of the Grand Ronde Community of Oregon are entitled to

12  an award of punitive damages sufficient to punish and make an example of McKinsey.

13              **3.      Fraud under Oregon Law**

14      1471.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

15  herein, and further alleges as follows:

16      1472.   McKinsey committed fraud by acting to conceal and advising the concealment of

17  the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase

18  sales of opioids through its work for Purdue and others, and concealing all of this information

19  from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint,

20  McKinsey, working through Purdue and other opioid supply chain clients, made material

21  misrepresentations concerning the sale of prescription opioids, as well as false or misleading

22  descriptions and representations of fact during the advertising and promotion of prescription

23  opioids, and those material misrepresentations and false or misleading descriptions and

24  representations of fact were knowingly or recklessly made. These were accompanied by

25  omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

26      1473.   For instance, McKinsey, working through Purdue and other opioid supply chain

27  clients, made these material misrepresentations and false or misleading descriptions and

28  representations of fact in an intentional effort to deceive and induce doctors and patients to

1  prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

2  for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were

3  unsuited to these treatments and that opioids were highly addictive and subject to abuse.

4      1474.  McKinsey also made statements promoting the use of opioids to treat chronic pain

5  that omitted or concealed material facts and failed to correct prior misrepresentations and

6  omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and

7  misleading in their own right, render even their seemingly truthful statements about opioids false

8  and misleading.

9      1475.  McKinsey continued making these materials misrepresentations and omissions,

10  and failed to correct them, despite repeated regulatory settlements and publications demonstrating

11  the false nature of McKinsey's claims.

12      1476.  Doctors, including those working in hospitals and clinics operated by Tribal health

13  organizations in Oregon or serving Oregon Tribal communities, relied on these

14  misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and

15  non-cancer pain, and for other uses not approved by the FDA.

16      1477.  Patients, including members of the Confederated Tribes of the Grand Ronde

17  Community of Oregon, relied on McKinsey's misrepresentations and omissions in taking

18  prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not

19  approved by the FDA.

20      1478.  McKinsey is liable to the Confederated Tribes of the Grand Ronde Community of

21  Oregon for the damage McKinsey's material, uncorrected, and knowingly or recklessly made

22  misrepresentations, omissions, and false statements have caused to the Confederated Tribes of the

23  Grand Ronde Community of Oregon.

24      **4.    Violation of Oregon Unlawful Trade Practices Act (O.R.S. §§ 646.605-**
            **56)**

25

26      1479.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

27  herein, and further allege as follows:

28

1480.   McKinsey has violated the Oregon Unlawful Trade Practices Act, O.R.S. §§ 646.605-56, by committing unfair or deceptive trade practices.

1481.   McKinsey, in the regular course of its trade, knowingly made false or misleading statements in connection with the sale of prescription opioids. Such statements may have, tended to, and/or did deceive or mislead others. O.R.S. § 646.608(1)(u).

1482.   McKinsey caused false representations to be made that prescription opioids have characteristics, uses, and/or benefits that they do not have. O.R.S. § 646.608(1)(e).

1483.   McKinsey caused false representations to be made that prescription opioids were safe and effective. O.R.S. § 646.608(1)(g).

1484.   McKinsey caused the marketing and sale of prescription opioids in a manner that deceived or tended to deceive by (a) using exaggeration, innuendo, or ambiguity as to material facts or (b) failing to state material facts regarding the safety and efficacy of these drugs.

1485.   By reason of these deceptive acts and/or practices, and these unconscionable acts, the Confederated Tribes of the Grand Ronde Community of Oregon and their citizens were injured.

1486.   At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from the Confederated Tribes of the Grand Ronde Community of Oregon, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the Oregon Unlawful Trade Practices Act as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the Oregon Unlawful Trade Practices Act because the practices were likely to deceive consumers in Oregon.

1487.   McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

1488.   McKinsey's omissions, which were deceptive and misleading, render even McKinsey's seemingly truthful statements about opioids false and misleading. All this conduct, separately and collectively, was likely to deceive the Confederated Tribes of the Grand Ronde Community of Oregon.

1489.   McKinsey's business practices as described in this Complaint are unlawful and violate the Oregon Unlawful Trade Practices Act.

