James L. Bernard (Admitted *Pro Hac Vice*)
(jbernard@stroock.com)
David M. Cheifetz (Admitted *Pro Hac Vice*)
(dcheifetz@stroock.com)
Daniel J. Yost (Admitted *Pro Hac Vice*)
(dyost@stroock.com)
STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Telephone:  (212) 806-5400

Josh A. Cohen (CA SBN 217853)
(jcohen@clarencedyer.com)
Shaneeda Jaffer (CA SBN 253449)
(sjaffer@clarencedyer.com)
CLARENCE DYER & COHEN LLP
899 Ellis Street
San Francisco, CA 94109
Telephone:  (415) 749-1800

*Attorneys for Defendants McKinsey & Company, Inc., McKinsey & Company, Inc. United States, McKinsey & Company, Inc. Washington D.C. and McKinsey Holdings, Inc.*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION<br><br>This document relates to:<br><br>Master Complaint (Subdivision)<br>Master Complaint (School Districts)<br>Individual Cases Listed in Appendix L | Case No. 3:21-md-2996-CRB (SK)<br><br>**MCKINSEY DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS THE COMPLAINTS ON THE GROUNDS OF *RES JUDICATA* AND RELEASE; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date:       March 31, 2022<br>Time:       10:00 a.m.<br>Courtroom:  Courtroom 6, 17th Floor<br>Judge:      Hon. Charles R. Breyer |

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that on March 31, 2022 at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Charles R. Breyer, United States District Judge, in Courtroom 6, 17th Floor of the San Francisco Courthouse, located at 450 Golden Gate Ave., San Francisco, California 94102, Defendants McKinsey & Company, Inc., McKinsey & Company, Inc. United States, McKinsey & Company, Inc. Washington D.C., and McKinsey Holdings, Inc. (collectively, "McKinsey") will and do hereby move to dismiss Plaintiffs' Master Complaint (Subdivision), Master Complaint (School Districts) and all individual cases set forth in Appendix L.

This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6), and Pretrial Order No. 7, on the grounds that the Plaintiffs' claims are barred by the doctrines of *res judicata* and release.

This motion is based on this Notice of Motion and Motion, the supporting Memorandum of Points and Authorities, the Declaration of David M. Cheifetz in Support of McKinsey Defendants' Motion to Dismiss the Complaints on the Grounds of *Res Judicata* and Release, the Request for Judicial Notice, all other pleadings and papers filed herewith, and such other arguments and other materials as may be presented before the motion is taken under submission.

DATED:  December 23, 2021

Respectfully submitted,

**STROOCK & STROOCK & LAVAN LLP**

_____/s/ *David M. Cheifetz*_____
David M. Cheifetz

*Attorneys for Defendants McKinsey &*
*Company, Inc., McKinsey & Company, Inc.*
*United States, McKinsey & Company, Inc.*
*Washington D.C. and McKinsey Holdings,*
*Inc.*

1

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITES ............................................................................................... iii

ISSUES TO BE DECIDED ............................................................................................... ix

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................... 4

      A.    Procedural History ................................................................................... 4

            1.   The States' Claims .......................................................................... 4

            2.   McKinsey's Global Settlement with the States ............................... 6

      B.    The Plaintiffs' Copycat Lawsuits............................................................. 8

III.  ARGUMENT....................................................................................................... 12

      A.    Plaintiffs, as Political Subdivisions, Are Subordinate, Administrative
            Arms of the State Whose Claims Must Yield to Those of Their Respective
            States ........................................................................................................ 12

      B.    All Plaintiffs' Claims Are Barred by the Doctrine of *Res Judicata* .................... 16

            1.   The Consent Judgments Are Final Judgments on the Merits ........................ 17

            2.   Plaintiffs Are Asserting the Same "Cause of Action" as the States .............. 18

            3.   Plaintiffs Are in Privity with Their Respective States................................... 24

                 a)    Privity Between Governmental Entities Turns on the
                       Commonality of Interests Represented................................. 25

                 b)    There Is Privity Here Because Plaintiffs Represent the
                        Same Public Interests as the States .................................... 30

                 c)    A Finding of Privity Is Particularly Warranted Here
                       Because Public Policy Strongly Favors State Control
                       and Resolution of Matters of Statewide Public Concern .................. 32

            4.   California, Georgia, Mississippi, New Mexico, Ohio and Tennessee
                 Plaintiffs' Public Nuisance Claims, as well as Alabama, California
                 and Illinois Plaintiffs' Consumer Protection Claims, Must Be
                 Brought on Behalf of the State and Are Therefore Barred by
                 *Res Judicata* for this Additional Reason......................................... 35

– i –

C.  Plaintiffs' Claims Are Also Barred by the Releases in The Consent Judgments ........................................................................................ 37

    1.  Plaintiffs' Claims Fall Squarely Within the Scope of the Releases ................ 37

    2.  The Releases Are Enforceable Against Plaintiffs Because State Attorneys General Have Authority to Settle and Release Claims of Political Subdivisions ................................................................ 40

IV.  All of the Indiana Plaintiffs' Claims Are Statutorily Barred ......................................... 44

V.   CONCLUSION ........................................................................................................ 45

– ii –

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&R Janitorial v. Pepper Constr. Co.*,
    124 N.E.3d 962 (Ill. 2018) ...................................................................................17

*Alaska Sport Fishing Ass'n v. Exxon Corp.*,
    34 F.3d 769 (9th Cir. 1994) ...........................................................15, 16, 25, 26, 30

*Alderwoods Grp., Inc. v. Garcia*,
    119 So. 3d 497 (Fla. Dist. Ct. App. 2013) ..........................................................26

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
    458 U.S. 592 (1982) .............................................................................................12

*Allstar Towing, Inc. v. City of Alexandria*,
    344 S.E.2d 903 (Va. 1986) ..................................................................................18

*B&B Hardware, Inc. v. Hargis Indus.*,
    575 U.S. 138 (2015) .............................................................................................16

*Badgley v. City of New York*,
    606 F.2d 358 (2d Cir. 1979) ................................................................................26

*Baraga Cnty. v. State Tax Comm'n*,
    645 N.W.2d 13 (Mich. 2002) ..............................................................................26

*Bauhaus Grp. I, Inc. v. Kalikow*,
    139 N.Y.S.3d 193 (N.Y. App. Div. 2021) ..........................................................23

*Bd. of Supervisors v. Local Agency Formation Comm.*,
    838 P.2d 1198 (Cal. 1992) ...................................................................................13

*Boeken v. Phillip Morris USA, Inc.*,
    230 P.3d 342 (Cal. 2010) ..........................................................................20, 24, 36

*Boothbay v. Getty Oil Co.*,
    201 F.3d 429 (1st Cir. 1999) ..........................................................................28, 32

*Brown & Williamson Tobacco Corp. v. Gault*,
    627 S.E.2d 549 (Ga. 2006) .........................................................................17, 27, 32

*California v. Check 'N Go of California, Inc.*,
    No. C 07-02789, 2007 WL 2406888 (N.D. Cal. Aug. 20, 2007) .........................36

– iii –

*In re Certified Question from U.S. Dist. Court for E. Dist. of Michigan*,
    638 N.W.2d 409 (Mich. 2002)..................................................................................... *passim*

*Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Ass'n*,
    71 Cal. Rptr. 2d 77 (Cal. Ct. App. 1998) ...................................................................26

*City of Martinez v. Texaco Trading & Transp., Inc.*,
    353 F.3d 758 (9th Cir. 2003) ...........................................................................24, 27, 32

*City of Sapulpa v. Land*,
    223 P. 640 (Okla. 1924)...............................................................................................38

*City of Trenton v. State of New Jersey*,
    262 U.S. 182 (1923).....................................................................................................13

*Clark v. Neese*,
    262 So.3d 1117 (Miss. 2019) ......................................................................................24

*Cnty. of Boyd v. US Ecology, Inc.*,
    858 F. Supp. 960 (D. Neb. 1994) .....................................................................28, 29, 32

*Cnty. of Boyd v. US Ecology, Inc.*,
    48 F.3d 359 (8th Cir. 1995) ..................................................................................28, 29

*Collyer v. State Tax'n & Revenue Dep't*,
    913 P.2d 665 (N.M. Ct. App. 1995)............................................................................25

*Comm. for Educ. Equality v. State*,
    294 S.W.3d 477 (Mo. 2009) ........................................................................................27

*Curtis v. Altria Grp., Inc.*,
    813 N.W.2d 891 (Minn. 2012)....................................................................................37

*Dep't of Fair Employment & Hous. v. Lucent Techs., Inc.*,
    642 F.3d 728 (9th Cir. 2011) ......................................................................................32

*State ex rel. Derryberry v. Kerr-McGee Corp.*,
    516 P.2d 813 (Okla. 1973)...........................................................................................43

*People ex rel. Devine v. Time Consumer Marketing, Inc.*,
    782 N.E.2d 761 (Ill. Ct. App. 2002) ...........................................................................42

*Dyson v. Cal. State Personnel Bd.*,
    213 Cal. App. 3d 711 (Cal. Ct. App. 1989) ................................................................25

*Endo v. Second Judicial Dist. Court*,
    492 P.3d 565 (Nev. 2021) ............................................................................................31

*Env't Conservation Org. v. City of Dallas,*
  529 F.3d 519 (5th Cir. 2008) ................................................27

*Ewald's Ex'r v. Louisville,*
  232 S.W. 388 (Ky. 1921) ................................................34

*Fabiano v. Philip Morris Inc.,*
  862 N.Y.S.2d 487 (N.Y. App. Div. 2008) ................................................27

*In re Facebook, Inc., Consumer Privacy User Profile Litig.,*
  354 F. Supp. 3d 1122 (N.D. Cal. 2019) ................................................25

*Freels v. Koches,*
  94 N.E.3d 339 (Ind. Ct. App. 2018)................................................24

*Funny Guy, LLC v. Lecego, LLC,*
  795 S.E.2d 887 (Va. 2017)................................................19

*Grand Traverse Band of Ottawa & Chippewa Indians v. Dir., Michigan Dep't of
  Nat'l Res.,*
  141 F.3d 635 (6th Cir. 1998) ................................................28

*Green v. Santa Fe Indus., Inc.,*
  514 N.E.2d 105 (N.Y. 1987)................................................24

*Hayashi v. Illinois Dep't of Fin. & Prof'l Regulation,*
  25 N.E.3d 570 (Ill. 2014) ................................................18

*Headwaters Inc. v. U.S. Forest Serv.,*
  399 F.3d 1047 (9th Cir. 2005) ................................................16

*Hess v. Port Auth. Trans–Hudson Corp.,*
  513 U.S. 30 (1994) ................................................13, 14

*Hilliard v. Jacobs,*
  957 N.E.2d 1043 (Ind. Ct. App. 2011) ................................................20

*Holcombe v. Hosmer,*
  477 F.3d 1094 (9th Cir. 2007) ................................................17

*Indiana Dep't of Env't Mgmt. v. Conard,*
  614 N.E.2d 916 (Ind. 1993) ................................................26

*State ex rel. Inman v. Brock,*
  622 S.W.2d 36 (Tenn. 1981)................................................43

*Jordan v. Kansas City,*
  929 S.W.2d 882 (Mo. App. 1996) ................................................17

– v –

*Ex parte King,*
    59 So.3d 21 (Ala. 2010) ................................................................................................40, 42

*Lawrence v. Bingham Greenebaum Doll, L.L.P.,*
    599 S.W.3d 813 (Ky. 2019) ............................................................................................18, 19

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) ................................................................................................4

*Lerner v. Los Angeles City Bd. of Educ.,*
    380 P.2d 97 (Cal. 1963) .......................................................................................................25

*Lyons v. Ryan,*
    780 N.E.2d 1098 (Ill. 2002) ................................................................................................40

*Menzel v. Cnty. Utilities Corp.,*
    501 F. Supp. 354 (E.D. Va. 1979) .......................................................................................27

*Montana v. United States,*
    440 U.S. 147 (1979) ..............................................................................................................16

*Nash Cnty. Bd. of Educ. v. Biltmore Co.,*
    640 F.2d 484 (4th Cir. 1981) ..........................................................................12, 13, 15, 40

*New Hampshire v. Dover,*
    891 A.2d 524 (N.H. 2006) ........................................................................................ *passim*

*New Jersey v. New York,*
    345 U.S. 369 (1953) ..............................................................................................................29

*Nixon v. Missouri Mun. League,*
    541 U.S. 125 (2004) ..............................................................................................................13

*Old Republic Ins. Co. v. Lanier,*
    790 So.2d 922 (Ala. 2000) ..................................................................................................19

*Perdue v. Baker,*
    586 S.E.2d 606 (Ga. 2003) ..................................................................................................43

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ..............................................................................................................13

*Rojas v. Romanoff,*
    128 N.Y.S.3d 189 (N.Y. App. Div. 2020) .........................................................................25

*Sailors v. Bd. of Educ.,*
    387 U.S. 105 (1967) ..............................................................................................................13

*Samara v. Matar*,
  419 P.3d 924 (Cal. 2018) ..................................................................................17

*Satsky v. Paramount Commc'ns, Inc.*,
  7 F.3d 1464 (10th Cir. 1993) ...............................................................26, 27, 32

*State ex rel. Schachter v. Ohio Pub. Emp. Ret. Bd.*,
  905 N.E.2d 1210 (Ohio 2009) ..........................................................................24

*Schwartz v. City of Flint*,
  466 N.W.2d 357 (Mich. Ct. App. 1991) ...........................................................16

*Sierra Club v. Two Elk Generation Partners, Ltd. P'ships*,
  646 F.3d 1258 (10th Cir. 2011) ........................................................................27

*Simmons v. Trans Express Inc.*,
  170 N.E.3d 733 (N.Y. 2021) .............................................................................19

*Slocum on Behalf of Nathan A v. Joseph B*,
  588 N.Y.S.2d 930 (N.Y. App. Div. 1992) .........................................................33

*State of Florida ex rel. Shevin v. Exxon Corp.*,
  526 F.2d 266 (5th Cir. 1976) ............................................................................42

