1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE: MCKINSEY & CO., INC.              Case No. 21-md-02996-CRB (SK)
     NATIONAL PRESCRIPTION OPIATE
12   CONSULTANT LITIGATION                    **SUBDIVISION PLAINTIFFS'**
                                              **OPPOSITION TO MCKINSEY**
13   This Document Relates to:                **DEFENDANTS' MOTION TO DISMISS**
                                              **ON THE GROUNDS OF RES JUDICATA**
14   ALL SUBDIVISION ACTIONS                  **AND RELEASE**

15

16                                            **JUDGE:  Hon. Charles R. Breyer**
                                              **DATE:    March 31, 2022**
17                                            **TIME:    10:00 AM**
                                              **CTRM.: 6, 17th FLOOR**
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION .................................................................................................. 1

II. BACKGROUND ................................................................................................... 7

III. ARGUMENT ...................................................................................................... 10

    A.  McKinsey's motion to dismiss on the basis of res judicata should be
denied. .......................................................................................................... 10

        1.  Res judicata is an affirmative defense not ordinarily resolvable on a
motion to dismiss. ............................................................................. 12

        2.  McKinsey must prove the elements of claim preclusion for each
state. .................................................................................................. 13

        3.  McKinsey cannot show that the Attorneys General intended to
release subdivision claims. ................................................................ 14

            a.  The consent judgments are silent as to subdivision claims. .......... 14

            b.  The release does not include subdivision claims. ....................... 16

            c.  The terms of the injunction confirm the release does not
include subdivision claims. ........................................................ 18

            d.  The exclusions do not expand the scope of the release. .............. 18

            e.  The meaning of an ambiguous contract cannot be
determined on a motion to dismiss. ............................................ 20

        4.  The States were not in privity with the subdivisions. ............................. 20

            a.  McKinsey cannot establish as a matter of law that cities and
counties have no distinct, local interests. .................................... 21

            b.  Privity is a factual determination based on a case-by-case
analysis of the relationship and interests of the parties. .............. 26

            c.  Privity between state and local governments requires
distinctive facts not present here. ................................................ 30

            d.  Subdivision claims for nuisance or unfair practices are not
precluded based on AG releases in Alabama, California,
Georgia, Illinois, Mississippi, New Mexico, Ohio, and
Tennessee. .................................................................................. 35

            e.  McKinsey's expansive view of government privity would
have untoward consequences for attorney general litigation. ...... 36

        5.  McKinsey cannot show that the Attorneys General had authority to
bring subdivision claims. .................................................................. 38

            a.  In eleven States, the Attorney General lacks the authority to
represent subdivisions. ............................................................... 40

            b.  In eleven States, it is unclear at best whether the Attorney
General can represent subdivisions. ............................................ 50

    B.  McKinsey's motion to dismiss based on release should be denied. .................. 58

IV. CONCLUSION .................................................................................................. 60

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*,
  No. 15-6314, 2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ................................. 59

*Aerojet-General Corp. v. Askew*,
  511 F.2d 710 (5th Cir. 1975) .................................................................. 33

*Agolf, LLC v. Vill. of Arlington Heights*,
  946 N.E.2d 1123 (Ill. App. 2011) ............................................................ 27

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
  458 U.S. 592 (1982) ............................................................................ 25

*Amador Cty., Cal. v. Salazar*,
  640 F.3d 373 (D.C. Cir. 2011) ................................................................ 14

*Arizona v. California*,
  530 U.S. 392 (2000) ............................................................................ 14

*Attorney Gen. of Tex. v. El Paso Indep. Auto. Dealers Ass'n*,
  966 S.W.2d 783 (Tex. App. 1998) ........................................................... 34

*Avery v. Midland Cty.*,
  390 U.S. 474 (1968) ............................................................................ 17

*Baraga Cty. v. State Tax Comm'n*,
  645 N.W.2d 13 (Mich. 2002) ................................................................. 35

*Barnhart v. Peabody Coal Co.*,
  537 U.S. 149 (2003) ............................................................................ 19

*Batiste v. City of Beaumont*,
  421 F. Supp. 2d 969 (E.D. Tex. 2005) ...................................................... 22

*Benson v. Wanda Petrol. Co.*,
  468 S.W.2d 361 (Tex. 1971) .................................................................. 27

*Brady v. Brooks*,
  89 S.W. 1052 (Tex. 1905) ..................................................................... 58

*Brown & Williamson Tobacco Corp. v. Gault*,
  627 S.E.2d 549 (Ga. 2006) .................................................................... 14

*BTC Leasing, Inc. v. Martin*,
  685 S.W.2d 191 (Ky. App. 1984) ............................................................ 11

*Cal. State Auto. Ass'n Inter-Ins. Bur. v. Sup. Ct.*,
  788 P.2d 1156 (Cal. 1990) .................................................................... 14

*CFTC v. Monex Credit Co.*,
  931 F.3d 966 (9th Cir. 2019) ................................................................. 12

*Chickasaw Nation v. United States*,
  534 U.S. 84 (2001) ............................................................................. 16

*Chun v. Bd. of Trs. of Emps.' Ret. Sys. of the State of Haw.*,
  952 P.2d 1215 (Haw. 1998) .................................................................. 42

*Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2002) ................................................................ 24

*City and Cty. of San Francisco v. Purdue Pharma L.P.*,
  491 F. Supp. 3d 610 (N.D. Cal. 2020) .................................................. 2, 21

# TABLE OF AUTHORITIES
## (continued)

Page

*City of Martinez v. Texaco Trading & Transp., Inc.*,
353 F.3d 758 (9th Cir. 2003) ..................................................................... 27, 32

*City of Naperville v. Morgan*,
466 N.E.2d 1349 (Ill. App. 1984) ...................................................................... 28

*City of New York v. Beretta U.S.A. Corp.*,
315 F. Supp. 2d 256 (E.D.N.Y. 2004) ................................................ 2, 23, 28, 29

*City of New York v. State*,
655 N.E.2d 649 (N.Y. 1995) ............................................................................... 46

*City of Sunland Park v. Harris News, Inc.*,
124 P.3d 566 (N.M. App. 2005) ........................................................................ 36

*Collyer v. State Tax. & Rev. Dep't Motor Vehicle Div.*,
913 P.2d 665 (N.M. App. 1995) ........................................................................ 33

*Commonwealth v. Carsia*,
517 A.2d 956 (Pa. 1986) .................................................................................... 57

*County of Santa Clara v. Atl. Richfield Co.*,
137 Cal. App. 4th 292 (Cal. App. 2006) ......................................................... 2, 23

*Cty. of Boyd v. US Ecology, Inc.*,
858 F. Supp. 960 (D. Neb. 1994), *aff'd*, 48 F.3d 359 (8th Cir. 1995) ............ 33, 34

*Cty. of Cook v. Wells Fargo & Co.*,
314 F. Supp. 3d 975 (N.D. Ill. 2018) ................................................................. 28

*Cty. of San Mateo v. McKinsey & Co., Inc.*,
No. 21-6009 (N.D. Cal.) ..................................................................................... 36

*Davis v. State*,
No. 31079, 2013 WL 1442183 (Mich. App. Apr. 9, 2013) ................................. 30

*De La Cruz v. Brown*,
109 S.W.3d 73 (Tex. App. 2003), *rev'd on other grounds*, 156 S.W.3d 560 (Tex. 2004) ........ 58

*Deflon v. Sawyers*,
137 P.3d 577 (N.M. 2006) .................................................................................. 27

*DKN Holdings LLC v. Faerber*,
352 P.3d 378 (Cal. 2015) ................................................................................... 30

*Doe v. St. Joseph's Catholic Church*,
850 S.E.2d 267 (Ga. App. 2020) ....................................................................... 36

*Doyle v. Smith*,
202 P.3d 856 (Okla. App. ss2008) .................................................................... 27

*Dyson v. State Personnel Bd.*,
213 Cal. App. 3d 711 (Cal. App. 1989) ............................................................. 34

*Ewald's Ex'r v. Louisville*,
232 S.W. 388 (Ky. 1921) .................................................................................... 30

*Ex Parte King*,
59 So. 3d 21 (Ala. 2010) ............................................................................. 50, 51

*Ex Parte Weaver*,
570 So. 2d 675 (Ala. 1990), *overruled on other grounds*, 57 So. 3d 704 (Ala 2010) .............. 51

*F.E.V. v. City of Anaheim*,
15 Cal. App. 5th 462 (Cal. App. 2017) ............................................................... 11

**TABLE OF AUTHORITIES**
(continued)

Page

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*,
  314 U.S. 95 (1941) ................................................................................................. 16

*Florida City Police Dep't v. Corcoran*,
  661 So. 2d 409 (Fla. App. 1995) ........................................................................... 41

*Froebel v. Meyer*,
  217 F.3d 928 (7th Cir. 2000) ................................................................................. 28

*Furnace v. Giurbino*,
  838 F.3d 1019 (9th Cir. 2016) ............................................................................... 11

*Grand Traverse Band of Ottowa & Chippewa Indiana v. Dir., Mich. Dep't of Nat'l Res.*,
  141 F.3d 635 (6th Cir. 1998) ................................................................................. 35

*Greenfield v. Mather*,
  194 P.2d 1 (Cal. 1948) ........................................................................................... 11

*Hansen v. Utah St. Ret. Bd.*,
  652 P.2d 1332 (Utah 1982) .................................................................................... 48

*Harris Cty., Tex. v. CarMax Auto Superstore Inc.*,
  177 F.3d 306 (5th Cir. 1999) ................................................................................. 28

*Henson v. Santander Consumer USA Inc.*,
  137 S. Ct. 1718 (2017) ........................................................................................... 18

*Holland v. Watson*,
  14 So.2d 200 (Fla. 1943) ........................................................................................ 41

*Howard v. City of Coos Bay*,
  871 F.3d 1032 (9th Cir. 2017) ............................................................................... 39

*Hudson v. City of Bossier*,
  766 So. 2d 738 (La. App. 2000) ............................................................................. 27

*Huelsman v. Kan. Dep't of Rev.*,
  980 P.2d 1022 (Kan. 1999) ..................................................................................... 27

*Hunter v. City of Leeds*,
  941 F.3d 1265 (11th Cir. 2019) ............................................................................. 34

*Huntington on the Green Condo. v. Lemon Tree I-Condo*,
  874 So. 2d 1 (Fla. App. 2004) ............................................................................... 14

*In re Arb. Between United Pub. Workers Local 646 & City & Cty. of Honolulu*,
  315 P.3d 233 (Haw. App. 2011) ............................................................................. 34

*In re Certified Question from U.S. Distr. Ct. for the East. Dist. of Mich.*,
  638 N.W.2d 409 (Mich. 2002) .......................................................................... 34, 35

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Prac. Litig.*,
  No. 12-2320, 2013 WL 1332097 (D.N.H. Apr. 2, 2013) ........................................ 59

*In re Est. of Bell*,
  976 So. 2d 965 (Miss. App. 2008) .......................................................................... 27

*In re Facebook, Inc. Consumer Privacy User Profile Litig.*,
  354 F. Supp. 3d 1122 (N.D. Cal. 2019) ................................................................. 32

*In re Forfeiture of Fourteen Thousand Six Hundred Thirty Nine Dollars In U.S. Currency In Various Denominations and Two Digital Pagers*,
  902 P.2d 563 (N.M. App. 1995) ............................................................................. 34

*In re iPhone Application Litig.*,
  844 F. Supp. 2d 1040 (N.D. Cal. 2012) ................................................................. 20

**TABLE OF AUTHORITIES**
(continued)

Page

*In re JUUL*,
   497 F. Supp. 3d 552 (N.D. Cal. 2020) ................................................................. 24

*In re Lease Oil Antitrust Litig. (No. II)*,
   16 F. Supp. 2d 744 (S.D. Tex. 1998), *aff'd*, 200 F.3d 317 (5th Cir. 2000) ............... 33

*In re MTBE*,
   725 F.3d 65 (2d Cir. 2013) ................................................................................. 24

*In re Nat'l Prescription Opiate Litig. (Lake Cty.)*,
   477 F. Supp. 3d 613 (N.D. Ohio 2020) ................................................................. 36

*In re Nat'l Prescription Opiate Litig.*,
   458 F. Supp. 3d 665 (N.D. Ohio 2020) ................................................................. 35

*In re Stephiana UU.*,
   887 N.Y.S.2d 699 (N.Y. App. 2009) ..................................................................... 31

*In re United Parcel Serv., Air-In-Ground Mkt. & Sales Prac. Litig.*,
   580 F. App'x 543 (9th Cir. 2014) ......................................................................... 59

*Johnson v. Gen. Motors Corp.*,
   574 S.W.3d 347 (Tenn. App. 2018) ...................................................................... 27

*Jones v. Royal Admin. Servs., Inc.*,
   887 F.3d 443 (9th Cir. 2018) ............................................................................... 60

*Kane v. City of Albuquerque*,
   358 P.3d 249 (N.M. 2015) .................................................................................. 46

*Kent Cty. Bd. of Educ. v. Bilbrough*,
   525 A.2d 232 (Md. 1987) ................................................................................... 36

*Lerner v. Los Angeles City Bd. of Educ.*,
   380 P.2d 97 (Cal. 1963) ..................................................................................... 34

*Lusnak v. Bank of Am., N.A.*,
   883 F.3d 1185 (9th Cir. 2018) ............................................................................. 12

*Marrese v. Am. Acad. of Orthopaedic Surgeons*,
   470 U.S. 373 (1985) .......................................................................................... 13

*Marshall Cty., Okla. v. Homesales, Inc.*,
   339 P.3d 878 (Okla. 2014) .................................................................................. 56

*Matsushita Elec. Indus. Co., Ltd. v. Epstein*,
   516 U.S. 367 (1996) .......................................................................................... 13

*Matter of Rhone-Poulenc Rorer, Inc.*,
   51 F.3d 1293 (7th Cir. 1995) ............................................................................... 5

*Matthews v. Pernell*,
   582 N.E.2d 1075 (Ohio App. 1990) ...................................................................... 28

*Mayer v. Bernalillo Cty.*,
   No. 18-666, 2018 WL 6594231 (D.N.M. Dec. 13, 2018)........................................... 46

*Mayor and City Council of Baltimore v. Monsanto Co.*,
   No. 19-483, 2020 WL 1529014 (D. Md. Mar. 31, 2020) .......................................... 24

*McDaniel v. Harleysville Mut. Ins. Co.*,
   84 So. 3d 106 (Ala. App. 2011)............................................................................ 27

*McHugh v. United Serv. Auto. Ass'n*,
   164 F.3d 451 (9th Cir. 1999) ............................................................................... 17

- v -

**TABLE OF AUTHORITIES**
(continued)

Page

*Medcalf v. Thompson Hine LLP*,
84 F. Supp. 3d 313 (S.D.NY. 2015) ........................................................................... 39

*Media Rts. Tech. v. Microsoft Corp.*,
922 F.3d 1014 (9th Cir. 2019) .................................................................................... 11

*Microsoft Corp. v. Hon Hai Precision Indus. Co., Ltd.*,
No. 19-1279, 2019 WL 3859035 (N.D. Cal. Aug. 16, 2019) ..................................... 20

*Moore v. Cty. of Alameda*,
411 U.S. 693 (1973) .................................................................................................... 17

*Nash Cty. Bd. of Educ. v. Biltmore Co.*,
640 F.2d 484 (4th Cir. 1981) ...................................................................................... 33

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*,
571 F.3d 299 (3d Cir. 2009) ....................................................................................... 27

*New Hampshire v. Dover*,
891 A.2d 524 (N.H. 2006) ..................................................................................... 31, 32

*Nijau v. Harford Cty.*,
No. 15-49, 2015 WL 7352215 (D. Md. Nov. 19, 2015) ............................................. 30

*Noel v. Hall*,
341 F.3d 1148 (9th Cir. 2003) .................................................................................... 13

*NORCAL Mut. Ins. Co. v. Newton*,
84 Cal. App. 4th 64 (Cal. App. 2000) ......................................................................... 59

*Norfolk S. Corp. v. Chevron U.S.A., Inc.*,
371 F.3d 1285 (11th Cir. 2004) .................................................................................. 19

*Nowak v. St. Rita High Sch.*,
757 N.E.2d 471 (Ill. 2001) .......................................................................................... 11

*Oswego Cty., Dep't of Social Servs. v. Duane E.*,
267 A.D.2d 1063 (N.M. App. 1999) ........................................................................... 31

*Pac. Gas & Elec. Co. v. Cty. of Stanislaus*,
947 P.2d 291 (Cal. 1997) ............................................................................................ 52

*Peelua v. Impac Funding Corp.*,
No. 12-611, 2015 WL 4042200 (Haw. App. July 2, 2015) ........................................ 27

*People ex rel. Bd. of Trustees of Univ. of Ill. v. Barrett*,
46 N.E.2d 951 (Ill. 1943) ............................................................................................ 42

*People ex rel. Devine v. Time Consumer Mktg., Inc.*,
782 N.E.2d 761 (Ill. Ct. App. 2002) ........................................................................... 42

*People ex rel. Harris v. Rizzo*,
214 Cal. App. 4th 921 (Cal. App. 2013) ..................................................................... 52

*People ex rel. Hartigan v. E&E Hauling*,
607 N.E.2d 165 (Ill. 1992) .......................................................................................... 42

*People v. ConAgra Grocery Prods. Co.*,
17 Cal. App. 5th 51 (Cal. App. 2017) ......................................................................... 24

*People v. Ingersoll*,
58 N.Y. 1 (N.Y. 1874) ................................................................................................ 47

*People v. New Penn Mines, Inc.*,
212 Cal. App. 2d 667 (Cal. App. 1963) ...................................................................... 36

**TABLE OF AUTHORITIES**
(continued)

Page

*People v. Townsend*,
233 N.Y.S. 632 (N.Y. Sup. Ct. 1929) ................................................................. 47

*Perdue v. Baker*,
586 S.E.2d 606 (Ga. 2003) ................................................................................... 53

*Pierce v. Sup. Ct.*,
37 P.2d 460 (Cal. 1937) ........................................................................................ 51

*Pinkard v. Morris*,
450 S.E.2d 330 (Ga. App. 1994) .......................................................................... 27

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995) .............................................................................................. 39

*Price v. Sacramento Cty.*,
6 Cal. 254 (Cal. 1856) .......................................................................................... 23

*Printz v. United States*,
521 U.S. 898 (1997) .............................................................................................. 39

*Proby v. State ex rel. West*,
498 So. 2d 792 (Miss. 1986) ................................................................................ 36

*Provident Funding Assocs., L.P. v. MDTR*,
257 So. 3d 1114 (Fla. App. 2018) ........................................................................ 11

*Quackenbush v. Allstate Ins. Co.*,
517 U.S. 706 (1996) .............................................................................................. 40

*Quinlan v. Jones*,
922 So. 2d 899 (Ala. App. 2004), *reversed on other grounds*, 922 So. 2d 914 (Ala. 2005) ..... 51

*R.J. Edwards, Inc. v. Hert*,
504 P.2d 407 (Oka. 1972) ..................................................................................... 56

*Reinhardt v. Cty. of Maui*,
23 Haw. 102 (Haw. 1915) ..................................................................................... 41

*Richards v. Jefferson Cty.*,
517 U.S. 793 (1996) ........................................................................................ 11, 20

*RMR Equip. Rental, Inc. v. Res. Fund 1347, LLC*,
65 Cal. App. 5th 383 (Cal. App. 2021) ................................................................ 14

*Roberts v. Commonwealth Dep't of Soc. Servs.*,
48 Va. Cir. 305 (Va. Cir. Ct. Mar. 23, 1999) ...................................................... 31

*Russello v. United States*,
464 U.S. 16 (1983) ................................................................................................ 18

*Saint v. Allen*,
134 So. 246 (La. 1931) .......................................................................................... 44

*Shearman v. Asher*,
851 So. 2d 1225 (La. App. 1997) .......................................................................... 14

*St. Paul Mercury Ins. Co. v. Williamson*,
224 F.3d 425 (5th Cir. 2000) ................................................................................ 13

*State ex rel. Att'y Gen. v. Burning Tree Club, Inc.*,
481 A.2d 785 (Md. App. 1984) ............................................................................ 44

*State ex rel. Att'y Gen. v. Reese*,
430 P.2d 399 (N.M. 1967) .................................................................................... 46

**TABLE OF AUTHORITIES**
(continued)

Page

*State ex rel. Bobo v. Moore Cty.*,
   341 S.W.2d 746 (Tenn. 1960) ............................................................... 33

*State ex rel. Caldwell v. Molina Healthcare, Inc.*,
   283 So. 3d 472 (La. 2019) ..................................................................... 43

*State ex rel. Derryberry v. Kerr-McGee Corp.*,
   516 P.2d 813 (Okla. 1973) ..................................................................... 56

*State ex rel. Dewine v. Crock Constr. Co.*,
   No. 13-405, 2014 WL 2999302 (Ohio App. June 16, 2013) ................... 33

*State ex rel. Inman v. Brock*,
   622 S.W.2d 36 (Tenn. 1981) ................................................................. 48

*State ex rel. Jones v. Doucet*,
   14 So. 2d 622 (La. 1943) ....................................................................... 43

*State ex rel. McKittrick v. Mo. Pub. Serv. Comm'n*,
   175 S.W.2d 857 (Mo. 1943) .................................................................. 45

*State ex rel. Nixon v. Am. Tobacco Co., Inc.*,
   34 S.W.3d 122 (Mo. 2000) .............................................................. 44, 45

*State ex rel. Patterson for Use and Benefit of Adams Cty. v. Warren*,
   180 So. 2d 293 (Miss. 1965) ................................................................. 55

*State ex rel. Wood v. Schweickardt*,
   19 S.W. 47 (Mo. 1891) ......................................................................... 23

