1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11   IN RE: McKINSEY & CO., INC.        Case No. 21-md-02996-CRB (SK)
     NATIONAL PRESCRIPTION OPIATE

12   CONSULTANT LITIGATION           **SUBDIVISION AND SCHOOL DISTRICT**
                                    **PLAINTIFFS' SUPPLEMENTAL BRIEF**

13   This Document Relates to:            **IN OPPOSITION TO McKINSEY**
                                    **DEFENDANTS' MOTION TO DISMISS**

14   ALL SUBDIVISION ACTIONS        **ON THE GROUNDS OF RES JUDICATA**
                                    **AND RELEASE**

15   ALL SCHOOL DISTRICT ACTIONS

16

17

18

19

20

21

22

23

24

25

26

27

28

2421715.1                                             SUBDIVISION AND SCHOOL DISTRICT PLAINTIFFS'
                                                               SUPPLEMENTAL BRIEF
                                                             21-MD-02996-CRB (SK)

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ....................................................................................................... 3

    A.    McKinsey cannot establish that the AGs had exclusive or concurrent authority to bring the subdivision claims pleaded in this MDL. .......................... 3

        1.    State law matters. ................................................................................. 3

        2.    McKinsey's construct of "statewide public interest claims" does not reflect actual state law. ....................................................................... 6

        3.    McKinsey's construct of "statewide public interest claims" does not reflect Plaintiffs' actual claims .......................................................... 7

    B.    McKinsey's state-by-state arguments fail. ............................................... 8

        1.    Alabama ............................................................................................... 9

        2.    California ........................................................................................... 10

        3.    Florida ............................................................................................... 12

        4.    Georgia .............................................................................................. 13

        5.    Hawai'i .............................................................................................. 15

        6.    Illinois ............................................................................................... 16

        7.    Kentucky ........................................................................................... 17

        8.    Louisiana ........................................................................................... 18

        9.    Maryland ........................................................................................... 19

        10.    Michigan ........................................................................................... 19

        11.    Mississippi ........................................................................................ 21

        12.    Missouri ............................................................................................ 22

        13.    New Mexico ...................................................................................... 22

        14.    New York .......................................................................................... 23

        15.    Ohio .................................................................................................. 24

        16.    Oklahoma .......................................................................................... 25

        17.    Pennsylvania ..................................................................................... 26

        18.    Tennessee .......................................................................................... 26

        19.    Texas ................................................................................................. 27

        20.    Utah .................................................................................................. 28

        21.    Virginia ............................................................................................. 29

        22.    Wisconsin .......................................................................................... 29

    C.    McKinsey obtained release of claims that the AGs are authorized by statute to bring, including valuable claims for civil penalties. ........................................ 30

    D.    McKinsey fails to prove its affirmative defense of res judicata ............................ 32

III.  CONCLUSION .................................................................................................. 33

# TABLE OF AUTHORITIES

**Page**

## CASES

*Associated Builders & Contractors v. City of Lansing,*
  880 N.W.2d 765 (Mich. 2016)............................................................ 20, 21

*Boyd County ex rel. Hedrick v. MERSCORP, Inc.,*
  614 F. App'x 818 (6th Cir. 2015) ............................................................ 17

*Brown & Williamson Tobacco Corp. v. Gault,*
  627 S.E.2d 549 (Ga. 2006) ............................................................ 13, 14

*Brown v. Allstate Ins. Co.,*
  17 F. Supp. 2d 1134 (S.D. Cal. 1998)............................................................ 31

*Chun v. Bd. of Trustees of Emps.' Ret. Sys. of State of Hawai'i,*
  952 P.2d 1215 (Haw. 1998) ............................................................ 15

*City of New York v. Beretta Corp.,*
  315 F. Supp. 2d 256 (E.D.N.Y. 2004) ............................................................ 32

*City of New York v. State of New York,*
  655 N.E.2d 649 (N.Y. 1995)............................................................ 24

*College Art Theatres, Inc. v. State ex rel. DeCarlo,*
  476 So. 2d 40 (Ala. 1985) ............................................................ 10

*Commonwealth ex rel. Conway v. Thompson,*
  300 S.W.3d 152 (Ky. 2009) ............................................................ 17

*Commonwealth ex rel. Pappert v. TAP Pharmaceutical Products, Inc.,*
  885 A.2d 1127 (Pa. Commw. Ct. 2005) ............................................................ 26

*Commonwealth v. Carsia,*
  517 A.2d 956 (Pa. 1986) ............................................................ 26

*Curtis v. Altria Grp., Inc.,*
  813 N.W.2d 891 (Minn. 2012) ............................................................ 7

*D'Amico v. Board of Medical Examiners,*
  520 P.2d 10 (Cal. 1974) ............................................................ 10, 11

*Env't Prot. Agency v. Pollution Control Bd.,*
  372 N.E.2d 50 (Ill. 1977) ............................................................ 16

*Ex Parte King,*
  59 So. 3d 21 (Ala. 2010)............................................................ 7, 9

*Frazier v. State By and Through Pittman,*
  504 So. 2d 675 (Miss. 1987)............................................................ 21

*Hall v. Walter,*
  969 P.2d 224 (Colo. 1998) ............................................................ 30

*Hancock v. Terry Elkhorn Mining Co., Inc.,*
  503 S.W.2d 710 (Ky. Ct. App. 1973) ............................................................ 17

*Hansen v. Utah State Ret. Bd.*
  652 P.2d 1332 (Utah 1982) ............................................................ 28

*Holland v. Watson,*
  14 So. 2d 200 (Fla. 1943) ............................................................ 12

**TABLE OF AUTHORITIES**
(continued)

Page

*Hussey v. Say,*
 384 P.3d 1282 (Haw. 2016) .................................................................. 15

*In re Certified Question from the U.S. Dist. Ct. for the E. Dist. Of Mich.,*
 638 N.W.2d 409 (Mich. 2002) ................................................. 6, 19, 20, 23

*In re Nat'l Prescription Opiate Litig. (Monroe Cnty.),*
 458 F. Supp. 3d 665 (N.D. Ohio 2020) ................................................ 20

*Jefferson Parish v. Stansbury,*
 228 So. 2d 743 (La. Ct. App. 1969) ...................................................... 19

*Loyd v. Alabama Department of Corrections,*
 176 F.3d 1336 (11th Cir. 1999) ............................................................. 10

*Mayer v. Bernalillo County,*
 No. 18-666, 2018 WL 6594231 (D.N.M. Dec. 13, 2018) ..................... 23

*McKittrick v. Missouri Public Service Commission,*
 175 S.W.2d 857 (Mo. 1943) ................................................................. 22

*Pac. Gas & Elec. Co. v. City of Stanislaus,*
 947 P.2d 291 (Cal. 1997) ..................................................................... 11

*People ex rel. Board of Trustees of University of Illinois v. Barrett,*
 46 N.E.2d 951 (Ill. 1943) ...................................................................... 16

*People ex rel. Devine v. Time Consumer Marketing, Inc.,*
 782 N.E.2d 761 (Ill. App. Ct. 2002) ...................................................... 7

*People ex rel. Harris v. Rizzo,*
 214 Cal. App. 4th 921 (2013) ............................................................... 11

*People ex rel. Hartigan v. E & E Hauling, Inc.,*
 607 N.E.2d 165 (Ill. 1992) .................................................................... 16

*People ex rel. Scott v. Briceland,*
 359 N.E.2d 149 (Ill. 1976) .................................................................... 16

*People v. Ingersoll,*
 58 N.Y. 1 (1874) ................................................................................... 24

*People v. Johnson & Johnson,*
 292 Cal. Rptr. 3d 424 (2022) ............................................................... 31

*Perdue v. Baker,*
 586 S.E.2d 606 (Ga. 2003) .................................................................. 14

*Pierce v. Superior Court,*
 37 P.2d 460 (Cal. 1934) ....................................................................... 11

*Sec. State Bank of San Juan v. State,*
 169 S.W.2d 554, 561 (Tex. Civ. App. 1943) ........................................ 28

*State ex rel. Att'y Gen. v. Reese,*
 430 P.2d 399 (N.M. 1967) ............................................................... 6, 23

*State ex rel. Caldwell v. Molina Healthcare, Inc.,*
 283 So. 3d 472 (La. 2019) ............................................................. 18, 19

*State ex rel. Derryberry v. Kerr-McGee Corp.,*
 516 P.2d 813 (Okla. 1973) ............................................................... 7, 25

**TABLE OF AUTHORITIES**
(continued)

Page

*State ex rel. Nixon v. Am. Tobacco Co., Inc.*,
34 S.W.3d 122 (Mo. 2000) ................................................................. 6, 22

*State ex rel. Patterson for Use and Benefit of Adams Cnty. v. Warren*,
180 So. 2d 293 (Miss. 1965) .............................................................. 21

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*,
777 S.E.2d 176, 189, 191 (S.C. 2015) ................................................ 30

*State of Florida ex rel. Shevin v. Exxon Corp.*,
526 F.2d 266 (5th Cir. 1976) ............................................................. 12, 13

*State v. Block*,
263 P.3d 940 (N.M. Ct. App. 2011) .................................................. 23

*State v. Epic Tech, LLC*,
323 So. 3d 572 (Ala. 2020) ................................................................ 10

*Thrasher v. City of Atlanta*,
173 S.E. 817 (Ga. 1934) .................................................................... 14

*Watson v. Caldwell*,
27 So. 2d 524 (Fla. 1946) .................................................................. 12

*Williams v. State*,
184 So. 3d 908 (Miss. 2014) ............................................................. 21

<u>**STATUTES**</u>

71 Pa. Stat. § 732-204(c) .................................................................... 26

73 Pa. Stat. § 201-8 .......................................................................... 31

735 ILCS 5/13-226(b)(1) ................................................................... 17

735 ILCS 5/13-226(b)(2) ................................................................... 17

815 Ill. Stat. § 505/6 ......................................................................... 31

Ala. Code § 36-15-15 ........................................................................ 9

Ala. Code § 36-15-21 ........................................................................ 9

Ala. Code § 6-5-1(a) .......................................................................... 9

Ala. Code § 6-5-121 ......................................................................... 9

Ala. Code § 6-5-122 ......................................................................... 10

Ala. Code § 6-5-155.2 ....................................................................... 10

Ala. Code § 8-19-11(b) ..................................................................... 9, 30

Cal. Bus. & Prof. Code § 17206 ......................................................... 31

Cal. Bus. & Prof. Code § 17535 ......................................................... 31

Cal. Bus. & Profs. Code § 17200 *et seq.* ............................................ 31

Cal. Bus. & Profs. Code § 17500 *et seq.* ............................................ 31

Cal. Civ. Code § 3479 ....................................................................... 31

Cal. Civ. Code § 3480 ....................................................................... 31

Cal. Civ. P. Code § 731 ..................................................................... 11

1

2

# TABLE OF AUTHORITIES
## (continued)

Page

3  Cal. Gov't Code § 12512 ................................................................................ 11

4  Cal. Gov't Code § 12652(a) ........................................................................... 11

5  Fla. Stat. § 501.207(1)(c) ............................................................................... 13

   Fla. Stat. § 501.2075 ...................................................................................... 30

6  Fla. Stat. § 60.05(1) ........................................................................................ 13

7  Fla. Stat. § 823.05 .......................................................................................... 13

8  Ga. Code § 10-1-397(b)(2)(B) ....................................................................... 30

   Ga. Code § 10-13B-1(5) ................................................................................ 14

9  Ga. Code § 10-13B-2(a)(4) ............................................................................ 14

10 Ga. Code § 10-13B-3(a) ................................................................................. 14

   Ga. Code § 10-1-405 ...................................................................................... 30

11 Ga. Code § 41-2-2 .......................................................................................... 14

12 Haw. Rev. Stat. § 480-1, *et seq.* .................................................................. 15

13 Haw. Rev. Stat. § 480-14 ............................................................................... 15

   Haw. Rev. Stat. § 480-15.1 ............................................................................ 30

