IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

Case No.  21-md-02996-CRB

IN RE: MCKINSEY & COMPANY, INC. NATIONAL OPIATE CONSULTANT LITIGATION

**ORDER DENYING MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

This multi-district litigation arises from consulting work that McKinsey & Company performed for several opioid companies.  Plaintiffs consist of school districts, Indian tribes, political subdivisions, children with neonatal abstinence syndrome, and third-party payors from 31 states.  Plaintiffs generally allege that McKinsey helped the opioid companies develop aggressive sales and marketing tactics to boost opioid sales, despite knowing that rapidly increasing supplies of opioids were causing serious harms in communities across the country.  McKinsey moves to dismiss the claims of all Plaintiffs from 19 states for lack of personal jurisdiction.  For the reasons discussed below, the Court denies McKinsey's motion.

**I.    BACKGROUND**

**A.    Parties**

McKinsey is a global management consulting firm with offices in over 130 cities across 65 countries.  Political Subdivision Master Complaint ("Compl.") (dkt. 295–2) ¶ 29.[1]  Four McKinsey entities are named as defendants in this action: "McKinsey &

_____

[1]  Factual allegations in all Master Complaints are the same.  See Opp. (dkt. 347) at 3 n.6.  For

Company, Inc." is incorporated and has its principal place of business in New York, while "McKinsey Holdings, Inc.," "McKinsey US," and "McKisney & Company, Inc. Washington D.C." are Delaware corporations with their principal places of business in New York (collectively, "McKinsey").  Compl. ¶¶ 24–27; Jain Decl. (dkt. 313–1) at 2.

For purposes of this motion, Plaintiffs are persons and entities from Alaska, Arizona, Colorado, Hawai'i, Indiana, Kentucky, Louisiana, Maryland, Mississippi, Montana, New Mexico, Oklahoma, Oregon, Tennessee, Utah, Virginia, Washington, West Virginia, and Wisconsin ("subject states").  See Mot. (dkt. 313) at 4.

**B.    The Complaint**

The complaint alleges that McKinsey "played a central role" in the opioid crisis by advising opioid companies on how "to sell as many opioids as conceivably possible." Compl. ¶ 2.  McKinsey allegedly "did more than just give advice"; it "worked collaboratively alongside its clients to implement McKinsey's recommendations."  Id. ¶ 7. The work involved "strategy work—'providing big picture advice to clients'—and implementation of the strategies" McKinsey devised.  Id. ¶¶ 59–60, 62.  In managing the implementation of the strategies it provided, McKinsey worked hand-in-hand with its clients.  See id.  In the words of one of the company's employees, "you can't even tell the difference between a McKinsey team member and one of our clients[.]"  Id. ¶ 62, 64. Specific examples of McKinsey's work are discussed in more detail below.

**1.    McKinsey's Contacts with the Subject States**

Plaintiffs' allegations regarding McKinsey's contacts with the subject states center on McKinsey's work for Purdue Pharma, the pharmaceutical company that created and manufactured the blockbuster opioid OxyContin.  See Compl. ¶¶ 10–11.  McKinsey provided consulting services for Purdue for 15 years, including during the core of the national opioid epidemic.  Id. ¶¶ 10–11, 101; Scheidler Decl. (dkt. 313-2) at 4.  Between 2009 and 2014, Purdue "relied extensively on McKinsey to develop and implement its

ease of reference, the Court primarily refers to Plaintiffs' Political Subdivision Master Complaint.

United States District Court
Northern District of California

sales and marketing strategy for OxyContin." Id. ¶ 106.  During that time, McKinsey employed a "granular" approach in its work for Purdue, identifying specific geographic regions where the company could significantly increase sales of OxyContin.  Id. ¶¶ 194, 199, 478; Humphreville Decl. (dkt. 347-1) Ex. A at 50, Ex. D 1–3.

McKinsey's "micro market analysis" helped identify "important pockets of growth that Purdue should focus on."  Humphreville Decl. Ex. D at 2.  As specific examples, McKinsey prepared an analysis titled "Micro Markets by Territory" that detailed the market attractiveness for OxyContin in "hundreds of cities, including locations in each of the subject states."  Opp. at 4 n.10; Humphreville Decl. Ex. B.  The analysis ranked cities on an "Overall Favorability Index" that determined the likelihood that targeting the city would yield increased OxyContin sales.  See Humphreville Decl. Ex. B.  McKinsey also used prescriber-level data to create a map of the United States that ranked the market attractiveness of regions for OxyContin growth.  See Opp. at 5; Compl. ¶ 249; Humphreville Decl. Ex. A at 0, 50.  McKinsey's analysis discusses the market attractiveness of cities located in several of the subject states, including Colorado, Kentucky, Maryland, Oklahoma, Utah, Virginia, Washington, and Wisconsin.  Opp. at 4; Humphreville Decl. Ex. A at 51.  These efforts were part of a broader strategy focused on boosting opioid sales nationwide.

