1    MARK DAVID MCPHERSON (CA SBN 307951)
     mmcpherson@mofo.com
2    CAITLIN S. BLYTHE (CA SBN 265024)
     cblythe@mofo.com
3    MORRISON & FOERSTER LLP
     425 Market Street
4    San Francisco, California 94105-2482
     Telephone: 415.268.7000
5
     JESSICA KAUFMAN (ADMITTED *PRO HAC VICE*)
6    jkaufman@mofo.com
     TIFFANI B. FIGUEROA (ADMITTED *PRO HAC VICE*)
7    tfigueroa@mofo.com
     MORRISON & FOERSTER LLP
8    250 West 55th Street
     New York, NY 10019
9    Telephone: 212.468.8000

10   Attorneys for Defendants
     McKINSEY & COMPANY, INC.
11   McKINSEY & COMPANY, INC. UNITED STATES
     McKINSEY & COMPANY, INC. WASHINGTON D.C.
12   McKINSEY HOLDINGS, INC.

13   [Additional Counsel Listed on Signature Page]

14                   UNITED STATES DISTRICT COURT

15                 NORTHERN DISTRICT OF CALIFORNIA

16

17   IN RE: MCKINSEY & CO., INC.            Case No.        3:21-md-2996
     NATIONAL PRESCRIPTION OPIATE
18   CONSULTANT LITIGATION                  **MCKINSEY DEFENDANTS' NOTICE OF
                                            MOTION AND MOTION TO DISMISS
19   This document relates to:             MASTER COMPLAINTS FOR FAILURE
                                            TO STATE A CLAIM; MEMORANDUM
20   ALL NAS ACTIONS;                       OF POINTS AND AUTHORITIES**
     ALL THIRD PARTY PAYOR ACTIONS;
21   ALL TRIBAL ACTIONS                     Date:    April 28, 2023
                                            Time:    10:00 a.m.
22                                          Ctrm:    Courtroom 6, 17th Floor
                                            Judge:   Honorable Charles R. Breyer
23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

3      PLEASE TAKE NOTICE that on April 28, 2023 at 10:00 a.m., or as soon thereafter as the

4   matter may be heard, before the Honorable Charles R. Breyer, United States District Judge, in

5   Courtroom 6, 17th Floor of the San Francisco Courthouse, located at 450 Golden Gate Ave., San

6   Francisco, CA 94102, Defendants McKinsey & Company, Inc., McKinsey & Company, Inc.

7   United States, McKinsey & Company, Inc. Washington D.C., and McKinsey Holdings, Inc.

8   (collectively, "McKinsey") will and do hereby move to dismiss Plaintiffs' claims as alleged in the

9   Master Complaint (NAS), ECF No. 298; the Consolidated Class Action Complaint (Third Party

10  Payors), ECF No. 299; and the Master Complaint (Tribal Plaintiffs), ECF No. 300.

11      This motion is made pursuant to Federal Rule of Civil Procedure 12(b)(6), on the grounds

12  that Plaintiffs fail to state any claim upon which relief may be granted, and Federal Rule of Civil

13  Procedure 9(b), on the grounds that Plaintiffs fail to plead fraud with particularity.

14      This motion is based upon this Notice of Motion and Motion, the following Memorandum

15  of Points and Authorities, all other pleadings and papers on file herewith, and such other

16  arguments and other materials as may be presented before the Motion is taken under submission.

17  Dated: January 9, 2023                **MORRISON & FOERSTER LLP**

18

19                          By: */s/ Mark David McPherson*
                                MARK DAVID McPHERSON
20
                            Attorneys for Defendants
21                          McKINSEY & COMPANY, INC.
                            McKINSEY & COMPANY, INC. UNITED STATES
22                          McKINSEY & COMPANY, INC. WASHINGTON D.C.
                            McKINSEY HOLDINGS, INC.
23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND ................................................................................. 3

III.    STANDARD OF REVIEW .................................................................................. 9

IV.     ARGUMENT ..................................................................................................... 11

    A.  Plaintiffs' RICO Claims Fail as a Matter of Law. ................................. 11

        1.  This Court Has Already Found the Alleged Causal Chain Insufficient to Support a RICO Claim. ....................................... 12

        2.  McKinsey Did Not Conduct or Participate in the Conduct of the Alleged RICO Enterprise. .......................................................... 13

        3.  The Complaints Fail to Allege a "Common Purpose" Because McKinsey Received No Incentives or Profit Aside from its Customary Fees. ........................................................................ 16

    B.  Without a Duty Running from McKinsey to the Plaintiffs, All of Plaintiffs' Negligence-Based Claims Fail. ............................................ 17

        1.  The Absence of Any Relationship Between McKinsey and Plaintiffs Precludes a Duty Here. .............................................. 18

        2.  Foreseeability Does Not Create a Duty Here. ........................... 20

        3.  Public Policy Compels Rejecting the Imposition of a Duty Here. ............ 24

    C.  Plaintiffs' Fraud and Negligent Misrepresentation Claims Fail as a Matter of Law. ...................................................................................... 25

        1.  McKinsey Made No Representations to Plaintiffs. ................... 25

        2.  Plaintiffs Fail to Identify Any Fraudulent Statements McKinsey Made. .......................................................................................... 27

    D.  As a Matter of Law, McKinsey Was Not the Cause of Any of Plaintiffs' Harms. ................................................................................................... 27

        1.  Plaintiffs Cannot Adequately Plead Cause in Fact. ................. 28

        2.  Plaintiffs Cannot Adequately Plead Proximate Cause. ............ 30

    E.  Plaintiffs' Public Nuisance Claims Fail as a Matter of Law. ................ 36

        1.  Plaintiffs Are Not Seeking to Vindicate a "Common Right." ......... 36

        2.  Plaintiffs Cannot Plausibly Allege that McKinsey Unreasonably Interfered with Any Common Right. .......................................... 39

        3.  Plaintiffs' Public Nuisance Claims Fail for Lack of Causation. .............. 42

    F.  Plaintiffs Fail to Allege the Elements of a Civil Conspiracy Claim. ............ 44

    G.  Plaintiffs' Aiding and Abetting Claims Fail as a Matter of Law. ........... 46

    H.  Plaintiffs Do Not State a Claim for Unjust Enrichment. ........................ 48

    I.  Plaintiffs' Consumer Protection Claims Fail for Numerous Reasons. ............. 51

        1.  Plaintiffs Cannot Pursue Claims Where the Parties Fall Outside the Scope of the Statute. ............................................................ 51

**TABLE OF CONTENTS**
(continued)

Page

2.  Plaintiffs Fail to Plead a Duty to Disclose to Support Their Omissions-Based Consumer Protection Claims. ...................................... 52

3.  Plaintiffs Fail to Plead Reliance or Causation to Pursue Certain Statutory Claims. ..................................................................... 53

4.  Plaintiffs Do Not Allege McKinsey Disseminated Statements to the Public or Otherwise Allege a Public Benefit or Interest. ......................... 53

J.  NAS Plaintiffs' Claims under West Virginia Law Each Fail. ............................. 53

1.  The Joint Venture Liability Claim Fails Due to a Lack of Profit Sharing or Joint Control. ............................................................ 53

2.  McKinsey's Conduct Did Not Satisfy the Definition of "Outrageous" Conduct. ............................................................ 55

3.  NAS Plaintiffs Do Not State a Claim for Negligent Infliction of Emotional Distress under West Virginia Law. ........................................ 56

4.  NAS Plaintiffs' Medical Monitoring Claims Fail Because They Cannot Succeed on Their Underlying Tort Claims. .................................. 56

K.  Plaintiffs' Claims Are Barred by First Amendment Protections. ........................ 56

V.  CONCLUSION ............................................................................................. 60

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**Cases**

4

*44 Liquormart v. Rhode Island*,
5
    517 U.S. 484 (1996) (plurality opinion) ......................................................................... 58, 59

6

*Abdulaziz v. McKinsey & Co.*,
    No. 21-2921, 2022 WL 2444925 (2d Cir. July 5, 2022) ................................................. 17, 21

7

*Abdulaziz v. McKinsey & Company*,
8
    No. 21 CIV. 1219 (LGS), 2021 WL 4340405 (S.D.N.Y. Sept. 22, 2021), *aff'd*,
9
    No. 21-2921, 2022 WL 2444925 (2d Cir. July 5, 2022) ...................................................... 18

10

*Acord v. Colane Co.*,
    719 S.E.2d 761 (W. Va. 2011) ........................................................................................... 56

11

*Am. Master Lease LLC v. Idanta Partners, Ltd.*,
12
    171 Cal. Rptr. 3d 548 (Cal. Ct. App. 2014) ....................................................................... 48

13

*In re Apple & AT&T iPad Unlimited Data Plan Litig.*,
    802 F. Supp. 2d 1070 (N.D. Cal. 2011) ............................................................................ 49

14

*Armor v. Lantz*,
15
    535 S.E.2d 737 (W. Va. 2000) ...................................................................................... 53, 54

16

*Artiglio v. Corning Inc.*,
17
    957 P.2d 1313 (Cal. 1998) .................................................................................................. 17

18

*Ashcroft v. Iqbal*,
19
    556 U.S. 662 (2009) .................................................................................................. 9, 10, 11

20

*B&G Foods N. Am., Inc. v. Embry*,
    29 F. 4th 527 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 212 (2022) ...................................... 60

21

*Bell Atl. Corp. v. Twombly*,
22
    550 U.S. 544 (2007) ............................................................................................... 9, 10, 47

23

*Bily v. Arthur Young & Co.*,
    834 P.2d 745 (Cal. 1992) ................................................................................ 19, 21, 22, 25

24

*Biofeedtrac, Inc. v. Kolinor Optical Enters. & Consultants, S.R.L.*,
25
    832 F. Supp. 585 (E.D.N.Y. 1993) .................................................................................... 15

26

*Bloxham v. Glock Inc.*,
27
    53 P.3d 196 (Ariz. Ct. App. 2002) ..................................................................................... 18

28

*Bower v. Westinghouse Elec. Corp.*,
   522 S.E.2d 424 (W. Va. 1999) ............................................................ 56

*Boyle v. United States*,
   556 U.S. 938 (2009) ........................................................................... 16

*Brandenburg v. Ohio*,
   395 U.S. 444 (1969) ........................................................................... 57

*Briosos v. Wells Fargo Bank*,
   737 F. Supp. 2d 1018 (N.D. Cal. 2010) ............................................... 9

*Brown v. USA Taekwondo*,
   483 P.3d 159 (Cal. 2021) ............................................................. 20, 21

*Bryant v. Glastetter*,
   38 Cal. Rptr. 2d 291 (Cal. Ct. App. 1995) ......................................... 33

*Cabral v. Ralphs Grocery Co.*,
   248 P.3d 1170 (Cal. 2011) ................................................................. 33

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*,
   637 F.3d 1047 (9th Cir. 2011) ........................................................... 10

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
   404 U.S. 508 (1972) ........................................................................... 59

*Cedar & Wash. Assocs., LLC v. Bovis Lend Lease LMB, Inc.*,
   944 N.Y.S.2d 47 (N.Y. App. Div. 2012) ............................................ 23

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   973 P.2d 527 (Cal. 1999) ..................................................................... 4

*Chevron Prods. Co. v. Advanced Corrosion Techs. & Training, LLC*,
   No. 20-CV-09095-CRB, 2021 WL 2156467 (N.D. Cal. May 27, 2021)
   (J. Breyer).......................................................................................... 27

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
   491 F. Supp. 3d 610 (N.D. Cal. 2020) ..................................... 10, 11, 12

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
   No. 18-CV-07591-CRB, 2022 WL 3224463 (N.D. Cal. Aug. 10, 2022) ....................... *passim*

*City of Chicago v. Am. Cyanamid Co.*,
   823 N.E.2d 126 (Ill. Ct. App. 2005) ................................................... 37

*City of Chicago v. Beretta U.S.A. Corp.*,
   821 N.E.2d 1099 (Ill. 2004) ......................................................... 38, 43

v

*City of Huntington v. AmerisourceBergen Drug Corp.*,
  Nos. 3:17-01362, 3:17-01665, 2022 WL 2399876 (S.D. W. Va. July 4, 2022) .............. 34, 40

*City of Modesto v. Dow Chem. Co.*,
  227 Cal. Rptr. 3d 764 (Cal. Ct. App. 2018) ......................................................... 42

*City of New Haven v. Purdue Pharma, L.P.*,
  No. X07HHDCV176086134S, 2019 WL 423990 (Conn. Super. Ct. Jan. 8,
  2019), *judgment entered*, 2019 WL 3761964 (Conn. Super. Ct. Jan. 8, 2019) .............. 29, 35

*City of Oakland v. Wells Fargo & Co.*,
  972 F.3d 1112 (9th Cir. 2020),
  *reh'g en banc granted, opinion vacated*, 993 F.3d 1077 (9th Cir. 2021), and
  *aff'd in part and rev'd in part on reh'g en banc*, 14 F. 4th 1030 (9th Cir. 2021).................. 30

*City of San Diego v. U.S. Gypsum Co.*,
  35 Cal. Rptr. 2d 876 (Cal. Ct. Appeals 1994) ..................................................... 38

*Cohen v. Subaru of Am., Inc.*,
  No. 120CV08442JHRAMD, 2022 WL 714795 (D.N.J. Mar. 10, 2022) ............................... 53

*Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*,
  235 F. Supp. 3d 1132 (E.D. Cal. 2017) .............................................................. 16

*Conant v. Walters*,
  309 F.3d 629 (9th Cir. 2002)..................................................................... 45, 57

*D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*,
  No. 10 C 8159, 2013 WL 1286696 (N.D. Ill. Mar. 28, 2013) ........................................ 15, 16

*Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*,
  924 F. Supp. 449 (S.D.N.Y. 1996).................................................................. 14

*Derdiarian v. Felix Contractor Corp.*,
  51 N.Y.2d 308 (1980) ............................................................................ 30

*DiPizio v. Empire State Dev. Corp.*,
  No. 15-CV-901, 2017 WL 9516816 (W.D.N.Y. May 9, 2017), *report and
  recommendation adopted*, 2017 WL 4230501 (W.D.N.Y. Sept. 25, 2017), *aff'd*
  745 F. App'x 385 (2d Cir. 2018) .................................................................. 14

*Doe v. Uber Technologies, Inc.*,
  No. 19-CV-03310-JSC, 2022 WL 4281363 (N.D. Cal. Sept. 15, 2022).......................... 21, 22

*Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*
  403 N.W.2d 830 (Mich. Ct. App. 1986), ........................................................... 46

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)....................................................................... 4

*Eiseman v. State*,
   70 N.Y.2d 175 (1987) ............................................................................................ 24, 25

*Elardo v. Town of Oyster Bay*,
   575 N.Y.S.2d 526 (N.Y. App. Div. 1991) ................................................................. 33

*In re Ethan C.*,
   279 P.3d 1052 (2012) ........................................................................................... 42, 43

*Evans Hotel, LLC v. Unite Here Local 30*,
   433 F. Supp. 3d 1130 (S.D. Cal. 2020) .................................................................... 60

*In re Ford Tailgate Litig.*,
   No. 11–CV–2953–RS, 2014 WL 3899545 (N.D. Cal. Aug. 8, 2014) .................... 51

*People ex rel. Gallo v. Acuna*,
   929 P.2d 596 (Cal. 1997) .................................................................................... 39, 41

*In re GlassHouse Techs., Inc.*,
   604 B.R. 600 (Bankr. D. Mass. 2019) ...................................................................... 19

*Gomez v. Guthy-Renker, LLC*,
   No. EDCV1401425JGBKKX, 2015 WL 4270042 (C.D. Cal. July 13, 2015) ...... 16

*Green v. Morningstar, Inc.*,
   No. 17 C 5652, 2018 WL 1378176 (N.D. Ill. Mar. 16, 2018) ......................... 15, 17

*Grewal v. Purdue Pharma L.P.*,
   No. ESX-C-245-17, 2018 WL 4829660 (N.J. Super. Ct. Oct. 2, 2018) ................. 38

*Gritzner v. Michael R.*,
   611 N.W.2d 906 (Wis. 2000) .................................................................................... 23

*Grynberg v. ENI S.p.A.*,
   No. 06 Civ. 6495 (GBD), 2011 WL 13176088 (S.D.N.Y. Aug. 24, 2011) ........... 49

*Guttman v. Nissin Foods (U.S.A.) Co.*,
   No. C 15-00567 WHA, 2015 WL 4309427 (N.D. Cal. July 15, 2015) ................. 38

*Hahn v. Mirda*,
   54 Cal. Rptr. 3d 527 (2007) ..................................................................................... 27

*Hain v. Jamison*,
   28 N.Y.3d 524 (2016) ............................................................................................... 35

*Hamilton v. Beretta U.S.A. Corp.*,
   96 N.Y.2d 222 (2001) ................................................................................... 17, 20, 24

*Handeen v. Lemaire*,
   112 F.3d 1339 (8th Cir. 1997) ................................................................................. 14

vii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Hemi Grp., LLC v. City of New York*,
   559 U.S. 1 (2010) ............................................................................................... 12

*Hocking v. City of Dodgeville*,
   768 N.W.2d 552 (Wis. 2009) .............................................................................. 19

*Holder v. Humanitarian L. Project*,
   561 U.S. 1 (2010) ............................................................................................... 57

*Honorato v. Mt. Olympus Enters., Inc.*,
   No. 20-CV-903-JDP, 2021 WL 4439073 (W.D. Wis. Sep. 28, 2021)................... 24

*State ex rel. Hunter v. Johnson & Johnson*,
   499 P.3d 719 (Okla. 2021) ................................................................ 35, 37, 38, 41

*Isler v. Ticor Title Guar. Co.*,
   595 N.Y.S.2d 34 (N.Y. App. Div. 1993) ............................................................ 45

*Jara v. Aurora Loan Servs.*,
   852 F. Supp. 2d 1204 (N.D. Cal. 2012) .............................................................. 10

*Jebran v. LaSalle Bus. Credit, LLC*,
   824 N.Y.S.2d 224 (N.Y. App. Div. 2006) .......................................................... 48

*State ex rel. Jennings v. Purdue Pharma L.P.*,
   No. N18C-01-223 MMJ, 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) ......... 38

*JLJ Recycling Contractors Corp. v. Town of Babylon*,
   754 N.Y.S. 2d 897 (N.Y. App. Div. 2003) ......................................................... 49

*Johnson v. Microsoft Corp.*,
   834 N.E.2d 791 (Ohio 2005).............................................................................. 50

*Kattula v. Jade*,
   No. 07-12569, 2008 WL 1837226 (E.D. Mich. Apr. 23, 2008)........................... 15

*Kent v. Commonwealth*,
   771 N.E.2d 770 (2002)....................................................................................... 30

*Kerns v. Slider Augering & Welding, Inc.*,
   505 S.E.2d 611 (W. Va. 1997)............................................................................ 54

*Khan v. Springer*,
   No. 2014CV033847, 2015 Colo. Dist. LEXIS 2655 (Colo. Dist. Ct. July 16,
   2015) .................................................................................................................. 46

*Krier v. Vilione*,
   766 N.W.2d 517 (Wis. 2009) .............................................................................. 19

*Kuiters v. Kukulka*,
    871 N.Y.S.2d 538 (N.Y. App. Div. 2008) ............................................................. 25

*La. Wholesale Drug Co. v. Sanofi-Aventis*,
    No. 07 Civ. 7343 (HB), 2009 WL 2708110 (S.D.N.Y. Aug. 28, 2009) .................. 59

*Laub v. Faessel*,
    745 N.Y.S.2d 534 (N.Y. App. Div. 2002) ............................................................. 27

*In re Lead Paint Litig.*,
    924 A.2d 484 (N.J. 2007)...................................................................................... 36

*Magic Kitchen LLC v. Good Things Int'l, Ltd.*,
    63 Cal. Rptr. 3d 713 (Cal. Ct. App. 2007) ........................................................... 50

*Marlin v. Bill Rich Constr.*,
    482 S.E.2d 620 (W. Va. 1996) .............................................................................. 56

*McBride v. Boughton*,
    20 Cal. Rptr. 3d 115 (Cal. Ct. App. 2004) ........................................................... 49

*Medtech Prods. Inc. v. Ranir, LLC*,
    596 F. Supp. 2d 778 (S.D.N.Y. 2008)................................................................... 44

*Meisel v. Grunberg*,
    651 F. Supp. 2d 98 (S.D.N.Y. 2009)..................................................................... 44

*Milavetz, Gallop & Milavetz, P.A. v. United States*,
    559 U.S. 229 (2010)............................................................................................... 57

*Modisette v. Apple Inc.*,
    241 Cal. Rptr. 3d 209 (Cal. Ct. App. 2018) ................................................... 28, 35

*Moore v. Apple, Inc.*,
    73 F. Supp. 3d 1191 (N.D. Cal. 2014) .................................................................. 10

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) .......................................................................................... 57

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964)............................................................................................... 56

*New York v. United Parcel Serv., Inc.*,
    No. 15-cv-1136 (KBF), 2016 WL 4203547 (S.D.N.Y. Aug. 9, 2016) .................. 13

*Newman v. Rothschild*,
    651 F. Supp. 160 (S.D.N.Y. 1986)........................................................................ 11

