Elizabeth J. Cabraser (State Bar No. 083151)
ecabraser@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

*Plaintiffs' Lead Counsel*

*[Additional Counsel Listed on Signature Page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION<br><br>This Document Relates to:<br><br>ALL NAS ACTIONS;<br>ALL THIRD PARTY PAYOR ACTIONS;<br>ALL TRIBAL ACTIONS | Case No. 21-md-02996-CRB (SK)<br><br>**NAS, TPP, AND TRIBAL PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MCKINSEY DEFENDANTS' MOTION TO DISMISS MASTER COMPLAINTS FOR FAILURE TO STATE A CLAIM**<br><br>Date:  April 28, 2023<br>Time: 10:00 a.m.<br>Courtroom: Courtroom 6, 17th Floor<br><br>Judge: The Honorable Charles R. Breyer |

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................. 1

    A.  McKinsey's Motion Rests On Two Erroneous Themes. ...................................... 1

    B.  McKinsey Mischaracterizes And Ignores Plaintiffs' Allegations......................... 2

    C.  McKinsey Rehashes Arguments This Court Rejected. ......................................... 3

II.  MCKINSEY DEVISED AND IMPLEMENTED UNLAWFUL SCHEMES  TO INCREASE SALES OF ADDICTIVE OPIOIDS ................................................ 4

    A.  McKinsey Masterminded And "Turbo-Charged" Purdue's Contributions To The Opioid Crisis. ................................................................................................ 4

    B.  McKinsey Spread Opioid Tactics From One Manufacturer To Another.............. 8

    C.  McKinsey's Opioid Work Benefited Its Investment Fund. ................................ 11

    D.  McKinsey Does Not Merely Give Advice, But Implements That Advice. ......... 11

    E.  McKinsey Contributed To The Opioid Crisis And Harmed Plaintiffs. .............. 13

        1.  NAS Plaintiffs Are Permanently Affected. .............................................. 13

        2.  Third Party Payor Plaintiffs Shouldered A Significant Portion Of The Financial Burden Of The Opioid Crisis. .......................................... 14

        3.  Tribal Plaintiffs Are Suffering Existential Threats. ................................. 15

III.  ARGUMENT ...................................................................................................... 16

    A.  Legal Standard ................................................................................................... 16

    B.  TPP And Tribal Plaintiffs Plead Cognizable RICO Claims. ............................. 17

        1.  The Alleged RICO Violations Proximately Caused Plaintiffs' Injuries....................................................................................................... 17

            a.  The TPP Plaintiffs Have Properly Pleaded Proximate Cause...... 17

            b.  The Tribal Plaintiffs Have Properly Pleaded Proximate Cause. ........................................................................................... 20

        2.  McKinsey Participated In The Conduct Of The RICO Enterprise. ......... 22

        3.  Plaintiffs Allege A RICO Enterprise With A "Common Purpose." ........ 24

    C.  Plaintiffs Properly Plead State-Law Causation. ............................................... 26

        1.  Plaintiffs Sufficiently Allege Factual Causation...................................... 26

        2.  Plaintiffs Properly Plead Legal Causation. .............................................. 27

            a.  The Harms Were Foreseeable. ..................................................... 27

            b.  Outlier Opioid Cases Finding A Failure Of Proof Do Not Support Dismissal Here. ............................................................. 29

            c.  Public Policy Does Not Require Dismissal.................................. 30

    D.  Plaintiffs Properly Plead Their Public Nuisance Claims. ................................. 30

         1.  Plaintiffs Adequately Allege McKinsey Contributed To A Substantial And Unjustified Interference With A Public Right.............. 31

            a.  Public Right.................................................................................. 31

**TABLE OF CONTENTS**
(continued)

Page

|  |  |  | b. | Unreasonable Interference. | 32 |
|  |  |  | c. | Substantial Factor | 35 |
|  | E. | Plaintiffs Sufficiently Plead Negligence-Based Claims | | | 36 |
|  |  | 1. | "Relationship" Between Plaintiffs And McKinsey Is Not Required. | | 37 |
|  |  | 2. | Plaintiffs Adequately Allege Foreseeability Of Harm. | | 38 |
|  |  | 3. | Plaintiffs' Claims Arise From McKinsey's Action, Not Inaction. | | 40 |
|  |  | 4. | Public Policy Favors A Duty Here | | 41 |
|  | F. | Plaintiffs Plead Cognizable Fraud / Negligent Misrepresentation Claims. | | | 42 |
|  | G. | Plaintiffs Adequately Allege Civil Conspiracy / Aiding And Abetting. | | | 46 |
|  |  | 1. | McKinsey's Conduct Is The Hallmark Of A Civil Conspiracy. | | 46 |
|  |  |  | a. | McKinsey Entered Into An Unlawful Agreement. | 47 |
|  |  |  | b. | McKinsey Participated In Tortious Conduct. | 47 |
|  |  |  | c. | McKinsey And Its Co-Conspirators Committed Numerous Torts. | 48 |
|  |  | 2. | McKinsey Is Liable For Aiding And Abetting. | | 48 |
|  |  |  | a. | McKinsey Knew Its Clients Were Committing Torts. | 48 |
|  |  |  | b. | McKinsey Provided "Encouragement." | 49 |
|  |  |  | c. | McKinsey Provided Its Clients Substantial Assistance. | 50 |
|  |  | 3. | McKinsey Misrepresents Plaintiffs' Aiding And Abetting Claims. | | 52 |
|  | H. | TPP Plaintiffs Plead Cognizable Claims For Unjust Enrichment. | | | 53 |
|  | I. | Plaintiffs Plead Cognizable Consumer Protection Claims. | | | 55 |
|  |  | 1. | Tribes Are Entitled To Pursue Statutory Relief. | | 55 |
|  |  | 2. | Plaintiffs Sufficiently Pleaded Their Omission-Based Claims. | | 55 |
|  |  | 3. | Plaintiffs Allege Sufficient Facts To Establish Causation. | | 56 |
|  |  | 4. | "Public Benefits" Are Not Required. | | 57 |
|  | J. | NAS Plaintiffs Have Pleaded Cognizable Claims Under West Virginia Law. | | | 57 |
|  | K. | Plaintiffs' Claims Are Not Barred By The First Amendment | | | 58 |
| IV. | CONCLUSION | | | | 60 |

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Abdulaziz v. McKinsey & Co., Inc.*,
2022 WL 2444925 (2d Cir. July 5, 2022).................................................................. 41

*Acebey v. Shearson Lehman Bros.*,
1994 WL 374298 (C.D. Cal. June 4, 1994) ......................................................... 23, 24

*Adcock v. Brakegate, Ltd.*,
645 N.E.2d 888 (Ill. 1994) ...................................................................................... 48

*Armor v. Lantz*,
535 S.E.2d 737 (W. Va. 2000)................................................................................. 58

*Astiana v. Hain Celestial Grp., Inc.*,
783 F.3d 753 (9th Cir. 2015) ................................................................................... 53

*Baumer v. Pachl*,
8 F.3d 1341 (9th Cir. 1993) ..................................................................................... 24

*Beacon Res. Cmty. Ass'n v. Skidmore, Owings & Merrill LLP*,
327 P.3d 850 (Cal. 2014).......................................................................................... 2

*Bily v. Arthur Young & Co.*,
834 P.2d 745 (Cal. 1992).................................................................................... 41, 42

*Bower v. Westinghouse Elec. Corp.*,
552 S.E.2d 424 (W. Va. 1999)................................................................................. 58

*Bridge v Phoenix Bond & Indemnity Co.*,
553 U.S. 639 (2008).................................................................................................. 18

*Brown v. USA Taekwondo*,
483 P.3d 159 (Cal. 2021) ......................................................................................... 40

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1971).................................................................................................. 59

*Canyon County v. Syngenta Seeds, Inc.*,
519 F.3d 969 (9th Cir. 2008) ................................................................................... 20

*Chavers v. Gatke Corp.*,
132 Cal. Rptr. 2d 198 (Cal. Ct. App. 2003)............................................................ 49

*Cheatham v. ADT Corp.*,
161 F. Supp. 3d 815 (D. Ariz. 2016) ...................................................................... 56

*Chevron Products Co. v. Advanced Corrosion Technologies & Training, LLC*,
2021 WL 2156467 (N.D. Cal. May 27, 2021)......................................................... 45

*Cincinnati v. Beretta*,
768 N.E.2d 1136 (Ohio 2002) ................................................................................. 31

*City & County of San Francisco v. Purdue Pharma L.P.*,
2022 WL 3224463 (N.D. Cal. Aug. 10, 2022) ................................................. passim

*City & County of San Francisco v. Purdue Pharma L.P.*,
491 F. Supp. 3d 610 (N.D. Cal. 2020).............................................................. passim

*City of Everett v. Purdue Pharma L.P.*,
2017 WL 4236062 (W.D. Wash. Sept. 25, 2017).............................................. 27, 28

*City of Huntington v. AmerisourceBergen Drug Corp.*,
2022 WL 2399876 (S.D.W. Va. July 4, 2022) .................................................. 29, 35

**TABLE OF AUTHORITIES**
(continued)

Page

*City of Industry v. City of Fillmore*,
129 Cal. Rptr. 3d 433 (Cal. Ct. App. 2011) ............................................... 47

*City of Modesto v. Dow Chem. Co.*,
227 Cal. Rptr. 3d 764 (Cal. Ct. App. 2018) ............................................... 49

*City of New Haven v. Purdue Pharma, L.P.*,
2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019) ..................................... 27

*Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*,
690 F.2d 1240 (9th Cir. 1982) ................................................................... 60

*Cloverleaf Car Co. v. Phillips Petroleum Co.*,
540 N.W. 2d 297 (Mich. Ct. App. 1995) .................................................... 31

*Cobb v. Indian Springs, Inc.*,
522 S.W.2d 383 (Ark. 1975) ....................................................................... 52

*Comm. on Children's Television, Inc. v. Gen. Foods Corp.*,
673 P.2d 660 (Cal. 1983) ..................................................................... 43, 46

*Coyle v. Historic Mission Inn Corp.*,
234 Cal. Rptr. 3d 330 (Cal. Ct. App. 2018) ............................................... 41

*Cozzetti v. Madrid*,
2017 WL 6395736 (Alaska Dec. 13, 2017) ................................................ 56

*Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*,
737 S.E.2d 270 (W. Va. 2012) .................................................................... 57

*Dailey v. Ayers Land Dev., LLC*,
825 S.E.2d 351 (W. Va. 2019) .................................................................... 57

*DIRECTV, Inc. v. Cavanaugh*,
321 F. Supp. 2d 825 (E.D. Mich. 2003) ..................................................... 55

*Docheff v. City of Broomfield*,
623 P.2d 69 (Colo. App. 1980) ................................................................... 31

*Doe v. Uber Technologies, Inc.*,
2022 WL 4281363 (N.D. Cal. Sept. 15, 2022), *appeal filed* (9th Cir. No. 22-16562) ........ 40, 41

*Domagala v. Rolland*,
805 N.W. 2d 14 (Minn. 2011) ..................................................................... 41

*Dunlop Tire & Rubber Corp. v. FMC Corp.*,
53 A.D.2d 150 (N.Y. 1976) ......................................................................... 39

*Eiseman v. State of New York*,
511 N.E.2d 1128 (N.Y. 1987) ...................................................................... 42

*ESG Cap. Partners, LP v. Stratos*,
828 F.3d 1023 (9th Cir. 2016) .................................................................... 54

*Ford Motor Credit Co. v. Majors*,
2005 WL 1021551 (Minn. Ct. App. May 3, 2005) ...................................... 56

*Gallegos v. LVNV Funding LLC*,
169 F. Supp. 3d 1235 (D. Utah 2016) ........................................................ 55

*Gisairo v. Lenovo (United States) Inc.*,
516 F. Supp. 3d 880 (D. Minn. 2021) ........................................................ 57

*Gonzalez v. Lloyds TSB Bank, PLC*,
532 F. Supp. 2d 1200 (C.D. Cal. 2006) ..................................................... 46

**TABLE OF AUTHORITIES**
(continued)

Page

*Gritzner v. Michael R.*,
611 N.W.2d 906 (Wis. 2000)..................................................................... 39

*Grp. Health Plan, Inc. v. Philip Morris Inc.*,
621 N.W.2d 2 (Minn. 2001) ..................................................................... 55

*Grynberg v. ENI S.p.A*,
2011 WL 13176088 (S.D.N.Y. Aug. 24, 2011)......................................... 54

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983) ................................................ 46, 47, 49, 50

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)...................................................................................... 59

*Ileto v. Glock Inc.*,
349 F.3d 1191 (9th Cir. 2003) ........................................................ 32, 36, 37

*In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*,
804 F.3d 633 (3d Cir. 2015) ..................................................................... 18

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*,
295 F. Supp. 3d 927 (N.D. Cal. 2018)........................................................ 3

*In re Enron Sec. Derivative & ERISA Litig.*,
235 F. Supp. 2d 549 (S.D. Tex. 2002) ........................................................ 2

*In re Ethan C.*,
279 P.3d 1052 (Cal. 2012) ....................................................................... 36

*In re GlassHouse Techs, Inc.*,
604 B.R. 600 (Bankr. D. Mass. 2019) ...................................................... 38

*In re JUUL Labs, Inc. Mktg., Sales Prac. & Prods. Liab. Litig.*,
2022 WL 1955678 (N.D. Cal. Jan. 28, 2022)............................................ 37

*In re JUUL Labs, Inc. Mktg., Sales Prac. & Prods. Liab. Litig.*,
2021 WL 3112460 (N.D. Cal. July 22, 2021)............................................ 37

*In re McKinsey & Co., Inc. Nat'l Opiate Consultant Litig.*,
2022 WL 15525768 (N.D. Cal. Oct. 27, 2022) ................................. passim

*In re Nat'l Prescription Opiate Litig. (Blackfeet Tribe)*,
2019 WL 3737023 (N.D. Ohio June 13, 2019) .................................... 29, 31

*In re Nat'l Prescription Opiate Litig. (Cleveland Bakers)*,
440 F. Supp. 3d 773 (N.D. Ohio 2020) .............................. 19, 29, 43, 54

*In re Nat'l Prescription Opiate Litig. (County of Lake)*,
477 F. Supp. 3d 613 (N.D. Ohio 2020) ..................................................... 60

*In re Nat'l Prescription Opiate Litig. (Summit County)*,
2018 WL 4895856 (N.D. Ohio Oct. 5, 2018) ...................................... 39, 43

*In re Nat'l Prescription Opiate Litig. (Summit County)*,
2018 WL 6628898 (N.D. Ohio Dec. 19, 2018) ........................... 37, 46, 54

*In re Nat'l Prescription Opiate Litig.*,
452 F. Supp. 3d 745 (N.D. Ohio 2020) ..................................................... 37

*In re Nat'l Prescription Opiate Litig.*,
458 F. Supp. 3d 665 (N.D. Ohio 2020) ..................................................... 46

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
712 F.3d 21 (1st Cir. 2013)................................................................... 18, 19

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Neurontin Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   433 F. Supp. 2d 172 (D. Mass. 2006)................................................................ 25

*In re Outlaw Lab'y, LP Litig.*,
   2020 WL 5552558 (S.D. Cal. Sept. 16, 2020)........................................... 23, 24

*In re Packaged Seafood Prods. Antitrust Litig.*,
   242 F. Supp. 3d 1033 (S.D. Cal. 2017)........................................................... 54

*In re RuralMetro Corp. Stockholders Litig.*,
   102 A.3d 205 (Del. Ch. 2014)........................................................................... 2

*In re: Purdue Pharma L.P. at al.*,
   No. 19-23649, ECF 2093 (Bankr. S.D.N.Y.)............................................. 49, 52

*Ins. Co. of N. Am. v. Cease Elec. Inc.*,
   688 N.W.2d 462 (Wis. 2004)........................................................................... 39

*J'Aire Corp. v. Gregory*,
   598 P.2d 60 (1979)......................................................................................... 38

*Jeng v. Nexo Fin., LLC*,
   2022 WL 174236 (N.D. Cal. Jan. 19, 2022)................................................... 54

*Johnson v. Blendtec, Inc.*,
   500 F. Supp. 3d 1271 (D. Utah 2020).............................................................. 56

*Johnson v. Microsoft Corp.*,
   834 N.E.2d 791 (Ohio 2005)........................................................................... 54

*Jones v. AIG Risk Mgmt., Inc.*,
   726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010)................................................ 43

*Jones v. KPMG LLP*,
   2018 WL 5018469 (S.D. Miss. Oct. 16, 2018).................................................. 2

*Ketayi v. Health Enrollment Grp.*,
   2021 WL 2864481 (S.D. Cal. July 8, 2021).................................................... 23

*Korea Supply Co. v. Lockheed Martin Corp.*,
   63 P.3d 937 (Cal. 2003)................................................................................. 54

*Kottle v. Nw. Kidney Ctrs.*,
   146 F.3d 1056 (9th Cir. 1998)......................................................................... 60

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018)........................................................................... 50

*Logan v. Morgan Lewis & Bockius LLP*,
   350 So. 3d 404 (Fla. Dist. Ct. App. 2022)........................................................ 2

*Lowery v. Echostar Satellite Corp.*,
   160 P.3d 959 (Okla. 2007).............................................................................. 38

*M&D, Inc. v. W.B. McConkey*,
   585 N.W.2d 33 (Mich. 1998)........................................................................... 56

*M.H. v. Caritas Fam. Servs.*,
   488 N.W.2d 282 (Minn. 1992)......................................................................... 56

*Magic Kitchen LLC v. Good Things Int'l, Ltd.*,
   63 Cal. Rptr. 3d 713 (Cal. Ct. App. 2007)...................................................... 54

*Mandarin Trading Ltd. v. Wildenstein*,
   944 N.E.2d 1104 (N.Y. 2011)......................................................................... 54

- vi -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3
*McBride v. Boughton*,
   20 Cal. Rptr. 3d 115 (Cal. Ct. App. 2004)...................................................... 54

4
*Meier v. Chesapeake Operating L.L.C.*,
   324 F. Supp. 3d 1207 (W.D. Okla. 2018)...................................................... 39

5

6
*Meijer, Inc. v. Ranbaxy Inc.*,
   2016 WL 4697331 (D. Mass. June 16, 2016),
   *report and recommendation adopted* (Sept. 7, 2016) ................................... 25

7
*N.J. Dep't of Treasury v. Qwest Commc'ns Int'l Inc.*,
   904 A.2d 775 (N.J. Super. Ct. App. Div. 2005) ............................................... 2

8
*Nat'l Org. for Women v. Operation Rescue*,
   37 F.3d 646 (D.C. Cir. 1994)........................................................................ 59

9

10
*Navarrete v. Meyer*,
   188 Cal. Rptr. 3d 623 (Cal. Ct. App. 2015) ................................................... 12

11
*NIFLA v. Becerra*,
   138 S. Ct. 2361 (2018)................................................................................. 59

12
*Nycal Corp. v. KPMG Peat Marwick LLP*,
   688 N.E.2d 1371 (Mass. 1998) ..................................................................... 38

13
*Odom v. Microsoft Corp.*,
   486 F.3d 541 (9th Cir. 2007) ........................................................................ 25

14
*Pac Shores Props., LLC v. City of Newport Beach*,
   730 F.3d 1142 (9th Cir. 2013) ...................................................................... 26

15
*Painters & Allied Trades District Council 82 Health Care Fund v. Takeda Pharm. Co. Ltd.*,
   943 F.3d 1243 (9th Cir. 2019) ........................................................ 17, 18, 19

16

17
*Pasternack v. Lab'y Corp. of Am. Holdings*,
   59 N.E.3d 485 (N.Y. 2016)........................................................................... 41

18
*People ex rel. Gallo v. Acuna*,
   929 P.2d 596 (Cal. 1997).............................................................................. 32

19
*People v. ConAgra Grocery Prods. Co.*,
   227 Cal. Rptr. 3d 499 (Cal. Ct. App. 2017) ................................................... 35

20
*People v. Purdue Pharma L.P.*,
   2021 WL 7186146 (Cal. Super. Ct. Dec. 14, 2021) ...................................... 35

21
*Pepper v. Routh Crabtree, APC*,
   219 P.3d 1017 (Alaska 2009) ........................................................................ 55

22
*Quiroz v. Alcoa Inc.*,
   416 P. 3d 824 (Ariz. 2018) ........................................................................... 37

23

24
*Ray v. BlueHippo Funding LLC*,
   2008 WL 1995113 (N.D. Cal. May 6, 2008).................................................. 52

25
*Redtail Leasing, Inc. v. Bellezza*,
   1997 WL 603496 (S.D.N.Y. Sept. 30, 1997)................................................. 54

26
*Reves v. Ernst & Young*,
   507 U.S. 170 (1993)...................................................................................... 22

27
*Rice v. Paladin Enters.*,
   128 F.3d 233 (4th Cir. 1997) ........................................................................ 49

28

- vii -

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Rindlisbacher v. Steinway & Sons Inc.,*
   497 F. Supp. 3d 479 (D. Ariz. 2020), *aff'd,*

4
   2021 WL 6067258 (9th Cir. Dec. 20, 2021) .................................................. 56

*Rutherford v. Owens-Illinois, Inc.,*

5
   941 P.2d 1203 (Cal. 1997) ............................................................................. 35

6
*Salinas v. United States,*
   522 U.S. 52 (1997) ......................................................................................... 19

7
*Sonner v. Premier Nutrition Corp.,*
   971 F.3d 834 (9th Cir. 2020) ......................................................................... 54

