IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION | Case No. 21-md-02996-CRB |
| | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| This document relates to: All NAS Actions | |

This case arises out of McKinsey's participation in one of the most serious public health crises of the last twenty years. In 2017, the Judicial Panel of Multidistrict Litigation centralized lawsuits against manufacturers, distributors and pharmacies alleging that opioid manufacturers overstated the benefits and downplayed the risks of the use of their opioids and aggressively marketed these drugs to physicians. The lawsuits further allege that distributors and pharmacies failed to monitor, detect, investigate, refuse, and report suspicious orders of prescription opioids.

After discovery, a new set of lawsuits followed. These cases were filed against McKinsey, a global consulting firm, and concerned its role in providing sales and marketing strategies to opioid manufacturers—most notably, Purdue Pharma. The lawsuits against McKinsey prompted the creation of this separate MDL proceeding in 2021.

McKinsey has settled or is in the process of settling with various governmental entities, Native American tribes, and third-party payors.

Remaining in this MDL are actions filed by eight sets of private plaintiffs suing on behalf of minors with neonatal abstinence syndrome. McKinsey has moved to dismiss their complaint for failure to state a claim.

## I. BACKGROUND

### A. NAS Plaintiffs

The NAS Plaintiffs are parents or legal guardians of children born with neonatal abstinence syndrome (NAS).[1] The children's birth mothers took opioids while pregnant. See NAS Compl. § IV(A) (dkt. 195-4). Some of the opioids were legally prescribed by the birth mothers' doctors, while others were obtained through illegal markets. Id. The mothers took opioids before and during their pregnancies. Id.

Taking opioids during pregnancy poses added risks, which is why drugs like OxyContin come with a warning: The use of opioids when pregnant should "be avoided to the extent possible." Id. ¶ 561. When a woman takes opioids during her pregnancy, the drugs pass through the placenta and adversely affect the fetus. Id. ¶ 546. Infants born with NAS often exhibit symptoms of opioid withdrawal, such as tremors, seizures, overactive reflexes, and tight muscle tone. Id. ¶ 548. They also cry excessively and have trouble feeding, leading to slow weight gain. Id. They develop breathing and sleeping problems as well as diarrhea, among other symptoms. Id. NAS infants are likely to experience long-term issues into adulthood, including developmental delays, motor problems, behavior and learning problems, emotional disorders, speech and language problems, sleeping issues, ear infections, and vision problems. Id. ¶ 553.

---

[1] Eight sets of NAS Plaintiffs remain in this MDL. Four are from West Virginia: Hayden Travis Blankenship; Lisa Renee Daniels; Timothy Lambert; Beverly and Andrew Riling. Marina Brizendine and her child are residents of Texas; she was prescribed opioids in Kentucky, where her child was born. April Hudak and her child are from Colorado. Julieann Valdez and her children are residents of Nevada; she was prescribed opioids in Utah. One of Valdez's children was born in Utah and the other was born in Nevada. Anita Whigham and her legally adopted child are from Wisconsin. See generally NAS Compl. § IV(A).

2

### B.     The Opioid Crisis and McKinsey

Most opioids are Schedule II drugs under the Controlled Substance Act. See id. ¶ 49. Schedule II drugs are the most dangerous drugs that may be legally prescribed and have a high potential for abuse, including risks of psychological or physical dependence. See id. But they also have accepted medical use: suppressing excruciating pain suffered by patients. Id. ¶ 49. OxyContin is designed to be taken once or twice daily and is advertised to relieve pain for twelve hours. Id. ¶ 52.

Purdue launched OxyContin in 1996, and marketed it as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications. See id. ¶¶ 51, 127. In 2007, Purdue pleaded guilty to fraudulently marketing and promoting OxyContin. Id. at ¶ 127. It simultaneously entered into a Corporate Integrity Agreement with the United States Department of Health and Human Services, which required Purdue to implement written policies on its compliance with federal health care program and Food and Drug Administration requirements, including for selling and marketing regulated products, compensation for persons engaged in the promoting and selling of Purdue's products, and information provided to healthcare providers. Id. ¶¶ 128–29.

