1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10

11   SANTA CRUZ COUNTY,                        Case No. 21-md-02996-CRB (SK)
     CALIFORNIA; POPE COUNTY,
12   ILLINOIS; and THE VILLAGE OF             **AMENDED MASTER CLASS ACTION**
     EDDYVILLE, ILLINOIS, Individually and    **COMPLAINT (SUBDIVISION)**
13   on Behalf of a Class of Persons Similarly
     Situated                                 **REDACTED**
14
     IN RE: MCKINSEY & CO., INC.              **JURY TRIAL DEMANDED**
15   NATIONAL PRESCRIPTION OPIATE
     CONSULTANT LITIGATION
16
     This Document Relates to:
17
     ALL SUBDIVISION ACTIONS
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.  PREAMBLE ......................................................................................................... 1

II.  INTRODUCTION ............................................................................................... 1

III.  JURISDICTION AND VENUE ........................................................................ 7

IV.  PARTIES ............................................................................................................. 7

    A.  Named Plaintiffs.......................................................................................... 7

    B.  Subdivision Plaintiffs ................................................................................. 7

    C.  Defendants................................................................................................ 10

V.  FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS ................. 11

    A.  The Opioid Crisis ..................................................................................... 11

    B.  Marketing and the Origins of the Opioid Crisis...................................... 14

    C.  What McKinsey Does: "Consulting is more than giving advice."........... 17

        1.  McKinsey's Long-Term Partnership with the Pharmaceuticals Industry ......................................................................................... 21

        2.  The McKinsey Pharmaceuticals and Medical Products Practice Group ............................................................................................. 21

        3.  The Transformational Relationship............................................... 26

    D.  McKinsey and Purdue: A Case Study in Transformation........................ 28

        1.  2004: McKinsey and Purdue Meet................................................. 30

        2.  2007: Purdue Pleads Guilty to Misbranding OxyContin and is Bound by a Corporate Integrity Agreement.................................. 31

        3.  The Sacklers React to the "Concentration of Risk" Posed to Them by the Opioid Business. ......................................................... 33

        4.  Purdue Tasks McKinsey with Boosting Opioid Sales in Light of the Guilty Plea and Corporate Integrity Agreement. ...................... 35

        5.  Purdue Relies on McKinsey.......................................................... 38

        6.  McKinsey Delivers. ....................................................................... 39

            a.  Courting the Regulators: "We All Feel Responsible." ................. 40

            b.  The Granularity of Growth ........................................................... 43

            c.  "Identifying Granular Growth Opportunities for OxyContin" ...................................................................................... 45

                i.  Marketing – Countering Emotional Messages................. 45

                ii.  Targeting – Selling More OxyContin to Existing High Prescribers ......................................................... 48

                iii.  Titration – Selling Higher Doses of OxyContin .............. 51

                iv.  Covered Persons – Sales Quotas and Incentive Compensation ................................................................. 53

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

**TABLE OF CONTENTS**
(continued)

Page

| | | | | |
|---|---|---|---|---|
| | | 7. | Transformation: Purdue and McKinsey Adopt and Implement McKinsey's Strategies. | 55 |
| | | 8. | Project Turbocharge | 56 |
| | | | a. Targeting High Subscribers | 60 |
| | | | b. Circumventing Safeguards Against Abuse and Diversion | 65 |
| | | | c. Incentivizing Opioid Sales | 66 |
| | | 9. | McKinsey's Efforts Triple OxyContin Sales | 67 |
| | E. | McKinsey's Opioid-Related Work with Other Clients. | 69 |
| | | 1. | Endo | 70 |
| | | | a. New Blues | 70 |
| | | | b. Old Friends | 72 |
| | | | c. Opana | 74 |
| | | | d. Belbuca: Endo's Answer to Butrans | 80 |
| | | | e. Turbocharging the Sales Force with a Blitz | 86 |
| | | 2. | Johnson & Johnson | 89 |
| | | | a. Noramco | 91 |
| | | | b. Duragesic | 92 |
| | | | c. Turbocharging Nucynta | 93 |
| | | 3. | Other Manufacturers | 96 |
| | | 4. | McKinsey's Work with Opioid Distributors | 97 |
| | | 5. | McKinsey's Work with the FDA | 97 |
| | F. | McKinsey's Efforts to Increase the Overall Size of the Opioid Market: the Larger the Pie, the Larger the Slice | 102 |
| | G. | McKinsey's Work Kills People. | 103 |
| | H. | McKinsey Knew that OxyContin Was Highly Abusable, Addictive, and Dangerous, and that Its Marketing Strategies Increased Those Harms. | 109 |
| | I. | McKinsey Portrays Itself as Part of a Solution to a Problem It was Integral in Creating. | 112 |
| | J. | Coda | 117 |
| | | 1. | Guilty Again - 2020 | 119 |
| | | 2. | A Mea Culpa | 120 |
| | | 3. | A Hedge Fund | 122 |
| VI. | | TOLLING OF STATUTES OF LIMITATIONS | | 126 |
| VII. | | HARM CAUSED TO SUBDIVISION PLAINTIFFS | | 128 |
| VIII. | | CLASS ACTION ALLEGATIONS | | 132 |
| IX. | | CLAIMS FOR RELIEF | | 135 |

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

# TABLE OF CONTENTS
## (continued)

|  |  | Page |
|---|---|---|
| B. | Multiple States' Plaintiffs | 135 |
| | 1. Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, *et seq.* (All Plaintiffs who pleaded RICO claims in underlying complaints) | 135 |
| | 2. Negligence (All Plaintiffs) | 171 |
| | 3. Gross Negligence (Florida, Pennsylvania, Virginia, and Washington Plaintiffs) | 173 |
| | 4. Negligence Per Se (All Plaintiffs) | 173 |
| | 5. Common Law Nuisance (Florida, Illinois, Indiana, Kentucky, Louisiana, Michigan, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, Washington, and West Virginia Plaintiffs) | 174 |
| | 6. Civil Conspiracy (All Plaintiffs) | 177 |
| | 7. Fraud (All Plaintiffs) | 179 |
| | 8. Aiding And Abetting (All Plaintiffs) | 181 |
| | 9. Wanton Intentional Conduct (Alabama, Indiana, Louisiana, and Tennessee Plaintiffs) | 182 |
| | 10. Declaratory Relief (28 U.S.C. § 2201; N.Y. CPLR § 3001) (All Plaintiffs) | 182 |
| C. | Alabama Plaintiffs | 183 |
| | 1. Public Nuisance (Ala. Code §§ 6-5-121, 6-5-122, 11-1-2) | 183 |
| | 2. Drug Nuisance (Ala. Code § 6-5-155) | 185 |
| D. | California Plaintiffs | 186 |
| | 1. Public Nuisance (Cal. Civ. Code §§ 3479, 3480) | 186 |
| E. | Florida Plaintiffs | 188 |
| | 1. Civil Remedies For Criminal Practices Act (Fla. Stat. §§ 772.101 *et seq.*) | 188 |
| F. | Georgia Plaintiffs | 189 |
| | 1. Public Nuisance (O.C.G. § 41-2-2) (Georgia County Plaintiffs) | 189 |
| | 2. Drug Dealer Liability Act (O.C.G. § 51-1-46) | 191 |
| G. | Kentucky Plaintiffs | 191 |
| | 1. Failure to Warn | 191 |
| H. | Louisiana Plaintiffs | 193 |
| | 1. False Advertising (La. Rev. Stat. § 40:6245(A)) | 193 |
| I. | Michigan Plaintiffs | 195 |
| | 1. Drug Dealer Liability Act (MCL 691.1402 *et seq.*) | 195 |
| J. | Ohio Plaintiffs | 196 |
| | 1. Absolute Public Nuisance | 196 |

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

**TABLE OF CONTENTS**
**(continued)**

Page

2.    Injury through Criminal Acts (R.C. § 2307.60) ................................ 200

3.    Engaging in a Pattern of Corrupt Activity (R.C. 2923.21 *et seq*.) .......... 202

K.    Oklahoma Plaintiffs ................................................................. 209

1.    Public Nuisance (50 O.S. § 16) ................................................ 209

L.    Tennessee Plaintiffs ................................................................. 210

1.    Public Nuisance (Tenn. Code § 29-3-101(B)) .......................... 210

2.    Drug Dealer Liability Act (Tenn. Code § 29-38-105, *et seq*.) ............... 211

M.    Virginia Plaintiffs ................................................................. 211

1.    Public Nuisance (Va. Code § 15.2-900) .................................. 211

2.    Willful and Wanton Negligence ............................................. 214

N.    West Virginia Plaintiffs ......................................................... 215

1.    Intentional Acts and Omissions ............................................. 215

X.    PRAYER FOR RELIEF ................................................................. 217

XI.    JURY DEMAND ........................................................................... 217

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

## I.      **PREAMBLE**

This complaint is an administrative device as described in *In re Propulsid Prods. Liab. Litig.*, 208 F.R.D.133, 142 (E.D. La. 2002), for the specific purpose of enabling the Court to address the threshold issues it articulated in its statements and Orders to date, as well as settlement, and does not supersede the complaints filed in the individual actions consolidated in this multi-district litigation for pretrial proceedings only. *See Gelboim v. Bank of Am.*, 574 U.S. 405, 413 n.3 (2015). This Complaint is not intended to consolidate the Plaintiffs' claims for trial. This Complaint does not include every Plaintiff-specific fact alleged in the underlying complaints, including facts related to individual damages. This complaint incorporates by reference the complaints filed by individual subdivision Plaintiffs pending in this MDL as of November 22, 2021.

This Complaint does not concede that a federal court has subject matter jurisdiction over any Plaintiff's case or claim where that Plaintiff filed a timely motion to remand. Any properly-made objections to removal are preserved. Some Plaintiffs have filed motions to remand based on the absence of federal subject matter jurisdiction. By joining in the filing of this complaint, these Plaintiffs do not waive their right to seek remand of their cases to the state courts in which they were originally filed.

## II.     **INTRODUCTION**

1.      For more than two decades, the opioid crisis has raged across this country. An opioid-related public health emergency was declared by the President in 2017. Last year was the worst on record, with drug overdoses soaring nearly 30%.[1] Today, there are increasingly few Americans whose lives have not been affected by the consequences of opioid dependency, addiction, and overdoses.

2.      McKinsey is a management consulting firm with operations across the globe. It played a central role in the unfolding, propagation, and exploitation of the opioid crisis by advising multiple opioid manufacturers and other industry participants how to sell as many

---

[1] Betsy McKay, "U.S. Drug-Overdose Deaths Soared Nearly 30% in 2020, Driven by Synthetic Opioids," *Wall Street Journal*, July 14, 2021, *available at*: https://www.wsj.com/articles/u-s-drug-overdose-deaths-soared-nearly-30-in-2020-11626271200.

opioids as conceivably possible. Knowing that its clients' products were highly addictive, ineffective, and unsafe for the treatment of long-term chronic pain, non-acute pain, and non-cancer pain, McKinsey developed a singular focus on increasing opioid sales, no matter the resultant cost to society. McKinsey did this for well over a decade, despite knowing full well the risk to public health and safety and the widespread economic harm from developing and implementing the transformation of strictly-controlled substances into top-selling blockbuster drugs.

3.      The purpose of McKinsey's work with its opioids clients was at all times to maximize return on investment. The whole point for those clients (and hence McKinsey) was to make as much money as possible. They all did. This relentless drive to increase sales and create greater availability of opioids was made with no concern about the parallel, known, and inevitable increase in opioid-related deaths, addiction, abuse, diversion, and misuse.

4.      In the world of management consulting, McKinsey is preeminent. It is one of the world's oldest, largest, and most lucrative consulting firms and is generally seen as the most prestigious firm in the industry. More consiglieri than one-off advisor, McKinsey touts its model of engaging in "transformational partnerships" with its clients. McKinsey learns each client's business intimately, embeds itself into all levels of the corporate hierarchy, and provides granular strategies to achieve transformative goals for its clients.

5.      Marvin Bower, the managing director of McKinsey from 1950 to 1967, was "the father of the consulting profession."[2] He "turned the business of selling management advice into a keystone of American corporate culture," and is "credited with taking a fledgling industry and setting its course not only as to the kinds of services it could sell but also the standards it must uphold for its work to be respected."[3] A lawyer by trade, Bower stressed that management consulting should be seen as an emergent profession, akin to the law or accounting, with obligations to clients and to the broader society that extend beyond the mere commercial.

---

[2] Douglas Martin, *Marvin Bower, 99; Built McKinsey & Co.*, N.Y. Times, Jan. 24, 2003, *available at*: https://www.nytimes.com/2003/01/24/business/marvin-bower-99-built-mckinsey-co.html
[3] *Id.*

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

6. Bower instilled an ethos at McKinsey that has been reinforced throughout the decades as a core value of the firm: "Deliver the bad news if you must, but deliver it properly."[4] Bower's principles, and the values he imparted within McKinsey, are said to guide the firm to the present day. "In many ways, certainly in spirit and soul, Marvin continued to lead it after he retired, and he leads it still," eulogized Rajat Gupta, McKinsey's then-global managing partner, at Bower's funeral in 2003.[5]

7. This case is, in large part, about the firm's failure to adhere to Bower's simple, foundational tenet. It arises instead from the firm's steadfast and continual work to maximize opioid sales in partnership with numerous clients during the pendency of the worst man-made epidemic in modern medical history. It is about McKinsey never delivering the "bad news" of opioids' devastating impact on Plaintiffs and the public, properly or otherwise, and instead looking the other way for money.

8. When it came to opioids, McKinsey did far more than just give advice. Not only did it suggest courses of action that its clients should adopt, the firm remained in place and worked collaboratively alongside its clients to actually implement McKinsey's recommendations to achieve objectives jointly identified by the clients and McKinsey. McKinsey stood alongside its clients in the arena doing the deeds.

---

[4] Duff McDonald, *The Firm* 35 (2014).

[5] *Id.* at 270. In many ways, Gupta was an interesting figure to opine on Bower's legacy. Indeed, Gupta's leadership of McKinsey is in many respects to be *contrasted* with Bower's legacy. Many of the values Bower emphasized—an emphasis on professionalism over commercial exploitation, for example—were jettisoned under Gupta's tenure as managing partner of the firm, which ended in 2003. "Under his watch, McKinsey began to chase top billings in a way it never had before." *Id.* at 234. For instance, McKinsey first began accepting equity stakes in clients as a form of incentive compensation during Gupta's tenure. Previously, McKinsey only charged standard fees for its consulting services as Bower disdained the notion of taking equity stakes in clients. *Id.* at 234. Under Gupta, McKinsey also began to allow consultants' compensation to be tied to client performance. *Id.*

Consistent with Gupta's efforts to monetize McKinsey's consulting business in ways previous firm leadership had not, McKinsey also began to expand its client base. "While the firm would never admit as much, under Gupta, McKinsey began working for just about anyone with a fat bank account and a checkbook." *Id.* at 266.

Institutions age, and by the time Gupta came to lead the firm in 1994, McKinsey was a mature institution. It had built up significant value in its *reputation* by historically advising *only* "blue chip" companies "at the top of the corporate pyramid." *Id.* Under Gupta, McKinsey began the process of realizing that value. For McKinsey, the way to monetize an elite reputation was to start advising those it historically may have shunned as clients—to start offering its *imprimatur*, in addition to its services, for money. McKinsey's work with opioid manufacturers began under Gupta's leadership.

9.     The deceptive marketing strategies that McKinsey and its clients invented, developed, deployed, and continually refined for years to expand the market for opioids are foundational to the epidemic.

10.     McKinsey worked hand-in-hand with major opioid manufacturers, including Purdue Pharma L.P., Endo Pharmaceuticals,[6] Johnson & Johnson,[7] and Mallinckrodt[8] for years. At the same time, McKinsey advised other participants in the opioid supply chain, including distributors, pharmacies, and even regulators.

11.     In particular, McKinsey advised the Sackler family and their company, Purdue, for years while Purdue aggressively marketed OxyContin, widely viewed as the taproot of the opioid crisis. The relationship began no later than 2004. In the years following Purdue's 2007 guilty plea for misleadingly marketing OxyContin, McKinsey continued to work closely with Purdue to dramatically increase OxyContin sales, notwithstanding the existence of a five-year Corporate Integrity Agreement that Purdue entered as part of its guilty plea.

12.     McKinsey knew of the dangers of opioids and in particular the prior misconduct of Purdue but nonetheless advised Purdue and other opioid manufacturers to improperly market and sell OxyContin and other prescription opioids, supplying granular sales and marketing strategies and remaining intimately involved throughout implementation of those strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that fueled and prolonged the opioid crisis.

13.     For years, McKinsey advised Purdue on, designed, and helped to implement various strategies to raise sales of OxyContin by focusing on high dose sales and deceptively messaging to physicians that OxyContin would improve function and quality of life. For example, McKinsey urged Purdue to maximize sales by dictating, to a greater degree, which prescribers its sales representatives would target, exploring ways to increase the amount of time those sales

---

[6] "Endo Pharmaceuticals" or "Endo" refers to Endo Health Solutions Inc., Endo International plc, and Endo Pharmaceuticals Inc., collectively.
[7] "Johnson & Johnson" refers to Johnson & Johnson Services, Inc. and its wholly-owned subsidiary Janssen Pharmaceuticals, Inc. ("Janssen").
[8] "Mallinckrodt" refers to Mallinckrodt LLC and Mallinckrodt plc, together.

2331554.1
4857-5942-6172.v1

representatives spent in the field increasing opioid sales and prioritizing OxyContin in incentive compensation targets.[9]

14.     McKinsey's partnership with Purdue reached its fever pitch in the summer of 2013. In January of that year, Purdue's Corporate Integrity Agreement expired, and Purdue was no longer bound by its constraints. Within months, the Sacklers tasked McKinsey with transforming Purdue's approach to OxyContin sales in order to extract as much money as possible from the remaining patent life of the drug.[10]

15.     In response, McKinsey developed and proposed Project Turbocharge, a series of transformational changes that McKinsey proposed to implement at Purdue to dramatically increase OxyContin sales by re-tooling Purdue's sales force and investing large amounts of capital to "turbocharge" it. "[O]ur recommendation is that Purdue makes a clear go-no-go decision to 'Turbocharge the Sales Engine'," McKinsey told Purdue on August 8, 2013.

16.     The Sacklers chose "go," and McKinsey subsequently implemented and continually refined Project Turbocharge at Purdue over the course of years, to devastating, but profitable, effect.

17.     McKinsey has recently been the subject of scrutiny for its various business practices, including its work facilitating the opioid crisis with Purdue.[11] On March 7, 2019, Kevin Sneader, McKinsey's then-global managing partner, addressed all McKinsey employees regarding this scrutiny. Drawing inspiration from Theodore Roosevelt, Sneader stated,

> [W]e cannot return to a time when we were in the background and unobserved. Those days have gone. Indeed, I have little doubt that scrutiny—fair and unfair— will continue. It is the price we pay for being "in the arena" and working on what matters.[12]

---

[9] PPLPC012000437346

[10] OxyContin, like any branded pharmaceutical, is subject to eventual patent expiration and competition from generic opioid manufacturers.

[11] *See* Michael Forsythe and Walt Bogdanich, *McKinsey Advised Purdue Pharma How to 'Turbocharge' Opioid Sales, Lawsuit Says*, N.Y. Times, Feb. 1, 2019, *available at:* https://www.nytimes.com/2019/02/01/business/purdue-pharma-mckinsey-oxycontin-opioids.html.

[12] *See* "*The Price We Pay for Being 'In the Arena'": McKinsey's Chief Writes to Staff About Media Scrutiny and Scandal*, Fortune Magazine, March 8, 2019, *available at* https://fortune.com/2019/03/08/mckinsey-staff-letter-kevin-sneader/. The "arena" reference is to *Citizenship in a Republic*, a speech delivered by Theodore Roosevelt at the *Sorbonne* on April 23, 1910:

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1        18.     Weeks later, McKinsey announced that it would no longer work for any opioid

2 manufacturer. "Opioid abuse and addiction are having a tragic and devastating impact on our

3 communities. We are no longer advising clients on any opioid-specific business and are

4 continuing to support key stakeholders working to combat the crisis."[13]

5        19.     The price for being in the arena is more than mere scrutiny. McKinsey is liable for

6 its misconduct and the harms it caused or exacerbated. McKinsey is liable for its successful

7 efforts to increase opioid sales for years. It continued this work unabated and with alacrity despite

8 events as stunning as Purdue's 2007 guilty plea for misbranding OxyContin, Purdue's 2015

9 settlement with the State of Kentucky, and numerous other enforcement actions related to opioid

10 sales and marketing by McKinsey clients. Through it all, McKinsey remained steadfast in its

11 efforts to promote opioid sales for all of its clients for the purpose of maximizing return on

12 investment without regard to the obvious implications of what they were doing. Indeed, the firm

13 endeavored alongside its clients to increase the size of the *overall* opioid market for *nearly two*

14 *decades*, until as late as March 22, 2019, despite increasingly blood-red flags along the way.[14]

15

16

17

---

18      It is not the critic who counts; not the man who points out how the strong man stumbles, or where
19 the doers of deeds could have done them better. The credit belongs to the man who is actually in the
arena [here, McKinsey; and the arena, opioid sales], whose face is marred by dust and sweat and
20 blood; who strives valiantly; who errs, who comes short again and again, because there is no effort
without error and shortcoming; but who does actually strive to do the deeds; who knows great
21 enthusiasms, the great devotions; who spends himself in a worthy cause; who at the best knows in
the end the triumph of high achievement, and who at the worst, if he fails, at least fails while daring
22 greatly, so that his place shall never be with those cold and timid souls who neither know victory
nor defeat.

23      As it happens, Mr. Sneader is not the only McKinsey person to draw inspiration from Roosevelt. *Citizenship*
*in a Republic* similarly inspired Dominic Barton, the man Mr. Sneader succeeded as McKinsey's global managing
24 partner. It served as the basis for his 2017 address to the Ivey Business School in Canada. *See* Dominic Barton *In the*
*Arena: Leadership in an Age of Disruption,* October 17, 2017, *available at*: https://www.ivey.uwo.ca/media/3780710/
25 daquino_lecture2017.pdf. While McKinsey continues to preach the values of corporate integrity from the Bower area,
its actions show that it has moved far afield from its professed moral compass.

26 [13] *See* Paul La Monica, *Consulting firm McKinsey no longer working with opioid maker Purdue Pharma*, CNN, May
24, 2019, *available at*: https://www.cnn.com/2019/05/24/business/mckinsey-purdue-pharma-oxycontin/index.html.
The statement was attributed to McKinsey as an entity. No individual's name was attributed.

27 [14] *See* "About McKinsey's past work for opioid manufacturers," *last updated March 22, 2021, available at:*
https://www.mckinseyopioidfacts.com ("We decided nearly two years ago to end all work on opioid-specific
28 business . . . .")

2331554.1

4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

III.     **JURISDICTION AND VENUE**

20.     This Court has subject matter jurisdiction over this action for the reasons stated in each underlying complaint.

21.     This Court has personal jurisdiction over McKinsey for the reasons stated in each underlying complaint.

22.     Venue is appropriate for pretrial proceedings under *In re McKinsey & Co., Inc., Nat'l Prescription Opiate Consultant Litig.*, MDL No. 2996, 2021 WL 2351628 (J.P.M.L. June 7, 2021).

IV.     **PARTIES**

A.     **Named Plaintiffs**

23.     Plaintiff County of Santa Cruz is a political subdivision of the State of California.

24.     Plaintiff Pope County is a political subdivision of the State of Illinois.

25.     Plaintiff The Village of Eddyville is a political subdivision of the State of Illinois.

26.     Plaintiffs County of Santa Cruz, Pope County, and The Village of Eddyville are willing to serve as Named Plaintiffs over the national class of plaintiffs and as Settlement Representatives for any settlement class.

B.     **Subdivision Plaintiffs**

27.     This Complaint is an administrative summary of claims by the following:

a.     <u>Alabama Plaintiffs</u>: Walker County; City of Jasper

b.     <u>California Plaintiffs</u>: County of San Mateo; County of Santa Cruz

c.     <u>Florida Plaintiffs</u>: City of Pembroke Pines

d.     <u>Georgia Plaintiffs</u>: Peach County; City of Woodbury

e.     <u>Illinois Plaintiffs</u>: St. Clair County; Pope County; Madison County; Village of Eddyville

f.     <u>Indiana Plaintiffs</u>: Orange County; Scott County; City of Madison; City of Austin

g.     <u>Kentucky Plaintiffs</u>: Green County Fiscal Court; Breckinridge County Fiscal Court; Hardin County Fiscal Court; Meade County Fiscal Court; Menifee County Fiscal

2331554.1
4857-5942-6172.v1

1    Court; Nelson County Fiscal Court; Ohio County Fiscal Court; Washington County Fiscal Court;

2    Green County Fiscal Court; City of Henderson; The City of Columbia; The City of Jamestown;

3    Russell County Fiscal Court; The City of Russell Springs; Breathitt County Fiscal Court;

4    Caldwell County Fiscal Court; Clinton County Fiscal Court; Harrison County Fiscal Court; Hart

5    County Fiscal Court; Larue County Fiscal Court; Logan County Fiscal Court; Mason County

6    Fiscal Court; Mercer County Fiscal Court; Todd County Fiscal Court; Calloway County Fiscal

7    Court; The City of Campbellsville; Daviess County Fiscal Court; Fulton County Fiscal Court;

8    Hancock County Fiscal Court; Hickman County Fiscal Court; McLean County Fiscal Court;

9    Muhlenberg County Fiscal Court; The City of Murray; The City of Owensboro; Spencer County

10   Fiscal Court; Taylor County Fiscal Court; Webster County Fiscal Court

11              h.      Louisiana Plaintiff: Parish of Livingston

12              i.      Michigan Plaintiff: Cannon Township

13              j.      New York Plaintiffs: County of Albany; County of Westchester; County of

14   Genesee; Town of Auburn; City of Buffalo; County of Chautauqua; County of Chemung; County

15   of Chenango; County of Clinton; County of Cortland; County of Hamilton; City of Ithaca; City of

16   Kingston; County of Livingston; County of Madison; City of Mount Vernon; County of Niagara;

17   County of Orleans; City of Poughkeepsie; Town of Poughkeepsie; County of Rensselaer; City of

18   Saratoga Springs; County of Steuben; City of New York; County of Suffolk; County of Broome;

19   County of Columbia; County of Dutchess; County of Erie; County of Fulton; County of Greene;

20   County of Herkimer; County of Lewis; County of Monroe; County of Montgomery; County of

21   Ontario; County of Orange; County of Oswego; County of Schenectady; County of Seneca;

22   County of St. Lawrence; County of Sullivan; County of Ulster; County of Washington; County of

23   Wyoming

24              k.      Ohio Plaintiffs: County of Montgomery; City of Dayton; County of

25   Portage; City of Ravenna; City of Kent; City of Aurora; County of Stark; City of Canton; City of

26   Alliance; County of Summit; City of Akron; City of Fairlawn; City of Barberton; Village of

27   Boston Heights; Boston Township; Village of Clinton; Copley Township; Coventry Township;

28   City of Cuyahoga Falls; City of Green; Village of Lakemore; Village of Mogadore; City of

1    Munroe Falls; City of New Franklin; City of Norton; Village of Peninsula; Village of Richfield;

2    Village of Silver Lake; Springfield Township; City of Stow; City of Tallmadge; Cuyahoga

3    County; City of Broadview Heights; City of Euclid; City of Garfield Heights; City of North

4    Olmsted; City of Olmsted Falls; City of Parma Heights; City of Parma; City of Strongsville; City

5    of Warrensville Heights; County of Medina; County of Ashtabula; City of Findlay; County of

6    Harrison; County of Jefferson; County of Lorain; City of Lorain; City of North Ridgeville;

7    County of Trumbull; City of Warren; County of Lake; Township of Painesville; Seven Hills; City

8    of Toledo

9               l.       Oklahoma Plaintiffs: City of Shawnee; Kay County

10              m.       Pennsylvania Plaintiffs: Bedford County

11              n.       Tennessee Plaintiffs: Blount County; City of Maryville

12              o.       Virginia Plaintiffs: The City of Chesapeake; The County Board of

13   Arlington County; Fairfax County Board of Supervisors; Chesterfield County; Prince William

14   County Board of Supervisors; Loudoun County; Henrico County; City of Roanoke; Roanoke

15   County; Fauquier County; City of Bristol; City of Salem; Alleghany County; Accomack County;

16   Northumberland County; City of Lexington; Franklin County; Frederick County; Halifax County;

17   Rockbridge County; Dickenson County; Louisa County; Madison County; Floyd County; City of

18   Covington; City of Fredericksburg; Charlotte County; Greensville County; Culpeper County;

19   Prince George County; City of Emporia; Amherst County; Botetourt County; Isle of Wight

20   County; City of Buena Vista; King and Queen County; Northampton County; Goochland County;

21   Dinwiddie County; Mecklenburg County; City of Fairfax; Stafford County; City of Winchester;

22   City of Alexandria; Washington County; Lee County; City of Norton; Pittsylvania County; Henry

23   County; City of Martinsville; Page County; City of Galax; Giles County; Montgomery County;

24   Cumberland County; Patrick County; City of Radford; Shenandoah County; City of Waynesboro;

25   The County Board of Arlington County; Fairfax County Board of Supervisors; Chesterfield

26   County; Prince William County Board of Supervisors; Loudoun County; Henrico County; City of

27   Roanoke; Roanoke County; Fauquier County; City of Bristol; City of Salem; Alleghany County;

28   Accomack County; Northumberland County; City of Lexington; Franklin County; Frederick

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

County; Halifax County; Rockbridge County; Dickenson County; Louisa County; Madison
County; Floyd County; City of Covington; City of Fredericksburg; Charlotte County; Greensville
County; Culpeper County; Prince George County; City of Emporia; Amherst County; Botetourt
County; Isle of Wight County; City of Buena Vista; King and Queen County; Northampton
County; Goochland County; Dinwiddie County; Mecklenburg County; City of Fairfax; Stafford
County; City of Winchester; City of Alexandria; Washington County; Lee County; City of
Norton; Pittsylvania County; Henry County; City of Martinsville; Page County; City of Galax;
Giles County; Montgomery County; Cumberland County; Patrick County; City of Radford;
Shenandoah County; City of Waynesboro

p.      _Washington Plaintiffs_: King County; Skagit County; Lewis County; City of
Kent; Island County; Kitsap County

q.      _West Virginia Plaintiffs_: County Commission of Mingo County; The Town
of Kermit

**C.      Defendants**

28.      Defendant McKinsey & Company, Inc. is a corporation organized under the laws
of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue,
New York, NY 10017. It may be served with process via its registered agent, Corporation Service
Company, at 80 State Street, Albany, NY 12207.

29.      Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal
place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with
process via its registered agent, Corporation Service Company, 251 Little Falls Drive,
Wilmington, DE 19808

30.      Defendant McKinsey & Company, Inc. United States is a Delaware corporation
with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may
be served with process via its registered agent, Corporation Service Company, 251 Little Falls
Drive, Wilmington, DE 19808

31.      Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware
corporation with its principal place of business is located at 711 Third Avenue, New York, NY

10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

32.     Upon information and belief, McKinsey & Company, Inc. is the parent company of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information and belief, each subsidiary corporation is wholly-owned by its parent. Despite the corporate form, McKinsey began as a partnership and still refers to its senior employees as "partners." Those partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as "McKinsey."

33.     McKinsey a is global management consultancy with offices in over 130 cities in 65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston, TX; Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte, NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa, FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle, WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

34.     McKinsey is registered to do business in all fifty states.

## V.   FACTUAL ALLEGATIONS APPLICABLE TO ALL CLAIMS

### A.   The Opioid Crisis

35.     The term "opioid" refers to a class of drugs that bind with opioid receptors in the brain and includes natural, synthetic, and semi-synthetic opioids. Natural opioids are derived from the opium poppy. Generally used to treat pain, opioids produce multiple effects on the human body, the most significant of which are analgesia, euphoria, and respiratory depression.

36.     The opium poppy contains various opium alkaloids, three of which are used in the pharmaceutical industry today: morphine, codeine, and thebaine. Early use of opium in Western medicine was a tincture of opium and alcohol called laudanum, which contains all of the opium alkaloids and is still available by prescription today. Chemists first isolated the morphine and codeine alkaloids in the early 1800s.

37.     In 1827, the pharmaceutical company Merck began large-scale production and commercial marketing of morphine. During the American Civil War, field medics commonly used morphine, laudanum, and opium pills to treat the wounded, and many veterans were left with morphine addictions. By 1900, an estimated 300,000 people were addicted to opioids in the United States, and many doctors prescribed opioids solely to prevent their patients from suffering withdrawal symptoms. The nation's first Opium Commissioner, Hamilton Wright, remarked in 1911: "The habit has this nation in its grip to an astonishing extent . . . . Our prisons and our hospitals are full of victims of it, it has robbed ten thousand businessmen of moral sense and made them beasts who prey upon their fellows . . .  it has become one of the most fertile causes of unhappiness and sin in the United States."

38.     Pharmaceutical companies have long tried to develop substitutes for opium and morphine that would provide the same analgesic effects without the addictive properties. In 1898, Bayer Pharmaceutical Company began marketing diacetylmorphine (obtained from acetylation of morphine) under the trade name "Heroin." Bayer advertised heroin as a non-addictive cough and cold remedy suitable for children, but as its addictive nature became clear, heroin distribution in the United States was limited to prescription only in 1914 and then banned altogether a decade later.

39.     Although heroin and opium became classified as illicit drugs, there is little difference between them and prescription opioids. Prescription opioids are synthesized from the same plant as heroin, have similar molecular structures, and bind to the same receptors in the human brain.

40.     Due to concerns about their addictive properties, prescription opioids have usually been regulated at the federal level as Schedule II controlled substances by the Drug Enforcement Administration since 1970.

41.     Throughout the twentieth century, pharmaceutical companies continued to develop prescription opioids like Percodan, Percocet, and Vicodin, but these opioids were generally produced in combination with other drugs, with relatively low opioid content.

2331554.1
4857-5942-6172.v1

42.     In contrast, OxyContin, the product whose launch in 1996 ushered in the modern opioid epidemic, is pure oxycodone. Purdue initially made it available in the following strengths: 10 mg, 15 mg, 20 mg, 30 mg, 40 mg, 60 mg, 80 mg, and 160 mg. The weakest OxyContin delivers as much narcotic as the strongest Percocet, and some OxyContin tablets delivered sixteen times that.

43.     The effects of opioids vary by duration. Long-acting opioids, such as Purdue's OxyContin and MS Contin, Janssen's Nucynta ER and Duragesic, Endo's Opana ER, and Actavis's Kadian, are designed to be taken once or twice daily and are purported to provide continuous opioid therapy for, in general, twelve hours. Short-acting opioids, such as Cephalon's Actiq and Fentora, are designed to be taken in addition to long-acting opioids to address "episodic pain" (also referred to as "breakthrough pain") and provide fast-acting, supplemental opioid therapy lasting approximately four to six hours. Still other short-term opioids, such as Insys's Subsys, are designed to be taken in addition to long-acting opioids to specifically address breakthrough cancer pain, excruciating pain suffered by some patients with end-stage cancer. The opioid manufacturers promoted the idea that pain should be treated by taking long-acting opioids continuously and supplementing them by also taking short-acting, rapid-onset opioids for episodic or "breakthrough" pain.

44.     Patients develop tolerance to the analgesic effect of opioids relatively quickly. As tolerance increases, a patient typically requires progressively higher doses in order to obtain the same perceived level of pain reduction. The same is true of the euphoric effects of opioids—the "high." However, opioids depress respiration and, at very high doses, can, and often do, arrest respiration altogether. At higher doses, the effects of withdrawal are more severe. Long-term opioid use can also cause hyperalgesia, a heightened sensitivity to pain.

45.     Discontinuing opioids after more than just a few weeks of therapy will cause most patients to experience withdrawal symptoms. These withdrawal symptoms include severe anxiety, nausea, vomiting, headaches, agitation, insomnia, tremors, hallucinations, delirium, pain, and other serious symptoms, which may persist for months after a complete withdrawal from opioids, depending on how long the opioids were used.

1    46.    As one doctor put it, the widespread long-term use of opioids "was an experiment

2    on the population of the United States. It wasn't randomized, it wasn't controlled, and no data

3    was collected until they started gathering death statistics."

4    47.    The results were devastating, and the nation continues to reach ever grimmer

5    milestones. In 2020, drug-overdose deaths in the United States soared nearly 30%, reaching all-

6    time highs.[15]

7    ## B.    Marketing and the Origins of the Opioid Crisis

8    48.    OxyContin, manufactured by Purdue Pharma L.P., was introduced to the market in

9    1996. Within six years of its introduction, the increasingly widespread misuse and abuse of

10   OxyContin and similar opioids had drawn the attention of the United States Senate.

11   49.    Two decades ago, Dr. Art Van Zee traveled from the rural coal town of St.

12   Charles, in the southwestern corner of Virginia, to Washington D.C. to provide testimony to the

13   United States Senate Committee on Health, Education, Labor and Pensions. On February 12,

14   2002, that Committee held a hearing entitled "Examining the Effects of the Painkiller OxyContin,

15   Focusing on Federal, State, and Local Efforts to Decrease Abuse and Misuse of this Product

16   While Assuring Availability for Patients Who Suffer Daily from Chronic Moderate to Severe

17   Pain."[16]

18   50.    Today, OxyContin—and the methods used to sell it—is widely seen as a principal

19   taproot of the opioid crisis. In those early days of the unfolding opioid epidemic, Dr. Van Zee's

20   medical practice in St. Charles put him in a position to offer informed, first-hand observations of

21   the toll that the pharmaceutical industry's efforts to market opioids was exacting from his

22   community. He testified:

23       In the 25 years I have practiced as a general internist in St. Charles, which is a small
24       Appalachian coal mining town, there has never been anything to compare to the
         epidemic of drug abuse and addiction that we have seen the last 3 years with
25       OxyContin. Contrary to what is sometimes portrayed in the media as long-term

---

26   [15] Betsy McKay, "U.S. Drug-Overdose Deaths Soared Nearly 30% in 2020, Driven by Synthetic Opioids," *Wall Street Journal*, July 14, 2020, *available at*: https://www.wsj.com/articles/u-s-drug-overdose-deaths-soared-nearly-30-in-2020-11626271200.

27   [16] A transcript of the hearing is *available at*: https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/html/CHRG-107shrg77770.htm

28

addicts switching to the drug *du jour*, what we have seen for the most part is numerous young people recreationally using OxyContin and then becoming very rapidly addicted. Many of these kids are good kids, good families with bright, promising futures that are being destroyed in every way by their opioid addiction.[17]

51.     Further, Dr. Van Zee identified the sales and marketing practices of the pharmaceutical industry when selling controlled substances as a primary cause of the problem:

My own personal view of the complicated OxyContin abuse problem is that there are at least three major elements involved. First, there has been an obvious problem with physician misprescribing and overprescribing of this drug. Second, this epidemic has been a vicious indicator of the alarming degree of prescription drug abuse in our society. *Third and perhaps the one closest to this committee and the FDA is that the promotion and marketing of OxyContin by Purdue Pharma has played a major role in this problem.*[18]

52.     Five years after Dr. Van Zee's testimony and eighty miles from his hometown of St. Charles, United States Attorney John Brownlee announced in Abingdon, Virginia, the guilty plea of the Purdue Frederick Company, the parent of Purdue Pharma, L.P., relating to the misbranding of OxyContin. Brownlee stated, "Even in the face of warnings from health care professionals, the media, and members of its own sales force that OxyContin was being widely abused and causing harm to our citizens, Purdue, under the leadership of its top executives, continued to push a fraudulent marketing campaign that promoted OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. In the process, scores died as a result of OxyContin abuse and an even greater number of people became addicted to OxyContin; a drug that Purdue led many to believe was safer, less subject to abuse, and less addictive than other pain medications on the market."

53.     Two years later, in 2009, Dr. Van Zee published *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy* in the American Journal of Public Health.

54.     In his paper, Dr. Van Zee stated the matter plainly: "Compared with noncontrolled drugs, controlled drugs, with their potential for abuse and diversion, pose different public health

---

[17] *See* https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/html/CHRG-107shrg77770 htm
[18] *Id.* (emphasis added).

risks when they are overpromoted and highly prescribed."[19] In one sense, Dr. Van Zee's observation is not particularly novel. Indeed, it approaches tautology: controlled substances are *controlled* precisely because they should not be sold to maximize volume and profits. This did not prevent McKinsey and Purdue from marketing Purdue's opioids full hilt, however. By 2004, "OxyContin had become the most prevalent prescription opioid in the United States."[20]

55.     Dr. Van Zee identified the three principal marketing tactics Purdue employed as a source of OxyContin misuse and abuse—the exact tactics McKinsey identified and promoted—and suggested that regulation may be appropriate to curtail its use. The first was the use of granular sales and marketing data to profile individual prescribers and identify those that already prescribe large amounts of opioids. "Through these profiles, a drug company can identify the highest and lowest prescribers of particular drugs on a single zip code, county, state, or the entire country. One of the critical foundations of Purdue's marketing plan for OxyContin was to target the physicians who were the highest prescribers for opioids across the country."[21]

56.     The second tactic was the use of incentive compensation structures to encourage the salesforce to sell ever more prescriptions of OxyContin. Bonuses at Purdue were "uncapped," meaning there was no upper limit to what an OxyContin salesperson could earn. Rather, salesforce remuneration was a direct function of overall OxyContin sales—the more you sell, the more you make. "A lucrative bonus system encouraged sales representatives to increase sales of OxyContin in their territories, resulting in large numbers of visits to physicians with high rates of opioid prescriptions, as well as a multifaceted information campaign aimed at them."[22]

57.     The third tactic was to increase the overall number of individual calls that the salesforce placed to prescribers. "From 1996 to 2000, Purdue increased its internal sales force from 318 sales representatives to 671, and its total physician call list from approximately 33,400 to 44,500 to approximately 70,500 to 94,000 physicians."[23]

---

[19] Art Van Zee, *The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy*, American Journal of Public Health, February 2009, *available at* https://www ncbi nlm nih.gov/pmc/articles/PMC2622774/pdf/221.pdf
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

58.     When combined, these tactics produced the intended result. "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[24]

59.     Dr. Van Zee's observations regarding the direct link between OxyContin marketing and overall opioid overdose mortality would, in time, be confirmed by further academic work, including empirical research published by the National Bureau of Economic Research in 2019.

60.     McKinsey played a central role in the sales and marketing of these Schedule II controlled substances in the United States for many years. Throughout that time, the purpose of McKinsey's actions was singular: making the most money possible no matter the resultant cost to society. Indeed, no significant concern was given to the fact that greater availability of drugs correlates to opioid-related deaths, addiction, abuse, and misuse. Return on investment was McKinsey's guiding light. McKinsey partnered with numerous opioid manufacturers and other opioid industry participants to maximize the return on investment in sales and marketing efforts for numerous opioid products, and did so contemporaneously. Despite the fact that the Schedule II controlled substances were designed for a small, narrowly defined group—patients with acute, terminal, or cancer-related pain—McKinsey's goal, in all instances, was to sell as many pills as conceivably possible.

**C.     What McKinsey Does: "Consulting is more than giving advice."**

61.     McKinsey is a global consulting firm with many areas of expertise, including the pharmaceutical industry. As a management consulting firm, McKinsey provides plans to managers, directors, and owners on how to run their companies or other enterprises, and helps implement those plans.

62.     Management consulting is the business of providing solutions to clients. Solutions take many forms, depending on the client's needs. "Management consulting includes a broad

---

[24] *Id.*

range of activities, and the many firms and their members often define these practices quite differently."[25]

63.    Broadly speaking, there are two schools of management consulting. "Strategy" consulting provides big-picture advice to clients about how they approach their business: how the business is structured, which markets to compete in, potential new business lines, and mergers and acquisitions. The strategy consultant provides a plan to the client that the client may choose to adopt or not.

64.    "Implementation" consulting is what comes next. If strategy consulting is providing advice to a client, "implementation" work is what happens once the client has adopted the consultant's plan. After a client has adopted the strategy consultant's recommendations, the implementation consultant remains in place with the client to actually do the necessary work and execute on the plan.

65.    In his 1982 *Harvard Business Review* article entitled "Consulting is More Than Giving Advice," Professor Arthur Turner of the Harvard Business School described the then-current state of the consulting industry's attitude toward implementation work:

> The consultant's proper role in implementation is a matter of considerable debate in the profession. Some argue that one who helps put recommendations into effect takes on the role of manager and thus exceeds consulting's legitimate bounds. Others believe that those who regard implementation solely as the client's responsibility lack a professional attitude, since recommendations that are not implemented (or implemented badly) are a waste of money and time. And just as the client may participate in diagnosis without diminishing the value of the consultant's role, so there are many ways in which the consultant may assist in implementation without usurping the manager's job.[26]

66.    Although McKinsey has historically been regarded as a "strategy" consulting firm, by the time it was working with Purdue, implementation services were a core component of the suite of services that McKinsey provided within the "transformational relationship" it developed with its clients.[27] Indeed, writing in 2013, Harvard Business School Professor Clayton

---

[25] Arthur Turner, *Consulting is More Than Giving Advice*, Harvard Business Review, September 1982, *available at*: https://hbr.org/1982/09/consulting-is-more-than-giving-advice
[26] *Id.*
[27] For McKinsey's own description of its implementation services, *See https://www.mckinsey.com/business-functions/mckinsey-accelerate/how-we-help-clients/implementation* (last accessed October 19, 2020).

Christensen observed the decline in "pure" strategy work performed by consultants, as the industry sought to diversify its income streams by offering implementation and other services to clients. "For example, at traditional strategy-consulting firms, the share of work that is classic strategy has been steadily decreasing and is now about 20%, down from 60% of 70% some 30 years ago."[28]

67.     When partnering with clients, a core component of the McKinsey relationship is discretion. "The basis of any client relationship with the firm is trust. Companies share their most competitive secrets with McKinsey with the understanding that confidentiality is paramount. McKinsey consultants aren't even supposed to tell their own spouses about their client work."[29] McKinsey recognizes it must have its clients' trust and make confidentiality "paramount," as "[c]ompanies share their most competitive secrets with McKinsey" for McKinsey to do its work.[30]

68.     During the implementation phase, McKinsey essentially bonds with the client. Describing McKinsey's approach to implementation, one McKinsey consultant stated, "In some of the most successful engagements I've seen, you can't even tell the difference between a McKinsey team member and one of our clients because we working that cohesively together."[31]

69.     Another McKinsey Senior Implementation Coach described McKinsey's approach: "We're in there interacting with every element of that organization, from the welders or mechanics on the front line, all the way up to the board of directors."[32]

---

[28] Clayton Christensen, Dina Wang, and Derek van Bever, "Consulting on the Cusp of Disruption," *Harvard Business Review*, October 2013, *available at* https://hbr.org/2013/10/consulting-on-the-cusp-of-disruption
[29] McDonald, *The Firm*, Pg. 308.
[30] *Id.* at 308.
[31] McKinsey on Implementation, April 30, 2017, *available at* https://www.youtube.com/watch?v=rEQOGVpl9CY
[32] *Id.*

2331554.1
4857-5942-6172.v1

70.     McKinsey's implementation team even has a symbol: a rowing team.



McKinsey Careers: what's behind McKinsey Implementation's logo and success?

5,507 views • Oct 22, 2018     👍 20   👎 1    ↱ SHARE   ≡+ SAVE   ...

71.     Jenny, a Practice Manager at McKinsey, explained its significance: "The rowers symbolized to us being in the boat with the clients, doing real work and being jointly responsible for the success."[33]

72.     Eugene, a partner, further offered:

> The reason McKinsey implementation works is because clients love it. The fact that we are staying longer with them, the fact that we're getting in to the trenches, the fact that we are there to walk the emotional journey with them when they're going through the tough times and really changing their companies, is what makes McKinsey implementation truly distinctive.[34]

73.     In the broadest of generalities, then, McKinsey's business model, as a provider of strategy and implementation consulting services, is to partner with clients to pursue business objectives identified by McKinsey. Once an objective is identified, the client and McKinsey then

---

[33] *See* "McKinsey Careers: what's behind McKinsey Implementation's logo and success?", October 22, 2018, *available at* https://web.archive.org/web/20200419140214/https://www.youtube.com/watch?v=3-Zx859VJtw
[34] *Id.*

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

engage in concerted action as a seamless and cohesive unit in order to implement the necessary means to achieve it.

**1.  McKinsey's Long-Term Partnership with the Pharmaceuticals Industry**

74.     Today, McKinsey's website explains "How We Help Clients" in the pharmaceuticals industry: "Helping clients maximize commercial value by assisting with product launch, marketing, sales, and market access."[35] McKinsey helps numerous clients throughout the pharmaceutical industry, from manufacturers to distributors and pharmacies. It often does so contemporaneously. For instance, McKinsey might advise multiple opioid manufacturers on the sales and marketing of competing branded opioid products.

75.     McKinsey's dominance of the consulting space in the pharmaceutical industry presents its own opportunity for further client service. Specifically, McKinsey also helps its clients by telling them what their competitors—who are also McKinsey clients—are doing.

76.     For example, McKinsey pitched its services to Purdue on the basis that it was able to "*bring examples from other successful companies*" and perform "detailed analytics."[36]

**2.  The McKinsey Pharmaceuticals and Medical Products Practice Group**

77.     Like most management consulting companies, McKinsey organizes itself into practice groups that specialize in a given industry.

78.     McKinsey has long maintained a Pharmaceuticals and Medical Products ("PMP") industry practice group dedicated to working with pharmaceutical companies. In 2004, when McKinsey's relationship with Purdue began, the PMP group was led by Michael Pearson. Pearson worked for McKinsey for twenty-three years and was a member of the firm's shareholder council (McKinsey's equivalent of a board of directors) in addition to leading PMP before departing McKinsey in 2008 to helm Valeant Pharmaceuticals.[37]

---

[35] https://www.mckinsey.com/industries/life-sciences/how-we-help-clients/commercial
[36] PPLPC021000601208 (emphasis added).
[37] John Gapper, *McKinsey's fingerprints are all over Valeant*, Financial Times, March 23, 2016, *available at:* https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a

Notably, Rob Rosiello, a McKinsey partner who was a Director of Client Services (or "DCS") of the Purdue account alongside co-DCS'es Maria Gordian and Martin Elling , went on to join Pearson at Valeant in 2015 as Chief Financial Officer. The DCS is the partner in charge of the client account.

79.     Pearson stated: "At McKinsey pharmaceuticals was one of our biggest industry groups."[38] Pearson was "not the quintessential suave and intellectual McKinsey partner. He was loud and profane and was seen, in the words of one former colleague, as 'sharp-edged and sharp elbowed.'"[39]

80.     Under his leadership, McKinsey's knowledge and expertise in the pharmaceutical industry was significant. By 2009, McKinsey described its capabilities: "We have an unparalleled depth of both functional and industry expertise as well as breadth of geographical reach. Our scale, scope, and knowledge allow us to address problems that no one else can. At heart, we are a network of people who are passionate about taking on immense challenges that matter to leading organizations, and often, to the world."

81.     In 2012, while advising Purdue, McKinsey described PMP and its health care capabilities thusly: "Indeed, there is a doctor in the house. We have more than 1,700 consultants with significant healthcare experience, including more than 150 physicians and 250 consultants with advanced degrees in genetics, immunology, biochemical engineering, neurobiology, and other life sciences. We also have 75 consultants with advanced degrees in public health, healthcare management, and related fields."

82.     That same year, the PMP group published a report entitled "Death of a Sales Model, or Not: Perspectives on the Evolution of Pharmaceutical Field Based Selling."[40] In it, McKinsey partner Laura Moran co-authored a segment called "The Few, The Proud, The Super-Productive: How a 'smart field force' can better drive sales." In the segment, Moran and her co-authors described various ways a pharmaceutical company could optimize its sales force. Moran worked on the Purdue account, where the strategies outlined in her article were incorporated into Project Turbocharge two years later.

---

[38] Michael Peltz, *Mike Pearson's New Prescription for the Pharmaceuticals Industry*, Institutional Investor, September 3, 2014, *available at:* https://www.institutionalinvestor.com/article/b14zbjfm8nf1c4/mike-pearsons-new-prescription-for-the-pharmaceuticals-industry
[39] John Gapper, *McKinsey's fingerprints are all over Valeant*, Financial Times, March 23, 2016, *available at:* https://www.ft.com/content/0bb37fd2-ef63-11e5-aff5-19b4e253664a
[40] "Death of a Sales Model, or Not," Pharmaceutical and Medical Product Practice, McKinsey, *available at* https://www.mckinsey.com/~/media/mckinsey/dotcom/client_service/pharma%20and%20medical%20products/pmp%20new/pdfs/2012%20death%20of%20a%20sales%20model%20or%20not.pdf

2331554.1
4857-5942-6172.v1

83.     With respect to pharmaceutical marketing, the PMP group states, "We support clients in creating high-impact strategies that maximize value, using customized tools. We also have detailed market data for all major geographic regions."[41] PMP also works with pharma clients regarding their sales force: "Our efforts span the entire organization—we can help train and restructure sales forces, work directly in the field to provide coaching, maximize value from back-office services, develop strategies to accelerate short-term sales, and assist with company-wide commercial transformations."[42]

84.     McKinsey has long considered itself a "leadership factory" for good reason.[43] Nowhere is this more apparent than the pharmaceutical industry, where, thanks to PMP's efforts under Pearson's leadership, McKinsey continues to reign as the dominant management consultant.

85.     Consistent with PMP's ambition that McKinsey be the dominant consultant in the pharmaceutical industry, McKinsey has blanketed the entire pharmaceutical supply chain with alumni.

86.     Rajiv de Silva, for instance, was appointed CEO of Endo Pharmaceutical in March 2013. Endo's two top-selling drugs were pain medications. Endo—and de Silva, individually—have been named in multiple lawsuits related to the ongoing opioid crisis. Previously, de Silva worked with Pearson in a leadership position within PMP at McKinsey before joining Rob Rosiello, a former McKinsey partner, and Pearson at Valeant.[44] McKinsey advised Endo on its opioid business.

87.     Likewise, Frank Scholz was a partner at McKinsey and a leader in the PMP group for seventeen years prior to departing in 2013 to join Mallinckrodt, another opioid manufacturer presently in bankruptcy after being named in numerous lawsuits relating to the ongoing opioid crisis. In fact, Scholz was the President of the "Specialty Generics" division of Mallinckrodt

---

[41] *See* https://www.mckinsey.com/industries/pharmaceuticals-and-medical-products/how-we-help-clients/commercial
[42] *Id*.
[43] *See* Adam Jones, "Should business schools fear McKinsey's leadership factory?," *Financial Times*, May 22, 2016, *available at:* https://www.ft.com/content/0d17f670-1612-11e6-b197-a4af20d5575e
[44] David Sell, *"Endo CEO downplays Valeant link,"* Philadelphia Inquirer, November 5, 2015, *available at* https://www.inquirer.com/philly/business/20151106_Endo_CEO_downplays_Valeant_link.html

1  (formerly SpecGX LLC), which is the division that sold generic opioids. McKinsey advised

2  Mallinckrodt on its opioid business.

3      88.    Teva Pharmaceuticals,[45] another opioid manufacturer named in numerous lawsuits

4  for its role in the opioid crisis, is led by President and Chief Executive Officer and McKinsey

5  alumnus, Kare Schultz. He joined the company in 2017, at which point he was also appointed to

6  Teva's board of directors. Through an asset manager named Deerfield, McKinsey's in-house

7  hedge fund held a financial stake in Teva Pharmaceuticals while McKinsey advised its numerous

8  clients on how to maximize opioid sales.[46]

9      89.    McKinsey's involvement with Teva has been long-term. In 2006, upon his

10  retirement from McKinsey, Roger Abravanel joined Teva's board of directors the following

11  year.[47] By 2011, Teva had acquired Cephalon, Inc., another manufacturer of opioids, as "a core

12  part of [Teva's] strategy" of "growth through acquisitions."[48] Befitting the pattern, Cephalon had

13  its own long-standing ties to McKinsey before being acquired by Teva. In 2008, when Cephalon's

14  Executive Vice President, General Counsel, and Secretary John E. Osborn retired, he accepted a

15  job as "an advisor on life sciences regulatory and compliance matters to the international

16  consulting firm McKinsey & Company, Inc."[49]

17      90.    McKinsey has ties to another notable opioid industry combination: the 2012

18  acquisition of Actavis, Inc.by Watson Pharmaceuticals, Inc. ("Watson") for €4.25 billion. In the

19  aftermath of the acquisition of the large European pharmaceutical company, Watson created a

20  "Global Integration Management Office" reporting directly to its CEO, Paul Bisaro, to focus "on

21

22

---

23  [45] "Teva Pharmaceuticals" or "Teva" refers to Teva Pharmaceutical Industries Ltd. and Teva
    Pharmaceuticals USA, Inc., together.

24  [46] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from
    treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-

25  giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969
    McKinsey's in-house hedge fund is discussed further, below.

26  [47]   Form  20-F  dated  December  31,  2012,  Teva  Pharmaceutical  Industries  Limited,  *available  at*
    https://www.sec.gov/Archives/edgar/data/818686/000119312513050510/d450498d20f htm

27  [48] *Id.*

28  [49]  "Cephalon  General  Counsel  John  E.  Osborn  to  Resign  Position,"  February  8,  2008,  *available  at*
    https://www.sec.gov/Archives/edgar/data/873364/000110465908008569/a08-5085_1ex99d1 htm

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

planning and implementing the integration of Actavis."[50] In order to achieve this critical task, Watson hired Marc Lehnen: "We were very pleased to recruit Marc from McKinsey & Company, Inc. to lead the Integration Management Office. Marc has years of experience in the generic industry and knows our culture and way of operating."[51] Notably, the press release indicates that McKinsey was already advising Watson regarding the acquisition: "*Although Marc does not formally join our Company until July*, he will nevertheless be involved in the integration planning during this interim period."[52]

91.    Allergan,[53] another opioid manufacturer and defendant in the nationwide opioid litigation, has also relied on McKinsey as a source of management candidates. McKinsey Senior Adviser Christopher J. Coughlin joined Allergan's board in 2014 and remains there today.

92.    Abbott Labs, which partnered with Purdue in the early years of OxyContin to use Abbott's sales force to market Purdue's drug, has been led by CEO Miles White since 1998. White began his career at McKinsey around 1980.

93.    As the preceding paragraphs make clear, McKinsey was in a truly unique position: given its dominance of pharmaceutical management consulting through PMP, practically all opioid industry participants were its clients. And those same clients routinely hire McKinsey consultants to leadership positions within their companies. While advising multiple industry participants regarding the sales of competing products, McKinsey was in a position to know confidential information and trade secrets of these clients "with the understanding that confidentiality is paramount."[54]

94.    Because of its client relationships, McKinsey was, quite literally, the sole repository on Earth of this collective knowledge of industry-wide tactics regarding the sales and marketing of opioids, and the outcomes thereof. This unique collection of knowledge and

---

[50] "Watson Announces Formation of Global Integration Management Office to Support ending Actavis Acquisition," PR Newswire, May 9, 2012, *available at* https://www.prnewswire.com/news-releases/watson-announces-formation-of-global-integration-management-office-to-support-pending-actavis-acquisition-150755565.html
[51] *Id.*
[52] *Id.* (emphasis added).
[53] Allergan is part of the same corporate family as Actavis and Watson.
[54] McDonald, *The Firm*, Pg. 308.

2331554.1
4857-5942-6172.v1

expertise made McKinsey a hub: even if any two given industry participants did not know what each other was doing, McKinsey knew exactly what *both* were doing because both were clients.

95.     McKinsey's relationships and influence carry far beyond the manufacturers. For instance, current McKinsey director Nancy Killefer has also been an independent director of Cardinal Health, Inc. ("Cardinal") —one of the "Big Three" Distributor Defendants in the ongoing nationwide opioid litigation—since 2015. Chunhui Moi, Cardinal's current Vice President of Corporate Strategy, was previously an associate principal at McKinsey, where he worked for nine years. Michele Holcomb, Cardinal's current Executive Vice President, Chief Strategy and Business Development Officer, was a partner in the Global Pharmaceutical Practice at McKinsey.

96.     McKinsey populates the "strategy" positions at the other opioid distributors as well. At AmerisourceBergen, the "Director of Corporate Development and Strategy" was hired away from McKinsey, where she had previously been a senior associate. AmerisourceBergen's Executive Vice President and Chief Strategy Officer had previously been a partner at McKinsey.

97.     At McKesson Corporation ("McKesson"), another McKinsey client, the President of McKesson Specialty Health and, previously Vice President of Corporate Strategy, was Marc Owen. "Prior to joining McKesson, Owen was a senior partner at McKinsey, advising pharmaceutical manufacturers, healthcare providers, distributors and technology companies, *including McKesson*, for more than a decade."[55] After Owen was promoted in 2012, McKesson hired yet another Vice President of Corporate Strategy away from McKinsey.

98.     In short, one way McKinsey adds value for a client is by knowing what all of its competitors are doing. It possesses a greater body of knowledge about any given industry in which it advises multiple participants than any individual participant does itself.

### 3.    The Transformational Relationship

99.     McKinsey has long touted the notion of a "transformational relationship." It is the goal of every client relationship McKinsey develops and, McKinsey argues, the best way to

---

[55] "Marc Owen Appointed President of McKesson Specialty Health," McKesson, January 31, 2012, *available at* https://www.mckesson.com/about-mckesson/newsroom/press-releases/2012/marc-owen-appointed-president-of-mckesson-specialty-health/ (emphasis added)

2331554.1
4857-5942-6172.v1

extract value from a client's use of McKinsey's services. McKinsey is not a one-off seller of advice for any given CEO's problem of the day. Rather, McKinsey argues that real value for the client derives from an ongoing "transformational" relationship with the firm.[56]

100.    At its core, the "transformational relationship" is *long-term*. It is the antithesis of a one-off contract wherein McKinsey performs one discreet project for a client and then concludes its business. Rather, "once McKinsey is inside a client, its consultants are adept at artfully creating a feedback loop through their work that purports to ease executive anxiety but actually creates more of it."[57] The long term result can be "dependence" on the McKinsey consultants. "We insinuate ourselves," Ron Daniel, McKinsey's then-managing partner, told *Forbes* in 1987.[58]

101.    "They have follow-on work not just because they're good at what they do, but because they are trained in how to manage these kinds of client relationships. They understand that the core reality is the relationship and the conversation, and that any particular engagement is merely epiphenomenal," explained Alan Kantrow, formerly the editor of *McKinsey Quarterly*.[59]

102.    This strategy of weaving itself into all aspects of its clients' business proved enormously successful for McKinsey over the years. It was a strategy McKinsey encouraged its consultants to take with clients to great effect:

> The sell worked: Once ensconced in the boardrooms of the biggest corporate players in the world, McKinsey rarely left, ensuring a steady and growing flow of billings for years if not decades. In 2002, for example, *BusinessWeek* noted that at that moment, the firm had served four hundred clients for fifteen years or more.[60]

---

[56] Duff McDonald, *The Firm*, Pg. 136-37 ("McKinsey no longer pitched itself as a project-to-project firm; from this point forth [the late 1970s], it sold itself to clients as an ongoing prodder of change, the kind a smart CEO would keep around indefinitely.").

[57] *Id.* at pg. 6. Purdue provides a fine example of this feedback loop in action. In 2008, when McKinsey was advising Purdue regarding Risk Evaluation and Mitigation Strategies ("REMS") for OxyContin required by the FDA, McKinsey partner Maria Gordian wrote to fellow partners Martin Elling and Rob Rosiello regarding progress in the "REMS work" as well as "Broader Strategy work." Regarding the latter, Gordian noted that Purdue board members Jonathan Sackler and Peter Boer "basically 'blessed' [Craig Landau] to do whatever he thinks is necessary to 'save the business.'. . . *I believe there is a good opportunity to get another project here*." MCK-MAAG-0117875 (emphasis added). Indeed, after the REMS work was completed, McKinsey continued to work on "Broader Strategy work" for another decade.

[58] John Merwin, "We Don't Learn from Our Clients, We Learn from Each Other," *Forbes*, October 19, 1987.

[59] Duff McDonald, *The Firm,* Pg. 185.

[60] *Id.* at pg. 136.

2331554.1
4857-5942-6172.v1

103.     Another aspect of the transformational relationship McKinsey develops with clients is the development and marketing of "leave-behind" products, such as software applications, that are sold to clients as tools that can be used by the business on an on-going and recurring basis, separate and apart from McKinsey's project-based consulting work. As described by Harvard Business School Professor Clayton Christensen, starting in 2007, "McKinsey & Company initiated a series of business model innovations that could reshape the way the global consulting firm engages with clients. One of the most intriguing of these is McKinsey Solutions, software and technology-based analytics and tools that can be embedded at a client, providing ongoing engagement outside the traditional project-based model."[61]

104.     McKinsey's relationship with Purdue provides an example of the deployment of these "leave-behind" products. One McKinsey Solution is a pharmaceutical sales and marketing workforce optimization tool called FieldGuide, a proprietary software application McKinsey sells to clients. "The FieldGuide tool optimizes salesforce deployment and territory design through advanced geospatial analysis that leverages both market-potential insights across device categories and advanced sales-response curve analysis."[62] McKinsey sold it to Purdue for the purpose of optimizing Purdue's OxyContin salesforce.

**D.     McKinsey and Purdue: A Case Study in Transformation**

105.     Indeed, McKinsey's work with Purdue is a prime example of the transformational relationship in action. McKinsey counted Purdue as a client at least as early as 2004, three years *before* Purdue's parent and officers first pleaded guilty to misbranding OxyContin in 2007. McKinsey was actively working with Purdue to increase OxyContin sales despite that guilty plea and continued to do so throughout the time period that Purdue and its advisors were bound by the terms of the Corporate Integrity Agreement entered in to alongside the guilty plea. McKinsey's work with Purdue continued through at least 2018.

---

[61] Clayton Christensen, Dina Wang, and Derek van Bever, "Consulting on the Cusp of Disruption," *Harvard Business Review*, October 2013, *available at* https://hbr.org/2013/10/consulting-on-the-cusp-of-disruption
[62]                          https://www.mckinsey.com/industries/pharmaceuticals-and-medical-products/how-we-help-clients/medtech/marketing-and-sales

106.    McKinsey staffed at least forty known consultants to Purdue, from senior partners all the way down through engagement managers and entry-level associates. Throughout the unfolding of the nationwide opioid crisis that only continued to worsen after the 2007 guilty plea, McKinsey remained steadfast alongside the Sacklers and Purdue every step of the way. The *mea culpas* would come only later.

107.    McKinsey partner Maria Gordian, in her March 26, 2009 "EY 2009 Impact Summary" internal report to McKinsey director Olivier Hamoir and McKinsey's Personnel Committee, recounted her accomplishments that year on the Purdue account. The document is an annual self-assessment produced by McKinsey partners. In it, Gordian described the state of firm's relationship for Purdue:

> With client work extending through the 3rd quarter, and several additional proposals in progress, we continue to expand the depth and breadth of our relationships at Purdue. We look forward to deepening our relationships with the Sackler family and serving them on key business development issues, and to expanding our relationship with [John] Stewart and other members of the senior management team.[63]

108.    Gordian even described herself as a counselor to Richard Sackler in the same memorandum, in addition to being a "point of contact for the Board and Sackler family."[64]

109.    The continued expansion of the depth and breadth of McKinsey's relationship with Purdue was an ever-present internal goal for McKinsey, as it was accompanied by recurring and ever-increasing client billings.

110.    By 2014, both the breadth and depth of McKinsey's relationship with Purdue had expanded dramatically. During the 2009 to 2014 period in particular, Purdue relied extensively on McKinsey to develop and implement its sales and marketing strategy for OxyContin. But McKinsey's work for Purdue involved many other facets of Purdue's business beyond sales and marketing, including general and administrative consulting, review of product acquisition,

---

[63] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No. 2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex 7, Pg. 48; MCK-MAAG 0118669.
[64] *Id.*

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

evaluation of research and development, advising Purdue on the design of clinical studies, risk management, and interactions with regulators.

111.     McKinsey's sales and marketing work for Purdue focused on creating and implementing strategies and tactics to bolster the sales of OxyContin, a Schedule II drug that is widely recognized as among the most frequently diverted and abused opioids. As Purdue faced growing scrutiny, McKinsey also helped the company protect its public image and profit from the market for illicit opioids, which McKinsey's industry-wide efforts helped to promote and maintain.

112.     McKinsey understood the Sacklers' goals for Purdue and the work it would need to perform to maintain and grow Purdue's opioid profits amidst a growing epidemic of addiction and abuse. Part of McKinsey's work involved assessing the "underlying drivers" of OxyContin's (financial) performance. As described below, these drivers boil down to two things: (1) a widespread deceptive marketing campaign and (2) fueling an illicit market for non-medical use. Purdue entered into guilty pleas arising out of both types of conduct in 2007 and 2020, respectively. McKinsey delved into the "granular" aspects of Purdue's sales and promotion. And, throughout the two companies' long-term relationship, McKinsey understood Purdue's business "both in terms of content and culture," as its own renewed consulting agreement assured in 2013.

### 1.     2004: McKinsey and Purdue Meet

113.     On March 1, 2004, McKinsey entered into a Master Consulting Agreement with Purdue for services that would be defined from time to time.[65] The Agreement was signed on McKinsey's behalf by Rob Rosiello, then a senior partner in the PMP practice group. After a ruling that held patents on OxyContin unenforceable due to Purdue misleading the patent office, McKinsey stepped in to help Purdue.[66]

114.     The Master Consulting Agreement ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

---

[65] PPLPC012000069192
[66] *Id.*

2331554.1
4857-5942-6172.v1

1    ██████████████████████████████████████████████████

2    ██████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████████

4    ████████████████████████████[68]

5        115.     From 2004 through 2008, McKinsey advised Purdue on research and development,

6 business development, and product licensing related to Purdue's opioid products.[69] Consistent

7 with its business model, McKinsey leveraged these projects into growth of its "Broader Strategy

8 work" also underway with Purdue.[70] Specifically, in October 2008, Purdue retained McKinsey for

9 broad strategy work after two board members "blessed" Purdue executive Craig Landau with

10 doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and

11 introduction of generic competition to the older OxyContin.[71]

12        **2.**    **2007: Purdue Pleads Guilty to Misbranding OxyContin and is Bound by a Corporate Integrity Agreement**

13

14        116.     On May 10, 2007, John Brownlee, United States Attorney for the Western District

15 of Virginia, announced the guilty plea of the Purdue Frederick Company, the parent of Purdue

16 Pharma, relating to the misbranding of OxyContin. Brownlee stated,

17        Even in the face of warnings from health care professionals, the media, and members
of its own sales force that OxyContin was being widely abused and causing harm to

18        our citizens, Purdue, under the leadership of its top executives, continued to push a

19        fraudulent marketing campaign that promoted OxyContin as less addictive, less
subject to abuse, and less likely to cause withdrawal. In the process, scores died as

20        a result of OxyContin abuse and an even greater number of people became addicted
to OxyContin; a drug that Purdue led many to believe was safer, less subject to

21        abuse, and less addictive than other pain medications on the market.

22        117.     Purdue Frederick Company as well as three of Purdue's officers, pleaded guilty to

23 the misbranding of OxyContin pursuant to various provisions of the Federal Food, Drug, and

24 Cosmetic Act, 21 U.S.C. §§ 301, *et seq.*

25

26   [67] *Id.*

27   [68] PPLPC020000034087
  [69] PPLPC013000116218; PPLP004401340

28   [70] MCK-MAAG-0117875
  [71] *Id.*

2331554.1
4857-5942-6172.v1

118.    Purdue admitted that "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Part of this deceptive messaging included highlighting OxyContin as a long-acting ("LA") or extended release ("ER") opioid and suggesting it created less chance for addiction than "immediate release" opioids because it had fewer "peak and trough" blood level effects or "did not cause a 'buzz' or euphoria" in the same manner as these other opioids.

119.    Concurrent with its guilty plea, Purdue entered into a Corporate Integrity Agreement with the Office of Inspector General of the United States Department of Health and Human Services on May 7, 2007. Purdue's compliance obligations under the Corporate Integrity Agreement ran for a period of five years, and ultimately terminated in January 2013.[72]

120.    Pursuant to the Corporate Integrity Agreement, Purdue was obligated to implement written policies regarding its compliance program and compliance with federal health care program and Food and Drug Administration requirements, including:

a.    "selling, marketing, promoting, advertising, and disseminating Materials or information about Purdue's products in compliance with all applicable FDA requirements, including requirements relating to the dissemination of information that is fair and accurate . . . including, but not limited to information concerning the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products";

b.    "compensation (including salaries and bonuses) for Relevant Covered Persons engaged in promoting and selling Purdue's products that are designed to ensure that financial incentives do not inappropriately motivate such individuals to engage in the improper promotion or sales of Purdue's products"; and

c.    "the process by which and standards according to which Purdue sales representatives provide Materials or respond to requests from [health care providers] for information about Purdue's products, including information concerning withdrawal, drug tolerance, drug addiction, or drug abuse of Purdue's products," including "the form and content of

---

[72] *See* https://www.justice.gov/opa/press-release/file/1329576/download

Materials disseminated by sales representatives," and "the internal review process for the Materials and information disseminated by sales representatives."

121.    Purdue was obligated to engage an Independent Review Organization to ensure its compliance with the strictures of the Corporate Integrity Agreement and to file compliance reports on an annual basis with the Inspector General.

122.    In the wake of its accession to the Corporate Integrity Agreement, Purdue faced newly imposed constraints on its sales and marketing practices. The Corporate Integrity Agreement was a problem to solve. Despite the agreement's constraints (i.e., do not lie about OxyContin), Purdue and its controlling owners, the Sackler family, still intended to maximize OxyContin sales.

### 3.    The Sacklers React to the "Concentration of Risk" Posed to Them by the Opioid Business.

123.    The Sackler family has owned and controlled Purdue and its predecessors since 1952. At all times relevant to this Complaint, individual Sackler family members occupied either six or seven of the seats on Purdue's board of directors, and at all times held a majority of Board seats. To advise the board of directors of Purdue Pharma was to advise the Sackler family. The interests of the Sackler family and the Purdue board of directors, and Purdue itself, as a privately held company, were all aligned. Practically, they were indistinguishable.[73]

124.    As a result of the 2007 guilty plea, the Sacklers made the strategic decision to distance the family from Purdue, which was regarded, in the words of Richard Sackler, as an increasingly dangerous "concentration of risk" for Purdue's owners. Ten days after the guilty plea was announced, David Sackler wrote to his father, Richard Sackler, and uncle, Jonathan Sackler, describing precisely what that "risk" was: legal liability for selling OxyContin. In response to Jonathan stating that "there is no basis to sue 'the family,'" David replied:

---

[73] Craig Landau, soon to become CEO of Purdue, acknowledged in May 2017 that Purdue operated with "the Board of Directors serving as the 'de facto' CEO." The future CEO of the company, in other words, understood that he would have little practical power despite his new title. The owners ran the business.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

| Message | |
|---|---|
| From: | David Sackler ███████████████ |
| Sent: | 5/17/2007 11:08:08 PM |
| To: | 'Sackler, Jonathan' ████████████ ███: Sackler, Dr Richard ████████████ |
| CC: | Ives, Stephen A. ████████████████████████ |
| Subject: | RE: Idea |
| Attachments: | image001.jpg |

Well I hope you're right, and under logical circumstances I'd agree with you, but we're living in America. This is the land of the free and the home of the blameless. We will be sued. Read the op-ed stuff in these local papers and ask yourself how long it will take these lawyers to figure out that we might settle with them if they can freeze our assets and threaten us.

125.     Given concern over this "concentration of risk," the two sides of the Sackler family spent considerable time and energy debating the best way to achieve distance from Purdue, and collectively considered a variety of options for doing so. One option was to sell the company to or merge the company with another pharmaceutical manufacturer. They discussed Shire as a possible target, as were Cephalon, UCB, and Sepracor, Inc. The proceeds of such a transaction could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance from opioids.

126.     Mortimer D.A. Sackler advocated for a sale or merger in a February 21, 2008 email to Richard Sackler (a former president and co-chairman of Purdue) and several others, writing, "The pharmaceutical industry has become far too volatile and risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to OxyContin.

127.     Another option was to have Purdue borrow money in order to assure Purdue had adequate funds to continue operating while the Sacklers, as owners, began to make substantial distributions of money from the company to themselves. Once again, the proceeds of the distributions could then be re-invested in diversified assets, thereby achieving the Sacklers' desired distance.

128.     In order to pursue either of these options, the Sacklers needed to maximize opioid sales in the short term so as to make Purdue — by then the subject of substantial public

- 34 -

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

scrutiny—appear either as an attractive acquisition target or merger partner to another pharmaceutical manufacturer or as a creditworthy borrower to a lender.

129.   In short, the Sacklers planned to engage in a final flurry of opioid pushing in order to rid themselves of their pharmaceutical company dependency for good.

130.   In fact, in the years after the 2007 guilty plea, Purdue would retain only the absolute minimum amount of money within it as possible: $300 million. Purdue was required to retain that amount pursuant to a partnership agreement with separate company. Otherwise, all the money was distributed to its owners.[74]

131.   Given the complexity of the problem, the Sacklers and Purdue realized that they would need assistance in achieving these internally contradictory objectives. Purdue did not have the capabilities in-house to design and implement a sales strategy for OxyContin that would achieve the Sacklers' objectives. They turned to the global management consulting firm McKinsey, which had already been advising the Sacklers and Purdue for at least three years, for help with their new problem.

132.   Notably, under the terms of Paragraph II.C.1(b) of the Corporate Integrity Agreement, McKinsey, as a contractor to Purdue performing sales and marketing functions for the company, was itself a "Covered Person" subject to the strictures of the Agreement.[75]

**4.   Purdue Tasks McKinsey with Boosting Opioid Sales in Light of the Guilty Plea and Corporate Integrity Agreement.**

133.   The Sacklers faced a problem: the need to grow OxyContin sales as dramatically as possible so as to make Purdue an attractive acquisition target or borrower, while at the same time appearing to comply with the Corporate Integrity Agreement. As one Purdue executive stated of Purdue's attitude toward the Corporate Integrity Agreement: "They did not listen to their

---

[74] *See* Jared S. Hopkins, *At Purdue Pharma, Business Slumps as Opioid Lawsuits Mount*, Wall Street Journal, June 30, 2019, *available at:* https://www.wsj.com/articles/purdue-pharma-grapples-with-internal-challenges-as-opioid-lawsuits-mount-11561887120?mod=hp_lead_pos6

[75] The relevant language in the Corporate Integrity Agreement provides: "'Covered Persons' includes . . . all contractors, subcontractors, agents, and other persons who perform sales, marketing, promotional, pricing, government contract, or regulatory functions . . . on behalf of Purdue." PDD1712900096.

1  critics and insisted they had just a few isolated problems. After the settlement, they didn't
2  change—the way the sales force was managed and incentivized, everything stayed the same."[76]

3  134.    Purdue and the Sacklers were well aware of the constraints posed by the
4  Agreement. Indeed, during a May 20, 2009 Executive Committee Meeting, the discussion led to
5  whether Purdue should have a single sales force marketing all Purdue products, including
6  OxyContin, or instead to "create a separate Sales Force for Intermezzo (a sleeping pill) that would
7  be comprised of approximately 300 representatives." John Stewart, Purdue's then-CEO, saw an
8  opportunity, and asked if the Corporate Integrity Agreement would apply if Purdue were to
9  launch Intermezzo and another Purdue product, Ryzolt (a branded version of Tramadol, another
10  narcotic painkiller), using the separate sales force. Might the new drug launch fall outside of the
11  Corporate Integrity Agreement, he asked?[77]

12  135.    It would not, he was told by Bert Weinstein, Purdue's Vice President of
13  Compliance.[78]

14  136.    Given the tension between compliance with the Corporate Integrity Agreement
15  and the desire to sell more OxyContin, Purdue needed help.

16  137.    Ethan Rasiel, a former McKinsey consultant, has described the typical way
17  McKinsey begins working with a client: "An organization has a problem that they cannot solve
18  with their internal resources. That's the most classic way that McKinsey is brought in."[79]

19  138.    Such was the case with Purdue. Because it did not have the requisite expertise to
20  address the problems posed by the Corporate Integrity Agreement internally, Purdue expanded on
21  its already-existing relationship with McKinsey to devise a sales and marketing strategy to
22  increase opioid sales despite the Corporate Integrity Agreement and growing concern about the
23  "concentration of risk" that Purdue's business of selling opioids posed to its owners.

---

[76] David Crow, *How Purdue's 'one-two' punch fuelled the market for* opioids, Financial Times, September 9, 2018, *available at:* https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
[77] PPLPC012000226606, Purdue Pharma Executive Committee Meeting Notes and Actions, May 20, 2009, Pg. 2.
[78] *Id.*
[79] *How McKinsey Became One of the Most Powerful Companies in the World*, CNBC, June 6, 2019 *available at:* https://www.youtube.com/watch?v=BBmmMj_maII

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

139.    McKinsey's task was to thread the needle: to increase OxyContin sales despite the strictures imposed by the five-year Corporate Integrity Agreement. This McKinsey did, turbocharging[80] the sales of a drug it knew fully well was addictive and deadly, while purporting to respect to the Corporate Integrity Agreement.

140.    In short, Purdue would pay money to McKinsey in exchange for McKinsey enabling the company how to sell as much OxyContin as conceivably possible so that the Sacklers could obtain cash to diversify their investment holdings away from Purdue, and keep their money safe from the reach of court judgments, fines, and penalties they feared.

141.    Consistent with their plan to dissociate themselves from the company, the Sacklers appointed Mr. Stewart as the CEO of Purdue in 2007. The Sacklers viewed Stewart as someone loyal to the family. He had previously worked for a division of Purdue in Canada. Stewart's job was to assist the Sacklers with the divestiture or eventual orderly wind-down of Purdue. Stewart was paid more than $25 million for his services to Purdue from 2007 through 2013.

142.    Purdue's Executive Committee discussed Stewart's concerns regarding the constraints posed by the Corporate Integrity Agreement on May 20, 2009. Within weeks, McKinsey was working with Purdue to devise and implement new marketing strategies for OxyContin.

143.    Stewart, as CEO, was in charge of the relationship with McKinsey. He controlled workflow to and from McKinsey and required his personal approval for any work orders with McKinsey.

144.    In addition, Purdue's Vice President of Corporate Compliance, "responsible for developing and implementing policies, procedures, and practices designed to ensure compliance with the requirements set forth in the [Corporate Integrity Agreement]," reported directly to Stewart.[81]

---

[80] If the description is overbearing, note that it is McKinsey's own, as described below.
[81] PDD1712900096.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

145.    Throughout their relationship, McKinsey routinely obtained information from, advised, communicated with, and ultimately worked for the Purdue board of directors, controlled by the Sackler family.

146.    McKinsey would also work in granular detail with the Purdue sales and marketing staff, led during the relevant period by Russell Gasdia, Vice President of Sales and Marketing.

147.    From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate its sales and marketing strategy for OxyContin. The relationship was characterized by ongoing interactions between teams from McKinsey and Purdue regarding not only the *creation* of an OxyContin sales strategy, but also its *implementation*. McKinsey was a real presence at Purdue. "A team of McKinsey analysts went in-house, camping out in a conference room at Purdue headquarters."[82]

### 5.    Purdue Relies on McKinsey.

148.    Purdue hired McKinsey not only to give advice, but to devise and then implement a deceptive marketing strategy. For example, for one "major initiative" with Purdue, "McKinsey forecast[ed] a potential incremental increase in sales in the $200-400mm range" over a three-year period, "[w]hen properly implemented."[83]

149.    McKinsey is not cheap, either. Indeed, hiring McKinsey is an expensive proposition. A single junior consultant—typically a recent college or business school graduate— runs clients millions of dollars annually.[84] McKinsey is a highly selective employer and advertises that its employees join "for the opportunity to apply their talents to complex, important challenges."[85] "Talent" is key to McKinsey's model; clients pay for the best and brightest.

150.    A client does not choose to pay McKinsey unless it expects to receive benefits it could not have obtained within its own organization. McKinsey offers solutions to clients facing

---

[82] Patrick Radden Keefe, *Empire of Pain* 302 (2021). In September, McKinsey named Mr. Keefe's history of the Sackler family and Purdue and the opioid crisis to its 2021 shortlist for "Business Book of the Year." *See https://www.mckinsey.com/about-us/new-at-mckinsey-blog/for-your-reading-list-the-2021-business-book-of-the-year-shortlist*

[83] PPLPC012000257444

[84] Ian MacDougal, *How McKinsey is Making $100 Million (and Counting) Advising on the Government's Bumbling Coronavirus Response*, ProPublica (July 15, 2020), https://www.propublica.org/article/how-mckinsey-is-making-100-million-and-counting-advising-on-the-governments-bumbling-coronavirus-response.

[85] https://www.mckinsey.com/about-us/overview

1    challenges they feel they cannot adequately address on their own. This model has been a stunning

2    success for McKinsey. In 2008, McKinsey's annual revenue was $6 billion. Today, the firm earn

3    more than $10 billion in revenue each year.[86]

4           151.   Clients pay these exorbitant rates for a reason: McKinsey's plans and partnership

5    work. Even critics of the consulting industry recognize the unique efficacy of McKinsey's work.

6    JPMorgan Chase CEO Jamie Dimon once derided consultants as "substituted management" and

7    stated that "consultants can become a disease for corporations." Dimon made one exception to

8    this rule: McKinsey.[87] Given unique levels of trust, respect, and access by major corporations

9    across the United States and the world, McKinsey has unmatched power to affect how those

10   corporations behave.

11          152.   When Purdue entered into a "Master Consulting Agreement" with McKinsey in

12   2004, Purdue explicitly recognized McKinsey "has a fine reputation as well as excellent

13   experience and relationships in our industry," which Purdue was counting on to boost its opioids

14   business.[88]

15          153.   Purdue explicitly recognized that McKinsey stepped in to help Purdue "protect

16   [its] sales and continue to *grow our business*."[89]

17          154.   Furthermore, that the Sacklers, as board members of Purdue, relied on McKinsey

18   in their conduct of Purdue affairs is an admitted fact. In a public filing in the recent Purdue

19   bankruptcy proceedings, the one side of the Sackler family conceded that they did so: "McKinsey

20   is widely recognized as 'a leading management consulting firm' and the Former Directors were

21   statutorily entitled to rely on such expertise."[90]

22                 **6.    McKinsey Delivers.**

23          155.   Purdue, as a monoline manufacturer of opioids, relied on McKinsey in practically

24   all aspects of its business.

---

[86] Forbes, *McKinsey & Company* (retrieved September 9, 2021), https://www.forbes.com/companies/mckinsey-company/?sh=1201a12624c1.
[87] Duff McDonald. *Behind the singular mystique of McKinsey & Co.* The Guest Blog. CNBC. Sept 25, 2013. Available at: https://www.cnbc.com/2013/09/25/behind-the-singular-mystique-of-mckinsey-co html
[88] PPLPC012000069192
[89] *Id.* (emphasis added).
[90] *In re: Purdue Pharma, L.P.*, No. 19-23649, Doc. 3441-1, at ¶ 328 (Aug. 5, 2021).

a.      **Courting the Regulators: "We All Feel Responsible."**

156.    One critical aspect of Purdue's operations, given its status as a producer of controlled substances, was regulatory compliance. McKinsey guided Purdue through practically all of its interactions with regulators whose efforts to protect the public might pose threats to Purdue's business.

157.    McKinsey advised Purdue on how to approach the FDA in light of its criminal conviction and retain business in light of the reputational damage to the company and to OxyContin after the admissions in its guilty plea.

158.    In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time-release mechanism in OxyContin tablets—i.e., another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

159.    Having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA submission, McKinsey knew that reformulated OxyContin could still be abused. Purdue nonetheless touted its introduction of reformulated OxyContin and another ADF opioid as evidence of its good corporate citizenship and commitment to protecting the public. McKinsey worked with the Sacklers to prepare for Purdue's meetings with the FDA.

160.    On January 20, 2009, McKinsey partner Maria Gordian wrote to partners Rob Rosiello and Martin Elling to update them on these ongoing efforts with Purdue:

> We had a very good FDA rehearsal yesterday *with several family members present*. The team did an outstanding job on the study. [P]reparing the client and executing the mock meeting. We are off to DC today for the actually (sic) FDA meeting tomorrow.[91]

161.    Gordian's email to Rosiello and Elling forwarded encouraging words from Richard Sackler. He wrote to his daughter, Marianna:

> I am writing to tell you how impressed I was by the preparation for the FDA meeting. Both the method and the process as well as the content was excellent and a major

---

[91] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No. 2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex D, Pg. 25 (emphasis added).

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

departure from efforts like this in the past. Please share with the team my views and best wishes for a successful interchange with the FDA.[92]

Marianna forwarded the well-wishes to Gordian and the team at McKinsey.

162.    In September 2009, Purdue made a presentation to the FDA advisory committee considering its application for its reformulated OxyContin and stated that the new formulation would deter abuse. According to metadata, the PowerPoint presentation was prepared by McKinsey.

163.    The FDA approved the reformulation of OxyContin in April 2010.[93]

164.    Having successfully navigated the approval process with McKinsey's chaperoning, Purdue then proceeded to market the ADF version of OxyContin as a solution to opioid abuse and as a reason that doctors could continue to safely prescribe their opioids.

165.    In 2020, two FDA advisory committees evaluating the impact of the reformulated OxyContin concluded that reformulated OxyContin did not, in fact, substantially reduce abuse.

166.    At the same time as it worked to rehabilitate Purdue's image with the FDA, McKinsey, in parallel, advised Purdue on how to limit FDA regulations aimed at mitigating the risks of opioid use. In 2008, shortly after Purdue's criminal plea, the FDA requested Purdue submit a proposed "Risk Evaluation and Mitigation Strategy" ("REMS") for OxyContin. McKinsey provided Purdue with drafts of the submission.[94] Indeed, McKinsey was crucial in devising Purdue's response to the FDA's request for a REMS proposal from Purdue. Gordian informed Rosiello and Elling on October 23, 2008 that John Stewart, Purdue's CEO, "is aware of the critical role we are playing in pulling REMs together and is very appreciative." In the same email, she noted that "the family" was focused "on the response to the non-approval letter" from the FDA.[95]

---

[92] *Id.*
[93] *See* https://www.fda.gov/media/126835/download
[94] PDD8901578031
[95] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No. 2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex C, Pg. 22.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1    167.    In 2009, the FDA expanded its scope to a class-wide extended release/long-acting

2    REMS program.

3    168.    Seeking to avoid a requirement that prescribers undergo mandatory training on

4    OxyContin's risks or management or obtain certification before prescribing OxyContin, which

5    would limit the numbers of available prescribers, Purdue turned to McKinsey. McKinsey found

6    the cost to Purdue of a system to verify completion of prescriber education before prescriptions

7    could be filled would be $50 million—an estimate Purdue used to oppose efforts for more

8    rigorous risk management strategies.[96] ██████████████████████████████████

9    ████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████

11   ██████████████████████████████████████████.[97]

12   169.    Armed with McKinsey's analysis, Purdue's strategy on REMS was effective. The

13   REMS program avoided verification and enrollment provisions that would harm Purdue's profits.

14   170.    Meanwhile, based on McKinsey's work on extended release opioid REMS,

15   McKinsey was aware of warnings and adverse events included within the OxyContin medication

16   guide and communications plans, including risks of overdose and adverse events including

17   dizziness and lethargy.

18   171.    In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee

19   meeting. ██████████████████████████████████████████████████████

20   ████████████"[98]

21   172.    McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated

22   OxyContin: Question & Answer Book" in September 2009, with questions including "Why

23   should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge

24   mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]"

25

26

---

[96] PDD8901530124
[97] PPLPC019000622253
[98] PDD8901645845

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the needs of patients[.]"[99]

173.    Sometimes, McKinsey's work was as obfuscating as it was self-revealing. To the question of "Who at Purdue takes personal responsibility for all these deaths?[,]" McKinsey offered the following response:[100]



**b.    The Granularity of Growth**

174.    To this end, McKinsey prides itself on certain managerial techniques it professes to have detailed knowledge of and expertise in deploying. These techniques are generally applicable to problems encountered by many businesses; they are conceptual frameworks that McKinsey deploys when tasked with solving a problem for a client.

175.    After Purdue's first guilty plea, the Sacklers desired dramatic, short-term growth of Purdue's opioid sales so as to increase the company's attractiveness as an acquisition target or borrower while allowing the Sacklers to take money out of the company. One service McKinsey offers to its clients is to tell them how to grow.

176.    In order to identify growth opportunities for a client, McKinsey espouses a "granular" approach to identifying which subsets of the client's existing business are the sources of growth, and exploiting them for all they are worth. In August 2008, McKinsey directors Patrick Viguerie and Sven Smit, together with Mehrdad Baghai, published a treatise on the

---

[99] MCK-MAAG-0152135
[100] The Ad Hoc Group of Non-Consenting States' Statement in Support of the Official Committee of Unsecured Creditors' Motions to Compel Production of Purportedly Privileged Documents for *In Camera* Review, Doc. No. 2012, *In re Purdue Pharma, Inc.*, filed November 18, 2020, Case No. 19-23649 (S.D.N.Y.), Ex F, Pg. 39.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

matter: *The Granularity of Growth: How to Identify the Sources of Growth and Drive Enduring Company Performance* (Wiley, April 2008). "The key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[101]

177.    Previously, in an article in *McKinsey Quarterly* (coincidentally published the same month that Purdue pled guilty), the authors explained:

> Our research on revenue growth of large companies suggests that executives should "de-average" their view of markets and develop a granular perspective on trends, future growth rates, and market structures. Insights into subindustries, segments, categories, and micromarkets are the building blocks of portfolio choice. Companies will find this approach to growth indispensable in making the right decisions about where to compete.[102]

178.    Additionally, McKinsey encouraged a granular assessment of the geography of corporate growth. "The story gets more precise as we disaggregate the company's performance on the three growth drivers in 12 product categories for five geographic regions."[103]

179.    One can imagine this strategy applied to a seller of, say, cartons of milk. If McKinsey were to perform an analysis of the milk seller's sales and marketing and discover that the profit margin on milk cartons sold to university cafeterias in dairy-producing states is much greater than the margin on cartons sold at convenience stores in the southwest, and further that the milk seller has previously devoted equal amounts of time and resources selling to both university cafeterias and convenience stores, then McKinsey would likely advise the client to deploy additional resources towards selling milk to university cafeterias in dairy-producing states. McKinsey's "granular" approach to the milk seller's business channels has identified a way to increase higher margin sales, leading to newfound growth and profitability for the client.

180.    Rather than milk, McKinsey deployed this strategy on OxyContin, a controlled substance, after its manufacturer pled guilty to misrepresenting the addictive and deadly properties of the drug.

---

[101] *The granularity of growth*, Book Excerpt, McKinsey & Company, March 1, 2008, *available at*: https://www.mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth
[102] Mehrdad Baghai *et. al.*, *The granularity of growth,* McKinsey Quarterly, May 2007, *available at*: https://www.mckinsey.com/featured-insights/employment-and-growth/the-granularity-of-growth
[103] *Id.*

2331554.1
4857-5942-6172.v1

1

    c.    **"Identifying Granular Growth Opportunities for OxyContin"**

2          181.    McKinsey's granular analysis of Purdue's OxyContin sales efforts led to the

3    implementation of a number of strategies to sell more pills.

4          182.    By January 2010, McKinsey informed Purdue, in accordance with the lessons of

5    McKinsey's granular growth analysis, that Purdue could generate "$200-400mm" in additional

6    annual sales of OxyContin by implementing McKinsey's strategies.[104]

7          183.    In November 2010, a McKinsey report instructed sales reps to maximize profits by

8    "emphasizing [the] broad range of doses"—which meant pushing the doses that were highest and

9    most profitable.[105]

10         184.    In 2012, John Stewart assigned McKinsey to "understand the significance of each

11   of the major factors affecting OxyContin's sales."[106]

12         185.    This McKinsey did in excruciatingly granular detail, analyzing each sales channel

13   for Purdue's opioids to identify weaknesses, opportunities, and to suggest courses of action to

14   improve performance. Many core themes of McKinsey's work would be crystallized in a series of

15   presentations and updates made to the Sackler family and to Purdue's board of directors in the

16   summer of 2013 entitled "Identifying Granular Growth Opportunities for OxyContin."

17         i.    **Marketing – Countering Emotional Messages**

18         186.    From the outset of McKinsey's known work for Purdue, the work was grim. In

19   June 2009, McKinsey teamed with Purdue's then-Chief Medical Officer (and current CEO) Craig

20   Landau and his staff to discuss how best to "counter emotional messages from mothers with

21   teenagers that overdosed in [sic] OxyContin."

22         187.    Months later, McKinsey advised Purdue to market OxyContin based on the false

23   and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, give

24   patients "the best possible chance to live a full and active life," and concomitantly reduce stress

25   and isolation.[107]

26   _____

27   [104] PPLPC012000257443; PPLPC012000257446
     [105] PPLPC018000346294

28   [106] PPLPC020000587064
     [107] PPLPC023000239858

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-2996-CRB (SK)

188.    These marketing claims were tailored to avoid any pitfalls that the Corporate Integrity Agreement might hold. While false and misleading, these claims regarding "freedom" and "peace of mind" of OxyContin users were narrowly tailored in order to avoid representations regarding "the withdrawal, drug tolerance, drug addiction or drug abuse of Purdue's products," as specified in Section III.B.2.c of the Corporate Integrity Agreement.[108]

189.    Purdue's marketing materials from that time period are illustrative of the approach:[109]



190.    Likewise, McKinsey informed Purdue that by highlighting the ability to "tailor the dose" and treat a "broad range of appropriate patients," the prescriber-takeaway would be that "physicians can help their patients function better and lead a fuller and more active life," even though this conclusion was not to be explicitly addressed.[110]

---

[108] PDD1712900096
[109] *Tennessee v. Purdue Pharma L.P.*, Case No. 1-173-18 (Compl. May 15, 2018) ¶ 24.
[110] PPLPC019000329253

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

2331554.1
4857-5942-6172.v1

191.    Claims that OxyContin improved function and quality of life were not supported by substantial evidence and, in addition, failed to take into account risks of addiction. The FDA and other federal agencies have, for years, made clear the lack of evidence for claims that the use of opioids for chronic pain improves patients' function and quality of life.[111] A Centers for Disease Control and Prevention guideline, following a "systematic review of the best available evidence," concluded that "[w]hile benefits for pain relief, function and quality of life with long-term opioid use for chronic pain are uncertain, risks associated with long-term opioid use are clearer and significant."[112] According to the CDC director, "for the vast majority of patients, the known, serious, and too-often- fatal risks far outweigh the unproven and transient benefits [of opioids for chronic pain]."[113]

192.    In addition to crafting carefully-tailored quality of life assurances designed to avoid the pitfalls of the Corporate Integrity Agreement, McKinsey invented other misleading marketing efforts for Purdue.

193.    For instance, McKinsey urged Purdue to capitalize on OxyContin's extended-release characteristics in another way: marketing OxyContin's twelve-hour dosing as though users only need to take OxyContin twice a day, thus requiring fewer pills. OxyContin in fact was well known to wear off after eight to ten hours in many patients, however. What McKinsey called "convenient," would later be called "a [d]escription of Hell."

194.    This misleading assurance of twelve-hour relief is especially pernicious, as end-of-dose failure renders OxyContin even more dangerous because patients begin to experience withdrawal symptoms, followed by a euphoric rush with their next dose—a cycle that fuels a

---

[111] The FDA has warned other drug makers that claims of improved function and quality of life were misleading. *See* Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010) (rejecting claims that Actavis' opioid, Kadian, had an "overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."). ALLERGAN_MDL_00387583; Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Brian A. Markison, Chairman, President and Chief Executive Officer, King Pharmaceuticals, Inc. (March 24, 2008) (finding the claim that "patients who are treated with [Avinza (morphine sulfate ER)] experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."). ALLERGAN_CA_00161496. The FDA's warning letters were available to McKinsey on the FDA website.
[112] CDC Guideline at 2, 18.
[113] Thomas R. Frieden and Debra Houry, New England Journal of Medicine, "Reducing the Risks of Relief – The CDC Opioid-Prescribing Guideline" at 1503 (Apr. 21, 2016).

craving for OxyContin. For this reason, Dr. Theodore Cicero, a neuropharmacologist at the Washington University School of Medicine in St. Louis, called OxyContin's twelve-hour dosing "the perfect recipe for addiction."[114] Many patients will exacerbate this cycle by taking their next dose ahead of schedule or resorting to a rescue dose of another opioid, increasing the overall amount of opioids they are taking. Promotion of twelve-hour dosing, without disclosing its limitations, is misleading because it implies that the pain relief supplied by each dose lasts twelve hours.

195.    In addition to designing misleading marketing messages, McKinsey even suggested encouraging a new channel through which those messages could be delivered to prescribers. McKinsey encouraged the tactic of "patient pushback," wherein McKinsey and Purdue would foment patients to directly lobby their doctors for OxyContin even when those physicians expressed reservations regarding the administration of Purdue's opioids.

196.    The idea was that McKinsey and Purdue could spread their own message through pain patients who would be perceived as more credible sources suggesting a need for controlled or extended release opioid—even though the team devising this strategy would have known that extended release opioids did not substantially control pain or thwart addiction better than lower-dose, immediate release opioids.[115]

197.    McKinsey also coached Purdue on building "trust" (which from its vantage point, McKinsey knew was misplaced) in Purdue following its criminal conviction.

ii.    **Targeting – Selling More OxyContin to Existing High Prescribers**

198.    Perhaps the key insight McKinsey provided was, using its granular approach, to identify historically large prescribers and target ever more sales and marketing resources on them, without any regard for, and indeed conscious disregard of, patient safety. Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales. This relentless drive to increase sales and create greater availability of

---

[114] Harriet Ryan, "'*You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, available at http://www.latimes.com/projects/oxycontin-part1/.
[115] PDD8901645845

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1    opioids was made with no notable concern about the parallel increase in opioid-related deaths,

2    abuse, and misuse.

3         199.    On January 20, 2010, Purdue's board was informed of the ongoing work

4    McKinsey was performing concerning a new "physician segmentation" initiative whereby

5    McKinsey would analyze the opioid prescribing patterns of individual physicians to identify those

6    that had historically been the highest prescribers.[116] McKinsey then worked with Purdue's sales

7    and marketing staff to specifically target those prescribers with a marketing blitz to encourage

8    even further prescribing.

9         200.    Purdue trained its sales force in tactics to market to these high prescribers based on

10   McKinsey's insights and designed in conjunction with McKinsey.

11        201.    Many of the historically highest prescribers of OxyContin—those same individuals

12   that McKinsey urged Purdue to target for ever more prescriptions—had prescribed Purdue's

13   OxyContin *before* the 2007 guilty plea and had already been subjected to Purdue's

14   misrepresentations regarding OxyContin that were the subject of that guilty plea.

15        202.    McKinsey identified these physicians—those that had already been influenced by

16   Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a

17   massive marketing push to sell more OxyContin.

18        203.    McKinsey worked assiduously with Purdue over many years to continually refine

19   this approach and required ever-more granular data for its analysis. More than three years after

20   the initial introduction of the physician segmentation initiative, McKinsey requested, and Purdue

21   provided, "prescriber-level milligram dosing data" so that McKinsey could further analyze the

22   individual amounts of OxyContin prescribed by individual physicians.

23        204.    At the same time it requested this "prescriber-level milligram dosing data" from

24   Purdue, McKinsey urged the Sacklers to strictly manage the target lists of each sales

25   representative to assure that the maximum amount of each sales representative's time was spent

26   with the most attractive customers.

27

28   ------

[116] PPLPC012000257446

2331554.1
4857-5942-6172.v1

205.     On July 23, 2013, Purdue's board discussed concerns about "the decline in higher strengths" of Purdue's opioids as well as an observed decline is "tablets per Rx." In order to assure that the threat to OxyContin sales growth be addressed, McKinsey was assigned "to actively monitor the number and size of opioid prescriptions written by individual doctors."[117]

206.     In unveiling Project Turbocharge to Purdue and the Sacklers, McKinsey stated that the most prolific OxyContin prescribers wrote "25 times as many OxyContin scripts" as less prolific prescribers and urged Purdue and the Sacklers to "make a clear go-no go decision to 'Turbocharge the Sales Engine'" by devoting substantial capital toward McKinsey's plan.[118]

207.     McKinsey also stated that increased numbers of visits by sales representatives to these prolific prescribers would increase the number of opioid prescriptions that they would write. This singular focus on increasing prescriptions was not coupled with colorable concern for the patient population.

208.     By November 2013, McKinsey had obtained the physician-level data they had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them. The Purdue board was kept apprised of McKinsey's progress.

209.     Not only did McKinsey identify which doctors prescribed the most of Purdue's opioids, McKinsey also recommended segmenting prescribers into "types" and tailoring messages and tactics to the different prescriber profiles. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended release opioids, including in opioid naïve patients (patients who were not already using opioids), McKinsey urged emphasizing that its seven tablet strengths provide flexibility to "tailor the dose" to customer needs.[119] Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant with long-term use (rather than discontinue use when the drug lost its effectiveness).

---

[117] PPLP004307354
[118] PPLP004409890
[119] MCK-MDL2296-0126522

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

210.    In its October 26, 2009 presentation, "OxyContin – driving growth through stronger brand loyalty,"[120] McKinsey proposed tactics to turnaround declining sales, "[e]nhance loyalty to OxyContin among loyalist prescribers," "[c]onvert[ing] 'fence sitters' into more loyal OxyContin prescribers," and "[p]rotect OxyContin's market share[.]"[121] In other words, McKinsey proposed increasing sales by pushing both willing and reluctant physicians to prescribe more OxyContin.

211.    McKinsey also recommended a strategy to target those prescribers who did not regularly prescribe OxyContin—so-called "Resigned Followers and ER Delayers" —encouraging them to "increase step-up" to extended release opioids. These were physicians with "low comfort with extended release opioids." McKinsey encouraged Purdue to emphasize to them the "range of appropriate patients." In other words, McKinsey's strategy recommended that Purdue encourage prescribers to use OxyContin earlier in a patient's treatment for a wider range of patients and for longer periods of time.

### iii.    Titration – Selling Higher Doses of OxyContin

212.    McKinsey understood that the higher the dosage strength for any individual OxyContin prescription, the greater the profitability for Purdue. Of course, higher dosage strength, particularly for longer periods of use, also contributes to opioid dependency, addiction and abuse. Nonetheless, McKinsey advised Purdue to focus on selling higher strength dosages of OxyContin.

213.    Consistent with its granular growth analysis, as early as October 26, 2009, McKinsey advised the Sacklers and the Purdue board that Purdue should train its sales representatives to "emphasiz[e] the broad range of doses," which would have the intended effect of increasing the sales of the highest (and most profitable) doses of OxyContin.[122]

214.    McKinsey's work on increasing individual prescription dose strength continued throughout the time period McKinsey worked with Purdue. The Sacklers were informed on July 23, 2013 that Purdue had identified weakness in prescribing rates among the higher doses of

---

[120] *Id.*
[121] *Id.* at 2.
[122] PPLPC018000346294

OxyContin and reassured the Sacklers that "McKinsey would analyze the data down to the level of individual physicians" in order to study ways to maximize the sales of the highest-dose OxyContin pills.

215.    Purdue implemented McKinsey's suggestions through adopting the marketing slogan to "Individualize the Dose" and by 2013 encouraged its sales representatives to "practice verbalizing the titration message" when selling Purdue's opioids to prescribers.[123]

216.    McKinsey would have known, however, that higher doses of opioids carry greater risk. Patients receiving high doses of opioids (e.g., doses greater than 100 mg morphine equivalent dose ("MED") per day) as part of long-term opioid therapy are three to nine times more likely to suffer overdose from opioid-related causes than those on low doses. As compared to available alternative pain remedies, scholars have suggested that tolerance to the respiratory depressive effects of opioids develops at a slower rate than tolerance to opioids' analgesic effects. The Centers for Disease Control and Prevention also recognize that higher doses of opioids tend to increase overdose risks relative to any potential patient benefit.[124]

217.    Claims that opioids could be taken in ever-increasing strengths to obtain pain relief, without disclosing that higher doses increased the risk of addiction and overdose, are deceptive and misleading. They were particularly important to promotional efforts, however, because patients on opioids for more than a brief period develop tolerance, requiring increasingly high doses to achieve pain relief. Marketers needed to generate a comfort level among doctors to ensure the doctors maintained patients on the drugs even at the high doses that became necessary.

218.    Purdue adopted McKinsey's ▓▓▓▓▓▓▓▓▓▓▓ proposal.[125] ▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[123] PPLP003450924
[124] Dowell D, Haegerich TM, Chou R. CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016. MMWR Recomm Rep 2016;65(No. RR-1):1–49. DOI: http://dx.doi.org/10.15585/mmwr.rr6501e1
[125] PPLPC023000251226 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); see also PPLPC012000243668 (▓▓▓▓▓▓▓▓▓▓); PPLPC012000245087 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); PPLPC012000246009 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓); PPLPC021000265092 (▓▓▓▓▓▓▓▓▓▓)

1 ███████████████████████████████████████████████████████████

2 ████████ [126]

3    219.    The titration messaging worked. Nationwide, based on an analysis by the *Los*

4 *Angeles Times*, more than 52% of patients taking OxyContin longer than three months are on

5 doses greater than sixty milligrams per day, which converts to the ninety MED that the CDC

6 guideline urges prescribers to "avoid" or "carefully justify."[127]

7                    iv.    **Covered Persons – Sales Quotas and Incentive Compensation**

8    220.    McKinsey urged the use of quotas and bonus payments to motivate Purdue's sales

9 force to sell as many OxyContin prescriptions as possible. As McKinsey described it, "[r]evision

10 to incentive comp could better align reps to Purdue's economics."[128]

11    221.    Notably, this behavior was prohibited by the 2007 Corporate Integrity Agreement,

12 which required Purdue to implement written policies regarding "compensation (including salaries

13 and bonuses) for [sales representatives] engaged in promoting and selling Purdue's products that

14 are designed to ensure that financial incentives *do not inappropriately motivate such individuals*

15 *to engage in the improper promotion or sales of Purdue's products*."[129]

16    222.    By 2010, Purdue had implemented a four-year plan, consistent with McKinsey's

17 strategy, to dramatically increase the quota of required annual sales visits by Purdue sales

18 representatives to prescribers. The quota was 545,000 visits in 2010, 712,000 visits in 2011,

19 752,000 in 2012, and 744,000 visits in 2013.

20    223.    On August 15, 2013, as part of their "Identifying Granular Growth Opportunities

21 for OxyContin" presentation, McKinsey urged the Sacklers to "establish a revenue growth goal

22 (*e.g.,* $150M incremental stretch goal by July 2014) and set monthly progress reviews with CEO

23 and Board."[130]

24    224.    In its "Identifying Granular Growth Opportunities for OxyContin" presentation to

25 the Purdue board in July 2013, McKinsey nonetheless urged Purdue, in addition to increasing the

---

[126] PKY183123435

[127] CDC Guideline at 16.

[128] PPLPC012000441016

[129] PDD1712900096 (emphasis added).

[130] PPLP004409890

2331554.1

4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

focus of the sales force on the top prescribers, to increase the overall quotas for sales visits for individual sales representatives from 1,400 to 1,700 annually.

225.    In 2013, McKinsey identified one way that Purdue could squeeze more productivity out of its sales force: by slashing *one third* of the time that Purdue devoted to training its sales force (from 17.5 days per year to 11.5 days):

**One possible way to attain benchmark ~1500 calls per year is to decrease training days by ~6 days and increase calls per day by 5%**    One possible route to benchmark

| Current call activity | | Potential new allocation | |
|---|---|---|---|
| **Number of "on territory" days per year** | | **Number of "on territory" days per year** | |
| Item | Days[1] | Item | Days[1] |
| Number of working days | 260 | Number of working days | 260 |
| Holidays | -11.3 | Holidays | -11.3 |
| Vacation and other time off | -27.2 | Vacation and other time off | -27.2 |
| Trainings and meetings | -17.5 | Trainings and meetings | -11.5 |
| Other company-related time off of field | -4.3 | Other company-related time off of field | -4.3 |
| Total days | 199.7 | Total days | 205.7 |
| Avg calls per day | x    7 | Avg calls per day | x    7.35 |
| Total calls per year | 1398 | Total calls per year | 1512 |

1 Purdue 2012 Actual data was used for this analysis

SOURCE: Purdue: team analysis                                        McKinsey & Company | 59

226.    By eliminating one third of the amount of time sales representatives were required to be in training, McKinsey projected that Purdue could squeeze an additional 5% of physical calls per day out of its newly less-trained sales force.

227.    Additionally, McKinsey developed and advised Purdue on a new incentive compensation structure for the sales representatives, who were Covered Persons pursuant to the Corporate Integrity Agreement. McKinsey knew that, combined with the strictures of sales quotas and less training for the sales force, bonus/incentive compensation to the sales representatives

based on the number of OxyContin prescriptions the representative produced could be a powerful

driver of incremental OxyContin sales, without regard for patient safety.

### 7.   Transformation: Purdue and McKinsey Adopt and Implement McKinsey's Strategies.

228.    As early as September 11, 2009, McKinsey determined and told Purdue that it could generate $200 million to $400 million in additional annual sales of OxyContin by implementing McKinsey's strategy based on the opportunities its granular growth analysis had identified. McKinsey reiterated its assurances regarding the hundreds of millions of dollars of additional OxyContin sales on January 20, 2010.

229.    Purdue accepted and, with McKinsey's ongoing assistance, implemented McKinsey's strategies for selling and marketing OxyContin.

230.    For instance, in January 2010, Purdue was training its sales and marketing force on the new sales tactics based on a "physician segmentation" initiative that McKinsey urged. The strategy developed as a result of McKinsey's granular analysis of OxyContin sales channels. The initiative sought to identify the most prolific OxyContin prescribers and then devote significant resources towards convincing those high prescribers to continue to prescribe ever more OxyContin, in higher doses, for longer times, to ever more patients.

231.    On January 20, 2010, the Purdue board was informed of the progress in implementing McKinsey's "physician segmentation" initiative.

232.    This transformative collaboration would continue over the course of the relationship between Purdue and McKinsey.

233.    During the time that McKinsey was working with Purdue, Purdue deliberately minimized the importance of the Corporate Integrity Agreement. In 2008, Carol Panara joined the Purdue sales force from rival Novartis. She would stay with the company until 2013, during which time McKinsey was responsible for increasing OxyContin sales at Purdue, and culminating with the implementation of McKinsey's "Project Turbocharge," beginning September 2013.

234.    Ms. Panara stated that the 2007 guilty plea was deliberately minimized by the company in presentations to its sales staff: "They said, 'We were sued, they accused us of mis-

1   marketing, but that wasn't really the case. In order to settle it and get it behind us we paid a fine.'

2   You had the impression they were portraying it as a bit of a witch hunt."[131] (Purdue and its

3   executives paid $634.5 million in fines.)

4       235.    Consistent with McKinsey's mandate, McKinsey devised methods for sales staff to

5   sell OxyContin to doctors while at the same time maintaining technical compliance with the

6   Corporate Integrity Agreement. Ms. Panara stated that, though she was told she could not flatly

7   claim that OxyContin was better or safer than other opioids, "she was trained to talk about

8   product in ways that implied that it was safer." She might tout OxyContin's twelve-hour

9   formulation to a prescriber. "You could say that with a shorter-acting medication that wears off

10  after six hours, there was a greater chance the patient was going to jump their dosing schedule

11  and take an extra one a little earlier. We couldn't say [it was safer], but I remember we were told

12  that doctors are smart people, they're not stupid, they'll understand, they can read between the

13  lines."[132]

14          **8.**    **Project Turbocharge**

15      236.    The Corporate Integrity Agreement expired in January 2013. With this restriction

16  lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase

17  OxyContin sales.

18      237.    On May 14, 2013, McKinsey entered into a "Statement of Services to the Master

19  Consulting Agreement" (the "2013 Agreement") with Purdue to "conduct a rapid assessment of

20  the underlying drivers of current OxyContin performance, identify key opportunities to increase

21  near-term OxyContin revenue and develop plans to capture priority opportunities." ██████

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████"[133]

24      238.    The 2013 Agreement stated, "We have a long history of partnership with Purdue,

25  and we would make best efforts to leverage our understanding of your business – both in terms of

26  

27          [131] David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9, 2018, *available at*: https://www ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
        [132] *Id.*

28          [133] PPLPC030000770531

content and culture." It was signed by then-principal Arnab Ghatak, who would "lead the team with senior leadership from Rob Rosiello and Martin Elling." Elling was a leader of McKinsey's PMP group.[134]

239.    McKinsey was tasked with "Identifying Granular Growth Opportunities for OxyContin," conducting an "assessment of the underlying drivers of current OxyContin performance," identifying "key opportunities to drive near-term OxyContin performance," and developing "plans to capture priority opportunities."[135]

240.    For purposes of the project, McKinsey would need "[f]ull access to work done to date and key data."[136] ███████████████████████████████████████ ███████████████████████████████████████████ [137]

241.    Staff told the Sacklers that McKinsey would study how to get doctors to prescribe more OxyContin,[138] how to use incentive compensation to push reps to generate more prescriptions, how to use "patient pushback" to get doctors to prescribe more opioids, and how to keep patients on opioids longer.[139]

242.    The 2013 Agreement would lead to Project Turbocharge, McKinsey's successful bid to transform Purdue's sales and marketing efforts for OxyContin now that Purdue was no longer bound by the Corporate Integrity Agreement.

243.    In the summer of 2013, McKinsey made multiple recommendations to Purdue's board to increase OxyContin revenue, and urged the Sackler family to "make a clear go-no-go decision to 'Turbocharge the Sales Engine.'"

244.    Purdue, like McKinsey, recognized that the initiative was no small thing. An internal Purdue email states that ████████████████████████████████████████ ███████████████████████████████████████ [140]

---

[134] *Id.*
[135] PPLPC030000770531 / MCK-MAAG-0024283
[136] *Id.*
[137] PPLPC012000431809
[138] PPLPC012000431262
[139] *Id.*; PPLPC012000431266
[140] PPLPC012000437344

1    245.    The Sacklers were impressed. On August 15, 2013, Richard Sackler emailed

2    Mortimer D.A. Sackler, "[T]he discoveries of McKinsey are astonishing."

3    246.    Eight days later, on August 23, 2013, McKinsey partners met with the Sackler

4    family—not the Purdue board of directors—to pitch Project Turbocharge. Dr. Arnab Ghatak, one

5    of the McKinsey partners leading the Purdue account, recounted the meeting to fellow McKinsey

6    partner Martin Elling in an email exchange: "[T]he room was filled only with family, including

7    the elder statesman Dr. Raymond [Sackler] . . . . We went through exhibit by exhibit for about 2

8    hrs . . . . They were extremely supportive of the findings and our recommendations . . . and

9    wanted to strongly endorse getting going on our recommendations."[141]

10    247.    Elling, a co-leader of the Purdue account, remarked in the same email

11    correspondence that McKinsey's "findings were crystal clear to" the Sacklers, and that the

12    Sacklers "gave a ringing endorsement of 'moving forward fast.'"[142]

13    248.    As a result of the Sackler family endorsement of McKinsey's proposals, the

14    following month Purdue implemented Project Turbocharge based on McKinsey's

15    recommendations. In adopting "Project Turbocharge," Purdue acknowledged the improper

16    connotations of the name, and re-christened the initiative the decidedly more anodyne "E2E:

17    Evolve to Excellence."[143]

18    249.    Evolve to Excellence ("E2E") was the theme of Purdue's 2014 National Sales

19    Meeting.

20    250.    CEO John Stewart also told sales staff that board member Paolo Costa was a

21    "champion for our moving forward with a comprehensive 'turbocharge' process," referring to

22    McKinsey's plan.

23

24

25

---

26    [141] MCK-MDL2996-0403095

[142] Id.

27    [143] Regarding the name change, CEO John Stewart wrote to McKinsey partners Rob Rosiello and Arnab Ghatak on August 15, 2013: "Paolo Costa was especially engaged in the discussion and he (among others) will be a champion for

28    our moving forward with a comprehensive 'turbocharge' process – *though we do need to find a better and more permanently appropriate name*." PPLPC012000436626 (emphasis added).

251.    After Purdue adopted McKinsey's recommendations, McKinsey continued to work with Purdue sales and marketing staff reporting to Russell Gasdia during Purdue's implementation of McKinsey's recommendations.

252.    In fact, the entire E2E initiative was overseen by McKinsey and some Purdue executives, who together comprised the E2E Executive Oversight Team and Project Management Office.

253.    At the same time, the Sacklers were kept informed of the implementation of McKinsey's OxyContin strategy. According to a September 13, 2013 board agenda, the board discussed with the Sacklers the ongoing implementation of McKinsey's sales tactics.

254.    Evolve to Excellence called for a *doubling* of Purdue's sales budget. Under McKinsey's prior tutelage, Purdue's promotional spending had already skyrocketed. McKinsey's ongoing influence on Purdue's operations after the 2007 guilty plea is stark:



255.    At the time of McKinsey's first known work for Purdue, Purdue spent approximately $5 million per quarter on sales and marketing. By the time McKinsey's Project

1    Turbocharge was implemented, total quarterly sales and marketing spending at Purdue exceeded

2    $45 million, an increase of *800%*.

3           256.    Project Turbocharge continued despite the arrival of a new CEO at Purdue. On

4    January 17, 2014, new CEO Mark Timney received reports from McKinsey emphasizing that, in

5    order to increase profits, Purdue must again increase the number of sales visits to "high-value"

6    prescribers, i.e., those that prescribe the most OxyContin.[144]

7           257.    Purdue and McKinsey worked together to implement "Turbocharging the Sales

8    Engine." ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████[145]

11          258.    McKinsey and Purdue also worked together on an "implementation plan" for E2E,

12   with McKinsey taking on the role of "executive oversight" of projects including the creation of

13   target lists, internal dashboards to track progress, and changes to Purdue's incentive

14   compensation plan consistent with E2E.[146]

15                          a.    Targeting High Subscribers

16          259.    Project Turbocharge called for revising the existing process for targeting high-

17   prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to

18   considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is

---

[144] In fact, recent deposition testimony suggests McKinsey may have been responsible for the fact that Timney was given the CEO job at Purdue in the first place. On October 30, 2020, Timney provided the following testimony (emphasis added):

> Q: Are you familiar with McKinsey & Company?
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.
> Q: Did individuals at McKinsey *assist you in getting hired as the CEO* of Purdue?
> A: I decline to answer on the ground that I may not be compelled to be a witness against myself in any proceeding.

In fact, McKinsey appears to have played a substantial role in the succession of several Purdue CEO's. Martin Elling, in his 2018 annual self-assessment, provided the following example of "how I deliver impact:" "Actively managing CEO/CXO transitions: … from Michael Friedman to John Stewart (2007) to Mark Timney (2014) to Craig Landau (2017) at Purdue." MCK-MDL2996-0357931. "I drove our introduction of Purdue in 2004 and then, with Rob Rosiello, built it into a substantial and sustaining client… We have served across four CEOs and are now helping the new leadership team adapt to a world of headwinds for their core product OxyContin," he added. MCK-MDL2996-0357931.

[145] PPLPC021000615265

[146] MCK-MDL2996-0180338, at 0180340

2331554.1
4857-5942-6172.v1

significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

260.     The core objective of McKinsey's initiative was to ensure that Purdue was "making calls on the highest potential customers with the right frequency to maximize prescribing potential."

261.     McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half. McKinsey advised that Purdue would see a greater return on its sales investment by focusing on these targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. McKinsey's plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, without addressing whether the expanded sales would be for an illicit market.

262.     McKinsey found that Purdue did not "focus on the highest potential docs," measured both by the number of prescriptions and reimbursement considerations.[147] One McKinsey analyst urged McKinsey to recommend Purdue target "[l]iterally, at least all" prescribers in the top 20% of prescribers, "minus another few percent who are no sees[.]"[148] McKinsey team lead Arnab Ghatak replied that "they probably have 20% no see[], but i'd also assume there are not many high writers that are no see."[149] ("No see" prescribers are prescribers who do not accept visits from pharmaceutical sales representatives. Thus, McKinsey recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were willing to entertain sales visits from sales representatives.)

263.     "To put this in perspective," McKinsey stated,

the average prescriber in decile 5-10 [the top half of prescribers by volume] writes 25 times as many OxyContin scripts as a prescriber in decile 0-4. In Q1 2013 the majority (52%) of OxyContin primary calls were made to decile 0-4 prescribers. Including the secondary calls, 57% of the primary detail equivalents (PDEs) were

---

[147] MCK-MDL2996-0364024
[148] MCK-MDL2996-0364267
[149] Id.

2331554.1
4857-5942-6172.v1

made to decile 0-4 prescribers. Best practice in the industry is over 80% of effort on higher value prescribers."

McKinsey concluded: "Given that there are 14,000 uncalled physicians in deciles 5-10, there is significant opportunity to shift calls to higher potential prescribers."[150]

264.    McKinsey pointed to a "true physician example" in Wareham, Massachusetts, who wrote 167 more OxyContin prescriptions after Purdue sales reps visited him.[151]



*Graphic from McKinsey presentation recommending targeting high prescribers*

265.    To slow or reverse the decline in OxyContin sales, McKinsey recommended a shift to "value deciles," which purported to weigh prescribers according to factors including overall opioid prescriptions, including the number of branded versus generic prescriptions; prescriber rules in place limiting sales calls; managed care access; and the number of the prescribers new to brand prescriptions, including new opioid patients and switches from other opioid products.[152] The cumulative effect of the value rankings was to shift detailer emphasis onto the highest-volume prescribers. Further, McKinsey's analysis found that the highest-volume prescribers were themselves most influenced by detail visits.

---

[150] MCK-MDL2996-0187168 / PPLP004409892
[151] PPLPC012000437356
[152] PPLPC022000646874

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

266.     Purdue moved quickly to do as McKinsey advised. All sales representatives received a memo on December 23, 2013, identifying how to select "SuperCore" prescribers, or the top ten targets,[153] in their territory according to the E2E high prescribing principles and required that each SuperCore prescriber be visited at least twice a month.[154] █████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████[155] As part of these changes, McKinsey's plan involved *more* minimum sales calls overall.[156]

267.     ████████████████████████████████████████

████████████████████████████████████████████████████

███████████ who later plead guilty to criminal charges related to an opioid drug ring. The prescriber also surrendered his license to practice after an Ohio Medical Board investigation revealed that he prescribed excessive and dangerous combinations of opioids and muscle relaxers and that he prescribed opioids to a patients who complained of headaches and others who showed signs of addiction.[157] The same prescriber received at least sixty visits from Purdue from mid-2013 through 2016.[158]

268.     ████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ The doctor, who worked at a family practice, was charged with involuntary manslaughter, Medicaid fraud, drug trafficking, grand theft, and other offenses.

269.     ████████████████████████████████████████

████████████████████████████████████████████████████

---

[153] MCK-MDL2996-0316833
[154] PURCHI-000005915
[155] PPLPC022000686986
[156] MCK-MDL2996-0187168
[157] https://www.cnhinews.com/article_91ffac58-1b32-11e8-b264-6b34793bf5c3.html
[158] Public information about visits at which a payment was made is available for this time period through "Open Payments."

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1     ███████ [159] In 2018, the Drug Enforcement Administration issued an Order to Show Cause and

2     Immediate Suspension Order to Dr. Khan-Jaffrey over concerns that her DEA registration

3     "constituted an imminent danger to the public health and safety," finding she prescribed opioids

4     without a legitimate medical purpose and disregarded urine screens indicating abuse and

5     diversion.[160] Dr. Khan-Jaffrey's DEA registration was fully revoked on July 28, 2020.[161] Dr.

6     Louis Spagnoletti, of Marlton, New Jersey, ██████████████████████████████

7     ███████████ [162] lost his state license to prescribe controlled substances in 2018.[163]

8     Similarly, Dr. Vivienne Matalon, a Decile 10 prescriber from Cherry Hill, New Jersey, ████

9     ████████████████████ [164] went on to lose her license in 2018 as well, for

10    allegedly receiving kickbacks to prescribe the fentanyl drug Subsys to three patients, including

11    one that died.[165]

12          270.    Another prescriber, Dr. Damon Cary of Wilmington, Delaware, ████████

13    ████████████████████████████████████,[166] received an

14    emergency suspension order in 2019 after prescribing controlled substances, including opioids, to

15    undercover officers without performing any medical examinations.[167] Dr. Eva Dickinsson, of

16    Harrington, Delaware, ███████████████████████████████████████

17    ████████,[168] was arrested on marijuana charges in 2016 and had her license suspended in

18    2017 for sharing drugs, including opioids, with her patients.[169]

19          271.    Dr. Michael Cozzi of Fort Wayne, Indiana, ████████████████

20    ████████████████████████████████ had his medical license

21    suspended in 2016, where he had prescribed more controlled substances than any other Indiana

[159] PPLPC014000257127
[160] https://www.federalregister.gov/documents/2020/07/29/2020-16387/kaniz-f-khan-jaffery-md-decision-and-order
[161] Id.
[162] PPLPC014000257127
[163] https://patch.com/new-jersey/moorestown/state-suspends-doctor-accused-illegally-prescribing-opioids
[164] PPLPC014000257127
[165] https://nj.gov/oag/newsreleases18/pr20180504d.html
[166] PPLPC014000257130
[167] https://www.delawareonline.com/story/news/health/2019/08/05/doctor-prescribed-opioids-undercover-cops-failed-follow-protocol/1920386001/
[168] PPLPC014000257130
[169]        https://www.delawareonline.com/story/news/health/2017/01/19/doctors-license-suspended-delaware-maryland/96779080/

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

prescriber, with over two million doses of oxycodone, seeing ninety to 100 patients a day.[170] Dr. Jamie Gurrero, ███████████████████████████████████████████████████ ██████████████████████████████████████████[171] was sentenced to 100 months in prison in 2016 after pleading guilty to unlawful distribution or dispensing of controlled substances, health care fraud, conspiracy, and money laundering.[172]

272.    █████████████████████████████████████████████████████████████████ ████████████████████████████    Misrepresentations to these prescribers were especially insidious because they were aimed at general practitioners who lack the time and expertise to closely manage higher-risk patients on opioids.

273.    McKinsey also urged, consistent with continually refining its granular approach, that sales representatives devote two-thirds of their time to selling OxyContin and one-third of their time selling Butrans, another Purdue opioid product. Previously, the split had been fifty-fifty.

### b.    Circumventing Safeguards Against Abuse and Diversion

274.    Project Turbocharge also involved a granular analysis of Purdue's individual sales channels. In its August 8, 2013 report to the Purdue board, McKinsey also attributed the decline in OxyContin sales to safeguards to limit suspicious opioid sales. McKinsey informed Purdue that "[t]he retail channel, both pharmacies and distributors, is under intense scrutiny and direct risk." "There are reports of wholesalers stopping shipments entirely to an increasing number of pharmacies," "[m]any wholesalers are also imposing hard quantity limits on orders based on prior purchase levels," and "[p]harmacy chains are implementing guidelines for which patients can fill opioid prescriptions[.]"[173]

275.    For instance, McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin

---

[170]  https://www.wane.com/news/fort-wayne-pain-doctors-medical-license-suspended/ (He later died in a tractor accident, https://www.journalgazette.net/news/local/police-fire/20180816/tractor-accident-kills-pain-doctor)
[171]  PPLPC014000257130
[172]  https://www.justice.gov/usao-wdky/pr/kentuckiana-anesthesiologist-sentenced-100-months-unlawful-distribution-controlled
[173]  MCK-MAAG-0024297

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1   dispensing through Walgreens. McKinsey informed the Sacklers that "[d]eep examination of

2   Purdue's available pharmacy purchasing data shows that Walgreens has reduced its units by

3   18%." Further, "the Walgreens data also shows significant impact on higher OxyContin

4   dosages."[174]

5        276.    In order to counter these perceived problems, McKinsey suggested that Purdue's

6   owners lobby Walgreens specifically to increase sales and circumvent the safeguarding sales

7   limits. It also suggested the establishment of a direct-mail specialty pharmacy so that Purdue

8   could circumvent Walgreens and sell directly to Walgreens' customers. Finally, McKinsey

9   suggested the use of opioid savings cards distributed in neighborhoods with Walgreens locations

10  to encourage the use of Purdue's opioids despite Walgreens actions.

11       277.    McKinsey's initiative also included ways to circumvent these safeguards.

12  McKinsey recommended that the sales force distribute vouchers and "starter kits" for patients

13  who faced co-pays for OxyContin prescriptions.[175] In particular, McKinsey recommended

14  dispensing vouchers to outlets of a specific large national pharmacy chain where prescriptions

15  and OxyContin inventories were down.[176] This chain, as part of its own settlement with the Drug

16  Enforcement Administration, had removed pharmacist bonuses for dispensing opioids.[177]

17                    **c.    Incentivizing Opioid Sales**

18       278.    McKinsey's "turbocharging" plan also had other elements.



21  [178]

22  [179]

25  _____

26  [174] *Id.*
    [175] MCK-MDL2996-0290827.

27  [176] MCK-MDL2996-0041646.
    [177] MCK-MDL2996-0104431; MCK-MDL2996-0041646.

28  [178] PPLPC012000437346.
    [179] *Id.*

9.    **McKinsey's Efforts Triple OxyContin Sales**

279.    In 2013, despite significant headwinds, with marketing activities turbocharged, OxyContin sales peaked. The restrictions on Purdue's sales and marketing methods contained in the Corporate Integrity Agreement should have resulted in fewer overall OxyContin sales; the guilty plea identified a specific segment of existing OxyContin sales that were illegitimate and should thus cease. All else being equal, OxyContin sales should have decreased to account for the successful elimination of improper sales. In fact, OxyContin sales did decrease in the immediate aftermath of the 2007 guilty plea.

280.    And within five years, however, OxyContin sales would triple. McKinsey is responsible for the strategy that accomplished this. It presented specific plans to Purdue, which Purdue adopted and spent hundreds of millions of dollars implementing. The result: a final spasm of OxyContin sales before the inevitable decline of the drug.[180]

281.    The Purdue McKinsey collaboration was a spectacular success. Between the 2008 and 2016, Purdue distributed in excess of $4 billion to the Sackler family, with $877 million distributed in 2010 alone.

282.    These distributions would not have been possible without the McKinsey's work dramatically increasing OxyContin sales.

283.    The Sacklers were aware of the value McKinsey provided: on December 2, 2013, CEO John Stewart informed Kathe Sackler and Vice President of Sales and Marketing Russell Gasdia Project Turbocharge "was already increasing prescriptions and revenue." Crucially, these results were already being realized *before* the strategy was fully deployed as the theme of the 2014 National Sales Meeting. Stewart elaborated to Sackler that "trends are more positive than was the case a few months back, and when the E2E Project (the changes arising out of the McKinsey analysis) is fully implemented there will certainly be additional increases."[181]

---

[180] On February 10, 2018, Purdue announced that it is no longer marketing opioids, and disbanded its OxyContin sales force.
[181] PPLPC012000454422

284.  Later that month, ███████████████████████████████████████
████████████████████████████████████████[182]

285.  McKinsey's contributions to Purdue's growth after 2007 are remarkable. OxyContin sales should have naturally declined; the Department of Justice identified OxyContin sales that were illegitimate because of Purdue's conduct, and the Inspector General of the Department of Health and Human Services entered into a Corporate Integrity Agreement whereby Purdue was monitored to assure that those sales did not continue.

286.  In 2007, the year of Purdue's guilty plea, net sales of OxyContin totaled approximately $1 billion.[183]

287.  The guilty plea "did little to stem Purdue's blistering growth rate." In fact, by 2010, after McKinsey was advising Purdue on how to maximize sales, OxyContin sales exceeded $3 billion: a *tripling* of revenue from OxyContin sales.[184]

288.  Under McKinsey's guidance, OxyContin sales would reach their all-time peak in 2013, the year McKinsey proposed, and Purdue adopted, Project Turbocharge.[185] That OxyContin sales peaked in 2013 is especially notable, given that *overall* opioid prescriptions had *already peaked* three years earlier, in 2010.[186] McKinsey's efforts added a final boost to OxyContin sales before the eventual unraveling, and Purdue's decision, in the end, to cease marketing the drug.

289.  Project Turbocharge was a continuing success. ██████████████████████
███████████████████████████████████████,[187] and Chief Financial Officer Edward Mahoney reported to the Purdue board that the effort "has resulted in significant improvement."█

---

[182] PPLPC012000457292

[183] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times, September 9, 2018, *available at*: https://www ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c

[184] *Id.*

[185] Phil McCausland and Tracy Connor, *OxyContin maker Purdue to stop promoting opioids in light of epidemic*, NBC News, February 10, 2018, *available at:* https://www nbcnews.com/storyline/americas-heroin-epidemic/oxycontin-maker-purdue-stop-promoting-opioids-light-epidemic-n846726

[186] Gery P. Guy Jr, *at al.*, *Vital Signs: Changes in Opioid Prescribing Patterns in the United States, 2006-2015*, Centers for Disease Control and Prevention, July 7, 29017, *available at:* https://www.cdc.gov/mmwr/volumes/66/wr/mm6626a4 htm

[187] PPLPC037000159028

██████████████████████████████████████████████████████████████████████

████████████████████. [188]

290.    McKinsey was paid handsomely: it received more than ████████ for its work for Purdue from 2008 to 2013 alone. [189] In pursuit of these profits, McKinsey continued to help Purdue grow opioid sales even after Purdue reached a 2015 Assurance of Discontinuance with New York arising out of an investigation concerning its Abuse and Diversion Detection program and media coverage highlighted its lack of attention to diversion control. McKinsey's own work elsewhere identified "reducing prescribing" as among the efforts to combat the opioid epidemic and also showed that opioid prescribers were frequently writing prescription for patients with known risks of abuse. Still, McKinsey continued to work to help opioid manufacturers increase opioid sales, including through Purdue's deceptive marketing campaign.

291.    By 2014, according to Purdue, there were 5.4 million OxyContin prescriptions written, 80% for twelve-hour dosing. Of those prescriptions, more than half were for doses greater than sixty milligrams per day.

292.    The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

**E.    McKinsey's Opioid-Related Work with Other Clients.**

293.    Part of the unique value McKinsey provides is its deep knowledge of its clients' competitors, often because it counts those same competitors as its clients. McKinsey generally does not disclose to its clients its work for their competitors.

294.    The opioid industry was no different. Indeed, McKinsey specifically worked to

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████ [190]

---

[188] PPLPC014000263961
[189] PPLPC029000547371
[190] MCK-MDL2996-0041741.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1

### 1.   Endo

2    295.   While McKinsey was working for Purdue, McKinsey was also working for Endo

3   Pharmaceuticals. Arnab Ghatak was a principal McKinsey partner on both accounts at the same

4   time.[191] There was additional overlap between the McKinsey teams staffed to Purdue and Endo,

5   including McKinsey partners Nicholas Mills and Laura Moran. After all, these particular

6   consultants had granular expertise in the specific subject-matter relevant to these opioid

7   manufacturers. That subject-matter expertise is a compelling reason why McKinsey is hired in the

8   first place. McKinsey advised both Endo and Purdue how to maximize the sales or their branded

9   opioid products—Belbuca (Buprenorphine), Butrans (Buprenorphine), Opana (Oxymorphone),

10   and OxyContin (Oxycodone) —all at once.

### a.   New Blues

11

12    296.   Like Purdue, Endo was historically a pharmaceutical manufacturer focused on the

13   pain market. Like Purdue, Endo relied on opioid sales for a significant portion of its business. As

14   a matter of fact, Endo's history with opioids predates the Sacklers' ownership of Purdue. In 1950,

15   Endo's predecessor, Intravenous Products of America, Inc., launched Percodan, an

16   Oxycodone/Aspirin tablet. In 1971, Endo, then owned by E.I. du Pont de Nemours and Company

17   ("DuPont"), launched Percocet, another oxycodone-based tablet.[192]

18    297.   In 1997, Endo separated from DuPont to become a standalone private company

19   retaining Percodan and Percocet.[193] In 2000, as the result of an acquisition, the company became

20   public.[194]

21    298.   In 2006, Endo launched its own branded oxymorphone products, Opana and

22   Opana ER.[195] With the legacy assets of Percodan and Percocet, Endo's business had always been

23   ---

[191] Ghatak's familiarity with both Endo and Purdue is perhaps one reason why, on April 3, 2014, Ghatak was placed in
24   charge of analyzing a proposed *partnership* between Purdue and Endo to sell opioids. Lauran Moran described the
"partnership workstream" that McKinsey was then performing for Purdue to identify ways for Purdue to obtain near-
25   term growth. She stated that Purdue and McKinsey "agreed the partnerships workstream should include the top 3
potential partners (Valeant, Endo and Pfizer for now). And for each what assets each partner would bring and what
26   growth (most importantly) would the deal bring. Arnie [Ghatak] and Phil to work out Endo and Valeant, John G and
Raul to do Pfizer tomo." MCK-MDL2996-0421790.
[192] https://www.endo.com/about-us/history#fragment-25
27   [193] https://www.endo.com/about-us/history#fragment-24
[194] https://www.endo.com/about-us/history#fragment-21
28   [195] https://www.endo.com/about-us/history#fragment-15

focused on opioid sales. Oxymorphone is not a new opioid, and Opana was not Endo's first oxymorphone product. It was first synthesized more than a century ago in Germany. Endo began selling it in the United States in 1959 under the name Numorphan.

299.    Numorphan was referred to as "blues," after the color of the 10mg pills. It delivered a more euphoric high than heroin, according to some. In 1974, the National Institute on Drug Abuse noted in its "Drugs and Addict Lifestyle" report that Numorphan was popular as an abused drug for its quick and sustained effect.[196] By 1979, Endo withdrew Numorphan from the market. Upon information and belief, ████████████████████████████████████ ████████████████████████[197]

300.    The memory of the 1970s Numorphan addiction crises did not fade quickly. In 1989, the film *Drugstore Cowboy* featured Matt Dillon as an addict in the 1970s who robs drug stores to obtain drugs to sell in order to finance his opioid dependency.[198] In one scene, an addict asks Dillon's character if he has any "blues." Dillon's character explains that "blues" are increasingly hard to find, and offers to sell morphine sulfate to an addict instead. The addict explained that he much preferred the Numorphan, but settled for the morphine.[199]

301.    With the launch of Opana, Endo decided it was time for history to repeat itself. After Opana's approval in 2006, Endo solidified its position as a pain specialist among manufacturers. By 2012, opioid sales accounted for approximately $403 million of Endo's $3 billion in revenue, more than 10%. From 2010 to 2013, total Opana ER revenue alone exceeded $1.1 billion.

302.    Opana and Numorphan were both oxymorphone. The brand name was the only thing that changed. What Endo removed from the market in 1979 due to abuse concerns, it re-

[196] John Fauber & Kristina Fiore, *Abandoned Painkiller Makes a Comeback*, MedPage Today (May 10, 2015), *available at:* https://www.medpagetoday.com/psychiatry/addictions/51448

[197] EPI000443330 ████████████████ ENDO-OPIOID-MDL-06246554 (██████████ ████████████████████████████████████").

[198] *See* https://www.imdb.com/title/tt0097240/; https://www.bionity.com/en/encyclopedia/Oxymorphone.html

[199] Scene from Drugstore Cowboy, *available at:* https://www.youtube.com/watch?v=TksvZdrx9_A

1    introduced 27 years later. After 2006, Opana was on occasion referred to as "blue heaven," or,

2    more to the point, "new blues."[200]

3        303.    In 2017, Endo would once again remove its branded oxymorphone product from

4    the market, and for the same reason. Endo's abuse-deterrent formulation of Opana was removed

5    at the request of the FDA due to acute concerns about its abuse potential.

6        304.    In addition to its branded products, Endo, through subsidiaries Qualitest

7    Pharmaceuticals, Inc. and, after its acquisition in 2015, Par Pharmaceuticals, also manufactured

8    generic versions of oxycodone, oxymorphone, hydromorphone, and hydrocodone. Over the

9    course of McKinsey's relationship with Endo, McKinsey would repeatedly advise Endo how to

10   maximize its generics business in addition to sales of Endo's branded opioids.

11                    **b.    Old Friends**

12       305.    McKinsey's relationship with Endo began as early as in 2006, the same year as the

13   Opana launch.

14       306.    McKinsey's earliest known work with Endo concerned the launch of Opana in

15   Europe, but its relationship with Endo would expand to encompass all aspects of Endo's business,

16   including corporate organization and resource allocation, the launch of a new branded

17   Buprenorphine product, and sales force optimization efforts for Endo's branded and generic

18   opioid products.

19       307.    In 2007, McKinsey was shaping overall corporate strategy at Endo. In a

20   presentation to Endo's board of directors in May of that year ███████████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████

24   ██████████[201]

25       308.    McKinsey's partnership with Endo would last more than a decade, and, like its

26   relationship with Purdue, is an exemplary example of the transformational relationship in action.

27

28   
_____

[200] https://www.deadiversion.usdoj.gov/drug_chem_info/oxymorphone.pdf
[201] ENDO-OPIOID_MDL-02899510.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

309.    In some ways, the McKinsey's relationship with Endo was even more tightknit and companionable than with Purdue. For instance, no one at Purdue previously worked for McKinsey. In early 2013, Rajiv de Silva, previously a leader of McKinsey's PMP group, was appointed CEO of Endo. At Endo, McKinsey was now advising an old friend, one of its previous senior partners.[202]

310.    As de Silva himself explained, "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[203]

311.    Under de Silva, Endo relied more heavily on McKinsey than ever before. McKinsey consultants interacted directly and often *exclusively* with de Silva. McKinsey was so close to the Endo CEO that it could intervene in direct reporting from one of de Silva's deputies.[204] It is as if McKinsey had insinuated itself as a shadow layer of bureaucracy within Endo.

312.    McKinsey maintained weekly performance review meetings with de Silva and senior Endo management. In these meetings, granular weekly sales data was reviewed for each of Endo's branded products, including Opana.[205]

313.    McKinsey advised both Purdue and Endo contemporaneously for more than a decade. With each client, the goal was the same: to maximize opioid sales. The work McKinsey performed for each client was so similar that there was routinely confusion internally about whether a specific project or task to perform was for Endo or Purdue.[206]

---

[202] *See* "Rajiv De Silva Named President and CEO of Endo Health Solutions," Press Release dated February 25, 2013, *available at*:  https://investor.endo.com/news-releases/news-release-details/rajiv-de-silva-named-president-and-ceo-endo-health-solutions ("Earlier in his career, he was a Principal at McKinsey & Company, where he served as a member of the partnership group that led the global Pharmaceuticals and Medical Products practice.")

[203] ENDO-OPIOID-DEPMAT-000047877 at pg. 320:22 – 321:3.

[204] *See* MCK-MDL2996-0405502 (Email from Ghatak to de Silva, stating that it "would be great for you to push Blaine and Bob [both Endo employees] on why there are no slides showing the metrics on field call attainment . . . there was an explicit agreement to track them. Setting the expectation that you want them included would really help").

[205] MCK-MDL2996-0062712.

[206] In response to an internal email from Craig MacKenzie to other McKinsey consultants seeking "expert input on labels for abuse deterrent formulations" in conjunction with McKinsey's work on the Belbuca launch (discussed *infra*.), McKinsey consultant Jeff Smith replied, "Craig – is this for Purdue or Endo? If for Endo, I am conflicted." MCK-MDL2996-0383805.



314.    Despite McKinsey's emphasis on confidentiality, the fact that McKinsey repeats its work from one client to the next is well-known to the client. Indeed, it is part of the justification in hiring McKinsey in the first place. McKinsey can tell you what everyone else is doing. █████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████ [207]

### c.    Opana

315.    McKinsey's earliest known work with Endo ████████████████████████████ ███████████. In a November 22, 2006 presentation[208] entitled █████████████████ ████████████████████████," McKinsey advised ████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████ [209]

316.    McKinsey noted, ████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ██████. [210]

317.    McKinsey also ████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████

[207] ENDO-OPIOID-MDL-07619243.
[208] The McKinsey presentation was ██████████████████████████████████████ █████████████████████████████████ ENDO-OPIOID_MDL-02936031. By 2007, McKinsey had ████████████████████████████████ " ENDO-OPIOPID_MDL-06078889. Endo acquired Penwest in 2010. "Endo Pharmaceuticals Agrees to Acquire Penwest Pharmaceuticals," Fierce Biotech, August 10, 2010, *available at*: https://www.fiercebiotech.com/biotech/endo-pharmaceuticals-agrees-to-acquire-penwest-pharmaceuticals
[209] ENDO-OPIOID_MDL-02936031.
[210] *Id.*

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1  ██████████████████████████████████████████████████████████

2  ███████████████████████████████████████████████████████████

3  ████████████████████████████████████████"211

4  318.  McKinsey advised ████████████████████████████████████

5  ██████████████████████████████████████████████████████████

6  ████████████████████████████████████████████████████████████

7  █████████████████████212

8  319.  McKinsey ████████████████████████████████████████████

9  ██████████████████████████████████████████████████████████

10  ███████████████████████████████████████████████████████████

11  █████████████████████████████████████████████████████████

12  ███████████████████████████████████████████████████████████

13  ██████████████████████████████████████████████████████████213

14  320.  Within a few years of its introduction in the United States, abuse of the drug

15  became widespread. Endo then sought to introduce a reformulated version of Opana that it could

16  market as abuse-deterrent by introducing a tamper-resistant coating to the pill.

17  321.  In December 2011, Endo obtained FDA approval for a new formulation of Opana

18  ER with the coating that Endo claimed was crush-resistant. The following month, however, the

19  FDA told Endo that it could not market Opana ER, even after the reformulation, as abuse-

20  deterrent.

21  322.  Endo "did not submit any new clinical safety or efficacy data" as part of its

22  application, but rather relied entirely on the "bioequivalence" of the new and old formulations of

23  Opana. Obtaining approval of reformulated Opana ER on this basis allowed Endo to rely on the

24  safety and efficacy of the original version of the drug as the basis for approval of the reformulated

25  version.214 The FDA found that such promotional claims "may provide a false sense of security

26  ²¹¹ *Id.*

27  ²¹² *Id.*
   ²¹³ *Id.*

28  ²¹⁴ Intervenor Impax Laboratories, Inc.'s (1) Cross-Motion to Dismiss; or, in the Alternative, (2) Opposition to
    Plaintiff's Motion for a Preliminary Injunction, *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et*



1   since the product may be chewed and ground for subsequent abuse." In other words, Opana ER

2   was still crushable. In December 2011, Endo admitted that "[i]t has not been established that this

3   new formulation of Opana ER is less subject to misuse, abuse, diversion, overdose, or

4   addiction."[215]

5        323.   In 2013, an Endo training module directed key opinion leaders to instruct

6   prescribers that OPANA ER with INTAC is the only oxymorphone designed to be "crush-

7   resistant," and advised the key opinion leaders to state during their speeches that "[t]he only way

8   for your patients to receive oxymorphone ER in a formulation designed to be crush-resistant is to

9   prescribe OPANA ER with INTAC."[216] The speakers were advised to stress that generic versions

10  of Oxymorphone "are not designed to be crush-resistant."

11       324.   These abuse-deterrent attributes of the reformulation—the very characteristics

12  McKinsey and Endo touted as a reason to prescribe Opana—were a sham. The reformulation was

13  designed to prevent the pill from being crushed and snorted through the nose. It did not prevent

14  intravenous use, however. The result was that many users already dependent of Opana began

15  using needles to inject the drug for the first time. As an internal Endo email put it, ███████████

16  ████████████████████████████████████████████"[217]

17       325.   Jeff, a veteran of the war in Iraq, explained the process. Jeff first became

18  dependent on Percocet and Opana after returning from Iraq, where his back was injured when his

19  Humvee rolled over in 2008. After being prescribed opioids for his back pain, Jeff became

20  dependent, and began using Opana by snorting it. Endo then introduced the reformulated abuse-

21  deterrent version of Opana in 2012. "[A]nd then they reformulated them," he said, referring to the

22  Opana pills. "And the only way you could really do them is inject them because if you actually

23  swallow them, it – you – they really don't do nothing."[218]

24  *al.* ("Impax Br."), No. 1:12-cv-01936 Doc. 18 at 7 (D.D.C. Dec.9, 2012); *see also* FDA Summary Review for
25  Regulatory Action, NDA 201655 (Dec. 9, 2011) (stating that "[n]o new safety data were included in this submission"
    and "[n]o efficacy studies were submitted in this application.").
26  [215] Endo Dec. 12, 2011 News Release; Ex. A to Rurka Decl., *Endo Pharmaceuticals Inc. v. U.S. Food and Drug
    Administration, et al.*, No. 1:12-cv-01936 Doc. 18-2 (D.D.C. Dec. 9, 2012).
    [216] EPI000421543.
27  [217] END00010732.
    [218] Kelly McEvers, "Opioid Epidemic Sparks HIV Outbreak in Tiny Indiana Town," NPR, March 31, 2016, *available
28  at*: https://www.npr.org/2016/03/31/472577254/opioid-epidemic-sparks-hiv-outbreak-in-tiny-indiana-town

326.     Jeff and his companion Joy showed the journalist how the drug was used. "You want to see how to cook it?" Jeff asked. He and Joy then proceeded to place a portion of an Opana pill on piece of aluminum and heat it with a lighter. "Right away, I can start to see this hard, white coating just kind of floating off the piece of the pill. It looks like plastic," described the journalist witnessing the process.[219]

327.     Joy explained how the abuse-deterrent coating, once melted, was discarded by using the filter of a cigarette: "Now you see the coating of – all that mess laying there still? . . . That's what the filter's for."[220] The journalist described what then took place:

> And Joy puts that cigarette filter into the liquid, and they Joy, Jeff and another guy each take turns with their needles, sticking it into the filter and pulling the liquid through. Joy and Jeff turn their back to me while they inject. And then it just gets really, really quiet.

328.     Joy couldn't conceive of the position she was in. A nurse, she hurt her back at work and began taking prescription pain medication. She began taking the pills by mouth, and later began to snort them. Dependency began. But she told herself, "I'd never ever would use a needle, never. I'm never going to do that."[221]

329.     After Opana's reformulation, Joy began using it intravenously. "I started using the needle about – it was around the 6th of February," she said. "I'm so ashamed . . . . I pack so much shame, and I'm going to cry . . . . I pack so much shame from it. I do."[222]

330.     Endo's 2012 reformulation of Opana caused outbreaks of HIV in populations of intravenous Opana users. In Austin, Indiana, where Jeff and Joy resided, Opana was linked to an outbreak of at least 200 HIV cases in a town with a population of 4,500.[223]

331.     Intravenous use of reformulated Opana has also been associated with outbreaks of Hepatitis C and Thrombotic Thrombocytopenic Purpura ("TTP").[224] The concerns even reached

---

[219] *Id.*
[220] *Id.*
[221] *Id.*
[222] *Id.*
[223] *Id.*
[224] "Thrombotic Thrombocytopenic Purpura (TTP)–Like Illness Associated with Intravenous Opana ER Abuse — Tennessee, 2012," *Morbidity and Mortality Weekly Report* (Jan. 11, 2013).

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

Wall Street, where an analyst asked Endo about a TPP outbreak in Tennessee associated with Opana ER. Endo assured the analyst that the outbreak was, like the outbreak in Indiana, in "a very, very distinct area of the country."

332.   Endo was well aware of these problems. 

333.   In June of 2013, McKinsey

334.   McKinsey indicated

335.   In addition to being neither feasible nor safe/ethical, the study was beside the point. An insufflation study is meant to determine the abuse characteristics of a drug when used

225 ENDO00260151.
226 EPI002107711.
227 Id.
228 Id. (emphasis added).

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

nasally—i.e., by snorting the drug.[229] The relevant concern for Opana's reformulated version was *injection*, not insufflation.

336.    But the insufflation study worked for Purdue. Going forward, McKinsey suggested ████████████████████████████████████████████.[230]

337.    As the preceding paragraphs make clear, Endo and McKinsey were laser-focused on maximizing overall sales of Endo products, and decidedly *not* on concerns over their actual abuse potential or the appropriate *size* of the market for these products, given evident, longstanding, and ever-present concerns about their abuse. To the point, McKinsey regarded concerns about opioid abuse only as a means by which its clients could introduce *differentiated* products (i.e., those with purported abuse-deterrent or tamper-resistant features) to continually perpetuate overall opioids sales for their clients. In all instances, the parties desired for the size of that overall opioids market to grow in line with the introduction of "differentiated" products like a reformulated Opana.

338.    Endo's purported concern about deterring abuse of its drugs was laid bare as farce by a particularly striking decision: to continue to sell the old formulation of Opana despite touting the notion that the old formulation was purportedly dangerous in ways that the new formulation was not. Endo ████████████████████████████████████████████ ████████████████████████████████████████████.[231]

339.    Endo not only continued to distribute original Opana for nine months after the reformulated version became available, it declined to recall original Opana ER despite its dangers.[232] In fact, Endo also claimed in September 2012 to be "proud" that "almost all remaining inventory" of the original Opana ER had "been utilized."[233]

---

[229] *See* General Principles for Evaluating the Abuse Deterrence of Generic Solid Oral Opioid Drug Products, FDA Center for Drug Evaluation and Research, November 2017, *available at*: https://www.fda.gov/files/drugs/published/General-Principles-for-Evaluating-the-Abuse-Deterrence-of-Generic-Solid-Oral-Opioid-Drug-Products-Guidance-for-Industry.pdf
[230] EPI002107711.
[231] ENDO-OPIOID-MDL-02324795.
[232] Impax Br. at 1.
[233] *Id.*; Endo News Release, Sept. 6, 2012 (Ex. L to Rurka Decl) *Endo Pharmaceuticals Inc. v. U.S. Food and Drug Administration, et al.*, No. 1:12-cv-01936 (Doc. 18-4) (D.D.C. Dec. 9, 2012).

2331554.1
4857-5942-6172.v1

340.    In June 2013, an Endo employee informed the McKinsey consultants of a ███████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████ ˮ234



Comparative value propositions against Purdue products

| | | BELBUCA | OXYCONTIN | Hysingla ER |
|---|---|---|---|---|
| Safety | Abuse deterrence | Perceived due to inherent properties in formulation and molecule | Commonly abused; reformulated as "abuse deterrent" in 2010 | Formulated with abuse deterrent properties |
| | Side effects/tolerability | Good tolerability after titration, low constipation | Average, can be associated with nausea, vomiting, & constipation | Lack of NSAID or tylenol decrease risk of adverse reaction |

Product strengths

### d.    Belbuca: Endo's Answer to Butrans

341.    Buprenorphine is another differentiated product. Opioid manufacturers began to introduce Buprenorphine products to the market after the introduction of OxyContin, Opana, and other branded opioids long-known to have abuse and dependency problems. Buprenorphine products were marketed as purportedly less dangerous than products such as OxyContin or Opana.

342.    Of course, Endo and Purdue continued to assiduously market and sell OxyContin and Opana alongside their Buprenorphine products, and McKinsey worked with each at every step of the way, despite the implicit contradiction in marketing two products at the same time whose point of differentiation is one being *less addictive and dangerous* than the other.

343.    For example, on August 13, 2015, McKinsey's Craig MacKenzie circulated a discussion document to Endo and McKinsey staff entitled "Belbuca value proposition," which laid out McKinsey's thoughts on how to differentiate Endo's buprenorphine product from other

---

234 ENDO-OR-CID-00400235 (emphasis added).

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

opioids in the marketplace.[235] One point of differentiation McKinsey noted was that OxyContin was commonly abused, while Endo's Belbuca hopefully would not be: [236]

344.    The cognitive dissonance was palpable. At the same time that MacKenzie sent his email differentiating Belbuca, and as described *supra*, McKinsey was *also* maximizing OxyContin sales for Purdue—the opioid it was describing to Endo as commonly abused.

345.    ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ Butrans was Purdue's buprenorphine product.

346.    Once Butrans was launched at Purdue, McKinsey worked with Endo to create another branded Buprenorphine product to compete with Butrans. These product planning and launch processes are long-term affairs. McKinsey worked with Endo on this project for *four years* before Endo's Belbuca obtained FDA approval.

347.    McKinsey remained in place at Endo to implement the launch of Endo's Buprenorphine product. The strategic goal of Belbuca—the key to its commercial success—was to convert short acting opioid ("SAO") users to Belbuca. As McKinsey explained to CEO Rajiv de Silva, "The fundamental question is whether Belbuca will take share from the short-acting opioids."[237]

348.    Ultimately, Belbuca was not a large commercial success for Endo because it failed to transition a sufficient number of short acting opioid users to the long-acting Belbuca. As the drug underperformed, Endo felt ever more pressure to stimulate sales. John Harlow described one meeting with de Silva on April 8, 2016: "We just got out of the review with Rajiv and clearly our TRx trends are not good and are behind other recently launched pain products . . . the request from Rajiv was to do anything possible that could be implemented ASAP to stimulate RXs."[238]

349.    By July 6, 2016, McKinsey and Endo were increasingly focused on converting short-acting opioid users. ████████████████████████████████████████

---

[235] MCK-MDL2996-0410742.
[236] MCK-MDL2996-0006669, at 0006675.
[237] MCK-MDL2996-0210158.
[238] MCK-MDL2996-0358973, at 0358975.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1

2

██████████████████████████████ ”[239] Notably, the goal was to increase *overall* buprenorphine

3   prescriptions, not only those of Belbuca. The discussion document identified an objective to

4   create "a new treatment paradigm for [Buprenorphine] and Belbuca at the transition between

5   SAO and LAO."[240] In order to do so, the discussion group needed to determine "what medical

6   support we need to position Buprenorphine as the best transition from SAO to LAO."[241]

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   [239] ENDO-OPIOID_MDL-07264539
28   [240] *Id.*
     [241] *Id.*

- 82 -

350.    McKinsey provided a slide to Endo describing the way that narrative would first be *created* and then exploited for market positioning:[242]



## Overall timeline for rolling out Belbuca/Bup 'transition' positioning

**Q3 – Get the facts in place to tell the story**

**Q4 – Broadcast the story**

**1H 2017 – Create compelling data to accelerate the proof points**

- Medical Literature Review
- Crafting the overall cross-stakeholder story for Bup. as ideal 'transition'
- Prioritize stakeholders (payers, advocacy groups) for communication

- Publish national article on Bup transition
- Build out speakers on Bup
- Drive 'can't step through CII' message to payers
- Create pilots with payers/providers (e.g., VA, Geisinger) to prove value

- Make progress on RWE/RCT trials (e.g., H2H with Oxy, cancer pain)
- Finalize retrospective studies on abuse
- Health Economics analysis
- Exploration of 'step through Bup' deals with payers (prior to CII LAO)

*This report is solely for the use of client personnel. No part of it may be circulated, quoted, or reproduced for distribution outside the client organization without prior written approval from Legal*

endo   1

351.    McKinsey and Endo referred to this effort to revive Belbuca sales by promoting buprenorphine as a bridge to long-acting opioid use as a "moonshot."[243] One aspect of this "moonshot" would be that Belbuca (and Buprenorphine, generally) would convert short-acting opioid users to long-acting opioids users of products *other than Buprenorphine*. McKinsey and Endo instead conceived of Belbuca as an "*Initial* ATC Opioid Therapy." It was to be positioned as "the *first* LAO for poorly controlled or dissatisfied chronic pain patients transitioning from

---

[242] MCK-MDL2996-0382731.
[243] MCK-MDL2996-0382412.

2331554.1
4857-5942-6172.v1

short-acting to long-acting opioids." Patients could eventually transition from Belbuca to other

long-acting opioids, like Opana:[244]



352.    Thus, the overall marketing strategy McKinsey assisted Endo in designing and

deploying for Belbuca was designed to transition ever more patients to long-acting opioids.

Belbuca could find its market niche as a stepping stone as individuals proceed through the patient

funnel from short acting opioid users to longer-term long-acting opioid users. The farther an

individual proceeds through this funnel, the more the individual is worth.

[244] MCK-MDL2996-0404374, at 0404375.

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

353.    McKinsey also knew that this same pathway that begins with opioid therapy after a serious injury also leads to opioid dependency and addiction. In 2011, McKinsey was working on "Project X." which was the project to develop a buprenorphine product to compete with Butrans. (Belbuca, in other words, was the result of Project X.) McKinsey described the "opioid dependence treatment pathway" as follows:[245]



breakthrough thinking. collaboration. customer focus. accountability.

## OPIOID DEPENDENCE TREATMENT PATHWAY

- Patient begins opioid therapy following serious injury/surgery
- Patient pain not controlled, dosages increase, patient seeks additional medication options
- Patient referred to pain specialist
- Patient shows up in ER, Clinic or seeks out addictionologist
- Addictionologist – Pain Specialist or Psychiatrist with additional license to prescribe Methadone, Subutex/Suboxone for opioid dependence
- Options
  - Methdone
  - Subutex initiation, followed by Suboxone treatment

Confidential Internal Document.  Draft – Not Approved by Management.                    13

354.    In the same presentation, McKinsey identified the key to a successful launch of a branded Buprenorphine product: "The challenge faced by Endo will not be to gain formulary approval, it will be to gain tier 2 status and *minimize restrictions on prescribing*."[246]

---

[245] MCK-MDL2996-0131500, at 0131512.
[246] MCK-MDL2996-0131500, 0131525 (emphasis added).

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

e.  **Turbocharging the Sales Force with a Blitz**

355.    In 2015, a McKinsey team led by Arnab Ghatak proposed to Endo a sales transformation to invigorate Endo's product sales, including its opioids. At the suggestion of Ghatak, McKinsey used the Purdue Pharma Project Turbocharge model from the previous year as a template for the Endo proposal.[247] Even the PowerPoint presentations used to create the proposal to Endo were drafted off the Project Turbocharge slides. On June 28, 2015, Sherin Ijaz of McKinsey emailed Ghatak, Nicholas Mills, and Laura Moran to circulate a draft proposal for an "Endo sales force transformation" PowerPoint presentation. Ijaz explained, "Laura, I heavily leveraged what you send (sic) from Purdue as it was all applicable."[248] All three of the recipients of Ijaz's email regarding the Endo proposal had been working on the Purdue account for years.

356.    Endo ███████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████"[249]

357.    Endo's Vice President & General Manager of its Pain Business Unit, John Harlow,
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████[250]████████████████████████████
████████████████████████████████████████████████████████
█████████████████[251]

358.    The Endo and Purdue proposals were essentially identical sales transformations. The goals were the same: to maximize sales of opioids. Merely the names were changed. While McKinsey offered to "turbocharge" Purdue's sales force, McKinsey proposed a "sales force blitz" for Endo.[252]

---

[247] MCK-MDL2996-0075895.
[248] MCK-MDL2996-0070237.
[249] ENDO_AAC_00363406.
[250] *Id.*
[251] *Id.*
[252] *E.g.*, MCK-MDL2996-0130803; MCK-MDL2996-0132851.

2331554.1
4857-5942-6172.v1

1    359.    In fact, the names weren't *entirely* changed. ████████████

2    ████████████████████████████████████████████████████████████

3    ███████████████████████ [253]

> ## Overview of our approach: 'Turbocharging the Sales Engine'
>
> - There **are 5 key pillars** that should be addressed in the sales transformation effort
>   - **Sales strategy and targeting:** Shift from decile-based to workload-based targeting approach provide right support to sales force, and build deep sales analytics capabilities
>   - **Effective selling skills**: Mandate field adherence to the target list and compliance with targets
>   - **Disciplined sales process**: Increase rep productivity and explore ways to increase time in field
>   - **Efficient coverage**: Align resources with highest potential opportunities and consider re-alignment of territories and increasing overall field force size
>   - **Behavior & mindset**: Establish performance management system and incentives aligned with corporate objectives, and establish a culture of continual improvement
>
> - Comprehensive sales transformation programs **typically take 9 months**, which we recommend dividing **into three phases: Ready, Run, Refine**
>   - **Ready:** Set the groundwork for the sales transformation, including creating leadership buy-in and establishing high-level objectives and targets
>   - **Run:** Launch a major field force kickoff explaining the change and vision, followed by district meetings led by field and home office leaders, regional champions, and other support team members
>   - **Refine:** Expand the impact to the next level with additional high impact levers such as expanding the field force and re-aligning territories
>
> - There are a number of key **design and execution decisions** that need to be addressed before the sales transformation can begin in full
>
> - We have developed a **14-workstream plan with specific owners** to execute on this vision
>
> ⦿ endo
>
> 2

19    360.    ████████████████████████████████████████

20    ████████████████████████████████████████████████████████

21    ████████████████████████████████████████████████████████

22    ████████████████████████████████████████████████████████

23    ███████████████████████████████████████████████

24    ██████████

25    361.    ████████████████████████████████████████

26    ████████████████████████████████████████████████████████

---

[253] MCK-MDL2996-0069747, at 0069749. [ ████████ ]

362.    Upon McKinsey's suggestion, Endo began reallocating sales force resources to Opana from other Endo products such as Sumavel, a migraine medication, and Voltaren, an anti-inflammatory.[254] Writing to the McKinsey team, Endo's Alicia Logan stated the joint mission, "I agree that our main goal is to maximize the increased promotional efforts for [Opana ER] without disrupting/sacrificing [Sumavel] or [Voltaren] TRx volume and it appears that we [can] accomplish this with your recommendation of addition another 500 targets."[255]

363.    With the Sales Force Blitz underway, Endo received good news in New York. Years prior, Endo had initiated patent litigation against generic manufacturers of Opana ER, arguing that the generic versions of the drug infringed on Endo's patents. In part because of the perceived impending loss of exclusivity, Endo had in recent years allocated its sales force capacity away from Opana and to other Endo products.

364.    On August 14, 2015, Endo received a favorable initial ruling declaring that the generic versions of Opana violated Endo's patents, and enjoined their further sale. The ruling provided additional patent exclusivity for Opana, and Endo was keen to exploit its advantage.

365.    That afternoon, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[256]

366.    The following week, Harlow wrote to the McKinsey team working for Endo to focus their attention on Opana ER. "Now with our litigation victory from last week, plus our UHC opportunity, there is an increased need to increase FF support to drive Sep-Dec business. . . . With this win, I am now willing to go broader with OER targeting."[257]

---

[254] MCK-MDL2996-0409466.
[255] MCK-MDL2996-0409436, at 0409437 (sic).
[256] ENDO-OPIOID_MDL-02279530.
[257] MCK-MDL2996-0358871, at 0358872; ENDO-OPIOID_MDL-02201117 .

2331554.1
4857-5942-6172.v1

367.    McKinsey and Endo proceeded to design and implement retargeting strategies to boost Opana sales in late 2015.

### 2.    Johnson & Johnson

368.    McKinsey also working with Johnson & Johnson, whose role overseeing and contributing to the opioid crisis has been exhaustively detailed in other complaints. *See, e.g.*, *City and County of San Francisco v. Purdue Pharma L.P.*, N.D. Cal. No. 18-2591, Doc. 128 (Mar. 13, 2020). Johnson & Johnson occupied multiple roles within the opioids industry. Through its subsidiary, Janssen Pharmaceuticals ("Janssen"), it marketed and sold branded opioid products, including Duragesic (a transdermal fentanyl patch) and Nucynta (tramadol tablets and oral solution). Through its Noramco and Tasmanian Alkaloids subsidiaries, Johnson & Johnson farmed the poppy plant in New Zealand and created the precursor chemical and raw materials necessary to manufacture *all* opioids. Noramco and Tasmanian Alkaloids sold these raw materials to the other opioid manufacturers: Purdue, Endo, Mallinckrodt, and others. Johnson & Johnson was the origin point in the entire opioids supply chain.

369.    Just like McKinsey's relationships with Purdue, Endo, and the others, McKinsey's opioid-related work for Johnson & Johnson spanned decades.

370.    Just as Endo was led by former partner McKinsey partner Rajiv de Silva, Johnson & Johnson similarly relied on McKinsey as a pipeline for its own management timber. As described above, McKinsey alumni tend to move on to positions with McKinsey clients. Janssen's current Director of Customer Marketing & Value Based Care was hired from McKinsey's PMP group. The relationship flows both ways: Janssen's former Vice President of Sales and Marketing for Janssen Pharmaceuticals is currently a McKinsey partner. Moreover, Ian Davis has been an independent director since 2010 and currently sits on the Audit and Regulatory Compliance committees of Johnson & Johnson's board. Previously, he was a Senior Partner at McKinsey, "having served as Chairman and Worldwide Managing Director from 2003 until 2009."[258]

---

[258] https://www.jnj.com/leadership/ian-e-l-davis

371.    Kevin Sneader, until recently McKinsey's global managing partner, and one of Davis' successors, described Davis as a "mentor" who was the managing partner of McKinsey's London office when Sneader was working there and "worked on one of his teams."[259] Given Frazier's presence on the board, Johnson & Johnson was obviously an important account for McKinsey. At present, it is not known which McKinsey partner(s) was the Director(s) of Client Services for the Johnson & Johnson account.

372.    What is known, however, is that McKinsey ███████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ "[260] On July 6, 2011, Ghatak attended an internal McKinsey call with the consultants working on the Johnson & Johnson account to discuss the "J&J Nucynta sales force disruption."[261] The same day, Laura Moran, who like Ghatak worked both the Purdue and Endo accounts, also provided internal advice regarding Nucynta to her McKinsey partner Gerti Pellumbi, who was leading Nucynta sales efforts for the Johnson & Johnson account, and engagement manager Bryan Reinholt, who was with Pellumbi on the Johnson & Johnson account.[262] Martin Elling, one of the lead McKinsey partners on the Purdue account alongside Ghatak, attended internal McKinsey calls on March 25, 2010,[263] and again on May 27, 2011 to discuss McKinsey's work for Johnson & Johnson's Nucynta.[264] Then, on December 13, 2011, Elling attended a meeting with Johnson & Johnson personnel regarding "acceleration opportunities."[265] Aamir Malik attended the meeting with Elling, and, naturally, also worked on the Endo account.[266] Malik and Ghatak had an internal

---

[259] *See* Interview with Kevin Sneader, Harvard Project for Asian & International Relations, January 31, 2021, *available at* https://www.youtube.com/watch?v=qed53EGG8kU
[260] JAN-NH-00167575.
[261] MCK-MDL2996-0222833.
[262] MCK-MDL2996-0419348.
[263] MCK-MDL-2996-0256186.
[264] MCK-MDL-2996-0255907.
[265] MCK-MDL-2996-0255926.
[266] *Id.*; *see also* MCK-MDL-2996-0348536 (Example of Malik's work on Endo account).

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1  McKinsey meeting amongst themselves regarding the "Nucynta Kickoff" at Johnson & Johnson

2  six months prior, on June 3, 2011.[267]

3                                        **a.      Noramco**

4        373.    Janssen was not the only Johnson & Johnson unit ████████████████████

5  ████████████, and Janssen was not Johnson & Johnson's only division involved in the

6  narcotics trade.

7        374.    Opioids—all of them—are derivatives of opium, which is derived from the poppy

8  plant. In order to sell opioids, someone needs to farm the opium poppy and process the harvest

9  into the raw materials necessary for opioid manufacturers—all of them—to make their products.

10       375.    Johnson & Johnson was that farmer. It owned Noramco and Tasmanian Alkaloids,

11  which grew poppies in New Zealand and sold the raw ingredients for opioids to practically all

12  manufacturers.

13       376.    On August 19, 2009, McKinsey's ████████████████████████████

14  ████████████████████████████████████████████████████████

15  ████████.[268]

16       377.    ████████████████████████████████████

17  ████████████████████████████████████████

18  ████████████████████████████████████████

19  ████████████████████████████████████████

20  ████.[269]

21       378.    Seven years later, in 2016, Johnson & Johnson exited the business by selling

22  Noramco and Tasmanian Alkaloids to SK Capital, a private equity firm focused on the

23  pharmaceuticals business, for approximately $800 million.[270] ████████████████

24  ████████████████████████████████████████████████

25  ─────────────────────

26  [267] MCK-MDL-2996-0261694.
    [268] NORAMCO_TX_01136410.
27  [269] NORAMCO_TX_01136411, slide 4.
    [270] Gareth Macdonald, "US Investor buys J&J's opiate API business and announces restructuring," *Outsourcing*
28  *Pharma*, July 20, 2016, *available at*: https://www.outsourcing-pharma.com/Article/2016/07/21/US-investor-buys-J-J-s-opiate-API-business-and-announces-restructuring

1   ████████████████████████████████████ Not only was McKinsey's advice

2   invaluable to Johnson & Johnson, the perspective McKinsey gained of the overall opioid market

3   from advising the principal upstream supplier to the entire industry would be invaluable in to its

4   own work with its other opioid manufacturer clients.

5                        **b.    Duragesic**

6          379.    Fentanyl was first synthesized by Paul Janssen and his pharmaceutical company

7   Janssen Pharmaceuticals in 1959. In the 1990s, the company (by then owned by Johnson &

8   Johnson) developed Duragesic, which is a transdermal patch that administers fentanyl to the

9   patient wearing it.

10         380.    "Duragesic proved to be one of the most successful analgesic pharmaceutical

11  products ever developed, with sales in 2004 (its last year of patent life) exceeding $2.4 billion.

12  The success of the fentanyl patch caused many generic companies to produce equivalents once it

13  went off patent."[271]

14         381.    McKinsey was an integral part of fentanyl's success. As early as 2002, McKinsey

15  was advising Johnson & Johnson regarding methods to boost sales of its opioids. For example, on

16  March 14, 2002, McKinsey prepared a confidential report for Johnson & Johnson's subsidiary

17  Janssen regarding how to market their opioid Duragesic. Incredibly, one of the recommendations

18  McKinsey provided to Johnson & Johnson was that they concentrate their sales and marketing

19  efforts on doctors that were *already* prescribing large amounts of Purdue's OxyContin.[272]

20         382.    In other words, as early as 2002, McKinsey had such intricate knowledge of the

21  sales and marketing practices of opioid manufacturers, generally, and Purdue's efforts with

22  OxyContin, specifically, that it was able to recommend to *a competitor of Purdue* that it boost its

23  own opioid sales by *following in the footsteps of Purdue.*

24

25

26  [271] Theodore Stanley, "The Fentanyl Story," The Journal of Pain, Vol. 15, No. 12 (December), 2014, pg. 1220, *available
    at*: https://www.jpain.org/article/S1526-5900(14)00905-5/pdf

27  [272] Chris McGreal, *Johnson & Johnson faces multibillion opioids lawsuit that could upend big pharma*, The Guardian,
    June 23, 2019, *available at:* https://www.theguardian.com/us-news/2019/jun/22/johnson-and-johnson-opioids-crisis-

28  lawsuit-latest-trial

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

383.    McKinsey also advised Johnson & Johnson to target Duragesic on "high abuse-risk patients (e.g., males under 40)." This targeting would take advantage of the marketing claim that Duragesic "was harder to abuse than other opioids on the market."[273]

384.    McKinsey helped Janssen target its opioid marketing by identifying "priority growth opportunities" and growth strategies for Duragesic.[274] In 2002, McKinsey considered "[w]hat are settings of care for opioid high-prescribers and treaters of back pain," listing the "elderly" as an example;[275] ██████████████████████████████████████ ██████████████.[276]

### c.    Turbocharging Nucynta

385.    McKinsey's infamous Project Turbocharge to boost OxyContin sales at Purdue in 2013 and 2014—the same project detailed in Purdue's 2020 guilty plea with the Department of Justice—was not McKinsey's first experience turbocharging opioid sales. Before OxyContin, there was Nucynta:[277]



---

[273] Julia Lurie, *"Inside Johnson and Johnson's Quiet Domination of the Opioid Market,"* June 11, 2019, Mother Jones, *available at* https://www.motherjones.com/politics/2019/06/johnson-and-johnson-opioid-poppies-tasmania-oklahoma-lawsuit/

[274] *Oklahoma v. Johnson & Johnson*, Oklahoma Proposed Findings & Conclusions, citing 5/30/19pm Tr. & S-1253; *see also* JAN-MS-00481545 (Deem-Eshleman Ex 73).

[275] *Oklahoma v. Johnson & Johnson*, 5/30/19 Tr. At 46:1-15.

[276] JAN-MS-00481547 (Deem-Eshleman Ex 74) .

[277] MCK-MDL-2996-0135636.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

386.     Nucynta was Janssen's branded tapentadol product. Tapentadol is generally regarded as a moderately strong opioid. Nucynta was first approved as a Schedule II controlled opioid agonist tablet and oral solution in 2008, and indicated for "relief of moderate to severe acute pain in patients 18 years of age or older." In 2011, Janssen obtained approval for a long-acting version Nucynta ER, which was indicated for "management of moderate to sever chronic pain in adults and neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."

387.     McKinsey is a repeat opioid sales turbocharger. McKinsey's efforts to turbocharge Nucynta sales resembled those it later deployed in more robust form at Purdue a few years later. For example, "physician prescribing habits," and "switching behavior," were external factors McKinsey identified as key issues "impacting future Nucynta growth." Understanding these issues at a granular level would be crucial, including "What is physician/market awareness of Nucynta ER? By physician segment?"[278] These same factors drove McKinsey's later work turbocharging OxyContin.

388.     Along the way, McKinsey ████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████[279]

389.     Despite this ambivalence about tamper-resistance, in a status update on June 23, 2011, McKinsey informed Janssen that its "initial physician interview findings" indicate Nucynta ER has "lower addictive/abuse potential and side-effect profile as key differentiators vs. Oxycontin ER."[280]

390.     As part of the turbocharge process, ██████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

---

[278] MCK-MDL-2996-0135636.
[279] JAN-MS-00322271.
[280] MCK-MDL-2996-0009526, at 0009529.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1   ████████████████████████████████████████████████████

2   ████████████████████████ ”281

3       391.    By 2014, Janssen was began exploring the sale of Nucynta, and McKinsey was

4   involved in the process. Incredibly, ████████████████████████████████████

5   ██████.282 Purdue ultimately did not purchase Nucynta. Instead, in 2015, Johnson & Johnson's

6   Janssen unit sold its Nucynta rights to another manufacturer, Depomed Inc., for just over one

7   billion dollars.283

8       392.    The year prior, Nucynta accounted for $172 million in annual sales for Janssen.

9   Janssen described the Nucynta sale to Depomed as "a strategic decision designed to focus efforts

10  on growth efforts."284 Depomed, for its part, saw the Nucynta acquisition as a transformational

11  opportunity to position itself as "a pain and neurology-focused specialty pharmaceutical

12  company."285

13      393.    When Depomed bought Nucynta, ████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████████

16  ███████████████████████████████████████

17      ████████████████████████████████████████████

18      ████████████████████████████████████████████

19      ████████████████████████████████████ 286

20

21

22  ────────────────────────
    281 JAN-MS-02272779.
    282 PPLPC023000661013 (████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████████████████████
24  ████████████████████████████████████████████████████████████████████████
    ██████ .
25  283 See    https://www.prnewswire.com/news-releases/depomed-announces-closing-of-acquisition-of-us-rights-to-
    nucynta-tapentadol-nucynta-er-tapentadol-extended-release-tablets-and-nucynta-tapentadol-oral-solution-from-
26  janssen-pharmaceuticals-inc-for-105-billion-300060453 html
    284 Josh Beckerman, "DepoMed to Buy U.S. Rights to Nucynta From J&J Unit," Wall Street Journal, January 16, 2015,
27  available at: https://www.wsj.com/articles/depomed-to-buy-u-s-rights-to-nucynta-from-j-j-unit-1421357503
    285 Id.
28  286 DEPO-CDI-00071072 (emphasis added).

1

### 3.     Other Manufacturers

2      394.    McKinsey worked with numerous other manufacturers to promote the sale of

3  opioids. To date, Plaintiffs have identified as McKinsey clients ████████[287] and ███

4  ████████████[288]

5      395.    Coordination among these industry participants was a natural outgrowth of the fact

6  that McKinsey had existing client relationships with each participant. For instance, on May 7,

7  2009, Richard Sackler's personal counselor, McKinsey partner Maria Gordian, ████████

8  ███████████████████████████████████████████████████████

9  ███████████████████████████████████████████████████.[289]

10     396.  ████████████████████████████████████████

11  ███████████████████████████████████████████████

12  ██████████████[290]

13     397.  ████████████████████████████████████████████████████

14  ████████████████████████.[291]

15  <u>Prepared by:</u> The Industry Working Group (IWG)
    The IWG includes:

16      Actavis Group hf.
        Apotex, Inc.
        Endo Pharmaceuticals, Inc.

17      Janssen Pharmaceuticals, Inc.
        Lavipharm Laboratories, Inc.
        Mallinckrodt, Inc.

18      Mylan Technologies, Inc.
        Noven Pharmaceuticals, Inc.
        Pfizer, Inc.

19      Purdue Pharma L.P.
        Ranbaxy Pharmaceuticals, Inc.
        Rhodes Pharmaceuticals L.P.

20      Roxane Laboratories, Inc.
        Sandoz, Inc.

21      Teva Pharmaceuticals USA, Inc.
        The PharmaNetwork, LLC
        Upsher-Smith Laboratories, Inc.

22      VistaPharm, Inc.
        Watson Laboratories, Inc.

23

24

25

---

26  [287] MNK-MDL_001756041; MNK-T1_0000968026; MN-T1_0004715842; MNK-T1_0005985720.
    [288] TEVA_CHI_00187019.

27  [289] TEVA_CHI_00187019.
    [290] TEVA_CHI_00187023.

28  [291] *See* ALLERGAN_MDL_00637407. [ ████████ ]

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1

#### 4. **McKinsey's Work with Opioid Distributors**

2     398.   McKinsey worked with opioid distributor AmerisourceBergen ███████

3 ████████████████████████.[292]

4     399.   McKinsey worked with opioid distributor McKesson on the company's ████

5 ████████████████████████.[293]

6

#### 5. **McKinsey's Work with the FDA**

7     400.   As described above, McKinsey assisted Purdue and others to confront FDA

8 regulations that posed threats to their clients' ability to maximize revenues from their opioid

9 products. McKinsey's role in shepherding its clients through regulatory interactions takes on a

10 different hew when considered in light of one of McKinsey's other clients: the Food and Drug

11 Administration itself.

12     401.   Indeed, the FDA has proved a massive client for McKinsey, who since 2000 has

13 endeavored to expand its public sector practice under the direction and leadership of Nancy

14 Killefer, a now-retired senior partner and director of the firm.[294] Since 2008, the FDA has paid

15 McKinsey more than $140 million.[295] A significant portion of that work for the FDA related to

16 the FDA's Center for Drug Evaluation and Research ("CDER"). The CDER is the principal

17 division tasked with approving, among other classes of drugs, opioids. Since 2008, McKinsey has

18 been awarded at least 17 contracts worth at least $48 million for CDER work.[296]

19     402.   The REMS protocols, discussed above, that McKinsey assisted Purdue and others

20 in surmounting beginning in 2008 and culminating in 2012, were overseen by CDER.[297]

21     403.   Meanwhile, in 2010, McKinsey advised the FDA on building a monitoring system

22 called "track and trace" to assist in the identification of potentially improper distribution of

23 harmful prescription drugs, such as opioids. "The 'track and trace' system deeply impacted

24

---

25 [292] ABDCMDL12135609, slide 5.
[293] MCKSTCT00753097; MCKSTCT00753098.

26 [294] Duff McDonald, *The Firm*. Killefer is also a director of Cardinal Health, one of the distributor defendants in the ongoing nationwide opioid litigation, and a company subject to FDA regulations.

27 [295] Letter to Dr. Janet Woodcock from Senator Margaret Hassan et al, August 23, 2021, *available at*: https://www.hassan.senate.gov/imo/media/doc/fda-mckinsey_letter-final-210823.pdf ("Hassan Letter")

28 [296] *Id*.
[297] *Id*.

2331554.1
4857-5942-6172.v1

1   McKinsey clients, including the nation's three largest drug distributors—McKesson,

2   AmerisourceBergen, and Cardinal Health [where Killefer has been a director since 2015]."[298]

3       404.    Under one contract, McKinsey developed a roadmap and implemented plans to

4   modernize CDER's new drug regulatory program. Under another, McKinsey developed a

5   framework to increase information technology project delivery across CDER.[299]

6       405.    In 2007, Congress passed the Food and Drug Administration Amendments Act

7   ("FDAAA"), which placed new restrictions on the use of certain high risk prescription drugs,

8   including opioids. The new law mandated that FDA require manufacturers of certain drugs to

9   create REMS.

10      406.    The FDAAA also required the Secretary of Health and Human Services "to

11  develop standards and identify and validate effective technologies for the purpose of securing the

12  drug supply chain against counterfeit, diverted, subpotent, substandard, adulterated, misbranded,

13  or expired drugs." 21 U.S.C. § 355e(a).

14      407.    In 2010 and 2011, under the FDAAA, the FDA awarded McKinsey contracts to

15  design a "track and trace" system to monitor prescription drugs, including opioids, throughout the

16  supply chain and to streamline the drug approval process. The track and trace system had the

17  greatest effect on drug distributors, including McKinsey clients McKesson, AmerisourceBergen,

18  and Cardinal Health.[300]

19      408.    Under these contracts, McKinsey was required to consult with "supply chain

20  stakeholders," which likely included these three McKinsey clients as well as pharmaceutical

21  manufacturers.[301]

22      409.    In 2011, McKinsey also won a $1.8 million contract with CDER's Office of

23  Surveillance and Epidemiology ("OSE"), which monitors and evaluates the safety profiles of

24  drugs available to American consumers.[302] OSE "evaluates more than 2 million adverse event

---

[298] *See* http://cg.cardinalhealth.com/board-of-directors/default.aspx; Hassan Letter.
[299] Letter to Senator Chuck Grassley from Andrew Tantillo, Oct. 22, 2021, *available at*: https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf
[300] Hassan Letter.
[301] *Id.*
[302] https://www.documentcloud.org/documents/21071060-mckinsey-ose-contract

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

reports submitted every year to FDA's MedWatch program" and provides "risk management expertise on development and implementation of programs and initiatives to support [CDER's] policies related to [REMS] authorities.[303]

410.    The OSE contract tasked McKinsey with a widespread mission of understanding how OSE functions within the context of a broader system of drug safety in CDER and ultimately developing and implementing a new operating model. In other words, McKinsey helped to restructure a key body that has oversight over the opioid supply chain.

411.    The 2012 Food and Drug Administration Safety and Innovation Act required the FDA to modernize Sentinel, a system meant to monitor the safety of drugs once they are on the market.[304] According to the FDA, "Sentinel generates *real-world evidence* to support regulatory actions aimed at protecting the public's health," which in turn "inform[s] healthcare provider decision-making for patients."[305]

412.    A 2014 contract with the FDA charged McKinsey with assessing the "strengths, limitations and appropriate use" of Sentinel. Like the track and trace contract, the Sentinel project required McKinsey to interview "external stakeholders," including "industry organizations" and "drug and device industry leaders."[306] McKinsey also evaluated how the FDA employees used Sentinel to inform regulatory decision making.[307]

---

[303]        https://www.fda.gov/about-fda/center-drug-evaluation-and-research-cder/cder-office-surveillance-and-epidemiology
[304] https://www.documentcloud.org/documents/21071047-r_sentinel_assessment_award_contract_sow-redacted-pr
[305]        https://www.fda.gov/files/about%20fda/published/Sentinel-System-Overview—-Presentation.pdf; https://www.healthaffairs.org/do/10.1377/hpb20150604.936915/full/
[306] Ian MacDougall, "McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency," *ProPublica* (Oct. 4, 2021), *available at* https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency
[307] Letter to Bob Sternfels from Representative Carolyn B. Maloney, Nov. 5, 2021, *available at*: https://oversight.house.gov/sites/democrats.oversight house.gov/files/2021-11-05.CBM%20to%20Sternfels-McKinsey%20re%20Document%20and%20Information%20Request%20%28001%29.pdf

2331554.1
4857-5942-6172.v1

413.     McKinsey performed similar work for the FDA as recently as 2019,[308] when it signed a contract extension with the agency for work relating to the FDA's efforts to modernize the process by which it regulates new drugs.[309]

414.     The FDA's drug tracking programs have been panned as failures.[310]

415.     A theme was emerging: as new legislation and regulatory systems were enacted that could have hampered the opioid supply chain, McKinsey stepped in as a key consultant for the FDA. Each time, the new system failed to reign in the out-of-control opioid market. While the FDA was not solely responsible for regulating the opioid industry and McKinsey was not wholly responsible for the FDA's inaction, tools like Sentinel and track and trace could have been implemented in a way to provide new information to combat the country's growing opioid crisis.

416.     At the same time it was consulting for the FDA, McKinsey was working with its opioid industry clients on how skirt the FDA's regulatory systems.

417.     For example, McKinsey advised Purdue on how to soften the FDA's proposed REMS and on coordinating with other opioid manufacturers to advocate against strict oversight.[311] The finalized REMS for opioid products was largely devoid of the restrictions that FDA had initially proposed.[312]

418.     McKinsey's work with the FDA was a key factor in why pharmaceutical industry clients tapped McKinsey for FDA-related work. For example, in endorsing McKinsey's proposed strategy of banding together with other opioid manufacturers, Purdue CEO John Stewart suggested that the consultant itself facilitate the pharmaceutical group's approach to FDA. He wrote: "Perhaps a consultant such as McKinsey who did similar work in the industry and FDA on

---

[308] Ian MacDougall, "McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency," *ProPublica* (Oct. 4, 2021), *available at* https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency

[309] Letter to Bob Sternfels from Representative Carolyn B. Maloney, Nov. 5, 2021, *available at*: https://oversight.house.gov/sites/democrats.oversight house.gov/files/2021-11-05.CBM%20to%20Sternfels-McKinsey%20re%20Document%20and%20Information%20Request%20%2801%29.pdf

[310] Sabrina Tavernise, "F.D.A. Faulted for Problems With Drug Tracking" *The New York Times*, Jan. 14, 2016, *available at* https://www new nytimes.com/2016/01/15/health/fda-faulted-for-problems-with-drug-tracking.html; https://www.gao.gov/assets/gao-16-192.pdf

[311] Hassan Letter.

[312] Hassan Letter; Maloney Letter.

2331554.1

4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

some aspects of clinical trials or a healthcare-related group that would be interested in playing an active role in the program's development and delivery would be a good choice."[313]

419.    McKinsey performed work for the FDA without disclosing its potential conflicts of interest to the FDA in violation of the contracts between the company and the agency.

420.    The FDA typically includes conflict of interest clauses in its contracts and relies on contractors to assess and report any conflicts. McKinsey's contracts with the FDA related to CDER processes contained such provisions. One contract required McKinsey to "make an immediate and full disclosure, in writing, . . . of any potential or actual organizational conflict of interest or the existence of any facts that may cause a reasonably prudent person to question the contractor's impartiality because of the appearance or existence of bias."[314]

421.    But McKinsey never disclosed its work on behalf of opioid supply clients to the FDA despite having a hand in developing some of the FDA's most important regulatory processes.[315]

422.    Disclosing its conflicts might have turned off the lucrative tap to not only FDA contracts but also to pharmaceutical industry clients, given the clear value such clients placed on McKinsey's work for the FDA.

423.    McKinsey's manipulation of regulatory requirements—whether to skirt its own contractual requirements or to bend processes that regulate its clients—is nothing new. McKinsey has come under fire from the Office of Inspector General for the General Services Administration for contract procurement violations[316] and from the Justice Department related to violation of Chapter 11 bankruptcy rules.[317] Most recently, six senators have begun to investigate the

---

[313] Purdue Bankruptcy, Doc. 2166-5, at 58-59.

[314] Ian MacDougall, *McKinsey Never Told the FDA It Was Working for Opioid Makers While Also Working for the Agency*, *ProPublica* (Oct. 4, 2021), available at https://www.propublica.org/article/mckinsey-never-told-the-fda-it-was-working-for-opioid-makers-while-also-working-for-the-agency

[315] *Id.*; Letter to Senator Chuck Grassley from Andrew Tantillo, Oct. 22, 2021, *available at*: https://www.grassley.senate.gov/imo/media/doc/fda_to_grassley_-_mckinsey_conflicts_of_interest.pdf

[316] Ian MacDougall, *How McKinsey Makes Its Own Rules*, *ProPublica* (Dec. 14, 2019), available at https://www.propublica.org/article/how-mckinsey-makes-its-own-rules

[317] Mary Williams Walsh and Emily Flitter, *McKinsey Faces Criminal Inquiry Over Bankruptcy Case Conduct*, *New York Times*, Nov. 8, 2019, *available at* https://www.nytimes.com/2019/11/08/business/mckinsey-criminal-investigation-bankruptcy.html

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1  relationship between McKinsey and the FDA[318] the House Committee on Oversight and Reform

2  is exploring its abusive conduct in connection with the opioid industry.[319]

3    424.   As one commentator noted, McKinsey's conduct suggests that it "behaves as if it

4  believes the rules should bend to its way of doing things, not the other way around."[320]

5    **F.**    **McKinsey's Efforts to Increase the Overall Size of the Opioid Market: the**
       **Larger the Pie, the Larger the Slice**

6

7    425.   McKinsey advised multiple opioid manufacturers regarding how to grow opioid

8  sales. In order to benefit all its clients, McKinsey engaged in efforts to grow the entire opioid

9  market, and not only each individual client's share of it. The theory, basically, is that a rising tide

10  lifts all boats.

11    426.   For example, Purdue incentivized its sales staff "to increase not just sales of

12  OxyContin but also generic versions of extended release oxycodone." Typically, one would not

13  wish to encourage the sales of generic competitors that offer a similar product to one's own. If,

14  however, the goal is to position a company so as to look like an attractive acquisition target, the

15  growth of the overall opioid market is just as important as one's own market share: "Whereas

16  pharma salespeople are usually compensated based on their ability to grow sales of a particular

17  medicine, part of the bonus for Purdue's staff was calculated in relation to the size of the overall

18  market."[321] McKinsey designed that plan.[322]

19

20  [318] Hassan Letter.
   [319] Maloney Letter.
21  [320] Ian MacDougall, *How McKinsey Makes Its Own Rules*, *ProPublica* (Dec. 14, 2019), available at
   https://www.propublica.org/article/how-mckinsey-makes-its-own-rules
22  [321] *See* David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times, September 9,
   2018, *available at*: https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
23  [322] Worth noting is that this strategy of increasing overall opioid sales directly benefitted the Sacklers through their
   ownership of Rhodes Pharma, a generic opioid manufacturer. Naturally, McKinsey worked with the Sacklers in
24  connection with Rhodes as well, including proposing ideas for synergizing Purdue and Rhodes. *See, e.g.*, MCK-
   MDL2996-0324955; MCK-MDL2996-0285201. Especially worth noting is that this strategy also benefitted
25  McKinsey's other opioid clients as well. As one observer wrote: "They have a huge amount of inside information,
   which raises serious conflict issues at multiple levels," stated a former consultant, referring to McKinsey's influential
26  role as advisor to multiple participants in a given industry, such as opioid manufacturing. It "puts them in a kind of
   oligarchic position." Michelle Celarier, *The Story McKinsey Didn't Want Written*, Institutional Investor, July 8, 2019,
27  *available at:* https://www.institutionalinvestor.com/article/b1g5zjdcr97k2y/The-Story-McKinsey-Didn-t-Want-
   Written.
28    For example, in an August 15, 2013 presentation to Purdue management entitled "Identifying OxyContin
   Growth Opportunities," McKinsey noted that "McKinsey's *knowledge of the ways other pharma companies operate*

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

427.    This notion that the size of a company's market share is not as important as the size of the *overall* market in which it competes is a core insight of McKinsey's granular approach to identifying corporate growth opportunities. Describing their authors' conclusions in *The Granularity of Growth,* McKinsey stated, "One of their most surprising conclusions is that increased market-share is seldom a driver of growth. They contend, instead, that growth is driven by where a company chooses to compete: which market segments it participates in . . . the key is to focus on granularity, to breakdown big-picture strategy into its smallest relevant components."[323]

428.    In other words, "Purdue's marketing force was indirectly supporting sales of millions of pills marketed by rival companies."[324] "It's the equivalent of asking a McDonald's store manager to grow sales of Burger King and KFC," stated a government official with the Department of Health and Human Services.[325]

### G.    McKinsey's Work Kills People.

429.    The deceptive marketing strategies McKinsey developed and helped to implement were successful. Its granular growth tactics, myopically focused on increased revenues for its clients, substantially contributed to an explosion in the use of opioids across the country. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and as of 2016, 20% of office visits for non-cancer pain included the prescription of an opioid.[326]

430.    In 2009, Dr. Van Zee identified the *precise tactics* that McKinsey deployed for all of its opioid clients, including Purdue, as a source of OxyContin misuse and abuse, and suggested that regulation may be appropriate to curtail the use of the McKinsey's tactics: "The use of prescriber profiling data to target high-opioid prescribers—coupled with very lucrative incentives

---

suggests Purdue should reassess the roles of MSL and HECON Groups – and further drive the salesforce to be more responsive to formulary coverage changes." (emphasis added).
[323] *The granularity of growth*, Book Excerpt, McKinsey & Company, March 1, 2008, *available at*: https://www mckinsey.com/business-functions/strategy-and-corporate-finance/our-insights/the-granularity-of-growth
[324] *See* David Crow, *How Purdue's 'one-two' punch fueled the market for opioids*, Financial Times, September 9, 2018, *available at*: https://www ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c
[325] *Id*.
[326] Deborah Dowell, Tamara M. Haegerich, and Roger Choi, *CDC Guideline for Prescribing Opioids for Chronic Pain – United States, 2016*, CDC (March 18, 2016), https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

for sales representatives—would seem to fuel increased prescribing by some physicians—perhaps the most liberal prescribers of opioids and, in some cases, the least discriminate."[327]

431.    In time, additional evidence mounted supporting the conclusion that McKinsey's tactics were demonstrably exacerbating the nationwide opioid crisis. One way of demonstrating the link between aggressive sales and marketing of opioids and worsened mortality outcomes arose out of a quirk of Purdue's own marketing tactics.

432.    In 1996, when OxyContin was introduced, five states maintained "triplicate" programs that required prescribers of Schedule II controlled substances to fill out prescriptions in triplicate.[328] One of the triplicate copies would then be filed with the state agency in charge of maintaining a prescription database intended to monitor diversion and other potential issues relating to the over-dissemination of Schedule II narcotics. Because Purdue viewed these triplicate requirements as an overly burdensome hindrance on prescribing, the company chose to focus its marketing efforts in other states that did not impose these constraints.

433.    This resource-allocation decision by Purdue to focus more marketing efforts in states with fewer regulations regarding the prescribing of controlled substances provided a way to test whether *marketing* of OxyContin, by itself, was a cause of not only increased overdose rates for OxyContin, but of *all* opioid-related overdoses, *including* those involving illicit opioids such as heroin and fentanyl.

434.    The results were stark. In 2019, economists from the University of Pennsylvania, Notre Dame, and the RAND Corporation analyzed the disparate outcomes in overall opioid overdose mortality experienced in the triplicate states where Purdue did not primarily focus its marketing efforts and non-triplicate states where Purdue did primarily focus those efforts.[329]

435.    The economists found that "OxyContin distribution was about 50% lower in 'triplicate states' in the years after the launch. While triplicate states had higher rates of overdose

---

[327] Art Van Zee, The Promotion and Marketing of OxyContin: Commercial Triumph, Public Health Tragedy, 99 AM. J. PUB. HEALTH 221, 221, 224 (Feb. 2009), https://www ncbi nlm.nih.gov/pmc/articles/PMC2622774/pdf/221.pdf.
[328] Patrick Radden Keefe, *Empire of Pain*, Pg. 407.
[329] Abby E. Alpert, William N. Evans, Ethan M.J. Lieber, and David Powell, *Origins of the Opioid Crisis and its Enduring Impacts*, NBER Working Paper No. 26500, November 2019, *available at*: https://www.nber.org/papers/w26500

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

deaths prior to 1996, this relationship flipped shortly after the launch [of OxyContin] and triplicate states saw substantially slower growth in overdose deaths, continuing even twenty years after OxyContin's introduction. *Our results show that the introduction and marketing of OxyContin explain a substantial share of overdose deaths over the last two decades.*"[330]

436.    A 2017 *Journal of American Medical Association* study found that physicians ordered fewer promoted brand-name medications and prescribed more cost-effective generic versions if they worked in hospitals that instituted rules about when and how pharmaceutical sales representatives were allowed to detail prescribers.[331] The changes in prescribing behavior appeared strongest at hospitals that implemented the strictest detailing policies and included enforcement measures. Another study involved the research of four different practices which included visits by sales representatives, medical journal advertisements, direct-to-consumer advertising, and pricing, and found that sales representatives have the strongest effect on driving drug utilization. An additional study found that doctor meetings with sales representatives are related to changes in doctor prescribing practices and requests by physicians to add the drugs to hospitals' formularies.

437.    A more recent *Journal of American Medical Association* study analyzed the Centers for Medicare and Medicaid Services' Open Payments database regarding pharmaceutical company marketing efforts towards doctors, as well as CDC data on prescription opioid overdose deaths and prescribing rates, in order to assess whether pharmaceutical marketing of opioids to physicians affected the rate of prescription opioid overdose deaths. Notably, the study analyzed these marketing practices beginning August 1, 2013 and ending December 31, 2015.[332]

438.    Those dates are significant, as the study captures the same timeframe that McKinsey's Project Turbocharge, re-christened E2E, was implemented.

---

[330] *Id.* (emphasis added).
[331] Ian Larkin et al., *Association Between Academic Medical Center Pharmaceutical Detailing Policies and Physician Prescribing*, 317 J. Am. Med. Ass'n 1785 (2017).
[332] Scott E. Hadland *et. al.*, *Association of Pharmaceutical Industry Marketing of Opioid Products with Mortality from Opioid-Related* Overdoses, JAMA Network, January 18, 2019, *available at:* https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2720914.

2331554.1
4857-5942-6172.v1

439.    The study noted "physician prescribers are the most frequent source of prescription opioids for individuals who use opioids nonmedically."[333]

440.    The study found that "increased county-level opioid marketing was associated with elevated overdose mortality 1 year later, an association mediated by opioid prescribing rates; per capita, *the number of marketing interactions with physicians demonstrated a stronger association with mortality* than the dollar value of marketing."[334]

441.    Referring to the sales and marketing tactics McKinsey specialized in implementing, the authors concluded, "amid a worsening opioid crisis, our results suggest that industry marketing to physicians may run counter to current efforts to curb excessive opioid prescribing."[335]

442.    The authors' proposed solution was plain and simple, and echoed Dr. Van Zee's congressional testimony from 2002: "Pharmaceutical companies might also consider, as one manufacturer recently did, *voluntarily ceasing marketing opioid products directly to physicians*."[336]

443.    The dangers of opioids were known to McKinsey at the time it engaged in the misconduct described in this Complaint. The addictive potential of opioids and the need for control and restraint in their use was internally understood, as was the likelihood of large-scale opioid addiction, abuse, overdoses, illness, and early death resulting from sharply increased use.

444.    McKinsey also performed its own research in evaluating the anticipated effects of Project Turbocharge. An April 2014 implementation update observed an increase in sales calls, as well as that "OxyContin [health care providers] with increased calls consistently outperform HCPs with decreasing or no change in call frequency."

445.    The evidence of a direct link between increased opioids marketing and sales and increased opioid abuse was everywhere. A 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[337]

---

[333] *Id.*
[334] *Id*. (emphasis added)
[335] *Id.*
[336] *Id*. (emphasis added).
[337] Theodore J Cicero *et al.*, *Relationship Between Therapeutic Use and Abuse* of *Opioid Analgesics in Rural,*

2331554.1
4857-5942-6172.v1

McKinsey evidently understands this. In a September 2016 online article, McKinsey asserts that "[t]here is no doubt that more consistent use of best practices – across geographic areas, institutions, and clinicians – would provide tremendous help in combating the crisis" and describes certain examples of such practices as "successful in reducing prescribing."[338]

446.   There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[339] The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[340]

447.   In a 2016 report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for the majority of overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to reverse the epidemic of opioid drug overdose deaths and prevent opioid-related morbidity."[341]

448.   Compounding the harm from deceptive marketing, McKinsey worked with Purdue to continue and grow the opioid sales of prescribers that raised red flags of diversion, despite Purdue's legal obligations to report and halt supply. In doing so, it enabled an oversupply of opioids, which allows non-patients to become exposed to opioids, and facilitates access to opioids for both patients who could no longer access or afford prescription opioids and addicts struggling with relapse.

449.   Most of the illicit use originates from prescribed opioids. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

---

*Suburban, and Urban Locations in the United States*, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007), available at https://onlinelibrary.wiley.com/doi/10.1002/pds.1452.

[338] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic

[339] Dart, MD, *et al.*, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, New Engl. J. Med., 372:241-248 (Jan. 15, 2015).

[340] Califf, MD, *et al.*, *A Proactive Response to Prescription Opioid Abuse,* New Engl. J. Med. (Apr. 14, 2016).

[341] CDC, January 1, 2016 Morbidity and Mortality Weekly Report; Rudd, Rose A., *et al.* "Increases in drug and opioid overdose deaths – United States, 2000–2014." American Journal of Transplantation 16.4 (2016): 1323-1327.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

450.     As McKinsey itself has recognized in citing a study reaching this conclusion, roughly 80% of heroin users previously used prescription opioids.[342] As many as one in four patients who receive prescription opioids long-term for chronic pain in primary care settings struggles with addiction. And, the link between prescription narcotic painkiller abuse and subsequent and/or simultaneous heroin abuse continues to grow.

451.     In fact, people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin. The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. A more recent, and even more deadly problem stemming from the prescription opioid epidemic involves fentanyl, a powerful opioid prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Plaintiffs' communities.

452.     Carfentanil, a powerful derivative of fentanyl, has increasingly been found in heroin and fentanyl sold illicitly. Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants, and has been researched as a chemical weapon. A dose the size of a grain of salt can rapidly lead to deadly overdose in humans.

453.     No demographic is untouched by this epidemic. Nationally, one in five deaths among younger adults in 2016 involved opioids, according to one study. And, deaths involving both prescription and illicit opioids have risen sharply, nearly doubling since 2009.

454.     Opioids were involved in 42% of all fatal drug overdoses in 2015, and another 25% involved heroin. According to the CDC, between 1999 and 2015, more than 183,000 people died in the United States from prescription-related overdoses.

455.     Rising opioid use and abuse have negative social and economic consequences far beyond overdoses in other respects as well. According to a recent analysis by a Princeton University economist, approximately one out of every three working age men who are not in the labor force take daily prescription pain medication. The same research finds that opioid prescribing alone accounts for 20% of the overall decline in the labor force participation for this

---

[342] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic

1  group from 2014 to 2016, and 25% of the smaller decline in labor force participation among

2  women. Many of those taking painkillers still said they experienced pain daily.

3  **H.    McKinsey Knew that OxyContin Was Highly Abusable, Addictive, and**
   **Dangerous, and that Its Marketing Strategies Increased Those Harms.**

4

5  456.    McKinsey continued working with Purdue long after the severity of the opioid

6  crisis was well known. McKinsey knew that high dose OyxContin prescriptions carried a serious

7  risk of overdose. In 2017, over half of Purdue's opioids prescriptions exceeded the ninety mg

8  morphine equivalence threshold a day—the recommended maximal dose per the 2016 CDC

9  Guideline for Prescribing Opioids for Chronic Pain.

10  457.    Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By

11  that time, McKinsey had access to public information indicating that OxyContin and other

12  opioids pose significant risk of addiction and misuse.

13  458.    McKinsey was well aware of the risks of OxyContin based on its extensive

14  experience in the pharmaceutical industry, close collaboration with Purdue, and participation in

15  the regulatory submissions for reformulated OxyContin.[343]

16  459.    The first bullet point of Purdue's 2007 "Observations and Activities Requiring an

17  [Abuse, Diversion, and Detection] Report" was "[a]n apparent pattern of an excessive number of

18  patients for the practice type[.]"[344] Thus, McKinsey knew or should have known that there was a

19  higher risk of abuse and diversion among high-volume prescribers.

20  460.    What is more, on September 13, 2013 McKinsey briefed Purdue on the ongoing

21  concerns regarding OxyContin addiction and diversion among prescribers:

22

23

24

25

26  _____

27  [343] McKinsey ████████████████████████████████████████████████████ PPLPC0390000347612 (

28  ████████████████████); McK-MAAG-0118819 (email chain).
[344] PPLPC010000033944.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1

2

3

**Findings on messaging and positioning**                     |PRELIMINARY|

- Opioids overall are still viewed as effective and necessary class of painkillers, though side effects and addiction are concerns
- Key themes from prescriber interviews on abuse deterrents include:
  – Prescriber awareness of abuse deterrence and label change is mixed
  – Opinions on impact/efficacy of abuse deterrence vary
  – Most prescribers are concerned about abuse, but attempt to establish measures to protect themselves
  – Concerns remain that technology does not address oral abuse
  – Less informed prescribers ask for additional information and education around abuse deterrent formulations
- Existing market research suggests that most physicians do not feel that reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers

McKinsey & Company | 27

461.     In a PowerPoint slide entitled "Findings on messaging and positioning," part of a presentation to Purdue entitled "OxyContin growth opportunities: Phase 1 Final Report: Diagnostic," McKinsey noted that "most prescribers are concerned about abuse," and that "most physicians do not feel that [OxyContin] reformulation positively impacts their prescribing behavior, and that diversion, abuse and regulatory concerns continue to weigh on prescribers."

462.     In an August 2017 presentation, McKinsey recognized that the opioid epidemic was "triggered, in large part, by a massive increase in prescribed opioids in the early 2000's."

463.     McKinsey's presentations to Purdue included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

464.     Indeed, one reason that *Purdue* had knowledge that their own products were addictive and dangerous is because McKinsey told them.

465.     If McKinsey was not aware of the adverse consequences of OxyContin, the drug it was paid to sell, such ignorance could not survive the granular reality of its relationship with

Purdue. For example, in June 2009, McKinsey worked to "counter the emotional messages from mothers with teenagers that overdosed on OxyContin."[345]

466.    Within a few years of countering these emotional messages, McKinsey even developed a method to identify geographic hot spots of OxyContin abuse and diversion. Once developed, however, McKinsey simply never used it to decrease these harms.

467.    Paul Coplan ████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████[346]

468.    In deposition testimony in prior opioid-related litigation, Coplan was asked, "While you were at Purdue, did Purdue make an effort to identify hot spots for opioid abuse and addiction or not?"[347]

469.    "█████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████"[348]
█████████.[349]

470.    ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████
████████"[350]

471.    Instead, McKinsey focused on increasing opioid sales for its clients, despite knowing the harmful consequences of doing so. In yet another indication that OxyContin sales should not be turbocharged: during McKinsey's work for Purdue, Purdue was unable to purchase product liability insurance to cover its practice of selling OxyContin.

---

[345] PDD8901645845.
[346] Paul M. Coplan 1/18/19 Dep. Tr. At 16:18 -17:17.
[347] *Id.* at 355:10.
[348] *Id.* at 355:14–356:11.
[349] *Id.* at 357:8-16.
[350] *Id.* at 357:22–358:6.

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

472.    The basic premise of McKinsey's work put it on notice of the harmful consequences that would ensure. It was tasked with advising a monoline manufacturer of opioids about sales and marketing practices for its addictive products while that manufacturer was bound by a five-year Corporate Integrity Agreement covering the very same opioid sales and marketing practices. In 2012, OxyContin accounted for 94% of Purdue's revenue.[351] As late as 2018, it remained 84% of Purdue's revenue.[352] According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."[353] In 2015 alone, it obtained $3 billion in annual opioid sales—a four-fold increase from its 2006 sales of $800 million.

473.    McKinsey's mandate was to increase Purdue's opioid sales during a time when Purdue was obligated to restrict its previous marketing strategies because those strategies had caused the *overprescribing of opioids* and the inevitable consequences thereof. McKinsey's job was to counter the intended results of the Corporate Integrity Agreement; to devise strategies to sell as many pills as conceivably possible. Under McKinsey's tutelage, Purdue's growth continued its upward trajectory unabated, the Corporate Integrity Agreement notwithstanding.

**I.    McKinsey Portrays Itself as Part of a Solution to a Problem It was Integral in Creating.**

474.    McKinsey's work on the other side of the aisle—helping clients address opioid abuse and addiction—further proves that it was well aware of the risks of OxyContin, and thus the risks of pushing OxyContin sales and high dose sales, and targeting the highest-volume prescribers. McKinsey advised Purdue on "Project Tango," a 2014 plan to enter the addiction drug market.[354] McKinsey noted the ███████████████████████████████████████████████████████████████████████████████"[355]

---

[351] Gerald Posner, *Pharma,* pg. 524 (Simon & Schuster 2020).
[352] *Id.*
[353] https://www.justice.gov/opa/press-release/file/1329571/download
[354] *See* David Armstrong, OxyContin Maker Explored Expansion Into "Attractive" Anti-Addiction Market, ProPublica (Jan. 30, 2019), *available at* https://www.propublica.org/article/oxycontin-purdue-pharma-massachusetts-lawsuit-anti-addiction-market.
[355] PPLPC023000714734.

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

475.     More than assisting specific clients with addressing the crisis itself, McKinsey saw the ongoing opioid crisis as an opportunity to posture itself as contributing more broadly to *society*. McKinsey likes to think of itself as a change agent capable of solving problems that truly matter, and the opioid crisis is one McKinsey realizes matters. Dr. Sarun Charumilind, a McKinsey partner in Philadelphia, "has led the firm's support to clients and *society* to combat the opioid crisis.[356]

476.     In Detroit, partner Razili Lewis also helps "clients and *society* combat the opioids crisis." She does so by providing "insights, expertise, analytics, and technology."[357]

477.     Over in Cleveland, senior partner Tom Latkovic also "helps clients and *society* combat the opioids crisis."[358]

478.     Kana Enomoto, a senior expert in Washington, D.C., is a "national leader in mental health and substance-use policy," who acted as a "content director" on a study to "raise awareness about opioid-use disorders." She also provided strategic guidance to the United States Surgeon General regarding efforts to "combat the opioid epidemic" when she was his Chief of Staff.[359]

479.     McKinsey consistently states that it takes its obligations to society seriously. Indeed, the firm has established a center:[360]

> The Center for Societal Benefit through Healthcare was established to build on the long-standing mission of McKinsey's Public & Social Sector and Healthcare Systems & Services Practices to improve healthcare. The Center's work is funded solely by McKinsey; it is not commissioned by any business, government, or other institution. The Center brings a range of capabilities to bear, including McKinsey's healthcare expertise, advanced analytics, functional knowledge, technology assets, network, and investment capacity.

> The Center aspires to collaborate with other organizations to drive positive innovation to improve overall health and well-being and reduce healthcare disparities.

---

[356] *See* https://www.mckinsey.com/our-people/sarun-charumilind
[357] *See* https://www.mckinsey.com/our-people/razili-lewis
[358] *See* https://www.mckinsey.com/our-people/tom-latkovic
[359] *See* https://www.mckinsey.com/our-people/kana-enomoto
[360]     *See*     https://www.mckinsey.com/industries/healthcare-systems-and-services/how-we-help-clients/center-for-societal-benefit-through-healthcare/overview

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

480.    The Center has focused on addressing the impacts of the opioid crisis on society. One of the metrics that McKinsey uses to track the opioid crisis *as a matter of public health* is the "opioid prescribing rate" per 100 people in every county in the United States.[361]

481.    As McKinsey's data visualization makes clear, there is an association between areas with higher opioid prescribing rates and higher instances of opioid use disorder.

482.    The Center's data visualization is also reminiscent of similar work McKinsey did for Purdue in 2013, although the analysis McKinsey did for Purdue was more granular, analyzing opioid prescribing patterns on the *zip-code* level in all 50 states, as opposed to the county level:[362]



---

361    *See*    https://csbh-dashboard.mckinsey.com/#/data-insights?chart=SC&geo=County&lob=All&metric1=opioid_rxrate&metric2=oud&tab=Map
362 MCK-MAAG-0024283.

2331554.1
4857-5942-6172.v1

483.     In other words, the "opioid prescribing rate" was a metric McKinsey worked with its client to boost for years. Now McKinsey measures the extent of the crisis by the same metric:



484.     Meanwhile, McKinsey has partnered with Shatterproof, a national non-profit organization dedicated to reversing the addiction crisis in the United States, to prepare a report on overcoming stigma associated with opioid use disorder.[363] McKinsey touts the Shatterproof partnership on its webpage as an example of "our societal impact."[364]

485.     In August 2017, McKinsey prepared a presentation entitled "Perspectives on Combatting the Opioid Crisis," which referenced its work on combatting opioid addiction for various other entities:

---

[363] See https://www.shatterproof.org/sites/default/files/2020-07/A-Movement-to-End-Addiction-Stigma.pdf
[364] See https://www.mckinsey.com/us/our-societal-impact

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

**RECENT CLIENT EXPERIENCE**

》 Designed and helped launch a health home program to expand resources and accountability for **substance abuse treatment**

》 Conducted a **state wide assessment of opioid prescriber performance** in terms of prescribing rate, dosage, and duration

》 Defined clinically relevant opioid quality measures for a **portfolio of episodes-of-care**

》 Defined clinically relevant opioid quality measures for a **Patient Centered Medical Home and Accountable Care Organizations**

》 Used predictive analytics to develop multi-faceted approach to **assess patient risk** for opioid addiction

》 Used geo-spatial and social network analytics to **assess intensity of opioid abuse and treatment needs**

》 Integrated claims and PDMP data to **generate transparency on provider prescribing practices**

》 Developed a **substance abuse episode of care** focused on priority patient journeys

486.   In June 2018, Dr. Charumilind and Mr. Latkovic, along with fellow McKinsey partner Elena Mendez-Escobar, published a public report, "Ten insights on the Opioid crisis from claims data analysis," stating information about the risks of opioids that McKinsey knew while advising Purdue to sell more opioids and higher dose opioids, and target the highest volume prescribers:

a.     "Providers frequently prescribe opioids to patients with known or potential risk factors for abuse[;]"

b.     "Approximately 35% of the patients given opioid prescriptions in our analysis had features that put them at increased risk for opioid abuse[;]"

c.     "Most opioids are prescribed by providers other than the natural 'quarterback' of a patient's underlying complaint or condition. . . . This finding makes clear that high-dose prescribers and multi-prescriber patterns are separate issues—and both are important to address[;]" and

d.     "A small portion of opioid use originates in emergency departments."[365]

---

[365] https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/ten-insights-on-the-us-opioid-crisis-from-claims-data-analysis

487.     Two months later, the same authors, joined by Ms. Lewis, published "Why we need bolder action to combat the opioid epidemic."[366] "Our research suggests that much broader – and bolder – action is required," they announced.[367]

**J.     Coda**

488.     Marvin Bower, the McKinsey legend who admonished, "Deliver bad news if you must, but deliver it properly," died in 2003, one year before the firm began working with Purdue.

489.     McKinsey's work with Purdue would have been unrecognizable to Bower, one of the founders of modern management consulting. Instead of acknowledging the elephant in the room—that Purdue's business was knowingly maximizing the amount of addictive and deadly opioids sold in the United States—and delivering that bad news promptly properly to the client, McKinsey instead committed to partner with Purdue to maximize opioid sales without regard to the consequences.

490.     On October 23, 2017, the president of the United States declared the ongoing nationwide opioid epidemic a "public health emergency." Even at this late hour in the crisis, McKinsey continued to propose solutions to the Sacklers and Purdue to further boost opioid sales. These solutions were fashioned, in perfect McKinsey parlance, as "high impact interventions to rapidly address market access challenges."

491.     Less than two months after the public health emergency declaration, McKinsey proposed these high impact interventions to Purdue and its board. Among them was perhaps McKinsey's most audacious gambit of the entire Purdue relationship: paying money— "rebates"—to health insurers whenever someone overdosed on Purdue's drug.

492.     These payments for future OxyContin overdoses were christened "Event-Based contracts."[368]

---

[366] *See* https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic

[367] *Id.*

[368] "Consultant-ese," when applied to work as grim as maximizing opioid sales in the face of a national disaster, led one former McKinsey consultant to state: "This is the banality of evil, M.B.A. edition." Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, New York Times, November 27, 2020, *available at*: https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids html

2331554.1
4857-5942-6172.v1

493.     Helpfully, McKinsey provided estimates for the future costs of these "events."[369] McKinsey noted that, if Purdue were to start making overdose payments, it would "need to determine which payment amount is optimal."

494.     A "meaningful" amount, according to McKinsey, would be somewhere between six and fifteen thousand dollars for each person who overdoses or develops opioid-use disorder as a result of Purdue's drugs:



495.     The money would be paid to health insurers for the increased costs of additional medical services that resulted from the fact that Purdue's medications caused opioid-use disorder and overdoses in people whose health care costs were the payors' obligation. The money McKinsey proposed Purdue pay out in these circumstances would not go to the individuals afflicted, nor the estates of the dead.

496.     McKinsey's analysis also suggested that it could predict the number of people who would become addicted to opioids or overdose on pills sold through Purdue's downstream

---

[369] McKinsey defined an "event" as "first occurrence for overdose or opioid use disorder."

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1   customers. McKinsey "projected that in 2019, for example, 2,484 CVS customers would either

2   have an overdose or develop an opioid use disorder."[370]

3       497.    It is little surprise, then, that McKinsey was concerned with its legal liability for

4   this work. Within months of recommending "event-based contracts" to Purdue, Martin Elling

5   raised this concern with Arnab Ghatak and suggested corrective action: destroying evidence.

6

7   **Message**

8   From:       Martin Elling [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP
                (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=6B33C3264F744B04AF05FA59341271BE-MARTIN ELLI]

9   Sent:       7/4/2018 12:10:13 PM

    To:         A G [drarnabghatak@gmail.com]

10  Subject:    Re: [EXT]Re: Howdy

11

    Have a great fourth.  M

12  > On Jul 4, 2018, at 2:01 PM, A G <drarnabghatak@gmail.com> wrote:
    >
13  > Thanks for the heads up.  Will do.
    >
14  >> On Jul 4, 2018, at 7:57 AM, Martin Elling <martin_elling@mckinsey.com> wrote:
    >>
    >> Just saw in the FT that Judy Lewent is being sued by states attorneys general for her role on the
    Purdue Board.  It probably makes sense to have a quick conversation with the risk committee to see if we
15  should be doing anything other that eliminating all our documents and emails.  Suspect not but as things
    get tougher there someone might turn to us.  M
    >>
16  >> +===============================================================+
    >> This email is confidential and may be privileged. If you have received it
    >> in error, please notify us immediately and then delete it.  Please do not
17  >> copy it, disclose its contents or use it for any purpose.
    >> +===============================================================+

18      498.    Elling's prediction that things would "get tougher" for Purdue would prove

19  prescient.

20          1.      **Guilty Again - 2020**

21      499.    On October 20, 2020, Purdue—McKinsey's co-conspirator—agreed with the

22  United States Department of Justice to plead guilty to improper marketing of OxyContin and

23  other opioids again (the "2020 Settlement Agreement"). This time the plea agreement concerned

24  conduct from 2010 to 2018. The agreement includes $8.3 billion in penalties from Purdue and

25  $225 million from the Sackler family.

26

27  _____

    [370] Walt Bogdanich and Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin

28  Overdoses*, N.Y. Times (Nov. 27, 2020, updated Dec. 17, 2020), https://www.nytimes.com/2020/11/27/business/
    mckinsey-purdue-oxycontin-opioids html

2331554.1
4857-5942-6172.v1

- 119 -

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

500.     Purdue pleaded guilty to a dual-object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 331, 353, violating anti-kickback laws, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids— frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

501.     The new plea agreement does not identify Purdue's co-conspirators, and McKinsey is not identified by name in the agreement. Instead, McKinsey is referred to as the "consulting company."

502.     Purdue's new guilty plea concerns Covered Conduct (as defined in the plea agreement) that directly implicates McKinsey in the conspiracy. It is the same conduct described in this Complaint.

503.     Indeed, the plea agreement signed by McKinsey's co-conspirator states bluntly: "Purdue, *in collaboration with [McKinsey]*, implemented many of [McKinsey's] recommendations." (emphasis added).

504.     Further, Purdue admitted that E2E "*was overseen by [McKinsey]* and some of Purdue's top executives through the creation of the E2E Executive Oversight Team ('EOT') and Project Management Office ('PMO')" (emphasis added).

### 2.     A Mea Culpa

505.     On December 5, 2020, six weeks after Purdue's second guilty plea, McKinsey issued a rare public statement regarding its work with a specific client on its website. The client was Purdue, and the statement was issued is response to Purdue's second guilty plea and recent media reports regarding McKinsey's work selling OxyContin after 2007:

2331554.1
4857-5942-6172.v1

# McKinsey statement on its past work with Purdue Pharma

*December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

506.    As the statement indicates, McKinsey stopped doing work "anywhere in the world." Given that Purdue's operations addressed only the United States, the global reach of McKinsey's regret is noteworthy.

507.    In August 2013, when the Sacklers adopted McKinsey's "Project Turbocharge" for Purdue, Tim Reiner, a long-time McKinsey consultant, joined Mundipharma. Mundipharma is a separate company—also owned by the Sacklers—that sells opioids internationally.

508.    As late as 2019, Mundipharma has been asserting many of the same misleading claims about opioids that previously led to criminal liability in the United States.[371] McKinsey has long assisted the Sacklers in growing Mundipharma's opioids market.[372] By 2015, McKinsey's workload with Mundipharma was large enough to merit formal coordination and incorporation with the overall McKinsey team servicing the Purdue account. Around this time, McKinsey's Elling agreed to assume "a real operational DCS" role with respect to the work that McKinsey was performing for the various Sackler interests, including "integrat[ing] the

---

[371] *See* Kinetz, Erika, *Fake doctors, pilfered medical records drive OxyChina sales*, Associated Press, November 19, 2019, *available at*: https://apnews.com/article/4122af46fdba42119ae3db30aa13537c

[372] *See, e.g.*, MCK-MDL2996-0256120; MCK-MDL2996-0327127; MCK-MDL2996-0183279; MCK-MDL2996-0238998; MCK-MDL2996-0286490.

2331554.1
4857-5942-6172.v1

- 121 -

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

Mundipharma stuff." [373] Even if the various components of the Sackler "family conglomerate" were nominally independent, McKinsey consolidated its own treatment of its work for all of these companies as serving just a single client.

### 3.     A Hedge Fund

509.     On February 4, 2021, forty-nine state attorneys general announced a multistate settlement with McKinsey related to its work for opioid manufacturers. McKinsey agreed to pay almost $600 million dollars. At the time of the announcement, most of the participating states each filed a complaint and consent decree finalizing the settlement.

510.     Three days after the settlement, it came to light that McKinsey appears to have benefitted from its work promoting opioids not only through the fees paid to McKinsey by its clients, but also through investments in opioid-related business made by McKinsey's own hedge fund, the McKinsey Investment Office ("MIO"). MIO is the hedge fund referenced above, with respect to McKinsey's investment in Teva Pharmaceutical.

511.     Consultants don't typically have in-house hedge funds overseeing retirement accounts and partners' personal investments. In fact, McKinsey is the only one. "Most large companies, including all the major consulting firms, hire third-party firms . . . to oversee their employees' retirement accounts."[374] MIO manages approximately $31 billion on behalf of McKinsey partners, employees, and former partners.[375]

512.     Through MIO, McKinsey was heavily invested in the opioid industry, and stood to gain financially from the continuation of the opioid crisis. It even invested in opioid addiction treatment businesses—a growing industry, as McKinsey knew.

---

[373] MCK-MDL2996-0210149

[374] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969

[375] SEC Order dated November 19, 20201 at Para. 5, available a*t:* https://www.sec.gov/litigation/admin/2021/ia-5912.pdf. That $31 billion under management would make MIO Partners the thirteenth largest hedge fund on Earth. *See* https://www.pionline.com/interactive/largest-hedge-fund-managers-2021.

2331554.1

4857-5942-6172.v1

- 122 -

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

513.   In short, "during the years McKinsey was helping opioid makers propel sales of the drugs, MIO Partners held stakes in companies that profited from increased usage."[376]

514.   To understand MIO, an organizational chart of McKinsey is helpful:



515.   MIO Group, Inc., and MIO Partners, Inc. are directly-owned subsidiaries of McKinsey & Company, Inc. Given that McKinsey advises countless large corporations, McKinsey's hedge fund inevitably invests in McKinsey's clients.

516.   MIO manages money for pension plans sponsored by McKinsey in which current and former McKinsey employees participate, as well as privately-offered investment funds available to partners and former partners. Today, nine of MIO's eleven directors are current or former McKinsey partners. Prior to 2017, there were no outside directors at MIO.

517.   MIO structures its investment activities in three principal ways: (1) approximately 50-60% of MIO's assets are managed by third-party money managers, who have sole discretion on what securities to buy with MIO's money, and where MIO may or may not have information regarding which securities the third-party money manager has purchased for MIO's benefit; (2)

---

[376] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969

2331554.1
4857-5942-6172.v1
- 123 -
MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

"separately managed accounts," comprising approximately 40% of MIO's holdings, are portfolios of securities managed by a third-party money manager, but where MIO "knows what securities are held through each account," and; (3) direct investments, where MIO invests its own money directly, which comprises approximately 10% of MIO's investments.

518.    In other words, for *at least 40*% of MIOs holdings, McKinsey partners are able to know the specific investments held by the various MIO funds. "MIO has a ledger for every security in their managed accounts."[377] That comprises a pool of capital worth more than $6 billion.

519.    MIO is run for the benefit of McKinsey's partners and, to a separate extent, McKinsey's employees. Those individuals (and, crucially, former McKinsey partners) invest their own money in MIO, and their access to those investment opportunities constitutes a meaningful and important component of those individuals' compensation. MIO has, "at a minimum, the ability to view the individual securities that account for approximately 40 to 50 percent." This is approximately $6 billion dollars of invested capital. What is more, MIO *directly invests* approximately 10% of its assets. That is $1.5 billion MIO directly invests in securities without the use of any outside money manager. These numbers exclude leverage.

520.    From a conflicts perspective, the fact that *former* partners may participate in MIO investments merits consideration. With respect to McKinsey's opioid investments, it is notable to consider just who some of those "former partners" are. As noted above, Rajiv de Silva, Chief Executive Officer of opioid defendant Endo Pharmaceuticals, is a former McKinsey partner. Kare Shultz, Chief Executive Officer of opioid defendant Teva Pharmaceutical, is a former McKinsey partner. Frank Scholz, President of opioid defendant SpecGX, a subsidiary of Mallinckrodt, is a former McKinsey partner. Marc Owen, President of opioid defendant McKesson, is a former McKinsey partner. This list is merely illustrative; it is not exhaustive.

521.    The result is the prospect of individual executives at various opioid manufacturing and distribution companies obtaining financial gain from the ongoing propagation of the opioid

---

[377] Michelle Celarier, *McKinsey's Managed Accounts Come Under Scrutiny in Trial*, Institutional Investor, February 5, 2020, *available at*: https://www.institutionalinvestor.com/article/b1k6wnn251s472/McKinsey-s-Managed-Accounts-Come-Under-Scrutiny-in-Trial

1   crisis *not* via compensation from their employers, but via participating in investments alongside

2   their *former* employer (and, in many cases, current consultant).

3       522.    Three days after McKinsey and the state attorneys general announced their

4   settlement, NBC News reported that MIO, McKinsey's hedge fund, owned opioid-related

5   investments during the time that it advised its opioid clients.

6       523.    One is Deerfield Management Co., "a $10 billion dollar health care investment

7   firm based in New York."[378] As ever, "two top Deerfield executives previously worked at

8   McKinsey." A retirement fund managed by MIO held a $108 million stake in funds managed by

9   Deerfield and invested in opioid industry participants. "In 2017, for example, Deerfield was a 6

10  percent shareholder in Mallinckrodt, a major opioid maker."[379] From 2011 through 2016,

11  Deerfield held a stake of up to $90 million in Teva. Deerfield also took stakes in the distributors

12  described above, including McKesson and Cardinal Health.[380]

13      524.    McKinsey is also invested in treatment, an inevitable growth industry sprouting

14  from the over-selling of opioids. Separate from its investments with Deerfield, MIO is also

15  invested in Adamis Pharmaceuticals, "a company that develops products to treat opioid

16  overdoses," and therefore "may also benefit from opioid settlement funds" paid by McKinsey as a

17  result of its settlement with the states. As of 2020, MIO owned 26% of the Adamis' preferred

18  shares through another outside investment manager (not Deerfield).[381] Separately, Deerfield

19  invested $331 million in Recovery Centers of America, an addiction treatment company that

20  operates facilities in states that McKinsey recently settled with.[382]

21      525.    These relationships and investments give a glimpse into the myriad means

22  McKinsey deploys to make money. Consulting is more than giving advice. Indeed, On November

23  19, 2021, MIO Partners agreed to pay an $18 million fine to the SEC due to MIO's possession of

24  material nonpublic information related to its holdings, information obtained through consulting.

25  _____

[378] Gretchen Morgenson, "Consulting giant McKinsey allegedly fed the opioid crisis. Now an affiliate may profit from

26  treating addicts.," *NBC News*, February 8, 2021, *available at* https://www.nbcnews.com/news/us-news/consulting-giant-mckinsey-allegedly-fed-opioid-crisis-now-affiliate-may-n1256969

[379] *Id*.

27  [380] *Id*.

[381] *Id*.

28  [382] *Id*.

2331554.1

4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1    **VI.    TOLLING OF STATUTES OF LIMITATIONS**

2              526.    McKinsey is equitably estopped from relying upon a statute of limitations defense.

3    Alongside its clients, McKinsey undertook active efforts to deceive the Plaintiffs and to

4    purposefully conceal its unlawful conduct and fraudulently assure the public, including Plaintiffs,

5    that opioids were non-addictive, effective, and safe for the treatment of long-term chronic pain

6    and non-acute, non-cancer pain with the goal of increased sales, greater availability and access to

7    opioids, and maximizing profits.

8              527.    McKinsey and its clients were deliberate in taking steps to conceal their

9    conspiratorial behavior and active role in the deceptive marketing of opioids. This deceptive

10   marketing—which included the above falsehoods that opioids were safer, less subject to abuse,

11   and less addictive than other pain medications—was a substantial factor in the oversupply of

12   opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

13             528.    McKinsey deliberately advised its clients on marketing strategies and tactics to

14   bolster their opioid products as non-addictive, safe, and efficacious without reliable scientific

15   evidence to support same. McKinsey's consulting services were given confidentially, and both

16   McKinsey and its clients concealed the content of those services from the public. In doing so,

17   McKinsey concealed its role in shaping, editing, and providing the content of the false and

18   misleading materials addressing pain management and opioids that were widely disseminated to

19   regulators, prescribers, and the public at large, including Plaintiffs.

20             529.    McKinsey also concealed from Plaintiffs the existence of the Plaintiffs' claims by

21   hiding it and its client's lack of cooperation with law enforcement. For example, in May 2007,

22   Purdue and three of its executives pled guilty to federal charges of misbranding OxyContin in

23   what the company acknowledged was an attempt to mislead doctors about the risk of addiction

24   and entered into a Corporate Integrity Agreement explained above. Purdue was ordered to pay

25   $600 million in fines and fees. In its plea, Purdue admitted that its promotion of OxyContin was

26   misleading and inaccurate, misrepresented the risk of addiction, and was unsupported by science.

27   Additionally, Michael Friedman, the company's president, pled guilty to a misbranding charge

28   and agreed to pay $19 million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

530.     Nevertheless, even after the guilty pleas, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations. Purdue also assembled an army of lobbyists to fight any legislative actions that might encroach on its business. Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions—eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this Complaint. McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

531.     McKinsey affirmatively sought to convince the public that its clients' legal duties to report suspicious sales of opioids had been satisfied through public assurances that they were working to curb the opioid epidemic. For example, after the 2007 Purdue guilty plea described above, McKinsey provided services to protect the company's public image and sales, aiding in the concealment of the addictive nature and dangers associated with opioid use and denying blame for the epidemic, attributing it instead solely to abuse and inappropriate prescribing. At the guidance and advice of McKinsey, Purdue and other McKinsey clients publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways, insisting they were good corporate citizens. Instead, McKinsey assisted Purdue, for example, with marketing campaigns and messaging that continued business as usual, indiscriminately targeting high prescribers and promoting opioids as safe but avoiding the pitfalls of the Corporate Integrity Agreement. These repeated misrepresentations misled regulators, prescribers, and the public, including the Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put the Plaintiffs on notice of potential claims.

532.     Plaintiffs did not discover the nature, scope, and magnitude of McKinsey's misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

533.     Prior to the applicable limitations period, Plaintiffs did not suspect, and had no reason to suspect, that McKinsey's conduct caused their injuries, including the consumption of Plaintiffs' resources as the opioid epidemic remains unabated.

534.     McKinsey intended that its actions and omissions made with its clients would be relied upon, including by the Plaintiffs. The Plaintiffs did not know and did not have the means to know the truth due to McKinsey and its clients' actions and omissions.

535.     The Plaintiffs reasonably relied on the affirmative statements developed by McKinsey and made by its clients regarding their purported compliance with their obligations under the law and consent orders, which were false and only intended to save the clients' public image.

536.     McKinsey's fraudulent concealment has tolled the running of any statute of limitations. Through it and its clients' affirmative misrepresentations and omissions, McKinsey actively concealed from Plaintiffs the risks associated with opioids that led to the opioids crisis. The wrongdoing, misrepresentations, and omissions by McKinsey has not ceased because the public nuisance remains unabated.

**VII.     HARM CAUSED TO SUBDIVISION PLAINTIFFS**

537.     By increasing opioid prescriptions and use, McKinsey fueled the opioid epidemic alongside its clients. The deceptive marketing strategies McKinsey developed and helped to implement worked, as described above. Deceptive marketing, including marketing McKinsey worked to develop and implement, substantially contributed to an explosion in the use of opioids across the country. Approximately 20% of the population between the ages of 30 and 44, and nearly 30% of the population over 45, have used opioids. Opioids are the most common treatment for chronic pain, and 20% of office visits now include the prescription of an opioid.

538.     Compounding the harms from deceptive marketing, McKinsey's strategy and implementation also expanded Purdue's role in supplying opioids beyond even what an expanded

2331554.1
4857-5942-6172.v1

market could bear. It sought to increase the sales from prescribers who would have raised red flags of potential diversion, and profiting from Purdue's role in funneling opioids into Plaintiffs' communities beyond what any legitimate market, even an expanded market for chronic pain, could bear.

539.    Scientific evidence demonstrates a close link between opioid prescriptions and opioid abuse. For example, a 2007 study found "a very strong correlation between therapeutic exposure to opioid analgesics, as measured by prescriptions filled, and their abuse."[383] McKinsey evidently understands this. In a September 2016 on-line article, McKinsey asserts that "[t]here is no doubt that more consistent use of best practices—across geographic areas, institutions, and clinicians—would provide tremendous help in combating the crisis" and describes examples of such practices as "successful in reducing prescribing."[384]

540.    There is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[385] The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[386]

541.    Compounding the harm from deceptive marketing, McKinsey worked with Purdue to continue and grow the opioid sales of prescribers that raised red flags of diversion, despite Purdue's legal obligations to report and halt supply. In doing so, it enabled an oversupply of opioids, which has allowed non-patients to become exposed to opioids, and facilitates access to opioids for both patients who could no longer access or afford prescription opioids and addicts struggling with relapse.

542.    Most of the illicit use originates from *prescribed* opioids. It has been estimated that 60% of the opioids that are abused come, directly or indirectly, through physicians' prescriptions.

[383] Theodore J Cicero *et al.*, *Relationship Between Therapeutic Use and Abuse* of *Opioid Analgesics in Rural, Suburban, and Urban Locations in the United States*, 16.8 Pharmacoepidemiology and Drug Safety, 827-40 (2007).
[384]    https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic
[385] Dart, MD, *et al.*, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, New Engl. J. Med., 372:241-248 (Jan. 15, 2015).
[386] Califf, MD, *et al.*, *A Proactive Response to Prescription Opioid Abuse,* New Engl. J. Med. (Apr. 14, 2016).

2331554.1
4857-5942-6172.v1
- 129 -
MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

543.   As McKinsey itself has recognized in citing a study reaching this conclusion, roughly 80% of heroin users previously used prescription opioids.[387] Ohio's Prescription Drug Abuse Task Force similarly has found that individuals addicted to prescription opioids often transition to heroin due to its lower cost, ready availability, and similar high. Likewise, a study by the Ohio Substance Abuse Monitoring Network reported on the connection between oxycodone use and heroin addiction, finding that "[y]oung new heroin abusers seeking treatment reported OxyContin abuse prior to becoming addicted to heroin," that several reporting resorting to heroin after OxyContin became too expensive or difficult to obtain, and that "[a]buse of OxyContin prior to the abuse of heroin appears to be a common pattern."[388]

544.   In fact, people who are addicted to prescription opioid painkillers are 40 times more likely to be addicted to heroin. The CDC identified addiction to prescription pain medication as the strongest risk factor for heroin addiction. A more recent, and even more deadly problem stemming from the prescription opioid epidemic involves fentanyl—a powerful opioid prescribed for cancer pain or in hospital settings that, in synthetic form, has made its way into Plaintiffs' communities. Carfentanil, a powerful derivative of fentanyl, has increasingly been found in heroin and fentanyl sold illicitly. Carfentanil is so strong that it is typically used in veterinary medicine to sedate large wild animals such as elephants, and has been researched as a chemical weapon. A dose the size of a grain of salt can rapidly lead to deadly overdose in humans.

545.   This epidemic of opioid addiction, abuse, and use, has caused harm to Plaintiffs and the Class. The types of harm incurred by various Plaintiff subdivisions are:

a.   Decreases in funding available for public services for which funding was lost because it was diverted to other public services designed to address the opioid epidemic;

---

[387]   https://www.mckinsey.com/industries/healthcare-systems-and-services/our-insights/why-we-need-bolder-action-to-combat-the-opioid-epidemic

[388]   Ohio Substance Abuse Monitoring Network, OSAM Rapid Response Investigation Reveals Connection Between OxyContin Abuse and Heroin Addiction in Some Individuals, *available at* http://mha.ohio.gov/Portals/Wassets/Learning/OSAMaan02ConnxtsOxy.pdf

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1      b.      Increased costs for providing healthcare and medical care, additional

2  therapeutic and prescription drug purchases, and other treatments for patients suffering from

3  opioid-related addiction or disease, including overdoses and deaths;

4      c.      Increased costs of training emergency and/or first responders and other city

5  employees in the proper treatment of drug overdoses;

6      d.      Increased costs associated with providing police officers, firefighters,

7  emergency and/or first responders, and other city employees with naloxone – an opioid antagonist

8  used to block the deadly effects of opioids in the context of overdose;

9      e.      Increased costs associated with emergency responses by police officers,

10  firefighters, emergency and/or first responders, and other city employees to opioid overdoses;

11      f.      Increased costs for providing mental-health services, treatment, counseling,

12  rehabilitation services, and social services to victims of the opioid epidemic and their families;

13      g.      Increased costs associated with the destruction of Plaintiffs' property and

14  public infrastructure, including damages caused by improper needle and syringe disposal; and

15      h.      Increased costs associated with maintaining incarceration systems,

16  including training and equipment to detect opioids being sent into the jails;

17      i.      Replacing Plaintiff-owned property damaged by, e.g., the improper

18  disposal of needles;

19      j.      Purchases of opioid antagonists to prevent overdose fatalities;

20      k.      Costs of caring for children from homes with drug abuse, including

21  children themselves addicted to opioids;

22      l.      Increased costs associated with increased drug crimes, including costs for

23  prosecutors, jail, adult probation, indigent defense, common pleas court operations, drug court

24  operations, juvenile court operations, and juvenile probation and detention;

25      m.      Increased costs associated with substance use disorder treatment, including

26  outreach, screening and assessment, outpatient counseling, intensive outpatient counseling, family

27  counseling, home-based counseling, and referral; and

28      n.      Costs associated with running needle exchanges.

1    546.    Plaintiffs seek to recover for harm caused to, and damages incurred by,

2  themselves, not for harm or damages incurred by individual residents or by the Plaintiffs' States.

3  **VIII.   CLASS ACTION ALLEGATIONS**

4    547.    Plaintiffs reallege all of the foregoing allegations and incorporate them by

5  reference as if fully set forth in their following Claims for Relief.

6    548.    Plaintiffs bring this case on behalf of themselves and as a class action under Fed.

7  R. Civ. P. 23(b)(1), 23(b)(2), 23(b)(3), and 23(c)(4) on behalf of all members of the following

8  Class:

9        any (1) General Purpose Government (including, but not limited to, a municipality,
         county, county subdivision, city, town, township, parish, village, borough, gore, or
10        any other entity that provides municipal-type government), (2) Special District
         within a State, and (3) any other subdivision, subdivision official (acting in an
11        official capacity on behalf of the subdivision) or sub-entity of or located within a
         State (whether political, geographical or otherwise, whether functioning or non-
12        functioning, regardless of population overlap, and including, but not limited to,
         nonfunctioning governmental units and public institutions).  The foregoing shall
13        specifically include but not be limited to the litigating subdivisions listed in
         Schedule A.  The foregoing shall exclude any sub-entity of Indiana, American
14        Samoa, the Commonwealth of Guam, the Commonwealth of the Northern Mariana
         Islands, the U.S. Virgin Islands, and all school districts.  "General Purpose
15        Government," and "Special District" shall correspond to the "basic types of local
         governments" recognized by the U.S. Census Bureau and match the 2017 list of
16        Governmental Units.[389]  The General Purpose Governments are county, municipal,
         and township governments.[390]   "Fire District," "Health District," "Hospital
17        District," and "Library District" shall correspond to categories of Special Districts
         recognized by the U.S. Census Bureau.[391]  References to a State's Subdivisions or
18        to a Subdivision "in," "of," or "within" a State include Subdivisions located within
         the State even if they are not formally or legally a sub-entity of the State; provided,
19        however, that a "Health District" that includes any of the following words or phrases

20

21  [389] https://www.census.gov/data/datasets/2017/econ/gus/public-use-files.html.
22  [390] *E.g.*, U.S. Census Bureau, "Technical Documentation: 2017 Public Use Files for State and
    Local Government Organization" at 7 (noting that "the Census Bureau recognizes five basic types
23  of local governments," that three of those are "general purpose governments" (county governments,
    municipal governments, and township governments), and that the other two are "school district and
24  special district governments"), https://www2.census.gov/programs-surveys/gus/datasets/2017/
    2017_gov_org_meth_tech_doc.pdf.
25  [391] A list of 2017 Government Units provided by the Census Bureau identifies 38,542 Special
    Districts and categorizes them by "FUNCTION_NAME."  "Govt_Units_2017_Final" spreadsheet,
26  "Special District" sheet, included in "Independent Governments – list of governments with
    reference        information,"        https://www.census.gov/data/datasets/2017/econ/gus/public-use-
27  files.html.  As used herein, "Fire District" corresponds to Special District function name "24 –
    Local Fire Protection," "Health District" corresponds to Special District function name "32 –
28  Health," "Hospital District" corresponds to Special District function name "40 – Hospitals," and
    "Library District" corresponds to Special District function name "52 – Libraries."  *See id.*

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

in its name shall not be considered a Subdivision: mosquito, pest, insect, spray, vector, animal, air quality, air pollution, clean air, coastal water, tuberculosis, and sanitary.

549.    Plaintiffs reserve the right to amend or modify the Class definition with greater specificity or further division into subclasses or limitation to particular issues.

550.    **Numerosity**.  The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable.  While the precise number of Class Members has not been determined at this time, Plaintiffs are informed and believe there are approximately 3,142 counties and 19,495 incorporated municipalities within the United States.

551.    **Commonality and Predominance**.  There are questions of law and fact common to the Class that predominate over any questions affecting only Individual Class Members.  These common questions of law and fact include, without limitation:

a.    Defendants' conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin;

b.    Whether Defendants performed reasonable due diligence in ascertaining the risks associated with Defendants' strategies for "turbocharging" OxyContin sales at Purdue in 2013 and thereafter;

c.    Whether Defendants' implementation of its own sales and marketing strategies for its client, Purdue, caused or contributed to an increase in opioid addiction;

d.    Whether Defendants' conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue was negligent, grossly negligent, or reckless;

e.    Whether Defendants' conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue caused or contributed to causing a public nuisance;

2331554.1
4857-5942-6172.v1

1          f.      Whether Defendants' conduct with respect to developing and

2  implementing nationwide opioid sales and marketing practices at Purdue constituted fraudulent

3  misrepresentations to healthcare provides regarding the safety of Purdue's opioid products;

4          g.      Whether Defendants conspired with or aided and abetted Purdue with

5  respect to developing and implementing nationwide opioid sales and marketing practices at

6  Purdue; and

7          h.      Whether Defendants' acceptance of funds from Purdue and other opioid

8  manufacturers regarding Defendants' work promulgating and implementing nationwide opioid

9  sales and marketing strategies constitutes unjust enrichment.

10     552.    **Typicality**.  The claims of the named Plaintiffs are typical to the claims of the

11  Class.  Plaintiffs and all Class Members were exposed to undeviating behavior and sustained

12  damages arising out of and caused by Defendants' unlawful conduct.

13     553.    **Adequacy of Representation**.  Plaintiffs will fairly and adequately represent and

14  protect the interests of the members of the Class.  Plaintiffs have retained counsel with substantial

15  experience in prosecuting complex litigation and class actions.  Plaintiffs and their counsel are

16  committed to vigorously prosecuting this action on behalf of the Class Members and have the

17  financial resources to do so.  None of the Plaintiffs or their counsel have any interest adverse to

18  those of the other Class Members.

19     554.    **Superiority of Class Action**.  A class action is superior to other available methods

20  for the fair and efficient adjudication of this controversy since joinder of all the members of the

21  Class is impracticable.  Furthermore, the adjudication of this controversy through a class action

22  will avoid the possibility of inconsistent and potentially conflicting adjudication of the claims

23  asserted herein and/or varying legal outcomes that would establish incompatible standards of

24  conduct.  A class action would provide a superior vehicle for resolving the issues for all similarly

25  affected and situated.  Moreover, based upon the considerable anticipated expense of the

26  litigation, completion of individual cases is not financially feasible for most Class Members,

27  especially considering the amount of damages in play for each member of the Class.  There will

28  be no difficulty in the management of this action as a class action.

555.     **Policies Generally Applicable to Class**.  Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and other Class Members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class.

556.     **Notice to the Class**.  Plaintiffs contemplate that the eventual issuance of notice to the proposed Class Members would set forth the subject and nature of the instant action. Plaintiffs believe that information related to the total number of counties and municipalities in the United States at issue are sufficient for email notice to reach the vast majority of putative Class Members.  To the extent that any further notices may be required, published notice in appropriate newspapers, professional publications, and journals can also be provided.

## IX.     CLAIMS FOR RELIEF

557.     Plaintiffs reallege all of the foregoing allegations and incorporate them by reference as if fully set forth in their following Claims for Relief.

### B.     Multiple States' Plaintiffs

#### 1.     Racketeer Influenced and Corrupt Organizations (RICO), 18 U.S.C. § 1961, *et seq.* (All Plaintiffs who pleaded RICO claims in underlying complaints)

558.     This claim is brought by all Plaintiffs, and by Named Plaintiffs on behalf of themselves and the Class against McKinsey for actual damages, treble damages, and available injunctive and/or equitable relief under 18. U.S.C. § 1964, for violations of 18 U.S.C. § 1961, *et seq.*, specifically, 18 U.S.C. § 1962(c) and (d).

559.     Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c).

560.     At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

2331554.1
4857-5942-6172.v1

561.    Plaintiffs and the Class Members are each a "person," as the term is defined in 18 U.S.C. § 1961(3), and have standing to sue under 18 U.S.C. § 1964(c) as they were and are injured in their business and/or property "by reason of" the RICO Act violations described herein.

562.    Section 1962(d) makes it unlawful for "any person to conspire to violate" Section 1962(c), among other provisions. *See* 18 U.S.C. § 1962(d).

563.    McKinsey conducted the affairs of an enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c) and § 1962(d).

**Description of the Enterprise**

564.    Section 1961(4) defines an enterprise as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

565.    Under 18 U.S.C. § 1961(4), a RICO "enterprise" may be an association-in-fact that, although it has no formal legal structure, has (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity sufficient to pursue the enterprise's purpose. *See Boyle v. United States*, 556 U.S. 938, 946 (2009).

566.    Opioid manufacturers, including Purdue, Johnson & Johnson, Janssen, Cephalon, Endo, and Mallinckrodt (collectively the "Opioid Manufacturers"), together with McKinsey, which participated in the marketing and sale of opioids as described in this Complaint, (collectively, the "Opioid Marketing Enterprise Members" or the "Enterprise Members") engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market and the market as a whole—through repeated and systematic misrepresentations, concealments, and omissions of material fact about the safety and efficacy of opioids for treating long-term chronic pain, together with other deceptive and fraudulent acts and practices, as described in the Factual Allegations section of this Complaint.

567.    In order to unlawfully increase the demand for opioids and thereby increase their own profits despite their knowledge of the harmful effects that would follow, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise" or the "Enterprise"). The Opioids Manufacturers worked together to accomplish their

2331554.1
4857-5942-6172.v1

1   aims, with McKinsey serving as a go-between that held all of the companies together and helped

2   coordinate the deceptive marketing and sales strategies. Through McKinsey and their own

3   personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to

4   form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose: lying

5   to prescribers and Plaintiffs in order to increase sales of addictive and dangerous drugs and line

6   the enterprise members' pockets. The Opioid Marketing Enterprise Members' substantial

7   financial contributions to the Opioid Marketing Enterprise and the advancement of opioids-

8   friendly messaging fueled the U.S. opioid epidemic.

9        568.    In the alternative, the association-in-fact Opioid Marketing Enterprise existed just

10  between McKinsey and Purdue, who worked together to unlawfully increase sales of opioids—

11  and grow Purdue's share of the prescription painkiller market—through repeated and systematic

12  misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

13  McKinsey knew Purdue was marketing its opioids illegally and fueling an opioid epidemic, but

14  using the knowledge it gained from its work with other opioid manufacturers, McKinsey joined

15  forces with Purdue to turbocharge the opioids market in order to profit from this crisis.

16       569.    The Controlled Substances Act (the "CSA") and its implementing regulations

17  require that "[e]very person who manufactures, distributes, dispenses, imports, or exports any

18  controlled substance," including opioids, become a "registrant." *See* 21 U.S.C. § 823(a)-(b); 21

19  C.F.R. § 1301.11(a). These registrants, including opioid manufacturer and distributors, must

20  maintain a system to identify and report suspicious orders, including orders of unusual size or

21  frequency, or orders deviating from a normal pattern, and maintain effective controls against

22  diversion of controlled substances. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

23       570.    Despite these duties, McKinsey and the other Enterprise Members engaged in a

24  scheme with the overarching purpose of materially expanding prescription opioid use by altering

25  the medical community's opioid prescribing practices through repeated fraudulent statements and

26  misrepresentations. The Opioid Marketing Enterprise's scheme was sophisticated, well-

27  developed, and fraudulent and was designed to increase the prescription rate for opioid

28  medications the Enterprise Members knew where dangerous and highly addictive. At all relevant

times, McKinsey was aware of the conduct of the Enterprise, was a knowing and willing participant in that conduct, and reaped profits from that conduct in the form of payments from other Enterprise Members as a reward for work done to increase sales and distribution of prescription opioids.

**The Common Purpose and Scheme of the Opioid Marketing Enterprise.**

571.    The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and Plaintiffs and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. These misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition, which the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; and (9) that abuse-deterrent formulations provide a solution to opioid abuse.

572.    The scheme devised, implemented, and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Manufacturers' drugs. The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme.

573.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

2331554.1
4857-5942-6172.v1

574.     As public scrutiny and media coverage focused on how opioids ravaged communities throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, despite its knowledge of the ongoing fraud and the danger it posed, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

575.     The impact of the Opioid Marketing Enterprise's scheme is still in place—i.e., the opioids continue to be prescribed and used for chronic pain throughout the United States, and the epidemic continues to injure Plaintiffs and the Class and consume the resources of Plaintiffs and the Class.

576.     The evidence shows that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**The Conduct of the Opioid Marketing Enterprise Violated Civil RICO.**

577.     From at least 2004 to the present, each of the Opioid Marketing Enterprise Members played some part in directing the affairs of the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

578.     Creating and providing a body of deceptive, misleading, and unsupported medical and popular literature about opioids that

   a.     understated the risks and overstated the benefits of long-term use;

   b.     appeared to be the result of independent, objective research; and

   c.     was thus more likely to be relied upon by physicians, patients, and payors;

579.     Creating and providing a body of deceptive, misleading, and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the

2331554.1
4857-5942-6172.v1

benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

580.    Creating and providing a body of deceptive, misleading, and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

581.    Devising and implementing marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints; and

582.    Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications.

583.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to enrich themselves by increasing sales of prescription opioids by convincing doctors to prescribe and patients to use opioids, including for long-term chronic pain, despite the Opioid Marketing Enterprise Members' knowledge of the addictions and deaths that would occur as a result. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

**The Opioid Marketing Enterprise Members Conducted or Participated, Directly or Indirectly, in the Conduct of the Enterprise's Affairs.**

584.    "[T]o conduct or participate, directly or indirectly, in the conduct" of an enterprise, "one must participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993).

585.    As described herein, the Opioid Marketing Enterprise Members participated in the conduct of the Enterprise through a pattern of racketeering activity, and McKinsey was the mastermind of marketing schemes deployed by the Enterprise members to defraud prescribers and Plaintiffs and the Class by using the mail and wires in furtherance of plans that were designed with specific intent to defraud.

2331554.1
4857-5942-6172.v1

586.     The Opioid Marketing Enterprise Members conducted an association-in-fact enterprise and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain. Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the Enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use. In so doing, each of the Opioid Marketing Enterprise Members knowingly conducted and participated in the conduct of the Enterprise by engaging in mail and wire fraud, in violation of 18 U.S.C. §§ 1962(c) and (d).

587.     The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

588.     Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the Enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

589.     Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the Enterprise's goals and conceal their role, and the Enterprise's existence, from prescribers and Plaintiffs by, among other things, (i) funding, editing, and distributing publications that supported and advanced their false messages; (ii) funding key opinion leaders ("KOLs") to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

590.     Further, each of the Opioid Marketing Enterprise Members had systematic links to, and personal relationships with, each other through joint participation in lobbying groups, trade industry organizations, contractual relationships, and continuing coordination of activities. The systematic links and personal relationships that were formed and developed allowed the Opioid

2331554.1
4857-5942-6172.v1

Marketing Enterprise Members the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise. Specifically, each of the Opioid Marketing Enterprise Members coordinated their efforts through the same KOLs and front groups, based on their agreement and understanding that the front groups and KOLs were industry friendly and would work together with the Opioid Marketing Enterprise Members to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals and entities who formed the Opioid Marketing Enterprise acted to enable the common purpose and fraudulent scheme of the Opioid Marketing Enterprise.

591.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from each Opioid Manufacturer and its members; (b) was separate and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise; and (e) had sufficient longevity for the Enterprise to pursue its purpose and functioned as a continuing unit.

592.    The Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public perceptions in order to increase the prescription and use of prescription opioids and expand the market for opioids.

593.    The Opioid Marketing Enterprise Members each committed, conspired to commit, and/or aided and abetted in the commission of at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years. The multiple acts of racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity

1    was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities,

2    services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail,

3    and interstate wire facilities. The Opioid Marketing Enterprise Members participated in the

4    scheme to defraud by using mail, telephones, and the internet to transmit communications and

5    payments in interstate or foreign commerce.

6    **The Conduct was More than a Typical Business Relationship.**

7         594.    There were strong relationships among those associated with the Opioid Enterprise

8    and sufficient longevity among Enterprise associates to pursue the Enterprise's common purpose.

9    The common purpose was to increase opioid revenues unlawfully by misrepresenting and lying

10   about opioids in order to changing prescriber habits and the perception regarding the safety and

11   efficacy of opioids for chronic pain and long-term use. The Enterprise's deceit was, in part, in its

12   failure to disclose that increasing strength and dosing actually increased the risk of addiction and

13   overdose and that patients on opioids for more than a brief period develop tolerance, requiring

14   increasingly high doses to achieve pain relief.

15        595.    On March 1, 2004, McKinsey entered into a "Master Consulting Agreement" with

16   Purdue for "services that would be defined from time to time."[392] The Master Consulting

17   Agreement was signed by then-McKinsey director Rob Rosiello."[393]

18        596.    From 2004 through 2008, McKinsey advised Purdue on research and development,

19   business development, and product licensing related to Purdue's opioid products.[394] Consistent

20   with its business model, McKinsey leveraged these projects into growth of its "Broader Strategy

21   work" also underway with Purdue.[395] Specifically, in October 2008, Purdue retained McKinsey

22   for broad strategy work after two board members "blessed" Purdue executive Craig Landau with

23   doing "whatever he thinks is necessary to 'save the business'" after the 2007 criminal plea and

24   introduction of generic competition to the older OxyContin.[396] Purdue relied heavily on

25

26   [392] MCK-MDL2996-0085849; PPLPC012000069192
     [393] MCK-MDL2996-0085849, at 0085880.
27   [394] PPLPC013000116218; PPLP004401340
     [395] MCK-MAAG-0117875
28   [396] MCK-MAAG-0117875

2331554.1
4857-5942-6172.v1

McKinsey to help Purdue publicly portray itself as a good corporate citizen who could now be trusted and was even working on an "abuse-deterrent" or "ADF" form of OxyContin.

597.    Over their many years of working together, McKinsey and Richard Sackler developed a close relationship. Indeed, one McKinsey partner, Maria Gordian, describes herself as a counselor to Richard Sackler in an "Ey 2009 Impact Summary."[397]

598.    The Opioid Marketing Enterprise was more than a typical business relationship. Rather, the members of the Enterprise knew that opioids were addictive and causing serious harm to people and communities but chose to work together to lie to prescribers, Plaintiffs, and the Class about these drugs in order to increase their bottom lines. McKinsey worked closely with the Opioid Manufacturers to achieve these aims. McKinsey, as an advisor of multiple Opioid Manufacturers, also had access to information about multiple players and was able to coordinate the fraud occurring across the Enterprise. As discussed below, McKinsey was particularly embedded in Purdue's organizational structure and the relationship's longevity was sufficient to pursue the Enterprise's purposes. During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin.

599.    The intent to defraud is evident in the McKinsey's attempts to strengthen its relationship with Purdue and assist Purdue in selling opioids after Purdue's 2007 criminal guilty plea. As part of the guilty plea, Purdue admitted that its "supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medication."[398] But rather than be deterred by this, McKinsey dove in. In a March 2009 self-assessment, Ms. Gordian described McKinsey's progress in having "continue[d] to expand the depth and breadth of [its] relationships with Purdue" and plans to "deepen[]" McKinsey's "relationship with the Sackler family," including by "serving them on key business development issues" and "expanding" McKinsey's relationship with members of Purdue's senior management team.[399]

---

[397] MCK-MAAG-0118669
[398] Information at pp. 5-6, *United States v. Purdue Frederick Co.*, No. 07-cr-29-JPJ (W.D. Va. May 10, 2007), Doc. 5.
[399] MCK-MAAG-0118669

2331554.1
4857-5942-6172.v1

600. By August 2009, Richard Sackler had convened a meeting of Purdue board members and staff to discuss efforts to "reverse the decline in the OxyContin tablets market."[400] During the 2009-2014 period in particular, Purdue relied extensively on McKinsey to develop its sales and marketing strategy for OxyContin. McKinsey worked closely with Purdue on both the creation and implementation of OxyContin sales strategy. McKinsey's work for Purdue included consulting, review of product acquisition, evaluation of research and development, advising Purdue on the design of clinical studies, risk management, and product marketing.[401]

601. On May 28, 2013, McKinsey entered into a "Statement of Services to the Master Consulting Agreement" (the "2013 Agreement") with Purdue to "conduct a rapid assessment of the underlying drivers of current OxyContin performance, identify key opportunities to increase near-term OxyContin revenue and develop plans to capture priority opportunities."[402] The 2013 Agreement stated, "We have a long history of partnership with Purdue, and we would make best efforts to leverage our understanding of your business—both in terms of content and culture." The 2013 Agreement was signed by then-principal Arnab Ghatak who would "lead the team with senior leadership from Rob Rosiello and Martin Elling."

602. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██[403]

603. Thereby, even after the 2007 guilty plea, Purdue, with McKinsey's aid, saw growing profits from opioid sales. In 2015 alone, Purdue obtained $3 billion in annual opioid sales—a four-fold increase from its 2006 sales of $800 million.

604. McKinsey's relationship with Purdue went far beyond a typical business relationship. McKinsey worked closely with Purdue on both the creation and implementation of

---

[400] PPLPC061000045395
[401] PPLPC029000547371
[402] Excerpt from U.S. Department of Justice Plea Agreement with Purdue Pharma L.P. October 20, 2020. 18, ¶88. https://www.justice.gov/opa/press-release/file/1329576/download.
[403] PPLPC018001462324 ████████████████

OxyContin sales strategy, a strategy McKinsey knew had been based on misleading and defrauding doctors and patients alike about a dangerous and highly addictive drug.

605.    Further, McKinsey had access to detailed prescribing information enabling it to determine if there were suspicious or problematic prescribing patterns. Rather than using this information to help its clients prevent diversion of controlled substances, McKinsey and the Opioid Marketing Enterprise used this information in furtherance of their scheme to defraud prescribers and Plaintiffs, target and increase sales to prescribers who were overprescribing, and continue to fuel opioid addiction and the resulting epidemic.

**The Fraudulent Schemes**

606.    As detailed above, the operation of the Opioid Marketing Enterprise, included several schemes to defraud that helped to further the goals its members—i.e., to expand the market and increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and to increase profits for the Enterprise Members via expanding the market for opioids.

**_Fraudulent Marketing Scheme: Deceptive Messaging Regarding Opioid Use_**

607.    As described throughout, McKinsey sought to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term, chronic pain by changing prescriber habits and public perception regarding the safety and efficacy of opioids. McKinsey's fraud specifically targeted prescribers and set out to convince them that they should prescribe more and more opioids, overcoming what could otherwise be a check on opioid manufacturers ability to increase sales of addictive products.

608.    Despite McKinsey knowing that reformulated OxyContin could still be abused, having advised Purdue on the design of tests of reformulated OxyContin as part of Purdue's FDA submission,[404] in furtherance of the scheme to defraud, McKinsey spread messages that prescribing opioids could provide "freedom" and "peace of mind" for its users and that physicians could "tailor the dose."

---

[404] McK-MAAG-0118669

609.     After Purdue's 2007 criminal plea for illegally marketing OxyContin, McKinsey created strategies to repair Purdue's reputation and boost OxyContin sales. In 2008, Purdue submitted a New Drug Application for a reformulation of OxyContin, ostensibly to make it more difficult to abuse by extracting the active ingredient from it or otherwise defeating the time-release mechanism in OxyContin tablets—i.e., another product Purdue would later deceptively promote as safer than and less prone to abuse than it was.

610.     In June 2009, McKinsey helped Purdue prepare for an FDA advisory committee meeting. ███████████████████████████████████████████

████████████████ [405] ████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████████████ . [406]

611.     McKinsey prepared for Purdue an "FDA Advisory Committee on Reformulated OxyContin: Question & Answer Book" in September 2009, with questions including "Why should we trust you?" In response, McKinsey recommended Purdue say "We acknowledge mistakes made in the past[;]" "We have x, y and z measures in place that did not exist before[;]" and "[a]t all levels, Purdue's focus is on maintaining the highest ethical standards and meeting the needs of patients[.]"[407] To the question of "Who at Purdue takes personal responsibility for all these deaths?[,]" McKinsey recommended Purdue say, "We all feel responsible[.]"

612.     McKinsey and the other Opioid Marketing Enterprise Members knew the changes Purdue made would not make opioids non-addictive or prevent them from being used to create and further substance abuse problems. For example, in 2009, the FDA noted in permitting ADF labeling that "the tamper-resistant properties will have no effect on abuse by the oral route (the most common mode of abuse)." Similarly, in approving reformulated OxyContin, the FDA cautioned that the reformulation "is not completely tamper resistant and those intent on abusing this new formulation will likely find a means to do so. In addition, the product can still be

---

[405] PDD8901645845
[406] Id.
[407] MCK-MAAK-0152135

misused or abused and result in overdose by simply administering or ingesting larger than recommended oral doses."[408]

613.    Despite this knowledge, the Opioid Marketing Enterprise pursued messaging and a strategy that was deceptive and was designed to deceive doctors in particular. Even after Purdue pleaded guilty to offenses related to its marketing and distribution of addictive opioids, McKinsey advised Purdue to market OxyContin to encourage more prescriptions (that it knew would lead to abuse and overdose events) into higher dose prescriptions by a smaller number of loyalist prescribers.

614.    Far from the deception of doctors being an unforeseen consequence, McKinsey intentionally set out to target doctors as a cog in the Enterprise's scheme to defraud. Indeed, deceiving doctors was part of the marketing scheme, and doctors were utilized in furtherance of the marketing scheme. Medical providers were not a break in the causal chain of harm to Plaintiffs but were targeted players in the scheme to defraud and key links in the casual chain.

615.    The marketing scheme involved using data to target high prescribers and training marketers to make misleading statements with the goal to increase high dose prescriptions which McKinsey and Opioid Marketing Enterprise Members knew were more likely to be abused. Enterprise Members knew that overdoses were expected and that such overdoses would lead to need for increased services.

616.    Purdue's 2020 guilty plea acknowledged its role in using aggressive marketing to convince doctors to prescribe opioids unnecessarily, fueling the drug addiction crisis. McKinsey was the mastermind of marketing scheme following Purdue's 2007 guilty plea. McKinsey developed and helped implement these strategies.

617.    In an October 26, 2009 presentation, "OxyContin – driving growth through stronger brand loyalty," McKinsey proposed tactics to turnaround declining sales, "[e]nhance loyalty to OxyContin among loyalist prescribers," "convert[ing] 'fence sitters' into more loyal OxyContin prescribers,"[409] and "protect OxyContin's market share[.]"[410] In other words,

---

[408] FDA Summary Review, https://www.accessdata.fda.gov/drugsatfda_docs/nda/2010/022272s000SumR.pdf
[409] MCK-MDL2996-0126522
[410] Id. at 2

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

McKinsey proposed increasing sales by pushing both willing and reluctant physicians to prescribe more OxyContin.

618.    McKinsey recommended segmenting prescribers and tailoring messages and tactics to different segments. For prescribers dubbed "Early Adopting Experts" and "Proactive Teachers," defined by a willingness to use extended release opioids, including in patients who were not already using opioids, McKinsey urged emphasizing that its 7 tablet strengths provide flexibility to "tailor the dose" to customer needs.[411]  Upon information and belief, this message aimed to encourage prescribers to initiate and maintain patients on OxyContin long-term by reminding them they could increase the dose as patients became tolerant with long-term use (rather than discontinue use when the drug lost its effectiveness).

619.    Purdue adopted McKinsey's ███████████ proposal.[412] ██████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████ "[413]

620.    As detailed throughout, McKinsey and Opioid Marketing Enterprise Members were aware of the catastrophic injury inflected on the public by selling harmful, addictive opioid products. Yet when promoting opioids and engaging in doctor detailing, the Enterprise Members intentionally hid the potential for abuse and addiction by marketing OxyContin's 12-hour dosing as meaning that users only need to take OxyContin twice a day, thus requiring fewer pills.

621.    It was foreseeable that this marketing strategy would lead to greater addiction because OxyContin wore off after 8 to 10 hours in many patients. Prescribing 12-hour dosing led to "end of dose failure," which led to a vicious cycle that became "the perfect recipe for

---

[411] *Id.* at 12.
[412]   PPLPC023000251226 (██████████████████████████████████████); see also PPLPC012000243668 (████████████); PPLPC012000245087 (██████████ ████████████); PPLPC012000246009 (████████████████); PPLPC021000265092 (████████████)
[413] PKY183123435

1    addiction."[414] As a result, what McKinsey marketed as "convenient" led to what was described as

2    "a [d]escription of Hell."[415]

3         622.    The marketing scheme worked. Nationwide, based on an analysis by the Los

4    Angeles Times, more than 52% of patients taking OxyContin longer than three months are on

5    doses greater than 60 milligrams per day—which converts to the 90 morphine equivalent dose

6    that the CDC Guideline urges prescribers to "avoid" or "carefully justify."[416]

7         623.    A key element of the marketing scheme that fueled the deadly epidemic of opioid

8    abuse was doctor detailing using detailed prescriber data.

9    **Data Scheme: Use of Prescriber Data for Intentional Targeting of High Opioid Prescribers-**

10   **Not Diversion Prevention**

11         624.    McKinsey was an advisor to DEA registrants and Opioid Marketing Enterprise

12   Members, who had a legal duty to guard against diversion and report suspicious orders of

13   controlled substances. Rather than assisting in reporting suspicious orders, McKinsey used its

14   position and access to detailed prescriber information to actually divert resources to target high

15   volume prescribers to sell more opioids.

16         625.    Distributors of controlled substances have a legal duty to report suspicious orders,

17   and to report those that deviate substantially from a normal pattern and orders of unusual size and

18   frequency. *See* 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b). These obligations included a legal duty

19   to maintain effective controls and procedures to guard against diversion of controlled substances

20   and a legal duty to maintain a system to identify and report suspicious orders of controlled

21   substances. *See* 21 C.F.R. §§ 1301.7(a) (b); 1301.74(b). Rather than advising their registrant

22   clients on how to comply with their legal duties to maintain effective controls to guard against

23   diversion and how to operate a system to identify and report suspicious orders, in furtherance of

24   the scheme, McKinsey and the Opioid Marketing Enterprise Members used detailed data to target

25   prescribers to increase the opioid market.

26

27   [414] Harriet Ryan, "*'You Want a Description of Hell?' OxyContin's 12-Hour Problem*," Los Angeles Times, May 5, 2016, available at http://www.latimes.com/projects/oxycontin-part1/.
[415] *Id.*

28   [416] CDC Guideline at 16.

626.    Consistent with the Enterprise's purpose of increasing profit by deceptively marketing opioids, McKinsey was tasked with "Identifying Granular Growth Opportunities for OxyContin," conducting an "assessment of the underlying drivers of current OxyContin performance," identifying "key opportunities to drive near-term OxyContin performance," and developing "plans to capture priority opportunities."[417]

627.    McKinsey received physician-level sales data to develop its marketing strategy to increase OxyContin performance after Purdue's 2007 guilty plea. Rather than using this access to the granular data to avoid diversion and to prevent Enterprise members from targeting prescribers with suspicious prescribing patterns, McKinsey used this information to help the Opioid Marketing Enterprise members push more opioids on high volume prescribers in furtherance of its schemes to defraud. The targets were chosen based on their history of prescribing high doses of opioids in large quantities.

628.    One of the services the Enterprise used in furtherance of this scheme concerned the use of data to help Purdue meet its goals. McKinsey's analysis for the "Evolve to Excellence" proposal shows that it had detailed information from which it could discern, as could Purdue, whether a prescriber had problematic patterns suggesting operation as a "pill mill," including a shift to other opioids after OxyContin's reformulation. Yet, McKinsey urged Purdue to target, and seek to increase the prescribing of, all of these prescribers from whom it perceived Purdue could obtain greater profits.

629.    McKinsey found that Purdue did not "focus on the highest potential docs," measured both by the number of prescriptions and reimbursement considerations.[418] A McKinsey analyst urged McKinsey to recommend Purdue target "[l]iterally, at least all" prescribers in the top 20% of prescribers, "minus another few percent who are no sees[.]" McKinsey team lead Arnab Ghatak replied that "they probably have 20% no see[], but i'd also assume there are not many high writers that are no see."[419] ("No see" prescribers are prescribers who do not accept visits from pharmaceutical sales representatives. Thus, upon information and belief, McKinsey

---

[417] PPLPC030000770531
[418] MCK-MDL2996-0364024
[419] MCK-MDL2996-0364267

2331554.1
4857-5942-6172.v1

1    recognized that most of the highest volume prescribers, or "high writers" of prescriptions, were

2    willing to entertain sales visits from sales representatives.)

3          630.    The Opioid Marketing Enterprise used data for intentional targeting of high

4    prescribers and not for diversion prevention. McKinsey advised Purdue to raise sales of

5    Oxycontin by focusing on high dose sales and deceptively messaging to physicians that

6    OxyContin would improve function and quality of life. McKinsey urged Purdue to maximize

7    sales by dictating which prescribers its sales representatives would target. For example,

8    McKinsey advised Purdue that it should take "specific actions" to increase sales of OxyContin,

9    including "Prescriber Targeting" and "Turbocharg[ing] Purdue's Sales Engine."

10         631.    McKinsey targeted not just doctors but also nurse practitioners and physician

11   assistants, recommending Purdue "[d]ouble down on nurse practitioners and physician

12   assistants . . . as they represent a growing market segmentation of prescribers."[420]

13         632.    The Enterprise's scheme also explored ways to increase the amount of time sales

14   representatives spent in the field increasing opioid sales, and prioritizing OxyContin in incentive

15   compensation targets.[421]

16         633.    By April 24, 2014, the plan was working and McKinsey reported that Purdue's

17   "sales force is selecting an increasing percentage of high-value OxyContin prescribers as

18   targets."[422]

19         634.    McKinsey ensured Purdue would benefit from the lessons learned by other

20   Enterprise members, stating that "its experience with other pharmaceutical companies suggests

21   that such a comprehensive Sales transformation program takes nine months."[423] Likewise,

22   McKinsey recommended physician targeting to other Enterprise members, including Endo and

23   Janssen.[424]

24         635.    By targeting physicians based on their prescribing patterns, the Opioid Marketing

25   Enterprise was working toward the common purpose of deceptively convincing doctors to

26   [420] MCK-MDL2996-0303399
     [421] PPLPC012000437346
27   [422] MCK-MDL2996-0104840; PPLPC035000220406
     [423] MCK-MDL2996-0187168
28   [424] MCK-MDL2996-0130803; MCK-MDL2996-0135713

prescribe more opioids and thereby increase their own profits. By developing "Evolve to Excellence," which was implemented as a plan to "turbocharge" opioid sales, McKinsey advised that Purdue would see a greater return on its sales investment by focusing its targets, including on prescribers with alarming prescribing patterns that raised red flags they were writing "prescriptions" for non-medical use. The plan aimed at boosting sales of OxyContin by targeting the highest volume opioid prescribers, which McKinsey and the other members of the Opioid Marketing Enterprise knew and/or should have known would result in the expansion of the illicit opioid market.

636.    The Enterprise sought to grow opioid sales to prescribers who raised red flags of diversion and orders it knew or should have known were likely to be diverted or fuel an illegal market. Purdue had a legal obligation not to target these prescribers; rather, it was obligated to report their conduct to law enforcement. Yet the Enterprise used access to prescriber data not to report diversion but to enhance diversion.

**Pattern of Racketeering Activity**

637.    McKinsey together with the other Opioid Marketing Enterprise Members engaged in a scheme to unlawfully increase sales of opioids—and grow their share of the prescription painkiller market—through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain. As a unique consulting entity with knowledge of both the addictive properties and abuse potential of opioids and with access to data regarding internal prescribing behaviors of its targets, McKinsey perpetrated a number of fraudulent schemes using the mails and wires, including advising Purdue to market more opioids, in higher doses, to high volume prescribers while helping Purdue avoid mandatory prescriber education regarding the risks of opioids. McKinsey fueled the epidemic alongside its clients. Through targeted marketing that McKinsey worked to develop, "turbocharge," and implement, McKinsey substantially contributed to an explosion in the use of opioids across the United States. McKinsey is an enterprise that is engaged in and affects interstate commerce because the company advised opioid manufacturers on the sale of opioid products across the United States, as alleged herein.

638.     The Opioid Marketing Enterprise Members devised and knowingly carried out this illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute, and non-cancer pain. They knew that these representations deviated from the FDA-approved use of these drugs and were not supported by actual evidence. The Opioid Marketing Enterprise Members intended that their common purpose and scheme to defraud would, and did, deceive consumers, prescribers, regulators, Plaintiffs, and other intended victims and they used the U.S. Mail and interstate wire facilities with the specific intent to advance, and for the purpose of executing, their illegal scheme.

639.     By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

640.     To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members hid from the consumers, prescribers, regulators, and Plaintiffs: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

641.     The Opioid Marketing Enterprise Members with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

642.     Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids. This coordination was accomplished via their relationships with each other and via McKinsey's relationships and contacts with key opioids manufacturers.

643.     The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs and the Class, while

simultaneously generating billion-dollar revenues and profits for the Opioid Marketing Enterprise Members. The predicate acts were committed or caused to be committed by the Opioid Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

644.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity. McKinsey in particular used mail and wire transmission, directly or indirectly, in furtherance of this scheme by transmitting deliberately false and misleading statements to prescribers and the public.

645.    McKinsey had a specific intent to deceive and defraud prescribers, regulators and Plaintiffs. For example, as alleged above, McKinsey made repeated and unequivocal statements through the mails and wires that were false and misleading. McKinsey advised Purdue to market OxyContin based on the false and misleading notion that the drug can provide "freedom" and "peace of mind" for its users, and concomitantly reduce stress and isolation.

646.    Similarly, they caused to be transmitted through the mails and wires false and misleading statements regarding the addiction potential of opioids. Moreover, McKinsey had direct involvement in marketing statements and thus caused the statements to be made, notwithstanding that they knew they were false for the reasons detailed above.

647.    The marketing scheme is especially egregious since the public relies on physicians as a position of trust and authority in the community regarding their health and well-being. McKinsey intentionally deceived physicians regarding the abuse potential of opioids. It intended prescribers and the public to rely on its false statements. McKinsey intended reliance on these false statements as it was their goal for doctors to prescribe more and higher quantities of these dangerous pills to the public. This scheme was therefore reasonably calculated to deceive not only persons of ordinary prudence and comprehension but also educated physicians in a place of high trust in the community.

**Predicate Acts**

2331554.1
4857-5942-6172.v1

648.     To carry out, or attempt to carry out, the scheme, the Enterprise Members, each of whom is a person associated-in-fact with the Enterprise, did knowingly conduct or participate in, directly or indirectly, the affairs of the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c), and employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud).

649.     Specifically, the Enterprise Members have committed, conspired to commit, and/or aided and abetted in the commission of, at least two predicate acts of racketeering activity (i.e., violations of 18 U.S.C. §§ 1341 and 1343), within the past ten years.

650.     The multiple acts of racketeering activity which the Enterprises Members committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity."

651.     The racketeering activity was made possible by the Enterprise's regular use of the facilities, services, distribution channels, and employees of the Enterprise Members.

652.     The Opioid Marketing Enterprise Members participated in the schemes by using mail, telephone, and the internet to transmit mailings and wires in interstate or foreign commerce.

653.     The Enterprise Members used, directed the use of, and/or caused to be used, thousands of interstate mail and wire communications in service of their schemes through common misrepresentations, concealments, and material omissions.

654.     In devising and executing the illegal schemes, the Opioid Marketing Enterprises Members devised and knowingly carried out a material scheme and/or artifice to defraud Plaintiffs and prescribers and to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts.

655.     For the purpose of executing the illegal schemes, the Enterprise Members committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal schemes.

656.     The Opioid Marketing Enterprise Members' predicate acts of racketeering (18 U.S.C. § 1961(1)) include, but are not limited to the conduct described in the Factual Allegations section of this Complaint, and:

657.     Mail Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

658.     Wire Fraud: The Opioid Marketing Enterprise Members violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, materials by wire for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the prescription opioids by means of false pretenses, misrepresentations, promises, and omissions.

659.     The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments, and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute, and non-cancer pain, with the goal of profiting from the increased sales of the Opioid Marketing Enterprise Members' drugs that occurred because consumers, prescribers, regulators, and Plaintiffs relied on the Opioid Marketing Enterprise Members' misrepresentations. These uses of the U.S. Mail or interstate wires included, inter alia:

660.     Marketing materials about opioids and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, and published across the country, including in counties and cities and on Tribal Reservations and to Plaintiffs;

661.     Written representations and telephone calls among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members regarding the misrepresentations, marketing statements, and claims about opioids, including the non-addictive, safe use of opioids for chronic, long-term pain generally;

662.     E-mails, telephone calls, and written communications among the Opioid Marketing Enterprise Members agreeing to or implementing the opioids marketing scheme;

663.    Communications among the Opioid Marketing Enterprise Members and between the Opioid Marketing Enterprise Members and the media regarding the publication, drafting, and dissemination of treatment guidelines as part of the Opioid Marketing Enterprise;

664.    Written and oral communications directed to prescribers, the public, Plaintiffs, and the Class that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

665.    Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

666.    Many of the precise dates of the fraudulent uses of the U.S. mail and interstate wire facilities are not obtainable (e.g., each time a McKinsey trained marketer "calls" or reached out to a physician using the mails or wires in furtherance of the marketing scheme). Because the Opioid Marketing Enterprise Members disguised their participation in the Enterprise, and worked to keep the Enterprise's existence secret, many of the precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot be alleged without access to the books and records maintained by the Opioid Marketing Enterprise Members. Indeed, an essential part of the successful operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy. Plaintiffs have, however, described the types of predicate acts of mail and/or wire fraud, including the specific types of fraudulent statements upon which, through the mail and wires, McKinsey engaged in fraudulent activity in furtherance of their scheme.

667.    Below, Plaintiffs also describe examples of occasions on which the Opioid Marketing Enterprise Members disseminated misrepresentations and false statements to consumers, prescribers, regulators, Plaintiffs, and the Class and how those acts were in furtherance of the scheme.

| From | To | Date | Description |
|---|---|---|---|
| Purdue | Prescribers and Plaintiffs | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book |
| Purdue | Prescribers | Continuous | Telephonic and electronic communications by its sales representatives indicating that opioids will improve patients' function |

| Purdue | FDA advisory committee | September 2009 | Presentation prepared by McKinsey indicating that its reformulated OxyContin will deter abuse |
|---|---|---|---|
| Purdue | Prescribers and Plaintiffs | 2010 onwards | Statements that the reformulated OxyContin will deter abuse and therefore doctors can continue to safely prescribe opioids |
| Purdue | Prescribers and Plaintiffs | 2010-2020 | Statements from Purdue at McKinsey's direction that opioids can provide "freedom," "peace of mind," and give patients "the best possible chance to live a full and active life" |
| Purdue | Prescribers and Plaintiffs | Advertising produced in 2016 | Advertising from Purdue that "We sell hope in a bottle." |
| Purdue | Prescribers and Plaintiffs | 2010 onwards | Statements that OxyContin's 12-hour dosing would allow patients to only need to take OxyContin twice a day, thus requiring fewer pills |
| Purdue | Prescribers and Plaintiffs | 2013 onwards | Statements from Purdue at McKinsey's direction that OxyContin allowed physicians to "Individualize the Dose" and that the dose of OxyContin can safely be increased or tailored as the patients adapt to a certain dose |
| Endo | Prescribers and Plaintiffs | 2009 | Statements made on an Endo-sponsored website, PainKnowledge.com, indicating that patients who take opioids as prescribed usually do not become addicted |
| Endo | Prescribers and Plaintiffs | 2009 | Statements made on another Endo-sponsored website, PainAction.com, indicating that most chronic pain patients do not become addicted to opioid medications |
| Endo | Prescribers and Plaintiffs | Various | Statements in pamphlets and publications described by Endo indicating that most people who take opioids for pain relief do not develop an addiction |
| Endo | Prescribers and Plaintiffs | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid use does not result in addiction |
| Endo | Prescribers and Plaintiffs | Various | Statements made on the Endo-run website, Opana.com, indicating that opioid dependence can be addressed by dosing methods such as tapering |
| Endo | Prescribers and Plaintiffs | Various | Statements made on its website, PainKnowledge.com, that opioid dosages could be increased indefinitely |
| Endo | Prescribers and Plaintiffs | Various | Statements made in a publication entitled "Understanding Your Pain: Taking Oral Opioid Analgesics" suggesting that opioid doses can be increased indefinitely |
| Endo | Prescribers | Various | Electronic and telephonic communications to its sales representatives indicating that the formula for its medicines is "crush resistant" |
| Endo | Prescribers and Plaintiffs | 2007 | Statements that pain relief from opioids improves patients' function and quality of life in advertising and a book |
| Endo | Prescribers | Various | Telephonic and electronic communications by its sales representatives indicating that opioids will improve patients' function |

2331554.1

4857-5942-6172.v1

| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, indicating that concerns about opioid addiction are overestimated |
|---------|----------------------------|---------|----------------------------------------------------------------------------------------------------------------------------|
| Janssen | Prescribers and Plaintiffs | 2009 | Statements in a 2009 patient education guide claiming that opioids are rarely addictive when used properly |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements included on a 2009 Janssen-sponsored website promoting the concept of opioid pseudoaddiction |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, advocating the concept of opioid pseudoaddiction |
| Janssen | Prescribers and Plaintiffs | Various | Statements on its website, PrescribeResponsibly.com, indicating that opioid addiction can be managed |
| Janssen | Prescribers and Plaintiffs | 2009 | Statements in its patient education guide indicating the risks associated with limiting the dosages of pain medicines |
| McKinsey | Purdue (with prescribers as the planned target) | July 18, 2013 | Discussion of McKinsey plan to increase calls to doctors' offices to fraudulently promote OxyContin, including via "phone, video and even Google like proprietary tools" [425] |
| McKinsey | Purdue (with prescribers as the planned target) | April 24, 2017 | Plan to promote OxyContin to "no-see" physicians through "remote interactions" including presenting "brand interaction and materials" "over the phone/internet"[426] |
| McKinsey | McKinsey | July 14, 2013 | Internal emails interpreting "the Purdue situation" and discussing OxyContin sales strategy including sales benchmarks and "focus on the highest potential docs"[427] |
| McKinsey | Purdue (with prescribers as the planned target) | September 23, 2013 | Evolve 2 Excellence PowerPoint planning execution of the scheme and discussing targeted performance metrics including "sales management calls per day, calls per year and adhering to target list"[428] |
| McKinsey | Purdue | July 30, 2013 | Presentation showing "Scope of potential OxyContin growth opportunities" with proposed process including "Generate target list" and using "Reps/DMs [to] perform call planning (including refining target list)"[429] |

[425] MCK-MDL2996-0104431, at 0104442
[426] MCK-MDL2996-0104840
[427] MCK-MDL2996-0364024
[428] MCK-MDL2996-0316833, at 0316834
[429] MCK-MDL2996-0303399

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

668.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud consumers, prescribers, regulators, Plaintiffs, and other intended victims.

669.    These were not isolated incidents. Instead, the Opioid Marketing Enterprise Members engaged in a pattern of racketeering activity by committing thousands of predicate acts in a five-year period, in the form of mail and wire fraud, and there remains a threat that such conduct will continue in the future.

670.    Each instance of racketeering activity alleged herein was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including consumers, prescribers, regulators, and Plaintiffs. The Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high. In designing and implementing the scheme, the Opioid Marketing Enterprise Members understood and intended that those in the opioid distribution chain rely on the integrity of the pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific evidence regarding the Opioid Marketing Enterprise Members' products.

671.    Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

672.    The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators, and Plaintiffs. Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators, and Plaintiffs. The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering

2331554.1
4857-5942-6172.v1

activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

673.    Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

674.    As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for many years. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

675.    The Opioid Marketing Enterprise Members' violations of law and pattern of racketeering activity directly and proximately caused Plaintiffs' injury in their business and property. The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially, and foreseeably caused an opioid epidemic. The injuries of Plaintiff, as described herein, were not unexpected, unforeseen, or independent. Rather, as Plaintiffs allege, the Opioid Marketing Enterprise Members as a whole and McKinsey in particular knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry out the Opioid Marketing Enterprise's fraudulent scheme, thereby increasing sales of their opioid products.

676.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose and the injuries that occurred as a result.

**The Enterprise Was Well Aware of Risks of Abuse Before It "Turbocharged" its Marketing Scheme.**

677.     These devastating results were eminently foreseeable by the Opioid Marketing Enterprise Members.

678.     When Purdue pleaded guilty in 2007, it was evident that Purdue's behavior and excessive prescribing was directly linked to a drug addiction crisis that caused severe and extensive damage to America. Purdue's methods included "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids – frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."[430]

679.     McKinsey cannot deny knowledge regarding Purdue's 2007 guilty plea. At that point, McKinsey knew that opioids were addictive. McKinsey knew that OxyContin was being widely abused and causing harm to people and entities like Plaintiffs. And McKinsey knew that Purdue had been fraudulently marketing OxyContin as less addictive, less subject to abuse, and less likely to cause withdrawal. And yet, years later, in 2013, McKinsey orchestrated a scheme to continue to aggressively promote opioids despite knowledge that people were still dying from overdoses.

680.     Thus, McKinsey continued to add fuel to this fire by persisting in aggressively marketing to physicians and continuing to fuel the opioid crisis after Purdue's guilty plea. It was foreseeable that continuing to do so would devastate American communities.

681.     ████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████ "[431] ████████████████████████████████
████████████████████████████████████████████
████████████████████████

---

[430] Jan Hoffman & Katie Benner, *Purdue Pharma Pleads Guilty to Criminal Charges for Opioid Sales*, N.Y. Times (updated Dec. 17, 2020), https://www.nytimes.com/2020/10/21/health/purdue-opioids-criminal-charges.html.
[431] MCK-MDL2996-0070516, at 0070517 ████████████████████████ ]

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

2331554.1
4857-5942-6172.v1

682. ██████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1
2
3
4
5
6
7
8
9
10



683.     Similarly, news stories across the nation reported additional consequences of wide scale opioid addiction: needles littered around public property, posing costs to the governments and danger to residents.[432]

684.     The foreseeability of the abuse and need for additional services that would be required following the misleading marketing and increased prescribing and use of high dose opioids is also evidenced by McKinsey's attempt to put a price tag on overdoses. McKinsey suggested payment amounts for event-based contracts: $6,000 to $15,000 (paid to health insurers for increased medical services). Indeed, McKinsey was well aware that increased prescriptions would lead to overdoses and to an additional financial burden for social and health services.

685.     McKinsey is liable for its successful efforts to increase OxyContin sales after Purdue's 2007 guilty plea for misbranding the drug. Indeed, McKinsey's focus on increasing opioid sales after Purdue's guilty was incendiary to escalating and perpetuating the opioid epidemic by: (a) using data to specifically target high volume prescribers; (b) persuading sales of higher doses of opioids; (c) tailoring marketing messages to conceal their addictive principles; and (d) by reducing the training of sales representatives.

---

[432]  *See, e.g.*, https://www.bostonglobe.com/metro/regionals/south/2014/10/25/hypodermic-needles-litter-landscape-south-boston/pzgmgbyjYFCD967TePDyiM/story.html

2331554.1
4857-5942-6172.v1

686.    In 2012, when the consent decree expired (which obligated Purdue to submit annual compliance reports regarding its marketing), McKinsey helped Purdue reengage in its nefarious conduct of targeting and deceiving doctors about the abuse potential of opioids.

687.    After Purdue's guilty plea, McKinsey identified physicians—that had already been influenced by Purdue's misrepresentations and were thus already high prescribers—as optimal targets for a massive marketing push to sell more OxyContin. McKinsey monitored the prescription behaviors of individual doctors and utilized the prescriber-level data and urged Purdue to allocate its time and resources to high prescribing physicians.

688.    By November 2013, McKinsey had obtained the physician-level data it had previously requested and continued to study ways to sell additional OxyContin prescriptions by refining and targeting the sales pitch to them.

689.    In 2013, Project Turbocharge began. McKinsey proposed Project Turbocharge, a marketing strategy to increase opioids sales by hundreds of millions of dollars annually. With McKinsey's assistance, Purdue trained its sales representatives to operate using McKinsey's strategy for selling OxyContin. It is not coincidental to the Enterprise scheme that as soon as the constraints associated with its guilty plea and consent agreement ended, McKinsey assisted Purdue in turbocharging sales.

690.    While McKinsey was pushing hard to turbocharge and promote the sale of opioids, it anticipated and expected that people would die from opioid overdoses. It acknowledged this when in 2017, it proposed that Purdue pay health insurers or other entities in the distribution chain rebates "for every OxyContin overdose attributable to pills they sold."[433]

691.    McKinsey cannot deny that it was not aware of the abuse and overdose potential of opioids when it provided estimates for the future costs of overdose or opioid use disorder events.

692.    McKinsey and the other Opioid Marketing Enterprise Members marketed a product, through intentionally deceptive means, that it knew would result in consumer deaths and harm to Plaintiffs and the Class. This is not an attenuated causal chain. Rather, aggressively

---

[433] Walt Bogdanich & Michael Forsythe, *McKinsey Proposed Paying Pharmacy Companies Rebates for OxyContin Overdoses*, N.Y. Times (updated Nov. 5, 2021), https://www.nytimes.com/2020/11/27/business/mckinsey-purdue-oxycontin-opioids.html

marketing to high prescribing individuals, and training to not fully disclose the risk of abuse, were integral parts of the marketing scheme. Deceptive messaging to targeted prescribers who were likely to prescribe more pills in a dose with an anticipated abuse potential was part and parcel of the scheme to defraud.

693.    As a result, Plaintiffs have shouldered the burden of these anticipated increased services and harm to business and property that are inherently tied to opioid abuse and misuse, and both the increased services and harms were reasonably and actually expected from increased prescribing.

694.    The Enterprise's goal was to increase opioid prescribing, and the Enterprise Members knew that doing so would also result in the need for increased medical services. It was also foreseeable that increased prescriptions would also result in increased costs to Plaintiffs and Class Members throughout the United States.

695.    But for the increase in prescribed opioids, Plaintiffs and the Class would not have to expend additional resources or suffered other harm to business and property as a result of harms associated with opioid addiction. The Enterprise persisted in targeting prescribers to prescribe high doses of opioids and knew that doing so would result in adverse health and social outcomes, including overdoses, neo-natal complications, harm to communities like Plaintiffs and the Class, hazardous waste in Plaintiffs' and the Class' communities, as well as and increased expenditures on services to combat such ill effects.

**Plaintiffs' Business and Property Have Been Damaged by the Enterprise's RICO Violations.**

696.    The Opioid Marketing Enterprise's misleading marketing and failure to prevent prescription opioid diversion damaged Plaintiffs and the Class. In addition to medical services, the Opioid Marketing Enterprise's misconduct has contributed to a range of social problems, including violence and delinquency. Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair. These very harms were acknowledged by McKinsey during

the course of this fraudulent scheme. As a result, more and more of the resources of Plaintiffs and the Class are being devoted to responding to the opioid epidemic.

697.    Notably, Plaintiffs and the Class have experienced vast harm to business and property directly, proximately, and foreseeably caused by the racketeering enterprise. The full extent of each Plaintiff's damage cannot be captured fully in this pleading but can be fleshed out during the bellwether process. Below are some discrete examples that demonstrate the common and typical universal harm to Plaintiffs and the Class and the specific types of harm foreseeably caused by the Opioid Marketing Enterprise.

698.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to carry out their fraudulent scheme has injured Plaintiffs and the Class in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid epidemic. The injuries to Plaintiffs and the Class, as alleged throughout this Complaint, and expressly incorporated herein by reference, include:

a.    Costs associated with hazardous waste and removal of such waste from communities of Plaintiffs, including on real property of Plaintiffs and the Class;

b.    Costs for providing healthcare and medical care, including additional therapeutic care, prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

c.    Costs of training first responders in the proper treatment of drug overdoses;

d.    Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

e.    Costs associated with emergency responses by first responders to opioid overdoses;

f.    Costs for providing mental health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

g.    Costs associated with the injuries to the health and welfare of the residents who reside in the jurisdiction of Plaintiffs caused by the opioid epidemic;

h.      Costs associated with providing care for children whose parents suffer from opioid-related disability or incapacitation; and

i.      Losses caused by the diversion of revenue to address the opioid epidemic that would otherwise have been used to provide other services.

699.    The injuries to Plaintiffs and the Class were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Plaintiffs and the Class. But for the opioid epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs and the Class would not have lost money or property, and the health and welfare of citizens would not have been harmed.

700.    Plaintiffs and the Class have been injured by the Enterprise's conduct, and such injury would not have occurred but for the predicate acts, which also constitute acts taken in furtherance of the conspiracy pursuant to Section 1962(d). By working to expand the opioid market, fraudulently concealing the abuse potential of opioids, targeting high volume prescribers, and deceiving prescribers and the public in order to allow opioids to continue to remain on the market, the Enterprise caused the expansion of opioid prescribing and thus a large number of people across the United States, and in Plaintiffs' and the Class' communities, to become addicted to opioids, thereby forcing Plaintiffs and the Class to expend, time, money and resources to address the opioid epidemic that McKinsey and the Enterprise created through their conduct. Indeed, McKinsey intentionally deceived doctors and public health workers in order to continue to grow the opioid market. The repeated fraudulent misstatements by the Opioid Marketing Enterprise Members contributed to an explosion in the use of opioids across the country.

701.    Plaintiffs and the Class were direct victims of McKinsey's misconduct. The Enterprise displayed a wanton disregard for public health and safety by intentionally deceiving doctors about the addiction potential of opioids and by marketing higher doses to physicians. The harm created by McKinsey required Plaintiffs and the Class to expend financial and other resources to mitigate the health crisis of opioid misuse and addiction. The expansion of the opioid market was the goal of the Enterprise and was critical to its success. Therefore, the harm suffered

by Plaintiffs and the Class to their property and their forced expenditure of resources beyond ordinary costs of services to combat the opioid epidemic, was directly foreseeable, and in fact, and intentional result of the Enterprise's misconduct. In fact, McKinsey anticipated overdose events and actually estimated price premiums on these expected overdose events. McKinsey knew that the products it was marketing were highly addictive and could lead to deadly overdoses yet continued to "turbocharge" sales by fraudulently pushing the product on doctors through its deceptive marketing scheme.

702. The creation and implementation of the marketing scheme that McKinsey developed and deployed through the Opioid Marketing Enterprise, directly harmed Plaintiffs and the Class by imposing costs on their businesses and properties. Plaintiffs' injuries are not solely the result of routine government expenses. Instead, as a result of the Enterprise's misconduct, Plaintiffs have been and will be forced to go far beyond what a governmental entity might ordinarily be expected to pay to enforce laws and to promote the general welfare in order to combat the opioid epidemic, whose primary origins were in prescription opioids administrated by prescribers to whom McKinsey directed the targeting of the marketing scheme. This includes providing new programs and new services as a direct result and in direct response to the Enterprise's misconduct. In addition, Plaintiffs and the Class have suffered loses to their property as a direct result of the kind of inevitable consequences of the drug addiction and criminal behavior that McKinsey predicted. As a result of the conduct of the Enterprise, Plaintiffs and the Class have incurred and will continue to incur costs that far exceed the norm.

703. The injuries to Plaintiffs and the Class were directly and proximately caused by these racketeering activities because they were the logical, substantial, and foreseeable cause of the injuries to Plaintiffs. But for the opioid epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs and the Class would not have lost money or property, and the health and welfare of residents in Plaintiffs' and the Class' jurisdictions would not have been harmed. Moreover, McKinsey's internal documents show that it in fact foresaw many of the harms that resulted from its conduct.

704.     There are no intervening acts or parties that could interrupt the causal chain between McKinsey's mail and wire fraud and Plaintiffs' and the Class' injuries. McKinsey, in furtherance of the Enterprise's common purpose, caused to be made false and misleading statements directly to prescribers (who consumers rely on to provide health advice), patients, and Plaintiffs. Prescribers are not a break in the causal chain. Instead, the Enterprise Members as a whole, and McKinsey in particular, intentionally targeted doctors and sought to deceive them. That the doctors were then deceived and behaved as the Enterprise wanted, prescribing more and more opioids, was the purpose of the scheme, not an intervening cause.

705.     The Enterprise's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and the Class, and Plaintiffs are entitled to bring this action for three times their actual damages, as well as for injunctive/equitable relief, costs and reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## 2.   Negligence
## (All Plaintiffs)

706.     This claim is brought by all Plaintiffs, and by Named Plaintiffs on behalf of themselves and the Class against McKinsey.

707.     McKinsey, through its work with Purdue and other opioid manufacturers, owed Plaintiffs the Class duties, including but not limited to, a duty to not deceive, encourage, and facilitate the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health, safety, and welfare.

708.     McKinsey also owed such a duty as a "Covered Person" under the Corporate Integrity Agreement.

709.     McKinsey breached this duty by, for years, devising and assisting Purdue with implementing an aggressive sales and predatory marketing campaign, including Project Turbocharge, which promoted misleading claims regarding OxyContin to significantly bolster the amount of OxyContin prescribed and distributed throughout Plaintiffs' community.

2331554.1
4857-5942-6172.v1

710.     Plaintiffs and the Class have suffered harm directly, proximately, and foreseeably caused by Defendants' breaches of duties. Defendants' negligence was a substantial factor in causing Plaintiffs' harm.

711.     It was reasonably foreseeable that McKinsey's breaches of the duties would cause harm to Plaintiffs and the Class in the form of higher costs related to opioid use, as well as opioid abuse, addiction, and opioid related deaths—costs that would not have been paid but for Defendants' wrongful conduct. Thus, Plaintiffs have suffered monetary costs incurred to abate the effects of the opioid epidemic proximately caused by McKinsey's breaches of its duties.

712.     McKinsey's breaches of the common-law duties owed to Plaintiffs are the direct and proximate cause of Plaintiffs' harm and harm to the Class.

713.     McKinsey is also liable for Purdue's negligence as a result of a joint enterprise or joint venture between the two companies. Although the Master Consulting Agreement indicated that no partnership or joint venture was created between McKinsey and Purdue as a result of that agreement, the relationship between the parties, not the formal terms of the agreement, controls, particularly with respect to third parties, including Plaintiffs and the Class. McKinsey and Purdue agreed to carry on a joint enterprise to promote sales of opioids and formed a partnership lastly nearly fifteen years.

714.     In carrying out their common enterprise, McKinsey and Purdue shared a common purpose: to increase sales of OxyContin.

715.     Each company contributed its expertise and labor to the venture: McKinsey, its consulting services and marketing know-how and Purdue, its development of OxyContin.

716.     McKinsey and Purdue shared a common pecuniary interest in the promotion of opioids. Purdue paid McKinsey handsomely for its consulting services, and Purdue in turn reaped profits as a result of the strategies McKinsey provided. While the Master Consulting Agreement made clear that McKinsey was entitled to monthly payments from Purdue, it also made clear that with Purdue's success, McKinsey would further profit. For example, as Purdue's own ventures intensified, it would increase the services it called for from McKinsey. Similarly, through its support of Purdue's Research & Development Department, McKinsey had the opportunity to

2331554.1
4857-5942-6172.v1

generate further profits for itself if Purdue was successful. The converse was also true: with Purdue's failures or losses, McKinsey was likely to lose business.

717.    McKinsey had an equal right to a voice in the direction of its joint enterprise with Purdue, which gave it an equal right of control. McKinsey and Purdue met extensively over the course of more than a decade to develop their strategy together. McKinsey provided minute direction to Purdue as part of its consulting work, such as how many times sales representatives should visit particular doctors. McKinsey and Purdue together had the right and the duty of joint control.

### 3.    Gross Negligence
### (Florida, Pennsylvania, Virginia, and Washington Plaintiffs)

718.    This claim is brought by Florida, Pennsylvania, Virginia, and Washington State Plaintiffs, and by Named Plaintiffs on behalf of the Florida, Pennsylvania, Virginia, and Washington Class Members.

719.    Plaintiffs re-allege and incorporate the allegations contained in the Negligence cause of action.

720.    The opioid epidemic to which McKinsey contributed constituted an imminent or clear and present danger amounting to more than normal and usual peril.

721.    McKinsey knew that opioids were addictive and deadly, and that Purdue's representations about its products were false, misleading, and would create, contribute to, and exacerbate the opioid crisis.

722.    McKinsey had chargeable knowledge of the imminent or clear and present danger.

723.    Despite this knowledge, McKinsey acted with conscious disregard of the consequences when advising and assisting Purdue.

### 4.    Negligence Per Se
### (All Plaintiffs)

724.    This claim is brought by all Plaintiffs, and by Named Plaintiffs on behalf of themselves and the Class against McKinsey.

2331554.1
4857-5942-6172.v1

725.    Plaintiffs re-allege and incorporate the allegations contained the allegations in the Negligence cause of action.

726.    A presumption of negligence (negligence per se) is established where McKinsey's negligence involves the violation of a statute or regulation, where the plaintiff is within the class of persons that the statute or regulation was designed to protect, and the violation is a substantial factor in the plaintiff's harm.

727.    McKinsey contributed to and aided and abetted violations of the Controlled Substances Act, as well as state-specific controlled substances laws identified elsewhere in this Complaint. McKinsey also violated state-specific statutory nuisance laws, as identified elsewhere in this Complaint.

728.    Plaintiffs and the Class are within the class of persons the statutes were designed to protect. The Controlled Substances Act and analogous state laws were enacted in part to protect communities like Plaintiffs and the Class from the harm traceable to unregulated distribution of dangerous, addictive substances. State nuisance statutes were enacted in part to protect communities like Plaintiffs and the Class from the costs of public nuisances.

**5.      Common Law Nuisance
(Florida, Illinois, Indiana, Kentucky, Louisiana, Michigan, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, Washington, and West Virginia Plaintiffs)**

729.    This claim is brought by Florida, Illinois, Indiana, Kentucky, Louisiana, Michigan, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, Washington, and West Virginia Plaintiffs, and by Named Plaintiffs on behalf of themselves and Florida, Illinois, Indiana, Kentucky, Louisiana, Michigan, New York, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, Washington, and West Virginia Class Members.

730.    McKinsey created, exacerbated, and maintained a public nuisance which proximately caused injury to Plaintiffs and the Class.

731.    A public nuisance is an unreasonable interference with a right common to the general public. McKinsey's conduct has created an ongoing, significant, unlawful, and

2331554.1
4857-5942-6172.v1

1    unreasonable interference with rights common to the general public, including the public health,

2    welfare, safety, peace, comfort, and convenience of Plaintiffs' communities. *See* Restatement

3    (Second) of Torts § 821B.

4         732.    McKinsey has created and maintained a public nuisance by developing and

5    implementing deceptive marketing strategies and efforts to boost opioid sales in ways that

6    unreasonably interfere with the public health, welfare, and safety in Plaintiffs' communities.

7    Plaintiffs, the Class, and their residents have a common right to be free from such conduct and to

8    be free from conduct that creates a disturbance and reasonable apprehension of danger to person

9    and property.

10        733.    The interference is unreasonable because McKinsey's nuisance-creating conduct:

11             a.    Involves a significant interference with the public health, the public safety,

12   the public peace, the public comfort, and/or the public convenience;

13             b.    Was and is proscribed by state and/or federal laws and regulations at all

14   relevant times; and/or

15             c.    Is of a continuing nature and, as Defendants know, has had and continues

16   to have a significant effect upon rights common to the general public, including the public health,

17   the public safety, the public peace, the public comfort, and/or the public convenience.

18        734.    The significant interference with rights common to the general public is described

19   in detail throughout this Complaint and includes:

20             a.    The creation and fostering of an illegal, secondary market for prescription

21   opioids;

22             b.    Easy access to prescription opioids by children and teenagers;

23             c.    A staggering increase in opioid abuse, addiction, overdose, injuries, and

24   deaths;

25             d.    Infants being born dependent on opioids due to prenatal exposure, causing

26   severe withdrawal symptoms and lasting developmental impacts;

27             e.    Employers losing the value of productive and healthy employees; and

28

f.    Increased costs and expenses for Plaintiffs relating to healthcare services, law enforcement, the criminal justice system, social services, and education systems.

735.    McKinsey is liable for creating the public nuisance because its intentional and unreasonable and/or unlawful conduct was a substantial factor in producing the public nuisance and harm to Plaintiffs.

736.    McKinsey is also liable for creating the public nuisance because it aided and abetted opioid manufacturers' production of the nuisance.

737.    McKinsey's wrongful conduct of deceptively marketing and pushing as many opioids onto the market as possible led directly to the public nuisance and harm to Plaintiffs— exactly as would be expected when medical-grade heroin in the form of prescription opioids are deceptively marketed, flood the community, and are diverted into an illegal, secondary market.

738.    McKinsey had control over its conduct in Plaintiffs' communities and that conduct has had an adverse effect on rights common to the general public. McKinsey controlled deceptive advertising and efforts to mislead the public, and also influenced acts and omissions by Purdue in detailing by sales representatives and other means described in this Complaint. McKinsey also controlled its conduct in seeking to grow opioid sales to prescribers who raised red flags of diversion and orders it knew or should have known were likely to be diverted or fuel an illegal market.

739.    It was reasonably foreseeable that McKinsey's actions and omissions would result in the public nuisance and harm to Plaintiffs and the Class described herein

740.    The externalized risks associated with McKinsey's nuisance-creating conduct as described herein greatly exceed the internalized benefits.

741.    The nuisance created by McKinsey's conduct is abatable.

742.    As a direct and proximate result of McKinsey's tortious conduct and the public nuisance created by McKinsey, Plaintiffs and the Class have taken proactive measures to abate the public nuisance, and Plaintiffs seek to expand these efforts.

743.    In order to abate the public nuisance, Plaintiffs and the Class have incurred expenditures for special programs over and above their ordinary public services.

744.    McKinsey's misconduct alleged in this case was ongoing and persistent for many years.

745.    McKinsey's misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiffs and the Class allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

746.    Plaintiffs and the Class have suffered an indivisible injury as a result of McKinsey's tortious conduct and that of the manufacturers with which it worked.

### 6.    Civil Conspiracy
### (All Plaintiffs)

747.    The pleading of a separate claim for civil conspiracy in certain states does not waive any claim for vicarious liability under conspiracy principles even if not pleaded as an independent tort. Plaintiffs and the Class reserve the right to establish joint and several liability under conspiracy principles.

748.    McKinsey and Purdue engaged in a civil conspiracy in their unlawful marketing of opioids and/or efforts to boost the sale of opioids into Plaintiffs' communities. McKinsey entered into an agreement with Purdue to increase the sales of OxyContin by unfair, deceptive, and unconscionable means, in violation of Ohio and federal consumer protection and controlled substances laws.

749.    McKinsey and Purdue engaged in a civil conspiracy to commit fraud and misrepresentation in conjunction with their unlawful marketing of opioids and/or distribution of opioids into Plaintiffs' communities.

750.    McKinsey and Purdue employed unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years in which Purdue was subject to a Corporate Integrity Agreement, after Purdue pled guilty to criminal misbranding in 2007. McKinsey unlawfully

- 177 -

assisted Purdue with evading these reporting and compliance obligations to accomplish the lawful act of maximizing Purdue's OxyContin revenue.

751.    McKinsey aided Purdue in unlawfully failing to act to prevent diversion and failing to monitor for, report, and prevent suspicious orders of opioids.

752.    McKinsey aided Purdue in unlawfully marketing opioids in Plaintiffs' communities in furtherance of that conspiracy.

753.    McKinsey's conspiracy and acts in furtherance thereof are alleged in detail in this Complaint, including, Plaintiffs' common law and statutory nuisance claims.

754.    McKinsey's overt acts in furtherance of this conspiracy include, but are not limited to, designing and implementing marketing messages that:

a.    Comprised untrue, false, unsubstantiated, and misleading marketing, directly and with and through third parties in violation of 21 C.F.R. § 202.1(e), thereby causing opioid drugs to be misbranded;

b.    Promoted other purported advantages of OxyContin, including but not limited to improved function and quality of life in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

c.    Promoted higher sales, higher dose sales, and targeted the highest volume prescribers of a highly abusable, addictive, and dangerous drug;

d.    Promoted higher dose OxyContin prescriptions, known to pose greater risks; and

e.    Targeted the highest-prescribing physicians, without addressing whether those prescribers may be engaged in abuse and diversion and should not be targeted, to induce them to increase prescriptions of OxyContin further.

755.    The conspiracy was the product of agreement between McKinsey and Purdue, who were operating in close collaboration. When McKinsey's role in the conspiracy threatened to be exposed, upon information and belief, it took efforts to conceal its participation by attempting to destroy inculpating emails and files.

2331554.1
4857-5942-6172.v1

756.    McKinsey's conspiracy, and McKinsey's actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

757.    McKinsey's actions demonstrated both malice and also aggravated and egregious fraud. McKinsey engaged in the conduct alleged herein with a conscious disregard for the rights and safety of other persons, even though that conduct had a great probability of causing substantial harm. McKinsey's fraudulent wrongdoing was done with a particularly gross and conscious disregard.

### 7.    Fraud
### (All Plaintiffs)

758.    This claim is brought by all Plaintiffs, and by Named Plaintiffs on behalf of themselves and the Class, against McKinsey.

759.    McKinsey committed fraud by acting to conceal and advising the concealment of the true dangers of opioids and Purdue's prior and ongoing misconduct while working to increase sales of opioids through its work for Purdue and others, and concealing all of this information from regulators, the public, Plaintiffs, and the Class. McKinsey made, and caused to be made, false representations to healthcare providers working in Plaintiffs' communities, and/or omitted material facts regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

a.    downplayed the substantial risks of addiction and other side-effects of opioids, generally and Purdue's opioids, specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1     b.  overstated the efficacy of opioids, generally, and Purdue's opioids,

2 specifically, including making false statements regarding the effectiveness of the drugs for

3 treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability

4 to improve patient function; and

5     c.  misrepresented the medical usefulness and necessity of opioids, generally,

6 and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses

7 (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare

8 providers.

9   760.  McKinsey and Purdue's misrepresentations and omissions had a tendency to

10 deceive others, to violate public confidence, and/or injure public interests. McKinsey, having

11 chosen to craft the marketing plan used by Purdue to make representations to healthcare providers

12 regarding their opioids, was under a duty to disclose the whole truth, and not disclose partial and

13 misleading truths.

14   761.  McKinsey intended healthcare providers to rely upon McKinsey's false assertions

15 regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids,

16 specifically, to increase the number of opioid prescriptions made by healthcare providers.

17   762.  Healthcare providers working in Plaintiffs' communities did in fact rely on the

18 false representations made in Purdue's marketing plan created by McKinsey and implemented

19 with McKinsey's assistance.

20   763.  As a proximate result of McKinsey's conduct, Plaintiffs and the Class have

21 incurred excessive costs related to the diagnosis, treatment, and cure of addiction or risk of

22 addiction to opioids. Plaintiffs and the Class have borne the massive costs of these illnesses and

23 conditions by having to provide necessary resources for care, treatment facilities, law

24 enforcement services, and to allocate limited resources to combat the devastating social effects of

25 the opioid epidemic.

26

27

28

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1

2

8.    **Aiding And Abetting**
**(All Plaintiffs)**

3

764.    This claim is brought by all Plaintiffs, and by Named Plaintiffs on behalf of

4

themselves and the Class, against McKinsey.

5

6

765.    The pleading of a separate claim for aiding and abetting in certain states does not

7

waive any claim for vicarious liability under aiding and abetting principles under the laws of any

8

state. Plaintiffs reserve the right to establish joint and several liability under aiding and abetting

principles.

9

10

766.    McKinsey gave substantial assistance and/or encouragement to Purdue and the

Sacklers regarding conduct McKinsey knew to be tortious and/or in violation of a duty owed by

11

Purdue and the Sacklers to third persons, including Plaintiffs and the Class. McKinsey assisted

12

and encouraged Purdue over many years to commit unlawful acts relating to the sales and

13

marketing of Purdue's opioid products that McKinsey knew to be misleading and in violation of a

14

reasonable standard of care. McKinsey gave substantial assistance and/or encouragement to

15

Purdue to use unlawful means to commit unlawful acts as part of these marketing efforts and

16

sales.

17

767.    Further, McKinsey gave substantial assistance and/or encouragement to Purdue to

18

take actions that violated state laws, including but not limited to public nuisance and statutory

19

prohibitions, through McKinsey's misleading and predatory marketing campaign.

20

768.    McKinsey and Purdue knowingly made or caused to be made false or misleading

21

representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, and

22

Purdue's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the

23

efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids,

24

specifically.

25

769.    McKinsey acted with intent to facilitate the spread of misleading information by

26

Purdue, specifically with regard to the misrepresentations about the addictiveness of opioids in

27

Purdue's marketing efforts and sales.

28

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

2331554.1

4857-5942-6172.v1

770.     McKinsey, Purdue, and the Sacklers acted jointly in furtherance of the conspiracy.

771.     McKinsey, Purdue, and the Sacklers agreed to deploy unlawful sales and marketing tactics to achieve their shared objective of maximizing revenue of a closely held company.

772.     McKinsey's support was a substantial factor in causing harm to third parties, including Plaintiffs and the Class.

### 9.     Wanton Intentional Conduct
### (Alabama, Indiana, Louisiana, and Tennessee Plaintiffs)

773.     This claim is brought by Alabama, Indiana, Louisiana, and Tennessee Plaintiffs, and by Named Plaintiffs on behalf of the Alabama, Indiana, Louisiana, and Tennessee Class Members.

774.     Defendants' actions were the product of conscious and/or reckless disregard of the rights and safety of Plaintiffs, with the attendant awareness that harm would likely result.

775.     Defendants' conduct was willful.

776.     Defendants knew their breach of their legal duties would exacerbate the opioid epidemic, causing harm to Plaintiffs and the Class.

### 10.     Declaratory Relief
### (28 U.S.C. § 2201; N.Y. CPLR § 3001)
### (All Plaintiffs)

777.     This claim is brought by all Plaintiffs, and by Named Plaintiffs on behalf of themselves and the Class, against McKinsey.

778.     28 U.S.C. § 2201 authorizes "any court of the United States" to "declare the rights and other legal relations of any interested party seeking such declaration," and "[a]ny such declaration shall have the force and effect of a final judgment."

779.     New York CPLR § 3001 authorizes state courts to "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy."

780.     The Master Agreement between McKinsey and Purdue contains an indemnification provision pursuant to which Purdue agrees to indemnify and hold harmless

2331554.1
4857-5942-6172.v1

McKinsey and its Associated Companies and the directors, officers, stockholders, agents and employees of McKinsey and such Associated Companies from and against all actions, proceedings and claims brought by third parties against Purdue and/or McKinsey relating to or arising out of the services provided by McKinsey under the agreement.

781.     Plaintiffs are claimants in the Purdue bankruptcy. Any claim for indemnity made by McKinsey in the Purdue bankruptcy under the Master Agreement could have the effect of reducing the value of Plaintiffs' claims in the Purdue bankruptcy.

782.     Plaintiffs allege in their proofs of claim that their claims arise from Purdue's tortious, deceptive, unreasonable, or otherwise unlawful conduct with respect to the marketing, promotion, sale, and/or distribution of prescription opioid products. They further allege that Purdue acted jointly with others. McKinsey has argued that claims such as those made by Plaintiffs in this action, if successful, could give rise to indemnification and/or contribution claims by McKinsey against Purdue and therefore may affect property of Purdue's bankruptcy estate.

783.     If would be contrary to public policy for McKinsey to be indemnified by, or to receive contribution from Purdue for the wrongdoing alleged herein.

784.     The doctrine of *in pari delicto* bars McKinsey from being indemnified by, or to receive contribution from Purdue for the wrongdoing alleged herein.

785.     Plaintiffs are entitled to a declaration that under New York law McKinsey is not entitled to indemnification or contribution from Purdue for any liability arising from the wrongdoing alleged herein.

**C.**     **Alabama Plaintiffs**

**1.**     **Public Nuisance (Ala. Code §§ 6-5-121, 6-5-122, 11-1-2)**

786.     This claim is brought by Alabama Plaintiffs, and by Named Plaintiffs on behalf of the Alabama Class Members, against McKinsey.

2331554.1
4857-5942-6172.v1

787.    Alabama Plaintiffs and Class Members have standing to pursue nuisance claims for public nuisance pursuant to Ala. Code § 6-5-121.

788.    Alabama Plaintiffs and Class Members have standing to pursue nuisance claims against the Defendants for public nuisance pursuant to Ala. Code § 11-1-2.

789.    Pursuant to Alabama law, a nuisance includes "anything that works hurt, inconvenience or damage to another" and a public nuisance is defined as anything "which damages all persons who come within the spear of its operation, though it may vary in its effects on individuals." Ala. Code § 6-5-121 and 122.

790.    Defendants, in concert with opioid manufacturers, have created and fueled an opioid epidemic that has created harm, damage and inconvenience to the Plaintiffs. Defendants have created a nuisance and damaged the public by engaging in the following conduct:

      a.    downplayed the substantial risks of addiction and other side-effects of opioids, generally, and Purdue's opioids, specifically, including crafting Purdue's marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are, stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

      b.    overstated the efficacy of opioids, generally, and Purdue's opioids, specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability to improve patient function; and

      c.    misrepresented the medical usefulness and necessity of opioids, generally, and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare providers.

791.    Defendants' actions are continuing in nature and have negatively impacted the rights of the citizens of Plaintiffs' communities to live without unreasonable interference to the public health, safety, welfare, peace, comfort and convenience, unreasonable threat of crime, and

the right to be free from disturbance without the unreasonable apprehension of danger to personal property resulting from the opioid epidemic.

792.    Defendants' actions have been and continue to be a substantial factor in opioids becoming widely available and widely used for non-medical purposes. Defendants have a responsibility, and legal obligation, within the system of opioid distribution and marketing to refrain from conduct that would create a widespread nuisance which negatively affects Plaintiffs' communities, creating an enormous public health crisis resulting from the overuse of prescription opioids and heroin.

793.    Defendants' conduct is a direct and proximate cause of death, injury, and damage to the citizens of Alabama Plaintiffs' communities, which has caused financial damage to Plaintiffs, and if allowed to continue, unabated, will continue to threaten the health, safety and welfare of Plaintiffs' communities.

### 2.    Drug Nuisance (Ala. Code § 6-5-155)

794.    This claim is brought by Alabama Plaintiffs, and by Named Plaintiffs on behalf of the Alabama Class Members, against McKinsey.

795.    Defendants' actions have created consumption of opioid related drugs that has become dangerous and harmful to the public welfare. Prescription opioid abuse has led to increased crime and criminal activity in the State of Alabama and in Plaintiffs' communities and in those of Class Members.

796.    In Plaintiffs' communities, the nationwide opioid epidemic has been especially damaging, impacting people from all walks of life from newborns to the elderly, including all races and socio-economic levels of the population. By their conduct, Defendants have created a drug related nuisance in Plaintiffs' communities.

797.    Alabama recognizes that drugs can have a tremendous negative impact on communities, such as Plaintiffs' communities. The Alabama Code defines a "Drug-Related Nuisance" as the "sale, distribution, possession, storage, transportation or manufacture of any

1    controlled substance in violation of the controlled substances acts, or similar act of the United

2    States or any other state" that causes harm to a community. Ala. Code § 6-5-155.

3            798.    There is a duty and corresponding right provided under Alabama law for any

4    person to take action against drug related nuisances to "file an action in the circuit courts of this

5    state to abate, enjoin, and prevent the drug-related nuisance." Ala. Code § 6-5-155(2).

6            799.    The Alabama Uniform Controlled Substance Act, the federal Controlled

7    Substances Act and regulations promulgated by the Alabama State Board of Pharmacy proscribe

8    the manufacture and distribution of opioids while failing to maintain effective controls against

9    diversion. *See, e.g.,* 21 C.F.R. § 1301.74(b); 21 U.S.C. § 823(a)(1), (b)(1); Ala. Code §§ 20-2-56

10   and 57; Ala. Admin. Code §680-X-3-.05. This manufacture and distribution in violation of the

11   controlled substance acts or similar act of the United States constitutes a Drug-Related Nuisance.

12   As a result of the drug-related nuisance created by McKinsey, Plaintiffs and Alabama Class

13   Members have sustained damages, harm and unreasonable jeopardy to the health, morals,

14   comfort, welfare and safety of their communities and to their residents.

15       **D.      California Plaintiffs**

16           **1.      Public Nuisance (Cal. Civ. Code §§ 3479, 3480)**

17
18   800.    This claim is brought by California Plaintiffs, and by Named Plaintiff County of

     Santa Cruz on behalf of itself, and Named Plaintiffs on behalf of the California Class Members,

19   against McKinsey.

20

21           801.    Civil Code § 3479 provides that "[a]nything that is injurious to health … or is

22   indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere

23   with the comfortable enjoyment of life or property … is a nuisance."

24           802.    Civil Code § 3480 defines a "public nuisance" as "one which affects at the same

25   time an entire community or neighborhood, or any considerable number of persons, although the

26   extent of the annoyance or damage inflicted upon individuals may be unequal."

27           803.    Civil Code § 3490 states that "[n]o lapse of time can legalize a public nuisance,

28   amounting to an actual obstruction of public right."

2331554.1
4857-5942-6172.v1

804. Pursuant to § 731 of the California Code of Civil Procedure, this section is brought by California Plaintiffs and Named Plaintiff County of Santa Cruz on behalf of California Class Members to abate the public nuisance created by McKinsey.

805. McKinsey, individually and acting in concert with Purdue, has created, assisted, or permitted the creation of a condition that is harmful to public health, indecent or offensive to the sense, and was an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life and/or property of entire communities or neighborhoods. This condition affected any considerable and substantial number of persons in Plaintiffs' communities at the same time, in violation of Civil Code §§ 3479 and 3480.

806. The public nuisance is substantial and unreasonable. McKinsey's actions caused and continue to cause the public health epidemic described above in Plaintiffs, and the seriousness of the harm outweighs the social utility of McKinsey's conduct

807. McKinsey knew or should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent action would create or assist in the creation of the public nuisance – i.e., the opioid epidemic.

808. McKinsey's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used – causing harm to Plaintiffs and California Class Members. McKinsey's actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without McKinsey's marketing scheme, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

809. As Purdue's management consulting company, McKinsey was in a unique position to observe the flow of opioids and take action when orders were placed for suspicious quantities and suspect intervals, among other things. Instead, McKinsey breached its duties by honing in on these prescribers as cash cows for Purdue. McKinsey's role in marketing opioids and facilitating access to opioid drugs for long-term use contributed to a vast increase in opioid overuse and

2331554.1
4857-5942-6172.v1

addiction, including in Plaintiffs' communities. McKinsey's conduct thus directly caused a public health crisis, including costs for excessive prescribing, addiction related treatment, law enforcement and costs related to deaths, lost productivity of the workforce, and caring for children born addicted or with addicted parents.

810.    McKinsey's acts and omissions offend decency and include marketing opioids and facilitating access to opioid drugs for long-term use, which contributed to the increase in opioid overuse and addiction in Plaintiffs' and California Class Members' communities.

811.    Plaintiffs and California Class Members did not consent, expressly or impliedly, to the wrongful conduct of McKinsey.

812.    As a direct and legal result of the conduct of McKinsey, Plaintiffs and California Class Members suffered harm that is different from the type of harm suffered by the general public. Defendants' acts and omissions proximately caused injury to Plaintiffs and California Class Members, including costs for excessive prescribing addiction related treatment costs, law enforcement costs, costs related to deaths, costs related to lost productivity of the workforce, and costs related to caring for children born addicted or with addicted parents.

813.    McKinsey has a duty to abate the nuisance caused by the prescription opioid epidemic. The public nuisance – i.e., the opioid epidemic – created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

E.    **Florida Plaintiffs**

1.    **Civil Remedies For Criminal Practices Act (Fla. Stat. §§ 772.101 *et seq.*)**

814.    This claim is brought on behalf of Florida Plaintiffs, and by Named Plaintiffs on behalf of Florida Class Members.

815.    Plaintiffs re-allege and incorporate the allegations contained in the RICO cause of action.

816.    McKinsey, Purdue, and other opioid manufacturers constituted an "enterprise" within the meaning of Fla. Stat. §772.102(3) because they are associated in fact.

2331554.1
4857-5942-6172.v1

817.     McKinsey, Purdue, and other opioid manufacturers shared the common purpose of enriching themselves through a common course of conduct, i.e., ensuring the prescription of opioids for chronic pain and boosting opioid sales through deceptive marketing and turning a blind eye to signs of potential diversion.

818.     McKinsey was associated with the enterprise and conducted or participated, directly or indirectly, in that enterprise.

819.     The enterprise possesses sufficient longevity for its members to carry out its purpose in that the enterprise has operated since at least 2004, and operated until at least 2019.

820.     Said pattern of criminal activity included violations of the federal wire fraud statute and the Controlled Substances Act.

F.     **Georgia Plaintiffs**

1.     **Public Nuisance (O.C.G. § 41-2-2)**
       **(Georgia County Plaintiffs)**

821.     This claim is brought by Georgia Plaintiffs, and by Named Plaintiffs on behalf of Georgia Class Members.

822.     The County Attorney of Peach County, Georgia brings this claim on behalf of the citizens of Peach County pursuant to the statutory authority granted under O.C.G. § 41-2-2 to abate a public nuisance.

823.     Georgia statutory law provides that "[a] nuisance is anything that causes hurt, inconvenience, or damage to another and the fact that the act done may otherwise be lawful shall not keep it from being a nuisance. The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man." O.C.G. § 41-1-1. Georgia law further defines "[a] public nuisance [as] one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals." O.C.G. § 41-1-2.

824.     The Georgia nuisance statute also provides that "[u]pon filing of a petition as provided in Code Section 41-2-2, any nuisance which tends to the immediate annoyance of the

1   public in general, is manifestly injurious to the public health or safety, or tends greatly to corrupt

2   the manners and morals of the public may be abated . . . ." O.C.G. § 41-2-1.

3       825.    The improper efforts of McKinsey, working with Purdue and others, to promote

4   the use of opioids generally, and Purdue's opioids specifically, in Peach County and surrounding

5   communities has led to dramatic increases in opioid addiction and mortality, as well as associated

6   increases in crime and human suffering, which has resulted in an ongoing public nuisance in

7   Peach County that has strained the County's resources.

8       826.    McKinsey knew that prescription opioids were dangerous because those drugs are

9   defined under federal and state law, and are generally recognized, as substances posing a high

10  potential for abuse, addiction, and death.

11      827.    The conduct of McKinsey has contributed to the existence of an ongoing,

12  significant, unlawful, and unreasonable interference with the public health, public safety, public

13  peace, public welfare, and the public comfort of the citizens of Peach County. McKinsey's

14  conduct has obstructed and caused inconvenience and annoyance to the citizens of Peach County

15  and is manifestly injurious to public health and safety.

16      828.    The significant interference with rights common to the public includes:

17      829.    The creation and fostering of an illegal, secondary market for prescription opioids;

18      830.    Easy access to prescription opioids by children and teenagers;

19      831.    A staggering increase in opioid abuse, addiction, overdose, injuries, and deaths;

20      832.    Infants being born addicted to opioids due to prenatal exposure, causing severe

21  withdrawal symptoms and lasting developmental impacts;

22      833.    Employers have lost the value of productive and healthy employees; and

23      834.    Increased costs and expenses for Plaintiffs relating to healthcare services, law

24  enforcement, the criminal justice system, social services, and education systems.

25      835.    When McKinsey engaged in the conduct described herein, McKinsey either knew,

26  was substantially certain, or should have known that by failing to act reasonably and lawfully

27  with respect to its work with Purdue and others, and by participating in the false marketing of

28

2331554.1
4857-5942-6172.v1

opioids in Peach County and the surrounding communities, diversion and the associated harms and resulting interference with public health, safety, and welfare would occur.

836.   McKinsey's conduct was negligent, reckless, and malicious.

837.   McKinsey's conduct was a proximate or other legal cause of the public nuisance that exists in Peach County.

838.   The public nuisance in Peach County is abatable. However, McKinsey lacks the infrastructure and expertise needed to abate the public nuisance it created, contributed to, and/or maintained in Peach County. McKinsey's conduct - including its lack of regard for the well-being of the citizens of Peach County and surrounding communities by elevating its own business interests, the interests of Purdue and others, and the pursuit of profit over the safety and health of the Plaintiffs' and Class Members' communities, also renders McKinsey unfit to oversee the abatement of the public nuisance it created, contributed to, and/or maintained.

## 2.   Drug Dealer Liability Act (O.C.G. § 51-1-46)

839.   This claim is brought by Georgia Plaintiffs, and by Named Plaintiffs on behalf of Georgia Class Members.

840.   McKinsey is liable for its knowing participation in the illegal marketing of controlled substances in Georgia pursuant to O.C.G. § 51-1-46(d). To participate in illegal marketing includes "manufacturing, distributing, or delivering or attempting or conspiring to manufacture, distribute, or deliver, a controlled substance." O.C.G. § 51-1-46(e)(9)(B).

841.   Plaintiffs are governmental entities that are "persons" entitled to sue under the Act. O.C.G. § 51-1-46(d).

## G.   Kentucky Plaintiffs

### 1.   Failure to Warn

842.   This claim is brought by Kentucky Plaintiffs, and by Named Plaintiffs on behalf of Kentucky Class Members.

2331554.1
4857-5942-6172.v1

843.     McKinsey had a duty to exercise reasonable care in the marketing, promotion, distribution and sale of opioids manufactured by Purdue that were marketed, promoted, distributed and sold pursuant to McKinsey's plans and the implementation of those plans as part of its ongoing relationship with Purdue as alleged above, and that duty to exercise reasonable care included the duty to warn adequately of the potential dangers associated with the use of Purdue's opioids as alleged above.

844.     McKinsey knew, or in the exercise of reasonable care should have known, that opioids were highly addictive, and both inappropriate and unsafe for the treatment of chronic pain. McKinsey also knew, or in the exercise of reasonable care, should have known, the dangers associated with the use of Purdue's opioids, as alleged above.

845.     McKinsey further knew, or in the exercise of reasonable care should have known, that widespread opioid addiction and abuse was harmful to men and women, including pregnant women, and their children, friends, families, communities, and to those like Plaintiffs who are responsible for paying for government services for those exposed to opioids, as well as for health care costs associated with opioid addiction and abuse among their insureds.

846.     Nonetheless, McKinsey unreasonably persisted in spreading misinformation and burying the truth about the safety and efficacy of opioids. McKinsey breached its duty and failed to take reasonable precautions to warn of the dangers of opioids when presenting opioids to the public in conjunction with Purdue. Further, McKinsey was reckless and consciously indifferent to the consequences of its actions and inactions.

847.     By failing to adequately warn the public, including prescribing doctors and Plaintiffs, of the dangers of opioids, McKinsey's conduct directly injured Plaintiffs. Because of McKinsey's misinformation campaign, and failure to warn, Plaintiffs became obligated and have paid and will continue to pay for further and additional government services for residents exposed to opioids, and paid for or otherwise reimbursed the cost of unnecessary and/or inappropriate opioid prescriptions, as well as the health care costs associated, disability benefits and worker's compensation.

2331554.1
4857-5942-6172.v1

848.    As a consequence of McKinsey's breach of its duty to warn, which was a continuing duty, Plaintiffs have suffered damages and will continue to suffer damages as alleged above.

### H.    Louisiana Plaintiffs

#### 1.    False Advertising
#### (La. Rev. Stat. § 40:6245(A))

849.    This claim is brought by Louisiana Plaintiffs, and by Named Plaintiffs on behalf of Louisiana Class Members.

850.    Louisiana Revised Statute § 40:625(A) states that "An advertisement of a…drug…is false if it is false or misleading in any particular regarding the…drug…Any representation concerning any effect of a drug…is false under this Sub-section if it is not supported by demonstrable scientific facts of substantial and reliable medical or scientific opinion."

851.    "Advertisement" includes all representations of fact or opinion disseminated to the public in any manner, or by any means other than labelling. La. R.S. § 40:601.

852.    Defendants violated La. R.S. § 40:625, because they engaged in false advertising in the conduct of a business, trade, or commerce in this state.

853.    At all times relevant to this Petition, Defendants, directly, through control of third parties, and by aiding and abetting third parties, violated La. R.S. § 40:625 by making and disseminating untrue, false, and misleading advertisements to Louisiana consumers to promote the sale and use of opioids to treat chronic pain, and by causing untrue, false, and misleading advertisements about opioids to be made or disseminated to Louisiana consumers in order to promote the sale and use of opioids to treat chronic pain. The untrue, false, and misleading statements in advertisements and other patient brochures included, but were not limited to:

      a.    Misrepresenting the truth about how opioids lead to addition;

      b.    Misrepresenting that opioids improve function;

      c.    Misrepresenting that addiction risk can be managed;

      d.    Misleading patients through the use of misleading terms like "pseudoaddiction";

2331554.1
4857-5942-6172.v1

1          e.      Falsely claiming that withdrawal is simply managed;

2          f.      Misrepresenting that increased doses pose no significant addiction risks;

3      and

4          g.      Falsely omitting or minimizing the adverse effects of opioids and

5      overstating the risks of alternative forms of pain treatment.

6          854.    At all times relevant, Defendants, directly, through its control of third parties, and

7      by aiding and abetting third parties, also violated La. R.S. § 40:625 through misleading

8      advertisements in various marketing channels, including but not limited to: advertisements,

9      brochures, and other patient educational materials that omitted or concealed material facts to

10     promote the sale and use of opioids to treat chronic pain. Defendants and third-party allies

11     repeatedly failed to disclose or minimized material facts about the risks of opioids, including the

12     risk of addiction, and its risks compared to alternative treatments. Such material omissions were

13     deceptive and misleading in their own right, and further rendered even otherwise truthful

14     statements about opioids untrue, false, and misleading, creating a misleading impression of the

15     risks, benefits, and superiority of opioids for treatment of chronic pain.

16         855.    Defendants knew at the time of making or disseminating these misstatements and

17     material omissions, or causing these misstatements and material omissions statement to be made or

18     disseminated, that they were untrue, false, or misleading and therefore likely to deceive the public.

19     In addition, Defendants knew or should have known that its marketing and promotional efforts

20     created an untrue, false, and misleading impression of the risks, benefits, and superiority or opioids.

21         856.    In sum, Defendants: (a) directly engaged in untrue, false, and misleading

22     advertising; (b) disseminated the untrue, false, and misleading advertisements through third parties;

23     and (c) aided and abetted the untrue, false, and misleading advertising by third parties.

24         857.    All of this conduct, separately and collectively, was intended to deceive Louisiana

25     consumers who used or paid for opioids for chronic pain and Louisiana payors, including Plaintiff,

26     who purchased, or covered the purchase of, opioids for chronic pain; and the political subdivisions

27     of the state charged with maintaining law and order in the parishes who bore increased costs

28     associated with foreseeable criminal activity arising from the rise in addition that was a direct

1   consequence of Defendants' promotions of misleading advertisements about opioid risks and

2   benefits.

3   858.   By reason of the foregoing, Louisiana Class Members were injured and continues

4   to be injured by Defendants' false advertisements that caused consumers to request, doctors to

5   prescribe, and payors such as Louisiana Class Members to pay for long-term opioid treatment

6   that they would not have otherwise paid for were it not for Defendants' false advertising. But for

7   Defendants' false advertising, Louisiana Class Members would not have incurred increased law

8   enforcement and social services costs associated with addiction and criminal activity directly

9   attributable to Defendants' misconduct. Defendants caused and are responsible for those costs

10  and claims. Louisiana Class Members have been injured by reason of Defendants' violation of

11  La. R.S. § 40:625.

12  **I.**   **Michigan Plaintiffs**

13  **1.**   **Drug Dealer Liability Act (MCL 691.1402 *et seq.*)**

14
15  859.   This claim is brought by Michigan Plaintiffs, and by Named Plaintiffs on behalf of

16  Michigan Class Members.

17  860.   McKinsey is liable for its knowing participation in the illegal marketing of

18  controlled substances in Michigan pursuant to MCL 691.1401 et. seq. To participate in illegal

19  marketing includes "manufacturing or delivering, or attempting or conspiring to manufacture or

20  deliver, a controlled substance." MCL 691.1604(3)(a).

21  861.   McKinsey conspired with numerous opioid manufacturer clients including Purdue

22  Pharma, Endo, Mallinckrodt, and Johnson & Johnson to illegally market opioids in the state of

23  Michigan in violation of the DDLA.

24  862.   Michigan Class Members are "persons" that may assert a cause of action for civil

25  damages against persons who knowingly participated in illegal marketing of a controlled

26  substance pursuant to Act. MCL 691.1604(4).

27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**J.**     **Ohio Plaintiffs**

    **1.**     **Absolute Public Nuisance**

863.     This claim is brought by Ohio Plaintiffs, and by Named Plaintiffs on behalf of Ohio Class Members.

864.     Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

865.     The public nuisance is an absolute public nuisance because McKinsey's nuisance-creating conduct was intentional and unreasonable and violated statutes that established specific legal requirements for the protection of others.

866.     McKinsey has created and maintained an absolute public nuisance through its participation in the deceptive marketing of opioids, which are dangerously addictive drugs, and efforts to boost opioid sales without regard to whether those sales were legitimate, in a manner which caused prescriptions and sales of opioids to skyrocket in Plaintiffs' communities, contributed to the oversupply of opioids in Plaintiffs' communities, and facilitated and encouraged the flow and diversion of opioids into an illegal, secondary market, resulting in devastating consequences to Plaintiffs, Ohio Class Members, and their residents.

867.     McKinsey knew, and has known, that its intentional, unreasonable, and unlawful conduct would cause, and has caused, opioids to be used and possessed illegally and that its conduct has produced an ongoing nuisance that has had, and will continue to have, a detrimental effect upon the public health, welfare, safety, peace, comfort, and convenience of Plaintiffs and their residents.

868.     McKinsey, in a joint effort with and on behalf of, Purdue and other opioid manufacturers, intentionally and unreasonably and/or unlawfully marketed and participated in Purdue and other opioid manufacturers pushing as many opioids onto the market as possible, fueling addiction to and diversion of these powerful narcotics, resulting in increased addiction and abuse, an elevated level of crime, death and injuries to the residents of Ohio Class Members'

1  communities, a higher level of fear, discomfort and inconvenience to the residents of Ohio Class
2  Members' communities, and direct costs to Ohio Class Members.

3  869.  A violation of any rule or law controlling the sale and/or distribution of a drug of
4  abuse in Ohio Class Members' communities constitutes an absolute public nuisance. *See e.g.* R.C.
5  § 4729.35 ("The violation by a . . . person of any laws of Ohio or of the United States of America
6  or of any rule of the board of pharmacy controlling the distribution of a drug of abuse . . .
7  constitute[s] a public nuisance[.]").

8  870.  In the marketing and efforts to boost sales of opioids in Ohio Class Members'
9  communities, McKinsey violated federal law, including, but not limited to 18 U.S.C. § 2 and 21
10  U.S.C. § 846 with respect to Purdue's violation of 21 U.S.C.A. § 823 and 21 C.F.R. § 1301.74,
11  and Ohio law, including, but not limited to, R.C. § 2923.03 with respect to Purdue's violations of
12  R.C. § 4729.01(F), R.C. §§ 4729.51-4729.53, and O.A.C. §§ 4729-912, 4729-9-16, and 4729-
13  928.

14  871.  McKinsey's unlawful nuisance-creating conduct includes aiding and abetting the
15  violation of, and conspiracy with another to violate, federal and Ohio statutes and regulations,
16  including the controlled substances laws, by:

17  a.  Aiding, abetting, conspiring in, and expanding the distribution and sale of
18  opioids in ways that facilitated and encouraged their flow into the illegal, secondary market;

19  b.  Aiding, abetting, conspiring in, and expanding the distribution and sale of
20  opioids without maintaining effective controls against the diversion of opioids; and

21  c.  Aiding, abetting, conspiring in, and expanding distribution and sale of
22  opioids prescribed by "pill mills" when McKinsey knew or should have known the opioids were
23  being prescribed by "pill mills."

24  872.  McKinsey's intentional and unreasonable nuisance-creating conduct, for which the
25  gravity of the harm outweighs the utility of the conduct, includes:

26  a.  Aiding, abetting, conspiring in, and expanding the distribution and sale of
27  opioids in ways that facilitated and encouraged their flow into the illegal,   secondary market;

28

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

b.       Aiding, abetting, conspiring in, and expanding the distribution and sale of opioids without maintaining effective controls against the diversion of opioids; and

c.       Aiding, abetting, conspiring in, and expanding distribution and sale of opioids prescribed by "pill mills" when McKinsey knew or should have known the opioids were being prescribed by "pill mills."

873.    McKinsey intentionally and unreasonably aided, abetted, conspired in, and encouraged the distribution and sale of opioids that it knew would be diverted into the illegal, secondary market and would be obtained by persons with criminal purposes.

874.    McKinsey intentionally and unreasonably engaged in, and helped to increase the impact of, a deceptive marketing scheme that was designed to, and successfully did, change the perception of opioids and cause their prescribing and sales to skyrocket in Plaintiffs' communities.

875.    McKinsey's conduct violated the Ohio Consumer Sales Practices Act, R.C. § 1345.01 *et seq.*, which prohibits unfair, deceptive, or unconscionable acts or practices in connection with a consumer transaction. Its conduct also violates O.A.C. § 09:4-3-10, which provides that it is a deceptive act or practice for a supplier (which includes a "person engaged in the business of effecting or soliciting consumer transactions" and need not be a person who "deals directly with the consumer," R.C. § 1345.01(C)), in connection with a consumer transaction to "[m]ake any representations, claims, or assertions of fact, whether orally or in writing, which would cause a reasonable consumer to believe such statements are true, unless, at the time such representations, claims or assertions are made, the supplier possesses or relies upon a reasonable basis in fact such as factual, objective, quantifiable, clinical or scientific data or other competent or reliable evidence which substantiates such representations, claims, or assertions of fact."

876.    McKinsey's unfair, deceptive, and unconscionable acts and practices include, but are not limited to:

a.       Engaging in untrue, false, unsubstantiated, and misleading marketing, directly, and with and through third parties, in violation of 21 C.F.R. § 202.1(e), thereby causing opioid drugs to be misbranded;

b. Promoting other purported advantages of OxyContin, including but not limited to improved function and quality of life in violation of FDA regulations, including 21 C.F.R. § 202.1(e);

c. Promoting higher sales, higher dose sales, and targeting the highest volume prescribers of a highly abusable, addictive, and dangerous drug;

d. Promoting higher dose OxyContin prescriptions, known to pose greater risks; and

e. Targeting the highest-prescribing physicians, without addressing whether those prescribers may be engaged in abuse and diversion and should not be targeted, to induce them to increase prescriptions of OxyContin further.

877. McKinsey worked to undermine public policy, enshrined by regulations contained in state and federal law, aimed at ensuring honest marketing and safe and appropriate use of pharmaceutical drugs.

878. In the connection with the marketing and sale of opioids in Ohio and Plaintiffs' communities, McKinsey violated and/or aided and abetted violations of R.C. § 2925.02(A), which states: "No person shall knowingly do any of the following:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

879. McKinsey's marketing strategies were also oppressive in fueling addiction and diversion of drugs specifically known to McKinsey to be dangerous because, inter alia, these drugs are defined under federal and state law as substances posing a high potential for abuse and addiction.

880. McKinsey's tortious conduct was a substantial factor in creating the absolute public nuisance.

881.   McKinsey acted with actual malice because McKinsey acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

882.   Ohio Plaintiffs and Named Plaintiffs on behalf of Ohio Class Members assert this Cause of Action as a common law tort claim for absolute public nuisance and not as a "product liability claim" as defined in R.C. § 2307.71. In this Count, Ohio Plaintiffs do not seek damages for death, physical injury to person, emotional distress, or physical damage to property, as defined under the Ohio Product Liability Act.

### 2.   Injury through Criminal Acts (R.C. § 2307.60)

883.   This claim is brought by Ohio Plaintiffs, and by Named Plaintiffs on behalf of Ohio Class Members.

884.   Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

885.   R.C. § 2307.60(A)(1) provides that:

Anyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law, may recover the costs of maintaining the civil action and attorney's fees if authorized by any provision of the Rules of Civil Procedure or another section of the Revised Code or under the common law of this state, and may recover punitive or exemplary damages if authorized by section 2315.21 or another section of the Revised Code.

886.   In the marketing and efforts to increase the sale of opioids in Ohio Class Members' communities, McKinsey violated R.C. § 2925.02(A), which states:

(1) By force, threat, or deception, administer to another or induce or cause another to use a controlled substance; . . . or

(3) By any means, administer or furnish to another or induce or cause another to use a controlled substance, and thereby cause serious physical harm to the other person, or cause the other person to become drug dependent."

887.   McKinsey's actions in deceptively marketing opioids and to expand opioid profits in the face of potential diversion, as described throughout this Complaint, knowingly induced or

2331554.1
4857-5942-6172.v1

1    caused members of Ohio Class Members' communities to use a controlled substance by

2    deception, in violation of R.C. § 2925.02(A).

3        888.    Through McKinsey's actions as described in this Complaint, including deceptive

4    marketing and aiding, abetting, conspiring in, and encouraging the deliberate disregard of

5    obligations to maintain effective controls against diversion, McKinsey participated in furnishing

6    controlled substances to residents of Plaintiffs' communities, or induced or caused residents of

7    Plaintiffs' communities to use a controlled substance, thereby causing serious physical harm to

8    those persons and causing them to become drug dependent, in violation of R.C. § 2925.02(A)(3).

9        889.    The exemption in R.C. § 2925.02 only applies to drug manufacturers and other

10   persons when their "conduct is in accordance with Chapters R.C. § 3719., 4715., 4723., 4729.,

11   4730., 4731., and 4741." R.C. § 2925.02(B). McKinsey and its clients were not in compliance

12   with said Chapters and had thereby forfeited the protection provided by the exception.

13       890.    In connection with the sale of opioids in Ohio and Plaintiffs' communities,

14   McKinsey aided, abetted, conspired in, and encouraged the violation of R.C. § 2925.02(A)(2),

15   which makes it a crime to: "Prepare for shipment, ship, transport, deliver, prepare for

16   distribution, or distribute a controlled substance or a controlled substance analog, when the

17   offender knows or has reasonable cause to believe that the controlled substance or a controlled

18   substance analog is intended for sale or resale by the offender or another person."

19       891.    McKinsey may claim an exemption to R.C. § 2925.03(A)(2) only if its "conduct

20   is in accordance with Chapters 3719., 4715., 4723., 4729., 4730., 4731., and 4741. of the

21   Revised Code." McKinsey was not in compliance with said Chapters and had thereby forfeited

22   the protection provided by the exception.

23       892.    McKinsey engaged in additional criminal acts detailed in Plaintiffs' Absolute

24   Public Nuisance claim.

25       893.    It was foreseeable to McKinsey that its misconduct alleged in this Count would

26   lead to addiction, abuse, misuse, and diversion of opioids, both in Plaintiffs' communities and

27   throughout the United States.

28

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

894.     Ohio Class Members were within the zone of interest protected by these criminal laws.

895.     As a direct and proximate result of McKinsey's criminal acts as described in this Count, Plaintiffs suffered injury and damages, for which Plaintiffs are entitled to recover pursuant to R.C. § 2307.60(A)(1).

896.     McKinsey's misconduct alleged in this case was ongoing and persistent for many years.

897.     McKinsey's misconduct alleged in this case does not concern a discrete event or discrete emergency of the sort a political subdivision would reasonably expect to occur, and is not part of the normal and expected costs of a local government's existence. Plaintiffs allege wrongful acts which are neither discrete nor of the sort a local government can reasonably expect.

898.     Ohio Class Members have incurred expenditures for special programs over and above their ordinary public services.

899.     McKinsey acted with actual malice because it acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

### 3.     Engaging in a Pattern of Corrupt Activity (R.C. 2923.21 *et seq.*)

900.     This claim is brought by Ohio Plaintiffs and by Named Plaintiffs on behalf of Ohio Class Members.

901.     Plaintiffs re-allege and incorporate the allegations contained in the RICO cause of action.

902.     McKinsey and the opioid manufacturers with which it conspired are "persons" within the meaning of R.C. 2923.31(G) who conducted the affairs of an enterprise—the "Opioid Marketing Enterprise"— through a pattern of corrupt activity in violation of R.C. 2923.31.

903.     Plaintiffs are "person[s]," as that term is defined in R.C. 2923.31, who were injured as a result of McKinsey's wrongful conduct.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

904.    Under R.C. 2923.32:

(A)(1) No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt.

(2) No person, through a pattern of corrupt activity or the collection of an unlawful debt, shall acquire or maintain, directly or indirectly, any interest in, or control of, any enterprise or real property.

(3) No person, who knowingly has received any proceeds derived, directly or indirectly, from a pattern of corrupt activity or the collection of any unlawful debt, shall use or invest, directly or indirectly, any part of those proceeds, or any proceeds derived from the use or investment of any of those proceeds, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise.

905.    Description of the Enterprise

a.    McKinsey, Purdue, and other opioid manufacturers were members of a legal entity enterprise within the meaning of R.C. 2923.31(C). McKinsey and these opioid makers formed an association-in-fact enterprise –the "Opioid Marketing Enterprise." The Opioid Marketing Enterprise consists of McKinsey, including its employees and agents, and the opioid manufacturers, including Purdue, described above.

b.    Alternatively, McKinsey and each of its co-conspirators constitutes a single legal entity or associated-in-fact "enterprise" within the meaning of R.C. 2923.31(C), through which the members of the enterprise conducted a pattern of corrupt activity. The Opioid Marketing Enterprise was, for years, an ongoing and continuing business organization that created and maintained systematic links for a common purpose: to ensure the prescription of opioids for chronic pain and to boost opioid sales through deceptive marketing and turning a blind eye to signs of potential diversion.

c.    McKinsey and the participating opioid manufacturers formed the Opioid Marketing Enterprise for the purpose of unlawfully increasing demand for, and thus sales of and revenues and profits from prescription opioids by maintaining an oversupply of prescription opioids through illegal practices, including committing fraud and drug offenses (as laid out above and below). McKinsey and these manufacturers, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public,

including the Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use — and sought to profit from, and increase opioid prescribing even in the face of signs of potential diversion. At all relevant times, the Opioid Marketing Enterprise: (a) had an existence separate and distinct from McKinsey; (b) was separate and distinct from the pattern of corrupt activity in which McKinsey engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and legal entities, including McKinsey; (d) was characterized by interpersonal relationships between and among each member of the Opioid Marketing Enterprise, including McKinsey; (e) had sufficient longevity for the enterprise to pursue its purpose and functioned as a continuing unit.

d.      Upon information and belief, McKinsey and the other members of the Opioid Marketing Enterprise had a systematic link to each other through contractual relationships, financial ties, and continuing coordination of activities, as spearheaded by the opioid manufacturers and McKinsey. They coordinated for example, through McKinsey's urging to spread messaging through pain patients seemingly more credible than Purdue and encouragement for Purdue to band together with other manufacturers, described above. Their coordination can also be inferred through the consistent misrepresentations described in this Complaint and Plaintiffs prior complaints against the manufacturers.

e.      McKinsey and Purdue also created an organizational structure for the "E2E" program.

f.      Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose.

g.      Upon information and belief, McKinsey and Purdue exerted substantial control over the Opioid Marketing Enterprise through communications with each other.

h.      There was, upon information and belief, regular communication between McKinsey, Purdue, and other opioid manufactures, in which information was shared, misrepresentations and/or strategies are coordinated, and payments were exchanged. Typically, the coordination, communication and payment occurred, and continues to occur, through the

repeated and continuing use of the wires and mail, including, but not limited to, e-mail correspondence and use of the mails. McKinsey and the opioid manufacturer members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

i.      Taken together, the interaction and length of the relationships between and among McKinsey and Purdue as well as, upon information and belief, Janssen and Endo, reflects a deep level of interaction and cooperation between two groups in a tightly knit industry with a common interest in preserving and expanding a broader market for opioids.

906.    Conduct of the Enterprise

a.      During the time period alleged in this Complaint, McKinsey exerted control over, conducted and/or participated in the Opioid Marketing Enterprise by developing and implementing plans for fraudulently marketing opioids for the treatment of chronic pain and profiting from, and even expanded opioid sales and use through prescribers who raised red flags of potential diversion. In devising and executing the illegal scheme, the members of the Opioid Marketing Enterprise devised and knowingly carried out a material scheme and/or artifice to defraud the Plaintiffs and the public to obtain money by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the risks, benefits, and superiority of opioids in general and their opioids in particular.

b.      In addition, as part of this scheme, McKinsey and Purdue misled the public regarding their role in the opioid epidemic and commitment to combatting opioid addiction and abuse.

907.    Pattern of Corrupt Activity

a.      McKinsey conducted and participated in the conduct of the affairs of the Opioid Marketing Enterprise, through a pattern of corrupt activity as defined in R.C. 2923.31(E) & (I)(2).

b.      Corrupt activities as defined in R.C. 2923.31(I) include, among other things: engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or

intimidating another person to engage in any conduct defined as racketeering activity under the Organized Crime Control Act of 1970, 84 Stat. 941, 18 U.S.C. § 1961(1)(B), (1)(C), (1)(D), and (1)(E), as amended; and, any "violation of section . . . 2913.05."

    c.    A "'pattern of corrupt activity' means two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

    d.    Incidents of corrupt activity include, but are not limited to:

        i.    Wire Fraud: The members of Opioid Marketing Enterprise violated 18 U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received, fraudulent materials by wire for the purpose of selling opioids for chronic pain.

        ii.    Telecommunications Fraud: The members of Opioid Marketing Enterprise violated R.C. 2913.05 by "knowingly disseminat[ing], transmit[ing], or caus[ing] to be disseminated or transmitted by means of a wire, radio, satellite, telecommunication, telecommunications device, or telecommunications service any writing, data, sign, signal, picture, sound, or image with purpose to execute or otherwise further the scheme to defraud."

        iii.    Violation of Controlled Substances Act. The members of the Opioid Marketing Enterprise violated 21 U.S.C. § 483(a)(4), which makes it unlawful "for any person to knowingly or intentionally furnish false or fraudulent information in, or omit any material information form, any application, report, record or other document required to be made, kept or filed under this subchapter," and a violation of which is punishable by up to four years in jail, *see* 21 U.S.C. § 483(d)(1), making it a felony.

    e.    Defendants used, directed the use of, and/or caused to be used, thousands of interstate wire communications in furtherance of these Enterprise's fraudulent scheme and common course of conduct to preserve and expand the market for their opioids and increase their profits through misleading and deceptive marketing and turning a blind eye to potential diversion. This conduct in furtherance of the Opioids Marketing Enterprise involved numerous separate communications.

2331554.1
4857-5942-6172.v1

f.      The multiple acts of corrupt activity which the members of the Opioid Marketing Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of corrupt activity."

g.      McKinsey's participation in the Opioid Marketing Enterprise was necessary for the successful activity in which it engaged. The scheme devised and implemented by members of the Opioid Marketing Enterprise amounted to a common and continuing course of conduct intended to increase the profits and sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain and seeking to increase sales even to prescribers potentially engaged in diversion. The scheme was a continuing course of conduct that went on for years.

h.      As detailed above, McKinsey aided Purdue in committing various fraudulent acts which constitute fraud and a scheme to defraud. These intentional omissions of material fact and affirmative representations made through McKinsey's strategies and projects were false when made and also encouraged breach of Purdue's duties to guard against diversion and to report and halt sales to suspicious prescribers. McKinsey, as described above, received lucrative fees for the perceived value it added to the deceptive marketing and sales effort. McKinsey has also been described as in possession of a "huge amount of inside information" due to its connections and operation of an internal hedge fund, known as McKinsey Investment Office.

i.      The multiple acts of corrupt activity which the members of the Opioid Marketing Enterprise committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of corrupt activity, through which the members of the Opioid Marketing Enterprise defrauded and intended to defraud Ohio consumers, the State, and other intended victims."

2331554.1
4857-5942-6172.v1

908.    Damages

a.    McKinsey's contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging and efforts to "turbocharge" sales even amidst a growing epidemic fueled the opioid crisis.

b.    McKinsey's violations of law and the pattern of corrupt activity directly or indirectly caused the Plaintiffs' injuries. The Enterprise's pattern of corrupt activity logically, substantially and foreseeably caused an opioid epidemic. Plaintiffs' injuries, as described below, were not unexpected, unforeseen or independent. Rather, as the Plaintiffs allege, McKinsey knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse, and also had troubling signs of potential diversion, including among the same prescribers from which it planned increased opioid sales. Nevertheless, McKinsey and the Enterprise engaged in a scheme of deception that utilized the wires as part of their fraud, in order to increase sales of opioid products and the consulting fees McKinsey obtained from its efforts.

c.    It was foreseeable and expected that a massive marketing campaign that misrepresented the risks and benefits of prescription opioids as well as methods to increase sales to prescribers that raised red flags of (and/or were found to have been engaged in) diversion, would lead to a nationwide opioid epidemic and a devastating public health crisis in Plaintiffs' communities. Plaintiffs' injuries were logically, foreseeable, and substantially caused by the opioid epidemic that McKinsey, and the Enterprise, created.

d.    McKinsey's pattern of corrupt activity directly and proximately caused the Ohio Plaintiffs and Ohio Class Members' injuries because Ohio Plaintiffs and Ohio Class Members paid for costs associated with the opioid epidemic, as described above in language expressly incorporated herein by reference. But for Defendants' conduct, Ohio Plaintiffs and Ohio Class Members would not have incurred the costs for health care and addiction treatment, law enforcement, child welfare, and other expenditures required as a result of the opioid epidemic.

K.     **Oklahoma Plaintiffs**

1.     **Public Nuisance (50 O.S. § 16)**

909.     This claim is brought by Oklahoma Plaintiffs, and by Named Plaintiffs on behalf of Oklahoma Class Members.

910.     Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

911.     Plaintiffs bring this claim against McKinsey under Oklahoma common law as well as an Oklahoma statute which confers upon cities the power to determine what is a public nuisance within its corporate limits and the power to abate all nuisances that are or may be injurious to the health and welfare of its residents. 50 O.S. § 16.

912.     McKinsey's misrepresentations and omissions regarding opioids, as set forth above and in the Purdue marketing plan, have fueled an opioid epidemic within the corporate limits of Plaintiffs that constitute a public nuisance. McKinsey and Purdue knowingly exacerbated a condition that affects entire municipalities, towns, and communities.

913.     McKinsey's misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, constitute unlawful acts and/or omissions of duties, that annoy, injure, or endanger the comfort, repose, health, and/or safety of others. The annoyance, injury, and danger to the comfort, repose, health, and safety of residents of Plaintiffs includes, but is not limited to:

a.     Drug overdose deaths in Oklahoma had already increased six-fold from 1999 to 2012. In 2010, one year after McKinsey began advising Purdue on sales and marketing strategy, overdose deaths surpassed car crash deaths in Oklahoma. McKinsey crafted a strategy that tripled OxyContin sales during that time;

b.     From 2004 to 2014, Oklahoma's unintentional poisoning death rate effectively doubled from 8.2 deaths per 100,000 individuals to 16.3 per 100,000. Prescription opioids contributed to the majority of those deaths. The following year, McKinsey developed

"Project Turbocharge," which was adopted as the national sales theme for the following year, under the rubric of "Evolve to Excellence";

        c.     In 2014, during the year Purdue implemented McKinsey's strategy through "Evolve to Excellence," Oklahoma suffered in excess of 600 deaths attributable to opioid overdoses. By 2018, the number almost doubled, to 1,132.

        d.     Prescription opioid addiction often leads to illicit opioid use and addiction;

        e.     According to the Centers for Disease Control, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

        f.     Oklahoma hospitals are reporting increasing numbers of newborns testing positive for prescription medications; and

        g.     McKinsey's crafted deceptive marketing strategies that were prepared for Purdue, purchased by Purdue, and implemented by Purdue with McKinsey's ongoing assistance. These strategies enflamed, purposefully, an opioid abuse and addiction epidemic that has caused Oklahoma Plaintiffs and Oklahoma Class Members to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others.

**L.**     **Tennessee Plaintiffs**

     **1.**     **Public Nuisance (Tenn. Code § 29-3-101(B))**

914.    This claim is brought by Tennessee Plaintiffs, and by Named Plaintiffs on behalf of Tennessee Class Members.

915.    Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

916.    Under Tennessee statutory law, "[a]ny person who uses, occupies, establishes or conducts a nuisance, or aids or abets therein, and the owner, agent or lessee of any interest in any such nuisance, together with the persons employed in or in control of any such nuisance by any such owner, agent or lessee, is guilty of maintaining a nuisance and such nuisance shall be abated as provided hereinafter." Tenn. Code Ann. § 29-3-101(b).

917.    The term "nuisance" includes "[a]ny place in or upon which. . . [the] unlawful sale of any regulated legend drug, narcotic or other controlled substance . . . are carried on or permitted, and personal property, contents, furniture, fixtures, equipment and stock used in or in connection with the conducting and maintaining any such place for any such purposes." *Id*. § 29-3-101 (a)(2)(A).

918.    The nuisance statute further provides that, in an "order of abatement, the court may . . . assess costs of public services required to abate or manage the nuisance, including, but not limited to, law enforcement costs, if any, caused by the public nuisance." *Id*. § 29-3-110.

919.    Defendants were a direct and proximate cause of the overflow of opioids into the state of Tennessee.

920.    The opioid epidemic constitutes a statutory nuisance in Tennessee.

921.    Defendants established, conducted, and aided and abetting the nuisance.

## 2.    Drug Dealer Liability Act (Tenn. Code § 29-38-105, *et seq.*)

922.    This claim is brought by Tennessee Plaintiffs, and by Named Plaintiffs on behalf of Tennessee Class Members.

923.    McKinsey knowingly participated in the illegal drug market in the State of Tennessee. Tenn. Code § 29-38-105(a). McKinsey committed multiple acts intended to facilitate the marketing and distribution of an illegal drug in Tennessee. Tenn. Code Ann. § 29-38-104(9).

924.    Tennessee Plaintiffs and Tennessee Class Members are governmental entities that fund drug treatment programs and/or employee assistance programs or have otherwise extended money on behalf of individual drug users, and are entitled to bring suit against drug market participants. Tenn. Code Ann. § 29-38-106(a)(4).

## M.    Virginia Plaintiffs

### 1.    Public Nuisance (Va. Code § 15.2-900)

925.    This claim is brought by Virginia Plaintiffs, and by Named Plaintiffs on behalf of Virginia Class Members.

2331554.1
4857-5942-6172.v1

926.     Plaintiffs re-allege and incorporate the allegations contained in the Common Law Nuisance cause of action.

927.     This action is brought by Plaintiffs pursuant to Va. Code Ann. § 15.2-900 to abate the public nuisance created by Defendants, and to recover costs that Virginia Plaintiffs and Virginia Class Members have already incurred and future costs Virginia Plaintiffs and Virginia Class Members expect to incur in its provision of emergency services that are reasonably required to abate the public nuisance created by Defendants.

928.     Defendants helped create a condition of an excessive amount of opioids in circulation that was and continues to be dangerous to the public and has injured those inhabitants in Virginia who have come within its influence.

929.     Defendants knew or should have known that their work in proliferating the use of opioids would create a public nuisance:

a.     Defendants' actions created and expanded the market for opioids;

b.     Defendants encouraged the misrepresentation of the benefits of opioids for chronic pain and the fraudulent concealment, misrepresentation, and omission of the serious adverse effects of opioids, including the addictive nature of the drugs; and

c.     Defendants knew or should have known that their work would lead to addiction and other adverse consequences and that the larger community would suffer as a result.

930.     Defendants' actions were a substantial factor in making opioids widely available and widely used and in doctors and patients not accurately assessing and weighing the risks and benefits of opioids for chronic pain. Defendants' actions caused excess opioids to be shipped to Virginia, and these excess opioids were diverted into the black market. Without Defendants' actions, opioid use would not have become so widespread, and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists would have been averted.

931.     Defendants knowingly and intentionally designed marketing strategies that would maximize the number of opioids in the marketplace.

932.     The public nuisance created by Defendants endangered, and presently endangers, the life, health and safety of each Virginia Plaintiffs' and Virginia Class Members' residents.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

933.     The public nuisance created by Defendants interferes with the reasonable and comfortable use of each Virginia Plaintiffs' and Virginia Class Members' property and resources.

934.     The public nuisance created by Defendants' actions has caused and continues to cause significant harm to the Virginia Plaintiffs' and Virginia Class Members' communities that includes but is not limited to:

　　　　　a.     Opioid-related drug overdose deaths;

　　　　　b.     The disease of opioid addiction and other diseases related to long-term opioid use;

　　　　　c.     Infants born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

　　　　　d.     Other child abuse and neglect resulting from opioid abuse;

　　　　　e.     Crime associated with illegal drug use and opioid sales;

　　　　　f.     Unemployment resulting from an inability to work while addicted to opioids; and

　　　　　g.     Blight, vagrancy, property damage, and property crime.

935.     Public resources are being unreasonably consumed in efforts to address the opioid epidemic, thereby eliminating available resources which could be used to benefit the public at large in each Virginia Plaintiffs' and Virginia Class Members' communities.

936.     The public nuisance created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

937.     Each Virginia Plaintiff and Virginia Class Member has incurred significant costs to date in its efforts to provide services that were reasonably necessary to abate the public nuisance created and perpetuated by Defendants. Each Virginia Plaintiff and Virginia Class Member expects to incur significant costs going forward to ameliorate the harm caused by Defendants.

938.     As a direct and proximate result of the public nuisance, each Virginia Plaintiff and Virginia Class Member has sustained (and continues to sustain) harm by spending a substantial amount of money trying to fix the societal harms caused by the Defendants' nuisance-causing

2331554.1
4857-5942-6172.v1

activity, including, but not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of each Virginia Plaintiffs' and Virginia Class Members' limited and diverted resources.

## 2. **Willful and Wanton Negligence**

939.     This claim is brought by Virginia Plaintiffs, and by Named Plaintiffs on behalf of Virginia Class Members.

940.     Plaintiffs re-allege and incorporate the allegations contained in the Negligence, Gross Negligence, and Wanton and Intentional Conduct causes of action.

941.     Defendants' scheme to optimize profits regardless of the effect on each Virginia Plaintiff was undertaken and executed intentionally.

942.     Defendants' role in designing and implementing sales and marketing strategies and tactics that would dramatically increase the amount of OxyContin prescribed and distributed to each Virginia Plaintiff's and Virginia Class Members' communities was willfully and wantonly negligent in that it was done in conscious disregard of the rights of each Plaintiff and its residents and/or with reckless indifference to the consequences of their actions.

943.     At all relevant times, Defendants were aware, from its knowledge of existing circumstances and conditions, that their conduct would likely cause injury to each Plaintiff and its residents.

944.     As a proximate result of its willfully and wantonly negligent conduct, the Defendants have caused the Virginia Plaintiffs and Virginia Class Members to incur excessive costs related to responding to the opioid crisis. These costs include but are not limited to, the costs of healthcare, emergency medical services, social services, prevention, treatment, intervention, law enforcement, lost tax revenues, direct spending on opioids and opioid antagonists, and lost communal benefits of each Plaintiff's limited and diverted resources.

2331554.1
4857-5942-6172.v1

945.   Furthermore, Defendants should be held liable for punitive damages to each Plaintiff because they had prior knowledge of the specific dangerous conditions its willful and wanton negligence created, it consciously disregarded that knowledge and continued to engage in its exceedingly dangerous course of conduct, and the harm inflicted on each Virginia Plaintiff and Virginia Class Member and their residents by Defendants' conduct was the natural and probable result of that conduct.

**N.      West Virginia Plaintiffs**

**1.      Intentional Acts and Omissions**

946.   This claim is brought by West Virginia Plaintiffs, and by Named Plaintiffs on behalf of West Virginia Class Members.

947.   McKinsey intentionally contributed to the prescription drug abuse epidemic in Plaintiffs' communities and throughout the state through repeated intentional violations of various provisions of the West Virginia Uniform Controlled Substances Act and through reckless disregard to the safety and well-being to the citizens of West Virginia Plaintiffs and West Virginia Class Members:

a.      McKinsey conspired with Purdue to intentionally and improperly distribute prescription drugs contrary to W.Va. Code § 60A-3-308;

b.      McKinsey conspired with Purdue to intentionally engage in prohibited acts, contrary to W.Va. Code §§ 60A-4-401 through 403;

c.      McKinsey aided and abetted Purdue in deceiving and attempting to deceive medical practitioners in order to obtain prescriptions in violation of W.Va. Code § 60A4-401;

d.      McKinsey conspired with Purdue to intentionally fail to meet the requirements of W.Va. Code § 60A-8-1 *et seq.*;

e.      McKinsey conspired with Purdue to intentionally violate the WV Uniform Controlled Substances Act;

f.       McKinsey intentionally failed to ensure its conduct conformed to industry standards;

g.       McKinsey intentionally failed to ensure its conduct conformed to West Virginia law and regulations; and

h.       McKinsey intentionally turned a blind eye toward industry standards by assisting Purdue in distributing large quantities of commonly-abused, highly addictive controlled substances to clients who were serving a customer base comprised of individuals who were abusing prescription medications, many of whom were addicted and whom can reasonably be expected to become addicted or to engage in illicit drug transactions.

948.    The intentional acts and omissions by McKinsey have led to the dispensing of controlled substances for non-legitimate medical purposes and fueling a prescription drug abuse epidemic in Plaintiffs.

949.    McKinsey acted solely for the maximization of profit, the expansion of market, and overall opioid sales. McKinsey acted with the intent to barely comply with and manipulate controlling regulations regarding quota and distribution.

950.    In doing so, McKinsey's intentional acts and omissions ultimately supplied millions of doses of commonly-abused, highly addictive controlled substances to patients of pill mills.

951.    The intentional acts and omissions by McKinsey fueled countless prescriptions that were primarily filled to divert the medication to illegal purposes.

952.    The intentional violations of West Virginia law by McKinsey makes it liable for all the damages which are sustained therefrom. W. Va. Code § 55-7-9.

953.    The intentional acts and omissions of McKinsey have proximately caused and substantially contributed to damage suffered by Plaintiffs and created conditions which contribute to the violation of West Virginia laws by others.

954.    The intentional acts and omissions by McKinsey have proximately caused and substantially contributed to damages suffered by West Virginia Plaintiffs and West Virginia Class

1   Members and were in violation of the customs, standards and practices within the industry of

2   management consulting and pharmaceutical sales and marketing.

3   **X.**     <u>**PRAYER FOR RELIEF**</u>

4        Plaintiffs seek all legal and equitable relief permitted by law, including:

5        •   Certification of the proposed Class;

6        •   Appointment of Plaintiffs County of Santa Cruz, California; Pope County, Illinois;

7           and The Village of Eddyville, Illinois as Class Representatives;

8        •   Compensatory damages;

9        •   Abatement of the public nuisance that McKinsey created, assisted in creating,

10          contributed to, or exacerbated.

11       •   Restitution;

12       •   Disgorgement of profits;

13       •   Punitive and/or exemplary damages;

14       •   Injunctive/equitable relief;

15       •   Treble damages;

16       •   Pre- and post-judgment interest; and

17       •   Attorneys' fees and costs.

18  **XI.**     <u>**JURY DEMAND**</u>

19       Plaintiffs demand a trial by jury on all issues so triable.

2331554.1
4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1   Dated: September 26, 2023

Respectfully submitted,

2

By: */s/ Aelish M. Baig*
3   Aelish M. Baig
aelishb@rgrdlaw.com
4   **ROBBINS GELLER RUDMAN & DOWD, LLP**
One Montgomery Street, Ste 1800
5   San Francisco, CA 94104
Telephone: (415) 288-4545

6

By: */s/ Emily Roark*
7   Emily Roark
emily.roark@bryantpsc.com
8   **BRYANT LAW CENTER, PSC**
601 Washington Street, P.O. Box 1876
9   Paducah, KY 42002-1876
Telephone: (270) 550-1230
10

*PSC Members – Political Subdivisions, Counsel for*
11   *proposed Named Plaintiffs and proposed Class*
*Counsel*
12

By: */s/ Jayne Conroy*
13   Jayne Conroy
jconroy@simmonsfirm.com
14   **SIMMONS HANLY CONROY, LLC**
112 Madison Avenue, 7th Floor
15   New York, NY 10016
Telephone: (212) 257-8482
16

By: */s/ Joe Rice*
17   Joe Rice
jrice@motleyrice.com
18   **MOTLEY RICE, LLC**
28 Bridgeside Boulevard
19   Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
20

By: */s/ Matthew Browne*
21   Matthew Browne
mbrowne@brownepelican.com
22   **BROWNE PELICAN, PLLC**
7007 Shook Avenue
23   Dallas, TX 75214
Telephone: (405) 642-9588
24

*PSC Members – Political Sub-Divisions and*
25   *proposed Class Counsel*
26

**Filing Authorized by Plaintiffs' Lead Counsel**
27   **Pursuant to PTO 2:**

28

2331554.1

4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

1

2
                       By: */s/ Elizabeth J. Cabraser*
                       Elizabeth J. Cabraser
                       ecabraser@lchb.com

3
                       **LIEFF CABRASER HEIMANN &**
                       **BERNSTEIN, LLP**

4
                       275 Battery Street, 29th Floor
                       San Francisco, CA 94111-3339

5
                       Telephone: (415) 956-1000

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2331554.1

4857-5942-6172.v1

MASTER COMPLAINT
(SUBDIVISION)
21-MD-02996-CRB (SK)

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on September 26, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Aelish M. Baig
ALISH M. BAIG

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
Email:  aelishb@rgrdlaw.com

**Mailing Information for a Case 3:21-md-02996-CRB In re: McKinsey & Co., Inc. National Prescription Opiate Consultant Litigation**

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Gregory R. Abboud**
  greg@abboudlawfirm.com

- **Mark Abramowitz**
  mabramowitz@dlcfirm.com,1064889420@filings.docketbird.com

- **Benjamin D. Adams**
  badams@cldlaw.com

- **Henry J. Avery**
  havery@zsz.com

- **Salvatore C. Badala**
  sbadala@napolilaw.com,1936354420@filings.docketbird.com

- **Salvatore Charles Badala**
  sbadala@napolilaw.com

- **Aelish Marie Baig**
  AelishB@rgrdlaw.com,kmccormack@rgrdlaw.com,pmitchell@rgrdlaw.com,e_file_sd@rgrdlaw.com,creis@rgrdlaw.com

- **Adam Phillip Bailey**
  abailey@hobbsstraus.com

- **Amanda K. Baker**
  AKBaker@hollandhart.com

- **Lauren G. Barnes**
  lauren@hbsslaw.com,racheld@hbsslaw.com,jennyo@hbsslaw.com

- **David R. Barney , Jr**
  drbarneywv@gmail.com

- **Talat Mahammad Bashir**
  talat4321@hotmail.com

- **Mark D. Bauman**
  mbauman@hinshawlaw.com

- **John C. Beiers**
  jbeiers@smcgov.org,slectura@smcgov.org,jbarbarotto@smcgov.org

- **TerriAnne Benedetto**
  tbenedetto@dugan-lawfirm.com

- **James Reginald Benjamin , Jr**
  jrbenjamin@baltimorecountymd.gov

- **Steve W. Berman**
  steve@hbsslaw.com,robert@hbsslaw.com,heatherw@hbsslaw.com,benh@hbsslaw.com,nicolleh@hbsslaw.com

- **James Lawrence Bernard**
  jbernard@stroock.com,trozina@stroock.com,mnathanson@stroock.com,rtrumbauer@stroock.com,docketing@stroock.com

- **Scott R. Bickford**
  srb@mbfirm.com,usdcedla@mbfirm.com

- **Andrea Bierstein**
  abierstein@simmonsfirm.com

- **Jonathan Blanton**
  jonathan.blanton@ohioattorneygeneral.gov

- **Caitlin Sinclaire Blythe**
  cblythe@mofo.com,npan@mofo.com,caitlyn-blythe-2697@ecf.pacerpro.com

- **Little Fawn Boland**
  littlefawn@ceibalegal.com,ellen@ceibalegal.com

- **Christopher Scott Boynton**
  cboynton@vbgov.com

- **Nicolle B Brito**
  NBrito@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_fl@rgrdlaw.com,khanson@rgrdlaw.com

- **Henry Donald Brock , Jr**
  don@whittingtonlaw.com

- **James M. Brodzik**
  jbrodzik@hinshawlaw.com

- **C. Ezra Bronstein**
  ebronstein@findjustice.com

- **Ezra Bronstein**
  ebronstein@findjustice.com

- **Matthew Browne**
  mbrowne@brownepelican.com

- **Matthew P Browne**
  mbrowne@brownepelican.com

- **Curtis Bruehl**
  cbruehl@fulmersill.com

- **Curtis N Bruehl**
  cbruehl@bruehllaw.com

- **Celeste Brustowicz**
  cbrustowicz@clfnola.com

- **Celeste L Brustowicz**
  cbrustowicz@sch-llc.com,taultman@clfnola.com

- **David G Bryant**
  david@davidbryantlaw.com

- **Mark P Bryant**
  mark.bryant@bryantpsc.com,joe.roark@bryantpsc.com,christina.ellegood@bryantpsc.com

- **Russell W. Budd**
  rbudd@baronbudd.com

- **Russell Wills Budd**
  rbudd@baronbudd.com

- **Kevin R. Budner**
  kbudner@lchb.com,kevin-budner-2411@ecf.pacerpro.com

- **Birch P. Burdick**
  sa-defense-notices@casscountynd.gov

- **Michael Burrage**
  mburrage@whittenburragelaw.com

- **Elizabeth Joan Cabraser**
  ecabraser@lchb.com,elizabeth-cabraser-1441@ecf.pacerpro.com

- **Hannah Honeycutt Calandro**
  hannah@fayardlaw.com

- **Ann E. Callis**
  acallis@hollandtriallawyers.com

- **W. Stuart Calwell**
  scalwell@calwelllaw.com

- **Gretchen Freeman Cappio**
  gcappio@kellerrohrback.com,bianca-nealious-3081@ecf.pacerpro.com,debra-wilcher-6644@ecf.pacerpro.com,cate-brewer-0141@ecf.pacerpro.com,bnealious@kellerrohrback.com,gretchen-freeman-cappio-5238@ecf.pacerpro.com

- **Edgar R. Cataxinos**
  cataxinos@mcgiplaw.com

- **David Cates**
  dcates@cateslaw.com

- **Daniel Carl Cederborg**
  dcederborg@yolocounty.org,bprice@yolocounty.org

- **D. Bryant Chaffin**
  bryant@mchughfuller.com

- **H. Truman Chafin**
  truman@thechafinlawfirm.com

- **Letitia Neese Chafin**
  Tish@thechafinlawfirm.com

- **Mark P. Chalos**
  mchalos@lchb.com,mark-chalos-5442@ecf.pacerpro.com

- **Deborah Chandler**
  dchandler@aklawfirm.com

- **David M. Cheifetz**
  dcheifetz@stroock.com,docketing@stroock.com

- **John Y. Choi**
  attorneyjohnchoi@gmail.com

- **Joseph L. Ciaccio**
  jciaccio@napolilaw.com

- **Edward J. Ciarimboli**
  ejc@fclawpc.com

- **City of Cleveland, Ohio**
  lawdepartment@city.cleveland.oh.us

- **Abbey Herrin Clarkson**
  abbey@theclarksonfirm.com

- **James Franklin Clayborne , Jr**
  jclayborne@cswlawllp.com,sebrecht@cswlawllp.com

- **John W. Cleary , Jr**
  jcleary@msprecoverylawfirm.com,serve@msprecoverylawfirm.com

- **John R. Climaco**
  jrclim@climacolaw.com

- **Paul D. Coates**
  pcoates@pckb-law.com

- **Victor Cobb**
  vcobb@clfnola.com

- **Christopher Luke Coffin**
  ccoffin@pbclawfirm.com,sshirey@pbclawfirm.com,mwaldrop@pbclawfirm.com,sbaudin@pbclawfirm.com,pwpendley@pbclawfirm.com

- **Thomas P. Colantuono**
  tcolantuono@wardlawnh.com

- **Adam P. Collins**
  admin@collinsconley.com

- **Joshua K Conaway**
  jconaway@fchclaw.com

- **Andrew Joseph Conn**
  aconn@hlmlawfirm.com

- **Matt Conn**
  mconn@friedman-lawyers.com

- **Matthew D. Conn**
  mconn@friedman-lawyers.com,tmartin@friedman-lawyers.com

- **Jayne Conroy**
  jconroy@simmonsfirm.com,ClassDocketing@ecf.courtdrive.com,esternickle@simmonsfirm.com,jkraus@simmonsfirm.com

- **Barry J. Cooper, Jr.**
  bcooper@clfnola.com

- **Joseph W. Cotchett**
  jcotchett@cpmlegal.com

- **Donald E. Creadore**
  donald@creadorelawfirm.com

- **R. Seth Crompton**
  scrompton@hollandtriallawyers.com

- **Leslie M. Cronen**
  lcronen@garycjohnson.com

- **Christina D Crow**
  ccrow@jinkslaw.com

- **Christina Diane Crow**
  christy.crow@jinkscrow.com,am.stewart@jinkscrow.com,ryan.mcferrin@jinkscrow.com,jodi.myers@jinkscrow.com,beth.warren@jinkscrow.com

- **Martin Francis Cunniff**
  martincunniff@fieldslawpllc.com,Schrader@fieldslawpllc.com

- **Jeffrey A Curran**
  jcurran@gablelaw.com

- **Steven W. Dahlem**
  sdahlem@mariposacounty.org

- **M. Stephen Dampier**
  stevedampier@dampierlaw.com

- **Matthew S. Daniel**
  mdaniel@lawyerworks.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com,MDearman@ecf.courtdrive.com

- **Mark J. Dearman**
  mdearman@rgrdlaw.com

- **Diandra S. Debrosse Zimmermann**
  fu@dicellolevitt.com

- **Hadiya Khan Deshmukh**
  hdeshmukh@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **L. Dante DiTrapano**
  dditrapano@cldlaw.com

- **Nathan A. Dickson , II**
  ndickson@jinkslaw.com

- **Rodney Dillard , II**
  rdillard@friedman-lawyers.com

- **Holly H. Dolejsi**
  HDolejsi@RobinsKaplan.com

- **Spencer R Doody**
  srd@mbfirm.com,usdcedla@mbfirm.com

- **Anderson O. Dotson , III**
  dotsonfirm@gmail.com

- **Dan Drachler**
  ddrachler@lchb.com,dan-drachler-6676@ecf.pacerpro.com

- **Frank C. Dudenhefer**
  fcdlaw@aol.com

- **Frank C. Dudenhefer , Jr**
  fcdlaw@aol.com

- **James R. Dugan , II**
  jdugan@dugan-lawfirm.com,dscalia@dugan-lawfirm.com,bonnie@dugan-lawfirm.com,amcadam@dugan-lawfirm.com

- **Melissa Rose Ellsworth**
  mellsworth@thompsonbarneylaw.com

- **Sarah N. Emery**
  semary@justicestartshere.com

- **Sarah Nicole Emery**
  semery@justicestartshere.com,amcmullen@justicestartshere.com,tcoaston@justicestartshere.com

- **Kyle D Evans**
  kevans@gablelaw.com

- **Robert J. Evola**
  revola@hollandtriallawyers.com

- **Paul T. Farrell , Jr**
  paul@farrellfuller.com

- **Paul T. Farrell , Jr**
  paul@farrell.law

- **Paul T. Farrell, Jr.**
  paul@farrellfuller.com

- **Eric B. Fastiff**
  efastiff@lchb.com,catkins@lchb.com,elovell@lchb.com,eric-fastiff-2015@ecf.pacerpro.com,jremuszka@lchb.com

- **George H. Faulkner**
  faulkner@fhplaw.com

- **Calvin C. Fayard , Jr**
  calvinfayard@fayardlaw.com,wandaedwards@fayardlaw.com

- **Cathryn Caroline Fayard**
  caroline@fayardlegal.com

- **Cassandra L. Feeney**
  cfeeney@hwac.com

- **Gregory E. Fellerman**
  gef@fclawpc.com

- **Jarrett J. Ferentino**
  ferentino@pfslawyer.com

- **Richard W. Fields**
  fields@fieldslawpllc.com

- **Tiffani B. Figueroa**
  TFigueroa@mofo.com

- **John Paul Fiske**
  jfiske@baronbudd.com,kepeters@baronbudd.com,jhutchison@baronbudd.com,1869571420@filings.docketbird.com,chines@baronbudd.com

- **Crystal Gayle Foley**
  cfoley@simmonsfirm.com,ClassDocketing@ecf.courtdrive.com,ClassDocketing@simmonsfirm.com

- **W. Jesse Forbes**
  wjforbes@forbeslawwv.com

- **Jenna N. Forster**
  jforster@lchb.com,jenna-forster-0574@ecf.pacerpro.com

- **Alexander Chesney Frampton**
  alex.frampton@nelsonmullins.com

- **Andrew G Frank**
  afrank@kwdlaw.com

- **Jennifer Rachel Frankovich**
  jfrankovich@baltimorecountymd.gov

- **Richard S Frankowski**
  richard@frankowskifirm.com

- **T. Roe Frazer , II**
  roe@frazer.law,grant@frazer.law,angela@frazer.law,mac@frazer.law,elizabeth@frazer.law

- **Thomas Roe Frazer , II**
  roe@frazer.law

- **Andrew J. Freedman**
  afreedma@hodgsonruss.com

- **Jeff Friedman**
  jeff@hbsslaw.com

- **Jeffrey E. Friedman**
  jfriedman@friedman-lawyers.com

- **Jeffrey Edwin Friedman**
  jfriedman@friedman-lawyers.com,tmartin@friedman-lawyers.com

- **Brian C. Frontino**
  brian.frontino@morganlewis.com,lina.cocuyame@morganlewis.com

- **Michael J. Fuller**
  mike@farrellfuller.com

- **Michael J. Fuller , Jr**
  mike@mchughfuller.com

- **Michael Jay Fuller**
  mike@farrellfuller.com

- **Michael Jay Fuller , Jr**
  mike@farrellfuller.com

- **Michael J. Fuller, Jr.**
  mike@farrellfuller.com

- **Tara A. Fumerton**
  tfumerton@jonesday.com

- **Gregory Edward Gaskins**
  ggaskins@baltimorecountymd.gov

- **Daniel L. Gaustad**
  dan@grandforkslaw.com

- **Paul Jeffrey Geller**
  pgeller@rgrdlaw.com

- **Elmer J. George**
  Dana@kylawoffices.com

- **Matthew M. Gerend**
  mgerend@kellerrohrback.com,cathy-hopkins-4757@ecf.pacerpro.com,matthew-gerend-4891@ecf.pacerpro.com,chopkins@kellerrohrback.com

- **Marc P. Gertz**
  mpgertz@gertzrosen.com

- **Michael Gervais**
  mgervais@susmangodfrey.com,gfisk@susmangodfrey.com,greg-fisk-8459@ecf.pacerpro.com

- **Robert Cecil Gilbert**
  gilbert@kolawyers.com,dalia@gilbertpa.com

- **Scott D Gilbert**
  gilberts@gotofirm.com

- **Simarjit Singh Gill**
  sgill@slco.org

- **Leslie John Girard**
  girardlj@co.monterey.ca.us,OntiverosS@co.monterey.ca.us

- **Leslie A. Goller**
  Lgoller@terrellhogan.com

- **Edmund Clay Goodman**
  egoodman@hobbsstraus.com

- **R. Booth Goodwin , II**
  rbg@goodwingoodwin.com

- **Jonah D. Grabelsky**
  grabelsky@fhplaw.com

- **Andrew M. Grabhorn**
  a.grabhorn@grabhornlaw.com

- **Michael D. Grabhorn**
  m.grabhorn@grabhornlaw.com

- **Michael Douglas Grabhorn**
  m.grabhorn@grabhornlaw.com

- **Mark K. Gray**
  mgray@grayandwhitelaw.com

- **David C. Grossman**
  david@legalgrouphotline.com

- **Ed Han**
  edhan@fhcfirm.com

- **Troy W. Haney**
  thaney@troyhaneylaw.com

- **Gerald Logan Harris**
  glharris@vbgov.com

- **Edward B. Havas**
  ehavas@dkowlaw.com

- **William Hawal**
  wh@spanglaw.com

- **Joshua Patrick Hayes**
  jhayes@princelaw.net

- **Jason Michael Heath**
  Jason.Heath@co.santa.cruz.ca.us,pamela.iriguchi@santacruzcounty.us,csl054@co.santa-cruz.ca.us,annessa.wright@santacruzcounty.us,csl026@co.santa-cruz.ca.us

- **Derrick G. Helm**
  derrickhelm@ymail.com

- **Neil L Henrichsen**
  nhenrichsen@hslawyers.com

- **Jorge A. Herrera**
  jherrera@herreralaw.com

- **Kathryn Hettler**
  kh@hrsclaw.com

- **Joseph C. Hoffman , Jr**
  hoffman@fhplaw.com

- **Cameron L Hogan**
  clhogan@lloydhoganlaw.com

- **John Wayne Hogan**
  hogan@terrellhogan.com

- **D. Blayne Honeycutt**
  dbhoneycutt@fayardlaw.com

- **David Blayne Honeycutt**
  dbhoneycutt@fayardlaw.com,benita@fayardlaw.com

- **Hannah Elayne Honeycutt**
  hannah@fayardlaw.com

- **Robert L. Houston**
  rhouston@htllawyers.com

- **Jenna A. Hudson**
  hudsonj@gilbertlegal.com

- **James F. Humphreys**
  jhumphreys@jfhumphreys.com

- **Samuel Issacharoff**
  si13@nyu.edu

- **Michael L. Jackson**
  michaeljackson@jacksonbelllaw.net

- **P. Rodney Jackson**
  prodjackson27@yahoo.com

- **Christopher Isaac Jacobs**
  cij@knlegal.com

- **Jordan E. Jacobson**
  jjacobson@ktmc.com,courtney-hemsley-3395@ecf.pacerpro.com,megan-corson-3521@ecf.pacerpro.com

- **William M. Jay**
  WJay@goodwinlaw.com

- **William Joseph Jenner**
  jjenner@wjennerlaw.net

- **Crystal Goan Jessee**
  crystaljessee@jesseelawoffice.com

- **Lynn Wilson Jinks , III**
  ljinks@jinkslaw.com,sstuart@jinkslaw.com,ndickson@jinkslaw.com

- **Gary C. Johnson**
  gary@garycjohnson.com

- **Gillard B. Johnson , III**
  gjohnson@gbjlegal.com

- **Ronald E. Johnson , Jr**
  rjohnson@justicestartshere.com,amcmullen@justicestartshere.com,tcoaston@justicestartshere.com

- **Ryan Ronald Jones**
  rrj@jones-mayer.com

- **Joshua Karsh**
  jkarsh@findjustice.com

- **Andrew Kaufman**
  akaufman@lchb.com,korsland@lchb.com,andrew-kaufman-1312@ecf.pacerpro.com

**Jessica Kaufman**
jkaufman@mofo.com,jessica-kaufman-5947@ecf.pacerpro.com

**Amy E. Keller**
akeller@dicellolevitt.com,agreen@dicellolevitt.com,aotto@dicellolevitt.com,3336248420@filings.docketbird.com

**Joseph L Kerr , Jr**
jkerr@friedman-lawyers.com

**Colin P. King**
cking@dkowlaw.com

**Sarah Erica King**
sking@hinshawlaw.com

**Debra Potter Klauber**
dklauber@haliczerpettis.com

**David J. Ko**
dko@kellerrohrback.com,cbrewer@kellerrohrback.com,cate-brewer-0141@ecf.pacerpro.com,david-ko-8713@ecf.pacerpro.com

**Karl W. Kristoff**
kwk278@aol.com

**Joseph Martin Kurt**
jkurt@vbgov.com

**John A Lancione**
jal@lancionelaw.com

**J. Burton LeBlanc , IV**
bleblanc@baronbudd.com

**J. Burton LeBlanc**
bleblanc@baronbudd.com

**Thomas J. Lech**
tlech@ghalaw.com

**Alan D Leeth**
aleeth@burr.com

**Whitney A. Leonard**
whitney@sonosky.net,karin@sonosky.net,chloe@sonosky.net

**Bruce W. Leppla**
bleppla@lchb.com,bruce-leppla-7158@ecf.pacerpro.com

**Richard J. Leveridge**
leveridger@gilbertlegal.com

**Michael Ian Levin-Gesundheit**
mlevin@lchb.com,michael-levin-gesundheit-7686@ecf.pacerpro.com

**Jamie A. Levitt**
JLevitt@mofo.com,jamie-levitt-6630@ecf.pacerpro.com,docketny@mofo.com

**Charles Coleman Lifland**
clifland@omm.com,charles-lifland-4890@ecf.pacerpro.com

**Jeff Link**
jeff@jefflinklaw.com

**William Litt**
littwm@co.monterey.ca.us,edwardsg@co.monterey.ca.us,catod@co.monterey.ca.us,zarcoc@co.monterey.ca.us,britoa@co.monterey.ca.us,villad@co.monterey.ca.us

**Amanda M. Lockaby**
amanda.lockaby@dinsmore.com

**Derek W. Loeser**
dloeser@kellerrohrback.com

**Derek William Loeser**
dloeser@kellerrohrback.com,cbrewer@kellerrohrback.com,derek-loeser-0264@ecf.pacerpro.com,cate-brewer-0141@ecf.pacerpro.com

**Casey Langston Lott**
clott@langstonlott.com

**Rebecca D. Louks**
rlouks@ohlaw.com

**Lower Brule Sioux Tribe**
boydgourneau@yahoo.com

- **Stephen Glenn Lowry**
  steve@hpllegal.com

- **Harrison C Lujan**
  hlujan@fulmersill.com,shicks@fulmersill.com

- **W Jay Luneau**
  jay@luneaubecklaw.com

- **James L. Magazine**
  jim@lucasmagazine.com

- **James Lawrence Magazine**
  jim@lucasmagazine.com

- **James E. Magleby**
  magleby@mgpclaw.com

- **Anthony J. Majestro**
  amajestro@powellmajestro.com,amarshall@powellmajestro.com,jnelson@powellmajestro.com,jcpowell@powellmajestro.com,paula@powellmajestro.com,helen@po

- **Shauna D Manion**
  smanion@mzmilw.com

- **Christine C Mansour**
  cmansour@baronbudd.com

- **Christine C. Mansour**
  cmansour@baronbudd.com

- **Christine Cooney Mansour**
  cmansour@baronbudd.com

- **Justin Jerome Marcum**
  justin@marcumlawoffice.com

- **Miriam Ellora Marks**
  mmarks@lchb.com,miriam-marks-8754@ecf.pacerpro.com

- **Michael T. Maroney**
  michael.maroney@hklaw.com,HAPI@HKLAW.COM

- **Ingrid S. Martin**
  imartin@toddweld.com,mcottreau@toddweld.com

- **Juan Ramon Martinez**
  juanmartinez@forthepeople.com,acook@forthepeople.com

- **Rebeca Martinez Sicari**
  rmartinez@nsprlaw.com

- **Walter M. Mason**
  wmason@dkowlaw.com

- **Robert L. Massie**
  bob.massie@nelsonmullins.com

- **Julie G. Matos**
  jmatos@stroock.com,docketing@stroock.com

- **Caroline Mayhew**
  CMayhew@hobbsstraus.com

- **Robert G McCampbell**
  rmccampbell@gablelaw.com

- **Alexander D. McLaughlin**
  amclaughlin@cldlaw.com

- **Ian Ronald McLean**
  imclean@serklandlaw.com

- **Kelly Kristine McNabb**
  kmcnabb@lchb.com,kelly-mcnabb-1924@ecf.pacerpro.com

- **Mark David McPherson**
  mmcpherson@mofo.com,dara--pilgrim-4904@ecf.pacerpro.com,dpilgrim@mofo.com

- **Cyrus Mehri**
  cmehri@findjustice.com

- **Joseph H. Meltzer**
  jmeltzer@ktmc.com,kmarrone@ktmc.com,jwotring@ktmc.com,chemsley@ktmc.com,pleadings@ktmc.com,1472664420@filings.docketbird.com,KSheronas@ktmc.c

- **Daniel P. Mensher**
  dmensher@kellerrohrback.com,lara-mishler-4166@ecf.pacerpro.com,daniel-mensher-8016@ecf.pacerpro.com

- **Donald A. Migliori**
  dmigliori@motleyrice.com

- **Charles M. Miller**
  charles.miller@ohioattorneygeneral.gov

- **Lloyd B. Miller**
  lloyd@sonosky.net,lydia@sonosky.net,karin@sonosky.net

- **Robert R Miller**
  rmiller@ohlaw.com

- **Emily Hawk Mills**
  emily@alalawyers.net

- **Michael J. Modl**
  mmodl@axley.com

- **Lucas C Montgomery**
  luke@montgomeryponder.com

- **Samuel Aitken Morris**
  smorris@burr.com

- **Peter James Mougey**
  pmougey@levinlaw.com,ldunning@ecf.courtdrive.com,mailsec@levinlaw.com

- **P. Matthew Muir**
  mmuir@aklawfirm.com

- **Anil A Mujumdar**
  anil@dagneylaw.com

- **Anne Marie Murphy**
  amurphy@cpmlegal.com,nkingra@cpmlegal.com,bkittle@cpmlegal.com,jdiaz-marquez@cpmlegal.com,shernandez@cpmlegal.com

- **Christopher Bryan Murray**
  christopher.murray@llojibwe.net

- **Dwayne M. Murray**
  dmm@murraylaw.net

- **N. Majed Nachawati**
  mn@ntrial.com

- **Rohit Dwarka Nath**
  rnath@susmangodfrey.com

- **William D. Nefzger**
  will@bccnlaw.com,andria@bccnlaw.com

- **Bryan S. Neiderhiser**
  bneiderhiser@marcusandmack.com

- **Stephen P New**
  steve@newlawoffice.com

- **John D. Nibbelin**
  jnibbelin@co.sanmateo.ca.us

- **Leslie C. Nixon**
  lcnixon56@gmail.com

- **Anthony E. Nowak**
  tony@smithphillips.com

- **Stephanie L. Ojeda**
  sojeda@handl.com

- **Oneida Nation**
  cartman@oneidanation.org

- **Jon B. Orndorff**
  jon.orndorff@om-pllc.com

- **Charles G. Orr**
  corr@baronbudd.com

- **Ralph J Overholt**
  ralph.overholt@llojibwe.net

- **Christine M. Palmer**
  cmpalmer@co.kitsap.wa.us

- **Daryl Dion Parks**
  dparks@darylparks.com

- **Ashley A Peck**
  aapeck@hollandhart.com

- **Julia Q. Peng**
  jpeng@cpmlegal.com,shernandez@cpmlegal.com

- **Dori Ann Persky**
  dpersky@baronbudd.com

- **James C. Peterson**
  jcpeterson@hpcbd.com

- **James Charles Peterson**
  jcpeterson@hpcbd.com

- **Eugene K. Pettis**
  EPettis@hpslegal.com

- **Kenneth C. Pierce , II**
  kpierce@blantonpierce.com

- **Mark Pifko**
  mpifko@baronbudd.com

- **Mark P Pifko**
  MPifko@baronbudd.com

- **Mark Philip Pifko**
  mpifko@baronbudd.com,awilson@baronbudd.com,jmartinez@baronbudd.com,jcampbell@baronbudd.com

- **J Bradley Ponder**
  brad@montgomeryponder.com

- **Timothy Q Purdon**
  tpurdon@robinskaplan.com

- **Marcus J Rael , Jr**
  marcus@roblesrael.com

- **John Warren Raggio**
  jraggio@fnlawfirm.com

- **John Warren Raggio**
  jraggio@ntrial.com,zbland@ntrial.com,filing@ntrial.com,vmcneme@ntrial.com,tbeasley@ntrial.com,blink@ntrial.com,sandrew@ntrial.com

- **Vaishali S. Rao**
  vrao@hinshawlaw.com

- **Randa Reeves**
  rreeves@whittenburragelaw.com

- **Emily Anne Reitmeier**
  emily.reitmeier@skadden.com,emily-reitmeier-
  8948@ecf.pacerpro.com,patrick.hernandez@skadden.com,deanna.pospisil@skadden.com,brigitte.travaglini@skadden.com

- **Kurt E. Reitz**
  kreitz@thompsoncoburn.com

- **Christopher L. Rhoads**
  chris@rhoadsandrhoads.com

- **Joseph F. Rice**
  jrice@motleyrice.com,gworthington@motleyrice.com

- **Bradley Joe Richardson**
  brichardson@co.nye.nv.us

- **Adam R. Rivera**
  arivera@msprecoverylawfirm.com

- **Emily Ward Roark**
  emily.roark@bryantpsc.com,david@davidbryantlaw.com,christina@bryant.law,kirsta.cruthis@bryantpsc.com

- **Luis E. Robles**
  luis@roblesrael.com

- **J. Robert Rogers**
  jrobertrogers@hotmail.com

- **Laurance Nicholas Chandler Rogers**
  chandler@rogerslawgroup.com

- **Anna Natalie Rol**
  arol@baronbudd.com

- **Bridget K. Romano**
  bromano@slco.org,ipittman@slco.org

- **Karen Rosenthal**
  krosenthal@smcgov.org,drosas@smcgov.org

- **Michael B. Rush**
  rushm@gilbertlegal.com

- **Daniel K. Ryan**
  dryan@hinshawlaw.com

- **Shayna E. Sacks**
  ssacks@napolilaw.com

- **Shayna Erin Sacks**
  ssacks@napolilaw.com

- **Lisa M. Saltzburg**
  lsaltzburg@motleyrice.com

- **Jaime Ann Santos**
  JSantos@goodwinlaw.com

- **Lynn Lincoln Sarko**
  lsarko@kellerrohrback.com,cengle@kellerrohrback.com

- **Ann Davison Sattler**
  sattler@aiken.com

- **David Scott Scalia**
  dscalia@dugan-lawfirm.com

- **Barry J. Scatton**
  bscatton@forthepeople.com

- **Frank Rocco Schirripa**
  fschirripa@hrsclaw.com

- **Carlos E Sedillo**
  csedillo@fchclaw.com

- **David Dale Seif, Jr. , Jr**
  dseif@law-oh.com

- **Sona R. Shah**
  sshah@zsz.com

- **Devon Shannon**
  devon.shannon@kingcounty.gov

- **Kevin H. Sharp**
  ksharp@sanfordheisler.com,skelly@sanfordheisler.com,mallen@sanfordheisler.com,jhannaway@sanfordheisler.com,ariddick@sanfordheisler.com,jtepe@sanfordheisl

- **Adam F. Shearer**
  ashearer@clarencedyer.com,achin@clarencedyer.com

- **Taeva Cantor Shefler**
  TShefler@rgrdlaw.com,pmitchell@rgrdlaw.com,e_file_sd@rgrdlaw.com,tome@rgrdlaw.com

- **Thomas I Sheridan , III**
  tsheridan@simmonsfirm.com,jlucena@simmonsfirm.com

- **Hunter J. Shkolnik**
  hunter@nsprlaw.com,SSacks@NapoliLaw.com,1505475420@filings.docketbird.com,nfarnolo@napolilaw.com,SBadala@NapoliLaw.com

- **Rebeca Martinez Sicari**
  rmartinez@nsprlaw.com

- **David Abraham Silberman**
  dsilberman@smcgov.org,klyssand@smcgov.org

- **James D Sill**
  jsill@fulmersill.com

- **Matthew J Sill**
  Matt@sill-law.com

- **Matthew James Sill**
  msill@fulmersill.com

- **Donald J. Simon**
  dsimon@sonosky.com,karin@sonosky.net

- **Scott D. Simpkins**
  sdsimp@climacolaw.com

- **Emilee N Sisco**
  emilees@hbsslaw.com

- **Steven James Skikos**
  sskikos@skikos.com

- **Steven Gerald Sklaver**
  ssklaver@susmangodfrey.com,GWise@susmangodfrey.com,jwilliams@susmangodfrey.com,jerod-williams-0433@ecf.pacerpro.com,ecf-d2dbeeed8fe0@ecf.pacerpro.com,gregory-wise-3486@ecf.pacerpro.com

- **Thomas M. Sobol**
  tom@hbsslaw.com,kristenjp@hbsslaw.com,AbbyeO@hbsslaw.com,marcellaj@hbsslaw.com,ChristineT@hbsslaw.com,achebes@hbsslaw.com,jessicao@hbsslaw.com

- **Rebecca Luise Solomon**
  rsolomon@tousley.com,1362222420@filings.docketbird.com

- **Ike Spears**
  ikespears@gmail.com

- **Michael Gregory Stag**
  mstag@stagliuzza.com,jbatt@stagliuzza.com

- **Kim D. Stephens**
  kstephens@tousley.com,3690889420@filings.docketbird.com,kkulgren@tousley.com,efile@tousley.com,erashby@tousley.com

- **Kara M. Stewart**
  kara.stewart@dinsmore.com,lynn.whitson@dinsmore.com,amanda.lockaby@dinsmore.com,janet.gross@dinsmore.com

- **Joshua Allen Stigdon**
  jstigdon@htllawyers.com

- **Mark Douglas Stiles**
  mstiles@vbgov.com

- **Heath P. Straka**
  hstraka@axley.com

- **Geoffrey D. Strommer**
  gstrommer@hobbsstraus.com,hclapp@hobbsstraus.com,emanning@hobbsstraus.com,rplumer@hobbsstraus.com,emanning@ecf.courtdrive.com

- **Robert Strongarone**
  rstrongarone@msprecoverylawfirm.com,jpupo@msprecoverylawfirm.com,serve@msprecoverylawfirm.com

- **Frank Sullivan , III**
  fsullivan@franksullivanlaw.com

- **Sarah J. Surber**
  ssurber@thompsonbarneylaw.com

- **Tara DeAnn Sutton**
  TSutton@RobinsKaplan.com,aguttormson@robinskaplan.com,sjump@robinskaplan.com

- **Teris Swanson**
  teris@bryant.law

- **Teris N. Swanson**
  teris@bryant.law

- **Charles Jones Swayze , III**
  cjsiii@whittingtonlaw.com

- **Christopher M Sylvia**
  cmsattorneyatlaw@yahoo.com

- **Tina M. Tabacchi**
  tmtabacchi@jonesday.com,jzhou@jonesday.com,nadiaz@jonesday.com

- **Fred N Tabak**
  fredtabak@gmail.com

- **Mark A. Tate**
  marktate@tatelawgroup.com,tlgservice@tatelawgroup.com,twells@tatelawgroup.com,mhayes@tatelawgroup.com

- **J. Scott Taylor**
  scott@wncjustice.com

- **Justin C. Taylor**
  jtaylor@baileywyant.com,jzubrzycki@baileywyant.com,rjburks@baileywyant.com

- **Michael W. Taylor**
  mtaylor@baileywyant.com

- **Kevin W. Thompson**
  kwthompsonwv@gmail.com

- **Thomas W. Tucker**
  ttucker@tuckerlong.com

- **Tracy L Turner**
  tturner@pbclawfirm.com

- **K Scott Wagner**
  swagner@mallerysc.com

- **Scott Jason Weiselberg**
  weiselberg@kolawyers.com

- **Christopher Weld , Jr**
  cweld@toddweld.com,jmcgonagle@toddweld.com

- **Richard Wesch**
  trialsection@leegov.com

- **Bradley C West**
  brad@thewestlawfirm.com

- **Lindsey Walker West**
  lwest@dinsmore.com

- **Terry W West**
  terry@thewestlawfirm.com

- **Richard Alan Weyrich**
  richardw@co.skagit.wa.us

- **Jessica Whelan**
  jewhelan@hollandhart.com

- **White Mountain Apache Tribe**
  ghesse@pinetoplawyers.com

- **Marc E. Williams**
  marc.williams@nelsonmullins.com

- **Roy W Williams , Jr**
  rwilliams@jacksonwilliams.org

- **Michael A. Woelfel**
  mikewoelfel3@gmail.com

- **Stephen H. Wussow**
  swussow@clfnola.com

- **Charles David Wysong**
  cwysong@hsplegal.com,rortiz@hsplegal.com

- **James Dennis Young**
  jyoung@forthepeople.com,acook@forthepeople.com

- **Gregory M Zarzaur**
  gregory@zarzaur.com

- **Gregory Martin Zarzaur**
  gregory@zarzaur.com

- **Terence Scott Ziegler**
  tziegler@ktmc.com,4689919420@filings.docketbird.com

- **Diandra S. Debrosse Zimmermann**
  fu@dicellolevitt.com

- **Paulina do Amaral**
  pdoamaral@lchb.com,elovell@lchb.com,paulina-do-amaral-4305@ecf.pacerpro.com,rmccullough@lchb.com,opioidsecfs@lchb.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

**Whitten          Burrage**
512 North Broadway Avenue,
 Suite 300
Oklahoma City,, OK 73102

**Allison          Cross**
Henrichsen Law
Ste. 800
655 15th Street NW
Washington, DC 20005

**David          J Hodge**
Attorney at Law
38 Miller Ave #157
Mill Valley, CA 94941

**L.          J. Hollenbach          , III**
3836 Washington Square
Louisville, KY 40207

**Louis          J. Hollenbach**
3836 Washington Square
Louisville, KY 40207

**Archie          C Lamb          , Jr**
Levin Papantonio Thomas Mitchell Rafferty & Proctor, PA
316 S Baylen Street
Suite 600
Pansacola, FL 32502-5996

**Michael          P. McNamee**
McNamee & Hill
2371 Lakeview Drive
Beavercreek, OH 45431

**Jeffery          A Mobley**
Lowe, Mobley & Lowe
1210-21st Street
PO Box 576
Haleyville, AL 35565

**Montgomery County Public Schools**
,

**Jeffrey          D Moseley**
Buerger, Moseley & Carson, PLC
306 Public Square
Franklin, TN 37064

**Peter          J. Mougey**
Beggs & Lane
P.O. Box 12950
Pensacola, FL 32591

**Mark          P. Pikfo**
Baron & Budd, P.C.
15910 Ventura Blvd #1600
Encino, CA 91436

**Michael          L. Roberts**
Roberts Law Firm
20 Rahling Circle
P.O. Box 241790
Little Rock, AR 72223-1790

**Santa Rosa County, Florida**
,

**State of Kansas**
Office of Kansas Attorney General
120 SW 10th Ave., 3rd Fl.
Topeka, KS 66612

**Peter          H. Weinberger**
Spangenberg Shibley & Liber LLP
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH 44144

**Terence          S. Ziegler**
Kessler Topaz Meltzer & Check LLP
280 King of Prussia Road
Rador, PA 19087