[*Submitting Counsel on Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION | Case No. 21-md-02996-CRB (SK) |
| | **CLASS ACTION** |
| This Document Relates to: | **PLAINTIFF SCHOOL DISTRICTS' UNOPPOSED NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| ALL SCHOOL DISTRICT ACTIONS | JUDGE:  Hon. Charles R. Breyer<br>DATE:    [DATE], 2023<br>TIME:    [TIME]<br>PLACE:  Courtroom 6, 17th Floor |

1

2

3 **NOTICE OF MOTION AND MOTION**

4 TO: ALL PARTIES AND THEIR ATTORNEYS OF RECORD

5 PLEASE TAKE NOTICE that as soon as they may be heard, the following public school

6 district plaintiffs—Putnam County School District in Florida; Jefferson, Martin, Estill, Larue,

7 Breathitt, Fayette, and Bullitt County Boards of Education in Kentucky; Regional School Units of

8 34 and 68 in Maine; Southwestern Central and Rochester City School District in New York; and

9 Hamblen and Hancock County Boards of Education in Tennessee—on behalf of themselves and

10 all members of the Class, will move this Court for an Order, under Rule 23 of the Federal Rules

11 of Civil Procedure: (i) finding that their proposed $23 million settlement with Defendants is

12 within the range of final approval as fair, reasonable, and adequate, and granting preliminary

13 approval of that proposed Settlement under Rule 23(e); (ii) appointing them as Public School

14 Class Representatives and appointing Cyrus Mehri, Wayne Hogan, and Neil Henrichsen as Public

15 School Settlement Class Counsel; (iv) approving their form of proposed Public School class

16 notice, as well as the proposed methods of disseminating notice to the Public School Class;

17 (v) authorizing and directing Plaintiffs to retain Epiq Class Action and Claims Solutions, Inc.

18 (Epiq) as the Claims Administrator and Dr. Andrés Alonso and Truist Bank as trustees of the

19 Public School District Opioid Recovery Trust; (vi) continuing to defer consideration of

20 McKinsey's[1] pending *res judicata* motion until the Court renders a final decision on the approval

21 of the Settlement; (viii) scheduling a date for the final fairness hearing and relevant deadlines in

22 connection with the Settlement; and (ix) all other relief as the Court considers just and

appropriate.

23 This Motion is supported by the following memorandum of points and authorities and

24 exhibits, including the Declaration of Cyrus Mehri ("Mehri Decl.") (Exhibit 1) and proposed

25 Settlement Agreement (Exhibit 2).

26

27 [1] "McKinsey" or "Defendants" shall mean McKinsey & Company, Inc., McKinsey Holdings,
Inc., McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Washington,
28 D.C., Inc., collectively.

1

2

3    [*Submitting Counsel on Signature Page*]

4

5

6

7

8

9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13    IN RE: MCKINSEY & CO., INC.                Case No. 21-md-02996-CRB (SK)

14    NATIONAL PRESCRIPTION OPIATE

15    CONSULTANT LITIGATION

16

17    This Document Relates to:

18

19    ALL SCHOOL DISTRICT ACTIONS

20

21

22    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR**

23           **PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ...............................................................................................i

TABLE OF AUTHORITIES ........................................................................................iii

I.   INTRODUCTION ............................................................................................. 1

II.  BACKGROUND ................................................................................................ 4

    A.  Summary of the Litigation/Procedural History ........................................ 4

    B.  Settlement Negotiations and Mediation .................................................... 5

III. THE PROPOSED SETTLEMENT ................................................................... 5

    A.  The Proposed Settlement Class ................................................................. 5

    B.  Settlement Value ........................................................................................ 6

    C.  Scope of Class Members' Releases ........................................................... 7

    D.  Settlement Notice ...................................................................................... 8

        1.  Method of Notice ............................................................................. 8

        2.  Content of Class Notice ................................................................... 8

    E.  Attorneys' Fees and Expenses .................................................................. 9

    F.  Incentive Awards ....................................................................................... 9

    G.  McKinsey's Reservation of Rights ......................................................... 10

IV.  ARGUMENT ................................................................................................... 10

    A.  Because the Court will likely be able to certify a class and approve the settlement the Court should authorize class notice and schedule a fairness hearing. ..................................................................................................... 10

    B.  Class certification will be appropriate: the proposed settlement class meets the requirements of Rule 23(a). ....................................................... 10

        1.  The Class is sufficiently numerous. ............................................... 10

        2.  There are questions of law and fact common to the class. ............. 11

        3.  The proposed class representatives' claims are typical of the claims of all other class members. ........................................................................ 11

4.   The proposed class representatives and their counsel will fairly and adequately protect the interest of the class. ....................................... 12

C.   The proposed class also meets the requirements of Rule 23(b)(3). .......................... 12

1.   Common issues predominate. ............................................................ 12

2.   A class action is superior to other available methods for fairly and efficiently adjudicating this controversy. ........................................... 13

D.   The proposed settlement warrants preliminary approval. ......................................... 13

E.   The proposed notice plan satisfies due process ........................................................ 14

F.   This settlement is the product of serious, informed, and noncollusive negotiations. ............................................................................................................ 14

1.   The proposed settlement has no obvious deficiencies. ....................................... 15

2.   The proposed settlement does not improperly grant preferential treatment to class representatives or other segments of the class. .................................... 15

3.   The proposed settlement would provide class members with an award that falls within the range of possible approval. ........................................................ 16

4.   The factors identified in the Northern District of California's Procedural Guidance for Class Action Settlements support approval here. ......................... 17

G.   The Court should continue to stay proceedings on McKinsey's res judicata motion. ........................................................................................................................ 19

CONCLUSION ......................................................................................................................... 19

