# EXHIBIT 1

**DECLARATION OF CYRUS MEHRI IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT FOR SCHOOL DISTRICTS**

I, Cyrus Mehri, declare and state that:

1.      I am an attorney licensed to practice in the District of Columbia and the State of Connecticut. In 2001, I co-founded the law offices of Mehri & Skalet. Most of my practice has involved class actions and other forms of complex litigation. In August 2021, the Court appointed me to serve on the Plaintiff Steering Committee on behalf of Independent Public School Districts. [ECF 211].

### History of Public School District Litigation in MDL 2996

2.      My firm and co counsel filed suit against McKinsey on behalf of Public School Districts in Kentucky and West Virginia on May 5, 2021, for McKinsey's role in "turbocharging" the opioid crisis. On June 8, 2021, the federal Judicial Panel on Multidistrict Litigation ("JPML") created MDL 2996 and referred opioid litigation cases in the federal system to this Court. Following the JPML transfer, my firm filed cases with co-counsel on behalf of school districts from Maine, New York, Ohio, Tennessee, and Florida, each with counsel representing the interests of school districts in that state. In each of these class action complaints, the School Districts filed on behalf of themselves and all School Districts in their state. Ultimately, on December 6, 2021, a Master Complaint was filed for School Districts. An amended Master Complaint is being filed simultaneously with this filing.

3.      On August 16, 2021, this Court appointed a Plaintiffs' Steering Committee ("PSC"), with Elizabeth Cabraser as lead counsel and with Subdivisions represented by Jane Conroy, Joe Rice, Aelish Baig, Mathew Browne, and Emily Roark. The Court appointed me to serve as the PSC member representing independent Public-School Districts. My principal colleagues and co-counsel on this matter include Joshua Karsh and Ezra Bronstein, a partner and senior associate at my firm respectively, and Wayne Hogan of Terrell Hogan Yegelwel, P.A. and Neil Henrichsen of The Henrichsen Law Group, PLLC. In addition, we had local co-counsel representing the interests of school districts for each of the seven filed complaints, namely, Hendy Johnson Vaughn Emery, PSC in Kentucky; James F. Humphreys & Associates, L.C. in West Virginia; Terrell Hogan Yegelwel in Florida; Drummond Woodsum in Maine; Hodgson Russ, LLP in New York; Gertz & Rosen, Ltd. In Ohio; and Eldridge & Blakney, PC in Tennessee.

4.      McKinsey moved to dismiss on res judicata grounds on December 23, 2021. The motion raised complex and novel legal issues. Lead counsel, Subdivision, and School District Counsel all worked together to research, draft, and oppose the motion to dismiss. On behalf of School Districts, our research included conducting state-by-state analyses of the law for each relevant state. We also participated in preparing law professor Samuel Issacharoff for an oral argument, which occurred on March 31, 2022. Following that hearing, the Court asked for supplemental briefing, resulting in further state-by-state analysis and our drafting, editing, and filing of an extensive supplemental brief.

5.      In July 2022, with the res judicata motions pending and a second hearing on the motions scheduled for September 13, 2022 settlement

DECLARATION OF CYRUS MEHRI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

negotiations began between McKinsey, plaintiffs' lead counsel, counsel for Subdivisions, and Counsel for School Districts. The parties selected JAMS mediators Jed Melnick and Simone Lelchuk to serve as mediators. They convened a two-day in-person mediation at the JAMS New York office on August 8 and 9. In preparation for the mediation, School District counsel prepared a settlement structure document outlining a grant making Trust to benefit a nationwide class of School Districts. Further, in preparation for the mediation, I contacted Subdivision counsel about allocating settlement proceeds between Subdivisions and School Districts in the event of a successful mediation.  Proposals for and discussions about allocation included reviewing expert analyses bearing on the size of School Districts' and Subdivisions' respective damages.

6.     Ultimately, Subdivisions and School Districts reached an impasse with McKinsey at the in-person mediation. However, talks continued up to the eve of the September 13 hearing on the res judicata motion. The Court rescheduled the hearing on the res judicata motion to October 14, 2022. This allowed Mediators Mr. Melnick and Ms. Lelchuk to hold another mediation session on September 21, 2022. Settlement talks intensified as the res judicata hearing approached. A settlement in principle between Subdivisions/School Districts and McKinsey was reached on the eve of the October 14 hearing. McKinsey agreed to resolve Subdivisions and School Districts' claims for a global figure of $230 million.

7.     Following the settlement in principle with McKinsey, Subdivision and School District Counsel still had to do the hard work of negotiating the allocation between Subdivisions and School Districts. In December 2022, Counsel for Subdivisions and School Districts agreed to ask the JAMS mediators Mr. Melnick to mediate this topic. The first mediation

addressing allocation took place on January 3, 2023, by Zoom. My firm and School District local counsel from Florida, Kentucky, Maine, and West Virginia participated in that session and remained actively involved as the mediation continued for months. Ron Johnson, who represents Kentucky School Districts, was particularly involved and joined me on several mediation calls with mediator Jed Melnick and Subdivision counsel. At times, Subdivisions and School Districts appeared to be approaching an impasse. Ultimately, in mid-March, Subdivisions and School Districts agreed to a 90/10 split, where School Districts would receive $23 million of the $230 million global settlement.

8.      School Districts' counsel have also been active in this MDL in other ways. I have regularly attended PSC meetings and contributed to strategic decisions. I also participated in case management discovery negotiations and developing proposed orders early in the case. At times, schools' counsel have also researched items impacting other plaintiff groups in the MDL that do not directly impact School Districts. My firm has also actively contributed to the enormous document review and analysis efforts. Further, my firm contributed financially to the PSC litigation fund.

**Public School District Settlement and Plan of Allocation**

9.      McKinsey has agreed to fund a School District-specific Settlement of $23 million. After deducting reasonable costs for notice, claims administration, the Public School District Opioid Recovery Trust, attorneys' fees, litigation costs, any incentive awards to the Class Representatives, and any other costs or fees approved by the Court, the remaining balance will be used by the Public School Opioid Recovery Trust to make grants to school districts to abate opioid harms in the schools. No part of the School District

settlement funds will revert to McKinsey, and no part will be paid for a cy pres award.

10.     The settlement recovery in this litigation, which will be deposited into the School District Opioid Recovery Trust ("the Trust"), will supplement the amounts recovered from other opioid defendants, including Purdue, Mallinckrodt, and Endo. Amounts received (or to be received) from those and other opioid defendants will also fund the Trust. Purdue has agreed to pay $25.5 million, which will be added to the Trust, although receiving that money has now been delayed by the Supreme Court's review of the Purdue bankruptcy plan. *See*, *e.g.*, *Harrington v. Purdue Pharma, L.P. et al.*, No. 23-124, 2023 U.S. LEXIS 2872, 2023 WL 5116031 (U.S. Aug. 10, 2023) (granting certiorari). A $5 million recovery from Mallinckrodt is already secured and escrowed and will be used by the Trust. A $3 million recovery from Endo, which will be added to the Trust, is awaiting bankruptcy court approval. Together, Public School Districts' recoveries in Purdue, Mallinckrodt, and Endo total $33.5 million; the addition of $23 million from McKinsey in this settlement will bring the total to $56.5 million; and that number is expected to grow with future recoveries from other opioid defendants.

11.     The $23 million recovery through this litigation for Public School Districts—constituting ten percent of the total settlement amount of $230 million for all local government units (Subdivisions, Special Districts, and School Districts)—compares favorably to Public School Districts' recoveries in Purdue, Endo, and Mallinckrodt. In those cases, Schools' recoveries have been significantly smaller compared to Subdivisions' recoveries. In the judgment of proposed class counsel, the School District settlement with McKinsey is fair and reasonable under the circumstances,

especially when measured against the risks involved in McKinsey's motions to dismiss and the delay of likely appeals. As described above, the School Districts' negotiations both with McKinsey and Subdivision counsel were undertaken at arms' length over several months of intensive negotiations with help from experienced mediators.

12.     Estimating the value of this settlement relative to McKinsey's potential exposure is as difficult for Public Schools as it is for subdivisions. A reasonable estimate of McKinsey's liability would take into account amounts already recovered from other opioid defendants (but in light of principles of joint and several and coconspirator liability would not necessarily be reduced to account for apportionment or comparative fault). *See United States v. Philip Morris USA, Inc.,* 316 F. Supp.2d 19, 28 (D. D.C. 2004). A realistic assessment would also require a discount for risk—including rulings on motions to dismiss, still unresolved, raising questions of res judicata, release, and, for some claims, whether McKinsey owed duties to government units (or just to its clients), as well as or the risk of an adverse ruling on summary judgment and for trial risk. (Opioid plaintiffs have already lost some cases at summary judgment or trial). It is plaintiffs' counsel's considered judgment that $23 million is a fair, reasonable, and adequate recovery for Public Schools against McKinsey relative to the risks of continued litigation, the delay that would result from continued litigation, postponing receipt and distribution of a recovery that Public Schools desperately need to help defray the costs of the opioid epidemic on their budgets, and in light of the very favorable result here, for Public Schools, compared to earlier opioid settlements.

13.     The Public School District Opioid Recovery Trust Agreement is attached as <u>Exhibit A</u>. Under a traditional pro rata distribution of the $23 million recovered here, the value of any schools district's share of the

settlement would be quickly diluted: providing each of the nearly 14,000 school districts nationwide with either equal or proportional shares of $23 million would yield an insignificant amount for any individual school district opioid abatement effort. For that reason, the proposed settlement here must take a different approach. Instead of a pro rata or proportional distribution, this settlement would—with the consent of the class—allocate settlement money through an innovative trust mechanism. Rather than dividing the settlement funds 14,000 ways, the proposed settlement calls for McKinsey to pay settlement funds into the Public School District Opioid Recovery Trust, overseen by an independent trustee, Special Trustee, who will solicit, receive, and review applications for funding from class members (with every class member eligible to apply) and then, from among the received, the trustee will award grants to a limited number of schools districts or school systems—in order to direct the limited settlement funds to School Districts where it can have the greatest impact. The Trust is a grant-making trust. All class members are eligible to apply for grants but no school district is guaranteed any settlement funds: the Trust will not distribute Trust funds on a pro rata or proportional basis. The class notice explicitly communicates that fact.

14. The Special Trustee for the Trust, Dr. Andres Alonso, was selected by representatives from a cross section of school districts involved in opioid litigation. I observed the interviews of Special Trustee candidates. The selection process cast a wide net when searching for and interviewing prospective candidates. The interviews and background analysis were rigorous. Dr. Alonso emerged as the strongest candidate in the candidate pool. Dr. Alonso is a Ph.D., J.D.. He has served as the Deputy Chancellor of New York City Department of Education and Chief Executive Officer of Baltimore City School District. He has also served as a Trustee or Chairman

of the Board of other organizations, such as the Carnegie Foundation for the Advancement of Learning, the William T. Grant foundation, and the Panasonic Foundation. His many honors and awards include a "Lifetime Achievement Award" from the Association of Latino Administrators and Superintendents (2014); the White House "Hero of Education Distinction" (2010); and "School Superintendent of the Year" from the Fullwood Foundation (2009). His CV is attached as <u>Exhibit B.</u> His duties as Trustee are set forth in Article III (paragraphs 3.1-3.13) of the Trust documents.

15.     Public School Districts considered multiple candidates and have selected Truist Bank to handle traditional trust roles such as maintaining books and records, preparing quarterly reports and filing tax returns. Truist's duties are set forth in the Trust documents in Articles IV-V (paragraphs 4.1-5.7).

16.     The Special Trustee (Dr. Alonso) will receive an annual salary of $75,000, which will not increase if there are more settlements or additional funds added to the Trust. Truist Bank has agreed to a discount of approximately 25% discount for its fees. Reasonable expenses will be divided among the various sets of recoveries. For recordkeeping purposes, Truist Bank will maintain separate accounts for funds recovered from each opioid defendant (or proceeding).

17.     Dr. Alonso expects to initiate the grant making solicitation process in early 2024.

18.     Dr. Alonso will solicit and review funding proposals made by School Districts across the country, with all class members being eligible to participate. And from among the requests and proposals received, he will award grants to a limited number of schools districts—with the intent of directing the settlement money where it can be expected to have the greatest

impact. Consistent with that purpose, Dr. Alonso will give priority, for example, to:

    (a) Applications for funding from public school districts (or consortia of districts) in areas most affected by the opioid crisis.

    (b) Applications from underfunded school districts or school districts with low per-pupil spending.

    (c) Applications that target services to children under the age of 8, where the potential gains are likely to be the highest.

    (d) Applications showing that funds received will be used to leverage matching funds from other sources, increasing their impact.

    (e) Applications showing how programs funded by the grant will become self-sustaining once the grant money has been spent.

    (f) Applications for projects that are innovative or designed to be replicated elsewhere.

    19.    Grants are expected to be used for direct services for students and innovative programing. Grants will not be available to support research. No special priority will be given to class representative school districts. Grants must also supplement rather than supplant other funds.

    20.    With input from School District clients, counsel has concluded that the most effective form of abatement is through the grant-making trust process. Our clients oppose using a pro rata model. There are approximately 14,000 School Districts. As a result, opioid recoveries divided pro rata would be too small to meaningfully address the effect of the opioid crisis in any school district. Further, School Districts often apply for funding grants, so they are accustomed to grant processes, making this a natural fit. Great care was applied in selecting someone of the background and experience of Dr.

DECLARATION OF CYRUS MEHRI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

Alonso to serve as the Special Trustee making the grant decisions.

21.     On a final note, unlike the State Attorneys Generals' abatement efforts, the School District Trust addresses the effect of the opioid crisis on Public School Districts and the impacted children they serve, including children who have suffered from the long-term cognitive and developmental consequences of neo-natal opioid exposure, students from families disrupted or destroyed by opioid addiction, and students who themselves are or may be addicted to opioids. Public Schools also provide one of the best forms of abatement because of positive multiplier effects: every dollar spent on schools reduces downstream costs that would otherwise be borne by other governmental entities later—including healthcare, unemployment, cash assistance, and law enforcement costs. I believe that the School District Trust will shine brightly as one of the most effective forms of abatement provided by the opioid settlements.

**Notice Plan**

22.     After interviewing and receiving bids from multiple candidates, School District counsel selected Epiq Class Action & Claims Solutions, Inc ("Epiq") to handle claims administrative services for this settlement. There are nearly 14,000 School District class members. As Epiq outlines in its declaration from Cameron Azari ( "Azari Declaration"), Epiq will oversee four forms of notice:

(a) Direct mailed notice to all class members. This long form notice is attached as Attachment 2 to the Azari Declaration.

(b) Published Notice in Ed Week and School Administrator,  publications with readership covering most school districts. A copy of this shorter form notice is attached as Attachment 4 to the Azari Declaration.

(c) A mailing to the highest level Education official in each state, with information to be shared with school districts in each state. A copy of the letter to these officials is attached as Attachment 3 to the Azari Declaration.

(d) A website that includes relevant information for school district class members.

This notice plan incorporates and provides an opportunity for school districts to opt out or object to the settlement. The proposed Interim Settlement Class Counsel believes that the notice plan is the best practicable and most effective notice under the circumstances, satisfying both Fed. R. Civ. Proc. 23(c)(2) and Due Process.

### Proposed Class Counsel and Class Representatives

23.     Public Schools' motion for preliminary approval proposes that Wayne Hogan of Terrell Hogan Yegelwel and Neil Henrichsen of The Henrichsen Law Group and I serve as Interim Settlement Class Counsel. The three of us have been representing Public School Districts in opioid litigation since 2019, we filed a nationwide class complaint on behalf of Chicago Public Schools. Our complaint was the first in the country to focus on the rising special education costs attributable to neonatal opioid exposure, which had been an overlooked issue in opioid litigation. Working with nationally renowned experts, we also developed a damages model allowing school districts to present their damages claims when needed. In several bankruptcy proceedings involving opioid industry defendants, I have been appointed to serve as an Ex Officio Member on the opioid creditor committee. In MDL 2804, Judge Dan Aaron Polster asked me to lead an effort to contact certain state Attorneys Generals which resulted in the State of Maine earmarking abatement monies for school district special education efforts. Our firms are

-11-                          Case No.: BC579498

uniquely situated to serve as class counsel.

24.     Wayne Hogan is a nationally recognized trial attorney, whose firm joined with others including the predecessor to Motley Rice to lead the State of Florida's tobacco litigation and has received countless awards and accomplishments, such as the American Association for Justice's Lifetime Achievement Award, the Presidency of the Florida Justice Association, and the American Board of Trial Advocates 2023 Champion of Justice Award. Neil Henrichsen is a successful trial attorney with offices in New York, Washington DC. and Jacksonville Florida. He has been honored as a 2021 Super Lawyer and was recognized by ALM Media as one of Washington DC's and Baltimore's Top-Rated Lawyers. The Court has my background from my PSC application [ECF 179]. My firm's resume is attached as Exhibit C. Information on Terrel Hogan Yegelwel and Henrichsen Law Group can be found at https://terrellhogan.com/ and https://hslawyers.com/ respectively.

25. Class counsel and local School District counsel will seek an award of ten percent plus reimbursement of reasonable expenses for work done in this matter on behalf of School Districts. That is well below the benchmark of 25% used in federal court in the Northern District of California.

26.     The proposed School District Class Representatives are Putnam County School District in Florida; Jefferson, Martin, Estill, Larue, Breathitt, Fayette, and Bullitt County Public Schools in Kentucky; Regional School Units of 34 and 68 in Maine; Southwestern Central and Rochester City School District in New York; and Hamblen and Hancock County Boards of Education in Tennessee. School District leaders and their counsel from these school districts have been actively engaged in this and other opioid proceedings. They participate in periodic update telephone calls, review and

respond to email updates, helped to identify, interview, and select the School District Trust Special Trustee, and have otherwise provided invaluable insight to proposed class counsel. Florida, Kentucky and Maine school districts' local counsel also had meaningful roles in negotiating the allocation of funds between Subdivision and School Districts in this case and participated in that mediation.

27. School District Counsel propose that the 14 proposed Class Representative School Districts each receive an incentive award of $10,000 for their leadership and involvement in this matter. Collectively this amounts to .6 percent of the total recovery from this settlement, a fair amount proportionally to the amount for the class as a whole.

28. The incentive awards are justified. First, these plaintiffs helped to pioneer and pursue recovery for an overlooked aspect of the opioid crisis and litigation by focusing on the rising cost of special education due to the dramatic rise of NAS or NOWs births. Children exposed to opioids in utero disproportionately need expensive special education services. These districts have championed this important issue.

