# EXHIBIT 3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

MALLINCKRODT PLC, *et al.*,

Debtors.[1]

Chapter 11

Case No. 20-12522 (JTD)

(Jointly Administered)

**Re: Docket Nos. 825, 3410, 6660, 7670**

## NOTICE OF STATUS UPDATE REGARDING THE
## PUBLIC SCHOOL DISTRICT CREDITORS' SPECIAL EDUCATION INITIATIVE

The Public School District Creditors[2], by and through undersigned counsel, hereby submit this update to the Court regarding the status of the Public Schools' Special Education Initiative.

1.      On July 23, 2021, the Debtors filed a term sheet in the above-captioned action, pursuant to which the Debtors agreed to amend their joint plan of reorganization to provide for the payment of $5 million to an independent trust called the Public Schools' Special Education Initiative. *See Notice of Filing of Public Schools' Special Education Initiative Term Sheet*, Exhibit A (the "**School District Term Sheet**") [Docket No. 3410-1].

2.      On March 2, 2022, this Court entered an order confirming the Debtors' joint plan of reorganization. *See Findings of Fact, Conclusions of Law, and Order Confirming Fourth*

---

[1] A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt. The Debtors' mailing address is 675 McDonnell Blvd., Hazelwood, Missouri 63042.

[2] The term "Public School District Creditors" has the meaning given in the *Objection of Public School District Creditors to Motion of Debtors for Entry of Order (i) Approving the Disclosure Statement and Form and Manner of Notice of Hearing Thereon, (ii) Establishing Solicitation Procedures, (iii) Approving the Form and Manner of Notice to Attorneys and Solicitation Directive, (iv) Approving the Form of Ballots, (v) Approving Form, Manner, and Scope of Confirmation Notices, (vi) Establishing Certain Deadlines in Connection with Approval of Disclosure Statement, and Confirmation of Plan, and (vii) Granting Related Relief* [Docket No. 2821].

*Amended Joint Plan of Reorganization (with Technical Modifications) of Mallinckrodt plc and its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 6660]; *see also Notice of Entry of Order Confirming the Fourth Amended Joint Plan of Reorganization (with Technical Modifications) of Mallinckrodt PLC and Its Debtor Affiliates under Chapter 11 of the Bankruptcy Code* [Docket No. 6718]. The confirmed plan included a provision for a "Public Schools' Special Education Initiative Contribution" in the amount of $5 million, to be paid to the Public Schools' Special Education Initiative for funding of "educational supports to abate the effects of the opioid crisis." *See Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt Plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 6660-1]. A modified plan of reorganization, filed on June 21, 2022, also made provision for the $5 million contribution to the Public Schools' Special Education Initiative. *See Modified Fourth Amended Joint Plan of Reorganization (With Technical Modifications) of Mallinckrodt Plc and Its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 7670].

3. With the assistance of counsel experienced in the creation of trusts, counsel for the Public School District Creditors have prepared the Public School Districts' Opioid Recovery Trust (the "**School District Trust**"), attached hereto as **Exhibit A**. The School District Trust is designed as a grant-making trust. All of the nation's public school districts will be eligible to apply for grants under the School District Trust.

4. The School District Trust contemplates the appointment of two trustees: an Administrative Trustee and a Special Trustee.

   a. The duties of the Administrative Trustee are set forth at Sections 4.1-5.7 of the School District Trust. The Administrative Trustee will handle traditional trustee responsibilities, such as maintenance of books and records,

preparation of quarterly reports, and filing of tax returns. The Public School District Creditors have selected Truist Bank ("**Truist**") as the Administrative Trustee.

b.    The duties of the Special Trustee are set forth in Sections 3.1-3.13 of the School District Trust. The Special Trustee will have subject matter expertise with respect to grant-making decisions. After an extensive search and interview process, the Public School District Creditors have selected Dr. Andrés Alonso as the Special Trustee. Dr. Alonso has served as a Deputy Chancellor at the New York City Department of Education and as Chief Executive Officer of Baltimore City Public Schools. He has also served as a Trustee and/or Chairman of the Board of such organizations as the Carnegie Foundation for the Advancement of Teaching, the William T. Grant Foundation, and the Panasonic Foundation. His numerous honors include a Lifetime Achievement Award from the Association of Latino Administrators and Superintendents (2014); the White House "Hero of Education" distinction (2010) and "School Superintendent of the Year" from the Fullwood Foundation (2009). His *curriculum vitae* is attached hereto as **Exhibit B**.

5.    The School District Trust expects to establish a committee of school district leaders (the "**Committee of Public School Districts' Representatives**" or the "**PSDR Committee**") as a resource for the Special Trustee. The duties of the PSDR Committee are outlined at Sections 2.1-2.6 of the School District Trust.

3

6.     The Public Schools' Special Education Initiative Contribution will be combined with anticipated recoveries in other opioid-related proceedings, including:

a.  A contribution in the amount of $25.5 million in the reorganization of Purdue Pharma L.P. and affiliated debtors (the "**Purdue Pharma Bankruptcy**"), as set forth under the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, which was confirmed on September 17, 2021 by order of the Hon. Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York.  *See Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, Docket No. 3726, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 2, 2021); *Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan*, Docket No. 3786, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 17, 2021); *Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, Docket No. 3787, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. Sept. 17, 2021).[3]

b.  Payments of up to $3 million, subject to the Bankruptcy Court's approval of the proposed sale of substantially all of the debtors' assets in the Chapter 11 case of Endo International plc and affiliated debtors (the "**Endo Bankruptcy**"), as set forth in the resolution term sheet filed on August 15, 2023.  *See Notice of Filing of*

---

[3] Judge Drain's approval of the reorganization plan was affirmed by the Second Circuit Court of Appeals, *see In re Purdue Pharma L.P.*, 69 F.4th 45 (2d Cir. 2023), but remains subject to review by the U.S. Supreme Court.  *See Harrington v. Purdue Pharma L.P.*, Nos. 23-124, 23A87, 2023 WL 5116031 (Aug. 10, 2023) (directing the parties to brief and argue the question of "[w]hether the Bankruptcy Code authorizes a court to approve, as part of a plan of reorganization under Chapter 11 of the Bankruptcy Code, a release that extinguishes claims held by nondebtors against nondebtor third parties, without the claimants' consent.").

*Voluntary Public School District Creditors Resolution Term Sheet*, Docket No. 2632, *In re Endo Int'l plc*, No. 22-22549 (Bankr. S.D.N.Y. Aug. 15, 2023).

c. An anticipated settlement in the case of *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Consultant Litig.*, 21-md-02996 (N.D. Cal.) (the "**McKinsey MDL**"), a multi-district litigation presided over by U.S. District Court Judge Charles R. Breyer.

7.      Each of the aforementioned anticipated recoveries will be governed by the same (or nearly the same) trust terms and, for efficiency purposes, will be administered by the same Special Trustee and the same Administrative Trustee.

8.      Consistent with the Special Education Initiative Term Sheet filed in the Purdue Pharma Bankruptcy, the Special Trustee will receive an annual salary of $75,000 for his services, regardless of the number of resolutions secured for the Public School District Creditors. *See Notice of Filing of Special Education Initiative Term Sheet*, Docket No. 3120, *In re Purdue Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y. July 7, 2021). Truist's fees as Administrative Trustee are disclosed in the public fee schedule attached as Exhibit D to the School District Trust. *See* School District Trust ¶ 4.7, Exhibit D. Truist has agreed to a 25% reduction of its usual fees for trustee and trust management services. *See id.*

9.      All funds received into the School District Trust shall be commingled, invested and administered as a single fund. For record-keeping purposes, amounts recovered in separate opioid-related proceedings will be tracked separately by the Administrative Trustee. Reasonable expenses will be divided proportionately among the various recoveries.

10.      The Special Trustee expects to initiate the grant-making solicitation process in January of 2024. The solicitation process is expected to include an outreach campaign to inform

public school districts of potential recoveries available from actual or prospective resolutions in opioid-related proceedings (including in the above-captioned proceeding, the Purdue Pharma Bankruptcy, the Endo Bankruptcy, and the McKinsey MDL) and to advance the trust process in an efficient and orderly process.

11.     The Special Trustee will solicit and review funding proposals from public school district applicants and will award grants to a limited number of such applicants with the goal of maximizing the overall impact of the trust funds.  Consistent with that purpose, Dr. Alonso will give priority, for example, to:

a.      Applications for funding from public school districts (or consortia of public school districts) in areas most affected by the opioid crisis;

b.      Applications from underfunded school districts or school districts with low per-pupil spending;

c.      Applications that target services to children under the age of 8, where the potential gains are likely to be the highest;

d.      Applications demonstrating that funds received will be used to leverage matching funds from other sources, thereby increasing their impact;

e.      Applications for funding of programs that will become self-sustaining once the grant money has been spent; and

f.      Applications for projects that are innovative and/or are designed to be replicated elsewhere.

12.     Grants are expected to be used to fund model programing initiatives and direct services to students.  Grants will not be awarded to support research.

