IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>_____/<br><br>This Order Relates To:<br><br>ALL ACTIONS<br><br>_____ | MDL No. 3084 CRB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MCKINSEY'S MOTION TO DISMISS THE NAS PLAINTIFFS' AMENDED COMPLAINT** |

Before the Court is McKinsey's motion to dismiss (dkt. 615) the NAS Plaintiffs' Amended Complaint. For the reasons that follow, the motion is granted in part and denied in part. The Court dismisses all the fraud-based and nuisance-based claims, as well as the conspiracy claims brought by the Julieann Valdez on behalf of M.V., the Nevada NAS Plaintiff. Finally, all claims asserted by Plaintiff Sarah Riley on behalf of E.A.B. are dismissed without prejudice, as Riley lacks standing to sue on behalf of E.A.B., who has reached the age of majority.

The remaining claims will proceed to discovery.

# I.     BACKGROUND

## A.     Procedural History

On June 7, 2021, the Judicial Panel on Multidistrict Litigation created this Multidistrict Litigation. In re McKinsey & Co., Inc., Natl. Prescription Opiate Consultant Litig., 543 F. Supp. 3d 1377 (J.P.M.L. 2021). Most of the subgroups of plaintiffs that had sued McKinsey—including the political subdivisions, the school districts, the Native American tribes, and the third-party payor entities—have settled, or are near settling, their

claims.  The NAS Plaintiffs continue to litigate.

On July 23, 2023, this Court granted McKinsey's motion to dismiss the NAS Plaintiffs' original complaint.  See Order Granting Defendant's Motion to Dismiss ("Order") (dkt. 573).  The Court held that the NAS Plaintiffs had failed to plead that McKinsey owed them any direct legal duties, which necessitated the dismissal of the Plaintiffs' negligence-based claims; that the NAS Plaintiffs had failed to plead reliance on any of McKinsey's misrepresentations, which necessitated the dismissal of their fraud-based claims; and that they had failed to plead a special injury sufficient to support a claim based on a public nuisance theory.  See id.  Subsequently, the NAS Plaintiffs filed an Amended Complaint (dkt. 582).

The legal theory underlying the Amended Complaint is fundamentally different than the one asserted in the original complaint.  Whereas the original complaint was mainly premised on theories of direct liability, the amended complaint foregrounds concerted-action theories premised on conspiracy and aiding-and-abetting liability.  The basic idea is that, although McKinsey may not itself have owed the NAS Plaintiffs a legal duty, its opioid manufacturer clients did, and McKinsey is liable for working with those clients to intentionally breach those duties.

### B.    The NAS Plaintiffs

The NAS Plaintiffs are children born with birth defects, cognitive deficits, developmental delays, or other symptoms associated with Neonatal Abstinence Syndrome ("NAS").  Am. Compl. ¶¶ 1–2.  There are eleven NAS Plaintiffs named in the Amended Complaint, each of whom sues through a parent or legal guardian.

Each of the NAS Plaintiffs' birth mothers took opioids while pregnant.  See id. ¶¶ 153–218.  Two of the mothers took medication-assisted treatment opioids during pregnancy to manage existing opioid dependencies that had begun with the prescription of opioids by doctors.  A few of the mothers were prescribed opioids during or immediately before pregnancy to manage pain associated with things like root canals and broken bones.  Most of the mothers were long-term users of opioids that were prescribed by their doctors.

United States District Court
Northern District of California

2

Most allege that they did not suffer from opioid addiction; rather, they simply continued to take prescribed opioids to manage pain during their pregnancies, having received no instructions to the contrary from their doctors.  See id.  ¶¶ 123–24, 153–218.  Two of the mothers also obtained opioids from illegal diversionary markets at some point prior to their pregnancies.  Id. ¶¶ 194, 213.  The NAS Plaintiffs were born across eight states: California, Colorado, Kentucky, Oklahoma, Nevada, Tennessee, West Virginia, and Utah.  The NAS Plaintiffs allege that at least one of each of their mothers' physicians, including many of their OB/GYNs, were on a McKinsey "target list."  Id. ¶¶ 154, 161, 168, 175, 181, 187, 194, 197, 202, 206, 214–15.

When a woman takes opioids during her pregnancy, the drugs pass through the placenta and can adversely affect the fetus.  Id. ¶ 132.  NAS, also called neonatal opioid withdrawal syndrome or "NOWS," is a group of conditions observed in infants who withdraw from certain drugs, most commonly opioids, that they are exposed to in the womb.  Id. ¶ 134.  Newborns exposed to opioids in utero often exhibit symptoms such as tremors, seizures, overactive reflexes, and tight muscle tone.  Id. ¶ 135.  Such infants may also cry excessively and have trouble feeding, leading to slow weight gain.  Id.  They develop breathing and sleeping problems, among other symptoms.  Id.  And children with NAS are likely to experience issues that persist into adolescence and adulthood, including developmental delays, motor problems, behavior and learning problems, emotional disorders, speech and language problems, sleeping issues, ear infections, and vision problems.  Id. ¶ 136.

Babies exposed to opioids in utero may also develop congenital malformations including gastroschisis, Arnold Chiari Brain Malformation, and spina bifida.  Id. ¶¶ 132, 140, 146.  In addition to NAS, several of the NAS Plaintiffs were born with one or more of these congenital malformations that are allegedly associated with in utero opioid use.

### C.    McKinsey

McKinsey was engaged by opioid manufacturers including Purdue, Endo, Mallinckrodt, and Johnson & Johnson to help increase the sale of their opioid drugs.  Part

United States District Court
Northern District of California

of Plaintiffs' theory is that McKinsey's work for clients across the opioid industry gave it a unique vantage point on the opioid market.  Plaintiffs allege that this market-spanning position made McKinsey's services especially useful to manufacturers looking to boost sales, for it gave McKinsey knowledge of the market for opioids—and the consequences of exploiting that market—that no single manufacturer possessed.  Id. ¶¶ 219–234. McKinsey could, for example, allegedly use its information about which doctors were writing the most prescriptions for a competitor opioid to devise prescriber "targeting" efforts for the manufacturer of another opioid.  See id. ¶¶ 232–33.  Or it could exploit insider knowledge about the shortcomings of one product to identify market opportunities for another.  Thus, although McKinsey advised Purdue's sales representatives to emphasize that OxyContin lasted twelve hours, it allegedly knew that the effects lasted only about eight hours.  See id. ¶¶ 84–85.  This presented a growth opportunity for other manufacturers, whom McKinsey could then advise to market their opioids as solutions for possible "breakthrough pain" experienced by OxyContin users who were finding that the drug did not really last as long as advertised.  See id.  Plaintiffs also allege that McKinsey orchestrated the preparation of misleading submissions to the FDA, both in connection with applications for approval of new drugs and ongoing pharmacovigilance disclosures regarding existing ones.  See id. ¶¶ 221, 244–56.  McKinsey allegedly advised its clients on strategies designed to increase the size of the entire opioid market, not just a given drug's share of it.  For example, based on a plan designed by McKinsey, Purdue "incentivized its sales staff 'to increase not just sales of OxyContin but also generic versions of extended release oxycodone.'"  Id. ¶ 428.

Although it is not the only client engagement described in the complaint, McKinsey's work on OxyContin with Purdue is central to Plaintiffs' allegations, and the allegations concerning Purdue are generally representative of the allegations concerning McKinsey's work with its other manufacturer-clients.  Purdue launched OxyContin in 1996, and it marketed the drug as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications.  Id. ¶ 45.  In

2007, Purdue pleaded guilty to fraudulently marketing and promoting OxyContin. Id. ¶ 45. In doing so, Purdue entered into a "Corporate Integrity Agreement" with the U.S. Department of Health and Human Services that required Purdue to implement written policies on its compliance with various federal regulations governing the sale and marketing of regulated products, compensation for persons engaged in the promoting and selling of Purdue's products, and information provided to healthcare providers. Id. ¶ 48.

The Corporate Integrity Agreement imposed constraints on the sales and marketing of Purdue's products. In response, Purdue asked McKinsey (with whom it had already been working in some capacity) to develop a strategy to boost OxyContin sales despite those regulatory constraints. See id. ¶¶ 287–313. McKinsey advised Purdue on how to approach regulators, identified granular sales opportunities for OxyContin, and helped Purdue target high-prescribing doctors through what it called "Project Turbocharge." "From as early as June 2009 and continuing at least through July 14, 2014, Purdue routinely relied upon McKinsey to orchestrate its sales and marketing strategy for OxyContin." Id. ¶ 301. McKinsey had a "real presence" at Purdue, where teams of analysts "camp[ed] out" in Purdue headquarters, assisting with both the "creation" and the "implementation" of the OxyContin sales strategy. Id. On its own terms, McKinsey's strategy was a success: OxyContin revenues increased threefold under its guidance, with sales peaking in 2013, the year Project Turbocharge was adopted. Id. ¶ 308. "A July 2014 analysis found that of the 200 prescribers who most increased prescriptions, 190 were targeted under" Project Turbocharge. Id. ¶ 309.

The Amended Complaint characterizes McKinsey's work with Purdue as a knowing, intentional effort to increase sales of OxyContin through unlawful means. For example, Plaintiffs tell a detailed story about McKinsey's efforts to help Purdue recapture sales that were lost when Purdue introduced a new Abuse-Deterrent Formulation of OxyContin called ADF OxyContin, and regulators began to impose tighter access restrictions on the drug. See id. ¶¶ 56–69. Both McKinsey and Purdue understood that the lost sales had been going largely to illegitimate users of OxyContin. McKinsey helped

United States District Court
Northern District of California

1  Purdue recapture these users.  McKinsey did so, according to the Amended Complaint, by

2  advising Purdue to focus its sales efforts on the highest-volume prescribers and by

3  suggesting ways to circumvent access restrictions.  And McKinsey helped Purdue to

4  implement these strategies by compiling lists of high-volume prescribers for sales targeting

5  and crafting messaging for salespersons.  See id. ¶¶ 56–69, 100–106, 119; see also dkts.

6  649-2, 649-3.

7        Plaintiffs also allege that McKinsey and its clients worked to lie about the benefits

8  and risks of opioid use.  In one example, Plaintiffs describe McKinsey advising Purdue's

9  sales representatives to emphasize that OxyContin lasted twelve hours, when in fact it was

10  "an open secret" that ADF OxyContin only lasted eight—and McKinsey itself was

11  advising its other opioid manufacturer clients to market their own drugs as possible

12  solutions to the resulting "breakthrough pain" experienced by OxyContin users.  See Am.

