[*Submitting Counsel on Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: MCKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION | CASE NO. 21-MD-02996-CRB (SK) |
| | **COMPLAINT** |
| This Document Relates to: | **JURY TRIAL DEMANDED** |
| ALL NAS ACTIONS | |

**COMPLAINT**

1.      This is an action brought by minor children Baby Doe 1, Baby Doe 2, and Baby Doe 3 ("Plaintiffs"), who were born dependent on opioids. They bring this lawsuit against All six Defendants are affiliated companies under the umbrella of McKinsey & Company, Inc., and collectively referred to as "McKinsey." Each "count" or claim against McKinsey, below, corresponds to an underlying tort committed by one or more of McKinsey's former opioid-manufacturing clients. McKinsey is liable for these torts because it encouraged or substantially assisted its client or clients in the underlying conduct despite McKinsey's awareness and knowledge at the time that the conduct it was encouraging and assisting required the client to violate at least one clear legal duty. McKinsey is also liable for the underlying torts of its clients

because McKinsey conspired with its clients or one or more individuals associated with the client to breach the legal duty. major drug producers, drug distributors, self-distributing pharmacy chain, and pill mill prescribers under the Tennessee Drug Dealer Liability Act ("DDLA"). This action seeks compensation for the harm inflicted on these children by Defendants' unscrupulous and immoral expansion of the illegal opioid market. They experienced this harm from their first moments of life as they suffered from opioid withdrawal. They continue to experience to this day as they struggle with the lasting effects of *in utero* exposure to opioids, including behavioral issues and learning disabilities. Plaintiffs reside in Roane County, Tennessee.

2.      Like thousands of children born every year, Plaintiffs were born dependent on opioids. Prenatal exposure to opioids causes severe withdrawal symptoms and lasting developmental impacts.  The first days of their lives were spent in excruciating pain as doctors weaned them from opioid addiction. They will require years of treatment and counseling to deal with the effects of prenatal exposure. They are victims of the opioid crisis that has ravaged the United States and Tennessee, causing immense suffering to those born dependent on opioids and great expense to those forced to deal with the aftermath.

3.      Their experience is part of an opioid epidemic sweeping through the United States, including Tennessee, causing thousands of infants great suffering and continuing developmental issues.  This epidemic is the largest health care crisis in U.S. history.

4.      Plaintiffs bring this case against McKinsey under the Tennessee Drug Dealer Liability Act, T.C.A. § 29-38-101 *et seq.* ("DDLA"). They seek to recover for harm caused by Defendants' knowing participation in the illegal drug market in Tennessee.

## INTRODUCTION

5.      Tennessee, along with its border states Kentucky, Alabama, and Mississippi, had the highest rates of NAS births in the nation from 2009-2012.

6.      Twenty-Nine counties in East and Upper East Tennessee are part of the Appalachia High-Intensity Drug Area, which was established in 1998. "Demographic conditions of the Appalachia HIDTA, including relatively high unemployment and low median family income, create an environment where illegal activities and corruption can flourish." Drug Division Special Agents of the Tennessee Bureau of Investigation, Drug Investigation Division, are assigned to Appalachia HIDTA.

7.      NAS is a condition that arises from a mother's use of – and oftentimes addiction to – opioids. It is a clinical diagnosis. NAS is "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."

8.      At birth, Plaintiffs were each diagnosed with NAS. They each were forced to endure a painful start to their lives, which began by experiencing opiate withdrawal.

9.      The opioid epidemic poses an ongoing crisis in Tennessee. Upon information and belief, from 2012 to 2020 (the last year for which data has been reported), Tennessee set a new state record each year for the number of opioid overdose deaths, with 1,543 in 2019 and 2,388 in 2020.[1] According to IMS Health data, in 2015, there were also a staggering 7.8 million opioid painkiller prescriptions filled in the state – or 1.18 prescriptions for every man, woman, and child, placing Tennessee at number 2 in the nation among all states for the number of opioid prescriptions per capita. This trend continued, as evidenced by the CDC report, which showed that Tennessee

---

[1] Tennessee Department of Health, Tennessee Drug Overdose Data Dashboard.
Available at: https://www.tn.gov/health/health-program-areas/pdo/pdo/data-dashboard.html.
(hereinafter "Tennessee Drug Overdose Data Dashboard").

providers wrote 68.5 opioid prescriptions per 100 persons in 2020, the third highest prescribing rate in the country and more than the average U.S. rate of 43.3 prescriptions.[2]

10.    Along with overdose deaths, the number of babies born with neonatal abstinence syndrome ("NAS") - a condition suffered by babies born to mothers addicted to opioids - has also increased dramatically in Tennessee. In 2020 alone, there were 824 NAS births in Tennessee.[3]

11.    Plaintiffs were born dependent on opioids. Like the tragedy that besets thousands of children born dependent on opioids every year, the first days of their lives were spent in excruciating pain, while doctors attempted to wean them from their opioid dependency. Their mother, Mary Doe, mother fell victim to an epidemic that has ravaged Tennessee, causing immense suffering to those born addicted to opioids.

12.    The Tennessee community into which Plaintiffs were born is plagued by the opioid epidemic, resulting in high rates of addiction, record numbers of overdose deaths, alarming rates of babies born opioid-dependent, and an illegal opioids market that continues to thrive despite the best efforts of law enforcement to combat it.

13.    The opioid epidemic did not appear overnight. It is the consequence of unconscionable greed perpetrated by the following groups of co-conspirators that McKinsey targeted, who fueled the rampant addiction to opioid drugs through unbridled distribution in pursuit of profit that still ravages the general public welfare:

    a.    The "Producer Co-Conspirators" or "Drug Producer Co-Conspirators": ACTAVIS LLC, ACTAVIS PHARMA, INC., ALLERGAN FINANCES, LLC , and WATSON LABORATORIES, INC. (collectively "Allergan"); JANSSEN PHARMACEUTICALS, INC. and JOHNSON & JOHNSON, INC. (collectively "J&J"); and TEVA PHARMACEUTICAL USA, INC. ("Teva"); VIATRIS

---

[2]    Center for Disease Control, *U.S. State Opioid Dispensing Rates, 2020* https://www.cdc.gov/drugoverdose/rxrate-maps/state2020.html.

[3]    Tennessee Department of Health, *Neonatal Abstinence Syndrome (NAS),* https://www.tn.gov/health/nas.html (hereinafter "Tennessee NAS Dasboard").

("VIATRAS"); MYLAN PHARMACEUTICALS ("Mylan"); AND HIKMA PHARMACEUTICALS, PLC and HIKMA PHARMACEUTICALS USA, INC. ("Hikma"); PURDUE PHARMA, ("Purdue") and ENDO PHARMACEUTICALS ("Endo");

b. The "Drug Distributor Co-Conspirators" or "the Distributor Co-Conspirators"): AMERISOURCEBERGEN DRUG CORPORATION ("AmerisourceBergen") and CARDINAL HEALTH, INC. ("Cardinal Health"); and MCKESSON CORPORATION ("MCKESSON").

c. The "Pharmacy Chain Co-Conspirators": WALGREEN CO. ("Walgreens"); WAL-MART, INC. and WAL-MART STORES EAST, L.P. ("Walmart"); and CVS PHARMCY, INC; CVS TN DISTRIBUTION, LLC, CVS INDIANA, LLC; AND TENNESSEE CVS PHARMACY, LLC ("CVS");

d. The "Pill Mill Co-Conspirators": DOUGLAS DEWAR, KINGSTON FAMILY PRACTICE; HOSKINS DRUGS STORE NO. 2; KINSER DRUGS, INC.; HARDIN HEALTH, INC., d/b/a CHASE DRUGS & CLINICAL SERVICES; RIDDLE DRUGS PHARMACY.

14.     Despite knowing about widespread diversion and illegal distribution by such actors as the Pill Mill Co-Conspirators, the opioid producers, distributors, and Pharmacy Co-Conspirators continued to flood Tennessee with their highly addictive prescription drugs, which both perpetuated their multi-billion dollar drug empire and propelled opioid abuse to unprecedented levels. As described herein, the Producer Co-Conspirators, the Distributor Co-Conspirators, the Pharmacy Co-Conspirators, and the Pill Mill Co-Conspirators committed various acts that were intended to—and did—facilitate illegal diversion of their drugs.

15.     Plaintiffs are victims of Defendants' avarice. They were each born dependent on opioids and forced to endure painful starts to their lives: crying excessively, arching their backs, refusing to feed, and shaking. After more than a decade of unbridled distribution of prescription opioids by McKinsey's Co-Conspirators, their birth mothers' community was awash in painkillers, fueling a dramatic increase in those exposed to and addicted to opioids.

16.    Indeed, McKinsey and its Co-Conspirators spent years convincing suspicious doctors that prescription opioids' addictive properties had been overblown, aggressively marketing opioids, and filling suspicious orders even when McKinsey and its Co-Conspirators knew that millions of Americans and hundreds of thousands of Tennesseans were abusing and misusing prescription opioids. McKinsey and its Co-Conspirators knew that entire regions of the country were being devastated by addiction to prescription drugs that they distributed.  They also recognized that prescribers were writing – and pharmacies filling – volumes of opioids that necessarily were both creating and supplying large volumes of drug addicts and pill seekers. Nevertheless, McKinsey and the Drug Producer Co-Conspirators, Drug Distributor Co-Conspirators, Pharmacy Chain Co-Conspirators, and Pill Mill Co-Conspirators persisted with distributing mind-boggling volumes of opioids into these same abuse-riddled communities, peddling the same misinformation to overcome prescribers' legitimate objections, urging suspect prescribers and pharmacies that supplied the illegal market to flood the market with even more opioids, and otherwise taking various measures to ensure that the flow of prescription opioids to feed drug addicts and pill seekers proceeded without impediment.

17.    Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."[4]  For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.[5] If either (or both) of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in

---

[4] Tenn. Code Ann. § 39-17-407.
[5] *See, e.g.*, Tenn. Code Ann. § 53-11-302, -303, -312(c), 401(a), *and* Rules of Tenn. Bd. Of Pharmacy, Ch. 1140-02.01; *see also* Tenn. Code Ann.§ 53-10-312.

Tennessee. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain.[6] The Producer Co-Conspirators, Distributor Co-Conspirators, and Pharmacy Chain Co-Conspirators did not lawfully distribute prescription opioids into or within Tennessee. Instead, using their licenses as a cover, they unlawfully distributed drugs without maintaining necessary controls (rendering the distribution unlawful), knowingly distributed those drugs into channels that they knew were resulting in diversion, knowingly encouraged high-volume pill mill prescribers to prescribe opioids without a legitimate medical purpose to feed drug abusers, pill seekers, and drug dealers, and knowingly supplied pharmacies serving pill mills. This was at the advice and direction of McKinsey Defendants.

18.    The Producer Co-Conspirators  also committed various other acts intended to facilitate diversion and illegal drug sales, from which they knowingly sought to profit. These acts include, inter alia: waging a public campaign of misinformation concerning opioids (including through "key opinion leaders" and front groups); encouraging prescribers to engage in prescription practices that the Producer Co-Conspirators knew and expected would drive up addiction rates; repeatedly calling on and targeting the highest volume prescribers to prescribe more opioids while knowing that those prescribers were or were likely operating pill mills; convincing naïve doctors willing to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale; devising marketing strategies to overcome prescribers' legitimate objections to prescribing opioids for long-term use and in higher doses; convincing prescribers whom defendants knew were likely engaging in unlawful conduct and feeding the illegal drug market to prescribe even more opioids; incentivizing sales representatives to do business both with pill mills and with pharmacies supplying pill mills through volume-based

---

[6] *See* Tenn. Code Ann. § 53-11-401.

compensation (and financially rewarding those sales associates for doing so); adding high-volume prescribers and pharmacies as customers without any due diligence, knowing that there was a strong likelihood that these high-volume businesses were running or supplying pill mills; filling suspicious orders despite knowing or reasonably suspecting that the orders reflected diversion; filling suspicious orders without any investigation; filling suspicious orders even where they met the Producer Co-Conspirators' own criteria for orders reflecting potential diversion; filling orders that they had subjectively identified as suspicious before undertaking or completing an investigation; continuing to do business with prescribers and pharmacies that had a history of suspicious prescribing or ordering practices; implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded; continuing to target pill mill prescribers to prescribe more opioids and to target associated pharmacies that served them, even after being told by law enforcement that they were likely feeding the illegal drug market; supplying outlandish volumes of prescription opioids to Tennessee communities far exceeding any conceivable medical need; and over-supplying Tennessee with opioids while recognizing that doing so would create addicts and expand the illegal drug market. Defendants' and Co-Conspirators actions included encouraging higher volumes of prescriptions, supplying, and otherwise doing business with entities in Tennessee patently engaging in diversion.

19.    The Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators similarly committed acts intended to facilitate the diversion of drugs into the illegal drug market in Tennessee. The Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators are or were major distributors of controlled substances. Like the Producer Co-Conspirators, the Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators were aware of (and helped cause) a growing epidemic from abuse, addiction, and diversion of the prescription opioids they

supplied nationwide and in Tennessee. They were aware of the quantities and frequency with which those drugs were distributed in Tennessee and Plaintiffs' community, and they knew with reasonable certainty which prescribers were operating pill mills (or otherwise over-prescribing) and which pharmacies were filling those prescriptions. Nevertheless, they chose to do business with pharmacies and dispensing physicians whom they knew or reasonably believed were feeding the illegal drug market.  Furthermore, the Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators recognized that they had a responsibility not to fill suspicious orders, because filling those orders would foster diversion into the illegal drug market. They knew what types of orders were indicative of diversion, such as frequent and large orders by pharmacies in rural communities with low population, orders by pharmacies that they recognized were serving pill mill operators, sharp increases in order volume without justification, orders for tablets exceeding the number of people in a community, and orders by pharmacies that they knew were filling prescriptions from "patients" who traveled hundreds of miles to fill the prescriptions.  Despite recognizing orders that reflected diversion, they processed and filled them anyway. Moreover, they intentionally ensured that they had no meaningful controls against diversion and intentionally structured their supposed suspicious order monitoring systems to fail.

20.    Moreover, everyone in the distribution chain collaborated to get around whatever sham suspicious order monitoring systems that the drug producers may have put in place. They offered sham justifications for suspicious orders that everyone in the chain accepted without accepted without question, no matter how ludicrous – thereby giving the Producer Co-Conspirators, Distributor Co-Conspirators, and the Pharmacy Chain Co-Conspirators a convenient pretense to make, fill, and ship orders that they knew would supply the illegal drug market. Through this symbiotic relationship, they persisted in filling suspicious orders for large volumes

of products, calling on suspicious prescribers and pharmacies, filling suspicious prescriptions, and/or otherwise shipping drugs to Tennessee communities ravaged by the opioid epidemic at levels far exceeding any conceivable need. They knew that their actions would cause (and in fact did cause) increased abuse, addiction, and overdose rates in Tennessee. They also knew that their actions facilitated illegal drug transactions in Tennessee. These Co-Conspirators also know that a significant share of the opioids market in Tennessee and Eastern Tennessee consists of illegal drug transactions, and that they are reaping profits from drug sales destined for this illegal drug market.

21.    The Pill Mill Co-Conspirators also facilitated the illegal opioid market in Tennessee. In violation of Tennessee law, they knowingly dispensed or supplied suspicious quantities of opioids that exhibited blatant red flags of diversion or to patients like Mary Doe who were clearly addicted. They knowingly failed to implement effective controls and procedures to guard against the diversion of opioids. Each Pill Mill Defendant knew that the amount of opioids they were prescribing/dispensing were not medically justified, and each became popular destinations for drug addicts and dealers to obtain opioids. Their actions fueled the illegal drug market in Plaintiffs' community.

22.    Defendants' actions caused—and continue to cause—Plaintiffs, their birth mother, and thousands of other Tennesseans to become addicted to opioids – an addiction that, as they well knew, was all but certain to occur. It is also beyond question that Defendants are aware that: opioids continue to be over-prescribed in Tennessee—including in Plaintiffs' community—at levels far beyond what could be medically justified; that a legion of addicts are obtaining pills on the black market or through "pill mills" to satisfy their addiction; that a significant share of the opioids market in Tennessee consists of illegal drug transactions; that they are doing business with pill mills; and that they are knowingly reaping profits from drug sales in the illegal drug market.

23. Defendants' misconduct garnered significant profits. In 2010 alone, opioids generated $11 billion in revenue for drug companies.[7] Opioids are now among the most prescribed class of drugs and the United States' opioid painkiller market is worth an estimated $10 billion annually.[8] According to Fortune magazine, the Distributor Co-Conspirators are each among the top 15 companies in the 2022 Fortune 500: AmerisourceBergen, No. 10, with $213 billion in total revenue; and Cardinal Health, No. 15, with $162 billion in total revenue.[9] Additionally, the Sackler family, which owns Purdue – a privately held company – was included on Forbes 2015 list of America's Richest Families, coming in at a stunning $14 billion.[10]

24. Upon information and belief, six companies distributed 75 percent of the pills during this period: McKesson Corp., Walgreens, Cardinal, AmerisourceBergen, CVS and Walmart.

25. For the years 1999-2008, Tennessee had the second highest statewide opioid prescription rate in the nation.

26. At all relevant times, McKinsey Defendants targeted its Co-Conspirators who manufactured, packaged, distributed, supplied, and sold opioids, which became part of the illegal drug market in Tennessee. The Co-Conspirators labeled, described, marketed, advertised, promoted, and/or purported to accurately represent the benefits and risks associated with the use

---

[7] Katherine Eban, *OxyContin: Purdue Pharma's painful medicine*, Fortune.com, Nov. 9, 2011. Available at: http://fortune.com/2011/11/09/oxycontin-purdue-pharmas-painful-medicine/.
[8] Ariana Eunjung Cha, *The drug industry's answer to opioid addiction: More pills*, The Washington Post, Oct. 16, 2016. Available at: https://www.washingtonpost.com/national/the-drug-industrys-answer-to-opioid-addiction-more-pills/2016/10/15/181a529c-8ae4-11e6-bff0-d53f592f176e_story.html?utm_term=.42e0328ca459.
[9] https://fortune.com/fortune500/2022/search/
[10] Alex Morrell, *The OxyContin Clan: The $14 Billion Newcomer to Forbes 2015 List of Richest U.S. Families*, Forbes, July 1, 2015. Available at: https://www.forbes.com/sites/alexmorrell/2015/07/01/the-oxycontin-clan-the-14-billion-newcomer-to-forbes-2015-list-of-richest-u-s-families/#4b11d5d375e0.

of the prescription opioid drugs.  The net result of this behavior was to flood the market with highly addictive, dangerous opioids, whether through the primary prescription market or the illegal drug market.  At all times, Co-Conspirators have manufactured, distributed, and sold prescription opioids without fulfilling their legal duty to prevent diversion and report suspicious orders. But for the dereliction of this legal duty, the robust illegal drug market for opioids in Tennessee could not have existed.

27.    Plaintiffs now sue to recover damages for which Defendants are liable under the DDLA.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction over this action for the reasons stated in each underlying complaint.

29. This Court has personal jurisdiction over McKinsey for the reasons stated in each underlying complaint.

30. Venue is appropriate for pretrial proceedings under *In re McKinsey & Co., Inc., Nat'l Prescription Opiate Consultant Litig.*, MDL No. 2996, 2021 WL 2351628 (J.P.M.L. June 7, 2021).

## BACKGROUND CONCERNING MARY DOE AND BABY DOES 1-3

### I.    Mary Doe & Douglas Dewar

31.    When she was 17 years old, Plaintiffs' mother ("Mary Doe"), got into a car wreck and was prescribed opioids.

32.    At the time, Douglas DeWar was a practicing physician at the Kingston Family Practice in Kingston, Tennessee.

33.    DeWar was Mary Doe's family doctor.

34.    After Mary Doe's car wreck, DeWar prescribed Mary Doe Hydrocodone/Acetaminophen and then progressed the prescriptions to Oxycontin, upping her dosage from 10mg to 80mg.

35.    DeWar prescribed opioids for Mary Doe for the next six years.

36.    From 2004 to 2010, Mary Doe was prescribed dangerous opioids.

37.    DeWar's prescription practices were illegal and improper. This caused Mary Doe to become addicted to opioids.

38.    On May 2010, DeWar entered into an Agreed Order with the Tennessee Board of Pharmacy, in which DeWar admitted (*inter alia*) that he had prescribed controlled substances to his patients for durations, quantities, and in a manner that caused them to become addicted. The Board found (and DeWar) agreed that his practices violated:

a.    T.C.A. § 63-6-214(b)(12) by dispensing, prescribing, or otherwise distribution prescription drugs outside the scope of professional practice;

b.    T.C.A. § 63-6-214(b)(13) for improperly dispensing, prescribing, or distributing controlled substances to people who were addicted;

c.    T.C.A. § 63-6-214(b)(14) for improperly dispensing, prescribing, or distributing controlled substances to in violation of state or federal law; and

d.    Multiple Rules and Regulations of the Tennessee Board of Medicine.

39.     As a consequence of these abhorrent and illegal prescription practices, the Tennessee Board of Pharmacy suspended DeWar's medical license.

40.     Mary Doe filled DeWar's prescriptions at pharmacies in Tennessee, including local pharmacies such as Kinser Drugs, Chase Drugs, and Riddle Drugs, and chain pharmacies such as Walgreens.  Due to her addiction, she also bought opioids on the street in Tennessee. This included purchasing OxyContin pills on the black market.

41.     DeWar cut off Mary Doe in 2010, and told Mary Doe he could no longer treat her after her addiction.

42.     This led Mary Doe to seeking other doctors, such as a doctor in Knoxville who wrote Mary Doe prescriptions for Percocet, and eventually led to her street use.

43.     Mary Doe began buying opioids from the street during her treatment as DeWar's patient due to her monthly prescriptions not lasting the entire month. After DeWar ceased Mary Doe's treatment, she was left to purchase opioids off the street.

44.     Between ages 17 and 25, Mary Doe purchased opioids off the street, including but not limited to Oxycontin, Oxycodone, Roxicodone, Hydrocodone, and Subutex.

45.     Mary Doe would typically purchase opioids at $1/per milligram.

46.     Upon information and belief, McKinsey Defendants targeted Douglas DeWar.

**II.    <u>Baby Doe 1</u>**

47.     When she was about 25 years old, Mary Doe became pregnant with her first child in late 2011 when she was 25 years old. She continued to fill prescriptions for opioids and purchase from the street until she was prescribed Subutex in April 2012, approximately seven months gestation. She continued with Subutex through the end of the pregnancy.

48.     In 2012, she gave birth to Baby Doe 1.

49.    Baby Doe 1 was diagnosed with NAS at birth.

50.    Baby Doe 1 was born at 38 weeks gestation at Methodist Medical Center on June 16, 2012, and transferred to East Tennessee Children's Hospital on June 17, 2012, for treatment of NAS.

51.    Baby Doe 1 was hospitalized for nearly eight weeks due to her NAS symptoms.

52.    Baby Doe 1 was treated with morphine on admission until July 29, 2012. Phenobarbital was added on June 28, 2012, with weaning started on July 31, 2012, and discontinued on August 7, 2012.

53.    After Baby Doe 1's birth, Mary Doe and Baby Doe 1 attended Mothers and Infants Sober Together Program, in addition to individual counseling.

54.    Nevertheless, Mary Doe continued to struggle due to her opioid addiction.

### III.    Baby Doe 2

55.    In 2016, Mary Doe became pregnant with Baby Doe 2. During the pregnancy, she remained on Subutex and also bought opioids off the street in Tennessee, such as Roxicodone, Oxycodone, and Suboxone.

56.    On November 14, 2016, Mary Doe gave birth to Baby Doe 2 at the University of Tennessee Medical Center. Baby Doe 2 was diagnosed at birth with Neonatal Abstinence Syndrome ("NAS") as a result of exposure to opioids *in utero*.

57.    Baby Doe 2 was born in Knoxville, Tennessee at 38 weeks gestation.

58.    Baby Doe 2 spent six weeks in the Neonatal Intensive Care Unit ("NICU") at the University of Tennessee Medical Center due to her exposure in utero.

59.    Baby Doe 2 spent the first weeks of her life in excruciating pain as doctors weaned Baby Doe 2 off of powerful opioids. This included placing Baby Doe 2 on morphine for the

withdrawal until December 23, 2016, with Phenobarbital added on November 28, 2016, and continued at home on suggested taper after discharge on December 26, 2016.

