STEPHEN NEW & ASSOCIATES
(admitted pro hac vice)
430 Harper Park Drive
Beckley, West Virginia 25801
Telephone: (304) 250-6017
Email: steve@newlawoffice.com
**Counsel for Plaintiffs**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: McKINSEY & CO., INC. NATIONAL PRESCRIPTION OPIATE CONSULTANT LITIGATION** | Case No.: 3:21-md-2996 CRB(SK)<br><br>PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AGAINST DEFENDANT MCKINSEY & COMPANY, INC.<br><br>THIS DOCUMENT RELATES TO: ALL ACTIONS |

**PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE AGAINST DEFENDANT McKINSEY & COMPANY, INC.**

**INTRODUCTION**

Plaintiffs are minor children exposed to opioids in utero, who have sustained life altering, permanent injuries. These opioids were manufactured and marketed by McKinsey clients, Purdue Pharma, Johnson & Johnson, Endo, and Mallincrokdt. McKinsey advised these manufacturers on those products for twenty years and across approximately 100 engagements. Throughout that period, Purdue was the subject of constant litigation: state attorney general lawsuits, federal criminal investigations, multistate consent judgments, multidistrict consolidation, and two federal felony pleas. McKinsey knew. Its own senior partners admitted in deposition that they knew. McKinsey had written policies, including the FinalDocs Policy, requiring its team members to preserve working papers from any engagement whenever litigation, government

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 1

investigation, or other legal action relating to the engagement was reasonably anticipated. Mckinsey destroyed documents, cell phones, computers, and laptops, despite its knowledge that legal actions were pending against Purdue. For this reason, McKinsey should be sanctioned with the harshest of sanctions available under Rule 37 of the Federal Rules of Civil Procedure.

McKinsey did not preserve evidence crucial to this case. Beginning no later than 2001, when the State of West Virginia became the first state to sue Purdue for OxyContin marketing fraud, McKinsey's preservation duty under its own policy attached to every Purdue working paper its consultants had then or would generate later. The duty was renewed and reinforced by Purdue's 2007 federal felony plea, by the 2008 multidistrict consolidation of OxyContin antitrust claims, by the Kentucky Attorney General's parallel state action, by the 2017 creation of MDL 2804 in the Northern District of Ohio, and by the 2018 wave of state attorney general lawsuits naming Purdue's directors and the Sackler family. Despite the duties as which arise from Mckinsey's own policies, McKinsey's personnel destroyed Purdue-related documents and electronically stored information rather than preserve it. Two senior partners independently took steps to delete Purdue documents in July and August 2018. One wrote a to-do list to himself titled "When home" reading "delete old pur documents from laptop," then carried out the plan over four days, including a self-reminder to "Remove Purdue folder from garbage" and the permanent deletion of an Outlook folder titled "Purdue Pharma." The same partner removed a Windows folder titled "Purdue" containing a "Strategy" subfolder of more than 100 items, seven of which referenced Purdue's then-CEO Michael Friedman, the executive who had pleaded guilty in 2007. This was after a decade and a half of failing to preserve "working papers" related to Purdue as criminal and civil litigation raged.

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 2

Forensic analysis confirms the conduct was no accident. The same senior partner had not permanently deleted any items from his Outlook account during the nine months before. The August 2018 sequence was a one-time, targeted, multi-day departure from his typical practice. It tracked specific litigation events: the day after a Politico article on the prior Western District of Virginia investigation reached him, on the same day the New York Times published a front-page article on intensified federal opioid enforcement, the deletion plan was written down. Two days later, execution began. This timing is not coincidental.

McKinsey itself agreed to facts establishing all of the above. The destruction sequence is set out in the Agreed Statement of Facts McKinsey filed in connection with its Deferred Prosecution Agreement with the United States in *United States v. McKinsey & Co.*, Case No. 1:24-cr-00046-RSB-PMS (W.D. Va.). **Exhibit 1**. The deponents in this MDL admitted both the policy obligation and their own non-compliance. The Court need not credit a single contested inference to grant this Motion. The threshold elements of Federal Rule of Civil Procedure 37(e) are satisfied on the face of McKinsey's own admissions, and the circumstantial evidence of intent to deprive is exactly the pattern the Ninth Circuit found sufficient in *Jones* v. *Riot Hospitality Group, LLC*, 95 F.4th 730, 735 (9th Cir. 2024), and stronger. Plaintiffs respectfully request the harshest sanctions authorized by Rule 37(e)(2)(c): enter default judgment against McKinsey and order the matter to proceed to trial on damages.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.    McKINSEY'S WRITTEN PRESERVATION POLICIES BOUND ITS PERSONNEL FROM 2002 ONWARD AND WERE READ INTO THE RECORD BY NEARLY EVERY DEPONENT IN THIS LITIGATION.**

Two written McKinsey policies governed the preservation of working papers during the entire period relevant to this Motion. The earlier policy, McKinsey's Retention and

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 3

Disposition of Working Papers Policy dated July 12, 2002, was discussed at the Moran deposition through Moran Exhibit 10, an April 26, 2005 email and attachments at Bates MCK-MDL2996-0181316 to MCK-MDL2996-0181328, with the policy provisions read into the record from pages bearing Bates MCK-MDL2996-0181319 to MCK-MDL2996-0181320. See, **Exhibit 2.** Read into the record, the policy provides that if any team member learns of or has reason to anticipate a litigation, government investigation, or other legal controversy relating to the subject matter of an engagement, that person should notify Firm Legal and must consult with Firm Legal before discarding or deleting working papers. Moran Dep. 133:22-134:7. Moran Depo., at **Exhibit 3**. The policy further authorized Firm Legal to determine that some or all related working papers should be preserved for an additional period of time. Moran Dep. 134:7-12. Ex. 3. The 2002 policy thus tied McKinsey's preservation obligation to a triggering condition broader than the federal common-law duty: any team-member-level anticipation of litigation, government investigation, or "other legal controversy" "relating to the subject matter of" any engagement necessitated the litigation hold. Every working paper after 2002 has been destroyed and having to do with McKinsey's opioid work.

