Laura Moran   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
November 14, 2025

I mean some -- something like an iPad or a Surface or a -- something like that.

A.    I didn't have an iPad.  I had, like, what I would call a laptop.

Q.    Okay.  How many laptops would you say you had while you were at McKinsey?

A.    Do you mean at the same time or sequentially?

Q.    Sequentially.

A.    More than five probably.  Maybe more than ten.  I -- I don't really know.

Q.    All right.  And each time that you upgraded or changed laptops, did you turn that back in to the firm?

A.    I think I did, but I don't really recall any of my electronics exchanges with the firm.

Q.    All right.  Are those laptops primarily where you generated working papers?

A.    Can you just ask the question a different way?

Q.    Yes.

A.    I'm not sure I understand.

Q.    Those laptops, those five to

Laura Moran   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
November 14, 2025

ten laptops that you said that you had in your tenure with McKinsey, is that where you would have generated your working papers on engagements?

A.   I just want to clarify.  I didn't say it was five to ten.  I said I don't really remember, but it was probably somewhere in the range of five to ten.  It may have been more --

Q.   Okay.  I understand that's an estimate, and that's fine.

A.   Yes.  We did -- I did most of my work on paper or on my laptop.  My firm-issued laptop, to correct myself.  Not my own personal laptop.

Q.   And that work that you're talking about, that's working papers for various engagements for various McKinsey clients, correct?

A.   Well, you asked about working papers --

Q.   Yes.

A.   -- so the working papers would have been generated on the laptops, as would have other work been generated --

Laura Moran   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
November 14, 2025

Q.    Right.

A.    -- on the laptops.

Q.    I'm going to get your definition of work here in just a little bit.

A.    Sure.

Q.    I promise, we'll get there.

Other than your laptops, at whatever number they were, your BlackBerry, your iPhone, any other technology that was firm-issued during your roughly 15 or so years with McKinsey?

A.    I also want to clarify, I didn't just have one iPhone.  I had multiple iPhones --

Q.    Okay.

A.    -- over the course of my tenure, and multiple BlackBerrys probably.

Q.    Okay.  Other than the multiple BlackBerrys, the multiple iPhones, the multiple laptops, any other technology that you would have used to do your work on engagements at McKinsey?

A.    Well, there would have been monitors at our desks in the office, when

Q.    It doesn't sound like you had a desktop computer.

Did you have a desktop computer?

A.    I don't think we had desktop computers in the office.

Q.    All right.

A.    But I'm not -- I'm not 100 percent sure, because we're talking about 20 years ago.

Q.    20 years, max, right?  So let's go ahead and talk about that.

When was the last time you worked for McKinsey?

A.    In 2020.

Q.    And my understanding is you started there in 2006, correct?

A.    In August -- I forget whether it was 2006 or 2005, but, if it was 2006, that -- that could be correct.

Q.    So it's 20 years max, right?  So somewhere between the last five and 20 years, that was your tenure at McKinsey, right?

A.    That's correct.

for Endo?

A.    I think so.

Q.    What was the nature of that work?

A.    I don't really recall.

Q.    Turn over a number of pages to the Purdue section of this, please, and your name first appears on the Purdue engagement 34.

Let me know if you spot your name.

A.    Yes, I found my name.

Q.    All right.  And according to this document, on Purdue engagement 34, you worked 42 hours, correct?

A.    Again, I don't know what this document is, but I agree that my name is there next to the word PUP034, and it says 42 next to it.

Q.    And if you go down to engagement 35, your name, 70 hours, correct?

A.    Again, yes, I see my name and the number 70.

Q.    And then engagement 36,

Laura Moran   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
November 14, 2025

308 hours, correct?

A.    Yes, I see 308 next to my name.

Q.    Back up there in engagement number 32, Robert Rosiello, 91 hours; engagement 34, 49 hours; engagement 35, 63 hours; engagement 36, 119 hours.

Was Rob Rosiello actively engaged in these Purdue engagements?

MS. JORDAN-PRICE:  Objection.

A.    I don't know how to answer that because I don't know what these engagements are.

Q.    And I'm not asking about -- I'm just saying what the engagements were and how many hours it shows for him.

When McKinsey did work for Purdue, was Rob Rosiello actively involved in that work?

MS. JORDAN-PRICE:  Objection.

A.    I'm confused.

Q.    Okay.  Let's take one on which you're both working, like Purdue engagement 36.  You have 308 hours, Rob Rosiello has 119.

When you did work for Purdue,

Laura Moran   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
November 14, 2025

Q.   Right.  What are those?

A.   Oh.  MA, I believe, stands for Mid Atlantic, and NJE stands for New Jersey.

Q.   All right.  "Engagement Nickname."  Do you see that?

A.   Yes.

Q.   Are you familiar with that term, "Evolve to Excellence"?

A.   Yes.

Q.   "Start date:  16 September 2013.  Close date:  31 January, 2014."

Do you see that?

