observe but not to participant.

And like we have in prior depositions in these proceedings, we are going to reserve our rights with respect to taking testimony from the witness under the auspices of the Illinois proceedings if necessary in the future.

ROBERT ROSIELLO,

having been satisfactorily identified and duly sworn by the Notary Public, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFFS

BY MR. NEW:

Q. Good morning.  Please state your full name for the record.

A. Robert Louis Rosiello.

Q. And, sir, you are the Robert Rosiello who worked for McKinsey & Company from about 1984 until about 2015.  Correct?

A. Yes.

Q. First question I want to ask you today is, sir, are you proud of the work that you and your colleagues at McKinsey did for Purdue and other opioid manufacturers?

A. I can't speak to work that was done for other opioid manufacturers.  I'm proud of the work

A. I don't know.

Q. Healthcare and pharma.  Right?  McKinsey advised healthcare and pharma, obviously?

A. Yes.

Q. Tech?  Yes?

A. "Tech" meaning computer companies?

Q. Yes.

A. Yes.

Q. Agriculture?

A. I don't know.

Q. Natural resources like oil and coal?

A. Yes.

Q. Do you know who Alpha Natural Resources is?

A. Say it again.

Q. Alpha Natural Resources.

A. I do not.

Q. Alcohol and tobacco?

A. Alcohol, yes.  I don't know about tobacco.

Q. Did McKinsey advise the makers of vapes while you were there, like JUUL, J-U-U-L?

A. I don't know.

Q. When was the first time that you were working for, serving Purdue Pharma?

A. I don't remember exactly.  I had moved

from New York to the Stamford, Connecticut office. My memory is soon after that there were a group of people that were getting to know Purdue, and I was brought into those meetings.

Q. When did you move to the Stamford, Connecticut area?

A. Again, I don't know precisely.  The late '90s.

Q. You said there was a group of people getting to know the people at Purdue.  Who were the group of people getting to know the people at Purdue?

A. So they would have been partners from the pharma practice.

Q. Who were they?

A. I don't remember who were in the initial team.  I remember that Roy Berggren was there.

Q. What was Roy Berggren's position?

MR. SAVAGE:  Can you let him finish his answer?

MR. NEW:  My apologies, Joe.

Q. My apologies, Mr. Rosiello.  I wasn't looking up.  I thought you were finished.

Go ahead.

A. I don't remember who the others were.

Q. What was Mr. Berggren's position with McKinsey?

A. So I don't remember Roy's precise title at that time.  He was one of the first medical doctors we had hired and was a leader in the pharmaceutical practice.

Q. And when you say "getting to know the people at Purdue," tell me what you mean.

A. It would be typical to have a contact at a company and have a conversation, set up a meeting to discuss perspectives, to listen.

Q. Go to dinner.  Right?

A. I don't know how to answer the question.

Q. Again, honestly.

Around this time, late '90s, you moved to Connecticut, you were having dinner with executives from Purdue?

A. I don't believe I -- so certainly not in that initial period.

Q. All right.  Was there a McKinsey contact at Purdue in the late '90s?

A. Please, I don't understand the question. Are you asking if there's a --

Q. Yes.  You said that this getting to know the people at Purdue would come through a contact

at the company, was I believe your testimony.

Did I understand that correctly?

A. Maybe I misspoke.  All I meant was, I was describing how McKinsey would get to know a company.  So I don't know who the original contact was.  It would have been the CEO of the company.

Q. And who was that?

A. Michael.  I don't remember Michael's last name.

Q. Friedman?

A. I believe that's -- yes.

Q. The guy that pled guilty in 2007 in Abington, Virginia, to mislabeling?  That Michael Friedman?

A. I don't know.

Q. All right.  We'll talk about it when we get there.

OxyContin was launched in 1996.  Correct?

A. I don't know.

Q. Do you have any reason to dispute -- if I tell you that Purdue Pharma launched OxyContin in 1996, have you got any reason to disagree with that?

A. No.

Q. Okay.  Have you ever had your deposition

Q. Do you recall receiving any litigation hold correspondence from 2000 to 2015 while a team member serving Purdue pharma?

A. I know that I received that while I was there.  I don't remember which client it was in the context of.

Q. I'll read to you from the policy.

"Anticipation of litigation.  Any team member who learns of or has reason to anticipate litigation, government investigation, or other legal action relating to the subject matter of an engagement, should immediately notify firm legal.

"In such circumstances, you must preserve the working papers from the engagement until the legal department determines the records are no longer needed.  That preservation obligation supersedes any previously or subsequently established destruction schedule for those records."

Do you have any reason to dispute what I just read?

A. I do not.

Q. So McKinsey had an established destruction schedule for working papers, 2000 to 2015?

A. So I don't know -- the thing you just read

anticipation of litigation or government investigation?