1490.   These unlawful practices include, but are not limited to:

a.      Through Purdue and other opioid supply chain clients, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of Oregon Unlawful Trade Practices Act;

b.      Through Purdue and other opioid supply chain clients, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of Oregon Unlawful Trade Practices Act;

c.      McKinsey failed to identify and report suspicious prescribing to law enforcement and health authorities; and

d.      Through Purdue and other opioid supply chain clients, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of Oregon Unlawful Trade Practices Act.

1491.   McKinsey's business practices as described in this Complaint are unfair and violate the Oregon Unlawful Trade Practices Act because they offend established public policy and because the harm they cause to the Confederated Tribes of the Grand Ronde Community of Oregon and their citizens greatly outweighs any benefits associated with those practices.

1492.   As a direct and proximate result of the foregoing acts and practices, McKinsey has received, or will receive, income, profits, and other benefits, which it would not have received if they had not engaged in the violations of the Oregon Unlawful Trade Practices Act described in this Complaint.

1493.   As a direct and proximate result of the foregoing acts and practices, McKinsey obtained an unfair advantage over similar businesses that have not engaged in such practices.

5.      **Civil Conspiracy under Oregon Law**

1494.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1495.   Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged, and continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout the Confederated Tribes' reservations and communities.

1496.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

1497.   Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

1498.   None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

1499.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1500.   As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, the Confederated Tribes of the Grand Ronde Community of Oregon and their citizens have suffered damages.

1     1501.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly

2     and severally liable for the results of their concerted efforts.

3         **L.        Utah Tribal Plaintiff**

4     1502.   The Utah Tribal Plaintiff is the Navajo Nation.

5              **1.        Public Nuisance under Utah Law**

6     1503.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

7     herein, and further allege as follows:

8     1504.   Section 821B of the Restatement (Second) Torts defines a "public nuisance" as

9     "an unreasonable interference with a right common to the general public."

10    1505.   This claim is brought by the Navajo Nation to abate the public nuisance created by

11    McKinsey through its work with Purdue and other opioid supply chain clients.

12    1506.   McKinsey has created and/or assisted in the creation of a condition that

13    significantly interferes with the common right to public health and public safety. McKinsey's

14    conduct has produced a permanent or long-lasting effect, and McKinsey knows its conduct has a

15    significant effect upon the public right.

16    1507.   The public nuisance is substantial and unreasonable. McKinsey's actions caused

17    and continue to cause the public health epidemic described above and that harm outweighs any

18    offsetting benefit.

19    1508.   McKinsey knew or should have known that its promotion of opioids was false and

20    misleading and that its deceptive marketing scheme and other unlawful, unfair, and fraudulent

21    actions would create or assist in the creation of the public nuisance—the opioid epidemic.

22    1509.   McKinsey's actions were, at the very least, a substantial factor in opioids

23    becoming widely available and widely used. McKinsey's actions were, at the very least, a

24    substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the

25    treatment of chronic pain. Without McKinsey's actions, opioid use, misuse, abuse, and addiction

26    would not have become so widespread, and the opioid epidemic that now exists would have been

27    averted or much less severe.

28

1510.   McKinsey has breached its duties to the Nation by disseminating false and misleading information through Purdue and other opioid supply chain clients regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less or non-addictive painkillers.

1511.   Working through Purdue and other opioid supply chain clients, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

1512.   McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of the Nation and the Nation's citizens and interfered with the comfortable enjoyment of life and property of others, specifically that of the Nation and its members.

1513.   McKinsey's activities have unreasonably interfered, are interfering, and will interfere with the common rights of the general public:

a.      to be free from reasonable apprehension of danger to person and property;

b.      to be free from the spread of disease within the community, including the disease of addiction and other diseases associated with widespread illegal opioid use;

c.      to be free from the negative health and safety effects of widespread illegal drug sales on premises on and around the Nation;

d.      to be free from blights on the community created by areas of illegal drug use and opioid sales;

e.      to live or work in a community in which local businesses do not profit from using their premises to sell products that serve the criminal element and foster a secondary market of illegal transactions;

f.      and to live or work in a community in which community members are not under the influence of narcotics unless they have a legitimate medical need to use them.