*State of Illinois v. Associated Milk Producers*,
  351 F. Supp. 436 (N.D. Ill. 1972) ....................................................................33

*State v. Exxon Mobil Corp.*,
  406 F. Supp. 3d 420 (D. Md. 2019) ..................................................................27

*Thornton v. State Farm Mut. Auto Ins. Co.*,
  No. 06 Civ. 00018, 2006 WL 3359482 (N.D. Ohio Nov. 17, 2006) ..................33

*Thrasher v. Atlanta*,
  173 S.E. 817 (Ga. 1934)....................................................................................35

*Tigrett v. Cooper*,
  No. 10-2724, 2011 WL 5025491 (W.D. Tenn. Oct. 21, 2011)...........................27

*Tyson v. Viacom, Inc.*,
  890 So.2d 1205 (Fl. Dist. Ct. App. 2005) .........................................................18

*United States v. City of Miami*,
  614 F.2d 1322 (5th Cir. 1980) ..........................................................................30

*United States v. Hooker Chems. & Plastics Corp.*,
  749 F.2d 968 (2d Cir. 1984)..............................................................................34

*United States v. Olin Corp.*,
  606 F. Supp. 1301 (N.D. Ala. 1985)....................................................26, 30

*Villacres v. ABM Indus. Inc.*,
  117 Cal. Rptr. 3d 398 (Cal. Ct. App. 2010)...................................................17

*White v. W. Title Ins. Co.*,
  710 P.2d 309 (Cal. 1985)...................................................38

*Xiaoyan Gu v. Da Hua Hu*,
  447 S.W.3d 680 (Mo. Ct. App. 2014)...................................................17

**Statutes**

815 Ill. Comp. Stat. 505/7...................................................36

Ala. Code § 8-19-8...................................................36

Cal. Bus. & Prof. Code § 17204...................................................36

Cal. Bus. & Prof. Code § 17536...................................................35, 36

Cal. Code Civ. Proc. § 731...................................................35

Ind. Code § 4-6-15-1 (2021)...................................................44

Ind. Code § 4-6-15-3 (2021)...................................................44

La. Rev. Stat. § 49:257(D)...................................................40

Miss. Code Ann. § 93-3-5...................................................35

N.M. Stat. Ann. § 30-8-8...................................................35

Ohio Rev. Code Ann. § 3767.03...................................................35

Okla. Stat. Ann. tit. 74, §§ 30.3 – 30.8...................................................34

Tenn. Code Ann. § 29-3-103...................................................35

**Other Authorities**

7 Am. Jur. 2d Attorney General § 5...................................................40

Restatement (Second) of Judgments § 24 (1982)...................................................18, 19

Wright & Miller, Federal Practice & Procedure § 4458...................................................28

– viii –

## ISSUES TO BE DECIDED

1.      Do the Consent Judgments executed by McKinsey with all 50 States, five territories and the District of Columbia, resolving all claims related to McKinsey's opioid-related work, bar, pursuant to the doctrine of *res judicata*, the claims of those States' political subdivisions, school districts, or similarly-situated plaintiffs, who now represent the same interests as the States?

2.      Do the provisions in the Consent Judgments releasing McKinsey from any further liability related to its opioid-related work bar the claims of political subdivisions, school districts, or similarly-situated plaintiffs, where those plaintiffs' claims fall squarely within the scope of the releases and the States' attorneys general had authority to release the claims?

MEMORANDUM OF POINTS & AUTHORITIES IN SUPPORT OF MOTION TO DISMISS,
CASE NO. 3:21-MD-02996-CRB

1   **I.       INTRODUCTION**

2           Earlier this year, McKinsey & Company, Inc. United States ("McKinsey," together with

3   McKinsey & Company, Inc., McKinsey Holdings, Inc. and McKinsey & Company, Inc.

4   Washington D.C.) became the first defendant to reach a global settlement in the sprawling,

5   years-long opioid litigation—a highly complex web of litigation involving dozens of defendants

6   and thousands of lawsuits commenced in state and federal courts throughout the country.

7   McKinsey is a consulting company that offers advice and recommendations to clients—it is not a

8   manufacturer, distributor, retailer or prescriber of opioids.  Nonetheless, in order to achieve

9   finality and avoid the inherent cost and risk of litigating in venues across the country, McKinsey

10  chose to be part of the solution to a complex public health crisis and entered into consent

11  judgments with all 50 states, five territories and the District of Columbia (collectively, the

12  "States").  To reach that settlement, McKinsey paid over $642 million and agreed to substantial

13  injunctive relief while denying all liability.  In exchange, the States released McKinsey from all

14  claims arising from its opioid-related work for pharmaceutical manufacturers and other clients.

15          Almost immediately after reaching this settlement, political subdivisions—cities, towns,

16  counties and school districts from the settling States represented by private counsel retained by

17  local governments and prosecutor offices—began filing lawsuits that replicated (sometimes to

18  the word) the allegations in the complaints filed by the States.  To date, political subdivisions and

19  school districts from 25 states (collectively, "Plaintiffs") have sued McKinsey asserting the exact

20  same factual allegations, seeking the same public relief and representing the same public interest

21  as the States.[1]  As a matter of law, sound public policy and efficient judicial administration,

---

[1] This motion seeks to dismiss all claims filed by political subdivisions, school districts and similarly-situated plaintiffs from the following 23 states (collectively, the "Subject States"): Alabama, California, Florida, Georgia, Hawai'i, Illinois, Indiana, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Mexico, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia and Wisconsin.  For reasons discussed

Plaintiffs' claims—as well as any future claim by any political subdivision, school district or municipal body of any kind—should be dismissed in their entirety because they have already been resolved.

Our system of federalism is comprised of two sovereign bodies of government—federal and state. Political subdivisions, in contrast, are subordinate, administrative arms of the State created as a matter of convenience to carry out state functions at the local level. Their residents are state residents. As a result, courts have repeatedly held in numerous contexts that the State is the proper party to represent the public interest in matters affecting residents statewide and that, when the State does so, duplicative lawsuits filed by political subdivisions are barred.

Consistent with these principles, Plaintiffs' claims are barred both by (1) the doctrine of *res judicata* and (2) the release provisions in the consent judgments executed by the States (the "Consent Judgments").[2] For purposes of *res judicata*, the Consent Judgments constitute "final judgments on the merits" and Plaintiffs are asserting precisely the same "cause of action" previously asserted by the States. Plaintiffs are also in privity with the States because they seek to represent the same public interest already represented by the States. For the benefit of all their residents, each of the States already sought and obtained, on a statewide basis, financial relief to remediate the opioid epidemic, including relief for health care, addiction treatment, law

---

below, this motion is not directed at lawsuits filed by political subdivisions or school districts within the states of Washington or West Virginia. Certain cases recently-filed by plaintiffs have not yet been transferred to this MDL proceeding, though McKinsey expects the cases to be transferred to this proceeding shortly. This motion seeks dismissal of any cases filed in the Subject States, or any cases filed directly in this MDL proceeding that would be remanded to a Subject State at the conclusion of pre-trial proceedings. McKinsey reserves the right to supplement this motion to seek dismissal of any other filed or transferred cases from the Subject States or from any other states in which McKinsey can similarly demonstrate, as it does in this motion, that the claims are barred on the grounds of *res judicata* and/or release.

[2] As directed by the Court, this motion seeks dismissal on the threshold issue of *res judicata* and release and McKinsey hereby preserves and does not waive all other grounds for dismissal. *See* Pretrial Order No. 7: Initial Case Management Order ¶ 6, ECF No. 293.

– 2 –

enforcement, criminal justice and child welfare.  Nonetheless, Plaintiffs now attempt to obtain from McKinsey the same relief secured by the States (less their private attorneys' fees) and many attempt to do so on behalf of *all* political subdivisions throughout their state on a class basis.  *Res judicata* bars such duplicative litigation.

Plaintiffs' claims are also barred for the separate and independent reason that the States released the very claims Plaintiffs purport to bring.  The attorney general is the chief law enforcement officer of each state with the authority to control litigation raising statewide issues, including the power to release overlapping claims brought by political subdivisions.  State law uniformly authorizes each state's attorney general to represent all state residents in litigation raising issues of statewide, public interest and this includes residents of a city, town, county or school district, who are, of course, the same state residents.  This authority necessarily includes the power to settle and release claims in a manner that binds the State as a whole—including each unit of local government—and the States properly exercised that authority here when they entered into the Consent Judgments.

In addition to being legally barred by *res judicata* and the release, Plaintiffs' duplicative lawsuits should be rejected because they threaten to undermine the statutory and constitutional allocation of state power as well as the authority of state attorneys general.  It is critical that a settlement with a state resolve duplicative claims by its political subdivisions where, as here, their interests so clearly overlap.  Absent such assurance, defendants will be less likely to settle with the State, driving up costs for all parties, hindering judicial efficiency and frustrating both the State's ability to resolve lawsuits of statewide interest and its responsibility to allocate funds in a fair and efficient manner based upon the needs of all state residents.  Indeed, the main defendants in the nationwide opioid litigation—manufacturers, distributors and pharmacies—

have thus far failed to reach a final, global settlement for this precise reason, denying relief that state residents would have otherwise received long ago.

For all of these reasons, the Court should dismiss Plaintiffs' claims in their entirety.

## II.   BACKGROUND

### A.   Procedural History

#### 1.   The States' Claims

Between 2019 and 2021, a group of state attorneys general jointly conducted an investigation into the consulting work McKinsey performed for various opioid manufacturers. McKinsey cooperated with the investigation and, in January 2021, entered into good-faith settlement negotiations with an executive committee of ten attorneys general representing all States.  (*See, e.g.*, Decl. of David M. Cheifetz in Supp. of Mot. to Dismiss ("Cheifetz Decl."), Ex. B § I.E.)[3]  As later reflected in their individual complaints, the States uniformly alleged that McKinsey's work for opioid manufacturers contributed to an increase in improper opioid prescriptions leading to increased healthcare, law enforcement and other costs throughout their respective states.  (*See, e.g.*, *id.*, Ex. A ¶¶ 5-7, 28.)

The States' allegations (which were all nearly identical) focused in large part on sales and marketing work McKinsey performed for Purdue Pharma LP ("Purdue") between 2009 and 2014.  Specifically, the States alleged that, in 2009, McKinsey helped Purdue develop messaging for OxyContin to "increase[e] 'brand loyalty'" among prescribers.  (*Id.*, Ex. C ¶¶ 15-16.)  The States alleged that, in 2013, McKinsey helped Purdue "turbocharge" OxyContin sales in connection with an engagement referred to as "Evolve 2 Excellence" or "E2E," by (1) focusing

---

[3] For the Court's convenience, the relevant complaints and Consent Judgments filed by the States are attached as exhibits to the Cheifetz Declaration.  (*See* Cheifetz Decl., Exs. A - UU.) The Court may take judicial notice of these public records.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.") (internal quotations and citations omitted).

– 4 –

sales calls on high-volume prescribers, (2) limiting sales force discretion, (3) focusing Purdue's messaging on increasing prescription dosage, and (4) suggesting an alternative distribution model for delivering OxyContin to patients.  (*See, e.g.*, *id.* ¶¶ 17-18.)  The States alleged that McKinsey worked with Purdue's Executive Oversight Team, Project Management Office and Sackler board members to implement E2E.  (*See, e.g.*, *id.* ¶ 19.)  The States also alleged that McKinsey encouraged Purdue to have "senior level discussions" with a pharmacy chain that had tightened its opioid dispensing guidelines, to work with patient advocacy groups to push back on hesitant prescribers and to consider using mail order pharmacies.  (*See, e.g.*, *id.* ¶ 21.)

In addition to that sales and marketing work, the States alleged that, in 2008, McKinsey advised Purdue to "band together" with other manufacturers to push back against "strict treatment" by the FDA in connection with the development of an FDA-required risk evaluation and mitigation strategy.  (*E.g.*, *id.* ¶ 14.)  The States also alleged that, in 2017, McKinsey recommended that Purdue pay health insurers "rebates" for OxyContin-related overdoses in order to increase coverage.  (*E.g.*, *id.* ¶ 24.)  In addition to work for Purdue, the States alleged that McKinsey also supported other opioid manufacturers, including Endo International, Johnson & Johnson and Mallinckrodt Pharmaceuticals, as well as government and non-profit clients. (*See, e.g.*, *id.* ¶¶ 26-27.)  Finally, the States alleged that there were "indications that individuals at McKinsey considered destroying or deleting documents related to their work for Purdue." (*E.g.*, *id.* ¶ 28.)

According to their complaints, each of the States brought their claims on behalf of the public in order to protect the health and well-being of state residents.  (*See, e.g.*, *id.*, Ex. K ¶ 1 ("The People of the State of Illinois, by Kwame Raoul, Attorney General of the State of Illinois, believes this action to be in the public interest of the citizens of the State of Illinois . . . ."); *id.*,

Ex. A ¶ 2 ("The [Alabama] Attorney General is authorized to bring this action in his *parens patriae* capacity, as the State has a quasi-sovereign interest in the health and well-being – physically and economically – of its citizens . . . .").)  The States sought both injunctive and monetary relief to recover "for increased costs in health care, child welfare, criminal justice, and many other programs needed to abate the epidemic."  (*E.g.*, *id.*, Ex. C ¶ 30.)

### 2.    McKinsey's Global Settlement with the States

Although McKinsey's work for opioid manufacturers was entirely lawful, in an effort to be part of the solution to a complex public health problem, McKinsey agreed to settle with the States rather than simultaneously defend dozens of lawsuits around the country.  (*See, e.g.*, *id.*, Ex. H § I.F ("McKinsey has cooperated with the Signatory Attorney General's . . . investigation and is willing to enter into this Judgment . . . in order to . . . avoid significant expense, inconvenience, and uncertainty."); *see also id.* § I.H ("The Signatory Attorney General acknowledges McKinsey's good faith and responsible corporate citizenship in reaching this resolution.").)