*State of Fla. ex rel. Shevin v. Exxon Corp.*,
   526 F.2d 266 (5th Cir. 1976) ................................................................. 41

*State v. Block*,
   263 P.3d 940 (N.M. App. 2011) ............................................................ 45

*State v. Bryant*,
   151 N.E.3d 1096 (Ohio App. 2020) ...................................................... 11

*State v. Coker*,
   59 So. 3d 670 (Ala. 2010) ..................................................................... 14

*State v. Naylor*,
   466 S.W.3d 783 (Tex. 2015) ................................................................. 30

*State v. Tensas Delta Land Co.*,
   52 So. 216 (La. 1910) ........................................................................... 43

*State v. Wis. Tel. Co.*,
   284 N.W.2d 41 (Wis. 1979) .................................................................. 49

*State Water Control Bd. v. Smithfield Foods, Inc.*,
   542 S.E.2d 766 (Va. 2001) ............................................................. 26, 34

*Steen v. John Hancock Mut. Life Ins. Co.*,
   106 F.3d 904 (9th Cir. 1997) ........................................................... 13, 40

*Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*,
   110 A.D.3d 87 (N.Y. App. 2013) ......................................................... 26

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ................................................................. 11, 12, 20

*Tenorio v. San Miguel Det. Ctr.*,
   No. 15-349, 2016 WL 9819588 (D.N.M. Aug. 11, 2016) ..................... 46

**TABLE OF AUTHORITIES**
(continued)

Page

*Turtle Island Restoration Network v. U.S. Dep't of State*,
  673 F.3d 914 (9th Cir. 2012) ................................................................ 36

*United States v. Collins*,
  854 F.3d 1324 (11th Cir. 2017) ........................................................... 16

*United States v. Ledee*,
  772 F.3d 21 (1st Cir. 2014)................................................................... 29

*United States v. Motor Vehicle Mfrs. Assoc.*,
  643 F.2d 644 (9th Cir. 1981) ................................................................ 14

*Ute Indian Tribe of the Uintah & Ouray Res. v. Utah*,
  790 F.3d 1000 (10th Cir. 2015) ...................................................... 30, 31

*van't Rood v. County of Santa Clara*,
  113 Cal. App. 4th 549 (Cal. App. 2003)............................................... 60

*VHS Huron Valley Sinai Hosp. v. Sentinel Ins. Co.*,
  916 N.W.2d 218 (Mich. App. 2018)...................................................... 14

*Vilas v. City of Manila*,
  220 U.S. 345 (1911)............................................................................. 21

*Wadell v. Stevenson*,
  683 S.W.2d 955 (Ky. App. 1984)......................................................... 27

*Washburn Cty. v. Thompson*,
  75 N.W. 309 (Wis. 1898)...................................................................... 49

*Washington v. Chimei Innolux Corp.*,
  659 F.3d 842 (9th Cir. 2011) ................................................................ 25

*Watson v. Caldwell*,
  27 So. 2d 524 (Fla. 1946) .................................................................... 40

*Welch v. Johnson*,
  907 F.2d 714 (7th Cir. 1990) ................................................................ 13

*Welsh v. Gerber Prods., Inc.*,
  555 A.2d 486 (Md. 1989) ..................................................................... 14

*Williams v. Apple, Inc.*,
  449 F. Supp. 3d 892 (N.D. Cal. 2010).................................................. 20

*Wilson v. City of Central City*,
  372 S.W.3d 863 (Ky. 2012)............................................................ 53, 54

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992)............................................................................. 25

*Yates v. United States*,
  574 U.S. 528 (2015)............................................................................. 18

**Statutes**

28 U.S.C. § 1738 ........................................................................................ 13

Ala. Code § 11-1-10 ................................................................................... 50

Ala. Code § 11-40-1 ................................................................................... 50

Ala. Code § 11-80-8.1 ................................................................................ 50

Ala. Code § 36-15-15 ................................................................................. 51

Ala. Code § 36-15-21 ................................................................................. 50

**TABLE OF AUTHORITIES**
(continued)

Page

Ala. Code § 8-19-8 ................................................................................. 36

Ala. Code § 8-9-10 ................................................................................. 36

Ala. Code § 9-10-42 ............................................................................... 50

Ala. Code § 9-3-18(b) ............................................................................ 50

Cal. Bus & Prof. Code § 16750(c) ........................................................ 52

Cal. Civ. P. Code § 731 ................................................................... 35, 52

Cal. Gov't Code § 12652(a) ................................................................... 52

Cal. Gov't Code § 23004 ................................................................. 23, 51

Cal. Gov't Code § 26520 ....................................................................... 51

Cal. Gov't Code § 26529 ....................................................................... 51

Cal. Gov't Code § 34501 ....................................................................... 23

Cal. Gov't Code § 8670.7 ...................................................................... 32

Fla. Stat. § 125.15 ................................................................................. 41

Fla. Stat. § 16.01(4) .............................................................................. 40

Ga. Code § 36-1-3 ................................................................................. 53

Ga. Code § 36-1-5 ................................................................................. 53

Ga. Code § 36-33-5(f) ........................................................................... 53

Ga. Code § 41-2-2 ................................................................................. 36

Ga. Code § 45-15-3(6) .......................................................................... 52

Ga. Code § 9-10-2 ................................................................................. 53

Ga. Code §§ 23-3-121-122 .................................................................... 53

Haw. Stat. § 26-7 .................................................................................. 41

Haw. Stat. § 28-01 ................................................................................ 41

Haw. Stat. § 46-1.5(22) ........................................................................ 41

55 Ill. Stat. 5/5-1001 ............................................................................ 42

65 Ill. Stat. 5/2-2-12 ............................................................................. 42

815 Ill. Stat. § 505/10A ................................................................... 36, 43

815 Ill. Stat. § 505/7 ....................................................................... 36, 43

Ind. Stat. § 4-16-15-1 ............................................................................. 5

Ind. Stat. § 4-6-15-2(a) ........................................................................... 5

Ind. Stat. § 4-6-15-2(b)-(c) ..................................................................... 6

Ind. Stat. § 4-6-15-4(a) ........................................................................... 5

Ky. Rev. Stat. § 15.020(3) ..................................................................... 54

Ky. Rev. Stat. § 15-020(1) ..................................................................... 53

Ky. Rev. Stat. § 65.045 ......................................................................... 54

Ky. Rev. Stat. § 67.080(1)(e) ................................................................ 54

Ky. Rev. Stat. § 69.210(1) ..................................................................... 54

La. Stat. § 49:257(A) ............................................................................. 43

La. Stat. § 49:257(D) ............................................................................. 43

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Md. State Gov't Code, § 6-107 ................................................................................ 44

4

Miss. Code § 11-45-1 ............................................................................................... 55

Miss. Code § 11-45-11 ............................................................................................. 55

5

Miss. Code § 11-45-17 ............................................................................................. 55

Miss. Code § 11-45-25 ............................................................................................. 55

6

Miss. Code § 11-46-1(i) ........................................................................................... 55

7

Miss. Code § 11-46-1(j) ........................................................................................... 55

Miss. Code § 7-5-1 ................................................................................................... 54

8

Mo. Stat. § 56.640 .................................................................................................... 45

9

Mo. Stat. § 98.330 .................................................................................................... 45

N.H. Rev. Stat. § 481:1 ............................................................................................ 32

10

N.H. Rev. Stat. § 485:20 .......................................................................................... 32

11

N.H. Stat. § 126-A:84 ................................................................................................ 6

12

N.M. Stat. § 3-18-1 .................................................................................................. 46

N.M. Stat. § 8-5-2 .................................................................................................... 45

13

N.M. Stat. § 8-5-3 .................................................................................................... 45

14

N.Y. Cty. Law § 3 .................................................................................................... 46

N.Y. Cty. Law § 51 .................................................................................................. 46

15

N.Y. Exec. Law § 63 ................................................................................................ 46

16

N.Y. Exec. Law § 63-c(1) ........................................................................................ 47

N.Y. Gen. Mun. Law § 2 .......................................................................................... 46

17

N.Y. Mun. Home Rule Law § 10 ............................................................................. 23

18

N.Y. Mun. Home Rule Law § 20 ............................................................................. 23

N.Y. Mun. Home Rule Law § 35 ............................................................................. 23

19

N.Y. Mun. Home Rule Law §§ 50-54 ..................................................................... 23

20

Ohio Rev. Code § 102.01(3) .................................................................................... 56

Ohio Rev. Code § 109.02 ......................................................................................... 56

21

Ohio Rev. Code § 109.36(B) .................................................................................... 56

22

Ohio Rev. Code § 305.12 ......................................................................................... 56

Okla. Stat. Title 11 § 22-101 .................................................................................... 56

23

Okla. Stat. Title 19 § 1 ............................................................................................. 56

24

Okla. Stat. Title 74 § 18b ......................................................................................... 56

16 Pa. Stat. § 202 ..................................................................................................... 57

25

71 Pa. Stat. § 1991 ................................................................................................... 57

26

71 Pa. Stat. § 732-204(c) ......................................................................................... 57

71 Pa. Stat. § 733-506 .............................................................................................. 57

27

Tenn. Code § 8-6-109(b)(1) ..................................................................................... 47

28

Tenn. Code § 20-13-203 .......................................................................................... 48

Tenn. Code § 29-3-103 ............................................................................................ 36

**TABLE OF AUTHORITIES**
(continued)

Page

Tenn. Code § 5-6-112(1) ........................................................................................ 47

Tenn. Code § 6-33-113(b)(1) ................................................................................. 47

Tenn. Code § 8-6-109(b)(14) ................................................................................. 47

Tenn. Code § 8-6-301(a) ........................................................................................ 47

Tenn. Code § 8-6-301(b) ........................................................................................ 47

Tex. Bus. & Com. Code § 15.40(a) ....................................................................... 58

Tex. Gov't Code § 403.501(5) ................................................................................. 7

Tex. Gov't Code § 418.195(b) ............................................................................... 58

Tex. Gov't Code § 504.503(c) ................................................................................. 7

Utah Code § 17-18a-202 ........................................................................................ 48

Utah Code § 17-18a-501 ........................................................................................ 48

Utah Code § 17-18a-601 ........................................................................................ 48

Utah Code § 17-50-101 .......................................................................................... 48

Utah Code § 17-50-302 .......................................................................................... 48

Utah Code § 67-5-1(2) ........................................................................................... 48

Va. Code § 15.2-1402 ............................................................................................ 57

Va. Code § 15.2-1404 ............................................................................................ 57

Va. Code § 15.2-822 .............................................................................................. 57

Va. Code § 15.2-900 .............................................................................................. 57

Va. Code § 2.2-507 ................................................................................................ 57

Wis. Stat. § 165.12(2) ............................................................................................ 50

Wis. Stat. § 165.12(2)-(4) ........................................................................................ 6

Wis. Stat. § 165.12(4) ............................................................................................ 50

Wis. Stat. § 165.25(15) .......................................................................................... 49

Wis. Stat. § 165.25(1m) ......................................................................................... 49

Wis. Stat. § 165.25(4) ............................................................................................ 49

Wis. Stat. § 59.01 .................................................................................................. 49

Wis. Stat. § 59.42(2)(b) ......................................................................................... 49

Wis. Stat. § 60.01 .................................................................................................. 49

Wis. Stat. § 62.09(12) ............................................................................................ 49

Wis. Stat. § 63.29 .................................................................................................. 49

Wis. Stat. § 66.0213 .............................................................................................. 49

Woodbury, Ga. City Charter .................................................................................. 53

**Rules**

Fed. R. Civ. P. 8(c)(1) ...................................................................................... 12, 58

**Treatises**

46 Am. Jur. 2d Judgments ...................................................................................... 27

Carolyn L. Carter et al., *Unfair and Deceptive Acts and Practices* (9th ed. 2016) ......... 8

David B. Brooks, *Texas Practice Series, County & Special District Law* (2d ed.) ...... 58

**TABLE OF AUTHORITIES**
(continued)

Page

McQuillin, The Law of Municipal Corporations (3d ed.)........................................................ 21, 22

Moore's Fed. Prac. (3d ed.)........................................................................................................ 21

Restatement (Second) of Judgments (1982) ............................................................................. 26

Wright & Miller, Fed. Prac. & Proc. (3d ed.) ................................................................. 14, 20, 30

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012)...... 19

Cal. AB-6 (2019-20 Session) ...................................................................................................... 6

Lynn A. Baker & Daniel B. Rodriguez, *Constitutional Home Rule and Judicial Scrutiny*,
   86 Denv. U. L. Rev. 1337 (2009) ......................................................................................... 22

Margaret H. Lemos, *State-Local Litigation Conflicts*,
   2021 Wisc. L. Rev. 971 (2021) ............................................................................................. 40

Micah L. Berman, *Using Opioid Settlement Proceeds for Public Health: Lessons from the
   Tobacco Experience*, 67 Kan. L. Rev. 1029 (2019) .............................................................. 38

Nora Freeman Engstrom & Robert L. Rabin, *Pursuing Public Health Through Litigation: Lessons
   from Tobacco and Opioids*, 73 Stan. L. Rev. 285 (2021).......................................................... 38

Paul Diller, *Why Do Cities Innovate in Public Health*,
   91 Wash. U. L. Rev. 1219 (2014)........................................................................................... 22

Sarah L. Swan, *Preempting Plaintiff Cities*,
   45 Fordham Urban L.J. 1241 (2018) ............................................................................... 24, 40

Tex. Senate Bill 1827 (2021-22 Session).................................................................................... 7

**Constitutional Provisions**

Fla. Const. Art. VIII, § 2(b) ....................................................................................................... 22

Ga. Const. Art. IX § II ¶¶ I & II.................................................................................................. 52

N.M. Const. art X, § 6(E)............................................................................................................ 46

N.Y. Const. art. IX, § 1 .............................................................................................................. 23

N.Y. Const. art. IX, § 2 .............................................................................................................. 23

I.      **INTRODUCTION**

As of February 3, 2021, no State had sued McKinsey for its role in the opioid crisis (several subdivision cases were, however, on file). No case was filed, let alone litigated. No motions were brought. No formal discovery was conducted. By the close of business on February 4, the States simultaneously filed cookie-cutter complaints and near-uniform consent judgments releasing McKinsey (for $600 million) from "all claims that Signatory Attorney General is authorized by law to bring" related to McKinsey's opioid work.

No city or county was party to the state settlements. With one immaterial exception, no state complaint so much as mentioned claims on behalf of, or harm to, anyone other than a state or its residents. Instead, the eight-page complaints each asserted a single claim (violation of the State's unfair trade practices act), sought injunctive relief and civil penalties, and alleged that McKinsey's "acts or practices injured consumers in the State" or the state itself. The consent judgments were no different: they were simply silent as to a great universe of claims that the settling parties were aware could, and likely would, be asserted by local governments for their own injuries.

Now McKinsey asserts that these carbon-copy judgments immunize it from *all* claims asserted by subdivisions in twenty-three States.[1] McKinsey's core arguments are that subdivisions lack *any* distinct interest or identity from their states; that the States, because they possess the sovereign power to create or eliminate subdivisions, by definition did in fact preclude subdivision litigation; and that state law clearly, uniformly, and categorically authorizes state attorneys general to settle subdivision claims, without notice, participation, consent, or consideration on the part of the affected subdivisions.

This is fiction piled on fiction. *First*, McKinsey posits that the subdivision actions are undifferentiated from the *parens patriae* claims settled by the state AGs. They are not. As the subdivision master complaint (Doc. 296) makes clear, the named subdivisions pursue damages and remedies for harm to themselves for local undertakings in response to the opioid epidemic, not harm to the States, and not as *parens patriae*. It would be convenient for McKinsey if

---

[1] Now twenty-two, given the enactment of the Indiana bar statute.

subdivisions had no identity, function, or role to perform or protect, but it isn't true. As the Chamber of Commerce's amicus brief illustrates, it is commonplace for subdivisions to litigate their own interests and harms distinct from those of their states or their residents, and they have long done so. *See, e.g.*, *County of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292 (Cal. App. 2006) (lead); *City of New York v. Beretta U.S.A. Corp.*, 315 F. Supp. 2d 256 (E.D.N.Y. 2004) (guns). The opioid crisis is no different. *See In re Nat'l Prescription Opiate Litig. (Monroe Cty.)*, 458 F. Supp. 3d 665, 675 (N.D. Ohio 2020) (rejecting the argument that because "the opioid crisis is a statewide … concern," a county's "claims necessarily seek to vindicate the state's interest," and explaining that the county "clearly seeks recovery for its own harms, and not on behalf of the state as a whole"). Subdivisions have their own role in responding to the epidemic, providing services that the state does not: e.g., police, emergency response, and rescuing local residents in acute distress. *See, e.g.*, *City and Cty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 629 (N.D. Cal. 2020) (alleged harm to San Francisco).

For more than six years, hundreds of cities and counties have litigated their own claims in the national opioid MDL. Several bellwethers have gone to verdict, or are in the midst or on the precipice of trial. National settlements with three major distributors and Johnson & Johnson ("J&J") provide for resolution and payment of both state and subdivision claims, including a process for them to agree on allocations that ensure the $26 billion is shared between states and subdivisions, and is directed to opioid abatement. *See* https://nationalopioidsettlement.com/. On November 23, 2021, a federal jury returned a public nuisance liability verdict against chain pharmacy defendants for the harms caused to two Ohio counties (not the State of Ohio, not all Ohio subdivisions); the MDL court will conduct the remedy phase of that bellwether in May 2022. And on December 30, 2021, a New York jury returned verdicts on separate nuisance claims by two counties and the State of New York as co-plaintiffs, with different counsel of record, individualized evidence, and separate judgments for each, and with the jury assigning a degree of fault to the State but none to the counties. *See* Ex. B (verdict forms). If McKinsey is right and subdivisions' interests are entirely redundant of the States', then what has everyone been doing all this time? If an AG settlement could easily extinguish subdivision claims, then why did the

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

distributors and J&J instead enter into settlements that require separate releases from subdivisions (or statutory bars accomplishing the same result)?

*Second*, McKinsey asserts that because subdivisions are creatures of the state, their claims were by definition resolved by the AG settlements. The premise does not answer the questions presented to the Court. The relevant inquiry is not whether a state has the foundational power to create subdivisions, but how the different states established their subdivisions, what rights and liabilities these subdivisions were assigned, and how other sub-state actors may represent (or not) those rights, questions on which the motion, its appendices, and its supporting amici are conspicuously silent.

That a state legislature may have the power to create subdivisions does not mean that state law, having authorized subdivisions to exist and to sue, dictates that those subdivisions' interests are part of an undifferentiated "public interest," or permits resolution of their claims by the state AG in this manner. Essentially, McKinsey asks the Court to step into the shoes of the state legislatures and bar claims of subdivisions using the fullest legislative power of the state, when the legislatures themselves have not done that. Instead, state AGs entered into agreements resolving certain claims. The question is whether those agreements could have, and in fact did, resolve subdivision claims, not whether states have the right to destroy subdivisions as a matter of state constitutional structure.

*Third*, McKinsey contends that state law uniformly authorizes state attorneys general to bring and settle subdivision claims, the paucity of actual examples of the exercise of this asserted power notwithstanding. The argument is remarkable. For as many years as opioid cases have been pending, at least, the delineation of authority between state attorneys general and subdivisions has been a subject of much debate and uncertainty. *See, e.g.*, *In re Nat'l Prescription Opiate Litig. (Summit County)*, No. 17-2804, Doc. 1025, at 98-100 (N.D. Ohio Oct. 5, 2018), *report and recommendation adopted*, 2018 WL 6628898 (N.D. Ohio. Dec. 19, 2018) (rejecting argument that pending litigation by Ohio AG precluded subdivision lawsuit). With rare exceptions, the AGs themselves have generally avoided seeking authoritative answers to these thorny political questions in opioid litigation, not filing state court actions to clarify the law, intervening in any

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

subdivision case, nor seeking to enforce the McKinsey releases in the state courts in which they were entered (despite the consent decrees expressly reserving state court jurisdiction to do so).

Yet, according to McKinsey, the answer in every state is as simple as identifying the AG as "the chief legal officer" of the state, Mot., App. I, and noting that (in some states) the AG has common law powers, Mot., App. J. As one would expect given the specter this issue has cast in opioid litigation, reality is much more complicated and varies state-to-state. In some states, the best reading of state law is that AGs *lack* the power to represent subdivisions; in others, state law on the matter is simply unclear. Indeed, until the filing of this motion, McKinsey itself conceded that analysis of this issue would vary in difficulty from one state to another. *See* Doc. 123 at 2 ("McKinsey proposes initially briefing the issue with respect to a subset of the states where it believes the law clearly supports dismissal of the political subdivisions' lawsuits.").

The body of law on the interrelationships of states and their cities and counties is more dimensional and nuanced, and has evolved further, than McKinsey's brief admits. The accompanying report of Professor Richard Briffault (attached as Exhibit A), who has devoted his life to the study and teaching of the law of state and local governments, is respectfully submitted to provide this background for the Court.

*       *       *

At bottom, McKinsey asks this Court to serve as a national state legislature in chief and impose through writ what the political process in the States has not done. As leery as federal courts should be of substituting themselves for state common law in a post-*Erie* world, the reluctance should be all the greater when it comes to refashioning the core political institutions of the States. In the actions presented to this Court, cities and counties claim damages for their direct losses, for the harms done to them in discharging the local responsibilities they perform under actual state law. Their legal rights and their ongoing need and entitlement to seek legal redress impose no obligation on them to either cede their legal claims to public authorities not authorized to speak for them, or to desist from actions before this Court.