14 Haw. Rev. Stat. § 480-3.1 .............................................................................. 30

15 Ky. Rev. Stat. § 15.020(1) ............................................................................. 17

16 Ky. Rev. Stat. § 15.293(d) ............................................................................. 18

   Ky. Rev. Stat. § 367.300 ........................................................................... 18, 31

17 Ky. Rev. Stat. § 69.210(1) ............................................................................. 17

18 La. Stat. § 13:4712 ......................................................................................... 19

19 La. Stat. § 51:1407 ......................................................................................... 31

   Md. Code, Com. L. § 13-405 .......................................................................... 31

20 Md. Code, Com. L. § 13-410 .......................................................................... 31

21 Md. State Gov't Code § 6-107 ........................................................................ 19

22 Mich. Comp. L. § 600.3805 ........................................................................... 21

   Miss. Code § 75-24-19 ................................................................................... 31

23 Miss. Code § 75-24-21 ................................................................................... 31

24 Miss. Code. § 95-3-5 ...................................................................................... 22

25 Mo. Stat. § 407.100 ........................................................................................ 31

   Mo. Stat. § 407.110 ........................................................................................ 31

26 N.M. Stat. § 30-8-8 ........................................................................................ 23

27 N.M. Stat. § 57-12-11 ..................................................................................... 31

28 N.M. Stat. § 57-12-8 ...................................................................................... 31

   N.M. Stat. § 8-5-3 .......................................................................................... 23

# TABLE OF AUTHORITIES
### (continued)

Page

N.Y. Exec. Law § 63-c(1) ........................................................................................... 24

N.Y. Gen. Bus. L. § 350-d ......................................................................................... 31

N.Y. Mental Hyg. L. § 25.18 ...................................................................................... 24

Ohio Rev. Code § 109.02 ............................................................................................. 4

Ohio Rev. Code § 109.36(B) ........................................................................................ 4

Ohio Rev. Code § 1345.07(d) ..................................................................................... 31

Ohio Rev. Code § 2307.011(F) ................................................................................... 25

Ohio Rev. Code § 2307.60 .......................................................................................... 25

Ohio Rev. Code § 3767.03 .......................................................................................... 25

Okla. Stat. tit. 74, § 18b(3) ......................................................................................... 26

Tenn. Code § 20-13-203 ............................................................................................. 27

Tenn. Code § 29-3-102 ............................................................................................... 27

Tenn. Code § 47-18-108 ............................................................................................. 31

Tenn. Code § 8-6-301(a)-(b) ....................................................................................... 26

Tex. Bus. & Com. Code § 15.40(a) ............................................................................ 28

Tex. Bus. & Com. Code § 17.48(b) ............................................................................ 31

Tex. Const. art. IV, § 22 ............................................................................................. 28

Utah Code § 13-11-17(1)(d) ....................................................................................... 31

Utah Code § 13-11-3(3) .............................................................................................. 31

Wis. Stat. § 823.02 ..................................................................................................... 29

Wis. Stat. Ann. § 100.18(11) ...................................................................................... 29

## <u>OTHER AUTHORITIES</u>

AG. Mo. SB985 (2022), https://www.senate.mo.gov/22info/pdf-bill/intro/SB985.pdf ............... 22

Andrew Welsh-Huggins, *Ohio attorney general sues to stop upcoming opioid trials*, ABC News (Sept. 1, 2019), https://abcnews.go.com/Health/wireStory/ohio-attorney-general-sues-stop-upcoming-opioid-trials-65324382 ........................................................................................ 4

Cal. AB-6 (2019-20 Session), https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB6 ............ 12

Carolyn L. Carter et al., *Unfair and Deceptive Acts and Practices* § 13.5.3.1 (9th ed. 2016) ...... 30

Fla. Ass'n of Counties, *Matters of Great Governmental Concern: Opioid Litigation*, https://www.fl-counties.com/matters-great-governmental-concern-opioid-litigation .............. 13

Fla. HB 1053 (2021), https://www.flsenate.gov/Session/Bill/2021/1053/BillText/c1/PDF .......... 13

Fla. SB 102 (2021), https://www.flsenate.gov/Session/Bill/2021/102/BillText/c1/PDF ............. 13

Ga. SB 500 (2022), https://legiscan.com/GA/bill/SB500/2021 .................................................. 14

Ind. House Enrolled Act No. 1193 (2022) § 3, https://nationalopioidsettlement.com/wp-content/uploads/2022/06/Indiana-Opioids-Legislation-HB1193.05.ENRS_.pdf ...................... 5

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

Margaret H. Lemos, *State-Local Litigation Conflicts*, 2021 Wisc. L. Rev. 971 (2021) ................. 4

4

National Opioid Settlement, https://nationalopioidsettlement.com/ (last visited June 2, 2022) ...... 5

5

One Ohio Memorandum of Understanding, § A.4, https://nationalopioidsettlement.com/
wp-content/uploads/2021/11/Exhibit-8-2021.07.28-One-Ohio-Memorandum-of-
Understanding.pdf ................................................................................................................. 5

6

One Ohio Memorandum of Understanding, § B.1 ................................................................ 5

7

One Ohio Memorandum of Understanding, § E.1-3 ............................................................ 5

8

Robin Goist, *Summit County executive, Akron mayor condemn proposed state takeover of
lawsuits against opioid makers*, Cleveland.com (Aug. 28, 2019),

9

https://www.cleveland.com/open/2019/08/summit-county-executive-akron-mayor-condemn-
proposed-state-takeover-of-lawsuits-against-opioid-makers.html ............................................... 4

10

Sarah L. Swan, *Preempting Plaintiff Cities*, 45 Fordham Urb. L.J. 1241 (2018) .......................... 4

11

Tennessee State-Subdivision Opioid Abatement Agreement,
https://www.tn.gov/content/dam/tn/attorneygeneral/documents/foi/opioids-settlements/tn-state-

12

subdivision-opioid-abatement-agreement.pdf ......................................................................... 27

13

Tex. SB 1827 (2021-22), https://legiscan.com/TX/amendment/SB1827/id/109603 ................... 28

Utah Att'y Gen., FAQ regarding the opioid deal, https://attorneygeneral.utah.gov/wp-

14

content/uploads/2021/07/FAQs-full-deal-final.pdf ................................................................. 29

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.**    **INTRODUCTION**

2        At the conclusion of the hearing on McKinsey's motion to dismiss, the Court framed the

3  inquiry into whether McKinsey's settlements with the state Attorneys General released the claims

4  brought by subdivisions as turning on two questions: (1) what was the nature of the authority of

5  the participating states in terms of being exclusive, separate, or concurrent with that of a

6  particular state's political subdivisions; and (2) if the state's jurisdiction is less than complete,

7  what exactly did McKinsey receive in exchange for the $600 million it paid to settle? McKinsey's

8  simple answer to the second question is that the settlement afforded it complete relief from all

9  opioid-related litigation. That answer follows, a fortiori, from the answer to the first question. For

10 McKinsey, the fact that states may bring claims in their own right for a variety of common law

11 and statutory claims means that the states are therefore empowered to assert all claims that any

12 subdivision might put forward and can compromise such subdivision claims unilaterally.

13       There is a sophistic quality to this argument because it assumes precisely what is at issue.

14 McKinsey begins with a premise that is unstated but underlies its entire brief and chart. The

15 argument is to posit that a state has the authority under all relevant laws to assert or compromise

16 claims *that belong to the **state***. That is then established by reference to the laws of each state that

17 demonstrate that, unsurprisingly, the state through the AG does have the power to assert or

18 compromise the claims that belong to the state. That seems to require forty pages to brief, though

19 inquiring minds might ask, who else would have that power? The federal government? France?

20 Russia? The local supermarket?

21       The question is not who has the power to prosecute or compromise the state's claims on

22 behalf of the state, but what are the state's claims. This is the key question that McKinsey leaves

23 unaddressed.

24       McKinsey confuses the meaning of concurrent jurisdiction as the Court invoked at the

25 prior hearing. Concurrent must mean that both parties have the legal entitlement to bring the same

26 claim, not that each could bring a claim, even a claim with the same name. If A and B are injured

27 in a car accident with C, both A and B may be able to bring negligence claims against C for

28 personal injury. But to call that concurrent jurisdiction would be incorrect. They each have a

claim, and each is the master of her own individual claim. A may bring her own claim and do with it as she likes. But A cannot bring B's claim, or settle it, or dismiss it, or in any other fashion claim dominion over B's claim. If B were her child, by contrast, A may very well have that authority, but it would be because state law made a parent a legal custodian over the rights and claims of minor children.

In the same fashion, both the states and their subdivisions may bring claims for negligent torts against their property or persons. But that does not establish that they have concurrent jurisdiction over the same claims, that is, claims arising from the same injuries. Such concurrence would have to be specifically prescribed by state law. After forty pages of briefing and yet another chart, McKinsey fails to even address the critical legal issue that must underlie any motion for res judicata.

We can begin with the very first state and the very first cause of action in McKinsey's State-by-State Chart. ECF No. 378-1 ("Chart"). According to this Chart, Alabama authorizes both the State and its subdivisions to assert claims for negligence. *Id.* at 1. McKinsey then dutifully checks the box for concurrent jurisdiction, which is simplistic, at best. *Id.* Again, returning to the simplest of tort cases, an auto accident, shows why this is not concurrent jurisdiction. If Tortfeasor Tom were to drive negligently down the highway and crash into an Alabama state vehicle, there is no question that the State could assert a claim for negligence against Tom. Similarly, if Tortfeasor Tom were then to continue barreling down the highway and then engage in the same conduct, but this time were to crash into a vehicle belonging to Mobile County, there is no question that the County, not the State, could assert a claim for negligence against Tom as well. The same would be true if the Mobile County vehicle was parked next to the Alabama state vehicle and Tom hit them both simultaneously—each entity would have its own claim against Tom. This is not concurrent jurisdiction; it is simply the recognition that each unit of government has the right to prosecute claims in defense of its own interests. Concurrent jurisdiction would require the State to be able to bring the claim for harms to Mobile County's vehicle. Nothing in the Chart or in forty pages of briefing addresses that issue.

1    Instead of doing the task committed to it by the Court and identifying which claims are

2  state claims properly brought and released by the AGs and which are subdivision claims not

3  subject to the AGs' authority, McKinsey labels all of the claims "statewide public interest claims"

4  and asserts the authority it needs must exist by virtue of the collective term. The phrase

5  "statewide public interest claim" appears *nowhere* in caselaw or in the statutes of the relevant

6  states. McKinsey invents categories of claims absent from state law and ignores what is manifest

7  in those bodies of law: specific statutory authority for an AG to bring some claims but not others.

8  Most relevant to McKinsey's decision to settle with the AGs, the AGs typically have exclusive

9  authority to seek civil penalties under deceptive trade practice statutes, valuable claims that the

10  AGs actually pleaded against McKinsey and had the authority to resolve.

11    In what follows, we answer the Court's inquiries directly. First, we will show that under

12  the relevant state law, the claims asserted by the political subdivisions against McKinsey in this

13  MDL could not have been prosecuted, compromised, or settled by the states. Second, we will

14  show that McKinsey bought peace from the claims that the AGs were authorized to assert as a

15  matter of state law. McKinsey obtained relief from the deceptive trade practice enforcement

16  claims, including civil penalties that did belong to the AGs as a matter of state law.