McKinsey also sought to target "existing high prescribers" of OxyContin, including in the several of the subject states.  Compl. ¶ 255.  McKinsey prepared an analysis for Purdue of another map of the United States that detailed at the zip-code level total prescription growth for OxyContin across all 50 states.  Opp. at 4; Compl. ¶¶ 51, 194–207, 478.  The map includes a chart with example zip codes that identify where a growth or decline in OxyContin prescriptions occurred.  Compl. ¶ 478.  Similar to McKinsey's other analysis, the chart includes market analysis for multiple subject states.  Id.

Additionally, McKinsey helped Purdue target specific doctors through a project

titled "Evolve to Excellence" ("E2E").[2]  Id. ¶¶ 244, 255–69.  McKinsey and Purdue executives headed the E2E Executive Oversight Team.  Humphreville Decl. Ex. E at 5.  The primary goal of E2E was "to significantly bolster OxyContin . . . sales."  Id. Ex. E at 4.  McKinsey designed E2E and oversaw "the creation of target lists, internal dashboards to track progress, and changes to Purdue's incentive compensation plan."  Compl. ¶¶ 238–39, 242, 244, 254.  As part of the E2E initiative, McKinsey prepared an analysis identifying 30,704 prescribers in almost all of the subject states.  Humphreville Decl. Ex. F.  The analysis included details such as the specialty of the prescriber (e.g., Family Medicine or Anesthesiology), the prescriber's location, and the prescriber's "OxyContin Valuation."  Id.  McKinsey used this data to create prescriber profiles and worked with Purdue's sales staff to develop sales messages likely to persuade specific prescribers.  See Compl. ¶¶ 205–07.

McKinsey also worked with Purdue sales representatives in the field.  McKinsey consultants accompanied Purdue representatives on sales visits in several subject states.  Opp. at 7; Humphreville Decl. Ex. H at MCK-MDL2996-0310910-11, Ex. I.  The "ride-a-longs" with Purdue sales representatives helped McKinsey consultants "gain as much insight as possible into prescriber's responses to [Purdue's] promotion of OxyContin."  Humphreville Decl. Ex. J.  They were part of the hand-in-hand process that McKinsey employed to help Purdue refine its nationwide and state-specific sales and marketing campaigns.  See id.

### C.    Procedural Posture

Plaintiffs filed their Master Complaints on December 6, 2021.  McKinsey moves to dismiss all of Plaintiffs' claims in the subject states for lack of personal jurisdiction.  See Mot. at 1.  Plaintiffs opposed the motion, and McKinsey replied.  See Opp. at 1–2; Reply (dkt. 363) at 1.

---

[2] "Evolve to Excellence" is also known as "Project Turbocharge."  Compl. ¶ 244.

4

## II.    LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(2), a defendant may move to dismiss for lack of personal jurisdiction.  In assessing whether personal jurisdiction exists, the court may consider evidence presented in affidavits or order discovery on jurisdictional issues.  Data Disc, Inc. v. Sys. Tech. Assoc., Inc., 557 F.2d 1280, 1285 (9th Cir. 1977). "When a district court acts on a defendant's motion to dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss."  Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995).

A prima facie showing is established if the plaintiff produces admissible evidence which, if believed, would be sufficient to establish personal jurisdiction.  See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d. 1122, 1129 (9th Cir. 2003).  "[U]ncontroverted allegations in [the plaintiff's] complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor."  Brayton Purcell LLP v. Recordon & Recordon, 606 F.3d 1124, 1127 (9th Cir. 2010).  However, "bare bones assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden."  Swartz v. KPMG LLP, 476 F.3d 756, 766 (9th Cir. 2007).