*ONY, Inc. v. Cornerstone Therapeutics, Inc.*,
    720 F.3d 490 (2d Cir. 2013).................................................................................. 58

ix

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
    961 F.3d 1062 (9th Cir. 2020) .................................................................................. 57

*Padilla v. United States*,
    No. 17-cv-01182-BAS-AHG, 2021 WL 1138191 (S.D. Cal. Mar. 24, 2021) ...................... 28

*Palsgraf v. Long Island Railroad Co.*,
    162 N.E. 99 (N.Y. 1928) ......................................................................................... 19

*Patton v. Bickford*,
    529 S.W.3d 717 (Ky. 2016) ..................................................................................... 31

*People v. ConAgra Grocery Prods. Co.*,
    227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017) ............................................................... 42

*People v. Purdue Pharma L.P.*,
    No. 30-2014-00725287-CU-BT-CXC, 2021 Cal. Super. LEXIS 31743 (Cal.
    Super. Ct. Dec. 14, 2021) ................................................................................. 40, 41

*People v. Sturm, Ruger & Co.*,
    761 N.Y.S.2d 192 (N.Y. App. Div. 2003) ............................................................ 40, 44

*Portnoy v. Am. Tobacco Co.*,
    Nos. 96/16323, 2-MG, 96-16324, 1997 WL 638800 (N.Y. Sup. Ct. Sept. 26,
    1997) ................................................................................................................... 46

*Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993) ................................................................................................. 59

*Puttuck v. Gendron*,
    199 P.3d 971 (Utah Ct. App. 2008) .......................................................................... 46

*Ray v. Swager*,
    903 N.W.2d 366 (Mich. 2017) .................................................................................. 33

*Redtail Leasing v. Bellezza*,
    No. 95 Civ. 5191(JFK), 1997 WL 603496 (S.D.N.Y. Sept. 30, 1997) ............................ 49

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) ............................................................................................... 13

*Rhode Island v. Lead Indus. Ass'n*,
    951 A.2d 428 (R.I. 2008) .............................................................................. 36, 37, 38

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    636 F.3d 88 (4th Cir. 2011) ..................................................................................... 37

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ............................................................................................... 57

*Rincon Band of Luiseño Mission Indians v. Flynt*,
   286 Cal. Rptr. 3d 29 (Cal. Ct. App. 2021), *review denied* (Feb. 16, 2022) ............................ 51

*Robinson v. Charter Practices Int'l, LLC*,
   696 F. App'x 226 (9th Cir. 2017) ................................................................. 4

*San Diego Gas & Elec. Co. v. Superior Court*,
   920 P.2d 669 (1996) ................................................................................ 41

*Shelton v. Wells Fargo Bank*,
   No. 3:09–CV–19, 2010 WL 10152301 (N.D. W. Va. Aug. 13, 2010) ................................... 54

*Sloan v. Gen. Motors LLC*,
   287 F. Supp. 3d 840 (N.D. Cal. 2018), *order clarified,* No. 16-CV-07244-
   EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018), *and on reconsideration,*
   438 F. Supp. 3d 1017 (N.D. Cal. 2020) ................................................................. 26

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ................................................................................ 50

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ................................................................................ 58

*Southlake Prop. Assocs., Ltd. v. City of Morrow*,
   112 F.3d 1114 (11th Cir. 1997) ................................................................................ 57

*Sperry v. Crompton Corp.*,
   831 N.Y.S.2d 760 (N.Y. 2007) ................................................................................ 49

*Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*,
   883 N.Y.S.2d 486 (N.Y. App. Div. 2009) ................................................................................ 48

*Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*,
   171 F.3d 912 (3d Cir. 1999) ................................................................................ 42

*Stillaguamish Tribe of Indians v. Nelson*,
   No. C10-327 RAJ, 2012 WL 1569613 (W.D. Wash. May 2, 2012) .............................................. 51

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) (J. Breyer) .................................................. 9, 10, 27

*Theme Promotions, Inc. v. News Am. Mktg. FSI*,
   546 F.3d 991 (9th Cir. 2008) ................................................................................ 59

*Thompson v. W. States Med. Ctr.*,
   535 U.S. 357 (2002) ................................................................................ 58

*Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*,
   984 F.2d 915 (8th Cir. 1993) ................................................................................ 38

*Travis v. Alcon Labs., Inc.*,
    504 S.E.2d 419 (W. Va. 1998) ............................................................... 55

*Treppel v. Biovail Corp.*,
    No. 03 CIV. 3002 (PKL), 2005 WL 2086339 (S.D.N.Y. Aug. 30, 2005) .............................. 44

*Tribeca Cos. v. First Am. Title Ins. Co.*,
    192 Cal. Rptr. 3d 354 (Cal. Ct. App. 2015) ............................................................... 30

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012) ............................................................... 60

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ............................................................... 57

*Van Horn v. Chambers*,
    970 S.W.2d 542 (Tex. 1998) ............................................................... 17

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ............................................................... 10

*Vons Cos. v. Seabest Foods, Inc.*,
    926 P.2d 1085 (Cal. 1996) ............................................................... 31

*Willoughby v. Cribbs*,
    No. H-13-1091, 2015 WL 4598290 (S.D. Tex. July 29, 2015) ............................................................... 33

*Wonderful Real Estate Dev. LLC v. Laborers Int'l Union of N. Am. Local 220*,
    No. 1:19-CV-00416-LJO-SKO, 2020 WL 91998 (E.D. Cal. Jan. 8, 2020) ............................................................... 60

*Wood v. Harshbarger*,
    No. 3:13–21079, 2013 WL 5603243 (S.D. W. Va. Oct. 11, 2013) ............................................................... 56

**Statutes**

18 U.S.C. § 1962(c) ............................................................... 13

Utah Code Ann. § 13-11-3(6), 4(1), 5(1) ............................................................... 52

**Other Authorities**

21 C.F.R. § 1306.04 ............................................................... 4, 40

Federal Rule of Civil Procedure 9(b) ............................................................... 10

Rest. (2d) Torts § 821B ............................................................... 36

Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin.
    L. Rev. 741, 815 (2003) ............................................................... 37

I.     INTRODUCTION

Plaintiffs seek to impose unprecedented liability on a professional consultant for advising clients how to increase sales of a legal, regulated product. At bottom, Plaintiffs' Complaints[1] accuse McKinsey of doing for Purdue and other pharmaceutical manufacturers what it does for other clients—provide advice. The Complaints are stuffed with misstatements and mischaracterizations of McKinsey's work—and McKinsey looks forward to setting the record straight if the cases proceed. Yet even were the Court to credit Plaintiffs' allegations, for them to state unprecedented claims against a consultant, the Court must accept that McKinsey can be liable for a nationwide, decades-long crisis that allegedly affected every part of the United States—a crisis that pharmaceutical manufacturers, distributors, prescribers, regulators, and pharmacies all contributed to—based on its professional advice to clients who then allegedly injured Plaintiffs. None of Plaintiffs' causes of action permits them to extend liability so far, and for good reason. Service providers like lawyers, accountants, financial advisors, and other consultants could not work if all were accountable for the conduct of not just their clients but others farther down the causal chain. Plaintiffs' claims here therefore fail as a matter of law for many reasons:

*First*, the Tribal and TPP Plaintiffs' core RICO claim fails for reasons that highlight the deficiencies in *all* of Plaintiffs' claims. As scores of cases following the Supreme Court's guidance have ruled, a professional service provider simply does not participate in a RICO enterprise by providing professional services to its clients, even if the service provider "go[es] beyond their customary role." And, more fundamentally, this Court has already ruled that the causal chain between a pharmaceutical manufacturer and any cognizable RICO injuries was too

---

[1] Pretrial Order 7 provides that "Defendants will not be required to respond to or move against each individual complaint filed in these MDL proceedings other than the Master Complaints," (ECF No. 293 ¶ 5), this motion is directed only at Plaintiffs' claims as alleged in the Master Complaint (NAS), ECF No. 298 ("NAS Complaint"); the Consolidated Class Action Complaint (Third Party Payors), ECF No. 299 ("TPP Complaint"); and the Master Complaint (Tribal Plaintiffs), ECF No. 300 ("Tribal Complaint") (collectively, the "Master Complaints" or "Complaints"). McKinsey thus preserves all defenses that could be raised as to any particular individual complaint, such as the defenses of lack of personal jurisdiction or insufficient service of process. In addition, consistent with the Stipulation and Order Regarding Briefing Schedule for Defendants' Further Motion to Dismiss Pursuant to FRCP 12(b)(6) (ECF No. 445), McKinsey reserves "the right to move to dismiss the Subdivisions' and School Districts' Master Complaints (ECF Nos. 296 & 297) at a later time, if necessary."

indirect to support a RICO claim against the manufacturer; *a fortiori*, no RICO claim can succeed against a consultant, which is even further removed from the causal chain than manufacturers.

*Second*, the Complaints reveal no relationship between McKinsey and Plaintiffs whatsoever. This undermines all the species of negligence claims Plaintiffs allege: under any state's law, the lack of a relationship precludes a finding of any legal duty of care McKinsey owed to Plaintiffs under the facts alleged here. Likewise, the absence of a relationship precludes Plaintiffs' fraud and misrepresentation claims, because Plaintiffs cannot allege that McKinsey made any representations *to them*, let alone that they relied on such representations.

*Third*, Plaintiffs cannot plausibly plead, under any state's law, that McKinsey's conduct proximately caused any of their alleged harms—an essential element of all of Plaintiffs' claims. Too many intervening actors contributed to Plaintiffs' alleged losses—manufacturers, distributors, prescribers, pharmacies, individuals, and even government regulators—to hold McKinsey responsible based on its advice to clients.

*Fourth*, Plaintiffs' public nuisance claims fail because they do not identify a "common right" with which McKinsey unreasonably interfered: case law establishes that there is no common right to be free from the threat that others will misuse a lawful, regulated product, the core of Plaintiffs' claims. And Plaintiffs cannot allege that McKinsey's lawful advice to clients constituted an unreasonable interference with a common right, even if such a right existed.

*Fifth*, even if Plaintiffs could identify facts enabling them to allege any tort or statutory claims against McKinsey, they face a final insurmountable hurdle: McKinsey's advice to its clients was professional speech that enjoys the highest protection under the First Amendment. Plaintiffs do not and cannot allege that McKinsey did anything more than provide advice—that is, speak. The Supreme Court has long held that the First Amendment precludes any regulation (including via tort claims) of professional speech such as McKinsey's, unless the regulation satisfies heightened scrutiny. As such, Plaintiffs cannot hold McKinsey liable for its speech, consistent with the First Amendment, unless they can plead and prove that McKinsey knew and intended for its advice to lead to the commission of illegal acts—an outlandish allegation that even these Complaints do not make. While Plaintiffs fault McKinsey for trying to maximize the

1   sales of opioids, not even they accuse McKinsey of intentionally trying to induce the illegal sale

2   or prescription of opioids.

3        These are just some of the most prominent ways in which Plaintiffs' claims fail as a

4   matter of law. This brief further details other legal deficiencies in all of Plaintiffs' claims,

5   however they mischaracterize McKinsey's work for its clients.

6        It goes without saying that the opioid crisis has produced tragic consequences throughout

7   our country. McKinsey itself recognized as much (ECF No. 300 ¶ 553)—and was the first

8   corporation to contribute hundreds of millions of dollars to every state and territory in the nation

9   to ameliorate the crisis. While Plaintiffs cynically use McKinsey's recognition of the crisis

10  against McKinsey, as purported evidence of liability (*id*.), Plaintiffs have not articulated any

11  viable legal theory under which they are entitled to recover damages from McKinsey for the

12  crisis. Rule 12 enables the Court to serve the essential function of acting as a gatekeeper to

13  protect against Plaintiffs' meritless claims. The Master Complaints should be dismissed.

14       **II.**     **FACTUAL BACKGROUND**

15       Plaintiffs seek to hold McKinsey liable for ostensibly playing a "central role in the

16  unfolding, propagation, and exploitation of the opioid crisis by advising multiple opioid

17  manufacturers and other industry participants how to sell as many opioids as conceivably

18  possible." (Tribal Compl. ¶ 2.) Their core theme is that McKinsey "focus[ed] on increasing

19  opioid sales" "to maximize return on investment" "no matter the resultant cost to society." (*Id*.

20  ¶¶ 2, 3.)

21       Given the seriousness of Plaintiffs' accusation—that McKinsey shares responsibility for

22  the opioid crisis with the manufacturers who produced and sold them, the distributors that

23  distributed them, the pharmacies that dispensed them, and the doctors who prescribed them—

24  there is a glaring absence of specific factual allegations supporting Plaintiffs' extraordinary

25  charge against McKinsey. Despite Complaints totaling hundreds of pages and thousands of

26  paragraphs, and even with the benefit of access to thousands of documents from McKinsey's

27  repository production, Plaintiffs offer no specific allegations of unlawful conduct *by McKinsey*.

28  Instead, the Complaints return again and again to various iterations of the theme that McKinsey

provided consulting advice to pharmaceutical manufacturers, suggesting ways for them to sell

more of the opioids they manufactured.

This core theme overlooks two crucial and incontrovertible facts. First, opioids are lawful,

regulated products that provide vital pain relief to millions of people. Even when it became clear

that some opioids were being abused, the FDA did not pull them from the market; rather, the

FDA expressly recognized that instances of diversion did not render opioids unsafe:

> Prescription opioid products are an important component of modern pain
> management. However, abuse and misuse of these products have created a
> serious and growing public health problem. One potentially important step
> towards the goal of creating safer opioid analgesics has been the development
> of opioids that are formulated with some properties intended to deter abuse.
> FDA considers development of these products a high public health priority.[2]

Accordingly, the pharmaceutical industry and regulatory agencies have sought to ensure access

for people who have a legitimate need for these drugs while implementing safeguards to

minimize abuse and diversion. Indeed, the Centers for Disease Control recently reaffirmed that

"[o]pioids can be essential medications for the management of pain" notwithstanding potential

risks.[3] Doctors using their medical judgment and expertise prescribe opioids for legitimate

medical purposes. *See* 21 C.F.R. § 1306.04.

Second, companies are not just permitted but expected to try to increase their sales. This is

a bedrock principle of our legal and economic system. *Robinson v. Charter Practices Int'l, LLC*,

696 F. App'x 226, 228 (9th Cir. 2017) (describing "profit maximization" as a "legitimate business

interest[]"); *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co*., 973 P.2d 527, 567 (Cal. 1999)

("[R]ational business behavior seeks to maximize profits."). Even Plaintiffs' theory that

McKinsey aimed to grow Purdue's profits so that the Sackler family could benefit from an

acquisition (Tribal Compl. ¶ 176)—if accepted as true—does not describe unlawful behavior.

*ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187,

200–01 (2d Cir. 2009) (holding "a generalized desire to achieve a lucrative acquisition proposal,"

---

[2] *Abuse-Deterrent Opioids-Evaluation and Labeling; Guidance for Industry; Availability*, 80 Fed. Reg.
17,765 (Apr. 2, 2015), *available at* https://www.regulations.gov/document/FDA-2013-D-0045-0032.
[3] CDC Clinical Practice Guideline for Prescribing Opioids for Pain – United States, 2022 (Nov. 4, 2022),
*available at* https://www.cdc.gov/mmwr/volumes/71/rr/rr7103a1.htm?s_cid=rr7103a1_w.

1  "maximize the corporation's profits," or earn "bonuses based on corporate earnings and higher

2  stock prices" cannot support an inference of wrongdoing).

3        That is not to say, of course, that a company cannot be liable for increasing sales in an

4  unlawful manner. But Plaintiffs' Complaints describe *lawful* ways in which McKinsey allegedly

5  advised its clients to try to increase opioid sales. Focusing almost entirely on McKinsey's work

6  for Purdue, Plaintiffs allege that McKinsey's advice took the following forms. And while

7  McKinsey looks forward to presenting evidence correcting Plaintiffs' mischaracterization of its

8  advice if the time to do so comes, for present purposes, they merely allege:

9        • McKinsey allegedly advised Purdue to follow "[b]est practice in the industry" by

10          improving the efficiency of its sales force. (Tribal Compl. ¶ 311.) As Plaintiffs

11          acknowledge, the techniques McKinsey recommended to accomplish this objective

12          are "generally applicable to problems encountered by many businesses; they are

13          conceptual frameworks that McKinsey deploys when tasked with solving a

14          problem for a client." (*Id.* ¶ 222.) Specifically, Plaintiffs allege that McKinsey

15          recommended Purdue (1) "strictly manage the target lists of each sales

16          representative to assure that the maximum amount of each sales representative's

17          time was spent with the most attractive customers," (*id.* ¶ 252); (2) "segment[]

18          prescribers into 'types' and tailor[] messages and tactics to the different prescriber

19          profiles" (*id*. ¶ 257); and (3) use "quotas and bonus payments to motivate Purdue's

20          sales force to sell as many OxyContin prescriptions as possible." (*Id.* ¶ 268.)

21          Plaintiffs point to nothing unlawful, or even novel, about this supposed advice.[4]

22          For years before McKinsey began to work with Purdue, pharmaceutical companies

23          were already segmenting prescribers of their products. *See* David Lefkowitz III,

24          MD, *How to Target Top Prescribers*, (Feb. 1, 2003), *available at*

25          https://www.pharmexec.com/view/how-target-top-prescribers (suggesting that

26          pharmaceutical marketing professionals should "[s]egment physicians according to

27  _____

[4] Plaintiffs' suggestion that sales quotas violated Purdue's Corporate Integrity Agreement finds no support
in the text of that agreement, which in no way prohibited quotas or other incentives to increase sales of
28  OxyContin through lawful means. (*Id.* ¶ 269.)

their value and focus resources on those with the greatest worth"). Plaintiffs do not allege that McKinsey's advice to Purdue deviated from this standard industry practice—and they certainly do not contend that McKinsey advised Purdue to prompt doctors to prescribe opioids illegitimately or at inappropriate dosages. In any event, the Complaints repeatedly acknowledge that it was up to Purdue to decide whether and how to apply McKinsey's advice. (Tribal Compl. ¶ 263 ("Purdue implemented McKinsey's suggestions . . ."); ¶ 270 ("By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's strategy . . ."); ¶ 277 ("Purdue accepted and . . . implemented McKinsey's strategies . . ."); ¶ 296 ("As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations.").

- Plaintiffs focus heavily on McKinsey's "Project Turbocharge," renamed "E2E: Evolve to Excellence" (TPP Compl. ¶ 248), alleging that in this initiative McKinsey called for targeting high subscribers "without addressing whether the expanded sales would be for an illicit market." (*Id*. ¶¶ 259-73.) According to the Complaints, however, in E2E McKinsey advised focusing on the *value* of potential prescribers based on a range of factors, not just a prescriber's historical prescribing volume. (*Id.* ¶ 265.) Moreover, Plaintiffs offer no facts suggesting that McKinsey advised Purdue to prompt doctors to prescribe opioids illegitimately or at inappropriate dosages. And Plaintiffs concede that sales of OxyContin peaked before E2E was fully deployed, belying their suggestion that the initiative increased sales of the drug. (*Id.* ¶¶ 279, 283.)

- McKinsey allegedly advised Purdue to direct its own marketing messages— messages that Purdue crafted—to doctors who were likely to respond well to those messages. Although Plaintiffs contend that those messages were based on the supposedly "false and misleading notion that the drug can provide 'freedom' and 'peace of mind' for its users," and led doctors to prescribe higher, riskier doses (*id.*

¶¶ 186-87, 215-17), Plaintiffs do not allege that McKinsey devised Purdue's promotional messages, or that McKinsey itself conveyed the messages to doctors, regulators, or others.

- McKinsey allegedly advised Purdue in connection with Purdue's application for FDA approval of a new abuse-deterrent formulation of OxyContin in 2009. Plaintiffs point, for example, to a presentation Purdue made to the FDA in 2009 (allegedly prepared by McKinsey) stating that a reformulation of Purdue's OxyContin "would deter abuse." Plaintiffs aver that McKinsey's work on this engagement is actionable because the FDA found 11 years later that the abuse-deterrent formulation did not in fact "substantially reduce abuse" (Tribal Compl. ¶¶ 210, 213), but they plead no facts suggesting that McKinsey knew or should have known that the FDA would opine, more than a decade later, that the abuse-deterrent characteristics of the new formulation—a formulation the FDA approved and for which the FDA specifically found that its abuse deterrent qualities could be set forth in the accompanying product label—would underperform.

Plaintiffs then allege that McKinsey provided similar advice to other pharmaceutical clients such as Endo and J&J, though these allegations read mostly as an after-thought. Plaintiffs' allegations concerning McKinsey's advice to Endo, for example, focus largely on advice that they cannot allege pertained to the United States (TPP Compl. ¶¶ 315-19). Plaintiffs allege that McKinsey provided Endo with advice concerning FDA approval of its drug Opana (advice Endo appears not to have taken) (*id*. ¶ 333), but do not allege that McKinsey otherwise assisted Endo in marketing Opana in the US.

Beyond this, Plaintiffs allege that McKinsey assisted Endo with an overall marketing strategy for a different opioid, Belbuca, designed to transition more patients to long-acting opioids. (*Id*. ¶ 352.) They also allege McKinsey assisted Endo in 2015 with a "sales transformation" that allegedly mirrored the E2E initiative for Purdue. (*Id*. ¶ 355.) As with McKinsey's alleged advice to Purdue, Plaintiffs do not allege that McKinsey urged Endo to prompt doctors to prescribe opioids illegitimately or at inappropriate dosages.