8
*Stanford v. Kuwait Airways Corp.,*
   89 F.3d 117 (2d Cir. 1995) ............................................................................ 38
9

10
*State ex rel. Horne v. AutoZone, Inc.,*
   258 P.3d 289 (Ariz. Ct. App. 2011) ............................................................... 56

11
*State ex rel. Hunter v. Johnson & Johnson,*
   499 P.3d 719 (Okla. 2021) ............................................................................. 29

12
*Takeya USA Corp. v. PowerPlay Mktg. Grp., LLC,*
   2022 WL 17357781 (C.D. Cal. 2022) ............................................................ 53

13
*Tatung Co., Ltd. v. Hsu,*
   2015 WL 11072178 (C.D. Cal. Apr. 23, 2015) .............................................. 22

14
*Thompson v. Trump,*
   590 F. Supp. 3d 46 (D.C. 2022) ..................................................................... 49

15

16
*Tingley v. Ferguson,*
   47 F. 4th 1055 (9th Cir. 2022) ....................................................................... 59

17
*Towe v. Scagawea, Inc.,*
   347 P.3d 766 (Or. 2015) ................................................................................. 36

18
*United Healthcare Servs. Inc. v. Advanced Reimbursement Sols. LLC,*
   2022 WL 4783771 (D. Ariz. Sept. 30, 2022) ................................................. 55

19
*United States v. George,*
   949 F.3d 1181 (9th Cir. 2020) .................................................................. 26, 27

20
*Vega v. Jones, Day, Reavis & Pogue,*
   17 Cal. Rptr. 3d 26 (Cal. Ct. App. 2004) ...................................................... 44

21
*Waldman v. New Chapter, Inc.,*
   714 F. Supp. 2d 398 (E.D.N.Y. 2010) ........................................................... 54

22

23
*Walter v. Drayson,*
   538 F.3d 1244 (9th Cir. 2008) .................................................................. 22, 24

24
*Wright v. Brooke Grp. Ltd.,*
   652 N.W.2d 159 (Iowa 2002) ......................................................................... 48

**Statutes**

25
18 U.S.C. § 1961, *et seq.* ...................................................................................... 34

26
21 C.F.R. § 1301.71(a) ......................................................................................... 34

27
21 C.F.R. § 1301.74(b) ......................................................................................... 34

21 U.S.C. § 823 ..................................................................................................... 34

28
Alaska Stat. § 45.50.471, *et seq.* .......................................................................... 34

**TABLE OF AUTHORITIES**
(continued)

Page

Ariz. Rev. Stat. §§ 44-1521-1534 ................................................. 34

Ariz. Rev. Stat. Ann. § 13-2917................................................ 31, 32

Cal. Bus. & Prof. Code § 17200, *et seq.*..................................... 34

Cal. Bus. & Prof. Code § 17500, *et seq.* .................................... 34

Cal. Civ. Code Ann. § 3480 ......................................................... 32

Mich. Comp. Laws. Ann. §§ 45.901-22 ...................................... 34

Minn. Stat. § 325D.09, et seq. ..................................................... 34

Minn. Stat. § 325D.43, *et seq.* ................................................... 34

Minn. Stat. § 325F.69................................................................. 34

Minn. Stat. Ann. § 609.74 ..................................................... 31, 32

Mont. Code Ann. § 27-30-102 .................................................... 32

N. M. Stat. Ann. § 57-12-1 ......................................................... 34

Or. Rev. Stat. § 646.605 .............................................................. 34

Wash. Rev. Code § 19.86............................................................ 34

**Treatises**

Restatement (Second) of Torts § 533 ........................................... 43

Restatement (Second) of Torts § 550 ........................................... 45

Restatement (Second) of Torts § 821B(2) .................................... 33

Restatement (Second) of Torts § 876 ........................................... 48

**Other Citations**

Brief of *Amici Curiae* of 448 Federally Recognized Tribes in Opp'n to Defs.' Mot. to Dismiss Tribal Claims (ECF 1026) ........................................................ 15, 16

Michael Forsythe & Walt Bogdanich, *When McKinsey Comes to Town: The Hidden Influence of the World's Most Powerful Consulting Firm* (2022).................... 6, 12

Plea Agreement as to Purdue Pharma L.P., *United States  v. Purdue Pharma L.P.,* No. 20-cr-01028-MCA (D.N.J. Nov. 24, 2020), ECF 6 .................................. *passim*

- ix -

1

## I.    **INTRODUCTION**

2          McKinsey was the architect of modern-day opioid addiction, creating an accelerating

3     selling frenzy and situating itself for more than a decade at the fulcrum of the opioid crisis.

4     Compl. ¶ 2.[1]  It engineered Purdue Pharma's innovations in opioid marketing and oversupply.

5     Armed with that expertise, McKinsey became the thread connecting all who participated in the

6     unlawful campaign to spur opioid demand and maximize sales well beyond what was conceivable

7     for legitimate medical use.  While the clients varied, the drugs were all controlled substances,

8     highly prone to addiction and abuse, and McKinsey's goal was unwavering: sell as many pills as

9     possible, regardless of illegality of method and severity of consequence.  *Id*. ¶ 108.

10         McKinsey was not merely in the advice business, like a remarkably expensive and

11    unscrupulous Dear Abby.  Instead, the "value proposition" McKinsey sold is a "transformational

12    relationship" with its clients, to the point where one "can't even tell the difference between a

13    McKinsey team member and one of [its] clients."  *Id.* ¶¶ 114, 116, 147.  This is precisely how it

14    worked at Purdue, where McKinsey personnel were so deeply embedded with the company top-

15    to-bottom that they proposed action plans directly to Sackler family members and then

16    accompanied individual sales representatives in the field.  *Id.* ¶ 294; *In re McKinsey & Co., Inc.*

17    *Nat'l Opiate Consultant Litig.*, 2022 WL 15525768, at *2 (N.D. Cal. Oct. 27, 2022) (Breyer, J.).

18    McKinsey consultants even sat on Purdue's Project Turbocharge "Executive Oversight Team and

19    Project Management Office."  Compl. ¶ 300.

20         A.    **McKinsey's Motion Rests On Two Erroneous Themes.**

21         *First*, McKinsey incorrectly claims that it is merely "an advisor that does not control what

22    its clients choose to do with the advice it provides."  McKinsey Defs.' Mot. to Dismiss Master

23    Compls. ("Mot."), at 8.  This narrative squarely conflicts with the general and specific allegations

24    in the complaints, including Purdue's admissions, documents produced in discovery, and

25    McKinsey's own public statements.  *See McKinsey*, 2022 WL 15525768, at *7 n.7 ("McKinsey's

26    argument that it is simply a 'service provider' is not persuasive.").  *Second*, McKinsey warns that

27

28    _____

[1] Citations to "Compl." refer to the Master Complaint (Tribal Plaintiffs) filed at ECF 300. Similar factual assertions are also contained in the TPP (ECF 299) and NAS Plaintiffs' (ECF 298) Master Complaints.  "McKinsey" refers to all named Defendants.

Plaintiffs' claims would, if successful, mean that "[s]ervice providers like lawyers, accountants, financial advisors, and other consultants could not work," invoking tired hydraulics metaphors. Mot. at 1, 36, 43 ("floodgates"), 40 ("flood").  But the analogy is false because management consulting carries none of the hallmarks of the other professions listed: there is no governing body, no self-regulation (really, no regulation at all), no credentialing requirements, no privileged communications.

McKinsey cannot claim categorical immunity: "Professional advisors of all kinds" are already subject to liability to third parties, particularly where, as alleged here, their activities go beyond the boundaries of traditional fiduciary relationships and extend to the realm of management consulting.  *See, e.g.*, *Beacon Res. Cmty. Ass'n v. Skidmore, Owings & Merrill LLP*, 327 P.3d 850, 854 (Cal. 2014) (explaining that "liability has been imposed . . . upon suppliers of goods and services" where conduct produced a "foreseeable risk" (citation omitted)).  For example, aiding and abetting claims against accounting giant Arthur Andersen were allowed to proceed where "Arthur Andersen's comprehensive accounting, auditing, and consulting services to Enron necessarily made it intimately privy to the smallest details of Enron's alleged fraudulent activity."  *In re Enron Sec. Derivative & ERISA Litig.*, 235 F. Supp. 2d 549, 706 (S.D. Tex. 2002); *see also, e.g.*, *N.J. Dep't of Treasury v. Qwest Commc'ns Int'l Inc.*, 904 A.2d 775, 779 (N.J. Super. Ct. App. Div. 2005) (allowing a claim under Restatement § 876(b) for aiding and abetting against Arthur Andersen where it acted as "outside auditor . . . as well as a professional consultant," "advising Qwest of the manner to structure the illicit swap transactions" and "directing the actual implementation of the financial reporting of the scheme").[2]

**B.**     **McKinsey Mischaracterizes And Ignores Plaintiffs' Allegations.**

The remainder of McKinsey's motion (and unauthorized appendices) is a long-winded exercise in rewriting allegations to be more to its liking.  McKinsey says that opioids are lawful, a

---

[2] These professions are not immune either.  *See, e.g.*, *Logan v. Morgan Lewis & Bockius LLP*, 350 So. 3d 404, 411 (Fla. Dist. Ct. App. 2022) ("[N]o blanket rule insulates attorneys from liability for aiding and abetting a tort that harms a third party."); *Jones v. KPMG LLP*, 2018 WL 5018469, at *3 (S.D. Miss. Oct. 16, 2018) (accounting and consulting firm); *In re RuralMetro Corp. Stockholders Litig.*, 102 A.3d 205, 219-20 (Del. Ch. 2014) (financial advisors).

contention that ignores the criminal convictions and tens of billions of dollars of civil liability that has attached to the participants in the supposedly "lawful" activity, and one that ignores the civil liability that statutory and common law impose on lawful products marketed irresponsibly.  Here, McKinsey ignores the gravamen of the complaints that McKinsey contributed to the *illegal* promotion of legal products, through deceptive and unfair marketing and knowing circumvention of anti-diversion safeguards.  McKinsey complains that Plaintiffs at times blur the lines between McKinsey and its clients, ignoring that erasing those distinctions was the intended and actual effect of McKinsey's relationships with those clients.  Compl. ¶¶ 113-21.  In its own words: "We insinuate ourselves."  *Id.* ¶ 148.  Plaintiffs plead accordingly.  *See, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 990 (N.D. Cal. 2018) ("Plaintiffs have essentially been forced to lump the Bosch companies because the Bosch Defendants have chosen to operate a specific way.").

McKinsey says Plaintiffs' claims are "unprecedented," but what is unprecedented is the outsized role McKinsey played in the web of misconduct that fueled the opioid epidemic. McKinsey's unparalleled (and confidential) access to and influence over a who's who of opioid super-sellers made it the sole repository of industry-wide tactics regarding opioid sales and marketing, as well as the resulting outcomes.  Compl. ¶ 142.  McKinsey's seminal role in designing the unlawful marketing campaign used by Purdue (and others) to maximize opioid sales, including but not limited to Purdue's Project Turbocharge, coupled with its existential commitment to "transform" its clients' business without ethical or moral constraints, wholly distinguishes McKinsey from the accountants and lawyers to which it compares itself, and, thus exposes it to liability.

### C.   McKinsey Rehashes Arguments This Court Rejected.

McKinsey fails to mention the Court's personal jurisdiction ruling and yet repeats assertions this Court already rejected therein, including McKinsey's effort to characterize itself as a passive service provider.  *McKinsey*, 2022 WL 15525768, at *7 n.7.  Among other things, this Court acknowledged Plaintiffs' allegations related to McKinsey's intentional acts of "working alongside Purdue sales representatives" and "working with Purdue to implement sales strategies."

1   *Id.* at \*5 (citations omitted).  "Not only did McKinsey advise Purdue on how to initiate and focus

2   its contacts . . .  it also had boots on the ground . . . , sending its consultants on 'ride-a-longs' with

3   Purdue sales associates to improve and refine sales strategies."  *Id.* at \*7 (citations omitted).  The

4   Court also rejected McKinsey's arguments that it merely "provided advice to clients, who then

5   chose to act on the advice."  *Id.* at \*7 n.8.  The Court instead noted Plaintiffs' allegations "that

6   McKinsey did 'create content'—sales and marketing strategies—aimed at the Subject states that

7   it later helped Purdue implement," *id.* (citations omitted), and that McKinsey's complex data

8   analyses "*directly influenced* how and where Purdue marketed OxyContin," *id.* at \*9 (emphasis

9   added) (citations omitted).  And, while McKinsey was not "a manufacturer or distributor" of

10  opioids, the Court observed that McKinsey "helped direct where and how Purdue would market

11  and sell OxyContin."  *Id.* at \*8 n.9 (citations omitted).

12       As before, the Court should acknowledge the complaints' allegations, which must be

13  taken as true, that "McKinsey played an instrumental role in developing and overseeing

14  aggressive marketing strategies designed to boost opioid sales . . . , despite being aware of the

15  severe harm that increasing supplies of opioids were inflicting on communities . . . ."  *Id.* at \*7

16  (footnote and citations omitted).  McKinsey's motion to dismiss should be denied.

17  **II.**   **MCKINSEY DEVISED AND IMPLEMENTED UNLAWFUL SCHEMES
18  TO INCREASE SALES OF ADDICTIVE OPIOIDS**

19      **A.**   **McKinsey Masterminded And "Turbo-Charged" Purdue's Contributions To
    The Opioid Crisis.**

20       As exhaustively alleged and proven elsewhere, opioid manufacturers maximized their

21  profits over many years through (1) "false and deceptive advertising techniques in a marketing

22  scheme designed to increase the demand and sale of prescription opioids," techniques "that

23  targeted physicians, patients, lawmakers, and enforcement agencies, in a systematic effort to

24  change prescriber habits and public perception regarding prescription opioids"; and (2) by

25  "manufactur[ing] . . . greater quantities of opioids than they knew would be necessary for

26  legitimate medical uses[.]"  *E.g.*, *City & County of San Francisco v. Purdue Pharma L.P.*, 491 F.

27  Supp. 3d 610, 629-30 (N.D. Cal. 2020) (*CCSF I*).

28

The standout was Purdue Pharma and its drug OxyContin, which accounted for over 90% of its revenue.  Compl. ¶ 520; *see, e.g.*, Req. for Judicial Notice (RJN) Ex. A at 47 (Purdue Plea Agreement Addendum A ¶ 5) (recounting Purdue's aggressive marketing programs, including the McKinsey-conceived Evolve to Excellence (E2E) Program), 52 (¶¶ 25-32) (knowingly causing medically unnecessary prescriptions to be submitted to federal healthcare programs through physician targeting, including through E2E), 64-67 (¶¶ 87-110) ("re-catalyzing medically unnecessary prescriptions" by "Turbocharging sales through E2E"), 68-70 (¶¶ 117-25) (encouraging stronger doses by encouraging doctors to tailor (or "titrate") OxyContin dosage strength to a patient's needs, which both knew would increase sales of more profitable, high-dosage prescriptions), 85-87 (¶¶ 206-11) (encouraging medically unnecessary prescriptions through alternative distribution channels McKinsey proposed, including specialty pharmacies).

Purdue was uniquely aware of the immense dangers posed by misbranding opioids: in 2007, its parent entity and three corporate officers pleaded guilty to federal crimes related to misbranding OxyContin.  Compl. ¶¶ 164-70, 203, 520, 505.  Purdue was ordered to pay $600 million in fines and fees.  *Id.* ¶ 577.  As part of its plea, Purdue admitted that its "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications."  *Id.* ¶ 166.  In tandem with the 2007 plea, Purdue also entered into a Corporate Integrity Agreement, with compliance obligations from May 2007 through January 2013.  *Id.* ¶ 167.

The Sacklers had a problem: Purdue's most profitable asset was both deadly and a dangerous source of liability.  *Id.* ¶¶ 173-77.  To maximize profits in light of these constraints, the Sacklers called on McKinsey, already a trusted partner (McKinsey had worked on OxyContin-related matters since 2004).  *Id.* ¶¶ 161-63.  And so, following Purdue's 2007 guilty plea, McKinsey increased its involvement in Purdue's opioid business, notwithstanding that the Corporate Integrity Agreement was in full effect.  *See id.* ¶¶ 167-68, 281-83.  In 2009, McKinsey shepherded Purdue's New Drug Application for an abuse-deterrent version of OxyContin through FDA approval despite knowing that its abuse-deterrent features were not meaningful.  *Id.* ¶¶ 204-

13.   Richard Sackler personally expressed his pleasure with McKinsey's FDA approval work.  *Id.*
¶ 209.  That same year, McKinsey worked with Purdue and others to circumvent the FDA's
proposed "Risk Evaluation and Mitigation Strategy" ("REMS") requirements for OxyContin,
which would have had the effect of limiting Purdue's sales.  *Id.* ¶¶ 214-18.  So extensive was
McKinsey's involvement that one of its partners at the time boasted that McKinsey's "series of
efforts . . . secured the future of the crucial OxyContin franchise."  *See* Michael Forsythe & Walt
Bogdanich, *When McKinsey Comes to Town: The Hidden Influence of the World's Most Powerful
Consulting Firm* 142 (2022).

McKinsey continued its close study of Purdue's opioid business in 2010.  In January,
McKinsey concluded that Purdue could generate $200-400 million in additional annual sales of
OxyContin if it implemented McKinsey's strategies.  *Id.* ¶¶ 230, 276.  One such strategy, detailed
in a November 2010 report, instructed sales representatives to maximize profits by emphasizing
the broad range of OxyContin doses available—*i.e.*, by highlighting the highest doses.  *Id.* ¶ 231.
McKinsey understood that higher doses were more profitable for Purdue, even if higher-dose
prescriptions also contributed to opioid addiction and abuse; McKinsey pushed the "titration"
messaging regardless.  *Id.* ¶¶ 260–67.  By 2014, 80% of the 5.4 million OxyContin prescriptions
written were for twelve-hour dosing.  *Id.* ¶ 339.  As Purdue chafed against its regulatory
obligations, McKinsey devised methods to evade them.  McKinsey created ways for Purdue's
sales staff to market OxyContin to doctors while technically complying with the Corporate
Integrity Agreement.  One former Purdue sales representative described how she was trained to
talk about OxyContin in ways that implied it was safer than other opioids, even though she was
not permitted to flatly claim that it was better or safer.  *Id.* ¶ 283.

As soon as the Corporate Integrity Agreement expired in 2013, McKinsey launched
Project Turbocharge, a massive sales and marketing transformation designed to dramatically
increase OxyContin "near term" sales.  *Id.* ¶¶ 284-93.  This "near term" focus was meant to
facilitate the Sackler family's goal of divesting from opioid-related investments and opioid
liability concerns.  *See id.* ¶¶ 172-79.  From the Sacklers' perspective, McKinsey's mandate to
maximize opioids sales was a strategy for protecting family assets—one final round of opioid

pushing to permit the family to extract as much money from the company before the inevitable regulatory crackdown.  *Id.* ¶¶ 177, 340.

Project Turbocharge, which Purdue renamed "E2E: Evolve to Excellence," *id.* ¶ 296, had several key elements.  E2E called for Purdue's sales force to target high-prescribing physicians, including those with alarming prescribing patterns suggestive of writing "prescriptions" for non-medical use.  *Id.* ¶¶ 307-12.  McKinsey had begun its "physician segmentation" initiative in January 2010 to identify the most prolific OxyContin prescribers and convince them to continue prescribing ever more OxyContin in higher doses.  *Id.* ¶¶ 278-79.  As part of Project Turbocharge, McKinsey recommended a system of "value deciles" whereby prescribers were sorted by factors like overall opioid prescriptions, the number of branded versus generic prescriptions, and prescriber's rules limiting sales calls.  *Id.* ¶ 313.  All Purdue sales representatives received a memo identifying the top ten "SuperCore" prescribers in their territory.  *Id.* ¶ 314.  Included among these were a prescriber who later pleaded guilty to criminal charges related to an opioid drug ring; a doctor later charged with involuntary manslaughter and drug trafficking; a doctor who lost her license for prescribing opioids without a legitimate medical purpose; and a physician who lost his license and pleaded guilty to unlawful distribution or dispensing of controlled substances.  *See id.* ¶¶ 316-19.

Through Project Turbocharge, McKinsey also directed Purdue to skirt parts of the supply chain that would burden Purdue with measures meant to reduce opioid abuse and diversion.  For instance, because federal regulators' enforcement was reducing OxyContin dispensing through Walgreens, McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program.  *Id.* ¶¶ 322-23.  McKinsey also recommended that the Purdue sales force distribute vouchers and "starter kits" for patients who faced co-pays for OxyContin prescriptions, specifically focusing on a large chain pharmacy where prescriptions and OxyContin inventories were down.  *Id.* ¶¶ 324-25.  McKinsey also proposed compensation changes to further incentivize opioids sales, never mind that this practice had been prohibited by Purdue's 2007 Corporate Integrity Agreement.  *Id.* ¶¶ 269, 275.  Specifically, McKinsey urged the use of quotas and bonus payments directly linked to OxyContin sales.  *Id.* ¶ 268.