The agreement also imposed constraints on the sales and marketing of Purdue's products. In response, Purdue tasked McKinsey with developing a strategy to boost OxyContin sales despite those regulatory constraints. See id. ¶¶ 131, 157. McKinsey advised Purdue on how to approach governmental regulators, id. § IV(D)(6)(a), and identified granular growth sales opportunities for OxyContin that could generate $200–400 million in additional annual sales, id. § IV(D)(6)(c). McKinsey helped Purdue target prescribing doctors through a project titled "Evolve to Excellence," which was also known as "Project Turbocharge." Id. § IV(D)(8). Project Turbocharge's goal was to significantly bolster OxyContin sales, and McKinsey oversaw "the creation of target lists, internal dashboards to track progress, and changes to Purdue's incentive compensation plan." Id. ¶ 267. McKinsey used this data to create prescriber profiles and worked with Purdue's

3

1    sales staff to develop sales messages likely to persuade specific prescribers. See id.
2    § IV(D)(6)(c)(i); id. ¶¶ 222–24. McKinsey's strategy was a success: OxyContin sales
3    increased by threefold under its guidance. Id. § IV(D)(9).
4         McKinsey also advised and helped other opioid manufacturers, including Endo
5    Pharmaceuticals and Johnson & Johnson, to increase opioid drug sales. See id. § IV(E).
6         In 2020, Purdue again pleaded guilty to improper marketing of OxyContin and
7    other opioids that occurred from 2010 to 2018—i.e., during the period that McKinsey
8    provided consulting services to Purdue. Id. ¶ 508. "Purdue pleaded guilty to a dual-object
9    conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act,
10   21 U.S.C. §§ 331, 353, violating anti-kickback laws, and 'using aggressive marketing
11   tactics to convince doctors to unnecessarily prescribe opioids—frivolous prescriptions that
12   experts say helped fuel a drug addiction crisis that has ravaged America for decades.'" Id.
13   ¶ 509. The plea agreement does not expressly name McKinsey but references it as the
14   "consulting company." Id. ¶ 510. In a separate, settled civil action, the Department of
15   Justice alleged that Purdue implemented many of McKinsey's recommendations, including
16   much of Project Turbocharge. See id. ¶¶ 511–13; Opp., Ex. A., at 20 ¶ 105.[2]

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v.

---

[2] The Plaintiffs request that the Court take judicial notice of Purdue's 2020 guilty plea agreement. Dkt. 482. The Court may take notice of the plea agreement for the limited purpose of accepting the fact that Purdue pleaded guilty to certain crimes, but the Court cannot accept the allegations in the civil or criminal agreements with the Department of Justice as true. See Sarmiento v. Sealy, Inc., 367 F. Supp. 3d 1131, 1142 (N.D. Cal. 2019) ("[C]ourts cannot take judicial notice of the contents of documents for the truth of the matters asserted therein when the facts are disputed.").

1   Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer

2   possibility that a defendant has acted unlawfully." Id.

3       While courts do not require "heightened fact pleading of specifics," a plaintiff must

4   allege facts sufficient to "raise a right to relief above the speculative level." Twombly, 550

5   U.S. at 555, 570. In deciding whether the plaintiff has stated a claim upon which relief can

6   be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable

7   inferences in favor of the plaintiff. See Usher v. City of Los Angeles, 828 F.2d 556, 561

8   (9th Cir. 1987). However, the court is not required to accept as true "allegations that are

9   merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re

10  Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

## III.  DISCUSSION

The parties have informed the Court that, in this MDL, only the NAS Plaintiffs' claims remain active, and only the portions of the parties' briefs specific to the NAS Plaintiffs remain relevant. Dkt. 562. The NAS Plaintiffs' claims generally fall into four categories: (1) negligence-based claims (negligence, negligent misrepresentation, and negligence per se); (2) fraud and deceit-based claims; (3) public nuisance; and (4) joint or vicarious liability (civil conspiracy and aiding and abetting). The four West Virginia NAS Plaintiffs also bring specific state law claims against McKinsey.

As an MDL court, this Court "must apply the law of the transferor forum, that is, the law of the state in which the action was filed." In re Anthem, Inc. Data Breach Litig., 162 F. Supp. 3d 953, 976 (N.D. Cal. 2016) (citing In re Vioxx Prods. Liab. Litig., 478 F. Supp. 2d 897, 903 (E.D. La. 2007)). A review of the relevant state laws governing the NAS Plaintiffs' claims indicates that, for purpose of addressing this motion, the elements and standards among the several states are materially the same.