1

2

3 <u>**TABLE OF AUTHORITIES**</u>

4 **Page(s)**

5 **Cases**

6
*In re Anthem, Inc. Data Breach Litig.*,
7    No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137 (N.D. Cal. Aug. 17,
     2018) ................................................................................................................ 10
8
*In re Bluetooth Headset Prods. Liab. Litig.*,
9    654 F.3d 935, 941-42 (9th Cir. 2011) ........................................................ 10, 14

10 *Churchill Vill., L.L.C. v. Gen. Elec.*,
11    361 F.3d 566 (9th Cir. 2004) ...................................................................... 14

12 *In re Google L.L.C. St. View Elec. Communs. Litig.*,
     611 F. Supp.3d 872 (N.D. Cal. 2020) (Breyer, J.) ...................................... 10
13
*Hanlon v. Chrysler Corp.*,
14    150 F.3d 1011 (9th Cir. 1998)...................................................................... 13

15 *Harrington v. Purdue Pharma, L.P. et al.*,
16    No. 23-124, 600 U.S. 15 (Aug. 10, 2023) .................................................... 6

17 *Hesse v. Sprint Corp.*,
     598 F.3d 581 (9th Cir. 2010)........................................................................ 15
18
*In re McKinsey & Co., Inc., Nat'l Opiate Consultant Litig.*,
19    637 F. Supp. 3d 773 (N.D. Cal. 2022) ........................................................ 4

20 *In re McKinsey & Company, Inc., National Prescription Opiate Consultant*
21    *Litigation*,
     543 F. Supp. 3d 1377 (J.P.M.L. 2021) ........................................................ 4
22
*In re Online DVD-Rental Antitrust Litig.*,
23    779 F.3d 934 (9th Cir. 2015)........................................................................ 10

24 *Rabin v. PricewaterhouseCoopers LLP*,
     No. 16-cv-02276-JST, 2020 U.S. Dist. LEXIS 211546 (N.D. Cal. Aug. 19,
25    2020) (Tigar, J.)............................................................................................ 16

26 *Staton v. Boeing Co.*,
27    327 F.3d 938 (9th Cir. 2003)........................................................................ 15

28

*Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods.*
    *Liab. Litig. v. Toyota Motor Corp.*,
    736 F. App'x 639 (9th Cir. 2018) ........................................................................ 14

*In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    MDL No. 2672 CRB (JSC), 2018 U.S. Dist. LEXIS 201681 (N.D. Cal. Nov.
    28, 2018) ........................................................................................ 11, 13, 14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................ 11

*Wolin v. Jaguar Land Rover N. Am., L.L.C.*,
    617 F.3d 1168 (9th Cir. 2010) ........................................................................ 12

**Statutes**

13 U.S.C. 161 ........................................................................................ 2, 11

Class Action Fairness Act of 2005, 28 U.S.C. §1711, *et seq.* ........................ 19

Indiana Code § 4-6-15-3 ........................................................................................ 6

**Rules**

34 C.F.R. §§ 300.320-300.328 ........................................................................ 1

Fed. R. Civ. P. 23 ........................................................................................ 13

Fed. R. Civ. P. 23(a) ........................................................................................ 11

Fed. R. Civ. P. 23(a)(2) ........................................................................................ 11

Fed. R. Civ. P. 23(a)(2), Rule 23(b)(3) ........................................................ 13

Fed. R. Civ. P.23(a)(4) ........................................................................................ 13

Fed. R. Civ. P.23(b)(3) ........................................................................................ 13

Fed. R. Civ. P. 23(c)(2)(B) ........................................................................................ 9

Federal Rule of Civil Procedure 23 (e) ........................................................ 14

Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii) ........................................................................ 11

Fed. R. Civ. P.23(h) ........................................................................................ 9

1

2

3    **Other Authorities**

4 6 Newberg on Class Actions § 18:19 (5th ed.) .............................................................. 15

5
United States Census Bureau quinqennial census of school districts, available at
6        https://www2.census.gov/programs-surveys/school-
         finances/tables/2020/secondary-education-finance/elsec20.xls ...................................... 2,6, 11
7
School District MOU with the State of Maine, available at
8        https://www.maine.gov/ag/docs/MOU-with-School-Districts.pdf .......................................... 2
9
Leslie Kendrick, *The Perils and Promise of Public Nuisance*, 132 Yale L.J. 702
10        (2023) ................................................................................................................... 16
11 Rule 23(b)(3) ................................................................................................................. 13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

American public schools perform an indispensable function, central to the health of American democracy, by providing a free education to every student who comes through their doors. But for the last decade at least, the job of public schools has been made more difficult by the increasing numbers of students affected by the opioid crisis. Addressing those students' needs, including complying with statutory mandates to provide special education services to students who, because of their exposure to opioids in utero, disproportionately need those services is significantly burdening school districts' budgets.

In this case, in their Amended Master Complaint, school districts have alleged that McKinsey has directly and proximately caused them substantial harms, and imposed substantial costs on them, through its role as the architect of a scheme to "turbocharge" opioid sales. ECF  297 ¶ 21. *First*, as a result of McKinsey's actions, the market was flooded with opioids, increasing the number of women using opioids during pregnancy and, in turn, the number of women giving birth to infants born with Neonatal Opioid Withdrawal Syndrome ("NOWS" sometimes referred to as "NAS"). *Id. Second*, because of the adverse neurodevelopmental consequences of NOWS, children with NOWS histories disproportionately need costly "special education" services, which school districts are mandated to provide, 34 C.F.R. §§ 300.320-300.328, from prekindergarten all the way through high school. ECF 297 ¶ 21. *Third*, providing special education services and student supports to opioid-affected children almost doubles the cost of their education, saddling public schools with large and unfunded costs that they would not incur but for the opioid crisis, which McKinsey exacerbated. *Id. Fourth,* these consequences of McKinsey's role in "turbocharging" opioid sales were foreseeable. *Id.*

Public Schools' injuries mainly stem from the costs of providing special education and related services to students exposed to opioids before birth. But they also include the time spent by classroom teachers and aides and school social workers and psychologists to address the trauma that students are experiencing as the result of opioid use orders—afflicting their family members, caretakers, friends, and sometimes themselves.