29. Second, they came forward against a strong headwind from many State Attorney appeared for schools participating in the Purdue bankruptcy proceeding, the top representa influential State Attorneys General warned me point blank, "your clients will be facing kni every direction." And that turned out to be true. The State Attorneys General in state after s legislatures to pass laws extinguishing the claims of School Districts in opioid litigation thr succeeded in ten states. And in virtually all states (except Maine) the State Attorneys Gene allocated opioid settlement funds without earmarking any funds for

School Districts. In addition, the AGs excluded educational supports from their definitions of "approved uses." On top of that, Attorneys General in most states also pressured litigating School Districts to sign participation agreements to release their claims (even without any monies being provided for School Districts). Many school districts succumbed to this pressure. But the proposed class representatives here did not. The risk run by these class representatives is also illustrated by events in Florida. The Florida Attorney General sued Putnam County (one of the named plaintiffs here) and Miami Dade School Districts in a declaratory action to try to extinguish their right to sue opioid defendants. A $10,000 incentive award for each of the 14 named plaintiff school districts is a modest recognition for their distinctive and commendable courage, conviction, and commitment.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and of my own personal knowledge. Executed at Washington, D.C. this 21st day of September 2023.

Cyrus Mehri
cmehri@findjustice.com
Mehri & Skalet, PLLC
2000 K Street NW, Suite 325
Washington, DC 20006
Telephone: (202) 822-5100

Case No.: BC579498

DECLARATION OF CYRUS MEHRI IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT

# EXHIBIT A

# PUBLIC SCHOOL DISTRICTS'
# OPIOID RECOVERY TRUST

This PUBLIC SCHOOL DISTRICTS' OPIOID RECOVERY TRUST dated _____, 2023, implements certain terms of the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, as it may be further amended ("**Plan No. 1**"), confirmed by an order entered on September 17, 2021 by the United States Bankruptcy Court for the Southern District of New York in bankruptcy proceedings jointly administered under Case No. 19-23649 (the "**Purdue Pharma Bankruptcy**"), and *the Modified Fourth Amended Joint Plan of Reorganization (with Technical Modifications) of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as may be further amended ("**Plan No. 2**"), confirmed by an order entered on March 2, 2022, by the United States Bankruptcy Court for the District of Delaware in bankruptcy proceedings jointly administered under Case No. 20-12522 (the "**Mallinckrodt Bankruptcy**"), as well as other possible recoveries relating to litigation involving McKinsey & Co. *et al.*, Endo Health Solutions, Inc. *et al*., and others, and is entered into by the Settlors, the Administrative Trustee, the Special Trustee, and the initial Districts' Representatives, all of whom are identified on the signature pages hereto. Except as otherwise specifically provided herein, any reference in this agreement to the "Trustee" is to the Administrative Trustee and any other Co-Trustee serving, except for the Special Trustee.

## STATEMENT OF PURPOSE

Certain public school districts, on behalf of public schools nationwide (the "**Public School Districts**"), engaged in separate and multiple litigation matters and settlement negotiations to obtain recovery of past and future costs, including special education costs, associated with educating students harmed as a result of the opioid epidemic. The Public School Districts have been awarded funds in the above-referenced Purdue Pharma and Mallinckrodt Bankruptcies and anticipate further recoveries from existing or future litigation matters and settlement negotiations (together, the "**Opioid Recovery Funds**"). The purpose of this Trust is to effect the global administration of the Opioid Recovery Funds for the benefit of the Public School Districts, with the intention that all funds received shall be commingled, invested and administered as a single fund in order to provide for a more efficient management, oversight, and distribution of such funds. Notwithstanding the foregoing, the Trustee will administer any Opioid Recovery Funds received in the above-referenced Purdue Pharma and Mallinckrodt Bankruptcies, as well as any future recoveries received from any debtor or defendant, as the case may be, as separate and independent shares, with each share being allocated a proportionate share of the gains, losses, expenses and other such items, and in such other manner as is necessary to facilitate compliance with any court accounting or reporting obligations as to as particular share.  All provisions of this agreement are to be construed in accordance with the stated purpose herein.

## RECITALS

**WHEREAS**, the Public School Districts have engaged in, and in some cases continue to engage in, litigation and/or settlement negotiations involving certain manufacturers and distributors of opioids.

9735108_1

**WHEREAS**, some or all of these manufacturers and distributors of opioids have or intend to reorganize under Chapter 11 of the Bankruptcy Code.

**WHEREAS**, Purdue Pharma L.P. and its affiliated debtors, on the one hand, and Mallinckrodt PLC and its affiliated debtors, on the other hand, filed for and received court approval for plans of reorganization in the Purdue Pharma and Mallinckrodt Bankruptcies, respectively, to include payments for the benefit of the Public School Districts.

**WHEREAS**, more specifically, Plan No. 1 provides, *inter alia*, for the payment of $25.5 million to a fully independent trust called the "Public Schools' Special Education Initiative Trust." A copy of Plan No. 1, including a term sheet as to the same, is attached hereto as **Exhibit A**.

**WHEREAS**, similarly, Plan No. 2 provides, *inter alia*, for the payment of $5 million to a fully independent trust called the "Public Schools' Special Education Initiative Trust." A copy of Plan No. 2, including a term sheet as to the same, is attached hereto as **Exhibit B**.

**WHEREAS**, the dispositive terms of Plan Nos. 1 and 2 are substantially similar as to the grant process, the structure, the staffing, and the allocation of public school funds with respect to the Public Schools' Special Education Initiative Trusts referenced respectively therein, and they provide, in pertinent part, the following: (i) the trustee of the Public Schools' Special Education Initiative Trust, to be selected by counsel for the Public School Districts (the "**Districts' Representatives**"), will ideally have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure; (ii) the trustee will establish and implement a grant process to provide educational support to qualifying Public School Districts to facilitate abatement; (iii) the trustee will publish the criteria on which awards will be based; and (iv) in making an award or determining whether to approve an application, the trustee will seek to maximize impact and to that end will consider certain factors as more particularly described herein, including, by way of example, targeting services to children under the age of eight (8).

**WHEREAS**, the Public School Districts anticipate the receipt of additional Opioid Recovery Funds, whether from existing or future litigation or settlements, with terms and purposes similar to those set forth in Plan Nos. 1 and 2.

**WHEREAS**, given the substantially similar terms set forth in Plan Nos. 1 and 2 with respect to the Public Schools' Special Education Initiative, the Parties believe it is in the best interests of the Public School Districts, and not inconsistent with the terms and purposes established in Plan Nos. 1 and 2, to administer the Opioid Recovery Funds received therefrom as a single trust, to include funds received from each debtor or defendant, as the case may be, as to any separate litigation matter and/or settlement negotiation, including but not limited to funds received in connection with the Mallinckrodt and Purdue Pharma Bankruptcies and funds received from existing or future litigation or settlements, being held as a separate share as to the whole.

**WHEREAS**, accordingly, the Parties intend that each debtor or defendant, as the case may be, be deemed the "Settlor" with respect to the portion of the Opioid Recovery Funds contributed by such debtor or defendant, and which is administered as a separate share as to the whole.

**WHEREAS**, since the litigation involved herein is subject to multiple jurisdictions, the Parties wish to establish a single trust situs, namely the District of Columbia.

9735108_1

**WHEREAS**, the Districts' Representatives, after consulting with the Public School Districts as provided under the Public Schools' Special Education Initiative Trust in the Purdue Pharma and Mallinckrodt Bankruptcies, have identified an individual, namely Andrés Alonso, Ed.D., with the necessary qualifications to develop and implement a grant process to effectuate the abatement of the harm caused by the opioid epidemic to the Public School Districts.

**WHEREAS**, the Districts' Representatives, after consulting with the Public School Districts and Andrés Alonso, Ed.D., desire to bifurcate the duties of the trustee, specifically as to administration and distribution, so as to provide for an "Administrative Trustee" and a "Special Trustee" as described herein.

**WHEREAS**, the Parties desire to enter into this trust to confirm their agreements with respect to: (i) the creation of a valid trust under the laws of the District of Columbia, and under the laws of any state in which this trust is subsequently administered; (ii) the establishment, maintenance, investment, and disbursement of the Opioid Recovery Funds in accordance with the Public Schools' Special Education Initiative set forth in Plans No. 1 and 2 (the "**Initiative**"); and (iii) certain other matters relating to the foregoing, as hereafter provided.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I
# AGREEMENT OF TRUST

**1.1.** **Creation and Name.** The Settlors hereby create a trust known as the PUBLIC SCHOOL DISTRICTS' OPIOID RECOVERY TRUST (the "**Opioid Recovery Trust**" or the "**Trust**"), for the benefit of the Public School Districts in accordance with the Initiative.

**1.2.** **Initial Funding**. The Trust will be initially funded with the proceeds received in the Mallinckrodt Bankruptcy in the amount of $5,000,000. The debtor(s) in the Mallinckrodt Bankruptcy shall collectively be deemed the "Settlor" as to the proceeds received therefrom.

**1.3.** **Additions.** Any person or entity, with the consent of the Trustees, may transfer additional property to this Trust, subject to the terms and conditions set forth herein.

**1.4.** **Separate Shares.** Each contributing person or entity shall be deemed the "Settlor" as to the portion of the Trust attributable to its contribution, with such portion identified as a separate share of the Trust and given a name that accurately describes the claim and/or settlement involved (*e.g.*, the "MALLINCKRODT SHARE" or the "PURDUE PHARMA SHARE"). Upon any additional contribution to the Trust, the Trustee will redetermine each separate share's *pro rata* share of the whole. For illustrative purposes, upon the initial funding of the Trust with $5 million in accordance with Plan No. 2, the MALLINCKRODT SHARE will, at least until other contributions are made, constitute the entire Trust corpus. If a subsequent contribution of $25.5 million is made in connection with the Purdue Pharma Bankruptcy, then the PURDUE PHARMA SHARE will consist of 83.607% of the Trust, and the MALLINCKRODT SHARE will consist of 16.393% of Trust (assuming, however, that the Trust balance, including accumulated income, is

$5 million at the time of contribution).  For purposes of calculating the separate shares, the Trustee will round to the nearest thousandth.

**1.5.  Common Fund**. All property contributed to the Trust, regardless of Settlor, shall be commingled and invested as a single fund, with each separate share created thereby allocated a proportionate share of gains, losses, expenses, and other such items.

**1.6.  Qualified Settlement Fund.**  The Parties intend for this Trust to qualify as a "qualified settlement fund" ("**QSF**") within the meaning of Treas. Reg. § 1.468B-1 et seq. ("**QSF Regulations**"). Accordingly, the Parties will take such steps as are necessary to satisfy the requirements set forth therein, including, but not limited to, obtaining court approval. No provision in this agreement shall be construed or implemented in a manner that would cause the Opioid Recovery Trust to fail to qualify as a QSF within the meaning of the QSF Regulations.

# ARTICLE II
# PUBLIC SCHOOL DISTRICTS' REPRESENTATIVES

**2.1.  Districts' Representatives**. As provided hereinabove, the Districts' Representatives are counsel for the Public School Districts, namely _____. Except as specifically provided in this agreement, the function of the Districts' Representatives is and shall be limited to the initial selection of the Administrative Trustee, the Special Trustee, and the PSDR Committee (as defined herein).

**2.2.  Committee of Public School Districts' Representatives**. The Parties recognize the need for a representative body to protect the interests of the Public School Districts. To that end, the Districts' Representatives and the Special Trustee will identify and appoint an advisory committee—the Committee of Public School Districts' Representatives (the "**PSDR Committee**")—to serve in such capacity.  The PSDR Committee's primary function shall be to counsel, advise, and facilitate communication between the Public School Districts and the Special Trustee, to support the interests of the Public School Districts with regard to the Special Trustee's disbursement of the Opioid Recovery Funds, and to fill the necessary function of acting on behalf of the Public School Districts to ensure the effectiveness of the Special Trustee and the Trustee.

(a) *Composition of Members*. The PSDR Committee shall be comprised of between three and five persons, each of whom shall have experience in education or services for at-risk youth.

(b) *Tenure of Members*.

(i) Each member of the PSDR Committee shall serve a term of three (3) years; provided, however, that the term of each initial member shall be a term of three (3) years, then two (2) years, then one (1) year and so on so that the terms of the initial members are staggered.

(ii) A member of the PSDR Committee may resign at any time by written notice to the other members of the PSDR Committee, the Special Trustee, and the Districts'

Representatives.  Such notice shall specify a date when such resignation shall take effect, which shall not be less than 90 days after the date such notice is given, when practicable.

      (iii)  A member of the PSDR Committee may be removed in the event he or she is unable to discharge his or her duties hereunder by reasons of incapacity, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, or for other good cause. Such removal shall be made at the recommendation of the remaining members of the PSDR Committee with the approval of the Special Trustee and the Districts' Representatives.

      (c)  ***Subsequent Composition***. The Districts' Representatives and the Special Trustee shall select a successor member of the PSDR Committee when a member dies, retires, withdraws, or otherwise ceases to serve as a member; provided, however, that the Districts' Representatives and the Special Trustee may unanimously elect to decrease the required number of members so long as at least three (3) members are serving at all times. If a member ceases to serve prior to the expiration of his or her term for any reason, any successor member appointed in his or her place will serve the balance of such member's term.

    **2.3.**  **Majority Vote**. Decisions of the PSDR Committee shall be made by a majority vote of the members. In the event of a deadlock, the Special Trustee will cast the deciding vote.

    **2.4.**  **Interaction with Trustees**. Where provided in this agreement, the Trustee and/or Special Trustee shall consult with PSDR Committee and shall provide to PSDR Committee any information reasonably related to the administration of this Trust.  The Special Trustee and the PSDR Committee shall meet at least twice annually.

    **2.5.**  **Compensation and Reimbursement**. Each member of the PSDR Committee shall be entitled to a $1,000.00 annual honorarium for their service and duties under this Trust; provided, however, each member may decline to accept the honorarium for their service.

    **2.6.**  **Procedure for Obtaining Committee Counsel and Advice**. In the event the counsel and advice of the PSDR Committee is required hereunder, the Trustee and/or Special Trustee, as the case may be (the "**Requesting Trustee**"), will provide the PSDR Committee with written notice and with all information regarding the matter in question.  The PSDR Committee will consider any request in good faith and will provide its advice and counsel in writing to the Requesting Trustee, no later than 30 days after the receipt of notice and information regarding such request. If no such advice and counsel is provided within 30 days, the PSDR Committee shall be deemed to have no objections to the course of action proposed by the Requesting Trustee. The Trustee and/or Special Trustee should provide the PSDR Committee with advance copies of any reports to be filed with the Court with sufficient time for the PSDR Committee to review such reports and seek clarification from and/or provide recommendations to the Trustee and/or Special Trustee.

9735108_1

# ARTICLE III
## SPECIAL TRUSTEE PROVISIONS

**3.1.** **Authority of Special Trustee**. The purpose of the Special Trustee is to separate decisions concerning the grant process from the other responsibilities of the Trustee. Accordingly, all powers and discretion with respect to the creation and implementation of the "grant process," which is described herein, including any selection of awards related thereto, shall be exercised exclusively by the Special Trustee. Notwithstanding the foregoing, the Special Trustee may not exercise any power or discretion in favor of or for the benefit of the Special Trustee.

**3.2.** **Interaction with Administrative Trustee**. The Administrative Trustee shall make distributions related to the grant process, including payments of awards as provided herein, only at the written direction of the Special Trustee. The Administrative Trustee shall be entitled to rely on any such written direction submitted by the Special Trustee and shall have no obligation to inquire as to the sufficiency of the direction or whether the Special Trustee has complied with the Special Trustee's obligations under this agreement.

**3.3.** **Designation of Special Trustee**. The initial Special Trustee will be Andrés Alonso. If the initial Special Trustee fails or ceases to serve, a successor Special Trustee will be appointed in accordance with the other provisions of this Article.

**3.4.** **Grant Process**.

(a)  The Special Trustee will take such steps as are reasonable and necessary to develop, implement, and manage one or more grant programs to supplement and enhance the educational framework associated with educating students harmed by the opioid epidemic, which in turn will maximize the abatement of harm (the "**Grant Mission**").

(b)  The Special Trustee, in his or her discretion, will determine the parameters of any grant programs to effect the Grant Mission—provided the Special Trustee complies with the terms of Plans No. 1 and 2, as well as any applicable court orders related thereto and the terms of any such other litigation matters or settlement negotiations resulting in the addition of funds, as applicable—including, but not limited to the following:

(i) The Special Trustee will design the grant program so as to encourage Public School Districts to apply for funding where it can have the greatest impact, whether for classroom services, school-based behavioral and mental services, instructional innovations, or other school-based supports.

(ii) In developing the eligibility criteria, the Special Trustee will give priority consideration to any one or more of the following:

(A) Public school districts (or consortia of public school districts) in areas hit the hardest by the opioid epidemic;

(B)  Poorly funded public school districts or public school districts with low per-pupil spending;

(C)  Targeting services to children under the age of eight (8);

(D)  Leveraging matching funds from other sources;

(E)  Sustainability planning;

(F)  Providing direct services to students; and

(G)  Innovative programing.

(iii)  The Special Trustee will determine the application review process and the timeline for the same, which may include, in the Special Trustee's discretion, enlisting a volunteer group of qualified individuals to manage and review grant applications and to select recipients.

(iv)  Notwithstanding any provision herein to the contrary, any grants awarded must comply with the following:

(A)  Awards must be used to supplement, not supplant, other source(s) of funding.

(B)  Awards must be used to extend and/or expand existing services or provide new services above and beyond what is already provided.

(C)  Awards must be granted to maximize impact, based on the merits of the application as determined in accordance with the published guidelines of the grant program. Accordingly, the Special Trustee may provide for grants in various amounts as the Special Trustee determines appropriate, as long as each applicant is treated fairly, equitably and reasonably as to the whole and consistently as provided herein.

(v)  The Special Trustee will determine a process by which to ensure grant compliance over the life of the grant.

(vi)  The Special Trustee shall have ultimate responsibility for the grant process and grant substantive decisions.  The PSDR Committee will have advice and counsel responsibilities, but no consent power, with regard to the grant process and grant substantive decisions, which is the sole responsibility of the Special Trustee; provided, however, that such responsibility and authority of the Special Trustee shall not be outside of parameters and set asides established by any court order.