Dated:  September 11, 2023         Respectfully submitted,
       Wilmington, Delaware

*/s/ David A. Felice*
David A. Felice (#4090)
**BAILEY & GLASSER, LLP**
2961 Centerville Road, Suite 302
Wilmington, Delaware 19808
Tel: (302) 504-6333

dfelice@baileyglasser.com

Joseph H. Huston, Jr. (#4035)
**STEVENS & LEE, P.C.**
919 North Market Street, Suite 1300
Wilmington, Delaware 19801
Tel: (302) 654-5180
Fax: (302) 654-5181
joseph.huston@stevenslee.com

Eric B. Fisher (*pro hac vice*)
**BINDER & SCHWARTZ LLP**
675 Third Avenue, 26th Floor
New York, New York 10017
Tel: (212) 510-7008
Fax: (212) 510-7299
efisher@binderschwartz.com

Cyrus Mehri (*pro hac vice*)
Joshua Karsh (*pro hac vice*)
**MEHRI & SKALET, PLLC**
2000 K Street NW, Suite 325
Washington, D.C. 20006
Tel: (202) 822-5100
Fax: (202) 822-4997
cmehri@findjustice.com
jkarsh@findjustice.com

Wayne Hogan *(pro hac vice)*
**TERRELL HOGAN YEGELWEL, P.A.**
233 E. Bay Street, Suite 804
Jacksonville, FL 32202
Tel.: (904) 722-2228
hogan@terrellhogan.com

Neil Henrichsen *(pro hac vice)*
Dawn Stewart *(pro hac vice)*
**HENRICHSEN LAW GROUP, PLLC**
1725 I Street NW, Suite 300
Washington, D.C. 20006
Tel.: (202) 423-3649
Fax: (202) 379-9792
nhenrichsen@hslawyers.com
dstewart@hslawyers.com

*Counsel to the Public School District Creditors*

# EXHIBIT A

# PUBLIC SCHOOL DISTRICTS'
## OPIOID RECOVERY TRUST

This PUBLIC SCHOOL DISTRICTS' OPIOID RECOVERY TRUST dated _____, 2023, implements certain terms of the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors*, as it may be further amended ("**Plan No. 1**"), confirmed by an order entered on September 17, 2021 by the United States Bankruptcy Court for the Southern District of New York in bankruptcy proceedings jointly administered under Case No. 19-23649 (the "**Purdue Pharma Bankruptcy**"), and *the Modified Fourth Amended Joint Plan of Reorganization (with Technical Modifications) of Mallinckrodt plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code*, as may be further amended ("**Plan No. 2**"), confirmed by an order entered on March 2, 2022, by the United States Bankruptcy Court for the District of Delaware in bankruptcy proceedings jointly administered under Case No. 20-12522 (the "**Mallinckrodt Bankruptcy**"), as well as other possible recoveries relating to litigation involving McKinsey & Co. *et al.*, Endo Health Solutions, Inc. *et al*., and others, and is entered into by the Settlors, the Administrative Trustee, the Special Trustee, and the initial Districts' Representatives, all of whom are identified on the signature pages hereto. Except as otherwise specifically provided herein, any reference in this agreement to the "Trustee" is to the Administrative Trustee and any other Co-Trustee serving, except for the Special Trustee.

## STATEMENT OF PURPOSE

Certain public school districts, on behalf of public schools nationwide (the "**Public School Districts**"), engaged in separate and multiple litigation matters and settlement negotiations to obtain recovery of past and future costs, including special education costs, associated with educating students harmed as a result of the opioid epidemic. The Public School Districts have been awarded funds in the above-referenced Purdue Pharma and Mallinckrodt Bankruptcies and anticipate further recoveries from existing or future litigation matters and settlement negotiations (together, the "**Opioid Recovery Funds**"). The purpose of this Trust is to effect the global administration of the Opioid Recovery Funds for the benefit of the Public School Districts, with the intention that all funds received shall be commingled, invested and administered as a single fund in order to provide for a more efficient management, oversight, and distribution of such funds. Notwithstanding the foregoing, the Trustee will administer any Opioid Recovery Funds received in the above-referenced Purdue Pharma and Mallinckrodt Bankruptcies, as well as any future recoveries received from any debtor or defendant, as the case may be, as separate and independent shares, with each share being allocated a proportionate share of the gains, losses, expenses and other such items, and in such other manner as is necessary to facilitate compliance with any court accounting or reporting obligations as to as particular share.  All provisions of this agreement are to be construed in accordance with the stated purpose herein.

## RECITALS

**WHEREAS**, the Public School Districts have engaged in, and in some cases continue to engage in, litigation and/or settlement negotiations involving certain manufacturers and distributors of opioids.

1

**WHEREAS**, some or all of these manufacturers and distributors of opioids have or intend to reorganize under Chapter 11 of the Bankruptcy Code.

**WHEREAS**, Purdue Pharma L.P. and its affiliated debtors, on the one hand, and Mallinckrodt PLC and its affiliated debtors, on the other hand, filed for and received court approval for plans of reorganization in the Purdue Pharma and Mallinckrodt Bankruptcies, respectively, to include payments for the benefit of the Public School Districts.

**WHEREAS**, more specifically, Plan No. 1 provides, *inter alia*, for the payment of $25.5 million to a fully independent trust called the "Public Schools' Special Education Initiative Trust." A copy of Plan No. 1, including a term sheet as to the same, is attached hereto as **Exhibit A**.

**WHEREAS**, similarly, Plan No. 2 provides, *inter alia*, for the payment of $5 million to a fully independent trust called the "Public Schools' Special Education Initiative Trust." A copy of Plan No. 2, including a term sheet as to the same, is attached hereto as **Exhibit B**.

**WHEREAS**, the dispositive terms of Plan Nos. 1 and 2 are substantially similar as to the grant process, the structure, the staffing, and the allocation of public school funds with respect to the Public Schools' Special Education Initiative Trusts referenced respectively therein, and they provide, in pertinent part, the following: (i) the trustee of the Public Schools' Special Education Initiative Trust, to be selected by counsel for the Public School Districts (the "**Districts' Representatives**"), will ideally have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure; (ii) the trustee will establish and implement a grant process to provide educational support to qualifying Public School Districts to facilitate abatement; (iii) the trustee will publish the criteria on which awards will be based; and (iv) in making an award or determining whether to approve an application, the trustee will seek to maximize impact and to that end will consider certain factors as more particularly described herein, including, by way of example, targeting services to children under the age of eight (8).

**WHEREAS**, the Public School Districts anticipate the receipt of additional Opioid Recovery Funds, whether from existing or future litigation or settlements, with terms and purposes similar to those set forth in Plan Nos. 1 and 2.

**WHEREAS**, given the substantially similar terms set forth in Plan Nos. 1 and 2 with respect to the Public Schools' Special Education Initiative, the Parties believe it is in the best interests of the Public School Districts, and not inconsistent with the terms and purposes established in Plan Nos. 1 and 2, to administer the Opioid Recovery Funds received therefrom as a single trust, to include funds received from each debtor or defendant, as the case may be, as to any separate litigation matter and/or settlement negotiation, including but not limited to funds received in connection with the Mallinckrodt and Purdue Pharma Bankruptcies and funds received from existing or future litigation or settlements, being held as a separate share as to the whole.

**WHEREAS**, accordingly, the Parties intend that each debtor or defendant, as the case may be, be deemed the "Settlor" with respect to the portion of the Opioid Recovery Funds contributed by such debtor or defendant, and which is administered as a separate share as to the whole.

**WHEREAS**, since the litigation involved herein is subject to multiple jurisdictions, the Parties wish to establish a single trust situs, namely the District of Columbia.

9735108_1

**WHEREAS**, the Districts' Representatives, after consulting with the Public School Districts as provided under the Public Schools' Special Education Initiative Trust in the Purdue Pharma and Mallinckrodt Bankruptcies, have identified an individual, namely Andrés Alonso, Ed.D., with the necessary qualifications to develop and implement a grant process to effectuate the abatement of the harm caused by the opioid epidemic to the Public School Districts.

**WHEREAS**, the Districts' Representatives, after consulting with the Public School Districts and Andrés Alonso, Ed.D., desire to bifurcate the duties of the trustee, specifically as to administration and distribution, so as to provide for an "Administrative Trustee" and a "Special Trustee" as described herein.

**WHEREAS**, the Parties desire to enter into this trust to confirm their agreements with respect to: (i) the creation of a valid trust under the laws of the District of Columbia, and under the laws of any state in which this trust is subsequently administered; (ii) the establishment, maintenance, investment, and disbursement of the Opioid Recovery Funds in accordance with the Public Schools' Special Education Initiative set forth in Plans No. 1 and 2 (the "**Initiative**"); and (iii) certain other matters relating to the foregoing, as hereafter provided.

**NOW, THEREFORE**, in consideration of the promises and mutual covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

# ARTICLE I
# AGREEMENT OF TRUST

**1.1. <u>Creation and Name.</u>** The Settlors hereby create a trust known as the PUBLIC SCHOOL DISTRICTS' OPIOID RECOVERY TRUST (the "**Opioid Recovery Trust**" or the "**Trust**"), for the benefit of the Public School Districts in accordance with the Initiative.

**1.2. <u>Initial Funding</u>.** The Trust will be initially funded with the proceeds received in the Mallinckrodt Bankruptcy in the amount of $5,000,000. The debtor(s) in the Mallinckrodt Bankruptcy shall collectively be deemed the "Settlor" as to the proceeds received therefrom.

**1.3. <u>Additions.</u>** Any person or entity, with the consent of the Trustees, may transfer additional property to this Trust, subject to the terms and conditions set forth herein.

**1.4. <u>Separate Shares.</u>** Each contributing person or entity shall be deemed the "Settlor" as to the portion of the Trust attributable to its contribution, with such portion identified as a separate share of the Trust and given a name that accurately describes the claim and/or settlement involved (*e.g.*, the "MALLINCKRODT SHARE" or the "PURDUE PHARMA SHARE"). Upon any additional contribution to the Trust, the Trustee will redetermine each separate share's *pro rata* share of the whole. For illustrative purposes, upon the initial funding of the Trust with $5 million in accordance with Plan No. 2, the MALLINCKRODT SHARE will, at least until other contributions are made, constitute the entire Trust corpus. If a subsequent contribution of $25.5 million is made in connection with the Purdue Pharma Bankruptcy, then the PURDUE PHARMA SHARE will consist of 83.607% of the Trust, and the MALLINCKRODT SHARE will consist of 16.393% of Trust (assuming, however, that the Trust balance, including accumulated income, is

3

$5 million at the time of contribution). For purposes of calculating the separate shares, the Trustee will round to the nearest thousandth.