13  Compl. ¶¶ 84–85.  The Amended Complaint also alleges that McKinsey played a key role

14  in procuring "rigged" research studies from contract research organizations to support its

15  clients' claims about the benefits of OxyContin (and other opioids), including claims that

16  McKinsey improperly "ghost-wrote" certain studies.  E.g., id. ¶ 221.

17        In 2020, Purdue again pleaded guilty to improper marketing of OxyContin and

18  other opioids between 2010 and 2018—more or less the period during which it had

19  engaged McKinsey.  See id. ¶¶ 314–23.  Specifically, Purdue pleaded guilty to a dual-

20  object conspiracy to defraud the United States and to violate the Food, Drug, and Cosmetic

21  Act, 21 U.S.C. §§ 331, 353, violating anti-kickback laws, and using aggressive marketing

22  tactics to convince doctors to unnecessarily prescribe opioids.  The plea agreement does

23  not expressly name McKinsey but refers to it as the "consulting company," and it generally

24  describes that company as the architect of a strategy to boost sales by targeting "extreme

25  high volume" OxyContin prescribers, a strategy that was "overseen by the consulting

26  company and some of Purdue's top executives."  Id. ¶¶ 321–22.

27        As noted, McKinsey worked with a variety of other opioid manufacturers, and these

28  engagements, too, feature in the Amended Complaint.  Plaintiffs allege that McKinsey

6

undertook an effort to "turbocharge" sales of Nucynta, a drug manufactured by Johnson & Johnson, in the years immediately before its work with Purdue.  See id. ¶¶ 269–77.  They allege that McKinsey encouraged Janssen to target abuse- and diversion-prone patients for prescription of Duragesic beginning around 2002.  See id. ¶¶ 40–44.  And Plaintiffs allege that McKinsey performed similar work for Endo, including advising it to target sales at hospitals in regions that the CDC had identified as having been worst hit by the crisis.  See id. ¶¶ 358–90.

### D.   Causes of Action

The Amended Complaint asserts ten claims against McKinsey: four aiding-and-abetting claims, four civil conspiracy claims, one California statutory public nuisance claim, and one claim for medical monitoring under West Virginia law.  All but the last two claims, which are state-specific, are brought on behalf of every plaintiff.  Each aiding-and-abetting and conspiracy claim is based on one of four underlying torts allegedly committed by McKinsey's manufacturer clients: negligence per se, public nuisance, products-liability failure to warn, and fraud/misrepresentation.  Plaintiffs bring claims under the laws of California, Nevada, Utah, Colorado, Tennessee, Kentucky, Oklahoma, and West Virginia.

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  Id.

While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  Twombly, 550 U.S. at 555, 570.  In deciding whether the plaintiff has stated a claim upon which relief can

United States District Court
Northern District of California

be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  See Usher v. City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  In re Gilead Scis. Sec. Litig., 536 F.3d 1049, 1055 (9th Cir. 2008).

## III.    DISCUSSION

The Court begins by discussing McKinsey's First Amendment defense.  The Court then turns to the conspiracy claims, followed by the aiding-and-abetting claims and the two state-specific claims.  Finally, the Court addresses McKinsey's cross-cutting arguments about causation.

### A.    First Amendment

"The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits."  Snyder v. Phelps, 562 U.S. 443, 451 (2011).  McKinsey argues that it is a complete defense to this suit.  The allegedly wrongful conduct, McKinsey says, is protected speech: the claims are based on McKinsey's advice to its clients and the information it produced for them.

Here, though, McKinsey essentially concedes that it cannot invoke the First Amendment as a defense to the conspiracy and aiding-and-abetting claims asserted in the Amended Complaint.  McKinsey acknowledges that the First Amendment does not bar this suit "if Plaintiffs plausibly allege McKinsey knew and intended that its advice would lead its clients to commit illegal acts."  Mot. at 38.  This is precisely Plaintiffs' theory, even though McKinsey may disagree that Plaintiffs have succeeded in alleging as much. Indeed, that McKinsey knew and intended its advice to aid its clients' tortious acts is what Plaintiffs must allege to get their concerted-action theories of liability off the ground.  Both civil aiding-and-abetting liability and civil conspiracy liability require knowledge and intent—and not mere knowledge and intent to do something lawful that turns out to have bad consequences (as McKinsey characterizes the allegations) but knowledge and intent to further an unlawful end or use unlawful means to achieve some goal.  See Parts III(B) and

III(C) infra.  It is well established that the mere fact "[t]hat the 'aiding and abetting' of an illegal act may be carried out through speech is no bar to its illegality."  Nat'l Org. for Women v. Operation Rescue, 37 F.3d 646, 656 (D.C. Cir. 1994) (citing United States v. Barnett, 667 F.2d 835, 842 (9th Cir. 1982)); see also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 495 (1949) ("That states have constitutional power to prohibit competing dealers and their aiders and abettors from combining to restrain freedom of trade is beyond question.").  The same is true of conspiracy liability.  See, e.g., United States v. Sattar, 395 F. Supp. 2d 79, 101 (S.D.N.Y. 2005), aff'd sub nom. United States v. Stewart, 590 F.3d 93 (2d Cir. 2009) ("The First Amendment lends no protection to participation in a conspiracy, even if such participation is through speech.") (citing United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999)).

To be sure, there are situations in which civil or criminal concerted action liability could have serious First Amendment implications.  Such situations are especially likely to arise where concerted action theories are used to target defendants for their political associations, the content of their speech, or other core First Amendment-protected activity carried out in groups.  See, e.g, N. A. A. C. P. v. Claiborne Hardware Co., 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected"); Citizens United v. Federal Election Comm'n, 558 U.S. 310, 349 (2010) ("If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech[.]").  But this is not one of those situations.  Plaintiffs do not seek to hold McKinsey liable for the ideas it expressed in its slide decks or the content of its conversation with its clients.  The object of the alleged conspiracy—misleading the public and regulators about the risks of opioid use and increasing abuse and diversion of the drugs in order to increase the manufacturers' sales—has little if anything to do with core First Amendment activity.  McKinsey did not associate with its clients for political or expressive reasons.  None of the underlying torts have anything to do with protected

9

speech or expressive conduct.  Rather, Plaintiffs seek to hold McKinsey liable for intentionally and knowingly collaborating with its manufacturer-clients in a scheme to misrepresent the benefits, conceal and understate the risks, and deliberately foster the medically illegitimate overprescription of opioids in violation of state and federal laws.

In other words, Plaintiffs do not seek to hold McKinsey liable for its speech, but for a course of conduct that happens to have been carried out, at least in part, through speech. See Pickup v. Brown, 740 F.3d 1208, 1229 (9th Cir. 2014), abrogated on other grounds by Nat'l Inst. of Fam. and Life Advocates v. Becerra, 585 U.S. 755 (2018) ("[I]t has never been deemed an abridgement of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.") (quoting Giboney, 336 U.S. at 502); see also Tingley v. Ferguson, 47 F.4th 1055, 1075–77 (9th Cir. 2022) (explaining that "the conduct-versus-speech distinction from Pickup remains intact").[1]  For that reason, Plaintiffs do not need to avail themselves of any categorical exceptions to First Amendment protection, so McKinsey's discussion of the commercial speech doctrine and the (now defunct) professional speech doctrine are not to the point.  Accepting Plaintiffs' allegations as true, the First Amendment does not bar their claims.

---

[1] McKinsey cites several times to Conant v. Walters, 309 F.3d 629 (9th Cir. 2002), but that case supports Plaintiffs' position, not McKinsey's.  The case concerned the investigation and punishment of California physicians who had made a "professional 'recommendation' of the use of medical marijuana."  Id. at 632.  The district court held that such recommendations were protected speech under the First Amendment, and it enjoined the federal government from investigating or punishing physicians solely for making them.  Id. On appeal, the government argued that the district court had effectively enjoined it from investigating acts that amounted to criminal aiding-and-abetting or criminal conspiracy. See id. at 635–36.  In upholding the injunction, the Court of Appeals expressly distinguished the physicians' mere recommendations from conduct that could sustain liability for aiding and abetting the violation of federal laws or for conspiracy to do so. See id.  In other words, the Court of Appeals construed the injunction not to cover the investigation or punishment of conduct that could support liability for aiding and abetting or conspiracy.  See id. at 636 (noting that "[t]he preliminary injunction order provided that 'the government may not take administrative action against physicians for recommending marijuana unless the government in good faith believes that it has substantial evidence of [conspiracy or aiding and abetting],' and that the court "read the permanent injunction as enjoining essentially the same conduct") (alteration in original).  The result in Conant depended, at least in part, on the distinction between mere "recommendations" and concerted action in furtherance of unlawful activity.

**B.    Conspiracy**

"[A] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means." Dunn v. Rockwell, 689 S.E.2d 255, 268 (W. Va. 2009); see also Restatement (Second) of Torts § 876(a) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . does a tortious act in concert with the other or pursuant to a common design with him[.]").[2]  Plaintiffs claim that McKinsey is liable for the following torts committed in the course of an unlawful conspiracy with its manufacturer clients: negligence per se, public nuisance, products-liability failure to warn,[3] and fraud/misrepresentation.

---

[2] See also Peoples Bank of N. Kentucky, Inc. v. Crowe Chizek & Co. LLC, 277 S.W.3d 255, 261 (Ky. Ct. App. 2008) ("In order to prevail on a claim of civil conspiracy, the proponent must show an unlawful/corrupt combination or agreement between the alleged conspirators to do by some concerted action an unlawful act."); Brock v. Thompson, 948 P.2d 279, 294, as corrected (Okla. Jan. 3, 1998) ("A civil conspiracy consists of a combination of two or more persons to do an unlawful act, or to do a lawful act by unlawful means."); Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 457 (Cal. 1994) ("The elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. . . . In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.") (alteration in original); Dow Chem. Co. v. Mahlum, 970 P.2d 98, 112 (Nev. 1998) ("An actionable [civil] conspiracy consists of a combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts."); Nelson v. Elway, 908 P.2d 102, 106 (Colo. 1995) ("To establish a civil conspiracy in Colorado, a plaintiff must show: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result. . . . Additionally, the purpose of the conspiracy must involve an unlawful act or unlawful means."); Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv., 416 P.3d 401, 425 (Utah 2017) ("In order to plead a claim for civil conspiracy, a complaint must allege sufficient facts to establish '(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.'"); Trau-Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 703 (Tenn. 2002) ("An actionable civil conspiracy is a combination of two or more persons who, each having the intent and knowledge of the other's intent, accomplish by concert an unlawful purpose, or accomplish a lawful purpose by unlawful means, which results in damage to the plaintiff.").

[3] McKinsey's motion does not specifically address Count 6 of the Amended Complaint, which asserts conspiracy liability for a failure to warn about the risks of opioid use. Although it is a products liability theory, Plaintiffs concede that this claim does not depend on strict liability (and probably could not succeed if it did). Rather, Count 6 seeks to hold McKinsey liable for conspiring to intentionally fail to disclose risks attending the use of

11

### 1.     Conspiracy Claims Premised on Negligence Per Se

McKinsey argues that no state recognizes a claim for "conspiracy to commit negligence" and that civil conspiracies must be based on intentional torts.  Thus, it says, Plaintiffs' conspiracy claims based on negligence per se must fail.