60.    Due to her NAS diagnosis, Baby Doe 2 was followed by the Pediatric Rehabilitation Therapy Team.

61.    Baby Doe 2 had abnormal 36-month milestones and unspecified behavioral issues.

62.    Baby Doe 2 was diagnosed with speech abnormality in December 2019 at age three.

63.    Baby Doe 2 attended public school, but was removed for homeschooling due to her illnesses.

64.    Baby Doe 2 continues to suffer effects from her prenatal opioid exposure, including behavioral disorders.

65.    Baby Doe 2 will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

## IV.    Baby Doe 3

66.    In April 2018, Mary Doe became pregnant with Baby Doe 3. During her pregnancy: (a) Mary Doe was on Subutex; (b) bought opioids off the street in Tennessee during the first 7 months of the pregnancy, including but not limited to, Roxicodone and Subutex; and (c) (after moving to Florida), Mary Doe attempted to quit opioids, but was taken to the Emergency Room about a month prior to delivery with Baby Doe 3 and was prescribed Subutex to treat her withdrawal.

67.    On January 31, 2019, Mary Doe gave birth to Baby Doe 3 in the Sacred Heart hospital in Pensacola, Florida.

68.    Baby Doe 3 was born at 39 weeks gestation.

69.    At birth, Baby Doe 3 was diagnosed with NAS as a result of exposure to opioids *in utero*. On his second day of life, Baby Doe 3 was placed in the NICU.

70.    Baby Doe 3 spent over two months in the NICU and was not discharged until April 4, 2019.

71.    Baby Doe 3 was placed on Methadone for treatment on February 2, 2019 due to high NAS scores, and was on this treatment until it was discontinued on March 29, 2019.

72.    Baby Doe 3 spent the first several weeks of his life in excruciating pain as doctors weaned him from drug dependence.

73.    After Baby Doe 3 was born, Mary Doe returned to Roane County, Tennessee.

74.    Baby Doe 3 will require years of treatment and counseling to deal with the effects of prenatal opioid exposure.

75.    Baby Doe 3 struggles every day with sensory issues and other effects from his prenatal opioid exposure, and will continue to suffer these effects for the rest of his life.

76.    Mary Doe and Baby Does 1, 2, and 3 all currently reside in Roane County, Tennessee.

77.    The Producer Co-Conspirators produced opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm, and Mr. Sackler directed Purdue to commit acts that caused the Baby Does harm. The Distributor Co-Conspirators and the Pharmacy Co-Conspirators distributed opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm. And the Pill Mill Co-Conspirators prescribed and dispensed opioids and otherwise contributed to the illegal drug market that caused Plaintiffs harm. These actions were at the targeting and direction of McKinsey Defendants.

78.     Plaintiffs bring this action by and through a guardian *ad litem* under T.C.A. § 29-38-106(a)(1).

**PARTIES**

**I.     Plaintiffs**

    **A. Baby Doe 1**: Baby Doe 1 was born in 2012 with NAS, as described above**.**

    **B. Baby Doe 2**: Baby Doe 2 was born in 2016 with NAS, as described above.

    **C. Baby Doe 3**: Baby Doe 3 was born in 2019 with NAS, as described above.

**II.     Defendants**

79.     Defendant McKinsey & Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, at 80 State Street, Albany, NY 12207.

80.     Defendant McKinsey Holdings, Inc. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

81.     Defendant McKinsey & Company, Inc. United States is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808

82.     Defendant McKinsey & Company, Inc. Washington D.C. is a Delaware corporation with its principal place of business is located at 711 Third Avenue, New York, NY 10017. It may be served with process via its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.

83.    Upon information and belief, McKinsey & Company, Inc. is the parent company of McKinsey & Company Holdings, Inc., which is itself the parent company of both McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. Upon information and belief, each subsidiary corporation is wholly owned by its parent. Despite the corporate form, McKinsey began as a partnership and still refers to its senior employees as "partners." Those partners are the firm's shareholders. Collectively, these four Defendants are referenced throughout as "McKinsey."

84.    McKinsey a is global management consultancy with offices in over 130 cities in 65 countries, including the following United States cities: Atlanta, GA; Austin, TX; Houston, TX; Dallas, TX; San Francisco, CA; Los Angeles, CA; Redwood City, CA; Boston, MA; Charlotte, NC; Chicago, IL; Cleveland, OH; Denver, CO; Detroit, MI; Miami, FL; Miramar, FL; Tampa, FL; Minneapolis, MN; Summit, NJ; New York, NY; Philadelphia, PA; Pittsburgh, PA; Seattle, WA; St. Louis, MO; Stamford, CT; Waltham, MA; and Washington, D.C.

85.    McKinsey is registered to do business in all fifty states.

## SCIENTIFIC BACKGROUND

### I.    Opioids Have Never Been Proven Appropriate for Long-Term Chronic Pain and Other Non-Acute Medical Problems

107.    This case primarily, but not exclusively, concerns the following four types of opioids:

   a.    Oxycodone: Oxycodone is a powerful type of opioid. It can be prescribed as oxycodone or more specifically branded by a company, such as OxyContin or Roxicodone.

   b.    Hydrocodone: Hydrocodone is also a type of opioid. It can be prescribed as hydrocodone or more specifically branded by a company, such as Lortab or Vicodin.

    c.   Oxymorphone: Oxymorphone is also a type of opioid. It can be prescribed as oxymorphone or more specifically branded by a company, such as Opana and Opana ER.

    d.   Hydromorphone: Hydromorphone is also a type of opioid. It can be prescribed as hydromorphone or more specifically branded by a company, such as Exalgo.

108.    The scientific consensus is that opioids such as these are dangerous, highly addictive, and inappropriate for long-term chronic pain – as opposed to cancer pain and pain associated with surgery and acute injuries. This opinion existed in the mid-1990s and has never been challenged in any meaningful way with new, valid scientific evidence.

109.    The National Safety Council, a not-for-profit organization chartered by Congress to improve public health, has published a summary of research titled "Evidence for the Efficacy of Pain Medications." The National Safety Council report concludes that "[d]espite the widespread use of opioid medications to treat chronic pain, there is no significant evidence to support this practice."

110.    Multiple researchers have found that "no evidence exists to support long term use—longer than four months—of opioids to treat chronic pain."

111.    A 2013 review of existing literature by Dr. Igor Kissin of the Department of Anesthesiology, Perioperative, and Pain Medicine at Brigham and Women's Hospital, Harvard Medical School, concluded that "[n]ot a single randomized controlled trial with opioid treatment lasting [greater than] 3 months was found."

112.    The same review found that "[a]ll studies with a duration of opioid treatment [greater than or equal to] 6 months were conducted without a proper control group."

113.    Dr. Kissin further concluded that "[t]here is no strong evidence-based foundation for the conclusion that long-term opioid treatment of chronic malignant pain is effective."

II.    **Opioids Carry a High Risk of Addiction, Serious Medical Problems, and Death**

114.    Opioids have severe side effects, including gastrointestinal bleeding, impaired recovery from injury or surgery, cognitive impairment, respiratory depression, endocrine abnormalities, hyperalgesia (increased sensitivity to pain), increased risk of fractures and hospitalization for the elderly, addiction, and death.

115.    Research based on actual patient interviews has found that, among patients who received four or more prescriptions in the prior year, 35% met the criteria for a lifetime opioid dependence, and 25.8% met the criteria for current opioid dependence.

116.    Dr. Nora D. Volkow and Dr. Wilson M. Compton, the Director and Deputy Director of the National Institute of Drug Abuse at the National Institute of Health, respectively, co-authored a 2006 study that concluded: "[t]hough the use of opioid analgesics for the treatment of acute pain appears to be generally benign, long-term administration of opioids has been associated with clinically meaningful rates of abuse or addiction."

117.    Consistent with this finding, a 2011 review of medical and pharmacy claims records revealed that two thirds of patients who took opioids daily for ninety days were still taking opioids five years later.

118.    Researchers evaluating opioids for treatment following lumbar disc herniation likewise found that giving such patients opioids had no effect on treatment outcome, but significantly increased their risk for long term opioid addiction.

119.    The transition from restricting use of opioid therapy for management of pain of cancer sufferers to widespread use for management of acute, chronic, and moderate pain is hard to pinpoint but, by 2016, the Center for Disease Control ("CDC") reported an estimated 20% of patients presenting to physician offices with noncancer pain symptoms or pain-related diagnoses

(including acute and chronic pain) received an opioid prescription. Dr. Mitchell H. Katz, current President and CEO of the New York City Health and Hospitals (the largest public healthcare system in the United States), has described how patients with nonmalignant conditions can end up as drug addicts because of the prescribing of opioids:

> A certain number of patients get better with NSAIDs [non-steroidal anti-inflammatory drugs, like Tylenol]. For those still complaining of pain, you next prescribe a short-acting opioid with a relatively low potency, such as acetaminophen with codeine. …You tell them about the adverse effects of opioids and encourage them to use the lowest dose necessary. Not infrequently, at the next visit they tell you that the medicine works but that they are taking the pills more frequently than directed. At this point, you worry about liver damage from the acetaminophen and switch to a higher potency, longer acting agent. The patient returns for follow-up visits and tells you that the pills work but that they sometimes take an extra pill and could you please increase the number so they "don't run out before the next visit." Before you know it, the patient is on a high dose of an opioid, and you are unsure whether you have actually helped them. What you know is you have committed yourself to endless negotiations about increasing doses, lost pill bottles, calls from emergency departments, worries that your patient is selling the drugs, and the possibility that one day, your patient will take too many pills, perhaps with alcohol, and overdose.

### III.      Opioids Can Have Harmful Effects on Babies In *Utero*

120.    During the period of 2010-2017, mothers with opioid related diagnoses increased 131%, while babies born with neonatal abstinence syndrome ("NAS") increased by 82% nationally.

121.    Available literature documents the potential harms associated with opioid use during pregnancy, including poor fetal growth, preterm birth, birth defects and neonatal opioid withdrawal syndrome ("NOWS").

122.    It is well documented that opioid use during pregnancy has a significant risk of being detrimental to the embryo.

123.    Opioids are known to cross the placenta.

124.    In animal studies, maternal oxycodone treatment causes pathophysiological change in the mouse placenta.

125.    It is well established that opioid receptors can be found on the mother's uterus and, when activated by opioid use, poor uterine development can occur due to intrinsic uterine defects caused by excess stimulation of opioid receptors.

126.    Maternal opioid use has been shown to be neurotoxic to the embryo.

127.    The development of the fetal brain is impacted by maternal use of opioids.

128.    Exogenous opioids negatively affect the somatosensory cortex, hippocampus, and cholinergic system in the developing embryo, leading to consequences ranging from poor memory function to learning disabilities.

129.    Use of opioids during pregnancy also has the potential to affect the embryonic heart.

130.    Fetal opioid exposure has been shown to slow down the growth of the cardiac tissue, decrease fetal heart rate, and increase the incidence of congenital heart defects.

131.    There is sufficient evidence that opioid use during pregnancy alters fetal development in measurable ways that constitute plausible explanations for the associated life-threatening complications during the postpartum period, as well as serious long-term neurobehavioral consequences.

132.    Gastroschisis is a birth defect of the abdominal wall, and several studies show increased rates of babies born with gastroschisis, as compared to countries with low opioid prescription rates, according to the CDC.

133.    Counties where doctors frequently prescribe opioids had 1.6 times more babies born with gastroschisis compared to counties with low opioid prescription rates, according to the CDC.

134.    In neonates, negative effects due to fetal opioid exposure include reduced ability to concentrate, increased incidence of apathy, reduced physical activity, and decreased visual acuity.

135.    The negative effects of fetal opioid exposure impact a child's physical and mental performance well into childhood and adulthood.

136.    The CDC has found that mothers who were prescribed opioids just before becoming pregnant were more likely to have a child with autism spectrum disorder ("ASD").

137.    Researchers found that children that experienced fetal opioid exposure ("FOE") are more likely than children without NAS to be evaluated for an educational disability, to be diagnosed with a developmental delay or speech/language impairment, and to have received classroom support or speech therapy.

138.    The most harmed victims of the opioid epidemic are babies born with Neonatal Abstinence Syndrome, like Plaintiffs.  NAS babies experience DNA changes at the cellular level, particularly in the tissues of the brain and nervous system, and suffer lifelong afflictions as a result of maternal use of prescription opioid medications during gestation.  These patients require extensive care because NAS is associated with, for instance, permanent mental health problems and disorders, developmental impairment and cognitive deficits, and physical health limitations and deformities.

## **MATERIAL FACTS**

139.    McKinsey did not make or sell opioids. McKinsey "consulted" with many who did. Plaintiffs allege that, in the course of many specific consulting arrangements—described in detail below—McKinsey *encouraged* its opioid-manufacturing clients to breach their statutory and

common-law duties. In other words, McKinsey *knew* that the course of conduct McKinsey was recommending to its clients constituted a breach of duty—in many cases, the conduct constituted an outright violation of statutory and criminal laws—and encouraged its clients to engage in that unlawful conduct anyway.

### B.    Illegal Promotion and Sale of Opioids to Prescribers Whose Patients Were Known Abusers and Diverters

140.    McKinsey encouraged and provided substantial assistance to many of its opioid-manufacturing clients to promote their products and to sell them to prescribers whose patients were known—to the manufacturers and certainly to McKinsey—to be abusing and diverting opioids. In all or at least most of these same instances, McKinsey partners and associates also conspired with the client company or with one or more persons associated with the client company (for example, certain shareholders or board members) to promote and to sell the company's products illegally. In some cases, McKinsey even conspired with certain client insiders to overcome the internal resistance from other client insiders to the illegal scheme.

141.    By promoting and selling their controlled substances to prescribers whose patients were known abusers and diverters, McKinsey's clients breached at least two distinct legal duties to the public and to end users of their products. First, it is illegal under the Controlled Substance Act, 21 U.S.C. § 801 et seq., for manufacturers of controlled substances to promote or knowingly sell their products for anything other than legitimate medical purpose. Under the common law of every state, manufacturers also have a duty to exercise reasonable care to avoid foreseeable harm from the use of their products—a duty that requires, at minimum, compliance with all applicable statutes and regulations governing their conduct to avoid foreseeable harm under the legal doctrine of negligence *per se* and related doctrines that vary only slightly, if at all, from state to state. Thus, by promoting and selling their controlled substances to prescribers whose

patients were known abusers and diverters, McKinsey's clients breached their duties of reasonable care and were therefore *negligent* or *negligent per se*.

142.    Second, McKinsey is also liable under the civil conspiracy doctrine.  As one court explained, "A civil conspiracy . . . is . . . a legal doctrine under which liability for a tort may be imposed on people who did not actually commit a tort themselves but who shared a common plan for its commission with the actual perpetrator(s)."

### C.    Unlawful Practices Involving the Concealment of Risks and the Inflation of Benefits of Opioids

143.    McKinsey encouraged its opioid-manufacturing clients to conceal adverse incidents and other evidence of the risks of their opioids from the public—end users, regulators, researchers, and prescribers. McKinsey also encouraged its opioid-manufacturing clients to overstate or inflate the benefits of their opioids in sales and other presentations and in study summaries and other writings, presentations, and communications intended for prescribers, researchers, and regulators. Beyond encouragement, McKinsey also provided substantial assistance to its clients in the concealment of risks and the inflation of benefits. In many of these same instances, McKinsey partners and associates also conspired with the client company or with one or more persons associated with the client company (for example, certain shareholders or board members) to conceal the risks and inflate the benefits of their opioids in their written and oral communications with researchers, regulators, and prescribers.

144.    By concealing the risks and inflating the benefits of their products in their sales, marketing, research, and regulatory communications, McKinsey's clients breached at least two distinct legal duties to end users of their products. The first is the common-law duty that all manufacturers have in all states—whether under the doctrine of strict products liability or negligence—to provide appropriate warnings and instructions for use, in order to minimize the risks of foreseeable harm from their products. Thus, by concealing the risks of their products,

manufacturers breached their duties to disclose all known risks of their products, and committed the tort commonly referred to as "failure to warn."

**D.** **Concerted Action Liability Requires Actual Knowledge on the Part of the Abettor or Co-Conspirator that the Conduct of the Other Constitutes a Breach of the Other's Legal Duty**

145.    The purpose of this section is to put the reader's mind at ease by identifying and acknowledging a critical distinction between the potential tort liability of a third party, such as McKinsey, under the aiding and abetting and conspiracy doctrines, on the one hand, and the liability of the underlying tortious actor, such as McKinsey's client manufacturers, on the other. McKinsey's client manufacturers have a duty to know those things that are knowable about their products when promoting, marketing, selling, and communicating with others about them. McKinsey's clients, for example, may have a duty to know (or to figure out) which prescribers are prescribing opioids to patients who are diverting or abusing them, and McKinsey's clients definitely have a duty to know the risks and benefits of their products, at least to the extent the true risks and benefits are knowable. Thus, the phrase "knew or should have known" is commonplace in any discussion about manufacturer liability, whether under strict products liability or negligence.

146.   McKinsey, however, does not have that same duty. In order for McKinsey to be liable for any breach of a duty by a client, McKinsey not only has to encourage, provide substantial assistance to, or conspire with its client to breach that duty, but also McKinsey has to have actual *knowledge*—not mere "constructive knowledge" or "should have known"-type notice—that the conduct it encouraged, assisted, or conspired with the other to engage in constituted a breach of the other's duty or duties.[11]

**I.**     **Overview: The Co-Conspirators Created the Illegal Drug Market Through Unlawful Distribution and Otherwise Knowingly Supplied and Knowingly Participated in the Illegal Drug Market in Tennessee**

---

[11] *See Rest. 2d Torts* § 876(b) ("For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.").

141.     The Drug Producer Co-Conspirators, Drug Distributor Co-Conspirators, Pharmacy Co-Conspirators, and Pill Mill Co-Conspirators all participated in the illegal drug market in Tennessee and capitalized on it. Each played a knowing role in creating, perpetuating, and expanding the opioid crisis.

142.     Controlled substances are, by definition, highly subject to abuse and diversion.  For this reason, Tennessee regulates every participant in the chain of distribution.  No one can distribute or dispense prescription opioids in Tennessee without maintaining effective controls against diversion and ensuring that the drugs are serving a lawful medical purpose.  Indiscriminate distribution without sufficient controls is unlawful and can lead to criminal penalties in Tennessee.

143.     The Drug Co-Conspirators, Distributor Co-Conspirators, and Pharmacy Chain Co-Conspirators have used their registration certificates with Tennessee as cover for what is essentially a criminal enterprise.  They knowingly distributed drugs into Tennessee without diversion controls, conscious that they were feeding pill mills and the black market rather than legitimate medical need. That conduct was unlawful.  Even in isolation, it subjects them to liability under the DDLA.

144.     But the problem was much, much worse than that. The Producer Co-Conspirators purposely created the illegal market for their own products by successfully convincing prescribers to prescribe opioids in high volumes, high dosages, and with such frequency that the patients quickly (and

inevitably) would become addicted – as the Producer Co-Conspirators knew would happen. They devised every way imaginable to guarantee this result. This included lying to prescribers about the risk profile of their opioids, spreading disinformation about how addictive their drugs were, and targeting with surgical precision the highest-volume prescribers to convince them to prescribe more opioids – knowing that they were operating pill mills. They established direct relationships with pharmacies that supplied pill mills. They flooded small Tennessee communities with opioids at levels that their own experts determined were resulting in diversion – filling the very prescriptions that they convinced corrupt prescribers to make, to feed the addicts and pill seekers that they had addicted to their drugs. They hired large sales forces, rewarded them for doing business with pill mills, and penalized them for missing sales targets. When the government directed them to implement effective controls against diversion, they purposely created sham "suspicious order monitoring" programs that were structured to fail and structured to allow them to ship opioids into known diversion channels. This entire system was a criminal chain of distribution from start to finish.

145. The Drug Distributor Co-Conspirators and Pharmacy Chain Co-Conspirators also participated in this enterprise and abused their authority. They knew who the pill mill operators were and knew when the level of drugs into these communities was feeding the illegal drug market. But like the Producer Co-Conspirators, they purposely did not implement meaningful diversion controls, incentivized their employees to service pill mills, and reaped handsome profits from the flow of drugs into the black market. They distributed these drugs unlawfully, and otherwise knowingly facilitated illegal prescription opioids sales.

146. The Pill Mill Co-Conspirators also participated in the illegal drug market by issuing and filling prescriptions for no legitimate medical purpose.

147. At every step, these Co-Conspirators sought to stream drugs into the illegal market, to continue over-supplying Tennessee communities at levels that were not medically justifiable, and enjoy profits derived from the illegal distribution of opioids. They continue to do so to this day.

## II. The Drug Producer Co-Conspirators, Distributor Co-Conspirators, and Pharmacy Chain Co-Conspirators Have All Participated in the Distribution Pipeline for Opioids in Tennessee and in Plaintiffs' Community

### A. McKinsey's Co-Conspirators Possessed Information Reflecting Diversion by Prescribers and Pharmacies but Facilitated that Diversion Anyway

148. As described herein, the Drug Producer Co-Conspirators, Distributor Co-Conspirators, and Pharmacy Chain Co-Conspirators did not maintain effective controls against diversion, rendering their actions illegal, and they otherwise engaged in many other acts to facilitate diversion of their drugs illegally. They also plainly undertook actions in Tennessee or directed at Tennessee that they knew were detrimental to public health and safety.

149. The related crises of abuse and illegal diversion of prescription opioids in Tennessee is well-documented in a variety of publicly available sources. Indeed, the prescription statistics reflect how the Producer Co-

Conspirators, Distributor Co-Conspirators, and Pharmacy Chain Co-Conspirators each are participating in the unconscionable flow opioids into Middle Tennessee.

150.    Through their market research and extensive networks of sales representatives and face-to-face detailing of health care providers ("HCP"), like the Pill Mill Co-Conspirators in this case. The Drug Producer Co-Conspirators could, and did, observe signs of illegal diversion. The Drug Producer Co-Conspirators could, and did, observe signs of diversion, including:

a.    an HCP who has a disproportionate number of patients who pay cash for office visits and dispensed medications;

b.    an HCP with a sudden unexplained change in prescribing or dispensing patterns that are not accounted for by changes in patient numbers or the practice type;

c.    an HCP's practice where unauthorized individuals are signing prescriptions or dispensing controlled substances;

d.    an HCP's practice where drugs or doses are not being individualized;

e.    an HCP with a lack of qualified staff, such as registered nurses or nurse practitioners;

f.    an HCP's practice with large numbers of patients who travel significant distances, for example, across state lines, to obtain and/or fill their prescriptions without rational explanation;

g.    an HCP's practice where there are reports that patients make frequent early requests for new prescriptions in advance; and

h.    an HCP who moves his or her practice from one state to another on more than one occasion within a couple of years without rational explanation.

31

151.    The Drug Producer Co-Conspirators also received information from credible sources—including, but not limited to, pharmacists and law enforcement agencies—that an HCP or his or her patients were diverting prescription medications.

152.    Upon information and belief, and as described further herein, the Drug Producer Co-Conspirators each maintained an internal database of HCPs suspected of inappropriately prescribing opioids. HCPs could be added to the database based on observed indicators of illicit prescribing such as excessive numbers of patients, cash transactions, patient overdoses, and unusual prescribing of the highest-strength pills. In particular, the Drug Producer Co-Conspirators tracked HCPs' prescribing practices using data obtained from IMS Health, which allowed them to identify HCPs writing excessively large numbers of prescriptions, particularly for high doses, which is a potential sign of diversion and drug dealing.[12]

153.    The Drug Producer Co-Conspirators also possess information called "chargeback" data from their distributors. As reported in the Washington Post, there is an "industry-wide practice" whereby pharmaceutical drug producers pay their distributors rebates and/or "chargebacks" on prescription opioid sales. In return, the distributors provide the Drug Producer Defendants with downstream purchasing information, which allows them to track their prescription opioids down the entire supply chain, all the way to the retail level.

---

[12] Harriet Ryan, Lisa Girion, & Scott Glover, *More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drug Maker Knew*, L.A. Times, July 10, 2016, available at: https://www.latimes.com/projects/la-me-oxycontin-part2..

154.    Using chargeback data, the Drug Producer Co-Conspirators knew – just as the prescription opioid distributors and pharmacy chains knew – the volume, frequency, and pattern of prescription opioid orders being placed and filled.  From that data, they knew or recognized which orders were suspicious and indicative of diversion in Tennessee and elsewhere.  However, they continued to fill orders relative to those accounts (including pharmacies and dispensing physicians) for their drugs, despite knowing that the orders were suspicious and indicative of diversion, that the pharmacies to whom the orders were shipped were engaging in suspicious practices indicative of diversion, and that the pharmacies were filling orders from pill mills and other high-volume prescribers engaged in suspicious prescribing practices.  To make matters worse, the Producer Co-Conspirators used this chargeback data for sales purposes to identify the highest volume prescribers and highest-volume pharmacies as sales targets.  Many of these targets were located in Tennessee communities with a thriving illegal drug market and an obvious over-supply issue.  In this way, the Producer Co-Conspirators knowingly facilitated the illegal diversion of prescriptions by (inter alia) suspicious prescribers and pharmacies, enabled the illegal diversion of prescription opioids, aided criminal activity, and otherwise facilitated the dissemination of massive quantities of prescription opioids into the black market.