McKinsey's FinalDocs Policy, in effect at the time of Purdue's legal troubles, including the November 13, 2012 version, reinforced and expanded that obligation. The policy was introduced at the Sherin Ijaz deposition, bearing Bates MCK-MDL2996-0211145 to -0211148. Ijaz Dep. 21:12-14, *infra*. The Anticipation of Litigation section of the FinalDocs Policy provides that any team member who learns of or has reason to anticipate litigation, government investigation, or other legal action relating to the subject matter of an engagement should immediately notify Firm Legal, and that the team member must preserve the working papers from the engagement until the Legal Department determines the records are no longer needed. Rosiello Dep. 99:7-19.

See, **Exhibit 4**. The same provision states that the preservation obligation supersedes any previously or subsequently established destruction schedule for those records. Rosiello Dep. 99:14-19; Ex. 4. The FinalDocs Policy also contains a "Discard Working Papers" section that, absent the litigation-anticipation trigger, directs team members at the end of an engagement to discard or delete working papers that are not Final Documents, including interview notes, drafts of reports and analyses, email and other correspondence, and documents furnished by the client, in paper or electronic form. Ijaz Dep. 22:11-17, **Exhibit 5**. The interaction between the two sections is therefore exactly what the policy text describes: at the end of an engagement, a McKinsey team member ordinarily destroys working papers; but if litigation, investigation, or other legal action relating to the engagement subject matter is anticipated, the destruction default is suspended and the working papers must be preserved. A decade and a half of working papers from dozens of McKinsey consultants have been destroyed by McKinsey along with the phones and laptops.

McKinsey's deponents admitted these obligations bound them and admitted they did not comply. Robert Rosiello worked at McKinsey from 1984 until 2015, ultimately as a Senior Partner, and he personally signed the Master Consulting Agreement with Purdue Pharma in 2004 on behalf of McKinsey. Rosiello Dep. 9:17-19; 134:11-17; Ex. 4. Rosiello acknowledged receiving litigation hold correspondence at McKinsey, though he did not recall which client matter generated it. Rosiello Dep. 99:1-6; Ex. 4. Asked whether refraining from deleting documents from an engagement once litigation is foreseeable was common sense, Rosiello answered that he also thought it was the law. Rosiello Dep. 101:10-16; Ex. 4. Rosiello also acknowledged participating in McKinsey "burno days," firm-wide events for destroying files, in Cleveland, London, New York,

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 5

and Stamford, but did not know whether burno days continued into the twenty-first century. Rosiello Dep. 102:11-23; Ex. 4.

Pasha Sarraf, M.D., Ph.D., worked at McKinsey from 2008 to 2018, including on work for Purdue during that period. Sarraf Dep. 150:4-5; 150:18-19; **Exhibit 6**. Sarraf confirmed that as a McKinsey team member he was expected to comply with the FinalDocs Policy. Sarraf Dep. 148:23-149:4; ex. 6. Sarraf further confirmed that during 2008 to 2018 he was familiar with the policy's Anticipation of Litigation section. Sarraf Dep. 150:4-8.; Ex. 6. Sarraf admitted he never contacted Firm Legal about anticipated Purdue litigation: "No. Not for any work I did for Purdue." Sarraf Dep. 150:18-19. Ex. 6.  Laura Moran was a McKinsey consultant from August 2005 or 2006 until 2020. Moran Dep. 17:15-19; Ex. 3. Moran confirmed that from the time she joined McKinsey she was subject to a working papers policy. Moran Dep. 132:25-133:21. Ex. 3. Moran acknowledged that, despite knowing Purdue was in litigation after 2013, she did not recall going to Firm Legal to inquire about preserving working papers related to her Purdue engagements, and saw no reason then or now to have done so. Moran Dep. 151:4-13. Ex. 3. Moran further admitted that, as her ordinary practice at the close of an engagement, she "deleted" or otherwise discarded electronic working papers that did not become Final Documents from her firm-issued laptop. Moran Dep. 128:1-129:13. Ex. 3. Moran testified she generated working papers on her firm-issued laptops, of which she had between five and ten over her tenure, and on multiple firm-issued BlackBerries and iPhones. Moran Dep. 13:25-15:16. Ex. 3.

Sherin Ijaz is a current McKinsey Senior Partner. She has been at the firm for approximately twenty years. Ijaz testified that she was familiar with the FinalDocs Policy, that the FinalDocs Policy provides an accurate definition of working papers, that McKinsey's process for collecting and deleting working papers and retaining final documents is the process described in

the policy, and that the discarding-of-working-papers procedure described in the policy is the procedure McKinsey used. Ijaz Dep. 21:14-22:24. Ex. 5. Ijaz further confirmed that, when Firm Legal ordered a hold related to an Endo sales-force-blitz engagement, she had working papers on her desktop at the time the hold came through. Ijaz Dep. 109:10-19. Ex 5. Asked whether all of his work from that engagement was in existence at the time of the hold, Ijaz answered that she could not say with certainty. Ijaz Dep. 110:8-9; Ex. 5. Nicholas Mills, an engagement director at McKinsey from 2007 to present, who worked on Endo sales-force engagements, confirmed that he understood McKinsey's policy to require preservation of working papers when litigation against the engagement client was anticipated, and confirmed that the policy obligation does not depend on a separate written hold notice from Firm Legal. Mills Dep. 205:8-24**; Exhibit 7.** Mills nonetheless testified that no one at McKinsey ever informed him during his work supporting Purdue engagements that Purdue was actively involved in ongoing litigation. Mills Dep. 204:15-20; Ex. 7.