A.   Yes, I do.

Q.   "Primary Industry, Healthcare - Pharmaceuticals" -- and I believe that would go on to say, if it wasn't cut off, Medical Products, right?

MS. JORDAN-PRICE:  Objection.

A.   Yeah, I have no way of knowing what that would say.

Q.   When you were with McKinsey, were you part of the division known as the PNP?

Have you ever heard that term before?

A.    I have heard the term PNP, yes.

Q.    "Primary Functional, M&S - Marketing and Sales."

Right?

A.    I see the words "Marketing and Sales," yes.

Q.    "Secondary Functional.  OPS or Operations."

And it has the -- it says "Func Classification:  Primary, Marketing & Sales - Sales excellence & channel management."

Tell me what that means.

MS. JORDAN-PRICE:  Objection.

A.    I'm completely unfamiliar with this document or its source or purpose or the structure, so I can give you a general interpretation of what I think "sales excellence and channel management" means.

Q.    Okay.  Please do.  Please do.

A.    I think "sales excellence" means a -- the sales function of a company and how they perform well, according to

A.    Wait.  Sorry.  I -- yes.  Yes, I see the date.  Yes.  Thank you.

Q.    "Hi Laura, I'm currently working with Sanjeev Aggarwal and Agnes Claye at Purdue, repositioning their OxyContin brand."

Who is Sanjeev Aggarwal?

A.    I think he was a McKinsey person.  By that I mean an employee of McKinsey.

Q.    Okay.  And who was Agnes Claye?

A.    She was an employee of McKinsey.

Q.    And "... at Purdue, repositioning their OxyContin brand.

As part of this work, we're also looking into the brand's sensitive to detailing, to inform a 'ballpark' assessment of whether they should resize their sales force.

Would it be possible to spend an hour with you problem-solving how best to do this later this week?  Thanks.  Joao."

Do you see that?

A.   I do.

Q.   And then you respond by BlackBerry:  "Hi Joao, the best way to do this is response curves.  I've copied Patrick, he can point you to PDs that have the methodology (I think) or at least examples.  I can also talk to you about general sizing methods.  Thanks."

Do you see that?

A.   I do.  I just want to clarify, I don't see Patrick copied.

Q.   I didn't either.

So who is Patrick?

A.   This is 2009.  I -- I don't know who Patrick was.  He must have been a McKinsey associate or some other person.

Q.   Okay.  So what are -- what's response curves?

A.   Response curves are a kind of analysis that companies use to understand the relationship between selling activity and sales.

Q.   Would an example of that be something along the lines of, as a hypothetical or an example, that 20 percent

Virginia in Abingdon, where it pled guilty, and these facts are now admitted.

My question to you is simply, for the facts, the admitted, stipulated facts contained in paragraphs 52 and 53, do you have any basis with which to disagree with those?

MS. JORDAN-PRICE:  Objection.

MS. ANGELINI:  Objection.

A.   I do want to clarify for the record, I actually did not ask for clarification of what the document was.

I stated that I do not know what the document is.

Q.   Okay.  And my question is the same.  Go to paragraphs 52 and 53, please.

Based on your knowledge, do you have any basis with which to disagree with the facts in 52 and 53?

MS. JORDAN-PRICE:  Objection.

A.   I do not.

Q.   In paragraph 52, McKinsey was predicting that implementing its advice would assist Purdue in selling more opioids, correct?

of the working papers, correct?

A.    Yes.  Yes.

Q.    And things discarded, correct?

A.    Yes.  Yes.

Q.    And so were each of those then transferred to some form of digital media?

A.    I don't really remember this process.  I do remember the stuff that you were supposed to keep was supposed to be put somewhere.  I -- I just don't remember.

Q.    The stuff that was going to be discarded, where did it go?

A.    It was probably deleted.  I -- I don't know what the process was to -- like, I -- I -- you didn't, like, gather it in one place and then delete it.  I -- I think you just went through and found it and deleted it, if that's what you're asking.

Q.    On the laptop, right?

A.    Well, or wherever it was.  Just to clarify, I did say electronically.  It is possible that there were working papers that were hard copies or in some other form, and the working papers policy, as I

understood it, referred to, like, all the final documents.

So if one wasn't electronic and was in some other medium, my understanding was you were obligated to capture and save that.

Q.   And destroy it, right?

A.   I was re -- just to clarify, I was referring to working papers.

Q.   Um-hum.

A.   Working papers have to be retained.  The discarded items have to be discarded.  So those are separate things.

(Exhibit 10, email dated April 26, 2005, Bates-stamped MCK-MDL2996-0181316 to MCK-MDL2996-0181328, marked for identification.)