A. It seems reasonable that -- so repeat the question.  I'm not sure I understood the question.

Q. Why would working papers from an engagement be preserved if there was anticipation of litigation or government investigation?  You said that seemed reasonable.

A. Yeah.  I think that's . . .

Q. That's sort of common sense, isn't it?  You don't delete emails, working papers, from an engagement once you have reason to know there's about to be a lawsuit or a government investigation.  It's pretty common sense, isn't it?

A. I also think it's the law.

Q. Okay.  Now, we had talked about from the room in Cleveland to things like servers, the cloud, what have you, if not physical, some technological place where final docs are stored.

Did you in your position as a senior partner have access to final documents, whether it was within your group or your area?

A. I don't believe so.

Q. Do you know who would have had access

to --

A. I don't know if anybody had access to them.  I don't know that they were centrally kept.

Q. You had mentioned a document-retention policy.  I assume that in 31 years that evolved.  Correct?

A. Yes.

Q. Do you know whether that document-retention policy evolved between 2000 and 2015?

A. I do not.

Q. Have you ever heard the term "burno day"?

A. Yes.

Q. What does that mean?

A. It is common in offices to have a day to clean out files.

I participated in burno days in Cleveland, London, New York, and Stamford.

Q. So burno days were going on as late as the late '90s?

A. That's probably right.

Q. Did burno days survive into the 21st century?

A. I don't know.

Q. When was the last time you participated in a burno day?

Q. As of the date of this proposal, McKinsey had been having discussions, conversations with Purdue Pharma over the course of four or five years.  Right?

A. I would have said no, but I don't remember.

(Exhibit 7 marked for identification)

Q. All right.  Do you recognize that document?

A. It's a master consulting agreement from 2004.

Q. And on the last page, is that your signature?

A. It is.

Q. And did you sign this document on behalf of McKinsey & Company?

A. Yes.

Q. And your title is director?

A. Correct.

Q. Why would your name appear on this document on behalf of McKinsey?

A. There were two or three senior people on the work -- on the client.  I led the office in Stamford.  I signed the document.

There's nothing significant in McKinsey's

Robert Rosiello   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
October 29, 2025

Q. All right.  Paragraph 17, "Shortly thereafter, in 2004, McKinsey and Purdue executed a master consulting agreement which formed the basis of McKinsey as a consultant for Purdue Pharma."

You signed that agreement, didn't you?

A. I did.

Q. "And thereafter, the parties executed a statement of services to the master consulting agreement and detailed the specific terms and plan for each individual project."

You signed at least one of those statements of services that we've looked at.  Correct?

A. Uh-hmm.

Q. Is that yes?

A. Yes.

Q. "As an outside consultant, McKinsey advised Purdue Pharma regarding what steps Purdue Pharma should take in connection with each particular engagement."

Is that accurate?

A. Yes.

Q. Paragraph 18, "Over the course of 75 engagements from 2004 through 2019, and against

Robert Rosiello   CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
October 29, 2025

the backdrop of a nationwide opioid crisis, McKinsey worked with Purdue Pharma on a variety of topics, including how to improve revenues from OxyContin and later reformulated OxyContin, achieve cost reductions, develop an M&A strategy, improve R&D design, and enhance organizational governance and maintenance.  Purdue Pharma in turn paid McKinsey approximately $93,546,499 over that 15-year period."

Do you have any reason to dispute that?

MR. SAVAGE:  You read the word "management" as "maintenance."

MR. NEW:  I'm sorry.

MR. SAVAGE:  I just want it clear for the record.

Q. So over 15 years McKinsey made $93.5 million doing work with Purdue.  Right?

A. Yes.

Q. And it starts against the backdrop of a nationwide opioid crisis.  Do you see that?

A. Yes.

Q. McKinsey knew there was a nationwide opioid crisis going on when you executed that master service agreement and that first statement of work, didn't it?

requirements and FDA law?

A. I know that they had an agreement with the government and that had some requirements.  I don't remember any specifics.

Q. Did you know that Purdue was obligated to appoint a compliance officer and that that person was to be a member of senior management?

A. I don't remember.

Q. Who was Purdue's compliance officer from 2007 forward?

A. I don't remember.

Q. But you knew they had one.  Right?

A. I just don't remember.

Q. And as I understand your testimony, you knew that there was a corporate integrity agreement.  You just didn't know the particulars of it.

Do I understand your testimony correctly?

A. I know that the CEO was fired.  I know there was a fine paid both personally, and my memory was he and the general counsel as well as the corporation.  And I would have known that with that would have come certain requirements that they do.  That's what I remember.

Q. Did you ever communicate with Purdue's