1514.   McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

1515.   McKinsey's acts and omissions render the Nation's citizens insecure.

1516.   The Nation did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

1517.   McKinsey's acts and omissions affect the entire communities of the Nation.

1518.   McKinsey's acts and omissions threatened and directly harmed the health and welfare of the Nation and its citizens.

1519.   McKinsey also has a duty to abate the nuisance caused by the prescription opioid epidemic.

1520.   The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

1521.   McKinsey has failed to abate the nuisance it created.

1522.   The Nation seeks an order providing for abatement of the public nuisance that McKinsey created or assisted in the creation of, and enjoining McKinsey from future conduct creating a public nuisance.

1523.   The Nation seeks damages from McKinsey to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

1524.   As a direct result of McKinsey's conduct, the Nation has suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial, and other services.

1525.   McKinsey is liable to the Nation for the costs borne by the Nation as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

1526.   McKinsey's interference with these public rights has been, is, and will continue to be unreasonable and objectionable because it:

     a.     has harmed and will continue to harm the public health and public peace of the Nation;

     b.     has harmed and will continue to harm the Nation's neighborhoods and communities by increasing crime, and thereby interfering with the rights of the community at large;

1          c.      violates statutory and common law duties;

2          d.      is of a continuing nature, and has produced long-lasting effects; and

3          e.      is known to McKinsey that its conduct has a significant effect upon the

4    public rights of the Nation and its citizens.

5          1527.   In addition, and independently, McKinsey's conduct invades a legally protected

6    interest. McKinsey's conduct constitutes an unreasonable, intentional, and substantial interference

7    because, *inter alia*, each co-conspirator has conducted a fraudulent campaign to misrepresent

8    knowingly the safety and efficacy of opioid drugs and to ensure their widespread use for chronic

9    pain.

10         1528.   Because the co-conspirators have marketed and sold prescription opioids in a

11   manner contrary to law and because McKinsey's conduct has unreasonably, intentionally, and

12   substantially interfered with a right common to the general public, McKinsey is liable for public

13   nuisance.

14         1529.   The nuisance has affected the Nation in that it has undermined, is undermining,

15   and will continue to undermine the public health, quality of life, and safety of the Nation's

16   citizens. It has resulted in increased crime and property damage within the Nation. It has resulted

17   in high rates of addiction, overdoses, and dysfunction within the Nation's families and

18   communities.

19         1530.   The Nation's resources have been, are being, and will be consumed in efforts to

20   address the opioid epidemic, thereby eliminating available resources that could be used to benefit

21   the Nation.

22         1531.   McKinsey's actions and omissions annoy, injure, and endanger the comfort,

23   repose, health, and safety of the Nation, offend decency, and render the Nation's citizens insecure

24   in their lives and the use of property.

25         1532.   McKinsey's nuisance-causing activities are not outweighed by their utility. In fact,

26   these activities are illegal and have no social utility whatsoever. There is no legitimately

27   recognized societal interest in marketing and selling prescription opioids through false and

28   misleading representations.

1533.   As a direct and proximate result of the nuisance caused by McKinsey and others, the Nation's citizens have been injured in their ability to enjoy rights common to the public.

1534.   As a direct and proximate result of the nuisance, the Nation has sustained economic harm by spending substantial sums on the societal harms caused by McKinsey's nuisance-causing activity, including costs to healthcare, criminal justice, social services, welfare, and education systems.

1535.   The Nation has suffered special injury different in kind from the general public because American Indian populations are more vulnerable to opioid abuse and the damage caused by the nuisance has inflicted harm on the very fabric of the Nation's culture as well as threatened its continued existence as a sovereign Nation.

1536.   The Nation has also suffered unique harms of a kind that are different from its citizens at large, namely, that the Nation has been harmed in its proprietary interests.

## 2.     Negligence under Utah Law

1537.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1538.   The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, the Nation suffered damages as alleged herein.

1539.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed the Nation a duty to not expose the Nation to an unreasonable risk of harm.

1540.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing of opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

1541.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to the Nation, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1542.   McKinsey breached its duty to the Nation by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Utah, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1543.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to the Nation described herein.

1544.   McKinsey's failure to comply with its duties of care proximately caused damage to the Nation.

1545.   The negligence of McKinsey was a substantial factor in causing the Nation's damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Utah, higher incidence of addiction among the Navajo Nation's members, and the Nation would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1546.   As a further direct and proximate result of McKinsey's negligence, the Nation suffered damages including, but not limited to, economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1547.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to the Nation.