To reach a final global resolution with the States, McKinsey agreed to pay $642,385,164 to be used "to remediate the harms caused to the Settling States and their citizens by the opioid epidemic."  (*Id.* § V.A.)  In addition, McKinsey agreed to substantial injunctive relief, including, but not limited to: (1) prohibiting consultants from accepting any work specifically related to the manufacture, marketing, sale or prescribing of opioids[4]; (2) developing a centralized document storage system and extending its document retention period; (3) implementing a policy requiring termination of any employee that engaged in intentional spoliation of evidence; and (4) revising

---

[4] Excluded from this prohibition was any of McKinsey's substantial work for "health care providers, health plans, non-profit entities, governments, quasi-governmental agencies, or any other client that is not a pharmaceutical manufacturer, for purposes of addressing a humanitarian health crisis, drug abuse prevention, treatment and mitigation or abatement efforts, or other public health benefit."  (*E.g.*, Cheifetz Decl., Ex. D § III.B.)

– 6 –

its client conflict policy to require written disclosures of any material conflicts to any state, county or municipal government clients.  (*See, e.g.*, *id.* § III.)  In the interest of transparency, McKinsey also agreed to publish a substantial volume of documents reflecting its work for opioid manufacturers in an online publicly available repository.  (*See, e.g.*, *id.* § IV.)

In exchange for this substantial financial and injunctive relief, the States agreed to release McKinsey from "all claims the Signatory Attorney General is authorized by law to bring arising from or related to the Covered Conduct."[5]  (*E.g.*, *id.* § VII.A.)  The definition of "Covered Conduct" broadly included all of McKinsey's prior opioid-related work:

> ***[A]ny and all*** acts, failures to act, conduct, statements, errors, omissions, events, breaches of duty, services, advice, work, deliverables, engagements, transactions, or ***other activity of any kind whatsoever***, occurring up to and including the Effective Date arising from or related ***in any way*** to (i) the discovery, development, manufacture, marketing, promotion, advertising, recall, withdrawal, distribution, monitoring, supply, sale, prescribing, reimbursement, use, regulation, or abuse of any opioid, or (ii) the treatment of opioid abuse or efforts to combat the opioid crisis, or (iii) the characteristics, properties, risks, or benefits of any opioid, or (iv) the spoliation of any materials in connection with or concerning any of the foregoing.

(*E.g.*, *id.* § II.A (emphasis added).)  The description of the claims released was similarly expansive and included "without limitation, claims that were or could have been brought by a Settling State under its State's consumer protection and unfair practices law, RICO laws, false claims law and claims for public nuisance, together with any related common law and equitable claims for damages or other relief."  (*E.g.*, *id.* § VII.A.)  McKinsey and the States expressly agreed that the Consent Judgments could not be used by any third party in any other litigation

---

[5] The Consent Judgments define "McKinsey" as "McKinsey & Company, Inc. United States, a Delaware Corporation, and all its current and former officers, directors, partners, employees, representatives, agents, affiliates, parents, subsidiaries, operating companies, predecessors, assigns and successors."  (*E.g.*, Cheifetz Decl., Ex. H § II.C.)

– 7 –

and that they may only be enforced in a separate action by either McKinsey, the Attorneys General or the Court.  (*See, e.g.*, *id.* § I.K.)

Between February 4, 2021 and April 5, 2021, the Consent Judgments reflecting the above settlement terms were filed, approved and entered by courts in all 50 States, five territories and the District of Columbia.  (*See, e.g.*, *id.*, Exs. A-UU.)

### B.     The Plaintiffs' Copycat Lawsuits

Despite full awareness of McKinsey's work for Purdue and other manufacturers since at least 2019,[6] the Plaintiffs only began filing lawsuits in early 2021, after McKinsey had entered into settlement discussions with the States, and the vast majority of Plaintiffs only filed suit after McKinsey and the States had publicly filed consent judgments reflecting their global resolution. (*Compare, e.g.*, *id.*, Ex. F (Consent Judgment between McKinsey and State of Florida filed February 4, 2021), *with City of Pembroke Pines, Florida Class Action Compl.*, 21-cv-4384, ECF No. 1 (Feb. 5, 2021).)  Unsurprisingly, Plaintiffs' lawsuits assert nearly identical allegations to those asserted in the States' complaints.  For example, allegations asserted by Scott County, Indiana are exact, word-for-word copies of those asserted by the State of Indiana.  (*Compare* Cheifetz Decl., Ex. M ¶¶ 6-33, *with Scott County, Indiana Class Action Compl.* ¶¶ 18-44, 21-cv-6237, ECF No. 1.)

---

[6] In 2019, in response to a third-party subpoena, McKinsey produced over 6,000 documents to the Plaintiffs' Executive Committee ("PEC") in the multidistrict litigation pending before Judge Polster in the Northern District of Ohio (the "Ohio MDL"), related to McKinsey's work for various opioid manufacturers, including Purdue.  *See* Mot. to Modify Protective Order at 2, 17-md-2804, ECF No. 4024 (N.D. Ohio Oct. 14, 2021).  Counsel constituting the Plaintiffs' Steering Committee in this proceeding substantially overlap with counsel representing the PEC in the Ohio MDL and therefore have had access to those documents since 2019.  *See id.* at 2 n.4.  And undoubtedly, the manufacturers' document productions to the PEC in the Ohio MDL (which began in 2017) also contained references to McKinsey's work for them.  In addition, the Massachusetts Attorney General's complaint against Purdue was publicly unsealed in January 2019 and contained allegations related to McKinsey's work for Purdue.  (*See* Cheifetz Decl., Ex. VV ¶¶ 269, 291, 402-407, 413, 425, 528, 564, 567-72.); *see also* Transcript of Oral Argument at 15:9-12, MDL No. 2996, ECF No. 151 (J.P.M.L. May 27, 2021) ("Judge Norton: Yes.  I'm wondering why y'all waited so long to bring these cases.  I mean, this 2804, as Mr. [Bernard] said, is over three years.  Why did we wait over three years to start these new claims against McKinsey.").

– 8 –

1    On June 8, 2021, the Judicial Panel on Multidistrict Litigation consolidated Plaintiffs'

2    claims before this Court for purposes of pretrial proceedings.  *See* Transfer Order, ECF No. 1.

3    By joint submission, McKinsey and Plaintiffs agreed that McKinsey would produce to Plaintiffs

4    all documents produced to the States for publication in an online repository as required by the

5    Consent Judgments.  *See* Joint Status Conference Submission at 1, ECF No. 240.  Following

6    McKinsey's production to Plaintiffs of over 115,000 documents on November 18, 2021,

7    Plaintiffs filed Master Consolidated Complaints ("MCCs") on December 6, 2021.  *See* Redacted

8    Master Complaint (Subdivision), ECF No. 296 ("Subdivision MCC"); Redacted Master

9    Complaint (School Districts), ECF No. 297 ("School District MCC").  The Subdivision MCC

10   purports to be an "administrative device" that "does not supersede the complaints filed in

11   individual actions" and that "incorporates by reference the complaints filed by individual

12   subdivision Plaintiffs pending in this MDL as of November 22, 2021."  Subdivision MCC at 1.

13   Accordingly, this motion is directed at both Plaintiffs' MCCs and their individual complaints.[7]

14       Just like the States, the Plaintiffs broadly allege that McKinsey's consulting work for

15   Purdue and other opioid manufacturers contributed to an increase in improper opioid

16   prescriptions.  *See, e.g.*, Walker County, Alabama Class Action Compl. ¶ 115, 21-cv-4960, ECF

17   No. 1; Subdivision MCC ¶ 425; School District MCC ¶ 432.  Also like the States, the Plaintiffs

18   focus primarily on McKinsey's work for Purdue between 2009 and 2014.  Specifically, the

19   Plaintiffs allege that, in 2009, McKinsey helped Purdue "enhance loyalty to OxyContin" among

20   prescribers.  *See, e.g.*, Scott County, Indiana Compl. ¶ 26, 21-cv-6237, ECF No. 1; Subdivision

---

[7] The Subdivision MCC omits certain causes of action and class allegations that are included in the individual complaints.  However, because the Subdivision MCC does not "supersede the complaints filed in individual actions" this motion addresses allegations contained in either the individual complaints or the MCCs.  McKinsey does not waive its right under Pretrial Order No. 7 to only respond to or move against the MCCs in future motions or pleadings.  *See* Pretrial Order No. 7: Initial Case Management Order ¶ 5, ECF No. 293.

MCC ¶ 138; School District MCC ¶ 610.  The Plaintiffs allege that, in 2013, McKinsey recommended "a marketing strategy to increase opioid sales" referred to as "Evolve 2 Excellence."  City of Shawnee, Oklahoma Pet. ¶ 11, 21-cv-4388, ECF No. 1-1; *see also* Subdivision MCC ¶ 244; School District MCC ¶ 251.

Just like the States, the Plaintiffs allege that E2E involved: (1) increasing sales calls to high-volume prescribers, *see, e.g.*, Board of Education of Jefferson County, Kentucky Class Action Compl. ¶ 66, 21-cv-4955, ECF No. 1; Subdivision MCC ¶ 257; School District MCC ¶ 264; (2) focusing marketing efforts on selling higher strength dosages, *see, e.g.*, City of Chesapeake, Virginia Compl. ¶ 83, 21-cv-5292, ECF No. 1; Subdivision MCC ¶ 599; School District MCC ¶ 606; (3) recommending a mail-order pharmacy program, *see, e.g.*, City of New York, New York Compl. ¶ 62, 21-cv-5183, ECF No. 1-1; Subdivision MCC ¶ 271; School District MCC ¶ 278; (4) coordinating with Purdue's Executive Oversight Team and Project Management Office, *see, e.g.*, St. Clair County, Illinois Compl. ¶ 138, 21-cv-4642, ECF No. 1-2; Subdivision MCC ¶ 248; School District MCC ¶ 255; and (5) lobbying pharmacy executives to increase sales, *see, e.g.*, Green County, Kentucky Class Action Compl. ¶ 113, 21-cv-4536, ECF No. 1-1; Subdivision MCC ¶ 272; School District MCC ¶ 279.

Also like the States, the Plaintiffs allege that, in 2008, McKinsey recommended that Purdue "band together" with other manufacturers to push back on "strict treatment" by the FDA, Scott County, Indiana Compl. ¶ 25, 21-cv-6237, ECF No. 1; Subdivision MCC ¶ 414; School District MCC ¶ 421, and that, in 2017, McKinsey recommended paying insurers rebates for adverse events tied to OxyContin, *see, e.g.*, San Mateo County, California Compl. ¶ 110, 21-cv-6009, ECF No. 1; Subdivision MCC ¶¶ 487-92; School District MCC ¶¶ 494-99.  The Plaintiffs also similarly allege that McKinsey worked for other opioid manufacturers, *see, e.g.*, City of

– 10 –

Pembroke Pines, Florida Class Action Compl. ¶ 158, ECF No. 1; Subdivision MCC ¶¶ 291-393;

School District MCC ¶¶ 298-400, and that McKinsey partners discussed deleting documents, *see, e.g.*, Peach County, Georgia Class Action Compl. ¶ 92, 21-cv-4963, ECF No. 1; Subdivision

MCC ¶ 493; School District MCC ¶ 500.

As did the States, the Plaintiffs assert their claims on behalf of the public interest in order

to protect the health and welfare of their residents. *See, e.g.*, Walker County, Alabama Class

Action Compl. ¶ 10, 21-cv-4960, ECF No. 1 ("Plaintiffs are responsible for the public health,

safety and welfare of their citizens."); Scott County, Indiana Class Action Compl. ¶ 1, 21-cv-

6237, ECF No. 1 ("Plaintiff . . . is authorized to bring this action in that it has quasi-sovereign

interest in the health and well-being physically and economically of its citizens . . . ."); City of

Chesapeake, Virginia Compl. ¶ 133, 21-cv-5292 ECF No. 1 ("Public resources are being

unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available

resources which could be used to benefit the public at large . . . ."); Subdivision MCC ¶ 713

("McKinsey's conduct has created an . . . interference with rights common to the general public,

including the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs'

communities."); School District MCC ¶ 699 (same). The Plaintiffs also seek the same relief as

the States—namely, injunctive and financial relief to remediate the effects of the opioid

epidemic, including costs associated with medical care, child welfare, law enforcement, public

safety and the criminal justice system. *See, e.g.*, City of Shawnee, Oklahoma Pet. ¶¶ 210,

212(g), 21-cv-4388, ECF No. 1-1; City of Chesapeake, Virginia Compl., 21-cv-5292, ECF No. 1

¶ 45; Subdivision MCC ¶ 684; School District MCC ¶ 540.

Not only do Plaintiffs' claims duplicate those of the States, Plaintiffs in nearly half of the

Subject States expressly seek **statewide** relief. In 11 of the 23 Subject States, Plaintiffs have filed

– 11 –

at least one class action suit on behalf of all political subdivisions or school districts statewide.

In addition, by way of example, 155 Ohio political subdivisions, 67 New York political

subdivisions and 37 Mississippi political subdivisions have filed suit to date, representing nearly

every corner of those three states.  Plaintiffs' allegations also underscore that Plaintiffs are

attempting to assert statewide claims.  *See, e.g.*, City of Shawnee, Oklahoma Pet. ¶ 202, 21-cv-

4388, ECF No. 1-1 ("McKinsey, through its work with Purdue, owed a duty of care ***to the***

***State*** . . . .") (emphasis added); Scott County, Indiana Class Action Compl. ¶ 41, 21-cv-6237,

ECF No. 1 ("The opioid crisis has forced ***Indiana*** to pay billions of dollars for increased costs in

health care, child welfare, criminal justice, and many other programs needed to abate the

epidemic.") (emphasis added); City of Chesapeake, Virginia Compl. ¶ 11, 21-cv-5292, ECF No.

1 ("***Virginia and*** Plaintiff have experienced a significant spike in opioid-related abuse and deaths

in recent years.") (emphasis added).  Accordingly, and as detailed below, Plaintiffs' claims

duplicate those of the States.