Whatever the wisdom of McKinsey's desire for states to vest all litigation and settlement authority in the control of attorneys general, it should be self-evident that a declaratory ruling by a

federal court is not how our constitutional system envisions the allocations of authority within the States. What is striking about the Chamber's brief (and confirmed by the amicus submitted by 11 state AGs, most of whom represent states not even implicated here), is recognition that McKinsey's preferred outcome is not application of the "actual law of any jurisdiction," but instead the imposition of "a kind of Esperanto" nationwide law, and a plea to override contrary or indeterminate state law standing in the way. *Matter of Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1300 (7th Cir. 1995). The best evidence of this recognition is that the States themselves, including the amici, negotiated and signed onto the Distributor/J&J settlements with their carefully crafted coordination mechanisms that these eleven states now urge are not necessary as a matter of law.[2]

Remarkably, the processes of political reexamination of legal authority over the very claims at issue here are underway right now. For example, McKinsey correctly argues that Indiana has enacted a statute that bars Indiana subdivision claims. *See* Ind. Stat. §§ 4-16-15-1, *et seq*. (The retroactive statute did not exist when the Indiana subdivision cases were filed; all but one of those cases have now been voluntarily dismissed). This statute identifies and balances competing policy values in opioid litigation. For example, the law provides that subdivisions are "party to any settlement … in opioid litigation by the attorney general," *id.* § 4-6-15-2(a), but at the same time allocates any "[f]unds received from opioid litigation settlements" three ways: 15% "for the benefit of the state," 15% "for distribution to cities, counties, and towns," and 70% "to be used for statewide treatment, education, and prevention programs for opioid use disorder." *Id.* § 4-6-15-4(a). This approach—adopting the "default" allocation in the Distributor/J&J agreements—acknowledges the value of a statewide approach to opioid litigation, but balances that against the need to give subdivisions both a seat at the table and the right to benefit from any settlements. This is how state law and policy determinations are and should be made, not through aggressive application of res judicata and third-party release in federal court. But, according to

---

[2] Of the amici states, only three (Ohio, Louisiana, and Texas) are implicated in this motion. In Louisiana, it is clear that the AG cannot represent subdivisions. *See* Section III.A.5.a. In Ohio and Texas, the scope of the AGs' power is, at best, unclear as a matter of state law and cannot be resolved by this motion. *See* Section III.A.5.b. The existence of this power is necessary, but not itself sufficient, to establish McKinsey's affirmative defenses. *See* Sections III.A.1-4.

- 5 -

1  McKinsey, this was all a useless exercise since this could have all been determined as a matter of
2  law by a federal court without any action by the Indiana legislature.

3       The Indiana statute also dispels the myths undergirding McKinsey's motion. By
4  guaranteeing subdivisions an independent share of any opioid settlement, the Indiana legislature
5  recognized that subdivisions possess what McKinsey's motion denies: legitimate, distinct, and
6  real harms and responsibilities in connection with, and distinct abilities to respond to, the opioid
7  crisis. And, critically, while the Indiana statute bars subdivision litigation after January 1, 2021, it
8  permits any subdivision that filed before that date to "opt out of" AG opioid settlements "and
9  choose to pursue its own claims." *Id.* § 4-6-15-2(b)-(c). This, too, is fatal to McKinsey's
10 positions. By permitting subdivisions to opt out, the statute recognizes that in Indiana, as in other
11 states, subdivisions have their own independent claims properly pursued separately from any AG
12 litigation or settlement.

13      It goes without saying that this Court must defer to the result of the legislative process in
14 Indiana. But also deserving of deference are the choices of other states, such as California, *not* to
15 adopt such legislation. *See* Cal. AB-6 (2019-20 Session) (unenacted bill that would have
16 "authorize[d] the Attorney General to release any claim related to the subject matter of [an
17 opioid] settlement that may be brought by a government entity").[3] Or to establish opioid funding
18 schemes, but deliberately *not* preclude subdivision lawsuits. *See, e.g.*, N.H. Stat. § 126-A:84, *et*
19 *seq.* Or to bar litigation after June 2021, but only with assurances that subdivision interests are
20 protected. *See*, *e.g.*, Wis. Stat. § 165.12(2)-(4) (requiring the state attorney general to "cooperate
21 with local governments … in entering into a joint settlement" of opioid litigation with "70 percent
22 of the settlement proceeds [] payable to local governments," money that may not "be considered
23 moneys of the state").

24      Texas is another perfect example. There, the legislature considered, but declined to adopt,
25 a provision that would have accomplished what McKinsey seeks by motion. *See* Tex. Senate Bill

26
27
28

---

[3] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB6

1827 (2021-22 Session)[4] ("A governmental entity may not bring an action asserting a claim that was released under a statewide opioid settlement agreement entered into by the attorney general." … "A court shall dismiss with prejudice" pending actions). Instead, in Texas, the as-enacted statute expressly contemplates subdivisions maintaining and resolving their own opioid cases. *See* Tex. Gov't Code § 403.501(5) (defining "Statewide opioid settlement agreement" to include "agreements … entered into by this state through the attorney general [or] political subdivisions that have brought a civil action for opioid-related harm claim … that provide relief for this state and political subdivisions of this state"). The law then directs proceeds into an abatement fund administered by a "Texas Opioid Abatement Fund Council," a body that must include members nominated by "the governing bodies of counties and municipalities that [] brought a civil action for an opioid-related harm [and] released an opioid-related harm." *Id.* § 504.503(c).

McKinsey's motion asks the Court to substitute its judgment on the powers of attorneys general, such as those in Texas and California, for the decisions of the respective states' legislatures. To state this proposition is to encapsulate its absurdity. The ongoing consideration, debate, and differing outcomes of such statutes demonstrate both that McKinsey's casually capacious understanding of pre-existing state AG power cannot be correct (otherwise, there would be no need for such statutes), and that McKinsey's public policy concerns should be (and are being) resolved through state political processes, not federal judicial declaration.

## II.    BACKGROUND

There are two documents in each state attorney general case: the complaint and the judgment. The complaints invoke the following sources of attorney general authority: (1) to enforce the state's consumer protection statute; (2) to recover for harm to the state; and (3) to recover for harm to the state's citizens as *parens patriae*. For example, New York:

---

[4] https://legiscan.com/TX/amendment/SB1827/id/109603/Texas-2021-SB1827-Senate_Amendment_S_2_F1-Huffman.html

1

2

3

4

5

6

7

8

9

> **I.    Parties**
>
> 1.    Plaintiff is the The People of the State of New York, through its attorney, Letitia James, Attorney General of the State of New York. The Attorney General is charged with, among other things, enforcing and seeking redress for violations of New York consumer protection laws, including New York General Business Law Art. 22-A, § 349.
>
> 2.    The Attorney General is authorized to bring this action in her *parens patriae* capacity, as New York has a quasi-sovereign interest in the health and well-being—physically and economically— of its citizens who have suffered because of McKinsey's conduct. The State of New York, as a legal entity, has suffered harm and losses as a direct and proximate result of McKinsey's conduct in violation of New York General Business Law Art. 22-A, § 349.

10

11

12

McKinsey Ex. CC ¶¶ 1-2. Each complaint asserted a single claim: violation of the state's unfair trade practices act. In the few paragraphs setting out its basis, each complaint asserted harm only to (1) consumers in the state or (2) consumers and the state itself:

13

14

> **IV.    Claims for Relief**
>
> **First Claim for Relief**
>
> **Violation of New York General Business Law § 349**

15

16

17

18

19

20

21

22

> 34.    Plaintiff realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if they were set out herein.
>
> 35.    In the course of its business, McKinsey worked with certain of its opioid manufacturing clients to promote and sell more opioids to more patients for longer periods of time.  McKinsey's actions constituted deceptive and unfair trade practices that are prohibited by New York General Business Law § 349.
>
> 36.    The acts or practices described herein occurred in business, trade or commerce as defined in New York General Business Law § 349.
>
> 37.    These acts or practices injured consumers in the State of New York.  McKinsey's actions directly and proximately caused New York's injuries.

23

24

25

26

27

28

*Id.* ¶¶ 34-37. Similarly, the relief sought was tailored to the unfair practices claim asserted: injunctive relief and "financial payments" or "monetary relief" plainly referring to the civil penalties generally available under those statues for AG claims (and not for subdivision claims). *See* Carolyn L. Carter et al., *Unfair and Deceptive Acts and Practices* § 13.5.3.1 (9th ed. 2016) ("Generally only the attorney general or other designated enforcement authority can seek civil penalties."). New York:

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1

2

3

4

5

6

7

8

9

10

11

### V.     Request for Relief

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an Order:

    a.  Adjudging and decreeing that McKinsey has engaged in the acts or practices complained of herein, and that such constitute deceptive acts or practices in violation of New York General Business Law Art. 22-A, § 349;

    b.  Issuing a permanent injunction prohibiting McKinsey, its agents, servants, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, from engaging in deceptive trade practices;

    c.  Ordering McKinsey to pay monetary relief in the amount of up to $32,158,566.52 for violation of the laws set forth above of the State of New York;

    d.  Ordering McKinsey to pay costs for the prosecution and investigation of this action, plus an additional allowance of $2,000 as provided in Civil Practice Law and Rules § Section 8303(a)(6).

    e.  Ordering such other and further relief as the Court may deem just and proper.

12

*Id.* ¶ V. No complaint, with one immaterial exception, even mentioned harm to cities or counties.[5]

13

While the AG complaints included minor adjustments state-to-state, the judgments were

14

mostly a copy-and-paste job. The consent judgments, like the complaints, focused on consumer

15

protection claims, the only causes of action actually brought by the Attorneys General. *See*

16

McKinsey Ex. DD at 1 ("pursuant to New York General Business Law 22-A, § 349"); *id.* ¶ I.E

17

("to resolve the Signatory Attorney General's claims and concerns under New York General

18

Business Law Art. 22-A, § 349"); *id.* ¶ II.G n.1 (listing state consumer protection laws). Each

19

judgment included an identical release and statement of "claims not covered":

20

21

22

23

24

25

26

27

Released Claims. By its execution of this Judgment/Order, the State of New York releases and forever discharges McKinsey and its past and present officers, directors, partners, employees, representatives, agents, affiliates, parents, subsidiaries, operating companies, predecessors, assigns and successors (collectively, the "Releasees") from the following: all claims **the Attorney General is authorized by law to bring arising from or related to the Covered Conduct,** including, without limitation, any and all acts, failures to act, conduct, statements, errors, omissions, breaches of duty, services, advice, work, engagements, events, transactions or other activity of any kind whatsoever occurring up to and including the effective date of the Judgment. Released claims will include, without limitation, claims that were or could have been brought by a Settling State under its State's consumer protection and unfair trade

28

---

[5] The arguable exception is Florida, which briefly asserted that McKinsey's "acts or practices injured Florida governmental entities, businesses, and consumers." McKinsey Ex. E at 8.

practices law, RICO laws, false claims laws and claims for public nuisance, together with any related common law and equitable claims for damages or other relief.

Claims Not Covered: Notwithstanding any term of this Judgment, specifically reserved and excluded from the release in Paragraph VII. A. as to any entity or person, including Released Parties, are any and all of the following:

1. Any criminal liability that any person and/or entity, including Released Parties, has or may have to the State of New York.

2. Any civil or administrative liability that any person and/or entity, including Released Parties, has or may have to the State of New York not covered by the release in Paragraph V.A above, including the following claims: (a) state or federal antitrust violations;(b) any claims arising under state tax laws; (c) any claims arising under state securities laws; (d) any action to enforce this consent judgment and any subsequent related orders and judgments.

3. Any liability under the State of New York above-cited State Consumer Protection Laws which any person and/or entity, including Released Parties, has or may have to individual consumers. Nothing herein precludes the Released Party from asserting any claims or defenses that may be available to it under the law in any court action.

*Id.* ¶¶ VII.A-B (emphasis added).

## III.   **ARGUMENT**

McKinsey advances affirmative defenses of res judicata and release. Res judicata provides certainty, but requires it as well: certainty that the AGs had authority to bring the subdivision claims purportedly released; certainty that the AGs intended to release those claims; and certainty as to privity, meaning that the states and subdivisions had coextensive interests and responsibilities in addressing the opioids crisis, which the AGs adequately represented throughout the settlement process. With the exception of Indiana, where the legislature has provided the requisite clarity, McKinsey cannot meet its burden to show that all of these elements are present here. This brief addresses res judicata first and then release second, with many of the arguments on the first defense dispositive of the second as well.

### A.   **McKinsey's motion to dismiss on the basis of res judicata should be denied.**

Although the precise formulation varies between states, claim preclusion generally requires that the second suit involve "(1) the same cause of action (2) between the same parties or

1  parties in privity with them (3) after a final judgment on the merits in the first suit." *Furnace v.*

2  *Giurbino*, 838 F.3d 1019, 1023 (9th Cir. 2016) (citation and alteration omitted). If the elements

3  are established, the judgment bars "claims that were raised or could have been raised in [the] prior

4  action." *Media Rts. Tech. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019) (internal

5  quotation marks omitted). Even if the elements are met, equitable considerations can defeat a

6  finding of preclusion. *See, e.g.*, *F.E.V. v. City of Anaheim*, 15 Cal. App. 5th 462, 475-76 (Cal.

7  App. 2017) ("declining to accord preclusive effect to the prior judgment" where "Plaintiffs have

8  not had the opportunity to litigate the merits of the claims asserted" and "at no point has there

9  been a resolution of the merits of any of Plaintiffs' state law claims").[6]

10      The "application of claim and issue preclusion to nonparties … runs up against the 'deep-

11  rooted historic tradition that everyone should have his own day in court.'" *Taylor v. Sturgell*, 553

12  U.S. 880, 898-95 (2008) (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 798 (1996)). In light

13  of this foundational principle against non-party preclusion, McKinsey's motion faces indomitable

14  obstacles. The subdivisions were not party to the attorney general suits, settlement negotiations,

15  or settlements. *See* McKinsey Ex. DD ¶ I.D ("'Parties' means McKinsey and the Attorney

16  General."). On a motion to dismiss, McKinsey has the burden of establishing, as a matter of state

17  law and with undisputed facts, that the judgments carry sweeping preclusive effect sufficient to

18  bar the subdivision claims asserted here. McKinsey's assertion of res judicata fails for the

19  following reasons:

20      *First*, McKinsey cannot show that the settling parties intended to release subdivisions or

21  their claims. *See* Section A.3. A consent judgment's preclusive effect is limited by the scope of

22  the parties' intent. The judgments are silent as to subdivision claims, a telling omission, given that

23  the settling parties undoubtedly were aware of the potential for such claims. The Court should not

24  give McKinsey by order what it could not secure at the bargaining table.

25

26

---

27  [6] *See also, e.g.*, *Greenfield v. Mather*, 194 P.2d 1, 8 (Cal. 1948); *Provident Funding Assocs., L.P. v. MDTR*, 257 So. 3d 1114, 1117 (Fla. App. 2018); *Nowak v. St. Rita High Sch.*, 757 N.E.2d 471,

28  477-78 (Ill. 2001); *BTC Leasing, Inc. v. Martin*, 685 S.W.2d 191, 197-98 (Ky. App. 1984); *State v. Bryant*, 151 N.E.3d 1096, 1104 (Ohio App. 2020).

*Second*, McKinsey cannot show that the settling states were in privity with the subdivisions such that non-party preclusion would be justified. *See* Section A.4. Privity is, in many cases and here, a fact-intensive inquiry, making an inappropriate basis for a motion to dismiss. McKinsey contends that the "public interest" and *parens patriae* interests represented by the settling attorneys general encompass the interests of the subdivisions, thus creating privity. They do not. Cities and counties have their own interests and own injuries resulting from the opioid crisis. And preclusion by representation requires more than the mere *capacity* to represent a non-party's interests; rather, it requires *actual* and *effective* representation of those interests. McKinsey cannot demonstrate, nationwide and as a matter of law, that the subdivisions' distinct interests were actually or adequately represented.

*Third*, in many of the relevant states, McKinsey cannot establish that the state attorneys general have the authority to represent subdivisions in the first place. *See* Section A.5. For those states, either the best reading of the law is that the attorneys general lack such omnibus and plenary power, or the answer is unknown. In either circumstance, in addition to being unable to show that the release provisions in the consent judgments apply to subdivisions or that the AGs adequately represented subdivision interests, McKinsey cannot meet its burden of showing that the claims in this case "could have been brought" in the state attorney general actions.

### 1. <u>Res judicata is an affirmative defense not ordinarily resolvable on a motion to dismiss.</u>

There is one uniform universal legal principle that applies in every relevant state: res judicata is an affirmative defense on which McKinsey bears the burden of pleading and proof. *See* Fed. R. Civ. P. 8(c)(1) (identifying "res judicata" as an "affirmative defense"); *Taylor*, 553 U.S. at 907 ("Ordinarily, it is incumbent on the defendant to plead and prove such a defense."). Rule 8 "does not require plaintiffs to plead around affirmative defenses." *CFTC v. Monex Credit Co.*, 931 F.3d 966, 972 (9th Cir. 2019). And "ordinarily, affirmative defenses may not be raised on a motion to dismiss," unless "there is some obvious bar to securing relief on the face of the complaint," *id.* at 973 (citations and alteration omitted), and "the defense raises no disputed issues of fact," *Lusnak v. Bank of Am., N.A.*, 883 F.3d 1185, 1194 n.6 (9th Cir. 2018).

Here, McKinsey's defense is not obvious on the face of the complaints. It also raises questions of fact. As discussed below, finding claim preclusion here would require resolving factual issues that are not present on the face of the complaints and are not matters that can be resolved by judicial notice. These critical facts include: (1) whether the settling parties intended to foreclose subdivision claims; (2) whether cities and counties have local claims and interests distinct from those of their states, as well the scope of those interests; and (3) whether the AGs actually and adequately represented subdivisions as a matter of both fact and of state law.

### 2.      McKinsey must prove the elements of claim preclusion for each state.

State law governs the Court's analysis of res judicata. The Full Faith and Credit Act, 28 U.S.C. § 1738, "requires a federal district court to give the same—not more and not less— preclusive effect to a state court judgment as that judgment would have in the courts of the state in which it was rendered." *Noel v. Hall*, 341 F.3d 1148, 1160 (9th Cir. 2003). If "a state court judgment is not entitled to preclusive effect under the law of that state, subsequent litigation in federal court is no more precluded by that judgment than subsequent litigation in state court." *Id.*

Ambiguity or uncertainty as to whether a state court would grant the judgment sufficient preclusive effect to bar the claims here requires denial of McKinsey's motion as to that state. On the res judicata defense, tie goes to the plaintiff: "any doubt" as to whether the predicates have been met requires rejection of preclusion. *Steen v. John Hancock Mut. Life Ins. Co.*, 106 F.3d 904, 912 (9th Cir. 1997).[7] All the more so on a 12(b)(6) motion. If, as here, state statutes and cases on their face do not support the assertion of preclusion, the appropriate course is not to pen new state law, but instead to deny the motion.[8]

---

[7] *See also St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 437 (5th Cir. 2000) (Louisiana); *Welch v. Johnson*, 907 F.2d 714, 720 (7th Cir. 1990) (Illinois).

[8] *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367 (1996) and *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985), are not to the contrary. Those cases emphasized that whether a state-court judgment precluded exclusively-federal claims was a "specific question" that state courts "usually … will not have occasion to address," but that federal courts "may consequently find guidance from general state law on the preclusive force of settlement judgments." *Matsushita*, 516 U.S. at 375 (citation omitted). General state preclusion law, which can be gleaned from widely accepted sources like the Second Restatement, is a far cry from foundational questions of state separation-of-powers McKinsey's motion raises.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**3.   McKinsey cannot show that the Attorneys General intended to release subdivision claims.**

When the judgment at issue is a consent judgment, rather than a litigated judgment, the preclusion analysis has an additional step. Although consent judgments generally *can* have preclusive effect, the proponent of res judicata in a subsequent case must establish that the parties intended the settlement to preclude the second action. *See Arizona v. California*, 530 U.S. 392, 414 (2000) (determining that "[a]s between the parties … the settlement … was intended to have,[] claim-preclusive effect") (alteration omitted); *United States v. Motor Vehicle Mfrs. Assoc.*, 643 F.2d 644, 648-51 (9th Cir. 1981) (noting that consent judgments, having attributes of a contract, should be construed according to the parties' intent); Wright & Miller, Fed. Prac. & Proc. § 4443 (3d ed.) ("The basically contractual nature of consent judgments has led to general agreement that preclusive effects should be measured by the intent of the parties.").[9] This additional step has consequences on a motion to dismiss. Because the intent behind a consent judgment "is a question of fact that may turn not only on the language of the agreement, but also on extrinsic evidence not yet in the record," *Amador Cty., Cal. v. Salazar*, 640 F.3d 373, 384 (D.C. Cir. 2011), it generally cannot be resolved on a motion to dismiss.

**a.   The consent judgments are silent as to subdivision claims.**

In the States at issue, the consent judgments are simply silent as to claims asserted by subdivisions. This silence is deafening. Context matters when interpreting contracts. *See, e.g.*, *RMR Equip. Rental, Inc. v. Res. Fund 1347, LLC*, 65 Cal. App. 5th 383, 396 (Cal. App. 2021) ("[T]he Supreme Court directs us, when interpreting a contract, to examine its nature and the surrounding circumstances.").[10] Here, there is no doubt that the negotiating parties were well aware that subdivision claims could, and likely would, be brought. National opioid litigation has

---

[9] *See also State v. Coker*, 59 So. 3d 670, 673 (Ala. 2010); *Cal. State Auto. Ass'n Inter-Ins. Bur. v. Sup. Ct.*, 788 P.2d 1156, 1159 (Cal. 1990); *Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 553 (Ga. 2006); *Shearman v. Asher*, 851 So. 2d 1225, 1226 (La. App. 1997); *VHS Huron Valley Sinai Hosp. v. Sentinel Ins. Co.*, 916 N.W.2d 218, 224 (Mich. App. 2018); *Welsh v. Gerber Prods., Inc.*, 555 A.2d 486, 490 (Md. 1989).