17  **II.    ARGUMENT**

18    **A.    McKinsey cannot establish that the AGs had exclusive or concurrent**
        **authority to bring the subdivision claims pleaded in this MDL.**

19

20      **1.    State law matters.**

21    As Professor Briffault explains, the general rule is that "[l]ocal governments have the

22  power to sue and be sued with respect to local matters" and "[a] matter will be 'local' if it affects

23  local interests even if the same matter crops up in other localities and so implicates state and

24  national interests as well." Ex. A (Rep. of Pls.' Expert Richard Briffault) at 18.[1] While states

25  generally have the power to preclude or preempt local litigation authority, that power is exercised

26

---

27  [1] Exhibits A-G are attached to Plaintiffs' Opposition to McKinsey's Motion to Dismiss on the
    Grounds of Res Judicata and Release, ECF No. 345 ("Subdivision Opposition" or "Pls.' Br.").
28  Exhibits H-L are attached to the Declaration of Elizabeth J. Cabraser filed with this supplemental
    brief.

through legislation, not executive officer whim. *Id.* In particular, "[t]here may very well be specific state statutes that give a state attorney general the authority to curtail a local government's power to litigate a specific cause or cause of action, but there would actually have to be such a specific statute granting the attorney general power." *Id.* at 19. The "generally brief" and vague authorizations common in state constitutions and enabling acts do not cut it. *Id.* at 18-19; *see also* Margaret H. Lemos, *State-Local Litigation Conflicts*, 2021 Wisc. L. Rev. 971, 989 (2021) (efforts by state AGs to "quash truly local litigation . . . appear[] to be relatively uncommon," and the power to do so is "contingent on the details of state law"); Sarah L. Swan, *Preempting Plaintiff Cities*, 45 Fordham Urb. L.J. 1241, 1248 (2018) ("The authority of state attorneys general to bind their municipalities ultimately depends on state law, and states' laws differ.").

Take Ohio, for example. As explained in the Subdivision Opposition, Ohio law gives the AG authority to bring claims on behalf of "the State," a term that "does not include political subdivisions." Pls.' Br. at 55-56 (citing Ohio Rev. Code §§ 109.02, 109.36(B)). The Ohio AG does not like this. He has sought to aggrandize his authority through filings in federal court (before Judge Polster) and now in an amicus brief here. Most relevant to the present question, the Ohio AG supported legislation that would have granted his office "the sole and exclusive authority" to file and resolve opioid lawsuits. *See* Robin Goist, *Summit County executive, Akron mayor condemn proposed state takeover of lawsuits against opioid makers*, Cleveland.com (Aug. 28, 2019).[2] The Governor and the state's local governments opposed the legislation, which went nowhere. Andrew Welsh-Huggins, *Ohio attorney general sues to stop upcoming opioid trials*, ABC News (Sept. 1, 2019) ("Ohio Gov. Mike DeWine . . . called that 'a serious mistake' and said he would never sign such a bill. DeWine said the legal process should go through the court system since residents and local governments have 'borne a great deal of that cost.'").[3]

---

[2] https://www.cleveland.com/open/2019/08/summit-county-executive-akron-mayor-condemn-proposed-state-takeover-of-lawsuits-against-opioid-makers.html

[3] https://abcnews.go.com/Health/wireStory/ohio-attorney-general-sues-stop-upcoming-opioid-trials-65324382

1       Instead, the Governor, the Attorney General, and local governments all voluntarily entered

2   into the "One Ohio" plan that created a "Negotiating Committee" with representation from both

3   the state and its local governments. One Ohio Memorandum of Understanding at § A.4.[4] One

4   Ohio requires that all committee members "be notified of and provided the opportunity to

5   participate in all negotiations" and that "[a]ny Settlement Proposal accepted by the Negotiating

6   Committee shall be subject to approval by Local Governments and the State." *Id.* at §§ E.1-3.

7   And all funds derived from settlements are divided 30% to local governments, 15% to the

8   "Attorney General as Counsel for the State of Ohio," and 55% going to a foundation, again with

9   both state and local representation, dedicated to abatement of the opioid crisis. *Id.* § B.1.

10      McKinsey chose its own negotiating path, and the scope of the settlement it obtained

11  follows directly from its decisions. There is an existing alternative that recognizes and solves for

12  the practical and political issues raised by a public health problem with both state and local

13  impacts and resulting in both state and local claims. This alternative includes existing national

14  infrastructure that allocates opioids settlement payments among states and their subdivisions.

15  These were the products of negotiations and resulting agreements within each state, between the

16  state and its subdivisions, and in some instances codified through legislation.[5] In one instance

17  (Indiana) that legislation elected to funnel all future opioid litigation, including claims against

18  McKinsey, through the AG. This contractual system is already being implemented to distribute

19  payments directly to states and to subdivisions in the Distributors and Johnson & Johnson

20  settlements. The structure is public and is available to parties seeking to resolve the entirety of

21  their potential opioids liability. *See* National Opioid Settlement,

22  https://nationalopioidsettlement.com/ (last visited June 2, 2022). This same structure forms the

23

---

24  [4] https://nationalopioidsettlement.com/wp-content/uploads/2021/11/Exhibit-8-2021.07.28-One-Ohio-Memorandum-of-Understanding.pdf

25  [5] Indiana is one example. The subdivisions' claims against all settling opioid defendants,

26  including McKinsey, are expressly barred through legislation resulting from state/subdivision negotiation that allocates a combined 50% of all settlements' proceeds to  cities, counties, and

27  towns under " a weighted distribution formula . . . that accounts for opioid impacts in communities." Ind. House Enrolled Act No. 1193 (2022) § 3,

28  https://nationalopioidsettlement.com/wp-content/uploads/2022/06/Indiana-Opioids-Legislation-HB1193.05.ENRS_.pdf.

1   foundation of ongoing settlement discussions with other defendants in MDL 2804, and those

2   negotiations begin with the same allocations and distributive infrastructure. McKinsey not only

3   could have done this to assure an effective global release; it still can do so.

4          **2.      McKinsey's construct of "statewide public interest claims" does not
               reflect actual state law.**

5

6          McKinsey contends that the actual nuances of state law do not matter because Plaintiffs

7   plead "statewide, public claims" or "statewide public interest claims" that AGs uniformly must

8   have the ability to bring and release, the lack of actual state litigating authority notwithstanding.

9   This concept, repeated ad nauseam, is of McKinsey's own invention. As Plaintiffs explained in

10  earlier briefing, state statutes commonly limit on whose behalf an AG may assert claims and

11  otherwise speak to varying degrees of clarity to the allocation of litigating authority between

12  subdivisions and other state government entities. McKinsey says those statutes are irrelevant.

13  McKinsey Defendants' Supplemental Brief in Further Support of Motion to Dismiss the

14  Complaints on the Grounds of *Res Judicata* and Release, ECF No. 378 ("Supp. Br.") at 29-30

15  (noting McKinsey's argument "does not depend" on which entities the AG may represent under

16  various state statutes).

17         The basis for this erasure of actual state law in favor of an alternative reality, is really a

18  single case from a single state: *In re Certified Question from the U.S. Dist. Ct. for the E. Dist. Of*

19  *Mich.*, 638 N.W.2d 409 (Mich. 2002). At most, *Certified Question* speaks to the law of Michigan

20  only and says nothing about the litigating authority of the AGs of the twenty-one other states at

21  issue here. To take the most obvious example that what happened in Michigan stayed in

22  Michigan, the Missouri Supreme Court came out the opposite way on the same question

23  regarding the same settlement. *State ex rel. Nixon v. Am. Tobacco Co.*, *Inc.*, 34 S.W.3d 122, 126-

24  27 (Mo. 2000); *see also State ex rel. Att'y Gen. v. Reese*, 430 P.2d 399, 406-07 (N.M. 1967)

25  (rejecting the argument that AG's common law powers mean that "questions having statewide

26  impact should be handled by him" and instead applying state statutes). Even as a matter of

27  Michigan law (as explained below in the state-specific section, *infra* at 19-21), *Certified Question*

28

does not control the outcome here because the case is distinguishable on its facts and rests on a

jurisprudential basis that has been undermined by subsequent Michigan caselaw.[6]

### 3. McKinsey's construct of "statewide public interest claims" does not reflect Plaintiffs' actual claims.

Whatever the meaning of "statewide public interest claim," that is not how Plaintiffs'

claims are pleaded. The opioid nuisance does not exist everywhere in the same way. For example,

the negotiation class certified by Judge Polster (certification reversed on Rule 23 grounds) would

have allocated any settlement among counties based on (1) the number of persons suffering

opioid use disorder in the county; (2) the number of opioid overdose deaths that occurred in the

county; and (3) the amount of opioids distributed within the county. Ex. H (Plaintiffs' Corrected

Memo. in Supp. of Certification of Rule 23(b)(3) Cities/Counties Negotiation Class) at 44-49.

Plaintiffs' pleading reflects that their claims assert local injuries. Look at the Master

Complaints. The Subdivision Plaintiffs explained how their claims target particularized local

concerns, including costs associated with emergency response, social services, incarceration,

local public infrastructure, and treatment. Master Complaint (Subdivision), ECF No. 296

("Subdivision MCC") ¶ 541; *see also* Master Complaint (School Districts), ECF No. 297 ¶ 540

(pleading harm particularized to school districts, such as the provision of special education).

McKinsey's motion essentially asks the Court to find that *all* of the injuries pleaded in *every* state

are of a statewide nature. That is not something the Court can do.

The claims will also be proven on a local, not statewide, basis in the case of subdivisions,

and based on harms specific to schools, in the case of school districts. In the national opioid

MDL, Ohio subdivision bellwether plaintiffs just completed their remedial phase trial. *See* Ex. I

---

[6] The other cases McKinsey cites to show that "*Certified Question* is hardly an outlier," Supp. Br. at 37, offer no help. As Plaintiffs previously explained, *People ex rel. Devine v. Time Consumer Marketing, Inc.*, 782 N.E.2d 761 (Ill. App. Ct. 2002), was about specific statutory authority to bring certain Consumer Fraud Act claims, authority that subdivisions do not even have. Pls.' Br. at 42-43. *Curtis v. Altria Grp., Inc.*, 813 N.W.2d 891 (Minn. 2012) is the same. *Ex Parte King*, 59 So. 3d 21 (Ala. 2010), involved litigation by a district attorney (expressly subject by statute to the "direct[ion] of the" AG) in the name of the state. Pls.' Br. at 50-51. And *State ex rel. Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813 (Okla. 1973), was about whether one AG could revisit litigation decisions made by his predecessor. None establishes that subdivision claims magically become state claims properly brought by the AG.

1  (Plaintiffs' Trial Br. for Phase 2). The evidence that was submitted proves that the abatement

2  measures required to abate the public nuisance in the two trial counties are all distinctly local.

3  *E.g.*, *id.* at 3 (identifying evidence going to "the impact on child welfare systems and related

4  agencies in the Counties, and some of the county programs necessary to remedy those harms");

5  *id.* (same, as to "the current programs that Lake County has to deal with the opioid epidemic" and

6  how the "plan fills the gaps in the needed abatement programs in Lake County"). Conversely, the

7  defendants in that trial aim to prove that some of the costs are not local, and so not properly the

8  subject of a local claim. *See* Ex. J (Walgreens and Walmart Joint Abatement Phase Trial Br.) at 2

9  (asserting that "Plaintiffs' estimate of the cost . . . incudes the costs of existing programs that are

10 already funded, often by the state or federal governments"). Or look at the evidence before the

11 Court in the *San Francisco* opioid bellwether. In proving liability, the City and County have put

12 on evidence of how the opioid crisis has played out in San Francisco in particular, not its effects

13 statewide. *E.g.*, Ex. K (*City and County of San Francisco v. Purdue*, 5/10/22 Trial Tr.) at 632

14 (testimony of Dr. Barry Zevin regarding how opioid crisis exists in San Francisco).[7]

15 **B.      McKinsey's state-by-state arguments fail.**

16        For the most part, McKinsey has declined the Court's invitation to argue the nuances of

17 state law. McKinsey's state-by-state analysis is largely rote repetition of the basic conceptual

18 error discussed above: in McKinsey's view, subdivision claims that relate to issues of overlapping

19 state and local concern are by definition state claims that can be brought—and thus released—by

20 the AG as the state's chief legal officer. That approach is cheap and easy. The problem is that it

21 does not reflect any actual state law. No statute says so. With one exception (Michigan), no state

22 decisional authority endorses the idea, and that one exception is distinguishable from the facts

23 here. In the real world, state legislatures have enacted or are considering legislation touching on

24 this very issue, demonstrating that existing state law does not support McKinsey's position.