A federal district court's jurisdiction over a defendant is the same as "the jurisdiction of a court of general jurisdiction in the state where the district court is located." Fed. R. Civ. P. 4(k)(1)(A).  To determine whether it can exercise jurisdiction, a district court employs a two-step inquiry.  First, "the plaintiff must show . . . the forum state's long arm statute confers personal jurisdiction over the out-of-state defendants."  Gray & Co. v. Firstenberg Mach. Co., 913 F.2d 758, 760 (9th Cir. 1990).  Second, "the exercise of jurisdiction [must] not violate federal constitutional principles of due process."  Id.  When a state's long-arm statute permits the exercise of jurisdiction to the limits of due process, the two-step inquiry collapses into one: "whether the exercise of jurisdiction . . . comports with due process."  Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284

F.3d 1114, 1123 (9th Cir. 2002).  All of the Subject states—except Mississippi[3]—permit the exercise of jurisdiction to the limits of due process.[4]

Under the Fourteenth Amendment's due process clause, "a tribunal's authority depends on the defendant having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021) (quoting International Shoe Co. v. Washington, 326 U.S. 310, 316–17 (1945)).  This inquiry "has long focused on the nature and extent of 'the defendant's relationship with the forum state.'" Id. (quoting Bristol-Myers Squibb Co. v. Super. Ct. of Cal., San Francisco Cnty., 137 S. Ct. 1773, 1779 (2017)).  And that "focus" has resulted in "two kinds of personal jurisdiction: general (sometimes called all-purpose) jurisdiction and specific (sometimes called case-linked) jurisdiction." Id.

A federal court may exercise general jurisdiction over a defendant only if the defendant is "essentially at home" in the forum state.  Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).  General jurisdiction depends on the defendant's relationship with the forum state—for companies, the question is whether the defendant is incorporated, headquartered, or otherwise "at home" there.  Ford Motor Co., 141 S. Ct. at 1024.

Specific jurisdiction is "different" in that it "covers defendants less intimately

[3] Plaintiffs' allegations meet the requirements of Mississippi's long-arm statute.  See Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 270 (5th Cir. 2006).

[4] McKinsey asserts that Oklahoma's long-arm statute is "narrower than the limits of constitutional due process." See Mot. at 11 n.7.  That is incorrect.  The Oklahoma Supreme Court has stated that Oklahoma's long-arm statute extends to "the outer limits permitted by . . . the due process clause of the United States Constitution." Hough v. Leonard, 867 P.2d 438, 442 (Okla. 1993).  Similarly, although Wisconsin's long-arm-statute "has been interpreted to confer jurisdiction to the fullest extent allowed under the due process clause" (see Felland v. Clifton, 682 F.3d 665, 678 (7th Cir. 2012) (quotations omitted)), Wisconsin law also requires that courts determine whether a defendant is "subject to jurisdiction under Wisconsin's long-arm statute." Thomas v. Ford Motor Co., 289 F. Supp. 3d 941, 943 (E.D. Wis. 2017).  However, the long-arm statute inquiry "is easily resolved . . . [o]nce the requirements of due process are satisfied" because Wisconsin's long-arm statute "has been interpreted to go the lengths of due process." Felland, 682 F.3d at 678.

6

connected with a State" and "only as to a narrower class of claims." Id.  While general

jurisdiction depends on the relationship between the defendant and the forum, specific

jurisdiction depends on the relationship between "the defendant, the forum, and the

litigation." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quoting Keeton v. Hustler Mag.,

Inc., 465 U.S. 770, 775 (1984)).  "Although a nonresident defendant's physical presence

within the territorial jurisdiction of the court is not required," such a defendant must still

have "minimum contacts" with the forum state "such that the suit does not offend

traditional notions of fair play and substantial justice." Id. at 283 (citation omitted).

As a framework for applying these principles, the Ninth Circuit has "established a

three-prong test for analyzing a claim of specific personal jurisdiction." Schwarzenegger

v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004).  In particular:

> (1)  The non-resident defendant must purposefully direct his activities or
> consummate some transaction with the forum or resident thereof; or perform
> some act by which he purposefully avails himself of the privilege of
> conducting activities in the forum, thereby invoking the benefits and
> protections of its laws;
>
> (2)  the claim must be one which arises out of or relates to the defendant's forum-
> related activities; and
>
> (3)  the exercise of jurisdiction must comport with fair play and substantial
> justice, i.e., it must be reasonable.

Id. (citation omitted).[5]

## III.   DISCUSSION

Plaintiffs do not contend that McKinsey is subject to general jurisdiction in any of

the subject states.  See Reply at 3.  Thus, the question is whether McKinsey is subject to

specific jurisdiction in the subject states.  See id.  To establish specific jurisdiction,

Plaintiffs must demonstrate that McKinsey purposefully directed activities at the subject

---

[5]  Under the first prong, the Ninth Circuit treats "purposeful direction" and "purposeful availment"
as "two distinct concepts." Schwarzenegger, 374 F.3d at. 802.  "A purposeful availment analysis
is most often used in suits sounding in contract," while a "purposeful direction analysis . . . is most
often used in suits sounding in tort." Id.  Because Plaintiffs' claims sound in tort (and not
contract), the purposeful direction test applies here. See id.; Mot. at 15; Opp. at 8.

states, and that Plaintiffs' claims arise out of or relate to McKinsey's forum-related activities. See Schwarzenegger, 374 F.3d at 802. If Plaintiffs meet their burden for the first two prongs, then McKinsey must show that exercising jurisdiction would be unreasonable. See id. For the reasons discussed below, Plaintiffs have established that McKinsey purposefully directed its activities at the subject states and that their claims arise from those activities. And McKinsey has not established that exercising jurisdiction over it would be unreasonable. McKinsey's motion is therefore denied.