7

As for J&J, Plaintiffs allege that McKinsey attended meetings with J&J in relation to Nucynta, with nothing more (*id*. ¶ 372); had discussions with J&J in 2009 regarding strategies for a company that grew poppies and sold raw ingredients (*id*. ¶¶ 375-78); suggested in 2002 that J&J "concentrate their sales and marketing efforts [of Duragesic, an opioid,] on doctors that were *already* prescribing large amounts of Purdue's OxyContin" (*id*. ¶ 381), and to target Duragesic on individuals Plaintiffs describe as "high abuse-risk patients" to take advantage of the marketing claim that the drug was harder to abuse than other opioids. (*id*. ¶ 383.) They also allege that McKinsey suggested "turbocharging" J&J's opioid, Nucynta. (*id*. ¶ 385.) Once again, Plaintiffs do not allege that McKinsey urged J&J to prompt doctors to prescribe opioids illegitimately or at inappropriate dosages.

Plaintiffs' Complaints suggest they understand the key weakness of their theory—that McKinsey is an advisor that does not control what its clients choose to do with the advice it provides. To overcome the obvious fact that McKinsey's clients made all the decisions regarding how and to whom to market opioids, the Complaints skip over the difference between McKinsey's conduct and its clients' conduct. They attempt to pair McKinsey's knowledge with its clients' conduct,[5] to conflate McKinsey's conduct with its clients' conduct,[6] and to confuse McKinsey's clients' goals for McKinsey's.[7] These distinctions matter.

Most significantly, Plaintiffs allege—implausibly—that McKinsey implemented its own recommendations. (*e.g.*, TPP Compl. ¶ 64.) This allegation, apparently based largely on a journal article from 1982 about the role of consultants in general (*id*. ¶ 65), does nothing to impute McKinsey's clients' conduct to McKinsey in these cases. Plaintiffs merely repeat the word

---

[5] *See, e.g.*, NAS Compl. ¶ 168 ("McKinsey knew that reformulated OxyContin could still be abused. Purdue nonetheless touted its introduction of reformulated OxyContin and another ADF opioid as evidence of its good corporate citizenship…."); TPP Compl. ¶ 159 (same); Tribal Compl. ¶ 207 (same).

[6] *See, e.g.*, TPP Compl. ¶ 614 ("[W]hat McKinsey marketed as 'convenient' led to what was described as 'a [d]escription of Hell.'"); Tribal Compl. ¶ 683 (same); TPP Compl. ¶ 624 ("McKinsey targeted not just doctors but also nurse practitioners and physician assistants…"); Tribal Compl. ¶ 693 (same).

[7] *See, e.g.*, NAS Compl. ¶ 69 ("McKinsey's goal, in all instances, was to sell as many pills as conceivably possible."); TPP Compl. ¶ 60 (same); Tribal Compl. ¶ 108 (same); NAS Compl. ¶ 205 ("The idea was that McKinsey and Purdue could spread their own message through pain patients…"); TPP Compl. ¶ 196 (same); Tribal Compl. ¶ 244 (same); TPP Compl. ¶ 640 ("McKinsey intended reliance on these false statements as it was their goal for doctors to prescribe more and higher quantities of these dangerous pills to the public."); Tribal Compl. ¶ 709 (same).

1   "implement" over and over again without offering any factual allegation concerning how

2   McKinsey allegedly "implemented" its advice here. Nowhere do Plaintiffs allege that McKinsey

3   itself specifically met with regulators on its clients' behalf, crafted specific marketing messages

4   for its clients, vetted its clients' advertisements, met with doctors to deploy marketing messages,

5   or did anything else to "implement" its advice.

6          Lacking actual facts to support their claims, Plaintiffs fall back upon extraneous

7   allegations to mask the deficiencies of their claims. For example, Plaintiffs allege McKinsey

8   violated its client engagement contracts with the FDA by failing to disclose potential conflicts of

9   interest to the FDA. Aside from being untrue, this allegation is unrelated to Plaintiffs' claims, as

10  McKinsey's work for the FDA is rightly not alleged to have contributed to Plaintiffs' alleged

11  injuries. Plaintiffs also dedicate several pages of their complaints to rehashing an NBC News

12  piece about the McKinsey Investment Office ("MIO"), a "hedge fund," as Plaintiffs call it. (*See*

13  Tribal Compl. ¶¶ 557-73; TPP Compl. ¶¶ 509-25.) Plaintiffs detail its structure, format of

14  investment activities, and alleged conflicts of interest, despite the fact that the Complaints do not

15  allege MIO ever provided services to pharmaceutical companies and MIO is not a defendant here.

16         The Complaints do not plausibly allege any claim[8] and should be dismissed.

17  ### III.   STANDARD OF REVIEW

18         Under Rule 12(b)(6), a complaint must be dismissed when it fails "to state a claim upon

19  which relief can be granted." A "motion to dismiss under Rule 12(b)(6)" thus "'tests the legal

20  sufficiency of a claim.'" *Briosos v. Wells Fargo Bank*, 737 F. Supp. 2d 1018, 1022 (N.D. Cal.

21  2010) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). In ruling on such a motion,

22  the Court may consider "allegations contained in the pleadings, exhibits attached to the

23  complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756,

24  763 (9th Cir. 2007) (J. Breyer).

25         Although a Rule 12(b)(6) motion requires that the "court must accept as true all of the

26  allegations contained in a complaint," that standard "is inapplicable to legal conclusions."

27  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (discussing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

28  ---
[8] Appendix A identifies in a chart the specific claims alleged in each Master Complaint at issue here.

9

555 (2007)). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Jara v. Aurora Loan Servs.*, 852 F. Supp. 2d 1204, 1207 (N.D. Cal. 2012) (quoting *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Jara*, 852 F. Supp. 2d at 1207 (quoting *Iqbal*, 556 U.S. at 678). In other words, "plausibility" demands "more than a sheer possibility that a defendant has acted unlawfully," *Iqbal*, 556 U.S. at 678, and the "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555.

Claims sounding in fraud are also subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003) (explaining that even "[i]n cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct," and in such cases, Rule 9(b)'s heightened pleading requirement must be met). Under Rule 9(b), a fraud-based claim must "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This rule therefore "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 646 (N.D. Cal. 2020) (quoting *Swartz*, 476 F.3d at 764). The plaintiff must also set forth "what is false or misleading about a statement, and why it is false." *Moore v. Apple, Inc.*, 73 F. Supp. 3d 1191, 1198 (N.D. Cal. 2014) (citation omitted).

A plaintiff's fraud-based claims, including RICO claims, thus must meet the standards articulated in both *Iqbal* and Rule 9(b). *See Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011) ("Because Rule 8(a) requires the pleading of a plausible claim, *Iqbal*, 129 S.Ct. at 1949–50, we hold that claims of fraud or mistake . . . must, in addition

1   to pleading with particularity, also plead plausible allegations."); *see also Iqbal*, 556 U.S. at 687

2   (noting Rule 9 excuses a party from pleading intent under an elevated pleading standard but does

3   not allow a plaintiff "to evade the less rigid–though still operative–strictures of Rule 8"); *Newman*

4   *v. Rothschild*, 651 F. Supp. 160, 162 (S.D.N.Y. 1986) ("It is particularly important to require such

5   specificity when the fraud allegations also constitute the predicate acts underlying RICO claims,

6   and implicate the reputation interests of defendants accused of committing racketeering offenses."

7   (internal citations omitted)).

8        The Court need not dwell on choice of law issues for purposes of this motion. That is

9   because there is no true conflict in the laws of the transferor states when assessing key elements

10   of Plaintiffs' claims. While the substantive law of the relevant states may vary in subtle ways,

11   Plaintiffs' theories of relief suffer from fundamental deficiencies that warrant dismissal regardless

12   of which state law applies. We detail these common deficiencies below, and the accompanying

13   appendices demonstrate that these deficiencies exist no matter which state law the Court applies

14   to Plaintiffs' claims.

15   **IV.**    **ARGUMENT**

16       **A.**    **Plaintiffs' RICO Claims Fail as a Matter of Law.**

17        Tribal and TPP Plaintiffs lead with RICO claims that are strikingly similar to those this

18   Court has already rejected in *City and County of San Francisco v. Purdue Pharma L.P.*, 491 F.

19   Supp. 3d 610 (N.D. Cal. 2020). They contend that McKinsey, together with Purdue and other

20   pharmaceutical manufacturers, participated in and conducted an "Opioid Marketing Enterprise"

21   by engaging in mail and wire fraud, misrepresenting the safety and efficacy of opioids. (*See, e.g.*,

22   TPP Compl. ¶¶ 559-61; Tribal Compl. ¶¶ 628-30.)

23        These claims fail for several reasons. First, Plaintiffs do not adequately plead proximate

24   causation, the bar for which is higher for RICO claims than for Plaintiffs' other claims. Second,

25   as a matter of law, McKinsey was not involved in the operation and management of the purported

26   enterprise. And third, the Complaints do not allege a structure with a common purpose, as they

27   must to sustain a RICO claim based on an association-in-fact enterprise.

28

**1.     This Court Has Already Found the Alleged Causal Chain Insufficient to Support a RICO Claim.**

"A plaintiff must show that a RICO predicate offense 'not only was a 'but for' cause of his injury, but was the proximate cause as well.'" *City & Cnty. of San Francisco*, 491 F. Supp. 3d at 653 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). Plaintiffs "must therefore demonstrate that there is 'some *direct relation* between [their asserted injuries] and the injurious conduct alleged.'" *Id.* (emphasis in original). An attenuated causal chain will not suffice, and a mere allegation that the injury was a foreseeable consequence of the enterprise's alleged fraud is not enough, either. *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 12 (2010) ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm"). Here, even more so than in *City and County of San Francisco*, Plaintiffs' alleged injuries "are too attenuated to satisfy RICO's narrow definition of proximate cause." *City & Cnty. of San Francisco*, 491 F. Supp. 3d at 653.

The alleged causal chain here stretches across numerous intervening actors (including those engaged in illegal conduct). (*See, e.g.*, NAS Compl. ¶¶ 288-89, 457; TPP Compl. ¶¶ 279-89, 448; Tribal Compl. ¶¶ 327-28, 496.) The alleged causal chain is substantively identical to the chain this Court found too remote in *City and County of San Francisco*:

> [The] causal chain…involves too many links and depends on independent and intervening acts—including criminal conduct—by third and fourth parties. For example, third—and potentially fourth and fifth—parties allegedly diverted or sold illicit opioids, administered opioids intravenously, and improperly discarded the used needles, which harmed city-owned property and businesses. While it is plausible that Defendants' conduct <u>enabled</u> this third-party behavior, it is impossible to conclude that Defendants' conduct <u>directly</u> caused the City's harm…[U]nder the most generous reading of the City's causal chain, Defendants' conduct (the predicate act) flows through prescribing physicians (Link 1), pharmacists (Link 2), and patients (Link 3) who then illegally misuse opioids, improperly discard the needles, and thus damage city-owned property and businesses (the harm). Neither the Ninth Circuit nor the Supreme Court have ever accepted a RICO proximate cause theory that involves three intermediaries.

*City & Cnty. of San Francisco*, 491 F. Supp. 3d at 656–57. While the only alleged injuries in *City and County of San Francisco* arose out of discarded needles, the Court's reasoning therein applies with equal force to the alleged harms here to TPPs' and Tribal businesses, as all of these harms

1    result from actions that are at least four steps removed from the supposed Enterprise's alleged

2    conduct. Thus, even the most generous reading of the causal chain alleged in the Complaints here

3    is more remote than in *City and County of San Francisco*: in addition to the intermediaries

4    identified there, here, the independent acts of pharmaceutical manufacturers, too, stand between

5    the alleged conduct of McKinsey and the alleged harms Plaintiffs allege.

6        The failure to plead proximate cause compels dismissal with prejudice of all Plaintiffs'

7    RICO claims. As in *City and County of San Francisco*, Plaintiffs "can *only* allege indirect injuries

8    to [their] property and businesses stemming from conduct by third parties," which "do not satisfy

9    proximate cause, and therefore, any amendment would be futile." *Id.* at 661.

10                    **2.      McKinsey Did Not Conduct or Participate in the Conduct of the**

11                              **Alleged RICO Enterprise.**

12       Plaintiffs' RICO claim fails for another reason: McKinsey, as an outside service provider,

13   did not conduct or participate in the conduct of the alleged RICO enterprise. Section 1962(c)

14   makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct

15   or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of

16   racketeering activity...." 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young*, 507 U.S. 170 (1993),

17   the Supreme Court held that the RICO statute requires that a defendant have "*some* part in

18   directing the enterprise's affairs." *Id.* at 179. Examining the language of 1962(c), the Court

19   reasoned that the verb "conduct" means "to lead, run, manage, or direct." *Id.* at 177. The Court

20   then applied that "operation or management" test to accountants who knowingly over-valued an

21   asset on a corporation's balance sheet, misrepresenting the corporation as solvent. It found that

22   the accountants had not violated Section 1962(c) because they had no part in directing the affairs

23   of the enterprise. *Id.*

24       "The test advanced in *Reves* is intended to make it difficult to hold an outside service

25   provider—such as, for instance, an accountant or lawyer—liable under § 1962(c)." *New York v.*

26   *United Parcel Serv., Inc.*, No. 15-cv-1136 (KBF), 2016 WL 4203547, at *4 (S.D.N.Y. Aug. 9,

27   2016). Courts have thus "made clear that providing ordinary but important business services to a

28   RICO enterprise is not itself sufficient to meet the operation or management test." *Id.*

1    Accordingly, extensive case law holds that "an attorney or other professional does not conduct an

2    enterprise's affairs through run-of-the-mill provision of professional services." *Handeen v.*

3    *Lemaire*, 112 F.3d 1339, 1348 (8th Cir. 1997) (collecting cases). Plaintiffs assert that

4    "McKinsey's relationship with Purdue went far beyond a typical business relationship" (TPP

5    Compl. ¶ 597; Tribal Compl. ¶ 666), but the factual content they actually plead proves otherwise.

6    Plaintiffs allege only that McKinsey provided ordinary consulting services: that it worked closely

7    with Purdue and other pharmaceutical manufacturers on their sales and marketing strategies for

8    opioids through distinct and time-bound engagements, had access to significant information as a

9    result of these projects, sought to strengthen its relationship with Purdue and others, and

10   performed services such as "consulting, review of product acquisition, evaluation of research and

11   development, advising Purdue on the design of clinical studies, risk management, and product

12   marketing." (TPP Compl. ¶ 593; Tribal Compl. ¶ 662.)

13          While Plaintiffs make much of both the length and depth of McKinsey's professional

14   relationship with Purdue, *see id.*, "[a]n outsider who merely enjoys substantial persuasive power

15   to induce management to take certain actions…does not exercise control over the enterprise."

16   *Dep't of Econ. Dev. v. Arthur Andersen & Co. (U.S.A.)*, 924 F. Supp. 449, 467 (S.D.N.Y. 1996)

17   (citation and quotation marks omitted). Moreover, even if McKinsey had in fact provided services

18   "far beyond the scope of its profession…these acts do not reflect control over the enterprise. At

19   best, they establish assistance to the enterprise." *Id.* at 469; *see also DiPizio v. Empire State Dev.*

20   *Corp.*, No. 15-CV-901, 2017 WL 9516816, at *20 (W.D.N.Y. May 9, 2017), *report and*

21   *recommendation adopted*, 2017 WL 4230501 (W.D.N.Y. Sept. 25, 2017), *aff'd* 745 F. App'x 385

22   (2d Cir. 2018) ("[T]he provision of professional services by outsiders, such as accountants, to a

23   racketeering enterprise is insufficient to satisfy the participation requirement of RICO….This is

24   true even where the services provided go beyond that which is customary or are so deficient as to

25   constitute professional misconduct.").

26          Courts routinely apply the *Reves* "operation or management" test to dismiss RICO claims

27   against consultants, lawyers, accountants, and other professionals who are alleged to have

28   provided advice or other professional services that may have assisted an alleged RICO enterprise,

1    "even when professionals go beyond their customary role." *Biofeedtrac, Inc. v. Kolinor Optical*

2    *Enters. & Consultants, S.R.L.*, 832 F. Supp. 585, 591 (E.D.N.Y. 1993). *Biofeedtrac* is instructive.

3    There, a lawyer provided advice that helped a client formulate a strategy to manufacture a product

4    to compete with the plaintiff's patented device, including advising the client to use renewal

5    contract negotiations to mask the scheme and mislead the plaintiff about the client's plans. *Id.* at

6    587–88. The court dismissed the RICO claim, finding that the lawyer's role was "confined, at all

7    times, to providing legal advice and legal services" and that the papers did not show he

8    participated in the decision to manufacture a competing device. *Id.* at 591. The court noted that

9    the defendant "was to receive no remuneration other than ordinary fees for legal services, had the

10   enterprise succeeded." *Id*. It gave no weight to the allegation that the lawyer was to become a

11   director of a company affiliated with the enterprise because "[c]orporate counsel customarily fill

12   such roles without becoming a part of the operation or management of the enterprise." *Id.*

13          So too where, as here, the Complaints allege only that the defendant was acting on its own

14   behalf, not making decisions on behalf of the enterprise. That is the case even where a consultant

15   provides a model or tool for the client to help make decisions Plaintiffs claimed harmed them, as

16   in *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*, No. 10 C 8159, 2013 WL

17   1286696 (N.D. Ill. Mar. 28, 2013). There, the court dismissed a RICO claim against a defendant

18   that had designed and implemented a software program for Allstate that plaintiffs alleged was

19   designed to depress medical disbursements to policyholders. *Id.* at *8. The claim failed to satisfy

20   the "operation or management" test because "Plaintiffs alleged no more than a customer-supplier

21   relationship" with Allstate and the defendant "had no direct dealings with Plaintiffs or other

22   victims of the alleged RICO enterprise." *Id*.; *see also, e.g., Green v. Morningstar, Inc*., No. 17 C

23   5652, 2018 WL 1378176, at *6 (N.D. Ill. Mar. 16, 2018) (dismissing RICO claim against

24   investment consultant where "nothing in the complaint reveal[ed] how one might infer that [the

25   client's] actions were taken on behalf of the enterprise as opposed to on behalf of [the client] in

26   its individual capacity, to advance its own self interests"); *Kattula v. Jade*, No. 07-12569, 2008

27   WL 1837226, at *4 (E.D. Mich. Apr. 23, 2008) (dismissing RICO claim against consultant who

28

1   contracted to provide "referrals of new business prospects, recommendations for improvements in

2   the delivery of services, industry specific marketing advice" to alleged enterprise).

3                    **3.      The Complaints Fail to Allege a "Common Purpose" Because
                               McKinsey Received No Incentives or Profit Aside from its**
4                    **Customary Fees.**

5        Plaintiffs' RICO claims fail for yet another, independent reason: they fail to allege that

6   McKinsey stood to gain from the enterprise beyond the consulting fees it was paid for engaging

7   in its own business. To base a Section 1962(c) claim on an association-in-fact enterprise, as

8   Plaintiffs attempt to do here, Plaintiffs must allege a structure, with a common purpose, among

9   other things. *Boyle v. United States,* 556 U.S. 938, 944–45 (2009). "To show a common purpose,

10  plaintiffs must allege that the group engaged in enterprise conduct distinct from their own

11  affairs." *Comm. to Protect Our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d

12  1132, 1173 (E.D. Cal. 2017) (citing *Odom v. Microsoft Corp.*, 486 F.3d 541, 549 (9th Cir. 2007)

13  (en banc). Plaintiffs here repeatedly allege that the "common purpose" of the alleged enterprise

14  was "to unlawfully increase profits and revenues from the continued prescription and use of

15  opioids for long-term, chronic pain." (TPP Compl. ¶ 579, Tribal Compl. ¶ 648.)  This mantra falls

16  woefully short of these pleading requirements.

17       Setting aside that increasing sales of an FDA-approved product is an ordinary business

18  objective, it is not an objective that McKinsey engaged in "*distinct from its own affairs*."

19  Plaintiffs allege that McKinsey was compensated for its alleged role with "payments from other

20  Enterprise Members as a reward for work done to increase sales and distribution of prescription

21  opioids." (TPP Compl. ¶ 563; Tribal Compl. ¶ 632.) But these payments are fees for McKinsey's

22  consulting work described in the Complaints as being, for instance, performed pursuant to the

23  "Master Consulting Agreement" entered into with Purdue. (TPP Compl. ¶ 588; Tribal Compl.

24  ¶ 657.) The "common purpose" element is "unmet when the alleged association-in-fact is merely

25  a routine contract for services, because the entities are actually pursuing their individual

26  economic interests, rather than any shared purpose." *Gomez v. Guthy-Renker, LLC*, No.

27  EDCV1401425JGBKKX, 2015 WL 4270042, at *9 (C.D. Cal. July 13, 2015) (collecting cases);

28  *see also D.M. Robinson*, 2013 WL 1286696, at *9 (the "shared goal of financial profit, by each

party conducting its own business, does not qualify as a 'common purpose'"); *see also Morningstar*, 2018 WL 1378176, at *6 ("[T]he complaint alleges that the only benefit provided to Morningstar was its continued receipt of design and consulting fees; there are no allegations that Morningstar received any additional fees or incentives beyond its customary fees. This 'role' is indistinguishable from Morningstar's contractual position as an investment consultant for one or both of the [defendants]").