1    In 2010, Purdue and McKinsey implemented a four-year plan to increase year-over-year

2    required annual sales visits by Purdue representatives to prescribers from 545,000 in 2010 to

3    744,000 visits in 2013—a 36.5% increase.  *Id.* ¶ 270.  McKinsey included in a July 2013

4    presentation to Purdue's board that overall quotas for sales visits by individual sales

5    representatives should be increased from 1,400 to 1,700 annually—a more than 20% increase.  *Id.*

6    ¶ 272.  To eke even more out of each Purdue sales representative, McKinsey proposed slashing

7    one third of the time that Purdue allocated to sales training, which McKinsey calculated would

8    enable sales representatives to increase their call volume by 5%.  *Id.* ¶¶ 273-74.  Project

9    Turbocharge involved an 800% increase in Purdue's promotional/sales and marketing

10   expenditures, *id.* ¶¶ 302-03, and it paid off.  Richard Sackler was personally impressed, telling his

11   nephew and fellow Purdue board member Mortimer Sackler that "the discoveries of McKinsey

12   are astonishing."  *Id.* ¶ 293.  McKinsey helped Purdue triple OxyContin sales from $1 billion to

13   $3 billion in the five years after Purdue pleaded guilty to misbranding OxyContin.  *Id.* ¶¶ 327-35.

14   Between 2008 and 2016, Purdue distributed in excess of $4 billion to the Sackler family—an

15   "achievement" that would not have been possible without McKinsey's success in dramatically

16   increasing OxyContin sales.  *Id.* ¶¶ 329-30.

17        **B.    McKinsey Spread Opioid Tactics From One Manufacturer To Another.**

18        McKinsey dismisses Plaintiffs' non-Purdue-related allegations as an "after-thought."

19   Mot. at 7.  While fewer than half of the complaints' 126 pages of factual allegations concern

20   McKinsey's work with Purdue, the rest address McKinsey's unique position within the *overall*

21   opioids scheme, working with other manufacturers like Endo and Johnson & Johnson and

22   furthering the enterprise's overall goals.  Compl. ¶¶ 341-445.  McKinsey's work with Purdue is

23   explained in detail simply because, as a result of Purdue's second guilty plea and its bankruptcy

24   proceedings, more is known about that work at this time.  Nevertheless, there is plenty above the

25   waterline that elucidates McKinsey's role as the hub in the opioid marketing conspiracy.  For at

26   least 17 years, McKinsey played a breathtakingly expansive role working with multiple clients in

27   concerted efforts to expand the size and scope of the U.S. opioids market.  McKinsey cross-

28   pollinated the most effective sales and marketing practices of each manufacturer so that all could

1    expand their opioids sales, despite knowing that increasing opioid sales means killing more

2    people.  *See id.* ¶¶ 361-62 ("benchmarking" at Endo), ¶¶ 365-66 (modeling Endo's Opana

3    marketing strategy after J&J's Duragesic and Purdue's OxyContin strategies), ¶¶ 382-84

4    (recommending improper insufflation studies to Endo because they were effective at Purdue),

5    ¶ 403 (same consultants working Endo and Purdue accounts), ¶ 408 (installing Executive

6    Oversight Team at Endo modeled on the EOT at Purdue), ¶ 420 (same consultants working J&J

7    and Purdue accounts), ¶¶ 429-30 (modeling J&J's Duragesic marketing strategy after Purdue's

8    OxyContin strategy).

9         McKinsey was in the unique position of knowing what competitor manufacturers were

10   each doing to grow the opioid market.  *See, e.g.*, *id.* ¶ 142 ("[E]ven if any two given industry

11   participants did not know what each other was doing, McKinsey knew exactly what *both* were

12   doing because both were clients."), ¶ 341 ("Part of the unique value McKinsey provides is its

13   deep knowledge of its clients' competitors."), ¶ 362 (describing how McKinsey "repeats its work

14   from one client to the next," and giving specific example).  From this catbird's seat, McKinsey

15   advised multiple manufacturers to implement substantially similar sales and marketing programs

16   for OxyContin, Opana, Duragesic, Nucynta, and other opioids.  *Id.* ¶¶ 407-09, 433-35.  These

17   allegations are not "conclusory," Mot. at 45, but specific descriptions of McKinsey's direct

18   involvement in product launches and sales and marketing efforts for *each* manufacturers' branded

19   opioid products, contemporaneously.

20        One example of McKinsey's over-arching role in the opioids marketplace was its work for

21   Endo launching Belbuca.  Belbuca was meant to compete with Butrans, a similar drug already

22   sold by Purdue.  Compl. ¶¶ 389-94.  *Both* were marketed as less likely to be abused than

23   OxyContin, whose sales McKinsey was simultaneously turbocharging.  *Id.* ¶ 390.  Because

24   McKinsey advised both clients on the launches of both drugs, it was in the unique position to

25   advise the later market entrant (Endo) about how best to differentiate Belbuca from Purdue's

26   Butrans so as to maximize sales of *both* products (and concomitantly expand the overall

27   marketplace).  McKinsey's plan was to position Belbuca within the context of the *overall* opioids

28   marketplace as a waystation between patients who were on short-acting opioids as they

transitioned to extended-release formulations, most notably Endo's Opana.  *Id.* ¶¶ 391-400.  New patients converted from short-acting opioids would increase Opana sales.  But some of those newly converted extended-release patients would inevitably be prescribed a competing product, such as OxyContin.  McKinsey's Belbuca efforts were designed to grow the overall opioids market, benefiting the enterprise as a whole.  *Id.* ¶¶ 473-76.

McKinsey also told Endo to follow Purdue's playbook when marketing Opana.  *Id.* ¶¶ 365-66.  And just as McKinsey advised Purdue on obtaining FDA approvals for OxyContin, McKinsey advised Endo to submit misleading studies regarding abuse of Opana through insufflation (snorting the drug) when the known abuse concern was intravenous injection, not insufflation.  *Id.* ¶¶ 214-21, 380-84.  The intravenous abuse of the reformulated Opana led to localized HIV outbreaks and other harms, despite McKinsey's focus on insufflation studies as a tried-and-true method to obtain FDA approvals.  *Id.* ¶¶ 372-79.

McKinsey had such granular knowledge of the overall opioids industry that it even proposed that Endo and the Sackler family enter into partnerships to boost revenues from Opana and opioids manufactured by the Sacklers' Mundipharma companies.  *Id.* ¶ 367.  It advised Johnson & Johnson to differentiate Duragesic, a *fentanyl* patch, from Purdue's OxyContin by targeting "high abuse-risk patients (*e.g.*, males under 40)."  *Id.* ¶¶ 430-32.  It later suggested that the Sacklers buy Nucynta from Johnson & Johnson.  *Id.* ¶ 439.  Throughout its work with all of its manufacturer clients, McKinsey sought not only to increase the market share of individual brands, but also to grow the size of the overall market.  *Id.* ¶¶ 473-76.

McKinsey worked with the manufacturers of all of these brands continually to hone and perfect the three marketing tactics that have been identified as principal causes of the epidemic: (1) using granular sales data to profile individual prescribers and target them to increase opioid prescribing, (2) using sales force incentive compensation to encourage increased sales of controlled substances, and (3) the blunt force instrument of increased sales calls.  *Id.* ¶¶ 103-05; *id.* ¶¶ 13, 246-59, 288, 306-21 (targeting at Purdue); *id.* ¶¶ 409-14 (targeting at Endo); *id.* ¶¶ 431-32 (targeting at Johnson & Johnson); *id.* ¶¶ 13, 104, 268-75, 289, 306, 326, 694 (incentive compensation); *id.* ¶¶ 268-74, 308-15, 492 (quotas/volume of sales calls).

1

### C.     <u>McKinsey's Opioid Work Benefited Its Investment Fund.</u>

2       These tactics benefited not only McKinsey's clients but also McKinsey itself.  In addition

3 to its lucrative consulting fees, McKinsey operates a hedge fund—the McKinsey Investment

4 Office ("MIO").  *Id.* ¶¶ 558-73.  McKinsey is dismissive of Plaintiffs' MIO allegations, but they

5 show the interested nature of McKinsey's "advice" to its clients and highlight that McKinsey was

6 financially motivated to proliferate opioid prescriptions and use *overall*: the more opioids

7 McKinsey could help its clients sell, the more MIO's investments would profit, adding a separate

8 stream of revenue on top of its lucrative consulting fees.  *Id.* ¶¶ 570-72; *see also id.* ¶ 573 ("On

9 November 19, 2021, MIO Partners agreed to pay an $18 million fine to the SEC due to MIO's

10 possession of material nonpublic information related to its holdings, information obtained through

11 consulting.").  What is more, through MIO, individual McKinsey partners could share in the

12 benefits of an expanding opioids marketplace alongside individual executives at their opioid

13 clients who were themselves former McKinsey partners.  *See id.* ¶¶ 567-69 (noting that the

14 presidents and chief executive officers of Endo, Teva, and Mallinckrodt subsidiary SpecGX,

15 among others, were, as former McKinsey partners, entitled to invest in MIO).

16

### D.     <u>McKinsey Does Not Merely Give Advice, But Implements That Advice.</u>

17       McKinsey repeats ad nauseam that it is simply a "service provider," and that the service it

18 provides is disinterested advice, without more.  What McKinsey is, and does, is not so simple.

19 Implementation is an important part of this case, and McKinsey understandably seeks to

20 minimize it.  McKinsey says Plaintiffs "implausibly" suggest that McKinsey "implemented its

21 own recommendations," Mot. at 8, and chastises Plaintiffs for repeating the word: "Plaintiffs

22 merely repeat the word 'implement' over and over again without offering any factual allegation

23 concerning how McKinsey 'implemented' its advice," *id.* at 8-9.  But Plaintiffs didn't invent

24 "Implementation."  The complaints repeat the word "over and over again" because they *quote*

25 *McKinsey*.  The complaints quote a "McKinsey Senior Implementation Coach."  Compl. ¶ 117.

26 They quote a McKinsey partner describing what makes "McKinsey implementation truly

27 distinctive."  *Id.* ¶ 120.  And they recount how McKinsey's implementation team has a symbol—

28 a rowing team—which, in the team's words, "symbolized to us being in the boat with the clients,

1   doing real work and being jointly responsible for the success." *Id.* ¶¶ 118-19.  The analogy fits.

2   *Cf. Navarrete v. Meyer*, 188 Cal. Rptr. 3d 623, 634 (Cal. Ct. App. 2015) ("[T]he fact Meyer was a

3   passenger in Coleman's vehicle rather than driving a separate car strengthens the inference that

4   she encouraged and incited him, and that they jointly engaged in a series of acts that led directly

5   to the collision.").

6        McKinsey's opioid work followed the firm's "implementation" model.  Purdue itself

7   admitted that it, "in collaboration with [McKinsey], implemented many of [McKinsey's]

8   recommendations."  Compl. ¶ 551 (quoting Purdue Plea Agreement, *see* RJN Ex. A).  And

9   McKinsey's personnel served on the Project Turbocharge "Executive Oversight Team and Project

10  Management Office."  *Id.* ¶ 300.  If "Oversight" and "Management" are not hallmarks of

11  implementation, then what is?

12       These allegations are further supported by McKinsey's documents.  McKinsey treated

13  implementation work as separate and distinct from diagnostic or advisory work.  *See* Ex. B

14  (MCK-MDL2996-0259321) at 69.  It billed Purdue separately for "implementation" of Project

15  Turbocharge (renamed "Evolve to Excellence"), having previously charged Purdue for

16  "recommendations" and "diagnostics."  *Id.*  Internally, McKinsey assigned a unique identifier—

17  an "Engagement Code"—for each client engagement.  *Id.*  Beginning on September 16, 2013,

18  McKinsey conducted engagement PUP036, indicating that it was the 36th engagement McKinsey

19  had undertaken for Purdue.  The "Scope and Objective" of PUP036 was "Implementation of prior

20  recommendations;" the "Background" for the engagement was similarly terse: "Implementation

21  following diagnostic."  *Id.*  As described in the McKinsey exposé, *When McKinsey Comes to*

22  *Town*, in 2013, "Purdue instructed McKinsey to stop the hemorrhaging" of decreased OxyContin

23  sales.  In response, McKinsey "descend[ed] into Purdue's engine room . . . [to] come up with a

24  plan," applied their own "proprietary 'corporatized provider network connector,'" and even sent

25  "consultants" on "ride-alongs with sales reps."  Forsythe & Bogdanich, *supra*, at 139.

26       McKinsey assigned at least 9 consultants for more than 4 months for "implementation" of

27  their prior Project Turbocharge recommendations.  Ex. B (MCK-MDL2996-0259321) at 69-70.

28  And PUP036 wasn't unique.  PUP024, from April 20, 2010 to May 14, 2010, was identified as

1   the "REMS Technology Implementation" engagement.  PUP041, from April 28, 2014 to May 30,

2   2014, stated that "McKinsey will prepare a detailed masterplan to guide implementation of the

3   new Strategy."  *Id.* at 79-80.  For PUP044, from November 10, 2014 to May 1, 2015, the "Scope

4   and Strategy" for the engagement was "[d]riving implementation of inorganic growth strategy."

5   *Id.* at 85-86.  For PUP049, from September 8, 2015 to April 15, 2016, "Client hired McKinsey to

6   assist them not only in developing the presentation but also potentially assisting in the

7   implementation (after approval from the Board)."  *Id.* at 93-94.  PUP049's recommendations

8   were subsequently implemented in PUP055, nine months later.  *See id.* at 109-10.

9        McKinsey's suggestion that it is "implausible" that the firm would dirty its hands with

10  implementation work relies on a sepia-toned notion of management consulting as it once may

11  have been, but not as it is now, and certainly not as it was and is at McKinsey.  As early as 1982,

12  management consultants increasingly moved into implementation work, consciously and

13  purposefully going further than merely giving strategic advice.  Compl. ¶¶ 113-14.  McKinsey

14  was no different: implementation is now one of McKinsey's primary functions.  *Id.* ¶¶ 114-21.

15  As the Harvard Business Review observed in September 2013, "big-think strategy work is no

16  longer in such demand, and top-tier firms like McKinsey are competing more frequently with less

17  elite firms as contract analysts and implementers."[3]  The HBR article was timely: PUP036,

18  McKinsey's implementation of Project Turbocharge, began the same month it was published.  *Id.*

19  ¶ 281; Ex. B (MCK-MDL2996-0259321).  What Professor Arthur Turner said in 1982 is truer

20  today than ever before: "Consulting is more than giving advice."  Compl. ¶ 113.

21       **E.**   **McKinsey Contributed To The Opioid Crisis And Harmed Plaintiffs.**

22            **1.**   **NAS Plaintiffs Are Permanently Affected.**

23       NAS Plaintiffs are children born with neonatal abstinence syndrome ("NAS") caused by

24  their withdrawal from opioids after their exposure in the womb.  NAS Compl. ¶ 23.  NAS is a

25  tragic and persistent outgrowth of the opioid epidemic.  When a pregnant woman takes opioids,

26  the drugs pass through the placenta and adversely affect the fetus.  *Id*. ¶ 546.  Infants born with

27

28  [3] Daniel McGuinn, *Inside Consulting's Black Box*, Harvard Business Review, Sept. 2013,
    *available at* https://hbr.org/2013/09/inside-consultings-black-box.

NAS often exhibit symptoms of opioid withdrawal including tremors, seizures, overactive reflexes, and tight muscle tone; fussiness or excessive crying; poor feeding or sucking or slow weight gain; breathing problems; fever,  sweating, or blotchy skin; trouble sleeping and lots of yawning; diarrhea or vomiting; and stuffy nose or sneezing.  *Id*. ¶ 548.

Between 2000 and 2009, the incidence of NAS among newborns increased from 1.20 to 3.39 per 1,000 hospital births, and one study has estimated a ten-fold increase from 2005 to 2011 in the number of infants with NAS who were admitted to neonatal intensive care units. According to another report, a newborn is diagnosed with NAS due to fetal opioid exposure every 15-25 minutes in the United States.  *Id.* ¶¶ 554-55.  Infants born with NAS are at increased risk for a number of other birth defects and there are, consequently, increased costs associated with NAS births, much of which are due to increased hospital stays.  One study estimated these costs at $53,400 in 2009, compared to $9,500 for a non-NAS birth.  *Id.* ¶ 557.  NAS infants are also likely to experience long-term issues into adulthood, including developmental delays, motor problems, behavior and learning problems, emotional disorders, speech and language problems, sleeping issues, ear infections, and vision problems.  *Id.* ¶ 553.  NAS Plaintiffs allege that McKinsey, through its work with opioid manufacturers, suppressed the risks and harms of fetal opioid exposure, and instead focused on driving the increase in prescription opioid supply that led women of child-bearing age to become addicted and expose their fetuses to opioids.  *Id.* ¶¶ 548-53, 559-62.

## 2. <u>Third Party Payor Plaintiffs Shouldered A Significant Portion Of The Financial Burden Of The Opioid Crisis.</u>

Third Party Payor (TPP) Plaintiffs are private benefit plans, funds, and commercial insurers that provide health and welfare benefits, including reimbursement for some or all of the costs of prescription opioids that were on their approved formularies.  McKinsey and its pharmaceutical manufacturer clients were well aware of the structure of the U.S. health-care system and recognized that, to increase opioid prescriptions, they needed to place prescription opioids on favorable tiers of TPPs' formularies.  TPP Compl. ¶ 354 (McKinsey identified the importance of formulary approval as well as "tier 2 status"), ¶ 426 n.322 ("McKinsey's

1    knowledge of the ways other pharma companies operate suggests Purdue should . . . further drive

2    the salesforce to be more responsive to formulary coverage changes." (citation omitted)).

3           The four named TPP Plaintiffs collectively serve hundreds of thousands of active union

4    members, retirees, and their families across many states.  *Id.* ¶¶ 24-27.  They represent a proposed

5    TPP class of more than 40,000 TPPs representing millions of covered lives across the country.

6    McKinsey's deceptive marketing strategies were aimed at increasing opioids sales and revenues

7    for its clients, the natural and foreseeable consequence of which was increased costs to TPPs for

8    the prescription opioids themselves, as well as for the resulting addiction-related treatment that

9    followed.  *Id.* ¶¶ 532-37 (recognizing that 60% of opioids that are abused come from physician

10   prescriptions, which are paid for by TPPs).

11                      **3.      Tribal Plaintiffs Are Suffering Existential Threats.**

12          The Tribal Plaintiffs are sovereign, federally-recognized Native American Tribes,

13   intertribal consortia, and Tribal health organizations, which collectively represent nearly 300

14   Tribes.  *See* Compl. ¶ 23.  McKinsey's role in fueling the opioid epidemic has done particular

15   damage to Tribal Plaintiffs who, as sovereign governments, are responsible for their citizens'

16   health, well-being, and membership.  According to the CDC, American Indians and Alaska

17   Natives (AI/AN) had the highest drug overdose death rates of any U.S. ethnic group in 2015 and

18   the largest percentage increase (400%) in deaths over time from 1999 to 2015.  The overdose

19   death rate among Native Americans more than doubled between 2015 and 2019.  Between 2009

20   and 2012, American Indian women were 8.7 times more likely to be diagnosed with opiate

21   dependence or abuse during pregnancy.  Compared to other racial and ethnic groups, a higher rate

22   of Native infants suffer from NAS and opioid withdrawal.  *Id.* ¶¶ 585-98.  AI/AN opioid overdose

23   deaths rose from 2.9 per 100,000 in 1999 to a staggering 13.9 per 100,000 in 2016.[4]

24          Tribal Plaintiffs have incurred significant costs as a result of the opioid epidemic.  Tribal

25   lands have often served as a haven for the illegal sale of opioid products and a hiding place for the

26

---

27   [4] *See also* Brief of *Amici Curiae* of 448 Federally Recognized Tribes in Opp'n to Defs.' Mot. to
     Dismiss Tribal Claims (ECF 1026), at 16-43, *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-
28   02804-DAP (N.D. Ohio Oct. 5, 2018) (describing severe impacts on Native communities and
     tribal services).

sellers and non-Tribal users of opioids, and many Tribes have been forced to expand Tribal law enforcement and combat hazardous waste on their lands, among many other costs they have shouldered.  Tribes in remote areas often must expend huge sums of money to ensure transportation to hospitals or treatment facilities.  Tribes have also faced increasing needs for family and social services.  Many Tribes' survival depends on maintaining successful businesses, whose revenues fund Tribal government programs, yet the opioids crisis has robbed many Tribes of capital and a sufficient workforce.  Due to the sharp increase in opioid use on their reservations, Tribes have suffered damages in the form of lost productivity of employees, increased administrative costs, and lost opportunity for members' growth and self-determination.

The opioid epidemic further threatens Tribes' cultural practices and identity, as the deaths of Tribal elders interfere with transmitting of Tribal knowledge from one generation to the next. Particularly for smaller Tribes, the opioid epidemic has posed an existential threat, as opioid-addicted parents see their children fostered to non-Native foster and adoptive parents—a trend that breaks cultural connections and can mean fewer enrolled members over time, culminating in the Tribes' extinction.  Compl. ¶¶ 599-606.  The opioid crisis has torn the social fabric of many Tribal communities, preventing the transmission of cultural knowledge and resulting in a loss of tribal identity.  *See* MDL 2804 *Amici Curiae* Br., at 42-43.

### III.   <u>ARGUMENT</u>

#### A.   <u>Legal Standard</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only "state a claim to relief that is plausible on its face."  *CCSF I*, 491 F. Supp. 3d at 646 (citation omitted).  A "claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (internal quotation marks omitted).  When "evaluating a motion to dismiss, the Court must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  *Id.* (internal quotation marks omitted).  Claims for fraud must "be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the

1    fraud charged so that they can defend against the charge and not just deny that they have done

2    anything wrong." *Id.* at 646 (internal quotation marks omitted).