### A.  NAS Plaintiffs Have Not Adequately Pleaded McKinsey's Duty to Them.

The threshold question in all actions in negligence is whether a duty was owed. To bring a negligence claim, the Plaintiffs must demonstrate that they are owed a legal duty by McKinsey to use due care, a breach of that legal duty, and the breach as the proximate

1  or legal cause of the resulting injury.  See Ileto v. Glock Inc., 349 F.3d 1191, 1203 (9th
2  Cir. 2003).  It has long been established that individuals generally have "no duty to control
3  the conduct of another."  Tarasoff v. Regents of Univ. of Cal., 17 Cal. 3d 425, 435 (1976);
4  Brown v. USA Taekwondo, 11 Cal. 5th 204, 214 (2021).  "A duty exists only if the
5  plaintiff's interests are entitled to legal protection against the defendant's conduct."  Sheen
6  v. Wells Fargo Bank, N.A., 12 Cal. 5th 905, 920 (2022).  Courts "have invoked the
7  concept of duty to limit generally 'the otherwise potentially infinite liability which would
8  follow from every negligent act.'"  Beacon Residential Cmty. Assn. v. Skidmore, Owings
9  & Merrill LLP, 59 Cal. 4th 568, 573 (2014) (citation omitted).

10  There are generally two exceptions in which courts have found that "a defendant
11  may have an affirmative duty to protect the plaintiff from harm at the hands of a third
12  party, even though the risk of harm is not of the defendant's own making."  Brown, 11 Cal.
13  5th at 215; Miller v. Whitworth, 455 S.E.2d 821, 825 (W. Va. 1995).  First, where the
14  parties are in a "special relationship"—e.g., parents and children, colleges and students,
15  employers and employees.  Brown, 11 Cal. 5th at 216.  And second, "where it is the
16  defendant [McKinsey] who has created a risk of harm to the plaintiff, including when the
17  defendant [McKinsey] is responsible for making the plaintiff's position worse."  Id. at 214.
18  To be sure, these exceptions are not "a freestanding means of establishing duty," id. at 217,
19  and a court "must not engage in a simple weighing of equities, for a legal duty does not
20  arise when[ever] symmetry and sympathy would so seem to be best served," see In re
21  N.Y.C. Asbestos Litig., 27 N.Y.3d 765, 787–88 (2016).

22  In this case, McKinsey argues that the NAS Plaintiffs have not established a duty
23  running from the consulting firm to them, so the negligence-based claims fail as a matter
24  of law.  Mot. at 17–25.  Specifically, McKinsey argues that it had no special relationship
25  with the NAS Plaintiffs to impose a duty of care.  Id.  Nor is, McKinsey argues,
26  foreseeability by itself enough to create a duty to the NAS Plaintiffs.  Id.  McKinsey
27  asserts that public policy considerations should prevent courts from imposing limitless
28  liability on professional advisors.  Id. at 24–25.  In response, the Plaintiffs argue that a

special relationship is not required to establish the element of duty, and that it was reasonably foreseeable that McKinsey's failure to exercise reasonable care in advising Purdue and developing the marketing and sale strategies would cause harm to the NAS Plaintiffs. Opp. at 38–39.

The Court holds that there was no source creating a duty running from a consulting firm, McKinsey, to the NAS Plaintiffs. To impose an owed duty, it is not enough that McKinsey's actions could foreseeably cause harm to the NAS Plaintiffs. "[F]oreseeability is not coterminous with duty." Sakiyama v. AMF Bowling Centers, Inc., 110 Cal. App. 4th 398 (2003). That is because foreseeability concerns the scope of duty, which is relevant "only after it has been determined that there is a duty." See Pulka v. Edelman, 40 N.Y. 2d 781, 785 (1976) ("The principle expressed in Palsgraf . . . is applicable to determine the scope of duty. . . . Where there is no duty . . . , that principle is inapplicable."). The NAS Plaintiffs' theory for duty is that, as a result of McKinsey's services, "more people [would] becom[e] addicted to opioids, that some people are women, and that some would be pregnant," Opp. at 38–39. While that may be true, foreseeable injury, by itself, does not create a duty. To so hold would impose potential liability on third party consultants who have no control over the implementation of their advice.