The proposed settlement agreement before the Court would resolve Public Schools' claims against McKinsey for $23 million. McKinsey has agreed to pay $230 million, in the aggregate, to resolve both subdivision and school district claims, with $23 million designated for school districts. This is a precedent-setting result for Public Schools. Except in the state of Maine, until now, *no* money has yet been earmarked for schools in any other MDL opioid settlement—not in the settlements with manufacturers (Johnson & Johnson, Teva, and Allergan), distributors (AmerisourceBergen, Cardinal Health, and McKesson), or pharmacies (Walgreens, CVS, and Walmart).[2] The proposed settlement here is the first MDL settlement to allocate funds specifically for schools. That is a substantial accomplishment.

Even so, the dollar amount of this proposed settlement with McKinsey is limited compared to the large number of members of the proposed Public School class. (There are nearly 14,000 public elementary, middle, and secondary school districts nationwide, all of them, with only minor exceptions, included within the proposed class).[3] As a result, under a traditional pro rata distribution, the value of Public Schools' share of the $23 million settlement would be quickly diluted: providing each of the nearly 14,000 school districts nationwide with either equal or proportional shares of $23 million would yield a modest and insignificant amount for any individual school district or school system. For that reason, the proposed settlement here takes a different approach. Instead of a pro rata or proportional distribution, this settlement would—*with the consent of the class*—allocate settlement money through an innovative trust mechanism. Rather than dividing the settlement funds 14,000 ways, the proposed settlement calls for McKinsey to pay settlement funds into a Public School District Opioid Recovery Trust, overseen by an independent trustee who will solicit, receive, and review applications for funding from class

---

[2] Only school districts in Maine have thus far received any money from opioid settlements. Maine's school districts are receiving three percent of Maine's recovery from the Distributor and Janssen (Johnson & Johnson) settlements. https://www.maine.gov/ag/docs/MOU-with-School-Districts.pdf.

[3] The identify of class members is readily ascertainable. The United States Census Bureau is statutorily charged with conducting a "census of [state and local] governments," 13 U.S.C. 161, and as part of that charge, conducts a quinquennial census identifying school districts nationwide, with the most recent results available at https://www2.census.gov/programs-surveys/school-finances/tables/2020/secondary-education-finance/elsec20.xls.

members (with every class member eligible to apply). Then, from among the requests and proposals received, the trustee will award grants to a limited number of school districts or school systems — to direct the limited settlement fund to school districts or school systems where it can be expected to have the greatest impact. Consistent with that purpose, the trustee will give priority, for example, to:

**(a)**      Applications for funding from Public Schools (or consortia of public school districts) in areas most affected by Neonatal Opioid Withdrawal Syndrome births and the opioid crisis.

**(b)**      Applications from underfunded school districts or school districts with low per-pupil spending.

**(c)**      Applications that target services to children under the age of 8, where the potential gains are likely to be the highest.

**(d)**      Applications showing that funds received will be used to leverage matching funds from other sources, increasing their impact.

**(e)**      Applications showing how programs funded by the grant will become self-sustaining once the grant money has been spent.

**(f)**      Applications for projects that are innovative or designed to be replicated elsewhere.

Under the proposed trust, settlement funds will not be available to support research.

The Public School District Opioid Recovery Trust, into which the proceeds of this Settlement would be deposited, will also hold funds Public Schools have collected from other opioid defendants in other opioid cases—including from the Purdue, Mallinckrodt, and Endo bankruptcies, from which the trust has already received a recovery (in the case of Mallinckrodt) or expects to receive recoveries (in the cases of Purdue and Endo). Those funds, like the funds

from this settlement, will be distributed to Public Schools nationwide through the RFP/grant process administered by the independent trustee. *See generally* the status report in Mallinckrodt attached as Exhibit 3.

Dr. Andrés Alonso will serve as the independent special trustee for the Trust. Dr. Alonso was formerly the chief executive officer of the Baltimore City Public School System and, before that, deputy chancellor of the New York Public School System. He has also been the former chair and a former trustee of the Carnegie Foundation for the Advancement of Teaching. A copy of his C.V. is Exhibit 4. A description of the structure and purposes of the Public School District Opioid Recovery Trust is Exhibit 5. Truist Bank would serve as the administrative trustee.

## II.     BACKGROUND

### A.     Summary of the Litigation/Procedural History

The earliest complaints against McKinsey were filed in MDL No. 2804, alongside claims against manufacturers and distributors, and they  were primarily filed by five groups: political subdivisions (mostly cities and counties), school districts, Tribes, Third-Party Payors, and guardians of NAS children. Then, on March 5, 2021, McKinsey filed a Motion before the Judicial Panel on Multidistrict Litigation to transfer all these cases to the Southern District of New York. The J.P.M.L centralized the actions in this Court instead. *In re McKinsey & Company, Inc., National Prescription Opiate Consultant Litigation*, 543 F. Supp. 3d 1377 (J.P.M.L. 2021). After transfer, in June 2021, this Court appointed Lead Counsel and a Plaintiff Steering Committee, including representation for School Districts on the Steering Committee. ECF 211.