**3.5.  <u>Information</u>**. The Special Trustee will provide the Trustee with a quarterly report of receipts, expenditures, and distributions of any Opioid Recovery Funds. Upon the request of the PSDR Committee, the Special Trustee will provide such Committee with any information and/or reports reasonably related to the grant process that are necessary to effect the purposes of this agreement.

7

**3.6.** **Compensation; Reimbursement**. The Special Trustee is entitled to fair and reasonable compensation for services rendered. For purposes of this Section, "fair and reasonable compensation" refers to the said trustee's annual payment under the *Public Schools' Special Education Initiative (Purdue)*, filed on July 7, 2021 in the bankruptcy proceedings jointly administered under Case No. 19-23649 in the United States Bankruptcy Court for the Southern District of New York, and any additional reasonable compensation that may be due as result of further contributions to the Trust. In addition to receiving compensation, the Special Trustee may be reimbursed for reasonable costs and expenses incurred in carrying out the Special Trustee's duties under this Trust.

**3.7.** **Appointment of Additional Special Trustee**. If the Special Trustee is unable or unwilling to serve in this capacity for any reason, the PSDR Committee will appoint an individual as successor Special Trustee. Otherwise, the then-serving Trustee may petition a court of competent jurisdiction to appoint a successor Special Trustee to fill any vacancy. Any Special Trustee so appointed will ideally have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure.

**3.8.** **Resignation of Special Trustee**. The Special Trustee may resign by giving written notice to the Trustee and the PSDR Committee. The notice of resignation shall specify the resignation's effective date, which date must be at least sixty (60) days after delivery of such notice, or earlier if otherwise agreed to by the Trustee and Special Trustee in writing.

**3.9.** **Removal of Special Trustee**. The Special Trustee may be removed by any court of competent jurisdiction or upon the conclusion of the operations of the Trust.

**3.10.** **Operational Costs**. The Parties acknowledge that the Special Trustee may incur various expenses to provide for effective management of the grant process. Accordingly, the Special Trustee will submit a budget proposal, in writing, outlining projected expenses, whether direct or indirect, to the PSDR Committee, which will advise on whether such expenses are recommended as allowable expenses in accordance with Plans No. 1 and 2, and any other bankruptcy plans, court orders or settlement agreements, as applicable.

**3.11.** **Special Trustee's Employment of Professionals**. The Special Trustee may, but is not required to, retain and/or consult counsel, accountants, auditors, experts, and such other parties as are necessary to carry out the duties of the Special Trustee set forth herein.

**3.12.** **Limitations on Special Trustee Liability**. Any individual that serves as Special Trustee will not incur any liability by reason of any error of judgment, mistake of law, or action or inaction of any kind in connection with the administration of this Trust, unless the Special Trustee's decision is shown by clear and convincing evidence to have been made in bad faith or with reckless indifference to the purposes of the Trust or the interests of the Public School Districts. Similarly, any individual that serves as Special Trustee will not incur any liability for any action, omission, or forbearance in connection with the administration of this Trust that was made in good faith reliance on information, consent, or directions received from the Trustee, except for cases of willful misconduct or reckless indifference on the Special Trustee's part.

9735108_1

3.13. **Indemnification of Special Trustee**. Any individual currently serving as a Special Trustee may expend any portion of the trust assets to defend any claim brought against the Special Trustee in connection with his or her administration of this Trust, including claims related to his or her good faith reliance on any information, consent, or directions received from the Trustee, unless the Special Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts. Any individual or corporate fiduciary that formerly served as a Special Trustee is entitled to reimbursement from the trust estate for any expenses, including reimbursement for attorney's fees and litigation costs, reasonably incurred to defend any claim brought against the Special Trustee in connection with his or her administration of this Trust, including claims related to the Special Trustee's good faith reliance on any information, consent, or directions received from the Trustee, unless the Special Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts.

# ARTICLE IV
# TRUSTEE PROVISIONS

4.1. **Designation of Trustee**. The initial Trustee of this trust is TRUIST BANK. If TRUIST BANK fails or ceases to serve as Trustee, a successor Trustee will be appointed in accordance with the other provisions of this Article IV.

4.2. **Appointment of Additional Trustees**. If there is no successor Trustee appointed or if no appointed successor is able and willing to act as Trustee, the PSDR Committee may appoint a successor Trustee with advice and counsel of the Special Trustee. Otherwise, the then-serving Trustee may petition a court of competent jurisdiction to appoint a successor Trustee to fill any vacancy.

4.3. **Rights and Obligations of Successor Trustees.** Each successor Trustee serving under this instrument will have all the title, rights, powers, and privileges granted to the initial Trustee named under this instrument. In addition, each successor Trustee will be subject to all of the restrictions imposed upon, as well as to all discretionary and ministerial obligations and duties given to, the initial Trustee named under this instrument. No successor Trustee shall be liable personally for any act or omission of its predecessor Trustee. No successor Trustee shall have any duty to investigate the acts or omissions of its predecessor Trustee.

4.4. **No Bond.** The Trustee is not required to furnish any bond for the faithful performance of the Trustee's duties unless required by a court of competent jurisdiction, and only if the court finds that such bond is needed to protect the Public School Districts' interests. No surety will be required on any bond required by any law or court rule, unless the court specifies its necessity.

4.5. **Limitations on Trustee Liability**. Any individual or corporate fiduciary that serves as Trustee will not incur any liability by reason of any error of judgment, mistake of law, or action or inaction of any kind in connection with the administration of this Trust, unless the Trustee's decision is shown by clear and convincing evidence to have been made in bad faith or with reckless indifference to the purposes of the Trust or the interests of the Public School Districts. Similarly, any individual or corporate fiduciary that serves as Trustee will not incur any liability for any

9

action, omission, or forbearance in connection with the administration of this Trust that was made in good faith reliance on information, consent, or directions received from the Special Trustee, except for cases of willful misconduct or reckless indifference on the Trustee's part.

4.6. **Indemnification of Trustee**. Any individual or corporate fiduciary currently serving as a Trustee may expend any portion of the trust assets to defend any claim brought against the Trustee in connection with his or her administration of this Trust, including claims related to the Trustee's good faith reliance on any information, consent, or directions received from the Special Trustee, unless the Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts. Any individual or corporate fiduciary that formerly served as a Trustee is entitled to reimbursement from the trust estate for any expenses, including reimbursement for attorney's fees and litigation costs, reasonably incurred to defend any claim brought against the Trustee in connection with his or her administration of this Trust, including claims related to the Trustee's good faith reliance on any information, consent, or directions received from the Special Trustee, unless the Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts.

4.7. **Trustee Compensation; Reimbursement for Expenses.** Any individual serving as Trustee is entitled to fair and reasonable compensation for the services provided as Trustee. On the other hand, a corporate fiduciary serving as Trustee will be compensated in accordance with the corporate fiduciary's current published fee schedule. The current published fee schedule for TRUIST BANK is attached and made part of this Agreement as **Exhibit C**. A Trustee entitled to compensation may charge additional fees for services provided that are beyond the ordinary scope of duties, such as fees for legal services, tax return preparation, and corporate finance or investment banking services. In addition to receiving compensation, a Trustee may be reimbursed for reasonable costs and expenses incurred in carrying out the Trustee's duties under this trust.

4.8. **Liability Insurance**. The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of the Trustee and the Special Trustee against any liability arising from its status as Trustee or Special Trustee, as the case may be, upon request for such insurance. The cost of such liability insurance shall be a common expense of administration under this agreement and shall not be allocated to the expenses of the Special Trustee.

# ARTICLE V
# TRUSTEE POWERS AND ADMINISTRATION

5.1. **Trustee Powers**. Except as otherwise specifically provided hereunder, the Trustee may exercise the powers granted by this Trust without prior approval from any court, including those powers set forth under the laws of the District of Columbia or any other jurisdiction whose law applies to this Trust. The Trustee shall exercise the Trustee powers in the manner the Trustee determines to be in the best interests of the Public School Districts. The Trustee must not exercise

9735108_1

any power reasonably inconsistent with the statement of purpose set forth in the preamble and the terms of the Initiative.

    **5.2.** __Specific Enumerated Powers__. Without limiting the generality of Section 5.1 above, and except as limited herein or in the Initiative, the Trustee shall have the power to:

    (i)  Invest in any type of investment that the Trustee determines is consistent with the investment goals of the Trust, provided that the overall investment portfolio of the trust shall consist primarily of investments in institutional money market funds and/or U.S. Treasury instruments of 3-6 months duration;

    (ii)  enter into leasing and financing agreements with third parties to the extent such agreements are reasonable and necessary to effectuate the purposes of the Opioid Recovery Trust;

    (iii)  pay liabilities and expenses of the Opioid Recovery Trust;

    (iv)  establish such funds, reserves and accounts within the Opioid Recovery Trust estate as are required by applicable law and/or as the Trustee deems useful in carrying out the purposes of the Opioid Recovery Trust, subject to the limitations set forth herein;

    (v)  pay reasonable compensation to the Trustee's advisors, agents, consultants, employees and professionals, including legal, financial, accounting, investment, auditing, and forecasting professionals;

    (vi)  appoint such officers, hire such employees, and engage such advisors, agents, consultants, and professionals—including legal, financial, accounting, investment, auditing, and forecasting professionals—as the business of the Opioid Recovery  Trust requires and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable, convenient or necessary in order to carry out the terms of the Opioid Recovery  Trust;

    (vii)  execute and deliver such instruments as the Trustee deems proper in administering the Opioid Recovery Trust;

    (viii)  make, pursue (by litigation or otherwise), collect, compromise, settle or otherwise resolve in the name of the Opioid Recovery Trust, any claim, right, action or cause of action included in Opioid Recovery Funds or which may otherwise hereafter accrue in favor of the Opioid Recovery Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction;

    (ix)  exercise any and all other rights and take any and all other actions as are permitted of the Trustee in accordance with the terms of this agreement and the Initiative.

9735108_1

**5.3.** **Conflicts**. The Trustee will act in accordance with the terms of this agreement and the Initiative.  In the event that there is a conflict between this agreement and the Initiative, the terms of any court order with respect to  the Initiative will control.

**5.4.** **QSF**. The Trustee shall be the "*administrator*" of the Opioid Recovery Trust within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements required to be filed in connection with the Opioid Recovery Trust; (ii) timely pay, out of the trust reserve, all taxes required to be paid by the Opioid Recovery Trust; (iii) comply with all applicable reporting and withholding obligations; (iv) satisfy all requirements necessary to qualify and maintain qualification of the Opioid Recovery Trust as a QSF within the meaning of the QSF Regulations; (v) take such acts as are required to comply with the QSF Regulations, consistent with the terms of this agreement and the Trustee's role hereunder; and (vi) take no action that could cause the Opioid Recovery Trust to fail to qualify as a QSF within the meaning of the QSF Regulations.  For the avoidance of doubt, even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the Opioid Recovery Trust for the Opioid Recovery Trust to be treated as a grantor trust for federal income tax purposes.

**5.5.** **Tax Requirements**. The Trustee shall be responsible for all of the Opioid Recovery Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee shall also file (or cause to be filed) any statement, return or disclosure relating to the Opioid Recovery Trust that is required by any governmental unit and shall be responsible for payment, out of the Opioid Recovery Trust assets, of any taxes imposed on the Opioid Recovery Trust or its assets. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Opioid Recovery Trust for all taxable periods through the dissolution of the Opioid Recovery Trust.

**5.6.** **Accounting**. Except to the extent required by law, the Trustee is not required to file accountings in any jurisdiction. The Trustee shall provide the Special Trustee and the PSDR Committee with a quarterly trust accounting and any other information reasonably related to the trust administration, including any filings, court reports, and potential contextual or specific information relevant to the effective administration of the Trust.

**5.7.** **Termination**. Given the nature of the Trust, as well as the anticipation of further recoveries from existing or future litigation matters and settlement negotiations, the term of the Trust is unknown. Accordingly, this Trust will terminate upon the substantial completion of the purposes for which the Trust was established, the determination of which shall be made by the Special Trustee and PSDR Committee; provided, however, that the Trustee may petition a court of competent jurisdiction for consent as to the same or for such direction as may be required.

# ARTICLE VI
## GENERAL PROVISIONS

**6.1.** **Amendments.**  The Special Trustee, after consultation with the PSDR Committee, may modify or amend this agreement in any way required to ensure that this Trust continues to satisfy the uses and purposes for which this Trust was established, including (i) to alter the administrative and investment powers of the Trustee; (ii) to reflect tax or other legal changes that affect trust administration; (iii) to correct ambiguities, including scrivener errors, that might otherwise

9735108_1

require court construction or reformation; and (iv) to comply with the Initiative. Any modification or amendment made pursuant to this Section 6.1 must be done in writing. Notwithstanding the foregoing, any such amendment shall <u>not</u> be valid if, as a result thereof: (i) it materially and adversely impacts the Public School Districts; (ii) the provisions of this Section 6.1 are changed, except to further restrict the amendment powers conferred under this agreement; (iii) it is exercised in favor of the Trustee and/or Special Trustee, for the Trustee's and/or Special Trustee's benefit, or for the benefit of any person to whom the Trustee and/or Special Trustee is related or subordinate within the meaning of Section 672(c) of the Internal Revenue Code; (iv) such change could disqualify the property as a QSF; or (v) such change is inconsistent with the Initiative.

**6.2.** **Severability.**   Should any provision in this agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of this agreement.

**6.3.** **Notices**. Any notices or other communications required or permitted hereunder to the Parties hereto shall be in writing and delivered to the addresses or e-mail addresses designated on **Exhibit E**, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties in compliance with the terms of this agreement. All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.4.** **Entire Agreement; No Waiver.**   The entire agreement of the Parties relating to the subject matter of this agreement is contained herein, and in the documents referred to herein (including Plans No. 1 and 2), and this agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof.   No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude either a further exercise of such right, power or privilege or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of any rights under law or in equity.

**6.5.** **Headings.**   The headings used in this agreement are inserted for convenience only and do not constitute a portion of this agreement, nor do the headings in any manner affect the construction of the provisions of this agreement.

**6.6.** **Governing Law.**   The validity and construction of this agreement and all amendments hereto, and the rights of all Parties hereto and the effect of every provision hereof, shall be governed by, subject to, and construed in accordance with the laws of the District of Columbia, without regard to any conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction.

**6.7.** **Changing Trust Situs.**   The Trustee may change the situs of the administration of the trust and remove all or any part of the trust property from one jurisdiction to another.   The Trustee may elect, by filing an instrument with the trust records, that the trust will then be construed, regulated, and governed by the new jurisdiction's laws.   The Trustee may take action under this Section for any purpose the Trustee considers appropriate.

9735108_1

**6.8. <u>Counterpart Signatures.</u>**   This agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.



14

**EXHIBIT A**

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

### <u>NOTICE OF FILING OF SPECIAL EDUCATION INITIATIVE TERM SHEET</u>

**PLEASE TAKE NOTICE** that on June 3, 2021, the above-captioned debtors and debtors

in possession (collectively, the "**Debtors**") filed the *Fifth Amended Joint Chapter 11 Plan of*

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2982] (as modified,

amended or supplemented from time to time, the "**Plan**"). Capitalized terms used but not

otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PLEASE TAKE FURTHER NOTICE that the Debtors, the proposed representatives of a putative class of independent public school districts (the "**Public School District Creditors**"), the Ad Hoc Committee and the MSGE Group have agreed to amend the Plan to provide for a $25.5 million contribution to the Public Schools' Special Education Initiative on the Effective Date out of the Initial NOAT Distribution, on terms set forth in the term sheet attached as **Exhibit A** hereto (the "**Term Sheet**").

PLEASE TAKE FURTHER NOTICE that copies of the Term Sheet may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that the Confirmation Hearing will be commenced on **August 9, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; provided that, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Hearing shall be conducted telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2] Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice.

---

[2] A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/court-operationsunder-exigent-circumstances-created-covid-19.

Dated:   July 7, 2021
         New York, New York

                              DAVIS POLK & WARDWELL LLP

                              By:   */s/ Eli J. Vonnegut*_____

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile:  (212) 701-5800
                              Marshall S. Huebner
                              Benjamin S. Kaminetzky
                              Timothy Graulich
                              Eli J. Vonnegut
                              Christopher S. Robertson

                              *Counsel to the Debtors*
                              *and Debtors in Possession*

# Exhibit A

**Term Sheet**

July 7, 2021

**Public Schools' Special Education Initiative (Purdue)**

The Purdue proposed plan of reorganization (the "Plan") will be promptly amended to provide for the Debtors' payment of $25.5 million to the Public Schools' Special Education Initiative out of the Initial NOAT Distribution as described below.

**Structure
and Staffing**:

> A fully independent trust[1] called the Public Schools' Special Education Initiative will be funded by the Debtors.  The Debtors will pay the full amount of the $25.5 million on the Effective Date out of the Initial NOAT Distribution.  This trust will be administered by a single trustee, selected by counsel for the public schools with input from public school claimants. Ideal candidates for trustee could have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure. Counsel for the public schools is committed to interviewing a diverse slate of candidates and soliciting potential candidates with input from public school claimants, the Debtors and other stakeholders such as the UCC and the NAACP.

**Grant Process:**

> The trustee will notify all school districts nationwide of the grant process and will invite proposals for projects to provide abatement through the public schools. The trustee will select grant recipients from among the proposals received. Grant money must be spent on abatement. In all cases, grant applications must demonstrate that funds will:
>
> (a)  Supplement, not supplant, other source(s) of funding, and,
>
> (b)  Be used to extend and/or expand existing services, or provide new services above and beyond services already provided.
>
> The trustee may choose to enlist input from a volunteer committee of experts to help select grant recipients.

---

[1] Form of Public Schools' Special Education Initiative TBD.

**Allocation of Public
School Funds:**

The trustee will make awards based on published criteria, known to all applicants beforehand. The trustee must direct funding to educational supports. The trustee will also aim to maximize impact (and not attempt a pro rata distribution). Although these factors are not dispositive, the trustee will give priority, in funding educational supports, to:

**(a)** Applications from school districts (or consortia of districts) in areas hardest hit by the opioid crisis.

**(b)** Applications from poorly funded school districts or school districts with low per-pupil spending.

**(c)** Applications that target services to children under the age of 8, where the potential gains are the highest.

**(d)** Applications that show that funds received will be used to leverage matching funds from other sources, increasing their impact.