**1.5.** <u>**Common Fund**</u>. All property contributed to the Trust, regardless of Settlor, shall be commingled and invested as a single fund, with each separate share created thereby allocated a proportionate share of gains, losses, expenses, and other such items.

**1.6.** <u>**Qualified Settlement Fund.**</u>  The Parties intend for this Trust to qualify as a "qualified settlement fund" ("**QSF**") within the meaning of Treas. Reg. § 1.468B-1 et seq. ("**QSF Regulations**"). Accordingly, the Parties will take such steps as are necessary to satisfy the requirements set forth therein, including, but not limited to, obtaining court approval. No provision in this agreement shall be construed or implemented in a manner that would cause the Opioid Recovery Trust to fail to qualify as a QSF within the meaning of the QSF Regulations.

# ARTICLE II
# <u>PUBLIC SCHOOL DISTRICTS' REPRESENTATIVES</u>

**2.1.** <u>**Districts' Representatives**</u>. As provided hereinabove, the Districts' Representatives are counsel for the Public School Districts, namely _____. Except as specifically provided in this agreement, the function of the Districts' Representatives is and shall be limited to the initial selection of the Administrative Trustee, the Special Trustee, and the PSDR Committee (as defined herein).

**2.2.** <u>**Committee of Public School Districts' Representatives**</u>. The Parties recognize the need for a representative body to protect the interests of the Public School Districts. To that end, the Districts' Representatives and the Special Trustee will identify and appoint an advisory committee—the Committee of Public School Districts' Representatives (the "**PSDR Committee**")—to serve in such capacity.  The PSDR Committee's primary function shall be to counsel, advise, and facilitate communication between the Public School Districts and the Special Trustee, to support the interests of the Public School Districts with regard to the Special Trustee's disbursement of the Opioid Recovery Funds, and to fill the necessary function of acting on behalf of the Public School Districts to ensure the effectiveness of the Special Trustee and the Trustee.

(a) *Composition of Members*. The PSDR Committee shall be comprised of between three and five persons, each of whom shall have experience in education or services for at-risk youth.

(b) *Tenure of Members*.

(i) Each member of the PSDR Committee shall serve a term of three (3) years; provided, however, that the term of each initial member shall be a term of three (3) years, then two (2) years, then one (1) year and so on so that the terms of the initial members are staggered.

(ii) A member of the PSDR Committee may resign at any time by written notice to the other members of the PSDR Committee, the Special Trustee, and the Districts'

9735108_1

Representatives. Such notice shall specify a date when such resignation shall take effect, which shall not be less than 90 days after the date such notice is given, when practicable.

(iii) A member of the PSDR Committee may be removed in the event he or she is unable to discharge his or her duties hereunder by reasons of incapacity, a consistent pattern of neglect and failure to perform or to participate in performing the duties of such member hereunder, or for other good cause. Such removal shall be made at the recommendation of the remaining members of the PSDR Committee with the approval of the Special Trustee and the Districts' Representatives.

(c) *Subsequent Composition*. The Districts' Representatives and the Special Trustee shall select a successor member of the PSDR Committee when a member dies, retires, withdraws, or otherwise ceases to serve as a member; provided, however, that the Districts' Representatives and the Special Trustee may unanimously elect to decrease the required number of members so long as at least three (3) members are serving at all times. If a member ceases to serve prior to the expiration of his or her term for any reason, any successor member appointed in his or her place will serve the balance of such member's term.

**2.3. Majority Vote**. Decisions of the PSDR Committee shall be made by a majority vote of the members. In the event of a deadlock, the Special Trustee will cast the deciding vote.

**2.4. Interaction with Trustees**. Where provided in this agreement, the Trustee and/or Special Trustee shall consult with PSDR Committee and shall provide to PSDR Committee any information reasonably related to the administration of this Trust. The Special Trustee and the PSDR Committee shall meet at least twice annually.

**2.5. Compensation and Reimbursement**. Each member of the PSDR Committee shall be entitled to a $1,000.00 annual honorarium for their service and duties under this Trust; provided, however, each member may decline to accept the honorarium for their service.

**2.6. Procedure for Obtaining Committee Counsel and Advice**. In the event the counsel and advice of the PSDR Committee is required hereunder, the Trustee and/or Special Trustee, as the case may be (the "**Requesting Trustee**"), will provide the PSDR Committee with written notice and with all information regarding the matter in question. The PSDR Committee will consider any request in good faith and will provide its advice and counsel in writing to the Requesting Trustee, no later than 30 days after the receipt of notice and information regarding such request. If no such advice and counsel is provided within 30 days, the PSDR Committee shall be deemed to have no objections to the course of action proposed by the Requesting Trustee. The Trustee and/or Special Trustee should provide the PSDR Committee with advance copies of any reports to be filed with the Court with sufficient time for the PSDR Committee to review such reports and seek clarification from and/or provide recommendations to the Trustee and/or Special Trustee.

# ARTICLE III
## SPECIAL TRUSTEE PROVISIONS

**3.1. <u>Authority of Special Trustee</u>**. The purpose of the Special Trustee is to separate decisions concerning the grant process from the other responsibilities of the Trustee. Accordingly, all powers and discretion with respect to the creation and implementation of the "grant process," which is described herein, including any selection of awards related thereto, shall be exercised exclusively by the Special Trustee. Notwithstanding the foregoing, the Special Trustee may not exercise any power or discretion in favor of or for the benefit of the Special Trustee.

**3.2. <u>Interaction with Administrative Trustee</u>**. The Administrative Trustee shall make distributions related to the grant process, including payments of awards as provided herein, only at the written direction of the Special Trustee. The Administrative Trustee shall be entitled to rely on any such written direction submitted by the Special Trustee and shall have no obligation to inquire as to the sufficiency of the direction or whether the Special Trustee has complied with the Special Trustee's obligations under this agreement.

**3.3. <u>Designation of Special Trustee</u>**. The initial Special Trustee will be Andrés Alonso. If the initial Special Trustee fails or ceases to serve, a successor Special Trustee will be appointed in accordance with the other provisions of this Article.

**3.4. <u>Grant Process</u>**.

(a) The Special Trustee will take such steps as are reasonable and necessary to develop, implement, and manage one or more grant programs to supplement and enhance the educational framework associated with educating students harmed by the opioid epidemic, which in turn will maximize the abatement of harm (the "**<u>Grant Mission</u>**").

(b) The Special Trustee, in his or her discretion, will determine the parameters of any grant programs to effect the Grant Mission—provided the Special Trustee complies with the terms of Plans No. 1 and 2, as well as any applicable court orders related thereto and the terms of any such other litigation matters or settlement negotiations resulting in the addition of funds, as applicable—including, but not limited to the following:

(i) The Special Trustee will design the grant program so as to encourage Public School Districts to apply for funding where it can have the greatest impact, whether for classroom services, school-based behavioral and mental services, instructional innovations, or other school-based supports.

(ii) In developing the eligibility criteria, the Special Trustee will give priority consideration to any one or more of the following:

(A) Public school districts (or consortia of public school districts) in areas hit the hardest by the opioid epidemic;

(B) Poorly funded public school districts or public school districts with low per-pupil spending;

(C) Targeting services to children under the age of eight (8);

(D) Leveraging matching funds from other sources;

(E) Sustainability planning;

(F) Providing direct services to students; and

(G) Innovative programing.

(iii) The Special Trustee will determine the application review process and the timeline for the same, which may include, in the Special Trustee's discretion, enlisting a volunteer group of qualified individuals to manage and review grant applications and to select recipients.

(iv) Notwithstanding any provision herein to the contrary, any grants awarded must comply with the following:

(A) Awards must be used to supplement, not supplant, other source(s) of funding.

(B) Awards must be used to extend and/or expand existing services or provide new services above and beyond what is already provided.

(C) Awards must be granted to maximize impact, based on the merits of the application as determined in accordance with the published guidelines of the grant program. Accordingly, the Special Trustee may provide for grants in various amounts as the Special Trustee determines appropriate, as long as each applicant is treated fairly, equitably and reasonably as to the whole and consistently as provided herein.

(v) The Special Trustee will determine a process by which to ensure grant compliance over the life of the grant.

(vi) The Special Trustee shall have ultimate responsibility for the grant process and grant substantive decisions. The PSDR Committee will have advice and counsel responsibilities, but no consent power, with regard to the grant process and grant substantive decisions, which is the sole responsibility of the Special Trustee; provided, however, that such responsibility and authority of the Special Trustee shall not be outside of parameters and set asides established by any court order.

**3.5.** **Information**. The Special Trustee will provide the Trustee with a quarterly report of receipts, expenditures, and distributions of any Opioid Recovery Funds. Upon the request of the PSDR Committee, the Special Trustee will provide such Committee with any information and/or reports reasonably related to the grant process that are necessary to effect the purposes of this agreement.

9735108_1

**3.6. Compensation; Reimbursement**. The Special Trustee is entitled to fair and reasonable compensation for services rendered. For purposes of this Section, "fair and reasonable compensation" refers to the said trustee's annual payment under the *Public Schools' Special Education Initiative (Purdue)*, filed on July 7, 2021 in the bankruptcy proceedings jointly administered under Case No. 19-23649 in the United States Bankruptcy Court for the Southern District of New York, and any additional reasonable compensation that may be due as result of further contributions to the Trust. In addition to receiving compensation, the Special Trustee may be reimbursed for reasonable costs and expenses incurred in carrying out the Special Trustee's duties under this Trust.

**3.7. Appointment of Additional Special Trustee**. If the Special Trustee is unable or unwilling to serve in this capacity for any reason, the PSDR Committee will appoint an individual as successor Special Trustee. Otherwise, the then-serving Trustee may petition a court of competent jurisdiction to appoint a successor Special Trustee to fill any vacancy. Any Special Trustee so appointed will ideally have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure.