But there is a difference between the requirement that civil conspiracy claims be based on <u>intentional conduct</u> and McKinsey's assertion that the underlying wrong in a civil conspiracy must be an <u>intentional tort</u>.  Generally speaking, the former is true, but the latter is not.  Plaintiffs acknowledge that they must allege that McKinsey intended unlawful conduct, such as prescription practices that promoted abuse and diversion or the maintenance of an illegal secondary market in opioids.  But, under the law of most of the relevant states, if McKinsey intentionally agreed to further an unlawful purpose, then it can be held liable for civil conspiracy predicated on torts that sound in negligence.  That is so even if McKinsey did not specifically intend to cause harm to the NAS Plaintiffs.

To be sure, there is no such thing as negligent participation in a conspiracy.  Consider a defendant whose negligence allows another person's unlawful conduct to go undetected.  The defendant may have facilitated or enabled the unlawful conduct, but he cannot be held liable as a co-conspirator—his contribution to the unlawful acts was merely accidental.  See <u>Peoples Bank of N. Ky., Inc., v. Crowe Chizek & Co. LLC</u>, 277 S.W.3d 255, 261 (Ky. App. Ct. 2008).  That principle is straightforward, and it follows from the requirement that a conspiracy involve a "common design," <u>Applied Equip. Corp. v. Litton Saudi Arabia Ltd.</u>, 511, 869 P.2d 454, 457 (Cal. 1994), or "concerted action to accomplish an unlawful purpose," <u>Dunn v. Rockwell</u>, 689 S.E.2d 255, 268 (W. Va. 2009).  A "design" cannot be accidentally conceived.  The cases also show that the "unlawful purpose" or "unlawful means" that are the object of the conspiracy must be intended by the co-conspirators.  <u>E.g.</u>, <u>Nelson v. Elway</u>, 908 P.2d 102, 106 (Colo. 1995) (stating that under Colorado law, "the purpose of the conspiracy must involve an unlawful act or unlawful means").

---

certain opioids in violation of its tort law duties.  <u>See</u> Opp'n at 9 n.2.

But the need for a defendant to intend the object of the conspiracy does not entail that a civil conspiracy claim can only be based on an "intentional tort." That would mean that co-conspirators had to intend not just to accomplish an unlawful purpose or use unlawful means, but that they had to intend to cause harm. Notably, Nevada law does recognize this sort of limitation on civil conspiracy liability. It requires that "that the [co-conspirators] have an intent to accomplish an unlawful objective for the purpose of harming another[.]" Dow Chem. Co. v. Mahlum, 970 P.2d 98, 112 (Nev. 1998) (emphasis added). But Nevada is an exception that proves the rule. No other relevant state recognizes such a requirement, while some courts have explicitly rejected it. See Navarrete v. Meyer, 237 Cal. App. 4th 1276, 1294 (Cal. Ct. App. 2015) (noting a lack of California "authority requiring the participants to a conspiracy to possess the specific intent to harm a particular person or commit a specific injury"); see also supra note 2.

While Plaintiffs' theory may seem counterintuitive, it is not as strange or novel as it sounds. Imagine two motorists who agree, whether tacitly or explicitly, to have a drag race. During the race, the motorists drive at unlawful speeds and violate a state law against street racing. As a result of their dangerous and unlawful driving, one of the drivers ends up hitting and injuring a pedestrian. Neither driver intended to hurt anyone, and both drivers may even have preferred if no one was hurt. But they did intend to break the law, and the intended violation was the proximate cause of the Plaintiffs' injuries. Both the Restatement (Second) and California law recognize these facts as a basis for both racers' joint and several liability to the pedestrian. See Navarrete, 237 Cal. App. 4th at 1294 (holding that materially the same facts can support conspiracy liability); Restatement (Second) of Torts § 876(a), cmt. b & illust. 2.

Accepting the allegations as true, McKinsey and its manufacturer clients could be liable to Plaintiffs under the same theory. Plaintiffs allege that McKinsey agreed with its manufacturer-clients to increase opioid sales by unlawful means—i.e., that they agreed to a course of conduct that violated statutory and other legal duties—and that the unlawful conduct caused the Plaintiffs' injuries. Like the drag racers, McKinsey and its clients need

United States District Court
Northern District of California

not have intended to harm plaintiffs. They might well have preferred that no one was harmed. Nevertheless, if McKinsey intended to violate the law in order to increase opioid sales and Plaintiffs were harmed as a result of the violation, McKinsey could be liable for that harm. That is the essence of negligence per se.[4] The same is true of Plaintiffs' conspiracy claim predicated on an alleged failure to warn of the risks of opioids, including the risks of use during pregnancy. The allegations are that the failure to adequately disclose these risks was an intentional object of agreement between McKinsey and its clients, and that the failure to warn harmed the NAS Plaintiffs. That these underlying torts are not themselves usually categorized as "intentional torts" is irrelevant. Plaintiffs may hold McKinsey liable for harms caused by its clients' breaches of duty where these were carried out in furtherance of a common design with McKinsey.[5]

Nevada law is exceptional, in that the Nevada Supreme Court would not recognize a conspiracy claim like the one pled by Plaintiffs—unless Plaintiffs pled that McKinsey and its co-conspirators agreed to their course of conduct "for the purpose of harming another." Mahlum, 970 P.2d at 112. None of Plaintiffs' conspiracy-based claims assert that harming Plaintiffs or others like them (rather than simply making money through opioid sales) was

---

[4] Plaintiffs will, of course, eventually have to show that all the elements of negligence per se are satisfied: "(1) [McKinsey's clients] violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused death or injury to person or property; (3) the death or injury resulted from an occurrence of the nature of which the statute, ordinance, or regulation was designed to prevent; and (4) the person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." Spriesterbach v. Holland, 155 Cal. Rptr. 3d 306, 312 (Cal. Ct. App. 2013). But McKinsey does not challenge Plaintiffs' ability to meet these requirements at this stage.

[5] For what it is worth, state high courts that have explicitly considered the question agree that civil conspiracy liability need not be based on intentional torts. These courts have concluded that negligence-based torts committed in furtherance of conspiracies can give rise to liability. See Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 173 (Iowa 2002) (carefully analyzing law and concluding that "the plaintiff may base a claim of civil conspiracy on wrongful conduct that does not constitute an intentional tort"); Adcock v. Brakegate, Ltd., 645 N.E.2d 888, 895 (Ill. 1995) (holding that a plaintiff had stated an actionable civil conspiracy claim where he alleged that "asbestos manufacturers engaged in an industrywide conspiracy to conceal and affirmatively misstate the hazards associated with asbestos exposure," reasoning in part that "[o]nce a defendant knowingly agrees with another to commit an unlawful act or a lawful act in an unlawful manner, that defendant may be held liable for any tortious act committed in furtherance of the conspiracy, whether such tortious act is intentional or negligent in nature").

14

the object of the asserted conspiracy.  Accordingly, Counts 2, 4, 6, and 8 must be dismissed insofar as they are asserted by Julieann Valdez on behalf of M. V.

### 2.    Conspiracy Claims Premised on Public Nuisance

McKinsey challenges Plaintiffs' public-nuisance-based conspiracy claim on the grounds that (1) Plaintiffs have not adequately alleged an underlying claim for public nuisance and (2) the laws of the relevant states do not recognize claims for conspiracy to create a public nuisance.

### a.    Merits of the Underlying Public Nuisance Claim

A public nuisance is an unreasonable interference with a right common to the general public.  Restatement (Second) of Torts § 821B.  Public nuisance actions generally must be brought by government officials.  See, e.g., Cnty. of Santa Clara v. Superior Ct., 235 P.3d 21, 34 (Cal. 2010).  But a private party may bring a public nuisance action where the nuisance is "specially injurious" to the private party, beyond the harm caused by the nuisance to the general public.  E.g., Birke v. Oakwood Worldwide, 87 Cal. Rptr. 3d 602, 609 (Cal. Ct. App. 2009); Cal. Civ. Code. § 3493.  Here, the alleged public nuisance is "the creation, fostering, growth, and sustaining of an illegal secondary market for opioid abuse and diversion."  Am. Compl. ¶ 515.  This nuisance was allegedly created through "the illegal promotion and sale (and pressure on others to allow the illegal promotion and sale) of opioids" and "failures to warn, concealment and suppression of adverse events and research findings, and . . . misrepresentations about the risks and benefits of [the client-manufacturers'] opioid products."  Id. ¶ 513.

McKinsey argues that Plaintiffs fail to allege an underlying public nuisance on two grounds: (1) Plaintiffs do not seek to vindicate a common right because "there is no common right to be free from the threat that others will misuse a lawful product" and (2) Plaintiffs cannot allege any special injuries, as required for a private plaintiff to sue on a public nuisance.  See Mot. at 19.  The Court disagrees that Plaintiffs have failed to allege interference with a right common to the public, but it agrees that they have failed to plead special injuries that resulted from the nuisance.

### i.      Public Right

McKinsey contends that Plaintiffs have failed to allege interference "with a right common to the general public."  Restatement (Second) of Torts § 821B(1).  In part, the thrust of this argument is that Plaintiffs have merely used the word "epidemic" to dress up a collection of individual harms, incurred as a result of the use of a lawful product, as a public nuisance.  In part, too, the argument is that nuisance doctrine cannot fly too close to products liability law or too far from property-based harms.  McKinsey worries, along with the Oklahoma Supreme Court and the Eighth Circuit, that if public nuisance claims like Plaintiffs' are recognized, "[n]uisance . . . would become a monster that would devour in one gulp the entire law of tort[.]"  State ex rel. Hunter v. Johnson & Johnson, 499 P.3d 719, 726 (Okla. 2021) (quoting Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co., 984 F.2d 915, 921 (8th Cir. 1993)).

These arguments are ultimately unpersuasive.  Plaintiffs have alleged an interference with a public right: the public's rights "to use and enjoy public spaces without fear, danger, harassment, theft, and without encountering filth, disease, and blight, and to be free from the deleterious health and safety effect of an illegal drug trade."  Am. Compl. ¶ 517.  In other words, the nuisance allegations concern not just a collection of individual harms, but the consequences of McKinsey and its clients' alleged misconduct on "the public health" and "the public safety."  See Restatement (Second) of Torts § 821B.  That is sufficient to describe interference with a public right.  The Ninth Circuit recognized as much in Ileto v. Glock Inc., 349 F.3d 1191, 1210–11 (9th Cir. 2003), where it considered comparable allegations.  There, the plaintiffs alleged that gun manufacturers had undertaken to "market, distribute, promote, and sell firearms, a lethal product, with reckless disregard for human life and for the peace, tranquility, and economic wellbeing of the public," and that they had "knowingly created, facilitated, and maintained an over-saturated firearms market that makes firearms easily available to anyone intent on crime." Id. at 1198.  These allegations were held to constitute a nuisance under California law.  See id. at 1210–11.