155.    Tennessee regulates the distribution of controlled substances.  Under Tennessee law, prescription opioids are "Schedule II" controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."   For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must register with the State and must ensure that the drugs are only being distributed to serve legitimate medical purposes.  If either or both of these preconditions is not satisfied, it is unlawful

to distribute prescription opioids in Tennessee. Indeed, entities holding a Tennessee license can be criminally prosecuted for violating their responsibilities in the distribution chain. Co-Conspirators violated these preconditions and acted unlawfully.

### B.    Co-Conspirator Purdue

156.    The story of Purdue Pharma's role in the initial explosion of opioid prescriptions in the late 1990s and early 2000s is well-known at this point. For example, we know from government documents resulting in a Purdue guilty plea in 2007 that, beginning in 1996 and continuing until at least 2007, Purdue falsely marketed OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause withdrawal than physicians were trained to believe based on years of the medical community's experience with all opioids. During this time period, Purdue trained its sales staff to tell physicians that the risk of addiction with opioids like OxyContin was "less than one percent," even though the only (scant) data it possessed were from reported rates of opioid addiction in acute pain settings, not the long-term treatment of chronic pain that its sales staff was pushing on physicians, including primary care physicians, with the "less than one percent" message.

157.    It is somewhat less well-known that Purdue's OxyContin (usually upwards) sales trajectory included several dips and flatlines, before and after 2007, caused by external efforts to curb or curtail what came to be known as the "opioid epidemic" – the widespread diversion and abuse of prescription opioids in the United States. Those dips in Purdue's sales – and the options that Purdue contemplated in response to the dips, as well as the actions in response that Purdue

(and others) ultimately chose – provide the clearest window we have into what Purdue and McKinsey knew about Purdue's ultimate customer base, and how to reach it.

158.    Purdue's first major setback occurred more than five years before the 2007 guilty plea, when, in 2001, the DEA released a communication to the pharmaceutical industry called, "Action Plan to Prevent the Diversion and Abuse of OxyContin."  The DEA's 2001 OxyContin Action plan specifically flagged the abuse and diversion potential of extended-release formulations of oxycodone.  Data published by the CDC in 2012 show that the overall industry response, including opioid prescribers, was simply to switch a large swath of patients from extended-release formulations to immediate-release formulations of oxycodone.  Over the next five years, total prescriptions for extended-release formulations of oxycodone like OxyContin remained relatively flat.  However, there was no interruption in the overall upward trend of oxycodone prescriptions.  Over those same five years, from 2001 to 2006, prescriptions for immediate-release formulations of oxycodone rose by 56%.

159.    Purdue's second major setback occurred in 2007, when a Purdue affiliate pled guilty to misbranding OxyContin.  Purdue agreed to pay more than $600 million in penalties as part of that plea agreement, and Purdue entered into a "Corporate Integrity Agreement" with the United States Department of Health and Human Services.

160.    Partially in response to these setbacks, and partially motivated by concern about the impending expiration of its patent on the original OxyContin formulation, Purdue developed a so-called "abuse deterrent formulation" of OxyContin ("ADF OxyContin").  Purdue claims, with some evidence, that ADF OxyContin is more difficult to crush to a powder form or dissolve in liquid, and thus more difficult to abuse by snorting or injecting the substance.  Purdue received regulatory approval to begin marketing ADF OxyContin in April 2010.  In August 2010,

Purdue discontinued the original formulation of OxyContin and thereafter marketed and sold only ADF OxyContin.

### 2. Declining Sales by Total Milligram After August 2010

161.    It is undisputed that sales of OxyContin began to decline significantly following the introduction of ADF OxyContin, particularly on a total milligram basis.  In June 2011, less than one year after completing the transition to ADF OxyContin, internal Purdue documents show that executives expected a budget shortfall for the year of $1 billion, based on a revised forecast of revenues from OxyContin sales from $3.9 billion to $2.8 billion.[13]  The decline was most pronounced in the higher dose tablets of OxyContin, which are preferred by abusers and diverters.[14]

162.    The declining sales trend continued into 2013.  According to a McKinsey presentation to high-ranking Purdue executives in July 2013, total milligrams of OxyContin sold declined by 7.2% in 2012, and by another 8.7% in the first quarter of 2013 compared to the first quarter of 2012.

163.    Purdue's own researchers largely attributed the post-ADF decline in sales to a decline in prescriptions written for "patients" who had been abusing or diverting OxyContin.  For example, a study initially presented to Purdue's board in October 2011 looked at prescription patterns over a two-year period spanning the year before and the year after the introduction of ADF OxyContin.  Purdue's researchers found that OxyContin prescriptions by so-called

---

[13] Honig, Rachael, et al., Letter Memorializing Plea Agreement with Purdue (October 20, 2020), "Addendum A to Settlement Agreement" at 12 ¶¶ 59–60.
[14] *Id.*

"Region Zero" providers—providers flagged by Purdue's legal department as suspected diverters and not to be called upon by Purdue sales representatives[15]—declined by 86%, a decline that significantly outpaced the decline in prescriptions written by other prescribers.  The decline was even more pronounced among Region Zero prescribers for the higher milligram tablets, which is significant because OxyContin abusers and diverters tend to prefer higher milligram tablets.[16]

164.    Later assessments conducted by Purdue researchers purport to show that the decline in OxyContin abuse, based on reports of OxyContin abuse in publicly available databases from 2011 to 2013, outpaced the decline in OxyContin prescriptions following the introduction of ADF OxyContin.[17] Purdue's scientists and researchers concluded that ADF OxyContin was actually working—that is, it was having its intended effect of deterring abuse, with the unintended (but unavoidable) effect that Purdue was losing a significant portion of the segment of its sales from prescriptions that went to abusers and diverters. In other words, Purdue's researchers believed that the drop in OxyContin sales following the introduction of ADF OxyContin should be attributed directly to a reduction in abuse and diversion of OxyContin, meaning that the lost sales had been going mostly to patients using the drug for some illegal purpose—that is, something other than a legitimate medical purpose.

165.    McKinsey's own internal documents and emails indicate that Purdue's own *executives* were willing to accept the conclusion of their researchers—even willing to accept the

---

[15] The basis for Purdue's legal department's "Region Zero" determinations are not transparent.  While, theoretically at least, those determinations could take into account reports of suspicious activity from Purdue's own sales representatives, it appears that in practice the list was compiled by the legal department based on reports from government agencies or reports of law enforcement investigations or interventions.

[16] Honig, Rachael, et al., Letter Memorializing Plea Agreement with Purdue (October 20, 2020), "Addendum A to Settlement Agreement" at 15 ¶ 76.

[17] Coplan, P. & Chilcoat, H., "Effects of Reformulating OxyContin on Opioid Abuse in 6 National US Abuse Surveillance Systems," Presentation at the International Society for Pharmacoepidemiology Annual Meeting (August 2015).

loss of a large chunk of sales on the evidence that the sales had been going to drug abusers and diverters—and to move forward with lower expectations for OxyContin sales. Purdue's own *executives* apparently wanted to increase sales and marketing efforts for other, less lucrative drugs in Purdue's "portfolio" in an effort to "diversify" that portfolio.[18] Purdue executives were even willing—to the clear bewilderment of McKinsey's consultants[19]—to allow sales representatives the freedom to call on lower volume, occasional OxyContin prescribers—sales calls with lower potential to generate profits but also with much lower risk of generating additional illegal prescriptions to drug abusers and diverters.

156.    However, key members of the Sackler family—Purdue's main shareholders and controlling board members—had very different ideas about the inevitability or acceptability of the loss of OxyContin sales revenues and attendant profits. Richard Sackler and Mortimer Sackler fretted throughout 2012 and 2013 about the loss of OxyContin sales over the prior two years and queried Purdue's management about what they planned to do about it.[20] At one point, Mortimer Sackler emailed other board members and suggested they consider replacing both Purdue's CEO and head of sales.[21] Upon information and belief, in June or July 2013, the Sacklers turned to their old friends at McKinsey to help them convince the board to go after and try to recapture the sales and

---

[18] For example, in an August 12, 2013, internal McKinsey email from John Goldie to Martin Elling, Goldie wrote: "I do know that when [a Purdue executive] says he disagrees with some of the recommendations he is referring to the assertion that we move to 100% Oxy P1s (or really remove any effort from [selling another Purdue drug]). In fact, just about everyone at client is against this.  They believe the portfolio needs diversification esp[ecially] in light that there is still some risk on the Oxy IP." MCK-MDL2996-0079538.

[19] For example, in a July 13, 2013, internal McKinsey email, one McKinsey employee noted with dismay the high percentage of Purdue sales calls that were off the target list and to lower volume prescribers, and could imagine no explanation other than that Purdue's sales representatives and sales managers were "lazy." MCK-MDL2996-0364607.

[20] Honig, Rachael, et al., Letter Memorializing Plea Agreement with Purdue (October 20, 2020), "Addendum A to Settlement Agreement" at 12–13 ¶¶ 62 & 65.

[21] *Id.* at 13 ¶ 63.

profits Purdue had lost following the switch to the new formulation—former OxyContin sales that Purdue's own researchers and most executives attributed to illegal prescriptions and purchases for non-medical uses.

157.    McKinsey knew that trying to recapture the lost OxyContin sales was an effort to recapture sales that had been going to diverters and abusers—sales that are illegal and expose anyone involved in the sale who knows the illegal purpose (and probably even those who only suspect an illegal purpose) to criminal liability. In other words, McKinsey knew that, by recommending ways for Purdue to recapture that lost OxyContin revenue, it was encouraging Purdue to violate the law and to actively market OxyContin for sale ultimately to end users who intended to abuse and divert OxyContin.

158.    In fact, McKinsey's entire pitch to Purdue's executives—that the revenue decline is due to downstream impediments to OxyContin access, not reduced end-user demand for the ADF formulation—is a thinly coded way of saying: "Don't worry. Abusers and diverters still want the ADF version of the pill, especially in high doses, but our downstream sellers are restricting access and making it harder for them to get those high doses they crave. We need to work to lift those impediments, not switch to selling other, less lucrative products."

## C.    Co-Conspirator Allergan Knowingly Participated in Tennessee's Illegal Drug Market

159.    Co-Conspirator Allergan was one of the two largest manufacturers of generic opioids. Because Allergan lacked a meaningful suspicious order monitoring program, its opioids flooded the market without pause, worsening the opioid epidemic.

160.    Allergan's promotional spending on opioids, which was virtually nonexistent in the 2004-2008 period, began to sharply rise in 2009, when it began marketing Kadian. The third quarter of 2011 saw a peak of $3 million and nearly $7 million for the year.

161.    To ensure that these messages reached individual physicians, Allergan deployed sales representatives to visit HCPs in Tennessee and across the country. Allergan chose its detailing targets based on the likelihood of higher numbers of prescriptions at higher doses, with no consideration as to the risk of misuse. Allergan carefully tracked the prescription trends of the HCPs whom it detailed.

162.    Allergan trained its sales representatives to deceptively minimize the risk of addiction by: (1) attributing addiction to "predisposing factors" like family history of addiction or psychiatric disorders; (2) emphasizing the difference between substance dependence and substance abuse; and (3) promoting the unsupported term "pseudoaddiction."

163.    Allergan misleadingly instructed its sales team that opioid doses could be escalated during long-term opioid therapy, without hitting a dose ceiling, which purportedly made them safer than other forms of therapy such as acetaminophen or NSAIDs.

164.    Allergan also actively marketed its generic drugs. Prior to the sale of its generic business to Teva, Allergan's marketing strategy included promotion of its generic opioids, including generic Kadian (morphine sulfate), directly to HCPs. Allergan sales representatives received bonuses for both branded and generic Kadian sales, and used the same selling points for both versions of the drug, available in many leading pharmacies, advertising that the generic had the same features and benefits as the branded product.

165.     Allergan also promoted its generic Opana ER (oxymorphone ER). Allergan saw a business opportunity due to Endo discontinuing certain dosages and Endo production issues, and began training and deploying the Kadian sales force to detail doctors to promote generic Opana ER. Allergan also paid bonuses to its sales team for meeting sales goals for generic Opana ER.

166.     Allergan also promoted its generics through direct mail and email campaigns and journal advertisements aggressively marketed its generic opioids through its distributors.

167.     Allergan collaborated with Distributor Defendants Cardinal and ABC to promote Allergan's generic opioids through targeted telemarketing and direct mail campaigns aimed at pharmacies. Allergan collaborated with ABC in an initiative to drive generic conversion at a faster rate than what would occur without its intervention.

168.     Allergan also worked with Walgreens to send a letter to patients who had filled a prescription for Opana ER within the prior year, informing them that although Endo no longer manufactured certain dosages of Opana ER, a generic was now available from Allergan.

169.     Through its aggressive marketing, Allergan expanded the market for opioids in Tennessee. Allergan compounded this harm by failing to put in place appropriate procedures to ensure that suspicious orders—orders of unusual size, frequency, or those deviating from a normal pattern—would be reported to governmental authorities as required by law. Instead, Allergan continued to supply far more opioids than were justified, flooding the Tennessee market.

170.     As an entity registered with the DEA and the Tennessee Board of Pharmacy, Allergan knew it was required to maintain effective controls against diversion of opioids and to report suspicious orders.

171.    Allergan possessed ample sources of data that allowed it to detect and report suspicious orders of opioids, both from its direct and indirect customers. The company's sales representatives regularly visited pharmacies and HCPs to promote Allergan's products, which allowed them to observe red flags of diversion.

172.    Despite these available sources of information regarding potential diversion, Allergan failed to properly design and operate a system that would be capable of detecting suspicious opioid orders. Prior to 2011, any process that Allergan had that could be considered an opioid order monitoring system was not even properly automated. After 2011, Allergan finally began to acknowledge its responsibility to create an opioid order monitoring system, but the procedures it put in place were severely lacking, and were focused on approving—not restricting— orders of excessive quantities of opioids.

173.    To the extent Allergan established thresholds to detect suspicious orders, they were wholly inadequate. Allergan also adjusted and otherwise manipulated its thresholds so that it could ship its opioid products without any obstacles.

174.    Allergan failed to perform appropriate due diligence on its customers, both generally and at the time it should have been alerted to a suspicious order. Instead of independently investigating customers and the reasons behind suspicious orders, Allergan reached out to customers and simply asked them to provide a justification for large orders. Allergan even required customers to provide a reason for reduced orders.

175.    Allergan failed to stop shipments after it knew or should have known that opioid orders remained suspicious, had no requirement to stop shipments on suspicious indirect sales, and failed to report suspicious orders to the DEA. Eventually, Allergan ceased operating any suspicious order monitoring program at all, when it "outsourced" those duties to a distributor.

176.    Allergan failed to discontinue detailing HCPs who were suspected of diversion. On the contrary, Allergan chose its detailing targets based on the likelihood of higher numbers of prescriptions.

177.    Allergan knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. Allergan is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. Allergan knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including Allergan's products. Allergan also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

178.    Also, Allergan knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing of prescription opioids; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

### D.    Co-Conspirator Endo Knowingly Participated in Tennessee's Illegal Drug Market

179.    Endo developed, marketed, and sold prescription drugs, including the opioid Percocet in the U.S. and Tennessee. Opioids made up roughly $403 million of Endo's overall revenues of $3 billion in 2012. Endo also manufactured and sold generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the U.S. and Tennessee, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. At the time Endo acquired Qualitest in 2010, it was the 5th largest generics company in the United States. Qualitest merged into Par in July 2016, effectively dissolving Qualitest as a company.

180.    Endo is a co-conspirator of McKinsey's, and currently the Endo Trustee is suing McKinsey regarding reckless opioid sales advice in the United States Bankruptcy Court for the Southern District of New York.

### E.    Co-Conspirator J&J Knowingly Participated in Tennessee's Illegal Drug Market

181.    J&J manufactures, markets, sells, and distributes the following opioids in Davidson County, in Tennessee, and nationwide: Duragesic (fentanyl patch), Nucynta ER (tapentadol hydrochloride), and Nucynta (tapentadol hydrochloride), both of which are Schedule II narcotics.

182.    J&J introduced Duragesic in 1990. It is indicated for the "management of pain in opioid-tolerant patients, severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment

options are inadequate." After seeing the success of OxyContin for chronic non-cancer pain, J&J re-launched Duragesic for chronic non-cancer pain as well.

183.    J&J also marketed Nucynta, which was first approved by the FDA in 2008, formulated in tablet form and in an oral solution, and indicated for the "relief of moderate to severe acute pain in patients 18 years of age or older. J&J also marketed Nucynta ER ,which was first approved by the FDA in 2011 in tablet form. Initially, it was indicated for the "management of…pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate." This pain indication was later altered to "management of moderate to severe chronic pain in adults" and "neuropathic pain associated with diabetic peripheral neuropathy (DPN) in adults."

184.    J&J instructed sales representatives in Tennessee, and nationwide to market Duragesic as having better efficacy, better tolerability, and better patient compliance because it was a patch instead of a pill. These sales representatives were instructed to tell doctors that the patch provided better control in the event of patient opioid abuse because patients could not increase the patch dosage. However, sales representatives were aware of patients who increased the dosage by applying more than one patch at a time and were also aware that some patients abused the patch by freezing then chewing on it.

185.    These dishonest and amoral sales tactics extended to J&J's promotion of Nucynta, wherein J&J trained its sales representatives to avoid the so-called "addiction ditch"— i.e., to avoid the negatives (addiction) and emphasize the positives (supposed efficacy) in sales calls—and to use a study from Dr. Portenoy "to create dialogue about Opiophobia as a barrier."

186.    J&J further trained their sales representatives that there was a 2.6% or lower risk of addiction when using opioids prescribed by a doctor. As part of this same training, J&J

trained its sales representatives to "establish that moderate to severe acute pain continues to be undertreated."

187.    However, J&J did not provide its sales force with any training on opioid addiction. Instead, J&J sales representatives were rewarded with bonuses for targeting high-volume opioid prescribers, several of whom were later indicted or convicted for illegal prescribing of controlled substances.

188.    As part of its "pain management franchise" from the 1990s through at least 2016, Johnson & Johnson wholly owned Tasmania Alkaloids Limited ("Tasmania Alkaloids"), which was based in Tasmania and cultivated and processed opium poppy plants to manufacture narcotic raw materials to be imported into the U.S. to be processed and made into active pharmaceutical ingredients ("APIs") necessary to manufacture opioid drugs. It also wholly owned Noramco, Inc. which is based in Athens, Georgia and imported the raw narcotic materials produced by Tasmania Alkaloids, processed the materials into APIs, then sold the APIs to other opioid manufacturers in the U.S. J&J, through these subsidiaries, supplied the following APIs to other drug manufacturers in the U.S.: oxycodone, hydrocodone, morphine, codeine, fentanyl, sufentanil, buprenorphine, hydromorphone, and naloxone. J&J had supply agreements to sell controlled substance API with all 7 of the top U.S. generic companies as we as many of the top branded opioid producers.

189.    Through its sales force, J&J had visibility, on both macro and micro levels, of how rampantly overprescribed branded and generic opioids and that they were ending up on the black market; however, J&J continued

supplying these materials to opioid producers which helped fuel the illegal opioid market.

190.    Additionally, J&J failed to design and operate a system to monitor suspicious orders of controlled substances and failed to notify the appropriate DEA field division of suspicious orders. They also failed to report the sales of drugs subject to abuse.

191.    J&J knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. J&J is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. J&J knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including J&J's products. J&J also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

192.    Also, J&J knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing of prescription opioids; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

### F.    Co-Conspirator Teva Knowingly Participated in Tennessee's Illegal Drug Market

193.    Teva continues to flood Tennessee with opioids in an amount that clearly contributes to the illegal opioid drug market.

194.    Teva's generic oxycodone and hydrocodone products both represent the largest market share for either product throughout Tennessee according to IMS Health Data. These quantities of opioid pills clearly exceed the number that would be appropriate for normally prescribed therapeutic use and contribute to the illegal Tennessee opioid market.

195.    Teva also knowingly participated in the illegal drug market in Tennessee by supplying suspicious quantities of its products to suspect physicians and pharmacies in Tennessee, without disclosing suspicious orders as required by applicable regulations.

196.    According to IMS data, from September 2015 to August 2016, Teva accounted for 33.5% of the hydrocodone prescribed in Tennessee, 28.8% of the oxycodone prescribed in Tennessee, 16.8% of the oxymorphone, and 1.6% of the hydromorphone. This amounted to 1,913,712 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 3.5 Tennesseans during that year.

197.    During the same timeframe of September 2016 through August 2017, Teva accounted for 32.3% of Tennessee hydrocodone prescriptions, 25.1% of its oxycodone prescriptions, 1.8% of its oxymorphone prescriptions, and 1.8% of its hydromorphone prescriptions. This amounted to 1,619,143 Tennessee opioid prescriptions filled by Teva in one year. On average, this means Teva filled an opioid prescription for one out of every 4.1 Tennesseans during that year.

198.    Teva's role relative to branded drugs involved knowing participation in the illegal drug market. Cephalon, a pharmaceutical company

purchased by Teva in 2011, sold two opioid drugs, Actiq and Fendora.  As part of the approval process for Actiq the FDA required a risk management program (RMP) for the marketing of the drug.  The RMP for Actiq in 1998 specifically included special adverse event reporting for adverse events related to "unintended pediatric exposure," "diversion (i.e., use by an individual other than for whom it was prescribed)," or "in the context of 'off label use'".  As of 2001, the FDA further informed Cephalon that it had concerns that its fentanyl-based drug, Actiq, might be used by patients who were not indicated for its use and that there was potential for diversion and abuse of the drug.  In 2006 The Wall Street Journal reported that Actiq, a fast-acting lollipop like oral analgesic that contained fentanyl, was reportedly being called "perc-a-pop" on the street.

199.    In 2005, Cephalon knew that 90% of Actiq prescriptions were for off-label use, and 55% of that total were for chronic back pain.  From 2000 to 2006, sales of Actiq grew from $15 million to over $400 million a year.  The Wall Street Journal further reported that surveys from research firm ImpactRx from June 2005-October 2006 found that more that 80% of patients who use the drug don't have cancer.

200.    In 2006, as Actiq was losing its patent protection as a branded drug, Cephalon began marking a new fentanyl-based drug to replace it, called Fentora.  Fentora, like Actiq, was only ever approved by the FDA for the treatment of breakthrough cancer pain.  As part of the FDA approval of Fentora, Cephalon again was required to agree to a risk management program or RiskMAP, including a plan to monitor, evaluate and determine the incidence of use of Fentora by opioid intolerant individuals, misuse of Fentora, and unintended (accidental) exposure to Fentora.

201.    In November 2007, Cephalon submitted a supplemental New Drug Application (sNDA) to the FDA requesting that the FDA approve Fentora for use in non-cancer

opioid tolerant patients with breakthrough pain. The FDA denied Cephalon's request, explaining that "[i]n the face of a national crisis of prescription opioid abuse and misuse, it is critical that you provide a risk management program with established efficacy [and] adequate restrictions to avoid widespread abuse and misuse." The FDA's letter to Cephalon denying its request addressed the complete failure of the company to address the abuse and misuse of both its potential and its existing products:

> [Y]ou have not adequately addressed the public health concern of increased abuse, misuse, overdose and addiction that is to be expected with more widespread availability of this product in the community. Your proposed plan to mitigate these risks has not been adequately tested to assure that it will, indeed, achieve this outcome for your currently approved indication, let alone the proposed expanded indication.

These problems were never resolved by Cephalon in an amended application and the FDA never approved Fentora for expanded use beyond cancer pain.

202.    Teva expanded its opioid business beyond Actiq and Fentora when it bought pharmaceutical company Actavis, which produces several generic opioids, mainly hydrocodone-acetaminophen and oxycodone-acetaminophen. Those types of opioids are prevalent in Tennessee.

203.    After the FDA in 2012 required all opioid manufacturers to adopt a strategy to combat opioid abuse, Teva began developing a new branded

opioid called Vantrela.  In seeking FDA approval of the drug, Teva presented Vantrela as an "abuse-deterrent" form of hydrocodone.  Teva then developed a marketing plan to target managed care organizations in the hopes they would add this new drug to their formulary. The opioids that Teva sold were the generic versions of these same opioids.  In fact, Teva sold millions of those same opioids in Tennessee from, and as part of its pitch, Teva cited to publicly available documents that demonstrated that the U.S. was in the midst of an opioid abuse and addiction crisis.