The aggregate effect of the deposition record is uniform. Every McKinsey deponent who testified about the FinalDocs Policy or the 2002 Working Papers Policy confirmed that the policy applied to him or her, that the policy required preservation upon anticipation of litigation, government investigation, or other legal action relating to engagement subject matter, that the policy obligation operated independently of any separately-issued written hold notice, and that the deponent did not comply with the policy with respect to McKinsey's Purdue engagements.

II.    **PURDUE PHARMA WAS UNDER CONTINUOUS CIVIL OR CRIMINAL LITIGATION FROM 2001 THROUGH 2019, AND McKINSEY KNEW THAT FROM THE INCEPTION OF ITS PURDUE RELATIONSHIP**

McKinsey did not enter the Purdue relationship in a vacuum. By the late 1990s, McKinsey was actively cultivating Purdue as a client. Rosiello, who had moved to McKinsey's

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 7

Stamford, Connecticut office in the late 1990s, testified that soon after his arrival, "a group of people that were getting to know Purdue" included him in their meetings. Rosiello Dep. 29:23-30:25; Ex. 4. The original McKinsey contact at Purdue, by Rosiello's account, was Purdue's CEO, Michael Friedman, the same executive who would later plead guilty in 2007. Rosiello Dep. 31:25-32:12; Ex.4.

By the time McKinsey signed the Master Consulting Agreement with Purdue on March 1, 2004, Purdue was already the defendant in a series of OxyContin marketing lawsuits. Although McKinsey will likely dispute what is and is not "legal action related to engagement subject matter" it cannot dispute litigation and sort investigation.  In 2001, plaintiffs filed a class action against Purdue in the Circuit Court of Putnam County, West Virginia, alleging that Purdue had encouraged widespread use of OxyContin for off-label uses and doses while misleading patients about the safety and effectiveness of the drug. *McCallister v. Purdue Pharma LP*, 164 F. Supp. 2d 783, 787-88 (S.D.W. Va. 2001). The same year, plaintiffs in the Eastern District of Kentucky pursued a federal class action seeking injunctive relief against Purdue's OxyContin marketing. *Foister v. Purdue Pharma, L.P.*, 2001 U.S. Dist. LEXIS 23765, at *3-*5 (E.D. Ky. Dec. 27, 2001). The State of West Virginia separately sued Purdue in 2001, with that action resolving in 2004. Mills Dep. 204:10-12; Ex. 7. The federal investigation that became the Western District of Virginia's prosecution of *Purdue Frederick* was already underway by this point: between 2002 and 2007, the United States Attorney for that district, with other state and federal authorities, conducted an extensive investigation into Purdue's marketing and promotion of OxyContin that culminated in the 2007 plea. *United States v. Purdue Frederick Co.*, 963 F. Supp. 2d 561, 563-64 (W.D. Va. 2013); *see alsoUnited States v. The Purdue Frederick Co.*, 495 F. Supp. 2d 569 (W.D. Va. 2007) (accepting plea agreements).

When Martin Elling of McKinsey was first in email contact with Purdue regarding the engagement that became the 2004 Master Consulting Agreement, Purdue was simultaneously the subject of federal and state criminal and civil investigations. McCallister, 164 F. Supp. 2d at 787-88; Foister, 2001 U.S. Dist. LEXIS 23765, at *3-*5; Purdue Frederick, 963 F. Supp. 2d at 563-64. McKinsey nonetheless executed the Master Consulting Agreement on March 1, 2004, with Rosiello signing on behalf of the firm. Rosiello Dep. 134:11-17 (referencing Rosiello Ex. 7, MSA, MCK-MDL2996-0281081); Ex. 4.

The litigation environment Purdue was operating in and McKinsey was advising in at the time of the 2004 MSA only intensified. On May 10, 2007, The *Purdue Frederick* Company, Inc. pleaded guilty in the Western District of Virginia to misbranding OxyContin with intent to defraud or mislead, a felony under the federal Food, Drug, and Cosmetic Act. *Purdue Frederick*, 495 F. Supp. 2d at 570-72. Three Purdue executives, Michael Friedman (President and CEO), Howard R. Udell (Executive Vice President and Chief Legal Officer), and Paul D. Goldenheim (former Chief Scientific Officer), pleaded guilty as responsible corporate officers to the misdemeanor charge of misbranding. *Id.* at 571. The total criminal and civil resolution exceeded six hundred million dollars. *Id.* at 572. Forty-nine states opted into the parallel federal civil settlement. *United States v. Purdue Frederick Co.*, 963 F. Supp. 2d 561, 564-65 (W.D. Va. 2013). The Commonwealth of Kentucky was the only state that opted out; it filed its own action in the Pike County Circuit Court on October 4, 2007, jointly with Pike County. *Purdue Frederick*, 963 F. Supp. 2d at 565. That Kentucky action was removed, transferred, and consolidated as part of *In re OxyContin Antitrust Litig.*, 530 F. Supp. 2d 554 (S.D.N.Y. 2008), and *Kentucky v. Purdue Pharma, L.P.* (*In re OxyContin Antitrust Litig.*), 542 F. Supp. 2d 1359 (J.P.M.L. 2008), then remanded to Kentucky state court, *Kentucky ex rel. Conway v. Purdue Pharma, L.P.* (*In re*

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 9

*OxyContin Antitrust Litig.*), 821 F. Supp. 2d 591 (S.D.N.Y. 2011), petition for leave to appeal denied, *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208 (2d Cir. 2013). Purdue's 2013 attempt to enjoin the Kentucky Attorney General under the All Writs Act was denied. *United States v. Purdue Frederick Co.*, 963 F. Supp. 2d 561 (W.D. Va. 2013).