Q.   We'll start with the first page, which is an April 26, 2005 email from Rob Rosiello to Arnab Ghatak.

A.   Are we still on Exhibit 9?

Q.   No.  We're on Exhibit 10.

You reviewed that email, ma'am?

A.   Yes, I have.

all-inclusive definition of working papers?

MS. JORDAN-PRICE:  Objection.

A.    I'm not the author of the scope of working papers or the definition, so I don't know if there's something else that the authors intended to have covered by working papers.

Just generally, this looks similar, but not exactly the same as what I recall as working papers from my time in the firm.

Q.    This was distributed to all firm members, it says, correct?

A.    I would just also point out, while that is correct, it also says July 12, 2002.  So I'm just not 100 percent sure if this document was the same working papers policy in effect from 2005, August through 2020.  I'm just not sure that it is.

Q.    We're going to get there.

A.    Okay.

Q.    Not my question.

But, from the time that you joined McKinsey, you were both aware of and

subject to the retention and disposition of working papers, correct?

A.    That is correct.  But I do just need to restate that, while at the time I was aware of and subject to, I started at the firm in 2005, and it's now 2025, almost 2026; so my ability to recall the precise definition of working papers 20 years ago, and in this case 2002, which would have been, like, three or four years before I joined the firm, I just want to make it clear in my testimony that I cannot state whether this was, in fact, the policy or that I followed this policy.

Q.    And that wasn't really my question.

I said a working papers policy of some kind immediately upon joining McKinsey, correct?

A.    Yes, there was a working papers policy.

Q.    All right.  Paragraph 6: "Anticipation of Litigation.  If any team member learns of or has reason to anticipate a litigation, government

investigation, or other legal controversy relating to the subject matter of an engagement, such person should notify Firm Legal.  In such circumstances, the person must consult with Firm Legal before discarding or deleting Working Papers pursuant to this Policy.  Firm Legal may determine that it is appropriate to preserve some or all related Working Papers (and to suspend recycling of backup tapes as described in paragraph 15) for some additional period of time."

Do you see that?

A.    I do see that.

Q.    When you joined the firm in August of 2005, were there any working papers holds pursuant to paragraph 6 for any of the work that you were doing?

A.    I don't recall.

Q.    If there were litigation hold letters or communications saying, don't discard or delete working papers pursuant to this policy, how would that have been communicated through the firm?

A.    I can't really speak for the

Laura Moran   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
November 14, 2025

a few minutes ago together.

Q.    Okay.  All right.  So I'll break the question down, then.

After 2013, when you learned there was litigation against Purdue, did you go to firm legal and inquire about working papers?

MS. ANGELINI:  Objection.

Q.    You can -- you can answer.

A.    I don't recall going to firm legal, nor do I see now nor at that time see any reason for me to need to go to firm legal.

Q.    The same question with respect to discarded or deleted materials.

Did you approach firm legal or any higher-ups in McKinsey about preserving what would be discarded or deleted materials?

MS. JORDAN-PRICE:  Objection.

MS. ANGELINI:  Objection.

MR. NEW:  One at a time, ladies.

Q.    You can answer.

A.    No.

the past, when you do that, you generally don't email that around, and there is pretty -- pretty significant legal action, typically, after a lot of people lose their job unexpectedly, that I inferred that was the reason they had asked.

Just to expand further, we had been working on opioids for this point four years.

Q.    You had been working on it four years?

A.    Yes.  And in that time, no one had asked me not to email decks around, until we came to this workforce reduction topic, so I drew that conclusion independently.

Q.    Okay.  And then take a look at Arnie Ghatak's 7:08 a.m. text.  After you suggest "have Michael put it on a neutral template.  Not Purdue," Arnie says:  "Why? It will live only on our laptops and then we can delete as part of" working papers, "WP."

Do you see that?

A.    Yeah.

Q.   So if there was going to be, let's say, employment, or potential employment litigation, you and Arnie can't delete anything at that point under that policy that we looked at earlier, can you?

MS. ANGELINI:  Objection.

Q.   You can answer.

A.   He's actually saying, as part of working papers in capital, WP, which means he's referring to following whatever the rules say, that's how I look at it, because he capitalized it.  He's not saying our working papers.

He's saying, whatever the rules say, that's what we're going to do.  So it'll be in our laptops and we can delete them.  I don't know.  It's like there's rules, they'll come at the end.

Q.   But whatever, up till May of 2017, that you and Arnie and the other teams had done, it should have been preserved, right, and not discarded or deleted?

A.   I can't really comment on that. I don't know.