1548.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1549.   Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected the Nation to cruel and unjust hardship in conscious disregard of its rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including the Nation and its citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of the Nation. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1550.   The Nation is without fault, and the injuries to the Nation would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

1551.   The Nation is entitled to an award of punitive damages sufficient to punish and make an example of McKinsey.

### 3.      Fraud under Utah Law

1552.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

1553.   McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and

1   representations of fact were knowingly or recklessly made. These were accompanied by

2   omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

3          1554.   For instance, McKinsey, working through Purdue and other opioid supply chain

4   clients, made these material misrepresentations and false or misleading descriptions and

5   representations of fact in an intentional effort to deceive and induce doctors and patients to

6   prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

7   for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were

8   unsuited to these treatments and that opioids were highly addictive and subject to abuse.

9          1555.   McKinsey also made statements promoting the use of opioids to treat chronic pain

10  that omitted or concealed material facts and failed to correct prior misrepresentations and

11  omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and

12  misleading in their own right, render even their seemingly truthful statements about opioids false

13  and misleading.

14         1556.   McKinsey continued making these materials misrepresentations and omissions,

15  and failed to correct them, despite repeated regulatory settlements and publications demonstrating

16  the false nature of McKinsey's claims.

17         1557.   Doctors, including those working in hospitals and clinics operated by Tribal health

18  organizations in Utah or serving Utah Tribal communities, relied on these misrepresentations and

19  omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for

20  other uses not approved by the FDA.

21         1558.   Patients, including members of the Navajo Nation, relied on McKinsey's

22  misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute,

23  and non-cancer pain, and for other uses not approved by the FDA.

24         1559.   McKinsey is liable to the Navajo Nation for the damage McKinsey's material,

25  uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false

26  statements have caused to the Nation.

27

28

4.   **Violation of Utah Consumer Sales Practice Act (Utah Code Ann. §§ 13-1-1 to -23)**

1560.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1561.   McKinsey violated the Utah Consumer Sales Practice Act ("Utah CSPA"), U.C.A. §§ 13-1-1 to -23, by engaging in deceptive acts and/or practices in connection with the marketing and/or sale of prescription opioids.

1562.   McKinsey engaged in these deceptive acts and/or practices by knowingly or intentionally representing that prescription opioids have characteristics, uses, or benefits that they do not have. U.C.A. § 13-11-4(2)(a).

1563.   McKinsey falsely represented that prescription opioids were safe and effective. U.C.A. § 13-11-4(2)(b).

1564.   McKinsey engaged in unconscionable acts in the marketing and/or sale of prescription opioids. U.C.A. § 13-11-5.

1565.   By reason of these deceptive acts and/or practices, and these unconscionable acts, the Nation and its citizens were injured.

1566.   At times, places, and involving participants known exclusively to McKinsey and other parties and concealed from the Nation, McKinsey has engaged in unlawful, unfair, and fraudulent business practices in violation of the Utah CSPA as set forth above. McKinsey's business practices as described in this Complaint are deceptive and violate the Utah CSPA because the practices were likely to deceive consumers in Utah.

1567.   McKinsey knew or should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

1568.   McKinsey's omissions, which were deceptive and misleading, render even McKinsey's seemingly truthful statements about opioids false and misleading. All this conduct, separately and collectively, was likely to deceive the Nation.

1      1569.  McKinsey's business practices as described in this Complaint are unlawful and

2   violate the Utah CSPA.

3      1570.  These unlawful practices include, but are not limited to:

4            a.      Through Purdue and other opioid supply chain clients, McKinsey

5   represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits

6   which they did not have in violation of Utah CSPA;

7            b.      Through Purdue and other opioid supply chain clients, McKinsey

8   represented that opioids were of a particular standard, quality, or grade when they were of another

9   in violation of Utah CSPA;

10           c.      McKinsey unlawfully failed to identify and report suspicious prescribing to

11  law enforcement and health authorities; and

12           d.      Through Purdue and other opioid supply chain clients, McKinsey made or

13  disseminated, directly or indirectly, untrue, false, or misleading statements about the use of

14  opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to

15  be made or disseminated to the general public in violation of Utah CSPA.