## III.    ARGUMENT

### A.    Plaintiffs, as Political Subdivisions, Are Subordinate, Administrative Arms of the State Whose Claims Must Yield to Those of Their Respective States

Every state in the Union is empowered to address matters affecting its residents,

including and especially matters of public health.  Whether through their common law tradition,

constitution, or statutes, all states prioritize the authority of their attorney general to represent

those interests.  For this reason, the State is the party best suited to represent the public interest in

matters affecting residents or political subdivisions statewide.  *See Alfred L. Snapp & Son, Inc. v.*

*Puerto Rico ex rel. Barez*, 458 U.S. 592, 603-04 (1982) ("'[I]f the health and comfort of the

inhabitants of a State are threatened, the State is the proper party to represent and defend

them.'") (quoting *Missouri v. Illinois*, 180 U.S. 208, 241 (1901)); *Nash Cnty. Bd. of Educ. v.*

– 12 –

*Biltmore Co.*, 640 F.2d 484, 496 (4th Cir. 1981) ("It would seem self-evident that common sense dictates that when an alleged wrong affects governmental units on a state-wide basis, the state should seek redress on their behalf as well as on its own rather than parceling out the actions among local agencies.").

Political subdivisions are simultaneously part of and subordinate to the State and this relationship directly informs the application of the law of *res judicata* and release in each state, compelling the dismissal of Plaintiffs' claims under both doctrines.[8]  "Political subdivisions of States—counties, cities or whatever—never were and never have been considered as sovereign entities." *Reynolds v. Sims*, 377 U.S. 533, 575 (1964).  Rather, they are "regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function," *Sailors v. Bd. of Educ.*, 387 U.S. 105, 107-08 (1967), and all local government authority is derived from the State, *see Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004) (noting that political subdivisions are "created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them in its absolute discretion"); *see also Bd. of Supervisors v. Local Agency Formation Comm.*, 838 P.2d 1198, 1205 (Cal. 1992) ("In our federal system the states are sovereign but cities and counties are not; in California as elsewhere they are mere creatures of the state and exist only at the state's sufferance.").  Even a political subdivision's existence is subject to the supremacy and will of the State.  *See City of Trenton v. State of New Jersey*, 262 U.S. 182, 187 (1923) ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit.  However great or small its sphere of action, it remains the creature of the state exercising and holding powers and privileges subject to the sovereign will."); *see also Hess*

---

[8] The law of *res judicata* and release in each state relevant to this motion is discussed in detail below.  *See infra* Parts III.B-C.

– 13 –

1    *v. Port Auth. Trans–Hudson Corp.*, 513 U.S. 30, 47 (1994) ("[U]ltimate control of every state-

2    created entity resides with the State . . . [and p]olitical subdivisions exist solely at the whim and

3    behest of their State.").

4          For this reason, pursuant to various legal doctrines, including but not limited to *res*

5    *judicata* and release, courts have repeatedly barred duplicative, piecemeal litigation by

6    subordinate political subdivisions in favor of the State's power to bring final resolution to

7    matters affecting the statewide public interest.  For example, in *New Hampshire v. Dover*, the

8    New Hampshire Supreme Court held that a parallel products liability suit brought by the cities of

9    Dover and Portsmouth against producers of the chemical compound MTBE must be dismissed in

10   favor of the New Hampshire Attorney General's suit asserting the same claims.  *See* 891 A.2d

11   524 (N.H. 2006).  The court first found that the Attorney General was suing to protect the

12   "general health and well-being of its residents" with respect to the statewide water supply.  *Id.* at

13   529.  As a result, the Attorney General was deemed to represent all New Hampshire citizens

14   unless the cities could demonstrate a "compelling interest" in maintaining separate suits.  *Id.* at

15   530-31.  The cities argued that they had demonstrated such an interest because the attorney

16   general's suit (1) named fewer defendants, (2) failed to allege theories that the cities alleged, (3)

17   failed to seek remedies sought by the cities, and (4) was subject to defenses not applicable to the

18   cities.  *See id.* at 531.  The cities also complained that the Attorney General "promised to use any

19   recovery to establish a public fund to be managed by the attorney general instead of distributing

20   it to cities in accordance with individual damages."  *Id.*  The court rejected each argument,

21   further noting:

22

23
> There is no reason for the Court to conclude, on the facts
> presented, that the State will not seek to obtain full compensation
> for all communities, including the Cities.  While the compensation
> sought may not be the same as that which the cities would desire, a

– 14 –

difference of that nature does not demonstrate an interest that is not properly represented by the State.

*Id.* Applying a line of cases denying intervention in state-controlled litigation, the Court held that the cities "failed to show a sufficient reason why the State cannot adequately represent them," and therefore concluded that their "suits must yield to the State's suit." *Id.* at 534.

Courts have reached similar results under the doctrines of *res judicata* and release (discussed in further detail below). In *Biltmore*, the Fourth Circuit Court of Appeals held that federal antitrust claims asserted by a county board of education against dairy producers were barred, under the principles of *res judicata*, by a consent judgment previously obtained by the North Carolina Attorney General against the same defendants. *See* 640 F.2d 484. The Court of Appeals found that (1) a consent decree constituted a final judgment on the merits, (2) the claims were identical because they "deal[t] with the same subject-matter," and (3) the parties were in privity because the attorney general had the authority to represent the school districts and both parties asserted identical interests. *Id.* at 487-96 ("The Attorney General as legal representative of the sovereign and its constitutional subdivisions had both common law and statutory power to bind the State and the subdivisions by his acts."); *see also In re Certified Question from U.S. District Court for Eastern District of Michigan* ("*In re Certified Question*"), 638 N.W.2d 409, 415 (Mich. 2002) (holding Michigan Attorney General had power to settle and release claims of a "subordinate" county where "the Attorney General acted to bind the state as a whole in a matter clearly of state interest").

Even claims by *private individuals* are dismissed in favor of claims brought by the State if those individuals seek to represent a public interest previously represented by the State. For example, in *Alaska Sport Fishing Association v. Exxon Corporation*, the Ninth Circuit Court of Appeals affirmed a district court ruling that *res judicata* barred sport fishers from pursuing

– 15 –

public loss of use claims against Exxon (arising from the 1989 *Exxon Valdez* oil spill) because a consent decree entered into by the State of Alaska and Exxon "settled all such public claims."  34 F.3d 769, 770 (9th Cir. 1994).  In exchange for a release of "any and all civil claims," Exxon paid $900 million to the State of Alaska and the federal government in compensation for "injury to, destruction of, or loss of any and all Natural Resources."  *Id.* at 771.  The Ninth Circuit reasoned that where a state sues to protect a public interest, the state is "presumed" to "adequately represent the position of its citizens."  *Id.* at 773.  Accordingly, the sport fishers' lawsuit was barred by the consent decree obtained by the State of Alaska pursuant to the doctrine of *res judicata*.  *See id.*

The law in each Subject State similarly requires the dismissal of Plaintiffs' claims both on the grounds of *res judicata* and release.

### B.    All Plaintiffs' Claims Are Barred by the Doctrine of *Res Judicata*

The doctrine of *res judicata* provides that a "final judgment on the merits bars further claims by parties or their privies based on the same cause of action."  *Montana v. United States*, 440 U.S. 147, 153 (1979).  The doctrine is "central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdiction," *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1051-52 (9th Cir. 2005), and protects "against the expense and vexation attending multiple lawsuits, conserve[es] judicial resources, and foster[s] reliance on judicial action by minimizing the possibility of inconsistent verdicts," *B&B Hardware, Inc. v. Hargis Indus.*, 575 U.S. 138, 147 (2015) (internal quotations and citations omitted); *see also Schwartz v. City of Flint*, 466 N.W.2d 357, 359 (Mich. Ct. App. 1991) ("The doctrine of *res judicata* is a manifestation of the recognition that interminable litigation leads to vexation, confusion, and chaos for the litigants, resulting in the inefficient use of judicial time.").  *Res judicata* therefore bars the re-litigation of matters that either "were raised or could have been

– 16 –

raised" but were not in a prior lawsuit.  *Villacres v. ABM Indus. Inc.*, 117 Cal. Rptr. 3d 398, 409 (Cal. Ct. App. 2010) (internal quotations and citations omitted).

"[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Holcombe v. Hosmer*, 477 F.3d 1094, 1097 (9th Cir. 2007).  Under the law of each state relevant to this ground for dismissal,[9] the elements to establish *res judicata* are: (1) a final judgment on the merits; (2) an identity of claims; and (3) identity of or privity between parties.[10]  *See, e.g.*, *Samara v. Matar*, 419 P.3d 924, 926 (Cal. 2018); *A&R Janitorial v. Pepper Constr. Co.*, 124 N.E.3d 962, 965 (Ill. 2018).  Each of these elements is satisfied here.

### 1.    The Consent Judgments Are Final Judgments on the Merits

*Res judicata* requires a final judgment on the merits.  Under the law of each relevant state, a court-approved consent judgment formalizing a settlement agreement constitutes a "final judgment on the merits" for purposes of *res judicata*.  *See, e.g.*, *Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 553 (Ga. 2006) ("Although a consent judgment is brought about by agreement of the parties, it is accorded the weight and finality of a judgment.  Thus, a consent

---

[9] As noted above and explained in more detail below, this motion is not directed at lawsuits brought by political subdivisions in the states of Washington or West Virginia.  Moreover, because McKinsey settled by private agreement with the State of Wisconsin, rather than by Consent Judgment, McKinsey is only arguing that Wisconsin released the claims of its political subdivisions.  It is not arguing that political subdivisions from Wisconsin are barred under the doctrine of *res judicata*.  Accordingly, to date, there are 22 jurisdictions relevant to this ground for dismissal.

[10] Missouri has a fourth requirement for *res judicata* which also goes to the identity of parties, requiring "identity of the quality of the person for or against whom the claim is made."  *Xiaoyan Gu v. Da Hua Hu*, 447 S.W.3d 680, 689 (Mo. Ct. App. 2014).  This requirement turns on whether the status or capacity in which the parties sued or were sued was the same in both actions.  *See Jordan v. Kansas City*, 929 S.W.2d 882, 887 (Mo. App. 1996) ("The status in which the City was sued was the same in both actions" because consecutive suits against city employee and city itself were both based on employee's acts in scope of employment for city); *Xiaoyan Gu*, 447 S.W.3d at 692 (holding that because "Plaintiff sued Defendant in her individual capacity as a judgment creditor in both the prior and present garnishment suits," and defendant was sued in same capacity, fourth element was satisfied).  As discussed below, this factor is plainly met here, as Plaintiffs are suing the same defendants to vindicate the same public interests that their State already represented.

– 17 –

decree is an enforceable judgment and can be accorded preclusive effect.").[11]  Accordingly, the Consent Judgments reflecting McKinsey's settlement with the States, which were approved and entered by courts in all relevant states, constitute final judgments on the merits for purposes of *res judicata*.  (*See* Cheifetz Decl., Exs. A-RR.)

### 2.    Plaintiffs Are Asserting the Same "Cause of Action" as the States

For purposes of *res judicata*, "cause of action" is not defined by the formal claim pleaded (e.g., negligence, fraud, public nuisance, etc.), the theories raised, or the relief sought, but, rather, by the alleged facts giving rise to the claims.  *See, e.g.*, *Allstar Towing, Inc. v. City of Alexandria*, 344 S.E.2d 903, 905-06 (Va. 1986) ("For the purposes of *res judicata*, a 'cause of action' may be defined broadly as an assertion of particular legal rights which have arisen out of a definable factual transaction.") (internal quotations and citations omitted); *Tyson v. Viacom, Inc.*, 890 So.2d 1205, 1212 (Fl. Dist. Ct. App. 2005) ("*Res judicata* defines a cause of action in terms of identical facts.").  Accordingly, a "cause of action" will be the same where the facts giving rise to the claims are the same.  *See, e.g.*, *Hayashi v. Illinois Dep't of Fin. & Prof'l Regulation*, 25 N.E.3d 570, 585 (Ill. 2014) ("Separate claims will be considered the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts, regardless of whether they assert different theories of relief.") (internal quotations and citation omitted).

To determine whether a "cause of action" is the same for *res judicata* purposes, 20 of the 22 relevant states apply the "transactional approach" outlined in the Second Restatement of Judgments.  *See* Restatement (Second) of Judgments § 24 (1982); *see, e.g.*, *Lawrence v. Bingham*

---

[11] *See also* Appendix A.  Given the large number of jurisdictions relevant to this motion, for the Court's convenience, attached hereto as Appendices A-K are tables providing citations to factual allegations and relevant state law for certain propositions of law McKinsey relies on in this motion.

*Greenebaum Doll, L.L.P.*, 599 S.W.3d 813, 826 (Ky. 2019) ("Kentucky follows the 'transactional approach' in determining whether identity of causes of action exists.").[12]  The transactional approach bars all claims arising out of the same "transaction or series of transactions," or the same "core of operative facts," as the prior claims, regardless of any difference in the legal theories raised or relief sought.  *See, e.g.*, *Old Republic Ins. Co. v. Lanier*, 790 So.2d 922, 928 (Ala. 2000) ("*Res judicata* applies not only to the exact legal theories advanced in the prior case, but to all legal theories and claims arising out of the same nucleus of operative facts.").

       "What factual grouping constitutes a 'transaction,' and what groupings constitute a 'series,' are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Funny Guy, LLC v. Lecego, LLC*, 795 S.E.2d 887, 892 (Va. 2017) (quoting Restatement (Second) of Judgments § 24, comment a).  This is consistent with the majority trend "to see a claim in factual terms and to make it coterminous with the transaction regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to plaintiff, regardless of the number of primary rights that may be invaded, and regardless of the variations in evidence needed to support the theories or rights." Restatement (Second) of Judgments § 24 comment a (1982).  The transactional approach "is grounded in public policy concerns, including fairness to the parties, and is intended to ensure finality, prevent vexatious litigation and promote judicial economy." *Simmons v. Trans Express Inc.*, 170 N.E.3d 733, 737 (N.Y. 2021).

---

[12] *See also* Appendix B.