[10] *See also, e.g., Huntington on the Green Condo. v. Lemon Tree I-Condo*, 874 So. 2d 1, 4-5 (Fla. App. 2004) ("[C]ourts should place themselves, as near as possible, in the exact situation of the parties to the instrument, when executed, so as to determine the intention of the parties, objects to be accomplished,… and other essential features.").

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1   been spearheaded by cities and counties, countless numbers of whom have long had claims

2   pending in MDL 2804, and many of whom have proceeded to or are on the precipice of trial.

3   Large numbers of states have considered or enacted legislation expressly acknowledging or

4   contemplating independent subdivision opioid claims. And, at the same time as the Attorneys

5   General were negotiating the settlements with McKinsey, they, in partnership with representatives

6   of thousands of litigation cities and counties, were finalizing negotiations and documenting of

7   $26 billion in settlements with Johnson & Johnson and three major opioid distributors,

8   settlements that carefully delineate between state and subdivision claims, provide expressly for

9   allocation of settlement proceeds among states, and between states and subdivisions, and require

10  individual releases from each subdivision to be bound.[11]

11          It is easy to imagine consent judgments between McKinsey and AGs that would have

12  included language like "political subdivisions," "governmental entities," or "local governments,"

13  making clear an intent to try to preclude subdivision claims—if that had that been the mutual

14  intent. Because the consent judgments have no such language, that intent does not leap off the

15  page, and cannot plausibly be inferred. Given that McKinsey and the settling states obviously

16  knew about subdivision claims, that McKinsey undoubtedly would have secured more

17  specifically expansive release language if it could, and that the parties nevertheless said exactly

18  nothing about subdivision claims in the consent judgments, only one conclusion can be drawn:

19  the parties never reached agreement on that point. Perhaps they knew that actually resolving non-

20  parties' claims would be a longer, more difficult process, and one (for reasons explained

21  elsewhere in this brief) that would actually require the participation of the non-parties. So instead

22  of reaching agreement on those issues, the parties punted, embracing language that ultimately left

23  alone the question of claims on the part of subdivisions. Or perhaps there were other obstacles.

24  But on this record and at this stage, the Court should not find a meeting of the minds where none

25  exists on the face of the consent judgments. Indeed, one attorney general, who agreed to the

26  standard language, has publicly clarified that she did not intend to release subdivision claims. *See*

27  Ex. C at 20 (NY AG brief) ("If, … the Proposed Judgment *does not* release the Subdivisions'

---

28  [11] *See* https://nationalopioidsettlement.com/faq/

1   claims—as both the NYAG and the Subdivisions maintain…. the release in the Proposed

2   Judgment does not affect their claims.").

3                    **b.        The releases do not include subdivision claims.**

4        McKinsey asserts that subdivision claims are within the scope of the releases because

5   (a) the releases include claims that "could have been brought by a Settling State" and (b) the

6   references to "Settling State" actually mean "Settling State *and its subdivisions*" given that

7   subdivisions are "inherently coextensive with each 'Settling State.'" Mot. at 37. This argument

8   fails for three reasons.

9        *First*, the releases are worded to cover as "all claims the Attorney General is authorized by

10  law to bring," which, the provision goes on to say, "will include ... claims that were or could have

11  been brought by a Settling State." McKinsey Ex. DD at 16. The second clause ("claims that were

12  or could have been brought by a Settling State") does not expand on the first ("all claims the

13  Attorney General is authorized by law to bring"). McKinsey cites no authority for finding that

14  "includes" expands the scope of preceding terms. In fact, courts do the opposite, construing

15  "including" clauses narrowly so not to expand the definitions they follow. *See Fed. Land Bank of*

16  *St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of

17  all-embracing definition, but connotes simply an illustrative application of the general

18  principle."); *Chickasaw Nation v. United States*, 534 U.S. 84, 89-91 (2001) (dismissing item in

19  "including" clause as "simply a bad example"); *United States v. Collins*, 854 F.3d 1324, 1333

20  (11th Cir. 2017) (construing statute so that the phrase "including committed by fraud or deceit"

21  refers only to an "offense against property"). Applying these principles, the scope of the release is

22  limited by the AGs' authority, which, as discussed in Section A.5 below, McKinsey does not

23  establish extends to subdivision claims.

24       *Second*, this would be an awkward, unusual, and patently insufficient way for the settling

25  parties to refer to subdivision claims. At the very same time the AGs were negotiating the

26  McKinsey settlement, they were assembling the Distributor/J&J settlements, which specifically

27  provide for voluntary participation agreements from subdivisions to release subdivision claims.

28  And, when attorneys general intend to extinguish subdivision claims in other cases, they do so by

1   expressly identifying and including them. For example, in another ongoing litigation featuring

2   state and sub-state claims, two states, Arizona and North Carolina, entered into consent

3   judgments with Juul Labs, Inc. that *did* purport to release subdivision claims to the extent

4   permissible. *See* Ex. D ¶ 10.ee (North Carolina JUUL consent judgment) ("any … governmental

5   or public entity to the full extent of the State's and the Attorney General's power to release

6   Claims"); Ex. E at 4 (Arizona JUUL consent judgment) ("to the full extent of any additional

7   authority of the Attorney General (if any) to release Claims under Arizona law any other State

8   entity or public or governmental entity within the State").[12] The unavoidable conclusion is that

9   McKinsey was unable to get the AGs to agree to that here. That conclusion is re-enforced by the

10  New York AG's unequivocal position that New York did *not* agree to release subdivision claims

11  against McKinsey.[13]

12      *Third*, McKinsey's substituting of "State and subdivisions" for "State" on the basis that

13  they are states and subdivisions are "coextensive" is inconsistent with how contracts and litigation

14  involving states and subdivisions work in the real world. It "is a fundamental principle that unless

15  the contract terms are specifically different than the common usage of the terms, that the common

16  usage of the terms will be adopted." *McHugh v. United Serv. Auto. Ass'n*, 164 F.3d 451, 455 (9th

17  Cir. 1999). And in common usage, cities, counties, and states are not "co-extensive." They are

18  different parties, with different functions, responsibilities, and liabilities, as the law recognizes in

19  myriad ways. *See, e.g.*, *Moore v. Cty. of Alameda*, 411 U.S. 693, 718-79 (1973) (determining that

20  a county, unlike a state, was a "citizen" for purposes of diversity jurisdiction because, in light of

21  the powers and liabilities assigned to the county "in contrast to the State and state agencies," it

22  "cannot be deemed a mere agent of the State," but instead has "independent status"); *Avery v.*

23  *Midland Cty.*, 390 U.S. 474, 481 (1968) (holding that one-person, one-vote applied to local

24  ——————————

[12] Similarly, when Oklahoma settled with Purdue, the consent judgment defined "Releasors" to
25  include "any political subdivision of the State on whose behalf the Attorney General possesses, or
    obtains, the authority to bind." Ex. F at 6.

26  [13] That the West Virginia and Washington consent judgments include different language
27  specifically exempting subdivisions does not mean that the remaining consent judgments, which
    said nothing at all about subdivisions, unambiguously encompassed those claims. Instead, it
28  confirms only that the settling parties were aware of the existence of subdivision claims, but
    nevertheless elected not to address them in the plain language of the agreements.

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

governments because "the States universally leave much policy and decisionmaking to their governmental subdivisions").

### c. The terms of the injunction confirm the release does not include subdivision claims.

The consent judgments do mention subdivisions in one place—as part of the injunction:

> McKinsey agreed "to revise its conflict policy pertaining to potential engagements by **any Settling State, county government, or municipal government** (or any government agency of the aforementioned) ("Government Client") to require a written disclosure of any material conflict ("Conflict Disclosure") when (A) responding in writing to a request for proposal; (B) formally proposing work; (C) tendering an engagement letter to a Government Client; or (D) beginning work for a Government Client in the absence of an engagement letter, proposal, or request for a proposal, whichever occurs first ("Triggering Event").

McKinsey Ex. DD at 7 (emphasis added). That mention weakens rather than supports McKinsey's position. This provision shows that the drafters of the judgments knew how to refer to subdivisions when they wanted to, and did so when, by mutual agreement, a provision applied to both a state and its subdivisions. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."). If, as McKinsey says, "Settling State" in the release includes subdivisions, then it must include subdivisions in the injunction as well. *See, e.g.*, *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1722-23 (2017) (explaining the "usual presumption that identical words used in different parts of the same statute carry the same meaning") (internal quotation marks omitted). Given that, McKinsey's interpretation would render the language "county government, or municipal government" and the definition "Government Client" surplusage. *See, e.g.*, *Yates v. United States*, 574 U.S. 528, 543 (2015) (invoking "the canon against surplusage") (citation omitted).

### d. The exclusions do not expand the scope of the release.

It does not matter that the consent judgments carve out certain express exclusions from the release, subdivision claims not among them. With one exception, each of the exclusions refers to a claim the *State* might bring, not a subdivision, only underscoring that the scope of the general

1   release was limited to claims on behalf of the State, not anyone else. McKinsey Ex. DD ¶ VII.B.2

2   (excluding "civil or administrative liability" under certain theories "any person and/or entity …

3   may have *to the State of New York*) (emphasis added).[14] A release that lists specific exclusions

4   does not compel the interpretation that a release includes anything not specifically excluded. The

5   "canon *expressio unius* ... depends on identifying a series of two or more terms or things that

6   should be understood to go hand in hand, … supporting a sensible inference that the term left out

7   must have been meant to be excluded." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168-69

8   (2003) (internal quotation marks omitted); *see also* Antonin Scalia & Bryan A. Garner, *Reading*

9   *Law: The Interpretation of Legal Texts* 107 (2012) ("Virtually all authorities who discuss the

10  negative-implication canon emphasize that it must be applied with great caution, since its

11  application depends so much on context."). The listed exclusions, like the release itself, say

12  nothing about cities or counties or their claims. The reasonable inference is not that those claims

13  are impliedly encompassed, but instead that they are "nothing more than a case unprovided for."

14  *Barnhart*, 537 U.S. at 169; *see also Reading Law* at 108 ("Even when an all-inclusive sense

15  seems apparent, one must still identify the scope of the inclusiveness (thereby limiting implied

16  exclusion).").

17  In any event, the Court must give meaning to the plain terms of the release itself, just as it

18  must to the exclusions. *See Norfolk S. Corp. v. Chevron U.S.A., Inc.*, 371 F.3d 1285, 1289-90

19  (11th Cir. 2004) ("[W]e do not see a need to treat an express description of claims excepted from

20  *res judicata* any differently from an express description of claims subject to *res judicata*. In both

21  cases, the preclusive effect of the earlier judgment is determined by the intent of the parties.")

22  (internal quotation marks omitted); *id.* ("[T]he district court erred in beginning its analysis by first

23  assuming that *res judicata* applied in full to all of the claims … and then 'carving out' from the

24  scope of this preclusive effect only those claims … expressly reserved in the Settlement

25  Agreement. Instead, the court should have looked to the Settlement Agreement to determine what

26

---

27  [14] The one exception was the exclusion of claims asserting "liability under the …. above-cited
    consumer protection laws which any person and/or entity … has or may have to individual

28  consumers." *Id.* ¶ VII.B.3. This exclusion again demonstrates the focus of the release on the
    consumer protection claims, the only claims actually asserted by the AGs.

- 19 -

claims it precluded from future litigation."). Here, the release says nothing about subdivision claims; the natural and only permissible reading is that it does release them.

### e.     The meaning of an ambiguous contract cannot be determined on a motion to dismiss.

The fact that the releases don't mention subdivisions should be conclusive. Silence on those claims reveals no intent to extinguish them. The only alternative is ambiguity: by saying neither aye nor nay, the consent judgments leave the issue of subdivision claims ambiguous. Ambiguity means McKinsey cannot carry its burden on the affirmative defense.

Where contract "language leaves doubt as to the parties' intent, the motion to dismiss must be denied." *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 909-10 (N.D. Cal. 2010) (citation omitted). If "a contract is capable of two different reasonable interpretations, the contract is ambiguous." *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1076 (N.D. Cal. 2012) (citation omitted). Here, Plaintiffs and McKinsey offer different interpretations of the consent judgments. Given the silence in the release on subdivision claims, the context, and the negative implication derivable from the injunction language, Plaintiffs' interpretation is "reasonable." *Williams*, 449 F. Supp. 3d at 909. As a result, "the disputed contractual language is," at best for McKinsey, "ambiguous, and this ambiguity raises a question of fact as to the parties' intent [and] the motion to dismiss must be denied." *Id.* at 909-10 (internal quotation marks omitted); *see also Microsoft Corp. v. Hon Hai Precision Indus. Co., Ltd.*, No. 19-1279, 2019 WL 3859035, at *6 (N.D. Cal. Aug. 16, 2019) ("The parties may well argue at a later stage of the litigation that the intent of the parties or properly admitted extrinsic evidence supports their respective interpretations of the contract. Such factually based arguments are appropriate at a later stage of the litigation, not on the pleadings.") (citation and alterations omitted).

### 4.     The States were not in privity with the subdivisions.

It is a bedrock principle that "everyone should have his own day in court." *Richards*, 517 U.S. at 798. In light of that tradition, "[s]ome substantial justification must be found to justify preclusion of a nonparty." Fed. Prac. & Proc. § 4448. Courts generally label the conclusion that a substantial justification exists "privity." *See Taylor*, 553 U.S. at 894 n.8 ("The term 'privity,'

however, has also come to be used more broadly, as a way to express the conclusion that nonparty preclusion is appropriate on any ground."). One "principle that extends preclusion to non-parties," and the one that McKinsey says applies here, "relies on representation by a party." 18A Fed. Prac. & Proc § 4454.

Privity, however, is generally a fact-intensive inquiry, making it inappropriate as the basis for a motion to dismiss. *See* 18 Moore's Fed. Prac. – Civil § 131.40 (3d ed.) ("The existence of privity for purposes of claim preclusion is usually considered to be a question of fact."). McKinsey's argument for privity proceeds in two steps: (1) the subdivisions "are in privity with the States because they are seeking to represent the *same public interest* already represented by the States," Mot. at 25; and (2) there is a "presumption that the state will *adequately represent*" that interest. Mot. at 25-26 (emphases added). Neither assertion is accurate: subdivisions have their own distinct and important interests in connection with the opioid crisis, and McKinsey cannot show that any State adequately represented those interests. Both also raise fact questions, meaning privity cannot be established on this motion.

### a.   McKinsey cannot establish as a matter of law that cities and counties have no distinct, local interests.

The central premise of McKinsey's motion is that subdivisions' interests are coextensive with the interests of their respective states. This is false, as even McKinsey at least tacitly admits. *See* Mot. at 33 (distinguishing between "the needs of the entire state instead of the parochial interests of local governments"); *id.* at 31 n.19 (differentiating between "matters of statewide concern" and those of "local concern" with respect to standing). The existence and extent of distinct, local injuries necessarily will vary from plaintiff to plaintiff, but that is a matter for proof in individual cases. *See, e.g.*, *San Francisco*, 491 F. Supp. 3d at 629 (harms to city in case against manufacturers, distributors, and pharmacies). It is not resolvable on a motion to dismiss, and certainly not across the board.

To start, a local government's individual interests stem in part from the "dual character of municipal corporations." *See Vilas v. City of Manila*, 220 U.S. 345, 356 (1911); *see also* 2A McQuillin, The Law of Municipal Corporations, § 10.5 (3d ed.). Cities and counties have a "two-

1  fold character and dual powers" and not only "public, governmental, political, or legislative"

2  powers, but also powers referred to as "municipal, private, quasi-private, or proprietary." *Id.* The

3  "purposes of municipal corporations, using the term in its strict meaning, are twofold: the one to

4  assist in the government of the state as an agent of the state, often referred to as an arm of the

5  state, and to promote the public welfare generally; the other to regulate and to administer the local

6  and internal affairs of the territory which is incorporated, for the special benefit and advantage of

7  the urban community embraced within the corporation boundaries." *Id.* § 2:13.

8  　　　Local governments are responsible for local activities that states are not. As Professor

9  Briffault explains, political subdivisions are not like state agencies, which are subordinate to the

10  state for all purposes. Briffault Rpt. at 2 (explaining that "the term 'political subdivision' is

11  deceptive and fails to capture the true nature of the relationship between the states and their local

12  governments"). Unlike "state agencies, the governing bodies of cities, counties and similar

13  entities are locally elected, not appointed by the state, and are accountable to local

14  constituencies." *Id.* As a consequence, local governments are on the front lines of public health

15  policy and innovation. *See* Paul Diller, *Why Do Cities Innovate in Public Health*, 91 Wash. U. L.

16  Rev. 1219, 1225-43 (2014).

17  　　　Every state delegates powers to political subdivisions via their respective state

18  constitutions and statutes, *see* McQuillin § 10.3, and several states even recognize an "inherent"

19  right to local self-government beyond the powers expressly granted by those states. *See id.* § 4.80.

20  Many states have designated "home rule" powers to their municipalities, generally including the

21  right to sue and be sued. *See, e.g.*, Briffault Rpt. at 13 ("Altogether, 40 states provide in their

22  constitutions for some form of home rule for some or all of their municipalities."); Lynn A. Baker

23  & Daniel B. Rodriguez, *Constitutional Home Rule and Judicial Scrutiny*, 86 Denv. U. L. Rev.

24  1337, 1338-39 & nn. 6, 12 (2009) (reviewing prevalence of robust home rule doctrines); *Batiste v.*

25  *City of Beaumont*, 421 F. Supp. 2d 969, 985 (E.D. Tex. 2005) ("Home rule charters generally

26  reserve to municipalities the power to sue and be sued."); Fla. Const. Art. VIII, § 2(b) (granting

27  municipalities "governmental, corporate and proprietary powers to enable them to conduct

28  municipal government, perform municipal functions and render municipal services, and may

2314105.5

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1    exercise any power for municipal purposes except as otherwise provided by law,"); Cal. Gov't

2    Code §§ 23004 ("providing that counties may "[s]ue and be sued"), 34501 ("Every city … may

3    sue and be sued."); *Price v. Sacramento Cty.*, 6 Cal. 254, 254 (Cal. 1856) ("Counties are

4    corporations as far as to be capable of suing and being sued."); N.Y. Const. art. IX, §§ 1, 2; N.Y.

5    Mun. Home Rule Law §§ 10, 20, 35, 50-54. The details vary between states: "The actual legal

6    relationship between a particular state and its local government will be determined by the specific

7    constitutional provisions, statutes and judicial decisions of that state." Briffault Rpt. at 3.

8          As a result of these distinct identities, responsibilities, and powers, it has long been

9    established that cities and counties have the authority to bring and resolve claims to recover for

10   their owns harms and to abate public nuisances affecting them, and need not rely on state

11   governments to do so. *See, e.g.*, *id.* at 18 ("These general principles concerning the state-local

12   relationship with respect to local legislation and regulation apply to local litigation behalf of the

13   local government's interests."); *Beretta*, 315 F. Supp. 2d at 274 ("In practice, the interests of the

14   City and the State are often different."); *State ex rel. Wood v. Schweickardt*, 19 S.W. 47, 52 (Mo.

15   1891) ("They have thus their public or political character, in which they exercise a part of the

16   sovereign power of the state for governmental purposes, and they have their private character, in

17   which, for the benefit and convenience of their own citizens, they exercise powers not of a

18   governmental nature, and in which the state at large has only an incidental concern, as it may

19   have with the action of private corporations. It may not be possible to draw the exact line between

20   the two, but provisions for local conveniences for the citizens, like water, light, public grounds for

21   recreation, and the like, are manifestly matters which are not provided for by municipal

22   corporations in their political or governmental capacity, but in that quasi private capacity, in

23   which they act for the benefit of their corporators exclusively.").

24          For example, in the early 2000s, counties across California sued paint manufacturers for

25   knowingly marketing lead paint for use inside homes, seeking abatement of the public nuisance.

26   *See Santa Clara*, 137 Cal. App. 4th at 300-01. At trial, the counties proved that the nuisance

27   caused them distinctly local harm, including "environmental investigation," "outreach and

28   education," "notices to correct lead paint and soil lead hazards," "risk assessments," "lead

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1    inspections," and "code enforcement." *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th

2    51, 73-76 (Cal. App. 2017). While state-funded programs provided "secondary prevention,"

3    mainly targeting children already with severe exposure, there was no funding for "primary

4    prevention," the costs of which the counties bore themselves. *Id.*

5          Other examples abound. *See Mayor and City Council of Baltimore v. Monsanto Co.*,

6    No. 19-483, 2020 WL 1529014, at *9 (D. Md. Mar. 31, 2020) (recognizing that city's allegations

7    of injury include "the costly damage to its stormwater system and water which it constructs

8    and/or maintains for the public welfare" and "incurred costs as a result of implementing

9    impervious surface restoration efforts"); *In re MTBE*, 725 F.3d 65, 107-08 (2d Cir. 2013)

10   (describing city's injuries due to MTBE pollution in its capacity as "public water provider");

11   *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1140 (Ohio 2002) (permitting nuisance

12   claims against firearm manufacturers where city alleged "expenses such as increased police,

13   emergency, health, and corrections costs"). Most recently, subdivisions have brought cases

14   related to the youth vaping crisis for local harms caused by that crisis. *See In re JUUL*, 497 F.