25

26

_____

27 [7] This Court is currently presiding over the liability phase trial of San Francisco, a subdivision
   bellwether. And as previously noted, in December 2021, the New York AG and two New York
28 counties won separate liability verdicts, with distinct allocation of fault, on their respective public
   nuisance claims, which were coordinated for trial. Pls.' Br. at 2.

SUBDIVISION AND SCHOOL DISTRICT PLAINTIFFS'
SUPPLEMENTAL BRIEF
21-MD-02996-CRB (SK)

McKinsey cannot meet its burden in any of the twenty-two states at issue. *See* Pls.' Br. at 12 (identifying burden).

### 1. **Alabama**

McKinsey fails to identify any grant of authority permitting the Alabama AG to bring claims on behalf of a subdivision. McKinsey cites *Ex Parte King*, 59 So. 3d 21 (Ala. 2010), but that case involved the AG's control over a lawsuit filed by a district attorney in the name of the State. *Id.* at 29 ("[T]he attorney general must have the prerogative to step in and dismiss the action on behalf of the State . . . ."); *id.* at 26-28 ("[T]he State has an interest in an action, such as the present one, that is filed in the State's name and on its behalf to vindicate its policies and concerns."). Alabama district attorneys are charged with representing the State, not subdivisions, *id.* at 28 ("[D]istrict attorneys (as well as the attorney general) are charged with instituting and prosecuting criminal and civil actions on behalf of the State."), and are expressly subject to the direction of the AG. Ala. Code § 36-15-15 ("Attorney General may advise or direct district attorney.").

McKinsey cites the statute permitting the AG to "control" "litigation concerning the interests of . . . any department of the state," Supp. Br. at 3 (citing Ala. Code § 36-15-21), but ignores the explanation in Plaintiff's earlier brief that cities and counties are not "department[s] of the state." Pls.' Br. at 50. McKinsey also notes that the State "may commence an action in its own name" and for its own "remedies," Ala. Code § 6-5-1(a), but that is exactly the point: a claim on behalf of the state "in its own name" is by statute distinct from claims owned by cities or counties.

McKinsey cites the AG's authority under the Alabama Deceptive Trade Practices Act but fails to recognize that this specific grant of power, including the exclusive right to seek civil penalties, Ala. Code § 8-19-11(b), suggests that AGs lack a general residual power to assert any claim involving a "public interest." McKinsey claims that public nuisances "must be abated by a process instituted in the name of the state," Supp. Br. at 3 (quoting Ala. Code § 6-5-121), but does not inform the Court that a parallel statute provides that "[a]ll municipalities in the State of Alabama may commence an action *in the name of the city* to abate or enjoin any public nuisance

injurious to the health, morals, comfort, or welfare of the community or any portion thereof." Ala. Code § 6-5-122 (emphasis added). Finally, McKinsey notes the AG's authority to abate a statutorily-defined "drug-related nuisance," but that statute also grants a cause of action to "the attorney for a county or municipality, a person residing in the county in which the property is located . . . , or any community-based organization." *Id.* § 6-5-155.2. Nothing in the statute says or implies that one entity's claim under it is the same as the claims belonging to another entity. If McKinsey were right, then a "person" or "community-based organization" would have the power to bring and release the AG's drug-related nuisance claim.[8]

In their earlier brief, Plaintiffs explained that *Loyd v. Alabama Department of Corrections*, 176 F.3d 1336 (11th Cir. 1999), by requiring the Alabama AG to identify a specific state interest to intervene to challenge a consent decree involving a county jail, suggests that the AG lacks a general authority to bring or control subdivision litigation. Pls.' Br. at 51. McKinsey asserts that *Loyd* "supports McKinsey's argument that the [AG] may have a concurrent legal interest with local governments." Supp. Br. at 30-31. But *Loyd*, which based its holding on the identification of a *distinct* legal interest, stands for the point that a state interest properly represented by the AG does not create concurrent authority over the same *claims*. Otherwise, the AG in *Loyd* would have had the right to intervene on behalf of the county itself and would not have needed to identify a state-specific basis for intervention.

## 2. **California**

McKinsey does not cite any California cases or statutes supplying a general authority for the AG to bring subdivision claims upon identifying a state interest. McKinsey relies on *D'Amico v. Board of Medical Examiners*, 520 P.2d 10 (Cal. 1974), but in that case, the AG represented the Board of Medical Examiners under express statutory authority. *Id.* at 20 ("[H]e has the duty to defend all cases in which the state or one of its officers is a party.") (citing Cal.

---

[8] In any event, the Alabama plaintiff has pleaded both public nuisance generally and the statutory drug-related nuisance claim. Subdivision MCC ¶¶ 764-75. McKinsey also cites *State v. Epic Tech, LLC*, 323 So. 3d 572, 579 (Ala. 2020), for the proposition that the State, through the Attorney General, can abate a public nuisance. *Epic Tech* relies on *College Art Theatres, Inc. v. State ex rel. DeCarlo*, 476 So. 2d 40, 44 (Ala. 1985), which was brought by a district attorney, confirming Plaintiffs' argument.

Gov't Code § 12512). The language McKinsey quotes from *D'Amico* confirms only that, where the AG has statutory authority to bring or defend a claim, he has the implied power to manage the litigation in his own judgment of the public interest. *See id.* at 20 (holding that the AG's decision to concede certain "constitutional facts" did not deprive the "public interest" of "adequate representation"). And McKinsey cites *Pierce v. Superior Court*, 37 P.2d 460 (Cal. 1934), but that case distinguished between the right of an "individual to institute . . . an action" and "the power of the [AG] to bring a similar action on behalf of the state," and explained that the two causes of action "exist[] independent[ly]." *Id.* at 461. Independent causes of action are, by definition, the opposite of "concurrent" authority over the same cause of action.

McKinsey cites authority for the proposition that the AG "may bring an action to abate a nuisance on behalf of the state and the people." Supp. Br. at 4. But McKinsey cites nothing for the threshold presumption inherent in its argument that such a nuisance claim is the *same* claim available to a subdivision. It is not. Cal. Civ. P. Code § 731 establishes a nuisance cause of action for city or county counsel—not the AG—and states that "[e]ach of *those* officers shall have concurrent right to bring an action for a public nuisance existing within a town or city." (Emphasis added); *see also* Pls.' Br. at 35-36, 52. McKinsey correctly notes that local prosecuting authorities (including city and county attorneys) can bring deceptive trade practices claims, *see* Supp. Br. at 4, but cites no authority for the proposition that such a claim brought by the AG is the *same* claim available to a subdivision.

McKinsey also misunderstands the examples in California law where the AG *does* have concurrent authority over subdivision claims. Those examples, Plaintiffs explained, demonstrate the lack of a general residual authority triggered by mere identification of a state interest. Pls.' Br. at 52 (citing *People ex rel. Harris v. Rizzo*, 214 Cal. App. 4th 921, 936-38 & nn.17, 19 (2013) (city unable to bring its own claims and asked AG for assistance) and *Pac. Gas & Elec. Co. v. City of Stanislaus*, 947 P.2d 291, 332-33 (Cal. 1997) (express statutory authority to bring subdivision Cartwright Act claims under certain conditions)); Cal. Gov't Code § 12652(a) (express statutory authority to bring subdivision False Claims Act claims). McKinsey asserts (correctly) that the False Claims Act statute gives the AG concurrent authority to bring

1  subdivision claims, Supp. Br. at 31 n.10, a curious argument given that no California entity in this

2  litigation has pleaded any such claims.

3       Finally, McKinsey ignores that, in California, as in many other states, the power of AGs to

4  bring and release subdivision claims related to opioids is the topic of ongoing political debate,

5  underscoring that such authority is not already established by state law. Specifically, the

6  California legislature has considered, but has not enacted, legislation that would "authorize the

7  Attorney General to release any claim related to the subject matter of [an opioid] settlement that

8  may be brought by a government entity." Cal. AB-6 (2019-20 Session).[9]

9                  **3.**   <u>**Florida**</u>

10       In earlier briefing, Plaintiffs explained that two seminal Florida decisions established that

11  the AG lacks authority to bring subdivision and school claims. Pls.' Br. at 40-41 (discussing

12  *Watson v. Caldwell*, 27 So. 2d 524, 528-29 (Fla. 1946) and *Holland v. Watson*, 14 So. 2d 200,

13  202-03 (Fla. 1943)). McKinsey again relies on *State of Florida ex rel. Shevin v. Exxon Corp.*, 526

14  F.2d 266 (5th Cir. 1976). That decision is distinguishable. *Shevin* explained that the Florida cases

15  "dealt with a situation in which there was a conflict between the wishes of the [AG] and the

16  government body as to the body's legal representation." *Id.* at 273. Here, there is exactly that sort

17  of conflict. *Shevin* is inapposite.

18       More fundamentally, *Shevin* ultimately did not decide whether the AG had had the

19  authority to bring a claim on behalf of a subdivision or school. The only issue in the case was

20  whether the AG had standing to bring an action. The court explained that the AG's "right to

21  represent the state on behalf of the basic Executive Departments" established standing, leaving it

22  unnecessary to decide the scope of the causes of action available. *Id.* at 273 & n.23. McKinsey

23  asserts that the AG's litigation powers were the "first and foremost" basis of the decision, but in

24  fact, the court identified the core issue of standing (as opposed to which claims were

25  maintainable) as its "most important[]" consideration. *Id.* at 273. Nothing in *Shevin* undermines

26  the clear holdings of *Caldwell* and *Holland*.

27

28

---

[9] https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201920200AB6

1      Apart from *Shevin*, McKinsey relies on the AG's express concurrent authority under

2    Florida's Deceptive and Unfair Trade Practices Act, to bring "an action on behalf of one or

3    more . . . governmental entities for . . . actual damages." Fla. Stat. § 501.207(1)(c). This

4    authorization by implication negates a general authority to assert subdivision or school claims.

5      Other Florida law dispels McKinsey's casual finding of concurrent authority. Take Fla.

6    Stat. § 823.05, which authorizes actions in connection with certain statutorily-defined nuisances.

7    The statutes provide that where "any nuisance as defined in [Fla. Stat. § 823.05] exists, the

8    Attorney General, state attorney, city attorney, county attorney, sheriff, or any citizen of the

9    county may sue in the name of the state on his or her relation to enjoin the nuisance, the person or

10   persons maintaining it, and the owner or agent of the building or ground on which the nuisance

11   exists." Fla. Stat. § 60.05(1). On McKinsey's understanding of the law, such a statute establishes

12   "concurrent authority" over the same claim. But by that logic, "any citizen of the county" would

13   have the power to preclude nuisance litigation by the AG. That cannot be right.

14      Finally, the Florida legislature has considered, but has not enacted, legislation that would

15   have given the AG "the sole authority to file a civil proceeding on behalf of the affected

16   governmental entities in this state" with regard to any "matter of great governmental concern."

17   Fla. SB 102 (2021).[10] The debate over such legislation further demonstrates that the AG's

18   authority to file such claims is not clearly established by existing state law.