### A.     Purposeful Direction

To establish purposeful direction, a plaintiff must show that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." Id. at 803 (citing Calder v. Jones, 465 U.S. 783 (1984); Dole Foods Co., Inc. v. Watts, 303 F.3d 1104, 1111 (9th Cir. 2002)).

### 1.     Intentional Act

Plaintiffs have established that McKinsey committed intentional acts directed toward the subject states. To satisfy the intentional act prong, "the defendant must act with the 'intent to perform an actual, physical act in the real world.'" Picot v. Weston, 780 F.3d 1206, 1214 (9th Cir. 2015) (quoting Schwarzenegger, 374 F.3d at 806). McKinsey performed numerous acts directed at the subject states. These acts included creating granular analyses of market attractiveness of the subject states, creating target lists of prescribers in the subject states, working alongside Purdue sales representatives in the subject states, and working with Purdue to implement sales strategies in the subject states. See id.; Compl. ¶¶ 51, 194–207, 238–39; 242, 244, 249, 254, 478; Humphreville Decl. Ex. A at 50–51, Ex. B, Ex. F, Ex. H–J.

### 2.     Expressly Aimed

Plaintiffs argue that McKinsey's actions were expressly aimed at the subject states for two reasons. See Opp. at 9. First, McKinsey designed a nationwide sales campaign for Purdue that caused harm in the subject states. See id. Second, to increase opioid sales in

8

the subject states, McKinsey employed a granular approach that involved "specifically tailored strategies aimed at each subject state." See id. at 10.

McKinsey, on the other hand, argues that its actions were only aimed at its clients. See Mot. at 16; Reply at 7. Because McKinsey's clients are not located in the subject states, McKinsey argues that it did not expressly aim its conduct at the subject states. See Mot. at 16–17; Reply at 10–11; see also Mot. at 24 (Plaintiffs "do not connect the services McKinsey allegedly provided for those manufacturers to the Subject states.").

Under the express aiming prong, courts assess a defendant's connection to the forum state. See Picot, 780 F.3d at 1214. The inquiry centers on whether the defendant specifically targeted the forum state. See Morrill v. Scott Fin. Corp., 873 F.3d 1136, 1143 (9th Cir. 2017) (citing Walden, 571 U.S. at 284). A defendant does not expressly aim its activities at the forum state when the unilateral activity of a plaintiff or third party is the defendant's only connection to the forum state. See Walden, 571 U.S. at 284–85 (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291–92 (1980)). Rather, the focus is on the defendant's "own contacts," i.e., "contacts that the defendant himself creates with the forum state."[6] See id. (emphasis in original); Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064, 1070 (9th Cir. 2017).

The express aiming prong is met when a defendant specifically tailors its activities to target the forum state. In Ayla, LLC v. Alya Skin Pty. Ltd., the Ninth Circuit held that a defendant who sold products internationally expressly aimed its activities at the United States because it tailored its promotions to U.S. residents. See 11 F.4th 972, 980 (9th Cir. 2021). There, the plaintiff sued the foreign defendant, alleging that the defendant's product infringed on the plaintiff's trademark. Id. at 977. The defendant moved to dismiss for lack of personal jurisdiction, and the district court granted the defendant's motion,

---

[6] Walden changed how the Ninth Circuit applied the express aiming prong. See Axiom, 874 F.3d at 1069–70. Before Walden, the Ninth Circuit had held that "wrongful conduct targeted at a plaintiff whom the defendant knows to be a resident of the forum state" satisfied the express aiming test. Id. at 1069. After Walden, the court held that individualized targeting of a plaintiff who resides in the forum state, without more, is not enough for express aiming. Id. at 1070.

United States District Court
Northern District of California

finding that the defendant's "marketing targeted sales internationally rather than specifically at Americans." Id. at 977, 980.