### B.   Without a Duty Running from McKinsey to the Plaintiffs, All of Plaintiffs' Negligence-Based Claims Fail.

"The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another…." *Artiglio v. Corning Inc.*, 957 P.2d 1313, 1318 (Cal. 1998). This is true for all of the numerous claims Plaintiffs assert that sound in negligence, including negligence,[9] negligent misrepresentation,[10] and negligence per se.[11] For any of these claims to survive, Plaintiffs must allege that McKinsey "owed not merely a general duty to society but a specific duty to [them], for without a duty running *directly* to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232 (2001) (emphasis added) (citation and quotation marks omitted). "The nonexistence of a duty ends the inquiry into whether negligence liability may be imposed." *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex. 1998). Whether McKinsey owed any Plaintiffs a duty of care is a question of law. *See Abdulaziz v. McKinsey & Co.*, No. 21-2921, 2022 WL 2444925, at *2 (2d Cir. July 5, 2022) ("The determination whether or not a defendant had a cognizable duty of care is a legal question that the court must resolve.").

The Complaints here lack any factual allegations suggesting McKinsey owed a duty *to Plaintiffs specifically*. It is undisputed that McKinsey had no professional relationship with, and provided no advice to, any of the Tribal or NAS Plaintiffs in this case. (The TPP Plaintiffs do not assert a negligence claim.) Although Plaintiffs contend that "McKinsey, *through its work with Purdue and other opioid supply chain clients*, owed Plaintiffs a duty" (NAS Compl. ¶ 612

---

[9] *See* Appendix B.
[10] *See* Appendix C.
[11] *See* Appendix D.

(emphasis added)), one cannot incur a legal duty by way of the transitive property. McKinsey's *clients* may (or may not) have owed a duty to Plaintiffs, but as detailed below, McKinsey did not.

### 1.    The Absence of Any Relationship Between McKinsey and Plaintiffs Precludes a Duty Here.

While states vary in their specific formulations of what gives rise to a duty of care, they generally consider the same key factors, including the relationship between the parties, foreseeability, and public policy considerations.[12] Analyzed under these factors, no state law would support a legal duty running from McKinsey to Plaintiffs. This is for the simple, and uncontested, reason that McKinsey had *no relationship whatsoever* with *any* of the Plaintiffs. "The question of duty…is whether the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff." *Bloxham v. Glock Inc.,* 53 P.3d 196, 199 (Ariz. Ct. App. 2002) (citation omitted).

Before discussing the case law foreclosing Plaintiffs' negligence theory, it is worth pausing to note just how expansive and unprecedented that theory is. Plaintiffs seek to hold a consultant liable not for the intrinsic properties of the consultant's own conduct—Plaintiffs would have no claim if McKinsey's clients did nothing with its advice—but based on how the consultant's *clients* allegedly acted on its advice. As far as we are aware, no courts in any of Plaintiffs' states have held a consultant liable to third-party plaintiffs for advice it provided to a client, based on the client's conduct thereafter.

To the contrary, one court has interpreted New York law to flatly bar such a claim. In *Abdulaziz v. McKinsey & Company*, No. 21 CIV. 1219 (LGS), 2021 WL 4340405, at *6 (S.D.N.Y. Sept. 22, 2021), *aff'd*, No. 21-2921, 2022 WL 2444925 (2d Cir. July 5, 2022), the court rejected a plaintiff's theory that McKinsey was liable based on consulting advice it allegedly provided the Kingdom of Saudi Arabia, which allegedly used McKinsey's advice to target plaintiff and his family for harassment. The court rejected the "consequence of finding McKinsey owed [the third-party plaintiff] a duty" because such a conclusion "would require any party conducting research, performing investigations or otherwise providing information to a

---

[12] *See* Appendix E.

18

client . . . to (1) assess how their client might react to the information provided and (2) identify and warn any persons foreseeably negatively affected by the client's hypothetical reaction," but "New York courts typically resist such broad expansions of the duty of care." *Id.*

Stepping back from the specific factual context alleged here, courts also reject analogous negligence theories. Considering potential liability of auditors for the work they perform for their clients, courts generally hold that such professional advisors owe no duty to third parties as a matter of law, absent facts not alleged here. *See, e.g.*, *Bily v. Arthur Young & Co.*, 834 P.2d 745, 771 (Cal. 1992), as modified (Nov. 12, 1992) ("California courts have consistently required some manifestation on the part of a professional who offers an opinion, information, or advice that he or she is acting to benefit a third party or defined group of third parties in a specific and circumscribed transaction" in order to find duty); *In re GlassHouse Techs., Inc.*, 604 B.R. 600, 631–32 (Bankr. D. Mass. 2019) (under Massachusetts law, "[a] professional typically does not owe a duty of care to a noncontractual third party," such that "recovery is 'limited to instances where the defendant knew that the plaintiff would rely on his services'") (citation omitted).[13]

And even if one reads Plaintiffs' Complaints to allege that McKinsey owed them a duty to protect them from its clients' conduct—as the courts in New York and Arizona read complaints against gun manufacturers, and as the Complaints here must be read, for reasons detailed below, *see infra*, at 21-22—that theory fares no better. To find a duty to control or to protect plaintiffs from the conduct of third parties, the key inquiry is whether "the defendant's relationship with

---

[13] While some states are more permissive in finding auditor liability to third parties, even those states require more than mere foreseeability of injury from an auditor's work. Wisconsin, for example, "has adopted the minority view from *Palsgraf v. Long Island Railroad Co.,* 162 N.E. 99 (N.Y. 1928), which established that everyone owes a duty to the world at large," yet even in Wisconsin, "the duty owed to the world is not unlimited but rather is restricted to what is reasonable under the circumstances." *Hocking v. City of Dodgeville*, 768 N.W.2d 552, 556 (Wis. 2009). The specific cases in which the Wisconsin Supreme Court has found a duty to exist between a defendant and someone with whom it has no contractual relationship are quite limited. "In order for an accountant to bear responsibility to a third party," for example, "the third party must have done something to its detriment based upon the accountant's information." *Krier v. Vilione*, 766 N.W.2d 517, 531 (Wis. 2009). That limited duty has not been expanded to include consultants, but even if it had, Plaintiffs do not allege they did anything in their detriment based on McKinsey's advice to Purdue. And where the Wisconsin Supreme Court has found liability of other professionals such as architects or attorneys to third parties, the duty has been limited to situations in which the plaintiffs stood in the shoes of the party with whom the architect/attorney had a contractual relationship or were intended beneficiaries of the services there. Nothing like that can be alleged here.

either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Hamilton*, 96 N.Y.2d at 233. State law uniformly holds that there are only two such circumstances: (i) where the defendant exercises actual control over the third-party tortfeasor, or (ii) where a special relationship exists between the defendant and the plaintiff requiring the defendant to protect the plaintiff from the conduct of others.[14] Special relationships of this kind include those such as parents and children, colleges and students, common carriers and passengers, and innkeepers and guests.[15]

The Complaints contain no allegations that McKinsey exercised actual control over Purdue or any other of its clients. To the contrary, Plaintiffs allege that Purdue and other clients retained McKinsey (and thus had authority to terminate the business relationship), and McKinsey worked at its clients' direction in furtherance of its clients' goals. (*See, e.g.*, NAS Compl. ¶ 152 ("Stewart, as CEO [of Purdue], was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey."); TPP Compl. ¶ 143 (same); Tribal Compl. ¶ 191 (same).) Nor do Plaintiffs even try to allege a special relationship that could require McKinsey to protect Plaintiffs from the conduct of its clients, as no such relationship exists. At bottom, Plaintiffs do not plausibly allege that it is McKinsey—and not McKinsey's clients, or other entities in the supply chain for opioids—that is "in the best position to protect against the risk," *Hamilton*, 96 N.Y.2d at 233, of the harms Plaintiffs allege.

## 2. Foreseeability Does Not Create a Duty Here.

Plaintiffs' allegations that McKinsey could or should have foreseen the consequences of its clients' conduct do not help them establish a duty running from McKinsey to Plaintiffs here. Where, as here, Plaintiffs seek to hold a defendant liable based on the conduct of a third party, foreseeability is relevant only to determining the scope of a duty that has already been found to exist. *Brown v. USA Taekwondo*, 483 P.3d 159, 161 (Cal. 2021) (only after determining "there exists a special relationship between the parties or some other set of circumstances giving rise to

---

[14] *See also* Appendix F.
[15] *See also* Appendix G.

MCKINSEY DEFENDANTS' MOTION TO DISMISS COMPLAINTS FOR FAILURE TO STATE A CLAIM

an affirmative duty to protect" can the court consider factors like foreseeability of harm "to determine whether relevant policy considerations counsel limiting that duty").[16] And many states reject the notion that mere foreseeability of harm can create the existence of a duty in any context. *Abdulaziz*, 2022 WL 2444925, at *3 ("[I]n considering whether a defendant owes a duty of care, foreseeability of injury does not determine the existence of duty. Rather than evidencing the existence of a duty, foreseeability merely determines the scope of the duty once it is determined to exist.") (internal citations and quotation marks omitted).[17]

Even in states that consider foreseeability of harm as a factor in determining whether to recognize a duty generally, McKinsey owed Plaintiffs no duty to protect them from their alleged injuries. That is so for several reasons.

First, even states that generally acknowledge the role of foreseeability in defining a duty decline to find a duty in the specific context here—where a professional service provider is alleged to owe a duty to protect Plaintiffs from the consequences of advice it gave to third parties (its own clients). For example, California generally considers foreseeability in determining whether a duty exists, *Bily*, 834 P.2d at 761 ("The determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors, among which are the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, and the policy of preventing future harm.") (citation omitted). Yet as noted, even California does not permit foreseeability alone to confer a duty to protect a plaintiff from the conduct of a third party. *Brown*, 483 P.3d at 161.

That is precisely the duty Plaintiffs seek to impose here, even if they purport to define McKinsey's duty as a duty to avoid acting in a way that would itself harm Plaintiffs. *Doe v. Uber Technologies, Inc.*, No. 19-CV-03310-JSC, 2022 WL 4281363, at *3 (N.D. Cal. Sept. 15, 2022), proves the point. In that case, a victim of a sexual assault by someone posing as an Uber driver

---

[16] *See also* Appendix H.
[17] *See also* Appendix I.

1   sued Uber, alleging that Uber was liable for the assault. To get around the limitations on a duty to

2   protect someone from harm caused by another, the plaintiff alleged that Uber itself committed

3   *mis*feasance, not just *non*feasance, by engaging in conduct that allegedly increased the chances

4   that someone could pose as an Uber driver and thereby harm others. The court rejected those

5   allegations, agreeing with a California Court of Appeal that "the question was not whether the

6   fake Uber scheme was a foreseeable consequence of its business model, but whether the resulting

7   harm was 'a necessary component' of the business model." *Id.* at *4. The court therefore held that

8   Uber did not commit misfeasance—and thus owed plaintiff no duty—because the harm that befell

9   plaintiff was not a necessary component of Uber's conduct, even if the harm was foreseeable:

> that a defendant's organization or business creates an opportunity for criminal
> conduct against a plaintiff and thereby worsens the plaintiff's position does not
> render such criminal conduct a necessary component of the organization's
> actions—even when that conduct is foreseeable. Providing such an opportunity
> does not constitute misfeasance triggering a duty to protect.

13  *Id.* at *3.

14          So too here, Plaintiffs cannot paint McKinsey's alleged conduct as misfeasance, because

15  their alleged harms (even if foreseeable) were not "necessary components" of McKinsey's

16  conduct: as discussed, McKinsey's conduct alone could not have had any effect on Plaintiffs but

17  for the (allegedly unlawful) conduct of McKinsey's third-party clients allegedly based on that

18  advice. For McKinsey to owe Plaintiffs any duty, therefore, Plaintiffs must allege that a special

19  relationship exists requiring McKinsey to protect them from the harm allegedly caused by Purdue

20  and other manufacturers—something that Plaintiffs cannot allege, *see supra*, at 19.

21          Second, even if the Court declines to view Plaintiffs' claim as one seeking to hold

22  McKinsey liable for the conduct of its clients, the foreseeability of Plaintiffs' alleged injuries does

23  not suffice to confer a duty on McKinsey as to Plaintiffs. Again, even in a state like California,

24  which otherwise considers foreseeability of injury in determining the existence of a duty, courts

25  refuse to extend liability to a professional service provider for injuries foreseeably resulting from

26  its conduct. In *Bily*, for example, the California Supreme Court "decline[d] to permit all merely

27  foreseeable third party users of audit reports to sue the auditor on a theory of professional

28  negligence." *Bily*, 834 P.2d at 761. The Court recognized that "foreseeability'…'is endless

because [it], like light, travels indefinitely in a vacuum," and thus "declined to allow recovery on a negligence theory when damage awards threatened to impose liability out of proportion to fault or to promote virtually unlimited responsibility for intangible injury." *Id.* at 762.

Third, if there were any states left in which the mere foreseeability of harm could potentially lead to the creation of a duty, that would be so only as to the foreseeability of harm to persons or property. For example, in Wisconsin, "[a] person is negligent … if the person, without intending to do harm, does something (or fails to do something) that a reasonable person would recognize as creating an unreasonable risk of injury or damage to a person or property." *Gritzner v. Michael R.*, 611 N.W.2d 906, 912–13 (Wis. 2000).

Here, Tribal Plaintiffs do not adequately allege injury to person or property. While they allude to injury "in their business and/or property," (Tribal Compl. ¶ 623), that is merely a legal conclusion meant to give them standing to allege violations of RICO. Where they otherwise allege injury to property, the most they say is that the opioid epidemic caused hazardous waste to be disposed on their property. (*Id.* ¶ 1087.) That is not a plausible allegation of any injury to property, but at most merely an economic injury measured by the cost to clean the property. *See, e.g., Cedar & Wash. Assocs., LLC v. Bovis Lend Lease LMB, Inc.,* 944 N.Y.S.2d 47, 48 (N.Y. App. Div. 2012) ("Plaintiff's tort claims…fail since plaintiff merely alleges economic loss, not personal injury or property damages….Although plaintiff alleges that it was damaged by glass, debris, smoke, dust and water that fell into and around its property…these allegations of property damage are too speculative or conclusory to have merit. Indeed, there is no indication of the extent of the damages, the cost of repair or how its buildings were affected").

While the NAS Plaintiffs allege personal injury, their allegations that such injuries were foreseeable *to McKinsey* are far too conclusory to satisfy Plaintiffs' obligation to allege plausible facts giving rise to a duty of care running from McKinsey to them. The NAS Plaintiffs merely allege that McKinsey, because of its position in the market and its long-standing relationship with Purdue, "knew, or should have known, of the risks and harms of fetal opioid exposure," (NAS Compl. ¶ 559), and "could have, and should have, included warnings for the prescribing of opioid drugs during pregnancy in its opioid marketing plans" (*id.* ¶ 562). This allegation fails for two

1   reasons: it is yet another effort to allege that McKinsey should have done something (warned of

2   the risks of opioids during pregnancy) to protect them from others' conduct—and that theory fails

3   for the reasons noted above, *see supra*, at 19-20. And no matter how Plaintiffs' allegations are

4   construed, they cannot allege that "the risks and harms of fetal opioid exposure" were a

5   foreseeable risk of McKinsey's conduct, because nowhere do they allege that McKinsey provided

6   advice to Purdue and other clients about targeting doctors who would prescribe opioids to

7   pregnant women or knew that the doctors they suggested targeting would do so. *See, e.g.,*

8   *Honorato v. Mt. Olympus Enters., Inc.,* No. 20-CV-903-JDP, 2021 WL 4439073, at *3 (W.D.

9   Wis. Sep. 28, 2021) ("[a] defendant is [only] responsible for the foreseeable consequences of his

10  or her own actions.").

11            **3.      Public Policy Compels Rejecting the Imposition of a Duty Here.**

12            Whether courts should impose a duty of care "rest[s] on policy considerations of whether

13  plaintiff's interests are entitled to legal protection against defendant's conduct." *Eiseman v. State*,

14  70 N.Y.2d 175, 189-90 (1987). Particularly in the context of extending a duty running from

15  professional service providers to individuals or entities with which they had no relationship,

16  relevant policy considerations include the potential to expose defendants to limitless liability, and

17  the destructive impact of such limitless liability on publicly beneficial business activities. *See*

18  *Hamilton*, 96 N.Y.2d at 233 ("This judicial resistance to the expansion of duty grows out of

19  practical concerns both about potentially limitless liability and about the unfairness of imposing

20  liability for the acts of another."). These factors strongly counsel against finding that McKinsey

21  owed a duty to Plaintiffs.

22            Here, Plaintiffs' theory of duty is, in effect, that a professional advisor such as McKinsey

23  owes a duty to *any* downstream party, no matter how remote, who is allegedly harmed by the

24  conduct of the advisor's client that relates to the subject matter of the advisor's work. The

25  potential scope of liability under this theory is not just unprecedented; it is breathtakingly

26  expansive, threatening liability to virtually every professional advisory business. Professional

27  advisors of all kinds—attorneys, accountants, researchers, investigators, or other professional

28  providers of advice or information—would face the risk of liability from "any member of an

indeterminate class of persons, present and prospective, known and unknown, directly or indirectly injured" by these advisors' clients. *Eiseman*, 70 N.Y.2d at 188. "The hazards of a business conducted on these terms are so extreme" that they demonstrate "a flaw…in the implication of a duty that exposes to these consequences." *Id.* (quoting *Ultramares Corp. v. Touche*, 255 N.Y. 170, 179–80 (1931)).

### C.   Plaintiffs' Fraud and Negligent Misrepresentation Claims Fail as a Matter of Law.

#### 1.   McKinsey Made No Representations to Plaintiffs.

Though different species of claims, the crux of both Plaintiffs' fraud and negligent misrepresentation claims is that McKinsey misrepresented the safety and efficacy of opioids and concealed the risks thereof. (*See, e.g.*, NAS Compl. ¶¶ 625-26, 633; TPP Compl. ¶ 696; Tribal Compl. ¶¶ 956-58.) Under the law of virtually every state at issue, however, reliance is an essential element of claims for fraud, fraudulent concealment, and negligent misrepresentation.[18] And, in the unique states in which reliance is not an element for fraud by omission claims, those states nevertheless impose the additional requirement that the defendant have a duty to disclose information to the plaintiff.[19] Yet none of the Complaints allege that McKinsey made *any* representations to *any* of the Plaintiffs. Plaintiffs thus cannot plausibly allege that they actually relied on McKinsey's statements when *none* of these statements were made *to them*. *See Kuiters v. Kukulka*, 871 N.Y.S.2d 538, 539 (N.Y. App. Div. 2008) ("The allegedly fraudulent misrepresentations were not made to plaintiffs, and plaintiffs thus lack standing to assert a fraud cause of action against defendants."); *Bily*, 834 P.2d at 768, 772 ("[T]he person or class of persons entitled to rely upon the [negligent] representations is restricted to those to whom or for whom the misrepresentations were made. Even though the defendant should have anticipated that the misinformation might reach others, he is not liable to them. . . the gravamen of the cause of action for negligent misrepresentation in this context is actual, justifiable reliance on the representations") (citations and quotation marks omitted).

---

[18] *See* Appendix J.
[19] *See* Appendix K.

NAS Plaintiffs allege only that *other* actors, pharmaceutical manufacturers, repeated "false information regarding OxyContin and other opioids" to yet another group of actors—third-party healthcare providers—who were making "decision[s] to prescribe opioids to patients." (NAS Compl. ¶¶ 625-26, 633.) But NAS Plaintiffs cannot plead that McKinsey itself ever made such statements to their biological mothers' healthcare providers or, much less, to the NAS Plaintiffs themselves or their legal representatives. Tribal Plaintiffs similarly cannot allege that McKinsey itself made any fraudulent or misleading statements; their pleading repeatedly alleges that "McKinsey, working through Purdue and other opioid supply chain clients, made material misrepresentations …" (Tribal Compl. ¶ 807.) Moreover, Tribal Plaintiffs never allege that McKinsey communicated any alleged misstatements to them. Indeed, they cannot: in their discussions of their RICO claims, Tribal Plaintiffs include charts listing the makers of the allegedly fraudulent or misleading statements made by the purported enterprise, and to whom they were made. (*See id.* ¶ 729.) By Plaintiff's own admission, *every* misrepresentation allegedly made by McKinsey was made either internally within McKinsey, or to Purdue—*none* were made to Tribal Plaintiffs. And even those statements are not alleged to be "representations," but rather "*[i]nternal* emails," "[d]iscussion[s]," "[p]lan[s]," and "proposed process[es]"—that is, in-house discussions or recommendations for Purdue to consider. *Id.* (emphasis added). Plaintiffs cannot plausibly allege that internal McKinsey emails and mere plans or proposals for a client constitute representations that could have defrauded *them*.