3    **B.    TPP And Tribal Plaintiffs Plead Cognizable RICO Claims.**

4    Most of the elements of Plaintiffs' RICO claims are uncontested.  McKinsey's limited

5    challenges address proximate cause, the company's role in directing the operations of the RICO

6    enterprise, and the common purpose of the enterprise.  Each challenge fails.

7    **1.    The Alleged RICO Violations Proximately Caused Plaintiffs' Injuries.**

8    This Court knows RICO proximate causation well, having recently written a lengthy

9    examination of the standard in related opioids litigation.  *See id.* at 653-61.  In that case, the Court

10   concluded that the City of San Francisco could not establish a "direct relation" between the

11   alleged RICO violations and its limited cognizable injury to business or property.  *Id.* at 659.

12   McKinsey relies on that decision for its conclusory proximate cause section but effectively

13   ignores its reasoning.  Indeed, McKinsey glides over key distinctions between that case and this

14   one—most notably, the different injuries and their implications for the causal chain—and fails to

15   mention, much less distinguish, the most recent Ninth Circuit opinion (discussed at length in

16   *CCSF I*) finding RICO proximate causation satisfied under facts remarkably similar to the RICO

17   claims here.  That case, *Painters & Allied Trades District Council 82 Health Care Fund v.*

18   *Takeda Pharmaceuticals Co. Ltd.*, 943 F.3d 1243 (9th Cir. 2019), and this Court's analysis of it,

19   strongly support a finding of proximate cause for both the TPP and Tribal Plaintiffs.

20   **a.    The TPP Plaintiffs Have Properly Pleaded Proximate Cause.**

21   The TPPs' injuries here are nothing like the harms in *CCSF I*.  There, the only cognizable

22   injury to business or property related to the cleanup of "improperly" discarded "needles . . . used

23   to inject illegal" opioids.  *CCSF I*, 491 F. Supp. 3d at 656.  Those limited harms, the Court

24   observed, were far removed from the RICO violations and dependent on "criminal conduct" of

25   "parties [that] allegedly diverted or sold illicit opioids, administered opioids intravenously, and

26   improperly discarded the used needles, which harmed city-owned property and businesses."  *Id.*

27   at 656-57 (footnote omitted).  Here, in contrast, the alleged injuries occur much further up the

28   causal chain.

1    The TPPs allege that they were damaged by paying for addictive prescription opioids

2  rather than the safer, non-addictive, and lower-cost prescription drugs (including over-the-counter

3  pain relievers) that would have been used, and further paid for opioid-related medical care, as a

4  result of the RICO enterprise's fraudulent scheme devised and implemented by McKinsey.  *See*

5  TPP Compl. ¶¶ 24-27, 532-37.  In other words, the injury occurred when the opioids were

6  prescribed and then paid for, and was not at all dependent on the subsequent criminal conduct

7  implicated in *CCSF I*.  The TPPs' injuries were the intended results of the fraudulent scheme:

8  McKinsey and its co-conspirators knew that, in the American health care system, TPPs pay for

9  most prescription drugs, and appreciated that the key to increased prescriptions and sales was

10  placement on the preferred tiers of the TPPs' formularies.  *See id.* ¶¶ 354, 426 n.322, 491-95,

11  532-37.

12    These facts—including the alleged injury and causal nexus—are nearly identical to those

13  at issue in *Painters*, the binding precedent missing in action from McKinsey's motion.[5]  In

14  *Painters*, TPPs and patients alleged that defendants violated RICO by concealing the increased

15  risk of bladder cancer associated with their diabetes drug, Actos.  Like the TPPs here, those in

16  *Painters* alleged that "but for the defendant's omitted mention of a drug's known safety risk, they

17  would not have paid for the drug."  *Painters*, 943 F.3d at 1246.  After a lengthy review of both

18  Supreme Court and circuit precedent, the Ninth Circuit concluded that the TPP plaintiffs'

19  allegations "satisfy the Supreme Court's direct relation requirement."  *Id.* at 1248-60.  *Painters*

20  squarely rejects the bulk of McKinsey's proximate cause arguments.  As it recognized, "'because

21  of the structure of the American health care system,' . . . [Defendants] are well aware that TPPs

22  and individual patients pay for the drugs," and that "Defendants' alleged fraudulent marketing

23  scheme . . . 'only became successful once [they] received payments for the additional [Actos]

24  prescriptions [they] induced'—the very injury for which Plaintiffs seek recovery."  *Id.* at 1257

25  (quoting *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 38-39 (1st Cir. 2013), and

26  citing *In re Avandia Mktg., Sales Pracs. & Prod. Liab. Litig.*, 804 F.3d 633, 645 (3d Cir. 2015)).

27
28
[5] McKinsey also ignores *Bridge v. Phoenix Bond & Indemnity Co*., which found RICO proximate causation established where, as here, the harm was a "foreseeable and natural consequence" of the defendants' scheme.  553 U.S. 639, 658 (2008).

*Painters* further observed that it was "perfectly foreseeable that physicians who prescribed Actos would play a causative role in Defendants' alleged fraudulent scheme to increase Actos's revenues." *Id.* at 1257. Thus, "prescribing physicians do not constitute an *intervening cause* to cut off the chain of proximate cause." *Id.* (emphasis in original). Finally, if "prescribing physicians' and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause," then "drug manufacturers would be insulated from liability for their fraudulent marketing schemes, as they could continuously hide behind prescribing physicians and pharmacy benefit managers. That is not the purpose the requirement of proximate cause is intended to serve." *Id.* at 1257-58.[6] As this Court put it in applying *Painters* to the opioid litigation, "Defendants' violations foreseeably caused physicians to prescribe more opioids," and thus proximately caused injuries connected to "increased rates of addiction and overdoses." *CCSF I*, 491 F. Supp. 3d. at 657-58 (observing that prescribers and pharmacists were *non*-intervening links in the causal chain).[7]

This conclusion applies equally here. McKinsey's assertion that "the independent acts of pharmaceutical manufacturers . . . stand between the alleged conduct of McKinsey and the [plaintiffs'] alleged harms," Mot. at 13, is wrong as a matter of both fact and law. As discussed, McKinsey worked hand-in-hand with Purdue and other manufacturers to both develop and implement the fraudulent marketing and data schemes that caused Plaintiffs' harms. *See, e.g.*, §§ II.B, II.D, *supra*; Compl. ¶¶ 628-32. Contrary to McKinsey's unsupported argument, moreover, in a RICO enterprise, "conspirators are liable for the acts of their co-conspirators." *Salinas v. United States*, 522 U.S. 52, 64 (1997). Here, McKinsey's work with Purdue and the other opioid manufacturers *is* the RICO enterprise, and the schemes it carried out directly harmed the TPPs. The acts of McKinsey's co-conspirators do not break the causal chain.

---

[6] *Accord, e.g.*, *In re Neurontin*, 712 F.3d at 38.

[7] Judge Polster, too, has denied motions to dismiss RICO claims premised on TPP plaintiffs' "allege[d] injuries arising from inappropriate payments for opioid prescriptions and for members' opioid abuse treatments." *In re Nat'l Prescription Opiate Litig. (Cleveland Bakers)*, 440 F. Supp. 3d 773, 802 (N.D. Ohio 2020).

1

           **b.**     **The Tribal Plaintiffs Have Properly Pleaded Proximate Cause.**

2       A similar analysis applies to the Tribal Plaintiffs.  The types of harms the Tribal Plaintiffs

3 can recover under RICO could arguably be limited by *Canyon County v. Syngenta Seeds, Inc.*,

4 519 F.3d 969, 976 (9th Cir. 2008), a case this Court analyzed in depth in *CCSF I*.  But, for the

5 reasons set forth below, it is far from clear that *Canyon County* should apply to Tribes, as

6 opposed to municipal governments.  Additionally, the Tribal Plaintiffs have alleged types of

7 injury to both business and property that are clearly not foreclosed by *Canyon County*, and which

8 are directly related to McKinsey's RICO violations.  Among these are the injuries Tribes suffered

9 as market participants.  For example, Tribes fund their own healthcare services and, like the

10 TPPs, suffered economic harms by purchasing more opioids than they otherwise would have and

11 paying higher prices for opioid products than they would have for cheaper pain-management

12 medication.  *Cf.* Compl. ¶ 605. These are core market participant injuries arising from a

13 "distortion in the marketplace" caused by McKinsey's misconduct.  *CCSF I*, 491 F. Supp. 3d at

14 652.  They are also directly related to, and proximately caused by, the alleged RICO violations for

15 all the reasons discussed in the TPP section above.[8]

16       Tribal Plaintiffs also suffered cognizable "business" injuries.  *See In re JUUL Labs, Inc.,*

17 *Mktg., Sales Prac. & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 643-44 (N.D. Cal. 2020) (*JUUL I*)

18 (declining to resolve reach of *Canyon County* after finding government entity alleged property

19 damage).  *Canyon County* addresses only the "property" prong of the statute.  *See* 519 F.3d at

20 976-77.  But RICO also recognizes business injuries, and "[s]overeign entities that undertake

21 commercial business endeavors, such as providing a service or goods, are 'engaged in a business'

22 for purposes of RICO standing."  *CCSF I*, 491 F. Supp. 3d at 653 (citation omitted).  Tribal

23 Plaintiffs operate many such businesses; indeed, some Tribes' very survival depends on starting

24 and maintaining successful businesses.  As opioid addiction (foreseeably caused by the RICO

25 enterprise members' fraudulent schemes) ravaged tribal communities, it robbed these Tribes of

26

27

28

---

[8] To the extent the Court finds this injury insufficiently alleged, the Tribal Plaintiffs seek leave to amend.

capital and a sufficient workforce for their tribal businesses.[9]  Compl. ¶¶ 604-06, 760(O)-(P) (alleging lost "business revenue due to decreased productivity of Tribes' employees and adverse economic conditions created by the opioid epidemic, and . . . [a] decrease in revenues in Tribally-owned businesses due to decreased employee productivity and adverse economic conditions that accompany the opioid epidemic").[10]  This is a RICO injury.

And it was caused by the RICO violations.  As discussed above, the Court already concluded that false and misleading promotion of opioids "foreseeably caused physicians to prescribe more opioids and consequently increased rates of addiction and overdoses."  *CCSF I*, 491 F. Supp. 3d at 658.  Lost productivity and reduced ability to participate in the workforce are inherent, foreseeable, and actually foreseen impacts of that addiction and overdose.  *See, e.g.*, Compl. ¶ 752 (describing McKinsey's acknowledgment that OxyContin leads to overdoses and proposing that Purdue offer rebates to account for them).  These business injuries are therefore cognizable and proximately caused by the alleged RICO violations.

These are not the only injuries the Tribes suffered—far from it.  Tribal Plaintiffs have been absolutely devastated by the opioid epidemic.  *See* § II.E.3, *supra*.  It threatens to tear apart the very fabric of tribal society, and the Tribes have poured in (and continue to need) vast amounts of resources to combat it.  Under a rote application of *Canyon County*, most of these additional property injuries may be foreclosed.  *See CCSF I*, 491 F. Supp. 3d at 648.  But it is not clear that *Canyon County*, which arises from litigation brought by non-tribal entities and does not mention tribes, should apply to the Tribes at all.  Unlike many states and local governments, the Tribal Plaintiffs do not have a robust tax base or a complex legislative process allocating funds.

Furthermore, the municipal cost recovery rule underpinning *Canyon County* does not apply in circumstances that the Tribes face here.  As Judge Polster observed, "[t]he current trend among state court judges ruling in opioid-related cases around the country is that the municipal

---

[9] Tribal businesses also suffered direct injury to their property, such as physical property damage and cleanup costs associated with individuals using opioids and overdosing at tribally-owned hotels, gaming facilities, and tribal housing developments.  *See* Compl. ¶ 603.

[10] *See also id.* ¶¶ 800, 876, 949, 1025, 1097, 1196, 1262, 1343, 1393, 1465, 1546, 1608 (the various Tribes' allegations of business injuries, among others).

1  cost recovery rule does not apply when . . . an ongoing and persistent course of intentional

2  misconduct creates an unprecedented, man-made crisis that a governmental entity plaintiff could

3  not have reasonably anticipated as part of its normal operating budget for . . . tribal services." *In*

4  *re Nat'l Prescription Opiate Litig. (Muscogee (Creek) Nation)*, 2019 WL 3737023, at *8 (N.D.

5  Ohio June 13, 2019) (rejecting application of the municipal cost recovery rule to tribes' state law

6  claims).  This same logic could apply with equal force here.

7  ## 2.     McKinsey Participated In The Conduct Of The RICO Enterprise.

8       Throughout the complaints, Plaintiffs detail McKinsey's intimate role in designing and

9  implementing the false and misleading opioids marketing strategies that increased prescriptions,

10 addiction, and other harm.  *See* §§ II.A-E, *supra*.  McKinsey again ignores those allegations and,

11 consistent with the general theme of its motion, argues that its role as a consultant insulates it

12 from RICO liability.  The case law does not support that position.  Under the Supreme Court's

13 "operation and management" test, a RICO defendant must hold at least "*some* part in directing the

14 enterprise's affairs."  *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (emphasis in original).

15 Notably, however, the Court declined to raise the bar further and specifically rejected a test that

16 would have required "*significant control* over or within an enterprise."  *Id.* at 179 n.4 (emphasis

17 added) (citation omitted).[11]

18     In the Ninth Circuit, courts applying the *Reves* test consider: "whether the defendant

19 (1) gave or took directions; (2) occupied a position in the 'chain of command' through which the

20 affairs of the enterprise are conducted; (3) knowingly implemented decisions of upper

21 management; or (4) was indispensable to achievement of the enterprise's goal in that the

22 defendant's position is 'vital' to the mission's success."  *Tatung Co., Ltd. v. Hsu*, 2015 WL

23 11072178, at *20 (C.D. Cal. Apr. 23, 2015) (quoting *Walter v. Drayson*, 538 F.3d 1244, 1249

24 (9th Cir. 2008)).  Applying these considerations, courts have found that service providers like

25 accountants, attorneys, and consultants *can* be held liable under RICO if they "originated the

26 ─────────────────────

27 [11] Even if McKinsey could be viewed as an outsider, as it stridently argues, *Reves* specifically
   noted that "'outsiders' may be liable under § 1962(c) if they are 'associated with' an enterprise
   and participate in the conduct of its affairs—that is, participate in the operation or management of

28 the enterprise itself."  *Id.* at 185.  Plaintiffs' allegations establish that McKinsey did exactly that.

scheme" or were "the architect of" a significant element of it, *In re Outlaw Lab'y, LP Litig.*, 2020 WL 5552558, at *8-9 (S.D. Cal. Sept. 16, 2020); if they had knowledge of the scheme and "participated in developing and administering" it, *Ketayi v. Health Enrollment Grp.*, 2021 WL 2864481, at *12 (S.D. Cal. July 8, 2021); or even if they prepared reports or financial statements on behalf of the RICO enterprise, *Acebey v. Shearson Lehman Bros.*, 1994 WL 374298, at *2 & n.7 (C.D. Cal. June 4, 1994).

Plaintiffs' allegations about McKinsey's involvement in the enterprise easily clear this bar.  To recap just a few relevant allegations, Plaintiffs plausibly claim that: "McKinsey was the mastermind of marketing schemes deployed by the Enterprise members," Compl. ¶ 647; "McKinsey, as an advisor of multiple Opioid Manufacturers, . . . had access to information about multiple players and was able to coordinate the fraud occurring across the Enterprise," *id.* ¶ 660; "[w]ith McKinsey's assistance*, Purdue trained its sales representatives to operate *using McKinsey's strategy* for selling OxyContin," *id.* ¶ 751 (emphasis added); "McKinsey used its position and access to detailed prescriber information to actually divert resources to target high volume prescribers to sell more opioids," *id.* ¶ 686; and Purdue relied on McKinsey to *develop* and *implement* both sales and marketing strategies for OxyContin because Purdue lacked the capabilities to do so in-house, *id.* ¶¶ 158-59, 190, 195.

Notably, a significant portion of this conduct took place *after* Purdue pleaded guilty to fraudulent marketing in 2007, after which McKinsey was specifically tasked with finding a way to continue increasing opioid sales despite the guilty plea.  *Id.* ¶ 678.  When Purdue pleaded guilty again in 2020, its plea acknowledged McKinsey's role in this scheme, stating, for instance, that "Purdue, *in collaboration with the consulting company* [McKinsey], implemented many of the consulting company's recommendations."  Ex. A at 67 (Purdue Plea Agreement Addendum A ¶ 105) (emphasis added).  The plea agreement further explains that the fraudulent marketing plan McKinsey developed for Purdue ("Evolve to Excellence" (E2E), also known as "Project Turbocharge") "was overseen by the consulting company [McKinsey] and some of Purdue's top executives."  *Id.* at 68 (¶ 111).

Given these allegations, McKinsey's efforts to paint itself as a mere "outside service provider" fall flat.  As this Court recognized, McKinsey "d[oes] more than just give advice" and offer recommendations; McKinsey works "hand-in-hand with its clients" to "manag[e] the implementation of the strategies it provided."  *McKinsey*, 2022 WL 15525768, at *1.  So integrated was McKinsey's approach that: "You can't even tell the difference between a McKinsey team member and one of our clients[.]"  *Id.* (alteration in original).  These allegations establish that McKinsey not only had "some part" in conducting the affairs of the Opioid Marketing Enterprise, but that it had a leading and integral role in developing and conducting the schemes it carried out.

Unsurprisingly, these operation and management allegations are even more extensive than those in cases where courts *denied* motions to dismiss on this basis—*see, e.g.*, *Outlaw Lab'y, LP Litig.*, 2020 WL 5552558; *Acebey*, 1994 WL 374298—and distinguish this case from McKinsey's cited authority, all of which involved far more limited allegations of control.[12]  McKinsey's participation in the enterprise comfortably passes the *Reves* test.

### 3.    Plaintiffs Allege A RICO Enterprise With A "Common Purpose."

McKinsey's "common purpose" argument boils down to the categorical—and incorrect—assertion that consultants cannot be held liable in RICO conspiracies with their clients.  As discussed at length, however, McKinsey did more than further the "ordinary business objective" of "increasing sales of an FDA-approved product."  Mot. at 16.  Rather, Plaintiffs allege that the enterprise's common purpose included "lying to prescribers and Plaintiffs in order to increase sales of addictive and dangerous drugs"—sales derived from illegitimate prescriptions—"and line the enterprise members' pockets."  TPP Compl. ¶ 560; Compl. ¶ 629.  Plaintiffs also explain how McKinsey was engaged to help avoid the consequences of Purdue's 2007 Corporate Integrity Agreement ("CIA") and 2015 "Assurance of Discontinuance," and instead to "devise strategies to sell as many pills as conceivably possible."  Compl. ¶¶ 285, 287, 473, 521.

---

[12] *E.g.*, *Baumer v. Pachl*, 8 F.3d 1341, 1344 (9th Cir. 1993) (finding insufficient involvement where an attorney's role was "sporadic at best" and his services were limited to sending several letters and preparing a partnership agreement); *Walter v. Drayson*, 538 F.3d 1244 (9th Cir. 2008) (finding insufficient involvement where an attorney "wrote emails, gave advice, and took positions on behalf of her clients" but was not "vital" to the scheme).

Ninth Circuit precedent confirms the sufficiency of these allegations.  In *Odom v. Microsoft Corp.*, for example, plaintiffs alleged that Microsoft and Best Buy worked together to "increase[] the number of people using Microsoft's Internet Service"—a legitimate and ordinary business objective—but that they did so "by fraudulent means."  486 F.3d 541, 552 (9th Cir. 2007).  This, the court held, was a cognizable "common purpose" for a RICO enterprise.  *Id.*  As applied here, selling pharmaceuticals may be an ordinary business practice, but doing so through lies and fraud is not.  Neither is working to avoid government enforcement.

Other cases in the pharmaceutical context further confirm that Plaintiffs' allegations satisfy RICO's common purpose requirement.  *See, e.g.*, *In re Neurontin Mktg., Sales Pracs. & Prods. Liab. Litig.*, 433 F. Supp. 2d 172, 178-81 (D. Mass. 2006) (finding common purpose in enterprise comprised of drug manufacturer and marketers working to promote off-label uses); *Meijer, Inc. v. Ranbaxy Inc.*, 2016 WL 4697331, at *24 (D. Mass. June 16, 2016), *report and recommendation adopted* (D. Mass. Sept. 7, 2016) (finding that plaintiffs adequately pleaded RICO enterprise between pharmaceutical manufacturer, its outside counsel, and its consultant, who had the common purpose of misleading the FDA about the manufacturer's facilities).  McKinsey's limited cases do not hold otherwise.  In *Neurontin*, RICO liability attached even though the FDA-approved drug at issue was neither a controlled substance nor alleged to be dangerous or harmful; the RICO defendants' scheme harmed the TPPs who paid for off-label prescriptions for which the drug was simply ineffective.  The conduct of Purdue, McKinsey, and others here was every bit as purposeful and did exponentially greater harm.

Equally unavailing is the argument that the enterprise lacked a common purpose because McKinsey was compensated only through "a routine contract for services."  Mot. at 16.  As discussed above, McKinsey's hedge fund owned a financial stake in various opioid manufacturers that were also McKinsey's clients.  *See* § II.C, *supra*.  This hedge fund, by managing investments for employees, partners, and former partners, opened the door for further conflicts of interest between McKinsey, its clients, and others in the opioid manufacturing industry.  Plaintiffs describe an industry in which consulting arrangements are less about one-off, project-specific fees; McKinsey was, to borrow its own metaphor, in the boat with its clients' senior management,

1   rowing strenuously to accomplish the business goals that its clients could not achieve in-house.