The Second Circuit and district court's decisions in Abdulaziz v. McKinsey are in accord. 2022 WL 2444925, at *1 (2d Cir. July 5, 2022); Abdulaziz v. McKinsey, 2021 WL 4340405, at *5 (S.D.N.Y. Sept. 22, 2021). In the Abdulaziz cases, McKinsey allegedly created a report for the government of Saudi Arabia, identifying the plaintiff as an influential dissident using social media to criticize policies of the Saudi government and the Saudi royal family. 2022 WL 2444925, at *1. After receiving McKinsey's report, the Saudi government "target[ed] him with assassination attempts and arrested, tortured, and harassed his family members and friends currently living in Saudi Arabia." Id. The plaintiff then filed suit against McKinsey for, among other claims, negligence and negligent infliction of emotional distress. Id.

7

Were the Saudi government's actions foreseeable? The district court assumed "yes." Abdulaziz, 2021 WL 4340405, at *5. But that does not mean McKinsey, as the author of the report, could be held liable for pure negligence because "foreseeability alone does not create a duty." Id. McKinsey did not control its client's actions. Id. Moreover, the court was reluctant to hold that an outside consultant "must contemplate how the client will react to [its advice], and assess the risk of harm to individuals" arising from its advice. Id. The district court in Abdulaziz cautioned that the "consequence of finding McKinsey owed [the plaintiff] a duty . . . would require any party conducting research, performing investigations or otherwise providing information to a client . . . [be] subject[ed] [ ] to litigation on the basis of post-hoc allegations of foreseeable harm." Abdulaziz, 2021 WL 4340405, at *6. That "McKinsey knew or should have known" that harm would result from its consulting services is not, by itself, sufficient to create an owed duty of care to a third party. Abdulaziz, 2022 WL 2444925, at *3. It is the absence of control that is significant.

So too here. Absent from the NAS Plaintiffs' complaint are factual allegations that establish an owed duty. The NAS Plaintiffs cannot rest their negligence claim based on foreseeability alone. See Bily v. Arthur Young & Co., 3 Cal. 4th 370, 412 (1992) ("[F]oreseeability is not a substitute for legal duty.") (citation omitted). No special relationship exists between the NAS Plaintiffs and McKinsey. And although McKinsey helped Purdue and other opioid manufacturers "turbocharge" the sale of opioids, McKinsey did not encourage the precise wrongful conduct here—that is, prescribing opioids to pregnant women. McKinsey's consulting services to opioid manufacturers do not, by themselves, create a duty to the NAS Plaintiffs. Indeed, "that a defendant's organization or business creates an opportunity for [wrongful] conduct against a plaintiff and thereby worsens the plaintiff's position does not render such [wrongful] conduct a necessary component of the organization's actions—even when that conduct is foreseeable." Doe v. Uber Techs., Inc., 2022 WL 4281363, at *3 (N.D. Cal. Sept. 15, 2022) (Corley, J.) (citation omitted). "Providing such an opportunity does not constitute

8

1    misfeasance triggering a duty to protect." Id.  Put differently, McKinsey's advisory role
2    did not necessarily create the undue risk that led to the NAS Plaintiffs' harms.  Compare,
3    e.g., Weirum v. RKO General, Inc., 15 Cal. 3d 40, 45 (1975) (holding radio station could
4    be liable for negligence because hazardous driving was a "necessary component" of the
5    live radio contest that required searching for disc jockey in red automobile), with
6    Sakiyama v. AMF Bowling Centers, Inc., 110 Cal. App. 4th 398, 410 (2003) (holding
7    skating rink owner that hosted rave party where teenagers used drugs did "not owe a duty
8    of care to a person injured hours later at a remote location as a result of voluntary drug
9    use" even if the resulting harm was foreseeable).

10          The NAS Plaintiffs' reliance on several decisions from the JUUL MDL, see Opp. at
11   37, is misplaced for a simple but important reason:  The JUUL defendants—JUUL's
12   investors, directors and executives—are part of or have a stake in the company and are not
13   outside consultants.  As alleged, the JUUL defendants, including its directors and
14   investors, played an active role in "targeting youth without disclosing the risks of harm."
15   See In re JUUL Labs, Inc., Mktg. Sales Prac. & Prod. Liab. Litig., 2021 WL 3112460, at
16   *12 (N.D. Cal. July 22, 2021) (Orrick, J.).  The complaint stated that the directors and
17   investors had a high level of personal participation in the marketing of Juul products to
18   youths, controlled the company's action, and their "personal participation" placed the
19   youths "in the foreseeable zone of risk."  In re JUUL Labs, Inc., Mktg., Sales Pracs., &
20   Prod. Liab. Litig., 533 F. Supp. 3d 858, 877 (N.D. Cal. 2021); JUUL, 2021 WL 3112460,
21   at *5 ("plaintiffs have plausibly alleged sufficient facts regarding each of the [director
22   defendants'] positions on and control over the Board and management . . . [,] allowing
23   JUUL to be deceptively marketed as a cessation device and failing to disclose the unique
24   addictiveness and dangers of the product—to achieve their ultimate aim of cashing in on
25   their JLI equity by positioning the company for investment by Altria").