Public Schools filed their Master Complaint in December 2021. ECF 297. Responding, McKinsey filed two Rule 12 motions, one on grounds of *res judicata* and release (ECF 310) and a second challenging personal jurisdiction (ECF 313). The Court denied McKinsey's motion to dismiss for lack of personal jurisdiction. *In re McKinsey & Co., Inc., Nat'l Opiate Consultant Litig.*, 637 F. Supp. 3d 773 (N.D. Cal. 2022). At the parties' request, the Court stayed proceedings on McKinsey's *res judicata* motion, pending submission of a proposed settlement for preliminary approval. ECF 436.,

Discovery has proceeded in the meantime. *See* ECF 440 (joint discovery schedule). McKinsey has begun producing documents. Two joint discovery dispute letters have been submitted to Magistrate Judge Kim—and both have been resolved by order. ECF 543. At the same time, Plaintiffs, including Public Schools, have also been reviewing evidence gathered from other sources, including: (a) McKinsey's third-party production of documents in MDL 2804, (b) documents produced by other opioid market participants in MDL No. 2804 relating to McKinsey's advice and conduct, and (c) documents McKinsey produced to the state Attorneys General.

### B.     Settlement Negotiations and Mediation

The proposed settlement agreement before the court (Exhibit 2) results from extensive, arm's length negotiations between subdivisions, schools, and McKinsey, with help from experienced and sophisticated mediators with decades of proven experience, Jed D. Melnick, Esq. and Simone Lelchuk of JAMS.

The parties mediated with Mr. Melnick and Ms. Lulchuk for two days, in person, at JAMS in New York City on August 8 and August 9, 2022. After that, they continued their negotiations, remotely but still with Mr. Melnick's supervision and assistance, for several more months, through the first quarter of 2023, before ultimately reaching the agreement now before the Court in August 2023. *See* Exhibit 1 ¶¶ 5-7 (Mehri Decl.).

### III.    THE PROPOSED SETTLEMENT

### A.     The Proposed Settlement Class

The Public Schools' settlement is conditioned on this Court's approval, for settlement purposes only, of a nationwide Settlement Class of school districts comprised of:

> All elementary, middle, or secondary Public School Districts in the United States except those in Indiana, American Samoa, the Commonwealth of Guam, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands. The

foregoing shall specifically include but not be limited to the Public School Districts listed on Schedule A and the litigating School Districts listed on Schedule B.[4]

### B.     Settlement Value

McKinsey has agreed to create two Settlement Funds, one for $207 million designated for subdivisions and another for $23 million designated for public schools. This monetary recovery is in addition to the approximately $641.5 million that McKinsey has already paid to settle with the State AGs and the valuable injunctive relief also provided under the AG Agreement and under the resulting consent judgments.

After deducting costs of notice and of administering the Public School District Opioid Recovery Trust, any fee and costs award, any incentive awards to the Public Schools Representatives, and any other costs or fees approved by the Court, the remaining balance will be paid to the Public School District Opioid Recovery Trust. No part of the Public School settlement funds will revert to McKinsey, and no part will be paid as a cy pres award.

The recovery for Public Schools here will be added to the Public School District Opioid Recovery Trust, supplementing amounts recovered from other opioid defendants, including Purdue, Mallinckrodt, and Endo. Purdue has agreed to pay $25.5 million to be added to the Trust, although receiving that money has now been delayed by the Supreme Court's review of the Purdue bankruptcy. *See, e.g.*, *Harrington v. Purdue Pharma, L.P. et al.*, No. 23-124, 600 U.S. 15 (Aug. 10, 2023) (granting certiorari). A $5 million recovery from Mallinckrodt is already secured and escrowed. A $3 million recovery from Endo is awaiting bankruptcy court approval. Together, Public Schools' recoveries in Purdue, Mallinckrodt, and Endo total $33.5 million; the addition of $25.5 million from McKinsey in this settlement will bring the total to $56.5 million; and that number could grow with future recoveries from other opioid defendants .

The $23 million recovery here for Public Schools—constituting ten percent of the total settlement amount of $230 million for all local government units (Subdivisions, Special Districts,

---

[4]The list of school districts on Schedule A to the agreement is borrowed from the list generated by the United States Census Bureau's most recent quinquennial census identifying school districts nationwide. https://www2.census.gov/programs-surveys/school-finances/tables/2020/secondary-education-finance/elsec20.xls. The list of "litigating" school districts on Schedule B identifies school districts that have filed complaints against McKinsey.

and School Districts)—compares favorably to Public Schools' recoveries in Purdue, Endo, and Mallinckrodt. In this proposed settlement Public Schools are recovering a greater share, relative to subdivisions, than in any earlier opioid settlement. For Public Schools, this proposed settlement is a substantial accomplishment.

Estimating the value of this settlement relative to McKinsey's potential exposure is as difficult for Public Schools as it is for subdivisions. A realistic assessment would require a discount for risk — including rulings on motions to dismiss, still unresolved, raising questions of res judicata, release, and, whether McKinsey owed duties to government units, as well as the risk of an adverse ruling on summary judgment and trial risk. (Opioid plaintiffs have already lost some cases at summary judgment or trial). It is plaintiffs' counsel's considered judgment that $23 million is a fair, reasonable, and adequate recovery for Public Schools against McKinsey relative to the risks of continued litigation, the delay that would result from continued litigation, postponing receipt and distribution of a recovery that Public Schools desperately need to help defray the costs of the opioid epidemic on their budgets, and in light of the very favorable result here, for Public Schools, compared to earlier opioid settlements.