**(e)** Applications that show how programs funded by the grant will become self-sustaining once the grant money has been spent.

**(f)** Applications for funding for direct services to students. Funding is not for research.

**(g)** Applications for projects that are innovative or designed to be replicated elsewhere.

Districts will be encouraged to apply for funding where it can have the greatest impact, whether for classroom services, school-based behavioral and mental services, instructional innovations, or other school-based supports.

**Illustrations of Uses:**

Uses that align with abatement goals and the criteria identified above might include:

- Grants for direct services, including to hire special education teachers, behavior specialists, counselors, social workers, reading coaches, occupational, mental health, or physical therapists;

- Grants for multi-disciplinary programs, such as partnerships between schools and medical or social services providers; or

2

- Grants to develop models, with nationwide applicability, for how to train and develop staff to provide special education or multi-disciplinary services to abate the ravages of the opioid epidemic in schools.

**Allowable Expenses:**

With the primary focus on high impact grants, other distributions of Public School Funds shall be limited to:

(a) Salary and expenses of the trustee, incurred to announce the opportunity to school districts, select grant recipients, and monitor compliance with grant requirements. It is expected that the trustee will receive $75,000/year in salary, plus reasonable expenses for support staff and travel, not to exceed $25,000/year, and reasonable expenses for school notice and outreach not to exceed $25,000/year.

(b) Modest awards to school districts that stepped forward and filed claims in the bankruptcy proceeding or otherwise contributed to making this recovery possible. The amount of these incentive awards will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee.

(c) $500,000 dedicated for out-of-pocket litigation expenses, such as for special bankruptcy counsel and expert fees and expenses.

(d) Putative class counsels' reasonable attorneys' fees and litigation costs will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee. Allocation to the Common Benefit Fund in the amount of 5.0% ($1,250,000) will be deducted from the fee award and paid to the Common Benefit Fund at the time of the fee award.

3

**Transparency and Records:**

1. The trustee will maintain records of:

   (a) Grant applications received;

   (b) Grants awarded;

   (c) Salary and expenses; and

   (d) Interim and final reports by grantees.

2. The trustee will monitor and enforce compliance with grant requirements, ensuring that funds are used for abatement purposes, and will require all grant recipients to record and file both interim and final reports showing, at a minimum:

   (a) Itemized expenditures of grant funds; and

   (b) Quantitative and qualitative information about the grant's impact.

3. The trustee shall file reports with the bankruptcy court, every six months, disclosing summaries of items 1 and 2 above.

**Eligibility for Other Funding:**

Nothing in the Plan will preclude schools from (i) being eligible to participate in any other aspect of abatement, (ii) receiving funds from the estates of Purdue Pharma L.P. and/or its affiliated Debtors, or (iii) receiving funds from any other sources, including third-party payors.

4

**EXHIBIT B**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 2916** |
| | ) |

## NOTICE OF FILING OF PUBLIC SCHOOLS'
## SPECIAL EDUCATION INITIATIVE TERM SHEET

PLEASE TAKE NOTICE that, on June 8, 2021, the above-captioned debtors in possession (the "***Debtors***") filed the solicitation version of the *Joint Plan of Reorganization of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2916] (as may be amended, supplemented or modified from time to time, the "***Plan***")[2] with the United States Bankruptcy Court for the District of Delaware (the "***Court***").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the Public Schools' Special Education Initiative Term Sheet (as may be amended, supplemented or modified from time to time, the "***Term Sheet***"), attached hereto as **Exhibit A**, pursuant to which the Debtors agree to amend the Plan in accordance with the Restructuring Support Agreement as set forth in the Term Sheet.

---

[1]  A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2]  Capitalized terms used but not otherwise defined herein shall meanings ascribed to such terms in the Plan.

PLEASE TAKE FURTHER NOTICE that the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***") will commence at **10:00 a.m. (prevailing Eastern Time) on September 21, 2021**, before the Honorable John T. Dorsey, United States Bankruptcy Judge,  at the Court, located at 824 Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801.

PLEASE TAKE FURTHER NOTICE that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on such parties as the Court may order.

*[Remainder of page intentionally left blank]*

RLF1 25723026v.2

Dated: July 23, 2021

_/s/ Garrett S. Eggen_

**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Garrett S. Eggen (No. 6655)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:     (302) 651-7701
Email:         collins@rlf.com
               merchant@rlf.com
               steele@rlf.com
               schlauch@rlf.com
               eggen@rlf.com

- and -

George A. Davis (admitted _pro hac vice_)
George Klidonas (admitted _pro hac vice_)
Andrew Sorkin (admitted _pro hac vice_)
Anupama Yerramalli (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 906-1200
Facsimile:     (212) 751-4864
Email:         george.davis@lw.com
               george.klidonas@lw.com
               andrew.sorkin@lw.com
               anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:     (213) 891-8763
Email:         jeff.bjork@lw.com

- and -

Jason B. Gott (admitted _pro hac vice_)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:     (312) 993-9767
Email:         jason.gott@lw.com

**EXHIBIT A**

July 23, 2021

### **Public Schools' Special Education Initiative (Mallinckrodt)**

The Mallinckrodt proposed plan of reorganization (the "Plan") will be amended to provide for the Debtors' payment of $5 million to the Public Schools' Special Education Initiative as described below.

**Structure and Staffing**:

A fully independent trust called the Public Schools' Special Education Initiative will be funded by the Debtors. The Debtors will pay the full amount of the $5 million on the Effective Date. This trust will be administered by a single trustee, selected by counsel for the public schools with input from public school claimants. Ideal candidates for trustee could have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure. Counsel for the public schools is committed to interviewing a diverse slate of candidates and soliciting potential candidates with input from public school claimants, the Debtors and other stakeholders such as the OCC and the NAACP.

**Grant Process:**

The trustee will notify all school districts nationwide of the grant process and will invite proposals for projects to provide abatement through the public schools. The trustee will select grant recipients from among the proposals received. Grant money must be spent on abatement. In all cases, grant applications must demonstrate that funds will:

(a) Supplement, not supplant, other source(s) of funding, and,

(b) Be used to extend and /or expand existing services, or provide new services above and beyond services already provided.

The trustee may choose to enlist input from a volunteer committee of experts to help select grant recipients.

**Allocation of Public School Funds:**

The trustee will make awards based on published criteria, known to all applicants beforehand. The trustee must direct funding to educational supports. The trustee will also aim to maximize impact (and not attempt

1

a pro rata distribution). Although these factors are not dispositive, the trustee will give priority, in funding educational supports, to:

(a)  Applications from school districts (or consortia of districts) in areas hardest hit by the opioid crisis.

(b)  Applications from poorly funded school districts or school districts with low per-pupil spending.

(c)  Applications that target services to children under the age of 8, where the potential gains are the highest.

(d)  Applications that show that funds received will be used to leverage matching funds from other sources, increasing their impact.

(e)  Applications that show how programs funded by the grant will become self-sustaining once the grant money has been spent.

(f)  Applications for funding for direct services to students. Funding is not for research.

(g)  Applications for projects that are innovative or designed to be replicated elsewhere.

Districts will be encouraged to apply for funding where it can have the greatest impact, whether for classroom services, school-based behavioral and mental services, instructional innovations, or other school-based supports.

**Illustrations of Uses:**

Uses that align with abatement goals and the criteria identified above might include:

• Grants for direct services, including to hire special education teachers, behavior specialists, counselors, social workers, reading coaches, occupational, mental health, or physical therapists;

• Grants for multi-disciplinary programs, such as partnerships between schools and medical or social services providers; or

• Grants to develop models, with nationwide applicability, for how to train and develop staff to provide special education or multi-disciplinary services to abate the ravages of the opioid epidemic in schools.

2

**Allowable Expenses:**

With the primary focus on high impact grants, other distributions of Public School Funds shall be limited to:

(a) Salary and expenses of the trustee, incurred to announce the opportunity to school districts, select grant recipients, and monitor compliance with grant requirements. It is expected that the trustee will receive $75,000/year in salary, plus reasonable expenses for support staff and travel, not to exceed $25,000/year, and reasonable expenses for school notice and outreach not to exceed $25,000/year.

(b) Modest awards to school districts that stepped forward and filed claims in the bankruptcy proceeding or otherwise contributed to making this recovery possible.  The amount of these incentive awards will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee.

(c) Putative class counsels' reasonable attorneys' fees and litigation costs will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee. Allocation to the Common Benefit Fund in the amount of 5.0% ($250,000) will be deducted from the fee award and paid to the Common Benefit Fund at the time of the fee award.

**Transparency and Records:**

1. The trustee will maintain records of:

   (a) Grant applications received;

   (b) Grants awarded;

   (c) Salary and expenses; and

   (d) Interim and final reports by grantees.

2. The trustee will monitor and enforce compliance with grant requirements, ensuring that funds are used for abatement purposes, and will require all grant recipients to record and file both interim and final reports showing, at a minimum:

   (a) Itemized expenditures of grant funds; and

   (b) Quantitative and qualitative information about the grant's impact.

3. The trustee shall file reports with the bankruptcy court, every six months until the closing of the chapter 11 cases, disclosing summaries of items 1 and 2 above.

**Eligibility for Other Funding:**

Nothing in the Plan will preclude the public schools from (i) being eligible to participate in any other aspect of abatement or (ii) receiving funds from any other sources, and for the avoidance of doubt, other sources does not include from the Debtors or Reorganized Debtors.

**EXHIBIT C**



## Foundations and Endowments Specialty Practice

# INVESTMENT ADVISORY AND ADMINISTRATIVE SERVICES
## SHORT DURATION FIXED INCOME MANAGEMENT
## SCHEDULE OF FEES

The following annual Advisory Fee will apply to services typically provided with regard to a short duration (1-3 years) investment advisory account that holds marketable securities, including, but not limited to, the custody of securities, investment management, account administration, and periodic accounting statements:

**MINIMUM ANNUAL ADVISORY FEE $20,000**
**Fees Based on Market Value of Assets Held\*:**

| | |
|---|---|
| First $ 25,000,000 | 0.20% (20 basis points) per year |
| Next $ 25,000,000 | 0.10% (10 basis points) per year |
| Next $ 50,000,000 | 0.08% (  8 basis points) per year |
| Over $100,000,000 | 0.05% (  5 basis points) per year |
| \*The above Market Value fees will be discounted 25% | |

The annual Advisory Fee will be charged on a monthly basis and will be calculated based on month-end market value.

**Other Fees**
- Accounts utilizing affiliated or unaffiliated sub-advisors, model portfolio services or investment managers are separately responsible for any such expenses incurred.  Any such compensation paid to such service providers will not reduce compensation payable to Truist under its standard fee schedule or be applied toward Truist's minimum fee.

- Accounts invested in mutual funds, private investment funds, investment partnerships, common trust funds and similar pooled investment vehicles will incur their pro-rata share of expenses paid from the pooled investment vehicle.

- Truist outsources the filing of all securities class action claims to a third party vendor which is compensated with a contingency fee (presently 10%) paid from the awards it obtains for Truist accounts. Truist receives no additional compensation in connection with such securities class action awards, however, the use of a third party vendor to perform these services creates an additional expense for each applicable account which will not reduce compensation earned by Truist under this schedule and or reduce any applicable minimum fee. Current information regarding the amount of the applicable contingency fee paid in connection with securities class action claims can be obtained from your Truist Advisor.

© 2020 Truist Financial Corporation. Truist, the Truist logo and Truist Purple are service marks of Truist Financial Corporation.

PV827 4/2023



Unless Truist services are terminated, the fees listed herein will be charged as of the effective date. Truist will treat continued use of the services described on this schedule as your agreement to and acceptance of this Schedule of Fees.  Truist has the right to renegotiate fee schedules if the structure, size or complexity of the relationship changes substantially from initial estimates.

**This Schedule of Fees may be changed from time to time after advance notice.**

By execution of this Schedule of Fees by the designated authorized person, the obligation to pay such fees and expenses as set forth in this Schedule of Fees is hereby agreed to and accepted.

School Settlement Trust

Authorized Signature: _____   Date:

© 2020 Truist Financial Corporation. Truist, the Truist logo and Truist Purple are service marks of Truist Financial Corporation.

*PV827 4/2023*



# Disclosures

Truist Bank ("TB") and its affiliates and the directors, officers, employees and agents of Truist Bank and its affiliates (collectively "Truist") are not permitted to give legal or tax advice. While Truist can assist clients in the areas of estate and financial planning, only an attorney can draft legal documents, provide legal services and give legal advice. Clients of Truist should consult with their legal and tax advisors prior to entering into any financial transaction or estate plan. Because it cannot provide legal services or give legal advice, Truist's services or advice relating to "estate planning" are limited to (i) financial planning, multi-generational wealth planning, investment strategy, (ii) management of trust assets, investment management and trust administration, and (iii) working with the client's legal and tax advisors in the implementation of an estate plan.

<u>Sweep Vehicles</u>. TB may receive compensation in exchange for administrative services that it provides to various money market mutual funds which may be held in your Truist Wealth account. This compensation is paid to TB either directly from the mutual fund or its affiliates or through TB's Clearing Broker, SEI Private Trust Company, and will not reduce compensation TB is entitled to receive from this account under this Schedule of Fees.

Federated Hermes; Dreyfus BNY Mellon; and JPMorgan Chase and/or their respective affiliates have engaged TB to provide shareholder and administrative services to trust and investment agency accounts invested in money market mutual funds offered by these firms, except for managed individual retirement accounts and qualified retirement plan accounts subject to ERISA requirements. The compensation TB will receive from these firms in connection with such services varies by mutual fund and ranges, on an annual basis, from 0.0% to 0.10% of the amount invested. In the case of custodial, directed trustee and escrow accounts established with and administered by TB, compensation paid to TB in connection with investments in money market mutual funds selected by its clients, administrative and shareholder service fees (including Rule 12b-1 fees) may range, on an annual basis, from 0.00% to 0.35%. The fees paid by such mutual funds for shareholder and administrative services are more fully described in each mutual funds prospectus and the statement of additional information, copies of which may be obtained from your TB representative. Such fees are expenses of the mutual funds which reduce shareholder returns by a like amount.

TB receives financial benefits in the form of interest rate spread earnings in connection with all deposits and investments made in any <u>TB deposit account</u>, including cash sweep accounts in which your Trust Wealth Account's cash balances may be deposited. Such earnings are derived from the difference, or "spread", between the interest rate and other costs TB pays on amounts deposited, and the interest income and other benefits TB earns when it makes loans or invests the deposited funds in the ordinary course of its banking business.

<u>Sterling Capital Management Mutual Funds and Investment Advisory Services Provided by Affiliates</u>. Services and products featured herein may include services and investment products offered by companies affiliated with TB and its corporate parent, Truist Financial Corporation ("TFC"). Examples of affiliated products include Sterling Capital Management, LLC ("Sterling") Sterling Capital Funds and investment advisory, separate account management and sub-advisory services provided by Sterling and Truist Advisory Services, Inc. Compensation paid to such affiliates for services and products is retained by such affiliates and, except, in the case of managed individual retirement accounts and qualified retirement plan accounts subject to ERISA requirements, is not credited to customer accounts and does not reduce or offset the account level compensation earned by TB for fiduciary, agency, custodial and similar services described in this statement. As a result, the TFC enterprise, as a whole, receives more compensation when such products and services are selected than would otherwise be received if a non-affiliated service or product was used. When TB offers any service or product to a client, TB uses the same investment process to evaluate both affiliated and non-affiliated services and products. TB expresses no opinion on the use of TFC affiliated services and products when it does not provide investment advice or exercise investment discretion with respect to an account and instead the client selects such services and products in a client-directed account, such as a self-directed IRA, custodial, escrow, directed trustee or similar relationship. The investment management compensation earned by Sterling in connection with investments in the Sterling Capital Funds ranges, on an annual basis, from 00.08% to 00.85% of the amount invested and is more fully described in each mutual fund's prospectus and the statement of additional information, copies of which may be obtained from your TB representative or at https://sterlingcapital.com/strategies/mutual-funds. Fees paid to Sterling are expenses of the mutual funds which reduce shareholder returns by a like amount.

<u>Notice Regarding Fiduciary Relationships</u>. TB and its affiliates do not accept fiduciary responsibility for all banking and investment account types offered. Please consult with your TB representative to determine whether TB and its affiliates have agreed to accept fiduciary responsibility for your account(s) and you have completed the documentation necessary to establish a fiduciary relationship with TB or an affiliate. Additional information regarding account types and important disclosures may be found at www.TB.com/investmentinfo.

Accounts utilizing affiliated or unaffiliated sub-advisors, model portfolio services or investment managers are separately responsible for any such expenses incurred. Any such compensation paid to unaffiliated service providers will not reduce compensation payable to TB under its standard fee schedule or be applied to reduce TB's minimum fee.

**Truist Wealt**h. Truist Wealth is a marketing name used by TB, Truist Delaware Trust Company, Truist Investment Services, Inc. and Truist Advisory Services, Inc. which are each affiliates of TFC. Banking and trust products and services, including investment management products and services, are provided by TB and Truist Delaware Trust Company. Investment advisory services are offered by Truist Advisory Services, Inc., an investment adviser registered with the U.S. Securities and Exchange Commission (SEC). Securities and insurance (including annuities) are offered by Truist Investment Services, Inc., a SEC registered broker-dealer, member FINRA, SIPC, and a licensed insurance agency.


**Trust, Investment Agency, Directed Trust, Custodial, Escrow Accounts offered by Truist Bank and Investment Advisory Brokerage, Insurance and Mutual Fund Products offered by TB's Affiliates:**

**• Are not FDIC or any other Government Agency Insured • Are not Bank Guaranteed • May Lose Value**

© 2020 Truist Financial Corporation. Truist, the Truist logo and Truist Purple are service marks of Truist Financial Corporation.     *PV827 4/2023*

# EXHIBIT B

# Andrés Antonio Alonso

110 Oak Street 1                                          201-912-0460 (cell)
Weehawken, NJ 07086                          andresaalonso@outlook.com

**Education**

**2006**          **Doctor of Education**
                 Harvard Graduate School of Education

**1999**          **Master of Education**
                 Harvard Graduate School of
                 Education
                 Urban Superintendents Program

**1982**          **Juris Doctor**
                 Harvard Law School

**1979**          **Bachelor of Arts**
                 Columbia College of Columbia University
                 Magna cum Laude, Phi Beta Kappa and Jose Marti Prize
                 Majored in History and English

**Experience**

**2014 – Present**     **CEO**
                       Andres A Alonso LLC

- Serves as strategic advisor on education issues to state and district leaders and leadership teams and as trustee to education focused foundations and organizations.
- Chair, Driving Change, Certificate of Advanced Education Leadership (CAEL), an online course on driving change for a community of world educators, as part of "Leaders of Learning" portfolio at Harvard Graduate School of Education.