**3.8. Resignation of Special Trustee**. The Special Trustee may resign by giving written notice to the Trustee and the PSDR Committee. The notice of resignation shall specify the resignation's effective date, which date must be at least sixty (60) days after delivery of such notice, or earlier if otherwise agreed to by the Trustee and Special Trustee in writing.

**3.9. Removal of Special Trustee**. The Special Trustee may be removed by any court of competent jurisdiction or upon the conclusion of the operations of the Trust.

**3.10. Operational Costs**. The Parties acknowledge that the Special Trustee may incur various expenses to provide for effective management of the grant process. Accordingly, the Special Trustee will submit a budget proposal, in writing, outlining projected expenses, whether direct or indirect, to the PSDR Committee, which will advise on whether such expenses are recommended as allowable expenses in accordance with Plans No. 1 and 2, and any other bankruptcy plans, court orders or settlement agreements, as applicable.

**3.11. Special Trustee's Employment of Professionals**. The Special Trustee may, but is not required to, retain and/or consult counsel, accountants, auditors, experts, and such other parties as are necessary to carry out the duties of the Special Trustee set forth herein.

**3.12. Limitations on Special Trustee Liability**. Any individual that serves as Special Trustee will not incur any liability by reason of any error of judgment, mistake of law, or action or inaction of any kind in connection with the administration of this Trust, unless the Special Trustee's decision is shown by clear and convincing evidence to have been made in bad faith or with reckless indifference to the purposes of the Trust or the interests of the Public School Districts. Similarly, any individual that serves as Special Trustee will not incur any liability for any action, omission, or forbearance in connection with the administration of this Trust that was made in good faith reliance on information, consent, or directions received from the Trustee, except for cases of willful misconduct or reckless indifference on the Special Trustee's part.

**3.13.** **Indemnification of Special Trustee**. Any individual currently serving as a Special Trustee may expend any portion of the trust assets to defend any claim brought against the Special Trustee in connection with his or her administration of this Trust, including claims related to his or her good faith reliance on any information, consent, or directions received from the Trustee, unless the Special Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts.  Any individual or corporate fiduciary that formerly served as a Special Trustee is entitled to reimbursement from the trust estate for any expenses, including reimbursement for attorney's fees and litigation costs, reasonably incurred to defend any claim brought against the Special Trustee in connection with his or her administration of this Trust, including claims related to the Special Trustee's good faith reliance on any information, consent, or directions received from the Trustee, unless the Special Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts.

# ARTICLE IV
# TRUSTEE PROVISIONS

**4.1.** **Designation of Trustee**. The initial Trustee of this trust is TRUIST BANK. If TRUIST BANK fails or ceases to serve as Trustee, a successor Trustee will be appointed in accordance with the other provisions of this Article IV.

**4.2.** **Appointment of Additional Trustees**.  If there is no successor Trustee appointed or if no appointed successor is able and willing to act as Trustee, the PSDR Committee may appoint a successor Trustee with advice and counsel of the Special Trustee. Otherwise, the then-serving Trustee may petition a court of competent jurisdiction to appoint a successor Trustee to fill any vacancy.

**4.3.** **Rights and Obligations of Successor Trustees.**  Each successor Trustee serving under this instrument will have all the title, rights, powers, and privileges granted to the initial Trustee named under this instrument.  In addition, each successor Trustee will be subject to all of the restrictions imposed upon, as well as to all discretionary and ministerial obligations and duties given to, the initial Trustee named under this instrument.  No successor Trustee shall be liable personally for any act or omission of its predecessor Trustee.  No successor Trustee shall have any duty to investigate the acts or omissions of its predecessor Trustee.

**4.4.** **No Bond.** The Trustee is not required to furnish any bond for the faithful performance of the Trustee's duties unless required by a court of competent jurisdiction, and only if the court finds that such bond is needed to protect the Public School Districts' interests.  No surety will be required on any bond required by any law or court rule, unless the court specifies its necessity.

**4.5.** **Limitations on Trustee Liability**. Any individual or corporate fiduciary that serves as Trustee will not incur any liability by reason of any error of judgment, mistake of law, or action or inaction of any kind in connection with the administration of this Trust, unless the Trustee's decision is shown by clear and convincing evidence to have been made in bad faith or with reckless indifference to the purposes of the Trust or the interests of the Public School Districts. Similarly, any individual or corporate fiduciary that serves as Trustee will not incur any liability for any

action, omission, or forbearance in connection with the administration of this Trust that was made in good faith reliance on information, consent, or directions received from the Special Trustee, except for cases of willful misconduct or reckless indifference on the Trustee's part.

**4.6.** **Indemnification of Trustee**. Any individual or corporate fiduciary currently serving as a Trustee may expend any portion of the trust assets to defend any claim brought against the Trustee in connection with his or her administration of this Trust, including claims related to the Trustee's good faith reliance on any information, consent, or directions received from the Special Trustee, unless the Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts. Any individual or corporate fiduciary that formerly served as a Trustee is entitled to reimbursement from the trust estate for any expenses, including reimbursement for attorney's fees and litigation costs, reasonably incurred to defend any claim brought against the Trustee in connection with his or her administration of this Trust, including claims related to the Trustee's good faith reliance on any information, consent, or directions received from the Special Trustee, unless the Trustee is shown to have acted in bad faith or with reckless indifference to the purposes of this Trust or the interests of the Public School Districts.

**4.7.** **Trustee Compensation; Reimbursement for Expenses.** Any individual serving as Trustee is entitled to fair and reasonable compensation for the services provided as Trustee. On the other hand, a corporate fiduciary serving as Trustee will be compensated in accordance with the corporate fiduciary's current published fee schedule. The current published fee schedule for TRUIST BANK is attached and made part of this Agreement as **Exhibit C**. A Trustee entitled to compensation may charge additional fees for services provided that are beyond the ordinary scope of duties, such as fees for legal services, tax return preparation, and corporate finance or investment banking services. In addition to receiving compensation, a Trustee may be reimbursed for reasonable costs and expenses incurred in carrying out the Trustee's duties under this trust.

**4.8.** **Liability Insurance**. The Trustee may purchase and maintain reasonable amounts and types of insurance on behalf of the Trustee and the Special Trustee against any liability arising from its status as Trustee or Special Trustee, as the case may be, upon request for such insurance. The cost of such liability insurance shall be a common expense of administration under this agreement and shall not be allocated to the expenses of the Special Trustee.

# ARTICLE V
# TRUSTEE POWERS AND ADMINISTRATION

**5.1.** **Trustee Powers**. Except as otherwise specifically provided hereunder, the Trustee may exercise the powers granted by this Trust without prior approval from any court, including those powers set forth under the laws of the District of Columbia or any other jurisdiction whose law applies to this Trust. The Trustee shall exercise the Trustee powers in the manner the Trustee determines to be in the best interests of the Public School Districts. The Trustee must not exercise

9735108_1

any power reasonably inconsistent with the statement of purpose set forth in the preamble and the terms of the Initiative.

**5.2.** <u>**Specific Enumerated Powers**</u>. Without limiting the generality of Section 5.1 above, and except as limited herein or in the Initiative, the Trustee shall have the power to:

(i)  Invest in any type of investment that the Trustee determines is consistent with the investment goals of the Trust, provided that the overall investment portfolio of the trust shall consist primarily of investments in institutional money market funds and/or U.S. Treasury instruments of 3-6 months duration;

(ii)  enter into leasing and financing agreements with third parties to the extent such agreements are reasonable and necessary to effectuate the purposes of the Opioid Recovery Trust;

(iii)  pay liabilities and expenses of the Opioid Recovery Trust;

(iv)  establish such funds, reserves and accounts within the Opioid Recovery Trust estate as are required by applicable law and/or as the Trustee deems useful in carrying out the purposes of the Opioid Recovery Trust, subject to the limitations set forth herein;

(v)  pay reasonable compensation to the Trustee's advisors, agents, consultants, employees and professionals, including legal, financial, accounting, investment, auditing, and forecasting professionals;

(vi)  appoint such officers, hire such employees, and engage such advisors, agents, consultants, and professionals—including legal, financial, accounting, investment, auditing, and forecasting professionals—as the business of the Opioid Recovery  Trust requires and delegate to such persons such powers and authorities as the fiduciary duties of the Trustee permit and as the Trustee, in his or her discretion, deems advisable, convenient or necessary in order to carry out the terms of the Opioid Recovery  Trust;

(vii)  execute and deliver such instruments as the Trustee deems proper in administering the Opioid Recovery Trust;

(viii)  make, pursue (by litigation or otherwise), collect, compromise, settle or otherwise resolve in the name of the Opioid Recovery Trust, any claim, right, action or cause of action included in Opioid Recovery Funds or which may otherwise hereafter accrue in favor of the Opioid Recovery Trust, including, but not limited to, insurance recoveries, before any court of competent jurisdiction;

(ix)  exercise any and all other rights and take any and all other actions as are permitted of the Trustee in accordance with the terms of this agreement and the Initiative.

9735108_1

**5.3. Conflicts**. The Trustee will act in accordance with the terms of this agreement and the Initiative.  In the event that there is a conflict between this agreement and the Initiative, the terms of any court order with respect to  the Initiative will control.

**5.4. QSF**. The Trustee shall be the "*administrator*" of the Opioid Recovery Trust within the meaning of Section 1.468B-2(k)(3) of the Treasury Regulations and shall (i) timely file such income tax and other returns and statements required to be filed in connection with the Opioid Recovery Trust; (ii) timely pay, out of the trust reserve, all taxes required to be paid by the Opioid Recovery Trust; (iii) comply with all applicable reporting and withholding obligations; (iv) satisfy all requirements necessary to qualify and maintain qualification of the Opioid Recovery Trust as a QSF within the meaning of the QSF Regulations; (v) take such acts as are required to comply with the QSF Regulations, consistent with the terms of this agreement and the Trustee's role hereunder; and (vi) take no action that could cause the Opioid Recovery Trust to fail to qualify as a QSF within the meaning of the QSF Regulations.  For the avoidance of doubt, even if permitted by the QSF Regulations, no election shall be filed by or on behalf of the Opioid Recovery Trust for the Opioid Recovery Trust to be treated as a grantor trust for federal income tax purposes.