16

Plaintiffs have alleged interference with a common right on a similar theory.  The crucial fact is that the public nuisance allegations "do not concern the . . . product itself, but rather the alleged consequence of [McKinsey and its clients'] conduct."  In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig., 497 F. Supp. 3d 552, 646 (N.D. Cal. 2020).  In other words, the nuisance allegations are not that the product in question is defective.  Rather, the allegations are that McKinsey conspired with its clients to aggressively and unlawfully increase opioid sales in a manner designed to foster an illegal secondary market in opioids and to profit from the abuse and diversion of the drugs.  Such allegations adequately describe a substantial and unreasonable interference with the public health and the public safety.  This public nuisance theory is not novel, and has been recognized in cases involving opioids, electronic cigarettes marketed to children, guns, and lead paint.  See City & Cnty. of San Francisco v. Purdue Pharma L.P., 620 F. Supp. 3d 936, 946 (N.D. Cal. 2022) (discussing "The Opioid Epidemic's Interference with Public Rights in San Francisco"); In re Nat'l Prescription Opiate Litig., 622 F. Supp. 3d 584, 598–600 (N.D. Ohio 2022) (recognizing opioid-related injuries to public health as public nuisance under Ohio law); In re JUUL Labs, 497 F. Supp. 3d at 646–47 (denying motion to dismiss public nuisance claims under laws of Arizona, California, Florida, Pennsylvania, and New York); People v. ConAgra Grocery Prod. Co., 17 Cal. App. 5th 51, 112 (2017) ("Interior residential lead paint that is in a dangerous condition does not merely pose a risk of private harm in private residences.  The community has a collective social interest in the safety of children in residential housing.  Interior residential lead paint interferes with the community's 'public right' to housing that does not poison children.  This interference seriously threatens to cause grave harm to the physical health of the community's children."); see also Cincinnati v. Beretta U.S.A. Corp., 768 N.E.2d 1136, 1145 (Ohio 2002) (recognizing public nuisance cause of action against gun manufacturers).  Each of these cases involved a legal, regulated product, which nevertheless was promoted or distributed in such a way as to give rise to conditions constituting a public nuisance.  Rather than "devour[ing] in one gulp the entire law of

United States District Court
Northern District of California

tort," <u>Hunter</u>, 499 P.3d at 726, public nuisance law has continued to coexist peaceably alongside other tort causes of action in places like California and Ohio, which have recognized public nuisance actions of this general form for some time.  Nor is it the case that every products liability case can be transformed into a public nuisance theory.  For one thing, the latter requires a "substantial" and "unreasonable" interference with a public right, requirements not found in products liability law.[6]

The authorities are, of course, not uniformly in agreement that the public nuisance doctrine does or should apply to cases like this one.  The Supreme Court of Oklahoma has declined to apply public nuisance doctrine to the opioid crisis.  <u>See</u> <u>Hunter</u>, 499 P.3d at 729–30 (reasoning that "[e]xtending public nuisance law to the manufacturing, marketing, and selling of products—in this case, opioids—would allow consumers to 'convert almost every products liability action into a [public] nuisance claim'" and holding that Oklahoma public nuisance law does not recognize the marketing of opioids as a public nuisance).[7]  A federal district court held that West Virginia law could not support a public nuisance claim against opioid distributors.  <u>See</u> <u>City of Huntington v. AmerisourceBergen Drug Corp.</u>, 609 F. Supp. 3d 408, 472–75 (S.D. W. Va. 2022).  But while the <u>Hunter</u> decision forecloses Plaintiffs' nuisance-based causes of action in Oklahoma, McKinsey has not shown that the other relevant states would not recognize Plaintiffs' claims.[8]

Nor does the fact that courts in those states have not already extended public

---

[6] In addition, public nuisance has historically been significantly more flexible than McKinsey's arguments suggest.  <u>See</u> Leslie Kendrick, <u>The Perils and Promise of Public Nuisance</u>, 132 Yale L. J. 702, 716–18 (2023).

[7] <u>See also, e.g.</u>, <u>City of Chicago v. Beretta U.S.A. Corp.</u>, 821 N.E.2d 1099, 1116 (Ill. 2004) (no common right to be free from gun violence); <u>State v. Lead Industries, Ass'n, Inc.</u>, 951 A.2d 428, 453 (R.I. 2008) (no common right to be free from hazards of unabated lead).

[8] McKinsey also cites <u>People v. Purdue Pharma L.P.</u>, No. 30201400725287CUBTCX, 2021 WL 5227329, at *2 (Cal. Super. Nov. 01, 2021).  But the case is distinguishable on the facts: the plaintiffs there offered "no evidence of medically inappropriate prescriptions caused or induced by any allegedly false or misleading marketing and promotion by Defendants," and the court therefore held that "any adverse downstream consequences flowing from <u>medically appropriate prescriptions</u> cannot constitute an actionable public nuisance."  18-19.  (emphasis in original).  Here, Plaintiffs specifically allege that McKinsey's conduct led to the creation of an illegal diversionary market in opioids, and that it is this market that constituted the public nuisance.

nuisance doctrine to the opioid crisis does not in itself suggest that they would not do so, especially in the absence of any persuasive state authority to the contrary.  See In re JUUL Labs, 497 F. Supp. 3d at 647.  Oklahoma aside, each of the relevant states recognizes public nuisances based on an interference with the health or safety of the public.[9]  Even in West Virginia, despite the decision in City of Huntington, the law is unsettled.  As Judge Polster has noted, "every West Virginia state court that has addressed identical public nuisance claims against opioid defendants has come to a different conclusion than Judge Faber on the scope and contours of West Virginia public nuisance law."  In re Nat'l Prescription Opiate Litig., 622 F. Supp. 3d 584, 600 n.20 (N.D. Ohio 2022).  City of Huntington is currently on appeal to the Fourth Circuit, which recently certified a question to the West Virginia Supreme Court regarding the application of public nuisance doctrine to the case.  The certification order reflects doubt about the district court's narrow view of West Virginia nuisance doctrine.  See City of Huntington v. AmerisourceBergen Drug

---

[9] See State Dep't of Health v. The Mill, 887 P.2d 993, 1002 (Colo. 1994) ("A public nuisance is the doing or failure to do something that injuriously affects the safety, health, or morals of the public or works some substantial annoyance, inconvenience, or injury to the public."); Nuchols v. Com., 226 S.W.2d 796, 798 (Ky. 1950) ("A common or public nuisance is a condition of things which is prejudicial to the health, comfort, safety, property, sense of decency, or morals of the citizens at large, resulting either (a) from an act not warranted by law, or (b) from neglect of a duty imposed by law."); Nev. Rev. Stat. Ann. § 40.140 ("Anything which is injurious to health, or indecent and offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance[.]"); People v. ConAgra Grocery Prods. Co., 227 Cal. Rptr. 3d 499, 551–52 (Cal. Ct. App. 2017) ("Anything which is injurious to health . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . is a nuisance.") (quoting Cal. Civ. Code § 3479) (alterations in original); State ex rel. Swann v. Pack, 527 S.W.2d 99, 113 (Tenn. 1975) (defining a common law public nuisance as "extend[ing] to everything that endangers life or health, gives offense to the senses, violates the laws of decency, or obstructs the reasonable or comportable use of property," and holding that "the handling of snakes in a crowded church sanctuary" constituted a public nuisance); Utah Code Ann. § 76-10-803 ("A public nuisance is a crime against the order and economy of the state and consists in unlawfully doing any act or omitting to perform any duty, which act or omission . . . (a) annoys, injures, or endangers the comfort, repose, health, or safety of three or more persons . . . ."); Sharon Steel Corp. v. City of Fairmont, 334 S.E.2d 616, 621 (W. Va. 1985) (stating that public nuisances encompass "anything which interferes with the rights of a citizen, either in person, property, the enjoyment of his property, or his comfort," and that "[a]s suggested by this broad definition, nuisance is a flexible area of the law that is adaptable to a wide variety of factual situations").

Corp., No. 22-1819, 2024 WL 1145974, at *5 (4th Cir. Mar. 18, 2024) ("[W]e do not view as dispositive the fact that the Supreme Court of Appeals has not yet applied principles of public nuisance to the distribution of a product.  And we hesitate to infer such limits on West Virginia's common law of public nuisance in light of the broad language used by the Supreme Court of Appeals in describing public nuisance claims . . . and in light of decisions by West Virginia trial courts holding that common law claims of public nuisance are cognizable against distributors of opioids.") (citation omitted).  The Court will not dismiss the West Virginia nuisance claims on these grounds.

Accordingly, the Court denies McKinsey's motion to dismiss the public nuisance claims for failure to plead a right common to the public as to all Plaintiffs except Brandi Shatnawe on behalf of A.A., whose nuisance-based claim is not permitted under Oklahoma law.

### ii.    Special Injury

McKinsey also argues that, even if Plaintiffs have pled the existence of a public nuisance, they would be unable to maintain their public-nuisance claims as private parties.  The Court's order dismissing the NAS Plaintiffs' original pleading rejected the public nuisance claims on this basis—namely, that the NAS Plaintiffs had failed to allege a "special injury" sufficient to maintain their nuisance-based claims.  See Order Granting Defs.' Mot. to Dismiss at 13–15.  The Court held that because "the personal injuries from opioid exposure are not suffered by a few but rather by millions of adults and minors alike," the NAS Plaintiffs had not explained "how they were uniquely harmed by their exposure to opioids." Id. at 14–15.  McKinsey argues that, for the same reasons, the same result is due here.

Plaintiffs argue that the Court's prior order was wrong on the law.  Their view is that one who suffers a bodily or personal injury from a public nuisance always suffers a "special injury," regardless of whether countless others suffer the same kind of physical harm as a result of the nuisance.  Separately, Plaintiffs also argue that they have revised the nuisance allegations in their Amended Complaint in ways they argue should rescue the

United States District Court
Northern District of California

claims.  Although both of these arguments merit serious consideration, the Court is ultimately not persuaded to depart from its prior holding.  Plaintiffs' public nuisance-based claims still founder on the special injury requirement.

Plaintiffs' special injury allegations are stuck between two fatal problems.  If Plaintiffs characterize the nuisance more or less as they did in the original pleading—as an epidemic of opioid overprescription and abuse—then cannot show how their injuries are different in kind from those suffered by others who suffered injuries from using or abusing opioids.  And if Plaintiffs characterize the nuisance differently, as the creation and maintenance of an illegal secondary market in opioids that interferes with the public's rights "to use and enjoy public spaces . . . and to be free from the deleterious health and safety effect of an illegal drug trade," then it is difficult to see how the NAS Plaintiffs were injured <u>by the nuisance</u>.

Consider, first, Plaintiffs' efforts to argue against the Court's prior holding. Plaintiffs point out that the treatise on which the Court partly relied for its "special injury" holding relies, in turn, on a California case called <u>Venuto v. Owens-Corning Fiberglass Corp.</u>, 99 Cal. Rptr. 350 (Cal. Ct. App. 1971).  <u>See</u> Order Granting Defendant's Motion to Dismiss at 15 (citing Dobbs, The Law of Torts § 403 (2d ed.)).  In the decades since it was decided, <u>Venuto</u> has been significantly distinguished by other California appellate courts. It is worth looking at these cases.