204.    In 2015 and 2016, Teva was reviewing and sharing publicly available information and studies about opioid addiction in preparation for Teva's third-party payer marketing strategy for Vantrela, planning to promote Vantrela as an abuse deterrent product. One such publicly available source was a Time Magazine article in June 2015, highlighting the public health crisis of opioid addiction, including specifically in Tennessee.  The Time story highlighted, among other things, that patients often buy the pills on the black market after becoming addicted, and approximately 1/5 of Americans who take opioids are estimated by the National Institutes of Health to be in danger of turning to the black market for more pills.

205.    In June 2016 Actavis prepared a managed care overview to be provided to payers outlining why the misuse, abuse and diversion of opioids is a major public health concern, including the fact that in 2010 1 in 20 Americans over 12 abused opioids, in 2011 1 in 3 ER visits were opioid related, and in 2014 there were 18,000 opioid overdose deaths, a 300% increase in deaths from 1999.  Teva recognized that between 9-28% of misusers of pain relievers get their drugs through a doctor's prescription. Teva also recognized the substantial economic burden of opioid abuse on healthcare, workplace, criminal justice, and societal costs.  Teva even cited studies showing that approximately 27% of chronic pain patients prescribed opioids for non-cancer pain are likely to abuse the drugs.  Teva positioned its branded Vantrela as a cost savings for managed

care payers compared to its generic opioids because generic opioids have a "high rate of abuse and generate enormous costs," lead to high levels of addiction, are responsible for around 2/3 of overdose deaths, contribute to increased healthcare costs and other indirect costs.

206.    Despite now having clear knowledge of the risks of abuse of opioids, including its own opioid products, Teva continued to send its generic opioid products into Tennessee and throughout the United States in large numbers. Vantrela was approved by the FDA in January 2017, yet Teva continues to promote its generic, less abuse-deterrent drugs.  From 2015-2017, IMS data shows that over 2 million Teva produced opioids prescriptions were filled in Tennessee.

207.    Like the other Drug Producer Co-Conspirators, Teva received chargeback data from its distributors that told Teva precisely where its pills were going, in what amount, and to whom.  It had the ability to deny chargebacks relative to pharmacies and dispensing physicians supplied by its distributors, which effectively amounted to controlling whether its pills would reach those pharmacies or not.  And like other defendants, it recognized when orders were manifestly suspicious (because of the size of the order, the size of the community served, and other indicators) and likely to be diverted.  However, it rarely, if ever, denied chargebacks relative to pharmacies anywhere in the country, let alone in Tennessee.  Instead, it chose to fill those suspicious orders anyway, including in Tennessee, recognizing that the shipments were likely being dispensed to fill pill mill prescriptions or otherwise to be diverted into the black market.

208.    Teva recognized that prescription rates per capita are an indicator of potential abuse of prescription opioids.  Nevertheless, Teva continued to fill orders in the Plaintiffs' community where the per capita prescription rates were high and that Teva knew or should have known had no legitimate medical need for the opioids being sold there. Instead of recognizing these orders as suspicious and reporting them to the DEA, Teva simply continued on with business as usual in filling millions of prescriptions for its generic opioids that Teva knew were being widely abused and misused.

209.    As with the other defendants, Teva's suspicious order monitoring system did not actually detect suspicious orders.  Upon information and belief, Teva placed primary responsibility for detecting and reporting suspicious orders with its sales personnel, who were financially incentivized to call on customers who made suspicious prescriptions or submitted suspicious orders rather than report them, and to come up with sham justifications to "clear" suspicious orders or to justify calling on them further. From 2002 to 2011, Teva did not report a single one of its prescription orders as suspicious.  In fact, prior to being named in numerous opioid-related lawsuits, Teva's SOM system has only flagged – and Teva only reported to the DEA – 6 TOTAL suspicious orders for the entire country. The included just one in 2013, one in 2014, four in 2015, and none in 2016.  Otherwise, Teva supplied essentially anyone and everyone who submitted an order for its drugs. This included filling orders that it recognized were being dispensed, in large volumes, to fill prescriptions relative to prescribers under circumstances that Teva recognized were suspicious and indicative of diversion.

210.    Teva shipped orders of opioids in frequencies and in volumes that were inherently suspicious. For example, in April 2015 alone, Teva shipped nearly 5 million pills of hydrocodone into Tennessee, through AmerisourceBergen and others.  The multitude of orders

comprising this volume necessarily were suspicious. Yet Teva filled them. Upon information and belief, Teva filled similarly large volumes of orders from all of the Distributor Defendants for pharmacies and dispensing physicians within Tennessee, under circumstances demonstrating that each order was suspicious.

211.   Other than its so-called suspicious order monitoring program, Teva does nothing to prevent the illegal diversion of its prescription opioid products once the products leave the individual manufacturing facilities, even though it knew that some customers of prescription opioids obtain them expressly for nonmedical purposes. Teva is also aware that the opioid drug diversion problem is particularly large and problematic in Tennessee.

212.   As with the other Co-Conspirators:

a.     Teva's suspicious order monitoring program was structured to be ineffective.

b.     Teva, like the other Producer Defendants, utilized a sales force to sell its branded opioids who called on prescribers directly and on pharmacies and dispensing physicians – nationwide and in Tennessee.

c.     Teva, like the other Producer Co-Conspirators, paid sales representatives of its branded opioids bonuses or commissions based on sales volume relative to Tennessee (as elsewhere).

d.     Relative to branded sales, Teva financially incentivized its sales force to call on high-volume prescribers and targeted those high-volume prescribers to prescribe more opioids.

e.    Relative to its relationship with pharmacies and dispensing physicians, Teva financially incentivized its sales personnel to process and fill suspicious orders.

213.    Teva knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. Teva is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. Teva knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids, including Teva's products. Teva also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of its products to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein. This included knowingly and illegally distribution opioids without effective controls against diversion and filling suspicious orders.

214.    Also, Teva knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing of opioids in Tennessee and Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for detailing prescribers who were subsequently arrested or convicted for illegal prescribing of prescription opioids; and (iii) permitting and directing sales representatives to visit prescribers whose were engaging in suspicious conduct.

## IV.    The Distributor Co-Conspirators Participated in the Illegal Drug Market

### A.    The Distributor Co-Conspirators' Business Models are Unlawful or Otherwise Facilitated Diversion

215.    The Distributor Co-Conspirators facilitated illegal drug transactions in Tennessee by submitting suspicious orders, having them filled, and stocking suspect independent and retail chain pharmacies and dispensing physicians with opioids destined for the illegal drug market.  They had a choice when faced with suspicious orders: submit them or impound them and investigate until they actually cleared the suspicion. They consistently chose to ship opioids to downstream buyers who were likely – and in many instances were criminally convicted for – diverting prescription opioids.  They also acted by promoting their services to suspect pharmacies and dispensing physicians to drive sales volumes, knowing that doing so would encourage diversion. Furthermore, to avoid reporting their own customers, they provided sham justifications for suspicious orders to the Producer Co-Conspirators, as part of a "nod, nod, wink, wink" collaboration between the Distributor Co-Conspirators and the Producer Co-Conspirators. Essentially, the Distributor Co-Conspirators recognized that the Producer Co-Conspirators would accept essentially any purported justification for an inherently suspicious order. Through this "nod nod, wink wink" arrangement, the Distributor Co-Conspirators and Drug Producers collaborated to put prescription drugs into the illegal market without alerting law enforcement or losing their best customers.

216.    Through these depraved acts and schemes, the Producer Co-Conspirators and the Distributor Co-Conspirators helped each other get rich from the devastation that they wrought on Tennessee communities, including Plaintiffs' community. This included causing increasing numbers of opioid overdose abuse

deaths each year – including 1,543 deaths in 2019 and 2,388 deaths in 2020 – and staggering rates of NAS births, including over 1,600 babies born with NAS in Tennessee over the last two years. Co-Conspirators did not care about the human and economic toll on Tennesseans that their misconduct caused – all they cared about was profit.

217.    The Co-Conspirators knew they should monitor, detect, and halt suspicious orders.  For example, industry compliance guidelines established by the Healthcare Distribution Management Association, the trade association of pharmaceutical distributors, explain that distributors are "[a]t the center of a sophisticated supply chain" and therefore "are uniquely situated to perform due diligence in order to help support the security of the controlled substances they deliver to their customers."  The guidelines set forth recommended steps in the "due diligence" process, and note in particular "[i]f an order meets or exceeds a distributor's threshold, as defined in the distributor's monitoring system, or is otherwise characterized by the distributor as an order of interest, the distributor should not ship to the customer, in fulfillment of that order, any units of the specific drug code product as to which the order met or exceeded a threshold or as to which the order was otherwise characterized as an order of interest."

218.    The Distributor Co-Conspirators sold prescription opioids in and around Plaintiffs' community, which Defendants knew were likely to be diverted into the illegal drug market.

219.    DEA Agent Joseph Rannazzisi has emphasized the importance of the Distributor Defendants in preventing opioid diversion: "[b]ecause distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances . . . from legitimate channels into the illicit market, it is incumbent on distributors to maintain effective controls to prevent diversion of controlled

substances. Should a distributor deviate from these checks and balances, the closed system created by the [Controlled Substances Act] collapses."

220.    The sheer volume of prescription opioids distributed to pharmacies in Plaintiffs' community is excessive for the medical need of the community and facially suspicious. Some red flags are so obvious that no one who engages in the legitimate distribution of controlled substances can reasonably claim ignorance of them.

221.    The Distributor Co-Conspirators filled inherently suspicious orders originating from Plaintiffs' community which the Distributor Defendants knew were likely to be diverted to or within Plaintiffs' community.

222.    The Distributor Co-Conspirators filled suspicious orders of unusual size, orders deviating substantially from a normal pattern, orders of unusual frequency in Plaintiffs' community, and orders which Defendants knew or should have known were likely to be diverted into Plaintiffs' community.

223.    Distributor Co-Conspirators possessed direct knowledge of obvious signs of diversion by their customers.    This included filling suspicious orders. Suspicious orders include orders of unusually large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency and duration. They knew that Tennessee pharmacies were receiving prescription opioids in volumes grossly disproportionate to the population and any conceivable medical need.  They knew that local prescribers near those pharmacies

were prescribing at levels that were not medically justifiable and that the pharmacies were filling prescriptions for suspect prescribers.

224.    Rather than seek to stop pharmacies from supplying pills or to stop dispensing physicians who were operating pill mills, the Distributor Co-Conspirators targeted these entities and competed for their business.  In other words, the Distributor Co-Conspirators targeted high-volume dispensing pharmacies (including independent or locally owned pharmacies) to compete for their business. Effectively, they competed for pill mill market share.

225.    The Distributor Co-Conspirators have been subject to repeated investigations and citations for streaming prescription opioids into the illegal drug market.

226.    For example, on September 27, 2006, the DEA sent a letter to "every commercial entity in the United States registered with the [DEA] to distribute controlled substances."  The letter stated that manufacturers and distributors "share responsibility for maintaining appropriate safeguards against diversion" and "given the extent of prescription drug abuse in the United States, along with the dangerous and potentially lethal consequences of such abuse, even just one distributor that uses its DEA registration to facilitate diversion can cause enormous harm."  The letter advised that "DEA will use its authority to revoke and suspend registrations in appropriate cases."  The letter also provides that "in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels."  The letter further discusses that "distributors must be vigilant in deciding whether a prospective customer can be trusted to deliver controlled substances only for lawful purposes. This responsibility is critical, as Congress has expressly declared that the illegal

distribution of controlled substances has a substantial and detrimental effect on the health and general welfare of the American people."

227.    The DEA sent another letter on December 27, 2007 to "reiterate the responsibilities of controlled substance manufacturers and distributors to inform DEA of suspicious orders."   This letter reminded manufacturers and distributors of their obligation to "maintain effective controls against diversion" and "design and operate a system to disclose to the registrant suspicious orders of controlled substances."

228.    The letter states that in terms of reporting suspicious orders:

Registrants that rely on rigid formulas to define whether an order is suspicious may be failing to detect suspicious orders. For example, a system that identifies orders as suspicious only if the total amount of a controlled substance ordered during one month exceeds the amount ordered the previous month by a certain percentage or more is insufficient. This system fails to identify orders placed by a pharmacy if the pharmacy placed unusually large orders from the beginning of its relationship with the distributor. Also, this system would not identify orders as suspicious if the order were solely for one highly abused controlled substance if the orders never grew substantially. Nevertheless, ordering one highly abused controlled substance and little or nothing else deviates from the normal pattern of what pharmacies generally order.

When reporting an order as suspicious, registrants must be clear in their communications with DEA that the registrant is actually characterizing an

order as suspicious. Daily, weekly, or monthly reports submitted by a registrant indicating "excessive purchases" do not comply with the requirement to report suspicious orders, even if the registrant calls such reports "suspicious order reports."

The 2007 letter also said that "[f]ailure to maintain effective controls against diversion is inconsistent with the public interest . . . and may result in the revocation of the registrant's DEA Certificate of Registration."

229.    The 2007 letter also references the final order issued in *Southwood Pharmaceuticals, Inc*., 72 FR 36487 (2007), which "[i]n addition to discussing the obligation to report suspicious orders when discovered" and "some criteria to use when determining whether an order is suspicious," the order "also specifically discusses your obligation to maintain effective controls against the diversion of controlled substances."

230.    The Distributor Co-Conspirators knew which pharmacies and dispensing physicians were filling prescriptions, including the amount and type of drug. The Distributor Co-Conspirators maintained direct relationships with pharmacies and dispensing physicians, including those plainly engaging in filling pill mill prescriptions *en masse*.

231.    The illegal market for prescription opioids exists because distributors choose to submit suspicious orders to manufacturers, manufacturers choose to fill them, and the distributors distribute them to suspect pharmacies where they fill prescriptions written by pill mill doctors.    In American Overdose, Mr. Rannazzisi summed up the role of distributors: To Rannazzisi, distributing highly addictive and potentially lethal drugs wasn't the same as delivering chocolate bars. He regarded the lucrative licenses the wholesalers held as carrying particular responsibilities: "These companies have one task, and that is the safe and secure distribution of

drugs, particularly prescription drugs. Otherwise FedEx or UPS could do this role. This isn't a compliance challenge, like gender discrimination at a tech company, which is horrific, but it's not fundamental to their operation. This is the equivalent of a tech company failing on cybersecurity. If these companies were doing their job right, you shouldn't be seeing black-market prescription painkillers."

**B.    AmerisourceBergen Has a History of Facilitating Illegal Drug Transactions**

232.    On April 24, 2007, the DEA issued an immediate suspension order ("ISO") on AmerisourceBergen's Orlando, Florida distribution center, alleging that AmerisourceBergen was not controlling shipments of prescription opioids to Internet pharmacies and revoking the facility's license to distribute controlled substances.

233.    On June 22, 2007, AmerisourceBergen entered into a settlement with the DEA which led to the reinstatement of the Orlando distribution center's suspended license.    Under that agreement, AmerisourceBergen was required to implement an enhanced order-monitoring program in all of its distribution centers by June 30, 2007.

234.    In 2012, West Virginia's then-Attorney General Darrell McGraw filed lawsuits against AmerisourceBergen, Cardinal Health, and a dozen smaller drug distributors for their role in a drug supply chain that includes doctors who write prescriptions for nonmedical purposes and "pill mill" pharmacies that dispense excessive numbers of painkillers, including opioids.    In February 2017,

Cardinal Health and AmerisourceBergen agreed to pay $20 million and $16 million, respectively, to resolve West Virginia's claims.

235.    The settlement, which is believed to be the largest pharmaceutical settlement in West Virginia history, came shortly after a Charleston Gazette-Mail investigation revealed that drug wholesalers shipped 780 million hydrocodone and oxycodone pills to West Virginia in just six years – a period when 1,728 West Virginians fatally overdosed on those two drugs. AmerisourceBergen alone shipped 80.3 million hydrocodone pills and 38.4 million oxycodone pills from 2007 to 2012. And Cardinal Health and AmerisourceBergen combined to ship nearly 40 percent of all hydrocodone and oxycodone pills to West Virginia.

236.    According to unsealed court documents from the West Virginia case, AmerisourceBergen distributed 149,300 hydrocodone pills – or 12,400 pills a month – to Tug Valley Pharmacy in Mingo County in 2009. The pharmacy filled prescriptions for Drs. Diane Shafer, Katherine Hoover and William Rykman, who operated "sham" pain clinics in Williamson. Federal agents raided the clinics in 2010 and they never reopened.

237.    Unsealed court documents from that case further evidence that AmerisourceBergen shipped 8,000 hydrocodone painkiller tablets to a drive-thru pharmacy over two days in July 2012. On those same two days, a competing drug wholesaler shipped 8,600 hydrocodone tablets to the same "pill mill" pharmacy. AmerisourceBergen sold another 3,800 oxycodone pills to the same pharmacy that month.

238.    AmerisourceBergen also sent 16 billion pills to Missouri in a five-year period, during which time it reported only 244 suspicious orders nationwide.

239.    In 2017, AmerisourceBergen plead guilty to illegally distributing misbranded drugs and agreed to pay $260 million to resolve criminal liability for its distribution of drugs from a facility that was not registered with the FDA.

240.    In 2018, AmerisourceBergen entered into a Corporate Integrity Agreement ("CIA") with the U.S. Dept. of Health & Human Services, and agreed to pay $625 million to resolve civil fraud charges.

241.    Upon information and belief, AmerisourceBergen had a sales force responsible for establishing relationships with pharmacies and dispensing physicians.  Upon information and belief, AmerisourceBergen premised utilized sales of prescription opioids as a basis for sales representative compensation at least through 2012.  Upon information and belief, AmerisourceBergen continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

242.    AmerisourceBergen has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs.  This involved repeatedly filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

243.    AmerisourceBergen recognized that many of its customers in Tennessee were supplying the illegal drug market, filling prescriptions for pill mills, and otherwise filling prescriptions far beyond any legitimate medical need.

AmerisourceBergen observed firsthand obvious signs of diversion by its customers, including parking lots filled with out-of-state license plates and reports from law enforcement concerning the involvement of pharmacies in supplying criminals with opioids, but chose to keep supplying those accounts anyway. It also filled orders originating in Tennessee and Plaintiffs' community of unusual size or frequency, or that the Distributor Co-Conspirators otherwise recognized were indicative of diversion.

244. AmerisourceBergen knowingly shipped orders to fill prescriptions issued by pill mill operators and other over-prescribers in Tennessee and Plaintiffs' community, including but not limited to the Prescriber Co-Conspirators in this action and the other prescribers referenced herein.

245. AmerisourceBergen knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. AmerisourceBergen is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. AmerisourceBergen knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids. AmerisourceBergen also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

246. Also, AmerisourceBergen knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription

opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

C.    **Cardinal Health Has a History of Facilitating Illegal Drug Transactions**

247.    On September 27, 2006, the DEA sent a letter to Cardinal reminding Cardinal that it was the distributors' responsibility to ensure that their products were not diverted for illicit use.  The letter reminded Cardinal that it could not "simply rely on the fact that the person placing the suspicious order is a DEA registrant and turn a blind eye to the suspicious circumstances."  Cardinal and, upon information and belief, all the other defendants in this action nevertheless used that an entity was registered as a basis to submit and fill plainly suspicious orders.

248.    Based on findings from DEA investigations, in November and December 2007, the DEA issued three Immediate Suspension Orders ("ISOs") to Cardinal Health.

249.    On November 28, 2007, the DEA issued an ISO to Cardinal Health in connection with its distribution center in Auburn, Washington (the "Auburn Facility"), immediately suspending the facility's Certificate of Registration because its continued registration constituted "an imminent danger to public health and safety."

250.    According to the ISO, the Auburn Facility repeatedly "distributed unusually large amounts of hydrocodone" to Horen's Drugstore, Inc. ("Horen's Drugstore") – distributing 600,000 dosage units of hydrocodone to Horen's Drugstore from March 2007 through September 2007 – and "disregard[ed]

the clear indications that Horen's Drugstore was engaged in the diversion of controlled substances[.]" Horen's Drugstore was Cardinal Health's largest purchaser of combination hydrocodone products in 2007, and according to the ISO, the drugstore was "a pharmacy engaged in a scheme to dispense controlled substances based on prescriptions that are issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice. This pharmacy dispensed excessive amounts of hydrocodone based on illegitimate prescriptions originating from rogue Internet pharmacy websites, in violation of applicable Federal and State law." The DEA found that Cardinal Health "failed to maintain effective controls against diversion of a particular controlled substance into other than legitimate medical, scientific and industrial channels," and concluded that its continued registration with the DEA constituted "an imminent danger to the public health and safety."

251.    On December 5, 2007, the DEA issued an ISO notifying Cardinal Health of the immediate suspension of its Lakeland, Florida drug distribution facility for failure to maintain effective controls against diversion of hydrocodone.

252.    The ISO detailed how, from August 2005 through October 2007, Cardinal Health failed to maintain effective controls against the diversion of hydrocodone into other than legitimate medical, scientific and industrial channels. According to the ISO, Cardinal Health distributed hydrocodone to various pharmacies, even though the company knew that many of the orders placed by the pharmacies were of an unusual size and were "suspicious" as defined in the CSA. For example, Cardinal Health distributed 1,213,000 dosage units of hydrocodone to Q-R-G, Inc. over the course of February to June 2006, and approximately 1,148,100 dosage units to United Prescription Services, Inc. from July to October 2006. The ISO further detailed that, on September 1, 2006, Eric Brantley, Manager of Quality and Regulatory Affairs for Cardinal Health, sent an

email to the DEA stating that Cardinal Health discontinued all sales of controlled substances to 13 Internet pharmacies, including RKR Holdings, Inc. Nevertheless, from September 1, 2006 to January 31, 2007, Cardinal Health distributed 393,600 dosage units of hydrocodone products to RKR Holdings.  As explained therein Cardinal distributed over 8,000,000 dosage units of hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific, and industrial channels.   Indeed, the ISO indicated that many of Cardinal's largest purchasers "were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that are issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

253.    On December 7, 2007, the DEA issued an ISO to Cardinal Health regarding its distribution center in Swedesboro, New Jersey which, from January 2005 to August 2007, "distributed over 4.5 million dosage units of combination hydrocodone products to customers that it knew or should have known were diverting hydrocodone into other than legitimate medical, scientific and industrial channels."

254.    The ISO stated that some of Cardinal Health's "largest purchasers of combination hydrocodone products were pharmacies engaged in a scheme to distribute controlled substances based on purported prescriptions that were issued for other than a legitimate medical purpose and by physicians acting outside the usual course of professional practice."

255.    In addition to the November and December 2007 ISOs, on January 30, 2008, the DEA issued an Order to Show Cause as to why the agency should not revoke the Certificate of Registration assigned to Cardinal Health's Stafford, Texas distribution center for the improper distribution of hydrocodone.  The DEA also found that Cardinal Health failed to maintain effective controls against the diversion of controlled substances at its McDonough, Georgia facility, Valencia, California facility, and Denver, Colorado facility.  In total, the DEA had reason to believe that seven of Cardinal Health's twenty-seven then-registered distribution centers were not adhering to their obligations under the CSA.

256.    On December 27, 2007, the DEA sent another letter to Cardinal reminding it that all distributors had an obligation to maintain effective controls against diversion.

257.    Following the three 2007 ISOs and the Order to Show Cause, the DEA and Cardinal Health entered into a Settlement and Release Agreement and Administrative Memorandum of Agreement ("MOA") on September 29, 2008.  Pursuant to the MOA, Cardinal Health agreed to pay a civil fine of $34 million, and "maintain a compliance program designed to protect and prevent diversion of controlled substances as required under the CSA and applicable DEA regulations."

258.    After entry of the 2008 MOA, Cardinal Health began violating the CSA again almost immediately. A further investigation of Cardinal Health's Lakeland, Florida facility by the DEA "revealed a persistent failure to exercise due diligence to ensure that controlled substances were not being diverted" over a period of approximately 3 years, from November 2008 to December 2011.  The lack of anti-diversion controls resulted in the top four customers of Cardinal Health's Lakeland facility being supplied with approximately 50 times the amount of oxycodone compared to the average Florida retailer that Cardinal Health services, which the DEA

referred to as a "staggering" difference in distribution. Of those four pharmacies, one was found to be "dispensing oxycodone 30mg prescriptions . . . for persons whose addresses were in Kentucky and Tennessee and who paid cash."