Rosiello acknowledged that McKinsey knew of Purdue's 2007 conviction and its consequences. He testified that he knew Purdue's CEO had been fired, that fines had been paid both personally and corporately, and that the conviction would have come with certain governmental requirements. Rosiello Dep. 172:19-24; Ex. 4. Rosiello specifically acknowledged knowing that Purdue had entered into an agreement with the government carrying requirements, a reference to Purdue's five-year Corporate Integrity Agreement, which ran from 2007 through 2012. Rosiello Dep. 172:2-4; Ex. 4. Despite this knowledge, McKinsey continued advising Purdue but failed to preserve any working papers. By May 2009, two years after the criminal conviction and during the operation of the Corporate Integrity Agreement, Moran was advising McKinsey colleagues on whether Purdue should reposition the OxyContin brand and on sales-force sizing for that brand. Moran Dep. 86:22-87:8. From September 2013 through January 2014, Moran logged 308 hours on a Purdue sales engagement codenamed "Evolve to Excellence" (PUP036), classified under sales excellence and channel management. Moran Dep. 55:25-56:2; 61:5-13; 62:11-14; Ex. 3. Moran did not dispute McKinsey's admitted estimate that its sales and marketing recommendations would generate two hundred million to four hundred million dollars in additional Purdue revenue. Moran Dep. 108:17-21; SOF para. 52-53; Ex. 3. None of the working papers were preserved regarding the turbocharging of reformulated OxyContin.

Litigation against Purdue continued without interruption through this period and beyond. In December 2017, the Judicial Panel on Multidistrict Litigation centralized federal opiate

litigation against Purdue and other manufacturers and distributors, creating MDL 2804 in the Northern District of Ohio. *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375, 1378-79 (J.P.M.L. 2017). The MDL transfer order described actions by cities, counties, and states sharing common factual questions about the alleged improper marketing and widespread diversion of prescription opiates, with potential tag-along actions by individuals, consumers, hospitals, and third-party payors. *Id.* at 1378-79. Beginning in 2018, multiple states sued Purdue's directors, officers, and members of the Sackler family by name. The Second Circuit later summarized that, by the time of Purdue's September 2019 bankruptcy filing, the company and the Sacklers faced an aggregating wave of opioid-related claims from state, local, and individual plaintiffs. *In re Purdue Pharma L.P.*, 69 F.4th 45, 56-61 (2d Cir. 2023), rev'd sub nom. *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024). Oklahoma's separate state-court action against Purdue, Johnson & Johnson, and other manufacturers proceeded to a 2019 bench trial; Oklahoma settled with Purdue in March 2019; the trial court entered a $572 million judgment against Johnson & Johnson on August 26, 2019, which the Oklahoma Supreme Court subsequently reversed. *State ex rel. Hunter v. Purdue Pharma L.P.*, 2019 Okla. Dist. LEXIS 3486 (Cleveland Cnty., Okla. Dist. Ct.); *State ex rel. Hunter v. Johnson & Johnson*, 2021 OK 54.

Purdue filed for Chapter 11 bankruptcy on September 15, 2019. *In re Purdue Pharma L.P.*, 633 B.R. 53, 56-57 (Bankr. S.D.N.Y. 2021) (factual findings recited in subsequent appellate proceedings). The bankruptcy proceedings produced extensive findings about Purdue's litigation exposure and the Sackler family's response to it. The Second Circuit recounted that, from 2008 to 2016, Purdue distributed approximately eleven billion dollars to Sackler family trusts and holding companies, an increase over prior distribution patterns that drained Purdue's total assets by seventy-five percent during that period. *In re Purdue Pharma L.P.*, 69 F.4th at 59. The Second

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 11

Circuit also recounted that, beginning in 2007, the Sacklers anticipated that the effects of litigation against Purdue would eventually impact them directly. Purdue itself pleaded guilty a second time on November 24, 2020, in the District of New Jersey, to a three-count felony information including a dual-object conspiracy to defraud the United States and to violate the Federal Food, Drug, and Cosmetic Act and two counts of conspiracy to violate the federal Anti-Kickback Statute.

The Mills deposition presents the litigation continuity in particularly direct terms. Asked whether it would surprise him to know that, from 2001 through 2019, there was no period during which Purdue was not being civilly or criminally prosecuted in some manner, Mills answered that it would be news to him. Mills Dep. 203:21-204:8; Ex. 7. The Plaintiffs do not require Mills's confirmation; the public record alone establishes the continuous litigation environment. Mills's lack of awareness instead illustrates a different point relevant to this Motion: McKinsey did not internally communicate Purdue's litigation status to its team members, despite a written policy that placed the obligation to anticipate litigation, and the consequent obligation to preserve, on those team members. It stretches credulity that a 15 billion dollar a year, multinational consulting firm which employs the brightest minds in the world would not be aware of the legal troubles of Purdue, nor of exposure of other clients like Johnson & Johnson and Endo.

III.   **SENIOR McKINSEY PARTNERS RECOGNIZED IN INTERNAL COMMUNICATIONS THAT THEIR PURDUE WORK WOULD BECOME EVIDENCE IN LITIGATION.**

Even if the public record were not sufficient, McKinsey's internal communications independently establish that the firm's senior partners were anticipating litigation against McKinsey arising from its Purdue work no later than May 2017.

McKinsey's Agreed Statement of Facts (Ex. 2), filed in connection with its 2024 Deferred Prosecution Agreement in *United States v. McKinsey & Co.*, No. 1:24-cr-00046-RSB-

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 12

PMS (W.D. Va.), establishes the following. In an iMessage exchange dated May 11, 2017, McKinsey Consultant 6 texted McKinsey Senior Partner 3 about emailing "opioid decks" to Purdue executives and expressed concern that those communications could be drawn into Purdue litigation; the message stated that it was best the firm's emails "are not sucked into" the litigation. SOF para. 185. By 2017, McKinsey's own partners recognized that their client service to Purdue could become the subject of legal proceedings. SOF para. 184.