16     1571.  McKinsey's business practices as described in this Complaint are unfair and

17  violate the Utah CSPA because they offend established public policy and because the harm they

18  cause to the Nation and its citizens greatly outweighs any benefits associated with those practices.

19     1572.  As a direct and proximate result of the foregoing acts and practices, McKinsey has

20  received, or will receive, income, profits, and other benefits, which it would not have received if

21  they had not engaged in the violations of the Utah CSPA described in this Complaint.

22     1573.  As a direct and proximate result of the foregoing acts and practices, McKinsey

23  obtained an unfair advantage over similar businesses that have not engaged in such practices.

24           **5.      <u>Civil Conspiracy under Utah Law</u>**

25     1574.  Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

26  herein, and further allege as follows:

27     1575.  Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged,

28  and continue to engage, in a massive marketing campaign to misstate and conceal the risks of

treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a significant increase in the number of opioids prescribed nationwide and throughout the Navajo Nation's reservation and communities.

1576.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey, Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this Complaint.

1577.   Without Purdue, other opioid supply chain clients, and McKinsey's misrepresentations, which created greater demand for opioids, they would not have been able to sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

1578.   None of the opioid supply chain companies or McKinsey would have succeeded in profiting so much from the opioid epidemic without the concerted conduct of the other parties.

1579.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing, selling, and distributing prescription opioids by means of misrepresentations and omissions, violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1580.   As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, the Nation and its citizens have suffered damages.

1581.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

**M.    Washington Tribal Plaintiffs**

1582.   The Washington Tribal Plaintiffs are the Jamestown S'Klallam Tribe; the Port Gamble S'Klallam Tribe; the Puyallup Tribe of Indians; the Quileute Tribe of the Quileute Reservation; the Suquamish Tribe; and the Swinomish Indian Tribal Community.

1.     **Public Nuisance under Washington Law**

1583.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1584.   Pursuant to RCW 7.48.010, an actionable nuisance is defined as, *inter alia*, "whatever is injurious to health or indecent or offensive to the senses . . . so as to essentially interfere with the comfortable enjoyment of the life and property.

1585.   RCW 7.48.120 further defines nuisance as an "act or omission [that] either annoys, injures or endangers the comfort, repose, health or safety of others ... or in any way renders other persons insecure in life, or in the use of property."

1586.   Pursuant to RCW 7.48.130, "[a] public nuisance is one which affects equally the rights of an entire community or neighborhood, although the extent of the damage may be unequal."

1587.   Tribal members have a right to be free from conduct that endangers their health and safety. Yet, McKinsey has engaged in conduct that endangers or injures the health and safety of the members of Washington Tribal Plaintiffs by their consulting services regarding the production, promotion, distribution, and marketing of opioids for use by members of Washington Tribal Plaintiffs and in a manner that impacts Washington Tribal Plaintiffs.

1588.   McKinsey has created or assisted in the creation of a condition that is injurious to the health and safety of Washington Tribal Plaintiffs and their members and interferes with the comfortable enjoyment of life and property within the reservations.

1589.   McKinsey's conduct working with opioid supply chain clients has directly caused deaths, serious injuries, and severe disruption of the public peace, order and safety, including fueling the opioid crises facing Washington Tribal Plaintiffs. McKinsey's conduct continues to produce permanent, substantial and long-lasting damage.

1590.   The health and safety of the members of Washington Tribal Plaintiffs, including those who use, have used, or will use opioids, as well as those effected by users of opioids, are matters of substantial public interest and of legitimate concern to members of Washington Tribal Plaintiffs and residents of their reservations.

1591.   McKinsey's conduct has impacted and continues to impact a substantial number of members of Washington Tribal Plaintiffs and is likely to continue causing significant harm to patients with chronic pain who are being prescribed and take opioids, their families, and their communities.

1592.   But for McKinsey's actions, opioid use and ultimately misuse and abuse would not be widespread as it is today, and the massive epidemic of opioid abuse that currently exists would have been averted.