Two states relevant to this motion apply different, though related, standards.  Indiana applies the "identical evidence" test, which asks "whether identical evidence will support the issues involved in both actions."  *Hilliard v. Jacobs*, 957 N.E.2d 1043, 1047 (Ind. Ct. App. 2011).  California applies the "primary rights" test, which defines a "cause of action" as "the right to obtain redress for a harm suffered, regardless of the specific remedy sought or the legal theory (common law or statutory) advanced."  *Boeken v. Phillip Morris USA, Inc.*, 230 P.3d 342, 348 (Cal. 2010).

Under either the "transactional," "identical evidence" or "primary rights" test, Plaintiffs assert the same "cause of action" as the States.  Their claims arise out of the ***exact*** same series of engagements McKinsey performed for Purdue and other opioid manufacturers that gave rise to the States' claims.  Plaintiffs plead (sometimes word-for-word) the exact same factual allegations pleaded by the States and are seeking redress for the alleged invasion of the same right and same alleged harms.  The following table provides representative allegations from each of the States' complaint as well as the duplicative allegations in complaints filed by Plaintiffs from each State, illustrating the identity of the "cause of action" asserted by the States and Plaintiffs under each of the relevant tests:

| States' Claims | Plaintiffs' Claims |
|---|---|
| "McKinsey worked with entities involved in manufacturing and selling opioids and thereby contributed to the opioid crisis."  (Cheifetz Decl., Ex. CC ¶ 8 (State of New York); *see also id.* Ex. II ¶ 8 (State of Pennsylvania) (same).) | "McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse—and that the actions and omissions of their several opioid manufacturer clients, including but not limited to Purdue, were actually contributing to a nationwide opioid epidemic."  City of New York, New York Compl. ¶ 79, 21-cv-5183, ECF No. 1-1; *see also, e.g.*, Bedford County, Pennsylvania Compl. ¶ 257, 21-cv-5182, ECF No. 1-1; |

– 20 –

| | Subdivision MCC ¶ 425; School Districts MCC ¶ 432. |
|---|---|
| "McKinsey advised Purdue to 'band together' with other opioid manufacturers toward a class REMS to 'formulate arguments to defend against strict treatment by the FDA.'" (Cheifetz Decl., Ex. EE ¶ 16 (State of Ohio); *see also id.* Ex. OO ¶ 13 (State of Utah) (same).) | "McKinsey recognized the value of collaboration, urging Purdue to band together with other manufacturers to 'defend against strict treatment' by the federal Food & Drug Administration ('FDA')."  Montgomery County, Ohio Compl. ¶ 4, 21-cv-4487, ECF No. 1; *see also, e.g.,* Cache County, Utah Compl. ¶ 4, Case No. 210100355 (Utah Dist. Ct.) (removal and transfer forthcoming) (same); Subdivision MCC ¶ 414; School Districts MCC ¶ 421. |
| "In 2009, Purdue hired McKinsey to increase 'brand loyalty' to OxyContin. McKinsey recommended the best ways to ensure loyalty to the brand by targeting specific patients, including patients new to opioids, and developing targeted messaging for specific prescribers." (Cheifetz Decl., Ex. S ¶ 12 (State of Maryland).) | "By 2009, McKinsey was working with its long-time client to craft and implement a sales and marketing plan to increase OxyContin sales . . . ."  Allegany County, Maryland Compl. ¶ 14, 21-cv-9920, ECF No. 1; *see also, e.g.,* Subdivision MCC ¶ 138; School Districts MCC ¶ 610. |
| "Purdue approved McKinsey's plan, and together with McKinsey, moved to implement the plan to 'Turbocharge Purdue's Sales Engine,' under the name Evolve 2 Excellence ('E2E')."  (Cheifetz Decl., Ex. O ¶ 17 (State of Kentucky); *see also id.* Ex. QQ ¶ 19 (State of Virginia) (same).) | "[T]he following month Purdue implemented Project Turbocharge based on McKinsey's recommendations . . . and re-christened the initiative . . . 'E2E: Evolve to Excellence.'"  Green County, Kentucky Class Action Compl. ¶ 159, 21-cv-4536, ECF No. 1-1; *see also, e.g.,* City of Chesapeake, Virginia Compl. ¶ 95, 21-cv-5292, ECF No. 1 (same); Subdivision MCC ¶ 244; School Districts MCC ¶ 251. |
| "Among the key components of McKinsey's plan adopted by Purdue were to . . . focus sales calls on high-volume opioid prescribers . . . ."  (Cheifetz Decl., Ex. GG ¶ 16 (State of Oklahoma); *see also id.* Ex. W ¶ 16 (State of Mississippi) (same).) | "Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them."  Kay County, Oklahoma Pet. ¶ 93, 21-cv-4382, ECF No. 1-1; *see also, e.g.,* Amite County, Mississippi Compl. ¶ 137, 21-cv-9831, ECF No. 1 (same); Subdivision MCC ¶ 257; School Districts MCC ¶ 264. |
| "Among the key components of McKinsey's plan adopted by Purdue were to . . . focus | "McKinsey advised Purdue to focus on selling higher strength dosages of |

– 21 –

| | |
|---|---|
| Purdue's marketing messaging to titrate to higher, more lucrative dosages . . . ." (Cheifetz Decl., Ex. E ¶ 16 (State of Florida); *see also id.*, Ex. KK ¶ 16 (State of Tennessee) (same).) | OxyContin."  City of Pembroke Pines, Florida Class Action Compl. ¶ 106, 21-cv-4384, ECF No. 1; *see also, e.g.*, Blount County, Tennessee Class Action Compl. ¶ 72, 21-cv-4969, ECF No. 1 (same); Subdivision MCC ¶ 599; School Districts MCC ¶ 606. |
| "McKinsey told Purdue's owners to . . . accelerate considerations of an alternative distribution channel, such as delivering OxyContin directly to patients through mail-order pharmacies."  (Cheifetz Decl., Ex. U ¶ 20 (State of Michigan); *see also id.* Ex. Y ¶ 16 (State of Missouri) (same).) | "[McKinsey] also suggested the establishment of a direct-mail specialty pharmacy so that Purdue could circumvent Walgreens and sell directly to Walgreens' customers."  Cannon Township, Michigan Class Action Compl. ¶ 110, ECF No. 1; *see also, e.g.*, Audrain County, Missouri Compl. ¶ 117, 21-cv-9834, ECF No. 1 (same); Subdivision MCC ¶ 271; School Districts MCC ¶ 278. |
| "McKinsey partners participated as part of an Executive Oversight Team and Project Management Office, reporting to Purdue's Executive, the Purdue board, and with the Sacklers, individually. McKinsey worked side by side with Purdue and helped Purdue plan and implement E2E, assisting with sales representative training, productivity, messaging, and call plans, IT systems, promotional strategies, and market forecasting."  (Cheifetz Decl., Ex. M ¶ 18 (State of Indiana); *see also id.*, Ex. Q ¶ 18 (State of Louisiana) (same).) | "McKinsey partners participated as part of an Executive Oversight Team and Project Management Office, reporting to Purdue's Executive, the Purdue board, and with the Sacklers, individually. McKinsey worked side by side with Purdue and helped Purdue plan and implement E2E, assisting with sales representative training, productivity, messaging, and call plans, IT systems, promotional strategies, and market forecasting."  City of Austin, Indiana Class Action Compl. ¶ 30, 21-cv-5403, ECF No. 1; *see also, e.g.*, Parish of Livingston, Louisiana Compl. ¶ 113, 21-cv-4962, ECF No. 1 (same); Subdivision MCC ¶ 248; School Districts MCC ¶ 255. |
| "One proposal McKinsey recommended was for Purdue to pay 'additional rebates on any new OxyContin related overdose or opioid use disorder diagnosis.'"  (Cheifetz Decl., Ex. G ¶ 23 (State of Georgia); *see also id.*, Ex. MM ¶ 27 (State of Texas) (same).) | "In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates 'for every OxyContin overdose attributable to pills they sold.'"  Peach County, Georgia Class Action Compl. ¶ 90, 21-cv-4963, ECF No. 1; *see also, e.g.*, City of San Antonio, Texas Compl. ¶ 189, 21-cv-9101, ECF No. 1 (same); Subdivision MCC ¶¶ 487-92; School Districts MCC ¶¶ 494-99. |
| "McKinsey designed and implemented for other opioid manufacturers marketing plans similar to those it created for Purdue." | "As early as 2002, McKinsey was advising other opioid manufacturers regarding methods to boost sales of their drugs."  St. Clair |

– 22 –

| | |
|---|---|
| (Cheifetz Decl., Ex. K ¶ 26 (State of Illinois); *see also id.* Ex. AA ¶ 26 (State of New Mexico) (same).) | County, Illinois Compl. ¶ 158, 21-cv-4642, ECF No. 1; *see also, e.g.*, Bernalillo County, New Mexico Compl. ¶ 3, 21-cv-9838, ECF No. 1 (same); Subdivision MCC ¶¶ 291-393; School Districts MCC ¶¶ 298-400. |
| "There are indications that individuals at McKinsey considered destroying or deleting documents relating to their work for Purdue." (Cheifetz Decl., Ex. A ¶ 26 (State of Alabama).) | "In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids."  Walker County, Alabama Class Action Compl. ¶ 93, 21-cv-4960, ECF No. 1; *see also, e.g.*, Subdivision MCC ¶ 493; School Districts MCC ¶ 500. |
| "The opioid crisis has forced California to pay billions of dollars for increased costs in health care, child welfare, criminal justice, and many other programs needed to abate the epidemic." (Cheifetz Decl., Ex. C ¶ 30 (State of California); *see also id.*, Ex. I ¶ 29 (State of Hawai'i) (same).) | "Plaintiff provides essential services for its citizens and residents, including law enforcement, emergency medical assistance, services for families and children, public assistance, public welfare, and other care and services for the health, safety and welfare of their citizens and residents. The rising numbers of people addicted to opioids have led to significantly increased costs, as well as a dramatic increase of social problems, including, but not limited to, drug abuse and the commission of criminal acts to obtain opioids."  San Mateo County, California Compl. ¶ 14, 21-cv-6009, ECF No. 1; *see also, e.g.*, Kauai County, Hawai'i Compl. ¶ 23, 21-cv-496 (D. Haw.) (transfer forthcoming), ECF No. 1-1 (same); Subdivision MCC ¶ 684; School Districts MCC ¶ 540. |

These and other allegations confirm that Plaintiffs' claims arise out of the same "series of transactions" as the resolved States' claims—namely, McKinsey's work for Purdue and other opioid manufacturers related to the sale of prescription opioids. *See, e.g.*, *Bauhaus Grp. I, Inc. v. Kalikow*, 139 N.Y.S.3d 193, 195-96 (N.Y. App. Div. 2021) (affirming dismissal on *res judicata*

– 23 –

grounds where plaintiffs raised the "same loan transactions and factual allegations underlying the claims made in the [prior] action").[13]  The identical allegations also confirm that identical evidence supports the issues relevant to both actions.  *See, e.g.*, *Freels v. Koches*, 94 N.E.3d 339, 344 (Ind. Ct. App. 2018) (applying "identical evidence" test and concluding that "the underlying facts demonstrate that both litigations are essentially the same").  Moreover, the alleged harm suffered by California Plaintiffs confirms they are asserting the exact same "primary rights" as did the State of California—i.e., the right of California communities and residents to be free from the effects of improper opioid prescriptions.  *See, e.g.*, *Boeken*, 230 P.3d at 348 ("[U]nder the primary rights theory, the determinative factor is the harm suffered.").

Accordingly, Plaintiffs are asserting the same "cause of action" as the States.

### 3.  Plaintiffs Are in Privity with Their Respective States

For purposes of *res judicata*, a non-party will be considered to be in privity with a party to a prior lawsuit, and thereby bound by a prior judgment, where "the connection between the parties [is] such that the interests of the nonparty can be said to have been represented in the prior proceeding."  *Green v. Santa Fe Indus., Inc.*, 514 N.E.2d 105, 108 (N.Y. 1987); *see also City of Martinez v. Texaco Trading & Transp., Inc.*, 353 F.3d 758, 764 (9th Cir. 2003) ("The California courts further apply privity where the nonparty has an identity of interest with, and adequate representation by, the party in the first action and the nonparty should reasonably expect to be bound by the prior adjudication.") (internal quotations and citations omitted); *State ex rel. Schachter v. Ohio Pub. Emp. Ret. Bd.*, 905 N.E.2d 1210, 1217 (Ohio 2009) ("[A] mutuality of interest, including an identity of desired result, may create privity.") (internal

---

[13] Mississippi law similarly requires an identity of "subject matter" to establish *res judicata*.  *See Clark v. Neese*, 262 So.3d 1117, 1123 (Miss. 2019) (holding that "*res judicata* bars a second action between the same parties on the subject matter directly involved in the prior action" and noting that "subject matter" refers to the "substance of the lawsuit").  As is clear from the allegations, Plaintiffs' claims relate to the same "subject matter" as the States' claims.

– 24 –

quotations and citation omitted).[14]  The "concept of privity requires a flexible analysis . . . considering whether the circumstances of the actual relationship, the mutuality of interests, and the manner in which the nonparty's interests were represented in the earlier litigation established a functional representation such that the nonparty may be thought to have had a vicarious day in court."  *Rojas v. Romanoff*, 128 N.Y.S.3d 189, 197 (N.Y. App. Div. 2020).  Accordingly, a non-party whose interests have once been represented is not free to relitigate those same interests. *See, e.g.*, *Alaska Sport Fishing*, 34 F.3d 769.