15   Supp. 3d 552, 650 (N.D. Cal. 2020) ("Santa Cruz County … alleges that it plays a unique role as

16   the entity required to protect the public health of its community, a responsibility not shared by the

17   general public or even other unspecified agencies, and therefore conduct that affects the public

18   health of the County injures the County in a different way from the general public within the

19   County."). Subdivision litigation is the norm, not the exception. *See* Sarah L. Swan, *Preempting*

20   *Plaintiff Cities*, 45 Fordham Urban L.J. 1241, 1265 (2018) ("Generally speaking, … states have

21   left cities with a significant amount of litigation leeway.").

22         The opioid crisis is no different. As alleged in the master complaint, Plaintiffs assert

23   injuries to local government interests, including:

24   - Medical examiner costs;
     - Crisis response and street outreach;
25   - Emergency and ambulance service costs;
     - Education programs;
26   - Mental health, treatment, counseling, rehabilitation, and social services;
     - Programs to connect "hard to reach" individuals to treatment and keep them in
27       treatment, including costs related to homelessness services and supportive
         housing;

28

- 24 -                    SUBDIVISION OPP. TO MOT. TO DISMISS
                                                                                (RES JUDICATA AND RELEASE)
                                                                                21-MD-02996-CRB (SK)

- Opioid abuse programming, including outreach, case managers and staffing, and behavioral health components, and peer recovery coaching;
- Therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related disorders or disease, including overdoses and deaths;
- Public health clinic staffing, services, and resources;
- Hospital costs;
- Sober living facilities and other residential and stepdown treatment programs;
- Narcan/naloxone purchase, distribution, and administration;
- Public employee task forces, including crisis indicator tracking and coordination efforts;
- Cost of prescription opioid disposal;
- Law enforcement expenditures; and
- Repair and upkeep costs to property and public infrastructure.

Master Complaint (Subdivision) ¶ 541.

McKinsey's brief is littered with citations to cases articulating the state's role in pursuing claims as "*parens patriae*, apart from its sovereign and proprietary interests." *E.g.*, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 603-04 (1982) (cited at Mot. at 12). Conceded. But *parens patriae* claims are those brought by a "sovereign … on behalf of its citizens" and generally to "secure monetary relief for injury sustained by those natural persons." *Washington v. Chimei Innolux Corp.*, 659 F.3d 842, 847 (9th Cir. 2011) (citation and alteration omitted). Plaintiffs do not sue as *parens patriae* (i.e., to recoup their residents' losses), but seek recourse for their own injuries. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448-49 (1992) (noting distinction between "claims of *parens patriae*" and "allegations of direct injury"). The caselaw relied upon over and over by McKinsey is simply apples to oranges.

One final note. Largely disregarding the master complaints that frame the common issues for the Court, McKinsey canvassed every complaint filed against it (including many not even transferred as of the filing) to find allegations that it deems admissions the subdivision claims are actually state claims. *See* Mot. at 11-12, 31 & App. E. Some of this is simply incorrect. For example, that a nuisance claim may have a public harm element, *see* App. E at 6, does not mean that the only interest behind a claim is statewide. The relevant public harm is local, not statewide, and the underlying abatement request is to reimburse or pay for services and costs that local entities, not the states, provide or incur. Regardless, the question before the Court is whether preclusion bars *all* claims subdivisions in the relevant states might bring, not whether particular language in particular complaints is problematic. Overbroad pleading is not a basis for res

1  judicata. At most, imprecision in a particular complaint would be grounds for amendment, not

2  dismissal with prejudice.

3       **b.      Privity is a factual determination based on a case-by-case
              analysis of the relationship and interests of the parties.**

4       With an accurate appreciation of the distinct subdivision interests at stake, privity cannot

5  be found. A representative cannot bind a non-party to a judgment merely because the

6  representative has the *capacity* or *purports* to represent the non-party. (For reasons explained in

7  Section A.3, above, and Section A.5, below, even those prerequisites are absent here: no attorney

8  general purported to represent subdivisions, and McKinsey fails to establish any had the capacity

9  to do so.) Rather, preclusion by representation requires *actual* and *effective* representation. *See,*

10 *e.g.*, Restatement (Second) of Judgments §§ 41, 42 (1982) (privity lacking where "[a]n official or

11 agency [is] invested by law to represent the person's interest" but "[t]he representative failed to

12 prosecute or defend the action with due diligence and reasonable prudence").

13      Here, there is no showing, certainly not as a matter of undisputed fact, that cities' and

14 counties' distinct interests were adequately represented. Their interests are broad and diverse. The

15 subdivisions were not on notice of the AG actions, and did not have an opportunity to participate

16 in the negotiations. No special statutory scheme gave the AGs a decisive role in resolving opioid-

17 related issues; in contrast, the relevant statutes expressly preserve subdivision claims. And the

18 settlements did not apportion funds for the benefit of cities and counties, in sharp contrast to the

19 Distributor/J&J settlements, which, absent state-specific arrangements negotiated between a state

20 and its subdivisions, provide a default allocation that directs at least half of the proceeds to

21 subdivisions directly or indirectly.

22      McKinsey's motion takes a one-size-fits-all approach. But privity requires "case by case

23 examination of the relationship and interests of the parties," *State Water Control Bd. v. Smithfield*

24 *Foods, Inc.*, 542 S.E.2d 766, 769 (Va. 2001), and "a flexible analysis of the facts and

25 circumstances of the actual relationship between the party and nonparty in the prior litigation,"

26 *Syncora Guarantee Inc. v. J.P. Morgan Sec. LLC*, 110 A.D.3d 87, 93 (N.Y. App. 2013) (citation

27

28

omitted).[15] In assessing privity, state courts consider factors such as whether the litigating party had the incentive to contest the non-party's claims,[16] whether the non-party "received the benefits" of the previous judgment;[17] whether the non-party "knew about" the previous litigation;[18] whether the parties to the earlier action could have joined the non-parties but "were content to leave the [non-parties] out;"[19] whether the non-party's claims "were … addressed in the" previous action or the "abrupt consent" of the party "created a perception of a 'friendly action'";[20] whether "the party in the first suit had some obligation to safeguard the interests of the party to the second suit";[21] whether there was "an understanding that the party is acting in a representative capacity or special procedural protections";[22] and whether "notice of the original suit has been given to the persons alleged to have been represented."[23]

Given the case- and fact-specific nature of the inquiry, the "fact that the city exists and functions by virtue of the laws adopted by the State is not determinative."[24] Applying these principles, "[c]ourts have … generally found that no privity exists between … state and local governments." 46 Am. Jur. 2d Judgments § 603; *see also, e.g.*, *Bank of Kentucky v. Commonwealth of Kentucky*, 207 U.S. 258, 265-66 (1907) (county not bound by res judicata to the result of previous litigation by state officials and other counties); *City of Martinez v. Texaco Trading & Transp., Inc.*, 353 F.3d 758, 764 (9th Cir. 2003) (city and state agency not in privity in a lawsuit over oil spill damage because the city had property interests at stake that the state did

---

[15] *See also, e.g.*, *Benson v. Wanda Petrol. Co.*, 468 S.W.2d 361, 363 (Tex. 1971) ("careful examination into the circumstances of each case"); *In re Est. of Bell*, 976 So. 2d 965, 968 (Miss. App. 2008) ("the surrounding circumstances"); *Peelua v. Impac Funding Corp.*, No. 12-611, 2015 WL 4042200, at *6-7 (Haw. App. July 2, 2015) ("careful examination of the circumstances of each case"); *Deflon v. Sawyers*, 137 P.3d 577, 580 (N.M. 2006) (not a mechanistic inquiry).

[16] *McDaniel v. Harleysville Mut. Ins. Co.*, 84 So. 3d 106, 113 & n.1 (Ala. App. 2011).

[17] *Pinkard v. Morris*, 450 S.E.2d 330, 331-32 (Ga. App. 1994).

[18] *Agolf, LLC v. Vill. of Arlington Heights*, 946 N.E.2d 1123, 1133 (Ill. App. 2011).

[19] *Wadell v. Stevenson*, 683 S.W.2d 955, 958 (Ky. App. 1984).

[20] *Hudson v. City of Bossier*, 766 So. 2d 738, 744 (La. App. 2000).

[21] *Doyle v. Smith*, 202 P.3d 856, 866 (Okla. App. 2008).

[22] *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 313 (3d Cir. 2009).

[23] *Johnson v. Gen. Motors Corp.*, 574 S.W.3d 347, 353 (Tenn. App. 2018).

[24] *Huelsman v. Kan. Dep't of Rev.*, 980 P.2d 1022, 1025 (Kan. 1999).

not); *Froebel v. Meyer*, 217 F.3d 928, 934 (7th Cir. 2000) (county and state agency not in privity because county was uninvolved in the events giving rise to the previous lawsuit and was represented by different counsel than the state); *Harris Cty., Tex. v. CarMax Auto Superstore Inc.*, 177 F.3d 306, 316-19 (5th Cir. 1999) (county not in privity with state attorney general because "the attorney general does not represent all district and county attorneys in the state when he makes decisions regarding the conduct of litigation" and the county "neither knew or nor participated in the [previous] suit"); *Cty. of Cook v. Wells Fargo & Co.*, 314 F. Supp. 3d 975, 997-98 (N.D. Ill. 2018) (denying motion to dismiss, rejecting argument that the Attorney General was in privity with a county or that a consent decree obtained by the state Attorney General barred later litigation on the same subject by the county, and explaining that "the Attorney General was not representing Cook County's unique legal interests in seeking damages for the cost of managing and administering the increased quantity of mortgage foreclosures allegedly caused by Wells Fargo's conduct" and "the state case was brought under different statutory authority … seeking different relief … under a different legal theory of injury").[25]

Judge Weinstein's analysis in *City of New York v. Beretta Corp.*, 315 F. Supp. 2d 256 (E.D.N.Y. 2004) is instructive, both as to privity's limits in the subdivision context, and the need for careful examination of the interests at stake and the context in which one party purportedly represented another. There, New York City brought an action to abate a nuisance caused by firearm manufacturers, importers, and distributors. *Id.* at 262. As here, the defendants asserted that a previous nuisance action brought by the "Attorney General of the State of New York on behalf of the people of New York in his *parens patriae* capacity" precluded the City's action because "it seeks to vindicate the same interest on behalf of the same citizens." *Id.* at 264, 266. The court denied a motion to dismiss because, among other reasons, privity was lacking.

The court emphasized that privity "is an amorphous concept not easy of application" and "must be determined in a case-by-case basis." *Id.* at 265 (internal quotation marks omitted).

---

[25] *See also, e.g.*, *City of Naperville v. Morgan*, 466 N.E.2d 1349, 1350-51 (Ill. App. 1984) (no privity between the State of Illinois and a municipality); *Matthews v. Pernell*, 582 N.E.2d 1075, 1078-79 (Ohio App. 1990) (in nuisance action, explaining that "*[r]es judicata* has no application" because the earlier action "was brought in the name of the state" and "[t]he current action is brought by a township").

1    Privity "is determined by considering whether the circumstances of the actual relationship, their

2    mutuality of interests and the manner in which the nonparty's interests were represented in the

3    earlier litigation establishes a functional representation such that the nonparty may be thought to

4    have had a vicarious day in court." *Id.* (internal quotation marks omitted). The court noted that

5    "New York courts have largely refused to find two functionally independent governmental

6    entities in privity with each other for purposes of preclusion." *Id.* at 267.

7        Carefully analyzing the structure of New York government, the specific interests at stake,

8    and the authorities of the AG and the city counsel, the court found no privity, for three reasons.

9    *First*, "[t]he law affords New York City a substantial degree of autonomy from the State" because

10   "[a]s a result of the home rule movement in New York, the state constitution now contains a bill

11   of rights for local government and grants municipalities a wide latitude to legislate on matter of

12   local concern such as the safety, health, and well-being of their residents." *Id.* at 268-72. *Second*,

13   "[o]ne issue of particular local concern … is the problem of gun-related violence. Although

14   deaths and injuries due to firearms occur throughout the State, the prevalence and severity of the

15   problem in the City means that its priorities are functionally and fundamentally discrete from

16   those of the State." *Id.* at 268, 273. *Third*, "[b]arring the City from litigating its public nuisance

17   claim would also interfere with the proper delineation of authority between the Corporation

18   Counsel and the Attorney General" because while "the Attorney General is granted" authority "to

19   protect the interest of the state … [t]here is nothing in the law to suggest that the Attorney

20   General has the authority to represent the City's legal interests." *Id.* at 268, 273-74.

21       The *Beretta* analysis—careful, granular review of the "circumstances of this case," *id.* at

22   274—is the polar opposite of what McKinsey asks the Court to do here: determine as a matter of

23   law nationwide that privity is established when the state litigates on matters in which there is

24   some statewide interest, regardless of the presence of distinct local interests. *Cf. United States v.

25   Ledee*, 772 F.3d 21, 30 (1st Cir. 2014) ("[C]ourts have recognized in the preclusion context the

26   folly of treating the government as a single entity …."). McKinsey barely hides the ball, citing

27   Wright and Miller for the speculation that "[i]t seems likely that state law will work increasingly

28   toward the conclusion that litigation by the state or state officials is binding on political

subdivisions, simply as a matter of establishing central control and common results." Mot. at 28 (quoting 18A Fed. Prac. & Proc. § 4458). What state law might become is not what state law is, and how states might choose to balance "central control and common results" against other policy values is not the basis for a motion to dismiss in federal court.[26]

**c.** **Privity between state and local governments requires distinctive facts not present here.**

McKinsey's canvassing of the privity cases involving government entities (and some cases that do not) illustrates mainly that privity is a function of the facts of each case rather than application of categorical rules.[27] But a few common themes do emerge, that while lacking here, in those cases supported a determination that "the nonparty should reasonably have expected to be bound by the first suit." *DKN Holdings LLC v. Faerber*, 352 P.3d 378, 387-88 (Cal. 2015) (internal quotation marks omitted). McKinsey's cases fall into four groups—those best explained by (1) the discrete, narrow interests at stake; (2) a specific statutory scheme; (3) especially clear evidence of intent and authority to act for subdivisions; or (4) the non-party's active participation in the earlier suit.

**Discrete, Narrow Interests**. Where the interest at stake is narrow, for example determination of a binary discrete issue, it is relatively easy for a court to find that the non-party's interest was adequately represented. For example, McKinsey cites (in Appendix D) *Ute Indian Tribe of the Uintah & Ouray Res. v. Utah*, 790 F.3d 1000 (10th Cir. 2015), which held that privity existed between a county and the State of Utah. But there, the disputed issue was narrow: whether certain lands were part of Utah instead of tribal territory. *Id.* at 1003. The state of Utah and its counties had an identical interest in the question: if the answer was "yes," then both "the State

---

[26] McKinsey also omits the next sentence: "Even then, however, state law may recognize substantial autonomy that frees a subdivision from the burdens—and even the benefits—of litigation by a state agency." *Id.*

[27] Many of the cited cases are plainly off point. *See Njau v. Harford Cty.*, No. 15-49, 2015 WL 7352215, at *10 (D. Md. Nov. 19, 2015) (in pro se case, "patently clear that Njau intended to sue agencies of the county, and was unaware that these entities are actually State agencies"); *Davis v. State*, No. 31079, 2013 WL 1442183, at *2 (Mich. App. Apr. 9, 2013) (preclusion of same plaintiff, not non-parties, where "defendants are essentially the same"); *Ewald's Ex'r v. Louisville*, 232 S.W. 388, 391 (Ky. 1921) (city suing for taxes owed to the commonwealth). One is just wrong. *See State v. Naylor*, 466 S.W.3d 783, 790 (Tex. 2015) (finding no privity).

2314105.5

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1  and its counties" could "prosecut[e] tribe members in state court for offenses occurring on" the

2  disputed lands. *Id.* at 1004. If the answer was "no," then neither could. *Id.* at 1005-06 ("A state

3  and its subdivisions generally lack authority to prosecute Indians for criminal offenses arising in

4  Indian country."). There was no daylight between the respective interests of the state and its

5  counties in the only issue presented by the litigation, and correspondingly no doubt that the

6  interests were congruent and that the state effectively represented its subdivisions. The court

7  made the basis for its holding explicit: "[T]he County offers … no reason to think Utah failed to

8  serve as an *effective representative* of its interests in" the earlier suits. *Id.* (emphasis added). And

9  quickly cautioned its limits: "[W]e don't mean to exclude the possibility that a county and state

10  sometimes lack a sufficient identity of interests to warrant the application of preclusion

11  principles; we mean to suggest only that nobody has given us any reason to think that possibility

12  is realized here." *Id.*[28]

13       **Special Statutory Scheme**. In *New Hampshire v. Dover*, 891 A.2d 524 (N.H. 2006), the

14  court, on the state's request for declaratory judgment, ordered dismissal of municipal MTBE

15  litigation based on a determination that "[t]here is no reason for the Court to conclude, on the

16  facts presented, that the State will not seek to obtain full compensation for all communities,

17  including the cities," in large part because the cities failed to show, on the facts, "a compelling

18  interest" that was not otherwise represented by the State. *Id.* at 531. *Dover* is, of course, an

19  illustration of an action any AG could have taken in an appropriate forum to resolve the questions

20  presented by McKinsey's motion; none has. Here, the Court is not faced with evaluating ongoing

21  litigation, a task that necessarily focuses on the litigation party's capacity and potential to

22  represent non-parties' interests, but instead final consent judgments, where the facts of the actual

23  representation, or lack thereof, are laid bare.

24

25  ───────────────

[28] Other cases cited by McKinsey involve similar interests so narrow that adequate representation
26  is a low bar. *See In re Stephiana UU.*, 887 N.Y.S.2d 699, 703 (N.Y. App. 2009) (finding privity
between two different social services departments, both part of state Office of Children and
27  Family Services, on fact questions of child neglect); *Roberts v. Commonwealth Dep't of Soc.
Servs.*, 48 Va. Cir. 305, at *4 (Va. Cir. Ct. Mar. 23, 1999) (same, as between state and county
social services departments); *Oswego Cty., Dep't of Social Servs. v. Duane E.*, 267 A.D.2d 1063,
28  1064 (N.M. App. 1999) (same, as between departments of different states).

- 31 -

And those "facts presented" matter. *Dover* concerned "pollut[ion of] the State's ground and surface waters." *Id.* at 527. The court's determination of the state and local interests at stake was directed by the statutory scheme specific to that issue, a scheme that declared "[t]he state as trustee of the water of New Hampshire for the public benefit declares that it has the authority and responsibility to provide careful stewardship over all the waters lying within its boundaries." *Id.* at 529 (quoting N.H. Rev. Stat. § 481:1). While state law permitted municipalities to sue "for injunctive relief against existing or impending" water pollution, it also required that "municipalities … give notice of any such action to the attorney general … who may take such steps as they deem necessary to ensure uniform statewide enforcement, including … assuming sole prosecution of the action." *Id.* at 533 (quoting N.H. Rev. Stat. § 485:20). This provision, the court explained, was "inconsistent with the cities' claim that the statutory framework authorizes the cities to maintain separate suits concerning MTBE contamination in the face of such a suit by the State." *Id.*[29]

Along the same lines as *Dover*, other cases McKinsey cites involve particular statutes, exactly the kind of authoritative state law glaringly absent from McKinsey's motion. McKinsey relies on *Martinez*, 353 F.3d at 763-64, an oil spill case, even though the court there ultimately found no privity due to the city having distinct interests. The court did conclude that the city's "'public' claims" were barred, but based that determination on a comprehensive and detailed statutory scheme regarding "Oil Spill Response and Contingency Planning," including the express authority for the state administrator to "coordinate all actions required by state *or local agencies*." Cal. Gov't Code § 8670.7 (emphasis added; cited in *Martinez*, 353 F.3d at 764). Similarly, in *In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 354 F. Supp. 3d 1122, 1132 (N.D. Cal. 2019), not even a preclusion case, the court's determination that State of Illinois was the real party in interest in a case brought by a State's Attorney was based on express statutory assignment of authority to bring that specific claim. *Id.* at 1132; *see also* Section A.5

---

[29] Whatever may be said about the overlap between state and local interests in water pollution in New Hampshire, opioid litigation is different. For years, the New Hampshire AG has had litigation pending against opioid defendant in state court at the same time as subdivisions have maintained actions in the federal MDL.

1   (discussing McKinsey's misplaced reliance on *Time Consumer Marketing*, another case under the

2   same statute). In *Collyer v. State Tax. & Rev. Dep't Motor Vehicle Div.*, 913 P.2d 665 (N.M. App.

3   1995), a DMV seeking to revoke a driver's license based on a second criminal conviction was

4   bound by a district attorney's plea agreement treating a conviction as a first offense because state

5   law gave the district attorney specific authority to negotiate guilty pleas, and the DMV's

6   authorizing statute required it to rely on actual convictions "rendering a person a 'subsequent

7   offender.'" *Id.* at 667-68.[30]

8       **Clear Intent and Authority to Act as Representative.** In *Nash Cty. Bd. of Educ. v.*

9   *Biltmore Co.*, 640 F.2d 484 (4th Cir. 1981), the court found privity between the state AG and a

10  school district where the Attorney General in "filing his state action," expressly "declared himself

11  the legal representative of each public school system in this state" and "[t]he authority of the

12  Attorney General to sue as representative of the school districts of the State … seems clear." *Id.* at

13  494; *see also Cty. of Boyd v. US Ecology, Inc.*, 858 F. Supp. 960, 969 (D. Neb. 1994), *aff'd*, 48

14  F.3d 359 (8th Cir. 1995) (finding privity where "the interests of Boyd County, Nebraska, were

15  expressly … asserted by Governor Nelson and the State of Nebraska"). Here, the AGs made no

16  such declaration, *see* Section A.3, and the authority is anything but clear, *see* Section A.5.[31]

17      **Active Involvement in Previous Action**. In *County of Boyd*, another reason for the

18  finding of privity was that counsel for the local government actively participated in the state's

19  litigation, including contending that an adverse decision in that matter would preclude the local

20  government "of the opportunity" to litigate and taking "affirmative steps to assist" the state

21  plaintiff. 858 F. Supp. at 970. The court explained: "From [counsel]'s "involvement, it is

22  *apparent as a matter of fact*, that" privity was present, particularly because "this somewhat

23

---

24  [30] Similar cases cited by McKinsey are *Aerojet-General Corp. v. Askew*, 511 F.2d 710, 719 (5th
    Cir. 1975) (statutory scheme that gave the party the obligation to protect the non-party's specific

25  rights at issues); *State ex rel. Dewine v. Crock Constr. Co.*, No. 13-405, 2014 WL 2999302, at
    *12 (Ohio App. June 16, 2013) (statutory scheme that gave state officer power to grant

26  subdivisions enforcement authority); *State ex rel. Bobo v. Moore Cty.*, 341 S.W.2d 746, 749
    (Tenn. 1960) (party had "exclusive" right to "act in certain capacities" for non-party, and party's

27  members were by statute "officers" of non-party).