19                     **4.**     <u>**Georgia**</u>

20      Georgia provides a perfect example of the absurdity of McKinsey's approach in simply

21   asserting that causes of action that may be brought by distinct actors establishes concurrent

22   jurisdiction over all such claims. To begin with, and most obviously, McKinsey cites no Georgia

23   statutes or cases finding AG authority to bring a subdivision claim. Instead, McKinsey cites

24   *Brown & Williamson Tobacco Corp. v. Gault*, 627 S.E.2d 549, 551 (Ga. 2006), a parens patriae

25   case that affirmed the state, through the AG "can . . . maintain an action on behalf of its citizens

26

27   [10] https://www.flsenate.gov/Session/Bill/2021/102/BillText/c1/PDF; *see also* Fla. HB 1053 (2021), https://www.flsenate.gov/Session/Bill/2021/1053/BillText/c1/PDF; Fla. Ass'n of

28   Counties, *Matters of Great Governmental Concern: Opioid Litigation*, https://www.fl-counties.com/matters-great-governmental-concern-opioid-litigation (visited Apr. 27, 2022).

to seek compensation or sovereign or quasi-sovereign claims, but it may not represent its citizens'

private interests." *Id.* at 421. This case says nothing at all about how Georgia law apportions

litigating authority as between the AG and subdivisions. *See* Pls.' Br. at 52-53 (describing

specific indications in Georgia law protecting subdivisions' independent causes of action).[11]

McKinsey also cites *Thrasher v. City of Atlanta*, 173 S.E. 817 (Ga. 1934), for the proposition that

a public nuisance action "must be abated by a process instituted in the name of the state." *Id.* at

820. McKinsey fails to mention that the relevant statute does not even permit the AG to bring

such a claim. *See* Ga. Code § 41-2-2 (permitting "the district attorney, solicitor-general, city

attorney, or county attorney on behalf of the public" to bring a nuisance claim).

Finally, newly-enacted legislation in Georgia refutes McKinsey's argument. *See* Ga. SB

500 (2022).[12] Georgia law now expressly reaffirms what McKinsey denies: that "local

governments generally have the authority to pursue and litigate claims against businesses and

individuals to protect their own interests." Ga. Code § 10-13B-1(5). The statute also recognizes

that

> in certain limited circumstances involving particular industries, the interests of the
> state as a whole are best served by having a unified settlement structure that benefits
> both the state and its local governments and brings full and complete closure to the
> claims that were asserted or could have been asserted and maximizes the state and
> local governments' potential recovery to address this extraordinary crisis.

*Id.* To strike the appropriate balance, the legislation provided that "state-wide opioid

settlement[s]" entered into by the "Attorney General" after March 31, 2021 (after Georgia's

February 2021 settlement with McKinsey) would bar subdivision claims, but *only if* "at least 65

percent of the governmental entities which have active and pending litigation" affirmatively "join

such settlement agreement." *Id.* §§ 10-13B-2(a)(4), 10-13B-3(a). The existence of this legislation

confirms there is no residual authority for the AG to bring or release subdivision claims.

---

[11] Similarly, *Perdue v. Baker*, 586 S.E.2d 606 (Ga. 2003), says nothing about the relationship
between the Attorney General and subdivisions. Rather, that case held "that the Governor and
Attorney General have concurrent powers over litigation in which the State is a party." *Id.* at 609.
The Governor's power is not at issue here, nor is the State of Georgia a party to the Georgia
subdivisions' cases in this MDL.

[12] https://legiscan.com/GA/bill/SB500/2021 (indicating the bill was signed by the Governor on
May 2, 2022)

### 5.   Hawai'i

McKinsey cites no Hawai'i authority that says that the AG may bring and release the subdivision claims asserted here. McKinsey recites language that when the "[AG] appears in a proceeding on behalf of the state," she has authority to conduct the litigation pursuant to her understanding of "the interest of the state and the public at large." Supp. Br. at 24 (quoting *Chun v. Bd. of Trustees of Emps.' Ret. Sys. of State of Hawai'i*, 952 P.2d 1215, 1235 (Haw. 1998)). That statement in *Chun* referred to the AG's "tactical position[s]" in litigation, not her substantive authority over certain claim. *Id.* at 1234. Nothing there establishes that the AG may pursue subdivision claims.

McKinsey's other arguments fare no better. McKinsey relies on the AG's authority to "appear for the State" in court, but simply assumes that power means "appear for a subdivision" without ever explaining why. Supp. Br. at 6. McKinsey cites *Hussey v. Say*, 384 P.3d 1282 (Haw. 2016), but in that case, it was undisputed that the AG could, by virtue of her statutory authority to represent "public officers" and give counsel to the "legislature," could represent the legislature in litigation. *Id.* at 1291. The only question was whether the ability to represent the legislature meant the AG could also represent the House of Representatives standing alone. *Id.* As is evident, this has nothing to do with whether the AG has statutory authority to represent subdivisions at all. McKinsey asserts that the Hawai'i AG has "elsewhere brought the very same claims Plaintiffs allege here," Supp. Br. at 6, but nowhere explains why claims on behalf of "The State of Hawai'i," ECF No. 379-1, McKinsey Ex. DDD, are necessarily the "very same" as those asserted by Hawai'i subdivisions.

When Hawai'i grants the AG concurrent authority to bring subdivision claims, it does so expressly, confirming the lack of a general power. The Hawai'i AG has authority to enforce the state's unfair practices statute, including to bring claims for subdivisions. Haw. Rev. Stat. § 480-1, *et seq.* The AG "may require the county attorney" or "corporation counsel . . . to maintain the action or proceeding under the direction of the attorney general." *Id.* § 480-20(b). And she "may bring an action on behalf of the State or any of its political subdivisions or governmental agencies." *Id.* § 480-14.

1

### 6.   <u>Illinois</u>

2       McKinsey relies on the Illinois AG's common law powers to assert all sorts of claims that

3   an aggrieved actor might put forward for harms recognized at common law. Supp. Br. at 6-7. But

4   this is irrelevant to the question of the spheres of authority of the state and the subdivisions.

5   Subdivisions and their right to sue are creatures of statute, not the common law. When the AG

6   interacts with statutorily-created bodies, his powers can be limited by statute. That is the clear

7   holding of *People ex rel. Board of Trustees of University of Illinois v. Barrett*, 46 N.E.2d 951 (Ill.

8   1943), which held that "[n]either the constitution nor the statutes . . . have conferred upon the

9   [AG] the power . . . to represent public corporations" and that "[n]o such powers or duties existed

10  at the common law." *Id.* at 964. McKinsey recites the facts of *Barrett* but never explains why the

11  legal principle that it applied does not control in this case. McKinsey relies on *People ex rel.*

12  *Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165 (Ill. 1992), in which the Illinois Supreme Court

13  permitted the AG to bring a claim on behalf of a metropolitan fair and exposition authority. But

14  *Hartigan*, while recognizing that the state can have an interest in subdivision litigation (including

15  on the basis that the state had "provided over $145 million of State funds to the Authority"),

16  found AG authority to represent that interest through litigation of a subdivision's claims only

17  because "the Authority [did] not object[] to the suit." *Id.* at 485-86 (distinguishing *Barrett* on that

18  basis).

19      McKinsey also relies on *People ex rel. Scott v. Briceland*, 359 N.E.2d 149 (Ill. 1976), but

20  that decision held only that a statue authorizing a state environmental protection agency to

21  "prosecute enforcement actions" before the state "Pollution Control Board" was unconstitutional

22  in light of the AG's exclusive role as the litigation representative for the state. *Id.* at 151.[13] The

23  actions here are not state-wide enforcement actions, but instead claims for damages due to

24  injuries incurred by the subdivision plaintiffs. If *Briceland* were applicable here, then the

25  subdivisions would not have standing to bring their claims; even McKinsey concedes they do.

26

27  _____

[13] *Env't Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50 (Ill. 1977), similarly involved legal

28  representation of a state agency and had nothing to do with the Attorney General's authority to
    sue on behalf of subdivisions.

Finally, the Illinois legislature has refuted McKinsey's understanding of state law. It has enacted a statute providing that, after July 9, 2021 (after McKinsey's February 2021 settlement with the Illinois AG), "no unit of local government . . . may file or become a party to opioid litigation against an opioid defendant that is subject to a national multistate opioid settlement unless approved by the Attorney General." 735 ILCS 5/13-226(b)(1). In addition, the legislature provided a roadmap for how McKinsey could have secured a release of subdivision claims in Illinois:

> If counties representing 60% of the population of the State, including all counties with a population of at least 250,000, have agreed to an intrastate allocation agreement with the Attorney General, then the Attorney General has the authority to appear or intervene in any opioid litigation, and release with prejudice any claims brought by a unit of local government or school district against an opioid defendant that are subject to a national multistate opioid settlement.

*Id.* 5/13-226(b)(2).

### 7.   <u>Kentucky</u>

In earlier briefing, Plaintiffs explained why Kentucky law does not clearly establish that the AG has the ability to bring subdivision or school claims. Pls.' Br. at 53-54. McKinsey's new arguments do not support a different conclusion. As with Illinois, McKinsey relies on the AG's common law powers but does not acknowledge that those powers govern only when not "modified by statutory enactment." Ky. Rev. Stat. § 15.020(1). Here, the "statutory enactment" is Kentucky's specific assigning of litigating authority to county fiscal courts. *Id.* § 69.210(1). McKinsey cites *Commonwealth ex rel. Conway v. Thompson*, 300 S.W.3d 152 (Ky. 2009), but that case holds only that the AG ordinarily has the "power to act to enforce the state's statutes." *Id.* at 173. Here, the Kentucky subdivisions and schools do not bring enforcement actions under state statutes, but instead assert common law claims for their own injuries. That distinction was the basis of the holding in *Boyd County ex rel. Hedrick v. MERSCORP, Inc.*, 614 F. App'x 818 (6th Cir. 2015), which rejected counties' efforts to enforce a state statute lacking a private right of action. *Id.* at 823 (declining to recognize right to "act on behalf of the commonwealth" in this fashion). *Hancock v. Terry Elkhorn Mining Co., Inc.*, 503 S.W.2d 710, 715 (Ky. Ct. App. 1973), which permitted the AG to intervene in a private citizen's public nuisance action, means only the

uncontroversial proposition that the Commonwealth can maintain a public nuisance action. It does not say that no one else has an independent public nuisance claim.

Where Kentucky law assigns concurrent authority over claims to subdivisions and the AG, it does so expressly. Under the Kentucky Consumer Protection Act, for example, county attorneys may "institute and prosecute actions" under the statute only "with prior approval of the Attorney General." Ky. Rev. Stat. § 367.300. In addition, Kentucky has provided by statute that, when the AG enters into settlements with certain opioid defendants (McKinsey not among them), each local government unity "shall be deemed to have released its claims against" those defendants. *Id.* § 15.293(d). One might surmise that this is precisely why the Kentucky AG sued under the Commonwealth's consumer protection laws and not under any other theory.

### 8.  <u>Louisiana</u>

In earlier briefing, Plaintiffs cited Louisiana law rejecting the AG's authority to bring subdivision claims absent "highly exceptional circumstances." Pls.' Br. at 43 (quoting *State ex rel. Caldwell v. Molina Healthcare, Inc.*, 283 So. 3d 472, 485 (La. 2019) (citation omitted)). In *Caldwell*, the court found such circumstances existed because the sole claim at issue was breach of contract related to Medicaid reimbursements. The court explained that the Department of Health had formal authority to administer the State's Medicaid program, and so ordinarily would be the body responsible for litigating in connection with that program. However, the court found "highly exceptional circumstances" present because the Department had delegated "an essential role in the administration" of the state program to a private party operating as the State's "fiscal intermediary." *Caldwell*, 283 So. 3d 472 at 474, 485-86. Moreover, the claim arose from the delegation contract, a "contract to which the state itself is allegedly a party," and which expressly incorporated and required compliance with "the State's Solicitation for Proposal." *Id.* at 475, 486. In other words, the claim involved harm incurred *only* by the State, and not by the public body the AG sought to represent. *Id.*; *see also id.* at 488 (Johnson, C.J., concurring) ("It is the state that suffers damages if the contract is breached and funds are misspent, as the state is the source of funding and the party responsible to the federal government for federal funds."). McKinsey

1    claims that *Caldwell* permitted the AG claim because the case involved "governmental

2    functions," Supp. Br. at 25, but omits the key contextual language from the opinion:

> [T]he attorney general on behalf of the state has a right of action to bring a lawsuit against a private entity that has allegedly contracted to perform governmental functions essential to a program governed by both state and federal law where performance of the contract is subject to ongoing legislative oversight.