The Ninth Circuit reversed. Id. at 980. It reasoned that the defendant had purposefully directed its activities at the United States by promoting "its allegedly infringing product by means of references explicitly aimed at Americans." Id. at 980. For example, the defendant advertised on Instagram: "ATTENTION USA BABES WE NOW ACCEPT afterpay." Id. The defendant also advertised "Black Friday" sales on its Facebook page, which it knew was "America's biggest shopping day," and promoted on its website that American magazines featured its products. Id. The Ninth Circuit held that the defendant "satisfied the purposeful direction requirement by directing 'an insistent marketing campaign toward the forum.'" Id. at 981 (quoting Rio Props., v. Rio Int'l Interlink, 284 F.3d 1007, 1020 (9th Cir. 2002)).

Furthermore, express aiming does not require that the out-of-state defendant itself disseminate or sell a product that causes harm in the forum. For example, in Calder v. Jones, the U.S. Supreme Court held that intentional acts outside of the forum that contribute to an effect felt in the forum can satisfy the express aiming requirement. 465 U.S. 783, 789–90 (1984). In that case, the Supreme Court held that a Florida-based reporter and editor for the National Enquirer were subject to jurisdiction in California for an allegedly libelous article that they wrote about a California resident. Id. at 784–86, 788–89. The defendants argued that they did not purposefully direct their conduct at California because the National Enquirer made the decision to disseminate the article in California, not them. Id. at 789. The defendants argued that as employees they "could not control their employer's marketing activity," and the "mere fact that they [could] foresee" the National Enquirer circulating their article in California was not sufficient to establish jurisdiction. Id. The Court rejected the defendants' argument, reasoning that the defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" because they wrote the article knowing it "would have a potentially devastating impact" in California, where the National Enquirer had its "largest circulation." Id. at

789–90.  The Supreme Court thus held that jurisdiction over the defendants in California was proper.  Id.; see also Lions Gate Ent. Inc. v. TD Ameritrade Servs. Co., Inc., 170 F. Supp. 3d 1249, 1254, 1261–62 (C.D. Cal. 2016).

Here, Plaintiffs allege that McKinsey not only knew that the effects of its sales and marketing work for Purdue would be felt in the subject states, they allege that McKinsey advised Purdue where and how it should implement its marketing and sales strategies in the subject states.  See Compl. ¶¶ 2, 194–207, 238–39, 249, 254–69, 456, 478; Humphreville Decl. Ex. A at 50–51, Ex. B, Ex. D at 2–3, Ex. F.  Plaintiffs allege that McKinsey helped create the marketing and sales strategies that Purdue implemented in the subject states, and that McKinsey exercised "control [over Purdue's] marketing activity" in the subject states.  See Calder, 465 U.S. at 489; Compl. ¶¶ 106, 194–207, 238–39, 249, 254–69, 478; Humphreville Decl. Ex. A at 50–51, Ex. B, Ex. D at 2–3, Ex. F.

Like the defendant in Ayla, McKinsey specifically tailored its sales and marketing advice to target the subject states.  See 11 F. 4th at 980; Humphreville Decl. Ex. A at 50–51, Ex. B, Ex. F.  McKinsey took a granular and data-driven approach to identify "pockets of growth" where Purdue could increase its OxyContin sales.  See Humphreville Decl. Ex. D at 2–3.  This analysis resulted in McKinsey advising Purdue to increasingly target high prescribers of opioids in the subject states.  See id. Ex. B; Compl. ¶ 255.  McKinsey also analyzed data on hundreds of cities in the subject states and ranked their overall favorability.  See Humphreville Decl. Ex. B.  It oversaw "the creation of target lists and internal dashboards to track progress," collecting details on thousands of prescribers in the subject states and developing sales messages based on the prescribers' unique profiles. See id. Ex. F; Compl. ¶¶ 204–07, 254.  Not only did McKinsey advise Purdue on how to initiate and focus its contacts with the Subject states, it also had boots on the ground in the subject states, sending its consultants on "ride-a-longs" with Purdue sales associates to improve and refine sales strategies.  See id. Ex. J; Opp. at 7; see also Walden, 571 U.S. at 285 (Physical presence in a state "is certainly a relevant contact.").  McKinsey's multi-year engagement with Purdue to develop and implement sales and marketing strategies directed

11

toward the subject states suffices to meet the express aiming requirement.