And TPP Plaintiffs do not even attempt to allege that McKinsey made representations to them, but instead contend only that McKinsey fraudulently concealed information that it had a duty to disclose. (*See* TPP Compl. ¶ 696.) Yet TPP Plaintiffs do not plead that McKinsey made any statements to them that would give rise to a duty to correct any such statements, or that McKinsey otherwise owed them a duty to disclose information to them; as detailed above, McKinsey owed them no duty for the simple reason that McKinsey had no relationship with them. Their fraud by concealment claim should therefore be dismissed. *See Sloan v. Gen. Motors LLC,* 287 F. Supp. 3d 840, 865 (N.D. Cal. 2018), *order clarified,* No. 16-CV-07244-EMC, 2018 WL 1156607 (N.D. Cal. Mar. 5, 2018), *and on reconsideration,* 438 F. Supp. 3d 1017 (N.D. Cal.

2020) ("A common law fraudulent omission claim requires demonstrating that…the defendant must have been under a duty to disclose the fact to the plaintiff"); *Hahn v. Mirda,* 54 Cal. Rptr. 3d 527, 530 (2007) (same).

### 2. Plaintiffs Fail to Identify Any Fraudulent Statements McKinsey Made.

Rule 9(b) demands that Plaintiffs' fraud-based claims provide "an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'" *Swartz*, 476 F.3d at 764 (citation omitted). Plaintiffs do not attempt to satisfy this standard.

For example, in the Complaints' hundreds of pages and thousands of paragraphs, Plaintiffs identify only one purported statement by *McKinsey* that was allegedly false—the allegation that sometime after June 2009, "McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide 'freedom' and 'peace of mind' for its users, and concomitantly reduce stress and isolation" (Tribal Compl. ¶¶ 235, 707). Even this is not an allegation that McKinsey made a false statement—at best, it is an allegation that McKinsey advised Purdue to make a false statement—but even giving Plaintiffs the benefit of reading it as a statement of McKinsey's, Plaintiffs do not allege who at McKinsey made this statement, when, or how the statement was false or misleading. *Chevron Prods. Co. v. Advanced Corrosion Techs. & Training, LLC*, No. 20-CV-09095-CRB, 2021 WL 2156467, at *4 (N.D. Cal. May 27, 2021) (finding plaintiff failed to meet Rule 9(b) on negligent misrepresentation claims where "Chevron alleges that ACTT failed to accurately report its work, but does not specify which of the reports ACTT submitted during the year and a half that the contract was in place were incorrect, who signed those incorrect reports, nor the specifics of what was incorrect in the reports") (J. Breyer).

### D. As a Matter of Law, McKinsey Was Not the Cause of Any of Plaintiffs' Harms.

For *all* of the claims asserted—whether in tort or based on an alleged breach of a statutory duty—Plaintiffs must plausibly allege that McKinsey's conduct proximately caused Plaintiffs' injuries. *Laub v. Faessel*, 745 N.Y.S.2d 534, 536 (N.Y. App. Div. 2002) ("An essential element of the plaintiff's cause of action for negligence *or for…any…tort*, is that there be some reasonable

1    connection between the act or omission of the defendant and the damage which the plaintiff has

2    suffered.") (emphasis added) (citation omitted). Whether Plaintiffs adequately plead causation is a

3    question of law that can be resolved by the Court, including on a motion to dismiss. *See Modisette*

4    *v. Apple Inc.*, 241 Cal. Rptr. 3d 209, 224 (Cal. Ct. App. 2018) ("[W]here the facts are such that

5    the only reasonable conclusion is an absence of causation, the question [of proximate cause] is

6    one of law, not of fact.").[20]

7        Here, Plaintiffs do not adequately plead that McKinsey caused their alleged injuries. At

8    bottom, the chain of causation here is simply far too attenuated to support a claim that

9    McKinsey's conduct was a cause in fact—let alone the proximate cause—of Plaintiffs' alleged

10   injuries. Standing between McKinsey's consulting work and Plaintiffs were numerous

11   independent actors, including pharmaceutical manufacturers, distributors, pharmacies, the FDA,

12   the DEA, prescribing doctors, hospitals, health insurance companies, and millions of individuals,

13   including both patients taking lawfully-prescribed opioids and illegal drug users. To the extent

14   Plaintiffs could adequately plead any links in a chain of causation between McKinsey and the

15   Plaintiffs' alleged injuries, the actions of any one of these intervening actors would break that

16   chain.

17                    **1.    Plaintiffs Cannot Adequately Plead Cause in Fact.**

18       An act "is a cause [in fact] of plaintiff's injury if [] the plaintiff would not have suffered

19   the injury but for the defendant's conduct." *Padilla v. United States*, No. 17-cv-01182-BAS-

20   AHG, 2021 WL 1138191, at *3 (S.D. Cal. Mar. 24, 2021) (citation and marks omitted).[21] "If the

21   injury or illness would have happened anyway, whether the defendant was negligent or not, then

22   the negligence was not a cause in fact of plaintiff's injury or illness." *Id.* (applying substantial

23   factor test to dismiss for lack of cause-in-fact).

24       Here, the Complaints themselves undermine the notion that McKinsey's alleged conduct

25   was a but-for cause of Plaintiffs' injuries. Plaintiffs set forth at length the economic harms they

26   have allegedly suffered as a result of McKinsey's conduct, including increased costs for medical

27   _____

28   [20] *See also* Appendix L.
     [21] *See also* Appendix M.

care, law enforcement, emergency responders, addiction treatment, mental health services, incarceration systems, other costs associated with increased drug crimes, care for children from homes with drug abuse, needle exchanges, and repair or replacement of public property damaged by improper disposal of needles. (NAS Compl. ¶ 558; TPP Compl. ¶ 537; Tribal Compl. ¶ 614.) In short, Plaintiffs allege that McKinsey's conduct caused the harms that have arisen out of the opioid crisis writ large.

Yet Plaintiffs allege that OxyContin's "launch in 1996 ushered in the modern opioid epidemic," (NAS Compl. ¶ 51; TPP Compl. ¶ 42; Tribal Compl. ¶ 90), and that "[w]ithin six years of its introduction [i.e., in 2002], [there was] increasingly widespread misuse and abuse of OxyContin and similar opioids," (NAS Compl. ¶ 57). They go on to allege that McKinsey did not begin its relationship with Purdue until 2004 (*id.* ¶ 11), by which point "'OxyContin had [already] become the most prevalent prescription opioid in the United States'" (*id.* ¶ 63). That is, Plaintiffs admit that the opioid crisis, rooted in Purdue's OxyContin, was ongoing well before McKinsey *ever* worked for Purdue, such that its work could not possibly be a but-for cause of the opioid crisis and its related costs.

If Plaintiffs mean instead that McKinsey's advice was a but-for cause of their alleged injuries being greater than they otherwise would have been, their pleadings similarly lack allegations to support such a theory. The Complaints contain no allegations that even attempt to identify, let alone quantify, the harms they contend were caused by McKinsey as opposed to the numerous other actors—pharmaceutical manufacturers, distributors, pharmacies, prescribing doctors, and illegal drug users, among others—who have contributed to the opioid crisis and its attendant societal costs. Courts have acknowledged the impossibility of tracing municipal expenses due to opioid use to individual pharmaceutical manufacturers. *See City of New Haven v. Purdue Pharma, L.P.*, No. X07HHDCV176086134S, 2019 WL 423990, at *6 (Conn. Super. Ct. Jan. 8, 2019), *judgment entered*, 2019 WL 3761964 (Conn. Super. Ct. Jan. 8, 2019) (dismissing claims brought by municipalities against Purdue and other pharmaceutical manufacturers for lack of standing where causal chain was too attenuated). *A fortiori*, Plaintiffs here cannot present any plausible allegation of causation where the independent factors between *McKinsey* and the

1    Plaintiffs' alleged harms associated with "broadly defined social crises like . . . opioid abuse"

2    make the causal chain Plaintiffs allege even less coherent.

3                        **2.      Plaintiffs Cannot Adequately Plead Proximate Cause.**

4              And even if Plaintiffs could allege that McKinsey was a cause-in-fact of their injuries,

5    they cannot allege that McKinsey *proximately* caused them harm. Proximate causation "is

6    ordinarily concerned, not with the fact of causation, but with the various considerations of policy

7    that limit an actor's responsibility for the consequences of his conduct." *Tribeca Cos. v. First Am.*

8    *Title Ins. Co.*, 192 Cal. Rptr. 3d 354, 366 (Cal. Ct. App. 2015) (internal citations omitted). "Put

9    differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too

10   remote' from the defendant's unlawful conduct." *City of Oakland v. Wells Fargo & Co.*, 972 F.3d

11   1112, 1123 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 993 F.3d 1077 (9th Cir.

12   2021), and *aff'd in part and rev'd in part on reh'g en banc*, 14 F. 4th 1030 (9th Cir. 2021)

13   (citation omitted). In assessing whether a defendant's conduct was the proximate cause of a

14   plaintiff's injury, courts look to factors such as the foreseeability of the harm in relation to the

15   alleged wrongful conduct,[22] whether there are intervening acts that break the chain of causation,[23]

16   and public policy considerations that counsel against extension of liability to the defendant's

17   conduct.[24] Whether assessed in terms of foreseeability, intervening causes, or the public policy-

18   imposed limitations on liability, the remoteness of McKinsey's alleged conduct from Plaintiffs'

19   injuries precludes a finding of proximate cause. Because proximate cause is a matter of law,

20   courts often dismiss claims at the pleading stage where, as here, Plaintiffs offer no plausible

21   theory for how the defendants' conduct proximately caused their alleged injuries. *See Derdiarian*

22   *v. Felix Contractor Corp.*, 51 N.Y.2d 308, 315 (1980) ("There are certain instances, to be sure,

23   where only one conclusion may be drawn from the established facts and where the question of

24   legal cause may be decided as a matter of law"); *Kent v. Commonwealth*, 771 N.E.2d 770, 776

25   (2002) ("Proximate cause may be determined as a question of law when there is no dispute as to

26

27   [22] *See also* Appendix N.
     [23] *See also* Appendix O.
28   [24] *See also* Appendix P.

30

the effect of the facts established"); *Patton v. Bickford*, 529 S.W.3d 717, 731 (Ky. 2016) ("[P]roximate causation is regarded as an issue of law to be decided by the courts").

### a.   Unforeseeable, Intervening Acts Broke the Chain of Causation.

The Complaints alone reveal numerous independent events and actors operating between McKinsey's conduct and Plaintiffs' harms:

**Clients.** The first break in the causal chain is rooted in the nature of the business relationship between McKinsey and its clients: McKinsey provides advice, but has no control over how, or whether, its clients choose to use its advice. Plaintiffs' own allegations reflect as much: McKinsey is described throughout the Complaints as having "advised," "identified," "informed," "assisted," "recommended," "urged," "proposed," "presented," or "suggested,"[25] whereas McKinsey's clients are alleged to have considered those inputs and made decisions and controlled whether and how to adopt and use the sales and marketing strategies that Plaintiffs allege led to unlawful use of opioids. (*See, e.g.*, NAS Compl. ¶ 238 ("Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin."); *id.* ¶ 257 ("As a result of the Sackler family endorsement of McKinsey's proposals, the following month Purdue implemented Project Turbocharge based on McKinsey's recommendations."); *id.* ¶ 289 ("[McKinsey] presented specific plans to Purdue, which Purdue adopted and spent hundreds of millions of dollars implementing.").)[26]

---

[25] *See, e.g.*, NAS Compl. ¶¶ 10-12, 181, 191, 204, 211, 215, 218, 223, 289, 297, 345, 361.

[26] While this Court held that Plaintiffs did "plausibly allege that McKinsey's actions significantly contributed to the wide-ranging harms that have affected the Subject states" (ECF No. 439 at 12) for purposes of establishing personal jurisdiction, notwithstanding the fact that it was McKinsey's clients that are alleged to have taken action based on McKinsey's advice, this finding does not speak to whether the conduct of McKinsey's clients severs the chain of causation. Whether McKinsey "expressly aimed" its conduct at certain states sufficient to be subject to specific jurisdiction there is not the same as whether McKinsey's alleged conduct was the proximate cause of any injuries that occurred in those states (or beyond). Indeed, in analyzing the jurisdictional question, the Court relied upon the Supreme Court's ruling that "some relationships will support jurisdiction without a causal showing." (*Id.* at 14 (quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1027 (2021) (rejecting a causation-only approach for "requirement of a 'connection' between plaintiff's suit and a defendant's activities" and finding "the suit [must] 'arise out of or relate to the defendant's contacts with the forum'") (*id.* at 1019)); *see also Vons Cos. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1105-07 (Cal. 1996) (rejecting proximate cause test for personal jurisdiction "because it is inconsistent with the rationale underlying specific jurisdiction" and noting that the Supreme Court "has not been concerned with causation in this [personal jurisdiction] context. Rather, it has spoken of a relationship between the cause of action and the contacts in the forum, and has used relatively broad terms to describe the necessary relationship").

**Regulators.** Regulators, including the FDA, also severed the link between McKinsey's advice and Plaintiffs' injuries. Plaintiffs make much of what McKinsey and its clients allegedly knew about the risks of opioids, and manufacturers' decisions to market certain formulations as abuse-deterrent. But they admit that these products were approved by the FDA, an independent regulatory body with specific expertise in assessing the safety and efficacy of pharmaceuticals. (*See, e.g., id.* ¶¶ 171-72 ("In September 2009, Purdue made a presentation to the FDA advisory committee considering its application for its reformulated OxyContin and stated that the new formulation would deter abuse….The FDA approved the reformulation of OxyContin in April 2010."); *see also id.* ¶ 330; *id.* ¶ 354; *id.* ¶ 355.) No amount of marketing or sales recommendations would have had any impact on the volume of these products sold if the FDA had not approved them for sale.

For Plaintiffs to challenge McKinsey's advice about how to obtain FDA approval (*e.g.*, TPP Compl. ¶¶ 159-63) is no answer. For one thing, Plaintiffs do not sufficiently allege that McKinsey itself—as opposed to Purdue—made any statements to the FDA. Nor do Plaintiffs allege that Purdue's statements to the FDA concerning abuse-deterrent properties were misleading when made; they allege at most that the FDA declared 11 years after Purdue's statement about abuse deterrence that OxyContin did not prove to "substantially reduce abuse." (Tribal Compl. ¶¶ 210, 213.)

**Salespersons, Prescribers, Distributors, and Pharmacies.** Plaintiffs' alleged injuries also turned on the behavior of salespersons and doctors. Individual Purdue salespersons contacted and sold OxyContin prescriptions to physicians. (Tribal Compl. ¶ 104.) In the exercise of their medical judgment, countless individual physicians then chose to prescribe opioids to individual patients. Indeed, Plaintiffs admit that the prescribing decisions of individual physicians who had relationships with their individual patients were necessary to bring about their harms, noting that "[p]atients receiving opioid prescriptions for chronic pain account for the majority of overdoses…. Most of the illicit use originates from prescribed opioids." (*Id.* ¶¶ 495, 497.)

Once these physicians had written prescriptions, individual pharmacies then had to fill those millions of prescriptions. The pharmacies' ability to fill opioid prescriptions, in turn,

required distributors to have supplied sufficient opioids to the pharmacies to meet demand. And once individual pharmacies filled prescriptions for individual patients, those patients then had to choose to either personally use or divert the medications. Countless individuals, so many steps removed from McKinsey's advisory work, with so many independent actors operating along the way, then had to misuse opioids in Plaintiffs' communities in such numbers as to cause the extensive financial harms Plaintiffs allege.

As a matter of law, McKinsey's conduct cannot be deemed a proximate cause of these harms. "An act that triggers a series of events that leads to plaintiff's injury, but is not a substantial factor in causing it, will not give rise to liability." *Willoughby v. Cribbs*, No. H-13-1091, 2015 WL 4598290, at *3 (S.D. Tex. July 29, 2015). Rather, "the injury must be the natural and probable consequence of a negligent act or omission, which, under the circumstances, an ordinary prudent person ought reasonably to have foreseen might probably occur as the result of his negligent act." *Ray v. Swager*, 903 N.W.2d 366, 374 n.33 (Mich. 2017) (internal citations omitted). *See also Cabral v. Ralphs Grocery Co.*, 248 P.3d 1170, 1180 (Cal. 2011) ("[W]here the injury suffered is connected only distantly and indirectly to the defendant's negligent act, the risk of that type of injury from the category of negligent conduct at issue is likely to be deemed unforeseeable."); *Bryant v. Glastetter*, 38 Cal. Rptr. 2d 291, 296 (Cal. Ct. App. 1995) (connection between drunk driver's negligence and the type of injury that resulted—an errant vehicle striking the tow truck driver called to remove her car from the freeway—was too indirect and attenuated, because "there is no logical cause and effect relationship between that negligence and the harm suffered by decedent except for the fact that it placed decedent in a position to be acted upon by the negligent third party.") (California law); *Elardo v. Town of Oyster Bay*, 575 N.Y.S.2d 526, 528 (N.Y. App. Div. 1991) (failure of town to bar entry to area where debris was stored did not proximately cause injury where a trespassing child throwing a piece of plexiglass into the plaintiff's eye was a superseding cause "which so attenuated the Town's negligence from the ultimate injury that the imposition of liability would be unreasonable under the circumstances.") (New York law).

To overcome these intervening acts of third parties, it is not enough for Plaintiffs to allege that an increase in opioid prescriptions was a foreseeable result of McKinsey's conduct; Plaintiffs must allege that *their injuries* were also foreseeable results of *McKinsey's conduct. See, e.g.*, *City of Huntington v. AmerisourceBergen Drug Corp.*, Nos. 3:17-01362, 3:17-01665, 2022 WL 2399876, at *62 (S.D. W. Va. July 4, 2022) (rejecting argument that "the very high level of pills shows, on its face, that many of the prescriptions those pills went to fill should not have been written"). Plaintiffs' general allegations about the foreseeability of increased prescriptions leading to abuse, overdoses, and additional financial burdens miss this mark. While "[a] lack of reasonable care in the handling, distribution, and administration of controlled substances can foreseeably harm the individuals who take them," Plaintiffs do not allege that McKinsey handled, distributed, or administered any controlled substance. *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, No. 18-CV-07591-CRB, 2022 WL 3224463, at *57 (N.D. Cal. Aug. 10, 2022) (hereinafter "CCSF"). And Plaintiffs' allegations regarding foreseeability are not unique to McKinsey and are an insufficient basis to plausibly allege that *McKinsey's conduct* in providing lawful advice to its clients regarding a legal product proximately caused Plaintiffs' injuries.

Two courts—the Southern District of West Virginia and the Supreme Court of Oklahoma—recently rejected such tenuous claims of causation in cases brought against pharmaceutical distributors and manufacturers, entities much closer in the chain of causation than McKinsey. In *City of Huntington v. AmerisourceBergen Drug Corp.*, plaintiff political subdivisions alleged that the distributor defendants had created a public nuisance in their communities arising out of diversion of prescription opioids. 2022 WL 2399876. The Southern District of West Virginia ruled after a bench trial that plaintiffs had failed to prove that the distributors had proximately caused the alleged nuisance, on account of the numerous intervening causes of plaintiffs' harms over which defendants had no control. *Id.* at *65–67. The Supreme Court of Oklahoma reached a similar conclusion in overturning a trial court's ruling that pharmaceutical manufacturer Johnson & Johnson had caused a public nuisance within the state. Key to the court's determination was that "the alleged nuisance in this case [wa]s several times removed from the initial manufacture and distribution of opioids by J&J." *State ex rel. Hunter v.*

1    *Johnson & Johnson*, 499 P.3d 719, 728 (Okla. 2021). These courts' conclusions are all the more

2    compelling as to McKinsey, an outside advisor who is several steps further removed from

3    Plaintiffs' alleged injuries than pharmaceutical manufacturers or distributors.

4          Although *City of New Haven* addressed the question of standing to sue a pharmaceutical

5    manufacturer under Connecticut law, its description of the many links "to prove the causation

6    chain" in a case such as this one is spot on. *See City of New Haven*, 2019 WL 423990, at *3.

7    Indeed, Plaintiffs "have many links to make here: Link 1: The manufacturers make the opioids.

8    Link 2: The manufacturers sell the opioids to the distributors. Link 3: The distributors sell the

9    opioids to a pharmacy. Link 4: Doctors prescribe the opioids. Link 5: Patients take them. Link 6:

10   Some patients become addicted. Link 7: The city must give emergency and social services to

11   some addicts while the city's quality of life, property values and crime rate worsen from the

12   spread of addiction, further straining city resources." *Id*. But it does not stop there since "[t]here

13   are further side sets of links they would have to rely on to explain some aspects of the problem:

14   Link 8: Pills get loose and are sold on the black market creating other costly addicts. Link 9: Pills

15   get too expensive or scarce for some addicts who turn to more accessible stocks of street fentanyl

16   or heroin, creating costly addicts." *Id*. McKinsey would serve only as an additional, more remote,

17   link in this attenuated chain of causation and Plaintiffs' allegations do nothing to rebut that these

18   independent factors between McKinsey and Plaintiffs' alleged harms make the causal chain

19   Plaintiffs attempt to allege even less coherent.

20                      **b.      Public Policy Compels Finding a Lack of Proximate
                                  Causation.**

21

22          Public policy, too, counsels against a finding of proximate cause in this case. "[T]he

23   determination of proximate cause involves, among other things, policy-laden considerations; that

24   is, the chain of causation must have an endpoint in order to place manageable limits upon the

25   liability that flows from negligent conduct." *Hain v. Jamison*, 28 N.Y.3d 524, 528 (2016). *See*

26   *also Modisette*, 241 Cal. Rptr. 3d at 225 ("[L]egal responsibility must be limited to those causes

27   which are so close to the result, or of such significance as causes, that the law is justified in

28   making the defendant pay."). As with their proposed theory of duty (discussed above), Plaintiffs

1    ask the Court to adopt an unprecedentedly expansive theory of causation: that a professional

2    service provider who advises a client relating to its business will be deemed to have caused the

3    injuries of any downstream party, no matter how remote, who claims a harm arising out of the

4    client's business. To adopt this theory would open the floodgates of potential liability to

5    essentially limitless plaintiffs who have no relationship with the advisor who could claim to have

6    been harmed by the conduct of a professional advisor's client. It would also utterly undermine the

7    business of professional advisors of all kinds, as this specter of unlimited liability would

8    inevitably circumscribe the scope of advice they could provide on lawful products.