2   McKinsey sought out and was retained repeatedly by its opioid clients.  Each successful

3   engagement begat another, providing McKinsey still further financial incentive to advance its

4   clients' goals.  McKinsey acted in concert with its opioid clients in furtherance of the common

5   purpose of increasing opioid sales through fraudulent means and helping its clients skirt

6   government enforcement.  McKinsey was a knowing and active participant in the scheme, had

7   significant skin in the game, and can be held liable under RICO.

8            **C.**     **Plaintiffs Properly Plead State-Law Causation.**

9            McKinsey argues that, as a matter of law, Plaintiffs cannot adequately plead either factual

10  or legal causation for any of their statutory or tort claims.  Mot. at 27-36.  The Ninth Circuit has

11  cautioned that "[c]ausation is an intensely factual question that should typically be resolved by a

12  jury."  *Pac Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013).

13  So it is here.

14            **1.**     **Plaintiffs Sufficiently Allege Factual Causation.**

15           Factual causation "is a relatively undemanding standard: a but-for cause of harm can be

16  anything without which the harm would not have happened."  *United States v. George*, 949 F.3d

17  1181, 1187 (9th Cir. 2020).  McKinsey asserts that Plaintiffs somehow undermine their theory of

18  harm because "the opioid crisis . . . was ongoing well before McKinsey *ever* worked for Purdue."

19  Mot. at 29.  This argument is meritless.  With respect to Purdue, Plaintiffs allege that McKinsey's

20  efforts *tripled* Purdue's OxyContin sales by 2013, even after Purdue's guilty plea in 2007.

21  Compl. ¶¶ 327-40; *see also id.* ¶ 336 (explaining that OxyContin sales reached their all-time peak

22  in 2013, whereas overall opioid prescriptions had already peaked in 2010, and thus "McKinsey's

23  efforts added a final boost to OxyContin sales before the eventual unraveling").  As to Project

24  Turbocharge, Plaintiffs allege that this Purdue-McKinsey collaboration was "a spectacular

25  success," *id.* ¶ 329, and that Purdue's distributions to the Sackler family "would not have been

26  possible without [] McKinsey's work dramatically increasing OxyContin sales," *id.* ¶ 330.

27  Plaintiffs also allege that McKinsey increased sales for other opioid industry clients, such as

28  Endo, Johnson & Johnson, AmerisourceBergen, and McKesson.  All of these allegations bolster

the central argument that, absent McKinsey's single-minded, profit-driven focus on promoting the sales and marketing of opioids, the resultant harms of the opioid epidemic would have been markedly less severe.  *See id.* ¶¶ 343-447.  In short: "McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis."  *Id.* ¶ 12.

McKinsey next insists that Plaintiffs must identify and quantify the harms caused by McKinsey as opposed to other opioid industry participants.  Mot. at 29-30.  Plaintiffs *do* allege in extensive detail how McKinsey collaborated with its clients to worsen the epidemic.  And Plaintiffs are not required to tease out the specific quantum of effect each tortfeasor had on the overall epidemic, and certainly not at the pleading stage.  That is a matter for comparative fault, joint or several liability, or other allocation principles down the line.  The only authority McKinsey cites otherwise is *City of New Haven v. Purdue Pharma, L.P.*, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019), which applied certain policy considerations in finding no standing under state law for claims against Purdue.  This Court has already declined to follow *New Haven* and should do so again.  *CCSF I*, 491 F. Supp. 3d at 633 n.11.

## 2. **Plaintiffs Properly Plead Legal Causation.**

At common law, "[g]enerally, proximate causation exists only when a harm was a foreseeable result of the wrongful act."  *George*, 949 F.3d at 1187 (citation omitted); *see also CCSF I*, 491 F. Supp. 3d at 679 ("Unlike RICO, courts place great emphasis on 'foreseeability of harm' in determining whether a public nuisance claim sufficiently alleges proximate cause." (citations omitted)).  McKinsey argues that the harm it caused was not foreseeable, and that public policy otherwise precludes a finding of legal causation.  The Court should reject both arguments.

### a. **The Harms Were Foreseeable.**

McKinsey first argues that "unforeseeable, intervening acts" by its clients, regulators, salespersons, prescribers, distributors, and pharmacies broke the chain of causation.  Mot. at 31-33.  Not so.  *City of Everett v. Purdue Pharma L.P.* is instructive.  *See* 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017).  In that opioids case, the court concluded that the causal chain alleged between Purdue and the plaintiff municipality was a "direct sequence" and noted that it

1    was "facially plausible that the involvement of third parties, even criminals, was reasonably

2    foreseeable given the extensive facts of Purdue's knowledge in the pleadings." *Id.* at *6; *see also*

3    *id.* at *5 (noting Everett pleaded that Purdue "foresaw that the OxyContin it was supplying was

4    being illegally diverted and that it would be trafficked and abused" (citation omitted)).

5          It was foreseeable that working with opioid manufacturers to flood the country with

6    prescription opioids would result in harm, and foreseeable that McKinsey's efforts to increase

7    flagging opioids sales would prolong the opioid epidemic, causing harms that otherwise would

8    have been averted.  The 2007 Purdue guilty plea made the likely harms very clear.  *See, e.g.*,

9    Compl. ¶ 505.  The opioid crisis was not a secret; increased sales obviously would add fuel to the

10   opioid fire.  In spite of these foreseeable consequences, McKinsey's unique vantage point,

11   advising and collaborating with manufacturers, distributors, *and* the FDA, made foreseeability

12   unavoidable.  *Id.* ¶¶ 448-72 (describing McKinsey's work with the FDA).

13         It is indisputable that McKinsey continued working with Purdue and other opioid

14   manufacturers long after the severity of the opioid crisis was well known.  McKinsey knew that

15   OxyContin was highly abusable, addictive, and dangerous, and nevertheless deployed marketing

16   strategies that made the crisis worse.  *See id.* ¶¶ 504-21.  As an experienced presence in the

17   pharmaceutical industry, McKinsey was well aware of the risks of OxyContin.  Despite being put

18   on notice by Purdue's 2007 guilty plea, and despite the overall peak of opioid prescriptions in

19   2010, McKinsey forged ahead in 2013 to increase sales of those same substances—to try to

20   revive flagging sales and surpass prescription rates in 2010.  McKinsey's internal client

21   presentations include discussions of physicians' concerns related to opioid abuse, but, "[r]ather

22   than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles

23   to confront with new messaging." *Id.* ¶¶ 509, 511.  McKinsey repeats that it did not "control" its

24   clients.  Mot. at 31.  But Plaintiffs have alleged in exhausting detail how McKinsey intertwines

25   itself with its clients and helps them implement its advice.  Control or no, it was foreseeable that

26   McKinsey knew its ideas would be implemented and would cause harm.

27

28

1

2          **b.      Outlier Opioid Cases Finding A Failure Of Proof Do Not
                     Support Dismissal Here.**

3          McKinsey cites cases that merely restate the general theory of proximate causation and/or

4   present dissimilar factual scenarios.  *Id.* at 33.  McKinsey then predictably marshals two of the

5   primary opioids decisions in which judges ruled on behalf of defendants: *City of Huntington v.*

6   *AmerisourceBergen Drug Corp.*, 2022 WL 2399876 (S.D.W. Va. July 4, 2022), *appeals pending*

7   (4th Cir. Nos. 22-1819, 22-1822), and *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719

8   (Okla. 2021).  Mot. at 34-35.  Neither supports McKinsey's arguments.[13]

9          *First*, to the extent these cases can even be read to support McKinsey's proximate cause

10  argument, they are out of step with the weight of authority in opioid litigation.  *See, e.g.*, *In re*

11  *Nat'l Prescription Opiate Litig. (Cleveland Bakers)*, 440 F. Supp. 3d at 795-99 (finding third

12  party payors adequately pleaded proximate cause in claims against manufacturers and wholesale

13  distributors); *In re Nat'l Prescription Opiate Litig. (Blackfeet Tribe)*, 2019 WL 3737023, at *3-6

14  (N.D. Ohio June 13, 2019) (same, for claims by Native American tribe); *CCSF I*, 491 F. Supp. 3d

15  at 678-84 (same, where plaintiff city sued manufacturers, distributors, and retailers).

16         *Second*, even on their own terms, the two cases do not support dismissal.  *City of*

17  *Huntington* set forth factual findings following a bench trial against opioids distributor

18  defendants.  *State ex rel. Hunter* is even farther afield; there, the Supreme Court of Oklahoma

19  reversed the district court's $465 million verdict following a bench trial in a public nuisance

20  lawsuit against opioid manufacturer Johnson & Johnson.  *See Hunter*, 499 P.3d at 722-23.  That

21  case hinged on Oklahoma's public nuisance law, which the court held would be "impermissibly

22  vague" if left as interpreted by the district court.  *Id.* at 731.

23         McKinsey relies on this Court's finding that "[a] lack of reasonable care in the handling,

24  distribution, and administration of controlled substances can foreseeably harm the individuals

25  who take them."  *City & County of San Francisco v. Purdue Pharma L.P.*, 2022 WL 3224463, at

26  *57 (N.D. Cal. Aug. 10, 2022) (*CCSF II*).  But as the Court noted, Plaintiffs allege that McKinsey

27  was instrumental in helping Purdue unlawfully "handle[]" controlled substances from top to

28  ---
[13] McKinsey also relies on, again, *City of New Haven*, which this Court has already distinguished.
*CCSF I*, 491 F. Supp. 3d at 633 n.11.

bottom, from the boardroom to sales representative vehicles.  *McKinsey*, 2022 WL 15525768, at

*2.  McKinsey says it is "several steps further removed from Plaintiffs' alleged injuries than

pharmaceutical manufacturers."  Mot. at 35.  Given that McKinsey worked directly with

"manufacturers," it is unclear why McKinsey claims "several" such steps.  Plaintiffs allege that

McKinsey rows the boat with its clients, to the point where "you can't even tell the difference

between a McKinsey team member and one of [its] clients."  Compl. ¶¶ 114, 116, 147.  Either

way, McKinsey's entire business proposition is that its goals are indistinguishable from its

clients—the same is true here.

### c.  Public Policy Does Not Require Dismissal.

McKinsey invokes public policy to reject Plaintiffs' allegations for lack of proximate

causation.  Mot. at 35-36.  McKinsey does not explain why policy counsels against finding

proximate causation here, except to insist that "limitless plaintiffs" could claim to have been

harmed by the conduct of a professional advisor.  *Id.* at 36.  Common law causes of action already

have ample guardrails to ensure that this doomsday scenario does not come to pass, and

professional advisors of all kinds are already subject to liability to individuals other than their

clients.  *See supra* § I.A & n.2 (collecting cases).  Indeed, given the lack of constraints on

management consultants, public policy here is *more* supportive of civil liability than in other

contexts.  If lawyers aid and abet misconduct, they can lose their license.  Same for accountants

or financial advisors.  All of these professions require certification of their qualifications and

ethical standing to practice.  The titles of doctor, lawyer, or accountant do not immunize

defendants from the legal consequences of their actions.  All the more true, then, that the lack of

such formal professional self-regulatory constraints on consultants cannot mean that they are

beyond the reach of law.  To the contrary, persons and entities doing business as consultants

simply stand in the same relationship to statutory and common law liability as does anyone.

### D.  Plaintiffs Properly Plead Their Public Nuisance Claims.

NAS Plaintiffs and most of the Tribal Plaintiffs allege that McKinsey knowingly

contributed to a public nuisance in Plaintiffs' communities through the promotion and marketing

of highly addictive and commonly misused opioids.  *See, e.g.*, *supra* § II.D; Compl. ¶¶ 235-59,

260-67, 272, 275, 278-79, 299, 304-05, 314-15; 331-32; NAS Compl. ¶¶ 195-205, 218-20, 225-27, 237-40, 249-52, 257-67, 274-76.  McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely used, causing Plaintiffs' harm.  Absent McKinsey's marketing scheme, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.  Compl. ¶¶ 774-75.

### 1. Plaintiffs Adequately Allege McKinsey Contributed To A Substantial And Unjustified Interference With A Public Right.

#### a. Public Right.

McKinsey asserts that Plaintiffs do not identify a public right in their nuisance claims.  In making this argument, McKinsey oversimplifies public nuisance law, stating that "the core of a nuisance claim is the same nationwide," relying on the Restatement (Second) of Torts.  Mot. at 36.  McKinsey not only ignores that nuisance is a statutory claim in many states, but also "conveniently overlook[s] large portions of the Restatement" itself.  *Blackfeet Tribe*, 2019 WL 3737023, at *10 (rejecting similar arguments).  The Restatement acknowledges that "public health" has traditionally been considered a "public right," *id.* at *10, and, as McKinsey concedes, this Court has already found that the opioid epidemic is a public nuisance, *CCSF II*, 2022 WL 3224463, at *1 ("Widespread opioid use has strained the city's hospitals. It has forced streets, parks, and public spaces to close.").  Judge Polster rejected the same arguments McKinsey put forward here regarding public rights, finding that "Plaintiffs' claims rely on . . . rights commonly held by the public" rather than "an aggregation of individual rights."  *In re Nat'l Prescription Opiate Litig.*, 406 F. Supp. 3d 672, 674 (N.D. Ohio 2019).  These conclusions apply in full to the laws of the various states pleaded here.[14]  Indeed, Plaintiffs' claims under the laws of Arizona, California, Minnesota, and Montana do not even require a showing of a public right *per se*, because the public nuisance statutes in those states explicitly define a public nuisance as an

---

[14] *See, e.g.*, Ariz. Rev. Stat. Ann. § 13-2917; Minn. Stat. Ann. § 609.74; *Docheff v. City of Broomfield*, 623 P.2d 69, 71 (Colo. App. 1980); *Cloverleaf Car Co. v. Phillips Petroleum Co.*, 540 N.W. 2d 297, 300 (Mich. Ct. App. 1995); *Cincinnati v. Beretta*, 768 N.E.2d 1136, 1142 (Ohio 2002).

interference that affects a considerable number of persons.[15]  The complaints plead sufficient facts to show that the harm caused by McKinsey's actions affects a considerable number of persons in the relevant jurisdictions.  *See* NAS Compl. ¶¶ 554-55; Compl. ¶¶ 585-618.

### b.  Unreasonable Interference.

A public nuisance claim generally requires an interference be "substantial and unreasonable." *E.g.*, *Ileto v. Glock Inc.*, 349 F.3d 1191, 1211 (9th Cir. 2003) (citation omitted).  Plaintiffs adequately plead both elements.[16]

Although McKinsey invokes the "substantial" requirement, Mot. at 39, it does not clearly articulate any argument supporting that its conduct was not a substantial interference.  This Court has already held that "Plaintiffs plausibly allege that McKinsey's actions significantly contributed to the wide-ranging harms that have affected the Subject states."  *McKinsey*, 2022 WL 15525768, at *7.  The impact on the NAS and Tribal Plaintiffs is no less significant.  As explained herein (*see supra* § III.C), McKinsey's actions are both a legal and factual cause of the devastating opioid epidemic and therefore its conduct "cause[d] 'significant harm.'"  Mot. at 39 (quoting *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 604-05 (Cal. 1997)).

As alleged, McKinsey's conduct went well beyond simply advising its clients on how to allocate resources and lawfully promote FDA-approved products.  *See id.* at 39-41.  Indeed, Plaintiffs allege that McKinsey engaged in both the development of Purdue's (and other manufacturers') fraudulent and unlawful marketing strategies and the affirmative implementation of those strategies.  NAS Compl. ¶¶ 72-73, 75, 77, 156; Compl. ¶¶ 111-12, 114, 116, 195.  Plaintiffs allege that McKinsey was deeply engaged across multiple areas of Purdue's opioid business, including sales strategies, product acquisition, research and development, designing clinical studies, risk management, regulatory affairs, and other administrative matters.  NAS Compl. ¶ 119; Compl. ¶ 158.  McKinsey identified and targeted high prescribers and attractive

---

[15] *See* Ariz. Rev. Stat. Ann. § 13-2917; Cal. Civ. Code Ann. § 3480; Minn. Stat. Ann. § 609.74; Mont. Code Ann. § 27-30-102.

[16] McKinsey relegates to a footnote its assertion that Plaintiffs must allege, and have not plausibly alleged, that McKinsey knew its advice would interfere with a public right.  This argument has been waived.    Nevertheless, to the extent actual knowledge is required, as this Court recognized, Plaintiffs plead it.  *See McKinsey*, 2022 WL 15525768, at *1; *see also id.* at *7-8 (same).

markets for Purdue and other opioid manufacturers, NAS Compl. ¶¶ 268-82, Compl. ¶¶ 307-21, 686-98; analyzed individual sales channels, NAS Compl. ¶¶ 194, 204, 239, 283, Compl. ¶¶ 233, 243, 278, 322; and actively tracked performance metrics so that sales representatives could be encouraged and incentivized to sell as many opioids as possible.

McKinsey did all this despite its knowledge that opioids are controlled substances, which by their very nature are subject to addiction and abuse.  NAS Compl. ¶¶ 121, 194, 246, 248, 321; Compl. ¶¶ 160, 233, 285, 287, 360, 663, 688, 729.  McKinsey touted itself as far more than a traditional strategy consultant for its clients; it was a true partner.  NAS Compl. ¶¶ 73-82; Compl. ¶¶ 112-21.  Indeed, McKinsey worked with Purdue, the leader in this field, and other manufacturers who jumped on the Purdue bandwagon, to devise broad national plans to expand the overall market and maximize opioid sales.  NAS Compl. ¶¶ 434-37; Compl. ¶¶ 473-76.  This Court has already found that "Plaintiffs plausibly allege that for several years, McKinsey played an instrumental role in developing and overseeing aggressive marketing strategies designed to boost opioid sales in the subject states, despite being aware of the severe harm that increasing supplies of opioids were inflicting on communities in the subject states."  *McKinsey*, 2022 WL 15525768, at *7.  Taking these allegations as true, Plaintiffs have more than adequately pleaded McKinsey's actionable interference with a public right.

McKinsey incorrectly asserts that its conduct was not unreasonable.  The Restatement recognizes three disjunctive categories of "unreasonable" interference:

> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is proscribed by statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B(2).  California law further holds that conduct is unreasonable, as this Court recognized, "if it violates a statute, ordinance, or administrative regulation," or "if 'the gravity of the harm outweighs the social utility of the defendant's

conduct[.]"  *CCSF II*, 2022 WL 3224463, at *51 (citations omitted).  Plaintiffs' allegations adequately establish that McKinsey acted unreasonably under both the Restatement and California law.[17]  Plaintiffs plead that McKinsey and Purdue conspired to and did unlawfully provide false or misleading material information about prescription opioids, and unlawfully failed to use reasonable care or comply with statutory requirements in the sale and distribution of prescription opioids, conduct expressly *prohibited* under both federal and California law.[18]

Additionally, the harm here is extreme, and there is no countervailing social utility to false marketing or to the aggressive promotion of a dangerous product that conceals or minimizes the risk of harm.  Plaintiffs allege grave and sweeping harms to themselves and their communities, including soaring opioid overdoses and deaths.  NAS Compl. ¶¶ 1, 55-56, 546-609; Compl. ¶¶ 1, 94-95, 585-618.  Rather than engage with the stark reality of that harm, McKinsey defends its role as an "advisor to companies and institutions across a broad range of industries" and asserts that the FDA has already weighed the benefits and risks of their clients' opioids.  Mot. at 41.  What it does not defend against, however, are Plaintiffs' allegations that McKinsey designed strategies to market and sell those opioids "through false and misleading representations."  *See, e.g.*, NAS Compl. ¶¶ 662-63; Compl. ¶¶ 862, 1011, 1093, 1180, 1248, 1329, 1451, 1532.

McKinsey ignores the NAS Plaintiffs' allegations and disregards the Tribes' allegations as an "artifact of other opioid complaints," but they are not.  Mot. at 41.  Plaintiffs plead throughout their complaints that McKinsey worked directly with its clients to market opioid products by minimizing the risks, overstating the benefits, and targeting high-prescribing doctors and areas of known diversion.  In so doing, McKinsey directly participated in the oversupply of opioids to subject states.  For *this* conduct, there can be no utility and certainly not one that outweighs the

---

[17] McKinsey generally limits its argument to California law.  To the extent there are variations in other state laws, McKinsey has waived any argument those elements are not met.  *See, e.g.*, NAS Compl. ¶ 664 (pleading McKinsey's conduct was negligent, intentional, and/or unreasonable).

[18] *See, e.g.*, 18 U.S.C. § 1961, *et seq.*; 21 U.S.C. § 823; 21 C.F.R. § 1301.71(a); 21 C.F.R. § 1301.74(b); Alaska Stat. § 45.50.471, *et seq.*; Ariz. Rev. Stat. §§ 44-1521 to 1534; Cal. Bus. & Prof. Code § 17200, *et seq.*; Cal. Bus. & Prof. Code § 17500, *et seq.*; Mich. Comp. Laws. Ann. §§ 45.901-22; Minn. Stat. § 325F.69; Minn. Stat. § 325D.09, et seq.; Minn. Stat. § 325D.43, *et seq.*; Mont. Code Ann §§ 30-14-101 to 2602; N. M. Stat. Ann. §§ 57-12-1 to -26; Or. Rev. Stat. §§ 646.605-56; Utah Code Ann. §§ 13-1-1 to -23; Wash. Rev. Code § 19.86, *et seq.*

extreme harm it caused.  McKinsey cites two trial court orders to support its conclusion that

Plaintiffs fail to plead McKinsey acted unreasonably "by advising clients on using their salesforce

for their [medically appropriate] products through lawful channels to licensed doctors."  Mot. at

40 (citing *City of Huntington*, 2022 WL 2399876, at *60; *People v. Purdue Pharma L.P.*, 2021

WL 7186146, at *9 (Cal. Super. Ct. Dec. 14, 2021)).  It leans on these same orders to support its

argument that Plaintiffs failed to plead that any social utility to McKinsey's conduct was

outweighed by the harm it caused.  *See* Mot. at 41.  But even assuming one or both of those

decisions had some persuasive value down the line, they do not here: both of those cases survived

motions to dismiss and for summary judgment.