26          By contrast, McKinsey's role in relation to Purdue and other opioid manufacturers
27   is simply that of a routine consultant.  It is irrelevant that McKinsey worked closely with
28   Purdue and essentially filled a role that could have been, but was not, performed in-house,

see NAS Compl. ¶ 140.  That is what consultants do:  Their clients face a business problem, and the consultants come in trying to find a solution.  And part of the process of finding a solution often is to understand the issues from the client's perspective.  This fact may be material for personal jurisdiction analysis because it assesses McKinsey's contacts with forum states, see In re McKinsey & Co., Inc. Nat'l Opiate Consultant Litig., 2022 WL 15525768, at *1 (N.D. Cal. Oct. 27, 2022), but it does not create a duty between the consultant and the consumer.  The NAS Plaintiffs' reliance on this Court's earlier personal jurisdiction ruling is therefore misplaced.

Moreover, the NAS Plaintiffs do not allege that McKinsey actively promoted or encouraged opioid prescriptions to pregnant women.  During oral argument, Plaintiffs' counsel argued that 1,600 OB/GYNS were being marketed to by Purdue.  Hr'g Tr. 14:05–13 (June 30, 2023).  Although this allegation is not found in the Complaint, it also is insufficient to create a duty.  It appears that Purdue's call list includes around 100,000 physicians, see NAS Compl. ¶ 66.  That a fraction of the doctors Purdue contacted were OB/GYNs does not mean McKinsey crafted its sales strategy with pregnant women in mind or that it advised doctors to ignore OxyContin's label (and their medical judgment) that the prescription of opioids to pregnant women should be avoided if possible.

The other cases cited by the Plaintiffs are similarly inapplicable.  The defendants in those cases were the primary tortfeasors, see Ileto v. Glock Inc., 349 F.3d 1191, 1204 (9th Cir. 2003) (gun manufacturer), or they otherwise had a cognizable special relationship with the plaintiffs, see Stanford v. Kuwait Airways Corp., 89 F.3d 117, 123 (2d Cir. 1996) (airline with contract to interline airlines had relationship with interline passengers).[3]

Accordingly, the NAS Plaintiffs have not adequately pleaded the required element of duty against McKinsey.  Without a duty running from McKinsey to the NAS Plaintiffs, the negligence-based claims—negligence, negligent misrepresentation, and negligence per

---

[3] The NAS Plaintiffs broach the idea that McKinsey had a duty to the Plaintiffs because of McKinsey's status as a "Covered Person" under Purdue's Corporate Integrity Agreement.  See Opp. at 36.  The NAS Plaintiffs never fully explained or argued this point, however, so the Court need not address it.

se—fail as a matter of law.[4]

### B. Plaintiffs Have Not Adequately Pleaded Reliance to Support a Common Law Fraud Claim.

The NAS Plaintiffs assert a fraud claim against McKinsey, arguing that McKinsey concealed or advised to conceal the true dangers of opioids from regulators, the public, and the NAS Plaintiffs. To plead a common law fraud claim, a plaintiff must allege misrepresentation, knowledge of falsity, intent to induce reliance, justifiable reliance, and resulting damages. Salameh v. Tarsadia Hotel, 726 F.3d 1124, 1132 (9th Cir. 2013) (citing Okun v. Morton, 203 Cal. App. 3d 805 (1988)). Rule 9(b) of the Federal Rules of Civil Procedure requires that the circumstances constituting fraud be stated with particularity. Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009). "Averments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." Id. "A party alleging fraud must set forth more than the neutral facts necessary to identify the transaction." Id.