### C.     Scope of Class Members' Releases

In exchange for the $23 million that McKinsey will pay to settle school district class members' claims, class members will give McKinsey a release, narrowly tailored to the claims that Public Schools have or could have litigated, arising from McKinsey's "Covered Conduct," with the settlement stating as follows:

> "Released Claims" means any and all Claims, including Unknown Claims, that (a) directly or indirectly are based on, arise out of, or in any way relate to or concern Covered Conduct, or (b) in any way relate to or concern allegations *that have been asserted in any of the Actions, or that could have been alleged* in any of the Actions, or (c) result from or relate to a continuation or continuing effect of any such conduct, acts, transactions, events, occurrences, statements, omissions, or failures to act in any of the Actions. The Settling Parties intend that "Released Claims" be interpreted broadly. This Agreement does not release Claims by private

individuals except insofar as any private individuals are plaintiffs in any of the cases filed by the Settling Parties. It is the intent of the Settling Parties that Claims by private individuals be treated in accordance with applicable law.

Agreement § I.21 (emphasis added). McKinsey's "Covered Conduct" is defined to encompass the full scope of McKinsey's work with opioid manufacturers regarding opioid products, Agreement §I.6. The Release also makes clear that additional parties against whom Public Schools may still pursue claims—Publicis Group, ZS Associates, Practice Fusion, Inc. and Practice Fusion's successor in interest, Veradigm, Inc. f/k/a Allscripts Healthcare Solutions, Inc.— are not "Released Parties." Agreement § I.22.

### D.    Settlement Notice

#### 1.    Method of Notice

Under the proposed notice plan, class members will be notified of the terms of the proposed settlement by four means: (a) directly through a long-form notice mailed to each class member; (b) through a short-form notice, which will be published in *Education Week* and in *School Administrator* magazine; (c) through materials mailed to the top official in each state having responsibility for public education, who will be encouraged to notify public schools in their state; and (d) by postings on a National School District Opioid Settlement website. See Mehri Dec. ¶ 22.

Public Schools' counsel solicited and received competitive bids for notice services. As a result of that bidding process, counsel intend to retain Epiq Class Action and Claims Solutions, Inc ("Epiq"), a nationally recognized class notice administrator. The fees and costs of the Settlement Administrator—for implementing the notice program and performing the other administrative tasks described in the Settlement—will be paid from the Settlement Fund. Cam Azari from Epiq outlines the notice plan in his declaration which is attached as Exhibit 6.

The Settlement Fund will fund the notice costs.

#### 2.    Content of Class Notice

The proposed long-form and short-form notices are Attachments 1 and 2 to the Azari Declaration. (Exhibit 6). Both have been written to advise class members clearly and concisely

and in plain, easily understood language of (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members. Fed. R. Civ. P. 23(c)(2)(B).

*In addition, because of the innovative structure of the proposed trust mechanism, which differs from customary pro rata or proportional distributions to every class member, the notice also specifically advises class members of:* (a) the proposed trust structure, (b) that the plan of allocation from the trust does not use distribute settlement funds to class members on a pro rata or proportional basis, (c) *that, therefore, under the proposed settlement, no individual class member is guaranteed or has any entitlement to any settlement funds*; and (d) that any school district or system that does not consent to that structure (or otherwise objects to the Settlement) has a right to opt out.

### E.    Attorneys' Fees and Expenses

Under Rule 23(h) and this Court's Pretrial Order No. 3 (ECF 215), Public Schools' Class Counsel will apply to the Court for an award of reasonable attorneys' fees and expenses. That request will not exceed 10% of the Public School Settlement Fund. This is well below the Ninth Circuit's benchmark of 25% for the "percent-of-recovery method" of allocation. *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 949 (9th Cir. 2015) (citing *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-42 (9th Cir. 2011)). If approved, fees and expenses will be deducted and paid from the Settlement Fund. Agreement § VI.2.

McKinsey reserves the ability to make an objection to Plaintiffs' counsel's fee petition. No portion of the Fund will revert to McKinsey .

### F.    Incentive Awards

Class Counsel will also apply to the Court for incentive awards of up to $10,000 for each of the 14 fourteen named Plaintiffs—for their time, efforts, leadership, and vanguard role in prosecuting claims on behalf of the Class. Those school districts are Putnam County School District in Florida; Jefferson, Martin, Estill, Larue, Breathitt, Fayette, and Bullitt County Public Schools in Kentucky; Regional School Units of 34 and 68 in Maine; Southwestern Central and

Rochester City School District in New York; and Hamblen and Hancock County Boards of Education in Tennessee.

The requested awards total $140,000, or .6 percent of the settlement fund, which is less than the .7 percent of the settlement fund that this Court approved in incentive awards for 21 class representatives in the Google "Street View" privacy case. *In re Google L.L.C. St. View Elec. Communs. Litig.*, 611 F. Supp.3d 872, 889-90 (N.D. Cal. 2020) (Breyer, J.). *See also In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617-LHK, 2018 U.S. Dist. LEXIS 140137, at *168-76 (N.D. Cal. Aug. 17, 2018) (services awards totaling $597,500 and .52% of the settlement fund, for 105 named plaintiffs).

. The awards are warranted for the vanguard role that these named plaintiffs showed in stepping forward to bring these claims in light of the adverse positions of some State Attorneys General to school districts. Mehri Decl. ¶¶ 27-29

### G.     McKinsey's Reservation of Rights

Under the proposed settlement, McKinsey reserves the option, in its sole discretion, to terminate the proposed Public School settlement, including because of the number of school districts that may validly request exclusion from the settlement. Agreement §  VII(5)(c).

## IV.     ARGUMENT

### A.     Because the Court will likely be able to certify a class and approve the settlement the Court should authorize class notice and schedule a fairness hearing.

Rule 23(e)(1) provides that the Court must direct notice to the class when justified by the parties' showing that the court "will likely be able to" (i) certify the Class for settlement purposes and (ii) after notice the class, finally approve the Settlement. Fed. R. Civ. P. 23(e)(1)(B)(i)–(ii).