**2018 – 2019**     **Visiting Professor of Practice**
                    Harvard Graduate School of Education (HGSE)

- Co-Chair, Public Education Leadership Project (PELP), a partnership with Harvard Business School serving the country's largest districts.

1

- Chair, Driving Change, Certificate of Advanced Education Leadership (CAEL), an online course on driving change for a community of world educators, as part of "Leaders of Learning" online course portfolio.
- Partnered with HGSE Programs for Professional Education (PPE) in start-up of case writing program.
- Co-designed Harvard Business School Social Enterprise professional learning course for public school district boards in parnership with Council of Great City Schools.

**2013-2018**          **Professor of Practice**
Harvard Graduate School of Education

- Served on steering committees of the Education Doctorate Leadership Degree (EDLD) program and the Program for Professional Education.
- Co-chaired Public Education Leadership Project (PELP).
- Chaired Superintendents and Central Leaders Leadership Institute.
- Designed and chaired Driving Change course for "Leaders of Learning," Certificate of Advanced Education Leadership (CAEL).
- Taught on education reform, instructional leadership, driving change and the politics of organizations in urban systems and schools.
- Co-chaired Leadership Diversity Project for USDOE (along with Kaya Henderson).
- Served on Boston School Committee task force to examine supports for English Language Learners.
- Consulted on systemic reform with government and foundation partners in the US and Latin America, and on disproportionality in school discipline in a desegregation case.

**2007-2013**          **Chief Executive Officer**
Baltimore City Public Schools (City Schools)

- Implemented a comprehensive program of reform for City Schools, a district of roughly 200 schools and 85,000 students.
- Led progress across all categories of outcomes in state tests, graduation and college readiness data, and measures of climate during six-year tenure after entering as 7th superintendent in 10 years.
- Oversaw supports that reduced the number of dropouts by 56 percent between 2008 and 2012, most significantly among African American males.
- Expanded choice within district schools and the number of charters, increased early childhood and alternative options,

2

while closing under- enrolled and low performing schools and expanding desired schools and programs while focusing on community partnerships, collaboration across all schools, and increased student supports, helping reverse four- decade trend in declining enrollment with five consecutive years of enrollment growth.

- Mobilized communities in support of facilities master plan that addressed over-capacity in the district through closing of 26 buildings, and led to historic legislation and funding in support of the 21st Century Buildings Plan, a project for building new schools and renovating over fifty buildings in Baltimore City in partnership with city and state, after decades of efforts to find resources to build new schools or fix the district's crumbling buildings.
- Managed $1.3B budget that over time accumulated $100M fund balance, after inheriting a district that had needed a $53M city bailout in 2005.
- Negotiated progressive labor agreements that introduced career ladders, built collaborative structures, and tied evaluation to pathways and compensation for six different bargaining units.
- Served as national model for progressive discipline approaches that introduced restorative practices in schools, in partnership with the Health Department and community partners which led to record declines in out of school suspensions and truancy.
- Settled a 26-year consent agreement in the *Vaughn G.* special education lawsuit in recognition of systemic progress in serving students with disabilities and their families.
- Systemic reform efforts memorialized in three Harvard Business School cases ("Bounded Autonomy: Implementing Fair Student Funding in Baltimore City Public Schools," "Career Pathways, Performance Pay and Peer Review Promotion in Baltimore City Public Schools" and "Organizing for Family and Community Engagement in the Baltimore City Public Schools") and in two books (Achieving Coherence in District Improvement, HEP, 2015, and Improving Education Together: A Guide to Labor-Management-Community Collaboration, HEP, 2017).

**2006- 2007**        **Deputy Chancellor**
Teaching and Learning
New York City Department of Education

- Assisted the Chancellor in the development and implementation of policies, practices and procedures to support increased student achievement and improved school performance.

3

- Supervised ten regional superintendents and 94 local instructional superintendents leading 1,100 schools, as well as District 75 (district for self-contained, low incidence SWD) and District 79 (district for alternative programs and students).
- Identified and responded to all systemic issues concerning the provision of services related to Teaching and Learning, including curriculum and instruction; bilingual education, special education, gifted and talented, and early childhood programs.
- Oversaw offices of grants and compliance, secondary education, parent engagement and instructional technology.
- Interacted on behalf of the Chancellor with city and government agencies, the Education Policy Panel and community education councils, community organizations, private foundations and corporations.

**2003-2006**          **Chief of Staff**
Teaching and Learning
New York City Department of Education

- Assisted Chancellor and Deputy Chancellor in identification and response to all systematic issues concerning the provision of services related to Teaching and Learning.
- Oversaw implementation of Teaching and Learning elements of first phase of Children First reforms, including development and implementation of ELL and Special Education plans, operational support for core curriculum in English Language Arts and mathematics, and structural reorganization of system to an integrated K-12 regional structure.
- Coordinated work of the Office of Teaching and Learning with that of other deputy chancellors to improve effective support for regions and schools.
- Managed central office division consisting of 389 employees, with a budget of nearly $200 million.
- Supervised Teaching and Learning efforts in support of nearly 500 schools identified as needing improvement under NCLB Efforts.

**2001-2002**          **Advanced Doctoral Candidate**
Harvard University Graduate School of Education

- Researched, proposed, and collected data for dissertations study exploring superintendent influence on instructional guidance in an urban context of standards-based reform and high stakes accountability.

**1999-2000**     **Executive Intern to the Superintendent**
Springfield, Massachusetts Public Schools

- Spearheaded process for school improvement that involved reorganizing central office and principals.
- Helped lead a committee of central office administrators and principals that examined the professional development practices of the district.

**1999**     **Fellow**
Harvard Graduate School of Education

- Completed full year practiced-based academic program concentrating on the urban superintendency and requiring ongoing projects in neighboring urban schools.

**1994- 1998**     **Teacher, English as a Second Language, and Coordinator, Bilingual/ESL Needs Assessment**
Peshine Avenue School
Newark, New Jersey Public Schools

- Coordinated Bilingual/English as a Second Language program and taught English as a Second Language in K-8 elementary school.
- Chaired district committee that wrote English as a Second Language Curriculum Guide.

**1987- 1994**     **Teacher, English as a Second Language, and Coordinator, Bilingual/ESL Needs Assessment Coordinator**
Samuel L. Berliner School
Newark, New Jersey Public Schools

- Coordinated Bilingual/English as a Second Language program and taught English as a Second Language in center school for 11-14-year-old students classified as emotionally disturbed.
- Drafted district Bilingual Special Education Guide, conducted professional development workshops and mentored district bilingual teachers.

**1985- 1986**          Traveled throughout United States, Europe, and Israel

**1982-1984**          **Attorney**
                       Hughes, Hubbard, and Reed
                       New York, New York

- Practiced corporate litigation involving antitrust, administrative, first amendment, and securities and contract law.
- Conducted pro bono litigation on behalf of indigent claimants in New York administrative law system.

**Selected Honors and Awards**

- "Lifetime Achievement Award" – Association of Latino Administrators and Superintendents (2014).
- "Influential Marylander" Award – *The Daily Record.* (2009, 2010, 2012).
- "Distinguished Alumni Achievement Award" – Harvard Graduate School of Education Association of Students of Color (2012).
- "Medal for Distinguished Service" – Teachers College of Columbia University (2011).
- "Hero of Education" distinction, White House  (2010)
- "School Superintendent of the Year" – The Fullwood Foundation (2009)
- "Hispanic Hero Award" – U.S. Hispanic Youth Entrepreneur  Education. (2009)
- "Howard Pete Rawlings Courage in Public Service Award" – The Greater  Baltimore Committee (2009).
- "Audacious Individual" Award – Open Society Institute of Baltimore (2008).
- "Innovator of the Year" - *The Daily Record* (2008)*.*
- "Best New Public Servant" – *The City Paper* (2008)*.*

**Publications**

- Alonso, A.A. (2016). "Pandering in a Context of Limited Choices and Costs." In Meira Levinson and Jacob Fay (Eds.), <u>Dilemmas of Educational Ethics: Cases and Commentaries</u>.  Cambridge, MA: Harvard Education Press.

- Alonso, A. A. (2018). "PLIE: Improving the Capacity of School Leaders in Argentina (PEL-89)." Boston, MA: Harvard Business School Publishing.

- Moore, M.H. and Alonso, A.A. (2017).  "Creating Public Value: Superintendents as Strategic Managers of Public Schools (PEL-081)." Boston, MA: Harvard Business School Publishing.

- Moore, M.H. and Alonso, A.A. (2017).  "Superintendents of Public Schools as Sector Level Leaders (PEL-082)."  Boston, MA: Harvard Business School Publishing.

**Boards and Service**

- Trustee, Center for Collaborative Education.
- Trustee and Strategic Committee chair, Data Quality Campaign.
- Trustee, Grow Your Own Foundation (GYO).
- Trustee, Panasonic Foundation.
- Trustee, Scholastic Corporation.
- Trustee, board treasurer and Audit and Budget Committee chair, William T. Grant Foundation.
- Member of Teacher's College President Advisory Council.
- Past member of Annenberg Foundation Advisory Board.
- Past chair and trustee, Carnegie Foundation for the Advancement of Learning.
- Past trustee, Future Ready Columbus.
- Past trustee and chair of Reporting and Dissemination Committee, National Assessment   Governing Board.
- Past trustee, National Center for Effectiveness in Education and the Economy (NCEE).
- Past trustee, Teachers College of Columbia University.
- Past trustee of University of Chicago's UEI Chicago Impact.

# EXHIBIT C

# Mehri &Skalet

# Firm Resume

Last updated September 21, 2023

2000 K Street, NW
Suite 325
Washington, DC  20006
findjustice.com / 202.822.5100

## OUR BACKGROUND & COMMITMENT

**Mehri & Skalet, PLLC** ("M&S") handles high-impact, complex litigation. Since our founding in 2001, we have used the law to advance our clients' interests and to pioneer mission-driven cases. Our seasoned attorneys handle civil rights and consumer rights class actions; public nuisance claims on behalf of public school districts; whistleblower suits alleging fraud against the government, financial markets, investors, and consumers; cases involving corporate abuse in insurance, healthcare, and other areas; and individual cases with a broad impact.

M&S attorneys have decades of experience in litigation and issue advocacy, and strong ties with consumer, labor, whistleblower, and civil rights organizations. We have co-counseled cases with the Lawyers' Committee for Civil Rights Under Law, the Washington Lawyers' Committee for Civil Rights and Urban Affairs, the National Women's Law Center, A Better Balance, the AARP Foundation, and the Center for Science in the Public Interest. We have collaborated on projects with the NAACP, the National Council of Women's Organizations, the Center for Auto Safety, and Whistleblowers of America.

## OUR PRACTICE AREAS

### Civil Rights and Workers' Rights

M&S is well-known for its civil rights practice. We represent employees in class anti-discrimination cases filed across the country. M&S also represents individual professionals who have reached the heights of their careers but continue to face discrimination from employers or potential employers. Relatedly, we represent

business owners of color and women business owners who face discrimination in the marketplace.

### Illustrative Civil Rights and Workers' Rights Cases

**\* *Chalmers v. City of New York*, No. 20-cv-03389 (S.D.N.Y.)**

M&S and co-counsel represent a certified class of New York City Fire Protection Inspectors and Associate Fire Protection Inspectors (FPIs) and their union, AFCSME District Council 37 Local 2507, in their race discrimination claims against the City of New York.  The FPIs claim that they have been paid substantially less each year than New York City's building inspectors and that the two jobs are substantially similar. The FPIs allege that the pay difference arises because of race. More FPIs than building inspectors are people of color.  The United States District Court for the Southern District of New York granted plaintiffs' motion for class certification, and the parties reached a settlement.  A motion for preliminary approval of the $29.2 million class settlement was filed in late August 2023.

**\* *Howard v. Cook Cty. Sheriff's Office*, No. 17-cv-08146 (N.D. Ill.)**

M&S and co-counsel represented hundreds of women employed by the Cook County Jail as correctional officers, sheriff deputies, paramedics, nurses, and in other jobs.  The suit documented a pattern of pervasive and disturbing sexual harassment by inmates directed at women working in the Jail and failures by Cook County Sheriff Tom Dart and the County to act to address it.  The case settled for about $31 million and substantial programmatic relief.

### * _McNeely v. Metropolitan Life Ins. Co._, No. 1:18-cv-00885 (S.D.N.Y.)

M&S litigated a case against MetLife on behalf of approximately 125 dental consultants who were misclassified as independent contractors and denied overtime pay.  In January 2020, the U.S. District Court for the Southern District of New York granted final approval of a $3,390,000 settlement on behalf of the class.

### * _Roberts et al. v. The TJX Companies, Inc._, No. 1:13-cv-13142 (D. Mass.)

In 2021, after several years of litigation, M&S along with co-counsel, achieved a $31.5 million settlement on behalf of a class of employees who sued the parent company of discount retailers Marshalls, TJ Maxx, and HomeGoods asserting that the employer improperly denied them overtime wages.

### * _Borders v. Wal-Mart Stores, Inc._, No. 17-cv-00606 (S.D. Ill.)

M&S and co-counsel at The National Women's Law Center and A Better Balance represented a nationwide settlement class of several thousand Walmart employees who alleged that the company's policies discriminated against pregnant workers, and that the company systemically failed to provide pregnant workers the same types of workplace accommodations available to others.  The matter resulted in a groundbreaking, court-approved $14 million settlement in April 2020.

### * _Brown v. Medicis Pharm. Corp._, No. 13-cv-01345 (D.D.C.)

M&S and co-counsel represented a class of over 200 women who alleged that Medicis's top executives created a sexually hostile environment for the women in its sales force and discriminated against them in pay and promotions.  Under the court-

approved settlement, Medicis agreed to pay a total of about $7.1 million, an average of over $30,000 per class member, and to provide comprehensive programmatic relief.

* *White v. Lynch*, EEOC Case No. 510-2012-00077X

M&S represented a certified class of over 400 women alleging sexual harassment, and that the federal Bureau of Prisons permitted the inmates at its largest correctional complex to create a hostile work environment based on sex over many years. The women alleged that many managers were hostile toward their presence in the workforce and that the agency did not adopt reasonable measures to prevent or deter the virtually incessant sexual harassment by the inmates. This case settled for $20 million for the class of workers and meaningful injunctive relief aimed at reforming policies and practices to eliminate sexual harassment.

* *Ramos v. SimplexGrinnell LP*, No. 1:2007-cv-0981 (E.D.N.Y.)

M&S, along with co-counsel, brought several lawsuits on behalf of current and former fire alarm and sprinkler system workers of SimplexGrinnell LP, who claimed they were not paid "prevailing wages" as required by many states for work on public projects. After obtaining class certification in 2011 in the largest of the cases, *Ramos v. SimplexGrinnell LP, No. 1:07-cv-981* (Eastern District of New York federal court), the class settled part of their claims in 2012 for $5.525 million. The *Ramos* plaintiffs appealed their remaining claims to the U.S. Court of Appeals for the Second Circuit, which ruled in plaintiffs' favor.

* *Carter v. Wells Fargo Advisors, LLC*, No. 09-cv-01752 (D.D.C.); *Amochaev v. Smith Barney*, No. 4:05-cv-01298-PJH (N.D. Cal.); *Augst-Johnson v. Morgan Stanley & Co., Inc.*, No. 06-cv-01142 (D.D.C.)

Mehri & Skalet, PLLC

As part of our Women on Wall Street Project, M&S along with co-counsel filed class actions against Wachovia Securities, LLC, Smith Barney, and Morgan Stanley alleging that each company had engaged in systemic gender discrimination against its female financial advisors.  Settlement was achieved in each case—with Wells Fargo Advisors/Wachovia for $32 million, with Smith Barney for $33 million, and with Morgan Stanley & Co for $47 million—exceeding $114 million in total.  The settlements also provided significant programmatic relief, including changes to internal company policies, and the appointment of independent diversity monitors.

### * _Norflet v. John Hancock Life Ins. Co._, No. 04-cv-01099 (D. Conn.)

In 2004, M&S, along with co-counsel, initiated a ground-breaking class action against John Hancock Life Insurance for its company-wide policy prohibiting the sale of life insurance to African American consumers in the early to mid-20th century.  The lawsuit also confronted John Hancock's practice of offering African Americans substandard and seriously inferior life insurance products when it did sell insurance to African Americans.  The Court granted the Plaintiff's motion for class certification in 2007, and the parties reached a settlement in 2009, which created a $24-million fund to pay claims to the class plus fees and costs.  The settlement created a large _cy pres_ fund of approximately $15 million, which was distributed by a court-appointed committee to organizations that uplift Black communities.

### * _Robinson v. Ford Motor Co._, Nos. 04-cv-00844, 04-cv-00845 (S.D. Ohio)

M&S challenged Ford's procedures for selecting apprentices nationwide.  The suit alleged that Ford had discriminated against Black workers in apprenticeship

selection.   A settlement was approved by the Court in 2005.   The EEOC held a Commissioners' meeting in 2007 that focused on this settlement and eliminating bias in testing procedures.

### * *Ingram v. Coca-Cola Co.*, No. 98-cv-03679 (N.D. Ga.)

Cyrus Mehri represented a class of 2,200 Black employees that alleged race discrimination in promotions, compensation, and evaluations by Coca-Cola.   In 2001, the Court approved a settlement agreement, valued at $192.5 million and designed to ensure dramatic reform of Coca-Cola's employment practices.   A court-appointed task force chaired by Alexis Herman, former U.S. Secretary of Labor, issued several annual task force reports highlighting the progress Coca-Cola made in complying with the settlement agreement.

### * *Roberts v. Texaco*, No. 94-cv-02015 (S.D.N.Y.)

Cyrus Mehri represented six plaintiffs filed *Roberts v. Texaco* as a class action in 1994, alleging that Texaco discriminated against Black employees by failing to promote and adequately compensate them.   The case was settled in 1996 for what was the largest sum ever allowed in a race discrimination case, $176.1 million.   Along with damages, the settlement called for pay raises for about 1,400 Black employees as well as systemic programmatic relief.