**5.5. Tax Requirements**. The Trustee shall be responsible for all of the Opioid Recovery Trust's tax matters, including, without limitation, tax audits, claims, defenses and proceedings. The Trustee shall also file (or cause to be filed) any statement, return or disclosure relating to the Opioid Recovery Trust that is required by any governmental unit and shall be responsible for payment, out of the Opioid Recovery Trust assets, of any taxes imposed on the Opioid Recovery Trust or its assets. The Trustee may request an expedited determination under section 505(b) of the Bankruptcy Code for all tax returns filed by or on behalf of the Opioid Recovery Trust for all taxable periods through the dissolution of the Opioid Recovery Trust.

**5.6. Accounting**. Except to the extent required by law, the Trustee is not required to file accountings in any jurisdiction. The Trustee shall provide the Special Trustee and the PSDR Committee with a quarterly trust accounting and any other information reasonably related to the trust administration, including any filings, court reports, and potential contextual or specific information relevant to the effective administration of the Trust.

**5.7. Termination**. Given the nature of the Trust, as well as the anticipation of further recoveries from existing or future litigation matters and settlement negotiations, the term of the Trust is unknown. Accordingly, this Trust will terminate upon the substantial completion of the purposes for which the Trust was established, the determination of which shall be made by the Special Trustee and PSDR Committee; provided, however, that the Trustee may petition a court of competent jurisdiction for consent as to the same or for such direction as may be required.

# ARTICLE VI
# GENERAL PROVISIONS

**6.1. Amendments.**  The Special Trustee, after consultation with the PSDR Committee, may modify or amend this agreement in any way required to ensure that this Trust continues to satisfy the uses and purposes for which this Trust was established, including (i) to alter the administrative and investment powers of the Trustee; (ii) to reflect tax or other legal changes that affect trust administration; (iii) to correct ambiguities, including scrivener errors, that might otherwise

12

require court construction or reformation; and (iv) to comply with the Initiative. Any modification or amendment made pursuant to this Section 6.1 must be done in writing. Notwithstanding the foregoing, any such amendment shall <u>not</u> be valid if, as a result thereof: (i) it materially and adversely impacts the Public School Districts; (ii) the provisions of this Section 6.1 are changed, except to further restrict the amendment powers conferred under this agreement; (iii) it is exercised in favor of the Trustee and/or Special Trustee, for the Trustee's and/or Special Trustee's benefit, or for the benefit of any person to whom the Trustee and/or Special Trustee is related or subordinate within the meaning of Section 672(c) of the Internal Revenue Code; (iv) such change could disqualify the property as a QSF; or (v) such change is inconsistent with the Initiative.

**6.2.** **Severability.** Should any provision in this agreement be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of this agreement.

**6.3.** **Notices**. Any notices or other communications required or permitted hereunder to the Parties hereto shall be in writing and delivered to the addresses or e-mail addresses designated on **Exhibit E**, or to such other addresses or e-mail addresses as may hereafter be furnished in writing to each of the other Parties in compliance with the terms of this agreement. All such notices and communications if mailed shall be effective when physically delivered at the designated addresses or, if electronically transmitted, when the communication is received at the designated addresses and confirmed by the recipient by return transmission.

**6.4.** **Entire Agreement; No Waiver.** The entire agreement of the Parties relating to the subject matter of this agreement is contained herein, and in the documents referred to herein (including Plans No. 1 and 2), and this agreement and such documents supersede any prior oral or written agreements concerning the subject matter hereof. No failure to exercise or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude either a further exercise of such right, power or privilege or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and are not exclusive of any rights under law or in equity.

**6.5.** **Headings.** The headings used in this agreement are inserted for convenience only and do not constitute a portion of this agreement, nor do the headings in any manner affect the construction of the provisions of this agreement.

**6.6.** **Governing Law.** The validity and construction of this agreement and all amendments hereto, and the rights of all Parties hereto and the effect of every provision hereof, shall be governed by, subject to, and construed in accordance with the laws of the District of Columbia, without regard to any conflicts of law provisions thereof that would purport to apply the law of any other jurisdiction.

**6.7.** **Changing Trust Situs.** The Trustee may change the situs of the administration of the trust and remove all or any part of the trust property from one jurisdiction to another. The Trustee may elect, by filing an instrument with the trust records, that the trust will then be construed, regulated, and governed by the new jurisdiction's laws. The Trustee may take action under this Section for any purpose the Trustee considers appropriate.

**6.8. <u>Counterpart Signatures.</u>**   This agreement may be executed in any number of counterparts and by different Parties on separate counterparts (including by PDF transmitted by e-mail), and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute one and the same instrument.



9735108_1

# EXHIBIT A

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut
Christopher S. Robertson

*Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649 (RDD)** |
| **Debtors.[1]** | **(Jointly Administered)** |

## NOTICE OF FILING OF SPECIAL EDUCATION INITIATIVE TERM SHEET

**PLEASE TAKE NOTICE** that on June 3, 2021, the above-captioned debtors and debtors

in possession (collectively, the "**Debtors**") filed the *Fifth Amended Joint Chapter 11 Plan of*

*Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2982] (as modified,

amended or supplemented from time to time, the "**Plan**"). Capitalized terms used but not

otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

PLEASE TAKE FURTHER NOTICE that the Debtors, the proposed representatives of a putative class of independent public school districts (the "**Public School District Creditors**"), the Ad Hoc Committee and the MSGE Group have agreed to amend the Plan to provide for a $25.5 million contribution to the Public Schools' Special Education Initiative on the Effective Date out of the Initial NOAT Distribution, on terms set forth in the term sheet attached as **Exhibit A** hereto (the "**Term Sheet**").

PLEASE TAKE FURTHER NOTICE that copies of the Term Sheet may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that the Confirmation Hearing will be commenced on **August 9, 2021, at 10:00 a.m., prevailing Eastern Time**, before the Honorable Robert D. Drain, in the United States Bankruptcy Court for the Southern District of New York, located at 300 Quarropas Street, White Plains, New York 10601-4140; provided that, pursuant to General Order M-543, dated March 20, 2021 (Morris, C.J.) ("**General Order M-543**"), such Hearing shall be conducted telephonically so long as General Order M-543 is in effect or unless otherwise ordered by the Bankruptcy Court.[2] Please be advised that the Confirmation Hearing may be continued from time to time by the Bankruptcy Court without further notice.

---

[2] A copy of General Order M-543 can be obtained by visiting http://www.nysb.uscourts.gov/news/court-operationsunder-exigent-circumstances-created-covid-19.

Dated:    July 7, 2021
        New York, New York

                        DAVIS POLK & WARDWELL LLP

                        By:   */s/ Eli J. Vonnegut* _____

                        450 Lexington Avenue
                        New York, New York 10017
                        Telephone: (212) 450-4000
                        Facsimile:  (212) 701-5800
                        Marshall S. Huebner
                        Benjamin S. Kaminetzky
                        Timothy Graulich
                        Eli J. Vonnegut
                        Christopher S. Robertson

                        *Counsel to the Debtors*
                        *and Debtors in Possession*

**Exhibit A**

**Term Sheet**

July 7, 2021

## Public Schools' Special Education Initiative (Purdue)

The Purdue proposed plan of reorganization (the "Plan") will be promptly amended to provide for the Debtors' payment of $25.5 million to the Public Schools' Special Education Initiative out of the Initial NOAT Distribution as described below.

**Structure and Staffing**:

A fully independent trust[1] called the Public Schools' Special Education Initiative will be funded by the Debtors. The Debtors will pay the full amount of the $25.5 million on the Effective Date out of the Initial NOAT Distribution. This trust will be administered by a single trustee, selected by counsel for the public schools with input from public school claimants. Ideal candidates for trustee could have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure. Counsel for the public schools is committed to interviewing a diverse slate of candidates and soliciting potential candidates with input from public school claimants, the Debtors and other stakeholders such as the UCC and the NAACP.

**Grant Process:**

The trustee will notify all school districts nationwide of the grant process and will invite proposals for projects to provide abatement through the public schools. The trustee will select grant recipients from among the proposals received. Grant money must be spent on abatement. In all cases, grant applications must demonstrate that funds will:

(a) Supplement, not supplant, other source(s) of funding, and,

(b) Be used to extend and/or expand existing services, or provide new services above and beyond services already provided.

The trustee may choose to enlist input from a volunteer committee of experts to help select grant recipients.

---

[1] Form of Public Schools' Special Education Initiative TBD.

**Allocation of Public
School Funds:**

The trustee will make awards based on published criteria, known to all applicants beforehand. The trustee must direct funding to educational supports. The trustee will also aim to maximize impact (and not attempt a pro rata distribution). Although these factors are not dispositive, the trustee will give priority, in funding educational supports, to:

**(a)**   Applications from school districts (or consortia of districts) in areas hardest hit by the opioid crisis.

**(b)**   Applications from poorly funded school districts or school districts with low per-pupil spending.

**(c)**   Applications that target services to children under the age of 8, where the potential gains are the highest.

**(d)**   Applications that show that funds received will be used to leverage matching funds from other sources, increasing their impact.

**(e)**   Applications that show how programs funded by the grant will become self-sustaining once the grant money has been spent.

**(f)**   Applications for funding for direct services to students. Funding is not for research.

**(g)**   Applications for projects that are innovative or designed to be replicated elsewhere.

Districts will be encouraged to apply for funding where it can have the greatest impact, whether for classroom services, school-based behavioral and mental services, instructional innovations, or other school-based supports.