In <u>Venuto</u>, the plaintiffs alleged that the defendant fiberglass manufacturer created a public nuisance by severely polluting the air, thereby "injuring the health of the citizens of the county."  <u>Venuto</u>, 99 Cal. Rptr. at 353.  The plaintiffs' alleged special injury was that the pollution "aggravate[d] their allergies and respiratory disorders."  <u>Id</u>. at 356.  The <u>Venuto</u> court held that this injury was not special enough.  It reasoned that "the public [was] suffering from a general irritation to the respiratory tract," while the plaintiffs were merely "suffering a more severe irritation to such tract."  Thus, there could be no special injury where the plaintiffs' injuries were different from the general public's in degree, but not in kind.  <u>See id</u>.

21

Subsequently, two California appellate cases have criticized Venuto.  In Birke v. Oakwood Worldwide, 87 Cal. Rptr. 3d 602 (Cal. Ct. App. 2009), the plaintiff alleged that his childhood asthma and chronic allergies had been aggravated by secondhand smoke. This, the court said, was sufficient to plead a special injury that was different in kind from "the increased risks of heart disease and lung cancer" faced by the general public when exposed to secondhand smoke.  Id. at 610.  The court distinguished Venuto, despite its similar facts, as a result that was dictated by bad pleading on the part of the Venuto plaintiffs.  See Birke at 610.  And in Hacala v. Bird Rides, Inc., 306 Cal. Rptr. 3d 900 (Cal. Ct. App. 2023), review denied (June 21, 2023), the plaintiff was injured when he tripped over an electric scooter.  The court held that this was a special injury sufficient to bring a public nuisance action, for it was different in kind from the harms to the general public, who merely faced the inconvenience of "obstruct[ed] public sidewalks" and "tripping hazards."  See id. at 928–29.

Plaintiffs make a persuasive case that Venuto should be read with caution, given the inclination of intermediate appellate courts in California to treat it as all but confined to its own facts.  But—even if Birke and Hacala were representative of the law in the other relevant states—they still would not support Plaintiffs' broad special injury theory. Plaintiffs' suggestion is that once Venuto and the Dobbs treatise are set aside, it is clear that there is a "simple rule" that physical harm is always a special injury.  But Plaintiffs have simply not cited any binding or persuasive authority to that effect.  While Birke and Hacala criticize Venuto's application of the special injury requirement, they remain committed to the basic proposition that an injury is only "special" if it is in some sense different in kind, rather than degree, from the injuries suffered by the public as a result of the nuisance.  See Birke, 87 Cal. Rptr. 3d at 610 ("At the very least, we are not prepared to say, as a matter of law and at the pleading stage of this case, the injuries are of the same kind and simply differ in degree."); Hacala, 90 Cal. Rptr. 3d at 929 ("Hacala allegedly suffered a different kind of injury—she tripped on a Bird scooter and was physically injured.") (emphasis in original).  In Hacala, the plaintiff tripped, while the public merely

22

faced inconvenience and the risk of tripping.  See 90 Cal. Rptr. 3d at 929.  In Birke, the plaintiff suffered from aggravated asthma and respiratory problems, while the public merely faced the increased "risks of heart disease and lung cancer."  87 Cal. Rptr. 3d at 610 (emphasis added).  Indeed, Plaintiffs themselves acknowledge this basic rule.  Opp'n at 12 ("That harm must be different in 'kind,' not merely in 'degree.'") (quoting Restatement (Second) of Torts § 821C(1)).

The Restatement does note that bodily injuries are "normally" special injuries, but that is quite different from saying that they are always special injuries.  Restatement (Second) of Torts § 821C, cmt. d.  Indeed, the illustration that the Restatement offers in support of this comment underscores how different the situation it contemplates is from Plaintiffs' allegations.  The illustration is as follows: "A digs a trench across the public highway and leaves it unguarded at night without any warning light.  B, driving along the highway, drives into the trench and breaks his leg.  B can recover for the public nuisance."  Id. § 821C(1), cmt. d, ill. 2.  The difference is that between (1) a nuisance that has the capacity to cause physical harm but also interferes with common rights in other ways—for example, a trench blocking the road or a profusion of electric scooters on the sidewalks— and (2) a nuisance whose essential character is that of a public health crisis caused by the illegal promotion and sale of a product.  In the former case, a physical injury will be a strong indication that the plaintiff has suffered an injury different in kind from the harm to the public.  In the latter case, the impaired health of a given person is just one component of the injury to the public at large.  Under such circumstances, the injuries to the health of other members of the public are not different in kind.

Thus, if the nuisance is defined as the impairment to public health caused by the unlawful or fraudulent marketing, and resulting overprescription, of opioids, then the Plaintiffs' claimed injuries are just not meaningfully different in kind from those physical injuries suffered by other children exposed to opioids in utero or, more generally, by adults

who have suffered physical harms from opioid dependence.[10]  At the level of common sense, it is difficult to see what purpose the "special injury" requirement would serve in analogous public nuisance actions if any Plaintiff who suffered a physical harm could have standing to sue on the nuisance.  If everyone's injury is special, no one's is.  The rule that "[a] private person may maintain an action for a public nuisance, if it is specially injurious to himself, but not otherwise," Cal. Civ. Code § 3493, would be rendered meaningless.

At this point, the Plaintiffs might object that they have defined the interference with public rights differently than the Court did in its preceding discussion.  Specifically, in the Amended Complaint, Plaintiffs define the nuisance as "the creation, fostering, growth, and sustaining of an illegal secondary market for opioid abuse and diversion," which they argue has interfered with the public's rights "to use and enjoy public spaces without fear, danger, harassment, theft, and without encountering filth, disease, and blight, and to be free from the deleterious health and safety effect of an illegal drug trade."  Am. Compl. ¶¶ 515, 517.  The Court agrees that if the interference is described this way, Plaintiffs' alleged injuries are indeed different in kind: Plaintiffs have suffered "at least one permanent developmental or congenital injury from in utero poisoning by opioids."  Id. ¶ 518.

Here, though, is the second problem for Plaintiffs' ability to plead the special injury requirement.  If the nuisance is defined as the creation and maintenance of an illegal secondary market for opioids and that market's effects on public health and public space, then Plaintiffs have not alleged that their injuries resulted from the nuisance, so defined.  See, e.g., Restatement (Second) § 821C(1) ("In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.").

None of the Plaintiffs or their mothers was injured while attempting to exercise the common right "to use and enjoy public spaces."  Nor were they injured while exercising

---

[10] The same would be true if the nuisance were defined as the fraudulent or unlawful marketing practices themselves.

their right "to be free from the deleterious health and safety effect of an illegal drug trade." Plaintiffs' mothers all allegedly began using opioids under the direction of physicians, and the NAS Plaintiffs suffered their injuries because their mothers continued to use opioids during pregnancy.  Only two of the Plaintiffs' mothers—the mothers of E.G.W. and M.L., both West Virginia plaintiffs—ever allegedly obtained opioids from the illegal secondary market at any point.  Id. ¶¶ 194, 213.  And these mothers' interactions with the illegal market play no substantial role in the NAS Plaintiffs' allegations about their injuries.  Both E.G.W. and M.L.'s mothers allegedly became dependent on opioids long before they accessed pills from the diversionary market.  See id. ¶¶ 193, 212.  The illegal drug trade's effects on public health and public space did not cause the NAS Plaintiffs' injuries; at most, both the drug trade and Plaintiffs' injuries were caused by the same upstream conduct.  In short, Plaintiffs did not suffer their injuries while "exercising the right common to the general public that was the subject of interference."  Restatement (Second) § 821C(1).  Their injuries thus cannot be "special injuries" in relation to the nuisance, even if they were different in kind from the injuries that did result from it.

The contrast with Ileto v. Glock, on which Plaintiffs' revised nuisance allegations seem to be modeled, is instructive.  There, the Plaintiffs alleged that the defendants had "knowingly created, facilitated, and maintained an over-saturated firearms market," and that in doing so they "make the public vulnerable to crime and assault and their conduct 'obstructs the free passage or use . . . of the public parks, squares, streets, and highways[.]'"  Ileto, 349 F.3d at 1198–99.  The Court of Appeals held that the plaintiffs, who had either been shot or suffered emotional harm from witnessing a shooting in public places, had suffered injuries "different in kind from the 'danger, fear, inconvenience, and interference with the use and enjoyment of public places that affect the tenor and quality of everyday life' that plaintiffs allege are suffered by the general public."  Id. at 1212.  By contrast, the NAS Plaintiffs' injuries have no relationship to the illegal secondary market for opioids and its effects on the public health or public space.

In short, then, Plaintiffs' public nuisance-based claims are due to be dismissed.

25

First, Plaintiffs fail to show that the Court's previous order got it wrong. Accordingly, even if the nuisance were defined as before—as the interference with public health caused by the opioid epidemic, or by the marketing practices that allegedly gave rise to it—Plaintiffs would still have failed to plead injuries different in kind from those of the public at large. Second, under the revised definition of the nuisance as the illegal secondary market for opioids, Plaintiffs have not alleged that they were injured by the nuisance, so defined. Rather, they have only pled that they, too, were harmed by opioids in some more general sense.

Accordingly, the Court concludes that Plaintiffs have failed to plead a special injury sufficient to state a claim, as private plaintiffs, based on an underlying theory of public nuisance. The nuisance-based claims will be dismissed.

### 3. Conspiracy Claims Premised on Fraud/Intentional Misrepresentation

Rule 9(b) requires that fraud-based claims "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This rule "requires . . . an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." City & Cnty. of San Francisco v. Purdue Pharma L.P., 491 F. Supp. 3d 610, 646 (N.D. Cal. 2020) (quoting Swartz v. KPMG LLP, 476 F.3d 756, 764 (9th Cir. 2007)). Plaintiffs must further identify "what is false or misleading about a statement, and why it is false." Moore v. Apple, Inc., 73 F. Supp. 3d 1191, 1198 (N.D. Cal. 2014) (citation omitted).

Plaintiffs have been unable to remedy the defect that previously led the Court to dismiss their fraud claims: they still cannot allege reliance with particularity. See Order Granting Defendant's Motion to Dismiss at 11–13. Plaintiffs' theory of the underlying fraud is that their healthcare providers relied on the client manufacturers' alleged misrepresentations about the benefits and risks of opioid use, and that if their doctors had not been misled, the doctors would not have prescribed opioids to Plaintiffs during their pregnancies. Am Compl. ¶¶ 584–85; 601. There is not necessarily any problem with

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

alleged misrepresentations that only affected the Plaintiffs indirectly.[11]  But "even where an indirect misrepresentation is involved, there must still be reliance, and the reliance must be on the part of the indirect recipient of the misrepresentation."  Jones v. AIG Risk Mgmt., Inc., 726 F. Supp. 2d 1049, 1058 (N.D. Cal. 2010).  Plaintiffs acknowledge that they have difficulty pleading reliance.  The problem, they say, is that their fraud theory is based on the reliance of third parties—their doctors—and at this stage Plaintiffs are not able to determine what specific information their doctors received and relied on regarding the risks of opioid use.  The best Plaintiffs can do is allege "on information and belief" that their doctors relied on the alleged misrepresentations and that some of them were on McKinsey "target lists," meaning lists of high-volume prescribers McKinsey compiled for its clients' sales representatives.