259.    The DEA's further investigation culminated in the issuance of another ISO regarding the Lakeland, Florida facility on February 2, 2012 (the "2012 ISO") for failure to maintain effective controls against diversion of oxycodone.

260.    The 2012 ISO stated that, "[d]espite the MOA, the specific guidance to Cardinal by DEA, and despite the public information readily available regarding the oxycodone epidemic in Florida, Cardinal has failed to maintain effective controls against the diversion of controlled substances into other than legitimate medical, scientific, and industrial channels, in violation of [the CSA]." According to the ISO:

From January 1, 2008 through December 31, 2011 . . . Cardinal's sales of oxycodone products to its top four retail pharmacy customers exceeded 12.9 million dosage units. . . . From 2008 to 2009, Cardinal's sales to its top four retail pharmacy customers increased approximately 803%. From 2009 to 2010, Cardinal's sales to its top four retail pharmacy customers increased approximately 162%. [¶] The egregious quantities of oxycodone distributed by Cardinal to its top four retail pharmacy customers well exceeded the amount of oxycodone distributed to Cardinal's Florida retail pharmacies, which receive, on average, approximately 5,347 dosage units of oxycodone per month.

261.    The 2012 ISO further provided that "[n]otwithstanding the large quantities of controlled substances ordered by Cardinal's top retail pharmacy customers, Cardinal failed to conduct meaningful due diligence to ensure that the controlled substances were not diverted into other than legitimate channels, including Cardinal's failure to conduct due diligence of its retail pharmacy chain customers."

262.    In May 2012, following a DEA investigation, Cardinal Health entered into a second memorandum of agreement relative to its 28 registered distribution facilities. The MOA required Cardinal to maintain a compliance program to monitor and detect diversion, to implement a system for conducting an in-person investigation for any suspicious orders."

263.    On December 23, 2016, Cardinal Health agreed to pay a $34 million fine (separate from the $34 million fine in 2008) to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center.

264.    Also on December 23, 2016, Cardinal Health agreed to pay the United States $44 million to resolve allegations that it violated the Controlled Substances Act in Maryland, Florida, and New York by failing to report suspicious orders of controlled substances, including oxycodone, to the DEA. In the settlement, Cardinal Health admitted, accepted, and acknowledged that it had violated the CSA between January 1, 2009 and May 14, 2012 by failing to "timely identify suspicious orders of controlled substances and inform the DEA of those orders" or to "maintain effective controls against diversion of particular controlled substances into other than legitimate medical, scientific, and industrial channels."

265.    Upon information and belief, Cardinal Health had a sales force responsible for establishing relationships with pharmacies and dispensing physicians. Upon information and belief, Cardinal Health utilized sales of prescription opioids as a basis for sales representative

compensation at least through 2012. Upon information and belief, Cardinal Health continued to compensate sales personnel at least in part based on volume, providing a financial incentive to fill suspicious orders and not to report dispensers that engaged in diversion and supplied pill mills.

266.    Cardinal Health has engaged in the same misconduct relative to Tennessee that it did in the preceding paragraphs.  This involved repeatedly filling suspicious orders without due diligence, and otherwise shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need.

267.    Cardinal Health recognized that many of its customers in Tennessee were supplying the illegal drug market, filling prescriptions for pill mills, and otherwise filling prescriptions far beyond and legitimate medical need. Cardinal Health observed firsthand obvious signs of diversion by its customers, including parking lots filled with out of state license plates and reports from law enforcement concerning the involvement of pharmacies in supplying criminals with opioids, but chose to keep supplying those accounts anyway. It also filed orders originating in Tennessee and Plaintiffs' community of unusual size or frequency, or that Cardinal Health otherwise recognized was indicative of diversion.

268.    Upon information and belief, Cardinal Health knowingly shipped orders to fill prescriptions issued by pill mill operators and other over-prescribers in Tennessee and Plaintiffs' community, including but not limited to the Prescriber Defendants in this action and the other prescribers referenced herein.

269.    Cardinal knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. Cardinal is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. Cardinal knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids. Cardinal also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing/dispensing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

270.    Also, Cardinal knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## V.    The Pharmacy Chain Co-Conspirators' Self-Distribution of Opioids Facilitated the Illegal Opioid Market in Tennessee

271.    The Pharmacy Chain Co-Conspirators, in addition to purchasing opioids from the Distributor Co-Conspirators, also self-distributed opioid medications to their pharmacy locations.

272.    The Pharmacy Chain Co-Conspirators had the same obligations under Tennessee law to monitor, detect, and halt suspicious orders as the Distributor Co-Conspirators. Similarly, the Pharmacy Chain Co-Conspirators repeatedly failed to identify, investigate, report,

and/or halt hundreds of thousands of suspicious opioid orders across the country, including orders going to Tennessee.

273.    The numbers that each Pharmacy Co-Conspirator distributed into the State of Tennessee were staggering. From just 2006 to 2014:

a.    Walgreens distributed 642,704,930 dosage units of opioids into Tennessee;

b.    CVS distributed 186,897,900 dosage units into Tennessee; and

c.    Walmart distributed 251,048,435 dosage units into Tennessee.

274.    The Pharmacy Chain Co-Conspirators did not implement effective diversion control measures when shipping these pills. Instead, they put in place policies and protocols that ensured that the flow of drugs into the illegal market would continue.

**A.    CVS Knowingly Fueled the Illegal Opioid Market**

275.    Before 2009, CVS had no suspicious order monitoring system at all. Instead, it relied on individual "Pickers and Packers" to identify orders of unusual size, frequency, or pattern without clear criteria.  CVS had not written policies, procedures, or protocols for the Pickers and Packers, no formal qualifications for the position, and no training.

276.    In 2009, CVS at least began using a computer algorithm to flag suspicious orders, but that algorithm was flawed from the outset. The SOM did not function properly because it monitored by drug rather than active ingredient,

such that changes in a drug's description or name caused the historical data (necessary for valid calculations) to be lost. The system also failed to account for orders made by and shipped to CVS pharmacies from third parties. Thus, as CVS itself admitted, a particular store could defeat the computer threshold simply by purchasing excess of the threshold from someone other than CVS. CVS knew that this resulted in filling suspicious orders from its pharmacies. At least as of July 2013, CVS internally had identified that CVS's supposed SOM process was irrelevant and pointless. CVS did not implement a SOM system until mid to late 2014, at which point its distribution centers stopped distributing Schedule II opioids at the whole level

277. CVS did not conduct appropriate due diligence on flagged orders. It did not conduct meaningful diligence on more than a small fraction of flagged orders. In 2012 and 2013, CVS at times had only one employee reviewing all potentially suspicious orders for every CVS pharmacy in the country. CVS designed this program to fail, knowing that it would allow for suspicious orders to be filled unabated. Upon information and belief, CVS never reported a single suspicious order to the Tennessee Board of Pharmacy.

278. CVS knowingly entered and participated in the illegal drug market in Tennessee and the Baby Doe Plaintiffs' community. CVS is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. CVS knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids. CVS also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

279. Also, CVS knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## B.    Walgreens Knowingly Fueled the Illegal Opioid Market

280. Nationally, from 2006 to 2012, according to a Washington Post analysis, "Walgreens dominated the nation's retail opioids market."   During that period, Walgreens acted as its own wholesaler, obtaining 97 percent of pain pills directly from drug manufacturers, which allowed it to have more control over how many pain pills it sent to its stores.  Edward Bratton, Walgreens' manager of pharmaceutical integrity, described the company's SOM system prior to 2013 as a "system [that] would continue to send additional product to the store without limit or review which made possible the runaway growth of dispensing of products like Oxycodone[.]"

281. For example, Walgreens used rigid formulas to "detect" suspicious orders. The formulas simply utilized an average number based on historical orders, applied a three times multiplier on that base number, and then flagged an order if it exceeded that multiplier.  From 2007 forward, an order would have been flagged only if it exceeded that multiplier for two consecutive months.

The formulas were not scaled to the size of the community served.  Nor were they informed by geography, population, news reports, local information (provided by pharmacists or news reports), outside investigation, or any form of human input that would actually be effective at slowing the flow of opioids into the illegal drug market in Tennessee.  Instead, by setting these thresholds artificially high, Walgreens ensured that it would keep shipping orders below the threshold even though it should have halted those orders (rather than fill them).

282.    Even at the exceedingly high threshold it had set, Walgreens still identified thousands of orders each week that hit that threshold. Those orders were obviously suspicious. Yet rather than halt the orders, Walgreens elected to ship them. By shipping orders that Walgreens itself had identified as suspicious, it committed an act intended to facilitate the distribution of drugs into the illegal market.

283.    Walgreens then waited until after shipping the orders to report them to anyone. By waiting until after filling an order to report it, Walgreens was able to facilitate the flow of drugs into Tennessee's illegal market.

284.    In September 2012, the DEA issued an immediate suspension order ("ISO") for Walgreens' Schedule II distribution facility in Jupiter, Florida.   In the ISO, the DEA found that Walgreens' distribution practices constituted an "imminent danger to the public health and safety" and were "inconsistent with the public interest." The ISO made the following findings:

a.    In violation of its duty report under 21 CFR 1301.74 and a 2007 letter from the DEA, Walgreens had not reported suspicious orders as they were discovered, but instead had shipped the orders without due diligence to determine if the order was actually being made to serve legitimate medical needs;

b.      Even though the facility served 12 states and Puerto Rico, the formula was the same regardless of a pharmacy's location, the population it serves, or the number of other pharmacies in the area;

c.      Walgreens had failed to maintain an adequate suspicious order reporting system, ignored readily identifiable orders and ordering patterns that obviously reflected diversion at Walgreens pharmacies; and

d.      Walgreens had distributed large amounts of opioids to pharmacies that it knew or should have known were dispensing the drugs to fill prescriptions that were not intended to serve a legitimate medical purpose.

285.    Despite these and other warnings, Walgreens continued to commit acts intended to facilitate the distribution and dispensing of drugs by its pharmacies into the illegal market.  It has admitted that it is unaware of ever performing a due diligence review before shipment on orders listed on its Suspicious Drug Control Order report.

286.    At the distribution center level, Walgreens purposely designed its system simply to supply whatever quantities of drugs its pharmacies requested, rather than to identify red flags of potential diversion.

287.    Moreover, when Walgreens purported to implement anti-diversion measure in 2010 (for the first time), it designed the program to have significant holes. For years, the program did not include orders that Walgreens

stores were also placing to outside vendors, like Cardinal and AmerisourceBergen, allowing stores to order opioids from Walgreens distribution centers and from Cardinal and AmerisourceBergen, effectively permitting double dipping. Walgreens stores also could transfer controlled substances between stores and did not review these transfers (known as "interstores") within the SOM program, allowing transfer for which Walgreens' SOM system did not account. Stores could also place ad hoc "PDQ" (short for "pretty darn quick") orders for controlled substances outside of their normal orders days and outside of the SOM analysis and limits.  Walgreens even could remove a store entirely its from SOM review.

      288.    Furthermore, at times when a store would submit an order that exceeded Walgreens' exceedingly high threshold, Walgreens would reduce the order to the threshold and ship it without conducting further investigation into why its pharmacies were making suspicious orders.

      289.    Walgreens also intentionally understaffed the department that was supposed to conduct diligence and intentionally did not give that group proper training. Despite thousands of orders being flagged each week (even under Walgreens' improperly high threshold), Walgreens officials reviewed only a small fraction. It therefore continued to ship even those orders that it had identified as suspicious.

      290.    In November 2012, Walgreens simply began reducing orders down to threshold rather than halting the orders, investigating them, and reporting them to an appropriate official.

      291.    According to Walgreens witnesses, the company did not confirm a single suspicious order that it shipped to its stores.

292.    Walgreens has been repeatedly cited and penalized for shipping without effective controls against diversion.  For example, in April 2013, it agreed to a then-record $80 million settlement with the DEA to resolve allegations that it had shipped oxycodone and other prescription painkillers that were diverted into the black market. The agreement mandated that, at a corporate level, Walgreens had to maintain a "Department of Pharmaceutical Integrity, a Suspicious Order Monitoring system, remove controlled substance from the calculation of bonuses for pharmacists and technicians, and verify prescribers' DEA numbers to ensure their validity. Despite these warnings, Walgreens continued to violate its responsibilities as a Tennessee registrant.

293.    In particular, Walgreens' conduct facilitated the illegal distribution of opioids into the black market in Tennessee.

294.    Even when pharmacies did hit internal limits imposed by Walgreens, "they could still transfer pills from other stores or order from outside suppliers[,]" Walgreens officials intentionally authorized pharmacies to exceed the internal limits to maintain sales volume.

295.    "Pharmacies could also find workarounds by placing special PDQ orders, meaning 'pretty darn quick,' from Walgreens internal network[,]" a technique used repeatedly by Walgreens pharmacies in Tennessee. In 2012, Walgreens suggested forbidding PDQ orders for oxycodone products.  Pharmacy executive Kermit Crawford vehemently objected to the proposed change, writing, "I was not under the impression this was a done deal. Concerned we are 'all or none.' We have to do what's right for patients also."

296.    Walgreens' internal records showed that its pharmacies continued to operate in a manner that continued to supply opioid products to the illegal drug market in Tennessee, which included filling suspicious orders for pharmacies located in Tennessee, including areas that Walgreens had identified as at high risk of diversion.

297.    Walgreens knowingly entered and participated in the illegal drug market in Tennessee and Plaintiffs' community. Walgreens is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. Walgreens knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids. Walgreens also knowingly participated in the illegal drug market in Plaintiffs' community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

298.    Also, Walgreens knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

### **Walmart Knowingly Fueled the Illegal Opioid Market**

299.    From 2000 to approximately May 2018, Walmart self-distributed tens of millions of shipments of controlled substances to Walmart-branded and Sam's Club-branded pharmacies. Throughout the period from 2012 to 2018, Walmart was the largest self-distributor in the country for oxycodone, hydromorphone, and hydrocodone in terms of both dosage units and grams.

300.    Because Walmart acted as its own distributor, it had access to extensive data and other information that independent distributors would not ordinarily have. In particular, Walmart had a wealth of dispensing information that gave it the ability to investigate the circumstances underlying orders for controlled substances. Walmart had data about individuals who filled controlled-substance prescriptions at its pharmacies, the identities of medical providers who were prescribing controlled substances for those individuals, and reports from its own pharmacists raising concerns.

301.    Despite having information about how often and how much Walmart-branded pharmacies and Sam's Club-branded pharmacies ordered from third-party distributors, Walmart did not account for these orders and shipments in its SOM program.

302.    In November 2010, Walmart adopted Pharmacy Manual 21-402 ("Controlled Substance Monitoring"). This policy simply required certain Walmart employees to review a monthly report, known as a "control drug stock exception report," after the controlled substances had been shipped to the pharmacies and identify any controlled substances that constituted more than 3.99% of a pharmacy's total controlled and non-controlled substance purchases during the prior month.

303.    Under Pharmacy Manual 21-402 (November 2010), Walmart failed to detect many unusual orders. First, the monthly reports did not identify specific controlled substance orders that were unusually large. Instead, the reports aggregated all shipments of particular controlled substances and then

compared those aggregated totals to see if they exceeded 3.99% of a pharmacy's total shipments that month. As a result, many unusually large orders were not flagged because they were not subsumed in the aggregated totals. Second, the policy did not require Walmart to flag any orders that were otherwise suspicious (e.g., exhibiting an unusual frequency or unusual pattern).

304.    Pharmacy Manual 21-402 (November 2010) did not describe these aggregated totals as "suspicious orders" or even state that Walmart was required to detect and report suspicious orders to DEA.

305.    In a June 12, 2014 email, Walmart attached a risk assessment in which it observed that its system for monitoring suspicious orders was an "existing risk" and "emerging risk" for which it had "no processes in place." Walmart's own assessment was that the risk that its pharmacies would place suspicious orders with its own distribution centers was "likely," the second-highest of five levels on Walmart's scale of likelihood of risks.

306.    In July 2014, Walmart revised Pharmacy Manual 21-402 and titled the revised policy "Evaluating Orders of Interest and Suspicious Order Reporting." Unlike the 2010 version of the policy, Pharmacy Manual 21-402 (July 2014) instructed compliance unit personnel to evaluate individual orders as they were placed—rather than monthly aggregated totals after Walmart's distribution centers had already shipped the controlled substances—and report any suspicious orders to DEA.

307.    Pharmacy Manual 21-402 (July 2014) called for Walmart first to identify "orders of interest" from among all controlled substance orders, and then to investigate those "orders of interest" to determine whether they were indeed "suspicious orders" subject to reporting to DEA.

308. Both steps of this system failed. The criteria Walmart adopted for flagging "orders of interest in the first instance were plainly inadequate, allowing many suspicious orders to evade any scrutiny. And Walmart routinely failed to investigate orders that were flagged as "orders of interest" to ascertain whether they were suspicious, prioritizing expeditious distribution of controlled substances to meet its pharmacies' and pharmacists' demands over compliance with state and DEA regulations.

309. Walmart failed to detect and report at least hundreds of thousands of suspicious orders of controlled substances. Over an approximately four-year period from 2013 to 2018, a time during which Walmart shipped an estimated 37.5 million controlled-substance orders to its pharmacies, it reported only 204 suspicious orders to the DEA—in other words, almost none. By comparison, during the same time period, Walmart's back-up distributor McKesson Corporation, which filled orders only when Walmart could not, reported to the DEA more than 13,000 suspicious orders from Walmart pharmacies.[22]

310. Walmart knowingly entered and participated in the illegal drug market in Tennessee and the Baby Doe Plaintiffs' community. Walmart is aware of the extraordinary and unjustifiable volume of opioid prescriptions in Tennessee in relation to other states. Walmart knew that such inflated prescribing necessarily reflects improper prescribing and diversion of opioids. Walmart also knowingly participated in the illegal drug market in the Baby Doe Plaintiffs'

---

[22] Despite even reporting that many (and that is just for the single customer Walmart), in 2017, McKesson was fined $150,000,000 by the DEA for its systemic failure to report suspicious orders during roughly the same period that Walmart reported only 204.

community by supplying quantities of opioids to physicians and pharmacies whose prescribing habits necessarily or likely reflected unlawful diversion, and by engaging in the other acts referenced herein.

311.    Also, Walmart knowingly instituted internal procedures designed to fail to identify potential abuse, diversion, and/or inappropriate prescribing/dispensing of opioids in Tennessee and the Baby Doe Plaintiffs' community, including: (i) incentivizing sales representatives not to report signs of abuse, diversion, and inappropriate prescribing of prescription opioids; (ii) paying bonuses to sales representatives for clearing suspicious orders for prescription opioids; and (iii) permitting and directing SOM personnel to prioritize clearing orders over reporting them.

## VI.    The Pill Mill Co-Conspirators Have Illegally Trafficked Prescription Opioids in and Around Plaintiffs' Community, Aided by the Producer Co-Conspirators, the Distributor Co-Conspirators, and the Pharmacy Chain Co-Conspirators.

312.    Doctor Douglas DeWar and Kingston Family Practice engaged in illegal prescription practices, including prescribing drugs outside the scope of medical practice, prescribing drugs at such high volumes and duration that it addicted his patients to the drugs, and prescribing drugs to people he knew were addicted.

313.    Doctor Douglas DeWar and Kingston Family Practice conduct constituted knowing participation in the illegal drug market, including: knowingly supplying suspicious quantities of opioids to suspect patients who were showing signs of addiction or participation in diversion; knowingly supplying suspicious quantities of opioids that were not medically justified;

knowingly supplying suspicious quantities of opioids which quantities necessarily reflected diversion; and knowingly failing to implement effective controls and procedures to guard against diversion of opioids.

**VII. Drug Producer Co-Conspirators Helped Create the Illegal Drug Market**

**A. In the 1990s, the Drug Producer Co-Conspirators Knew that Using Opioids for Non-Malignant Pain Creates a Serious Risk of Abuse and Diversion Yet Encouraged Opioid Sales and Distribution Practices That It Knew Have Those Effects**

314. As stated by Tennessee's Commissioner of Health Dr. John Dreyzehener, "in the 1990's, MDs started prescribing opioids in large volume to treat [nonmalignant] pain which has caused an opioid addiction problem." Douglas Varney, Commissioner of the Tennessee Department of Mental Health, speaking at a meeting of the Governor's Working Group, similarly concluded that "[b]asically we are dealing with the fallout from the medical profession overprescribing opioids."

315. Up until the mid-1990s, physicians prescribed opioids primarily to cancer patients and persons recovering from surgery. Fearful of the addictive qualities of opioids, physicians would not generally prescribe them for long term chronic pain. As detailed in a review of the development of the opioid crisis published in the 2015 Annual Review of Public Health, "[p]rior to the

introduction of OxyContin [by Purdue in 1995], many physicians were reluctant to prescribe OPRs [opioid pain relievers] on a long-term basis for common chronic conditions because of their concerns about addiction, tolerance, and physiological dependence."

316.    This research confirmed the mid-1990s consensus of medical providers regarding the dangers of opioids. According to the Agreed Statement of Facts signed by Purdue in connection with its 2007 guilty plea to federal criminal charges for misbranding OxyContin: "During the period February through March 1995, Purdue supervisors and employees obtained market research that included focus groups of forty primary care physicians, rheumatologists, and surgeons to determine their receptivity to using OxyContin for non-cancer pain… '[t]he biggest negative of [OxyContin] was the abuse potential.'"

317.    When branded opioids were introduced to the U.S. market, including Tennessee, the Producer Co-Conspirators carefully evaluated physicians' concerns about the risks of addiction associated with opioids and embarked on a highly successful campaign to convince physicians that opioids created minimal risk of addiction. Upon information and belief, the Producer Co-Conspirators knew that, if its efforts were successful, many people would become addicted to prescription opioids and that, as a consequence, abuse and illegal diversion would follow.

318.    To convince doctors and patients in Tennessee that opioids can and should be used to treat chronic pain, these Co-Conspirators had to persuade them that long-term opioid use is both safe and helpful. Knowing that they could do so only by misrepresenting the risks and benefits of long-term opioid use to those doctors and patients, these Co-Conspirators themselves and through the above third-party organizations, made claims that were not supported by or were contrary to the scientific evidence and which were contradicted by data.

319.    To convince doctors and patients that opioids are safe, the Producer Co-Conspirators intentionally trivialized and failed to disclose the risks of long-term opioid use, particularly the risk of addiction, through a series of misrepresentations that have been conclusively debunked by the FDA and CDC. These misrepresentations  reinforced each other and created the dangerously misleading impression that: (a) starting patients on opioids was low-risk because most patients would not become addicted, and because those who were at greatest risk of addiction could be readily identified and managed; (b) patients who displayed signs of addiction probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and overdose and are inherently less addictive. Defendants have not only failed to correct these misrepresentations, but they continue to make them today.

320.    The Producer Co-Conspirators falsely claimed that the risk of opioid addiction is low and that addiction is unlikely to develop when opioids are prescribed (as opposed to obtained illicitly), and failed to disclose the greater risk of addiction with prolonged use of opioids.

321.    As the Producer Co-Conspirators' efforts demonstrated success in the form of rapid increases in opioid prescribing, other opioid producers joined in their efforts to expand the market for opioids.

**B.    The Drug Producer Co-Conspirators Funded "Key Opinion Leaders" to Spread Misinformation Regarding Opioids**

322.    The Producer Co-Conspirators engaged "key opinion leaders" to promote the use of their opioids in a variety of ways. Each Producer Defendant would pay a key opinion leader an honorarium each time he or she agreed to attend a variety of functions, from intimate meals with a single pain management clinic's staff to presenting at huge national and international symposia. Key opinion leaders were selected based on a number of criteria such as the prestige of their affiliated hospitals and the quantity of their published articles, but most importantly their willingness to promote the prescription of opioids.

**C.    The Drug Producer Co-Conspirators Funded Dr. Russell Portenoy, Who Facilitated the Widespread Distribution and Abuse of Opioids by Acting as a Vocal Proponent of Opioid Use**

323.    The Drug Producer Co-Conspirators funded and worked closely with Dr. Russell Portenoy, a physician who emerged as one of the industry's most vocal proponents of long-term opioid use.  According to a Wall Street Journal article, Portenoy essentially made it "his life's work" to campaign for the movement to increase use of prescription opioids.  To this end, speaking on Good Morning America in 2010, Portenoy stated categorically that "[a]ddiction, when treating pain, is distinctly uncommon. If a person does not have a history, a personal history, of substance abuse, and does not have a history in the family of substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very assured that that person is not going to become addicted." This program was broadcasted across the country and, upon information and belief, was widely watched, including within Tennessee and in Plaintiffs' community. Portenoy, who himself is facing lawsuits for his work as a paid opioid pitchman, has now conceded that this

promotion of opioids for chronic pain was "clearly the wrong thing to do."   He is on record stating: "I gave innumerable lectures in the late 1980s and 90's about addiction that weren't true."