The same period contains an internal communication from Arnab "Arnie" Ghatak, a McKinsey senior partner who worked on Purdue, J&J, and Endo engagements. In a May 2017 text message exchange that Moran was party to, Ghatak suggested that a particular document should "live only on our laptops and then we can delete as part of" working papers, an abbreviation Ghatak rendered as "WP." Moran Dep. 248:18-23; Ex. 3. Moran, on the receiving end of that message, testified that she understood Ghatak's reference to "WP" as a reference to following whatever the working-papers rules required. Moran Dep. 249:8-13; Ex. 3. The Ghatak message, made in 2017, demonstrates that senior McKinsey personnel counted on the deletion of Purdue-related materials before the August 2018 events described in Section IV below. The text exchange provides a glimpse into McKinsey's state of mind. Most if not all other texts and phones have been destroyed. Sarraf separately testified that, well before 2018, he was already declining to share Purdue data with McKinsey colleagues working for Endo, treating cross-client data sharing as inappropriate, and that he had observed similar requests for opioid information from McKinsey teams working on other manufacturers including Johnson & Johnson and Abbvie. Sarraf Dep. 132:25-134:19; Ex. 6. The point is not to litigate at this time cross-engagement conflicts. The point is that senior McKinsey personnel working on opioid clients understood, by their own account, that the work was sensitive, and had and would attract legal scrutiny. McKinsey's recognition that

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 13

its Purdue work would become litigation evidence was followed in August 2018 by intentional, multi-day, written-down destruction of that evidence.

### IV.    McKINSEY'S SENIOR PARTNERS DESTROYED PURDUE-RELATED ELECTRONICALLY STORED INFORMATION IN A WRITTEN-DOWN, COORDINATED, MULTI-DAY SEQUENCE IN AUGUST 2018.

The destruction sequence is set out in McKinsey's own Agreed Statement of Facts. Plaintiffs do not need to prove these facts; McKinsey has admitted them. On July 24, 2018, McKinsey Senior Partner 3 emailed a McKinsey information technology staff member with the question how to delete an email archive on Lotus Notes. SOF para. 194. On August 5, 2018, McKinsey Consultant 10 forwarded to McKinsey Senior Partner 2 a Politico article concerning the Western District of Virginia's prior investigation of Purdue Pharma, which had resulted in the 2007 felony plea. SOF para. 195.

On August 22, 2018, the New York Times published an article on intensified federal opioid enforcement, headlined "Snaring Doctors and Drug Dealers, Justice Dept. Intensifies Opioid Fight." McKinsey Senior Partner 2 maintained an active subscription to the New York Times on that date. SOF para. 196. The same day, August 22, 2018, McKinsey Senior Partner 2 emailed himself a to-do list with the subject line "When home." Among the items was: "delete old pur [Purdue Pharma] documents from laptop." SOF para. 197.

On August 24, 2018, McKinsey Senior Partner 2 initiated the process to move the "Purdue Pharma" folder in his Outlook account to the "Deleted Items" folder. SOF para. 199. On August 25, 2018, McKinsey Senior Partner 2 emailed himself: "Remove Purdue folder from garbage." SOF para. 200. On August 26, 2018, McKinsey Senior Partner 2 initiated the process to permanently delete items from the Outlook "Deleted Items" folder. SOF para. 201. The forensic record establishes the scope of what was removed. McKinsey Senior Partner 2 also removed a

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 14

folder titled "Purdue" containing a "Strategy" subfolder from his Windows operating system. SOF para. 202. That folder contained more than 100 items. Many were dated in critical timeframes, both before and after the initial Purdue Pharma guilty pleas. SOF para. 203. Of the documents the forensic analysis could partially identify, seven referenced the name of Purdue's then-CEO, Michael Friedman, the executive who pleaded guilty in 2007 to federal misbranding charges as a responsible corporate officer. SOF para. 204.

The forensic analysis further showed that McKinsey Senior Partner 2 had not permanently deleted any items from his Outlook account during the period from November 25, 2017 through August 26, 2018, indicating that such deletion was not his typical practice. SOF para. 205. The August 2018 sequence was a one-time, targeted, multi-day departure from a nine-month pattern. The destruction was not limited to Senior Partner 2. Senior Partner 3, who had inquired about deleting Lotus Notes archives in July, separately took steps to delete email archives during the same window. SOF para. 194. Two of McKinsey's most senior personnel acted in parallel during the same litigation-environment escalation.

Beyond the August 2018 sequence specifically, the deposition record establishes that the universe of opioid-related working papers generated by McKinsey across twenty years and approximately 100 engagements resided not only in central repositories but on individual consultants' firm-issued devices: laptops, BlackBerries, and iPhones. Moran Dep. 13:25-15:16; Ex. 3 (multiple firm-issued laptops, multiple firm-issued BlackBerries, multiple firm-issued iPhones during her McKinsey tenure). Moran further testified that her ordinary practice at the close of an engagement was to delete electronic working papers from her firm-issued laptop. Moran Dep. 128:1-129:13; Ex. 3. Ijaz testified that, with respect to email, he allowed McKinsey's automatic deletion program to delete emails after the firm's retention period. Ijaz Dep. 23:14-24:25; Ex. 5.

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 15

Ijaz further admitted that, at the time Firm Legal placed a hold on his Endo sales-force-blitz engagement, he could not say with certainty that all of his work from that engagement was still in existence. Ijaz Dep. 110:8-9; Ex. 5. The August 2018 Outlook and Windows deletions are the conduct on which Plaintiffs primarily rely; but the broader record demonstrates that McKinsey's preservation failures were systemic and predated, and continued past, the specific August 2018 sequence. Firm wide deletion and destruction occurred from 2001 to 2019.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 37(e), as amended in 2015, provides the exclusive vehicle for sanctions arising from the loss of electronically stored information. The Ninth Circuit has held that Rule 37(e)(2) by its plain terms displaces the district court's power to invoke its inherent authority in fashioning sanctions for the loss of ESI. *Gregory v. Montana*, 118 F.4th 1069, 1072 (9th Cir. 2024). The Rule precludes a court from resorting to inherent authority to evade its strictures. *Id.* at 1077-78; accord *Estate of Bosco v. Cnty. of Sonoma*, 640 F. Supp. 3d 918, 924 (N.D. Cal. 2022); *Fast v. GoDaddy.com LLC*, 340 F.R.D. 326, 335 (D. Ariz. 2022).