1593.   McKinsey has caused the foregoing damage and harm. McKinsey knew or reasonably should have known that statements it made through Purdue and other opioid supply chain clients regarding the risks and benefits of opioids were false or misleading, and that their false and misleading statements were causing harm from their continued production and marketing of opioids. Thus, the public nuisance caused by McKinsey to Washington Tribal Plaintiffs was reasonably foreseeable, including its financial and economic losses.

1594.   Washington Tribal Plaintiffs bring this cause of action in their own capacity and as *parens patriae* for the benefit of Washington Tribal Plaintiffs' members, to protect their health, safety, and welfare.

1595.   As a direct and proximate cause of McKinsey's conduct creating or assisting in the creation of a public nuisance, Washington Tribal Plaintiffs and their members have sustained and will continue to sustain substantial injuries.

1596.   Washington Tribal Plaintiffs seek economic damages from McKinsey as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

1597.   Washington Tribal Plaintiffs request an order providing for abatement of the public nuisance that McKinsey has created or assisted in the creation of, and enjoining McKinsey from future violations of RCW 7.48.010.

1598.   Washington Tribal Plaintiffs also seek the maximum statutory and civil penalties permissible by law.

2.     **Negligence under Washington Law**

1599.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1600.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed Washington Tribal Plaintiffs a duty to not expose Washington Tribal Plaintiffs to an unreasonable risk of harm.

1601.   McKinsey had a legal duty to exercise reasonable and ordinary care and skill in accordance with applicable standards of conduct in its work relating to the marketing, selling, and/or distributing opioids. It also owed such a duty pursuant to the Corporate Integrity Agreement as a "Covered Person."

1602.   McKinsey, through its work with Purdue and other opioid supply chain clients, owed a duty of care to Washington Tribal Plaintiffs, pursuant to which it would not encourage the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health.

1603.   McKinsey breached its duty to Washington Tribal Plaintiffs by, *inter alia*, advising Purdue and other opioid supply chain clients to implement sales and marketing strategies designed to increase prescriptions and sales of OxyContin and other opioids.

1604.   McKinsey breached its duty to Washington Tribal Plaintiffs by working with Purdue and other opioid supply chain clients to deceptively market and sell opioids, including minimizing the risks of addiction and overdose and exaggerating the purported benefits of long-term use of opioids for the treatment of chronic pain. McKinsey devised and assisted opioid supply chain clients with implementing a sales and marketing campaign, including Purdue with Project Turbocharge, that would dramatically increase the amount of opioids prescribed and distributed to Tribal members in Washington, including OxyContin. In the process, McKinsey continually devised misleading claims regarding opioids as part of their efforts to get healthcare providers to write more and more opioids prescriptions.

1605.   It was reasonably foreseeable that McKinsey's actions and omissions would result in the harm to Washington Tribal Plaintiffs described herein.

1606.   McKinsey's failure to comply with its duties of care proximately caused damage to Washington Tribal Plaintiffs.

1607.   The negligence of McKinsey was a substantial factor in causing Washington Tribal Plaintiffs' damages. But for McKinsey's services, Purdue would not have been able to increase sales in the years following the 2007 guilty plea, including the five years under the Corporate Integrity Agreement and the years since its expiration. In the absence of increased sales of prescription opioids, there would not have been increased supply of opioids in Washington, higher incidence of addiction among Washington Tribal Plaintiffs' members, and Washington Tribal Plaintiffs would not have incurred the increased costs that are associated with higher levels of supply and addiction.

1608.   As a further direct and proximate result of McKinsey's negligence, Washington Tribal Plaintiffs suffered damages including, but not limited to economic loss, business loss, property damage, emotional distress, annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal abstinence syndrome.

1609.   There is moral blame attached to McKinsey because of the terrible injuries and suffering their misconduct caused, including the damage to Washington Tribal Plaintiffs.

1610.   Public policy supports finding a duty of care in this circumstance, and a finding of a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the future.

1611.   Further, the conduct alleged against McKinsey in this Complaint was despicable and subjected Washington Tribal Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Washington Tribal Plaintiffs and their citizens. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of Washington Tribal Plaintiffs. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

1612.   Washington Tribal Plaintiffs are without fault, and the injuries to Washington Tribal Plaintiffs would not have happened in the ordinary course of events if McKinsey had used due care commensurate to the dangers involved in the distribution and dispensing of controlled substances.