> ### a)   Privity Between Governmental Entities Turns on the Commonality of Interests Represented

Plaintiffs are in privity with the States because they are seeking to represent the same public interest already represented by the States.  Governmental entities like the States and Plaintiffs will be in privity when they represent the same interest and pursue the same objectives in successive actions.  *See, e.g.*, *Dyson v. Cal. State Personnel Bd.*, 213 Cal. App. 3d 711, 727 (Cal. Ct. App. 1989) (finding privity where the "litigation objectives of the district attorney and the Attorney General in their respective proceedings were identical");[15] *cf. In re Facebook, Inc., Consumer Privacy User Profile Litig.*, 354 F. Supp. 3d 1122, 1132 (N.D. Cal. 2019) (finding that State of Illinois was the real party in interest in suit brought by local prosecutor because, under Illinois' Consumer Fraud Act, "the functions and responsibilities of the Attorney General and county prosecutors are largely the same").  Similarly, "the courts have held that the agents of the same government are in privity with each other, since they represent not their own rights but the right of the government."  *Lerner v. Los Angeles City Bd. of Educ.*, 380 P.2d 97, 106 (Cal. 1963); *see also Collyer v. State Tax'n & Revenue Dep't*, 913 P.2d 665, 667 (N.M. Ct. App. 1995)

---

[14] *See also* Appendix C.

[15] For additional examples of governmental privity, see Appendix D.

(holding that state officer that settled matter "necessarily represented all state agencies that were foreseeably affected by the compromise or settlement agreement").  Privity will only be found lacking where the governmental entity or officer asserting the later suit is serving a purpose or function wholly distinct from that served by the earlier suit or where barring the later suit would be inconsistent with the allocation of power between the two entities.  *See, e.g.*, *Baraga Cnty. v. State Tax Comm'n*, 645 N.W.2d 13, 17-18 (Mich. 2002) (finding no privity between county tax assessor and state tax commission because barring state's later lawsuit would "be inconsistent with the statutory scheme" giving the state supervisory authority over county tax assessor).

Indeed, where (as here) the State brings a lawsuit on behalf of the public interest to safeguard the health, safety or welfare of its citizens, "[t]here is *a presumption* that the state will adequately represent the position of its citizens" and later suits asserting the same public interests will be precluded.  *Alaska Sport Fishing Ass'n*, 34 F.3d at 773 (emphasis added); *see also Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993) ("[W]hen a state litigates common public rights, the citizens of that state are represented in such litigation by the state and are bound by the judgment."); *cf. Badgley v. City of New York*, 606 F.2d 358, 364 (2d Cir. 1979) (concluding that "Pennsylvania represented all of its citizens and that the terms of the decree are thus conclusive upon all Pennsylvania citizens and bind their rights.").[16]  Only later suits

---

[16] *See also United States v. Olin Corp.*, 606 F. Supp. 1301, 1304 (N.D. Ala. 1985) ("The weight of authority indicates that once a state represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon those citizens and is binding upon their rights."); *Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Ass'n*, 71 Cal. Rptr. 2d 77, 88 (Cal. Ct. App. 1998) ("We are persuaded that appellant, along with the public as a whole, was adequately represented by the state agencies vested with authority to litigate the issue of public access to the Bolinas Sandspit."); *Alderwoods Grp., Inc. v. Garcia*, 119 So. 3d 497, 504-05 (Fla. Dist. Ct. App. 2013) ("When the government brings an action in its *parens patriae* capacity, *res judicata* will bar litigation by private individuals seeking to redress acts that were settled in that prior action, even if the private individuals were not formal parties thereto."); *Gault*, 627 S.E.2d at 552 ("Because punitive damages serve a public interest and are intended to protect the general public, as opposed to benefitting or rewarding particular private parties, we find the State, in seeking punitive damages in the suit against B & W, did so as *parens patriae* and in this capacity represented the interests of all Georgia citizens, including plaintiffs here."); *Indiana Dep't of Env't Mgmt. v. Conard*, 614 N.E.2d 916, 923 (Ind. 1993) ("Once a governmental authority represents all of its citizens in a *parens patriae* suit, a consent decree or final judgment resolving the suit is conclusive upon those

asserting "purely private interests" that the State would not have had standing to raise may be permitted.  *Satsky*, 7 F.3d at 1470 ("To the extent these claims involve injuries to purely private interests, which the State cannot raise, then the claims are not barred."); *see also Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 531 (5th Cir. 2008) ("Once the EPA filed an enforcement action and secured a consent decree that adequately addressed the same violations alleged in ECO's suit, the public interest was vindicated to the full extent of ECO's ability to vindicate it.  When nothing was left for ECO to accomplish, it no longer had a stake in the litigation.").[17]

Accordingly, suits brought by political subdivisions in the public interest (such as Plaintiffs' here) will be barred by a prior judgment obtained by the State representing the same public interest.  *See, e.g.*, *City of Martinez*, 353 F.3d at 764 (distinguishing between public and private claims and holding that, "[t]o the extent that the City now seeks to represent the public interest in its complaint, the City and the [State Department of Fish and Game] are considered to be in privity because the DFG was clearly authorized to resolve the dispute involving the oil spill

---

citizens and is binding upon their rights.") (internal quotations and citations omitted); *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 470 (D. Md. 2019) ("When a state proceeds in its *parens patriae* capacity, it is deemed to represent all its citizens.") (internal quotations and citations omitted); *Comm. for Educ. Equality v. State*, 294 S.W.3d 477, 487 n.18 (Mo. 2009) (en banc) ("The doctrine of *parens patriae* creates a rebuttable presumption that the government adequately represents the public's interests in cases concerning matters of sovereign interest."); *Fabiano v. Philip Morris Inc.*, 862 N.Y.S.2d 487, 491 (N.Y. App. Div. 2008) ("[A] claim by a private attorney general to vindicate what is an essentially public interest in imposing a punitive sanction cannot lie where, as here, that interest has been previously and appropriately represented by the State Attorney General in an action addressed, on behalf of all of the people of the State, including plaintiffs and the decedent, to the identical misconduct."); *Tigrett v. Cooper*, No. 10-2724, 2011 WL 5025491 (W.D. Tenn. Oct. 21, 2011) (holding that State adequately represented interests of municipalities seeking to intervene in suit relating to consolidation of municipalities' governments despite argument that municipalities had uniquely local interests); *Menzel v. Cnty. Utilities Corp.*, 501 F. Supp. 354 (E.D. Va. 1979) (applying Virginia law and holding that Virginia residents were bound by parallel state court judgment in action between State and utility arising from discharge of wastewater into waterways because State was presumed to adequately represent its residents' interests).

[17] While some state courts have not directly addressed the question of whether a suit by the State representing the public interest bars later suits asserting similarly public claims, federal courts may look to federal *res judicata* principles in predicting how a state court would rule in such instances.  *See, e.g.*, *Sierra Club v. Two Elk Generation Partners, Ltd. P'ships*, 646 F.3d 1258 (10th Cir. 2011) (predicting that Wyoming Supreme Court would look to federal case law in determining whether a suit brought by the State representing the public interest would bar subsequent suit by Wyoming citizens asserting same public interest).

on behalf of the public"); *Cnty. of Boyd v. US Ecology, Inc.*, 858 F. Supp. 960, 973 (D. Neb. 1994) (holding public claims brought by county barred by prior suit brought by State of Nebraska on behalf of public), *aff'd* 48 F.3d 359 (8th Cir. 1995); *Boothbay v. Getty Oil Co.*, 201 F.3d 429 (1st Cir. 1999) (unpublished) (holding town's claims precluded by settlement reached by the State of Maine); *Dover*, 891 A.2d 524 (holding claims by cities barred by parallel suit brought by the State of New Hampshire on behalf of the public because State is presumed to adequately represent the interests of all citizens); *cf. Grand Traverse Band of Ottawa & Chippewa Indians v. Dir., Michigan Dep't of Nat'l Res.*, 141 F.3d 635, 641-42 (6th Cir. 1998) (finding non-party municipalities bound by consent order negotiated between the State of Michigan and Indian tribes); *see also* Wright & Miller, Federal Practice & Procedure § 4458 ("It seems likely that state law will work increasingly toward the conclusion that litigation by the state or state officials is binding on political subdivisions, simply as a matter of establishing central control and common results.").

   *County of Boyd* is illustrative.  In that case, the governor of Nebraska filed suit against a developer seeking to enjoin the construction of a nuclear waste disposal site and "asserting the interests of the State of Nebraska and the residents of Boyd County."  858 F. Supp. at 964.  The suit was dismissed as time-barred.  *See id.*  Thereafter, Boyd County filed suit alleging (as had the governor) that the developer failed to obtain the required "community consent," and sought damages arising from the resulting disruption to the community, including the county's "increased costs of law enforcement" and "increased costs for emergency response providers." *Id.* at 966.  Notwithstanding the fact that the governor's suit had not sought any damages, the Court held that the County was in privity with the State, and therefore barred, because (just like the States' and Plaintiffs' claims here) their respective lawsuits each sought to vindicate the same

– 28 –

"common public rights" rather than the "purely private interests" of individuals.  *Id.* at 972-73.

The Eighth Circuit affirmed noting the district court's "comprehensive, thorough opinion" as

well as the consequences of allowing such successive litigation.  *Cnty. of Boyd*, 48 F.3d at 362

("If this action were not precluded, and were the County to fail on the merits as the state of

Nebraska did . . . a suit could well follow by the village of Butte, representing its residents,

which if unsuccessful might well be followed by a class action on behalf of local residents.

Preclusion bars such successive litigation.").  Absent preclusion of Plaintiffs' claims, the same

endless litigation predicted by the court in *County of Boyd* could very well occur here,

undermining the essential goal of the settlement with the States: finality.

Finding privity between parties representing the same public interest also preserves the

sovereign authority of the State and places a limit on potentially endless follow-on litigation by

the States' citizens and political subdivisions.  *See New Jersey v. New York*, 345 U.S. 369, 373

(1953) ("The principle is a necessary recognition of sovereign dignity, as well as a working rule

for good judicial administration.  Otherwise, a state might be judicially impeached on matters of

policy by its own subjects, and there would be no practical limitation on the number of citizens,

as such, who would be entitled to be made parties.").  It is also consistent with a government's

inherent duty to consider and represent the interests of all its constituents when negotiating

binding settlements:

> Unlike the situations in which we fear that a party may be
> attempting [to] profit at the expense of unrepresented individuals,
> e.g., class actions and shareholder derivative suits, we here have as
> plaintiff the government department charged with seeing that the
> laws are enforced. We therefore need not fear that the pecuniary
> interests of the plaintiff and defendant will tempt them to agree to a
> settlement unfair to unrepresented persons, but can safely assume
> that the interests of all affected have been considered.

– 29 –

1    *United States v. City of Miami*, 614 F.2d 1322, 1332 (5th Cir. 1980); *see also Olin Corp.*, 606 F.

2    Supp. at 1304 ("The weight of authority indicates that once a state represents all of its citizens in

3    a *parens patriae* suit, a consent decree or final judgment entered in such a suit is conclusive upon

4    those citizens and is binding upon their rights.").

5                     **b)       There Is Privity Here Because Plaintiffs Represent the Same**
6                                **Public Interests as the States**

7            Each State previously asserted claims on behalf of the public interest.  (*See, e.g.*, Cheifetz

8    Decl., Ex. EE ¶ 2 ("Plaintiff is the State of Ohio, by and through the Attorney General of

9    Ohio . . . who brings this action in the public interest and on behalf of the State of Ohio . . . .");

10   *Id.*, Ex. K ¶ 1 ("The People of the State of Illinois, by Kwame Raoul, Attorney General of the

11   State of Illinois, believes this action to be in the public interest of the citizens of the State of

12   Illinois . . . ."); *Id.*, Ex. GG ¶ 2 ("The [Oklahoma] Attorney General is authorized to bring this

13   action, in his *parens patriae* capacity, to enforce the OCPA in the public interest to protect the

14   public's health, safety and welfare . . . .").)  Each State sought injunctive and financial relief to

15   remediate the effects of increased opioid use and misuse on their communities and residents.

16   (*See, e.g.*, *id.*, Ex. V § V.1 ("The proceeds from this settlement paid to the State of Michigan [by

17   McKinsey] must be used to remediate the harms caused to the Settling States and their citizens

18   by the opioid epidemic within each State . . . .").)  Because the States represented the public

19   interest, they are presumed to have adequately represented the interests of all of their citizens and

20   political subdivisions in resolving those lawsuits.  *See, e.g.*, *Alaska Sport Fishing*, 34 F.3d 769;

21   *Dover*, 891 A.2d 524; *cf. Olin Corp.*, 606 F. Supp. at 1304 ("[T]o intervene in a suit in district

22   court in which a state is already a party, a citizen or subdivision of that state must overcome this

23   presumption of adequate representation.").

– 30 –

Plaintiffs now seek to represent the *same* public interest previously represented by the States.  (*Compare, e.g.*, Cheifetz Decl., Ex. M ¶ 2 (State of Indiana Complaint) ("The Attorney General is authorized to bring this action in his *parens patriae* capacity, as Indiana has a quasi-sovereign interest in the health and well-being – physically and economically – of its citizens who have suffered because of McKinsey's conduct."), *with, e.g.*, Scott County, Indiana Class Action Compl. ¶ 1, 21-cv-6237, ECF No. 1 ("Plaintiff is [sic] Scott County, Indiana is a political subdivision of the State of Indiana, by and through its Board of Commissioners and is authorized to bring this action in that it has quasi-sovereign interest in the health and well-being physically and economically of its citizens who have suffered because of McKinsey's conduct in Scott County, Indiana.").)[18]  Many Plaintiffs do not even limit their claims to their local communities but, rather, like the States, seek to represent the interests of *all* residents and political subdivisions statewide explicitly through a class action.[19]  *See, e.g.*, Pope County, Illinois Class Action Compl. ¶ 108, 21-cv-4964, ECF No. 1 (seeking to represent class of "[a]ll Illinois local governmental entities for the period of 2004 to present"); Blount County, Tennessee Class Action Compl. ¶ 103, 21-cv-4969, ECF No. 1 (seeking to represent class of "[a]ll Tennessee Counties" and "[a]ll Tennessee Cities, Towns and/or Municipalities" "for the period of 2004 to the present").  Other Plaintiffs explicitly admit the identity of their own interests and rights with those of their State.  *See, e.g.*, City of Shawnee, Oklahoma Pet. ¶ 50, 21-cv-4388, ECF No. 1 ("McKinsey, through its work with Purdue, owed a duty of care ***to the State*** . . . .) (emphasis added); San Mateo County, California Compl. ¶ 120, 21-cv-6009, ECF No. 1 ("There is little

---

[18] *See also* Appendix E.