28  [31] *Nash* is not even good law. *See In re Lease Oil Antitrust Litig. (No. II)*, 16 F. Supp. 2d 744, 749
    (S.D. Tex. 1998), *aff'd*, 200 F.3d 317 (5th Cir. 2000) (casting doubt on *Nash*'s validity).

                                           SUBDIVISION OPP. TO MOT. TO DISMISS
                                                                            (RES JUDICATA AND RELEASE)
                                                                            21-MD-02996-CRB (SK)

exceptional factual circumstance suggests a coordinated litigation strategy between" the two sets of plaintiffs. *Id.* (emphasis in original). Other cases McKinsey relies on are similar. In *Dyson v. State Personnel Bd.*, 213 Cal. App. 3d 711 (Cal. App. 1989), a state personnel agency was precluded by a search-and-seizure determination in a previous action brought by a district attorney. *Id.* at 727. But the court explained that the personnel agency played a voluntary and critical role in the district attorney's prosecution: initiating the search by calling in "the sheriff's department," who "serves as the investigative arm for the district attorney"; filing a criminal complaint to initiate "[t]he criminal action" and serving as "the chief 'accuser' at the criminal proceeding"; and "testif[ying] at the criminal suppression motion, presenting evidence relating to the validity of the search." *Id.* In *Lerner v. Los Angeles City Bd. of Educ.*, 380 P.2d 97 (Cal. 1963), a teacher termination case, the non-party (a city board of education) "occupied a totally dependent and subordinate position" to the party ("the state board") in connection with the specific issue of teacher credentialing, "basing its decision entirely on the state board's revocation of the credential and its consequence legal obligation to discharge" the teacher. *Id.* at 106-07.[32]

***Certified Question* is Distinguishable.** Then there is *In re Certified Question from U.S. Distr. Ct. for the East. Dist. of Mich.*, 638 N.W.2d 409 (Mich. 2002), which is notable as the only case McKinsey cites from the states at issue that actually recognizes state AG authority to represent subdivisions. *See* Section A.5. *Certified Question*'s holding was based on two essential premises, neither of which can be shown here (at least in this posture): that the AG "has acted to limit the power of the counties to sue" and that the subject matter at issue was a matter of state, not local interest. *See id.* at 414-15 ("Accordingly, while counties have broad authority to sue and settle with regard to matters of local interest, the Attorney General has broad authority to sue and

---

[32] McKinsey cites many other cases applying this same principle. *See Hunter v. City of Leeds*, 941 F.3d 1265, 1275-76 (11th Cir. 2019) (officers involved in state's prosecution); *In re Arb. Between United Pub. Workers Local 646 & City & Cty. of Honolulu*, 315 P.3d 233, 243 (Haw. App. 2011) (both party and non-party were members of the same collective bargaining group that negotiated the agreements at issue); *In re Forfeiture of Fourteen Thousand Six Hundred Thirty Nine Dollars In U.S. Currency In Various Denominations and Two Digital Pagers*, 902 P.2d 563, 570 (N.M. App. 1995) (officers participated in state prosecution); *Attorney Gen. of Tex. v. El Paso Indep. Auto. Dealers Ass'n*, 966 S.W.2d 783, 785-86 (Tex. App. 1998) (non-party "declined to participate in this case" and "indicated that the real parties in interest were capable of adequately presenting the issues to the court"); *Smithfield Foods*, 542 S.E.2d at 770 (party and non-party "chose to participate in this joint endeavor").

1    settle with regard to matters of state interest."). In *Certified Question*, the release negotiated by

2    the AG clearly included subdivisions, *id.* at 412, while here it does not, *see* Section A.3. And

3    *Certified Question*'s second premise—that the interests at stake are exclusively statewide—is not

4    present where a subdivision bringing opioid-related claims "clearly seeks recovery for its own

5    harms, and not on behalf of the state as a whole." *In re Nat'l Prescription Opiate Litig.*, 458 F.

6    Supp. 3d 665, 675 (N.D. Ohio 2020) (distinguishing *Certified Question* on this basis). There is no

7    basis for reading *Certified Question* to go beyond its facts, particularly when the very same court

8    a mere sixth months later "agree[d]" that "Courts have also generally found that no privity exists

9    … between state and local governments." *Baraga Cty. v. State Tax Comm'n*, 645 N.W.2d 13, 17

10   (Mich. 2002) (quoting 46 Am. Jur. 2d Judgments § 603).[33]

11            **d.    Subdivision claims for nuisance or unfair practices are not**
                      **precluded based on AG releases in Alabama, California,**
12                    **Georgia, Illinois, Mississippi, New Mexico, Ohio, and**
                      **Tennessee.**
13

14            McKinsey contends that nuisance and unfair practices claims in certain states must be

15   "brought in the name of the 'state' or the 'people,'" and therefore may be brought once, by an AG

16   or a subdivision, but not both. Mot. at 35. That is incorrect.

17            **Nuisance**. McKinsey cites no authority for the proposition that statutes requiring nuisance

18   claims to be filed using a certain caption (e.g., "in the name of the People) mean that there is only

19   one claim available regardless of the different interests or injuries underlying the causes of action.

20   If it were so clear that these claims were one-and-done, one would expect case citations from the

21   relevant states making that point. McKinsey provides none. Most of these statutes are more than a

22   century old, yet lack a single judicial decision giving any substantive effect to the language to

23   which McKinsey points.

24            In some States, the relevant statutes do not even include the Attorney General as a person

25   authorized to bring a nuisance claim, and so by definition do not give the AG the ability to

26   preclude other entities' claims. *See* Cal. Civ. P. Code § 731 (mentioning only a "district attorney,"

27   _____

     [33] McKinsey also cites *Grand Traverse Band of Ottowa & Chippewa Indiana v. Dir., Mich. Dep't
     of Nat'l Res.*, 141 F.3d 635 (6th Cir. 1998), but that case concerned rights under a treaty between
28   Indian tribes and the United States that predated the establishment of the State of Michigan itself,
     and so obviously bound municipalities established by the same sovereign only later.

1   "county counsel," or "city attorney"); *People v. New Penn Mines, Inc.*, 212 Cal. App. 2d 667, 677

2   (Cal. App. 1963) (AG does not have authority to bring a nuisance claim where the statutory

3   scheme designated the power to enforce public nuisance to other entities); Ga. Code § 41-2-2

4   (mentioning only "the district attorney, solicitor-general, city attorney, or county attorney"); *see*

5   *also* Tenn. Code § 29-3-103 (emphasizing that "any city or county attorney" may sue to abate a

6   nuisance "without the concurrence" of the attorney general). And in any event, statutory

7   limitations like these would not affect common law nuisance claims in many states. *See Proby v.*

8   *State ex rel. West*, 498 So. 2d 792, 795 (Miss. 1986) (noting that "the common law had not been

9   preempted by our statutory scheme"); *Doe v. St. Joseph's Catholic Church*, 850 S.E.2d 267, 273

10   (Ga. App. 2020) (distinguishing between statutory and common law public nuisance); *City of*

11   *Sunland Park v. Harris News, Inc.*, 124 P.3d 566, 576 (N.M. App. 2005) (same); *In re Nat'l*

12   *Prescription Opiate Litig. (Lake Cty.)*, 477 F. Supp. 3d 613, 620 (N.D. Ohio 2020) (same).

13   　　　**Unfair Practices**. In Alabama and Illinois, McKinsey cites provisions that do not even

14   authorize claims by subdivisions. *See* Ala. Code § 8-19-8 (permitting "the Attorney General or

15   the … district attorney" to seek restraining orders); 815 Ill. Stat. § 505/7 (permitting "the

16   Attorney General or a State's Attorney" to seek an injunction, civil penalties, and restitution). In

17   those states, subdivisions have claims under different sections authorizing claims for actual

18   damages. *See* Ala. Code § 8-9-10; 815 Ill. Stat. § 505/10A. In California, the one county to plead

19   UCL and FAL claims did not do so in the name of the People, and so the Court need not decide

20   whether such claims would be precluded if differently captioned. *See Cty. of San Mateo v.*

21   *McKinsey & Co., Inc.*, No. 21-6009 (N.D. Cal.).

22   　　　　　　e.　　**McKinsey's expansive view of government privity would have**
　　　　　　　　　　　　**untoward consequences for attorney general litigation.**

23

24   　　　The flip-side of claim preclusion is claim joinder: if a claim would be precluded by an

25   action, then it must be brought in that action, or lost forever. *See, e.g.*, *Turtle Island Restoration*

26   *Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012); *Kent Cty. Bd. of Educ. v.*

27   *Bilbrough*, 525 A.2d 232, 239-40 (Md. 1987) ("So expansive a rule of claim preclusion would

28

1  have the effect of a compulsory joinder of claims in a plaintiff's complaint, a requirement which

2  the Federal Rules of Civil Procedure and the Maryland Rules have rejected.").

3  Taken to its logical conclusion, McKinsey's position would require attorneys general,

4  when bringing garden-variety enforcement or *parens patriae* actions, to also bring claims on

5  behalf of cities and counties or forfeit those claims. That is not what AGs do as common practice

6  or should be doing. They do not have the resources to bring every claim belonging to subdivisions

7  in each case or make a reasoned decision to decline to do so. Making those choices would have

8  significant political consequences, further hamstringing their ability to bring cases. And all of the

9  advantages of AG actions identified in the 11-state amicus brief—e.g., claims that do not require

10  proximate cause, States' Br. at 15—would be lost, for AGs would have to plead and prove

11  subdivision claims in most cases, or determine that those claims were meritless.

12  The Texas Attorney General has demonstrated this point in opioid litigation. When his

13  action against Purdue was joined in state multidistrict litigation with those brought by counties,

14  the Texas AG objected. He did not assert that the subdivision cases were required to yield to the

15  AG action. Instead, he moved to remand because the state's lawsuit was "unique as compared to

16  all 44 of the other similar Texas County lawsuits which have been consolidated in this Texas

17  Opioid MDL." Ex. G at 6. He explained that, while "[t]he State's enforcement lawsuit is brought

18  in the public interest" and asserted only a "DTPA claim," the counties' lawsuits, including their

19  "public nuisance claim[s]," were different, and would involve "the injuries of the Texas

20  Counties," including "the costs to social services, health systems, law enforcement, emergency

21  services, judicial systems, and treatment facilities of the county." *Id.* at 2, 11-12. He had no

22  interest in representing the subdivisions for their own claims, but McKinsey's position would

23  require him to do so.

24  The fact is that, while AGs are well-suited to enjoin misconduct and collect civil penalties,

25  they are poorly positioned to represent subdivisions. In addition to resource limitations and

26  political barriers, AGs have less ability to recover abatement and related remedies to redress

27  public and health and safety harms than do cities and counties. It has been well-documented that

28  the billions of dollars generated by the 1998 tobacco settlement went into states' general funds,

1    where they were generally used for anything except tobacco cessation, treatment, or prevention.

2    *See* Nora Freeman Engstrom & Robert L. Rabin, *Pursuing Public Health Through Litigation:*

3    *Lessons from Tobacco and Opioids*, 73 Stan. L. Rev. 285, 343 (2021). As a practical matter, AGs

4    cannot dictate how the funds they recover in the names of their states will be used. *See, e.g.*,

5    Micah L. Berman, *Using Opioid Settlement Proceeds for Public Health: Lessons from the*

6    *Tobacco Experience*, 67 Kan. L. Rev. 1029, 1044-47 (2019) (describing unsuccessful efforts to

7    direct funds to tobacco harm prevention programs); *id.* at 1052-53 (describing attorneys general

8    who did not view themselves as having power to direct funds). Cities and counties, on the other

9    hand, can and do apply their recoveries to abatement-specific programs, which is why they

10   spearheaded opioids litigation. *See, e.g.*, *id.* at 1035. That is why the settling distributors and J&J

11   required supermajority subdivision participation as a condition of implementation, and why the

12   participating states have reached allocation agreements with their subdivisions that send a

13   substantial percentage of the settlement money to subdivisions for local abatement, and provide

14   for shared decision-making over use of the majority of proceeds. *See*

15   https://nationalopioidsettlement.com/states/. McKinsey's decision (unique among opioids

16   defendants to date) to seek a shortcut settlement with AGs does not change this reality, and

17   should not upend the sound public policy that supports governmental entities suing for their own

18   harms, and applying their recoveries to address them.

19   **5.      McKinsey cannot show that the Attorneys General had authority to**
         **bring subdivision claims.**

20
         A threshold element of McKinsey's argument for preclusion is that the Attorney General

21   of each State had the authority to bring the subdivision claims asserted here. Without a

22   demonstration of that authority, McKinsey's motion stumbles repeatedly. As discussed in Section

23   A.3 above, the releases in the consent judgments were limited to claims that could be brought by

24   each AG; accordingly, their preclusive effect cannot go beyond the AGs' authority. And without

25   that authority, there can be no privity (as discussed above in Section A.4), for the Attorneys

26   General cannot be deemed to have represented the interests of the subdivisions if they lacked the

27   ability to do so. This missing element causes McKinsey an additional problem: claim

28

2314105.5

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1   preclusion—where it applies—extends at most to claims that "could have been brought in the

2   previous action." *Howard v. City of Coos Bay*, 871 F.3d 1032, 1039 (9th Cir. 2017) (citation

3   omitted).[34] If the Attorneys General could not represent subdivisions, then by definition the

4   subdivision claims could not have been brought in the attorney general actions.

5          McKinsey ignores how the AGs' authority affects the scope of preclusion, assuming that

6   AG authority is relevant only to the contractual argument and not to res judicata. *See* Mot. at 37-

7   44. But the States sued and settled with McKinsey through particular agents with defined

8   responsibilities and powers. The preclusive effects of those agents' actions necessarily are limited

9   by the scope of those powers. *See, e.g.*, *Medcalf v. Thompson Hine LLP*, 84 F. Supp. 3d 313, 322-

10  23 (S.D.N.Y. 2015) (explaining that "the existence of an agency relationship … does not establish

11  privity for the purposes of res judicata without more" and that there is no preclusion where the

12  agent acted outside the scope of his authority).

13         To prove claim preclusion, McKinsey therefore must establish that the AGs had authority

14  to bring subdivision claims. In many states, McKinsey does not cite—and evidently could not

15  find—a single case in which the state attorney general actually represented a subdivision. The

16  lack of any history of the exercise of the power McKinsey attributes to state attorneys general is

17  compelling evidence that such power does not exist. *See, e.g.*, *Printz v. United States*, 521 U.S.

18  898, 907-08 (1997) ("Indeed, it can be argued that the … utter lack of statutes imposing

19  obligations on the States' executive … suggests an assumed *absence* of such power.); *Plaut v.*

20  *Spendthrift Farm, Inc.*, 514 U.S. 211, 230 (1995) ("That prolonged reticence would be amazing if

21  such interference were not understood to be constitutionally proscribed.").

22         Instead of identifying and analyzing actual state law and actual state practice, McKinsey

23  points to two principles, one that it asserts exists in every state, and one that it says exists in some:

24  (1) that the AG is the "chief legal officer" of the state and (2) that many AGs possess common

25  law powers (never mind that the home rule revolution displaced the common law). This is not

26

---

27  [34] The States employ various formulations to describe the scope of claim preclusion, including
    "same transaction," "same cause of action," etc. While the different tests likely yield different

28  outcomes in edge cases, no state would preclude claims that could not have been brought in the
    previous action.

1    serious analysis of the diverse landscape of state law, but instead invention of a national common

2    law of state attorneys general. *See* Margaret H. Lemos, *State-Local Litigation Conflicts*, 2021

3    Wisc. L. Rev. 971, 989 (2021) (efforts by state AGs to "quash truly local litigation … appear[] to

4    be relatively uncommon," and power to do so is "contingent on the details of state law"); Swan,

5    *Plaintiff Cities*, at 1257 ("The authority of state attorneys general to bind their municipalities

6    ultimately depends on state law, and states' laws differ.").

7           Given the missing state-law answers to these state-law questions, McKinsey's preclusion

8    motion would require the Court to resolve them as first impression. The ask is breath-taking: a

9    single federal court deciding in one swoop the delineation of litigating authority between different

10   political actors in twenty-two states. But blazing new trails in areas "intimately involved with the

11   States' sovereign prerogative" is not a familiar or comfortable role for a federal court.

12   *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 717 (1996) (citation omitted). It is not a task the

13   Court should undertake unless necessary to resolve the controversy before it.

14          There is no necessity here. McKinsey bears the burden of establishing the elements of

15   claim preclusion beyond "any doubt." *Steen*, 106 F.3d at 912. Here, the state laws at issue either

16   show that attorneys general *lack* the authority to represent subdivisions or do not answer the

17   question either way. In either case, McKinsey fails to carry its burden and its motion must fail.

18                  **a.**      **In eleven States, the Attorney General lacks the authority to**
19                              **represent subdivisions.**

20          The attorney general of the following states lacks the authority to represent subdivisions:

21   Florida, Hawaii, Illinois, Louisiana, Maryland, Missouri, New Mexico, New York, Tennessee,

22   Utah, and Wisconsin.

23          **Florida**. The Florida AG is required to "appear in and attend to, in behalf of the state, all

24   suits … in which the state may be a party, or in anywise interested." Fla. Stat. § 16.01(4). In two

25   seminal decisions, the Florida Supreme Court held that statutorily-created bodies were not

26   required to permit the AG to represent them in legal matters, but could employ special counsel of

27   their choosing. *See Watson v. Caldwell*, 27 So. 2d 524, 528-29 (Fla. 1946) (explaining that the

28   statute establishing the "Trustees of the Internal Improvement Fund … contemplated the conduct

of law suits and legal actions," which "necessarily implied that the Trustees should have power and authority to employ counsel to represent them"); *Holland v. Watson*, 14 So.2d 200, 202-03 (Fla. 1943) (explaining that the "State Board of Administration … is not one of the Executive Departments that the Attorney General is required by the Constitution to advise, has no relation whatever to these departments, and was unknown to the common law" and that "[i]n creating these boards, the legislature might have made the Attorney General their legal advisor but it did not do so"). Like the bodies in *Caldwell* and *Holland*, Florida cities and counties are created by statute with express powers, including to sue and be sued. *See* Fla. Stat. § 125.15 (counties); *Florida City Police Dep't v. Corcoran*, 661 So. 2d 409, 410 (Fla. App. 1995) (cities).

McKinsey relies on *State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976), where the Fifth Circuit held that the AG could represent political subdivisions that have "not affirmatively authorized suit." *Id.* at 270. But *Shevin* distinguished *Caldwell* and *Holland* on the basis that those "cases dealt with a situation in which there was a conflict between the wishes of the Attorney General and the government body as to the body's legal representation." *Id.* at 273. In *Shevin*, "there [was] no evidence in the record … of any objection on the party of the government bodies which allegedly have been injured by the defendants' business practices," and "it seem[ed] most unlikely that those government entities would prefer to prosecute their causes of action individually." *Id*. Here, as in *Caldwell* and *Holland*, there is such a conflict.

**Hawai'i**. The Hawai'i AG cannot represent subdivisions, at least not in the circumstances here. While the AG has statutory authority to "appear for the State" and "represent the State," Haw. Stat. §§ 26-7, 28-01, no statute authorizes her to represent subdivisions. Instead, counties are "expressly created bodies corporate and politic with power to sue and liability to be sued in the corporate name." *Reinhardt v. Cty. of Maui*, 23 Haw. 102, 105 (Haw. 1915); *see also* Haw. Stat. § 46-1.5(22) ("Each county shall have the power to sue and be sued in its corporate name.").

Even assuming that the statute provides authority to represent subdivisions, it does not give the AG free reign: when representing a "statutory client—a public officer or instrumentality of the state vested with policy-making authority," the AG is not free to adopt "her vision of what is in the best global interests of the state or the public at large." *Chun v. Bd. of Trs. of Emps.' Ret.*

1    *Sys. of the State of Haw.*, 952 P.2d 1215, 1233 (Haw. 1998). Instead, when the AG's

2    determination of the interests of the state conflict with the wishes of "her statutory client," the

3    Hawai'i Rules of Professional Conduct disallow the representation. *Id.* at 1234-40 (holding that

4    the AG could not represent the Board of Trustees when she disagreed with the Board as whether

5    to file an appeal and "did not afford the Board the loyal representation to which it was statutory

6    entitled"). Here, the subdivision plaintiffs, if they were represented by the AG, did not receive the

7    representation to which they were entitled. *See id.* at 1234 ("[We] do not accept the Attorney

8    General's contention that, merely because she regards her duty to represent the 'state's' legal

9    interests as being paramount to her duty to represent her statutory client's legal interests, she may,

10   in her sole discretion, so control the course of litigation as to advance her view of the 'public

11   welfare' when it squarely conflicts with the substantive position taken by the policy-making state

12   governmental instrumentality whom she represents as a named party to the litigation.").