6    *Caldwell*, 283 So. 3d at 488.

7    McKinsey relies on La. Stat. § 13:4712, which authorizes the AG and many other parties,

8    including subdivisions, to seek "an injunction or order of abatement" for certain statutorily-

9    defined nuisances. But the Louisiana Court of Appeals has explained that such a statute does not

10   create concurrent authority over a single claim, but instead independent and separate claims:

11   "[E]ach party mentioned in the statute possesses a *separate and distinct right and cause of action*

12   *thereunder*." *Jefferson Parish v. Stansbury*, 228 So. 2d 743, 744-45 (La. Ct. App. 1969)

13   (emphasis added).[14]

14   ### 9.    **Maryland**

15   In earlier briefing, Plaintiffs explained that Maryland sets out by statute the limited

16   circumstances in which the AG can assert a subdivision claim, none of which exist here. Pls.' Br.

17   at 43 (citing Md. State Gov't Code § 6-107). McKinsey merely reasserts the AG's power to

18   litigate on behalf of the state and cites no contrary authority.

19   ### 10.    **Michigan**

20   McKinsey relies on *Certified Question*, but that case is distinguishable on its facts. The

21   court's holding was based on the AG's actual determination that subdivision litigation against

22   tobacco companies on "a broad range of claims . . . constitute[d] a state interest." 638 N.W.2d at

23   412, 415. There, the AG expressly released subdivision claims, naming them as "Releasing

24   Parties" in the settlement agreement. *Id.* at 412. The Michigan Supreme Court identified state law

25   providing that the AG could "become involved in litigation 'when *in his own judgment* the

---

[14] Similarly, McKinsey agrees that subdivisions, in addition to the AG, can bring claims pursuant to Louisiana's deceptive trade practices statute, Chart at 5, but selectively cites to the portion of the statute that authorizes the AG to seek civil penalties for violations. Supp. Br. at 9. Plaintiffs agree—this is precisely the relief McKinsey got when it settled with the states, including Louisiana. *Infra* § II.C.

1    interests of the state require it.'" *Id.* at 415. Accordingly, the court was constrained to "accord

2    substantial deference to the [AG]'s decision that a matter constitutes a state interest." *Id.* Here,

3    there is no indication that any settling AG made any determination as to whether subdivision

4    claims were "matters of state interest," so there is no such determination to which the Court must

5    defer. Indeed, we know that at least one AG (New York) has made the opposite determination.

6    Ex. C (N.Y. Att'y Gen.'s Memo. of Law in Opp. to the Subdivisions' Mot. to Intervene and

7    Objection to the Proposed Final Consent Order and Judgment, and in Supp. of Entry of the

8    Judgment).

9        In addition, *Certified Question* rested on a particular set of facts related to tobacco

10   litigation. This case presents different facts, namely claims that were pleaded and will be proved

11   around particularized local injuries not involving the state at all. *See In re Nat'l Prescription*

12   *Opiate Litig. (Monroe Cnty.)*, 458 F. Supp. 3d 665, 675 (N.D. Ohio 2020) (rejecting the argument

13   under Michigan law that because "the opioid crisis is a statewide . . . concern," a county's "claims

14   necessarily seek to vindicate the state's interest," explaining that the county "clearly seeks

15   recovery for its own harms, and not on behalf of the state as a whole," and distinguishing

16   *Certified Question*).

17       The reasoning of *Certified Question* has also been undermined by subsequent Michigan

18   caselaw. *Certified Question* relied on a distinction between "matters of state interest" on one

19   hand, and "matters solely of local interest" on the other. *Id.* at 414 ("Just as the authority of

20   counties to sue in matters of local interest cannot be used to undermine the authority of the state

21   to sue in matters of state interest, the authority of the state to sue in matters of state interest cannot

22   be used to undermine the authority of political subdivisions to sue in matters solely of local

23   interest."); *id.* ("Thus, although the Attorney General cannot sue on behalf of a county in a matter

24   solely of local interest, the Attorney General can sue on behalf of a county in a matter of state

25   interest."). The same court fourteen years later, in upholding a city's wage regulation, rejected the

26   "implicit dichotomy" that "if something is a matter of 'state concern' it cannot also be a matter of

27   'local concern.'" *Associated Builders & Contractors v. City of Lansing*, 880 N.W.2d 765, 770

28   (Mich. 2016). While *Lansing* did not expressly overrule *Certified Question*'s articulation of AG

1  authority, it did find that that limitation on municipal authority undergirding the previous

2  decision's outcome had "no continuing viability." *Id.* at 772.

3        Other elements of Michigan law demonstrate that separate authority to pursue the same

4  type of claim does not equate to concurrent authority over the same claim. A statute provides a

5  cause of action in connection with certain statutorily-defined nuisances to "[t]he attorney general,

6  the prosecuting attorney or any resident of the county in which a nuisance described in section

7  3801 is located, or a city, village, or township attorney for the city, village, or township in which

8  the nuisance is located." Mich. Comp. L. § 600.3805. But this section does not mean that the AG

9  has authority to bring and release a subdivision's nuisance claim. If it did, then "any resident of

10  the county" would also have authority to release the AG's claim, which cannot be right.

11              **11.**    **Mississippi**

12        In earlier briefing, Plaintiffs showed that Mississippi law is at best unclear as to whether

13  the AG can bring or release subdivision claims. Pls.' Br. at 54-55. McKinsey relies on *State ex*

14  *rel. Patterson for Use and Benefit of Adams Cnty. v. Warren*, 180 So. 2d 293 (Miss. 1965). That

15  case, as Plaintiffs earlier explained, is distinguishable both because it involved a claim against a

16  county's leadership, and so required the state to step in to defend the county's interests, and

17  because it rested on the AG's identification of a particular "statewide concern," the general

18  "duties and powers of [county] boards of supervisors." *Id.* at 308. Duties which are the same for

19  all eighty-two counties in Mississippi are distinct from each individual subdivision's unique

20  harms stemming from the opioid epidemic.[15] In addition, since 1965, Mississippi courts have

21  backed away from the expansive application of the Mississippi AG's common law powers in

22  *Patterson*. For example, in *Williams v. State*, 184 So. 3d 908 (Miss. 2014), over a dissent relying

23  on *Patterson*, the court refused to find that the AG's common law authority permitted him to

24  usurp a district attorney's statutory authority to conduct prosecutions within his district. *Id.* at

25  914; *see also Frazier v. State By and Through Pittman*, 504 So. 2d 675, 690 (Miss. 1987)

26  (holding that AG could not preclude the state Ethics Commission from retaining its own counsel

---

[15] Whether the allegations in the Mississippi subdivisions complaints are similar is irrelevant. *See* Supp. Br. at 33-34 & n.14. Plaintiffs expect that if these cases proceed to trial, each subdivision will provide evidence of its own harm. *See supra* at 7-8.

1   and filing a lawsuit, and explaining that "all public officers, including the Attorney General, are

2   subordinate to the laws of this State").

3   McKinsey also cites Miss. Code. § 95-3-5 for the proposition that the AG may bring

4   nuisance claims, Supp. Br. at 11, but omits that the same statute also grants standing to the

5   "county attorney," among others. That both parties can bring the same cause of action does not

6   mean they are bringing the same claim.

7   ### 12.   Missouri

8   Plaintiffs earlier explained that the Missouri Supreme Court has held that the AG lacks the

9   authority to bring or release subdivision claims. Pls.' Br. at 44-45 (discussing *Nixon*, 34 S.W.3d

10  122). McKinsey claims that *Nixon* concerned only "strictly local proprietary interests" but

11  supports that claim only by editing the world "proprietary" into a quote from that case that does

12  not contain it. Supp. Br. at 26. In reality, the court stated that "[t]he City of St. Louis has the

13  power to litigate claims in its own right where its own financial interests have been affected."

14  *Nixon*, 34 S.W.3d at 128. Just so here: Plaintiffs plead injury to their "own financial interests."

15  Plaintiffs also cited *State ex rel. McKittrick v. Missouri Public Service Commission*, 175 S.W.2d

16  857, 862 (Mo. 1943) for the proposition that Missouri courts understand statutorily-assigned

17  litigating authority to be exclusive, a citation to which McKinsey does not respond. Pls.' Br. at

18  45. McKinsey's remaining citations are to cases where the AG represented the State itself, not

19  subdivisions.

20  Underscoring that Missouri law does not currently authorize the AG to release subdivision

21  claims, the Missouri legislature is considering legislation that would preclude subdivisions from

22  asserting claims "released" in any "statewide opioid settlement agreement executed by the" AG.

23  Mo. SB985 (2022).[16]

24  ### 13.   New Mexico

25  Plaintiffs cited New Mexico statutes and caselaw making it clear that the AG does not

26  have authority to bring or release subdivision claims. Pls.' Br. at 45-46. The New Mexico AG's

27  powers are limited and conditioned by statute, *State v. Block*, 263 P.3d 940, 945 (N.M. Ct. App.

28  
---
[16] https://www.senate.mo.gov/22info/pdf-bill/intro/SB985.pdf

1    2011), and N.M. Stat. § 8-5-3, which circumscribes the specific instances in which the AG can

2    represent the interests of a county, indicates a lack of general authority.

3          The New Mexico Supreme Court has already rejected McKinsey's argument that a broad

4    grant of authority to the AG to litigate state interests should displace statutes granting others the

5    right to bring an action. *State ex rel. Att'y Gen. v. Reese*, 430 P.2d 399, 402-03 (N.M. 1967).

6    McKinsey contends that *Reese* recognized "concurrent right with the district attorney to bring an

7    action." Supp. Br. at 26. This misses the point. The action in *Reese* was "in the name of the state."

8    Even so, the court was unwilling to utilize broad conceptions of AG common law authority to

9    override a statute permitting the district attorney to bring the claim. The relevance of *Reese* is not

10   whether the AG has concurrent authority to bring a claim in the name of the state, but that the AG

11   may not expand his authority in violation of state statutory law. For the reasons explained in

12   Plaintiffs' earlier brief, New Mexico law protects subdivisions' right to sue. *See* Pls.' Br. at 46

13   (citing *Mayer v. Bernalillo County*, No. 18-666, 2018 WL 6594231, at *27 (D.N.M. Dec. 13,

14   2018) (In "the State of New Mexico, counties do not operate as the state's arms or

15   instrumentalities and, instead, operate as independent subdivisions.")).

16         McKinsey also relies N.M. Stat. § 30-8-8, which permits "any public officer or private

17   citizen" file a "civil action to abate a public nuisance." This statute cannot be understood to mean

18   that an AG nuisance claim precludes a subdivision's claim; otherwise, any "private citizen" could

19   preclude all public officers from abating a nuisance.

20         **14.   New York**

21         New York is perhaps the easiest state for the Court to evaluate on this issue. The New

22   York AG has made clear she did not release subdivision claims. Ex. C. McKinsey asks the Court

23   to adopt the reasoning of *Certified Question* and defer to AG determinations of what constitute

24   statewide concerns (notwithstanding state statutory law to the contrary or the lack of such a

25   determination here). Yet McKinsey would have the Court ignore the New York AG's

26   understanding of the scope of her own authority. That makes no sense.

27         Otherwise, as Plaintiffs explained, New York law does not provide any general power for

28   the AG to bring or release subdivision or school claims. Pls.' Br. at 46-47. Instead, New York

specifies the narrow circumstances when the AG can do so—where funds held by a local

government are "without right obtained." N.Y. Exec. Law § 63-c(1).[17] McKinsey contends that

the case leading to the enactment of that statute—*People v. Ingersoll*, 58 N.Y. 1 (1874), which

found no AG authority in that scenario—in fact recognized authority to bring claims related to the

"sovereign" power of the state. Supp. Br. at 27. *Ingersoll* says no such thing. Instead, what it says

is that the State has a claim where it can show "proof of a right . . . to the money as owner, and

which would give it a place in the treasury of the State when recovered." *Ingersoll*, 58 N.Y. at 18.