In arguing that there is no basis for personal jurisdiction in the subject states, McKinsey effectively contends that it can help Purdue develop and manage strategies to increase opioid sales in the subject states, but that it cannot be subject to jurisdiction when those strategies result in increased opioid sales that cause harm in the subject states. See, e.g., Mot. at 16–17. The argument is not persuasive. McKinsey is "not charged with mere untargeted negligence," Calder, 465 U.S. at 789, and it is not being subjected to specific jurisdiction based on "'random, fortuitous, or attenuated' contacts" that resulted from its interactions with other people affiliated with the subject states, Walden, 571 U.S. at 286 (quoting Burger King, 471 U.S. at 475). To the contrary, Plaintiffs plausibly allege that McKinsey's actions significantly contributed to the wide-ranging harms that have affected the Subject states. See Calder, 465 U.S. at 789–90; see also Walden, 571 U.S. at 288 n.7. Plaintiffs plausibly allege that for several years, McKinsey played an instrumental role in developing and overseeing aggressive marketing strategies designed to boost opioid sales in the subject states, despite being aware of the severe harm that increasing supplies of opioids were inflicting on communities in the subject states.[7] See, e.g., Compl. ¶¶ 106, 238–39, 242, 244, 456; Humphreville Decl. Ex. E at 5. As a result, McKinsey is not like "a welder employed in Florida who works on a boiler which subsequently explodes in California." See Calder, 465 U.S. at 789. McKinsey is more akin to an advertising agency that advised a manufacturer on how to sell boilers to residents of specific states, despite knowing that the boilers carried a significant risk of exploding. See id. at 789–90; Lions Gate, 170 F. Supp. 3d at 1254, 1261–62.[8]

---

[7] McKinsey's argument that it is simply a "service provider" is not persuasive, and the cases that it relies on for this argument are inapposite. See, e.g., Opp. at 21; Reply at 7–8; Trierweiler v. Croxton & Trench Holding Corp., 90 F.3d 1523, 1534 (10th Cir. 1996) (holding that a Colorado law firm was not subject to jurisdiction in Michigan based on a single opinion letter it wrote for a Colorado client that later forwarded the letter to Michigan); Fletcher Fixed Income Alpha Fund, Ltd. v. Grant Thornton LLP, 89 Mass. App. Ct. 718, 723 (2016) (holding that an out-of-state auditor was not subject to jurisdiction in Massachusetts based on an audit report that it sent to its New York client who later forwarded the report to Massachusetts).

[8] McKinsey attempts to distinguish itself from the defendants in Calder and Lions Gate by stating

1    There is no random or attenuated chain of contacts here.  Plaintiffs have plausibly

2 alleged that McKinsey intentionally and purposefully directed contacts at the subject states

3 for several years.  Plaintiffs have thus made a prima facie showing that the express aiming

4 requirement is met.[9]

5    ### 3.    Foreseeable Harm

6    Under the third prong, courts ask whether the defendant knew its intentional act

7 would cause harm in the forum state.  See Schwarzenegger, 374 F.3d at 803.  The focus of

8 the inquiry "is not the magnitude of the harm, but rather its foreseeability."  Lindora, LLC

9 v. Isagenix Int'l, LLC, 198 F. Supp. 3d 1127, 1141 (S.D. Cal. 2016).

10    Plaintiffs adequately allege that McKinsey knew that developing aggressive

11 strategies to "turbocharge" opioid sales during the midst of a nationwide opioid epidemic

12 would cause harm in the subject states.  For example, Plaintiffs allege that McKinsey

13 briefed Purdue regarding OxyContin abuse and that it was generally aware of the harm

14 caused by increasing sales of opioids.  See Compl. ¶ 456.  A McKinsey presentation states

15 that "[m]ost prescribers are concerned about [opioid] abuse" and that "side effects and

16 addiction are concerns."  See id.  McKinsey worked with Purdue to "counter emotional

17 messages from mothers with teenagers that overdosed in [sic] OxyContin."  See id. ¶ 182.

18

19

20 that "McKinsey did not create content aimed at an audience that another party published;
McKinsey provided advice to clients, who then chose to act on the advice or not."  See Reply at 7.
But Plaintiffs allege that McKinsey did "create content"—sales and marketing strategies—aimed

21 at the Subject states that it later helped Purdue implement.  See, e.g., Compl. ¶¶ 204–09, 214, 254;
Humphreville Decl. Ex. D at 2–3, Ex. A at 50–51.  Furthermore, McKinsey states that Lions Gate

22 was appropriately distinguished by New Venture Holdings, L.L.C. v. DeVito Verdi, Inc., 376 F.
Supp. 3d 683 (E.D. Va. 2019).  See Reply at 7.  But New Venture is markedly differently from

23 this case, and it cited Lions Gate with approval.  See New Venture, 376 F. Supp. 3d at 697.