9    **E.      Plaintiffs' Public Nuisance Claims Fail as a Matter of Law.**

10   The theory of Tribal and NAS Plaintiffs' public nuisance claims—that the opioid

11   epidemic constitutes a public nuisance, for which McKinsey is liable—is untenable. Although the

12   law of nuisance varies marginally from state to state, the core of a nuisance claim is the same

13   nationwide. To quote the Restatement, a public nuisance is an unreasonable interference with a

14   right common to the general public. Rest. (2d) Torts § 821B. This formulation is effectively

15   replicated in the statutes and case law of every state where a claim pending against McKinsey

16   originated.[27] Accordingly, no matter which state's law of nuisance the Court applies, the result is

17   the same: Plaintiffs cannot state a claim for nuisance against McKinsey because McKinsey did

18   not unreasonably interfere with a common right.

19   **1.      Plaintiffs Are Not Seeking to Vindicate a "Common Right."**

20   The ostensible "common right" that Plaintiffs seek to vindicate is not actually a common

21   right at all. To state a public nuisance claim, Plaintiffs must be seeking to vindicate "a public

22   right, in the sense of a right 'common to all members of the general public,' rather than a right

23   merely enjoyed by a number, even a large number of people." *In re Lead Paint Litig.*, 924 A.2d

24   484, 497 (N.J. 2007) (quoting Rest. (2d) of Torts § 821B cmt. g.). A "common right" is common

25   in the sense that the community *shares* the right, as distinguished from an individual right that

26   every member of the community has but does not share. *See Rhode Island v. Lead Indus. Ass'n*,

27   951 A.2d 428, 435 (R.I. 2008); Rest. (2d) Torts § 821B, cmt. g at 92 ("It is collective in nature

28   [27] *See* Appendix Q.

and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured."). Accordingly, the term "common right" is neither synonymous nor coextensive with the "common interest." Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. Cin. L. Rev. 741, 815 (2003) ("That which might benefit (or harm) 'the public interest' is a far broader category than that which actually violates 'a public right.'"). There is a common right to clean air and unobstructed waterways, but the right to health and safety is not a common right, even though everyone enjoys it. *See id.* ("[W]hile it is in the public interest to promote the health and well-being of citizens generally, there is no common law public right to a certain standard of medical care or housing."); *City of Chicago v. Am. Cyanamid Co.*, 823 N.E.2d 126, 131 (Ill. Ct. App. 2005) (a public right is a right to "an indivisible resource shared by the public at large, like air, water, or public rights of way").

Moreover, a right does not become common just because the number of violations is large and their impact is widely felt. *Hunter*, 499 P.3d at 726–27 ("The sheer number of violations does not transform the harm from individual injury to communal injury.") (quoting Gifford, 71 U. Cin. L. Rev. at 817); *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96-97 (4th Cir. 2011) (whether a right is public "is not simply a matter of tallying the number of people affected by a defendant's allegedly tortious conduct"); *Rhode Island v. Lead Indus. Ass'n*, 951 A.2d 428, 448 (R.I. 2008) ("[A] public right is more than an aggregate of private rights by a large number of injured people"). Many individuals' misuse of a drug may violate many others' rights, but the violation of many individual rights is distinct from the violation of a right the community holds in common.

Given the specific definition of a common right, courts have repeatedly held that there is no common right to be free from the threat that others will misuse a lawful product. This is so

across many realms: lead paint,[28] firearms,[29] asbestos,[30] packaged foods,[31] motor vehicles[32]—and, most recently, prescription opioids. *Hunter*, 499 P.3d at 727 (there is no "public right to be free from the threat that others may misuse or abuse prescription opioids.").[33] In each case, courts have been "reluctant to recognize a public right so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it." *Beretta U.S.A. Corp.*, 821 N.E.2d at 1116.[34] Courts agree that if there were a common right to be free from anything injurious to the public good, the law of nuisance would become "a monster that would devour in one gulp the entire law of tort." *Tioga Pub. Sch. Dist. v. U.S. Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993).

Plaintiffs' public nuisance claim founders on these shoals. Plaintiffs do not claim a right shared by the public at large to be free from *opioids*. Nor could they; opioids are a legal, FDA-approved, "vital treatment option" in doctors' arsenal against chronic pain. *Hunter*, 499 P.3d at 721. Rather, Plaintiffs claim a right to be free from the opioid *epidemic*, which Plaintiffs define as the widespread *misuse and abuse* of opioid medications and the downstream consequences that

---

[28] *See, e.g.*, *Lead Indus. Ass'n*, 951 A.2d at 453 (assertion that "the public's right to be free from the hazards of unabated lead had been infringed" "falls far short of alleging an interference with a public right as that term traditionally has been understood in the law of public nuisance.").

[29] *See, e.g.*, *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1114 (Ill. 2004) (holding there is no public right to be "free from unreasonable jeopardy to health, welfare, and safety, and from unreasonable threats of danger to person and property, caused by the presence of illegal weapons").

[30] *See, e.g.*, *City of San Diego v. U.S. Gypsum Co.*, 35 Cal. Rptr. 2d 876, 883 (Cal. Ct. Appeals 1994) ("If 'nuisance' is to have any meaning at all, it is necessary to dismiss a considerable number of cases which have applied the term to matters not connected … with any public right, as mere aberration.") (quoting Prosser & Keeton, Law of Torts § 86, at 618 (5th ed. 1985)).

[31] *Guttman v. Nissin Foods (U.S.A.) Co.*, No. C 15-00567 WHA, 2015 WL 4309427, at *5 (N.D. Cal. July 15, 2015) ("No decision applying California law has found that interference with the general public's right to a safe food supply by selling products with unhealthy ingredients constituted a public nuisance.").

[32] *See, e.g.*, *Beretta U.S.A. Corp.*, 821 N.E.2d at 1116 ("If there is [a] public right to be free from the threat that others may use a lawful product to break the law, that right would include the right to drive upon the highways, free from the risk of injury posed by drunk drivers. This public right to safe passage on the highways would provide the basis for public nuisance claims against brewers and distillers, distributing companies, and proprietors of bars, taverns, liquor stores, and restaurants with liquor licenses, all of whom could be said to contribute to an interference with the public right.").

[33] *See also State ex rel. Jennings v. Purdue Pharma L.P.*, No. N18C-01-223 MMJ CCLD, 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019) (dismissing public nuisance claim against pharmaceutical manufacturers and distributors because "[i]n Delaware, public nuisance claims have not been recognized for products"); *Grewal v. Purdue Pharma L.P.*, No. ESX-C-245-17, 2018 WL 4829660, at *17 (N.J. Super. Ct. Oct. 2, 2018) (dismissing public nuisance action against pharmaceutical manufacturer because the "roots of the State's claimed injuries are the physical effects of the opioids on patients," which are governed by the state's Products Liability Act).

[34] *See also* Appendix R.

flow from such misuse. (*See*, *e.g.*, Tribal Compl. ¶ 921 ("Without McKinsey's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.").) But as the case law makes clear, *see supra*, at 37-38, the right to be free from the threat of misuse of an FDA-approved medication is an individual right, not a common right shared by the community at large. The term "epidemic"—of any alleged widespread social ill—is not a talisman that converts a collection of individual rights into a right held in common by the public at large.[35]

### 2. Plaintiffs Cannot Plausibly Allege that McKinsey Unreasonably Interfered with Any Common Right.

Even if the Court were to find a common right to be free from the opioid epidemic, Plaintiffs have not plausibly alleged that McKinsey unreasonably interfered with such a right. To unreasonably interfere with a common right, one's conduct must be both substantial and unreasonable. *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 604-605 (Cal. 1997). Conduct is substantial when it causes "significant harm." *Id.* It is unreasonable when it "violates a statute, ordinance, or administrative regulation," or when its social utility is outweighed by the gravity of the harm it causes. *CCSF*, 2022 WL 3224463, at *51. Thus, in *City and County of San Francisco*, this Court found that a large pharmacy chain acted unreasonably by repeatedly dispensing opioids without conducting the due diligence required by law on "red flag" prescriptions over a period of many years. *Id.* at *52 ("Plaintiff proved that Walgreens pharmacies violated 21 C.F.R. § 1306.04(a) for fifteen years. This is unreasonable conduct sufficient to support a public nuisance claim.").

By contrast, Plaintiffs here cannot plausibly maintain that McKinsey's conduct constituted actionable interference with a public right. As a general matter, the notion that a consultant who advises a client in New Jersey pursuant to a private contract can be liable for a public nuisance that arises in California strains the concept of reasonableness past the breaking point. *See*, *e.g.*,

---

[35] In *CCSF*, this Court found that the opioid epidemic interferes with public rights and therefore constitutes a public nuisance. *See* 2022 WL 3224463, at *8–10. ("The Opioid Epidemic's Interference with Public Rights in San Francisco"). In so doing, the Court skipped over the threshold question whether there is a common right at issue in the first place. *See Beretta U.S.A. Corp.*, 213 Ill.2d at 373 ("The interference with a public right is the sine qua non of a cause of action for public nuisance. However, not all interferences with public rights are public nuisances.") (citation omitted).

1   *People v. Sturm, Ruger & Co.*, 761 N.Y.S.2d 192, 196 (N.Y. App. Div. 2003) (warning against

2   "open[ing] the courthouse doors to a flood of limitless, similar theories of public nuisance"). This

3   is especially so when, as here, Plaintiffs have not alleged that McKinsey violated any law or

4   regulation by advising pharmaceutical manufacturers about the sale of FDA-approved medication

5   to licensed physicians. At most, Plaintiffs allege that McKinsey advised manufacturers to allot

6   greater sales resources to doctors who met certain criteria indicating they were more likely than

7   others to prescribe opioids.[36] (*See* Tribal Compl. ¶¶ 307-13.) But there is nothing unlawful or

8   unusual about suggesting that a manufacturer focus its sales efforts on physicians who prescribe

9   their medication.

10         Plaintiffs' nuisance claim is further precluded by the fact that physicians are required by

11   law to issue prescriptions only in the usual course of professional practice and for a legitimate

12   medical purpose. 21 C.F.R. § 1306.04(a). As other courts have found, "the distribution of

13   medicine to support the legitimate medical needs of patients as determined by doctors exercising

14   their medical judgment in good faith cannot be deemed an unreasonable interference with a right

15   common to the general public." *City of Huntington*, 2022 WL 2399876, at *60; *see also People v.*

16   *Purdue Pharma L.P.*, No. 30-2014-00725287-CU-BT-CXC, 2021 Cal. Super. LEXIS 31743, at

17   *23 (Cal. Super. Ct. Dec. 14, 2021) ("If every prescription was medically appropriate for that

18   patient, the highly regrettable but foreseeable adverse downstream consequences are not

19   unreasonable as that term is used in *ConAgra* (and the cases it cites).") If making and distributing

20   opioids for medically appropriate prescriptions is not unreasonable interference, it follows that

21   Plaintiffs cannot plausibly contend that McKinsey—which had no visibility into the medical

22   appropriateness of the prescriptions doctors wrote—acted unreasonably by advising clients on

23   using their salesforce for their products through lawful channels to licensed doctors.[37]

---

24   [36] As Plaintiffs acknowledge in their Complaints, McKinsey advised its clients to tier doctors based on
       factors other than sheer volume of prescriptions written. (*See* Tribal Compl. ¶ 307 ("Project Turbocharge
25   called for revising the existing process for targeting high-prescribing physicians, with a shift from
       targeting solely on the basis of prescription deciles to considering additional factors.").)
26   [37] Moreover, Plaintiffs do not plausibly allege that McKinsey *knew* that its advice would substantially
       interfere with a common right—if there were one—to be free from the opioid epidemic. This knowledge is
27   a required element of a nuisance claim under California law. *CCSF*, 2022 WL 3224463, at *52. "[A]cting
       with knowledge of the hazard requires that the evidence be sufficient to support an inference that a
28   defendant must have known that its conduct contributed to the alleged harm, not simply that it should have

---

1       The result is the same if the Court views McKinsey's conduct through the lens of social

2   utility. *See San Diego Gas & Elec. Co. v. Superior Court*, 920 P.2d 669, 697 (1996) (interference

3   may be unreasonable if "the gravity of the harm outweighs the social utility of the defendant's

4   conduct"), cited in *CCSF*, 2022 WL 3224463, at *51; *see also Acuna*, 929 P.2d at 286 ("The

5   unreasonableness of a given interference represents a judgment reached by comparing the social

6   utility of an activity against the gravity of the harm it inflicts, taking into account a handful of

7   relevant factors."). Whereas the Court in *CCSF* found "no social utility in violating a federal

8   regulation designed to protect the public from harm," *CCSF*, 2022 WL 324463, at *52, Plaintiffs

9   here have not alleged that McKinsey's services as an advisor to companies and institutions across

10  a broad range of industries worldwide lacks any social utility. Nor do they allege more

11  specifically that McKinsey's lawful advice to pharmaceutical manufacturers about the sale of

12  FDA-approved medications is devoid of social value. Plaintiffs' only allegation in this regard—

13  that "[t]here is no legitimately recognized societal interest in marketing and selling prescription

14  opioids through false and misleading representations" (Tribal Compl. ¶¶ 862, 1011, 1083, 1182,

15  1248, 1329, 1451, 1532)—appears to be an artifact of other opioid complaints against different

16  defendants, as Plaintiffs do not allege that McKinsey marketed or sold opioids. Finally, Plaintiffs

17  do not plead that a comparison of social utility to harm weighs in favor of the latter—and any

18  effort to do so would be futile given that the FDA has already weighed the risks and benefits of

19  the prescription opioids that were the subject of McKinsey's advice. *See People v. Purdue*, 2021

20  Cal. Super. LEXIS 31743, at *18 ("[A]s the Federal government and the California Legislature

21  have already determined, and as this Court finds, the social utility of medically appropriate

22  prescriptions far outweighs the gravity of the harm inflicted by them and so is not 'unreasonable'

23  or, therefore, enjoinable."); *Hunter*, 499 P.3d at 727 (finding no interference with an ostensible

24

25  _____

26  known." *Id*. at *53 (citation and quotation marks omitted). Here, the Complaints fail to plead facts
    sufficient to allege that McKinsey knew that any particular doctor engaged in illicit prescribing. This
    omission, coupled with the law requiring doctors to issue prescriptions in the usual course of practice and

27  for legitimate medical purposes, defeats any plausible inference that McKinsey knew or intended that its
    clients would target doctors who wrote illegal or inappropriate prescriptions that, if and when filled, might

28  be diverted to a potential black market.

"public right of health" because "the lawful products, prescription opioids, have a beneficial use in treating pain").

### 3. Plaintiffs' Public Nuisance Claims Fail for Lack of Causation.

As noted, all of Plaintiffs' claims fail for lack of causation, *see supra*, at 27-36—a conclusion that applies with even greater force for their public nuisance claims. While "[d]irect proof of each link in a chain of causation is not required," *City of Modesto v. Dow Chem. Co.*, 227 Cal. Rptr. 3d 764, 781 (Cal. Ct. App. 2018), Plaintiffs must plausibly allege that McKinsey's advice was at least a "substantial factor in bringing about" the alleged nuisance. *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 543 (Cal. Ct. App. 2017). To be a substantial factor, McKinsey's advice must have been a cause in fact of the injury; that is, "the injury, or its full extent, [must] not have occurred but for that conduct." *In re Ethan C.*, 279 P.3d 1052, 1071 (2012). Plaintiffs must also adequately allege that McKinsey's conduct was the proximate cause of the alleged nuisance, requiring not only that it was foreseeable to McKinsey that its advice would cause the alleged nuisance, but also that the nuisance was not too remote. *See Steamfitters Local Union No. 420 Welfare Fund v. Phillip Morris, Inc.*, 171 F.3d 912, 921 (3d Cir. 1999) ("Remoteness is an aspect of the proximate cause analysis, in that an injury that is too remote from its causal agent fails to satisfy tort law's proximate cause requirement…").

Here, Plaintiffs cannot possibly establish that McKinsey's advice was a substantial factor in causing, much less a proximate cause of, the abuse of opioids or the downstream effects of that abuse. Even in Plaintiffs' telling, the road from McKinsey's advice to the opioid epidemic ran through manufacturers who supplied opioids, distributors who shipped them, doctors who overprescribed them, pharmacists who dispensed them, and bad actors who diverted them to illegal use.

This chain is far longer and more attenuated than the chain in Orange County or West Virginia (in which the courts found causation lacking) and more attenuated still than in *CCSF* (in which the court found causation).[38] If the inability to prove a causal link between false marketing

---

[38] In *CCSF*, the Court considered the causal chain from a pharmacy's fulfillment of prescriptions to the various manifestations of the opioid epidemic in San Francisco. There, the Court found that "[t]he link between Walgreens' violation of its regulatory duties and the resulting harm is direct. Walgreens

1  and unnecessary prescriptions negates a nuisance claim, and if the inability to prove a causal link

2  between inadequate monitoring and diversion is likewise fatal, Plaintiffs cannot possibly state a

3  claim against McKinsey based on lawful advice that a client was free to follow, modify, or

4  reject—and that, if followed, could only contribute to the alleged nuisance if multiple actors

5  within the distribution system took a series of acts over which McKinsey had no control.

6      Further demonstrating the absence of causation, "it is not at all clear that the [opioid

7  epidemic] would cease to exist even if these particular defendants entirely ceased" advising

8  pharmaceutical manufacturers. *Beretta U.S.A. Corp.*, 821 N.E.2d at 1137. To the contrary, it is

9  clear the condition would *not* cease to exist: the opioid epidemic started years before McKinsey's

10  first retention by Purdue and continues to rage nearly four years after McKinsey quit providing

11  opioid-related advice in 2019. Accordingly, it cannot be said that but for McKinsey's advice, the

12  alleged harm would not have occurred. *CCSF*, 2022 WL 3224463, at *54; *In re Ethan C.*, 279

13  P.3d at 1071 ("[I]f the injury would have occurred even if the actor had not acted wrongfully, his

14  or her conduct generally cannot be deemed a substantial factor in the harm.").

15                          * * *

16      In the final analysis, McKinsey is not like a manufacturer or a distributor or a pharmacy.

17  This Court was unpersuaded that "floodgates of litigation" would open if the Court found a

18  pharmacy liable for public nuisance based on a "fifteen-year violation of federal regulations that

19  were put in place to prevent the controlled substances that Walgreens dispenses from causing

20  harm." *CCSF*, 2022 WL 3224463, at *58. But the Court should be concerned that those

21  floodgates *will* open if a third-party advisor who violated no laws can be found liable for public

22  _____

23  pharmacies that fill illegitimate prescriptions contribute directly to opioid diversion." *CCSF*, 2022 WL 3224463, at *57. This direct linkage, the Court wrote, distinguished *CCSF* from recent cases in Orange
24  County and West Virginia in which manufacturers and distributors were found not liable for public nuisance. In Orange County, the causal chain "required proof that the [manufacturers'] marketing contained false and misleading statements…, that these statements reached prescribers, and that the
25  falsehoods in the statements caused prescribers to write medically unnecessary prescriptions." *Id.* at *56. And in West Virginia, the chain ran through distributors' "fail[ure] to maintain adequate systems to
26  identify suspicious opioid orders," "ship[ment of] suspicious opioid orders to pharmacies in violation of their duty to halt the orders," and then "diver[sion] at the pharmacy level." *Id.* In the Court's analysis, this attenuation between the defendant's conduct and the alleged harm in Orange County and West Virginia
27  made those nuisance claims significantly harder to prove. *Cf. id.* at *57 ("The causal link that Plaintiff had to prove here is much shorter.").

28

43

nuisance based on its professional advice. "All a creative mind would need to do is construct a scenario describing a known or perceived harm of a sort that can somehow be said to relate back to the way [a consultant advises] a company or an industry [to] make[], market[], and/or sell[] its nondefective, lawful product or service, and a public nuisance claim would be conceived and a lawsuit born." *Sturm*, 761 N.Y.S.2d at 197. The resulting deluge would drown not just McKinsey, but professional advisors writ large.

### F.    Plaintiffs Fail to Allege the Elements of a Civil Conspiracy Claim.

NAS and Tribal Plaintiffs' claims for civil conspiracy fail because their conclusory allegations that McKinsey conspired with Purdue and other manufacturers (1) do not plead sufficiently that there was an agreement to conspire, (2) do not allege that McKinsey participated intentionally in furtherance of the allegedly wrongful conduct, and (3) fail to plead a viable underlying tort that would serve as the requisite predicate for their conspiracy claims.