Many courts, including this one, have found at the motion-to-dismiss stage that allegations

that manufacturers, like Purdue, falsely, aggressively, and unlawfully marketed opioid

medications to inflate demand for these highly addictive products sufficiently pleaded actionable

conduct to support a nuisance claim.  *See, e.g.*, *CCSF I*, 491 F. Supp. 3d at 669.  If Purdue's (and

other manufacturers') false marketing and aggressive promotion of a controlled substance are

unreasonable, and if "you can't even tell the difference between a McKinsey team member and

one of [its] clients," then it is certainly plausible that McKinsey's hand-in-hand development and

implementation of that strategy is itself an unreasonable interference.  NAS Compl. ¶ 77; Compl.

¶ 116.

### c.  <u>Substantial Factor.</u>

Plaintiffs have alleged that McKinsey's advice was a "substantial factor in bringing

about" the alleged nuisance.  *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499, 543

(Cal. Ct. App. 2017).  The substantial factor standard is broad, "requiring only that the

contribution of the individual cause be more than negligible or theoretical."  *Rutherford v.

Owens-Illinois, Inc.*, 941 P.2d 1203, 1220 (Cal. 1997).  Even "a very minor force that does cause

harm is a substantial factor."  *CCSF II*, 2022 WL 3224463, at *54 (quoting *ConAgra*, 227 Cal.

Rptr. 3d at 543).  Plaintiffs need not prove McKinsey was the *sole* contributing cause of the

opioid epidemic to show that its actions substantially contributed to it.  If a defendant's conduct

operated concurrently with other forces to produce the harm, it is a substantial factor, so long as

1    "the injury, *or its full extent*, would not have occurred but for that conduct."  *In re Ethan C.*, 279

2    P.3d 1052, 1071 (Cal. 2012) (emphasis added).  As explained above in Section II.D, Plaintiffs

3    satisfy this standard.

4         **E.    Plaintiffs Sufficiently Plead Negligence-Based Claims.**

5         The Tribal and NAS Plaintiffs plead negligence-based claims against McKinsey, asserting

6    a duty to exercise ordinary care in connection with the marketing, selling, and distribution of

7    opioids.  Compl. ¶¶ 792, 869, 941, 1018, 1090, 1189, 1255, 1336, 1386, 1458, 1539, 1600; NAS

8    Compl. ¶¶ 611-13, 623-24, 677-78.  Both sets of Plaintiffs assign a duty based not only on

9    McKinsey's knowledge about the dangers of controlled substances, but also its status as a

10   "Covered Person" under Purdue's Corporate Integrity Agreement.  *E.g.*, Compl. ¶ 943.

11        As McKinsey points out, the relevant states for the most part include duty as an element of

12   negligence and question of law to be decided by the Court.[19]  That does not mean, however, that

13   McKinsey gets to ignore or rewrite Plaintiffs' factual allegations.  At this stage, those allegations

14   must be accepted as true.  *See Ileto*, 349 F.3d at 1204-05 ("Although whether a duty exists is a

15   question of law, foreseeability often is a question left for the jury to decide."); *id.* at 1204

16   (reversing dismissal where the "allegations . . . are more than sufficient to raise a factual question

17   as to whether the defendants owed the plaintiffs a duty of care . . . .").  In determining duty, the

18   relevant states take into account the foreseeability of the harm and/or public policy factors.  *See*

19   McKinsey App. E; *JUUL I*, 497 F. Supp. 3d at 655 ("Some jurisdictions give more weight to the

20   foreseeability of harm than others.").

21

22

23   _____
     [19] This is not entirely true.  Under Oregon law applicable to one of the Tribal Plaintiff's claims,
24   there is no freestanding duty requirement, but instead in most cases only a fact question of
     "reasonable foreseeability."  *Towe v. Sacagawea, Inc.*, 347 P.3d 766, 774-75 (Or. 2015).
25   McKinsey's series of Appendices also often include authority inconsistent with or contrary to the
     "propositions of law" identified.  For example, Appendix D purportedly relates to negligence per
26   se, but many of McKinsey's citations discuss gross negligence instead.  Appendix H purports to
     represent a legal consensus that "foreseeability does not create a duty," even though Appendix E
27   acknowledges that many states consider foreseeability as a crucial or even sole factor in
     determining duty.  In reality, Appendix H is full of cases regarding when an "affirmative duty to
28   protect" arises, which, as Plaintiffs explain below, is not at issue here.  Given the problems with
     the Appendices, the Court should assign them no weight.

1.     **"Relationship" Between Plaintiffs And McKinsey Is Not Required.**

In some states, the presence of a "special relationship" between the parties will create a duty even without foreseeability or other public policy factors.  *See, e.g.*, *JUUL I*, 497 F. Supp. 3d at 658.  McKinsey turns the point of law on its head, arguing that the lack of a special relationship precludes a finding of duty.  That is not the law.  Even in Arizona, the example McKinsey cites, a duty can be created *either* through "special relationships" *or* "relationships created by public policy." *Quiroz v. Alcoa Inc.*, 416 P. 3d 824, 840 (Ariz. 2018).

McKinsey says that such a relationship is required because of the presence of its clients in the causal chain connecting McKinsey to Plaintiffs—a factor McKinsey says makes this case unprecedented.  In reality, courts often find duties owed by co-conspirators and aiders and abettors, even where the tortfeasor acted, in some sense, through a third party.  In the *JUUL* litigation, for example, the court found duties owed to school districts, personal injury plaintiffs, and Native American tribes not just by Juul Labs, the manufacturer of the product causing injury, but also by Juul Labs' owners and investors and Altria Group, who allegedly conspired with and aided and abetted the individuals.  *See JUUL I*, 497 F. Supp. 3d at 655-63 (school districts and other government entities); *In re JUUL Labs, Inc. Mktg., Sales Prac. & Prods. Liab. Litig.*, 2021 WL 3112460, at *11-12, 18-19 (N.D. Cal. July 22, 2021) (*JUUL II*) (personal injury plaintiffs); *In re JUUL Labs, Inc. Mktg., Sales Prac. & Prods. Liab. Litig.*, 2022 WL 1955678, at *6-7 (N.D. Cal. Jan. 28, 2022) (*JUUL III*) (tribes).

In other opioid litigation, too, courts have found duties owed to government and private plaintiffs by various participants in the causal chain, notwithstanding the acts of third parties that undoubtedly played critical roles.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig. (Summit County)*, 2018 WL 6628898, at *18-19 (N.D. Ohio Dec. 19, 2018) ("*Summit County II*") (duties to county on the part of manufacturers, distributors, and pharmacies); *In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 785-87 (N.D. Ohio 2020) (same, as to hospital).  Other examples are numerous.  In *Ileto v. Glock*, the Ninth Circuit, applying California law, found that a gun manufacturer owed a duty to the family of a murder victim even though the gun was sold through an illegal market.  349 F.3d at 1203-05.  The court explained: "a defendant's duty of care

extends to those individuals a defendant puts at an unreasonable risk of harm through the reasonably foreseeable actions of a third party." *Id.* at 1204. And in *Stanford v. Kuwait Airways Corp.*, 89 F.3d 117 (2d Cir. 1995), the court, applying "generally accepted tort principles," found that one airline owed a duty to protect customers on *other* airlines from hijacking. *Id.* at 122-27. The court explained that the airline had engaged in a "cooperative endeavor" with other airlines "to facilitate travel among the cooperating carriers" and was on notice of the hijacking risks. *Id.*[20]

## 2.     Plaintiffs Adequately Allege Foreseeability Of Harm.

In many states, foreseeability is the central feature of the duty analysis. *See, e.g.*, *J'Aire Corp. v. Gregory*, 598 P.2d 60, 64 (1979) ("[F]oreseeability of the risk is a primary consideration in establishing the element of duty." (citation omitted)); *Lowery v. Echostar Satellite Corp.*, 160 P.3d 959, 964 (Okla. 2007) ("The most important consideration in determining the existence of a duty of care is foreseeability of harm to the plaintiff.").

The complaints lay out in detail how McKinsey's conduct foreseeably exacerbated the opioid epidemic, and how the harms to Tribal and NAS Plaintiffs were, in turn, foreseeable outcomes of that epidemic. In particular, they allege that McKinsey, while embedded in its clients' operations, including Purdue's, had actual knowledge, at least after Purdue's guilty plea in 2007, that opioids were flooding the market, being diverted, and were leading to addictions with catastrophic results to communities nationwide, including those where the Tribal and NAS Plaintiffs reside. *See* Compl. ¶¶ 2, 507-10; NAS Compl. ¶¶ 2, 465-67.

The NAS Plaintiffs also allege that McKinsey was on notice of the risks of opioids to pregnancy and fetal health. NAS Compl. ¶¶ 614, 618. McKinsey argues that the injuries to NAS Plaintiffs were not foreseeable because it never advised Purdue to target doctors prescribing opioids to pregnant women or knew that doctors were doing so. Mot. at 24. It was reasonably

---

[20] In Massachusetts, McKinsey relies on *In re GlassHouse Techs, Inc.*, 604 B.R. 600, 631-32 (Bankr. D. Mass. 2019). There are no Massachusetts negligence claims at issue in the motion (though there is a Massachusetts wrongful death case pending in the MDL). In any event, McKinsey is wrong. *See, e.g.*, *Nycal Corp. v. KPMG Peat Marwick LLP*, 688 N.E.2d 1371, 1374 (Mass. 1998) (noting that "conduct by the accountant providing a direct linkage to the third party" is not required to hold accountants liable a noncontractual third party's injuries under Massachusetts law). Even *GlassHouse*, McKinsey's case, emphasized the distinction between claims for "personal injuries," where duty is analyzed under traditional foreseeability principles, and those for "pecuniary loss." 604 B.R. at 632 n.15.

foreseeable that McKinsey's failure to exercise reasonable care in advising Purdue to target its sales efforts on illicit opioid prescribers would result in more people becoming addicted to opioids, that some people are women, and that some would be pregnant. McKinsey disputes these allegations, but on a motion to dismiss, they must be accepted.

Finally, McKinsey argues that foreseeability does not establish duty to the Tribal Plaintiffs because their negligence claims target economic harm. This passing argument must be rejected for several reasons. The existence and application of the economic loss rule is state- and context-dependent. For example, in *Summit County*, the court explained that the rule did not apply "where a tort claim alleges that a duty was breached independent of [a] contract," and noted as well that it would be "premature" on the limited record at the motion-to-dismiss stage to apply the economic-loss rule where defendants "characterized Plaintiffs' economic damages as purely derivative of personal injures" and where plaintiffs "facially pled damages to their proprietary interests." *In re Nat'l Prescription Opiate Litig. (Summit County)*, 2018 WL 4895856, at *19, 41 (N.D. Ohio Oct. 5, 2018) ("*Summit County I*"). And it is inaccurate to paint the Tribal claims as uniformly concerning economic loss: the complaint describes hazardous waste disposed of on tribal property (physical intrusion), as well as damage to cultural property and traditional food sources. Compl. ¶¶ 617, 760, 1087. Many Tribes have also sustained physical property damage to tribally-owned businesses such as hotels and gaming facilities (and can amend to so plead if necessary). Finally, none of the cherry-picked cases McKinsey cites supports a finding that the laws in all relevant states would require dismissal on this point. *See, e.g.*, *Meier v. Chesapeake Operating L.L.C.*, 324 F. Supp. 3d 1207, 1217 n.6 (W.D. Okla. 2018) ("No authority has been cited from a court in Oklahoma specifically adopting the economic loss rule outside of the products liability arena." (internal quotation marks omitted)).[21]

---

[21] McKinsey's cases are not persuasive even on their own terms. The Wisconsin case did not address the question of economic loss at all. *See Gritzner v. Michael R.*, 611 N.W.2d 906, 912-13 (Wis. 2000). In fact, the Wisconsin Supreme Court has specifically declined to extend the economic loss rule to the negligent performance of services. *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462, 471 (Wis. 2004). And while McKinsey points to a New York case declining to find a duty under certain circumstances where a plaintiff alleged exclusively economic loss, New York courts have not drawn a hard-line rule prohibiting such recovery. *See Dunlop Tire & Rubber Corp. v. FMC Corp.*, 53 A.D.2d 150, 154 (N.Y. 1976) (noting "if damage

### 3.   **Plaintiffs' Claims Arise From McKinsey's Action, Not Inaction.**

McKinsey argues that foreseeability does not matter because "Plaintiffs seek to hold a defendant liable based on the conduct of a third party." Mot. at 20.  This is category error: Plaintiffs' claim is not that McKinsey "had a legal duty to take action," as in the cases cited by McKinsey. *Brown v. USA Taekwondo*, 483 P.3d 159, 209 (Cal. 2021).  Instead, the claim is that McKinsey *took* concerted and ongoing actions, including the implementation services it touted, and is responsible for the consequences of those actions.  The problem is not that McKinsey failed to prevent third-party criminal conduct, but that it participated in and aided and abetted that criminal conduct.  In any case where third parties are involved, the defendant can distort the claim as a "failure to act" claim," but that did not prevent findings of duty in *JUUL*, *Ileto*, *Summit County*, or the other cases discussed above.

McKinsey relies on *Doe v. Uber Technologies, Inc.*, 2022 WL 4281363 (N.D. Cal. Sept. 15, 2022), *appeal filed* (9th Cir. No. 22-16562), which found that a claim against Uber arising from the actions of a person posing as an Uber driver was grounded in nonfeasance, not misfeasance, and so required an affirmative duty to act.  *Id.* at *2-3.  *Doe* was a summary judgment decision, not a motion to dismiss.  At the more forgiving pleading stage, the court "allowed [the] negligence claim to proceed under a misfeasance theory." *Id.* at *1.  More importantly, the differences between *Doe* and this case are obvious.  First, at the time of the third-party conduct, Uber and the driver were essentially strangers to each other—Uber had terminated his driver status months earlier.  *Id.* at *1.  Here, Plaintiffs allege that McKinsey and its clients, particularly Purdue, carried on a unique and special relationship for more than a decade, and that the premise of McKinsey's business is to "interact[] with every element of [the] organization" to the point that "you can't even tell the difference between a McKinsey team member and one of our clients."  Compl. ¶¶ 116-17.

Second, the court explained that, while third-party criminal conduct was a "foreseeable consequence" of Uber's "business model," finding misfeasance required that the third-party

---

from the loss of power was foreseeable, then the interruption of production was also foreseeable and the lost profits resulting from the interruption should be compensable").

conduct be a "necessary component" of that business model such that it could be connected to

action, rather than inaction.  2022 WL 4281363 at *2-3.  Here, Plaintiffs allege that the only

reason for McKinsey's "business model"—its work with opioid manufacturers like Purdue—was

to maximize opioid sales without regard for the human consequences.  McKinsey only kept its

business, and spread it to other manufacturers, because of its extraordinary success in that

mission.  Indeed, as *Doe* explained, California courts have found duties in similar situations

where, rather than tolerate dangers posed by third parties, the defendant "encouraged" those

"dangers."  *Id.* at *3.  Just so here.[22]

## 4.    Public Policy Favors A Duty Here.

McKinsey argues that the public policy factors considered by some states defeat a finding

of duty.  But the only factor McKinsey argues is the potential for "limitless liability."  Mot. at 24-

25.  In reality, states consider a variety of factors, including, "the moral blame attached to the

defendant's conduct," *Coyle v. Historic Mission Inn Corp.*, 234 Cal. Rptr. 3d 330, 336 (Cal. Ct.

App. 2018), the "policy of preventing future harm," *Domagala v. Rolland*, 805 N.W. 2d 14, 26

(Minn. 2011), and "the reasonable expectations of [the] parties and society generally," *Pasternack

v. Lab'y Corp. of Am. Holdings*, 59 N.E.3d 485, 490 (N.Y. 2016).  McKinsey discusses none of

these.  And any analysis of the factors would have to start with the elephant in the room: the

conduct in which McKinsey was so deeply involved led to *two* guilty pleas, tens of billions of

dollars in civil liability, and hundreds of millions of dollars in settlements for McKinsey itself.

McKinsey ignores these unpleasant details.  The cases McKinsey cites illustrate the nuances of

public policy duty analysis and the importance of looking at every factor, including those lacking

from its motion.  McKinsey repeatedly features *Bily v. Arthur Young & Co.*, 834 P.2d 745 (Cal.

1992), in which the court held that auditors owe no duty to third party users of their reports.  *Id.* at

761-62.  *Bily* rested, in part, on the fact that auditors' "'public watchdog' function demands . . .

total independence from the client at all times."  *Id.* at 752.  McKinsey, as alleged, stands in the

opposite position: totally integrated with its clients and playing an active, intentional role in the

---

[22] This distinction between misfeasance and nonfeasance also renders irrelevant *Abdulaziz v. McKinsey & Co., Inc.*, 2022 WL 2444925 (2d Cir. July 5, 2022), where the court understood the plaintiff's claim to rest only a "duty to control the conduct of others."  *Id.* at *2 (citation omitted).

tortious conduct. *Bily* also relied on policy considerations inapplicable here, including the unbounded nature of the "economic losses from investment and credit decisions," that the "generally more sophisticated class of plaintiffs in auditor liability cases . . . permits the effective use of contract rather than tort liability to control and adjust the relevant risks," and the "probable consequences of expanded liability," including "increased expense and decreased availability of auditing services." *Id.* at 761.[23]

McKinsey's concerns of limitless liability and "the destructive impact of such limitless liability on publicly beneficial business activities," Mot. at 24, are wildly overstated. *First*, the law already recognizes the potential for liability for professional advisors. *See, e.g.*, § I.A & n.2, *supra* (collecting cases). *Second*, the complaints lay out all of the factors that differentiate McKinsey from a run-of-the-mill service provider: its commitment to transform its clients, its ability to ingratiate itself into all levels of its clients' organizations, and its expertise in not just advice, but implementation. *Third*, even if "limitless liability" were a valid concern for a "professional advisor" working with a client, nothing about McKinsey's parade of horribles extends to the unique situation here: a consultant working with *all* of the major participants in a conspiracy to maximize the spread of dangerous pharmaceuticals and *enabling* those companies to utilize expertise of their competitors' tactics to which they otherwise would lack access. This is hardly an accountant auditing a sole client.

### F.    Plaintiffs Plead Cognizable Fraud / Negligent Misrepresentation Claims.

McKinsey contends that all of Plaintiffs' common law fraud and negligent misrepresentation claims should fail. Mot. at 25-27. Contrary to McKinsey's arguments, Plaintiffs adequately allege specific fraudulent misrepresentations made by McKinsey that opioids were non-addictive, effective, and safe for the treatment of long-term chronic pain and non-acute, non-cancer pain, and adequately allege their own reliance on those misrepresentations. It is of no consequence that McKinsey purportedly did not make representations to Plaintiffs

---

[23] Similarly, in *Eiseman v. State of New York*, 511 N.E.2d 1128 (N.Y. 1987), the court emphasized the "larger social consequences" at issue. If potential liability means that consultants feel constrained from devising, proposing, and implementing criminal conduct with recidivist clients, it is hard to see the "social consequences" as anything other than beneficial.

*themselves*: a "plaintiff is not required to prove direct reliance on a fraudulent misrepresentation to state a claim for fraud." *Cleveland Bakers*, 440 F. Supp. 3d at 816 (citation omitted). This theory is spelled out in the Restatement section entitled "Representations Made to a Third Person": "The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker *intends or has reason to expect* that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." Restatement (Second) of Torts § 533 (emphasis added). Among many others, "California courts have adopted the theory of indirect misrepresentation embodied in § 533 of the Restatement." *Jones v. AIG Risk Mgmt., Inc.*, 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010).

Judge Polster applied this theory in *Cleveland Bakers* to conclude that TPP plaintiffs sufficiently alleged a claim of common law fraud against opioid manufacturer defendants, 440 F. Supp. 3d at 816, drawing on his prior ruling that municipal plaintiffs sufficiently alleged justifiable third-party reliance on opioids manufacturer defendants' fraudulent representations where plaintiffs averred that defendants "set out to convince physicians, patients and the public at large that false propositions regarding the safety and efficacy of opioids were true," *Summit County I*, 2018 WL 4895856, at *42, *report and recommendation adopted in relevant part*, 2018 WL 6628898, at *1. TPP and Tribal Plaintiffs' allegations here are generally no different. To the extent McKinsey argues Plaintiffs here were not justified in their reliance on McKinsey's representations, Plaintiffs need not establish such reliance at this stage: "[W]hether a plaintiff justifiably relied on an allegedly fraudulent misrepresentation or omission is a question of fact and not appropriate for determination on a motion to dismiss." 2018 WL 4895856, at *41.