The NAS Plaintiffs do not plead facts showing that the birth mothers or their doctors relied on McKinsey's allegedly false or misleading statements. "[I]t is well established that reasonable reliance is an element of common law fraud and misrepresentation claims." Samica Enterprises LLC v. Mail Boxes Etc., Inc., 460 F. App'x 664, 665 (9th Cir. 2011). The 158-page Complaint largely focuses on explaining the opioid crisis and the roles Purdue and McKinsey allegedly played in causing the crisis. But generally absent in the lengthy pleading are factual allegations specific to the birth mothers of the NAS minors and what they or their doctors may have heard about the opioid drugs when the drugs were prescribed. The sections in the Complaint describing the NAS Plaintiffs generally follow this pattern: (1) identify the NAS minors' parents or legal guardians, (2) state that the birth mothers were prescribed opioids or obtained them from illegal diversionary markets, and (3) allege that the minors suffered from NAS. See

---

[4] Because the absence of duty is dispositive, the Court need not address the other arguments for these claims.

11

NAS Compl. ¶¶ 563–609. There are no indications that the birth mothers or their doctors relied upon McKinsey's allegedly false or misleading statements.

To be sure, and as the Plaintiffs argue, a fraud claim may be premised on indirect misrepresentation. Under the Restatement (Second) of Torts § 533, "the maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." RESTATEMENT (SECOND) OF TORTS § 533. But even under this theory, the NAS Plaintiffs must still plead reliance. See Jones v. AIG Risk Mgmt., Inc., 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010) ("[E]ven where an indirect misrepresentation is involved, there must still be reliance, and the reliance must be on the part of the indirect recipient of the misrepresentation.") (Chen, J.); Mirkin v. Wasserman, 5 Cal. 4th 1082, 1096 (1993) ("As the language of the Restatement indicates, a plaintiff who hears an alleged misrepresentation indirectly must still show 'justifiable reliance upon it.'"). The Plaintiffs have not stated sufficient facts showing reliance here.

The Plaintiffs' citation to the Ohio MDL court's opinion in Summit County does not save their fraud claim. In that case, the county alleged that it "rel[ied] on Marketing Defendants' representations and/or concealments both directly and indirectly [ ] and [] proceeded under the misapprehension that the opioid crisis was simply a result of conduct by persons other than Defendants [and] [a]s a consequence, these Defendants prevented Plaintiffs from a more timely and effective response to the opioid crisis." In re Nat'l Prescription Opiate Litig., 2018 WL 4895856, at *41 (N.D. Ohio Oct. 5, 2018). By contrast, the Complaint here makes no comparable allegations of reliance.

The NAS Plaintiffs note that they pleaded that "McKinsey intended healthcare providers, including the Minor Plaintiffs' biological mother's healthcare providers, to rely upon it and its clients' false and misleading assertions" relating to opioids. Opp. at 44

12

1 (citing NAS Compl. ¶ 636). McKinsey can "intend" all it wants, but whether the birth
2 mothers or their doctors in fact relied upon McKinsey's allegedly false or misleading
3 statements is an entirely separate inquiry. Both intention and reliance are necessary
4 elements to support a common law fraud claim. And although, as Plaintiffs argue, the
5 question of whether an individual justifiably relied on an allegedly fraudulent
6 misrepresentation is a question of fact, a plaintiff must still plead all the requisite elements
7 to survive a motion to dismiss. See Low v. SDI Vendome S.A., 2003 WL 25678880, at *5
8 (C.D. Cal. Jan. 7, 2003) (holding only "the reasonableness of Plaintiff's reliance and the
9 reasonable diligence of his inquiry are questions of fact not susceptible to resolution on a
10 motion to dismiss").

11 Accordingly, because allegations to support reliance are missing from the NAS
12 Complaint, the fraud claim is dismissed.

### C. Public Nuisance

A public nuisance is an unreasonable interference with a right common to the general public. RESTATEMENT (SECOND) OF TORTS § 821B. Public nuisance actions generally must be brought by government officials. See Cty. of Santa Clara v. Super. Ct., 50 Cal. 4th 35, 55 (2010). But a private party also may bring a public nuisance action where the nuisance is "specially injurious" to the private party, beyond the harm caused by the nuisance to the general public. Birke v. Oakwood Worldwide, 169 Cal. App. 4th 1540, 1548 (2009). This exception has its origins in the common law, which recognized that "the action would lie if the plaintiff could show that he had suffered special damage over and above the ordinary damage caused to the public at large by the nuisance." PROSSER ON TORTS 608 (3d ed.). The utility in this limitation is to "guard[ ] against the multiplicity of lawsuits that would follow if everyone were permitted to seek redress for a wrong common to the public." Davies v. S.A. Dunn & Co., LLC, 156 N.Y.S. 3d 457, 461 (2021).