### B.     Class certification will be appropriate: the proposed settlement class meets the requirements of Rule 23(a).

#### 1.     The Class is sufficiently numerous.

There are nearly 14,000 elementary, middle, and secondary school districts nationwide, as identified by the U.S. Census. https://www2.census.gov/programs-surveys/school-

finances/tables/2020/secondary-education-finance/elsec20.xls.[5] With limited exceptions, the class definition includes all of them. Settlement Agreement (Exhibit 2). Joinder "of thousands of class members," which would be the case here, is "clearly impractical." *In re Volkswagen 'Clean Diesel' Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 2672 CRB (JSC), 2018 U.S. Dist. LEXIS 201681, *4 (N.D. Cal. Nov. 28, 2018) (cleaned up). Neither ascertainability nor numerosity poses any obstacle to certifying this class.

### 2. There are questions of law and fact common to the class.

"[F]or purposes of Rule 23(a)(2), even a single common question will do" if it is "likely to drive resolution of the lawsuit." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Here, because McKinsey's knowledge, duties, and actions were the same toward all public schools, a core set of several questions are presented by every school district's claims, and they will also be answered the same way for all public schools. These questions include: (a) whether McKinsey's actions in developing, urging, and implementing strategies for promoting and selling opioids caused or contributed to an increase in opioid addiction and abuse; (b) whether McKinsey's actions in those regards were negligent, grossly negligent, reckless, or intentional; (c) what and when McKinsey knew, or should have known, about opioids' effects on children's cognitive, social, or emotional development; (d) whether exposure to opioids in utero causes deficits that make children eligible for special education services; (e) whether students' exposures to family members', friends', or neighbors' opioid use disorders are causing them to experience dysregulated emotions and behaviors in school settings; and (f) whether McKinsey has affirmative defenses, including res judicata and release, that would entitle it to a judgment in its favor. The case is subject to common proof and common expert testimony.

### 3. The proposed class representatives' claims are typical of the claims of all other class members.

Like all absent class members, the named plaintiffs contend that McKinsey injured them by designing and implementing strategies to turbocharge opioid sales (or conspiring or aiding and

---

[5] The United States Census Bureau is statutorily charged with conducting a "census of [state and local] governments," 13 U.S.C. 161, and, as part of that charge, conducts a quinquennial census of school districts nationwide, identifying all elementary, middle, and secondary school districts.

abetting Purdue and others to turbocharge opioid sales); and that McKinsey's strategies led to increasing rates of opioid use disorder, injuring children in ways that have increased the costs of their education. The representative plaintiffs, in other words, assert the same claims, arising from the same course of conduct, rely on the same legal theories, and allege the same types of injuries as absent class members. These similarities between the representative plaintiffs' claims and absent class members' claims satisfy the test for typicality. *See Wolin v. Jaguar Land Rover N. Am., L.L.C.*, 617 F.3d 1168, 1175 (9th Cir. 2010).

       **4.**      **The proposed class representatives and their counsel will fairly and adequately protect the interest of the class.**

The representative plaintiffs and all absent class members share the same interest in proving the same liability facts and will prove them with the same evidence. There are no apparent intraclass conflicts, and there is no reason to anticipate future potential conflicts. The representative plaintiffs have retained experienced, qualified counsel, who have thus far vigorously prosecuted this action and demonstrated their commitment to the case by committing substantial time and financial resources to it. *See* Mehri Decl. ¶¶ 23-24. The supervision of settlement negotiations here by an experienced, neutral mediator also provide functional and structural assurances of adequacy of representation here, adding confidence that all parties operated under a proper understanding of their representational responsibilities. Both the representative plaintiffs and their counsel satisfy the requirements for Rule 23(a)(4) adequacy. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998).

      **C.**      **The proposed class also meets the requirements of Rule 23(b)(3).**

Rule 23(b)(3) imposes two requirements—predominance and superiority. Both are satisfied here.

       **1.**      **Common issues predominate.**

Whereas common questions alone are enough to satisfy Rule 23(a)(2), Rule 23(b)(3) predominance focuses on the relationship between those common questions and individual issues, asking whether common or individual issues predominate. Here, common issues predominate. A common nucleus of facts—concerning McKinsey's role in the opioid crisis and the causal links (a) between opioid exposure and students' cognitive, social, and emotional development, and

(b) between deficits of cognitive, social, and emotional development and the increased costs borne by schools—are the central issues here. Individual questions—regarding variations in state law or individual damages questions—pale by comparison. *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) ("A common nucleus of facts and potential legal remedies dominates this litigation," satisfying Rule 23(b)(3) predominance).

### 2.      A class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

Aggregating claims here will save time, effort, and expense and promote uniformity without sacrificing procedural fairness. Fed. R. Civ. P. 23, 1966 Advisory Committee Notes; *In re Volkswagen "Clean Diesel," supra*, Mktg*.*, 2018 U.S. Dist. LEXIS 201681, *6. The alternative of individual litigation would both burden the judiciary and prove uneconomical for many public school districts, who either could not spend or would choose not to spend the substantial sums required to support litigation like this, with its foreseeably large costs for fact and expert discovery. "From either a judicial or litigant viewpoint, there is no advantage [here] in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon*, 150 F.3d at 1023. A class action is "superior" in this case "to other available methods for the fair and efficient adjudication of" this controversy. Fed. R. Civ. P. 23(b)(3).

### D.      The proposed settlement warrants preliminary approval.

The Ninth Circuit has identified nearly a dozen factors that district courts often consider before approving a proposed class action settlement. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011); *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004). But as this Court has observed, it can be "more effective" to consider those factors after notice of the settlement has been sent to class members and they have had the opportunity to object. *Volkswagen "Clean Diesel," supra*, 2018 U.S. Dist. LEXIS 201681, *13. "At the preliminary stage, then, "district courts in this circuit often consider a separate set of factors, which better reflect that the review at this stage is only an initial evaluation of the settlement's fairness." *Id*. These preliminary factors examine whether the settlement:

(1) appears  to  be  the  product  of  serious,  informed,  and  noncollusive

negotiations, (2) has any obvious deficiencies, (3) improperly grants preferential treatment to class representatives or segments of the class, and (4) provides class members with an award that falls within the range of possible approval.