* * *

## Whistleblower Litigation

M&S attorneys litigate cases under both the federal False Claims Act (FCA) and analogous state laws and advise whistleblowers who submit information to the

Mehri & Skalet, PLLC

Securities and Exchange Commission, the Internal Revenue Service, the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice, the Federal Deposit Insurance Corporation, and the U.S. Treasury Department concerning violations of standards maintained by those agencies.  The firm also represents whistleblowers who have been subjected to workplace retaliation.

**Illustrative Whistleblower Cases**

*United States ex rel. Relator 1, Relator 2, Relator 3, and Relator 4 v. Bechtel Corporation, et al.***, No. 4:17-cv-05074-SMJ (E.D. Wash.)**

M&S and co-counsel represented four whistleblowers whose actions resulted in the government uncovering a ten-year period of overcharging for labor costs and related wrongdoing by construction giants Bechtel and AECOM. In 2020, the whistleblowers' efforts resulted in a $57.75 million settlement between the government and the contractors, which is one of the largest involving a Department of Energy (DOE) facility. They received $13.75 million, nearly 24% of the government's recovery, as their award.  That percentage is among the highest ever awarded in cases where the government has intervened.  The whistleblowers also reached mutually satisfactory resolutions of their individual whistleblower retaliation claims.

\* *Busche v. URS Energy & Constr., Inc.***, DOL No. 10-1960-14-002**

This was a whistleblower retaliation case filed by a former engineer and manager working at the DOE's Hanford Waste Treatment Plant against URS Energy and Construction, Inc. and Bechtel National, Inc. (BNI).  In 2016, URS, BNI, and Ms. Busche arrived at a mutually satisfactory resolution of her case.

8

* ***Johnson v. Not-For-Profit Hosp. Corp.*** **(Resolved Pre-Filing)**

This case concerned a claim of whistleblower retaliation by the Human Resources Director of the only public hospital in the District of Columbia. The case was favorably concluded in 2018.

* ***Ferrigan v. City of Delray Beach, et al,*** **No: 9:22-cv-81088 (S.D. Fla.)**

M&S and co-counsel represented Christine Ferrigan, a former Delray Beach Industrial Pretreatment Inspector, who alleged the City violated her federal and state constitutional rights to free speech and engaged in illegal retaliation when it terminated her position after courageously exposing dangerous water contamination in Delray Beach. Ms. Ferrigan's concerns were validated by the Florida Department of Health and the Palm Beach County Office of Inspector General. Ms. Ferrigan's claims were brought in federal court and in front of the U.S. Department of Labor's Occupational Safety and Health Administration (OSHA). The federal case settled favorably in April 2023 followed by OSHA's "deeply troubling" determination that "the city harassed and ultimately fired an employee sworn to protect the public for doing their job."

The firm litigates other whistleblower matters that are either under seal or under investigation and cannot be disclosed.

* * *

**Consumer Protection**

M&S enforces the rights of consumers against various abuses. Our lawyers believe that consumers can ensure that the marketplace remains fair and efficient by

using the class action vehicle to achieve relief on behalf of all persons affected by an unfair or deceptive practice.   M&S also represents consumers in disputes with insurance companies, including people who claim insurance companies have refused to pay or who have been overcharged, unfairly discriminated against, or unlawfully declined or misled.

**Illustrative Consumer Protection Cases**

> \* *Mackmin v. Visa Inc.*, **No. 1:11-cv-1831-RJL (D.D.C.)**

For more than a decade, M&S and co-counsel litigated an antitrust case on behalf of bank consumers who were hit with excessive ATM surcharges.  The case alleged that Visa and MasterCard had an illegal price-fixing agreement that forbade ATM operators from charging lower fees for certain transactions.  In 2022, the U.S. District Court for the District of Columbia granted final approval to the parties' $66.7 million dollar settlement and awarded fees and costs to class counsel as well as service awards to the named plaintiffs.

> \* *Harris v. Farmers Ins. Exch.*, **No. BC579498 (Cal. Super. Ct., L.A. Cty.)**

M&S and co-counsel litigated a class action complaint in California challenging Farmers Insurance Company's practice of charging its most loyal policyholders more than what was justified by the risk they present, based on their lack of price sensitivity. In August 2020, after multiple court proceedings, a proceeding before the California Insurance Department, and extensive negotiations, Judge Maren Nelson approved a $15 million settlement which compensated long-term, Farmers policyholders who were overcharged.

Mehri & Skalet, PLLC

* *<u>Health Care Sharing Ministry Litigation</u>*

M&S is litigating a series of cases charging health care sharing ministries (HCSMs) with illegally marketing sham health care coverage. Unlike true health insurance products, HCSM products do not guarantee payment or reimbursement of "members'" (policyholders') medical expenses, even for covered expenses. And they are unregulated. With the passage of the Affordable Care Act, the marketing and sale of HCSMs became big business. In 2014, there were fewer than 200,000 Americans enrolled in HCSMs. Today, there are a reported 1.5 million. This explosive growth has been fueled by fraudsters peddling fake products. Working with co-counsel, M&S has already achieved settlements to recover more than $3 million for consumers in three of these suits and continues to litigate to recover millions more. *Duncan v. The Aliera Companies* (E.D. Cal.); *Albina v. The Aliera Companies* (E.D. Ky.); *Smith v. The Aliera Companies* (D. Colo.); *In re The Aliera Companies*, Case No. 21-11548, (Bankr. D. Del.).

* *<u>Worth v. CVS Pharmacy, Inc.</u>*, **16-cv-00498 (E.D.N.Y.)**

M&S was co-counsel with Center for Science in the Public Interest and another law firm on behalf of two consumers in a class action filed in federal court in the Eastern District of New York, alleging that CVS falsely marketed its Algal-900 DHA product to improve memory. Plaintiffs alleged that the study CVS relied on for its claim was conducted by the in-house scientists for another supplements company, which withdrew its own product from the market after the Federal Trade Commission warned that the study did not support its memory claims. In addition, Plaintiffs alleged that larger and more rigorous studies have consistently found no effect of DHA

supplements on memory.  That case settled in 2019 with refunds available to purchasers of the product.

   * **Reverse Mortgages:  *Bennett v. Donovan*, No. 11-cv-00498 (D.D.C.); *Plunkett v. Castro*, No. 14-cv-00326 (D.D.C.)**

M&S represented plaintiffs in a series of cases in federal court that resulted in three landmark reforms in the federal reverse mortgage program: (1) U.S. Department of Housing and Urban Development (HUD) revised the program in 2015 to allow surviving spouses of borrowers to obtain protection from foreclosure; (2) HUD rewrote its model mortgages in 2014 to protect spouses from foreclosure; and (3) HUD withdrew illegal "guidance" it had issued in 2008 that prevented borrowers from selling their homes to spouses or family members at fair market value.

M&S and AARP Foundation Litigation sued HUD in 2011 on behalf of three individuals, all of whom faced foreclosure soon after they lost their spouses.  HUD immediately withdrew its illegal guidance restricting the borrower's right to sell the property.  The Court of Appeals for the D.C. Circuit ruled in 2013 that Plaintiffs had standing to challenge HUD's illegal regulations, and also opined that HUD's regulations were illegal.  Soon afterward, a federal district court ruled that HUD's regulations were illegal and remanded the matter to HUD to fashion a remedy. Beginning with mortgages issued in August 2014, all surviving spouses in the reverse mortgage program were eligible for protection from foreclosure.  In June 2015, HUD announced a program allowing surviving spouses to stay in their homes by having the reverse mortgages assigned to HUD.  Based on HUD's own estimates, this litigation

likely benefitted tens of thousands of current borrowers and their families, and future borrowers in the program.

### * *Sonoda v. Amerisave Mortg. Corp.*, No. 11-cv-01803 (N.D. Cal.)

M&S, along with co-counsel, litigated a class action in California against Amerisave Mortgage Corporation for violating the Truth in Lending Act through their deceptive advertising practices in the selling of residential mortgages. The suit alleged that Amerisave promised customers they could quickly request a "lock-in" of low advertised online rates, required the consumer to pay for a property appraisal prior to the rate being locked-in, and then allowed the lock-in period to expire, locking the customer into the agreement at a higher rate. The case settled for $3.1 million, which was distributed to class members to compensate them for a portion of the improper fees they paid.

### * *In re MagSafe Apple Power Adapter Litig.*, No. 09-cv-01911 (N.D. Cal.)

M&S served as co-lead class counsel on behalf of millions of consumers, alleging that Apple's MagSafe adapter, which powered its laptop computers, was defectively designed and would prematurely fray and fail to work. In 2015, a California federal court approved a settlement providing up to 100% cash refunds for adapters that failed in the first year of use, and a percentage of the purchase cost for adapters that failed up to three years after purchase. In addition, Apple provided a free, redesigned adapter for anyone who presented one at an Apple store.

* * *

13

**Public Nuisance Claims on Behalf of Public Schools**

Public school districts are often on the frontlines of disastrous crises that frustrate their ability to educate the children of our communities.  M&S has pioneered new legal theories using public nuisance claims to protect public school districts' rights against wrongdoers such as social media companies and opioid manufacturers, dispensers, distributors and consultants.

**Key Public Nuisance Cases**

**_* In Purdue Pharma L.P. et al., No. 19-23649-RDD (Bankr. S.D.N.Y.)_**

In 2019, M&S filed a class action complaint on behalf of Chicago Public Schools (CPS) in the multi-district opioid litigation underway in federal court in Cleveland, Ohio, seeking damages for expenses that have been imposed on public schools – primarily relating to special education, other educational supports, counseling, and employee health insurance – by opioid market participants.  M&S has helped public schools across the country create a groundbreaking Public School District Opioid Recovery Trust, which will be funded by Purdue, Mallinckrodt, and Endo three pharmaceutical companies that played a major role in the opioid crisis and who filed for Chapter 11 bankruptcy.  These recoveries are expected to be about $33.5 million from these three bankruptcy proceedings.

**_* In Re: McKinsey & Co., Inc., National Prescription Opiate Consultant Litigation, 21-MD-2996-CRB (N.D. Cal.)_**

M&S and co-counsel, on behalf of public school districts in Maine, New York, Tennessee, West Virginia, Kentucky, Ohio, and Florida, brought lawsuits against McKinsey for the harm it caused School Districts These cases were transferred and

14

consolidated in a multidistrict litigation (MDL) that is presided over by Judge Charles Breyer in the Northern District of California.  Judge Breyer appointed M&S's founder, Cyrus Mehri, to the 10-member plaintiffs' steering committee of the MDL to represent the interests of public school districts.  A settlement in principle has been reached.

**\* _In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation_, 22-MD-2047-YGR (N.D. Cal.)**

M&S and co-counsel, on behalf of Baltimore City School District, sued Meta Platforms, Inc., Instagram LLC, Snap, Inc., TikTok, Inc., ByteDance, Inc., YouTube LLC, Google LLC, and Alphabet Inc, and others alleging their social media platforms are defective because they are designed to maximize screen time and encourage addictive behavior in adolescents.  As alleged, this conduct imposes significant costs on schools to address the various emotional and physical harms to their students caused by platforms and hampers schools' ability to fulfill their vital mission.

\* \* \*

**Sports Law**

M&S's attorneys have a long history of promoting equity in the sports industry. M&S founding partner Cyrus Mehri, together with Johnnie L. Cochran, Jr., co-founded the Fritz Pollard Alliance, an affinity group for NFL coaches of color, and helped design the NFL's Rooney Rule.  American University Professor and M&S of counsel attorney, N. Jeremi Duru, is an active member of the national sports law community and has written extensively on both sports and employment law. Mr. Mehri and Professor Duru represented the Fritz Pollard Alliance, the organization of coaches, scouts, and front

office personnel of color in the NFL for approximately 15 years.  They have also advised the Professional Footballers Association in the United Kingdom (the UK's soccer players union) in its efforts to increase diversity among managers in the UK soccer community.

## OUR ATTORNEYS

### <u>Cyrus Mehri</u>

Cyrus Mehri is a founding partner of Mehri & Skalet.  He litigates cases involving discrimination, civil and consumer rights, and corporate fraud.  The business press has long followed Mr. Mehri's work.  *The New York Times* stated, "Mr. Mehri's vision for corporate America involves sweeping change, not the piece meal kind."  *Fast Company* said "He is something of a one-man army in the battle against business as usual . . . [H]is impact—both in terms of penalties and remedies—is undeniable."  His work has been recognized in numerous books and articles, most recently in Diversity Inc, authored by award winning author Pamela Newkirk.  In 2021, the *Wall Street Journal* profiled Mr. Mehri in its Future of Work section and described Mr. Mehri as having fought "some of the most significant workplace race-discrimination lawsuits in U.S. history."

Mr. Mehri's reputation is well-earned.  He has led and co-led some of the largest and most significant race and gender cases in U.S. history, including the two largest race discrimination class actions in history: *Roberts v. Texaco Inc.*, which settled in 1997 for $176 million and *Ingram v. The Coca-Cola Company*, which settled in 2001 for $192.5 million.  Both settlements include historic programmatic relief, featuring independent

Task Forces with sweeping powers to reform key human resources practices such as pay, promotions and evaluations.  Trial Lawyers for Public Justice named Mr. Mehri a finalist for "Trial Lawyer of the Year" in 1997 and 2001 for his work on the Texaco and Coca-Cola matters respectively.

Currently, Mr. Mehri is leading a nationwide effort on behalf of public school districts adversely impacted by the opioid crisis due to rising special education and supplemental education costs to opioid-exposed children, including children diagnosed with neonatal opioid withdrawal syndrome.  Mr. Mehri led the negotiations that resulted in an agreement to help establish the Public School District Special Education Trust totaling $30.5 million from the Purdue and Mallinckrodt Bankruptcy proceedings.  Judge Charles Breyer appointed Mr. Mehri to serve on the Plaintiffs Steering Committee on behalf of Independent School Districts nationwide in the McKinsey consulting company opioid litigation.

Mr. Mehri's work supports underrepresented groups in various settings.  On April 6, 2004, Mr. Mehri, along with Martha Burk and the National Council of Women's Organizations, announced a project called "Women on Wall Street."  The project focuses on gender discrimination in financial institutions.  As a result of the project, in 2007, M&S announced a $46 million settlement with Morgan Stanley on behalf of female financial consultants.  In 2008, the firm announced a comparable $33 million settlement with Smith Barney, and in 2011, the firm reached a comparable $32 million settlement with Wachovia Securities/Wells Fargo Advisors.  These settlements have

sweeping reforms that fundamentally changed the allocation of business opportunities at these brokerage houses.

Furthermore, Mr. Mehri served as lead counsel in *Robinson v. Ford Motor Company*. The settlement created a record 279 highly coveted apprenticeship positions for African American employees as well as payment of $10 million.   In a May 2007 EEOC Commissioners meeting, Mr. Mehri and others testified about this settlement's significance on testing procedures in the workplace.

Additionally, Mr. Mehri uses his expertise to provide recommendations to the judicial nominations arena . In September 2008, Mr. Mehri testified before the Senate Judiciary Committee alongside Supreme Court litigant Lilly Ledbetter. Mr. Mehri's testimony called for diversifying the pool of potential judicial nominations not just in terms of race and gender but also in terms of life and work experience.

Mr. Mehri is also an instrumental advocate in sports law. On September 30, 2002, Mr. Mehri and Johnnie L. Cochran, Jr. released the report, "Black Coaches in the National Football League: Superior Performance, Inferior Opportunities." The report became the catalyst for the NFL's creation of a Workplace Diversity Committee and the adoption of a comprehensive diversity program. The NFL reached a record number of African American head coaches. Mr. Mehri co-founded the Fritz Pollard Alliance, an affinity group for coaches of color, front office, scouting personnel and game day officials in the NFL.   In 2007, the Miami-Dade County Office of the Mayor and Board of County Commissioners gave Mr. Mehri the "Distinguished Visitor" Award.

Mr. Mehri frequently authors or contributes to scholarly works. In 2020, following the murder of George Floyed, Mr. Mehri Co-Authored an article in the Atlantic with M&S Of Counsel retired federal judge U.W. Clemon and M&S Partner Josh Karsh calling for the revitalization of the nation's first civil rights statue,  now known as Section 1981.   This directly led to the legislation in the U.S. Congress called the Economic Inclusion Civil Rights Act.

In October 2008, Mr. Mehri co-authored a paper—with M&S partner Ellen Eardley— called "21st Century Tools for Advancing Equal Opportunity: Recommendations for the Next Administration." The American Constitution Society published this paper along with papers by several other authors including Senator Ted Kennedy and Former Attorney General Janet Reno.  For the 2008 National Employment Law Association Convention, Mr. Mehri co-authored a paper, "A 'Toolbox' for Innovative Title VII Settlement Agreements." Mr. Mehri also has co-authored an article in Fordham's Journal of Corporate and Financial Law entitled "One Nation, Indivisible: The Use of Diversity Report Cards to Promote Transparency, Accountability, and Workplace Fairness." He also co-authored—with M&S partner Michael Lieder—a book chapter entitled "Addressing the Ever Increasing Standards for Statistical Evidence: A Plaintiff Attorney's Perspective," which was published in *Adverse Impact Analysis: Understanding Data, Statistics, and Risk* (2017). Mr. Mehri is a frequent guest on radio and TV, including NPR and the *New York Times* podcast, the Daily. He has recently published articles in *The Atlantic*, *Politico* and the *Washington Post*.

Mr. Mehri graduated from Cornell Law School in 1988, where he served as Articles Editor for the Cornell International Law Journal.  After law school, he clerked for the Honorable John T. Nixon, U.S. District Judge for the Middle District of Tennessee.  Since then, Mr. Mehri has received numerous awards. Mr. Mehri received the Outstanding Youth Alumnus Award from Hartwick College and the Alumni Award from Wooster School in Danbury, Connecticut "for becoming a beacon of good, positively affecting the lives of many." Mr. Mehri gave the 2009 Commencement Speech at Hartwick College and the Founder's Day Speech at Wooster School.  The Pigskin Club of Washington, DC awarded Mr. Mehri the prestigious "Award of Excellence." In March 2003, the Detroit City Council passed a testimonial resolution honoring Mr. Mehri and wishing him "continued success in changing the fabric of America."  In 2007, the Miami-Dade County Office of the Mayor and Board of County Commissioners gave Mr. Mehri the "Distinguished Visitor" Award.  In 2019, Mr. Mehri accepted the Diversity and Trailblazing Award at the D&I Honors hosted by Diverse & Engaged during Congressional Black Caucus week. In 2021, Mr. Mehri received an Honorary Doctor of Laws degree from Hartwick College.  In 2023, Mr. Mehri joined the Board of Trustees of Hartwick College.