**Illustrations of Uses:**

Uses that align with abatement goals and the criteria identified above might include:

- Grants for direct services, including to hire special education teachers, behavior specialists, counselors, social workers, reading coaches, occupational, mental health, or physical therapists;

- Grants for multi-disciplinary programs, such as partnerships between schools and medical or social services providers; or

- Grants to develop models, with nationwide applicability, for how to train and develop staff to provide special education or multi-disciplinary services to abate the ravages of the opioid epidemic in schools.

**Allowable Expenses:**

With the primary focus on high impact grants, other distributions of Public School Funds shall be limited to:

(a) Salary and expenses of the trustee, incurred to announce the opportunity to school districts, select grant recipients, and monitor compliance with grant requirements. It is expected that the trustee will receive $75,000/year in salary, plus reasonable expenses for support staff and travel, not to exceed $25,000/year, and reasonable expenses for school notice and outreach not to exceed $25,000/year.

(b) Modest awards to school districts that stepped forward and filed claims in the bankruptcy proceeding or otherwise contributed to making this recovery possible. The amount of these incentive awards will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee.

(c) $500,000 dedicated for out-of-pocket litigation expenses, such as for special bankruptcy counsel and expert fees and expenses.

(d) Putative class counsels' reasonable attorneys' fees and litigation costs will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee. Allocation to the Common Benefit Fund in the amount of 5.0% ($1,250,000) will be deducted from the fee award and paid to the Common Benefit Fund at the time of the fee award.

**Transparency and Records:**

1. The trustee will maintain records of:

   (a) Grant applications received;

   (b) Grants awarded;

   (c) Salary and expenses; and

   (d) Interim and final reports by grantees.

2. The trustee will monitor and enforce compliance with grant requirements, ensuring that funds are used for abatement purposes, and will require all grant recipients to record and file both interim and final reports showing, at a minimum:

   (a) Itemized expenditures of grant funds; and

   (b) Quantitative and qualitative information about the grant's impact.

3. The trustee shall file reports with the bankruptcy court, every six months, disclosing summaries of items 1 and 2 above.

**Eligibility for Other Funding:**

Nothing in the Plan will preclude schools from (i) being eligible to participate in any other aspect of abatement, (ii) receiving funds from the estates of Purdue Pharma L.P. and/or its affiliated Debtors, or (iii) receiving funds from any other sources, including third-party payors.

# EXHIBIT B

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| MALLINCKRODT PLC, *et al.*, | ) Case No. 20-12522 (JTD) |
| | ) |
| Debtors.[1] | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. 2916** |
| | ) |

### NOTICE OF FILING OF PUBLIC SCHOOLS'
### SPECIAL EDUCATION INITIATIVE TERM SHEET

PLEASE TAKE NOTICE that, on June 8, 2021, the above-captioned debtors in possession

(the "***Debtors***") filed the solicitation version of the *Joint Plan of Reorganization of Mallinckrodt*

*plc and its Debtor Affiliates Under Chapter 11 of the Bankruptcy Code* [Docket No. 2916] (as may

be amended, supplemented or modified from time to time, the "***Plan***")[2] with the United States

Bankruptcy Court for the District of Delaware (the "***Court***").

PLEASE TAKE FURTHER NOTICE that the Debtors hereby file the Public Schools'

Special Education Initiative Term Sheet (as may be amended, supplemented or modified from time

to time, the "***Term Sheet***"), attached hereto as **Exhibit A**, pursuant to which the Debtors agree to

amend the Plan in accordance with the Restructuring Support Agreement as set forth in the Term

Sheet.

---

[1]   A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims
      and noticing agent at http://restructuring.primeclerk.com/Mallinckrodt.  The Debtors' mailing address is 675
      McDonnell Blvd., Hazelwood, Missouri 63042.

[2]   Capitalized terms used but not otherwise defined herein shall meanings ascribed to such terms in the Plan.

PLEASE TAKE FURTHER NOTICE that the hearing to consider confirmation of the Plan (the "***Confirmation Hearing***") will commence at **10:00 a.m. (prevailing Eastern Time) on September 21, 2021**, before the Honorable John T. Dorsey, United States Bankruptcy Judge, at the Court, located at 824 Market Street, 5th Floor, Courtroom 5, Wilmington, Delaware 19801.

PLEASE TAKE FURTHER NOTICE that the Confirmation Hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on such parties as the Court may order.

*[Remainder of page intentionally left blank]*

Dated: July 23, 2021

*/s/ Garrett S. Eggen*
**RICHARDS, LAYTON & FINGER, P.A.**
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Garrett S. Eggen (No. 6655)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:     (302) 651-7700
Facsimile:      (302) 651-7701
Email:           collins@rlf.com
                     merchant@rlf.com
                     steele@rlf.com
                     schlauch@rlf.com
                     eggen@rlf.com


- and -


George A. Davis (admitted *pro hac vice*)
George Klidonas (admitted *pro hac vice*)
Andrew Sorkin (admitted *pro hac vice*)
Anupama Yerramalli (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 906-1200
Facsimile:      (212) 751-4864
Email:           george.davis@lw.com
                     george.klidonas@lw.com
                     andrew.sorkin@lw.com
                     anu.yerramalli@lw.com

- and -

Jeffrey E. Bjork (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, California 90071
Telephone:     (213) 485-1234
Facsimile:      (213) 891-8763
Email:           jeff.bjork@lw.com

- and -

Jason B. Gott (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:     (312) 876-7700
Facsimile:      (312) 993-9767
Email:           jason.gott@lw.com

RLF1 25723026v.2

**EXHIBIT A**

July 23, 2021

## **Public Schools' Special Education Initiative (Mallinckrodt)**

The Mallinckrodt proposed plan of reorganization (the "Plan") will be amended to provide for the Debtors' payment of $5 million to the Public Schools' Special Education Initiative as described below.

**Structure
and Staffing**:

                    A fully independent trust called the Public Schools' Special Education Initiative will be funded by the Debtors. The Debtors will pay the full amount of the $5 million on the Effective Date. This trust will be administered by a single trustee, selected by counsel for the public schools with input from public school claimants. Ideal candidates for trustee could have experience in both administration and education or services for at-risk youth, including those with pre-natal substance exposure. Counsel for the public schools is committed to interviewing a diverse slate of candidates and soliciting potential candidates with input from public school claimants, the Debtors and other stakeholders such as the OCC and the NAACP.

**Grant Process:**

                    The trustee will notify all school districts nationwide of the grant process and will invite proposals for projects to provide abatement through the public schools. The trustee will select grant recipients from among the proposals received. Grant money must be spent on abatement. In all cases, grant applications must demonstrate that funds will:

    (a) Supplement, not supplant, other source(s) of funding, and,

    (b) Be used to extend and /or expand existing services, or provide new services above and beyond services already provided.

                    The trustee may choose to enlist input from a volunteer committee of experts to help select grant recipients.

**Allocation of Public
School Funds:**

                    The trustee will make awards based on published criteria, known to all applicants beforehand. The trustee must direct funding to educational supports. The trustee will also aim to maximize impact (and not attempt

1

a pro rata distribution). Although these factors are not dispositive, the trustee will give priority, in funding educational supports, to:

(a)     Applications from school districts (or consortia of districts) in areas hardest hit by the opioid crisis.

(b)     Applications from poorly funded school districts or school districts with low per-pupil spending.

(c)     Applications that target services to children under the age of 8, where the potential gains are the highest.

(d)     Applications that show that funds received will be used to leverage matching funds from other sources, increasing their impact.

(e)     Applications that show how programs funded by the grant will become self-sustaining once the grant money has been spent.

(f)     Applications for funding for direct services to students. Funding is not for research.

(g)     Applications for projects that are innovative or designed to be replicated elsewhere.

Districts will be encouraged to apply for funding where it can have the greatest impact, whether for classroom services, school-based behavioral and mental services, instructional innovations, or other school-based supports.

**Illustrations of Uses:**

Uses that align with abatement goals and the criteria identified above might include:

• Grants for direct services, including to hire special education teachers, behavior specialists, counselors, social workers, reading coaches, occupational, mental health, or physical therapists;

• Grants for multi-disciplinary programs, such as partnerships between schools and medical or social services providers; or

• Grants to develop models, with nationwide applicability, for how to train and develop staff to provide special education or multi-disciplinary services to abate the ravages of the opioid epidemic in schools.

**Allowable Expenses:**

With the primary focus on high impact grants, other distributions of Public School Funds shall be limited to:

(a) Salary and expenses of the trustee, incurred to announce the opportunity to school districts, select grant recipients, and monitor compliance with grant requirements. It is expected that the trustee will receive $75,000/year in salary, plus reasonable expenses for support staff and travel, not to exceed $25,000/year, and reasonable expenses for school notice and outreach not to exceed $25,000/year.

(b) Modest awards to school districts that stepped forward and filed claims in the bankruptcy proceeding or otherwise contributed to making this recovery possible. The amount of these incentive awards will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee.

(c) Putative class counsels' reasonable attorneys' fees and litigation costs will be determined by Ken Feinberg or Layn Phillips and awarded in that amount by the trustee. Allocation to the Common Benefit Fund in the amount of 5.0% ($250,000) will be deducted from the fee award and paid to the Common Benefit Fund at the time of the fee award.

**Transparency and Records:**

1. The trustee will maintain records of:

   (a) Grant applications received;

   (b) Grants awarded;

   (c) Salary and expenses; and

   (d) Interim and final reports by grantees.

2. The trustee will monitor and enforce compliance with grant requirements, ensuring that funds are used for abatement purposes, and will require all grant recipients to record and file both interim and final reports showing, at a minimum:

   (a) Itemized expenditures of grant funds; and

   (b) Quantitative and qualitative information about the grant's impact.

3. The trustee shall file reports with the bankruptcy court, every six months until the closing of the chapter 11 cases, disclosing summaries of items 1 and 2 above.