Plaintiffs urge that, for these reliance allegations, the Court should apply the "relaxed" Rule 9(b) standard that applies "to matters with the opposing party's knowledge."  Neubronner v. Milken, 6 F.3d 666, 672 (9th Cir. 1993).  But there is no reason to think that the doctors' reliance on given representation is a matter within McKinsey's knowledge.  And Plaintiffs have identified no authority to support an extension of the Neubronner rule to matters within third parties' knowledge.  The fraud-based claims are due to be dismissed for failure to plead reliance with particularity.

---

[11] "[T]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved."  Restatement (Second) of Torts § 533.  Plaintiffs do allege that if their mothers had received information about the risks of opioid use during pregnancy, they would not have taken them.  See, e.g., Am Compl. ¶¶ 210, 218.  McKinsey also argues that Plaintiffs cannot allege reliance because they were already taking opioids or were addicted before they became pregnant, but that does not necessarily preclude reliance.  It is plausible, making inferences in Plaintiffs' favor, that they would have stopped taking opioids during their pregnancies if they had known the risks that McKinsey allegedly concealed.  Or perhaps the doctors would have given different advice during the pregnancies.  Such inferences help with Plaintiffs' failure-to-warn claims.  But for the fraud claims to survive, Plaintiffs have to plead that they or their doctors relied on specific misrepresentations—not just that Plaintiffs or their doctors would have acted differently if they had received different information.

### 4.    Agreement

Finally, to state any of their conspiracy claims, Plaintiffs must allege the existence of an agreement, whether explicit or tacit, between McKinsey and its manufacturer clients to accomplish an unlawful objective or to accomplish a lawful objective by unlawful means.  See, e.g., Nelson v. Elway, 908 P.2d 102, 106 (Colo. 1995) (listing among the elements of civil conspiracy "a meeting of the minds on the object or course of action"). McKinsey argues that Plaintiffs are unable to do so.  McKinsey draws an analogy to Twombly; they say that no non-conclusory allegations can support the inference that the parties agreed to an unlawful course of conduct rather than the lawful objectives of increasing opioid sales.

But a fair reading of the complaint compels a different conclusion.  McKinsey's citations to cases like Twombly, which say that mere "parallel conduct" is insufficient to support the existence of an agreement, are inapposite.  This is not an antitrust case where the Court is being asked to infer collusion from the parallel actions of otherwise unconnected actors.  Here, no one disputes that McKinsey and its manufacturer-clients were working together.  McKinsey and clients clearly had an agreement, and it can easily be inferred that the object of this agreement was to increase the manufacturers' sales of opioids.  Of course, the existence of this agreement does not end the inquiry.  Increasing opioid sales is not an inherently unlawful objective.  The proper question is whether the Court can infer that McKinsey and its clients reached an agreement to increase the sales of opioids through unlawful means.  McKinsey's intent matters here.  To plead the existence of a conspiracy, it is not enough for Plaintiffs to allege that Purdue did in fact use unlawful means to increase the sale of opioids, or even that Purdue ended up exploiting McKinsey's advice to accomplish its own unlawful purposes.  There must be some indication that McKinsey and one or more of its clients at least tacitly agreed to a "common design" to use unlawful means to increase opioid sales.  E.g., Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 457 (Cal. 1994).

The Amended Complaint sufficiently pleads such a tacit agreement.  Well-pled

United States District Court
Northern District of California

allegations describe McKinsey's work with its clients to recapture and expand opioid sales into a segment of the market it knew consisted largely of individuals using opioids for illegitimate reasons.  With respect to Purdue, for example, Plaintiffs allege that Purdue engaged McKinsey, following the introduction of ADF OxyContin, to help it recapture a segment of the market that both knew consisted primarily of opioid abusers and diverters.  See Am. Compl. ¶¶ 56–69.  Making reasonable inferences in Plaintiffs' favor, McKinsey and Purdue would both have understood that they were undertaking a "common design" to push OxyContin to "pill mill" doctors and a population of patients that was largely abusing and diverting the drug.  See id. ¶¶ 56–69, 100–106, 119; see also dkts. 649-2, 649-3.  The Amended Complaint contains other similar examples.  For instance, it alleges that McKinsey advised Endo to target certain "advanced markets" that, in the same slide deck, McKinsey noted were markets where the CDC had successfully reduced levels of opioid use.  Am. Compl. ¶¶ 384–389; see also McKinsey Ex. 11. (dkt. 649-4).  A plausible reading of the slide is that McKinsey and Endo understood reductions in opioid use as representing commercial opportunities: the market was less saturated than before, and Endo could move in to capture sales to illegitimate users.

These allegations, and others like them, are sufficient to plead agreements between McKinsey and its clients not just to increase opioid sales, but to use unlawful means to do so.  Cf. In re Nat'l Prescription Opiate Litig., No. 1:17-MD-2804, 2018 WL 6628898, at *11 (N.D. Ohio Dec. 19, 2018) (holding that plaintiffs had plausibly pled a conspiracy between pharmacies that "shared a general conspiratorial objective of expanding the opioid market and that there was a common understanding between all Defendants to disregard drug reporting obligations to effectuate that goal").

## C.     Aiding and Abetting

Plaintiffs bring a second set of claims predicated on aider-and-abettor liability.  These claims depend on the same four underlying torts as the conspiracy claims: negligence per se, failure to warn, public nuisance, and fraud.  The parties agree that aiding and abetting liability is imposed when a plaintiff shows "(1) the existence of an underlying

29

tort; (2) knowledge of the tort on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in perpetration of the tort."  Restatement (Second) of Torts § 876(b).  "[U]nlike its close cousin conspiracy, aiding and abetting does not require any agreement with the primary wrongdoer to commit wrongful acts, thus eliminating a significant limiting principle."  Twitter, Inc. v. Taamneh, 598 U.S. 471, 489–90 (2023).

### 1.    Underlying Torts

McKinsey first argues that Plaintiffs have failed to allege underlying torts, either because the substance of the torts are not adequately alleged or because given torts are not clearly recognized as predicates for civil aiding-and-abetting liability under the laws of certain relevant states.

In its discussion above, the Court has addressed McKinsey's arguments concerning the substance of the underlying torts.  Plaintiffs have failed to adequately plead underlying fraud-based claims, so the claim for aiding and abetting fraud is due to be dismissed.  And Plaintiffs have also failed to plead a "special injury" sufficient to maintain the underlying public nuisance claim.  The other two substantive claims—failure to warn and negligence per se—have not been challenged on their merits by McKinsey.

Accordingly, the remaining issue raised by McKinsey is whether Colorado, Kentucky, Oklahoma, and Utah would recognize claims for aiding and abetting negligent conduct.  (McKinsey does not argue that the other states would not recognize such claims.) Plaintiffs have not produced any appellate cases from these states explicitly recognizing claims for aiding and abetting negligence, although McKinsey, for its part, has not cited any decisions that foreclose such claims.  When a state supreme court has not addressed a given issue, a federal court sitting in diversity must use its "best judgment to predict how the [state's supreme court] would resolve it 'using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP, 583 F.3d 1232, 1237 (9th Cir. 2009) (quoting Strother v. S. Cal. Permanente Med. Group, 79 F.3d 859, 865 (9th Cir. 1996).  "Although federal courts should not predict changes in a state's law, they "are not

precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy." Guerra v. Hertz Corp., 504 F. Supp. 2d 1014, 1019 (D. Nev. 2007) (quoting Air–Sea Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 186 (9th Cir.1989)).

The Court is not without guidance as to how the high courts of each state would look upon the claims asserted here.  For one thing, each of the relevant states does recognize civil aiding and abetting liability in some form.  See, e.g., Holmes v. Young, 885 P.2d 305, 308–09 (Colo. Ct. App. 1994); Nelson v. Elway, 971 P.2d 245, 249–50 (Colo. Ct. App. 1998); Miles Farm Supply, LLC v. Helena Chem. Co., 595 F.3d 663, 666 (6th Cir. 2010) ("[Kentucky law] recognizes a claim for aiding and abetting tortious conduct, which covers fiduciary-breach claims. . . . And it, like the majority of jurisdictions, follows the Restatement in defining the claim.") (citing Steelvest, Inc. v. Scansteel Serv. Ctr., Inc., 807 S.W.2d 476, 485 (Ky. 1991); Farmer v. City of Newport, 748 S.W.2d 162 (Ky. Ct. App. 1988); Restatement (Second) of Torts § 876); Keel v. Hainline, 331 P.2d 397, 401 (Okla. 1958) ("One who commands, directs, advises, encourages, procures, instigates, promotes, controls, aids, or abets a wrongful act by another has been regarded as being as responsible as the one who commits the act so as to impose liability upon the former to the same extent as if he had performed the act himself."); Cattani v. Drake, 424 P.3d 1131, 1145 (Utah Ct. App. 2018) ("Utah law recognizes a cause of action for aiding and abetting the breach of a fiduciary duty.") (quoting Mower v. Simpson, 278 P.3d 1076, 1088 (Utah Ct. App. 2012)).

For another, courts in three of these states have looked to the Restatement (Second) in defining the contours of the claims.  See Miles Farm Supply, 595 F.3d at 666 (discussing Kentucky law); Holmes, 885 P.2d at 308–09 (Colorado law); Cooper v. Bondoni, 841 P.2d 608, 611–12 (Okla. Ct. App. 1992) (relying on Keel and the Restatement to hold that defendants who knowingly and substantially assisted in a motorist's negligent driving could be liable for resulting injuries on an aiding and abetting theory).  The Restatement endorses aiding and abetting liability "both when the act done is

[intentional] and when it is merely a negligent act."  Restatement (Second) of Torts § 876(b) cmt. d.[12]

Finally, it is not clear that the premise of McKinsey's argument—that civil aiding-and-abetting liability for each underlying tort is a novel cause of action, such that aiding and abetting liability must be separately "recognized" for each underlying tort—is correct. Like civil conspiracy, aiding and abetting is just a means of assigning liability for a tortious injury to those who act in support of a wrong, even though they do not directly commit the tortious act.  See, e.g., Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983).  Conspiracy is predicated on agreement, while aiding and abetting is predicated on knowing and substantial aid or encouragement.  Id.  Thus, the fact that each of the relevant states recognizes both civil conspiracy liability and civil aiding-and-abetting liability in some contexts lends further support to Plaintiffs' claims.  It suggests that, if presented with an appropriate case, each state would "recognize" liability for aiding and abetting negligence per se and negligent or intentional failure to warn, just as they have recognized concerted action liability for other torts.  Accordingly, the Court is persuaded that the high courts of Colorado, Kentucky, Oklahoma, and Utah would recognize liability for aiding and abetting negligent conduct.