324.    The Drug Producer Co-Conspirators paid Dr. Portenoy millions of dollars from 1997 to 2007 to continue publicizing information that they knew would continue to create opioid addicts and would fuel the secondary illegal market for opioids. For example, in approximately 2004, Endo published an education pamphlet edited by Dr. Portenoy, called Understanding Your Pain: Taking Oral Opioid Analgesics, which claimed that "[a]ddicts take opioids for other reasons [than pain relief], such as unbearable emotional problems."  In funding Dr. Portenoy, the Drug Producer Co-Conspirators yet again knowingly helped foster the growing population of opioids addicts and perpetuated the illegal opioids market that serviced them and which would carry forward into the late 2010's.

325.    Teva listed Dr. Portenoy as a "Key Opinion Leader" at various times.

**D.     The Drug Producer Co-Conspirators Funded the American Pain Foundation, Which Claimed (Among Other Things) That the Belief That "Opioid Pain Medications are Universally Addictive" was a Common Misconception**

326.    The Drug Producer Co-Conspirators also funded the American Pain Foundation ("APF"), which has been described by the President of Physicians for Responsible Opioid Prescribing as "a front for opioid

manufacturers."  The APF's 2010 annual report details thousands of pro-opioid advertisements, public statements, letters, Facebook Posts, and similar communications. It states that: "Through online, print, radio, and television outlets, APF's local and national media outreach efforts secured 1,600 media stories on pain in 2010 – an increase of 1,255% from 2009. Reaching more than 600 million people with important pain-related messages, APF spokespeople and advocates provided education, information and assistance to people with pain and combated the negative stereotypes and stigmas associated with pain."  Upon information and belief, APF distributed the types of messages referenced in its 2010 Annual Report to physicians within Tennessee.

327.    For example, in or around 2011, the APF published "Policymaker's Guide," which characterized the notion that "strong pain medication leads to addiction" as a "common misconception[]":

Many people living with pain, and even some health care practitioners, falsely believe that opioid pain medicines are universally addictive. As with any medication, there are risks, but these risks can be managed when these medicines are properly prescribed and taken as directed. For more information about safety issues related to opioids and other pain therapies, visit http://www.painsafe.org.


The guide describes "pain in America" as "an evolving public health crisis" and characterizes concerns about opioid addiction as misconceptions: "Unfortunately, too many Americans are not getting the pain care they need and deserve. Some common reasons for difficulty in obtaining adequate care include: . . . Misconceptions about opioid addiction."  It even characterizes as a "myth" that "[c]hildren can easily become addicted to pain medications."  This

message is just one example of the types of messages that APF published with substantial financial support from the Drug Producer Co-Conspirators.

328.    Upon information and belief, the Drug Producer Co-Conspirators funded the APF and supported it with the intention and expectation that APF's messaging would continue to create more opioid addicts and necessarily result in more illegal abuse and distribution of opioids – and knowing that precisely those effects were occurring nationwide, in Tennessee, and in the communities at issue in this case.

## VIII.    Teva Also Contributed to the Illegal Prescription Opioid Market that Fuels Tennessee's Opioid Epidemic

### A.    Teva Pushed Opioid Drugs for Unapproved Purposes

329.    As described herein, Teva is knowingly participating in the distribution chain of illegal opioids in Tennessee and Plaintiffs' community by various means. Among other acts alleged herein, its prodigious supply of opioids into East Tennessee far exceeds the quantity of drugs that could be used legally and for medically necessary purposes, and necessarily reflects knowing participation in the widespread and notorious illegal opioids market in Plaintiffs' community. These facts alone establish knowing participation in the chain of distribution of illegal drugs in East Tennessee.  Teva's knowing participation in this illegal drug market is reinforced by its own historic efforts to increase the size of that market and/or to capture an increasing share of it from year to year.

330.    According to a DOJ press release that summarizes Teva's guilty plea for criminal violations of the Food and Drug Act, Teva trained its sales representatives to disregard restrictions of the FDA-approved label, employed sales representatives and healthcare professionals to speak to physicians about off-label uses of Teva opioids and funded Continuing Medical Education ("CME") Courses to promote off-label uses. Specifically, the DOJ stated:

From 2001 through at least 2006, [Teva] was allegedly promoting [Actiq] for non-cancer patients to use for such maladies as migraines, sickle-cell pain crises, injuries, and in anticipation of changing wound dressings or radiation therapy. [Teva] also promoted Actiq for use in patients who were not yet opioid-tolerant, and for whom it could have life-threatening results.

331.    As a result of this unlawful marketing of Actiq, almost 90% of Actiq prescriptions were to patients for off-label, non-cancer use.

332.    Then-acting U.S. Attorney Laurie Magid commented on the dangers of Teva's unlawful practices:

This company subverted the very process put in place to protect the public from harm, and put patients' health at risk for nothing more than boosting its bottom line. People have an absolute right to their doctors' best medical judgment. They need to know the recommendations a doctor makes are not influenced by sales tactics designed to convince the doctor that the drug being prescribed is safe for uses beyond what the FDA has approved.

**B.    Teva Funded Pro-Opioid Publications and Presentations**

333.    In addition to its direct marketing, Teva indirectly marketed through third parties to change the way doctors viewed and prescribed opioids - disseminating the messages that opioids were safe for the treatment of chronic, long-term pain, that they were non-addictive, and that they were under-prescribed to the detriment of patients who were needlessly suffering. Teva did so by sponsoring pro-opioid front groups, prescription guidelines, articles, and CMEs, and Teva paid physicians thousands of dollars every year to publicly opine that opioids were safe, effective and non-addictive for a wide variety of uses.

334.    Through its sponsorship of the FSMB's "Responsible Opioid Prescribing: A Physician's Guide," Teva continued to encourage the prescribing of opioid medication to "reverse ... and improve" patient function, attributing patients' displays of traditional drug- seeking behaviors as merely "pseudoaddiction."

335.    Teva sponsored APF's guide, which warned against the purported under-prescribing of opioids, taught that addiction is rare and suggested that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain.

336.    A summary of the February 12-16, 2008 AAPM annual meeting reinforced the message, promoted both by the AAPM and the APS, that "the undertreatment of pain is unjustified." It continues:

Pain management is a fundamental human right in all patients not only with acute postoperative pain but also in patients suffering from chronic pain. Treating the underlying cause of pain does not usually treat all of the ongoing pain. Minimal pathology with maximum dysfunction remains the enigma of chronic

pain. Chronic pain is only recently being explored as a complex condition that requires individual treatment and a multidisciplinary approach. It is considered to be a disease entity.

337.     Teva also sponsored, through an educational grant, the regularly published journal Advances in Pain Management. In a single 2008 issue of the journal, there are numerous articles from Portenoy, Dr. Steven Passik, Dr. Kenneth L. Kirsh, and Webster, all advancing the safety and efficacy of opioids. In an article titled "Screening and Stratification Methods to Minimize Opioid Abuse in Cancer Patients," Webster expresses disdain for the prior 20 years of opioid phobia.

338.     In another article from the same issue, "Appropriate Prescribing of Opioids and Associated Risk Minimization," Passik and Kirsh state: "[c]hronic pain, currently experienced by approximately 75 million Americans, is becoming one of the biggest public health problems in the US." They assert that addiction is rare, that "[m]ost pain specialists have prescribed opioids for long periods of time with success demonstrated by an improvement in function" and that then-recent work had shown "that opioids do have efficacy for subsets of patients who can remain on them long term and have very little risk of addiction."

339.     In November 2010, Fine and others published an article presenting the results of another Teva-sponsored study, concluding that: (a) "[t]here has been a steady increase in the use of opioids for the management of chronic non-cancer pain over the past two decades"; (b) the "widespread acceptance" had led to the publishing of practice guidelines "to provide evidence- and consensus-based recommendations for the optimal use of opioids in the management of chronic pain"; and (c) those guidelines lacked "data assessing the long-term

benefits and harms of opioid therapy for chronic pain." They also conclude that the number of abuse-related events was "small."

340. From 2000 forward, Teva has paid doctors nationwide millions of dollars for programs relating to its opioids, many of whom were not oncologists and did not treat cancer pain. These doctors included Portenoy, Fine, Passik, Kirsh, and others.

## IX.     **East Tennessee Was Flooded with Opioids from Florida**

341. Florida pill mills actively supplied the Tennessee drug market. Highway I-75 runs from Florida through the upper south, including Tennessee. The criminal diversion of prescription opioids along I-75 from Florida northward became known as the "Oxy Express."

## X.     **From 2012-2017, the Drug Producer Co-Conspirators Helped Funnel Millions of Dollars to Advocacy Groups that Promoted Opioid Use**

342. On February 13, 2018, Senator Claire McCaskill, released a report showing that Purdue and other producers funneled over $10 million to 14 advocacy groups and affiliated doctors who took "industry friendly positions," which included issuing medical guidelines promoting opioids for chronic pain, lobbying to defeat or include exceptions to state limits on opioid prescribing, and criticizing prescribing guidelines from the U.S. Centers for Disease Control and

Prevention.  The Report states that as these industry-funded entities and affiliated physicians:

[o]ften echoed and amplified messages favorable to increased opioid use – and ultimately the financial interest of opioid manufacturers. These groups have issued guidelines and policy minimizing the risk of opioid addiction and promoting opioids for chronic pain, lobbied to change laws directed at curbing opioid use, and argued against accountability for physicians and industry executives responsible for over-prescription and misbranding. Notably, a majority of these groups also strongly criticized 2016 guidelines from the Centers for Disease Control and Prevention (CDC) that recommended limits on opioid prescriptions for chronic pain – the first national standards for prescription opioids and a key federal response to the ongoing epidemic.

The fact that these same manufacturers provided millions of dollars to the group described [in this report] suggests, at the very least, a direct link between corporate donations and the advancement of opioids-friendly messaging. By aligning medical culture with industry goals this way, the groups described in this report may have played a significant role in creating the necessary conditions for the U.S. opioids epidemic.

343.    Senator McCaskill also aptly recognized:

The opioid epidemic is the direct result of a calculated marketing and sales strategy developed in the 90's, which delivered three simple messages to physicians. First, that chronic pain was severely undertreated in the United States. Second, that opioids were the best tool to address that pain. And third, that opioids could treat pain without risk of serious addiction. As it turns out, these messages were exaggerations at best and outright lies at worst.

XI.    **The Drug Producer Co-Conspirators Knowingly Fostered Opioid Addiction and Fueled the Illegal Opioids Market in Which They are Now Knowingly Participating**

344.    The Drug Producer Co-Conspirators' promotion of opioids gave rise to and fueled the illegal drug market that existed in Plaintiffs' community during all periods relevant to this suit. Their representations regarding the risks of opioids and actions taken to push opioids through aggressive marketing of their collective message contributed to the market for both illegally prescribed opioids and for diverted opioids (and heroin for those addicts who could no longer obtain or afford prescription opioids).

345.    As set forth in the examples above, the Drug Producer Co-Conspirators operated websites and/or funded third party physicians, organizations, and websites that all pushed the message that opioids were not highly addictive and/or were appropriate for long-term use to treat chronic pain. The Drug Producer Co-Conspirators chose not to fund any organizations and third parties who promoted the contrary (and scientifically supported) message that opioids were highly addictive and not suitable for long-term use to treat chronic pain. It also chose not to pull funding from the pro-opioids organizations. The Drug Producer Co-Conspirators made these choices knowing and expecting that by doing so, the opioids market would continue to expand and continue to create more opioid addicts dependent on the illegal diversion of their products.

346.    Each of their actions benefitted the other by creating legions of opioid addicts desperate to obtain opioids from any producer's line. The dramatic rise in opioid prescriptions, and associated overdoses, other related health problems, and NAS births (as detailed below) since the commencement of the Drug Producer Co-Conspirators' campaign in the mid-1990's shows the scope of the illegal drug market knowingly created by those defendants.

347.    The Defendants knew that opioid-dependent individuals in Tennessee would, ultimately, be constrained to obtain opioids through illegal distribution channels and further, that a significant number of those individuals are adult women of child bearing ages that would give (and have given) birth to babies dependent upon opioids with alarming frequency in Eastern Tennessee, and elsewhere in Tennessee (as a result of those addicted mothers' ingestion of opioids during pregnancy.

348.    Speaking before the House Opioid Task Force in 2017, Dr. Michael Baron of the Tennessee Board of Medical Examiners summed up the cumulative effect of the opioid producers' multi-year campaign:

> We came out with what I call 'Generation O.' A whole generation of physicians that were taught it's ok to prescribe opiates, that they're safe, and that it's what the patient wants. But we bypassed evidence-based medicine. The whole medical system was hijacked by industry and really agreed.
>
> [***]
>
> The triggers of the opioid epidemic were really the pharmaceutical industry and pain experts that were on the payroll of the pharmaceutical industry. And they preached that opioids are safe and effective for chronic, non-cancer pain, the risk of addiction is rare, and opioid therapy can be easily discontinued, all of which is nonsense.

## XII.    GENERAL ALLEGATIONS OF MCKINSEY'S CONTROL OF THE OPIOID CRISIS

349.    There is not one aspect of the opioid crisis that McKinsey[23] did not design, oversee, implement, and control. Beginning in at least the 1990s, McKinsey was the mastermind behind the opioid crisis. McKinsey created the Industry of Pain. It was not routine consulting—it was the McKinsey Way. It is the McKinsey Opioid Epidemic.

---

[23] As described later in the section on the parties, collectively, the Defendants are referenced as "McKinsey."

346.    Plaintiffs set forth the actions that McKinsey directly took to control, manipulate, and abuse the opioid market itself that resulted in the injuries suffered by Plaintiffs:

- McKinsey knew OxyContin and other extended-release drugs did not last for the 12-hour dose, which was the entire basis for FDA approval of long-acting opioid drugs, as well as the basis for targeting opioids prescribing by healthcare providers

- McKinsey knew precisely how abused OxyContin and other opioids were because it calculated how many doses each patient received at each dosage level and then instructed its co-conspirators to abuse the abuse by making more money by targeting those high dose patients and converting them to even higher doses

- McKinsey exploited and helped increase the opioid abuse epidemic in order to push abuse so high that the FDA would require abuse deterrent formulations and give exclusive sales rights to McKinsey's clients

- McKinsey constructed algorithms to identify prescribers to target with an onslaught of sales representatives—this went well beyond McKinsey merely pulling numbers of total opioid prescriptions per doctor

- McKinsey's data showed pregnant women were being diagnosed with Opioid Use Disorder while pregnant at alarmingly high rates

- McKinsey instructed multiple co-conspirators to pair opioid pain drugs with drugs targeted to specific conditions for women of childbearing age and ability, utilizing conspirators existing OBGYN pain targeting relationships—those conditions included those trying to get pregnant through In Vitro Fertilization (IVF)

- McKinsey's self-touted expertise in women's health (in general) and specifically maternal health included identifying how crucial OBGYNs were to women taking opioids during pregnancy and NAS outcomes, stating to state Medicaid clients that if Medicaid targeted OBGYNs to stop opioid usage, maternal opioid usage would decline—while telling opioid manufacturers to target OBGYNs for opioid sales

- McKinsey not only targeted OBGYNs for opioid sales, but refused to remove OBGYNs from the target lists when requested by sales representatives

- McKinsey knew fetal opioid exposure increases the risk of long-term injuries, including developmental and behavioral problems, neural tube defects, congenital heart defects, and gastroschisis, in addition to the concerns for pre-term birth, stillbirth, and withdrawal at birth

- McKinsey designed clinical studies, handled clinical data, interpreted data analyses, and ghostwrote scientific journal articles, as well as key crucial submissions to the FDA

347.    McKinsey had a duty not to promulgate lies that harm Plaintiffs; mislead the FDA about the safety and efficacy of opioid drugs; and escalate abuse and diversion by manipulating systems with conspirators to encourage abuse and diversion of opioids, particularly by prescribers.

348.    Over a span of decades McKinsey implemented a scheme to manipulate the Opioid Market on behalf of its' Opioid Clients to use its pivot position between the major manufacturers, Contract Research Organizations (CROs), the distributors, the FDA, third party payors and state governments; such Opioid Market Manipulation was not only knowingly violative of the Controlled Substances act, but also performed in a manner that aided and abetted its clients' efforts to hide their products addictive nature and harm to the unborn, causing proximate harm to the Plaintiffs pled herein.

349.    With Purdue, McKinsey designed and executed projects to target never-ending increases of prescribing by healthcare professionals—plans that were then continuously reevaluated and micromanaged to increase even more sales. McKinsey targeted health care facilities in order to reach larger audiences of unnamed healthcare professionals. Upon information and belief, this relationship between Purdue and McKinsey would continue well up to Purdue's bankruptcy.

350.    McKinsey targeted health insurers/payors to increase coverages of branded opioid drugs to increase branded sales, using its contacts in the industry, particularly as other clients of the consulting firm, to help persuade insurers/payors to continue funding the opioid crisis, increasing the flood of prescription opioids.

351.    McKinsey is architect of the vehicle to perpetuate false and misleading data for the FDA and health care providers. McKinsey had its hand-selected researchers and scientists perform analyses needed for FDA approval of opioid drugs, it directly sent the researchers and scientists experimental sample data provided by the manufacturers themselves, and ghostwrote articles in peer-reviewed journals presenting these findings as non-biased and scientifically sound. McKinsey then analyzed, wrote, and packaged FDA New Drug Applications for their

opioid manufacturing clients to gain FDA approval for new opioid drugs. McKinsey used its ghostwritten articles and scientific analyses to bolster the safety and efficacy claims of their client's drugs to gain FDA approval. McKinsey's work on this science was never disclosed to journals, regulators, or the public.

352.     McKinsey specifically orchestrated the targeting of medical journals, insurance companies/payors, and healthcare professionals for information and research on safety, efficacy, and abuse. This included executing proactive outreach activities to patients and doctors, identifying key opinion leaders in the medical community, and identifying health economics policy informatics (HECON) data. It crafted the medical messaging for opioid products that was false and misleading.

353.     McKinsey targeted deals with large healthcare facilities to ensure that places like large hospitals would continue to contract for large orders of McKinsey's clients' opioid drugs.

354.     McKinsey also targeted doctors, such as Plaintiffs' doctors.

### XIII.    The Drug Producer Co-Conspirators, the Drug Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators Engaged in a Conspiracy with McKinsey to Profit from the Illegal Opioid Market by Any Means Necessary Which Exacerbated the Opioid Epidemic

350.     The Drug Producer Co-Conspirators, the Drug Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators were engaged in a conspiracy with McKinsey to circumvent state and federal laws intended to minimize the diversion of opioids.

351.     Through chargeback data, the Drug Producer Co-Conspirators had visibility into the extravagant opioid orders being placed by independent and retail chain pharmacies, including those owned and operated by the Pharmacy Chain Co-Conspirators. Instead of reporting these orders to law enforcement and refusing to honor these rebates, the Drug Producer Co-Conspirators

almost always continued to supply the Pharmacy Chain Co-Conspirators and others with opioids at a discounted rate to maximize their profits.

352.    The Distributor Co-Conspirators were in regular contact with the Drug Producer Co-Conspirators about potentially suspicious pharmacies; but as long as the Drug Producer Co-Conspirators continued to honor chargebacks, the Distributor Co-Conspirators continued to fill these pharmacies' suspicious orders, especially if the pharmacy at issue was one of the Pharmacy Chain Co-Conspirators.

353.    The Pharmacy Chain Co-Conspirators knew that the Distributor Co-Conspirators fiercely competed with one another for their substantial books of business. As a prerequisite to gifting the Distributor Co-Conspirators their accounts, the Pharmacy Chain Co-Conspirators would demand that all of their locations be exempted from the Distributor Co-Conspirators' SOM system until their exorbitant monthly orders of opioids would not be identified as "suspicious" by the Distributor Co-Conspirators. Even when an order for a Pharmacy Co-Conspirator was identified by a Distributor Co-Conspirator's SOM system, the Distributor Co-Conspirator would expedite a threshold increase to clear the order. The Distributor Co-Conspirators were so worried about losing the Pharmacy Co-Conspirators' business that they would proactively reach out to the Pharmacy Chain Co-Conspirators when their SOM team saw a Pharmacy Co-Conspirator location nearing its threshold for opioids.

354.    As self-distributors of opioids themselves at certain points, the Pharmacy Chain Co-Conspirators understood that the Distributor Co-Conspirators had obligations to monitor for suspicious orders, but nevertheless demanded (and received) threshold increases for what the Pharmacy Chain Co-Conspirators clearly knew were suspicious orders for opioids. The Drug Producer Co-Conspirators witnessed and enabled these unlawful ordering tactics by continuing to

grant chargebacks for the Pharmacy Chain Co-Conspirators, and encouraged the Distributor to Co-Conspirators keep the opioids flowing to these suspicious pharmacies.

355.    The Drug Producer Co-Conspirators, the Distributor Co-Conspirators, and the Pharmacy Chain Co-Conspirators knew that their concerted and coordinated effort to subvert Tennessee state law resulted in the diversion of opioids into the illegal drug market, including the illegal drug markets in Tennessee and Plaintiffs' community.

356.    **The United States, and Tennessee in Particular, is Plagued by Rampant Opioid Abuse Driven by Defendants and Co-Conspirators Perpetuating an Illegal Market for Prescription Opioids**

### a.  Opioids are Abused and Diverted at Alarming Rates

357.    The increasing demand, and high availability, of prescription opioids correlates with increased addiction, abuse, and diversion (a term used to describe redistribution of prescription drugs for illegal uses) throughout the country, including Tennessee and Plaintiffs' community. According to the Centers for Medicare & Medicaid Services, "'[d]rug diversion' is best defined as the diversion of licit drugs for illicit purposes. It involves the diversion of drugs from legal and medically necessary uses towards uses that are illegal and typically not medically authorized or necessary."

358.    Opioid misuse is a national epidemic. For example, the federal government estimated that 11.5 million people had abused opioid pain relievers in 2016, including approximately 4.4% of all people in the United States aged 12 or older.  These statistics are disturbing, indicating that about 1 in 20 people in the U.S. are abusing opioids.

359.    Unfortunately, the situation in Tennessee is no better, and indeed may be worse. During 2013 – 2014, the State of Tennessee estimated that nearly 5% (221,000) of adults in Tennessee used pain relievers for non-medical purposes. Of these, the State estimated that 69,100

Tennesseans were addicted to prescription opioids and required treatment for prescription opioid abuse. The other 151,900 were using prescription opioids in ways that could be harmful and may benefit from early intervention strategies.  Not surprisingly, opioids abuse continues to go hand in hand with an illegal drug market from which the Defendants and Co-Conspirators are knowingly deriving                                substantial                                profits.



**a.  The Defendants and Co-Conspirators are Aware of a Nationwide Problem**

360.    Trends in opioid production, prescriptions, and usage over the last decade put drug producers and distributors on notice of a heightened risk of abuse and diversion nationwide. For example:

    a.    according to the Working Group Report, "[s]ince 1999, there has been no overall change in the amount of pain experienced by Americans, yet the number of prescriptions for opioids has quadrupled[;]"

    b.    in the past two decades, the rate of opioid prescribing in the United States has increased 600%.  The United States accounts for 4.6% of the world population but its citizens, by 2011, were consuming 80% of the world's opioid production;

    c.   between 2009 and 2013, both the number of prescriptions filled per patient and the number of days of medication per prescription increased by approximately 8.4%;

    d.   nearly half (46.9%) of new opioid users who take these medications for more than 30 days in the first year continue using them for three years or longer. Signaling a particularly alarming trend, nearly 50% of these patients are only taking short-acting opioids — which can make them more prone to addiction — rather than long-acting formulations, which are designed for extended pain relief;

    e.   on average, the patients who chronically used these medications filled 56 short-acting opioid prescriptions over three years — nearly 19 prescriptions each year; and

    f.   prescription opioid overdose deaths quadrupled in parallel with prescription opioid sales in the United States between 1999 and 2010.

361.    Defendants and Co-Conspirators know that production volumes of opioids skyrocketed in the last twenty-five years. In 1993, the DEA allowed pharmaceutical companies to produce 3,520 kilograms of oxycodone. In 2015, the DEA authorized production of 137,500 kilograms of oxycodone. That's a 39-fold increase in 22 years.

362.    Defendants and Co-Conspirators are also well-aware that for 2018, the DEA proposed a 20% reduction in the number of prescribed schedule II opioid painkillers that can be produced in the United States, with Acting Administrator Chuck Rosenberg warning that "Physicians, pharmacists, and patients must recognize the inherent risks of these powerful medications, especially for long-term use."