The threshold for relief under Rule 37(e) requires four findings. Sanctions are available where (1) the lost information is electronically stored information; (2) it should have been preserved in the anticipation or conduct of litigation; (3) the party failed to take reasonable steps to preserve it; and (4) it cannot be restored or replaced through additional discovery. Fed. R. Civ. P. 37(e); *Estate of Bosco*, 640 F. Supp. 3d at 924; *Smahi v. STMicroelectronics, Inc.*, 789 F. Supp. 3d 690, 694 (N.D. Cal. 2025).

When the threshold elements are met, the Rule provides a two-tier analysis. *Smahi*, 789 F. Supp. 3d at 694. Rule 37(e)(1) authorizes measures no greater than necessary to cure the prejudice. Fed. R. Civ. P. 37(e)(1). The most severe sanctions, including adverse inference

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 16

instructions and default judgment, are available only under Rule 37(e)(2), and only on a finding that the spoliating party acted with the intent to deprive another party of the information's use in the litigation. Fed. R. Civ. P. 37(e)(2); *Jones v. Riot Hosp. Grp., LLC*, 95 F.4th 730, 735 (9th Cir. 2024); *Smahi*, 789 F. Supp. 3d at 694. That standard is met here given the length of time and McKinsey's state of mind.

The duty to preserve under Rule 37(e) attaches when litigation is reasonably foreseeable. *Fast*, 340 F.R.D. at 337. The duty is not limited by the existence or absence of a formal written hold notice. The party's own internal recognition of litigation risk, the existence of investigations or proceedings against a party with whom the litigation-anticipating party is doing business on the matters at issue, and a party's own written preservation policies all bear on when the duty attached. Direct evidence of intent is rare. Courts therefore look to circumstantial evidence. As the Ninth Circuit recently held in affirming a Rule 37(e)(2) terminating sanction, ample circumstantial evidence can establish that a party acted willfully with intent to deprive. *Jones*, 95 F.4th at 735. The *Jones* court relied on circumstantial inferences drawn from the spoliating party's coordination with others to delete records and from the timing of the deletions relative to litigation events. *Id.* at 735. The Northern District of California has explained why the circumstantial approach is necessary: because courts cannot ascertain precisely what was in a person's head at the time spoliation occurred, they must look to circumstantial evidence to determine intent. *Estate of Bosco*, 640 F. Supp. 3d at 927; accord *Fast*, 340 F.R.D. at 339.

### **ARGUMENT**

The four threshold elements of Rule 37(e) are satisfied, and the circumstantial evidence of intent to deprive is overwhelming. The appropriate sanction is the default judgment instruction authorized by Rule 37(e)(2)(C).

## I. McKINSEY FAILED TO PRESERVE ELECTRONICALLY STORED INFORMATION IT HAD A DUTY TO PRESERVE

The threshold elements of Rule 37(e) are satisfied many times over. The destroyed materials are ESI. The working papers documents from approximately 100 engagements, the laptops, phones, and blackberries are all ESI. McKinsey Senior Partner 2 deleted a Windows folder titled "Purdue" containing a "Strategy" subfolder, with more than 100 items. SOF para. 202-203. He moved an Outlook "Purdue Pharma" folder to "Deleted Items" and then permanently deleted those items. SOF para. 199, 201. McKinsey Senior Partner 3 sought IT assistance to delete a Lotus Notes email archive. SOF para. 194. Each of these data sets is electronically stored information within the meaning of Rule 37(e).

McKinsey's duty to preserve attached no later than 2004, possibly as early as 2001 when it was soliciting Purdue and J&J. in 2004, when McKinsey signed the Master Consulting Agreement with a client that was at that very moment the subject of multiple state and federal civil and criminal proceedings concerning the very subject matter (OxyContin marketing) that McKinsey was being engaged to advise on. The McCallister and Foister actions had been on file since 2001. McCallister, 164 F. Supp. 2d at 787-88; Foister, 2001 U.S. Dist. LEXIS 23765, at *3-*5. The State of West Virginia separately sued Purdue in 2001. Mills Dep. 204:10-12. The federal grand jury investigation that produced the 2007 conviction had been open for years by the time McKinsey executed the MSA. *Purdue Frederick*, 495 F. Supp. 2d at 570-72. When McKinsey first contacted Purdue regarding the engagement, Purdue was simultaneously the subject of federal and state criminal and civil investigations. McCallister, 164 F. Supp. 2d at 787-88; Foister, 2001 U.S. Dist. LEXIS 23765, at *3-*5; Purdue Frederick, 963 F. Supp. 2d at 563-64. McKinsey's own preservation policy, by its express terms, was triggered by anticipation of any litigation.

government investigation, or other legal action relating to the subject matter of any McKinsey engagement. Rosiello Dep. 99:7-19. Each of those three triggers was satisfied at the moment of the 2004 MSA. The duty under Rule 37(e) is correspondingly satisfied: a party that contracts to advise on a subject matter that is currently being civilly and criminally litigated is on notice that its own work will become potentially relevant evidence.

Even if the Court declines to anchor the duty in 2004, every later litigation milestone independently triggered it. The 2007 federal felony plea was, by Rosiello's own admission, known to McKinsey. Rosiello Dep. 172:19-24; Ex. 4. The 2007 multistate consent judgments and the Kentucky action were public litigation events; the latter generated a stream of published opinions across more than a decade of procedural history. *Purdue Frederick*, 963 F. Supp. 2d 561; Kentucky v. Purdue Pharma, 542 F. Supp. 2d 1359; Kentucky ex rel. Conway, 821 F. Supp. 2d 591; *Purdue Pharma L.P. v. Kentucky*, 704 F.3d 208. The 2017 MDL transfer order centralized federal opiate litigation against opioid manufacturers and distributors arising from the very marketing conduct McKinsey was advising on. *In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d at 1378-79. By May 11, 2017, McKinsey's own internal communications confirm that the firm's partners had specifically identified the risk that their Purdue communications would be drawn into litigation. SOF para. 184-185. That internal recognition is a textbook example of the foreseeability the Rule requires. *Fast*, 340 F.R.D. at 337. By the time of the August 2018 destruction sequence, the duty to preserve had been triggered, retriggered, and reinforced for at least fourteen years.