### 3.   Fraud under Washington Law

1613.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further alleges as follows:

1614.   McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, and Plaintiffs. As alleged herein and throughout this Complaint, McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations concerning the sale of prescription opioids, as well as false or misleading descriptions and representations of fact during the advertising and promotion of prescription opioids, and those material misrepresentations and false or misleading descriptions and representations of fact were knowingly or recklessly made. These were accompanied by omissions and concealments of material facts, and deceptive acts and practices as alleged herein.

1615.   For instance, McKinsey, working through Purdue and other opioid supply chain clients, made these material misrepresentations and false or misleading descriptions and representations of fact in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA, despite McKinsey's knowledge that the opioids were unsuited to these treatments and that opioids were highly addictive and subject to abuse.

1616.   McKinsey also made statements promoting the use of opioids to treat chronic pain that omitted or concealed material facts and failed to correct prior misrepresentations and omissions about the risks and benefits of opioids. McKinsey's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

1617.   McKinsey continued making these materials misrepresentations and omissions, and failed to correct them, despite repeated regulatory settlements and publications demonstrating the false nature of McKinsey's claims.

1618.   Doctors, including those working in hospitals and clinics operated by Tribal health organizations in Washington or serving Washington Tribal communities, relied on these misrepresentations and omissions in prescribing opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1619.   Patients, including members of Washington Tribal communities, relied on McKinsey's misrepresentations and omissions in taking prescription opioids for long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA.

1620.   McKinsey is liable to Washington Tribal Plaintiffs for the damage McKinsey's material, uncorrected, and knowingly or recklessly made misrepresentations, omissions, and false statements have caused to Washington Tribal Plaintiffs.

### 4.   **Washington Consumer Protection Act/Unfair Business Practices Act (RCW § 19.86, *et seq.*)**

1621.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

1622.   The Washington Consumer Protection Act (the "Wash. CPA") is codified at RCW 19.86, *et seq.*

1623.   The Wash. CPA prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. Through its work with Purdue and other opioid supply chain clients, McKinsey engaged in a pattern of unfair methods of competition, and unfair and/or deceptive conduct pursuant to a common practice of misleading the public regarding the purported benefits and risks of opioids.

1624.   McKinsey, at all times relevant to this Complaint, working through Purdue and other opioid supply chain clients, violated the Wash. CPA by making unfair and deceptive representations about the use of opioids to treat chronic and non-cancer pain, including to physicians and consumers in Tribal communities in Washington. McKinsey also omitted or

1   concealed material facts and failed to correct prior misrepresentations and omissions about the

2   purported benefits and risks of opioids. In addition, McKinsey's silence regarding the full risks of

3   opioid use constitutes deceptive conduct prohibited by the Wash. CPA.

4        1625.   These unfair methods of competition and unfair and deceptive acts or practices in

5   the conduct of trade or commerce were reasonably calculated to deceive Washington Tribal

6   Plaintiffs and their members and did in fact deceive Washington Tribal Plaintiffs and consumers.

7   The impact of McKinsey's misrepresentations, concealments, and omissions continue to this day.

8        1626.   Washington Tribal Plaintiffs have paid significant sums of money treating their

9   members for opioid-related health costs. McKinsey's misrepresentations have further caused

10  Plaintiff to spend substantial sums of money on and have burdened law enforcement, emergency

11  services, social services, public safety, and other human services, as described above.

12       1627.   But for these unfair methods of competition and unfair and/or deceptive acts or

13  practices in the conduct of trade or commerce, Washington Tribal Plaintiffs would not have

14  incurred the significant costs for harmful drugs with limited, if any, benefit, or the substantial

15  costs related to the epidemic caused by McKinsey, as fully described above.

16       1628.   McKinsey's unfair and deceptive conduct caused the damage and harm

17  complained of herein. McKinsey knew or reasonably should have known that its statements

18  regarding the risks and benefits of opioids were false and misleading, and that their statements

19  were causing harm from their continued production and marketing of opioids. Thus, the harm

20  caused by McKinsey's unfair and deceptive conduct was reasonably foreseeable, including the

21  financial and economic losses incurred by Washington Tribal Plaintiffs.