[19] While not the subject of this motion, Plaintiffs do not have the authority to bring lawsuits such as those here that seek to raise matters of statewide concern.  *See, e.g.*, *Endo v. Second Judicial Dist. Court*, 492 P.3d 565 (Nev. 2021) (reversing district court's ruling that Nevada political subdivisions had authority to bring opioid-related lawsuit and remanding for determination of whether political subdivision lawsuits were limited to "local concern[s]" as statutorily required).  McKinsey expressly preserves and does not waive this argument.

– 31 –

doubt that each Defendants' actions have precipitated this public health crisis *in California* . . . .").  Indeed, Plaintiffs assert claims for public nuisance and seek punitive damages, both of which seek to serve the interests of the public.  *See Dep't of Fair Employment & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 737 n.2 (9th Cir. 2011) (noting that public nuisance is an example "of a set of interests that the State has in the well-being of its populace") (internal quotations and citations omitted); *Gault*, 627 S.E.2d at 552 ("[P]unitive damages serve a public interest and are intended to protect the general public . . . .").

Thus, the pleadings confirm that Plaintiffs are not representing "purely private interests." *Satsky*, 7 F.3d at 1470.  Rather, they are pursuing the exact same public objective as the States— remediation of the opioid epidemic throughout their states.  (*Compare, e.g.*, Cheifetz Decl., Ex. V § V.1 (State of Michigan Consent Judgment) ("The proceeds from this settlement paid to the State of Michigan [by McKinsey] must be used to remediate the harms caused to the Settling States and their citizens by the opioid epidemic within each State . . . ."), *with, e.g.*, Cannon Township, Michigan Class Action Compl. ¶ 19, 21-cv-4971, ECF No. 1 ("Plaintiffs seek the means to abate the opioid epidemic created by Defendants' wrongful and/or unlawful conduct.").)[20]  Because Plaintiffs seek to represent the same public interest as the States, they are in privity with one another and Plaintiffs' claims are barred.  *See, e.g.*, *City of Martinez*, 353 F.3d at 764; *Dover*, 891 A.2d at 531; *Cnty. of Boyd*, 858 F. Supp. at 973; *Boothbay*, 201 F.3d 429.

> **c)**     **A Finding of Privity Is Particularly Warranted Here Because Public Policy Strongly Favors State Control and Resolution of Matters of Statewide Public Concern**

A finding of privity is particularly warranted where, as here, "the case at hand also presents strong policy considerations favoring the application of *res judicata*, i.e., the need for

---

[20] *See also* Appendix F.

finality in the resolution of legal disputes, consistency in results, the avoidance of vexatious litigation and judicial economy in an overburdened court system." *Slocum on Behalf of Nathan A v. Joseph B*, 588 N.Y.S.2d 930, 932 (N.Y. App. Div. 1992) (noting that "[c]ourts should be particularly inclined to bind the nonparty to the former litigation" in such circumstances). The need for finality, consistency and judicial economy is particularly strong here because Plaintiffs' lawsuits undermine the internal allocation of state power and the authority of attorneys general in two critical ways.

First, Plaintiffs' duplicative lawsuits undermine the States' common law, constitutional and statutory authority to control and settle lawsuits alleging statewide harm. Without some assurance of global resolution, defendants have been and will be forced to simultaneously litigate claims they may have otherwise settled against ***both*** a state and ***all*** of a state's political subdivisions and school districts. *See Thornton v. State Farm Mut. Auto Ins. Co.*, No. 06 Civ. 00018, 2006 WL 3359482 at *3 (N.D. Ohio Nov. 17, 2006) ("[I]f courts consistently allow parallel or subsequent class actions in spite of state action, the state's ability to obtain the best settlement for its residents may be impacted, since the accused may not wish to settle with the state only to have the state settlement operate as a floor on liability or otherwise be used against it."). Second, duplicative local government suits undermine the State's ability to mount a coordinated response to public health issues and to allocate settlement funds based upon the needs of the entire state instead of the parochial interests of local governments. *See State of Illinois v. Associated Milk Producers*, 351 F. Supp. 436, 440 (N.D. Ill. 1972) ("Justice and judicial economy is best served by having the largest governmental unit sue on behalf of all its parts rather than having multiple suits brought by various political subdivisions within the State.")

– 33 –

Moreover, while not legally required to find privity, recently enacted and proposed legislation as well as announcements by state attorneys general confirm that the States are taking measures to ensure that funds obtained in their opioid settlements are used to remediate the opioid crisis throughout each of their states to the benefit of Plaintiffs, their communities and their residents. *See, e.g.*, Okla. Stat. Ann. tit. 74, §§ 30.3 – 30.8 (creating the "Oklahoma Opioid Abatement Fund" consisting of "all opioid funds obtained through a settlement or judgment by the Attorney General on behalf of the State of Oklahoma related to opioid litigation" and noting that "[i]t is the intent of the Legislature, through enactment of the Political Subdivisions Opioid Abatement Grants Act, to promote and protect the health of Oklahomans by using monetary grants to abate the opioid crisis in a comprehensive manner ***that includes cooperation and collaboration with political subdivisions***") (emphasis added).[21]

Mere dissatisfaction with the ***amount*** of compensation or nature of the benefit secured by the States in connection with this effort neither defeats privity nor warrants virtually endless litigation that undermines the power of the State to control lawsuits resolving issues of statewide public health. *See, e.g.*, *United States v. Hooker Chems. & Plastics Corp.*, 749 F.2d 968, 987 (2d Cir. 1984) ("The mere existence of disagreement over some aspects of the remediation necessary to abate the hazard does not demonstrate a lack of capacity on the part of the government as *parens patriae* to represent its constituents fairly and faithfully."); *Dover*, 891 A.2d at 531 ("While the compensation sought [by the State] may not be the same as that which the cities would desire, a difference of that nature does not demonstrate an interest that is not properly represented by the State."); *Ewald's Ex'r v. Louisville*, 232 S.W. 388, 391 (Ky. 1921) ("[I]t is sufficient to say that the doctrine of *res judicata* does not depend on ***the amount due***, ***the***

---

[21] *See also* Appendix G.

*amount sued for, or the amount recovered,* but rests entirely on the principle that parties and privies ought not to be permitted to litigate the same issue more than once.") (emphasis added).

Not only do Plaintiffs' claims meet the legal requirements for privity, but such a finding is particularly appropriate here given the importance of protecting the States' authority to control statewide litigation. If Plaintiffs are dissatisfied with McKinsey's $642 million settlement, they can address that with their own state governments, not through limitless, duplicative litigation.

> ### 4. California, Georgia, Mississippi, New Mexico, Ohio and Tennessee Plaintiffs' Public Nuisance Claims, as well as Alabama, California and Illinois Plaintiffs' Consumer Protection Claims, Must Be Brought on Behalf of the State and Are Therefore Barred by *Res Judicata* for this Additional Reason

As detailed above, all Plaintiffs are in privity with their respective States and their claims are therefore barred by the doctrine of *res judicata. See supra* Part III.B.3. Additionally, in California, Georgia, Mississippi, New Mexico, Ohio, and Tennessee, public nuisance claims must be brought in the name of the "state" or the "people of the state." *See* Cal. Code Civ. Proc. § 731 ("A civil action may be brought in the *name of the people of the State of California* to abate a public nuisance . . . .") (emphasis added).[22] Accordingly, these claims have been brought on behalf of the same party in both the Plaintiffs' and the States' actions. (*See* Cheifetz Decl.,

---

[22] *See also* Cal. Bus. & Prof. Code § 17536 (providing that civil actions under FAL are to be "brought *in the name of the people of the State of California* by the Attorney General or by any district attorney, county counsel, or city attorney") (emphasis added); Miss. Code Ann. § 93-3-5 ("Whenever a nuisance exists, the attorney-general of the state, the district attorney of the district, the county attorney, or any person who is a citizen of the county, may bring an action in equity *in the name of the State of Mississippi* . . . .") (emphasis added); N.M. Stat. Ann. § 30-8-8 ("A civil action to abate a public nuisance may be brought, by verified complaint *in the name of the state* without cost, by any public officer or private citizen, in the district court of the county where the public nuisance exists, against any person, corporation or association of persons who shall create, perform or maintain a public nuisance.") (emphasis added); Ohio Rev. Code Ann. § 3767.03 (permitting local governments to "bring an action in equity *in the name of the state*" "[w]henever a nuisance exists") (emphasis added); Tenn. Code Ann. § 29-3-103 (providing that counties may sue to abate a public nuisance "*in the name of the state*") (emphasis added); *Thrasher v. Atlanta,* 173 S.E. 817, 820 (Ga. 1934) ("Generally, a public nuisance gives no right of action to any individual, but must be abated by a process instituted in *the name of the State.*") (emphasis added).

Exs. C, G, W, AA, EE & KK (asserting claims, respectively, on behalf of the People of the State

of California and the States of Georgia, Mississippi, New Mexico, Ohio, and Tennessee).)

Similarly, with respect to their state consumer protection statute claims,[23] Plaintiffs from

Alabama, California and Illinois (all local governments or prosecutors) are statutorily required to

sue in the name of the state or the people of the state.  *See* Cal. Bus. & Prof. Code § 17204

("Actions for relief pursuant to [the UCL] shall be prosecuted . . . in the name of the people of

the State of California . . . ."); *see also  California v. Check 'N Go of California, Inc.*, No. C 07-

02789, 2007 WL 2406888, at *5 (N.D. Cal. Aug. 20, 2007) ("[W]hen the district attorney filed

an action pursuant to those provisions of the California Business and Professions [Code] in the

name of the People of the State of California, the State was the proper plaintiff, and the real party

in interest . . . .").[24]

Accordingly, all of these claims are precluded because they are asserted in the name of

the same party that asserted, or could have asserted them, in the States' lawsuits.  *See, e.g.*,

*Boeken*, 230 P.3d at 344 ("The doctrine of *res judicata* prohibits a second suit between the same

parties on the same cause of action.").

---

[23] The Subdivision MCC omits many of Plaintiffs' statutory consumer protection claims.  *See* Subdivision MCC ¶¶ 544-914.  However, the Subdivision MCC purportedly does not "supersede the complaints filed in the individual actions" and incorporates prior allegations by reference.  *Id.* at 1.  Accordingly, as noted above, this motion is directed at both the MCCs and individual complaints.

[24] *See also* Ala. Code § 8-19-8 ("Whenever the office of the Attorney General or the office of the district attorney has reason to believe that any person is engaging in, has engaged in or is about to engage in any act or practice declared to be unlawful by this chapter, the Attorney General or the district attorney may bring an action *in the name of the state* . . . .") (emphasis added); Cal. Bus. & Prof. Code § 17536 (providing that civil actions under the False Advertising Law are to be "brought *in the name of the people of the State of California* by the Attorney General or by any district attorney, county counsel, or city attorney") (emphasis added); 815 Ill. Comp. Stat. 505/7 ("Whenever the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action *in the name of the People of the State* . . . .") (emphasis added).

## C.     Plaintiffs' Claims Are Also Barred by the Releases in The Consent Judgments

Plaintiffs' claims should be dismissed for a second, independent reason—they fall squarely within the scope of the Consent Judgments' release provisions and the attorneys general had the authority to release claims of their States' political subdivisions.

### 1.     Plaintiffs' Claims Fall Squarely Within the Scope of the Releases

The attorneys general broadly released, "without limitation," all "claims that were or could have been brought by a Settling State under its State's consumer protection and unfair trade practices law, RICO laws, false claims laws and claims for public nuisance, together with any related common law and equitable claims for damages or other relief." (*E.g.*, Cheifetz Decl., Ex. D ¶ 17 (emphasis added).)  Thus, the attorneys general chose to release the claims of the *entire* "Settling State" that *could* have been brought by the "Settling State" (even if they were not).  Moreover, "Settling State" necessarily includes claims brought by a "Settling State's" constituents.  *See, e.g.*, *Curtis v. Altria Grp., Inc.*, 813 N.W.2d 891, 902 (Minn. 2012) (holding that release of defendant by Minnesota Attorney General "from any and all manner of civil claims . . . ***that the State of Minnesota***" had or will have, "whether directly, indirectly, representatively, derivatively or in any other capacity," also released duplicative claims brought by ***individual state citizens*** alleging the same conduct and harm) (emphasis added).  Indeed, as administrative arms of the State responsible for carrying out State functions, Plaintiffs are not only citizens of, but are inherently coextensive with, each "Settling State":

> [Municipal corporations] are involuntary political or civil divisions of the state created by authority of law to aid in the administration of government. . . .  They are organized, mainly, for the interest, advantage and convenience of the people residing within their territorial boundaries and the better to enable the government, the sovereign, to extend to them the protection to which they are entitled, and the more easily and beneficently to exercise over them its authority. ***The powers which they exercise in their public***

– 37 –

> *capacity are powers of the state, and the duties with which they*
> *are charged are duties of the state.*

*City of Sapulpa v. Land*, 223 P. 640, 646 (Okla. 1924) (quoting Abbot on Municipal

Corporations, vol. 1, § 22) (emphasis added).[25]  Accordingly, Plaintiffs fall within the definition

of "Settling State."

Other provisions of the Consent Judgments confirm the same.  ***First***, the States only

excluded from the release: (1) claims under "state or federal antitrust" laws, "state tax laws,"

"state security laws," or claims to enforce the consent judgment; and (2) claims that ***individual***

consumers may have.  (*E.g.*, Cheifetz Decl., Ex. D ¶ 18.)  Conspicuously absent from these

express exclusions are claims brought by political subdivisions, confirming that the States did

not intend to exclude such claims.  *See White v. W. Title Ins. Co.*, 710 P.2d 309, 314 n.4 (Cal.

1985) ("Under the familiar maxim of *expressio unius est exclusio alterius* it is well settled that,

when a statute expresses certain exceptions to a general rule, other exceptions are necessarily

excluded.  This canon, based on common patterns of usage and drafting, is equally applicable to

the construction of contracts.") (internal quotations and citations excluded).