13           **Illinois**. In Illinois, cities and counties are bodies politic and corporate with express

14   powers to "sue and be sued." 55 Ill. Stat. 5/5-1001; 65 Ill. Stat. 5/2-2-12. The Illinois Supreme

15   Court has held that "[n]either the constitution nor the statutes … have conferred upon the

16   Attorney General the power to represent public corporations" and [n]o such powers or duties

17   existed at common law." *People ex rel. Bd. of Trustees of Univ. of Ill. v. Barrett*, 46 N.E.2d 951,

18   954 (Ill. 1943). In so holding, the court explained that the "power of the legislature to create

19   public corporations is practically unlimited," and emphasized that the public corporation at issue

20   possessed by statute the "power … to sue and be sued … the same as if it were a municipal

21   corporation." *Id.* at 962-63; *see also People ex rel. Hartigan v. E&E Hauling*, 607 N.E.2d 165,

22   171 (Ill. 1992) (affirming that *Barrett* decided at minimum that "the Attorney General could [not]

23   impose his representation on a public corporation which objected to that representation").

24           McKinsey relies on *People ex rel. Devine v. Time Consumer Mktg., Inc.*, 782 N.E.2d 761

25   (Ill. Ct. App. 2002), but this case did not involve a lawsuit brought by a subdivision, but rather

26   one brought by the Cook County State's Attorney on behalf of the People of Illinois. *Id.* at 762-

27   63; *see also id.* at 765 ("[W]e now turn to the State's Attorney of Cook County's contention that

28   the release cannot be enforced with regard to the claims at issue because the Illinois Attorney

General does not have the authority to release a claim initiated by a State's Attorney on behalf of the People of the State of Illinois pursuant to the Consumer Fraud Act."). The case was brought under the provision of the Illinois Consumer Fraud Act authorizing either "the Illinois Attorney General or a State's Attorney" to seek an injunction, civil penalties, and restitution. *Id.* at 762; *see also* 815 Ill. Stat. § 505/7. The holding of the case was based on that authority made overlapping by express statute. Subdivisions are not authorized to bring those claims; rather, subdivisions may bring claims under § 505/10A of the Act, which authorizes "[a]ny person" to sue for "actual damages." 815 Ill. Stat. § 505/10A.

**Louisiana**. The Louisiana Attorney General generally cannot bring a claim on behalf of a governmental entity—like the parish plaintiff here—that has the capacity to sue and be sued. *See State ex rel. Caldwell v. Molina Healthcare, Inc.*, 283 So. 3d 472, 483 (La. 2019) (explaining that "the Attorney General's constitutional duty does not result in the state thereby being granted an interest in claims belonging to its subdivision" and discussing "the fundamental proposition that, in the absence of constitutional or statutory provisions to the contrary, the state cannot stand in judgment on a cause of action that is the property of one of its political subdivisions which has the right to sue and be sued") (quoting *State ex rel. Jones v. Doucet*, 14 So. 2d 622, 624 (La. 1943)); *see also State v. Tensas Delta Land Co.*, 52 So. 216, 221 (La. 1910) ("[N]o one would venture to say that the Attorney General could ignore the existence of these corporations and enforce, in the name of the state, any cause of action which any of them might have."). The court in *Caldwell* explained that AG authority over subdivision claims exists only where "highly exceptional circumstances" are present, such as "neglect or refusal to institute suit by a governmental entity statutory authorized to bring suit." 283 So. 3d at 485 (citation omitted). McKinsey does not cite any of the relevant cases or argue that such exceptional circumstances are present.

McKinsey cites La. Stat. § 49:257(D), which states that "the attorney general shall have authority to determine the purposes of the state, the department, or the state agency … to be served by the litigation." That provision is part of a section titled "Legal representation of certain state agencies," clearly does not refer to subdivisions, *see id.* § 49:257(A) ("the attorney general

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1    shall represent the state and all departments and agencies of state government"), and rightly goes

2    unmentioned in *Caldwell*, *Doucet*, and *Tensas*. *See also Saint v. Allen*, 134 So. 246, 246-49 (La.

3    1931) (rejecting the argument that the AG has authority to represent the highway commission,

4    and explaining that the state "Constitution … with reference to the duties of the Attorney General

5    and his assistants, has confined, by implication, the duties, there demanded to be rendered, to

6    those interests, possessed by the state, as a distinct entity, and has left it to the Legislature to

7    impose such other duties upon those officials as it may deem proper to do from time to time.).

8         **Maryland**. The Maryland Attorney General does not have the authority to represent

9    subdivisions. The AG's powers are only as specifically authorized by the text of the state

10   constitution and statutes. *See State ex rel. Att'y Gen. v. Burning Tree Club, Inc.*, 481 A.2d 785,

11   796 (Md. App. 1984) (explaining that "the Attorney General of Maryland possesses no common

12   law powers" and rejecting "out-of-state case law" asserting other states' AGs possess "broad

13   authority to initiate those suits which he believes are necessary to uphold the public interest").

14   And the Title of the Maryland Code enumerating the AG's powers sets out the circumstances

15   when the AG can represent "[p]olitical subdivisions": The AG "shall represent … the Board of

16   Supervisors of Elections of Baltimore City; the Board of Liquor Commissioners of Baltimore

17   City; and (3) the Sheriff of Baltimore City" and "may … represent a political subdivisions … as

18   to a matter that relates to State or federal antitrust law." Md. State Gov't Code, § 6-107. This

19   litigation involves neither the specified Baltimore offices, nor antitrust laws.

20        **Missouri**. The Missouri Attorney General does not have the authority to represent

21   subdivisions. In *State ex rel. Nixon v. Am. Tobacco Co., Inc.*, 34 S.W.3d 122 (Mo. 2000), the City

22   of St. Louis sought leave to intervene into the proceedings that resulted in Missouri's joining in

23   the nationwide settlement with the tobacco companies. *Id.* at 126. The City claimed "an interest in

24   the master settlement agreement and consent decree to the extent the approval of those

25   agreements may release the City's claims against the tobacco defendants" and "an interest in the

26   State's settlement proceeds if the attorney general has released its claims." *Id.* at 127. The court

27   denied intervention, holding that the City lacked any interest in the proceeding because the AG

28   could not possibly have released the City's claims:

1

2

3

4

5

> To say that the attorney general is empowered to enter settlements for the citizens of Missouri generally, including those who reside in the City of St. Louis, does not, however, answer the question of whether he has the power to compromise or extinguish a claim that is held by the City. The City of St. Louis has the power to litigate claims in its own right where its own financial interests have been affected, and we can find no statutory or constitutional provision that allows the attorney general to control or compromise the City's claims.

6    *Id.* at 128. The court explained that "the City's motion to intervene lacks a showing that the City's

7    interests in the future may be impaired or impeded by this settlement to support intervention as a

8    matter of right because the attorney general does not have the power to extinguish the City's

9    claim by this settlement." *Id.*

10       *Nixon*'s conclusion was compelled by applicable Missouri statutes. In Missouri, city

11   attorneys and county counselors are charged with representing cities and counties, respectively.

12   Mo. Stat. §§ 56.640 (county counselor represents "the county and all departments, officers,

13   institutions, and agencies thereof"), 98.330 ("It shall be the duty of the city attorney to prosecute

14   and defend all actions originating or pending in any court …"). And the Missouri Supreme Court

15   has long interpreted statutory assignrf litigating authority to be exclusive. *See State ex rel.*

16   *McKittrick v. Mo. Pub. Serv. Comm'n*, 175 S.W.2d 857, 862 (Mo. 1943) (holding that the AG

17   could not represent the Public Service Commission where a statute specifically required the

18   Governor to appoint an attorney to act as counsel for the Commission).

19       **New Mexico**. The New Mexico Attorney General has the authority to "prosecute and

20   defend … all actions or proceedings, civil or criminal, in which the state may be a party or

21   interests when, in his judgment, the interest of the state requires such action …." N.M. Stat. § 8-5-

22   2. But the AG's powers "may be limited or conditioned" by statute. *State v. Block*, 263 P.3d 940,

23   945 (N.M. App. 2011). In New Mexico, the AG is authorized "to act on behalf of [a] county"

24   only "upon the failure or refusal of any district attorney to act in any criminal or civil case or

25   matter in which the county … is a party or has an interest" and even then only after the AG

26   conducts "a thorough investigation" and "such action is ascertained to be advisable by the" AG.

27   N.M. Stat. § 8-5-3. This specific grant of authority dispels an unbounded reading of the more

28   general provision.

1      The New Mexico Supreme Court has held that the AG is unable to intervene in a case

2  brought by a district attorney, even where such action is "in the name of the state," absent a

3  showing that "the interests of the state are not being adequately represented or protected." *State*

4  *ex rel. Att'y Gen. v. Reese*, 430 P.2d 399, 402-03 (N.M. 1967). The court rejected the AG's

5  arguments (the same arguments McKinsey makes here) that he "is vested with common-law

6  powers," that "questions having statewide impact should be handled by him as an officer for the

7  entire state," and that the court should disregard the statute in light of concerns about a

8  "multiplicity of suits." *Id.* at 405-07. Instead, the court found the statutory language controlling.

9      This is consistent with the structure of political subdivision authority in New Mexico. In

10  "the State of New Mexico, counties do not operate as the state's arms or instrumentalities and,

11  instead, operate as independent political subdivisions." *Mayer v. Bernalillo Cty.*, No. 18-666,

12  2018 WL 6594231, at *27 (D.N.M. Dec. 13, 2018). Both counties and municipalities are bodies

13  politic and corporate with the express authority to sue or be sued. N.M. Stat. § 3-18-1 ("A

14  municipality is a body politic and corporate under the name and . . . may . . . sue or be sued.");

15  *Tenorio v. San Miguel Det. Ctr.*, No. 15-349, 2016 WL 9819588, at *5 (D.N.M. Aug. 11, 2016)

16  ("Under New Mexico law, counties are granted the same powers as municipalities, and therefore

17  may sue and be sued."). And the New Mexico Constitution home rule provisions state that "[t]he

18  purpose of this section is to provide for maximum local self-government. A liberal construction

19  shall be given to the powers of municipalities." N.M. Const. art X, § 6(E); *see also Kane v. City*

20  *of Albuquerque*, 358 P.3d 249, 264 (N.M. 2015) ("Municipal home rule was created to enable

21  municipalities to conduct their own business and control their own affairs, to the fullest possible

22  extent, in their own way.") (internal quotation marks omitted).

23      **New York**. The New York Attorney General is required to "[p]rosecute and defend all

24  actions and proceedings in which the state is interested ...." N.Y. Exec. Law § 63. This general

25  power does not extend to representing cities and counties, both of which are municipal

26  corporations with the power to sue and be sued. *See* N.Y. Cty. Law §§ 3, 51; N.Y. Gen. Mun.

27  Law § 2; *City of New York v. State*, 655 N.E.2d 649, 653 (N.Y. 1995) ("[F]rom early times

28  municipalities have had the statutory general power to sue and be sued in their own name …").

1   The limit on the AG's general power is confirmed by a sub-section of the authorizing statute, a

2   sub-section that authorizes the AG to sue on behalf of a county or city where funds held by a local

3   government are "without right obtained." N.Y. Exec. Law § 63-c(1). This law was enacted

4   specifically because the New York courts held that the AG otherwise lacked the power to pursue

5   fraud claims on the part of subdivisions. *See People v. Ingersoll*, 58 N.Y. 1, 20-21 (N.Y. 1874) (in

6   a pre-enactment fraud-on-the-government action, explaining that "I find no authority … for …

7   depriving a municipal corporation of a civil and corporation right of action … in the discretion of

8   the officer of the State"); *People v. Townsend*, 233 N.Y.S. 632, 636 (N.Y. Sup. Ct. 1929)

9   (explaining that § 63-c was enacted in light of *Ingersoll* "to give an additional remedy for the

10  plundering of municipalities by faithless and venal officials") (citation omitted). Here, of course,

11  regardless of her authority, the NY AG has clarified that she did not represent subdivisions in the

12  McKinsey settlement. Ex. C.

13      **Tennessee**. The Tennessee Attorney General does not have authority to represent cities

14  and counties. The AG is required to direct "all civil litigated matters and administrative

15  proceedings in which the state or any officer, department, agency board, commission, or

16  instrumentality of the state may be interested." Tenn. Code § 8-6-109(b)(1). Critically, for these

17  entities, the AG's authority is exclusive: "[a]ll legal services required … shall be rendered by, or

18  under the direction of, the attorney general" and "no such entities shall institute any civil

19  proceeding except through the attorney general and reporter." *Id.* § 8-6-301(a), (b).

20      This all-or-nothing approach to the AG's authority makes it clear that political

21  subdivisions are not "instrumentalities" subject to the AG's representation in litigation. Both have

22  express statutory authority to represent themselves in civil litigation. *See* Tenn. Code § 5-6-112(1)

23  ("The mayor has the power to … [i]f there is no county attorney, employ or retain counsel … to

24  represent the county either as plaintiff or defendant in such suits as may be brought by or against

25  the county …."); *id.* § 6-33-113(b)(1) ("The city attorney shall … [b]e responsible for

26  representing and defendant the city in all litigation in which the city is a party.").

27      Finally, when the Tennessee legislature intends the AG to represent subdivisions, it says

28  so expressly, confirming the absence of a general power. *See id.* § 8-6-109(b)(14) (specifically

1    empowering the AG to "bring suit upon behalf of … local government units or local education

2    agencies to recover public funds from entities financed by the funds and their directors or officers

3    when the funds through the improper actions of the directors or officers have been used for

4    unauthorized purposes, misapplied, or misappropriated"). The legislature has in fact made

5    specific rules as to opioid litigation, rules that do not preclude the actions here. *See id.* § 20-13-

6    203 (permitting the AG, as of May 24, 2021, to release pending or future claims of "governmental

7    entities" against McKesson, Cardinal, AmerisourceBergen, and Johnson & Johnson).

8         McKinsey relies on *State ex rel. Inman v. Brock*, 622 S.W.2d 36 (Tenn. 1981), but that

9    case concerned whether the AG could represent State Supreme Court Justices, whom the court

10   deemed obviously "officer[s] … of the state," making them subject to the plain terms of the

11   authorizing statute. *Id.* at 41-42 ("The legislature has undoubtedly vested the attorney general

12   with broad discretion to decide when he may lend the assistance of his office to defend public

13   officers."). Nothing about *Inman* establishes one way or the other whether subdivisions are

14   "instrumentalities" subject to AG authority.

15        **Utah**. The Utah Attorney General has the authority to "prosecute or defend all causes to

16   which the state or any officer, board, or commission of the state in an official capacity is a party,

17   and take charge, as attorney, of all civil legal matters in which the state is interested." Utah Code

18   § 67-5-1(2). The Utah Supreme Court, while recognizing the "broad powers" enjoyed by the AG,

19   has cautioned that such power "must be read in juxtaposition" with other statutes. *Hansen v. Utah

20   St. Ret. Bd.*, 652 P.2d 1332, 1337 (Utah 1982). Counties are bodies politic and corporate, with

21   express power to sue and be sued. Utah Code §§ 17-50-101, 17-50-302. The "county attorney,"

22   not the AG, "is the civil counsel for the county," *id.* § 17-18a-202, who "shall … appear in,

23   prosecute, and defend each civil action in which the county is a party," *id.* § 17-18a-501.

24   Moreover, Utah specifies the circumstances (in both civil and criminal matters) in which the

25   county attorney is required to assist the AG, *id.* § 17-18a-601, and in which the AG is required to

26   assist the county attorney (only in criminal matters). *Id.* § 17-18a-601. The specific statutory

27   scheme limits the broad authority asserted. *Hansen*, 572 P.2d at 1340 (holding that the AG lacked

28

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

authority to represent members of independent state agencies with "specific statutory authority authorizing the employment of independent counsel").

**Wisconsin**. It is unlikely that the Wisconsin Attorney General can represent cities and counties. His powers are strictly statutory; he is "devoid of [] inherent power." *State v. Wis. Tel. Co.*, 284 N.W.2d 41, 44 (Wis. 1979). The Wisconsin legislature has ensured that the AG lacks even general power to represent the state (no doubt why the McKinsey settlement was not converted to judgment). Instead, he may "prosecute" litigation in the trial court "in which the state or the people of this state may be interested" only "[i]f requested by the governor or either house of the legislature." Wis. Stat. § 165.25(1m). The authorizing statute sets out in granular detail when the AG can represent sub-state actors, but does not authorize the AG to represent cities or counties. *See, e.g.*, *id.* § 165.25(4) ("The department of justice shall furnish legal services upon request to the department of safety and professional services under § 167.35(7) [and] in all proceedings under § 440.21(3)."). Instead, the only mention of subdivisions in the authorizing section is a sub-provision granting *them* the power to make "appropriation[s] or grants" that the AG is then required to "receive and expend for its purposes." *Id.* § 165.25(15).

In contrast to the lack of any statute authorizing the AG to represent subdivisions, the Wisconsin statutes are clear that cities and counties can sue on their own behalf. Both are bodies politic and corporate with the power to sue and be sued. *Id.* §§ 59.01, 60.01, 66.0213; *see also Washburn Cty. v. Thompson*, 75 N.W. 309, 311 (Wis. 1898) ("[T]he law is well settled that public corporations have power to effect the compromise of claims in favor of or against them, and that such power is a necessary incident of the right to sue and be sued."). Counties "may employ a corporation counsel," who has the duty to "[p]rosecute and defend all civil actions … in any … body in any jurisdiction … in which the county … is interested or a party." Wis. Stat. § 59.42(2)(b). Likewise, cities must appoint a "city attorney" who "shall conduct all the law business in which the city is interested. *Id.* §§ 62.09(12), 63.29.

Finally, the Wisconsin legislature has recognized that the AG does not have general authority to release subdivision claims in opioid settlements. A statute effective in July 2021 requires, in any opioid case, that "[t]he attorney general … cooperate with local governments in

the state that are parties in the opiate litigation in entering into a joint settlement agreement of the legal or equitable claims of the state … and the claims of local governments" so long as the settlement divides the proceeds "30 percent … payable to the state" and "70 percent … payable to local governments." Wis. Stat. § 165.12(2). Importantly, "[n]o money paid or payable to the local governments may be considered moneys of the state" but instead "may be paid directly only to local governments." *Id.* § 165.12(4).

### b. In eleven States, it is unclear at best whether the Attorney General can represent subdivisions.

In the following states, the law is, at best for McKinsey, ambiguous as to whether the attorney general can represent subdivisions: Alabama, California, Georgia, Kentucky, Michigan, Mississippi, Ohio, Oklahoma, Pennsylvania, Virginia, and Texas. In none is there any direct and specific authority establishing the AG's right to represent subdivisions under any circumstances analogous to this case. McKinsey comes closest to making the required showing in Michigan, but *In re Certified Question*, its only relevant authority from that state, is distinguishable for the reasons explained in Section 4.c above. The remaining states are discussed here:

**Alabama**. It is at best unclear whether the Alabama Attorney General can bring claims on behalf of cities and counties within the state. By statute, "[a]ll litigation concerning the interest of the state, or any department of the state, shall be under the direction and control of the Attorney General." Ala. Code § 36-15-21. There is no indication that a subdivision is a "department of the state." Instead, cities and counties are "bodies politic and corporate" that "shall sue and be sued," Ala. Code § 11-40-1. Statutes distinguish subdivisions from "departments." *E.g.*, *id.* § 11-1-10 (empowering counties to enter into agreements, "with the State of Alabama or any of its … departments … and with any other county or municipality").[35] And when referring to counties and cities, Alabama statutes typically use the term "local governmental unit" or "political subdivision." *E.g.*, *id.* §§ 11-80-8.1, 9-10-42.

Caselaw does not help McKinsey either. McKinsey cites *Ex Parte King*, 59 So. 3d 21 (Ala. 2010), but that case involved litigation brought by a district attorney, not a subdivision. *Id.*

---

[35] *See also, e.g.*, *id.* § 9-3-18(b) ("The state and any department, office, or agency of the state, any municipality, any fire, water, sewer, garbage, or school district ….").

at 23. Alabama district attorneys charged with representing the state, not subdivisions, *see id.* at 28 ("district attorneys … are charged with instituting and prosecuting criminal and civil actions on behalf of the State"), and are expressly subject to the "advice" and "direct[ion] of the AG," Ala. Code § 36-15-15. Consistent with that district attorney role, there was no dispute in *King* that the action was "on behalf of the State." 59 So. 3d at 29; *see also id.* at 28 ("The district attorney argues that … it is the duty of a district attorney to prosecute civil actions in which the State is interests…"). In short, *King* was an action on behalf of the state, not a subdivision.

While there are cases where the AG represents the state (like *King*), state agencies, *Ex Parte Weaver*, 570 So. 2d 675, 685 (Ala. 1990),[36] and state employees, *Quinlan v. Jones*, 922 So. 2d 899, 910 (Ala. App. 2004),[37] there is no case where the AG represented subdivisions. In fact, the best clue suggests the AG lacks the authority to do so. In *Lloyd v. Ala. Dep't of Corr.*, 176 F.3d 1336 (11th Cir. 1999), the district court entered a consent decree involving a county, its jail, and its personnel. *Id.* at 1338. The Alabama AG moved to intervene and terminate the consent decree. The court held that the AG had an "interest" sufficient for intervention because "[t]he decree orders that state inmates will be transferred from county to state jails within a specified period of time, impacting the economic ability of the State to have facilities available to transfer [and] thus directly affects the interests of the State of Alabama." *Id.* at 1340. Had the AG possessed the authority to represent the county itself, there would have been no reason for the court to rely on the interests of the State to justify intervention.