In other words, the State through the AG and a subdivision each have separate claims founded

upon their separate injuries. McKinsey also cites *City of New York v. State of New York*, 655

N.E.2d 649 (N.Y. 1995), but that case held only that municipalities lack standing to challenge

state legislation. *Id.* 653. It said nothing about whether the AG has authority to bring or release a

claim that a municipality would have standing to plead. McKinsey says that *City of New York*

recognized "concurrent" authority (putting the word "concurrent" in quotes), Supp. Br. at 27, but

that word does not appear in the decision.

　　　　Finally, New York has enacted a bar statute extinguishing claims filed after June 30, 2019

and released in statewide opioid settlements against opioid manufacturers, distributors, and

dispensers (but not consultants). N.Y. Mental Hyg. L. § 25.18. The existence of this statute

further supports the lack of any preexisting authority to do the same.

### 15.　　Ohio

　　　　McKinsey does not identify any authority even suggesting the Ohio AG has the authority

to bring and release subdivision or school claims. McKinsey repeatedly points out that the Ohio

AG possesses common law powers, but not one of the many cases it cites even suggests that one

of those common law powers is the ability to bring suit to vindicate the rights of subdivisions or

schools. As discussed above and in earlier briefing, Ohio law does not so provide, as confirmed

by recent legislative and political events. *Supra* at 4-5; Pls.' Br. at 55-56.

---

[17] Thus, whether the AG has authority to bring claims under New York's deceptive trade practices statute is irrelevant, *see* Supp. Br. at 13, particularly where McKinsey also concedes that subdivisions can bring such claims as well. Chart at 8.

1    McKinsey further dismisses the significance of the draft legislation in Ohio, Supp. Br. at

2    34 & n.15, backed by the AG, which would have given him the power to represent subdivisions

3    in cases such as these. The mere existence of this bill, coupled with the AG's support, suggests

4    that the AG does not have the power to bring and release claims on behalf of subdivisions, and

5    that the AG is aware he does not have this power. McKinsey has no response other than to say the

6    AG may still have "concurrent authority," although it makes no argument as to why this is the

7    case. *Id.* at n.15.

8         One other note on Ohio law. Ohio Rev. Code § 3767.03 provides:

9         Whenever a nuisance exists, the attorney general; the village solicitor, city director
          of law, or other similar chief legal officer of the municipal corporation in which the
10        nuisance exists; the prosecuting attorney of the county in which the nuisance exists;
          the law director of a township . . . ; or any person who is a citizen of the county in
11        which the nuisance exists may bring an action in equity in the name of the state, . . .
          to abate the nuisance.
12

13        Under McKinsey's understanding of the law, this statute sets out "concurrent" authority

14   over the same claim rather than independent authority over separate claims. If McKinsey were

15   right, then "any person" would have the power to preclude the AG from filing a nuisance action.

16   The same logic applies to Ohio's Injury Through Criminal Acts statute, which McKinsey

17   selectively cites. Supp. Br. at 15. While Ohio Rev. Code §§ 2307.60 and 2307.011(F) provide a

18   cause of action to "the state," they do so expressly for "political subdivision[s]" as well.

19                           **16.    Oklahoma**

20        Plaintiffs earlier explained that Oklahoma statutes do not confer general authority on the

21   AG to represent subdivisions and that, when the Oklahoma legislature intends to create such

22   authority, it does so expressly. Pls.' Br. at 56. McKinsey says that the examples Plaintiffs cited

23   are not in fact express transfers of litigation authority from subdivisions to state entities but never

24   explains why. Supp. Br. at 35.

25        Instead, McKinsey ignores Plaintiffs' argument and relies on the AG's broad powers to

26   appear for the *State*, *not* subdivisions. McKinsey again cites broad language regarding the AG's

27   "complete dominion" from *State ex rel. Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813, 818

28   (Okla. 1973) but, as Plaintiffs explained and McKinsey ignores, that case concerned the AG's

1   authority to revisit litigation choices made by a previous AG, not whether the AG is given

2   authority under state law to bring certain claims. Pls. Br. at 56. Further, McKinsey's assertion that

3   opioid-related litigation constitutes an "interest[] of the state or the people of the state" under

4   Okla. Stat. tit. 74, § 18b(3) is meaningless. Supp. Br. at 48. All this means is that the AG could

5   appear in such an action on behalf of the State, not that he could litigate the interests of

6   subdivisions in that action.

### 17.  Pennsylvania

8       The Pennsylvania AG's powers are purely statutory. *See Commonwealth v. Carsia*, 517

9   A.2d 956, 958 (Pa. 1986). No statute allows the AG to represent subdivisions, and nothing cited

10  by McKinsey suggests this authority exists. McKinsey cites *Commonwealth ex rel. Pappert v.*

11  *TAP Pharmaceutical Products, Inc.*, 885 A.2d 1127 (Pa. Commw. Ct. 2005), for the proposition

12  that the AG has authority to bring claims raising "a quasi-sovereign interest." Supp. Br. at 16.

13  This case stands only for the proposition that the AG, as representative of the state, has parens

14  patriae standing "to pursue the alleged damages of individual consumers." *Pappert*, 885 A.2d at

15  1143. It does not say that the AG may bring claims belonging to political subdivisions, which are

16  not among the limited entities he is authorized to represent. *See* 71 Pa. Stat. § 732-204(c).

17  McKinsey's assertion that the AG has previously brought claims in the public interest has no

18  relevance when these cases were brought on behalf of the Commonwealth, rather than its

19  subdivisions. McKinsey cites the AG's exclusive authority under the state's Unfair Trade

20  Practices and Consumer Protection Law, but does not recognize that the existence of this specific

21  statutory authorization suggests that a general residual authority does not exist.

### 18.  Tennessee

23      Plaintiffs explained that the Tennessee AG has authority to bring and release state claims,

24  not subdivision or school claims. Pls.' Br. at 47-48. Tenn. Code § 8-6-301(a)-(b) requires that

25  entities the AG *can* represent *must* be represented by the AG, so the subdivisions' ability to retain

26  their own counsel makes it clear the AG cannot represent subdivisions. McKinsey does not

27  meaningfully respond to this argument. Instead, McKinsey's authority only reaffirms the obvious:

28  that the AG may litigate on behalf of the State.

McKinsey relies on Tenn. Code § 29-3-102, which provides for abatement actions

> upon petition in the name of the state, upon relation of the attorney general and reporter, or any district attorney general, or any city or county attorney, or without the concurrence of any such officers, upon the relation of ten (10) or more citizens and freeholders of the county wherein such nuisances may exist.

This statute does not mean that the AG has the power to bring and release a subdivision's nuisance claim; if it did, then any group of ten friends could preclude the AG from abating a nuisance.

In addition, Tennessee has enacted a statutory bar granting the AG express authority,

> [u]pon written approval of the governor and comptroller of the treasury, . . . to release any pending or future claim of governmental entities against McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Corporation, and Johnson & Johnson and affiliates, subsidiaries, and other entities related to these companies that are released in the McKesson Corporation, Cardinal Health, Inc., AmerisourceBergen Corporation, and Johnson & Johnson settlement agreements for activities related to the manufacture, marketing, distribution, dispensing, or sale of opioids, or related activities, if the attorney general deems the release necessary to the interest of the state in the resolution of the opioid crisis.

Tenn. Code § 20-13-203. The existence of this statute demonstrates the lack of a pre-existing authority for the AG to release such claims. Similarly, the Tennessee State-Subdivision Opioid Abatement Agreement, available via the Attorney General's website on Opioid Settlements related to the Distributor/J&J settlements and the Purdue and Mallinckrodt bankruptcy plans and entered into pursuant to the bar statute, expressly distinguishes between "State-Only Opioid Settlement Agreement[s,] . . . in which there are not provisions for Subdivision joinder" and "Statewide Opioid Settlement Agreement[s,] . . . in which subdivision claims are addressed."[18] This confirms that Tennessee law recognizes that, as a general matter, subdivisions are not subject to AG settlements.

### 19.   Texas

Plaintiffs previously explained the limited authority of the Texas AG, including certain express authorizations to bring subdivision claims. Pls.' Br. at 58. But McKinsey does not identify any statute providing the Texas AG the authority to bring the claims asserted here. Broad

---

[18] https://www.tn.gov/content/dam/tn/attorneygeneral/documents/foi/opioids-settlements/tn-state-subdivision-opioid-abatement-agreement.pdf.

1   invocations of the AG's ability to "institute[e] . . . suits in the name of the State" are irrelevant in

2   connection with claims properly brought in the name of someone else. Supp. Br. at 18.

3   McKinsey's assertion that the AG's powers are exclusive "in some instances" is similarly

4   irrelevant to the question at hand, particularly when the only "exclusive" power held by the

5   Attorney General is the ability to bring an action for an injunction against a corporation to

6   "prevent any private corporation from exercising any power or demanding or collecting any

7   species of taxes, tolls, freight or wharfage not authorized by law." Tex. Const. art. IV, § 22; *see*

8   *also Sec. State Bank of San Juan v. State*, 169 S.W.2d 554, 561 (Tex. Civ. App. 1943). This case

9   involves no such claims.

10          There is no authority which gives the Attorney General the power to bring or release the

11   claims brought by subdivisions in this case. When the Texas legislature grants the AG the

12   authority to represent subdivisions, it does so clearly. *See* Tex. Bus. & Com. Code § 15.40(a). As

13   noted in Plaintiff's earlier brief, Texas considered, but did not enact, a law that would have

14   permitted the AG to release subdivision opioid claims. Tex. SB 1827 (2021-22).[19]

15                          **20.   Utah**

16          Plaintiffs explained that, while the Utah AG enjoys "broad powers," those powers "must

17   be read in juxtaposition" with other statutes, Pls.' Br. at 48-49 (quoting *Hansen v. Utah State Ret.*

18   *Bd.*, 652 P.2d 1332, 1337 (Utah 1982)). McKinsey's recitations of the AG's general powers are

19   irrelevant when, as here, other statutes give subdivisions their own claims subject to their own

20   representation. *Id.* McKinsey argues that *Hansen* turned on the fact that the funds at issue were

21   "proprietary," Supp. Br. at 28, but the court's holding was based on the specific statutory

22   authority for the Retirement Board at issue to hire its own legal counsel. As the more specific

23   delegation of power, that statute was given deference over the general authority of the Attorney

24   General to provide legal services for state agencies. *Hansen*, 652 P.2d at 1340. McKinsey further

25   argues that "nobody is forcing legal representation upon Plaintiffs," Supp. Br. at 28, but Plaintiffs

26   never knew of or consented to the AG's release that McKinsey now asserts that Plaintiffs are

27   bound by.

28   _____

[19] https://legiscan.com/TX/amendment/SB1827/id/109603

Notably, the Utah AG has characterized the McKinsey settlement as resolving "State claims" as distinguished from the Distributor/J&J settlements that also involved "subdivisions." Utah Att'y Gen., FAQ regarding the opioid deal.[20]

### 21.   Virginia

Plaintiffs explained the lack of Virginia law on this issue, Pls.' Br. at 57-58, and McKinsey adds nothing new. McKinsey points out that the Virginia Attorney General has previously brought a variety of common law claims, but this is irrelevant given these claims were brought in the name of the Commonwealth, not subdivisions. Supp. Br. at 19. None of the authority McKinsey cites says anything about the AG asserting a claim assigned by state law to subdivisions.