24 [9] McKinsey also argues that "merely foreseeing consequences in a forum state is not enough to
confer jurisdiction over a defendant."  See Mot. at 19.  It cites to Ninth Circuit cases that hold that

25 a defendant does not purposefully direct its activities at the forum when it places a product into the
stream of commerce and is aware that product will eventually end up in the forum.  See, e.g.,

26 Holland Am. Line Inc. v. Wartsila N. Am., Inc., 485 F.3d 450, 459 (9th Cir. 2007).  It argues that
it is even further removed from such a defendant because it is not a manufacturer or seller of

27 products.  See Mot. at 20; Reply at 7–8.  But unlike a manufacturer or distributor that places its
product into the stream of commerce, McKinsey, for all of the reasons discussed previously,

28 helped direct where and how Purdue would market and sell OxyContin.  See, e.g., Compl. ¶¶ 238–
39, 242, 244; Humphreville Decl. Ex. A at 50.

United States District Court
Northern District of California

And McKinsey "developed a method to identify geographic hot spots of OxyContin abuse and diversion." See id. ¶ 462.  These allegations plausibly establish that McKinsey knew that increasing opioid sales would cause harm in the subject states.

## B.  Nexus Between McKinsey's Contacts and the Litigation

Under the second prong of specific jurisdiction, a plaintiff's claims must "arise out of or relate to the defendant's contacts" with the forum state. Ford Motor Co., 141 S. Ct. at 1025 (quoting Bristol-Myers, 137 S. Ct. at 1780).  Claims "arise out of" the defendant's contacts with the forum state when there is a causal connection between the contacts and the claims.  See id. at 1026.  Claims that do not "arise out of" the defendant's contacts may nonetheless "relate to" those contacts.  See id. at 1026–28.  While there is no precise test for determining whether a plaintiff's claims "relate to" a defendants' contacts, the U.S. Supreme Court has held that "some relationships will support jurisdiction without a causal showing." See id. at 1027 (explaining that when a company serves the market of a forum state, and the company's product causes an injury in the forum state, the forum state's courts have jurisdiction over the company even if the specific product that caused the injury was not designed, made, or sold by the company in the forum state).  At bottom, "there must be an affiliation between the forum and the underlying controversy, principally, an activity or an occurrence that took place in the forum State." Id. at 1025 (quoting Bristol Meyers, 137 S. Ct. at 1780) (cleaned up).

Plaintiffs' claims "arise out of or relate to" McKinsey's contacts in the Subject states.  See Ford Motor Co., 141 S. Ct. at 1025.  Plaintiffs allege that McKinsey's actions—for example, the creation of prescriber target lists, analysis of geographic regions, and influence on Purdue's sales strategies—contributed to the influx of opioids in the subject states and the myriad harms that resulted therefrom.  See Compl. ¶¶ 533–43.  Thus, Plaintiffs' claims "arise out of or relate to" McKinsey's contacts in the subject states.  See Ford Motor Co., 141 S. Ct. at 1025.

## C.  Reasonableness

The exercise of jurisdiction over the defendant must also be "reasonable."

1    Schwarzenegger, 374 F.3d at 802.  McKinsey bears the burden of showing that an exercise

2    of jurisdiction would be unreasonable.  See Ayla, 11 F.4th at 983.  To carry its burden,

3    McKinsey must "present a 'compelling case' that the exercise of jurisdiction would be

4    unreasonable and therefore violate due process."  Id. (quoting Boschetto v. Hansing, 539

5    F.3d 1011, 1016 (9th Cir. 2008)).  Courts use seven factors to evaluate whether jurisdiction

6    would be reasonable:

> "(1) the extent of the defendant's purposeful interjection into the forum state's
> affairs; (2) the burden on the defendant of defending in the forum; (3) the
> extent of conflict with the sovereignty of the defendant's state; (4) the forum
> state's interest in adjudicating the dispute; (5) the most efficient judicial
> resolution of the controversy; (6) the importance of the forum to the plaintiff's
> interest in convenient and effective relief; and (7) the existence of an
> alternative forum."

11   See id. at 984 (quoting Freestream Aircraft (Berm.) Ltd. v. Aero L. Grp., 905 F.3d 597,

12   607 (9th Cir. 2018)).

### 1.    Extent of Purposeful Interjection

14   Under the "purposeful interjection" factor, courts examine how extensive the

15   defendant's contacts are in the forum state.  See Harris Rutsky & Co. Ins. Servs., Inc. v.

16   Bell & Clements Ltd., 328 F.3d 1122, 1132 (9th Cir. 2003).  This factor weighs in favor of

17   defendants when the defendant's contacts with the forum state are attenuated.  See id.

18   Here, McKinsey argues there is no purposeful interjection because it did not

19   purposefully direct its conduct at the Subject states, and even if it did, such contacts are

20   "attenuated."  See Mot. at 26; Reply at 16.  Plaintiffs argue this factor weighs in their favor

21   because McKinsey purposefully directed its actions at the Subject states.  See Opp. at 19.