To state a claim for civil conspiracy, Plaintiffs generally must sufficiently allege "the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury." *Treppel v. Biovail Corp.*, No. 03 CIV. 3002 (PKL), 2005 WL 2086339, at *5 (S.D.N.Y. Aug. 30, 2005).[39] While Plaintiffs need not prove the existence of a conspiracy agreement at the pleading stage, conclusory allegations of a conspiracy are not sufficient. *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 121 (S.D.N.Y. 2009) (dismissing claim "because the complaint does not contain facts from which it can be inferred there was an agreement to engage in a common scheme or plan to defraud plaintiff"); *Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 794–95 (S.D.N.Y. 2008) (same).

Plaintiffs' threadbare allegations do not plead sufficient facts to establish that there was an agreement between McKinsey, Purdue and/or other pharmaceutical manufacturers to engage in a conspiracy. In place of the requisite specific factual allegations, Plaintiffs make only conclusory allegations that these entities "work[ed] collaboratively, they agreed, aided, and abetted one

---

[39] *See also* Appendix S.

1    another in committing numerous unethical, illegitimate and unlawful acts related to the regulatory

2    approval process and the research and development process, as well as to the sales and

3    marketing" of opioid products, and that "McKinsey occupie[d] the proverbial 'cat-bird seat,' from

4    which it drove and oversaw a notional [sic.] health crisis." (NAS Compl. ¶¶ 642-43.) Tribal

5    Plaintiffs' similar conclusory allegations that McKinsey, Purdue and opioid supplier chain clients

6    all "engaged . . . in a massive marketing campaign to misstate and conceal the risks of . . .

7    opioids" and "agreed with each other to accomplish the unlawful purposes of marketing, selling,

8    and distributing prescription opioids through violations of law and misrepresentations" are,

9    without more, also deficient. (*See* Tribal Compl. ¶¶ 825, 829.) Indeed, Plaintiffs cannot allege that

10   McKinsey agreed to engage in a conspiracy because McKinsey's lawful advice and provision of

11   consulting services to Purdue and other manufacturers is not tantamount to an agreement to

12   engage in a conspiracy to commit unlawful or wrongful acts.

13        Plaintiffs also fail to plead that McKinsey participated intentionally in the allegedly

14   tortious conduct. Tribal Plaintiffs are silent as to McKinsey's intent, and NAS Plaintiffs allege

15   only that "McKinsey and its co-conspirators acted together . . . with the intention of carrying out

16   and perpetrating the common scheme." (NAS Compl. ¶ 649.) This omission is fatal to Plaintiffs'

17   civil conspiracy claims. So is the fact that McKinsey only provided lawful advice regarding the

18   sale of FDA-approved products to pharmaceutical manufacturers, because a party cannot conspire

19   to carry out an action "for lawful acts performed in a lawful manner." *See Isler v. Ticor Title*

20   *Guar. Co.*, 595 N.Y.S.2d 34, 35 (N.Y. App. Div. 1993) (noting that "plaintiff's only claim [was]

21   that defendants should be charged with allegedly wrongful action of the representatives of the

22   estate."). Moreover, as the Ninth Circuit has explained, holding McKinsey responsible for

23   whatever conduct it "could anticipate [its clients] *might* engage in," as Plaintiffs seek to do here,

24   "is simply beyond the scope of either conspiracy or aiding and abetting." *See Conant v. Walters*,

25   309 F.3d 629, 636 (9th Cir. 2002) (noting, in the context of doctors recommending patients to

26   obtain marijuana in violation of federal law, that "a conspiracy would require that a doctor have

27   knowledge that a patient intends to acquire marijuana, agree to help the patient acquire marijuana,

28   and intend to help the patient acquire marijuana.") (emphasis in original).

1    Finally, because a civil conspiracy claim must be premised on an underlying tort that is

2    sufficiently alleged in the complaint, there can be no civil conspiracy here because, for the

3    reasons described in this brief, Plaintiffs' other claims must be dismissed. *See, e.g.*, *Puttuck v.*

4    *Gendron*, 199 P.3d 971, 978 (Utah Ct. App. 2008) ("The claim of civil conspiracy require[s], as

5    one of [its] essential elements, an underlying tort . . . . Thus, in order to sufficiently plead a claim

6    for civil conspiracy, a plaintiff is obligated to adequately plead the existence of such a tort.")

7    (citations omitted); *Early Detection Ctr., P.C. v. N.Y. Life Ins. Co.*, 403 N.W.2d 830, 836 (Mich.

8    Ct. App. 1986) ("[A] claim for civil conspiracy may not exist in the air; rather, it is necessary to

9    prove a separate, actionable, tort.").[40] And, to the extent Plaintiffs seek to premise their civil

10   conspiracy claims on negligence-based causes of action, courts generally preclude such claims.

11   *See, e.g.*, *Khan v. Springer*, No. 2014CV033847, 2015 Colo. Dist. LEXIS 2655, at *12–13 (Colo.

12   Dist. Ct. July 16, 2015) ("Generally, negligence has no element of willfulness, instead involving a

13   negative state of mind. As such, a negligent actor lacks the state of mind required to prove civil

14   conspiracy" because the "elements of conspiracy directly conflict with the lack of intent inherent

15   in a negligence claim.") (citations omitted); *Portnoy v. Am. Tobacco Co.*, Nos. 96/16323, 2-MG,

16   96-16324, 1997 WL 638800, at *7 (N.Y. Sup. Ct. Sept. 26, 1997) ("Because a claim of

17   conspiracy requires a showing of intentional conduct, there can hardly be a conspiracy to commit

18   negligence.") (citations omitted).

19              **G.    Plaintiffs' Aiding and Abetting Claims Fail as a Matter of Law.**

20   In order to sufficiently allege aiding and abetting, plaintiffs must show (1) the existence of

21   an underlying tort; (2) knowledge of the tort on the part of the aider and abettor; and

22   (3) substantial assistance by the aider and abettor in perpetration of the tort.[41] Here, Plaintiffs fail

23   to demonstrate either that McKinsey had knowledge of a tort committed by its clients, or that

24   McKinsey gave them substantial assistance as defined by law.

25   While Plaintiffs allege in a conclusory manner that McKinsey had the requisite knowledge

26   (*see, e.g.*, NAS Compl. ¶ 655, Tribal Compl. ¶ 1419), this is merely a "formulaic recitation" of

27   _____

28   [40] *See* Appendix T.
     [41] *See* Appendix U.

1   that element. *See Twombly*, 550 U.S. at 555. Even taking Plaintiffs' allegations on their face, they

2   cannot plausibly allege that McKinsey did anything more than give lawful marketing advice

3   about a lawful, regulated product. *See generally supra*, § II, McKinsey thus provided no aid, and

4   certainly no knowing aid, for any unlawful act. For example, what Plaintiffs refer to repeatedly as

5   "avoiding the pitfalls of the Corporate Integrity Agreement" (*see, e.g.*, NAS Compl. ¶¶ 197, 201,

6   540) is in reality *compliance* with the CIA, which can hardly be considered the basis of a tort

7   claim. Plaintiffs engage in another episode of misdirection regarding McKinsey's suggestion that

8   Purdue advertise Oxycontin "based on the false and misleading notion that the drug can provide

9   'freedom' and 'peace of mind' for its users, give patients 'the best possible chance to live a full

10  and active life,' and concomitantly reduce stress and isolation." (*See* NAS Compl. ¶ 196; TPP

11  Compl. ¶ 187; Tribal Compl. ¶ 235.) Oxycontin was a lawful, regulated pain medication used by

12  patients under prescription from their physician who would otherwise suffer from intense pain;

13  Plaintiffs' description of this statement as "false and misleading" is simply an unsupported legal

14  conclusion—and their own opinion—couched as "proof" that McKinsey encouraged its client to

15  break the law. In a further example, this time of tactical omission, Plaintiffs describe a handful of

16  doctors targeted by increased marketing efforts who were later arrested or had their licenses

17  revoked, some as much as *five years* after the marketing campaign began. (*See* NAS Compl. ¶¶

18  275-80; TPP Compl. ¶¶ 266-71; Tribal Compl. ¶¶ 314-19.) But Plaintiffs do not allege that

19  McKinsey, or even Purdue, knew that these doctors were improperly prescribing opioids when

20  McKinsey allegedly provided advice about marketing to them. Finally, for much of the advice

21  that McKinsey allegedly gave Purdue, Plaintiffs do not even claim that Purdue ultimately adopted

22  those recommendations. (*See, e.g.*, NAS Compl. ¶¶ 204 ("encouraged" tactic of patient

23  pushback), 218 ("urged" emphasizing multiple tablet strengths), 285 ("suggested" that Purdue

24  lobby Walgreens).) The Complaints are filled with wordplay designed to paint routine business

25  and marketing advice as tortious conduct, yet nowhere do Plaintiffs actually allege (much less

26  plausibly) that McKinsey knew its clients were engaged in tortious behavior that McKinsey was

27  in turn aiding and abetting.

28

1   Plaintiffs also fail to demonstrate that any assistance McKinsey gave was "substantial" as

2   defined by law. "Substantial assistance exists where (1) a defendant affirmatively assists, helps

3   conceal, or by virtue of failing to act when required to do so enables the fraud to proceed, and

4   (2) the actions of the aider/abettor proximately caused the harm on which the primary liability is

5   predicated." *Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co.*, 883 N.Y.S.2d 486,

6   489 (N.Y. App. Div. 2009); *see also Am. Master Lease LLC v. Idanta Partners, Ltd.*, 171 Cal.

7   Rptr. 3d 548, 568 (Cal. Ct. App. 2014) ("Additionally, causation is an essential element of an

8   aiding and abetting claim, i.e., plaintiff must show that the aider and abettor provided assistance

9   that was a substantial factor in causing the harm suffered.") (citation omitted).

10   Simply alleging a failure to disclose certain information "is insufficient to support a claim

11   of aiding and abetting fraud absent a fiduciary duty or some other independent duty owed by" the

12   defendant. *Stanfield*, 883 N.Y.S.2d at 489–90. As explained above, *see supra*, at 17-25,

13   McKinsey owed no duty to Plaintiffs, who therefore cannot maintain an aiding and abetting claim

14   based on the theory that McKinsey should have disclosed certain information. *See Jebran v.*

15   *LaSalle Bus. Credit, LLC*, 824 N.Y.S.2d 224, 225 (N.Y. App. Div. 2006) (alleging "simply that

16   defendant remained silent regarding a purported misrepresentation . . . is insufficient to sustain a

17   claim for aiding and abetting unless the defendant owes an independent duty to the plaintiff").

18   Nor do Plaintiffs allege that McKinsey itself ever assisted by implementing any of its own advice:

19   there are no allegations that McKinsey communicated with doctors or patients, engaged in

20   marketing efforts itself, or took any other action related to the distribution of opioids.

21   Plaintiffs also fail to demonstrate that McKinsey's actions were the proximate cause of

22   any of their harms as required under the second prong. As detailed, *see supra*, at 31-35, the

23   remoteness of McKinsey's conduct from the alleged harms, as well as the numerous independent

24   actors between them, means there is no realistic causal chain to be drawn between McKinsey and

25   these Plaintiffs. "[F]ailure to plead substantial assistance is, by itself, a sufficient ground for

26   dismissal [.]" *Stanfield*, 883 N.Y.S.2d at 490.

27   ### H.   Plaintiffs Do Not State a Claim for Unjust Enrichment.

28   TPP Plaintiffs' equitable claim of unjust enrichment fails for various reasons.

1      First, under California law, "[u]njust enrichment" itself is "not a cause of action . . . or

2  even a remedy, but rather a general principle, underlying various legal doctrines and remedies"

3  "synonymous with restitution." *See McBride v. Boughton*, 20 Cal. Rptr. 3d 115,121 (Cal. Ct.

4  App. 2004) (internal quotation and citation omitted). While some California courts have

5  construed "unjust enrichment" claims as one seeking restitution, such claims cannot proceed

6  where they are merely duplicative of statutory or tort claims, as is the case here. *See In re Apple*

7  *& AT&T iPad Unlimited Data Plan Litig.,* 802 F. Supp. 2d 1070, 1077 (N.D. Cal. 2011) (holding

8  "plaintiffs can not assert unjust enrichment claims that are merely duplicative of statutory or tort

9  claims").

10     For those states that recognize claims for unjust enrichment, the lack of any relationship

11  between Plaintiffs and McKinsey precludes Plaintiffs from pursuing their quasi-contractual claim.

12  As the court in *Redtail Leasing v. Bellezza* held, an unjust enrichment claim requires "direct

13  dealings or actual, substantive relationship with [a defendant.]" *See* No. 95 Civ. 5191(JFK), 1997

14  WL 603496, at *8 (S.D.N.Y. Sept. 30, 1997).[42] Plaintiffs do not allege such a relationship with

15  McKinsey, nor can they. The only identified direct dealings or actual relationships McKinsey had

16  were those between McKinsey and its clients—a fact Plaintiffs repeatedly concede in their

17  pleadings.[43] These allegations regarding connections with parties other than Plaintiffs cannot

18  support Plaintiffs' claim for unjust enrichment. *See, e.g., Grynberg v. ENI S.p.A.*, No. 06 Civ.

19  6495 (GBD), 2011 WL 13176088, at *3 (S.D.N.Y. Aug. 24, 2011) (dismissing unjust enrichment

20  claim where plaintiff "had no communications or relationship with" defendant and finding that

21

22  ───────────────
[42] *See also JLJ Recycling Contractors Corp. v. Town of Babylon*, 754 N.Y.S. 2d 897, 897 (N.Y. App. Div.
23  2003) (dismissing quantum meruit claim and stating that "if the services were performed at the behest of
someone other than the defendant, the plaintiff must look to that party for recovery," even if the defendant
24  benefited from plaintiff's actions); *Sperry v. Crompton Corp.*, 831 N.Y.S.2d 760, 766 (N.Y. 2007)
(dismissing an unjust enrichment claim because "the connection between the purchaser of tires and the
producers of chemicals used in the rubber-making process is simply too attenuated").
25  [43] *See, e.g.*, TPP Compl. ¶ 691 (alleging "McKinsey devised, and assisted Purdue with implementing, a
sales and marketing campaign"); *id*. ¶ 692 ("McKinsey was compensated out of Purdue's income from the
26  sale of opioids"); *id*. ¶ 229 ("Purdue accepted and, with McKinsey's ongoing assistance, implemented
McKinsey's strategies for selling and marketing OxyContin."); *id.* ¶ 248 ("As a result of the Sackler
27  family endorsement of McKinsey's proposals, the following month Purdue implemented Project
Turbocharge based on McKinsey's recommendations."); *id.* ¶ 280 ("[McKinsey] presented specific plans
28  to Purdue, which Purdue adopted and spent hundreds of millions of dollars implementing.").

1  "[e]ven if the speculative indirect connection between the parties did exist, it is simply too

2  attenuated to support an unjust enrichment claim").[44]

3       Likewise, certain states require that a plaintiff *directly* confer a benefit on the defendant to

4  permit an unjust enrichment claim. *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005)

5  (where "no economic transaction occur[s] between" the plaintiff and the defendant, the plaintiff

6  "cannot establish that [the defendant] retained any benefit 'to which it is not justly entitled'").[45]

7  Here, however, the most Plaintiffs allege is that "McKinsey. . . received a benefit from the sale

8  and distribution of prescription opioids paid for, in whole or part, by Plaintiffs and the proposed

9  class," (TPP Compl. ¶ 693), and "McKinsey was compensated out of Purdue's income from the

10  sale of opioids" (*id*. ¶ 693). This does not allege a benefit Plaintiffs *directly conferred on*

11  *McKinsey*. Plaintiffs concede that it is Purdue who received income from the sale and distribution

12  of prescription opioids Plaintiffs allegedly paid for—not McKinsey. (*Id*.)

13       In any event, Plaintiffs' pleadings also make clear that even any alleged *indirect* benefit

14  McKinsey could have received has already been remitted to States and territories, further

15  undermining their claims for unjust enrichment. Plaintiffs concede that "[o]n February 4, 2021,

16  forty-nine state attorneys general announced a multistate settlement with McKinsey related to its

17  work for opioid manufacturers" and "McKinsey agreed to pay almost $600 million dollars."

18  (NAS Compl. ¶ 518; TPP Compl. ¶ 509; Tribal Compl. ¶ 557.) *See, e.g., Johnson,* 834 N.E.2d at

19  799 ("the purpose of such claims 'is not to compensate the plaintiff for any loss or damage

20  suffered by him but to compensate him for the benefit he has conferred on the defendant.'").

21       Plaintiffs also fail to plead the absence of an adequate remedy at law to support this

22  equitable claim. *See, e.g., Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020)

23  (holding plaintiffs seeking equitable relief are required to allege lack of adequate legal remedy

24  under federal equitable principles and "such relief may be unavailable in federal court because

---

25

26  [44] Where courts in California have recognized claims for unjust enrichment, they have also required a direct relationship between the plaintiff and defendant. *Magic Kitchen LLC v. Good Things Int'l, Ltd*., 63 Cal. Rptr. 3d 713, 720 (Cal. Ct. App. 2007) (affirming dismissal of unjust enrichment claim where

27  "plaintiffs failed to demonstrate either a direct relationship between the plaintiffs and these defendants or a direct benefit conveyed by the plaintiffs to these defendants"). *See also* Appendix U.

28  [45] *See also* Appendix V.

1   equitable remedies are subject to traditional equitable principles unaffected by state law").[46] This

2   claim is also duplicative of Plaintiffs' other claims as it is based on the same factual predicate that

3   McKinsey devised alleged misleading claims regarding opioids to increase prescriptions and

4   sales. (TPP Compl. ¶¶ 690-91); *In re Ford Tailgate Litig.*, No. 11–CV–2953–RS, 2014 WL

5   3899545, at *3–4, n.3 (N.D. Cal. Aug. 8, 2014) (dismissing unjust enrichment claims under the

6   laws of several states where the complaint did not distinguish the alleged deception underlying

7   the unjust enrichment claims from that underlying the tort and contract claims and rejecting

8   claims of "alternative pleading").

9           **I.      Plaintiffs' Consumer Protection Claims Fail for Numerous Reasons.**

10          Although the reasons why Plaintiffs' consumer protection claims fail vary based on state

11  law, the conclusion is the same: they have no claim under any state's consumer protection laws.

12                  **1.      Plaintiffs Cannot Pursue Claims Where the Parties Fall Outside
                             the Scope of the Statute.**

13

14          Some state consumer protection statutes do not extend to Tribes. For example, courts have

15  made clear that the Tribal Plaintiffs are not "persons" with standing to bring the consumer

16  protection claims they seek to assert here. In California, the Court of Appeal recently held that

17  Tribes cannot bring a claim under the state's unfair competition law because they are

18  governmental entities, not "persons" within the meaning of the statutes. *See Rincon Band of*

19  *Luiseño Mission Indians v. Flynt*, 286 Cal. Rptr. 3d 29, 50–64 (Cal. Ct. App. 2021), *review*

20  *denied* (Feb. 16, 2022). Similarly, the Western District of Washington has ruled that a Tribe does

21  not qualify as a "person who sustains injury to his or her person, business, or property" with

22  standing to sue under the Washington Criminal Profiteering Act. *See Stillaguamish Tribe of*

23  *Indians v. Nelson*, No. C10-327 RAJ, 2012 WL 1569613, at *2 (W.D. Wash. May 2, 2012)

24  (citing Wash. Rev. Code Ann. § 9A.82.100(1)(a) (West 2012). The laws in at least 6 of the 10

25  states under which Tribes seek to bring consumer protection claims against McKinsey limit

26  standing to bring claims to "persons."[47] Further, certain consumer protection statutes otherwise

27  _____

28  [46] *See also* Appendix W.
    [47] These states include Alaska, California, Montana, New Mexico, Oregon, and Washington.

1  place limits on who can bring claims such as claims by "consumers" or a person who purchases

2  or leases goods "primarily for personal, family, or household purposes," or limit claims to those

3  involving sales or merchandise or "consumer transactions."[48] Tribal Plaintiffs do not fall into

4  these categories or otherwise fit these definitions.[49]

5       The Utah statute precludes Plaintiffs' claim because of McKinsey's status under the law:

6  Utah prohibits deceptive and unconscionable acts or practices "by a supplier in connection with a

7  consumer transaction," Utah Code Ann. § 13-11-3(6), 4(1), 5(1), but Plaintiffs do not allege that

8  McKinsey is a supplier engaged in any consumer transactions.

9              **2.      Plaintiffs Fail to Plead a Duty to Disclose to Support Their
                         Omissions-Based Consumer Protection Claims.**

10

11      Plaintiffs' consumer protection claims premised on alleged omissions of material fact (*see*

12  *e.g.*, Tribal Compl. ¶¶ 891-95, 975, 1040-41, 1047, 1111-16, 1133-34, 1141-42, 1281, 1285,

13  1363, 1368, 1484, 1488, 1568, 1624) fail under several state laws. That is because Plaintiffs do

14  not identify any duty to disclose that McKinsey owed them, as required to pursue their omissions

15  claims, and their allegations do not meet Rule 9(b)'s particularity requirement for states with this

16  requirement for such claims.[50] At most, Plaintiffs make only conclusory allegations that

17  McKinsey had an obligation to disclose "the whole truth" because it created marketing plans for

18  its clients or had a relationship with its clients. (*See e.g.*, Tribal Compl. ¶ 1402 ("McKinsey,

19  having chosen to craft the marketing plans used by its opioid supply chain clients to make

20  representations to healthcare providers regarding their opioids, were under a duty to disclose the

21  whole truth, and to not disclose partial and misleading truths.").) Completely absent from

22  Plaintiffs' pleadings are any non-conclusory allegations that (1) McKinsey had a duty to disclose

23  the allegedly omitted information to Plaintiffs, (2) provide a factual basis for finding such a duty

24  (such as a unique relationship), and (3) support a finding that Plaintiffs received any

25  communications directly from McKinsey that would warrant disclosures. Because Plaintiffs do

26

---

27  [48] *See* Appendix X.
    [49] *See e.g.*, Tribal Compl. ¶¶ 23-68 (listing "sovereign, federally recognized Indian Tribes, intertribal
    consortia, and Tribal health organizations").