McKinsey cannot argue that it had no "reason to expect" that its messaging about the efficacy and addictiveness of opioids would be repeated to healthcare providers or patients—the ultimate purchasers of prescription opioids. Such an argument "is inconsistent with the strategy of [McKinsey's] own advertising." *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 673 P.2d 660, 674 (Cal. 1983) (noting that defendant should not be able to escape liability by

"mak[ing] a representation to one group intending to influence the behavior of the ultimate purchaser").  As in *Summit County I*, Plaintiffs' allegations that McKinsey "intentionally made misrepresentations and omissions to the medical community, patients, and government regulators with the intent of inducing reliance . . .  support a reasonable inference that [McKinsey] intended to induce Plaintiffs to rely on [its] false assurances and omissions."  2018 WL 4895856, at *42.

NAS Plaintiffs allege that McKinsey committed fraud by "[d]ownplaying the substantial risks of addiction and other side effects of opioids generally," "[o]verstating the efficacy of opioids generally," "[m]isrepresenting the medical usefulness and necessity of opioids generally," and "[d]ownplaying the substantial and known risks and dangers associated with opioid use during pregnancy."  NAS Compl. ¶ 633.  NAS Plaintiffs specifically allege that "McKinsey *intended* healthcare providers, including the Minor Plaintiffs' biological mother's healthcare providers, to rely upon it and its clients' false and misleading assertions" relating to opioids.  *Id.* ¶ 636 (emphasis added).

Similarly, Tribal Plaintiffs allege that "McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids," and that both "[d]octors, including those working in hospitals and clinics operated by Tribal health organizations" and "[p]atients . . . relied on these misrepresentations and omissions" in, respectively, prescribing and taking prescription opioids for "long-term chronic, non-acute, and non-cancer pain, and for other uses not approved by the FDA."  Compl. ¶¶ 806-13.  Tribal Plaintiffs further allege that McKinsey made these material misrepresentations "in an intentional effort to deceive and induce doctors and patients to prescribe and use prescription opioids" in this manner.  *Id.* ¶ 808.  Both NAS and Tribal Plaintiffs have thus adequately alleged third-party reliance pursuant to Restatement § 533.

Contrary to McKinsey's argument as to TPP Plaintiffs' claims, *see* Mot. at 26-27, TPP Plaintiffs fully allege that McKinsey had a duty to correct any such statements.  TPP Compl. ¶¶ 699-704 ("McKinsey had a duty to disclose the true dangers of opioids.").  And McKinsey's duty to disclose arises from its active concealment of the truth and propagation of incomplete and misleading statements.  *See, e.g.*, *Vega v. Jones, Day, Reavis & Pogue*, 17 Cal. Rptr. 3d 26, 33 (Cal. Ct. App. 2004) ("Even where no duty to disclose would otherwise exist, . . .

One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud." (citation omitted)); Restatement (Second) of Torts § 550 ("One party to a transaction who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other . . . as though he had stated the nonexistence of the matter that the other was thus prevented from discovering."). TPP Plaintiffs allege that McKinsey was uniquely privy to its clients' information about the addictive and potentially harmful nature of opioids—information not known to or reasonably discoverable by Plaintiffs—and that, despite this knowledge, McKinsey worked with its clients to deploy affirmative statements about the safety of opioids. In short, McKinsey "volunteered to provide information about the opioids that McKinsey's clients offered for sale indirectly to Plaintiffs," "had the duty to disclose the whole truth," and "did not." TPP Compl. ¶ 701.

As required by Rule 9(b), TPP Plaintiffs also identify with particularity McKinsey's fraudulent statements. McKinsey's argument to the contrary ignores, among other things, charts in the complaints that detail dozens of McKinsey's alleged misrepresentations and false statements "to consumers, prescribers, regulators, and Plaintiffs." *Id.* ¶ 660; Compl. ¶ 729. For each alleged misrepresentation, these charts identify the McKinsey client responsible, the addressee, the date(s), and a description. McKinsey insists that Plaintiffs identify "only one purported statement by *McKinsey* that was allegedly false" and argues that Plaintiffs do not allege "who at McKinsey made this statement, when, or how the statement was false or misleading," Mot. at 27 (citing Compl. ¶¶ 235, 707), but this is both factually inaccurate (as to the first assertion) and unnecessary (as to the latter). This level of detail is not required to satisfy even the heightened Rule 9(b) standard. *See CCSF I*, 491 F. Supp. 3d at 646 (requiring only sufficient "notice of the particular misconduct which is alleged to constitute the fraud" (citation omitted)). McKinsey's reliance on this Court's order in *Chevron Products Co. v. Advanced Corrosion Technologies & Training, LCC* is also misplaced; in that case, Chevron failed to meet Rule 9(b)'s standard because [its] complaint did not "specifically allege the time, place, identities, and content of the misleading representations." 2021 WL 2156467, at *4 (N.D. Cal. May 27, 2021). Plaintiffs did all of this, and nowhere does *Chevron Products* require that a pleading identify the

name(s) of individual *person(s)* at a corporate entity who might have made specific

misrepresentations. And, even where Plaintiffs do not allege a detailed compendium of each and

every one of McKinsey's fraudulent statements made in conjunction with its opioid manufacturer

clients, "[p]laintiffs should be able to base their cause of action upon an allegation that they acted

in response to an advertising campaign even if they cannot recall the specific advertisements."

*Comm. on Children's Television*, 673 P.2d at 674.

### G.  Plaintiffs Adequately Allege Civil Conspiracy / Aiding And Abetting.

The Restatement (Second) of Torts § 876 governs liability via concerted action, including

by agreement or civil conspiracy (§ 876(a)), and by substantial assistance, or civil aiding and

abetting (§ 876(b)). As explained in the seminal case *Halberstam v. Welch*, "[t]he prime

distinction" between the two is that "a conspiracy involves an agreement to participate in

wrongful activity" whereas "[a]iding-abetting focuses on whether a defendant knowingly gave

'substantial assistance' to someone who performed wrongful conduct." 705 F.2d 472, 478 (D.C.

Cir. 1983). McKinsey ignores *Halberstam*, the many cases applying it, and the Restatement.

### 1.  McKinsey's Conduct Is The Hallmark Of A Civil Conspiracy.

McKinsey's clients have already been held on the pleadings to have engaged in a

conspiracy to "expand[] the opioid market" along with distributors and pharmacies. *Summit

County II*, 2018 WL 6628898, *11 (conspiracy of opioid manufacturers, distributors, and

pharmacies who "shared a general conspiratorial objective of expanding the opioid market" under

Ohio law); *In re Nat'l Prescription Opiate Litig.*, 458 F. Supp. 3d 665, 701 (N.D. Ohio 2020)

(same, applying Michigan law). McKinsey was a linchpin in designing and effectuating the sales

and marketing tactics through which that conspiracy was effectuated. On this basis alone, the

Court could sustain the civil conspiracy claims. Analysis of the claim's elements confirms the

same result. They are: (1) an agreement between two or more persons; (2) to participate in an

unlawful act or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act

performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in

furtherance of the common scheme. *Halberstam*, 705 F.2d at 482; *accord, e.g.*, *Gonzalez v.

Lloyds TSB Bank, PLC*, 532 F. Supp. 2d 1200, 1208 (C.D. Cal. 2006).

### a.       McKinsey Entered Into An Unlawful Agreement.

The agreement prong simply requires "an agreement to take part in an unlawful act or a lawful act in an unlawful manner." *Halberstam*, 702 F.2d at 479.  Given the nature of conspiracies, agreements between co-conspirators "must generally be inferred from circumstantial evidence." *Id.* at 480.  A court "must initially look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another." *Id*. at 481.  Here, McKinsey doggedly pursued the overall goal of the conspiracy: maximizing the size and profitability of the marketplace for Schedule II controlled substances known to be addictive in the United States, including "re-catalyzing medically unnecessary prescriptions: turbocharging sales through E2E." RJN, Ex. A at 64 (Purdue Plea Agreement Addendum A).  Moreover, McKinsey was in routine contact with all of its co-conspirators for *decades* in furtherance of this common goal.  This is significant because "the *length of time* two parties work closely together may also strengthen the likelihood that they are engaged in a common pursuit.  Mutually supportive activity by parties in contact with one another over a long period suggests a common plan." *Halberstam*, 705 F.2d at 481.

### b.       McKinsey Participated In Tortious Conduct.

McKinsey argues that Plaintiffs fail to allege that "McKinsey participated intentionally in the allegedly tortious conduct" because "McKinsey only provided lawful advice." Mot. at 46.  This is a red herring.  Civil conspiracy requires "overt" acts—not "unlawful" ones—in furtherance of unlawful conduct.  McKinsey's *own* conduct need not be the source of Plaintiffs' injury in a civil conspiracy. *Halberstam*, 705 F.2d at 482.  Instead, McKinsey is liable for the tortious or wrongful conduct of its co-conspirators.  Once a conspiracy is proven, any actionable deed by one of the conspirators is chargeable to all. *City of Industry v. City of Fillmore*, 129 Cal. Rptr. 3d 433, 450 (Cal. Ct. App. 2011).  Here, Purdue has admitted that it, "in collaboration with [McKinsey], implemented many of the consulting company's recommendations," and that Evolve to Excellence "was overseen by [McKinsey] and some of Purdue's top executives."  RJN, Ex. A at 66-67 (Purdue Plea Agreement Addendum A ¶¶ 105, 111).  This is an admission by a co-conspirator that it adopted McKinsey's recommendations and kept working with McKinsey to

1   implement them for the purpose of accomplishing an unlawful act.  *Id.* at 18; Compl. ¶¶ 305-06.

2   The participation prong is satisfied.

3            c.      **McKinsey And Its Co-Conspirators Committed Numerous**
                     **Torts.**

4            McKinsey argues that there can be no conspiracy because there is no underlying tort, but,

5   while some courts have held that civil conspiracy requires an *intentional* underlying tort (which

6   would disqualify negligence), that is not a universal rule.  *See Adcock v. Brakegate, Ltd.*, 645

7   N.E.2d 888, 894-95 (Ill. 1994) ("Once a defendant knowingly agrees with another to commit an

8   unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any

9   tortious act . . . , whether . . . intentional or negligent in nature); *Wright v. Brooke Grp. Ltd.*, 652

10  N.W.2d 159, 174 (Iowa 2002) ("[P]laintiff may base a claim of civil conspiracy on wrongful

11  conduct that does not constitute an intentional tort."); *see also* Restatement (Second) of Torts

12  § 876, cmt. d.  At a minimum, this Court would have to engage in a state-by-state analysis of this

13  issue.

14       2.      **McKinsey Is Liable For Aiding And Abetting.**

15          Unlike civil conspiracy, aiding and abetting requires no evidence of an agreement.

16  Instead, the defendant need only "know[] that the other's conduct constitutes a breach of duty and

17  give[] substantial assistance or encouragement to the other. . . ."  Restatement (Second) of Torts

18  § 876(b).

19          a.      **McKinsey Knew Its Clients Were Committing Torts.**

20          To satisfy this element, McKinsey need not have known about the commission of an

21  *intentional* tort because, as the Restatement section 876(b) comments make clear, aiding and

22  abetting applies to intentional torts *and* negligence.  Plaintiffs allege knowledge of both.

23  McKinsey was working hand-in-hand with Purdue before, during, and after Purdue's first guilty

24  plea in 2007, was tagged with designing and helping implement strategies to evade the limitations

25  from the resulting CIA, and spearheaded the OxyContin turbocharge that the Sacklers advanced

26  to maximize profits before the proverbial chickens came to roost.  Compl. ¶¶ 153, 167-70, 172-

27  79.  Plaintiffs further allege that McKinsey consultants were concerned about McKinsey's own

28

liability during the pendency of the Purdue client relationship, and discussed destroying evidence as a means of managing that exposure. *Id.* ¶ 545. Subsequently, McKinsey was implicated in criminal conduct in Purdue's *second* guilty plea in 2020. *Id.* ¶¶ 547-52. This Court has already held that "Plaintiffs adequately allege that McKinsey knew that developing aggressive strategies to 'turbocharge' opioid sales during the midst of a nationwide opioid epidemic would cause harm." *McKinsey*, 2022 WL 15525768, at *8. Plaintiffs also adequately allege that McKinsey knew its co-conspirators were committing intentional torts or acting negligently.

### b.   McKinsey Provided "Encouragement."

McKinsey's limited attacks on Restatement § 876(b) target the purported lack of "substantial assistance" and ignore "encouragement" entirely.[24] But, as the Restatement comments explain: "Advice or encouragement to act . . . . has the same effect upon the liability of the adviser as participation or physical assistance. . . . This is true . . . [even] when the act done is . . . merely a negligent act." Restatement (Second) of Torts § 876, cmt. d. In other words, "[t]he fact of encouragement [is] enough to create joint liability." *Thompson v. Trump*, 590 F. Supp. 3d 46, 91 (D.C. 2022) (quoting *Halberstam*).[25] As this Court recognized in a related context, advice alone can establish liability "even without direct evidence that any [tortfeasor] followed" the "advice." *See CCSF II*, 2022 WL 3224463, at *55 (discussing *City of Modesto v. Dow Chem. Co.*, 227 Cal. Rptr. 3d 764 (Cal. Ct. App. 2018)). There is no dispute that McKinsey, at a minimum, provided advice and encouragement to its opioid clients. In contrast to the tortfeasors in *City of Modesto*, Purdue board members have admitted that they and Purdue *did* rely on McKinsey when implementing Project Turbocharge.[26] McKinsey provided the requisite

---

[24] This includes McKinsey's Appendix U, which states an incomplete legal proposition.

[25] *See also Chavers v. Gatke Corp.*, 132 Cal. Rptr. 2d 198, 205 (Cal. Ct. App. 2003) ("If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."); *Rice v. Paladin Enters.*, 128 F.3d 233, 242-43 (4th Cir. 1997) (finding the publisher of a how-to manual for committing murder civilly liable as an aider and abettor to the victim when a hitman read the book, followed the author's advice and instructions, and killed someone).

[26] *See* The Raymond Sackler Family's Surreply in Further Support of its Opposition to the Official Committee of Unsecured Creditors' Exceptions Motion, *In re: Purdue Pharma L.P. at al.*, No. 19-23649, ECF 2093 at 28 (Bankr. S.D.N.Y.) (The Board "was entitled to rely on . . . McKinsey and management's reasoned advice about the proposed marketing program").

encouragement.  That alone is enough, and Plaintiffs have also alleged that McKinsey provided "substantial assistance" to its tortfeasing clients.

### c.      McKinsey Provided Its Clients Substantial Assistance.

In "practice, liability for aiding and abetting often turns on how much encouragement or assistance is substantial enough." *Halberstam*, 705 F.2d. at 478.  Factors relevant to such a determination include "[(i)] the nature of the act encouraged, [(ii)] the amount of assistance given by defendant, [(iii)] [his] presence or absence at the time of the tort, [(iv)] [his] relation to the principal, [and] [(v)] [his] state of mind[.]" *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (citing *Halberstam*, 705 F.2d at 483-84).  Each factor supports liability here.

### i.      The Nature Of The Act Encouraged Was Severe.

The conduct at issue is the deceptive marketing and sales of a highly addictive and often fatal drug.  That is as significant as it gets.  McKinsey "counter[ed] emotional messages from mothers with teenagers that overdosed [on] OxyContin"; it developed programs to identify "hot spots" of opioid diversion and abuse, and then never deployed it; it proposed paying $14k to insurers every time one of their insureds overdosed on OxyContin as an incentive to maintain formulary status.  Compl. ¶¶ 234, 514-18, 539-44.  The nature of the acts encouraged was clear: they were worth some money, and they killed people.

### ii.      McKinsey Gave Purdue And The Other Conspirators Significant Assistance.

As detailed in the complaints and summarized in this brief, McKinsey's assistance was significant and long-running.  McKinsey worked with Purdue for approximately fifteen years. *See Halberstam*, 705 F.2d at 485 ("[T]he length of time an alleged aider and abettor has been involved with a tortfeasor almost certainly affects the quality and extent of their relationship and probably influences the amount of aid provided as well.").  It interacted with every level of Purdue's corporate hierarchy, from advising the Board, to participating in Executive Committee meetings, to joining Purdue sales representatives for ride-along visits to prescribers.  It assisted the Sacklers in identifying three CEOs after Michael Friedman pleaded guilty in 2007.  McKinsey regularly attended and contributed to Purdue Executive Committee meetings.  And McKinsey

worked directly with Purdue's board.  One McKinsey partner went so far as to describe herself as a "counselor to Richard Sackler."  Compl. ¶ 156.  McKinsey maintained a co-managerial position over the implementation of Project Turbocharge serving, alongside Purdue personnel, on the Executive Oversight Team ("EOT") of this critically significant project.  These are just a few samplings of the extensive assistance McKinsey provided, which, together, strongly support aiding and abetting liability.

### iii.   McKinsey Was Present At The Time Of The Tort.

McKinsey officially began its relationship with Purdue in 2004, three years before Purdue and its executives pleaded guilty for the first time in 2007.  *Id.* ¶¶ 161-63.  McKinsey remained with Purdue throughout the 5-year Corporate Integrity Agreement, and proposed to Purdue transformational changes in their OxyContin sales and marketing tactics within months of the CIA's expiration early 2013.  *Id.* ¶¶ 186-87, 284-87.  Purdue adopted those transformational changes, and McKinsey and Purdue then proceeded to implement Project Turbocharge.  Those efforts were then the basis for Purdue's second guilty plea in 2020.  *Id.* ¶¶ 547-52.  McKinsey was there the whole time: before, during, and after, on-site at Purdue headquarters.  *Id.* ¶ 195.

### iv.   McKinsey Was Deeply Enmeshed In Its Clients' Businesses

McKinsey's business model is "to partner with clients to pursue business objectives identified by McKinsey" and then to "engage in concerted action as a seamless and cohesive unit in order to implements the necessary means to achieve it."  *Id.* ¶ 121.  As part of the transformational relationships that McKinsey espouses, McKinsey bonds with its client.  *Id.* ¶ 116.  "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."  *Id.* ¶ 117.  As this Court recognized, "McKinsey allegedly did more than just give advice; it worked collaboratively alongside its clients to implement McKinsey's recommendations . . . In the words of one of the company's employees, 'you can't even tell the difference between a McKinsey team member and one of our clients.'"  *McKinsey*, 2022 WL 15525768 at *1.  Clients value McKinsey's willingness

1  to "stay[] longer with them" and "walk the emotional journey with them when they're going

2  through the tough times and really changing their companies."  Compl. ¶ 120.

3       Moreover, McKinsey's elite, white-shoe reputation is relevant to a finding of aiding and

4  abetting liability, because the power of encouragement is stronger when that encouragement

5  comes from a "position of authority."  *Cobb v. Indian Springs, Inc.*, 522 S.W.2d 383, 387 (Ark.

6  1975).  As the Sackler family explained, Purdue "heeded McKinsey's advice" in part because it

7  was "regarded as one of the world's leading management consulting firms."  *In re: Purdue*

8  *Pharma L.P. at al.*, No. 19-23649, ECF 2093 at 26 (Bankr. S.D.N.Y.)

9       **v.      McKinsey Was Knowingly Complicit.**

10       In 2009, McKinsey's state of mind was sober-minded.  "We all feel responsible" was

11  McKinsey's answer to the question, "Who at Purdue takes personal responsibility for all these

12  deaths?"  Compl. ¶ 221; *see also id.* ¶ 234.  Four years later, McKinsey's state of mind was more

13  enthusiastic.  *Id.* ¶ 291 (urging the Sacklers to "make a clear go-no-go decision to 'Turbocharge

14  the Sales Engine'").  By 2018, its state of mind had grown macabre.  *Id.* ¶¶ 539-43 (proposing

15  payments to insurers for each future OxyContin overdose or death as a means of assuring

16  formulary access and continued sales of the drug).  And paranoid, with McKinsey concerned

17  enough about its own legal liability that a pharmaceutical practice leader proposed destroying

18  Purdue-related documents, fearing legal liability.  *Id.* ¶ 545.  Put simply, Plaintiffs plausibly

19  allege that McKinsey knew what it was doing.

20       **3.      McKinsey Misrepresents Plaintiffs' Aiding And Abetting Claims.**

21       McKinsey argues that it cannot be liable for "fail[ing] to disclose certain information,"

22  Mot. at 48, but, even if a person "does not have a duty to report another's tortious activity . . .

23  neither does [it] have a right to aid and abet another in a tortious activity and profit from it by

24  providing substantial assistance."  *Ray v. BlueHippo Funding LLC*, 2008 WL 1995113, *4 (N.D.

25  Cal. May 6, 2008).  The complaints are not premised upon McKinsey's failure to warn Plaintiffs

26  of the harms of the opioids epidemic; rather, Plaintiffs allege McKinsey was a central participant

27  in fostering the epidemic itself.  McKinsey's cases addressing *only* allegations of failure to

28  disclose information are therefore inapposite.  Finally, McKinsey argues that a finding of

1  substantial assistance requires a showing of proximate cause.  Mot. at 48.  Again, McKinsey

2  misinterpreted the factors that determine substantial assistance.  Courts look to the five factors

3  addressed above to evaluate substantial assistance or encouragement, and proximate cause is not

4  one of them.  Regardless, as argued above, McKinsey *was* a proximate cause of Plaintiffs' harms.

5  **H.    TPP Plaintiffs Plead Cognizable Claims For Unjust Enrichment.**

6  TPP Plaintiffs' equitable unjust enrichment claim seeks redress for the benefits McKinsey

7  received from the fraudulent marketing and sale of prescription opioids.  TPP Compl. ¶¶ 693-94.