The NAS Plaintiffs have not adequately pleaded special injuries to invoke standing to bring a public nuisance claim. The injuries they plead are personal injuries to the minors who experienced symptoms related to neonatal opioid withdrawal syndrome. See

13

NAS Compl. ¶ 576 (Plaintiff A.K.D.'s symptoms); id. ¶ 573 (similar for Plaintiff S.B.); id. ¶ 582 (similar for Plaintiff T.J.L.). That the injuries are similar among the NAS minors and others exposed to opioids means that they are not different in kind to confer the Plaintiffs with special standing to bring a public nuisance claim. See Institoris v. City of Los Angeles, 210 Cal. App. 3d 10, 20 (1989) ("Although a public nuisance can support recovery for either personal harm or property damage, a plaintiff suing on this basis must show special injury to himself of a character different in kind—not merely in degree—from that suffered by the general public."). Indeed, as the West Virginia Opioid Litigation Panel held, "the Minors' claimed injuries necessarily arise from exposure to opioids and thus are not different 'in character' from the injuries that might be suffered by 'the public in general' from exposure to opioids, or that might be suffered by other infants exposed in utero to opioids." W. Va. Op. at 12 (dkt. 560-1).

    The NAS Plaintiffs disagree with the West Virginia panel's decision, arguing that, under the Restatement, the "special injury" requirement is "presumptively satisfied by a plaintiff seeking to recover damages for physical harm in the form of bodily injuries as a result of the public nuisance." Dkt. 561 at 1–2 (citing RESTATEMENT (SECOND) OF TORTS § 821C(1)). But section 821C does not provide for such a "presumption."

    Professor Dobbs' treatise on public nuisance law in the context of personal injury provides a helpful explanation. A public nuisance, he explained, "is actionable under the common law only if the plaintiff's enjoyment of a public right is diminished and her injury differs in kind from injury to the general public." Dobbs, THE LAW OF TORTS § 403 (2d ed.). So, to illustrate, "the defendant who substantially pollutes the air or public waters commits a public nuisance, and is liable if a few people suffer personal injury as a result[.] But if the defendant's pollution causes respiratory problems for everyone in town, the plaintiff's respiratory harm does not differ in kind from that suffered by others and she cannot recover on a public nuisance theory." Id.

    Here, the personal injuries from opioid exposure are not suffered by a few but rather by millions of adults and minors alike. The individual NAS Plaintiffs do not explain how

14

they were uniquely harmed by their exposures to opioids. Accordingly, the NAS Plaintiffs have not adequately pleaded that they have standing to bring a public nuisance claim against McKinsey.

### D. Other Remaining Claims

Without the existence of an underlying tort in this case, claims for civil conspiracy or aiding and abetting cannot stand. Liberty City Movie, LLC v. U.S. Bank, N.A., 824 F. App'x 505, 508 (9th Cir. 2020); Tarpon Bay Partners LLC v. Zerez Holdings Corp., 547 F. Supp. 3d 195, 219 (D. Conn. 2021) (dismissing civil conspiracy and aiding-and-abetting claims because "no underlying tort claim survives in this case").

Similarly, the four West Virginia Plaintiffs' claims for joint venture liability, tort of outrage, negligent infliction of emotional distress, and medical monitoring are dismissed because of the absence of an underlying tort and duty. See W. Va. Op. at 25. There are also no factual allegations suggesting that McKinsey intentionally or recklessly encouraged the prescription of opioids to pregnant women. And although the West Virginia Opioid Litigation Panel's decision is not binding here, it casts significant doubt on the viability of any opioid-related claims brought by the four West Virginia NAS Plaintiffs in this MDL. See In re Korean Air Lines Co., Ltd., 642 F.3d 685, 699 (9th Cir. 2011) ("the MDL transferee court is generally bound by the same substantive legal standards, if not always the same interpretation of them, as would have applied in the transferor court").

### IV. CONCLUSION

For the foregoing reasons, McKinsey's motion to dismiss the NAS Complaint for failure to state a claim is **GRANTED** with leave to amend within 21 days.

**IT IS SO ORDERED.**

Dated: July 20, 2023

CHARLES R. BREYER
United States District Judge

15