*Volkswagen "Clean Diesel,"* 2018 U.S. Dist. LEXIS 201681, *14. All these "preliminary" factors favor preliminary approval here.

### E. The proposed notice plan satisfies due process

The multifaceted notice plan described above, providing direct mailed notice, published notice,  indirect mailed notice through the top educational official in each state, plus a website, more than satisfies due process and Federal Rule of Civil Procedure 23 (e). *Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig. v. Toyota Motor Corp.*, 736 F. App'x 639, 641 (9th Cir. 2018).

### F. This settlement is the product of serious, informed, and noncollusive negotiations.

This settlement occurs against the backdrop of other settlements with other opioid defendants, facing claims brought by many of these same plaintiffs and represented by the same class counsel. Indeed, Plaintiffs and class members have sued several of McKinsey's clients – Purdue, Endo, Johnson & Johnson, and Mallinckrodt— for the same deceptive efforts to increase the size of the opioid market, which they adopted because McKinsey advised them to. In those other cases, counsel, alongside and through the relevant appointed plaintiffs' committees, have received millions of pages of documents, terabytes of data, hundreds of depositions, expert reports, and testimony presented at several trials, all of which informed their evaluation of the merits and risks of this case and McKinsey's settlement offers.

As both subdivision and Public Schools' counsels' declarations attest, settlement negotiations here were at arm's length, arduous, protracted, and conducted with help from experienced neutral mediators. Further, nothing about the structure of the settlement suggests collusion: there are no contingencies under which any settlement funds would revert to McKinsey after approval. And (as discussed below), the settlement agreement does not propose to give class counsel a disproportionate share of the settlement funds. The negotiation history provides

evidence of serious, informed, and non-collusive negotiations.

### 1.    The proposed settlement has no obvious deficiencies.

Neither of the most common red flags for deficiencies—insufficient consideration or an over-broad release—are present here.

The settlement amount is within the range of possible approval (a factor that will be discussed in more depth below). And the scope of the release is narrowly tailored. It is limited to claims that relate to the Complaint's factual allegations, appropriately ensuring that the released claims are based on the same factual predicate as the claims actually asserted. *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010); *see also* 6 Newberg on Class Actions § 18:19 (5th ed.).

In addition, Public Schools' class counsel have agreed to limit their request for attorneys' fees to 10 percent of the settlement fund, well below the benchmark for attorneys' fees in common fund cases, which is twenty-five percent. *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003) ("This circuit has established 25% of the common fund as a benchmark award for attorney fees.") This factor favors preliminary approval.

### 2.    The proposed settlement does not improperly grant preferential treatment to class representatives or other segments of the class.

The proposed settlement treats certain class members differently in only one respect—but neither improperly nor unreasonably. Class counsel plan to seek incentive awards for the class representatives not to exceed $10,000 apiece, for a total of $140,000 or .6% of the $23 million settlement fund. If class members object to those awards, the Court can consider those objections before final approval. But at the preliminary approval stage, both this differentiation and the modest amount of the proposed incentive awards are fair, reasonable, and within the range of possible approval. *See Rabin v. PricewaterhouseCoopers LLP*, No. 16-cv-02276-JST, 2020 U.S. Dist. LEXIS 211546, at *33 (N.D. Cal. Aug. 19, 2020) (Tigar, J.) ("The Court need not resolve the specific amount of the [service] award[s] at this time as the matter will be conclusively determined at the Final Fairness and Approval Hearing.").

**3.      The proposed settlement would provide class members with an award that falls within the range of possible approval.**

Plaintiffs strongly believe in the merits of their claims. But there is also unusual risk in this case, including risks around two central legal issues.

Thus, Plaintiffs believe they will prevail on the threshold *res judicata* and release issues. But there is little prior decisional law on that issue. And it could be case dispositive. Without a settlement, that issue could ultimately reach the Ninth Circuit and even the Supreme Court (or potentially one or more state supreme courts), with an uncertain outcome.

Similarly, Plaintiffs firmly believe that they have the better of the argument that common law public nuisance is a cognizable cause of action on the facts here. Yet there is controversy about that question. *See generally* Leslie Kendrick, *The Perils and Promise of Public Nuisance*, 132 Yale L.J. 702 (2023). And Plaintiffs likewise believe that McKinsey owed duties to them—but this Court's ruling against the NAS Guardians' initial complaint on the issue of duty by McKinsey to NAS mothers highlights risk.

Factual risk can be mitigated—through, for example, discovery or by besting an opponent in front of a jury. But legal risk of the kind posed by a res judicata defense or the uncertain scope of a cause of action (here, public nuisance) are harder to mitigate. Legal risk differs from factual risk in that, in many cases, it never goes away: at every stage of a case, it's reviewable de novo by the next highest court.

At the same time, another factor—and the one that has driven Plaintiffs' Class Counsel, the PEC, and class members in opioid cases throughout the country—is that the opioid epidemic is ongoing. People die every day of opioid overdoses, and children need special education services due to prenatal opioid exposure now. Abatement is needed now. Relief sooner will accomplish what relief later cannot.

Settlement negotiations were conducted against these backdrops. The settlement amount is less than Public Schools had hoped for—but more than they have obtained from other opioid defendants thus far in other MDL settlements, to which this one therefore compares favorably for Public Schools.