In 2017, Mr. Mehri co-founded the consulting company, Working IDEAL which assists leaders who seek to advance diversity, equity, and inclusion in their organizations.

* * *

**Ellen Eardley**

Ellen Eardley is the managing partner of Mehri & Skalet.  She practices civil rights and employment discrimination law and also offers diversity, equity, inclusion, and justice consulting services.

Ms. Eardley co-leads the firm's civil rights practice.  She represents people who have experienced race discrimination, sex discrimination, sexual assault, and other civil rights violations in the workplace and at school.  She represents over 500 plaintiffs who have experienced sexual harassment while working at the Cook County Jail in Chicago, *Howard v. Cook County Sheriff's Office,* No. 17-8146 (N.D. Ill.), which is one of the largest sexual harassment cases in history.  Along with co-counsel from the National Women's Law Center and A Better Balance, Ms. Eardley was lead counsel in *Borders v. Wal-Mart Stores, Inc.,* a nationwide pregnancy discrimination class action in which a district court approved a $14-million settlement.

A leader on issues of diversity, inclusion, equity, and justice (DEIJ), Ms. Eardley offers strategic consulting services to organizations, employers, schools, non-profits, and government entities.   In collaboration with the Working IDEAL consulting network, she provides racial equity assessments, conducts investigations of allegations of discrimination, and develops DEIJ plans intended to dismantle structural barriers to inclusion.

Ms. Eardley was formerly the Assistant Vice Chancellor for Civil Rights & Title IX at the University of Missouri.  She served on both the Chancellor's and Provost's staffs and was responsible for addressing discrimination and sexual violence in a

community of more than 60,000 people.  She founded the University's first institutional equity office, creating a central place to address all forms of discrimination and sexual violence with an intersectional lens.  Ms. Eardley was credited with building a team of highly qualified equity professionals, increasing transparency through annual reports, improving key equity-related university policies, and co-chairing university-wide task forces to address sexual violence as well as to improve accommodations for pregnant students.  She increased campus resources for disability inclusion and fought to ensure that trans students could use their lived names on key documents, such as diplomas.

Before taking on her university administrator role, Ms. Eardley practiced law at M&S for eight years, where she was an associate and a partner.  She taught Sex Discrimination Law at American University's Washington College of Law during this time.  Ms. Eardley began her legal career as a fellow and counsel at the National Women's Law Center.  She also was an associate at a labor and employment firm now known as McGillivary Steele Elkin, LLP.  In addition to her law degree, Ms. Eardley holds a master's degree in women's and gender studies.

\* \* \*

**<u>Richard Condit</u>**

Richard Condit is a partner at M&S, and co-chairs the firm's Whistleblower Rights Practice.  His practice includes cases involving whistleblower retaliation, disclosures to the SEC and other federal agencies, and false claims or fraud against the government or its contractors.  Mr. Condit has over 30 years of experience working with whistleblowers of diverse backgrounds in a wide variety of industries,

representing lawyers, doctors, bank executives, firefighters, social workers, police officers, engineers, and laborers. The subject matter of the issues raised by whistleblowers Mr. Condit has worked with are equally diverse, covering such problems as fraud against the government, nuclear safety, environmental protection, bank fraud, food safety, mortgage fraud, securities law or regulatory violations, public transit safety, and many others.

Most recently, Mr. Condit, along with co-counsel, represented four whistleblowers whose actions resulted in the government uncovering a ten-year period of overcharging for labor costs and related wrongdoing by construction giants Bechtel and AECOM. In 2020, their efforts resulted in a $57.75 million settlement between the government and the contractors, which is one of the largest involving a U.S. Department of Energy facility. They received $13.75 million, nearly 24% of the government's recovery and one of the highest ever received in a case in which the government has chosen to intervene.

Prior to joining M&S, Mr. Condit worked at the Government Accountability Project (GAP)—first from 1987-1995 and again in 2007.  In his first stint at GAP, he helped develop the organization's environmental whistleblower and citizen enforcement programs.  When Mr. Condit returned to the organization, he served as Senior Counsel and lead GAP's in-house litigation of whistleblower and open government cases. Richard is also former General Counsel for Public Employees for Environmental Responsibility (PEER), where he led the group's whistleblower litigation efforts.  Moreover, he previously served as an adjunct faculty member of the

University of the District of Columbia David A. Clarke School of Law, teaching Whistleblower Law and Practice in the classroom and through the school's highly regarded clinical program.  Mr. Condit is admitted to practice before the U.S. Supreme Court and multiple federal district courts.  He has also appeared before several U.S. Courts of Appeal and regularly practices before the U.S. Department of Labor, the U.S. Office of Special Counsel, the U.S. Merit Systems Protection Board, and various state courts and agencies.

Mr. Condit's expertise is recognized by whistleblower law and support organizations. In 2021, he appeared at Whistleblowers of America's first Workplace Promise Institute conference and spoke on a panel focused on legal protections for whistleblowers. Mr. Condit also spoke at the Taxpayer's Against Fraud 21st Annual Conference.  At the TAF conference, he moderated a panel that discussed the mental health challenges, stress, and trauma experienced by whistleblowers.

Mr. Condit's work was recognized in Tom Mueller's 2019 book, *Crisis of Conscience: Whistleblowing in the Age of Fraud*; former U.S. EPA senior criminal enforcement lawyer Richard Emory's 2019 book, *Fighting Pollution and Climate Change*; and Chip Ward's 1999 book, *Canaries on the Rim – Living Downwind in the West*.

\* \* \*

### Joshua Karsh

Mr. Karsh joined M&S in 2020, opening up the firm's Chicago office.  In his 30 years of practice, Mr. Karsh has represented all kinds of clients—individual workers and nation states, community-based organizations and litigation classes with tens or

hundreds of thousands of class members, sole proprietors, and large companies.  He is a seasoned trial and appellate litigator: he has tried multiple cases to verdict (before both judges and juries), arbitrated and mediated cases, and briefed and argued appeals across the country.

Before joining M&S, Mr. Karsh was the Legal Director for the National Immigrant Justice Center.  Before that, he was a partner and shareholder in a high-powered litigation boutique in Chicago, where he worked for almost twenty years.

Mr. Karsh is a graduate of the University of Chicago Law School and Yale University, and clerked for United States District Court Judge Hubert L. Will.  He is a member of the American Law Institute (ALI), a Fellow of the College of Labor and Employment Lawyers, and has been heralded as an Illinois Super Lawyer® and listed on the Illinois Leading Lawyer Network List.

Mr. Karsh played a leading role in each of the following cases:

- *Cruz et al. v. Estados Unidos Mexicanos et al. (N.D. Cal., No.01-0892-CRB).* Represented thousands of guest workers (braceros) in litigation against the Mexican government and three Mexican state-owned banks to recover wages withheld from the workers between 1942 and 1946. Settlement of this class-action entitled 6,100 U.S-resident braceros, or their surviving family members, to reparations. Reported at 387 F. Supp.2d 1057 (N.D. Cal. 2005).

- ***Lewis v. City of Chicago*** (N.D. Ill., No. 98 C 5596) (bench trial in 2004; victory in the U.S. Supreme Court in 2010; damages judgment and remedial injunction in 2012). Represented more than 6,000 African Americans who had been denied jobs as entry-

level firefighters with the Chicago Fire Department because of their scores on a discriminatory, written hiring exam. Obtained a damages judgment and injunction creating 111 jobs for class members and awarding more than $70 million in backpay and retroactive pension contributions. Reported at 2005 WL 639618 (N.D. Ill. March 22, 2005), 560 U.S. 205 (2010), and 643 F.3d 201 (7th Cir. 2011).

- *Howard v. Cook County Sheriff et al.* (N.D. Ill., No. 17 C 08146). Represented more than 500 women working at the Cook County Jail, bringing hostile work environment claims against the Jail for failing to protect them from sexual harassment by male detainees. Obtained a $31 million settlement, plus programmatic relief, including the appointment of a retired federal judge as an outside monitor, to ensure the Jail's protection of these women in the future.

- *Gecker v. Flynn* (N.D. Ill., Bankr. Adv. No. 08 A 00972) (bench trials in 2010 and 2013). Represented a Chapter 7 bankruptcy trustee against seven defendant directors and officers of the defunct Emerald Casino, in breach-of-contract and breach-of-fiduciary-duty litigation, obtaining a $272 million judgment in 2014, which was affirmed on appeal in 2017. Reported at 867 F.3d 743 (7th Cir. 2017); 530 B.R. 44 (N.D. Ill. 2014).

- *Thornton Tp. High School Dist. 205 et al. v. Argo Comm. High School Dist. 217 et al.* (N.D. Ill., No. 06 C 2005). Represented several majority-African-American school districts challenging the decision made by eleven predominantly White high school districts to secede from the largest high school interscholastic conference in Illinois. The new arrangement they contemplated would have

effectively ended regular-season competition between majority-White and majority-African-American high schools in the southwest suburbs of Chicago. This case was one of the first to use the "effects test" provisions of the Illinois Civil Rights Act of 2003 and settled on terms that assured continued regular-season competition and meetings between majority-white and majority-African-American high schools.

- ***Ernst v. City of Chicago*** (N.D. Ill., No. 08 C 4370) (jury trial on liability in 2014; appellate argument before the Seventh Circuit in 2016; bench trial on damages in 2017). Represented five women denied employment by the Chicago Fire Department based on their scores on a discriminatory physical test that disproportionately excluded women while bearing no demonstrable relationship to job performance. Reversing the district court's adverse liability rulings, the Seventh Circuit directed entry of judgment in the women's favor and remanded for a determination of damages, which were tried. Obtained judgments totaling more than 4 million dollars, plus offers of instatement with full retroactive seniority and pension benefits. Reported at 837 F.3d 788 (7th Cir. 2016).

- ***del Valle v. McGuffage et al.*** (N.D. Ill., No. 01 C 796). Represented Latino and African American voters in a class action against seven local election jurisdictions and the Illinois State Board of Election Commissioners, challenging the use of flawed systems of recording and counting votes, as a violation of the Voting Rights Act and the Fourteenth Amendment. The use of these voting systems had consistently resulted in disproportionately high error rates and undercounting of

votes, particularly in predominantly minority voting districts. The settlement in the case led to elimination of punch-card ballots and optical-scan voting systems that failed to provide error notification throughout Illinois.

- ***Torres et al. v. Goddard, et al.,*** (D. Arizona, No. CV 06-2482-PHX-SMM). Represented Western Union money-transfer customers challenging the Arizona Attorney General's interdiction and seizure of thousands of electronic fund transfers, followed by civil forfeitures of the funds, as violations of the Fourth Amendment and the Due Process and Commerce Clauses.

- ***Jones v. Walgreen Co.*** (N.D. Ill., No. 07-0097). Represented a nationwide class of women retail store management employees in a Title VII class action against the nation's largest drugstore chain. Obtained a $17 million settlement, which also included injunctive relief requiring objective criteria for pay and promotion decisions and outside review of gender equity compliance efforts.

- ***Bell et al. v. Woodward Governor Company.*** (N.D. Ill., No. 03 C 50190). Represented minority employees in a Title VII class action alleging race and national-origin discrimination by a large manufacturing employer, resulting in a multi-million-dollar settlement, which also provided comprehensive injunctive relief. The injunctive relief included both appointment of a third-party monitor to assure Title VII compliance in the future and retention of workplace industrial-organizational experts to create and implement best practices for job-related compensation and promotional decisions going forward.

- ***Trombetta v. Proviso School District 209 et al.*** (N.D. Ill., No. 02 C 5895) (jury trial in 2004). Represented a school-district employee fired after exercising his First Amendment right to support the candidate of his choice in local school board elections. The jury verdict for compensatory and punitive damages was, at the time, one of the highest ever in a single-plaintiff civil rights action in the U.S. District Court for the Northern District of Illinois.

- ***Jefferson v. Ingersoll Int'l, Inc.,*** No. 98 C 50042 (N.D. Ill., Western Div.). Represented women and minorities bringing race and sex discrimination claims under Title VII, resulting in more than $1 million in monetary relief and a wide range of injunctive measures. 195 F.3d 894 (7th Cir. 1999).

- ***Jimenez v. GLK Foods*** (E.D. Wis., No. 12 cv 209). Represented approximately 100 Mexican migrant workers in a class and collective action against the world's largest sauerkraut producer, principally for wage-and-hour violations and wrongful discharge. In 2016, obtained a precedent-setting ruling that workers employed under the federal government's H-2B visa program are not terminable-at-will. In April 2017, obtained a judgment of $837,000 for the workers. Reported at 2016 WL 2997498.

- ***Rosiles-Perez et al. v. Superior Forestry Service, Inc.,*** 250 F.R.D. 332 (M.D. Tenn. 2008) (settled in 2010). Represented more than 2,200 H-2B visa guest workers in a Rule 23 class and FLSA collective action to recover unpaid wages, resulting in a $2.75 million settlement.

- ***Lopez v. Fish Farms*** (E.D. Tenn., No. 2:11-cv-00113). Represented fourteen Mexican migrant agricultural workers against a Tennessee tomato farm, bringing claims for retaliatory discharge. Settled for $390,000.

- ***Personal PAC v. McGuffage*** (N.D. Ill., No. 12-CV-1043). Represented Personal PAC and two of its supporters in a successful First Amendment challenge to portions of Illinois' campaign finance law, resulting in a permanent injunction barring enforcement. Reported at 858 F. Supp.2d 963 (2012).

- ***Goodman v. Ward*** (Ill. Supreme Ct., No. 109796). Represented a judge before the Illinois Supreme Court in this election-law case, which presented a novel question of Illinois constitutional law regarding the contours of the requirement of residency for judicial office. Reported at 241 Ill.2d 398 (2011).

* * *

## Cleveland Lawrence III

Cleveland Lawrence III is a partner at M&S, where he is Co-Chair of the Whistleblower Rights Group.  He is an expert on False Claims Act, whistleblower, fraud, and compliance issues, and has been a thought leader in the *qui tam* community for more than a decade.  At the firm, Mr. Lawrence has been lead counsel or had a significant role in in several of the whistleblower cases discussed above, including the case against Bechtel and AECOM that resulted in a $57.75 million settlement between the government and the contractors, which is one of the largest involving a U.S. Department of Energy facility.  From 2008 to 2016, Mr. Lawrence led the Taxpayers Against Fraud Education Fund (TAFEF) and its sister organization, Taxpayers Against

Fraud.  In those capacities, he regularly met with whistleblowers, federal and state government officials, private attorneys, and the public to combat fraud against federal and state funds.  He also served as editor in-chief of TAFEF's law journal, the False Claims Act & *Qui Tam* Quarterly Review, and managed annual national seminars on the IRS, SEC, and CFTC whistleblower programs.

A seasoned litigator, Mr. Lawrence also has experience as outside counsel, having handled a variety of fraud, compliance, ethics, and whistleblower issues— including as defense counsel.  Prior to his service at TAFEF, Mr. Lawrence spent more than six years as an associate at Weil, Gotshal & Manges, LLP, where among other things, he defended clients against FCA lawsuits, and assisted clients facing internal investigations and administrative subpoenas from government agencies.  In addition to these duties, he counseled corporate and individual clients in several other areas of litigation practice, including complex commercial law, products liability, bankruptcy, antitrust, class action, insurance coverage, healthcare, employment, and environmental law.

Throughout his career, Mr. Lawrence has worked with the highest levels of all three branches of Government to shape whistleblower law and policy.  He has partnered with high-ranking officials from the U.S.  Department of Justice to coordinate the nation's largest annual False Claims Act conference—which often featured Directors of the IRS, SEC, and CFTC whistleblower programs as well.  In addition to arguing before federal district and circuit courts on behalf of his own whistleblower clients, Mr. Lawrence has authored and filed numerous amicus curiae briefs on behalf

of TAFEF in federal and state courts across the country—including the United States Supreme Court.  In addition, Mr. Lawrence has: testified before Congress and state legislatures regarding FCA and whistleblower-related legislation; represented a testifying witness during Congressional committee hearings; prepared draft and model federal and state legislation; and submitted multiple comment letters to federal agencies implementing Dodd-Frank and other whistleblower reward programs.

Mr. Lawrence has examined whistleblowing from multiple perspectives and frequently speaks about the topic to a variety of audiences, including conferences, seminars, and other educational events for whistleblowers and attorneys sponsored by the American Bar Association, the Federal Bar Association, the National Healthcare Anti-Fraud Association, TAF, and others; law students, graduate students, compliance officers, and other groups; and media outlets such as *Law360*, *POLITICO*, and *The CPA Journal*.

Mr. Lawrence received a B.A. from Georgetown University and he graduated, with honors, from The George Washington University Law School, where he was a member of the Public Contracts Law Journal. A native of New Orleans, he is a founder and president of the Lagniappe Education Foundation, a 501(c)(3) non-profit organization that provides scholarship assistance to deserving college-bound graduates from his *alma mater*, Edna Karr High School.

* * *

**Michael Lieder**

Michael Lieder is a partner at M&S who joined the firm in 2012.  Since then, he has worked primarily on employment discrimination, wage and hour, and insurance class action litigation for the firm.  He has been lead counsel or had a significant role in five of the civil rights class action lawsuits discussed above – *Borders v. Wal-Mart Stores, Inc.*, *Chalmers v. City of New York*, *Richardson v. City of New York*, *Brown v. Medicis*, and *White v. Lynch* – in the wage and hour case against MetLife mentioned above, and several other concluded or ongoing cases.

Mr. Lieder's work includes "Onward and Upward after *Wal-Mart v. Dukes*," co-authored with M&S's Cyrus Mehri, on successfully pursuing employment justice in the wake of *Wal-Mart v. Dukes*.  He also co-authored—with M&S co-founder Cyrus Mehri—a book chapter entitled "Addressing the Ever Increasing Standards for Statistical Evidence: A Plaintiff Attorney's Perspective" which was published in *Adverse Impact Analysis: Understanding Data, Statistics, and Risk* (2017).