**Eligibility for Other Funding:**

Nothing in the Plan will preclude the public schools from (i) being eligible to participate in any other aspect of abatement or (ii) receiving funds from any other sources, and for the avoidance of doubt, other sources does not include from the Debtors or Reorganized Debtors.

4

# EXHIBIT C



## Foundations and Endowments Specialty Practice

## INVESTMENT ADVISORY AND ADMINISTRATIVE SERVICES
### SHORT DURATION FIXED INCOME MANAGEMENT
## SCHEDULE OF FEES

The following annual Advisory Fee will apply to services typically provided with regard to a short duration (1-3 years) investment advisory account that holds marketable securities, including, but not limited to, the custody of securities, investment management, account administration, and periodic accounting statements:

**MINIMUM ANNUAL ADVISORY FEE $20,000**
**Fees Based on Market Value of Assets Held*:**

| | |
|---|---|
| First $ 25,000,000 | 0.20% (20 basis points) per year |
| Next $ 25,000,000 | 0.10% (10 basis points) per year |
| Next $ 50,000,000 | 0.08% (  8 basis points) per year |
| Over $100,000,000 | 0.05% (  5 basis points) per year |
| *The above Market Value fees will be discounted 25% | |

The annual Advisory Fee will be charged on a monthly basis and will be calculated based on month-end market value.

**Other Fees**

- Accounts utilizing affiliated or unaffiliated sub-advisors, model portfolio services or investment managers are separately responsible for any such expenses incurred.  Any such compensation paid to such service providers will not reduce compensation payable to Truist under its standard fee schedule or be applied toward Truist's minimum fee.

- Accounts invested in mutual funds, private investment funds, investment partnerships, common trust funds and similar pooled investment vehicles will incur their pro-rata share of expenses paid from the pooled investment vehicle.

- Truist outsources the filing of all securities class action claims to a third party vendor which is compensated with a contingency fee (presently 10%) paid from the awards it obtains for Truist accounts. Truist receives no additional compensation in connection with such securities class action awards, however, the use of a third party vendor to perform these services creates an additional expense for each applicable account which will not reduce compensation earned by Truist under this schedule and or reduce any applicable minimum fee. Current information regarding the amount of the applicable contingency fee paid in connection with securities class action claims can be obtained from your Truist Advisor.

© 2020 Truist Financial Corporation. Truist, the Truist logo and Truist Purple are service marks of Truist Financial Corporation.

PV827 4/2023



Unless Truist services are terminated, the fees listed herein will be charged as of the effective date. Truist will treat continued use of the services described on this schedule as your agreement to and acceptance of this Schedule of Fees.  Truist has the right to renegotiate fee schedules if the structure, size or complexity of the relationship changes substantially from initial estimates.

**This Schedule of Fees may be changed from time to time after advance notice.**

By execution of this Schedule of Fees by the designated authorized person, the obligation to pay such fees and expenses as set forth in this Schedule of Fees is hereby agreed to and accepted.

School Settlement Trust

Authorized Signature: _____   Date:

© 2020 Truist Financial Corporation. Truist, the Truist logo and Truist Purple are service marks of Truist Financial Corporation.                    *PV827 4/2023*



# Disclosures

Truist Bank ("TB") and its affiliates and the directors, officers, employees and agents of Truist Bank and its affiliates (collectively "Truist") are not permitted to give legal or tax advice.  While Truist can assist clients in the areas of estate and financial planning, only an attorney can draft legal documents, provide legal services and give legal advice.  Clients of Truist should consult with their legal and tax advisors prior to entering into any financial transaction or estate plan.  Because it cannot provide legal services or give legal advice, Truist's services or advice relating to "estate planning" are limited to (i) financial planning, multi-generational wealth planning, investment strategy, (ii) management of trust assets, investment management and trust administration, and (iii) working with the client's legal and tax advisors in the implementation of an estate plan.

<u>Sweep Vehicles</u>.  TB may receive compensation in exchange for administrative services that it provides to various money market mutual funds which may be held in your Truist Wealth account. This compensation is paid to TB either directly from the mutual fund or its affiliates or through TB's Clearing Broker, SEI Private Trust Company, and will not reduce compensation TB is entitled to receive from this account under this Schedule of Fees.

Federated Hermes; Dreyfus BNY Mellon; and JPMorgan Chase and/or their respective affiliates have engaged TB to provide shareholder and administrative services to trust and investment agency accounts invested in money market mutual funds offered by these firms, except for managed individual retirement accounts and qualified retirement plan accounts subject to ERISA requirements. The compensation TB will receive from these firms in connection with such services varies by mutual fund and ranges, on an annual basis, from 0.0% to 0.10% of the amount invested.  In the case of custodial, directed trustee and escrow accounts established with and administered by TB, compensation paid to TB in connection with investments in money market mutual funds selected by its clients, administrative and shareholder service fees (including Rule 12b-1 fees) may range, on an annual basis, from 0.00% to 0.35%.  The fees paid by such mutual funds for shareholder and administrative services are more fully described in each mutual funds prospectus and the statement of additional information, copies of which may be obtained from your TB representative.  Such fees are expenses of the mutual funds which reduce shareholder returns by a like amount.

TB receives financial benefits in the form of interest rate spread earnings in connection with all deposits and investments made in any <u>TB deposit account</u>, including cash sweep accounts in which your Trust Wealth Account's cash balances may be deposited. Such earnings are derived from the difference, or "spread", between the interest rate and other costs TB pays on amounts deposited, and the interest income and other benefits TB earns when it makes loans or invests the deposited funds in the ordinary course of its banking business.

<u>Sterling Capital Management Mutual Funds and Investment Advisory Services Provided by Affiliates</u>.  Services and products featured herein may include services and investment products offered by companies affiliated with TB and its corporate parent, Truist Financial Corporation ("TFC"). Examples of affiliated products include Sterling Capital Management, LLC ("Sterling") Sterling Capital Funds and investment advisory, separate account management and sub-advisory services provided by Sterling and Truist Advisory Services, Inc.  Compensation paid to such affiliates for services and products is retained by such affiliates and, except, in the case of managed individual retirement accounts and qualified retirement plan accounts subject to ERISA requirements, is not credited to customer accounts and does not reduce or offset the account level compensation earned by TB for fiduciary, agency, custodial and similar services described in this statement.  As a result, the TFC enterprise, as a whole, receives more compensation when such products and services are selected than would otherwise be received if a non-affiliated service or product was used. When TB offers any service or product to a client, TB uses the same investment process to evaluate both affiliated and non-affiliated services and products. TB expresses no opinion on the use of TFC affiliated services and products when it does not provide investment advice or exercise investment discretion with respect to an account and instead the client selects such services and products in a client-directed account, such as a self-directed IRA, custodial, escrow, directed trustee or similar relationship.  The investment management compensation earned by Sterling in connection with investments in the Sterling Capital Funds ranges, on an annual basis, from 00.08% to 00.85% of the amount invested and is more fully described in each mutual fund's prospectus and the statement of additional information, copies of which may be obtained from your TB representative or at https://sterlingcapital.com/strategies/mutual-funds.  Fees paid to Sterling are expenses of the mutual funds which reduce shareholder returns by a like amount.

<u>Notice Regarding Fiduciary Relationships</u>.  TB and its affiliates do not accept fiduciary responsibility for all banking and investment account types offered. Please consult with your TB representative to determine whether TB and its affiliates have agreed to accept fiduciary responsibility for your account(s) and you have completed the documentation necessary to establish a fiduciary relationship with TB or an affiliate. Additional information regarding account types and important disclosures may be found at www.TB.com/investmentinfo.

Accounts utilizing affiliated or unaffiliated sub-advisors, model portfolio services or investment managers are separately responsible for any such expenses incurred. Any such compensation paid to unaffiliated service providers will not reduce compensation payable to TB under its standard fee schedule or be applied to reduce TB's minimum fee.

**Truist Weal**th. Truist Wealth is a marketing name used by TB, Truist Delaware Trust Company, Truist Investment Services, Inc. and Truist Advisory Services, Inc. which are each affiliates of TFC. Banking and trust products and services, including investment management products and services, are provided by TB and Truist Delaware Trust Company. Investment advisory services are offered by Truist Advisory Services, Inc., an investment adviser registered with the U.S. Securities and Exchange Commission (SEC). Securities and insurance (including annuities) are offered by Truist Investment Services, Inc., a SEC registered broker-dealer, member FINRA, SIPC, and a licensed insurance agency.

**Trust, Investment Agency, Directed Trust, Custodial, Escrow Accounts offered by Truist Bank and Investment Advisory Brokerage, Insurance and Mutual Fund Products offered by TB's Affiliates:**

**• Are not FDIC or any other Government Agency Insured • Are not Bank Guaranteed • May Lose Value**

© 2020 Truist Financial Corporation. Truist, the Truist logo and Truist Purple are service marks of Truist Financial Corporation.

*PV827 4/2023*

# EXHIBIT B

# Andrés Antonio Alonso

110 Oak Street 1                                              201-912-0460 (cell)
Weehawken, NJ 07086                                 andresaalonso@outlook.com

### Education

**2006**          **Doctor of Education**
                  Harvard Graduate School of Education

**1999**          **Master of Education**
                  Harvard Graduate School of
                  Education
                  Urban Superintendents Program

**1982**          **Juris Doctor**
                  Harvard Law School

**1979**          **Bachelor of Arts**
                  Columbia College of Columbia University
                  Magna cum Laude, Phi Beta Kappa and Jose Marti Prize
                  Majored in History and English

### Experience

**2014 – Present**     **CEO**
                       Andres A Alonso LLC

- Serves as strategic advisor on education issues to state and district leaders and leadership teams and as trustee to education focused foundations and organizations.
- Chair, Driving Change, Certificate of Advanced Education Leadership (CAEL), an online course on driving change for a community of world educators, as part of "Leaders of Learning" portfolio at Harvard Graduate School of Education.