Finally, McKinsey argues that it cannot be held liable for aiding and abetting a failure to warn because "strict products liability law does not apply to services." Jimenez v. Super. Ct., 58 P.3d 450, 453 (Cal. 2002) (citation omitted).  But this argument misunderstands the nature of the claim, which is not that McKinsey's services should be regarded as a defective product, but rather that McKinsey knowingly encouraged the manufacturers to misrepresent the risks and benefits of their own products.  At any rate, Plaintiffs characterize their failure-to-warn claims as predicated on negligent or intentional

---

[12] The Restatement (Second) contains the "Caveat" that "[t]he Institute takes no position on whether the rules stated in this Section are applicable when the conduct of either the actor or the other is free from intent to do harm or negligence but involves strict liability for the resulting harm."  Restatement (Second) of Torts § 876.  But none of Plaintiffs' claims depend on strict liability.

1    conduct rather than strict liability, and thus the same analysis conducted above also applies

2    here.[13]  See Opp'n at 9 n.2.

3                    **2.    McKinsey's Knowledge of the Underlying Torts**

4            McKinsey argues that Plaintiffs have failed to allege that it had "actual knowledge"

5    of any breaches of duty carried out by its client.  But, for largely the same reasons that

6    Plaintiffs have adequately pled McKinsey's tacit agreement to increase opioid sales

7    through unlawful conduct, they have also pled that McKinsey had actual knowledge of its

8    manufacturer-clients' alleged breaches of duty.  To be sure, "[t]here is a qualitative

9    difference between proving an agreement to participate in a tortious line of conduct, and

10   proving knowing action that substantially aids tortious conduct."  Halberstam, 705 F.2d at

11   478.  But the allegations here describe a situation in which "aiding-and-abetting liability

12   begins to blur with conspiracy liability."  Taamneh, 598 U.S. at 496; see also Halberstam,

13   705 F.2d at 478 ("Courts and commentators have frequently blurred the distinction

14   between the two theories of concerted liability.  Most commonly, courts have relied on

15   evidence of assistance to the main tortfeasor to infer an agreement, and then attached the

16   label "civil conspiracy" to the resultant amalgam.  Sometimes, although not always, the

17   inference has been factually justified; many tort defendants have both conspired with and

18   substantially assisted each other.").  The conspiracy and aiding-and-abetting theories blur

19   because of the length of McKinsey's alleged engagements with its manufacturer clients

20   and the thoroughgoing role Plaintiffs say that McKinsey had in planning, encouraging, and

21   sometimes effectuating the alleged wrongful conduct.  The evidence may eventually

22   compel the conclusion that there was substantial assistance but no agreement, or vice

23   versa.  But at this stage in the case, both theories are a plausible fit for the allegations.

24           To reprise, the Amended Complaint plausibly alleges that McKinsey knew not only

25

26   [13] Nor is aiding and abetting a failure to warn tort a novel concept.  See, e.g.,
     Temporomandibular Joint (TMJ) Implant Recipients v. Dow Chem. Co. (In re
27   Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.), 113 F.3d 1484, 1495 (8th
     Cir. 1997) (applying Second Restatement and recognizing claim for aiding and abetting a
28   products liability tort); In re Welding Fume Prods. Liab. Litig., 526 F. Supp. 2d 775, 807
     (N.D. Ohio 2007) (same).

United States District Court
Northern District of California

that opioids were inherently dangerous, but that by assisting and encouraging its clients to target sales to the highest-volume prescribers, encouraging Purdue to market OxyContin as lasting for longer than they knew it did, and in helping its clients procure "rigged" studies to support their claims and their submissions to regulatory bodies, McKinsey was knowingly assisting the clients in fostering opioid abuse and diversion in breach of a variety of legal duties.  See, e.g., Am. Compl. ¶¶ 56–69, 84–85, 100–106, 119, 221; see also Part III(B)(4) supra.

The alleged underlying conduct by the manufacturer-clients has been held to be potentially tortious by several courts.  See City & County of San Francisco v. Purdue L.P., 491 F. Supp. 3d 610 (N.D. Cal. 2020) (denying motions to dismiss); In re Nat'l Prescription Opiate Litig., 406 F. Supp. 3d 672 (N.D. Ohio 2019) (order denying manufacturers' motions for summary judgment).  And, as Plaintiffs point out, the Supreme Court has recognized that different inferences about an aider-and-abettor's knowledge are possible in cases concerning goods that, although lawful, have an obvious susceptibility to unlawful diversion.  See Direct Sales Co. v. United States, 319 U.S. 703, 711–12 (1943) ("The difference between sugar, cans, and other articles of normal trade, on the one hand, and narcotic drugs, machine guns and such restricted commodities, on the other, arising from the latter's inherent capacity for harm and from the very fact they are restricted, makes a difference in the quantity of proof required to show knowledge that the buyer will utilize the article unlawfully.  Additional facts, such as quantity sales, high pressure sales methods, abnormal increases in the size of the buyer's purchases, etc., which would be wholly innocuous or not more than ground for suspicion in relation to unrestricted goods, may furnish conclusive evidence, in respect to restricted articles, that the seller knows the buyer has an illegal object and enterprise.").  While Direct Sales concerned opioid sales in a very different economic context, its reasoning remains forceful.  See Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., 91 F.4th 511, 530 (1st Cir. 2024) (relying in part on Direct Sales to hold that plaintiffs had adequately pled an aiding-and-abetting theory where they alleged that defendant gun manufacturers "have resisted taking

measures that would make it more difficult for their firearms to fall into the cartels' hands . . . that they design and market their guns in such a way as to make them attractive to the illegal market, and that they benefit financially as a result").

At this stage, it is plausible that McKinsey had actual knowledge that its services were enabling its clients to breach their legal duties.

### 3.    Substantial Assistance

In evaluating whether an alleged aider-abettor's assistance was substantial, courts look to "the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; his relation to the tortious actor; and the defendant's state of mind." Halberstam, 705 F.2d at 483–84 (citing Rest. (2d) § 876(b), cmt. d).  The Supreme Court has said that "the knowledge and substantial assistance" components "should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." Taamneh, 598 U.S. at 503–04 (quotation marks omitted).  The Restatement provides that "[a]dvice or encouragement to act operates as a moral support to a tortfeasor, and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." Restatement (Second) of Torts § 876, cmt. d.

The allegations are sufficient to allege that McKinsey substantially assisted its manufacturer clients in creating and cultivating sales that it knew would lead to a robust diversionary market in opioids.  With respect to Purdue, for example, McKinsey allegedly crafted the sales strategy, identified high-volume prescribers, helped to persuade reluctant people within Purdue to take its approach despite concerns in some quarters that doing so would lead to abuse and diversion.  See, e.g., Am. Compl. ¶¶ 56–69, 100–06, 119; 321–22 see also dkts. 649-2, 649-3.  McKinsey allegedly had long-term, close relationships with Purdue and other opioid manufacturers that spanned years.  And the complaint alleges that McKinsey's work for different manufacturers over time, as well as its work for others at different parts of the production and distribution chain, gave it something like a panoptic view of the market for opioids—it allegedly knew more than any of the individual

manufacturers alone.  See id. ¶¶ 219–234.  Thus, Plaintiffs say, McKinsey's assistance was especially valuable.  Accepting the allegations as true, McKinsey may even have known more about some of the harmful or unlawful consequences of its proposed strategies than its manufacturer-clients, since it alone could see that its assistance was effectively aimed not just at increasing the market share of a particular opioid, but at increasing the overall size of the market for opioids.  See, e.g., id.; see also id. ¶¶ 84–85, 428.  Taken together—and considering these allegations in conjunction with the foregoing observations about McKinsey's knowledge—Plaintiffs have adequately pled that McKinsey substantially assisted its manufacturer-clients' breaches of duty.  See Taamneh, 598 U.S. at 503–04; see also Smith & Wesson, 91 F.4th at 530 (holding, where the plaintiffs alleged that the defendants were aware of the illegal uses to which their weapons were put, that they could identify the purchasers that engaged "in straw sales and large-volume sales to traffic guns into Mexico," and that they made a large amount of revenue from an illegal market," it was plausibly alleged that their assistance in creating and maintain the unlawful trafficking of their guns was both knowing and substantial).

### D.  California Statutory Public Nuisance

Plaintiffs bring a direct liability claim under Cal. Civ. Code § 3479, California's public nuisance statute.  McKinsey makes the same arguments against this claim as it does about Plaintiffs' ability to plead an underlying public nuisance in connection with their conspiracy and aiding-and-abetting claims.  For the reasons discussed above, Plaintiffs' statutory nuisance claim must be dismissed for failure to plead a special injury.

### E.  West Virginia Medical Monitoring

Under West Virginia law, "[l]iability for medical monitoring is predicated upon the defendant being at fault in exposing the plaintiff to a particular hazardous substance." Bower v. Westinghouse Elec. Corp., 522 S.E.2d 424, 433 (W. Va. 1999); see also Acord v. Colane Co., 719 S.E.2d 761, 770 (W. Va. 2011) ("Having found that [plaintiff] failed to present sufficient evidence to prove her tort theories of liability . . . , she cannot satisfy the third element necessary to sustain a claim for medical monitoring.").  Whether this claim

survives is, at least this stage, dependent on whether any of their other theories of liability survive under West Virginia law.  Some will indeed survive, so the medical monitoring claim will, too.

### F.    Causation

Finally, McKinsey argues that the Court should hold, as a matter of law, that Plaintiffs' harms were not caused by any of McKinsey's alleged conduct.  No other plausible inference, it says, can be drawn from the pleadings.  "An essential element of the plaintiff's cause of action for negligence or for that matter for any other tort, is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered."  State ex rel. Okla. Dep't of Pub. Safety v. Gurich, 238 P.3d 1, 4 (Okla. 2010) (quoting W. Page Keeton et al., Prosser and Keeton on Torts 263 (5th ed. 1984)).  "Causation is usually a question of fact to be decided by the jury."  Allen v. Martin, 203 P.3d 546, 566 (Colo. Ct. App. 2008).  "But if the facts are undisputed and reasonable minds could draw but one inference from them, causation becomes a question of law for the court."  Id.; accord, e.g., Modisette v. Apple Inc., 241 Cal. Rptr. 3d 209, 224 (Cal. Ct. App. 2018).  McKinsey challenges Plaintiffs' ability to satisfy the requirements of both cause-in-fact and proximate cause.

An initial clarification is in order.  McKinsey has framed its causation arguments in terms of whether the NAS Plaintiffs' injuries were caused by McKinsey's conduct.  But, with respect to the conspiracy and aiding-and-abetting claims, this is the wrong inquiry.  Civil conspiracy and civil aiding-and-abetting liability are forms of "vicarious liability for concerted action."  Halberstam, 705 F.2d at 477; see also Restatement (Second) of Torts § 876 (describing civil conspiracy and aiding-and-abetting liability as means of subjecting one to liability "[f]or harm resulting to a third person from the tortious conduct of another") (emphasis added).  Plaintiffs do not need to plead or prove that McKinsey's conduct was itself the but-for and proximate cause of their injuries.  Rather, Plaintiffs can plead that their injuries were caused by the tortious conduct of third parties with whom McKinsey was acting pursuant to a common design (as long as that tortious conduct was

carried out in furtherance of the common design) or whom McKinsey knowingly and substantially assisted in the tortious conduct.  Here, those third parties are McKinsey's manufacturer-clients.  This point alleviates some of the pressure on Plaintiffs' claims from McKinsey's causation arguments, which are pitched as though Plaintiffs were still asserting theories of direct liability.