### a.   The Stream of Opioids into Tennessee is Alarmingly High and Put Defendants on Notice of Abuse and Diversion

363.    Tennessee currently has the third highest statewide opioid prescription rate in the nation. Indeed, Tennessee doctors in 2015 wrote more than 7.8 million opioid prescriptions — or 1.18 prescriptions for every man, woman and child in the State, placing Tennessee number 2 in the nation among all States for the number of opioid prescriptions per capita according to IMS Health data. By contrast, California with its population of 38.8 million people only had 0.48

prescriptions per capita in 2015. As reported by the CDC, Tennessee's oxycodone prescription rate is twenty-two times that of Minnesota's. As reported by Commissioner of Health Dreyzehner in 2015 his presentation "Neonatal Abstinence Syndrome, a Tennessee Perspective," 51 hydrocodone pills and 21 oxycodone pills were prescribed for every Tennessean during the period covered by that report. The same report details the dramatic, multi-fold increase in opioid prescriptions since 1999, in the absence of any meaningful increase in patients experiencing chronic pain.

364.    According to the Tennessee Department of Health's Drug Overdose Dashboard, there were 7,636,112 opioid prescriptions written in Tennessee in 2016 alone.  The State is currently dispensing opioids at rate of 68.5 opioid prescriptions per 100 persons.

365.    According to IMS Health Data, the number of prescriptions of popular branded and generic opioid products containing hydromorphone, oxymorphone, oxycodone, and hydrocodone in the State of Tennessee totaled 6,148,823 for the 12-month period of September 2015 through August 2016, and 5,639,429 for the 12-month period of September 2016 through August 2017. This means in just over a two-year period, Tennesseans received more than 11.7 million of these prescriptions.

### a.  The Opioid Epidemic Has Devastated Tennessee Communities

366.    It is difficult to overstate the human, economic, and societal toll that the opioid epidemic and associated abuse and diversion have wrought in Tennessee. The levels of opioid abuse in Tennessee are staggering: Tennessee and Plaintiffs' community are awash in opioids, plagued by high levels of opioid-induced deaths and babies born with NAS, and racked by an illegal opioids market. The flood of opioids has had – and continues to have – predictably devastating effects on Tennessee communities, including Plaintiffs' community. This includes

staggering rates of addiction, opioid-related deaths, and babies born with NAS, along with the presence of criminal drug trafficking rings.

367.    "Opioid overdoses, mainly from prescription drugs, are … the leading cause of the recent unexpected rise in the mortality rate of middle-aged white Americans, particularly women in rural areas, after decades of steady decline."

368.    As recently as 2016, the preeminent medical journal in the United States concluded that "[t][wo major facts can no longer be questioned. First, opioid analgesics are widely diverted and improperly used, and the widespread use of the drugs has resulted in a national epidemic of opioid overdose deaths and addictions . . . . Second, the major source of diverted opioids is physician prescriptions."  Overdose deaths increased in Tennessee from 342 in 1999 to 2,388 in 2020, the last year for which overdoses have been calculated.  That represents a nearly 600% increase. Tragically, the rates of opioid deaths in Tennessee outpace the national average by a wide margin. The vast majority of overdose deaths in Tennessee – nearly 72% in 2015 – involved opioids. From 2012 to 2020 (the last year for which data has been reported), Tennessee set a new record each year for the number of opioid overdose deaths, with 2,388 in 2020 alone.   The rate in 2020 equated to more than 6 opioid overdose deaths in Tennessee every single day.

**Rates of Opioid Related Overdose Deaths (rate per 100,000 Population)**
**Tennessee and United States, 1999-2010**



Between 2005 and 2015, just one decade, unintentional overdose deaths in Tennessee increased over 250%. Unintentional overdose deaths now account for more early deaths in Tennessee than automobile accidents, suicides, or homicides.

369.   Defendants also contributed to NAS deaths in Tennessee. NAS is a clinical diagnosis, and "a consequence of the abrupt discontinuation of chronic fetal exposure to substances that were used or abused by the mother during pregnancy."

370.   According to a report produced by Governor Bill Haslam's Opioid Abuse Working Group pursuant to 2015 Tenn. Pub. Acts Ch. 389 ("Governor's Working Group Report"), "[t]he number of babies born with Neonatal Abstinence Syndrome (NAS). . . increased tenfold from 2000 to 2010." Since 2010, the problem has only gotten worse.

371.   Along with overdose deaths, the number and rate of NAS – a condition suffered by babies born to mothers addicted to opioids – has also increased dramatically in Tennessee since 2007:



372.    As illustrated by the following map, researchers analyzing hospital discharge data have determined that Tennessee, along with its border states Kentucky, Alabama, and Mississippi, have the highest rates of NAS births in the nation.



**NAS Incidence by Geographic Region, 2012**

NAS per 1,000
Hospital Births
15–20
10–15
5–10
0–5

Patrick  SW, Davis MM, Lehmann CU, et al. *J Perinatol.* 2015 Aug;35(8):650-5.

8

373.    The percentage of pregnant women served by the Tennessee Department of Mental Health & Substance Abuse Services—42.3% in 2012—listing prescription opioids as their primary substance of abuse was over twice the percentage in the United States overall (18.4% in 2012).

374.    TennCare eligibility records establish that 24.3% of babies born with NAS in 2012 were placed in the Department of Children's Services' custody within one year of birth.

375.    The epidemic of NAS babies is an outgrowth of the explosion in the amount of opioids in Tennessee since the mid-1990s. As the Appalachia HIDTA recognized in its 2015 Annual Report:

> [T]he state of Tennessee and east Tennessee in particular, is plagued by an epidemic of opioid abuse, which has unfortunately now resulted in a resurgence of heroin as a growing threat. A consequence of this opioid abuse is the alarming number of children being born dependent on opioids, afflicted with Neonatal Abstinence Syndrome (NAS). Children born with NAS suffer extreme physical symptoms of withdrawal and require specialized care in the neonatal wards of hospitals. This treatment often consists of children being given smaller doses of methadone or similar drugs, over time, to break their addiction to opioids.

376.    The direct link between the flood of prescription opioids and the NAS baby crisis in Tennessee has been clearly stated by Tennessee's Commissioner of Health Dr. John Dreyzehner. In a 2015 presentation entitled "Neonatal Abstinence Syndrome: A Tennessee Perspective," Commissioner Dreyzehner addressed "the Substance Abuse Epidemic and resulting NAS epidemic."

377.    In his NAS presentation, Commissioner Dreyzehner identified the obvious link between opioid sales and opioid related health problems, noting "the incredible correlation between sales and supply and availability [of opioids] and opioid related deaths and opioid treatment admissions."

378.    Additionally, Dr. Stephen Loyd, Medical Director of the Tennessee Department of Mental Health and Substance Abuse Services, recently testified before the Tennessee House of Representatives' Opioid Task Force ("House Opioid Task Force") that: "[m]arketing of opioids as having a low addictive potential when used for the treatment of chronic pain" resulted in "opioids prescribed more freely by practitioners," and, in turn, an "increase in number of babies born drug dependent."

379.    The Nationwide epidemic of NAS has a focal point in Tennessee.  The statistics are alarming:

      a.  in 2015, 12.1 of every 1,000 babies were born with NAS in Tennesse

      b.  in 2016, 12.2 of every 1,000 babies were born with NAS in Tennessee;

      c.  in 2017, 13.5 of every 1,000 babies were born with NAS in Tennessee;

380.    Among other issues, NAS babies experience long-term difficulties, including but not limited to the following types of effects: poor performance in school;  higher risk of developmental disabilities and the accompanying need for special needs services;  and lower

cognitive function.   Thus, Plaintiffs will likely suffer long-term effects that will require lifelong treatment and special education expenses, and the Plaintiffs may suffer sustained (perhaps lifelong) cognitive impairments.

381.    This has been part of a dramatic increase in the number of opioid-dependent babies that have been exposed to opioids.  Women are also victims of the opioid epidemic, and healthcare for opioid exposed mothers and their babies is a major factor in the nation's rising unreimbursed healthcare costs.

382.    The number of infants born suffering from this insidious condition is staggering. The incidence of NAS in the United States grew five-fold between 2000 and 2012.  Specifically, cases of NAS increased nationally from a rate of 1.2 per 1000 hospital births per year in 2000 to 5.8 per 1000, with a total of 21,732 infants diagnosed with NAS by 2012.  Currently, the best estimates are that a child with NAS is born as frequently as every 15-25 minutes, depending upon the time period referenced.

383.    Heroin and other opioid misuse during pregnancy are also associated with increased risks and incidence of placental abruption, preterm labor, maternal obstetric complications, maternal mortality, and fetal death. The opioid crisis caused by Defendants served to fuel an epidemic of heroin use.

384.    All NAS-diagnosed children are at increased risk for neuropsychological dysfunction and disorders (separate and apart from physical deformities and disorders). The challenges presented to them and their caregivers at birth can be summarized as: "Do they catch up, remain at a disadvantage, or proceed to function even more poorly than their peers over time?" Unfortunately, research arising from the Opioid Epidemic reveals that all children exposed to

opioids and other drugs in utero are at a substantially higher risk for lower mental abilities and more signs of attention deficits, and that these effects will persist or worsen through adolescence.

385.    The NAS epidemic and its consequences could have been, and should have been, prevented by Defendants who control the U.S. drug distribution industry and Defendants who manufacture the prescription opioids.  These Defendants have profited greatly by misinforming Tennessee citizens to become flooded with prescription opioids.

386.    The drug distribution industry is supposed to serve as a "check" in the drug delivery system, by securing and monitoring opioids at every step of the stream of commerce, protecting them from theft and misuse, and refusing to fulfill suspicious or unusual orders by downstream pharmacies, doctors, clinics, or patients. Distributor Defendants woefully failed in this duty, instead consciously ignoring known or knowable problems and data in their supply chains.

387.    Defendants thus recklessly and illegally created conditions in which vast amounts of opioids have flowed freely from drug manufacturers to innocent patients who became addicted, to opioid abusers, and even to illicit drug dealers–with distributors regularly fulfilling suspicious orders from pharmacies and clinics who were economically incentivized to ignore red flags at the point of sale and before dispensing the pills.

### a. In Addition to Death and NAS, the Opioid Abuse and Diversion Enabled by Defendants has Other Deleterious Economic and Societal Consequences

388.    In addition to these health effects, the flood of opioids into Tennessee corresponds to lost productivity and increases in crime, children in State custody, and treatment and healthcare costs.  In a 2013 report, the State of Tennessee itself identified prescription drug as the cause of these deleterious effects:

## SUMMARY OF THE PRESCRIPTION DRUG EPIDEMIC IN TENNESSEE

### Who Abuses Prescription Drugs?

- In 2012, prescription opioids became the primary substance of abuse for people in Department of Mental Health and Substance Abuse Services-funded treatment, overtaking alcohol for the first time.
- Almost 5% of Tennesseans have used pain relievers in the past year for non-medical purposes.
- Young adults (18-25-year-olds) in Tennessee are using prescription opioids at a 30% higher rate than the national average.

### Access to Prescription Drugs

- **High Number of Prescriptions Dispensed**
  - There were 25% more controlled substances dispensed in Tennessee in 2012 than in 2010.
- **Doctor Shopping**
  - In March 2013, 2,010 people received prescriptions for opioids or benzodiazepines from four or more prescribers.
- **Prescribing Practices**
  - As of August 1, 2013, 25 physicians had been prosecuted for overprescribing during 2013.
- **Sources of Prescription Drugs**
  - More than 70% of people who use prescription drugs for non-medical reasons got them from a friend or relative.

### Consequences of Prescription Drug Abuse

- **Healthcare Costs**
  - The number of emergency department visits for prescription drug poisoning has increased by approximately 40% from 2005 to 2010.
- **Overdose Deaths**
  - There has been a 220% increase in the number of drug overdose deaths from 1999 to 2012 (342 in 1999 to 1,094 in 2012).
- **Criminal Justice System Involvement**
  - Drug-related crimes against property, people and society have increased by 33% from 2005 to 2012.
- **Lost Productivity**
  - The cost of lost productivity due to prescription drug abuse in Tennessee was $142.9 million in 2008. This number adjusted for 2013 inflation is $155.2 million.
- **Children in State Custody**
  - About 50% of the youth taken into Department of Children's Services custody resulted from parental drug use.
- **Neonatal Abstinence Syndrome**
  - Over the past decade, we have seen a nearly ten-fold rise in the incidence of babies born with Neonatal Abstinence Syndrome in Tennessee.
- **Treatment Costs**
  - It is estimated that the cost of providing state-funded treatment services to individuals that abuse prescription drugs and live below the poverty level would cost $27,933,600.

389.    As the graphic below reflects, opioid overdose deaths represent only the "tip of the iceberg" of the human and societal costs of the opioid epidemic:



390.    According to a recent article by the Tennessean, the "substance abuse epidemic –most notably involving opioids" -- costs Tennessee more than $2 billion annually.  That $2 billion annual price tag includes $46 million for babies born in Tennessee with NAS; $422.5 million for hospitalizations associated with opioid abuse; and another $372,440 in emergency room visits associated with opioid abuse.  However, the largest component of the substantial yearly costs is the $1.29 billion in "lost income from having an estimated 31,000 people, or 1 percent of the workforce, out of jobs.  As the article further explains:

> Teresa Waters, the chair of preventive medicine at the University of Tennessee Health Sciences Center and person responsible for compiling the data used in the Tennessean article, said she "took a conservative approach to the analysis so the overall economic impact and state spending is likely higher."  In particular, Waters noted that "she didn't include costs associated with substance abuse overdoses because of debate over how to estimate economic impact from early loss of life."

391.    Defendants' creation and/or expansion of the opioid market has given rise to a market for heroin in Tennessee, made up largely of addicts who can no longer afford diverted prescription opioids available on the black market. There is a relationship between opioid pain

reliever use and heroin use. According to the federal government's National Survey on Drug Use and Health, four out of five heroin addictions begin with opioid prescription pain relievers.

392.    On November 13, 2015, E. Douglas Varney, Commissioner of the Tennessee Department of Mental Health, issued a message detailing the recent rise of heroin abuse in Tennessee. In the message, Varney explained that, as the state "forged efforts to reduce availability of opioid based pain remedies, in the shadows, heroin arrived on the scene. It arrived like a tidal wave in Tennessee. It's a far more potent form of opioids, cheaper, more dangerous and more lethal." Varney referenced data from multiple sources showing heroin, and heroin-related criminal activity, sharply on the rise, and said: "I'm saddened to see our friends and neighbors that have been struggling with opioid addiction now transitioning to heroin which is coming from the criminal underground street dealer."

393.    In a December 2016 publication of the Tennessee Medical Association titled "No Easy Fix: Tennessee's Doctors Take on The Opioid Abuse Epidemic," Dr. Roland W. Gray described the opioid epidemic as the "worst and deadliest drug epidemic in our nation's history." He went on to say that "[t]here's good news in that we are prescribing significantly fewer opiates in Tennessee; the bad news is they are being replaced by a heroin epidemic. Tennesseans are rapidly turning to those drugs – they're available on the street and are cheaper and far more powerful than prescription opiates."

394.    According to the Tennessee Department of Health, heroin-associated overdose deaths are also on the rise, increasing from 147 in 2014 to 205 in 2015.

395.    Commissioner Dreyzehner has determined that "[t]here is a direct correlation between opioid addiction and heroin use."

396.    As set forth in a September 2016 report by the Tennessee Department of Mental Health and Substance Abuse Services, people with prior treatment admissions, people who inject opioids, people ages 25-34, and people who started opioid use after age 18 are all at increased risk for switching from prescription opioids to heroin.

397.    The high rates of neonatal abstinence syndrome in Eastern Tennessee are a natural consequence of, and are proximately caused by, the illegal drug market in which the Defendants all participate.

398.    The Defendants and Co-Conspirators knew that their acts and omissions with regard to the marketing and distribution of opioids would result in a community of opioid-dependent individuals.

399.    Defendants and Co-Conspirators knew that opioid-dependent individuals in Tennessee would, ultimately, be constrained to obtain opioids through illegal distribution channels and further, that a significant number of those individuals are adult women of child bearing ages that would give (and have given) birth to babies dependent upon opioids with alarming frequency in Eastern Tennessee, and elsewhere in Tennessee (as a result of those addicted mothers' ingestion of opioids during pregnancy

400.    **Plaintiffs' Neonatal Abstinence Syndrome was a Result of Defendants' Participation in the Illegal Drug Market**

401.    Mary Doe (Plaintiffs' biological mother) became addicted to opioids and maintained her addiction using diverted opioids as a result of Defendants and Co-Conspirators' participation in the illegal drug market. While Defendants and Co-Conspirators callously and cynically profited from their addiction and the illegal market which fueled it, Mary Doe gave birth to Plaintiffs. These Plaintiffs, from their first breaths to today, has suffered from their in utero exposure to opioids.

402.    Plaintiffs' NAS and associated conditions are consequences of the illegal market in which the Defendants participated. Defendants knew that their acts and omissions with regards to the marketing, distribution, and dispensing of opioids would result in a community of addicts, that those addicts would likely seek opioids through illegal distribution channels. They also knew that a significant number of those individuals are women of child bearing ages who would give (and have given) birth to babies dependent upon opioids with alarming frequency in Eastern Tennessee, and elsewhere in Tennessee (as a result of those addicted mothers' ingestion of opioids during pregnancy).

403.    Plaintiffs are just six of the thousands of innocent infants victimized by Defendants and Co-Conspirators' unlawful conduct. For years to come, these children will have to bear the psychological, physical, and financial burdens of these Defendants' campaign to addict America to opioids.

## CAUSES OF ACTION

### COUNT I
### TENNESSEE DRUG DEALER LIABILITY ACT

404.    Plaintiffs incorporate all preceding paragraphs by reference.

405.    Tennessee's Drug Dealer Liability Act ("DDLA") Tenn. Code Ann. § 29-38-101, et seq., provides a civil remedy for "damages to persons in a community as a result of illegal drug use," including "infants injured as a result of exposure to drugs in utero." Tenn. Code Ann. § 29-38-102.

406.    Plaintiffs have been exposed to illegal opioids *in utero* because of their birth mother's addiction to, purchase, and use of those illegal drugs. Those exposures provide them the right to sue for damages under the DDLA. Tenn. Code Ann. § 29-38-106(a)(2).

407.    Mary Doe, the birth mother of each Plaintiff, was an "individual drug user" under Tenn. Code Ann. § 29-38-104(4) whose illegal drug use attributable to illegal opioids resulted in *in utero* opioid exposure during her respective pregnancy with each baby. Tenn. Code Ann. § 29-38-104(4).

408.    Mary Doe's opioid use was illegal in that she used opioids obtained without a valid prescription as required by Tenn. Code Ann. § 53-11-308(a).

409.    Mary Doe bought and used legal and illegal opioids throughout Roane County, Tennessee, including but not limited to, Oxycodone, Oxycontin, Roxicodone, Hydrocodone, Subutex. Under the DDLA, the legislative districts in Davidson County is the "place of illegal drug activity." Tenn. Code Ann. § 29-38-104(12).

410.    Defendants and its Co-Conspirators knowingly participated in the production, procurement of the originally diverted prescription, and/or distribution of prescription opioids into the illegal market that reached Plaintiffs' community during all times relevant to this complaint. For purposes of the DDLA, Defendants' "illegal drug market target community" is the entire state of Tennessee, because Defendants and its Co-Conspirators participated in the illegal drug market by distributing 4 ounces or more of a "specified illegal drug."  Tenn. Code Ann §§ 29-38-104(8), 29-38-109(4). As noted by the Tennessee Department of Health in a 2015 presentation, the Tennessee market for hydrocodone and oxycodone pills comprised of 51 hydrocodone pills and 21 oxycodone pills for every Tennessean. Commissioner of Health Dreyzehner noted that 50% of mothers of NAS babies obtained their pills, in whole or in part, from diverted pills (28.7% solely from diverted drugs). Given that a single oxycodone tablet, on information and belief, weighs approximately 135 mg and contains at least 10 mg of opioid, there can be no question that each of the Drug Producer Co-Conspirators far exceeded the four-ounce level, and the same holds true as

to the Distributor Co-Conspirators and Pharmacy Chain Co-Conspirators. The Pill Mill Co-Conspirators also exceed the four-ounce level.

411.    The Producer, Distributor, and Pharmacy Chain Co-Conspirators all recognized that they had a responsibility not to procure or fill suspicious orders, not to convince prescribers to write scripts without a valid medical purpose, and not to supply channels of distribution that they knew or reasonably expected would result in diversion.  Nevertheless, they violated these responsibilities through the various acts referenced herein.

412.    Under Tennessee criminal laws, including, but not limited to, Tenn. Code Ann. § 39-17-417 and Tenn. Code Ann. § 39-17-418, opioids (including prescription opioids) are illegal drugs if possessed, sold, and distributed without a valid prescription.

413.    The place of illegal drug activity by the individual drug user (here, Mary Doe) is within the illegal drug market target community of the Defendants and Co-Conspirators.

414.    The Defendants' participation in the illegal drug market was connected with the same type of illegal drug, an opioid, used by the individual drug user (Mary Doe).

415.    The Defendants and Co-Conspirators participated in the illegal drug market during Mary Doe's period of illegal drug use.

416.    Under Tennessee law, prescription opioids are controlled substances because they inherently have a "high potential for abuse" and that "may lead to severe psychic or physical dependence."  For this reason, everyone who handles prescription opioids in Tennessee (from production to retail sales) must maintain appropriate safeguards against abuse and diversion, and must ensure that the drugs are only being distributed to serve legitimate medical purposes.  If either or both of these preconditions is not satisfied, it is unlawful to distribute prescription opioids in Tennessee.  Indeed, entities holding a Tennessee license can be criminally prosecuted for violating

their responsibilities in the distribution chain.   The Producer, Distributor, Pharmacy Chain, and Pill Mill Co-Conspirators did not lawfully distribute prescription opioids into or within Tennessee. Instead, using their licenses as a cover, they unlawfully distributed drugs without maintaining necessary controls (rendering the distribution unlawful), knowingly distributed those drugs into channels that they knew were resulting in diversion, knowingly encouraged high-volume pill mill prescribers to prescribe opioids without a legitimate medical purpose to feed drug abusers, pill seekers, and drug dealers, knowingly supplied pharmacies serving pill mills, and knowingly dispensed prescriptions that were not made for a legitimate medical purpose.

417.   The Producer Co-Conspirators also committed various other acts intended to facilitate the marketing or distribution of illegal opioids (including opioids that reached Plaintiffs) for purposes of Tenn. Code Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

    a.  engaging in a mass marketing campaign to downplay the risks of addiction from long-term use of opioids of non-cancer pain;

    b.  taking actions that violated DEA and FDA requirement or guidelines regarding the marketing and promotion of their drugs and/or suspicious order monitoring;

    c.  utilizing front groups and key opinion leaders to spread misinformation regarding the risks of addiction and the signs of addiction;

    d.  utilizing marketing teams to devise ways to overcome the legitimate concerns of Tennessee prescribers regarding long-term use of opioids;

    e.  successfully encouraging Tennessee prescribers to engage in prescription practices that defendants knew and expected would drive up addiction rates;

    f.  oversupplying Tennessee and Plaintiffs' community with opioids, knowing that the oversupply would necessarily feed and expand the black market;

    g.  targeting the highest-volume Tennessee prescribers for sales efforts and calling on these prescribers repeatedly to convince them to prescribe more opioids;

h. using volume-based bonuses and commissions for sales representatives with respect to a highly addictive and widely abused narcotic, and otherwise encouraging and rewarding sales representatives for doing business with Tennessee pill mills and other over-prescribers;

i. knowingly establishing business relationships with Tennessee pill mills and over-prescribers to compete for their business by convincing them to prescribe more opioids, including high-volume prescribers in small, rural Tennessee communities who were prescribing opioids at unjustifiable levels;

j. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after it was clear, even by defendants' own stated criteria, that those prescribers were engaging in highly suspicious prescribing practices or criminal conduct;

k. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids after receiving reports from law enforcement that the prescribers and pharmacies were supplying drug addicts and the illegal market;

l. establishing new accounts with high-volume opioid prescribers without due diligence, knowing that the new account may be a pill mill;

m. providing patients or Tennessee prescribers incentives to prescribe more opioids;

n. convincing naïve Tennessee doctors willingly to write prescriptions for powerful opioids to pill seekers and prescription drug abusers who sell the prescriptions wholesale;

o. directly pushing Tennessee prescribers (through frequent calls, in-person visits, and promotions) to prescribe more opioids when defendants knew that those prescribers were likely engaging in unlawful conduct and feeding the illegal drug market;

p. incentivizing sales representatives to do business both with Tennessee pill mills and with pharmacies supplying pill mills (and financially rewarding those sales associates for doing so);

q. filling suspicious orders intended for distribution in Tennessee despite knowing that the orders reflected diversion;

r. implementing sham suspicious order monitoring programs that were structured to fail and to allow diversion to proceed unimpeded in Tennessee and elsewhere;

s. filling orders that defendants had subjectively identified as suspicious before undertaking or completing an investigation into those orders;

    t.   permitting sales representatives to call on or prescriber or pharmacy even after internally recommending that the entity be reported to the DEA;

    u.   continuing to call on pill mill prescribers and associated pharmacies even after being told by law enforcement that they were likely feeding the illegal drug market;

    v.   collaborating with the Drug Distributors to provide sham justifications to fill suspicious orders;

    w.   placing primary or sole responsibility for suspicious order monitoring in the hands of a commission/volume bonus-based sales force with an inherent conflict of interest;

    x.   allowing inherently conflicted sales representatives to "clear" suspicious orders without any independent investigation;

    y.   allowing sales associate to determine whether to self-report their best customers even where the stated criteria for reporting diversion are met; and

    z.   supplying outlandish volumes of prescription opioids to rural Tennessee communities far exceeding any conceivable medical need.