McKinsey failed to take reasonable steps to preserve. McKinsey's own policy required any team member with reason to anticipate litigation, government investigation, or other legal action relating to the engagement subject matter to immediately notify Firm Legal and to

preserve the working papers from the engagement. Rosiello Dep. 99:7-19. The reasonable-steps element does not impose a high bar. What McKinsey's partners did was the inverse of reasonable steps. None of the partners did anything despite knowledge Purdue was engaged in civil and criminal litigation. This went on from 2001 to 2018. Senior Partner 2 created a written list directing himself to delete the documents (SOF para. 197), executed that direction over a multi-day sequence (SOF para. 199-201), removed an entire Windows folder containing more than 100 Purdue items (SOF para. 202-203), and timed the conduct to specific media reporting on federal opioid enforcement (SOF para. 195-196). Senior Partner 3 separately sought IT assistance to delete email archives. SOF para. 194. Sarraf admitted that for any work he did for Purdue he never contacted Firm Legal about anticipated litigation. Sarraf Dep. 150:18-19; Ex. 6. Moran admitted she did not recall going to Firm Legal about her Purdue working papers, despite knowing of litigation against Purdue after 2013. Moran Dep. 151:4-13; Ex. 3. Ijaz could not say with certainty that all of his Endo working papers were in existence when Firm Legal ordered a hold. Ijaz Dep. 110:8-9; Ex. 5.

The destroyed information cannot be restored or replaced. The forensic analysis confirmed the deletions were carried to permanence. SOF para. 201, 205. Senior Partner 2 had not permanently deleted any items from Outlook from November 25, 2017 through August 26, 2018, meaning the August 2018 permanent deletions were the sole event of their kind in the relevant nine-month window. SOF para. 205. There is no backup tape, no archived mirror, no surviving copy of the deleted Windows folder identified in discovery. The same is true of Senior Partner 3's Lotus Notes archive. Plaintiffs have litigated this entire matter without the benefit of this crucial evidence, to their detriment.

Each of the four threshold Rule 37(e) elements is therefore satisfied.

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 20

**II. McKINSEY ACTED WITH INTENT TO DEPRIVE PLAINTIFFS OF THE USE OF THE DESTROYED EVIDENCE**

The Rule 37(e)(2) intent-to-deprive standard is clearly met. The Ninth Circuit has held that intent under 37(e)(2) may be established by ample circumstantial evidence of willfulness. *Jones*, 95 F.4th at 735. The circumstantial evidence here is precisely the pattern that supported the *Jones* intent finding, and stronger.

The pattern of deletion was deliberate .Ghatak's text to Moran is the clearest evidence of that intent. Senior Partner 2 wrote the deletion plan down before executing it. SOF para. 197. He titled the to-do list "When home," indicating awareness that the conduct was the kind of thing better done off the firm network. The list specifically targeted "old pur [Purdue Pharma] documents from laptop," not generic file cleanup. *Id.* He executed the plan over four days: moving the "Purdue Pharma" Outlook folder to "Deleted Items" on August 24 (SOF para. 199), reminding himself to "Remove Purdue folder from garbage" on August 25 (SOF para. 200), and initiating the permanent deletion on August 26 (SOF para. 201). He also removed a separate "Purdue" folder, with a "Strategy" subfolder and more than 100 items, from his Windows operating system. SOF para. 202-203. Direct evidence of intent is rarely available. *Estate of Bosco*, 640 F. Supp. 3d at 927. But the written to-do list, the multi-day execution, and the August 25 reminder to himself to "Remove Purdue folder from garbage" (SOF para. 200) leave little to circumstantial inference.

The deletions departed from the senior partner's typical practice. The forensic analysis established that Senior Partner 2 had not permanently deleted any items from his Outlook account from November 25, 2017 through August 26, 2018, indicating that such deletion was not his typical practice. SOF para. 205. The August 2018 deletion sequence was not how Senior

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 21

Partner 2 ordinarily handled email. It was a one-time, targeted event. Selective preservation is a recognized circumstantial indicator of intent. See *Jones*, 95 F.4th at 735.

The deletions tracked specific litigation events. Senior Partner 2 began the deletion sequence after McKinsey Consultant 10 forwarded him a Politico article about the Western District of Virginia's prior Purdue investigation (SOF para. 195) and on the same day the New York Times published an article on intensified federal opioid enforcement to which Senior Partner 2 subscribed (SOF para. 196). The trigger-and-response sequence between adverse press coverage and document destruction is the same chronology pattern the Ninth Circuit found probative of intent in *Jones*. 95 F.4th at 735. The conduct was coordinated across senior partners. Senior Partner 3 separately contacted IT on July 24, 2018 about deleting a Lotus Notes email archive. SOF para. 194. Two senior partners independently moved to delete Purdue-related ESI in roughly the same window. The Ninth Circuit in *Jones* treated coordination with others as a particularly strong indicator of intent: there, the spoliating plaintiff had coordinated with her witnesses to delete messages. 95 F.4th at 735. Here, two of McKinsey's most senior personnel separately initiated parallel deletion efforts during the same period of escalating litigation pressure.