22       1629.   As a direct and proximate cause of McKinsey's unfair and deceptive conduct,

23  Washington Tribal Plaintiffs have sustained and will continue to sustain injuries, and pursuant to

24  RCW 19.86.090, Washington Tribal Plaintiffs are entitled to actual and treble damages in

25  amounts to be determined at trial, attorneys' fees and costs, and all other relief available under the

26  Wash. CPA.

27

28

1    1630.   The Court should also grant injunctive relief enjoining McKinsey from future

2    violations of the Wash. CPA. McKinsey's actions, as complained of herein, constitute unfair

3    competition or unfair, deceptive, or fraudulent acts or practices in violation of the Wash. CPA.

4                    **5.       Civil Conspiracy under Washington Law**

5    1631.   Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

6    herein, and further allege as follows:

7    1632.   Purdue, McKinsey's other opioid supply chain clients, and McKinsey engaged,

8    and continue to engage, in a massive marketing campaign to misstate and conceal the risks of

9    treating long-term chronic, non-acute, and non-cancer pain with opioids as described in this

10   Complaint. Their aggressive marketing campaigns enabled them to overcome the longstanding

11   medical consensus that opioids were unsafe for the treatment of chronic pain and resulted in a

12   significant increase in the number of opioids prescribed nationwide and throughout Washington

13   Tribal Plaintiffs' reservations and communities.

14   1633.   For example, McKinsey, Purdue, and other opioid supply chain clients agreed to

15   collaborate for years to market and sell opioids through misleading and unlawful acts. McKinsey,

16   Purdue, and other opioid supply chain clients engaged in unfair trade practices as described in this

17   Complaint.

18   1634.   Without Purdue, other opioid supply chain clients, and McKinsey's

19   misrepresentations, which created greater demand for opioids, they would not have been able to

20   sell increasing quantities of prescription opioids for non-medical or inappropriate purposes.

21   1635.   None of the opioid supply chain companies or McKinsey would have succeeded in

22   profiting so much from the opioid epidemic without the concerted conduct of the other parties.

23   1636.   Purdue, other opioid supply chain clients, and McKinsey agreed with each other to

24   accomplish the unlawful purposes of marketing, selling, and distributing prescription opioids

25   through violations of law and misrepresentations. Purdue, other opioid supply chain clients, and

26   McKinsey performed numerous overt acts in furtherance of this conspiracy, including marketing,

27   selling, and distributing prescription opioids by means of misrepresentations and omissions,

28   violating federal and state laws, and turning a blind eye to diversion of prescription opioids.

1637.   As a result of the concerted action between Purdue, other opioid supply chain clients, and McKinsey, Washington Tribal Plaintiffs and their citizens have suffered damages.

1638.   Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

## IX.   **PRAYER FOR RELIEF**

Plaintiffs seek all legal and equitable relief permitted by law, including:

- Injunctive/equitable relief;
- Compensatory damages;
- Remediation;
- Abatement of the public nuisance that McKinsey created, assisted in creating, contributed to, or exacerbated;
- Restitution;
- Disgorgement of profits;
- Punitive and/or exemplary damages;
- Treble damages;
- Pre- and post-judgment interest; and
- Attorneys' fees and costs.

## X.   **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

1

2   Dated: December 6, 2021                    Respectfully submitted,

3                                              By: /s/        Lloyd B. Miller
                                               Lloyd B. Miller (admitted *pro hac vice*)
4                                              lloyd@sonosky.net
                                               **SONOSKY CHAMBERS SACHSE MILLER &**
5                                              **MONKMAN, LLP**
                                               725 East Fireweed Lane, Suite 420
6                                              Anchorage, AK 99503
                                               Telephone: (907) 258-6377
7                                              Facsimile: (907) 272-8332
                                               *PSC Member – Indian Tribes*
8
                                               **Filing Authorized by Plaintiffs' Lead Counsel**
9                                              **Pursuant to PTO 2:**

10                                             By: /s/        Elizabeth J. Cabraser
                                               Elizabeth J. Cabraser
11                                             ecabraser@lchb.com
                                               **LIEFF CABRASER HEIMANN &**
12                                             **BERNSTEIN, LLP**
                                               275 Battery Street, 29th Floor
13                                             San Francisco, CA 94111-3339
                                               Telephone: (415) 956-1000
14                                             Facsimile: (415) 956-1008

15

16

17

18

19

20

21

22

23

24

25

26

27

28