***Second***, in contrast to all other States, Washington and West Virginia expressly retained

the right in their Consent Judgments to (and ultimately did) take the position that any claims by

their political subdivisions were *not* released.  (*See* Cheifetz Decl., Ex. TT § VII.B.4; *id.* Ex. UU

§ VII.A.)  No other State took this position in their Consent Judgment, further demonstrating that

the releases as drafted were intended to encompass the claims of political subdivisions.  (*See id.*,

Exs. B, D, F, H, J, L, N, P, R, T, V, X, Z, BB, DD, FF, HH, JJ, LL, NN, PP, RR & SS.)

***Third***, the States negotiated the injunctive relief in such a way as to directly benefit their

political subdivisions.  (*See, e.g.*, Cheifetz Decl., Ex. D § III.F (requiring McKinsey to revise its

---

[25] *See, e.g.*, Appendix H.

client conflict policy "pertaining to potential engagements by any Settling State, ***county government, or municipal government***") (emphasis added).)  ***Fourth***, the States have taken affirmative steps to ensure that Plaintiffs and their residents benefit from the States' opioid settlements generally.  *See supra* Part III.B.3.c & Appendix G.  Accordingly, the text and structure of the Consent Judgments leave no doubt that the attorneys general "acted to bind the state as a whole in a matter clearly of state interest," including the States' political subdivisions, thereby releasing Plaintiffs' claims.  *In re Certified Question*, 638 N.W.2d 409, 415 (Mich. 2002).

Moreover, the scope of claims released by the States squarely covers the claims asserted by Plaintiffs.  (*Compare, e.g.*, Cheifetz Decl., Ex. D ¶ 17 (State of California releasing, "without limitation," claims under the "State's consumer protection and unfair trade practices law, RICO laws," "claims for public nuisance" as well as various "common law and equitable claims for damages or other relief"), *with, e.g.*, San Mateo County, California Compl. ¶¶ 130-191, 21-cv-6009, ECF No. 1 (asserting claims for violation of unfair competition law, false advertising law, public nuisance, fraud and negligence), *and, e.g.*, Calloway County, Kentucky Compl. ¶¶ 165-249, 21-cv-4969, ECF No. 1 (asserting claims for RICO, public nuisance, negligence and unjust enrichment).)  The conduct underlying Plaintiffs' factual allegations also falls squarely within the definition of "Covered Conduct" in the Release.  (*Compare, e.g.*, Cheifetz Decl. Ex. D § II.A (defining "Covered Conduct" to include any act related to "the discovery, development, manufacture, marketing, promotion, advertising, recall, withdrawal, distribution, monitoring, supply, sale, prescribing, reimbursement, use, regulation, or abuse of any opioid" and "the spoliation of any materials"), *with supra* Part III.B.2 (summarizing Plaintiffs' factual allegations arising from McKinsey's work related to the sale and marketing of prescription opioids).)

– 39 –

Accordingly, Plaintiffs' claims fall well within the scope of the release provisions in the Consent Judgments and therefore are barred.

### 2. The Releases Are Enforceable Against Plaintiffs Because State Attorneys General Have Authority to Settle and Release Claims of Political Subdivisions

As the chief law enforcement officers of the States, attorneys general enjoy the "exclusive constitutional power and prerogative to conduct the state's legal affairs." *Lyons v. Ryan*, 780 N.E.2d 1098, 1105 (Ill. 2002). Most attorneys general retain common law powers, including the broad discretion to bring and control any lawsuit necessary to protect the public interest:

> The most far-reaching of the attorney general's common-law powers is the authority to control litigation involving state and public interests . . . . As the state's chief legal officer, the attorney-general has power, both under common law and by statute, to make any disposition of the state's litigation that he deems for its best interest. He may abandon, discontinue, dismiss or compromise it. Most courts have given the attorney general a broad discretion . . . in determining what matters may, or may not, be of interest to the people generally.

*Ex parte King*, 59 So.3d 21, 27 n.4 (Ala. 2010) (internal quotations and citations omitted). Even jurisdictions that have not expressly retained an attorney general's common law powers grant the same broad discretion by way of constitutional or statutory law. *See, e.g.*, La. Rev. Stat. § 49:257(D) ("[T]he attorney general shall have authority to determine the purposes of the state, the department, or the state agency, as the case may be, to be served by the litigation . . . ."); *see also* 7 Am. Jur. 2d Attorney General § 5 ("[T]he statutes in the various jurisdictions are, as a rule, more or less declaratory of the common law."). Accordingly, courts have repeatedly held that, pursuant to this authority, state attorneys general have the power to bind political subdivisions in matters of state interest without their affirmative consent. *See, e.g.*, *Biltmore*, 640 F.2d at 495 ("At common law, an attorney general, in the absence of some restriction on his

– 40 –

[or her] powers by statute or constitution, has complete authority as the representative of the State or any of its political subdivisions to recover damages (whether under state or federal law) alleged to have been sustained by any such agency or political subdivision, even though those subdivisions may not have affirmatively authorized suit.") (internal quotations and citations omitted).

For example, in *In re Certified Question*, the Michigan Supreme Court held that the Michigan Attorney General's settlement with various tobacco manufacturers of claims brought on behalf of the State to recover the cost of healthcare provided to smokers released similar claims later brought by a Michigan county. *See* 638 N.W.2d 409 (Mich. 2002). The court compared the relative powers of counties to those of the attorney general. Michigan counties had the power to sue and be sued and the Michigan Constitution instructed that all provisions governing county power should be "liberally construed in their favor." *Id.* at 413. The attorney general, on the other hand, had "broad statutory authority to bring actions that are in the interest of the state of Michigan" and to litigate "on behalf of the people of the state." *Id.* at 413-14. The court reasoned that this power must include the authority "to represent the people of a county who are a part of these same people," and necessarily required the power to settle and release claims of a "subordinate" county where "the Attorney General acted to bind the state as a whole in a matter clearly of state interest." *See id.* at 413-15. As a result, the county's claims were barred: "[W]hile counties have broad authority to sue and settle with regard to matters of local interest, the Attorney General has broad authority to sue and settle with regard to matters of state interest, including the power to settle such litigation with binding effect on Michigan's political subdivisions." *Id.* at 414.

– 41 –

Similarly, in *People ex rel. Devine v. Time Consumer Marketing, Inc.*, the Cook County State's Attorney filed suit against Time Consumer Marketing ("Time") alleging violations of the Illinois Consumer Fraud Act in connection with sweepstakes mailings Time sent to county residents and seeking injunctive relief, restitution and civil penalties. *See* 782 N.E.2d 761, 762 (Ill. Ct. App. 2002). Around the same time, as part of a multistate investigation and settlement, the Illinois Attorney General, on behalf of the State, entered into a settlement with Time in which Time agreed to injunctive relief and restitution in exchange for a release of all claims which were or could have been asserted in connection with the mailings. *Id.* The trial court granted Time's motion to dismiss the Cook County State's Attorney's lawsuit on the basis that the claims were released by the Attorney General settlement. *See id.* at 762-63. On appeal, the court rejected the Cook County State's Attorney's argument that the Attorney General lacked authority to release the County's claims because the Consumer Fraud Act gave each office concurrent enforcement authority. *See id.* at 766-67. The court reasoned that the Attorney General's statutory power to bring and settle consumer fraud claims as well as the common law powers implicit in the Attorney General's status as the "chief legal officer of the state" necessarily included the power to settle and release the Cook County State's Attorney's claims. *See id.* at 766-68; *see also Ex parte King*, 59 So.3d at 27 n.4 (holding that Alabama Attorney General had authority to dismiss lawsuit over objection of district attorney and noting that "[i]in addition to having authority to initiate and manage an action, the attorney general may elect not to pursue a claim or to compromise or settle a suit when he [or she] determines that continued litigation would be adverse to the public interest"); *State of Florida ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976) (holding that Florida Attorney General retained common law powers conferring the right to bind Florida political subdivisions without their authorization).

– 42 –

Similarly here, the attorney general is the chief legal officer in each Subject State[26] and nearly all retain broad common law authority to represent the interests of the State in matters of statewide interest.  *See, e.g.*, *State ex rel. Inman v. Brock*, 622 S.W.2d 36, 41 (Tenn. 1981) ("'A broad discretion is vested in [the Attorney General] in determining what matters may, or may not, be of interest to the people generally.  We must recognize the fact that the office of Attorney General is ancient in its origin in history, and it is generally held by the states of the Union that the Attorney General has a wide range of powers at common law.'") (quoting *Mundy v. McDonald*, 185 N.W. 877, 880 (Mich. 1921)).[27]  In the few states that have not expressly retained the attorney general's common law powers, the attorneys general nonetheless enjoy similarly broad constitutional and statutory authority to sue on behalf of the State and control litigation in matters of statewide interest.  *See, e.g.*, *Perdue v. Baker*, 586 S.E.2d 606, 610 (Ga. 2003) (holding that governor and attorney general have concurrent constitutional and statutory authority to "decide what is in the best interest of the people of the State in every lawsuit involving the State of Georgia").[28]  As determined by numerous courts, this authority necessarily includes (indeed, requires) the power to settle and release claims of political subdivisions.  *See, e.g.*, *In re Certified Question*, 638 N.W.2d at 414 ("Given that the Attorney General has the authority to bring claims, it inevitably follows that the Attorney General has the authority to settle and release such claims . . . including the power to settle such litigation with binding effect on Michigan's political subdivisions."); *State ex rel. Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813, 818 (Okla. 1973) ("The Attorney General has authority to bring law suits . . . and to assume and control the prosecution thereof in the state's best interest.  It must logically follow that he

---

[26] *See* Appendix I.

[27] *See also* Appendix J.

[28] *See also* Appendix K.

– 43 –

has authority to compromise and dismiss the suit.").  Any other conclusion would allow political subdivisions to undermine the attorney general's authority to obtain final, global resolution of claims on behalf of the whole State.

Accordingly, the States had the authority to release Plaintiffs' claims and did so here.

## IV.    All of the Indiana Plaintiffs' Claims Are Statutorily Barred

Separate and apart from the above-described principles, which independently bar the Indiana Plaintiffs' claims, the Indiana Legislature recently reinforced that the State of Indiana—not political subdivisions—controls opioid-related lawsuits to redress the impact of the opioid epidemic to the State.  Specifically, on April 29, 2021, the Indiana Legislature statutorily barred Indiana political subdivisions from pursuing opioid-related lawsuits filed after January 1, 2021: "[a]fter January 1, 2021, no political subdivision shall initiate or file opioid litigation in any court." Ind. Code § 4-6-15-3 (2021).  "Opioid litigation" is "any civil lawsuit, demand, or settlement, including any settlement in lieu of litigation, filed against any opioid party for any cause of action filed for the purpose of redressing the impact of the opioid epidemic to the state or any political subdivision." *Id.* § 4-6-15-1(2).  The statute defines "[o]pioid party" to include "consultants." *Id.* § 4-6-15-1(3).  The statute further defines "political subdivision" as "counties, townships, cities, towns, and separate municipal corporations…" *Id.* at (4) (citing Ind. Code § 34-6-2-110).

Indiana Plaintiffs Scott County, Orange County, City of Madison and City of Austin filed their actions between March 29, 2021 and April 19, 2021.  *See* Scott County, Indiana Class Action Compl., 21-cv-6237, ECF No. 1; Orange County, Indiana Class Action Compl., 21-cv-5344, ECF No. 1; City of Madison, Indiana Class Action Compl., 21-cv-5402, ECF No. 1; City of Austin, Indiana Class Action Compl., 21-cv-5403, ECF No. 1.  Each seeks remediation to

– 44 –

1  address the impact of the opioid epidemic.  *See id.*  Accordingly, their lawsuits are statutorily

2  barred and should therefore be dismissed for this additional, independent reason.

3  **V.     CONCLUSION**

4          For the foregoing reasons, McKinsey respectfully requests that the Court dismiss in their

5  entirety the claims of Plaintiffs in the Subject States.

6

7  Dated:     New York, New York          **STROOCK & STROOCK & LAVAN LLP**
              December 23, 2021
8
                                           By:   /s/ *David M. Cheifetz*
9                                          James L. Bernard (Admitted *Pro Hac Vice*)
                                           (jbernard@stroock.com)
10                                         David M. Cheifetz (Admitted *Pro Hac Vice*)
                                           (dcheifetz@stroock.com)
11                                         Daniel J. Yost (Admitted *Pro Hac Vice*)
                                           (dyost@stroock.com)
12                                         180 Maiden Lane
                                           New York, NY 10038
13                                         Phone: (212) 806-5400

14
                                           **HINSHAW & CULBERTSON LLP**
15
                                           Vaishali S. Rao (*Pro Hac Vice* Pending)
16                                         (vrao@hinshawlaw.com)
                                           Sarah E. King (*Pro Hac Vice* Pending)
17                                         (sking@hinshawlaw.com)
                                           151 North Franklin Street
18                                         Chicago, IL 60606
                                           Phone: (312) 704-3000
19
                                           **MORRISON & FOERSTER LLP**
20
                                           Jessica Kaufman (Admitted *Pro Hac Vice*)
21                                         (jkaufman@mofo.com)
                                           Mark David McPherson (CA SBN 307951)
22                                         (mmcpherson@mofo.com)
                                           250 West 55th Street
23                                         New York, NY 10019
                                           Phone: (212) 468-8000
24

25

26

27

28

– 45 –

**CLARENCE DYER & COHEN LLP**

Josh A. Cohen (CA SBN 217853)
(jcohen@clarencedyer.com)
Shaneeda Jaffer (CA SBN 253449)
(sjaffer@clarencedyer.com)
899 Ellis Street
San Francisco, CA 94109
Phone: (415) 749-1800

*Attorneys for Defendants McKinsey & Company, Inc., McKinsey & Company, Inc. United States, McKinsey & Company, Inc. Washington D.C., and McKinsey Holdings, Inc.*

– 46 –