**California**. In California, the AG has authority to "file any civil action or proceeding directly involving the rights and interests of the state, or which he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights and interests." *Pierce v. Sup. Ct.*, 37 P.2d 460, 461 (Cal. 1937). Conversely, counties have the specific express power to sue and be sued, and to do so through district attorneys or county counsel. Cal. Gov't Code § 23004 ("A county may … [s]ue and be sued."); *id.* § 26520 ("The district attorney shall render legal services to the county …."); *id.* § 26529 ("In counties that have

---

[36] *Overruled on other grounds*, 57 So. 3d 704, 736-37 (Ala 2010).

[37] *Reversed on other grounds*, 922 So. 2d 914 (Ala. 2005).

a county counsel, the county counsel shall discharge all the duties vested in the district

attorney."). Of particular relevance to these proceedings, actions to abate public nuisances "may

be brought … by the district attorney or county counsel of any county in which the nuisance

exists, or by the city attorney of a town or city in which the nuisance exists," authority not granted

by statute to the AG. Cal. Civ. P. Code § 731.

The only California decision permitting the AG to represent a subdivision seeking to

recover for harm to itself expressly conditioned that determination on a finding of unique

circumstances, including the subdivision effectively consenting to such representation. *See

People ex rel. Harris v. Rizzo*, 214 Cal. App. 4th 921, 936-38 & nn. 17, 19 (Cal. App. 2013)

(determining that the AG could represent a city in an action against corrupt officials where "it

appeared that city officials were acting outside the scope of the law, and the city itself could not

pursue the miscreants as they still controlled the city," and the city council "aske[d] that this

Court allow the [AG] to proceed and seek justice for our community" because "the City was

hemorrhaging funds and could ill afford to pursue defendants alone"). Other California statutes

specifically authorize AG representation of subdivisions with procedural protections for those

subdivisions, implying that the AG lacks any general residual power to represent subdivisions

without consent. *See Pac. Gas & Elec. Co. v. Cty. of Stanislaus*, 947 P.2d 291, 332-333 (Cal.

1997) (explaining that the Cartwright Act authorizes the AG to represent "the state or any of its

political subdivisions" but only if the AG first "give[s] the entity in question written notice" and

the entity declines "to divest the [AG] of such authority") (quoting Cal. Bus & Prof. Code

§ 16750(c)); Cal. Gov't Code § 12652(a) (under the state False Claims Act, authorizing to the AG

to "bring a civil action … on a claim involving political subdivision funds," but requiring notice

to the subdivision, and granting the subdivision "the right to intervene").

**Georgia**. The Georgia Attorney General has the duty "[t]o represent the state in all civil

actions …." Ga. Code § 45-15-3(6). The Georgia courts have not addressed whether that authority

extends to political subdivisions. Other indications are that it does not. The Georgia Constitution

specifically protects counties' and cities' home rule rights. Ga. Const. Art. IX § II ¶¶ I & II. And

both cities ("municipal corporation[s]") and counties ("bod[ies] corporate") are granted by statute

1   the power "to sue and be sued." Ga. Code § 36-1-3; Woodbury, Ga. City Charter § 1.[38] Another

2   indication is that, while notice of rulings in lawsuits against the State or its officials must be

3   served on the AG, Ga. Code § 9-10-2, no parallel provision exists for lawsuits against a county or

4   city, and in fact statutes require service on those bodies' leadership directly, *id.* §§ 36-1-5

5   (counties); 36-33-5(f) (cities). In addition, when the Georgia legislature intends for the AG to

6   represent subdivisions, it says so expressly, suggesting that the default rule is for subdivisions to

7   represent themselves. *See* Ga. Code §§ 23-3-121-122 (under the Taxpayer Protection Against

8   False Claims Act, authorizing the AG to "bring a civil action" or "delegate to the local

9   government the authority to bring a civil action on its own behalf, or on behalf of any subdivision

10  or such local government, to recover damaged sustained by such local government as a result of

11  such violations").

12        McKinsey relies on *Perdue v. Baker*, 586 S.E.2d 606 (Ga. 2003), but that case held only

13  that the Governor could not compel the AG to dismiss an appeal because Georgia law did "not

14  vest either officer with the exclusive power to control legal proceedings involving the State of

15  Georgia." *Id.* at 609. *Perdue* has nothing to do with subdivision litigation and, if anything, only

16  confirms that McKinsey's vision of absolute AG authority does not reflect the real world. *See id.*

17  at 609-10 (holding that the Governor may independently "initiate legal proceedings to protect the

18  State's interests; [] may ensure that the State's interests are defended in legal actions; and [] may

19  institute investigations of wrongdoing by state agencies and officials"). If the State of Georgia has

20  somehow survived with dual litigating authority between a Governor and an AG, then separate

21  subdivision litigation is hardly the public policy disaster McKinsey portrays it to be.

22        **Kentucky**. Whether the Kentucky Attorney General can represent cities and counties is

23  unclear. The AG "is the chief law officer of the Commonwealth of Kentucky and all of its

24  departments, commissions, agencies, and political subdivisions." Ky. Rev. Stat. § 15-020(1). This

25  authority does not extend to representation of cities and counties in litigation for three reasons.

26  *First*, while Kentucky courts generally recognize counties as "subdivisions," the same is not true

27  of cities. *See Wilson v. City of Central City*, 372 S.W.3d 863, 868 (Ky. 2012) (concluding that

28  ─────────────
[38] https://library.municode.com/ga/woodbury/codes/code_of_ordinances?nodeId=PTICHRELA

cities are not "political subdivisions" under the Whistleblower Act, and explaining that "[w]hether an entity is or is not a political subdivision is not always clear" and that while "the main purpose of counties has been to function as administrative subdivisions of the state, … [o]n the other hand, cities are incorporated to manage purely local government functions, not to be agents of the central state government") (citation omitted); *see also id.* at 867 (noting "numerous Kentucky laws in which the General Assembly has designated municipalities as separate from either the Commonwealth or its political subdivision" and concluding that "we should not read the word 'municipality' into a statute when the General Assembly has shown a clear ability to include it if it desires to").

*Second*, the AG's role as "chief law officer" does not mean the AG has the authority to litigate on behalf of counties. A separate provision provides the AG litigating power and says nothing about counties. *See* Ky. Rev. Stat. § 15.020(3) ("[T]he Attorney General shall … commence all actions or enter an appearance in all cases, hearings, and proceedings in and before all other courts, tribunals, or commissions in or out of the state, and attend to all litigation and legal business in or out of the state required of the office by law, or in which the Commonwealth has an interest, and any litigation or legal business that any state officer, department, commission, or agency may have in connection with, or growing out of, his, her, or its official duties."). Instead, Kentucky law authorizes county "fiscal court[s]" to "[e]xercise all the corporate powers of the county unless otherwise provided by law," *id.* § 67.080(1)(e), and provides that "[t]he county attorney … when so directed by the fiscal court … shall institute, defend, and conduct all civil actions in which the county … is interested," *id.* § 69.210(1).

*Third*, under at least one statute, the Kentucky legislature has expressly assigning to the state litigating authority on behalf of cities and counties, suggesting that such authority does not, by default, exist. *See id.* § 65.045 ("The authority to bring suit and right to recover against any firearms or ammunition manufacturer …. by or on behalf of any city, county …. or other local government unit … shall be reserved exclusively to the Commonwealth.").

**Mississippi**. The Mississippi Attorney General is "the chief legal officer and advisor for the state … and is charged with managing all litigation on behalf of the state. Miss. Code § 7-5-1.

The AG "is given the sole power to bring or defend a lawsuit on behalf of a state agency, the subject matter of which is of statewide interest." *Id.* Conversely, the Mississippi code expressly anticipates subdivisions bringing their own litigation. *Id.* §§ 11-45-17 ("Any county may sue and be sued in its name … but suit shall not be brought by the county without the authority of the board of supervisors."), 11-45-25 ("A municipality may sue and be sued in its corporate name.").

Other provisions in the code confirm that cities and counties are not "the state" or an "agency" subject to the AG's representation. The Mississippi code distinguishes between lawsuits by and against the state, *id.* §§ 11-45-1 ("When and where state sued"), 11-45-11 ("State entitled to all remedies") and those by and against cities and counties, *id.* §§ 11-45-17 ("Suits by and against county"), 11-45-25 ("Suits by and against municipalities"); *see also id.* § 11-46-1(i), (j) (distinguishing between "the State" and "political subdivision," the latter of which is defined as "as "any body politic or corporate *other* than the state") (emphasis added)s.

The Mississippi Supreme Court has authorized the AG to bring a suit "for an on behalf of the state for the use and benefit of" a county. *State ex rel. Patterson for Use and Benefit of Adams Cty. v. Warren*, 180 So. 2d 293 (Miss. 1965). *Patterson* is distinguishable on several grounds. *First*, while *Patterson* permitted the AG to represent the state and seek money to "benefit" the county, the case did not deal with a situation where the AG sought to release the county's own claims (and said nothing about the preclusive effect such a "for the use and benefit of" case might have). *Second*, the court deferred to the AG's determination that the issue—whether a county board of supervisors misused funds—was "of statewide concern" because it "pertain[ed] … to the duties and powers of boards of supervisors, not only in Adams County but in all of the eighty-two counties." *Id.* at 308. Here, as explained above, opioid litigation raises particularized local concerns. *Third*, as in the *Rizzo* case from California, 214 Cal. App. 4th 921, the defendants were the very same officials who controlled the city, and so could hardly be expected to authorize litigation against themselves.

**Ohio**. There is no affirmative indication the Ohio Attorney General can represent cities or counties. The AG "is the chief law officer for the state and all its departments" and "shall appear for the state in any court or tribunal in a cause in which the state is a party, or in which the state is

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

1    directly interested." Ohio Rev. Code § 109.02. The term "State" includes "all departments,

2    agencies, institutions, and other instrumentalities of the state of Ohio," but "does not include

3    political subdivisions." *Id.* § 109.36(B); *see also id.* § 102.01(3) (distinguishing between

4    "department" and "county, municipal corporation, township"). Both cities and counties have the

5    power to sue and be sued. *Id.* §§ 305.12, 715.01. Indeed, cities are specifically authorized to abate

6    nuisances through the courts. *Id.* § 715.44. While the Ohio AG previously supported legislation to

7    give him authority to represent subdivisions, the state legislature did not enact it. *See* Jeremy

8    Pelzer, *Bill seeks to give Ohio AG Dave Yost control over local opioid lawsuits*, Cleveland.com

9    (Aug. 28, 2019).[39] Instead, in connection with other national settlements, Ohio reached allocation

10   agreements with its cities and counties. https://nationalopioidsettlement.com/states/ohio/.

11        **Oklahoma**. The Oklahoma Attorney General is authorized "[t]o appear for the state" in

12   civil actions. Okla. Stat. Title 74 § 18b. The general grant of authority does not mention cities or

13   counties, both of which are bodies politic and corporate, with the power to sue and be sued. *Id.*

14   Title 11 § 22-101; Title 19 § 1. When the Oklahoma legislature intends to transfer litigating

15   authority from subdivisions to state entities, it does so expressly. *See Marshall Cty., Okla. v.*

16   *Homesales, Inc.*, 339 P.3d 878, 884 (Okla. 2014) (authority to seek unpaid documentary taxes on

17   behalf of county given to Oklahoma Tax Commission and AG); *R.J. Edwards, Inc. v. Hert*, 504

18   P.2d 407, 418-19 (Oka. 1972) (explaining that, by statute, the AG "is made the attorney for these

19   subdivisions which desire to issue public securities or bonds"). McKinsey cites *State ex rel.*

20   *Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813 (Okla. 1973), but that case was at first about

21   whether one AG could vacate a settlement entered into on behalf of the state by the predecessor

22   AG, and then, once the new AG abandoned that issue on appeal, about whether the particular

23   settlement at issue had sufficient consideration. *Id.* at 818-21. *Derryberry* says nothing about

24   whether and when the AG can represent subdivisions.

25        **Pennsylvania**. The Pennsylvania Attorney General probably lacks the power to represent

26   counties (at present, only a county has sued McKinsey). The powers of the AG are limited by

27

28   ───────────────────
     [39] https://www.cleveland.com/open/2019/08/bill-seeks-to-give-ohio-ag-dave-yost-control-over-local-opioid-lawsuits.html

2314105.5                                         - 56 -                    SUBDIVISION OPP. TO MOT. TO DISMISS
                                                                            (RES JUDICATA AND RELEASE)
                                                                            21-MD-02996-CRB (SK)

statute. *See Commonwealth v. Carsia*, 517 A.2d 956, 958 (Pa. 1986) ("[T]he powers of the state Attorney General are no longer an emanation from some bed of common law precepts, but are now strictly a matter of legislative designation and enumeration."). The relevant statute authorizes the AG to "represent the Commonwealth and all Commonwealth agencies and upon request, the Departments of Auditor General and State Treasury and the Public Utility Commission in any action brought by or against the Commonwealth or its agencies." 71 Pa. Stat. § 732-204(c). Counties, which have power to sue and be sued, 16 Pa. Stat. § 202, are defined as "political subdivisions," and are neither "the Commonwealth" nor its "agencies." *See, e.g.* 71 Pa. Stat. § 1991 (defining, on the one hand, "Commonwealth" as "The Commonwealth of Pennsylvania" and, on the other, "Political Subdivisions" as "[a]ny county, city …."); *id.* § 733-506 (applying statute separately to an "agency" and a "political subdivision").

**Virginia**. The Virginia Attorney General does not have authority to represent political subdivisions. The AG performs "[a]ll legal service in civil matters for the Commonwealth, the Governor, and every state department, institution, division, commission, board, bureau, agency, entity, official court, or judge, including the conduct of civil litigation in which any of them are interested." Va. Code § 2.2-507. Cities and counties are not any of enumerated items, but instead are "local governments" or "bod[ies] politic," with the express power to "sue or be sued." *Id.* §§ 15.2-1402, 1404. The title of the Virginia Code setting out the powers of the AG (Title 2.2: Administration of the Government Generally) is different than the title setting out the powers of local governments (Title 15.2: Counties, Cities and Towns). The latter expressly contemplates all work on behalf of subdivisions be performed by officers or employees of those subdivisions, not of the Commonwealth. *See id.* § 15.2-822 ("Whenever it is not designated herein what officer or employee of the county shall exercise any power or perform any duty conferred upon or required of the county, of any officer thereof, by general law, then any such power shall be exercised or performed by that officer or employee of the county so designated by ordinance or resolution of the board."). Finally, local governments are expressly empowered to "maintain an action to compel a responsible party to abate, raze, or remove a public nuisance." *Id.* § 15.2-900.

1    **Texas**. The Texas Attorney General's authority is circumscribed by statute. While the AG

2    may "prosecute and defend all actions in which the state is interested before the supreme court

3    and courts of appeals," the AG does not even have general authority to bring affirmative litigation

4    in the trial courts. *See De La Cruz v. Brown*, 109 S.W.3d 73, 78 (Tex. App. 2003) ("While there is

5    no general statute authorizing the Attorney General to represent the State and its agencies in

6    district court, the Legislature has provided for such representation in particular types of cases."),

7    *rev'd on other grounds*, 156 S.W.3d 560 (Tex. 2004); 36 David B. Brooks, *Texas Practice Series,*

8    *County & Special District Law* § 21:13 (2d ed.) ("Depending on the legislation in question, the

9    state may be represented in trial court by either the attorney general or a local county or district

10   attorney."); *see also, e.g.*, *Brady v. Brooks*, 89 S.W. 1052, 1053 (Tex. 1905) (recognizing that the

11   legislature had authorized in a tax law "[t]he Attorney General … to bring suit in the name of the

12   state … to recover all taxes, penalties and forfeitures mentioned in this act").

13   Accordingly, Texas law specifies when the AG can represent subdivisions. First, "[t]he

14   attorney general may bring an action on behalf of the state or of any of its political subdivisions

15   or tax supported institutions to recover the damages provided for by the federal antitrust laws"

16   after providing notice to the subdivision. Tex. Bus. & Com. Code § 15.40(a). Upon receiving

17   notice, the subdivision may "withdraw the authority of the attorney general to bring the intended

18   action." *Id.* Second, under the State's emergency management laws, "[t]he attorney general may

19   provide legal counsel to a political subdivision subject to a declared state of disaster … on issues

20   related to disaster mitigation, preparedness, response, and recovery applicable to the area subject

21   to the disaster declaration." Tex. Gov't Code § 418.195(b). The Texas legislature has not

22   otherwise granted the AG broad powers to represent subdivisions, particularly in light of the

23   general limits to his authority.

**B.    McKinsey's motion to dismiss based on release should be denied.**

25   Like res judicata, release is an affirmative defense not amenable to a 12(b)(6) analysis.

26   *See* Fed. R. Civ. P. 8(c)(1). Most of the problems inherent to McKinsey's preclusion argument are

27   dispositive of its contractual argument as well. To start, the interpretation of contracts is a matter

28   of state law, and McKinsey does not conduct any analysis of any variations in applicable state

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)

law. This alone is basis for denying the motion on the contractual point. *See In re United Parcel Serv., Air-In-Ground Mkt. & Sales Prac. Litig.*, 580 F. App'x 543, 544 (9th Cir. 2014) (vacating grant of motion to dismiss in MDL, and holding that "[t]he district court should have addressed choice of law and conflict of law before making a determination on the merits of [the defendant's] dismissal motions").[40] Even putting that aside, McKinsey's motion must be denied.

**Meaning of Release**. As explained in Section A.3 above, the plain terms of the release do not include subdivision claims, an omission that must be understood as deliberate given both the context of the negotiations and the terms of the injunction that do expressly refer to subdivision claims. And even if the contracts were deemed ambiguous on this point, the motion to dismiss should be denied.

**Lack of AG Authority**. As explained above in Section A.5, McKinsey is unable to demonstrate on a state-by-state basis (indeed, does not really try) that the AGs had the authority to bring or release subdivision claims. This is dispositive because it means the AGs could not bind subdivisions to the agreements, and, as explained in Section A.3, the release by its terms incorporates only claims the AG could bring.

**Agency**. McKinsey ignores that its motion asks the Court to bind subdivisions to contracts to which they were not parties. Doing so requires "the existence of an agency or similar relationship between the non-signatory and one of the parties to the" contract. *NORCAL Mut. Ins. Co. v. Newton*, 84 Cal. App. 4th 64, 76 (Cal. App. 2000). This is not only a question of state law that McKinsey does not explore, but also a question of fact. *See, e.g.*, *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, No. 15-6314, 2018 WL 3707283, at *3 (N.D. Cal. Aug. 3, 2018) ("The existence of an agency relationship generally presents a question of fact.") (citation omitted). Here, there are only two "Parties" to each consent judgment: "McKinsey and the Attorney General." McKinsey Ex. DD ¶ I.D. The AG-subdivision relationship, even as McKinsey imagines it, does fit the standard agency model. *See, e.g.*, *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443,

---

[40] *See also, e.g.*, *In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Prac. Litig.*, No. 12-2320, 2013 WL 1332097, at *1 (D.N.H. Apr. 2, 2013) (in MDL, denying motion to dismiss where defendant did not perform choice of law analysis, and explaining that "[n]ot only do the elements of the plaintiffs' claims differ from state to state, but state courts also interpret those elements differently").

448 (9th Cir. 2018) ("For an agency relationship to exist, … the person represented must have a right to control the actions of the agent.") (citation omitted). Regardless, McKinsey cannot show, factually or legally, that the AGs acted as authorized or adequate representatives of subdivisions in entering into the consent judgments, as opposed to as representatives of the States only. *See, e.g.*, *van't Rood v. County of Santa Clara*, 113 Cal. App. 4th 549, 573 (Cal. App. 2003) ("A principal cannot be held liable when an actual agent acts beyond the scope of his actual or ostensible authority.").

## IV.     **CONCLUSION**

McKinsey cannot meet its burdens of proof on its affirmative defenses of res judicata and release. The motion to dismiss should be denied.

Dated: February 14, 2021                      Respectfully submitted,

By: */s/ Aelish M. Baig*
Aelish M. Baig
aelishb@rgrdlaw.com
**ROBBINS GELLER RUDMAN & DOWD, LLP**
One Montgomery Street, Ste. 1800
San Francisco, CA 94104
Telephone: (415) 288-4545

By: */s/ Emily Rourk*
Emily Roark
emily.roark@bryantpsc.com
**BRYANT LAW CENTER, PSC**
601 Washington Street, P.O. Box 1876
Paducah, KY 42002-1876
Telephone: (270) 550-1230

By: */s/ Jayne Conroy*
Jayne Conroy
jconroy@simmonsfirm.com
**SIMMONS HANLY CONROY, LLC**
112 Madison Avenue, 7th Floor
New York, NY 10016
Telephone: (212) 257-8482

By: */s/ Joe Rice*
Joe Rice
jrice@motleyrice.com
**MOTLEY RICE, LLC**
28 Bridgeside Boulevard

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mt. Pleasant, SC 29464
Telephone: (843) 216-9000

By: */s/ Matthew Browne*
Matthew Browne
mbrowne@brownepelican.com
**BROWNE PELICAN, PLLC**
7007 Shook Avenue
Dallas, TX 75214
Telephone: (405) 642-9588

*PSC Members – Political Sub-Divisions*

Samuel Issacharoff
40 Washington Square South, 411J
New York, NY 10012
(212) 998-6580

*Additional Counsel for Plaintiffs*

**Filing Authorized by Plaintiffs' Lead Counsel
Pursuant to PTO 2:**

By: */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
ecabraser@lchb.com
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

2314105.5

SUBDIVISION OPP. TO MOT. TO DISMISS
(RES JUDICATA AND RELEASE)
21-MD-02996-CRB (SK)