### 22.   Wisconsin

McKinsey does not dispute that the Wisconsin AG lacks any general litigating authority, let alone authority to bring or release claims belonging to a political subdivision. Pls.' Br. at 49-50. McKinsey cites the AG's authority to bring a nuisance claim, Supp. Br. at 20, 28, but omits that the statute distinguishes between nuisance actions "in the name of the state," which may be brought "by the attorney general," and actions "in the name of [a] municipality," which can be brought by "the municipality." Wis. Stat. § 823.02. No authority cited by McKinsey involves the AG bringing claims on behalf of a subdivision, but instead all describe his powers to represent the state. McKinsey's reliance on the Attorney General's ability to bring a claim under Wisconsin's unfair and deceptive trade practices statute is similarly misplaced. *See* Supp. Br. at 20. The statute only authorizes the AG to bring this claim on behalf of the State or the Department of Agriculture, with no mention of his ability to represent subdivisions on such claims. Wis. Stat. Ann. § 100.18(11).

Finally, McKinsey misses the point about the opioid litigation bar statute recently enacted in Wisconsin. The question is not whether the statute applies to the cases against McKinsey; it clearly does not, applying only the MDL 2804 claims. Rather, the statute demonstrates that,

_____

[20] https://attorneygeneral.utah.gov/wp-content/uploads/2021/07/FAQs-full-deal-final.pdf

1    absent its enactment, the AG lacked the authority to resolve such claims on the part of

2    subdivisions. *See* Pls.' Br. at 49-50.

3          **C.**    **McKinsey obtained release of claims that the AGs are authorized by statute to
           bring, including valuable claims for civil penalties.**

4

5          So what did McKinsey get for its $600 million? McKinsey got protection from the claims

6    for which there is specific state statutory authorization for the AGs to bring. The most obvious

7    examples of this are unfair trade practice claims pleaded pursuant to statutory authority in the AG

8    complaints against McKinsey. Those were the only claims that were pleaded. *E.g.*, ECF No. 312-

9    2, McKinsey Ex. CC ¶¶ 34-37. Those are the only claims that were identified by name in the

10   releases. *E.g.*, ECF No. 312-2, McKinsey Ex. DD ¶ II.G. n.1 (listing all state consumer protection

11   statutes with citation). Those are the claims that AGs bring in their everyday statewide

12   enforcement authority. And, crucially for answering the Court's questions, those statutes are

13   typically a source of exclusive AG authority.

14         AGs typically have exclusive authority to seek civil penalties under consumer protection

15   statutes. Carolyn L. Carter et al., *Unfair and Deceptive Acts and Practices* § 13.5.3.1 (9th ed.

16   2016) ("Generally only the attorney general or other designated enforcement authority can seek

17   civil penalties."); *see also, e.g.*, *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 777

18   S.E.2d 176, 189, 191 (S.C. 2015) (observing that "[t]o recover actual damages under SCUTPA, a

19   private claimant must suffer an actual loss, injury, or damages, and the claimant must demonstrate

20   a causal connection between the injury-in-fact and the complained of unfair or deceptive acts or

21   practices[,]" and that "[c]onversely, in an enforcement action brought by the Attorney General,

22   there is no actual impact requirement");  *Hall v. Walter*, 969 P.2d 224, 236 (Colo. 1998)

23   (explaining that the elements of "injury" and "caus[ation] . . . distinguish a private CCPA claim

24   from a district attorney or an attorney general's action for civil penalties"); *Amici Curiae* States'

25   Br., ECF No. 317-1, at 14-15 (arguing that "Attorney Generals make better plaintiffs" because

26   they can sue "without regard to proximate cause").[21]

27   _____

28   [21] *See also* Ala. Code § 8-19-11(b) (AG and DAs have exclusive authority to seek civil penalties);
     Fla. Stat. § 501.2075 (AG and state's attorneys); Ga. Code §§ 10-1-397(b)(2)(B), 10-1-405(a), (d)
     (AG only); Haw. Rev. Stat. §§ 480-3.1, 480-15.1 (AG and director of office of consumer

1   Would a rational company have paid $600 million to settle the deceptive trade claims

2   actually brought by the AGs? Although this is not typically a question put to a court after the fact,

3   the answer is yes, these were claims with substantial independent value. Indeed, McKinsey struck

4   a smart deal in settling AG claims for the amount it paid. Just recently, the California AG after

5   trial and appeal secured $302 million in civil penalties against a Johnson & Johnson subsidiary in

6   a suit related to defective pelvic mesh products. *People v. Johnson & Johnson*, 292 Cal. Rptr. 3d

7   424, 476 (2022).[22] But these claims, while important and valuable, are distinct from claims

8   available to subdivisions or schools. As a group of forty states just explained in a brief seeking to

9   protect their interests in the Johnson & Johnson bankruptcy proceeding, their "consumer

10  protection claims," with the potential for "civil penalties . . . into the trillions of dollars, . . . are

11  independent of, and in addition to, any . . . *claims of state or government entities that are not*

12  *Member States*." Ex. L (Mot. of the Ad Hoc Committee of States Holding Consumer Protection

13  Claims Seeking Relief with Respect to the Order Establishing Mediation Protocol) at 2 (emphasis

14  added). The Texas AG made the same point in seeking exclusion from coordinated proceedings in

15  Texas state court, explaining that "[t]he State's enforcement lawsuit," asserting only a "DTPA

---

17  protection); 815 Ill. Stat. § 505/6 (AG only); Ky. Rev. Stat. § 367.300 (no civil penalties, but
    subdivisions may bring claim only "with prior approval of the" AG); La. Stat. § 51:1407 (AG

18  only); Md. Code, Com. L. §§ 13-405, 13-410 (AG only); Miss. Code §§ 75-24-19, 75-24-21 (AG
    only); Mo. Stat. §§ 407.100, 407.110 (AG only); N.M. Stat. §§ 57-12-8, 57-12-11 (AG only);
    N.Y. Gen. Bus. L. § 350-d (AG only); Ohio Rev. Code § 1345.07(d) (AG only); 73 Pa. Stat. §

19  201-8 (AG and DAs); Tenn. Code § 47-18-108 (AG only); Tex. Bus. & Com. Code § 17.48(b)
    (AG and, "with prior written notice" and "full report to the" AG, a district or county attorney);

20  Utah Code §§ 13-11-3(3), 13-11-17(1)(d) (AG only).

21  [22] Under the California Unfair Competition Law ("UCL"), Cal. Bus. & Profs. Code § 17200 *et
    seq*., and the California False Advertising Law ("FAL"), Cal. Bus. & Profs. Code § 17500 *et seq*.,

22  the California AG and certain counties have express concurrent authority to seek civil penalties in
    the name of the State or the people of California. *See* Cal. Bus. & Prof. Code § 17206; Cal. Bus.

23  & Prof. Code § 17535; *Brown v. Allstate Ins. Co*., 17 F. Supp. 2d 1134, 1140 (S.D. Cal. 1998)
    (under UCL and FAL "civil penalties are recoverable only by specified public officers."). The

24  California AG could release *those* statutory claims on behalf of the political subdivisions—and
    that's what McKinsey paid for in California. Neither the School nor Political Subdivision

25  Plaintiffs assert claims under these statutes. In contrast to the UCL and FAL, Cal. Civ. Code §§
    3479, 3480—statutes actually asserted in the Subdivision MCC—provide for independent

26  subdivision authority to sue for their own harms, confirming Plaintiffs' argument that
    independent causes of action are, by definition, the opposite of "concurrent" authority over the

27  same cause of action. *See supra* at 10-12. The Subdivision MCC disclaims recovery for harms
    incurred by the State of California and seeks only to recover for harms incurred by the

28  Subdivision Plaintiffs—the independent claims that the AG cannot release. Subdivision MCC ¶
    542.

1  claim," was distinct from claims litigated by Texas counties for their own "injuries." Ex. G (State

2  of Tex.'s Mot. to Remand to Travis Cnty. Dist. Ct.) at 2, 6, 11-2.

3        **D.**      **<u>McKinsey fails to prove its affirmative defense of res judicata.</u>**

4        For the reasons Plaintiffs previously explained, McKinsey's defense of res judicata fails

5  due to the AGs' lack of ability, intent, and action to represent subdivision interests. Pls.' Br. at

6  10-58. McKinsey argues that it does not matter whether the AGs had authority to bring the claims

7  asserted here, but res judicata extends only to claims that could have been brought.

8        More fundamentally, McKinsey's res judicata defense relies on an understanding of state

9  law that makes no sense. Res judicata reflects a state law determination that litigation of one

10  claim should foreclose the litigation of another. But, as Plaintiffs have explained here, state law in

11  this case assigns certain claims to subdivisions or school districts and retains other claims for the

12  state. It would make no sense for a state to allocate causes of action in a deliberate and specific

13  way, and then undo that allocation through principles of preclusion. As Plaintiffs explained in

14  their earlier brief, McKinsey's argument would sweep all subdivision and school district claims

15  into the litigation every time the AG filed a case. Pls.' Br. at 36-38. A state's policy choice to

16  delegate certain claims to sub-state entities would be defeated. General state preclusion law

17  cannot be understood to undermine the state's substantive legal regimes in this way. *See, e.g.*,

18  *City of New York v. Beretta Corp.*, 315 F. Supp. 2d 256, 267 (E.D.N.Y. 2004) ("New York courts

19  have largely refused to find two functionally independent governmental entities in privity with

20  each other for purposes of preclusion."). Res judicata from one person's lawsuit does not bar

21  someone else's claims.

22

23

24

25

26

27

28

1    **III.    CONCLUSION**

2         McKinsey cannot meet its burdens of proof on its affirmative defenses of res judicata and

3    release. The motion to dismiss should be denied.

4    Dated: June 2, 2022                    Respectfully submitted,

5                                           By: */s/ Aelish M. Baig*
                                            Aelish M. Baig
6                                           aelishb@rgrdlaw.com
                                            **ROBBINS GELLER RUDMAN & DOWD, LLP**
7                                           One Montgomery Street, Ste. 1800
                                            San Francisco, CA 94104
8                                           Telephone: (415) 288-4545

9                                           By: */s/ Emily Rourk*
                                            Emily Roark
10                                          emily.roark@bryantpsc.com
                                            **BRYANT LAW CENTER, PSC**
11                                          601 Washington Street, P.O. Box 1876
                                            Paducah, KY 42002-1876
12                                          Telephone: (270) 550-1230

13                                          By: */s/ Jayne Conroy*
                                            Jayne Conroy
14                                          jconroy@simmonsfirm.com
                                            **SIMMONS HANLY CONROY, LLC**
15                                          112 Madison Avenue, 7th Floor
                                            New York, NY 10016
16                                          Telephone: (212) 257-8482

17                                          By: */s/ Joe Rice*
                                            Joe Rice
18                                          jrice@motleyrice.com
                                            **MOTLEY RICE, LLC**
19                                          28 Bridgeside Boulevard
                                            Mt. Pleasant, SC 29464
20                                          Telephone: (843) 216-9000

21                                          By: */s/ Matthew Browne*
                                            Matthew Browne
22                                          mbrowne@brownepelican.com
                                            **BROWNE PELICAN, PLLC**
23                                          7007 Shook Avenue
                                            Dallas, TX 75214
24                                          Telephone: (405) 642-9588

25                                          *PSC Members – Political Sub-Divisions*

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

By: */s/ Samuel Issacharoff*
Samuel Issacharoff
40 Washington Square South, 411J
New York, NY 10012
(212) 998-6580

*Additional Counsel for Plaintiffs*

By: */s/ Cyrus Mehri*
Cyrus Mehri
cmehri@findjustice.com
**MEHRI & SKALET PLLC**
2000 K Street NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100

*Plaintiffs' Steering Committee Member – Independent School Districts*

**Filing Authorized by Plaintiffs' Lead Counsel Pursuant to PTO 2:**

By: */s/ Elizabeth J. Cabraser*
Elizabeth J. Cabraser
ecabraser@lchb.com
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000