22   McKinsey performed extensive data analysis on forum-state cities, regions, and

23   prescribers.  Indeed, it analyzed data on over 30,000 prescribers across the subject states

24   and hundreds of cities.  See Humphreville Decl. Ex. A at 50, Ex. B, Ex. F.  This analysis

25   directly influenced how and where Purdue marketed OxyContin.  See id. Ex. D at 2–3;

26   Compl. ¶¶ 204–07.  McKinsey consultant also physically entered several of the subject

27   states.  See id. Ex. J; Opp. at 7.  In light of the extent to which McKinsey targeted

28   individuals, cities, and regions in the subject states, Plaintiffs met their burden in proving

purposeful direction, and this factor cuts in favor of Plaintiffs.  See Cont'l Appliances, Inc. v. Thomas, No. C-12-1310-EMC, 2012 WL 3646887, at *8 (N.D. Cal. Aug. 23, 2012) (quotations and citations omitted).

### 2.    Burden of the Defendant

McKinsey contends "it would be unreasonably burdensome" for it to try cases in several different jurisdictions.  See Mot. at 26; Reply at 16–17.  But three factors lessen McKinsey's burden.  First, pre-trial proceedings are centralized in the Northern District.  Second, McKinsey is a global company with offices across the United States.  Compl. ¶ 29.  Third, courts increasingly recognize that "modern advances in communications and transportation have significantly reduced the burden of litigating in another forum."  See, e.g., Freestream, 905 F.3d at 608 (quoting Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1199 (9th Cir. 1988)).  In light of these considerations, McKinsey fails to demonstrate that the burden of defending cases in multiple jurisdictions would be unreasonable.

### 3.    Conflict with Sovereignty of the Defendant's State

Both parties agree that this factor is neutral.  See Mot. at 26; Opp. at 20; Reply at 17.

### 4.    Forum State's Interest

"The forum state has a substantial interest in adjudicating the dispute of one of its residents who alleged injury due to the tortious conduct of another."  CE Distrib., LLC v. New Sensor Corp., 380 F.3d 1107, 1112 (9th Cir. 2004).  Here, Plaintiffs have alleged that McKinsey has tortiously injured Subject states residents and entities.  See, e.g., Compl. ¶¶ 533–41.  Thus, the Subject states have "a substantial interest in adjudicating the dispute."  See CE Distrib., 380 F.3d at 1112.  Accordingly, this factor heavily favors Plaintiffs.

### 5.    Most Efficient Judicial Resolution

This factor determines the most efficient judicial resolution based on the location of evidence and witnesses.  See Freestream, 905 F.3d at 609.  But this factor "is no longer weighed heavily given the modern advances in communication and transportation."  Harris

Rutsky, 328 F.3d at 1133 (quoting Panavision Int'l v. Toeppen, 141 F.3d 1316, 1323 (9th Cir. 1998)).  McKinsey argues that the only evidence located in the subject states belongs to Plaintiffs.  See Mot. at 27.  Plaintiffs counter that evidence related to Plaintiffs' injuries is in the Subject states.  See Opp. at 27.  Taking these competing considerations into account, this factor does not weigh strongly in favor of either party.

### 6.   Plaintiff's Interest

The Ninth Circuit gives little weight to a plaintiff's interest in the forum.  See, e.g., Freestream, 905 F.3d at 609.  Walden further reinforces that the focus in asserting specific jurisdiction is on "the defendant, the forum, and the litigation."  See 571 U.S. at 284 (quoting Keeton, 465 U.S. at 775).  Thus, this factor does not favor either party.

### 7.   Existence of an Alternative Forum

Alternative forums exist because McKinsey is subject to general jurisdiction in New York and Delaware.  See Mot. at 28.  But "whether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable."  Ayla, 11 F.4th at 984 (quoting CollegeSource, Inc. v. AcademyOne, Inc., 653 F.3d 1066 (9th Cir. 2011)) (cleaned up).  McKinsey has not made that showing here.

***

On balance, McKinsey has fallen far short of making a "compelling case" that exercise of jurisdiction in the Subject states would be unreasonable.  See Ayla, 11 F.4th at 983 (quoting Boschetto, 539 F.3d at 1016).

## IV.   CONCLUSION

For the foregoing reasons, the Court denies McKinsey's motion to dismiss based on lack of personal jurisdiction.[10]

---

[10]  Because the Court finds that there is specific jurisdiction over McKinsey, it does not address Plaintiffs' arguments regarding a conspiracy-based theory of personal jurisdiction, jurisdictional discovery, and deferring ruling on McKinsey's motion until trial.  See Opp. at 21–26.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: October 27, 2022



CHARLES R. BREYER
United States District Judge