28  [50] *See* Appendix Y.

1   not adequately allege any duty to disclose, Plaintiffs' omission claims are not actionable. *Cohen*

2   *v. Subaru of Am., Inc.*, No. 120CV08442JHRAMD, 2022 WL 714795, at *23 (D.N.J. Mar. 10,

3   2022) (dismissing consumer protection claims for lack of a duty to disclose).[51]

4   ### 3.    Plaintiffs Fail to Plead Reliance or Causation to Pursue Certain Statutory Claims.

5

6   While reliance and causation are required to state certain consumer protection claims,

7   Plaintiffs fail to adequately plead either, *see supra*, §§ IV.C.1, IV.D. Plaintiffs do not allege

8   McKinsey made any misrepresentations *to them* or that McKinsey made any disclosure to

9   Plaintiffs upon which Plaintiffs could have possibly relied. *See supra*, § II (*e.g.,* Tribal Compl.

10  ¶¶ 812, 1046, 1476).[52]

11  ### 4.    Plaintiffs Do Not Allege McKinsey Disseminated Statements to the Public or Otherwise Allege a Public Benefit or Interest.

12

13  Plaintiffs' failure to allege deception or misrepresentations directed toward consumers or

14  the public, or otherwise allege a non-conclusory public benefit or interest, dooms several of their

15  consumer protection law claims. The only communications involving McKinsey that Plaintiffs

16  identify are those directed to McKinsey's pharmaceutical clients, who are neither consumers nor

17  the public. (*See e.g.,* TPP Compl. ¶¶ 295, 343, 381, 429, 394, 442, 398, 446, 399, 447.) Plaintiffs'

18  claims under the consumer protection statutes with these requirements fail.[53]

19  ### J.    NAS Plaintiffs' Claims under West Virginia Law Each Fail.

20  ### 1.    The Joint Venture Liability Claim Fails Due to a Lack of Profit Sharing or Joint Control.

21

22  As relevant here, a joint venture in West Virginia has two distinguishing features. The

23  first feature is "the presence…of an agreement to share in the profits and losses of an enterprise."

24  *Armor v. Lantz*, 535 S.E.2d 737, 743–44 (W. Va. 2000). The second is "the right of joint

25  participation in the management and control of the business. . . . Absent such right, the mere fact

26  that one party is to receive benefits in consideration of services rendered or for capital

27  [51] *See* Appendix Z.

28  [52] *See* Appendix AA.
    [53] *See* Appendix BB.

1   contribution does not, as a matter of law, make him a partner or joint venturer." *Id*. at 745 (citing

2   *Bank of Cal. v. Connolly*, 111 Cal. Rptr. 468, 478 (Cal. Ct. App. 1973)). It is also essential that

3   each member of a purported joint venture have "an equal voice, giving an equal right of control in

4   the direction of the enterprise." *Id*. at 468 n.12 (*quoting McSorley v. Hauck*, 883 S.W.2d 562, 566

5   (Mo. Ct. App. 1994)). Plaintiffs have failed to allege either of these elements.

6          Nowhere do Plaintiffs allege that McKinsey had an agreement with its clients to share in

7   their profits, only that McKinsey was paid for its services. (NAS Compl. ¶ 299; TPP Compl.

8   ¶ 290; Tribal Compl. ¶ 338.) This is insufficient to state a claim. *See Armor*, 535 S.E.2d at 745

9   (testimony that an attorney "expected to be compensated for his services," as opposed to an

10  "agreement to share in the profits and losses of the joint representation," fell "far short of

11  demonstrating the requisite agreement to share in the profits and losses of the joint

12  representation"); *Kerns v. Slider Augering & Welding, Inc.*, 505 S.E.2d 611, 619 (W. Va. 1997)

13  (conducting operations for another firm and paying that firm a per-ton price for the coal extracted

14  did not constitute an agreement to share profits and losses sufficient to create a joint venture);

15  *Shelton v. Wells Fargo Bank*, No. 3:09–CV–19, 2010 WL 10152301, at *5 (N.D. W. Va. Aug. 13,

16  2010) (flat fee agreement, rather than fluctuating fees or profit sharing agreement, was

17  insufficient to survive summary judgment). Plaintiffs attempt to overcome this fatal defect by

18  alleging that investments by the McKinsey Investment Office—an independent entity not named

19  as a defendant here—in the opioid industry allowed McKinsey to "enjoy direct financial benefits"

20  from their clients' success. (NAS Compl. ¶ 688.) Not only is this investment theory implausible

21  on its face—because speculative investment income is hardly "direct"—it is unsupported by any

22  precedent.

23         Plaintiffs have also failed to allege the necessary "equal control over the common

24  commercial pursuit." *Armor*, 535 S.E.2d at 745. While McKinsey shared expertise with its

25  clients, it was hardly an equal partner in their endeavors. (*See, e.g.*, NAS Compl. ¶ 152 ("Stewart,

26  as CEO [of Purdue], was in charge of the relationship with McKinsey. He controlled workflow to

27  and from McKinsey and required his personal approval for any work orders with McKinsey.");

28  TPP ¶ 143 (same); Tribal Compl. ¶ 191 (same); NAS Compl. ¶ 141 (noting that McKinsey was "a

54

contractor to Purdue performing sales and marketing functions"); TPP ¶ 132 (same); Tribal Compl. ¶ 180 (same); NAS Compl. ¶ 154 ("McKinsey routinely obtained information from, advised, communicated with, and *ultimately worked for* the Purdue board of directors") (emphasis added); TPP ¶ 145 (same); Tribal Compl. ¶ 193 (same)).

### 2. McKinsey's Conduct Did Not Satisfy the Definition of "Outrageous" Conduct.

Intentional or reckless infliction of emotional distress, also called the "tort of outrage," requires "(1) that the defendant's conduct was atrocious, intolerable, and so extreme and outrageous as to exceed the bounds of decency; (2) that the defendant acted with the intent to inflict emotional distress, or acted recklessly when it was certain or substantially certain emotional distress would result from his conduct; (3) that the actions of the defendant caused the plaintiff to suffer emotional distress; and, (4) that the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it." *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419, 425 (W. Va. 1998). Plaintiffs fail to sufficiently allege these elements, especially as to the first and second elements.

First, Plaintiffs do not allege, nor could they, that McKinsey acted with either the intent to inflict emotional distress or the certainty that such distress would result. For that reason alone, Plaintiffs' claim fails.

In addition, West Virginia courts have explained the high bar to demonstrate such "atrocious, intolerable" conduct. Quoting the Restatement (Second) of Torts section 46, the Supreme Court has found liability "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Travis*, 504 S.E.2d at 425. "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]" *Id*. at 427 (quoting Rest. (2d) Torts § 46, cmt. (h)). Aside from a conclusory recitation of this element, however, Plaintiffs offer no explanation why marketing and business consulting would rise to this level, nor does it in this case, necessitating dismissal of this claim.

### 3. NAS Plaintiffs Do Not State a Claim for Negligent Infliction of Emotional Distress under West Virginia Law.

West Virginia law recognizes two types of NIED cases: those where the plaintiff witnesses a close relative "suffer critical injury or death as a result of defendant's negligent conduct," and those "based upon the fear of contracting a disease." *Marlin v. Bill Rich Constr.*, 482 S.E.2d 620, 638 (W. Va. 1996). Plaintiffs' claim, based on "emotional distress resulting from fetal opioid exposure" (NAS Compl. ¶ 698) falls within neither of these categories. *See Wood v. Harshbarger*, No. 3:13–21079, 2013 WL 5603243, at *9 (S.D. W. Va. Oct. 11, 2013) (dismissing claim because neither type of NIED applied to injuries sustained by plaintiff himself).

### 4. NAS Plaintiffs' Medical Monitoring Claims Fail Because They Cannot Succeed on Their Underlying Tort Claims.

"Liability for medical monitoring is predicated upon the defendant being at fault in exposing the plaintiff to a particular hazardous substance." *Bower v. Westinghouse Elec. Corp.*, 522 S.E.2d 424, 433 (W. Va. 1999); *see also Acord v. Colane Co.*, 719 S.E.2d 761, 770 (W. Va. 2011) ("Having found that [plaintiff] failed to present sufficient evidence to prove her tort theories of liability asserted against Colane, she cannot satisfy the third element necessary to sustain a claim for medical monitoring."). Because Plaintiffs cannot demonstrate that McKinsey is responsible for their harms, they cannot succeed on their claim for medical monitoring costs.

### K. Plaintiffs' Claims Are Barred by First Amendment Protections.

Finally, all of Plaintiffs' many causes of action fail for one additional, critical reason: they target speech. Plaintiffs attempt to hold McKinsey liable for the advice it gave to its clients, various pharmaceutical companies. That advice, in turn, pertained to those companies' marketing to consumers and doctors and petitioning to the FDA.

Claims based on McKinsey's advice to its clients are subject to heightened scrutiny under the First Amendment. *See, e.g.*, *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) (holding that it "matters not" for First Amendment purposes whether a state regulates via statute, regulation, or through "a civil action . . . that it is common law only"); *Pac. Coast Horseshoeing*

*Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (applying heightened scrutiny where regulation affects speech that "imparts a specific skill or communicates advice derived from specialized knowledge") (citation and quotation marks omitted). The Supreme Court's precedents "have long protected the First Amendment rights of professionals." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2374 (2018). While the Supreme Court acknowledged in *Becerra* that "[p]rofessional speech is…a difficult category to define with precision," *Becerra*, 138 S. Ct. at 2366, it has rejected the argument that professional speech is subject to diminished First Amendment protection and has applied strict scrutiny to content-based laws regulating the noncommercial speech of those who provide personalized services to clients. *See id.* (citing *Reed v. Town of Gilbert*, 576 U.S. 155 (2015) (lawyers); *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) (professional fundraisers); *Holder v. Humanitarian L. Project*, 561 U.S. 1 (2010) (organizations providing specialized advice on international law).

Where, as here, a plaintiff seeks to impose liability based on the content and viewpoint of *noncommercial* speech—*i.e.*, McKinsey's lawful recommendations to its clients for increasing pharmaceutical sales—that speech is subject to strict scrutiny and is "entitled to the strongest protection our Constitution has to offer." *Conant*, 309 F.3d at 637 (striking down regulation of professional speech that prohibited doctors from recommending medical marijuana) (citation and quotation marks omitted); *see also Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 n.24 (1976) ("There are commonsense differences between speech that does no more than propose a commercial transaction and other varieties"); *Southlake Prop. Assocs., Ltd. v. City of Morrow*, 112 F.3d 1114, 1117–18 (11th Cir. 1997) ("Noncommercial speech usually expresses an idea, an aim, an aspiration, a purpose, or a viewpoint" and is "fully protected by the First Amendment"). A plausible claim can only be stated for such speech if Plaintiffs plausibly allege McKinsey *knew* and *intended* that its advice would lead its clients to commit illegal acts. *Conant*, 309 F.3d at 636–37; *accord, e.g.*, *Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 247–48 (2010) (holding prohibition on certain forms of attorney advice withstood scrutiny because it was limited to advice attorneys would know would lead to fraudulent conduct); *Brandenburg v. Ohio*, 395 U.S. 444, 447, 449 (1969) (noting that states may

1   prohibit only advocacy "directed to inciting or producing imminent lawless action and . . . likely

2   to incite or produce such action" to hold that statute "purport[ing] to punish mere advocacy . . .

3   [fell] within the condemnation of the First [Amendment].").

4   But that is not what the Complaints allege. The Complaints are rife with allegations that

5   McKinsey knew and intended that Purdue and other pharmaceutical manufacturers would use its

6   advice to increase the volume of opioids prescribed. (*See, e.g.*, NAS Compl. ¶¶ 64-67; TPP

7   Compl. ¶¶ 55-58; Tribal Compl. ¶¶ 103-106.) But there is nothing unlawful about this. While

8   heavily regulated, opioids remain lawful products that are routinely lawfully prescribed. The

9   Complaints contain *no* allegations that McKinsey intended for its advice to lead to an increase in

10  unlawful prescriptions, nor even that it had any knowledge of illegitimate prescriptions that

11  resulted from its advice. Without any allegation that McKinsey intended its speech to incite

12  unlawful conduct, the Complaints should be dismissed on this basis alone.[54]

13  McKinsey is alleged to have done nothing more than offered recommendations, ideas, and

14  viewpoints, consistent with the category of noncommercial speech. But there is no basis to

15  plausibly allege that McKinsey's speech was false or misleading (the standard for challenging

16  commercial speech), either. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 557 (2011) ("Speech in aid

17  of pharmaceutical marketing . . . is a form of expression protected by the Free Speech Clause of

18  the First Amendment"). While a state may proscribe such speech if it is false or misleading, it

19  generally cannot limit *truthful* commercial speech. *44 Liquormart v. Rhode Island*, 517 U.S. 484,

20  507 (1996) (plurality opinion) (government cannot restrict truthful advertising where other

21  [54] The Complaints attempt, in conclusory fashion, to draw some connection between McKinsey's alleged
22  recommendations and its clients' own speech. Without a plausible allegation that McKinsey made the
    statements at issue, these allegations are irrelevant to Plaintiffs' claims. Regardless, Plaintiffs would need
23  to clear additional First Amendment hurdles to hold McKinsey liable in connection with its clients'
    statements. The bulk of Plaintiffs' claims focus on pharmaceutical companies' marketing efforts to
24  individual doctors and the public—including, for example, using the slogan "We sell hope in a bottle," or
    emphasizing that prescribing physicians could "tailor the dose." (NAS Compl. ¶¶ 198-99; TPP Compl. ¶¶
25  189-90; Tribal Compl. ¶¶ 237-38.) Indeed, as the Supreme Court has made clear, while "pharmaceutical
    marketing affects treatment decisions, it does so because doctors find it persuasive," which is not by itself
26  a "lawful basis for quieting" such speech. *Sorrell*, 564 U.S. at 576; *see Thompson v. W. States Med. Ctr.*,
    535 U.S. 357, 374 (2002) (First Amendment does not permit regulation of information dissemination
27  based on "fear that people would make bad decisions" if they receive it). Claims based on such marketing
    are actionable only if the marketing statements were false or misleading. *Id.*; *see ONY, Inc. v. Cornerstone*
28  *Therapeutics, Inc.*, 720 F.3d 490, 492 (2d Cir. 2013) (First Amendment requires construing Lanham Act
    and related New York causes of action only to "false or misleading" commercial speech).

1    regulations, such as limitations on purchases, could achieve same goal); *id.* at 518, 524–25

2    (Thomas, J., concurring) (interest in keeping "legal users of a product or service ignorant" is "*per*

3    *se* illegitimate"). Across the hundreds of pages and thousands of paragraphs of their Complaints

4    drafted with the benefit of McKinsey's repository production, Plaintiffs identify only *one* specific

5    statement that they allege was false or misleading that McKinsey even weighed in on: "McKinsey

6    advised Purdue to market OxyContin based on the false and misleading notion that the drug can

7    provide 'freedom' and 'peace of mind' for its users, give patients 'the best possible chance to live

8    a full and active life,' and concomitantly reduce stress and isolation." (*See* NAS Compl. ¶ 196;

9    TPP Compl. ¶ 187; Tribal Compl. ¶ 235.) Again, though, McKinsey did not itself make any

10   marketing statements to prescribers or the public, did not even make or suggest this statement to

11   Purdue, and had no control over how Purdue decided to deploy its proposed marketing messages.

12   The Complaint does not allege otherwise with the particularity required by Rule 9(b). *See supra*,

13   at 27.

14          To the extent Plaintiffs advance claims beyond those based on McKinsey's marketing

15   advice, they pertain to pharmaceutical companies' petitions for FDA approval. (*E.g.*, NAS

16   Compl. ¶¶ 165-72.) Such petitioning activity is likewise subject to the strictest First Amendment

17   protections. *E.g.*, *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49,

18   56-57 (1993). Under the *Noerr-Pennington* doctrine, a plaintiff cannot impose liability under

19   federal or state law based on a company's petition to the government—including to the FDA—

20   unless the plaintiff demonstrates the petition was a "sham." *Theme Promotions, Inc. v. News Am.*

21   *Mktg. FSI*, 546 F.3d 991, 1006–07 (9th Cir. 2008); *see also Cal. Motor Transp. Co. v. Trucking*

22   *Unlimited*, 404 U.S. 508, 510 (1972) ("the right to petition extends to all departments of the

23   Government."); *La. Wholesale Drug Co. v. Sanofi-Aventis*, No. 07 Civ. 7343 (HB), 2009 WL

24   2708110, at *4 (S.D.N.Y. Aug. 28, 2009) (petition to FDA protected under *Noerr-Pennington*

25   doctrine). That burden is onerous and subject to a two-part test: the plaintiff must first show that

26   the petition was "objectively baseless" in the sense that no reasonable petitioner could

27   realistically expect success on the merits, and must also then show that the baseless petition was

28   "subjective[ly] motivat[ed]" by an improper purpose. *Id.*

1      In assessing such a claim, courts apply a heightened pleading standard requiring "a

2   complaint [to] include allegations of the specific activities the defendant engaged in that deprive

3   the defendant's conduct of *Noerr-Pennington* protection." *Evans Hotel, LLC v. Unite Here Local*

4   *30*, 433 F. Supp. 3d 1130, 1144 (S.D. Cal. 2020) (internal quotation marks and citations omitted).

5   A plaintiff must thus specifically plead "facts that disprove the challenged [petition's] legal

6   viability." *Wonderful Real Estate Dev. LLC v. Laborers Int'l Union of N. Am. Local 220*, No.

7   1:19-CV-00416-LJO-SKO, 2020 WL 91998, at *7 (E.D. Cal. Jan. 8, 2020) (citation and quotation

8   marks omitted). These include, for example, allegations regarding conduct that involves a series

9   of petitions brought pursuant to a policy of starting proceedings "without regard to the merits and

10   for an unlawful purpose," or "unlawful conduct consist[ing] of making intentional

11   misrepresentations to the court" such that the intentional misrepresentations "deprive the

12   litigation of its legitimacy." *B&G Foods N. Am., Inc. v. Embry*, 29 F. 4th 527, 537–38 (9th Cir.

13   2022), *cert. denied*, 143 S. Ct. 212 (2022).

14      Here, Plaintiffs offer no plausible allegation to show that pharmaceutical

15   manufacturers'—not McKinsey's—petitions to the FDA were "objectively baseless" and

16   motivated by an improper purpose. That is the case even if the Court credits Plaintiffs' repeated

17   allegation that McKinsey's clients intended their marketing to "induce doctors and patients to

18   prescribe and use prescription opioids for long-term chronic, non-acute, and non-cancer pain, and

19   for other uses not approved by the FDA." (*See, e.g.*, Tribal Compl. ¶ 808.) Courts have expressly

20   held that the First Amendment protects the promotion of off-label use of an FDA-approved

21   product, so long as the statements in question are not false. *See United States v. Caronia*, 703

22   F.3d 149, 180 (2d Cir. 2012) (applying *Sorrell*).

23      **V.      CONCLUSION**

24      For all of these reasons, McKinsey respectfully requests that the Court dismiss the Tribal,

25   TPP, and NAS Master Complaints in their entirety.

26

27

28

1   Dated: January 9, 2023

**MORRISON & FOERSTER LLP**

2

3

By: */s/ Mark David McPherson*

4   MARK DAVID McPHERSON

5   **STROOCK & STROOCK & LAVAN LLP**
James L. Bernard (Admitted *Pro Hac Vice*)

6   jbernard@stroock.com
David M. Cheifetz (Admitted *Pro Hac Vice*)

7   dcheifetz@stroock.com
180 Maiden Lane

8   New York, NY 10038
Phone: (212) 806-5400

9

**CLARENCE DYER & COHEN LLP**

10   Josh A. Cohen (CA SBN 217853)
jcohen@clarencedyer.com

11   899 Ellis Street
San Francisco, CA 94109

12   Phone: (415) 749-1800

13   Attorneys for Defendants
McKINSEY & COMPANY, INC.

14   McKINSEY & COMPANY, INC. UNITED STATES
McKINSEY & COMPANY, INC. WASHINGTON D.C.

15   McKINSEY HOLDINGS, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28