8  *First*, McKinsey seeks to dismiss one TPP Plaintiff's California unjust enrichment claim

9  as duplicative of other claims.  Mot. at 49, 51.  It is not: the unjust enrichment claims seek

10  restitution of McKinsey's compensation, not compensatory damages for opioid- and treatment-

11  related payments.  TPP Compl. ¶¶ 692-94.  The cases McKinsey cites finding claims duplicative

12  because they are based on the same factual predicate have been overruled by the Ninth Circuit as

13  inconsistent with Rule 8.  *See Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762-63 (9th Cir.

14  2015) ("To the extent the district court concluded that the cause of action was . . . duplicative of

15  or superfluous to Astiana's other claims, this is not grounds for dismissal.").[27]

16  *Second*, McKinsey argues that "the lack of any relationship between Plaintiffs and

17  McKinsey precludes Plaintiffs from pursuing" unjust enrichment claims.  Mot. at 49.  But this is

18  not an element of an unjust enrichment claim in any of the relevant states.  In *Cleveland Bakers*,

19  for example, Judge Polster applied Ohio law and found that TPP plaintiffs alleged "facially

20  plausible unjust enrichment cause of action on the theory that Defendants allegedly gained

21  significant profits at Plaintiffs' expense and did so through fraudulent and illegal means."  440 F.

22  Supp. 3d at 818.  Similarly, here, TPP Plaintiffs allege that they paid more for opioids "than for

23  other efficacious drugs that were available at cheaper prices, and/or paid more for opioids due to

24  addiction," as well as for costly treatment related to opioid use and addiction.  TPP Compl. ¶ 537;

25

26

27  [27] McKinsey argues that California does not recognize unjust enrichment as a standalone claim, but this too has been rejected in the Ninth Circuit.  *See Takeya USA Corp. v. PowerPlay Mktg. Grp., LLC*, 2022 WL 17357781, at *17 (C.D. Cal. 2022).

28

1    *see also id.* ¶¶ 690-94 (describing economic harm specific to TPP Plaintiffs).[28]  Other states

2    similarly require only that a plaintiff confer a benefit upon the defendant, not that the conferral be

3    "direct."  *See, e.g.*, *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016)

4    (California) ("To allege unjust enrichment as an independent cause of action, a plaintiff must

5    show that the defendant received and unjustly retained a benefit at the plaintiff's expense.");[29] *In*

6    *re Packaged Seafood Prods. Antitrust Litig.*, 242 F. Supp. 3d 1033, 1091 (S.D. Cal. 2017)

7    (denying motion to dismiss, and noting the absence of any Massachusetts authority imposing a

8    directness requirement); *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110-11 (N.Y.

9    2011) (noting that "privity is not required for an unjust enrichment claim").[30]

10       *Third*, McKinsey says that Plaintiffs' unjust enrichment claims are precluded by

11   McKinsey's settlement with the state attorneys general, but provides no explanation why that

12   payment, none of which went to TPPs, has that legal effect.  Mot. at 50.

13       *Fourth*, McKinsey argues that Plaintiffs fail to plead an inadequate legal remedy, citing

14   *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020).  But *Sonner* held only that

15   a plaintiff who dropped legal claims on the eve of trial could not seek equitable relief.  *Id.* at 837.

16   The weight of authority holds that *Sonner* does not apply at the pleading stage.  *See, e.g.*, *Jeng v.*

17   *Nexo Fin., LLC*, 2022 WL 174236, at *27 (N.D. Cal. Jan. 19, 2022) (collecting cases).

18   ────────────

19   [28] In Ohio, McKinsey relies on *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005),
     but, as Judge Polster has explained, "that is not the rule in Ohio."  *Summit County II*, 2018 WL
     6628898, at *20; *see also Cleveland Bakers*, 440 F. Supp. 3d at 818 (same).

20   [29] McKinsey cites three California cases, but none help.  In *Magic Kitchen LLC v. Good Things*
21   *Int'l, Ltd.*, 63 Cal. Rptr. 3d 713, 731 (Cal. Ct. App. 2007), the trial court dismissed an unjust
     enrichment claim for several independent reasons (including statute of limitations), and the
22   appellate court affirmed without any published reasoning.  *Korea Supply Co. v. Lockheed Martin
     Corp.*, 63 P.3d 937, 947 (Cal. 2003), concerned the permissible scope of restitution under the
23   UCL, not an unjust enrichment theory (as McKinsey incorrectly asserts).  And *McBride v.
     Boughton*, 20 Cal. Rptr. 3d 115, 122-23 (Cal. Ct. App. 2004) said nothing at all about direct
24   conferral of benefits, but instead found an unjust enrichment claim precluded by public policy.

25   [30] In New York, a connection between the parties can be "too attenuated" to support an unjust
     enrichment claim.  *Id.*  McKinsey cites *Redtail Leasing, Inc. v. Bellezza*, 1997 WL 603496, at *8
26   (S.D.N.Y. Sept. 30, 1997), but that case thought unjust enrichment in New York requires privity;
     it does not.  Similarly, *Grynberg v. ENI S.p.A*, 2011 WL 13176088, at *3 (S.D.N.Y. Aug. 24,
27   2011), thought that "direct dealing" or a "substantive relationship" was required, but other courts
     have explained that is wrong.  *See, e.g.*, *Waldman v. New Chapter, Inc.*, 714 F. Supp. 2d 398,
28   403-04 (E.D.N.Y. 2010) ("New York law does not require an unjust enrichment plaintiff to plead
     'direct dealing,' or an 'actual, substantive relationship' with the defendant." (citation omitted)).

## I.    Plaintiffs Plead Cognizable Consumer Protection Claims.

McKinsey's efforts to dismiss the consumer protection claims under Alaska, Arizona, Michigan, Minnesota, and Utah Law must be denied.[31]

### 1.    Tribes Are Entitled To Pursue Statutory Relief.

Plaintiffs have standing to pursue claims even if they are not direct consumers of a defendant's services or products.  Under the Alaska statute, the plaintiff need not have been directly involved in a transaction with the defendant so long as the plaintiff was economically harmed by the defendant's conduct.  *Pepper v. Routh Crabtree, APC*, 219 P.3d 1017, 1024 (Alaska 2009) (attorneys subject to liability for representational activities in connection with consumer debt collection efforts).  Similarly, under the Arizona Consumer Fraud Act, a direct merchant-consumer transaction is not required.  *E.g.*, *United Healthcare Servs. Inc. v. Advanced Reimbursement Sols. LLC*, 2022 WL 4783771, at *5 (D. Ariz. Sept. 30, 2022) (holding insurer could bring claim against provider of health services where insurer paid more than it would have absent misstatements to insureds).  Michigan law likewise does not require a "transaction" between the parties to pursue a claim.  *DIRECTV, Inc. v. Cavanaugh*, 321 F. Supp. 2d 825, 838 (E.D. Mich. 2003); Mich. Comp. Laws § 445.902. "Any person" may bring a claim under Minnesota's consumer protection statutes.  *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 11 (Minn. 2001).  McKinsey's argument that it cannot be sued under Utah law because it is not a supplier also fails.  "Supplier" includes persons acting in connection with a consumer transaction.  *See Gallegos v. LVNV Funding LLC*, 169 F. Supp. 3d 1235, 1244 (D. Utah 2016) (law firms in the business of collecting consumer debt are suppliers under UCSPA).

### 2.    Plaintiffs Sufficiently Pleaded Their Omission-Based Claims.

McKinsey identifies no authority requiring a duty to disclose before an omission-based claim can be pursued under Alaska or Utah law; these claims are sufficiently pleaded.  For Arizona, McKinsey relies on a vacated appellate case.  Mot. at 53 n.51 (Appendix Z, citing *State*

---

[31] The Tribal Plaintiffs voluntarily dismiss the California False Advertising Law and Unfair Competition Law claims; the Montana Unfair Trade Practices and Consumer Protection Act claims; the New Mexico Unfair Practices Act claims; the Oregon Unlawful Trade Practices Act claims; and the Washington Consumer Protection Act claims.

1    *ex rel. Horne v. AutoZone, Inc.*, 258 P.3d 289, 299 (Ariz. Ct. App. 2011)).  To the contrary, valid

2    precedent holds a duty to disclose is not required.  *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815,

3    830-31 (D. Ariz. 2016).

4            Moreover, even if a duty to disclose under Arizona law is required, Plaintiffs adequately

5    alleged facts supporting the existence of such a duty here under Arizona, Michigan, and

6    Minnesota law.  Compl. ¶¶ 890-903, 1039-52, 1110-43.  Under Arizona, Michigan, and

7    Minnesota law, a party is obligated to disclose information that contradicts affirmative

8    misrepresentations or information which is necessary to prevent affirmative misrepresentations

9    from being misleading.  *See Rindlisbacher v. Steinway & Sons Inc.*, 497 F. Supp. 3d 479, 494-95

10   (D. Ariz. 2020), *aff'd*, 2021 WL 6067258 (9th Cir. Dec. 20, 2021) (requiring a person to disclose

11   "matters known to him that he knows to be necessary to prevent his partial or ambiguous

12   statement of the facts from being misleading").[32]  Here, because McKinsey elected to make

13   representations about the opioid drugs it was helping to market, it had an obligation to disclose

14   the full story.  *See, e.g.*, Compl. ¶¶ 900, 1049, 1115.

15                **3.       Plaintiffs Allege Sufficient Facts To Establish Causation.**

16           Under Alaska, Minnesota, and Utah law, a plaintiff need only establish causation, not

17   reliance.  *Cozzetti v. Madrid*, 2017 WL 6395736, at *7 (Alaska Dec. 13, 2017) ("actual reliance"

18   or even "deception" not required).[33]  This causal nexus is easily met: McKinsey marketed

19   addictive opioids by misleading patients and providers about the addictive qualities with the

20   purpose and intent of increasing prescriptions.  McKinsey knew, but failed to disclose these

21   dangers and indeed, affirmatively touted the safety of its clients' products, resulting in the desired

22   prescriptions which led to the opioid crisis ravaging Plaintiffs' communities.  In response to the

23   opioid crisis, the Plaintiff Tribes have been forced to devote substantial resources to remediation,

24   health care, child care, and law enforcement.  *See* § II.D.3, *supra*.  Under Arizona and Michigan

25   law, the Tribal Plaintiffs sufficiently allege reliance on McKinsey's unlawful acts.  Specifically,

26   _____

27   [32] *See also M&D, Inc. v. W.B. McConkey*, 585 N.W.2d 33, 39 (Mich. 1998) (similar); *M.H. v. Caritas Fam. Servs.*, 488 N.W.2d 282, 288 (Minn. 1992) (similar).

28   [33] *Ford Motor Credit Co. v. Majors*, 2005 WL 1021551, at *3 (Minn. Ct. App. May 3, 2005) (no reliance required); *Johnson v. Blendtec, Inc.*, 500 F. Supp. 3d 1271, 1294 (D. Utah 2020) (same).

doctors at Tribal health organizations and Tribal members heard misrepresentations developed by McKinsey about opioids and relied on those misrepresentations and omissions to prescribe and take prescription opioids.  Compl. ¶¶ 883-88, 895-900, 1032-37, 1041-51.

### 4.  "Public Benefits" Are Not Required.

The only state that requires a public benefit to pursue a claim under the consumer protection statute is Minnesota.  The public benefit requirement turns on the degree to which the acts affected the public, the form of the act, the relief sought and whether the conduct is ongoing. *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 889 (D. Minn. 2021).  Here, Plaintiffs allege that McKinsey's actions have devastated local communities.  This is sufficient.

### J.  NAS Plaintiffs Have Pleaded Cognizable Claims Under West Virginia Law.

NAS Plaintiffs do not intend to pursue claims for intentional or negligent infliction of emotional distress.  Otherwise, their claims under West Virginia law are well-pleaded.

Under West Virginia law, a joint venture "is an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge.  It arises out of a contractual relationship between the parties.  The contract may be oral or written, express or implied." *Dailey v. Ayers Land Dev., LLC*, 825 S.E.2d 351, 358 (W. Va. 2019) (citation omitted).  "[I]ntrinsic to a joint venture, is the concept of mutual efforts to promote the business, the success of which would accrue to the benefit of all parties." *Cunningham v. Herbert J. Thomas Mem'l Hosp. Ass'n*, 737 S.E.2d 270, 281 (W. Va. 2012) (internal quotation marks omitted).

NAS Plaintiffs have alleged the extent to which McKinsey and its clients combined their skills and knowledge in a mutual effort to promote the opioids business. *See, e.g.*, NAS Compl. ¶¶ 112, 223, 249, 284, 321, 686.  And NAS Plaintiffs have further sufficiently alleged that McKinsey entered into agreements to share in the profits of its clients. *See id.* ¶ 684 (alleging that McKinsey and its "clients/co-conspirators conducted themselves as a single business enterprise for profit").  Not only did McKinsey's opioid manufacturer clients expect to pay McKinsey handsome consulting fees, but their financial successes furthered McKinsey's own profits through the investments of its hedge fund, MIO, in opioid-related business. *See id.* ¶¶ 519-20, 525.

1    Specifically, NAS Plaintiffs explain that MIO was "the vehicle through which McKinsey heavily

2    invested in the opioid industry and thus stood to gain financially from the continuation of the

3    opioid crisis." *Id.* ¶ 689; *see also id.* ¶¶ 688, 690 (explaining how MIO partners held stakes in

4    companies that profited from increased opioid usage).

5          McKinsey is incorrect that NAS Plaintiffs' joint venture liability claim fails due to a lack

6    of profit sharing or joint control.  Mot. at 53.  McKinsey cites case law in *other* jurisdictions that

7    does not apply here.  *See Armor v. Lantz*, 535 S.E.2d 737, 745 (W. Va. 2000) (collecting cases

8    from other courts).  And McKinsey cherry-picks from *Armor*, where "it [was] undisputed that

9    there were no discussions between [the two attorneys] concerning how [one attorney] would be

10   paid."  *Id.*  McKinsey's other cited cases were at summary judgment, and so not applicable here.

11   McKinsey also maintains that no precedent exists to support MIO's investment behavior as

12   evidence of profit-sharing, but MIO is a uniquely situated hedge fund, subsidized by McKinsey,

13   with few (or no) analogues elsewhere.  Its method of profit-sharing may not be conventional, but

14   the increase in the value of MIO's opioid investments was directly tied to the success of

15   McKinsey and its clients.  McKinsey also disputes the notion that it has "equal control over the

16   common commercial pursuit."  *Armor*, 535 S.E.2d at 745.  McKinsey conflates the formal

17   relationship it enjoyed with its clients—*e.g.*, that McKinsey did ultimately work for the Purdue

18   board of directors, *see* NAS Compl. ¶ 154—with the notion of having equal control over the

19   *common commercial pursuit*, which here was McKinsey's design and implementation of

20   endeavors such as Project Turbocharge.  Finally, because NAS Plaintiffs have adequately pleaded

21   underlying theories of tort liability, their medical monitoring claims are permitted as well.  *See*

22   *Bower v. Westinghouse Elec. Corp.*, 552 S.E.2d 424, 434 (W. Va. 1999).

23          **K.      Plaintiffs' Claims Are Not Barred By The First Amendment.**

24          McKinsey argues that the claims against it—all of them—must be dismissed because they

25   offend McKinsey's First Amendment rights.  Before getting into why that is wrong as a legal

26   matter, McKinsey's position must be rejected on the facts.  McKinsey acknowledges that the First

27   Amendment provides no protection where the defendant "*knew and intended*" that its speech

28   "would lead" to "illegal acts" and that commercial speech, such as pharmaceutical marketing, is

actionable if it is false or misleading.  Mot. at 57-58.  Here, Plaintiffs allege that Purdue made false and misleading statements in furtherance of an overall scheme to market prescription opioids in ways that avoided the constraints imposed by the CSA and Corporate Integrity Agreement, and that McKinsey designed that scheme.  Compl. ¶¶ 235-36.  At this stage, those allegations must be accepted as true; alone, they are sufficient to deny the motion on this point.

McKinsey is wrong on the law, too.  The First Amendment does not protect speech that constitutes civil aiding and abetting or conspiracy.  *E.g.*, *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 656 (D.C. Cir. 1994) ("That 'aiding and abetting' of an illegal act may be carried out through speech is no bar to its illegality."); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1971) (civil conspiracy).  Further, the First Amendment does not preclude the regulation of professional *conduct* even where that conduct is interwoven with speech.  *See, e.g.*, *NIFLA v. Becerra*, 138 S. Ct. 2361, 2373 (2018) ("The First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." (citation omitted)); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 28-30 (2010) (upholding against First Amendment challenge prohibition against providing "material support" to terrorists, even where such support took "the form of speech").

For example, "[l]ongstanding torts for professional malpractices . . . fall within the traditional purview of state regulation of professional conduct."  *Becerra*, 138 S. Ct. at 2373 (internal quotation marks omitted); *see also, e.g.*, *Tingley v. Ferguson*, 47 F. 4th 1055, 1064 (9th Cir. 2022) (upholding ban on "conversion therapy" and explaining that "[s]tates do not lose the power to regulate the safety of medical treatments performed under the authority of a state license merely because those treatments are implemented through speech rather than through scalpel").  Here, Plaintiffs' claims target conduct, not mere speech, and are more akin to professional malpractice claims sustained in *Becerra* than a government attack on McKinsey's viewpoint.  This is especially true because Plaintiffs allege that McKinsey *implemented* its advice.  McKinsey does not argue that implementation is protected speech; it only argues it did not implement.  But as this Court has already observed of Plaintiffs' allegations: McKinsey's "[intentional] acts included granular analyses of market attractiveness of the subject states, creating target lists of

prescribers . . . , working alongside Purdue sales representatives . . . , and working with Purdue to implement sales strategies . . ."  *McKinsey*, 2022 WL 15525768, at *5.

Finally, McKinsey appeals to the *Noerr-Pennington* doctrine.  But *Noerr-Pennington* does not protect fraud on an adjudicatory body like the FDA.  *See, e.g.*, *Kottle v. Nw. Kidney Ctrs.*, 146 F.3d 1056, 1060-62 (9th Cir. 1998) (sham exception applies where defendant engages in intentional fraud on an administrative agency acting in an adjudicatory capacity); *Clipper Exxpress v. Rocky Mtn. Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1261 (9th Cir. 1982) ("[T]he supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity from the antitrust laws.").  Such activity is also relevant evidence of McKinsey's knowledge, motive, and intent, and the extent of the illegal scheme, even if it were not itself actionable.  *See, e.g.*, *In re Nat'l Prescription Opiate Litig. (County of Lake)*, 477 F. Supp. 3d 613, 634 (N.D. Ohio 2020).  The FDA allegations highlight the extent to which McKinsey was granularly involved in all aspects of Purdue and other manufacturers' core business operations, including interacting with their primary regulator, and that it did so by disseminating false and misleading statements to regulators in order to gain market access for its manufacturers' opioids.  Furthermore, the FDA allegations color the role of McKinsey as a unique mole within the conspiracy: a confidante to all the manufacturers who had the ear of their primary regulator.  *See* Compl. ¶¶ 448, 463, 466.

## IV.   **CONCLUSION**

As this Court already found in denying McKinsey's personal jurisdiction motion, this case revolves around the factual claims of McKinsey's intricate, active, and purposeful involvement with its opioids clients in their quest to sell increasing supplies of addictive opiates, and its design and implementation of a marketing end-run around the Controlled Substances Act and Purdue's Corporate Integrity Agreement.  Its current motion is a renewed attempt to deflect all moral blame and legal liability onto the clients alone.  The law, as explained herein, commands otherwise.  McKinsey's motion to dismiss should be denied, except for the particular emotional distress and consumer protection claims identified above.  Should the Court find any claims in need of further allegations, Plaintiffs respectfully request leave to amend.

1   Dated: March 3, 2023                         Respectfully submitted,

2                                                By: */s/ Elizabeth J. Cabraser*
                                                 Elizabeth J. Cabraser
3                                                ecabraser@lchb.com
4                                                **Lieff Cabraser Heimann &
                                                   Bernstein, LLP**
5                                                275 Battery Street, 29th Floor
                                                 San Francisco, CA 94111-3339
6                                                Telephone: (415) 956-1000
                                                 Facsimile: (415) 956-1000
7
                                                 *Plaintiffs' Lead Counsel*
8
                                                 By: */s/ Lloyd B. Miller*
9                                                Lloyd B. Miller (admitted *pro hac vice*)
                                                 lloyd@sonosky.net
10                                               **SONOSKY CHAMBERS SACHSE MILLER &
                                                   MONKMAN, LLP**
11                                               510 L Street, Suite 310
                                                 Anchorage, AK 99501
12                                               Telephone: (907) 258-6377
                                                 Facsimile: (907) 272-8332
13
                                                 *PSC Member – Native American Tribes*
14
                                                 By: */s/ James R. Dugan*
15                                               James R. Dugan (*admitted pro hac vice*)
16                                               jdugan@dugan-lawfirm.com
                                                 **DUGAN LAW FIRM, APLC**
17                                               One Canal Place
18                                               365 Canal Street, Suite 1000
                                                 New Orleans, LA  70130
19                                               Telephone:  504.648.0180

20                                               *PSC Member—Third Party Payors*
21
                                                 By: */s/ Scott R. Bickford*
22                                               Scott R. Bickford
                                                 srb@mbfirm.com
23                                               **MARTZELL, BICKFORD & CENTOLA, APC**
                                                 338 Lafayette Street
24                                               New Orleans, LA 70130
                                                 Telephone: (504) 581-9065
25                                               Facsimile: (504) 581-7635
26                                               *PSC Member – NAS Children*
27
28