Given the risks and delay of further litigation, and the favorable comparison between Public Schools' recovery here and in other opioid settlements that have *not* earmarked recovery for them, the Court should conclude that this proposed settlement is within the range of possible approval—and allow class members to weigh in.

### 4. The factors identified in the Northern District of California's Procedural Guidance for Class Action Settlements support approval here.

**Guidance 1(a):** There are no differences between the settlement class and the class proposed in Public Schools' Amended Master Complaint.

**Guidance 1(b);** The scope of the settlement release is the same as the scope of res judicata would be upon a judgment resolving claims in the Amended Master Complaint.

**Guidance 1(c):** The class' $23 million recovery under the settlement is fair, reasonable, and adequate when measured against: (a) the risks of this litigation; and (b) Public Schools' recoveries against other opioid defendants in other national settlements, which may serve as comparisons. In none of the other seven national settlements have Public School Districts received 10% of the amount received by subdivisions as they have here.

**Guidance 1(d):** Public Schools' class counsel are unaware of any other cases brought by Public Schools that the settlement will affect.

**Guidance 1(e):** The Trust, administered by an independent trustee, will solicit grant requests from all class members and make awards equitably and without bias.

**Guidance 1(f):** The novel nature of the Public School District Opioid Recovery Trust model makes it hard to predict how many school districts will apply for grants of Trust funds.

**Guidance 1(g):** There will be no reversion of any Trust funds to Defendants. All Trust money, net of fees and expenses, will be distributed among class members.

**Guidance 2:** Plaintiffs have selected Epiq as the Notice Administrator. Epiq has helped with settlement functions in MDL 2804. After negotiations and competitive bidding, Epiq has agreed to provide Notice services for less than $60,000.

**Guidance 3:** The proposed notice program has three components—long form mailed notice, short-form published notice, and notice to State Education Commissioners—and the

notice materials are worded with clarity and concision in mind, based on templates recommended by the Federal Judicial Center or with language suggested by the Procedural Guidance issued by this District.

**Guidances 4 and 5:** The class notices spell out how class members may opt out or object and provide contact information for class counsel.

**Guidance 6:** Class counsel will request an award of attorneys' fees and expenses, not to exceed 10% of the gross settlement amount, to be paid from the gross settlement amount.

**Guidance 7:** Class counsel will seek approval to make Service Awards in the amount of $10,000 for each of the fourteen class representatives.

**Guidance 8:** There will be no cy pres awards as part of this settlement. And no funds will revert to McKinsey.

**Guidance 9:** The parties suggest the following timeline for completing Notice and for a final approval hearing:

| Event | Proposed Time for Compliance |
|---|---|
| Deadline for Plaintiffs to confirm with Notice Administrator the identities of all Class members who should be sent Notice | Not later than 30 days following entry of Preliminary Approval Order |
| Deadline for Notice Administrator to complete email and/or U.S. mail notice ("Notice Date") | Not later than 30 days following receipt of confirmed list of Class members |
| Deadline for objectors to deliver written objections by hand or postmarked/sent by first-class mail | Postmarked or submitted not later than 60 days from Notice Date |
| Deadline for Class members to submit Request for Exclusion, if desired | Postmarked or submitted not later than 60 days from Notice Date |
| Deadline to submit opening briefs and supporting materials in support of Final Approval of Settlement | Not later than 65 days before Final Approval Hearing |
| Deadline to submit opening briefs and supporting materials in support of motion for attorneys' fees and expenses | Not later than 65 days before Final Approval Hearing |
| Final Approval Hearing | Day and time to be chosen at the Court's discretion |

**Guidance 10:** Defendants will be responsible, at their own cost, separate from the gross settlement fund, for providing notice under the Class Action Fairness Act of 2005, 28 U.S.C.

§1711, *et seq.*, to state AGs and the U.S. Attorney General. This notice shall be provided within ten days of the filing of this motion with the Court.

**Guidance 11:** There have been seven earlier national opioid settlements. In none of them have Public Schools achieved what they have achieved here: a recovery representing ten percent of the amount recovered by subdivisions. There are roughly twice as many subdivisions as school districts. And subdivisions claims, on average, are larger than schools' claims on average. This settlement sets a new benchmark for Public Schools.

### G.    The Court should continue to stay proceedings on McKinsey's res judicata motion.

Plaintiffs and Defendants jointly request that the court continue to stay oral argument and decision on McKinsey's motion to dismiss on res judicata grounds, pending consideration and approval of this proposed settlement.

### CONCLUSION

For all the reasons stated above, Plaintiff School Districts ask the Court to preliminarily approve this proposed class action settlement.

Dated: Sept. 26, 2023

Respectfully submitted,

By: */s/Cyrus Mehri*
Cyrus Mehri
cmehri@findjustice.com
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100

Wayne Hogan
hogan@terrellhogan.com
TERRELL HOGAN YEGELWEL, P.A
233 E. Bay Street, Suite 800
Jacksonville, FL 32202
Telephone: (904) 722-2228

Neil Henrichsen
nhenrichsen@hslawyers.com
HENRICHSEN LAW GROUP
301 W Bay Street, Suite 1400
Jacksonville, FL 32202
Telephone: (904) 381-8183

-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Cyrus Mehri
cmehri@findjustice.com
Joshua Karsh
jkarsh@findjustice.com
Ezra Bronstein
ebronstein@findjustice.com
MEHRI & SKALET, PLLC
2000 K Street, N.W., Suite 325
Washington, D.C. 20006
Telephone (202) 822-5100

**Filing Authorized by Plaintiffs' Lead Counsel
Pursuant to PTO 2**:

By: /s/ Elizabeth J. Cabraser
Elizabeth J. Cabraser
ecabraser@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

SCHOOL DISTRICT PLTFS.' MOT. FOR
PRELIMINARY APPROVAL
21-MD-02996-CRB (SK)