Prior to joining M&S, Mr. Lieder was of counsel, a partner, and a member of Sprenger & Lang, PLLC.  At that firm, he generally served as lead counsel or in another leading role in employment discrimination, ERISA, wage and hour, and consumer class action litigation, including the following prominent cases:

- *In re TV Writers Cases*, No. 268836 et al. (Cal. Super. Ct., L.A. Cty. 2011) (settled this age discrimination class action against major television networks, studios, and talent agencies on behalf of members of the Writers Guild of America for about $70

million, believed to be the largest settlement of an age discrimination class action ever);

- *Whitaker v. 3M Co.*, (Minn. Sup. Ct., Ramsey Cty. 2011) (settled this age discrimination class action claiming discrimination primarily in potential ratings, training, and promotions for about $16 million plus injunctive relief);

- *Seraphin v. SBC Internet Servs., Inc.*, No. CV 09-131-S-REB (D. Idaho 2011) (consumer class action);

- *Jarvaise v. RAND Corp.*, No. 1:96-CV-2680 (D.D.C. 2007) (settled this gender discrimination class action claiming discrimination in pay for about $3 million);

- *Carlson v. C.H. Robinson Worldwide, Inc.*, No. CV-02-3780 (D. Minn. 2006) (settled this gender discrimination class action on behalf of about 230 women against a logistics company for $15 million, about $65,000 per class member, one of the largest per capita settlements ever of a gender discrimination class action);

- *Lucich v. New York Life Ins. Co.*, No. 01-1747 (S.D.N.Y. 2004) (settled this ERISA pension benefits class action on behalf of sales agents for $16 million and agreement to make retirement benefits available to more agents);

- *Franklin v. First Union Corp.*, Nos. 3:99cv344 and 610 (E.D. Va. 2001) (settled this ERISA breach of fiduciary duty class action for about $26 million in what is believed to be the first successful challenge to plan fiduciaries selecting own underperforming funds in 401(k) plan);

- *Thornton v. National Railroad Passenger Corp.*, No. 98-890 (D.D.C. 2000) (settled this race discrimination class action for trackworkers for $16 million and broad

injunctive relief, most of which was incorporated into a collective bargaining agreement and is thereby enduring);

- *McLaurin v. National Railroad Passenger Corp.*, No. 98-2019 (D.D.C. 1999) (settled this race discrimination class action for managers and professionals for $8 million and broad injunctive relief including salary adjustments for employees identified as underpaid in pay equity analysis);

- *Hyman v. First Union Corporation*, No. 94-1043 (D.D.C. 1997) (settled this age discrimination collective action for $58.5 million, believed at the time to be the largest settlement of an age discrimination collective action and still possibly the largest per capita);

- *Burns v. Control Data Corporation*, No. M.D. 4-96-41 (D. Minn. 1997) (settled this age discrimination collective action for $29 million);

- *In Re: Maytag Corporation/Dixie Narco Plant Closing Litigation*, No. 92-C-417 (W.V. Cir. Ct., Jefferson Cty 1995) (settled this breach of contract and fraud class action arising out of the closing of a factory for $16.5 million); and

- *In re Pepco Employment Litigation*, No. 86-0603 (D.D.C. 1993) (settled this race discrimination class action for $38.5 million and broad injunctive relief).

The settlements in many of the cases required comprehensive injunctive relief in addition to substantial payments to the class members. In many of these cases, Mr. Lieder worked closely with co-counsel from other firms.

Mr. Lieder is well known in the class action employment bar. He has written papers and spoken at seminars and webinars concerning certification of employment

discrimination class actions, the impact of *Dukes* on certification of employment discrimination class actions, statistical evidence in employment discrimination cases, mediation of employment discrimination cases, the Age Discrimination in Employment Act, Rule 23(f) review of class action certification decisions, ERISA litigation, and wage-and-hour litigation.  He also has authored several amicus briefs to the Supreme Court and Courts of Appeal.  In 2007, he was named one of "500 Leading Plaintiffs' Lawyers in America" by Lawdragon magazine, and in 2013, he was selected as a "Super Lawyer."

Before beginning work at Sprenger & Lang in 1991, Mr. Lieder graduated magna cum laude from Georgetown University Law Center, where he was a Notes and Comments editor on the Georgetown Law Journal.  Mr. Lieder also worked for six years as an associate at the Madison, Wisconsin office of Foley & Lardner LLP, and served as a visiting assistant professor for a year at the University of Toledo College of Law.

Mr. Lieder is an accomplished author with wide-ranging interests.  He co-authored a book, *Wild Justice:  The People of Geronimo vs. the United States*, published by Random House in 1997, which was favorably reviewed by the New York Times and the Washington Post, among other leading publications.

Mr. Lieder also wrote or co-authored five pieces published in various law journals:

- Class Actions Under ERISA, 10 Employee Rights & Employment Policy J. 665 (2006);

- Navajo Dispute Resolution and Promissory Obligations:  Continuity & Change in the Largest Native American Nation, 18 Amer. Ind. L. Rev. 1 (1992);

- Constructing a New Action for Negligent Infliction of Economic Loss:  Building on Cardozo & Coase, 66 Wash. L. Rev. 937 (1991);

- Religious Pluralism and Education in Historical Perspective:  A Critique of the Supreme Court's Establishment Clause Jurisprudence, 22 Wake Forest L. Rev. 813 (1987); and

- Adjudication of Indian Water Rights Under the McCarran Amendment:  Two Courts Are Better Than One, 71 Geo. L.J. 1023 (1983).

* * *

**Jay Angoff**

Jay Angoff is a partner at M&S and heads the firm's insurance practice.  He previously served as the first director of the Affordable Care Act (ACA) implementation at HHS and as the Missouri Insurance Commissioner, making him one of the few people to have served as both a state Insurance Commissioner and the chief federal insurance regulator.

He is currently counsel in cases challenging the practice of price optimization—charging policyholders based on their willingness to tolerate a price increase, rather than on the risk they present—as well as the systematic overcharging of enlisted members of the military.

Cases in which Mr. Angoff has obtained refunds for consumers overcharged by insurers include: *Harris v. Farmers Insurance Exchange* (Cal. Super. Ct., L.A. Cty.) ($15 million settlement), *Landers v. Interinsurance Exchange of the Automobile Club* (Cal. Super. Ct., L.A. Cty.) ($24 million settlement), *Clutts v. Allstate* (Ill. Cir.) ($6 million

settlement), and *Foundation for Taxpayer and Consumer Rights v. GEICO* (Cal. Super. Ct.,

L.A. Cty.) (settlement valued at up to $12 million).

Mr. Angoff has also represented and advised state insurance departments in

connection with proposed mergers and restructurings, including the Maryland,

Pennsylvania, Montana, and Missouri Departments.  He also represents and advises

both for-profit and non-profit organizations on the ACA- and other insurance-related

matters, including in rate proceedings before state regulators.

Mr. Angoff also serves as an expert witness on insurance-related issues.  Among

the issues he has testified on are: payments constituting illegal rebates; fronting

arrangements; illusory coverage; duties of primary and excess insurers; an insurer's

duties in connection with its surplus; the scope of the business judgment rule; the

insurable interest rule; the duty of an insurer to settle within policy limits when liability

is reasonably clear; and the duty of the insured to inform the insurer of a material

change in the risk.

Recent decisions making new law in which he has prevailed include *St. Louis

Effort for AIDS v. Huff*, 782 F.3d 1016 (8th Cir. 2015), in which the 8th Circuit struck

down a Missouri statute limiting the ability of ACA-authorized consumer assistance

organizations to help consumers obtain health insurance, and *Corbin v. Allstate*, 140

N.E.3d 810 (Ill. App. Ct. 2019) in which the Illinois Appellate Court held that the filed

rate doctrine does not apply to filed auto insurance rates in Illinois.

At HHS, Mr. Angoff's responsibilities included developing the regulations

implementing the ACA's individual and small group market reforms, including the

Patient's Bill of Rights, Medical Loss Ratio rule and Rate Review rule; implementing the Consumer Assistance, Exchange, and Rate Review grant programs; and establishing the Early Retiree Reinsurance Program and Preexisting Condition Insurance Plan.  At HHS, Mr. Angoff also served as Senior Advisor to the Secretary and as Regional Director for Region VII, headquartered in Kansas City.

Between 1993 and 1998, Mr. Angoff served as Director of the Missouri Department of Insurance.  There, he became one of the first Insurance Commissioners to order a traditionally non-profit Blue Cross plan to establish a healthcare foundation with the full value of its assets.  After five years of ultimately successful litigation, he oversaw the establishment of the foundation, the Missouri Foundation for Health, which is now one of the nation's largest healthcare foundations with over $1.2 billion in assets.  He also helped implement a health insurance exchange for state workers, which reduced their health insurance rates by up to 45%.  And he established a competitive bidding process for workers compensation insurers that reduced workers comp rates by 24%.  He also oversaw and accelerated the run-off of the Transit Casualty and Mission insolvencies, two of the largest and longest-running insurer insolvencies in the nation.

Prior to his service in Missouri, Mr. Angoff served as Deputy Insurance Commissioner of New Jersey and Special Assistant to the Governor for Health Insurance Policy.  In those positions, he helped draft and implement New Jersey's individual and small group reform laws.  He is also one of the primary drafters of

Proposition 103, the California auto insurance reform initiative approved by the voters in 1988.

Mr. Angoff began his career as an antitrust lawyer with the Federal Trade Commission.  He also served as a staff attorney for Congress Watch, a public interest lobbying organization, as counsel to the National Insurance Consumer Organization, and as Vice-President for Strategic Planning for Quotesmith.com (now insure.com), an internet quotation service and insurance broker.

He has written for The New York Times, The Washington Post, and The Wall Street Journal, among other publications, and has appeared on MSNBC and Fox News. He is the recipient of the James R. Kimmey Lifetime Achievement Award and the Rory Ellinger Award for Public Interest Litigation.

Mr. Angoff is a member of the District of Columbia, Missouri, New Jersey, and U.S. Supreme Court bars, and is a graduate of Oberlin College and Vanderbilt Law School.

* * *

**Ezra Bronstein**

Ezra Bronstein is a Senior Associate at M&S. Building on his government experience, Mr. Bronstein guides domestic and foreign whistleblowers, from crypto technologists and construction workers to consultants and investors, through their legal matters, including the SEC's and CFTC's whistleblower reward programs, qui tam cases against government contractors, and lawsuits relating to workplace retaliation.  Mr. Bronstein also litigates class actions targeting abusive or fraudulent

40

business practices, and represents school districts nationwide in cases against social media giants for their platforms' harm to students' mental health and opioid-related litigation.

Before joining M&S, Mr. Bronstein directed the Federal Housing Finance Agency Office of Inspector General's whistleblower operations, led public corruption investigations, and participated in prosecutions of complex white-collar crimes. Mr. Bronstein also assessed regulatory compliance and internal controls of Fannie Mae, Freddie Mac, Federal Home Loan Banks, and the Federal Housing Finance Agency, and recommended improvements in public reports to Congress.

Mr. Bronstein serves as a board member and legal advisor to several nonprofit organizations, including Geder Avos, an organization dedicated to preserving historic Jewish cemeteries and mass graves in Eastern and Central Europe.

Mr. Bronstein graduated from The George Washington University Law School in 2012, where he was a Presidential Merit Scholar. While in law school, Mr. Bronstein interned at the U.S. Securities and Exchange Commission and a public company. Before law school, Mr. Bronstein volunteered as a community organizer and teacher in Johannesburg and Pretoria, South Africa, and was ordained as a rabbi.

Mr. Bronstein is a member of the District of Columbia, New York, and Florida Bars and is admitted to practice before numerous federal courts.

* * *

**Oluwadamilola Animashaun**

Oluwadamilola Animashaun joined M&S as an associate in August 2023. Previously, he was a Greenfield Fellow at the union-rights law firm of Bredhoff & Kaiser. He clerked with the Standford Law School Center for Racial Justice, the ACLU of Maryland, the DC Public Defender Service, and the Maryland Office of the Public Defender. He graduated from Howard University School of Law where he was a research and teaching assistant for Professor Josephine Ross.

**Jane Kim**

Jane Kim joined M&S as an associate in July 2023. Previously, Jane was a Seneca Falls Fellow with Public Justice and a public interest fellow with the California Department of Justice, Office of the Attorney General, Antitrust Section. Jane was a summer associate with Hausfeld, LLP. She clerked with or completed an externship with the Federal Trade Commission, the U.S. District Court for the Northern District of California, Housing and Economic Rights Advocates, and the South Korea Ministry of Justice, Human Rights Policy Division. She graduated from the University of California, Berkeley School of Law.

\* \* \*

**Judge U.W. Clemon**

Retired U.S. District Judge U.W. Clemon (Chief Judge N.D. Alabama), joined M&S as Of Counsel in 2017. Judge Clemon was Alabama's first black federal judge, serving as the Chief Judge of the Northern District of Alabama from 1999-2006. Joining

M&S gives him a chance to return to his roots in civil rights and other public spirited and complex litigation.

Judge Clemon served as the trial judge during Lilly Ledbetter's successful trial against Goodyear.  The Supreme Court created new legal standards and reversed Ms. Ledbetter's trial victory.  In her dissent, Justice Ginsberg called on Congress to act to restore the law and the legal principles consistent with Judge Clemon's trial decisions.  The Lilly Ledbetter bill became the first law that President Obama signed into law as President.  Ms. Ledbetter has this to say about Judge Clemon: "There is no finer person or jurist than Judge U.W. Clemon.  As the presiding judge, he managed my trial exactly how it should have been.  He was fair to both sides.  But for him, I may never have had my day in court and may never have had the opportunity to make history to change the law for the better for all Americans."

Judge Clemon serves on the plaintiffs' Steering Committee in perhaps the largest antitrust case in the nation, BlueCross Antitrust.  Judge Clemon is also frequently deployed as a mediator, arbitrator or court-appointed Special Master including serving as Special Master in a historic M&S case, *Norflet v. John Hancock*.

As a student activist at Miles College, Judge Clemon confronted the infamous Eugene "Bull" Connor over Birmingham's segregation ordinances in 1962 and marched with Dr. Martin Luther King in the following year.  In 1968 he graduated from Columbia Law School, where he began a life-long relationship with the NAACP Legal Defense & Educational Fund, Inc.

Before his judicial appointment, Judge Clemon was a civil rights lawyer. He sued Coach Paul Bear Bryant in 1969 to desegregate the University of Alabama's football team, and has represented many plaintiffs in employment cases. He was the first African American elected to the Alabama State Senate since Reconstruction and served respectively as chairman of the Rules and Judiciary Committees.

He confronted Governor George C. Wallace on many race-related issues. After nearly thirty years of service, Judge Clemon retired from the federal bench in 2009.

Judge Clemon was profiled in the New York Times Magazine for his decades-long involvement in the debate over desegregation in Alabama public schools. Judge Clemon represented Black plaintiffs in a lawsuit against suburban Gardendale, Alabama, whose all-white council proposed plans to split the community's schools into its own district, separate from the more diverse schools in Jefferson County. The district judge found that race discrimination was a motivating factor, but allowed the split to go forward. Judge Clemon argued the case on appeal, and in February 2018 the decision was reversed.

* * *

### N. Jeremi Duru

N. Jeremi Duru, a Professor of Law at American University's Washington College of Law, serves as Of Counsel to M&S. Before entering academia, Professor Duru was an associate at M&S, where he represented plaintiffs' interests in employment discrimination and other civil rights matters.

Much of Professor Duru's work involved challenges to discriminatory employment practices in professional athletics.  In recognition of this work, the National Bar Association honored Professor Duru with its 2005 Entertainment and Sports Lawyer of the Year award.  Professor Duru has lectured and written extensively on sports law and employment law topics and, among other publications, is co-author of Sports Law and Regulation: Cases, Materials, and Problems (3d ed.) (Wolters Kluwer) and author of Advancing the Ball: Race, Reformation, and the Quest for Equal Coaching Opportunity in the NFL (Oxford University Press).  In 2018, he received both the American University Faculty Award for Outstanding Teaching and the Washington College of Law Award for Excellence in Teaching.

After receiving his undergraduate education at Brown University, Professor Duru completed a joint-degree program at Harvard University, receiving a Master's degree in Public Policy from the John F. Kennedy School of Government and a Juris Doctorate from Harvard Law School.  He then served as a law clerk to the Honorable Damon J. Keith of the United States Court of Appeals for the Sixth Circuit.

* * *

**Steven A. Skalet**

Steven A. Skalet is a founding partner of M&S and was its managing partner for 20 years.  He has over 40 years of litigation and transactional experience in real estate, consumer fraud, bank fraud, discrimination, civil rights and class action litigation.  He retired as an equity partner and is currently Of Counsel to the firm and in that capacity

maintains an interest in a variety of cases.

Mr. Skalet began his career with the Washington, D.C. firm of Melrod, Redman & Gartlan, where he worked on several American Civil Liberties Union cases, including a case granting women the right to employment with the U.S. Park Service as park police. From 1973 until the formation of M&S, Mr. Skalet practiced with Kass & Skalet, PLLC, and various iterations of the firm, a well-known real estate, litigation, complex business, and consumer protection firm. The firm's practice focused on real estate and litigation, including consumer class actions under the Truth-in-Lending and Equal Credit Opportunity acts. The firm represented many tenant associations who purchased their rental property under the District of Columbia Tenant Opportunity To Purchase Act, and represented many condominium, cooperative and homeowner associations. That firm grew to approximately 23 lawyers in 3 jurisdictions and, when it split up in 1995, was known as Kass, Skalet, Segan, Spevack & Van Grack, PLLC.

In 2001, Mr. Skalet and Cyrus Mehri started M&S, concentrating on complex litigation and class actions. The firm has developed a varied and successful litigation practice in state and federal courts. Since its inception Mr. Skalet has been lead counsel or co-lead counsel in successful class action cases against Dell, Inc., Mercury Marine, Hewlett Packard, Sony, Apple, Ford, Verizon, Mitsubishi, Morgan Stanley, and many other companies.

Mr. Skalet has been an advisor to the Federal Reserve Board on credit and banking matters. He has served on the Montgomery County Advisory Committee reviewing the wholesale simplification of the Montgomery County Code. He also

served on the District of Columbia Bar Committee responsible for drafting form commercial leases and the Montgomery County Board of Realtors committee responsible for drafting residential real estate contracts.

Mr. Skalet has actively participated in Community Associations Institute activities and was Chair of the District of Columbia Legislative Action Committee for many years. In 1999, and again in 2001, he was awarded the Public Advocate Award for his work on District of Columbia legislation.

Mr. Skalet graduated from the University of Pennsylvania School of Law in 1971 and the University of Rochester in 1968.