**2018 – 2019**     **Visiting Professor of Practice**
                    Harvard Graduate School of Education (HGSE)

- Co-Chair, Public Education Leadership Project (PELP), a partnership with Harvard Business School serving the country's largest districts.

1

- Chair, Driving Change, Certificate of Advanced Education Leadership (CAEL), an online course on driving change for a community of world educators, as part of "Leaders of Learning" online course portfolio.
- Partnered with HGSE Programs for Professional Education (PPE) in start-up of case writing program.
- Co-designed Harvard Business School Social Enterprise professional learning course for public school district boards in parnership with Council of Great City Schools.

2013-2018      **Professor of Practice**
Harvard Graduate School of Education

- Served on steering committees of the Education Doctorate Leadership Degree (EDLD) program and the Program for Professional Education.
- Co-chaired Public Education Leadership Project (PELP).
- Chaired Superintendents and Central Leaders Leadership Institute.
- Designed and chaired Driving Change course for "Leaders of Learning," Certificate of Advanced Education Leadership (CAEL).
- Taught on education reform, instructional leadership, driving change and the politics of organizations in urban systems and schools.
- Co-chaired Leadership Diversity Project for USDOE (along with Kaya Henderson).
- Served on Boston School Committee task force to examine supports for English Language Learners.
- Consulted on systemic reform with government and foundation partners in the US and Latin America, and on disproportionality in school discipline in a desegregation case.

2007-2013      **Chief Executive Officer**
Baltimore City Public Schools (City Schools)

- Implemented a comprehensive program of reform for City Schools, a district of roughly 200 schools and 85,000 students.
- Led progress across all categories of outcomes in state tests, graduation and college readiness data, and measures of climate during six-year tenure after entering as 7th superintendent in 10 years.
- Oversaw supports that reduced the number of dropouts by 56 percent between 2008 and 2012, most significantly among African American males.
- Expanded choice within district schools and the number of charters, increased early childhood and alternative options,

2

while closing under- enrolled and low performing schools and expanding desired schools and programs while focusing on community partnerships, collaboration across all schools, and increased student supports, helping reverse four- decade trend in declining enrollment with five consecutive years of enrollment growth.

- Mobilized communities in support of facilities master plan that addressed over-capacity in the district through closing of 26 buildings, and led to historic legislation and funding in support of the 21st Century Buildings Plan, a project for building new schools and renovating over fifty buildings in Baltimore City in partnership with city and state, after decades of efforts to find resources to build new schools or fix the district's crumbling buildings.

- Managed $1.3B budget that over time accumulated $100M fund balance, after inheriting a district that had needed a $53M city bailout in 2005.

- Negotiated progressive labor agreements that introduced career ladders, built collaborative structures, and tied evaluation to pathways and compensation for six different bargaining units.

- Served as national model for progressive discipline approaches that introduced restorative practices in schools, in partnership with the Health Department and community partners which led to record declines in out of school suspensions and truancy.

- Settled a 26-year consent agreement in the *Vaughn G.* special education lawsuit in recognition of systemic progress in serving students with disabilities and their families.

- Systemic reform efforts memorialized in three Harvard Business School cases ("Bounded Autonomy: Implementing Fair Student Funding in Baltimore City Public Schools," "Career Pathways, Performance Pay and Peer Review Promotion in Baltimore City Public Schools" and "Organizing for Family and Community Engagement in the Baltimore City Public Schools") and in two books (Achieving Coherence in District Improvement, HEP, 2015, and Improving Education Together: A Guide to Labor-Management-Community Collaboration, HEP, 2017).

**2006- 2007**     **Deputy Chancellor**
Teaching and Learning
New York City Department of Education

- Assisted the Chancellor in the development and implementation of policies, practices and procedures to support increased student achievement and improved school performance.

3

- Supervised ten regional superintendents and 94 local instructional superintendents leading 1,100 schools, as well as District 75 (district for self-contained, low incidence SWD) and District 79 (district for alternative programs and students).
- Identified and responded to all systemic issues concerning the provision of services related to Teaching and Learning, including curriculum and instruction; bilingual education, special education, gifted and talented, and early childhood programs.
- Oversaw offices of grants and compliance, secondary education, parent engagement and instructional technology.
- Interacted on behalf of the Chancellor with city and government agencies, the Education Policy Panel and community education councils, community organizations, private foundations and corporations.

**2003-2006**    **Chief of Staff**
Teaching and Learning
New York City Department of Education

- Assisted Chancellor and Deputy Chancellor in identification and response to all systematic issues concerning the provision of services related to Teaching and Learning.
- Oversaw implementation of Teaching and Learning elements of first phase of Children First reforms, including development and implementation of ELL and Special Education plans, operational support for core curriculum in English Language Arts and mathematics, and structural reorganization of system to an integrated K-12 regional structure.
- Coordinated work of the Office of Teaching and Learning with that of other deputy chancellors to improve effective support for regions and schools.
- Managed central office division consisting of 389 employees, with a budget of nearly $200 million.
- Supervised Teaching and Learning efforts in support of nearly 500 schools identified as needing improvement under NCLB Efforts.

**2001-2002**    **Advanced Doctoral Candidate**
Harvard University Graduate School of Education

- Researched, proposed, and collected data for dissertations study exploring superintendent influence on instructional guidance in an urban context of standards-based reform and high stakes accountability.

4

**1999-2000**        **Executive Intern to the Superintendent**
Springfield, Massachusetts Public Schools

- Spearheaded process for school improvement that involved reorganizing central office and principals.
- Helped lead a committee of central office administrators and principals that examined the professional development practices of the district.

**1999**        **Fellow**
Harvard Graduate School of Education

- Completed full year practiced-based academic program concentrating on the urban superintendency and requiring ongoing projects in neighboring urban schools.

**1994- 1998**        **Teacher, English as a Second Language, and Coordinator, Bilingual/ESL Needs Assessment**
Peshine Avenue School
Newark, New Jersey Public Schools

- Coordinated Bilingual/English as a Second Language program and taught English as a Second Language in K-8 elementary school.
- Chaired district committee that wrote English as a Second Language Curriculum Guide.

**1987- 1994**        **Teacher, English as a Second Language, and Coordinator, Bilingual/ESL Needs Assessment Coordinator**
Samuel L. Berliner School
Newark, New Jersey Public Schools

- Coordinated Bilingual/English as a Second Language program and taught English as a Second Language in center school for 11-14-year-old students classified as emotionally disturbed.
- Drafted district Bilingual Special Education Guide, conducted professional development workshops and mentored district bilingual teachers.

5

**1985- 1986**          Traveled throughout United States, Europe, and Israel


**1982-1984**          **Attorney**
                       Hughes, Hubbard, and Reed
                       New York, New York

- Practiced corporate litigation involving antitrust, administrative, first amendment, and securities and contract law.
- Conducted pro bono litigation on behalf of indigent claimants in New York administrative law system.


### Selected Honors and Awards

- "Lifetime Achievement Award" – Association of Latino Administrators and Superintendents (2014).
- **"**Influential Marylander" Award – *The Daily Record.* (2009, 2010, 2012).
- "Distinguished Alumni Achievement Award" – Harvard Graduate School of Education Association of Students of Color (2012).
- "Medal for Distinguished Service" – Teachers College of Columbia University (2011).
- "Hero of Education" distinction, White House  (2010)
- "School Superintendent of the Year" – The Fullwood Foundation (2009)
- "Hispanic Hero Award" – U.S. Hispanic Youth Entrepreneur  Education. (2009)
- "Howard Pete Rawlings Courage in Public Service Award" – The Greater   Baltimore Committee (2009).
- "Audacious Individual" Award – Open Society Institute of Baltimore (2008).
- "Innovator of the Year" - *The Daily Record* (2008)*.*
- "Best New Public Servant" – *The City Paper* (2008)*.*

### Publications

- Alonso, A.A. (2016). "Pandering in a Context of Limited Choices and Costs." In Meira Levinson and Jacob Fay (Eds.), <u>Dilemmas of Educational Ethics: Cases and Commentaries</u>.  Cambridge, MA: Harvard Education Press.

6

- Alonso, A. A. (2018). "PLIE: Improving the Capacity of School Leaders in Argentina (PEL-89)." Boston, MA: Harvard Business School Publishing.

- Moore, M.H. and Alonso, A.A. (2017). "Creating Public Value: Superintendents as Strategic Managers of Public Schools (PEL-081)." Boston, MA: Harvard Business School Publishing.

- Moore, M.H. and Alonso, A.A. (2017). "Superintendents of Public Schools as Sector Level Leaders (PEL-082)." Boston, MA: Harvard Business School Publishing.

**Boards and Service**

- Trustee, Center for Collaborative Education.
- Trustee and Strategic Committee chair, Data Quality Campaign.
- Trustee, Grow Your Own Foundation (GYO).
- Trustee, Panasonic Foundation.
- Trustee, Scholastic Corporation.
- Trustee, board treasurer and Audit and Budget Committee chair, William T. Grant Foundation.
- Member of Teacher's College President Advisory Council.
- Past member of Annenberg Foundation Advisory Board.
- Past chair and trustee, Carnegie Foundation for the Advancement of Learning.
- Past trustee, Future Ready Columbus.
- Past trustee and chair of Reporting and Dissemination Committee, National Assessment  Governing Board.
- Past trustee, National Center for Effectiveness in Education and the Economy (NCEE).
- Past trustee, Teachers College of Columbia University.
- Past trustee of University of Chicago's UEI Chicago Impact.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on September 11, 2023, I electronically filed the *Notice of Status Update Regarding the Public School District Creditors' Special Education Initiative* was filed with the Clerk of the Court using the CM/ECF system, which then sent notification of filing to counsel of record.

/s/ David A. Felice
David A. Felice (#4090)