At this stage, and given that causation generally presents factual issues, Plaintiffs have adequately alleged that their injuries were caused by the underlying tortious conduct alleged in the complaint.

As for cause-in-fact, it is plausible that each of the underlying torts (setting aside the fraud and nuisance claims) was a but-for cause of the NAS Plaintiffs' injuries.  With respect to the negligence per se claims, the basic allegations are that the manufacturers intentionally marketed pills to overprescribing physicians and worked to remove external obstacles to unlawful overprescription.  It is a question of fact whether, without this conduct, Plaintiffs' mothers would either not have continued to use prescription opioids during their pregnancies, or else would not have become dependent on opioids before their pregnancies.  For example, McKinsey allegedly advised its clients to target at least one physician that prescribed opioids to the NAS Plaintiffs' mothers.  Am. Compl.  ¶¶ 154, 161, 168, 175, 181 ,187, 194, 197, 202, 206, 214–15.  With respect to the failure to warn claims, Plaintiffs allege that if the physicians or the mothers received warnings of the true risks of opioids to babies in utero, they would not have prescribed or taken the drugs during pregnancy.  See id. ¶¶ 158, 165, 172, 178, 185, 191, 200, 210, 218.  Other inferences are possible, to be sure, but there is enough in the Amended Complaint for each Plaintiff to push his or her claims across the line to plausibility.[14]

---

[14] In California, Plaintiffs need only prove that McKinsey's conduct was a substantial factor in bringing about their injuries.  See Ileto, 349 F.3d at 1206 ("The traditional notion of 'but for' causation is subsumed within the substantial factor test, whereby defendants' actions may be the proximate cause of a plaintiff's injuries if those actions were a substantial factor in bringing them about."); Mitchell v. Gonzales, 819 P.2d 872, 878 (Cal. 1991) "[T]he 'substantial factor' test subsumes the 'but for' test.").  Plaintiffs make that showing here for the same reasons they have pled but-for causation. See Ileto, 349 F.3d at 1208–09 (holding that plaintiffs had alleged proximate causation where "it was reasonably

United States District Court
Northern District of California

As for proximate cause, the allegations are sufficient: the Court cannot say that "the facts are such that the only reasonable conclusion is an absence of causation." State Department of State Hospitals v. Superior Court, 349 P.3d 1013, 1022 (Cal. 2015). McKinsey argues that the causal chain is too attenuated and involves too many intervening acts between the alleged torts and the NAS Plaintiffs' injuries. It presents a parade of intervening actors, each of whom it says acted independently and unforeseeably, thereby "sever[ing] the necessary causal link." See Mot. at 36–37. These intervening actors include McKinsey's clients, federal regulators, the opioid manufacturers' salespeople, individual prescribers, the distributors and pharmacies, and finally the NAS Plaintiffs' mothers.

But this exercise is unhelpful for at least two reasons. First, the list of supposedly intervening actors does not really account for the allegations in the Amended Complaint. As noted above, McKinsey's clients are not an intervening actor in any relevant sense. They are the ones who allegedly committed the underlying torts, with help or encouragement from, or in agreement with, McKinsey. If in fact the manufacturer-clients acted totally unpredictably or unforeseeably in relation to McKinsey's services, then this would certainly be a problem for Plaintiffs' claims. It would make it impossible for Plaintiffs to satisfy the "knowing and substantial assistance" requirements or to show that the torts were committed in furtherance of the common design. But that is not a conclusion anyone could reach by reading the pleading: the allegations are that the clients acted in accordance with McKinsey's advice. The same reasoning applies to McKinsey's suggestion that the actions of drug salespeople constitute a superseding cause. Plaintiffs allege that the salespeople were the subject of some of McKinsey's key advice about how to market certain opioids and who to target in doing so. If in fact the salespeople did not put McKinsey's plans into action, then this could present causation problems. Again,

---

foreseeable that if Glock continued to foster the illegal secondary market, a person like Furrow who was prohibited by law from purchasing a gun would be able to purchase one and use the gun in the manner that was the basis for prohibiting such purchases in the first place," thus injuring the plaintiff).

though, that is not what the pleading says.

Second, "the fact that one can fashion a multi-step description of the causal chain does not mean that the injurious conduct and the injury alleged are insufficiently connected." Smith & Wesson, 91 F.4th at 534. It is not the number or nature—innocent, tortious, or criminal—of the intervening acts that matters. It is the acts' foreseeability to the defendant. See, e.g., Restatement (Second) of Torts § 448 (intervening crime is superseding cause "unless the actor at the time of his negligent conduct realized or should have realized the likelihood . . . that a third person might avail himself of the opportunity to commit such a . . . crime"); id. § 449 ("If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby."); see also, e.g., Soule v. General Motors Corp., 882 P.2d 298, 312 n.9 (Cal. 1994) (holding that "the defense of 'superseding cause' . . . absolves a tortfeasor, even though his conduct was a substantial contributing factor, when an independent event intervenes in the chain of causation, producing harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible").

Assuming the truth of the allegations in the complaint and drawing reasonable inferences in Plaintiffs' favor, the NAS Plaintiffs' injuries were foreseeable, as was the conduct of the various intervening actors. As discussed at length above, the complaint alleges that McKinsey's clients, pursuant to an agreement with McKinsey and with its substantial assistance, misled doctors, patients, and regulators about the risks and benefits of certain opioids; targeted doctors who they knew were illegitimately overprescribing the drugs; and tried to remove or circumvent barriers to overprescription. According to the complaint, the widespread abuse and diversion of opioids was not just a foreseeable consequence of McKinsey's conduct. Rather, it was the result that McKinsey and its clients intended to accomplish. Cf. Smith & Wesson, 91 F.4th at 535. The complaint also contains allegations that McKinsey was involved with decisions to market opioids to

OB/GYNs and to "pair" them with women's health issues.  See Am. Compl. ¶ 110–117.

McKinsey rightly questions how strongly these allegations can support a theory that

OB/GYNs or pregnant women were specifically "targeted" with McKinsey's help.  But the

allegations do at least support the inference that NAS babies were a foreseeable kind of

plaintiff.  For example, McKinsey encouraged Purdue to expand into women's health

issues in accord "with [Purdue's] current investment themes," which included "[p]ain and

related products."  Def.'s Ex. 1 (dkt. 615-2) at 9–10.  A different document incorporated in

the Amended Complaint suggests that McKinsey's recommendations led Purdue to add

OB/GYNs to the list of targeted medical specializations for Purdue's opioid sales.  See

Defs.' Ex. 8 (dkt. 615-9); Am. Compl. ¶ 116.  The parties argue at length about the

meaning of these documents.  But it is not necessary, at this stage, to stake out the farthest

reaches of reasonable inference that the exhibits can support.  The exhibits at least allow

the Court to infer that McKinsey and its clients knew that OB/GYNs and pregnant women

would be among those affected by their conduct.  That is enough to show that the NAS

Plaintiffs' injuries were foreseeable—and that they were foreseeable in more than just the

general sense "that some people are women, and that some would be pregnant."  Order

Granting Def.'s Mot. to Dismiss at 7 (cleaned up).

McKinsey's last argument against proximate causation is simply a policy argument.

McKinsey says Plaintiffs' claims, if allowed to proceed, "would open the floodgates of

potential liability to essentially limitless plaintiffs who lack any relationship with the

professional services advisor."  Mot. at 37.  This argument is unpersuasive.  Previously,

the Court agreed with McKinsey that finding that it owed a legal duty to Plaintiffs "would

impose potential liability on third party consultants who have no control over the

implementation of their advice."  Order Granting Def.'s Mot. to Dismiss at 7.  But the

Court's ruling here—based on the accessory liability theories now advanced by the NAS

Plaintiffs—is different.  The policy implications are too.  Conspiracy and aiding-and-

abetting liability require a plaintiff to plead and prove much more than mere foreseeability,

and the scope of liability under such theories is likely to be much narrower.  Both these

theories of liability require, in slightly different ways, that a professional services provider actually know and intend that its services contribute to unlawful, tortious conduct.  That is obviously a very different matter from subjecting such entities to liability for mere negligence.  In this connection, the basis of the Court's rulings here are worth underscoring: Plaintiffs have pled not just that McKinsey's advice and assistance was used to increase opioid sales in unlawful ways; rather, they have alleged that McKinsey <u>actually knew and intended</u> that its advice would be so used.  Plaintiffs are able to make that picture plausible here in part because of the profusion of material to which they have access from the wider opioid litigation.  Such allegations may not be possible in most suits against professional advisors.

Accordingly, Plaintiffs have adequately alleged that the torts allegedly aided and abetted by McKinsey, or committed by its co-conspirators, caused their injuries.

### G.    Standing to Assert Claims on Behalf of Minors

Finally, McKinsey argues Plaintiff Sarah Riley, the only Utah plaintiff, lacks standing.  Riley asserts claims on behalf of her minor child E.A.B., but E.A.B. was born on August 30, 2005, and thus turned 18 last year.  Plaintiffs do not respond to this argument in their opposition.

McKinsey is correct that Riley can no longer maintain her claims on behalf of her child now that he is an adult.  <u>See</u> <u>Vandiver v. Hardin Cnty. Bd. of Educ.</u>, 925 F.2d 927, 930 (6th Cir. 1991) ("parents no longer ha[ve] standing to sue in a representative capacity" after the date child obtained majority); <u>see also</u> <u>Tagle v. Nevada</u>, No. 3:17-CV-00676-MMD-VPC, 2018 WL 3973404, at *4 (D. Nev. Aug. 20, 2018) ("Plaintiff lacks standing to bring any claims as to 'the boy' because he admits that 'the boy' became an adult before he filed his action."); <u>Stephenson v. McClelland</u>, 632 F. App'x 177, 181 (5th Cir. 2015) ("At the time this case was filed, Karlton was a minor; thus, his parents brought suit both individually and on his behalf. But as of July 19, 2013, before the trial and entry of final judgment in this case, Karlton reached majority.  His parents are therefore no longer his legal representatives and do not have standing to bring claims on Karlton's behalf.").

United States District Court
Northern District of California

1    Accordingly, Riley's claims on behalf of E.A.B. are dismissed without prejudice.

2    **IV.     CONCLUSION**

3          For the foregoing reasons, McKinsey's motion is **GRANTED IN PART AND**

4    **DENIED IN PART**.  It is granted for all Plaintiffs with respect to Counts 3, 4, and 9 (the

5    nuisance-based claims) and Counts 7 and 8 (the misrepresentation-based claims).  It is also

6    granted with respect to Counts 2 and 6 insofar as these claims are asserted by Julieann

7    Valdez on behalf of M.V. under Nevada law.  Finally, all claims asserted by Sarah Riley

8    on behalf of E.A.B. are dismissed without prejudice.  The motion is otherwise denied.

9

10          **IT IS SO ORDERED.**

11       Dated: May 16, 2024                    _____

12                                              CHARLES R. BREYER
                                                United States District Judge