418.    The Distributor Co-Conspirators and the Pharmacy Chain Co-Conspirators also committed acts intended to facilitate the marketing or distribution of illegal opioids (including opioids that reached Plaintiffs) for purposes of Tenn. Code Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference. Those acts include, but are not limited to:

    a.   providing volume-based bonuses or commissions to sales representatives relating to shipment of a highly addictive and widely abused narcotic;

    b.   incentivizing or otherwise rewarding sales personnel who did business with pharmacies that supply pill mills and other over-prescribers;

    c.   routinely filling suspicious orders, including that should have been flagged as suspicious and impounded based on the Drug Distributors' and Walmart's own stated criteria (such as orders of unusual size or frequency);

    d.   routinely filling orders, including plainly suspicious orders, without due diligence;

e.   establishing new accounts without due diligence;

f.   implementing a suspicious order marketing program that was designed to fail;

g.   making adjustments to the suspicious order monitoring program to make it less effective on purpose, such as changing thresholds for customers that initially exceeded them;

h.   providing sham justifications to "clear" orders from being impounded or accounts from being frozen through chargeback restrictions;

i.   intentionally seeking out relationships with pain clinics or pharmacies that serve pain clinics;

j.   shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee at levels far exceeding any conceivable legitimate need, where the volume of pills far exceeded the number of people, and where the prescription per capita rate was exceedingly high; and

k.   shipping excessive amounts of opioids to pharmacies and dispensing physicians in Tennessee, despite reports from law enforcement, firsthand observations, or other knowledge that the pharmacy was honoring pill mill prescriptions en masse.

416.   The Pill Mill Co-Conspirators also committed acts intended to facilitate the marketing and distribution of illegal opioids (including opioids that reached Plaintiffs) for purposes of Tenn. Code Ann. § 29-38-104(9). These acts are detailed in the preceding paragraphs, which are incorporated by reference.

417.   As a result, the Producer Co-Conspirators, Distributor Co-Conspirators, and Pharmacy Chain Co-Conspirators knowingly disseminated massive quantities of prescription opioids to suspect physicians, pharmacies, and into the black market, including to "pill mills" such as the Pill Mill Co-Conspirators.

418.   The Defendants and its Co-Conspirators committed acts intended to facilitate the marketing or distribution of illegal opioids that resulted in the minor children being exposed to opioids in utero. Tenn. Code Ann. § 29-38-104(9).

419.    Defendants and its Co-Conspirators have foreseeably caused damages to Plaintiffs, including the costs of neo-natal medical care, additional therapeutic services, prescription drug purchases, and other treatments for NAS afflicted newborns, and counseling, therapy, and rehabilitation services after birth and into the future.

420.    Under the DDLA, Defendants are accordingly responsible for the harms to Plaintiffs stemming from their participation in the illegal drug market.

**Aiding and Abetting Client Manufacturers' Negligence Per Se and Related Doctrines**

421.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

422.    Purdue Pharma owed a duty under federal law and the laws of the states not to promote or sell controlled substances, including opioids, for non-medical purposes, including abuse and diversion.  Infants who could be injured in utero by their biological mothers' ingestion of misused, abused, or diverted opioids are included within the class of persons that these laws are intended to protect.  McKinsey encouraged and substantially assisted Purdue in the violation of this duty, knowing that the conduct it was encouraging and assisting constituted a violation of this duty.  McKinsey is therefore jointly and severally liable for the resulting injury to Plaintiffs.

423.    Endo owed a duty under federal law and the laws of the states not to promote or sell controlled substances, including opioids, for non-medical purposes, including abuse and diversion.  Infants who could be injured in utero by their biological mothers' ingestion of misused, abused, or diverted opioids are included within the class of persons that these laws are intended to protect.  McKinsey encouraged and substantially assisted Endo in the violation of this duty, knowing that the conduct it was encouraging and assisting constituted a violation of this duty.  McKinsey is therefore jointly and severally liable for the resulting injury to Plaintiffs.

424.    Janssen owed a duty under federal law and the laws of the states not to promote or sell controlled substances, including opioids, for non-medical purposes, including abuse and diversion.  Infants who could be injured in utero by their biological mothers' ingestion of misused, abused, or diverted opioids are included within the class of persons that these laws are intended to protect.  McKinsey encouraged and substantially assisted Purdue in the violation of this duty, knowing that the conduct it was encouraging and assisting constituted a violation of this duty. McKinsey is therefore jointly and severally liable for the resulting injury to Plaintiffs.

425.    McKinsey encouraged and assisted Purdue, Janssen, Endo, and other opioid manufacturers to concentrate their sales and promotion resources on the highest-volume prescribers, knowing that the added prescriptions from these sales and promotion efforts would be written predominantly, if not exclusively, for "patients" who intended to abuse the drugs or divert them to the illegal secondary market.

426.    McKinsey encouraged and assisted Purdue, Janssen, Endo, and other opioid manufacturers to increase their sales and promotion efforts to prescribers serving "abuse-prone" demographics, such as (and specifically) young men in economically depressed communities, knowing that the added prescriptions from these sales and promotion efforts would be written predominantly, if not exclusively, for "patients" who intended to abuse the drugs or divert them to the illegal secondary market.

427.    McKinsey encouraged and substantially assisted Purdue, Janssen, Endo, and other opioid manufacturers to increase sales pressure on prescribers whose number, quantity, and/or dose range of opioid prescriptions were decreasing to resume their former patterns of prescribing and even to increase prescriptions beyond those former patterns.  McKinsey knew, when it gave that encouragement and assistance, that most or all of the prescriber decreases were in response to

government and public pressure to curb the abuse and diversion of opioids, meaning that the prescribers themselves or others believed that the former prescriptions had gone to patients who were abusing or diverting the drugs to the illegal secondary market. McKinsey knew that increases in the number, quantity, and dose range of opioid prescriptions in response to the sales pressure it encouraged its clients to apply would go to patients who intended to abuse or divert the drugs to the illegal secondary market.

428.    McKinsey encouraged and substantially assisted Purdue, Janssen, Endo, and other opioid manufacturers to increase pressure and to bring new (and uniquely McKinsey-esque) kinds of pressure and leverage to bear on regulators, distributors, and pharmacies who had implemented, whether formally or informally, successful measures designed to control the quantity and/or dose range of opioids distributed or dispensed in an effort to respond to government and public pressure to curb the abuse and diversion of opioids. This means that the distributors and pharmacies themselves believed that most or all of the decrease in the quantity and dose of opioids that they were distributing or dispensing was due to a decrease in opioids ultimately being supplied abusers and diverters—and McKinsey agreed with their assessments. The pressure tactics that McKinsey encouraged and assisted included McKinsey offering and using its leverage as consultant to multiple manufacturers who combined to make up a large percentage of the total prescription drugs distributed and dispensed, controlled and not controlled, and included threatening distributors and dispensers with the prospect that all or most of McKinsey's clients would attempt to bypass them individually or form a cartel or coop to bypass them.

429.    Upon information and belief, McKinsey encouraged and substantially assisted Noramco (Janssen's affiliate), the maker of the active ingredient of the clear majority of all opioids sold in the United States during all relevant times, to increase pressure and to bring new kinds of

pressure and leverage to bear on regulators who had implemented or were threatening to implement or tighten measures designed to control the quantity and/or dose range of opioids distributed or dispensed

430.    Upon information and belief, McKinsey encouraged and substantially assisted Noramco to increase sales pressure on other opioids manufacturers at times (for example, in 2001) when McKinsey identified an opportunity for one or more of Noramco's customers, such as makers of generics and immediate-release opioids, to increase sales and profits as a result of regulatory pressure or law enforcement pressure to reduce abuse and diversion of an individual brand opioid, such as Purdue's OxyContin, or a class of opioids, such as extended release oxycodone tablets—but not all opioids.

431.    Upon information and belief, McKinsey leveraged its total market knowledge from other client manufacturers and Noramco to identify opportunities to capture or recapture someone else's lost sales to abusers and diverters—where regulators or law enforcement were focused on abuse and diversion of one or several opioid brands or classes only—and also leveraged its relationships with, and knowledge of the capacities and abilities of other opioid manufacturers, to coordinate an all-industry response that simply shifted abuse and diversion from one brand or class of opioids to other brands and classes of opioids. For example, in response to DEA pressure and focus on abuse and diversion of OxyContin and extended release opioids in 2001 and succeeding years, McKinsey coordinated—that is, encouraged and assisted its clients through individual communications, but moved them all in the same direction by giving them coordinated encouragement and assistance—an industry-wide response that simply shifted those prescribers to abusers and diverters (who could no longer obtain OxyContin or extended-release oxycodone

tablets) over to prescribing immediate release oxycodone and (to a lesser extent) immediate release hydrocodone and other opioid products.

432.    The evidence that McKinsey knew that the sales, promotion, and pressure tactics it encouraged its clients to adopt were illegal and aimed at increasing sales of opioids that end up in the hands of abusers and diverters mostly comes from McKinsey's awareness and analysis of dips, flatlines, and changes in individual brand and aggregate opioid sales trends over the entire duration of the opioid epidemic, from the mid-1990s to the present.  McKinsey knew that these dips, flatlines, and changes in brand and aggregate sales always and everywhere occurred in response to some (usually easy to identify) external pressure or measure taken by someone (usually a government agency but sometimes the company itself, as when a company releases an abuse-deterrent formulation or "ADF") to curb or curtail opioid abuse and diversion.  In other words, McKinsey figured out very early in the opioid epidemic that the only downward driver (what analysts sometimes refer to as a "headwind") on individual brand and aggregate opioids in the market was pressure to curtail abuse and diversion and measures taken in response to this pressure.

433.    McKinsey also discovered early on that the corollary to the finding described in the last paragraph—that all dips and flatlines in opioid sales were due to pressure or measures taken to control abuse and diversion—was that the easiest and surest path to boost the sales of all opioids or any particular opioid was to target abuse-prone populations and prescribers who served patients that abused and diverted opioids.

434.    McKinsey deployed the corollary described in the last paragraph openly in its client recommendations during the early stages of the opioid epidemic (e.g., with Janssen in 2002), when it still thought no one was watching it or paying attention to it, and then slightly more cagily—but only slightly—in the later stages of the opioid epidemic. Indeed, McKinsey's self-appointed role

with its opioid clients was to encourage and assist the client to uncover and overcome any pockets of reluctance or hesitation anywhere within the company to boost sales through tactics that foster the abuse and diversion of opioids—whether those pockets were found at the executive, management, or sales force levels. That is it. That is what McKinsey offered its clients, whether that is what they wanted when they hired McKinsey (as in the case of the Sacklers) or not (as in the case of Purdue's management team).   n illustration of McKinsey employees' implicit understanding and faith in this self-appointed role comes from 2013 internal emails in which McKinsey employees discuss the problems with Purdue's culture—their derision of Purdue's "lazy" sales force and sales managers who would rather make calls on prescribers whose patients use Purdue's drugs for legitimate medical purposes than focus their efforts on unscrupulous prescribers; its concern about how to overcome Purdue's executive-level desire to "diversify" to other drugs because of management's sense that OxyContin sales carry some "risk."

435.    As a direct and proximate result of McKinsey's aiding and abetting of its clients' negligent and negligent per se conduct, the Minor Plaintiffs' biological mothers became dependent upon OxyContin and other opioids—in most cases the opioids were first prescribed by a licensed prescriber, but in some cases the opioids were subsequently obtained, including during pregnancy, through the illegal secondary market. Following birth, a direct and proximate result of McKinsey's aiding and abetting of its clients' negligent and negligent per se conduct, the Minor Plaintiffs suffered from, and continue to suffer from, developmental and congenital injuries from in utero opioid exposure, as described herein.

436.    The conduct alleged against McKinsey in this Complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an

amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Plaintiffs. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of Plaintiffs. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

437.    Plaintiffs' injuries as set forth herein were the foreseeable result of McKinsey's conduct.

438.    Minor Plaintiffs are without fault, and the injuries to Minor Plaintiffs would not have happened in the ordinary course of events had McKinsey's clients not breached their legal duties to exercise reasonable care, including by obeying laws intended to prevent harms such as the harms to the infant Plaintiffs from their mothers' opioid abuse and diversion, with McKinsey's knowing encouragement and substantial assistance.

**Civil Conspiracy with Client Manufacturers to Commit the Torts of Negligence Per Se and Related Doctrines**

438.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein, and further allege as follows:

439.    Plaintiffs' description of the underlying duties of McKinsey's client-manufacturers is incorporated from the previous claim (captioned: "Aiding and Abetting Client Manufacturers' Negligence and Negligence Per Se (All Plaintiffs)").

440.    Plaintiffs' description of McKinsey's conduct, behavior, and communications during its engagements with its clients is incorporated from the previous claim (captioned: "Aiding and Abetting Client Manufacturers Negligence and Negligence Per Se (All Plaintiffs)").

441.    McKinsey is liable for its participation in a civil conspiracy because it entered into agreements with its co-conspirators, including Purdue, Endo, and Janssen, and other opioid manufacturers, to participate in the unlawful acts or lawful acts intended to increase prescriptions, sales, distribution, and dispensing of opioids to known abusers and diverters. After McKinsey sold (encouraged) the client on the unlawful course of conduct, in each case, the client and McKinsey entered into an agreement that McKinsey would help to implement it, either by remaining involved in the day-to-day implementation of the duty violating conduct, or in some instances, by entering into an agreement that McKinsey would use its special conducts—for instance with regulators, distributors, pharmacies, and other manufacturers—to further the criminal conspiracy. McKinsey's agreement with Purdue in 2013 that McKinsey would offer special assistance in the high-level pressure tactics brought to bear against obstinate distributors and pharmacies is a perfect illustration of the kinds of post-encouragement agreements that McKinsey frequently entered into with its clients to help them sell more drugs by violating their duties.

442.    McKinsey's status as an advisor, or service provider, or professional, is irrelevant to a finding to civil conspiracy liability. Other professionals in similar circumstances are routinely held liable for engaging in concerted action with their clients. See *Logan v. Morgan Lewis & Bockius LLP,* 350 So.3d. 404, 411-12 (Fla. 2d DCA 2022); see also *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 561 F. App'x 882, 884-86 (11th Cir. 2014); *Reynolds v. Schrock*, 197 Or. App. 564, 107 P.3d 52, rev allowed, 339 Or. 475 (2005) (attorneys); *In re RuralMetro Corp. Stockholders Litigation*, 102 A.3d 205, 219-20 (Del. Ch. 2014) (financial advisors); *Jones v. KPMG LLP, Memorandum Opinion and Order Denying Motion to Dismiss*, Cause No. 1:17-cv-319 (S.D. Miss. Oct. 16, 2018) (accountants); *N.J. Dept. of Treasury v. Quest*

*Communications Int'l Inc. et. al*., 904 A.2d 775 (Sup. Ct. N.J – App. Div. 2005); *In re Enron Securities Derivative And Erisa Litigation*, 235 F.Supp.2d 549 (S.D. Tx. 2002) (consultants).

443.    Control is not an element of a civil conspiracy, and Plaintiffs need not show that McKinsey controlled its clients.  Plaintiffs need only to show an agreement to engage in unlawful conduct, or lawful conduct by unlawful means, and resulting injury Plaintiffs.

444.    McKinsey joined, ratified, and participated in the conspiracies, and therefore became liable for all acts of its co-conspirators, including those undertaken in furtherance of the conspiracy prior to McKinsey's time of joining. McKinsey took the conspiracy as it found it. See *de Vries v. Brumback,* 53 Cal. 2d. 643, 2 Cal. Rptr. 764, 349 P.2d 532 (1960); *Ally Bank v. Castle*, 2012 WL 3627631, *10 (N.D. Cal. 2012).

445.    Additionally, McKinsey's role as a hub in the conspiracy was unlike any other. McKinsey was in the unique position of knowing what competitor manufacturers were each doing to grow the market for opioids, and, just as importantly, when and why each of them had suffered setbacks due to enforcement activities, presenting opportunities for a different McKinsey client and co-conspirator to capture the illegal sales of the other. From this catbird's seat, McKinsey advised multiple manufacturers to implement substantially similar sales and marketing programs for OxyContin, Opana, Duragesic, Nucynta, and other opioids.

446.    The existence of a conspiracy among manufacturers and others to increase the size of the opioid market through illegal sales tactics aimed at increasing abuse and diversion of opioids has already survived summary judgment pleadings before Judge Polster in MDL 2804. Plaintiffs hereby allege that McKinsey was also a member of the very same conspiracy alleged by litigants in MDL 2804. See *In re Nat'l Prescription Opiate Litigation*, 2018 WL 6628898 at *11 (N.D. Oh. December 12, 2018) ("Plaintiffs adequately pled that Defendants shared a general conspiratorial

objective of expanding the opioid market..."); *In re Nat'l Prescription Opiate Litigation*, 2019 WL 4178610, at *11 (N.D. Ohio Sept. 3, 2019) (denying motions for summary judgment on civil conspiracy grounds against manufacturers and distributors and pharmacies).

447.    Among the implementing regulations to the Controlled Substances Act is the requirement that "[e]very person who manufactures, distributes, dispenses, imports, or exports any controlled substance," including opioids, become a "registrant." See 21 U.S.C. § 823(a)-(b); 21 C.F.R. § 1301.11(a). CSA registrants, including opioid manufacturers and distributors, must maintain a system to (i) identify and report suspicious orders, including identification of orders of unusual size, or frequency, or orders deviating from its normal pattern as well as (ii) maintain effective controls against diversion of controlled substances. See 21 U.S.C. § 823; 21 C.F.R. § 1301.74(b).

448.    Despite its lawful duties, McKinsey and its co-conspirators engaged in a scheme with the shared, overarching purpose of materially expanding prescription opioid use by overcoming or overwhelming (through pressure tactics) their fears and concerns about distributing, dispensing, and prescribing opioids in patterns, quantities, and doses that clearly indicated that the opioids were being abused or diverted.  Instead of reporting suspicious conduct, as required by law, McKinsey conspired with its clients to foster, encourage, and pressure distributors, pharmacies, and prescribers to distribute, dispense, and prescribe opioids for abuse and diversion.

449.    The conspiracy devised, implemented, and conducted by McKinsey and its co-conspirators was a common course of conduct designed to ensure that the co-conspirators illegitimately and unlawfully increased their sales and profits by creating, fostering, sustaining, and growing the illegal secondary market for opioid abuse and diversion.

450.    McKinsey and its co-conspirators were each willing participants in the conspiracy, had a common purpose and interest in the object of the conspiracy, and functioned within a structure designed to effectuate the conspiracy's purpose.

451.    As a result of the concerted action between the Purdue, other opioid manufacturer clients, and McKinsey, Plaintiffs have suffered damages.

452.    Purdue, other companies in the opioids supply chain, and McKinsey are jointly and severally liable for the results of their concerted efforts.

453.    As a direct and proximate result of the conspiracy between McKinsey and its clients for its clients to engage in negligent and negligent per se conduct, the Minor Plaintiffs' biological mothers became dependent upon OxyContin and other opioids—in most cases the opioids were first prescribed by a licensed prescriber, but in some cases the opioids were subsequently obtained, including during pregnancy, through the illegal secondary market.  Following birth, a direct and proximate result of McKinsey's aiding and abetting of its clients' negligent and negligent per se conduct, the Minor Plaintiffs suffered from, and continue to suffer from, developmental and congenital injuries from in utero opioid exposure, as described herein.

454.    The conduct alleged against McKinsey in this Complaint was despicable and subjected Plaintiffs to cruel and unjust hardship in conscious disregard of their rights, constituting oppression, for which McKinsey must be punished by punitive and exemplary damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard for the safety and welfare of others, including Plaintiffs. McKinsey's conduct was and is outrageous, done with malice and evidenced reckless indifference to the interests of Plaintiffs. An officer, director, or managing agent of McKinsey personally committed, authorized, and/or ratified the outrageous and wrongful conduct alleged in this Complaint.

455.    Plaintiffs' injuries as set forth herein were the foreseeable result of the conduct of McKinsey and its con-conspirators.

456.        Minor Plaintiffs are without fault, and the injuries to Minor Plaintiffs would not have happened in the ordinary course of events had McKinsey's clients not conspired with McKinsey to breach their legal duties to exercise reasonable care, including by obeying laws intended to prevent harms such as the harms to the infant Plaintiffs from their mothers' opioid abuse and diversion, with McKinsey's knowing encouragement and substantial assistance.

## PUNITIVE DAMAGES

458. Plaintiff reasserts each and every allegation set forth in all preceding paragraphs as if fully restated herein.

459.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiff.  Plaintiff is thus entitled to recover punitive damages against Defendants.

460.    Defendants acted with actual malice toward others, including Plaintiff or acted with a conscious, reckless and outrageous indifference to the health, safety and welfare of others, including Plaintiff. Plaintiff is entitled to recover punitive damages in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

461.    Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiff, in their activities and in failing to warn Plaintiff of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiff.

462.    Defendants realized the imminence of danger to Plaintiff and other members of the public but continued with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

463.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, malicious, oppressive, willful, wanton, reckless, and/or criminal indifference to civil obligations affecting the rights of others, including Plaintiff, Plaintiff suffered the injuries and dangers stated above.

464.    An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiff is entitled to an award of punitive damages.

465.    The conduct of Defendants as set forth herein clearly and convincingly demonstrates that Defendants acted maliciously, intentionally, fraudulently, and/or recklessly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

1.        Economic damages in an amount to be proven at trial. Under the DDLA, "[e]conomic damages, including, but not limited to: the cost of treatment and rehabilitation, medical expenses, loss of economic or educational potential, loss of productivity, absenteeism, support expenses, accidents or injury, and any other pecuniary loss proximately caused by the illegal drug use" described in this Complaint. Tenn. Code Ann. § 29-38-106(c)(1);

2.        Non-economic damages in an amount to be proven at trial. Under the DDLA, "[n]on-economic damages, including, but not limited to, physical and emotional pain, suffering, physical impairment, emotional distress, mental anguish, disfigurement, loss of enjoyment, loss of

companionship, services and consortium and other nonpecuniary losses proximately caused by an individual's use of an illegal drug." Tenn. Code Ann. § 29-38-106(c)(2);

3.    Exemplary/punitive damages;

4.    Awards from all Defendants, including but not limited to the costs and disbursements of this action, reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses as provided by the common fund doctrine and other applicable law pursuant to Tenn. Code Ann. §29-38-106(c)(3) (4)-(5);

5.    Declaratory relief;

6.    Equitable and Injunctive Relief;

7.    All other remedies and relief available under law; and

8.    Such other and further relief as the Court deems just and proper.

**The Plaintiffs demand a trial by jury on all issues <u>except</u> for attorney's fees and costs**.

Respectfully submitted

**Plaintiff
By counsel,**

By: */s/ Scott R. Bickford*_____
Scott R. Bickford (LA#1165)
srb@mbfirm.com
**MARTZELL, BICKFORD &
CENTOLA, APC**
338 Lafayette Street
New Orleans, LA 70130
Telephone: (504) 581-9065
Facsimile: (504) 581-7635

*PSC Member – NAS Children, and Counsel
for Plaintiffs*

-AND-

_/s/ Stephen P. New_
Stephen P. New (WVSB No. 7756)
STEPHEN NEW & ASSOCIATES
430 Harper Park Drive
Beckley, WV 25801
Ph: (304) 250-6017; Fax (304) 250-601