The destroyed materials targeted the period of greatest litigation risk. Of the seven documents in the deleted Windows folder that the forensic analysis could partially identify, all seven referenced Purdue's then-CEO, Michael Friedman. SOF para. 204. Friedman pleaded guilty in 2007 to federal misbranding charges as a responsible corporate officer; the conviction is the centerpiece of the very Purdue criminal history McKinsey knew about. The targeting was not random. McKinsey itself recognized the conduct was unlawful. The senior partner who signed the Master Consulting Agreement with Purdue testified that not deleting documents when litigation is foreseeable is not just common sense but the law. Rosiello Dep. 101:10-16; Ex. 4. McKinsey's

senior partners did the opposite of what their own most senior advisor at Purdue recognized as the law. Disposing of evidence of this kind reflects what the Fourth Circuit has called "a shared consciousness of guilt." *United States v. Dennis*, 19 F.4th 656, 670 (4th Cir. 2021). Senior partner Rosiello, who solicited Purdue's work in the late 90's signed the MSA in 2004, knew about Purdue's legal troubles. He was close with the Sacklers. He and McKinsey did nothing to preserve evidence they knew would be needed in litigation.

*Hiq Labs*, the case in which a court held the intent-to-deprive standard not met, stands in instructive contrast. There, the spoliating party's conduct reflected negligence or an intent to cut cost rather than specific intent to deprive an opposing party of evidence. *Hiq Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 977 (N.D. Cal. 2022). McKinsey's conduct is categorically different. There is no cost-cutting explanation for the deletion or failure to preserve sequence here, not for a 15 billion dollar per year consulting firm. The acts were deliberate. Senior Partner 2 moved his Outlook folder to deleted items, sent himself a reminder to clear the trash, and initiated permanent deletion across four days. There is no negligence reading of a written to-do list that targets "old pur [Purdue] documents." Ghatak's text demonstrates McKinsey's intent the *Hiq Labs* court did not find on those facts is the intent the record here makes inescapable.

## III. DEFAULT JUDGMENT INSTRUCTION IS THE APPROPRIATE SANCTION

Rule 37(e)(2)(c) authorizes the Court to award default judgment. Fed. R. Civ. P. 37(e)(2)(C). That is the sanction Plaintiffs request. The destroyed documents would have been directly relevant to Plaintiffs' claims. McKinsey advised Purdue on OxyContin sales strategies for fifteen years and earned $93,546,499 doing so. Rosiello Dep. 156:24-157:18; SOF para. 17-18. Documents from the deleted Purdue Strategy folder maintained by a senior partner would have directly addressed the issues central to Plaintiffs' claims: what McKinsey knew about OxyContin's

risks; how McKinsey advised Purdue on sales tactics during the operation of the Corporate Integrity Agreement; what role McKinsey played in driving the OxyContin marketing that injured Plaintiffs' birth mothers and, through them, Plaintiffs themselves.

Plaintiffs cannot prove the precise contents of documents that no longer exist. That is the nature of spoliation. But the categories are plain from the file titles, the timeframes, and the Friedman name appearing in seven of the partially recovered items. Rule 37(e)(2)(C) exists for this exact circumstance. The most that any 37(e)(1) measure could accomplish is to allow Plaintiffs to argue around the gap. That cannot replace primary evidence destroyed by the party with custody of it. The Ninth Circuit in *Jones* approved a terminating sanction on facts comparable in intentional design to those presented here. 95 F.4th at 733. Plaintiffs seek default.

**CONCLUSION**

Default judgment against McKinsey is more than warranted for failure to preserve working papers, laptops, and phones, for a decade and a half. McKinsey's senior partners destroyed more than 100 documents from a Purdue folder containing a Strategy subfolder while litigation against their client was visibly closing in. They wrote down the deletion plan, executed it over four days, reminded themselves to empty the trash, and departed from nine months of typical practice in doing so. Rule 37(e) provides the exclusive vehicle for the resulting sanction in this Circuit. The Rule's threshold elements are satisfied. The circumstantial evidence of intent to deprive, coordinated across senior partners, written down, and sequenced to public reporting on a federal opioid enforcement push, is the pattern the Ninth Circuit in *Jones* held supports a Rule 37(e)(2) intent finding. The appropriate response is the adverse inference instruction Plaintiffs request.

**WHEREFORE,** Plaintiffs respectfully request that this Court enter an order:

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 24

(a) finding that McKinsey & Company, Inc. spoliated electronically stored information within the meaning of Federal Rule of Civil Procedure 37(e);

(b) finding that McKinsey acted with the intent to deprive Plaintiffs of the use of that information in the litigation, within the meaning of Rule 37(e)(2);

(c) imposing the sanction authorized by Rule 37(e)(2)(C), in the form of default judgment;;

(d) awarding Plaintiffs the reasonable attorneys' fees and costs incurred in bringing this Motion; and

(e) granting such other and further relief as the Court deems just and proper.

Dated: May 21, 2026

Respectfully submitted,

 /s/ Stephen P. New
Stephen P. New
steve@newlawoffice.com
STEPHEN NEW & ASSOCIATES
430 Harper Park Drive
Beckley, West Virginia 25801
Telephone: 304-250-6017

Scott Bickford
Martzell, Bickford & Centola, APC
338 Lafayette Street
New Orleans, LA 70130-3244
504-581-9065
Fax: 504-581-7635
srb@mbfirm.com

Kevin W. Thompson
Thompson Barney Law Firm
2030 Kanawha Blvd, E.
Charleston, WV 25311

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 25

304-343-4401
kwthompsonwv@gmail.com

Donald E. Creadore
Creadore Law Firm, PC
450 Seventh Ave, Suite 1408
New York, NY 10123
212-355-7200
donald@creadorelawfirm.com


Kimball Jones
kimball@bighornlaw.com
BIGHORN LAW
3675 W. Cheyenne Ave., Suite 100
North Las Vegas, Nevada 89032

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 26

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing has been electronically filed and served via CM/ECF on this 21st day of May 2026.

 /s/ Stephen P. New
Stephen P. New

PLAINTIFFS' MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCEAGAINST DEFENDANT MCKINSEY & COMPANY, INC.THIS DOCUMENT RELATES TO: ALL ACTIONS - 27